## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MICHAEL MANLEY,<br><br>Petitioner,<br><br>v.<br><br>CARL C. DANBERG, Commissioner,<br>Delaware Department of Correction; and<br>THOMAS L. CARROLL, Warden,<br>Delaware Correctional Center at Smyrna,<br>Respondents | CIVIL ACTION<br><br>No. 1:07-CV-00472<br><br>**THIS IS A CAPITAL CASE.**<br><br>GREGORY M. SLEET, USDJ |

## CONSOLIDATED PETITION FOR WRIT OF HABEAS CORPUS BY A PRISONER IN STATE CUSTODY AND MEMORANDUM OF LAW

ANNE L. SAUNDERS, ESQUIRE
Asst. Federal Public Defender
Federal Public Defender
Middle District of Pennsylvania
Capital Habeas Unit
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
Tel. No. (717) 782-3843
Fax. No. (717) 782-3966
(Anne_Saunders@fd.org)

BETH ANN MUHLHAUSER, ESQUIRE
Asst. Federal Public Defender
Federal Public Defender
Middle District of Pennsylvania
Capital Habeas Unit
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
Tel. No. (717) 782-3843
Fax. No. (717) 782-3966
(Beth_Muhlhauser@fd.org)

Dated: February 5, 2008

## TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PRIOR COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

INTRODUCTORY STATEMENT ON EXHAUSTION . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    1.   The preconditions for applying Section 2254. . . . . . . . . . . . . . . . . . . . . . . . 5

    2.   The standard of review under Section 2254. . . . . . . . . . . . . . . . . . . . . . . . 6

    3.   The standard of review under Sections 2254(d)(2) and 2254(e)(1). . . . . . . . . . . 9

THERE IS NO BARRIER TO AN EVIDENTIARY HEARING. . . . . . . . . . . . . . . . . . . . 11

STANDARDS REGARDING CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL. . 12

GROUNDS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

CLAIM I.    AS A RESULT OF COUNSEL'S INEFFECTIVENESS AND PROSECUTORIAL MISCONDUCT, READILY AVAILABLE EVIDENCE DEMONSTRATING PETITIONER'S INNOCENCE WAS NOT PRESENTED TO THE JURY IN VIOLATION OF PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS. . . . . . . . . . . . . . . . . . 14

CLAIM II.    TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE, DEVELOP AND PRESENT AVAILABLE EVIDENCE DISPUTING AGGRAVATION IN VIOLATION OF PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS. . . . . . . 26

CLAIM III.    THE STATE'S FAILURE TO DISCLOSE EXCULPATORY IMPEACHMENT EVIDENCE IN ITS POSSESSION VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS. COUNSEL WAS INEFFECTIVE IN FAILING TO REQUEST MATERIAL IMPEACHMENT EVIDENCE AFTER THE PROSECUTION WITNESSES TESTIFIED ON DIRECT EXAMINATION IN VIOLATION OF PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS. . . . . . . . . . . . . . . . . . . . . . . 43

CLAIM IV.    TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE, DEVELOP AND
PRESENT AVAILABLE MITIGATING EVIDENCE IN VIOLATION OF PETITIONER'S
SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS. . . . . . . . . . . . . . . . . 47

CLAIM V.    AS A RESULT OF INEFFECTIVE ASSISTANCE OF COUNSEL AND PROSECUTORIAL
MISCONDUCT, PRIOR TESTIMONY AND OTHER RANK HEARSAY STATEMENTS
WERE ADMITTED IN PETITIONER'S SENTENCING HEARING IN VIOLATION OF HIS
SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS. . . . . . . . . . . . . . . . . 76

CLAIM VI.    PETITIONER IS ENTITLED TO RELIEF FROM HIS CONVICTION AND SENTENCE
BECAUSE THE COURT AND COUNSEL FAILED TO CONDUCT VOIR DIRE TO
DETERMINE THE RACIAL ATTITUDES OF THE JURORS IN VIOLATION OF
PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS. . . . . . . 97

CLAIM VII.    PETITIONER IS ENTITLED TO RELIEF FROM HIS CONVICTION AND SENTENCE
BECAUSE THE PROSECUTION'S USE OF PEREMPTORY STRIKES AGAINST WOMEN
AND MINORITIES DURING JURY SELECTION DEPRIVED PETITIONER OF HIS RIGHTS
UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED
STATES CONSTITUTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

CLAIM VIII.    PETITIONER IS ENTITLED TO RELIEF FROM HIS CONVICTION BECAUSE THE
PROSECUTION DELIBERATELY EXERCISED A PEREMPTORY STRIKE AGAINST A
MINORITY JUROR DURING JURY SELECTION AT THE 1996 TRIAL IN VIOLATION OF
THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. . . . . . . . . . . . . . . . . 113

CLAIM IX.    AS A RESULT OF COUNSEL'S INEFFECTIVENESS, JURORS WERE PERMITTED TO
VIEW PETITIONER IN PRISON CLOTHING IN VIOLATION OF PETITIONER'S SIXTH,
EIGHTH AND FOURTEENTH AMENDMENT RIGHTS. . . . . . . . . . . . . . . . . . . . . 120

CLAIM X.    PETITIONER WAS DENIED HIS RIGHT TO A FAIR AND IMPARTIAL JURY AT HIS
CAPITAL TRIAL IN 1996 IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH
AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

CLAIM XI.    AS THE RESULT OF TRIAL COURT ERROR AND INEFFECTIVE ASSISTANCE OF
COUNSEL DURING THE JURY SELECTION FOR PETITIONER'S 2005 RESENTENCING
TRIAL, PETITIONER WAS DENIED HIS SIXTH, EIGHTH AND FOURTEENTH
AMENDMENT RIGHTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

CLAIM XII.    HABEAS RELIEF IS REQUIRED BECAUSE THE COURT'S INSTRUCTIONS ON
ACCOMPLICE LIABILITY VIOLATED PETITIONER'S SIXTH, EIGHTH AND
FOURTEENTH AMENDMENT RIGHTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

CLAIM XIII.    PETITIONER IS ENTITLED TO A NEW SENTENCING HEARING BECAUSE THE COURT'S INSTRUCTIONS SKEWED AND LIMITED THE JURY'S CONSIDERATION OF MITIGATION IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

CLAIM XIV.    THE TRIAL COURT'S INSTRUCTION REGARDING THE APPLICATION OF EVIDENCE OF STEVENSON'S BAD ACTS AGAINST PETITIONER IN DETERMINING WHETHER THE PROSECUTION MET ITS BURDEN OF PROOF AS TO PETITIONER VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS. . . . . . 161

CLAIM XV.    PETITIONER SHOULD BE AFFORDED A NEW SENTENCING HEARING BECAUSE THE REASONABLE DOUBT INSTRUCTION VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

CLAIM XVI.    COUNSEL'S FAILURE TO MOVE FOR JUSTICE RIDGELY'S RECUSAL FROM PETITIONER'S PANEL ON DIRECT APPEAL WHERE JUSTICE RIDGELY HAD PREVIOUSLY BEEN PRESIDENT JUDGE IN NEW CASTLE COUNTY AND SUBMITTED FACTUAL AVERMENTS IN RESPONSE TO THE DELAWARE SUPREME COURT'S INQUIRY REGARDING THE ISSUE OF JUDGE BARRON'S RECUSAL VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS. . . . . . 174

CLAIM XVII.    COUNSEL'S FAILURE TO RAISE AND LITIGATE THE DENIAL OF PETITIONER'S RIGHTS TO A FAIR AND IMPARTIAL SENTENCING TRIBUNAL ON THE BASIS OF THE TRIAL COURT'S CONSIDERATION OF, AND DISPOSITION OF PETITIONER'S PRIOR POST-CONVICTION CLAIMS VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

CLAIM XVIII.    COUNSEL'S FAILURE TO RAISE AND LITIGATE THE PETITIONER'S ENTITLEMENT TO A NEW TRIAL ON THE BASIS OF THE IRREGULARITIES AND STRUCTURAL DEFECTS ARISING OUT OF THE CIRCUMSTANCES OF JUDGE BARRON'S ASSIGNMENT TO PETITIONER'S CASE VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

CLAIM XIX.    HABEAS RELIEF IS REQUIRED BECAUSE THE PROSECUTION WAS PERMITTED TO ADMIT HEARSAY STATEMENTS OF CO-DEFENDANT STEVENSON AGAINST PETITIONER IN VIOLATION OF PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

CLAIM XX.    PETITIONER IS ENTITLED TO RELIEF BECAUSE JOINING HIS GUILT-PHASE TRIAL WITH CO-DEFENDANT STEVENSON VIOLATED HIS SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

CLAIM XXI.    PETITIONER IS ENTITLED TO RELIEF BECAUSE HIS 2005 TRIAL WAS IMPROPERLY JOINED WITH THAT OF HIS CO-DEFENDANT IN VIOLATION OF PETITIONER'S SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS. . . . . . . . . . . . . . . . . . . . . . . 202

CLAIM XXII    THE ADMISSION OF VICTIM IMPACT TESTIMONY VIOLATED PETITIONER'S SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS. . . . . . . . . . . . . . . . . . . . . 208

CLAIM XXIII    THE PROSECUTION'S CONTINUOUS MISCONDUCT THROUGHOUT PETITIONER'S CAPITAL TRIAL VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 218

CLAIM XXIV    THE PROSECUTION'S CONTINUOUS MISCONDUCT THROUGHOUT PETITIONER'S CAPITAL RESENTENCING PROCEEDINGS VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . 225

CLAIM XXV    TRIAL COUNSEL'S FAILURE TO REQUEST A CHANGE OF VENUE OR VENIRE FOR PETITIONER'S 1996 CAPITAL TRIAL PREJUDICED PETITIONER IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . 233

CLAIM XXVI    RELIEF IS REQUIRED BECAUSE DELAWARE'S CAPITAL SENTENCING STATUTE VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 238

CLAIM XXVII   PETITIONER IS ENTITLED TO RELIEF BECAUSE OF THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN THIS CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 245

REQUEST FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Adams v. Texas*, 448 U.S. 38 (1980) ......................................... 122, 132, 133, 137, 140, 142, 180

*Ake v. Oklahoma*, 470 U.S. 68 (1985) ............................................................................. 16, 50

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) ........................................................... 239, 241, 244

*Arizona v. Fulminante*, 499 U.S. 279 (1991) ..................................................................... 125, 184

*Armstrong v. Dugger*, 833 F.2d 1430 (11th Cir. 1987) ............................................................. 74

*Atkins v. Virginia*, 536 U.S. 304 (2002) ...................................................................................... 156

*Baker v. Horn*, 210 F. Supp. 2d 592 (E.D.Pa. 2002) ..................................................................... 4

*Barber v. Page*, 390 U.S. 719 (1968) ................................................................... 83, 84, 85, 188, 194

*Batson v. Kentucky*, 476 U.S. 79 (1986) ............................................................. 103, 103, 110, 113

*Beck v. Alabama*, 447 U.S. 625 (1980) ................................................................. 16, 88, 152, 214

*Berger v. United States*, 295 U.S. 78 (1935) ......................................................... 44, 87, 218, 219, 225

*Berryman v. Morton*, 100 F.3d 1089 (3d Cir. 1996) ........................................................... 9, 245

*Billeci v. United States*, 184 F.2d 394 (1950) ......................................................................... 184

*Blanco v. Singletary*, 943 F.2d 1477 (11th Cir. 1991) ............................................................. 4, 74

*Boyde v. California*, 494 U.S. 370 (1990) ................................................................................ 145

*Brady v. Maryland*, 373 U.S. 83 (1963) .................................................................................... 43

*Bronshtein v. Horn*, 404 F.3d 700 (3d Cir. 2005) ......................................................................... 6

*Bullington v. Missouri*, 451 U.S. 430 (1981) ............................................................................. 85

*Burton v. Johnson*, 948 F.2d 1150 (11th Cir. 1991) ................................................................. 123

*Cage v. Louisiana*, 498 U.S. 39 (1990) ............................................................................. 144, 171

*Caldwell v. Maloney*, 159 F.3d 639 (1st Cir.1998) ..................................................... 108, 110, 116

*Caldwell v. Mississippi*, 472 U.S. 320 (1985) ................................. 88, 98, 131, 133, 152

*California v. Green*, 399 U.S. 149 (1970) ............................................................... 85

*California v. Ramos*, 463 U.S. 992 (1983) ............................................. 85, 98, 131, 133152, 180

*California v. Trombetta*, 467 U.S. 479 (1984) ....................................................... 15, 43

*Carella v. California*, 491 U.S. 263 (1989) ........................................................... 144

*Caro v. Calderon*, 165 F.3d 1223 (9th Cir. 1999) ................................................ 64

*Carpenter v. Vaughn*, 296 F.3d 138 (3d Cir. 2002) .................................... 149, 160, 191

*Carter v. Bell*, 218 F.3d 581 (6th Cir. 2000) ....................................................... 49

*Cave v. Singletary*, 971 F.2d 1513 (11th Cir. 1992) ............................................ 4, 74

*Chadwick v. Janecka*, 312 F.3d 597 (3d Cir. 2002) ............................................... 6

*Chambers v. Mississippi*, 410 U.S. 284 (1973) ................................................ 15, 85

*Chandler v. Florida*, 449 U.S. 560 (1981) ................................... 120, 164, 180, 193, 226

*Clabourne v. Lewis*, 64 F.3d 1373 (9th Cir. 1995) ............................................... 49

*Claudio v. Scully*, 982 F.2d 798 (2d Cir. 1992) ................................................ 96, *passim*

*Coffin v. United States*, 156 U.S. 432 (1895) .................................................... 121

*Coleman v. Kemp*, 778 F.2d 1487 (11th Cir. 1985) ............................................ 233

*Collier v. Turpin*, 177 F.3d 1184 (11th Cir. 1999) .............................................. 50

*Crawford v. Washington*, 541 U.S. 36 (2004) .................................. 83, 84, 85, 194

*Davis v. Alaska*, 415 U.S. 308 (1974) ............................................................ 15

*Dennis v. United States*, 339 U.S. 162 (1950) ................................................ 97, 131

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974) .............................................. 225

*Drake v. Kemp*, 762 F.2d 1449 (11th Cir. 1985) ............................................ 219, 225

*Eagle v. Linahan*, 279 F.3d 926 (11th Cir. 2001) ............................................. 112, 119

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) ................................. 47, 48, 153, 156, 214

*Enmund v. Florida*, 458 U.S. 782 (1982) .......................................................... 203

*Estelle v. Williams*, 425 U.S. 501 (1976) .................................................. 120, 121

*Evans v. Court of Common Pleas*, 959 F.2d 1227 (3d Cir. 1992) ............................... 3, 4

*Everett v. Beard*, 290 F.3d 500 (3d Cir. 2002) ......................... 5, 143, 149, 160, 191

*Evitts v. Lucey*, 469 U.S. 387 (1985) ................................. 145, 176, 181, 185

*Fetterly v. Paskett*, 997 F.2d 1295 (9th Cir. 1993) ............................... 146, 176, 185

*Ford v. Wainwright*, 447 U.S. 399 (1986) ...................... 11, 145, 146, 176, 185, 214

*Foster v. Delo*, 39 F.3d 873 (8th Cir. 1994) ................................. 146, 177, 185

*Francis v. Franklin*, 471 U.S. 307 (1985) ................................................. 144, 145

*Frank v. Mangum*, 237 U.S. 309 (1915) .................................................... 235

*Freeman v. Lane*, 962 F.2d 1252 (7th Cir. 1992) ............................... 96, *passim*

*Gaito v. Brierly*, 485 F.2d 86 (3d Cir. 1973) ............................................ 121

*Gall v. United States*, ____ U.S. ____, 128 S. Ct. 586 (2007) .............................. 64

*Gardner v. Florida*, 430 U.S. 349 (1977) ................................................. 214

*Gibson v. Scheidemantel*, 805 F.2d 135 (3d Cir. 1986) .................................... 4

*Giglio v. United States*, 405 U.S. 150 (1972) ............................................. 43

*Glenn v. Tate*, 71 F.3d 1204 (6th Cir. 1995) ........................... 49, 73, 245, 246

*Godfrey v. Georgia*, 446 U.S. 420 (1980) ..................... 85, 152, 164, 180, 194

*Gonzales v. Beto*, 405 U.S. 1052 (1972) ................................................. 123

*Gray v. Mississippi*, 481 U.S. 648 (1987) ................................................ 132

*Gregg v. Georgia*, 428 U.S. 153 (1976) .......................................... 47, 152, 214

vii

*Hardcastle v. Horn*, 368 F.3d 246 (3d Cir. 2004) ................................................. 9, 107

*Harrison v. Ryan*, 909 F.2d 84 (3d Cir. 1990) .......................................... 107, 111, 116

*Herring v. New York*, 422 U.S. 853 (1975) ............................................................. 50

*Hicks v. Oklahoma*, 447 U.S. 343 (1980) ............................................ 145, 146, 176, 185

*Hicks v. U. S.*, 150 U.S. 442 ................................................................................ 183

*Hill v. Lockhart*, 28 F.3d 832 (8th Cir. 1994) ................................................... 49, 74

*Hitchcock v. Dugger*, 481 U.S. 393 (1987) ............................................................. 16

*Holloway v. Horn*, 355 F.3d 707 (3d Cir. 2004) ...................................................... 9

*Hughes v. United States*, 258 F.3d 453 (6th Cir. 2001) ................................ 125, 128, 144

*Hull v. Kyler*, 190 F.3d 88 (3d Cir. 1999) ..................................................... 8, 72, 217

*Hunley v. Godinez*, 975 F.2d 316 (7th Cir. 1992) .............................................. 122, 123

*Imbler v. Pachtman*, 424 U.S. 409 (1976) ............................................................. 43

*Irvin v. Dowd*, 366 U.S. 717 (1961) ..................................... 97, 124131, 133, 233

*J.E.B. v. Alabama ex rel T.B.*, 511 U.S. 127 (1994) ................... 103, 104,106, 107, 113

*Jackson v. Leonardo*, 162 F.3d 81 (2d Cir. 1998) ........................................ 96, *passim*

*Jackson v. United States*, 395 F.3d 615 (D.C. Cir. 1968) ........................................ 123

*Jackson v. Virginia*, 443 U.S. 307 (1979) ..................................................... 164, 193

*Jacobs v. Horn*, 129 F. Supp. 2d 390 (M.D. Pa. 2001) ........................................... 11

*Jacobs v. Horn*, 395 F.3d 92 (3d Cir. 2005) .......................................... 6, 9, 11, 200

*Jeffries v. Wood*, 114 F.3d 1484 (9th Cir. 1997), *cert. denied* 522 U.S. 1008 .............. 10

*Jencks v. United States*, 353 U.S. 657 (1957) ......................................................... 46

*Jermyn v. Horn*, 266 F.3d 257 (3d Cir. 2001) ........................................................ 49

*Johnson v. Armontrout*, 961 F.2d 748 (8th Cir. 1992) ............................................ 125

*Johnson v. California*, 545 U.S. 162 (2005) ..................................................... 104

*Johnson v. Love*, 40 F.3d 658 (3d Cir. 1994) ................................................... 104

*Johnson v. Pinchak*, 392 F.3d 551 (3d Cir. 2004) ............................................ 3, 4

*Johnson v. Vasquez*, 3 F.3d 1327 (9th Cir.1993) ...................................... 109, 116

*Jones v. Superintendent*, 725 F.2d 40 (3d Cir. 1984) ............................................ 4

*Juan H. v. Allen*, 408 F.3d 1262 (9th Cir. 2005) ...................................... 164, 193

*King v. Lynaugh*, 828 F.2d 257 (5th Cir. 1987) ......................... 97, 98, 131, 134

*Kirk v. Raymark Industrial, Inc.*, 61 F.3d 147 (3d Cir.1995) ...................... 89, 90, 128

*Kubat v. Thieret*, 867 F.2d 351 (7th Cir. 1989) ................................................... 50

*Kyles v. Whitley*, 514 U.S. 419 (1995) ....................................... 13, 43, 73, 245

*Lark v. Beard*, 495 F. Supp. 2d 488 (E.D. Pa. 2007) ............................ 110, 111, 116

*Leonard v. United States*, 378 U.S. 544 (1964) ................................................ 123

*Lesko v. Lehman*, 925 F.2d 1527 (3d Cir. 1991) ...................................... 226, 245

*Lockett v. Ohio*, 438 U.S. 586 (1978) ..................................................... 16, *passim*

*Lockhart v. Fretwell*, 506 U.S. 364 (1993) ........................................................ 7

*Lonchar v. Thomas*, 517 U.S. 314 (1996) ...................................................... 242

*Lynce v. Mathis*, 519 U.S. 433 (1997) ........................................................... 240

*Magill v. Dugger*, 824 F.2d 879 (11th Cir. 1987) .............................................. 50

*Manley v. Delaware*, 127 S. Ct. 2885 (2007) ..................................................... 2

*Manley v. Delaware*, 525 U.S. 893 (1998) ........................................................ 1

*Marbury v. Madison*, 1 Cranch 137, 2 L. Ed. 60 (1803) ................................... 186

*Matire v. Wainwright*, 811 F.2d 1430 (11th Cir. 1987) ............................. 96, *passim*

*Matteo v. Superintendent*, 171 F.3d 877 (3d Cir. 1999) ....................................... 8

ix

*Mattox v. United States*, 146 U.S. 140 (1892) .......................................................................... 235

*Mattox v. United States*, 156 U.S. 237 (1895) ..................................................................... 83, 189

*McCandless v. Vaughn*, 172 F.3d 255 (3d Cir. 1999) ........................................................ 84, 85

*McClain v. Prunty*, 217 F.3d 1209 (9th Cir. 2000) .................................................. 108, 110, 116

*McKoy v. North Carolina*, 494 U.S. 433 (1990) ............................................................... 153, 157

*Middleton v. Dugger*, 849 F.2d 491 (11th Cir. 1988) ....................................................... 50, 64

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) ............................................................................... 9

*Miller-El v. Dretke*, 545 U.S. 231 (2005) .................................................................... 107, 110

*Mills v. Maryland*, 486 U.S. 367 (1988) ............................................... 85, 152, 153, 180

*Mooney v. Holohan*, 294 U.S. 103 (1935) ............................................................................ 87

*Morford v. United States*, 339 U.S. 258 (1950) ............................................................... 97, 131

*Morgan v. Illinois*, 504 U.S. 719 (1992) ................................................................ 97, 131, 132

*Motes v. United States*, 178 U.S. 458 (1900) ....................................................................... 84

*In re Murchison*, 349 U.S. 133 (1955) ......................................................................... 176, 180

*Murphy v. Florida*, 421 U.S. 794 (1975) ........................................................................... 233

*Murphy v. Puckett*, 893 F.2d 94 (5th Cir. 1990) ............................................................ 96, *passim*

*Napue v. Illinois*, 360 U.S. 264 (1959) ......................................................................... 43, 87

*Nix v. Whiteside*, 475 U.S. 157 (1986) ............................................................................. 13

*Norris v. Risley*, 918 F.2d 828 (9th Cir. 1990) ................................................................... 235

*O'Neal v. McAninch*, 115 S. Ct. 992 (1995) ...................................................................... 245

*In re Oliver*, 333 U.S. 257 (1948) ....................................................................................... 85

*Orazio v. Dugger*, 876 F.2d 1508 (11th Cir. 1989) ....................................................... 96, *passim*

*Osborne v. Ohio*, 495 U.S. 103 (1990) ............................................................................. 144

*Outten v. Kearney*, 464 F.3d 401 (3d Cir. 2006) ............................................................ 9, *passim*

*Parkus v. Delo*, 33 F.3d 933 (8th Cir. 1994) .............................................................. 11

*Payne v. Tennessee*, 501 U.S. 808 (1991) .......................................................... 213, 214

*Penry v. Johnson*, 532 U.S. 782 (2001) ................................................................ 156

*Perricone v. Kansas City Southern Railway Company*, 630 F.2d 317 (5thCir. 1980) ............... 90

*Perry v. Lynaugh*, 492 U.S. 302 (1989) ......................................................... 47, *passim*

*Picard v. Connor*, 404 U.S. 270 (1971) ................................................................. 3

*Pointer v. Texas*, 380 U.S. 400 (1965) .............................................. 83, 85, 188, 194

*Powell v. Wyrick*, 744 F.2d 632 (8th Cir. 1984) cert. denied, 469 U.S. 1223 (1985) ................... 4

*Powers v. Ohio*, 499 U.S. 400 (1991) ................................................................. 103

*Purkett v. Elem*, 514 U.S. 765 (1995) ............................................................ 110, 116

*Pursell v. Horn*, 187 F. Supp. 2d 260 (W.D. Pa. 2002) ........................................ 11, 63

*Quercia v. United States*, 289 U.S. 466 (1933) ....................................................... 184

*Remmer v. United States*, 347 U.S. 227 (1954) ....................................................... 235

*Richardson v. Marsh*, 481 U.S. 200 (1987) ............................................ 94, 95, 189, 192, 196

*Rickman v. Bell*, 131 F.3d 1150 (6th Cir. 1997) ................................................ 31,34

*Rideau v. Louisiana*, 373 U.S. 723 (1963) ............................................................ 233

*Riley v. Taylor*, 277 F.3d 261 (3d Cir. 2001) ......................................... 107, 110, 116

*Ring v. Arizona*, 536 U.S. 584 (2002) ................................................ 2, 239, 241, 244

*Ristaino v. Ross*, 424 U.S. 589 (1976) ............................................................. 97, 133

*Rock v. Arkansas*, 483 U.S. 44 (1987) .............................................................. 15

*Roe v. Flores-Ortega*, 528 U.S. 420 (2000) ................................................... 96, *passim*

*Rompilla v. Beard*, 545 U.S. 374 (2005) .................................................... 9, *passim*

xi

*Rosales-Lopez v. United States*, 451 U.S. 182 (1981) .............................................................. 97, 98

*Ross v. Oklahoma*, 487 U.S. 81 (1988) ........................................... 97, 131, 132, 133,180

*Sandoval v. California*, 511 U.S. 1 (1994) ................................................................. 171

*Sandstrom v. Montana*, 442 U.S. 510 (1979 ) ............................................................. 144

*Sattazahn v. Pennsylvania*, 537 U.S. 101 (2003) ........................................................ 239

*Schad v. Arizona*, 501 U.S. 624 (1991) ..................................................................... 148

*Schiro v. Farley*, 510 U.S. 222 (1994) ...................................................................... 239

*Schlup v. Delo*, 513 U.S. 298 (1995) ........................................................................ 242

*Sheppard v. Maxwell*, 384 U.S. 333 (1966) .............................................................. 233

*Simmons*, 512 U.S. at 172 (Souter, J., concurring) ..................................................... 153

*Skipper v. South Carolina*, 476 U.S. 1 (1986) ..................................................... 153, 155

*Slack v. McDaniel*, 529 U.S. 473 (2000) ...................................................................... 9

*Smith v. Dugger*, 758 F. Supp. 688 (N.D. Fla. 1990),
  *affirmed* Smith v.Singletary, 61 F.3d 815, 818 n ............................................... 11

*Smith v. Freeman*, 892 F.2d 331 (3d Cir. 1989) ......................................................... 11

*Smith v. Horn*, 120 F.3d 400 (3d Cir. 1997) ..................................................... 144, 145

*Smith v. Phillips*, 455 U.S. 209 (1982) ............................................. 122, 123, 128, 135

*Smith v. Secretary*, 50 F.3d 801 (10th Cir. 1995) ...................................................... 44

*Spaziano v. Florida*, 468 U.S. 447 (1984) ............................................................... 152

*Specht v. Patterson*, 386 U.S. 605 (1967) ................................................................. 85

*Spicer v. Roxbury Correctional Institute*, 194 F.3d 547 (4th Cir. 1999) ........................ 10

*Spiegel v. Sandstrom*, 637 F.2d 405 (5th Cir. 1981) ................................................... 3

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) ................................................ 104

*Starr v. Lockhart*, 23 F.3d 1280 (8th Cir. 1993 ) ........................................................ 96, *passim*

*Starr v. United States*, 153 U.S. 614 (1894) ............................................................... 183

*Stockton v. Virginia*, 852 F.2d 740 (4th Cir. 1988) ...................................................... 235

*Strickland v. Washington*, 466 U.S. 668 (1984) ................................................ 7, *passim*

*Stringer v. Jackson*, 503 U.S. 222 (1992) ................................................................... 203

*Stroud v. United States*, 251 U.S. 15 (1919) ............................................................... 132

*Sumner v. Shuman*, 483 U.S. 66 (1987) .............................................................. 155, 203

*Swain v. Alabama*, 380 U.S. 202 (1965) .............................................................. 103, 113

*Swanger v. Zimmerman*, 750 F.2d 291 (3d Cir. 1984) ..................................................... 4

*Szuchon v. Lehman*, 273 F.3d 299 (3d. Cir. 2001) ............................................... 137, 138

*Taylor v. Kentucky*, 436 U.S. 478 (1978) ................................................................... 245

*Taylor v. Louisiana*, 379 U.S. 466 (1965) ................................................................. 123

*Tennard v. Dretke*, 124 S. Ct. 2562 (2004) ......................................... 154, 15, 157, 159

*Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981) .............................. 104

*Thomas v. Beard*, 388 F. Supp. 2d 489 (E.D. Pa. 2005) ................................................. 63

*Toney v. Franzen*, 687 F.2d 1409 (7th Cir. 1982) ............................................................ 4

*Townsend v. Sain*, 372 U.S. 293 (1963) ....................................................................... 11

*Tumey v. Ohio*, 273 U.S. 510 (1927) ..................................................... 123, 176, 179

*Turner v. Murray*, 476 U.S. 28 (1986) ................................... 97, 98, 99, 133, 239

*United States ex rel. DeVita v. McCorkle*, 248 F.2d 1 (3d Cir. 1957) .................................. 123

*United States ex rel. Steward v. Hewitt*, 517 F.2d 993 (3d Cir. 1975) ................................ 123

*United States v. Agurs*, 427 U.S. 97 (1976) ................................................................ 88

*United States v. Allsup*, 566 F.2d 68 (9th Cir. 1977) ................................................... 123

*United States v. Bagley*, 473 U.S. 667 (1985) ........................................ 43, 44

*United States v. Barbour*, 420 F.2d 1319 (D.C. Cir. 1969) ........................ 183

*United States v. Burr*, 25 F. Cas. 49 (1807) ............................ 122, 123, 180

*United States v. Cronic*, 466 U.S. 648 (1984) ........................................ 15

*United States v. Donato*, 99 F.3d 426 (D.C. Cir. 1997) .......................... 184

*United States v. Eubanks*, 591 F.2d 513 (9th Cir. 1979) ........................ 123

*United States v. Evans*, 917 F.2d 800 (4th Cir. 1990) ............................ 133

*United States v. Gall*, 374 F. Supp. 2d 758 (D.C. Iowa 2005) .................. 64

*United States v. Gaudin*, 515 U.S. 506 (1995) ................ 164, 193, 226, 238

*United States v. Gray*, 878 F.2d 702 (3d Cir. 1989) ............................... 63

*United States v. Griffin*, 194 F.3d 808 (7th Cir.1999) .......................... 110

*United States v. Haynes*, 398 F.2d 980 (2d Cir. 1968) .......................... 122

*United States v. Hill*, 976 F.2d 132 (3d Cir. 1992) ................................. 44

*United States v. Lane*, 474 U.S. 438 (1986) .............................. 195, 204

*United States v. Manning*, 23 F.3d 570 (1st Cir. 1994) ......................... 222

*United States v. Mannino*, 212 F.3d 835 (3d Cir. 2000) .............. 96, *passim*

*United States v. Maree*, 934 F.2d 196 (9th Cir. 1991) ........................... 235

*United States v. Mezzanatto*, 513 U.S. 196 (1995) ................................ 44

*United States v. Navarro*, 472 F.2d 302 (2d Cir. 1973) ......................... 184

*United States v. Nell*, 526 F.2d 1223 (5th Cir. 1976) ........................... 122

*United States v. Perdomo*, 929 F.2d 967 (3d Cir. 1991) .......................... 44

*United States v. Quinn*, 901 F.2d 522 (6th Cir. 1990) ............................ 91

*United States v. Robinson*, 485 F.2d 1157 (3d Cir. 1973) ....................... 99

*United States v. Sanchez*, 176 F.3d 1214 (9th Cir. 1999) ........................................................ 222

*United States v. Spagnoulo*, 960 F.2d 990 (11th Cir. 1992) ........................................................ 44

*United States v. Swanson*, 943 F.2d 1070 (9th Cir. 1991) ........................................................ 31, 34

*United States v. Torres*, 128 F.3d 38 (2d Cir. 1997) ........................................................ 122, 135

*United States v. Wood*, 299 U.S. 123 (1936) ........................................................ 122

*United States v. Young*, 470 U.S. 1 (1985) ........................................................ 222, 225

*Uttecht v. Brown*, 127 S. Ct. 2218 (2007) ........................................................ 137, 138

*Vasquez v. Hillery*, 474 U.S. 254 (1986) ........................................................ 3

*Victor v. Nebraska*, 511 U.S. 1 (1994) ........................................................ 170, 172

*Wainwright v. Witt*, 469 U.S. 412 (1985) ........................................................ 122, *passim*

*Wallace v. Stewart*, 184 F.3d 1112 (9th Cir. 1999) ........................................................ 50

*Walton v. Arizona*, 497 U.S. 639 (1990) ........................................................ 153, 159, 239

*Wiggins v. Smith*, 539 U.S. 510 (2003) ........................................................ 5, *passim*

*Williams v. Holbrook*, 691 F.2d 3 (1st Cir. 1982) ........................................................ 4

*Williams v. Taylor*, , 163 F.3d 860 (4th Cir. 1998) ........................................................ 74

*Williams v. Taylor*, 529 U.S. 362 (2000) ........................................................ 9, *passim*

*Williams v. Woodford*, 396 F.3d 1059 (9th Cir. 2005) ........................................................ 112, 118

*Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997) ........................................................ 15

*Wilson v. Beard*, 426 F.3d 653 (3d Cir. 2005) ........................................................ 6

*Wilson v. Whitley*, 28 F.3d 433 (10th Cir. 1994) ........................................................ 44

*In re Winship*, 397 U.S. 358 (1970) ........................................................ 144, 164, 170, 193

*Witherspoon v. Illinois*, 391 U.S. 510 (1968) ........................................................ 131, 133, 134, 138

*Woods v. Dugger*, 923 F.2d 1454 (11th Cir. 1991) ........................................................ 11

*Woodson v. North Carolina*, 428 U.S. 280 (1976) ........................ 85, *passim*

*Zafiro v. United States*, 506 U.S. 534 (1993) ..................................... 195, 204

*Zant v. Stephens*, 462 U.S. 862 (1983) ................................................. 203

## STATE CASES

*Brice v. State*, 815 A.2d 314 (Del. 2003) ........................ 240, 241, 243, 244

*Cargle v. State*, 909 P.2d 806 (Okla. 1996) ........................................ 214

*Engle v. State*, 438 So. 2d 803 (Fla. 1983) ............................................ 85

*Filmore v. State*, 813 A.2d 1112 .................................................... 99, 101

*Fountain v. State*, 275 A.2d 251 (Del. 1971) ....................................... 145

*Hughes v. State*, 437 A.2d 559 (Del. 1981) .................................. 220, 230

*Johnson v. State*, 59 P.3d 450 (Nev. 2002) ......................................... 244

*Livingston v. State*, 444 S.E.2d 748 (Ga. 1994) ................................... 214

*McBride v. State*, 477 A.2d 174 (Del. 1984) ........................................ 234

*Rodgers v. State*, 948 So. 2d 655 (Fla. 2006) ........................................ 85

*State v. Biter*, 119 A.2d 894 (Del. 1955) ............................................. 234

*State v. Ring*, 65 P.3d 915 (Ariz. 2003) ............................................... 244

*Trump v. State*, 753 A.2d 963 (Del.2000) ............................................ 223

*United States v. Berry*, 1986 WL 18321 (4th Cir. 1986) .......................... 91

*United States v. Williams*, 1991 WL 55468 (9th Cir. 1991) ....................... 90

*Williams v. Warden*, 487 S.E.2d 194 (Va. 1997) .................................... 75

Petitioner, Michael R. Manley, through undersigned counsel, files this petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254.

## PARTIES

1.      Petitioner, Michael Manley, SBI 00338485, is in the custody of the State of Delaware in the Delaware Correctional Center, under sentence of death.

2.      Respondent Carl C. Danberg is Commissioner of Correction for the State of Delaware.  He is Petitioner's ultimate custodian and is responsible by state law for carrying out Petitioner's execution.

3.      Respondent Thomas Carroll is Warden of the Delaware Correctional Center.  He is Petitioner's immediate custodian and would also be responsible for assisting in Petitioner's execution.

## PROCEDURAL HISTORY

4.      Petitioner Michael Manley and co-defendant David Stevenson were convicted of first-degree murder on November 13, 1996, and sentenced to death on January 10, 1997.

5.      Petitioner's conviction and sentence of death were affirmed by the Supreme Court of Delaware on April 14, 1998, and is reported at Manley v. State, 709 A.2d 643 (Del. 1998). On October 5, 1998, the United States Supreme Court denied Petitioner's Petition for Writ of Certiorari. See Manley v. Delaware, 525 U.S. 893 (1998).

6.      On January 25, 1999, Petitioner filed a Motion for Post-Conviction Relief in the Superior Court, pursuant to Criminal Rule 61.  On April 27, 2000 the Superior Court denied this motion. State v. Manley, 2000 Del. Super. Lexis 118 (Del. Super. 2000).

7.      On appeal to the Supreme Court of Delaware, Petitioner's death sentence was vacated

1

and a new penalty hearing was ordered. <u>Manley v. State</u>, 782 A.2d 249 (Del. 2001). Petitioner's remaining Rule 61 claims were also remanded to the Superior Court for "consideration by a new judge ab initio." <u>Id</u>.

8.      On September 7, 2001 Petitioner filed an Amended and Restated Motion for Post-Conviction Relief. On January 11, 2002, the court held an evidentiary hearing. After the briefing on the issues raised in the Amended Rule 61 Motion was complete, but before any new penalty hearing was held, the United States Supreme Court decided <u>Ring v. Arizona</u>, 536 U.S. 584 (2002). Following the <u>Ring</u> decision, Petitioner filed a separate Motion to bar the court from holding the new penalty hearing that had been previously ordered. On October 2, 2003 the Superior Court issued its decision denying Petitioner's Amended Rule 61 Motion and Petitioner's <u>Ring</u> Motion. <u>State v. Manley and Stevenson</u>, (Del. Super. October 2, 2003) (Herlihy, J). On April 7, 2004, the Supreme Court of Delaware affirmed the decision of the Superior Court. <u>Manley v. State</u>, 846 A.2d 248 (Del. 2004).

9.      On November 8, 2005, a second penalty hearing was held. On February 3, 2006, Petitioner and co-defendant Stevenson were again sentenced to death. On January 3, 2007, the Supreme Court of Delaware affirmed the sentence of death. <u>Manley v. State</u>, 918 A.2d 321(Del. 2007). Petitioner filed a timely Writ of Certiorari to the United States Supreme Court, which was denied on May 29, 2007. <u>Manley v. Delaware</u>, 127 S.Ct. 2885 (2007).

10.     On or about July 30, 2007, Petitioner filed a *Motion for Appointment of Federal Habeas Corpus Counsel Pursuant to 21 U.S.C. § 848(q) and <u>McFarland v. Scott</u>, and for an Order Permitting Petitioner to Proceed In Forma Pauperis.*

11.     On August 14, 2007, this Court appointed the undersigned as counsel for Mr. Manley

2

and directed that counsel file Petitioner's Petition for a Writ of Habeas Corpus within one hundred twenty (120) days.

12.    On November 30, 2007, Petitioner filed a motion for an additional forty-five (45) days in which to file his Petition for Writ of Habeas Corpus, which the Court granted the same day.

13.    On January 22, 2008, Petitioner filed an unopposed motion for an additional thirty (30) days in which to file his Petition, which this Court also granted.

## PRIOR COUNSEL

14.    Petitioner was represented at trial and on direct appeal by Anthony Figliola, Esquire and Thomas Foley, Esquire.  Joseph Bernstein, Esquire and Joseph Gabay, Esquire, represented Petitioner during the initial Rule 61 proceedings, Petitioner's resentencing and the direct appeal from his resentencing.

## INTRODUCTORY STATEMENT ON EXHAUSTION

15.    A claim is exhausted if it was "fairly presented" in state court. Picard v. Connor, 404 U.S. 270, 275 (1971).  This does not mean that the claim presented in state court must be repeated in federal court in the exact same words.[1]  If the substance of the claim was fairly presented in state court, the facts presented in support of the claim may be supplemented in federal court,[2] and the fact

---

[1]  E.g. Evans v. Court of Common Pleas, 959 F.2d 1227, 1231 (3d Cir. 1992) ("Fair presentation" means that the claim raised in federal court is the "substantial equivalent" of the state court claim); Johnson v. Pinchak, 392 F.3d 551, 556 (3d Cir. 2004) ("Exhaustion requires that petitioner present in substance the same claim he is now seeking to have the federal courts review"); Spiegel v. Sandstrom, 637 F.2d 405, 407 (5th Cir. 1981) (noting that exhaustion principles do not require the petitioner to "spell out each syllable of his claim before the state court") (quoting Lambert v. Wainwright, 513 F.2d 277, 282 (5th Cir. 1975)) (internal quotations omitted).

[2]  Vasquez v. Hillery, 474 U.S. 254, 257-60 (1986) (supplemental facts presented in support of grand jury discrimination claim "did not fundamentally alter the legal claim already

3

that the claim is given a different label or designation in federal court is insignificant.[3]

16.     Moreover, when a claim has been presented to a state court, that court's failure to address the issue *does not render the claim unexhausted.* Swanger v. Zimmerman, 750 F.2d 291, 295 (3d Cir. 1984) ("The exhaustion requirement of 28 U.S.C. § 2254(b)-(c) has been judicially interpreted to mean that claims must have been presented to the state courts; they need not have been considered or discussed by those courts.").[4]

17.     Similarly, "[e]xhaustion is not a jurisdictional requirement, but rather a rule of comity, and a federal court may in certain circumstances decide the merits of a claim despite non-exhaustion." Evans, 959 F.2d at 1231. Where the petitioner "'has no opportunity to obtain redress in the state court or the state corrective process is so deficient as to render any effort to obtain relief futile,' exhaustion is not required." Evans, 959 F.2d at 1231 (quoting Gibson v. Scheidemantel, 805 F.2d 135, 138 (3d Cir. 1986)).

18.     This petition contains several claims that are exhausted because their legal and factual basis were expressly presented to the state courts during prior proceedings.

---

considered by the state courts"); Blanco v. Singletary, 943 F.2d 1477, 1506 (11th Cir. 1991) (approving district court's holding of federal evidentiary hearing to supplement state court record); Cave v. Singletary, 971 F.2d 1513, 1516-17 (11th Cir. 1992) (same).

[3] Evans, 959 F.2d at 1231-33.

[4] See also, Johnson, 392 F.3d at 556 (same) (citing Swanger v. Zimmerman, 750 F.2d at 295); Jones v. Superintendent, 725 F.2d 40, 42 (3d Cir. 1984); Powell v. Wyrick, 744 F.2d 632, 634 (8th Cir. 1984) cert. denied, 469 U.S. 1223 (1985); Williams v. Holbrook, 691 F.2d 3, 8 (1st Cir. 1982); Toney v. Franzen, 687 F.2d 1409, 1413 (7th Cir. 1982) ("state court that ignores an issue, [and] enters an order that falls short of the relief requested, . . . will not thereby bar an unsatisfied prisoner from seeking habeas corpus relief in the federal court."); Baker v. Horn, 210 F. Supp. 2d 592, 625 (E.D.Pa. 2002) (Brody, J.) ("[S]tate courts need not reach the merits of a claim for it to be properly exhausted; exhaustion requires only that a federal habeas petitioner afford the state courts the *opportunity* to consider a claim on its merits.").

19.    Counsel have also identified additional claims that were not presented to the state courts. It is undersigned counsel's belief that these claims are substantial and meritorious, and that review of these federal claims is available in state court in litigation under Delaware's Post-Conviction law. See DE R SUPER CT RCRP , Rule 61. Consequently, undersigned counsel has advised Petitioner to pursue state court remedies.  Most of these claims have been raised in Petitioner's *Motion for Postconviction Relief Pursuant to Superior Court Criminal Rule 61, and Consolidated Memorandum of Law* which was filed in the Delaware Superior Court on January 25, 2008 (copy attached herein as an Appendix), and counsel has advised Petitioner to seek to amend that Petition with the additional claims in the next thirty (30) days. See DE R SUPER CT RCRP Rule 61(b)(6)

20.    Petitioner is accord ingly filing with this *Petition* a Motion that these federal proceedings be stayed to permit exhaustion of state remedies.

## STANDARD OF REVIEW.

### 1.    The preconditions for applying Section 2254.

21.    Some of Petitioner's claims (or parts of claims) are not subject to § 2254(d) at all because the state court denied them without addressing the merits. Habeas review of those claims is the same *de novo*, plenary review that was required before AEDPA. See Rompilla, 545 U.S. at 390 (where state court did not address "prejudice" prong of ineffective assistance of counsel claim, habeas review is *de novo*); Wiggins v. Smith, 539 U.S. 510, 534 (2003) (same).

22.    By its plain language, §2254(d) applies to a claim only when that claim "was adjudicated on the merits" by the state court, and only where that adjudication resulted in a "decision" on the federal claim. See Everett v. Beard, 290 F.3d 500, 508 (3d Cir. 2002) (Section

5

2254 does not apply "unless it is clear from the face of the state court decision that the merits of the petitioner's constitutional claims were examined in light of federal law as established by the Supreme Court of the United States"); Chadwick v. Janecka, 312 F.3d 597, 606 (3d Cir. 2002) ("if an examination of the opinions of the state courts shows that they misunderstood the nature of a properly exhausted claim and thus failed to adjudicate that claim on the merits, the deferential standards of review in AEDPA do not apply"). See also Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005) (citing Everett). Thus, in order for the standards of §2254(d) to be applied to any one of Petitioner's claims, the state court must have issued a "decision" that (1) actually addresses the petitioner's federal claim;[5] and, (2) addresses and "adjudicate[s]" the federal claim "on the merits" (as opposed to on procedural or other grounds).[6] Where there is no state court "decision" showing that the claim was "adjudicated on the merits" §2254(d) does not apply and the federal court must provide de novo, plenary review.

**2. The standard of review under Section 2254.**

23.     For issues as to which there is a state court decision on the merits, review is governed by 28 U.S.C. § 2254(d), and relief is required where the state court decision is "contrary to" or "an unreasonable application of" clearly established law, or involves an "unreasonable determination of the facts," § 2254(d)(1)-(2).

---

[5] E.g. Everett, 290 F.3d at 508 (where the state court "reached the merits of Everett's underlying state law claim," but failed to address his federal constitutional claim, de novo review appropriate); Jacobs, 395 F.3d at 110-11 (de novo review proper because the state court failed to adjudicate – or even mention – an instructional claim regarding corpus delecti).

[6] E.g. Wilson v. Beard, 426 F.3d 653, 659 (3d Cir. 2005) (de novo review for claim deemed waived by state court, where waiver ruling was not adequate state ground); Jacobs, 395 F.3d at 118 n.21 (same); Bronshtein v. Horn, 404 F.3d 700, 710 n.4, 715 (3d Cir. 2005) (same).

### a.    Contrary to clearly established federal constitutional law

24.    There are two ways in which a state court decision could be "contrary to ... clearly established federal law." The first is if the state court does not correctly identify and articulate the legal principles that govern the claim. This happens when the state court's decision is "substantially different from the relevant precedent of this Court," when the state court "applies a rule that contradicts the governing law set forth in our cases" or when the state court applies law that is "diametrically different," "opposite in character or nature," or "mutually opposed" to established Supreme Court precedent. Williams v. Taylor 529 U.S. at 405-406.

25.    As Williams makes clear, in order to make this determination, the federal court must conduct an independent review of the relevant Supreme Court precedent. In Williams itself, the Virginia Supreme Court, citing Lockhart v. Fretwell, 506 U.S. 364 (1993), added to the prejudice prong of the Strickland v. Washington, 466 U.S. 668 (1984) test for ineffective assistance of counsel claims an additional requirement that the petitioner show that his conviction or sentence was fundamentally unfair. See Williams, 529 U.S. at 391-94 (discussing the Virginia Supreme Court's opinion).

26.    The Williams Court held that adding the Lockhart requirement to ineffective assistance claims is "contrary to" Strickland. Williams, 529 U.S. at 391-95, 397. Thus, if the state court misinterprets relevant Supreme Court precedent, the resulting "decision" is "contrary to ... clearly established federal law, as determined by the Supreme Court."

27.    The second way in which a state court decision may be "contrary to ... clearly established federal law" is "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different

7

from [that] precedent." Id. 529 U.S. at 406. This does not require that the facts of the two cases be identical, but only that they be "materially indistinguishable."

### b. Unreasonable application of clearly established federal constitutional law

28.    Relief should be granted under the "unreasonable application" clause "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409.[7]

29.    In Williams, 529 U.S. at 397-98, the Supreme Court found that the Virginia Supreme Court's decision was an "unreasonable application of" Strickland, in addition to being "contrary to" Strickland.  The state court's decision was unreasonable, both because it improperly added the Lockhart requirement to the petitioner's ineffective assistance claim, but also because in determining prejudice it failed to consider all of the available mitigating evidence in the petitioner's favor (even though it correctly emphasized the strength of the prosecution's case). Id. The Virginia Supreme Court's decision was an "unreasonable application of" Strickland because it failed to consider all of the facts relevant to the Strickland analysis, even though it correctly considered most of them.

30.    Williams makes clear that under section 2254(d)(1), federal court review of habeas claims must remain careful, robust, and thorough, consistent with the historic and continuing

---

[7] See also  Matteo v. Superintendent, 171 F.3d 877, 889-90 (3d Cir. 1999) (en banc) (claims evaluated under the "unreasonable application" clause are reviewed to determine "whether the state court's application of Supreme Court precedent was objectively unreasonable"); Hull v. Kyler, 190 F.3d 88 (3d Cir. 1999) (finding state court decision on Strickland claim to be an unreasonable application of Strickland and granting habeas relief under AEDPA).

importance of the writ of habeas corpus. "The writ of habeas corpus plays a vital role in protecting constitutional rights," Slack v. McDaniel, 529 U.S. 473, 483 (2000). Thus, any "deference" required by § 2254(d) "does not imply abandonment or abdication of [federal] judicial review." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003); see also Rompilla v. Beard, 545 U.S. 374 (2005) (finding state court decision contrary to and an unreasonable application of clearly established law and granting habeas relief); Wiggins v. Smith, 539 U.S. 510 (2003) (same); Williams v. Taylor, 529 U.S. 362 (2000) (same); Outten v. Kearney, 464 F.3d 401 (3d Cir. 2006) (same); Jacobs v. Horn, 395 F.3d 92, 107 (3d Cir. 2005) (same); Holloway v. Horn, 355 F.3d 707, 729-30 (3d Cir. 2004) (same); Hardcastle v. Horn, 368 F.3d 246 (3d Cir. 2004) (finding state court decision unreasonable, and remanding for evidentiary hearing).

### 3. The standard of review under Sections 2254(d)(2) and 2254(e)(1).

31.    The standard of review regarding state court findings is outlined in 28 U.S.C. Sections 2254(d)(2) and 2254(e)(1). As the Third Circuit has noted, this standard of review is similar to that provided under former section 2254(d). Berryman v. Morton, 100 F.3d 1089, 1103-04 (3d Cir. 1996). See also Jerymn v. Horn, 1998 W L754567, *6 (M.D. Pa. Oct. 27, 1998) affirmed 266 F.3d 257 (3d Cir. 2001) (noting the standard "is not a dramatic departure" from the former requirements).

32.    Given their similar language, topic and close proximity in the statute, sections (d)(2) and (e)(1) must be read in pari materia. When this is done, it is clear that the two provisions distinguish between reasonable "determination[s] of a factual issue" – to which the (e)(1) presumption of correctness applies – and "unreasonable" determinations of such issues, to which no such presumption applies. James Liebman & Randy Hertz, Federal Habeas Corpus Practice and Procedure, § 20.2c at 826 (4th ed. 2001) (hereafter "FHCPP"). In order to give meaning to this

9

distinction, see Williams, 529 U.S. at 404 (proper interpretation of statute must give "independent meaning" to separate clauses), the provisions should be interpreted to require a four part test.

33.     First, the federal court must determine whether there was an "adjudicat[ion of a factual issue] on the merits" in state court that "resulted in a decision," i.e., there must be an "explicit or at least a clearly inferable finding of historical fact that can be subjected to federal court review." FCHPP at 827-28. Second, the federal court must decide whether the state court's "determination" of the factual issue was *procedurally* "[]reasonable." This is similar to the analysis of whether the state court's decision-making procedures were trustworthy enough to entitle its decision to a presumption of correctness under the former 28 U.S.C. § 2254(d)(1-7). Id. at 828-29. Third, if the state court's decision was procedurally reasonable, the federal court must look to whether its decision was *substantively* "[]reasonable ... in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Finally, if the state court's decision was reasonable in all of these respects, the factual findings made by the court are presumed to be correct unless rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see FCHPP at 830.

34.     When presented with a clear showing that the state court's findings are substantively unreasonable in light of the state court record, or with clear and convincing evidence rebutting any presumption that the state court finding is correct, the federal courts have not hesitated to reject those findings and grant relief, pursuant to sections 2254(d)(2) and (e)(1).[8]  As with section 2254(d)(1),

---

[8]  E.g., Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), *cert. denied* 522 U.S. 1008 (rejecting Washington Supreme Court's finding that juror misconduct was not reported until two years after trial, as the trial record established the trial judge was alerted to the misconduct within days of the verdict); Spicer v. Roxbury Correctional Institute, 194 F.3d 547, 554-55 (4th Cir. 1999) (rejecting Maryland Court of Special Appeals finding that the undisclosed witness statement had only the "potential" of being Brady material); Appel v. Horn, 1999 WL 323805 at *8 n.15 (E.D. Pa. May 21, 1999) (rejecting Pennsylvania Supreme Court's finding regarding the

10

while sections 2254(d)(2) and (e)(1) require that federal courts pay respectful attention to state court rulings, they do not suggest that federal courts should rubber stamp state court rulings that are clearly erroneous.

### THERE IS NO BARRIER TO AN EVIDENTIARY HEARING.

35.    For the reasons stated herein, Petitioner is entitled to relief *on the current record*, including the affidavits, historical documents and transcripts.[9]  To the extent that the claims presented in Petitioner's habeas petition involve any disputed issues of material facts, Petitioner would be entitled to an evidentiary hearing on those claims.

36.    An evidentiary hearing is appropriate when the habeas petition alleges facts which, if proved, would entitle the petitioner to relief, and there is a material dispute about those facts. Townsend v. Sain, 372 U.S. 293, 312-19 (1963).[10]  "[H]earings are particularly important in capital cases ..., where the 'irremediable' penalty demands factfinding at a 'heightened standard of reliability.'" Parkus v. Delo, 33 F.3d 933, 939 n.6 (8th Cir. 1994) (quoting Ford v. Wainwright, 477

---

status of counsel); Jermyn v. Horn, 1998 WL 754567 at *11-14 (M.D. Pa. Oct. 27, 1998), *affirmed* 266 F.3d 257 (3d Cir. 2001), (rejecting Pennsylvania Supreme Court's finding that history of child abuse had been presented at trial, noting, "[W]e cannot accept the state court's factual findings.").

[9]  See Pursell v. Horn, 187 F. Supp.2d 260, 381-82 (W.D. Pa. 2002) (habeas relief granted based upon facts submitted by petitioner through affidavits and mental health reports); Jacobs v. Horn, 129 F.Supp.2d 390, 401-04 (M.D. Pa. 2001) (same), subsequent history, 395 F.3d 92 (3d Cir. 2005) (same); Rollins v. Horn, 2005 WL 1806504, *6-*12 (E.D. Pa. July 26, 2005) (same); Smith v. Dugger, 758 F.Supp. 688 (N.D. Fla. 1990) (same), *affirmed* Smith v. Singletary, 61 F.3d 815, 818 n.1 (11th Cir. 1995) ("the district court did not ... commit an abuse of discretion" in denying the state's "request for an evidentiary hearing"); Woods v. Dugger, 923 F.2d 1454, 1460 (11th Cir. 1991) (no need for hearing when petitioner's submissions show petitioner is entitled to relief; in such circumstances, further proceedings "would be a waste of judicial resources").

[10]  See also Smith v. Freeman, 892 F.2d 331, 337 (3d Cir. 1989); Pursell, 187 F. Supp.2d at 325-26.

11

U.S. 399 (1986)).

37.    In 28 U.S. §2254(e)(2), Congress addressed a federal court's ability to hold an evidentiary hearing to decide the merits of a habeas petition. The Supreme Court explained in (Michael) Williams v. Taylor, 529 U.S. 420, 430 (2000), that Section 2254(e)(2) works against a hearing *only* when the petitioner "failed to develop the factual basis of a claim in State court proceedings." Applying basic principles of statutory construction, the Court noted that "[i]n its customary and preferred sense, 'fail' connotes some omission, fault, or negligence on the part of the person who has failed to do something." Williams, 529 U.S. at 431 (citations omitted). The Court further noted:

> To say a person has failed in a duty implies he did not take the necessary steps to fulfill it. He is, as a consequence, at fault and bears responsibility for the failure. In this sense, a person is not at fault when his diligent efforts to perform an act are thwarted, for example, by the conduct of another or by happenstance. Fault lies, in those circumstances, either with the person who interfered with the accomplishment of the act or with no one at all. We conclude Congress used the word "failed" in the sense just described. Had Congress intended a no-fault standard, it would have had no difficulty in making its intent plain. It would have had to do no more than use, in lieu of the phrase "has failed to," the phrase "did not."

Id. 529 U.S. at 432. Thus, the Court concluded, "a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." Id. Here, as described within the individual claims, any failure to develop was not the result of any lack of diligence on Petitioner's part. Thus, Section 2254(e)(2) is not applicable and Petitioner is entitled to a hearing on any claim where the material facts are in dispute.

## STANDARDS REGARDING CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL.

38.    As a number of Petitioner's claims are grounded in allegations that prior counsel were

ineffective, Petitioner submits this statement regarding the standards governing such claims. The Sixth Amendment right to effective assistance of counsel is violated when counsel's performance is deficient, i.e., falls below "an objective standard of reasonableness;" and the defendant is prejudiced, i.e., when confidence is undermined in the outcome of the proceeding. Wiggins, 539 U.S. at 521; Strickland v. Washington, 466 U.S. 668, 694 (1984).

39.    In evaluating counsel's performance, the Court should consider the American Bar Association's Standards for Criminal Justice ("ABA STANDARDS") and Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA GUIDELINES"), which articulate "reasonable" professional "standards for capital defense work" and are the "norms" and "standards to which [the Supreme Court] long ha[s] referred as 'guides to determining what is reasonable'" under the Sixth Amendment. Wiggins, 539 U.S. at 522-25 (citing Strickland; Williams).

40.    The prejudice prong requires Petitioner to show only that "there is a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. As the Supreme Court has stressed: "the adjective is important . . . The question is not whether the defendant would *more likely than not have received* a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434 (1995); see also Strickland, 466 U.S. at 693 ("a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case"); Nix v. Whiteside, 475 U.S. 157, 175 (1986) ("a defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice"). Thus, a "reasonable probability of a different result"

*is less than a preponderance of the evidence.* It is present when an evaluation of all of the evidence that should have been before the jury is "sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 693.

## GROUNDS FOR RELIEF

41.    By this Petition for a Writ of Habeas Corpus, Petitioner submits that his conviction(s) and sentence(s) violate the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

42.    The rulings and decisions of the state courts in this case were contrary to, and/or involved an unreasonable application of, clearly established Federal constitutional law, as determined by the Supreme Court of the United States; and/or were based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

## CLAIMS FOR RELIEF

**CLAIM I.    AS A RESULT OF COUNSEL'S INEFFECTIVENESS AND PROSECUTORIAL MISCONDUCT, READILY AVAILABLE EVIDENCE DEMONSTRATING PETITIONER'S INNOCENCE WAS NOT PRESENTED TO THE JURY IN VIOLATION OF PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.**

43.    The claims and factual allegations set forth in all other sections of this *Petition* are incorporated by reference and realleged as if set forth entirely herein.

44.    As described below, counsel failed to investigate, develop and present readily available evidence directly disputing the prosecution's contention that Petitioner was involved in the murder in violation of Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

**A.    The Legal Standard**

45.    Sixth Amendment ineffective assistance of counsel claims are evaluated under the

14

two-prong test of Strickland v. Washington, 466 U.S. 668 (1984).[11] Petitioner must show: (a) counsel's deficient performance, i.e., that his attorney's performance fell below "an objective standard of reasonableness," id. at 688; and (b) prejudice, i.e., that confidence in the result of the original sentencing proceeding is undermined due to counsel's deficiencies, id. at 694.

**B.    Deficient Performance.**

46.    The duty to investigate is fundamental to counsel's role as an advocate. Counsel has "a duty to bring to bear such skill and knowledge as will render the [proceeding] a reliable adversarial testing process." Strickland, 466 U.S. at 688.  This can be done only if counsel investigates, id. at 691.  This duty to investigate is especially exacting in a capital case, where "counsel's duty to investigate all reasonable lines of defense is strictly observed." Williamson v. Ward, 110 F.3d 1508, 1514 (10th Cir. 1997).

47.    Moreover, a criminal defendant may not be denied the right to a fair opportunity to defend against the state's accusations. Chambers v. Mississippi, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process."); Davis v. Alaska, 415 U.S. 308 (1974); United States v. Cronic, 466 U.S. 648, 656 (1984); Strickland v. Washington, 466 U.S. 668, 684-685 (1984); California v. Trombetta, 467 U.S. 479, 485 (1984)); Rock v. Arkansas, 483 U.S. 44, 51 (1987).  Furthermore, the Eighth Amendment requires that the defendant's rights to be heard and present a defense be given even greater protection in a capital

---

[11] See also Williams v. Taylor, 529 U.S. 362 (2000), Wiggins v. Smith, 539 U.S. 510 (2003), and Rompilla v. Beard, 545 U.S. 374 (2005).

case. See e.g. Beck v. Alabama, 447 U.S. 625 (1980); Ake v. Oklahoma, 470 U.S. 68 (1985); Lockett v. Ohio, 438 U.S. 586, 604 (1978); Hitchcock v. Dugger, 481 U.S. 393, 394 (1987).  Whether by court or prosecution error or trial counsel's ineffectiveness, the denial of these fundamental rights requires relief.

48.    As described below, there existed a plethora of evidence directly disputing the prosecution's contentions that Petitioner was involved in the murder, yet counsel failed to investigate, develop or present that evidence.  Counsel's failure to develop and present the readily available evidence demonstrating Petitioner's innocence constitutes deficient performance.

### 1.    Failure to Challenge Unreliable Forensic Expert Evidence.

49.    The prosecution presented the testimony of William Kinard, a forensics expert from the Alcohol, Tobacco and Firearms Agency who conducted testing on clothing submitted by the police for purposes of determining the presence of gunshot residue.  Mr. Kinard found no elements consistent with gunshot residue on any of Petitioner's (or co-defendant Stevenson's) clothing.  In fact, the only clothing found to contain gunshot residue was the blue coat that belonged to the decedent.  Residue was found on the right, left sleeve and the inside pocket area of that coat.  NT 10/31/96 at 138.  This coat was inside the open rear area of the jeep at the time of the shooting and then briefly placed on top of the decedent after the shooting.

50.    During his testimony, the prosecution asked Mr. Kinard to make a number of speculations in order to explain the absence of residue on Petitioner's (and the co-defendant's) person and clothes.  For example, Mr. Kinard testified that there is a higher likelihood that residue will be found if the shots are fired inside as opposed to outside, speculating that wind or other weather conditions can dissipate gunshot residue.  Id. at 132-35.  Of course, there was no testimony

16

that there were sufficient weather conditions to do so in this case. Similarly, Mr. Kinard testified that you can remove gunshot residue from your hands by washing them or sweating. Id. While there was testimony that Petitioner and the co-defendant ran from the police and that they were sweating, there is no indication that their hands were so soaked in sweat that any residue was completely eliminated. Nor was there any testimony that Petitioner or the co-defendant stopped to wash their hands at any time prior to the arrest and the taking of samples for evaluation. Mr. Kinard also testified that the amount of gunshot residue expelled from an automatic weapon is less than a revolver. Id.

51.    While counsel did cross-examine Mr. Kinard on the presence of gunshot residue on clothing and during that cross-examination Mr. Kinard did acknowledge that residue on clothing would not dissipate until laundered, that is the extent of counsel's challenge of Mr. Kinard's opinions. Id. at 141-44.

52.    Petitioner has obtained the services of a forensics specialist, Dr. Albert Harper, Director of the Henry C. Lee Institute of the University of New Haven. Dr. Harper has reviewed Mr. Kinard's testimony as well as the photographs, police reports and diagrams and other records from this murder. Dr. Harper is troubled by a number of aspects of Mr. Kinard's testimony. First, Mr. Kinard was permitted to speculate on ways in which the gunshot residue might be removed from the hands without any evidence that those speculative methods actually occurred. More importantly, however, while it is true that an automatic weapon would expel less residue than a revolver, in this case, the automatic was fired at least five times in rapid succession. The number of times the weapon was fired was sufficient to cause residue to spread to the area of the jeep, thus explaining

17

the presence of residue on the blue coat inside that jeep.[12] Thus, Dr. Harper would expect to see residue on the clothing of the shooter, particular the cuff area of that clothing, regardless of the presence or absence of any residue on the hands of the shooter.

53.    Accordingly, the forensic testimony presented by the prosecution was incomplete and inherently unreliable. Had counsel been effective, he would have offered a forensic expert to dispute those conclusions.

### 2.    Counsel's Failure to Investigate, Develop and Present Evidence Challenging the Reliability of Prosecution Witnesses Purporting To Connect Petitioner to the Murder.

54.    The prosecution's theory at trial was that Petitioner was the actual shooter. In support of that contention, the prosecution relied on the testimony of three witnesses: Susan Butler, Phillip Hudson, and Debra Dorsey. As described below, there existed evidence directly challenging any connection these witnesses made between Petitioner and the actual shooter and counsel's failure to develop and present that evidence constituted prejudicially deficient performance.

### a.    Evidence Disputing Any Connection Between the Individual Susan Butler Described and Petitioner.

55.    At trial, Susan Butler described the individual she saw shortly after hearing the shots as a black male, "not overly tall" and "somewhat stocky build." NT 10/31/96 at 59. The individual that she saw was wearing a blue shirt and dark pants. Id. at 221. The prosecution argued that Ms. Butler's testimony identified Petitioner as the shooter.

56.    What the prosecution, (and defense counsel), failed to inform the sentencer, however,

---

[12] As Dr. Harper will testify, it is unlikely that the residue on the blue coat was the result of putting the coat on the decedent after the shooting, particularly in light of the location where the residue was found.

was that Ms. Butler *failed to identify Petitioner as the individual she saw on that date* in a photographic lineup conducted a week after the murder. The best she could say was that Petitioner's photograph had the "closest profile" (or the same "shape of head"), of those in the photographic lineup and that, on a scale of one to ten, his photo was a "four." See Exhibit 1 (Report of Det. McClaren, 11/20/95 Interview of Susan Butler); id. (notes from interview of Susan Butler). Thus, contrary to the prosecution's contention, the individual that Ms. Butler saw was *not* Petitioner.

57.     Counsel's only cross-examination of Ms. Butler involved whether she was presented with any clothing by the police to identify. She answered that she was not. Counsel did not, however, ask Ms. Butler if she was shown any photographs, nor did counsel ever present police testimony that she was presented with a photo array containing a picture of Petitioner and failed to identify Petitioner as the individual she saw on the date of the murder. Counsel's failure to present readily available evidence directly disputing any contention that Ms. Butler connected Petitioner to the murder constitutes deficient performance.

### b.     Evidence Disputing Ms. Dorsey-Crowell's Testimony

58.     Debra Dorsey-Crowell, the decedent's fiancee, testified that the night before the murder a black male knocked on her door around 7 pm. At trial, she described the individual as larger than her, but shorter than the decedent, stocky build, wearing a black hat, not a baseball hat, and a black "puffy" coat. NT 10/30/96 at 89-90. She also testified that the next morning, after hearing the gunshots, she saw a stocky man wearing dark clothes running from the decedent. Id. at 102. It was the prosecution's theory that the same man who knocked on the door the night before was the individual that she saw running from the decedent's body on the date of the murder and that the description matched Petitioner. Counsel cross-examined Ms. Dorsey regarding how tall she had

19

told the police the individual was and Ms. Dorsey was unable to recall her statement to the police. During the defense case, counsel presented Detective McClaren who testified that Ms. Dorsey's description of the individual was a black male, six feet tall, no facial hair, wearing a thick insulated type black coat and carrying gloves. NT 11/6/96 at 82.[13]

59.    Moreover, there were a number of avenues of cross-examination arising from Ms. Dorsey's prior statement to the police directly challenging the reliability and credibility of her at-trial testimony. First, following the arrest of Petitioner and Stevenson, the police (Officer Henderson Worthy), created two photographic line-ups, one containing a photograph of Petitioner and one containing a photograph of David Stevenson. At approximately 10:13 am on the date of the murder, the police presented these photo arrays to Ms. Dorsey. While she indicated that she recognized Stevenson's photograph, (and noted that she worked with him), *she did not identify Petitioner as the individual that she saw on the evening before the murder or the morning of the murder*. See Exhibit 2 (Notes from Police Photo Line-up). Yet, counsel failed to bring out her failure to identify Petitioner during cross-examination of Ms. Dorsey, or through any of the police witnesses.

60.    Also contained in Ms. Dorsey's statement to the police are clear indicia of Ms. Dorsey's personal bias against African Americans, further calling into question the reliability and credibility of her purported "identification" testimony. For example, when the police asked if the individual she saw the night before was the same person she saw the morning of the murder, Ms. Dorsey responded:

> I, I think it was the same person cause he looked like the same height, but ***they all look the same***, so

---

[13] Petitioner's arrest photograph, admitted into evidence by the prosecution, indicates that he had facial hair on the date of the murder.

Exhibit 3. Other references display, at a minimum, questionable racial bias on Ms. Dorsey's part. For example, when she was describing what the individual who knocked on her door did as he left, she stated, "You know *how they kind of go*? . . . You know *how they do that with their hands* sometimes?" Later, she stated:

> And I waited for him to call back and I said, do you know a black guy named Tim? *A big black guy* because he was wearing a big, one of those big Polar Bear coats *whatever they wear*.

Id. And, finally, as she did at Petitioner's trial, Ms. Dorsey described the coat as a "shoplifting coat." While not as blatant as the "all look alike" comment, these other characterizations (and generalizations) are clear inferences of racial bias, further diminishing the reliability and credibility of her testimony. Yet, the jury did not hear this evidence because trial counsel ineffectively failed to cross-examine Ms. Dorsey on these issues.

> **3.    Counsel's Failure to Develop and Present Available Evidence Disputing the Prosecution's Contention that Petitioner's Reserve Status Made Him More Likely to Have Committed the Murder.**

61.    Sgt. Wohlgemuth was called by the prosecution to testify regarding contents of Petitioner's reserve records, including his rank, (specialist), and clothing records indicating his size. NT 10/31/96 at 13; id. at 17. Sgt. Wohlgemuth also testified that the camouflage coat seized by the police was not available until approximately two to three years before Petitioner's first trial in 1996, and, as a result, was not available when Petitioner was issued clothing. Id. at 15. Indeed, the witness testified that the coat seized by the state was not indicated in any of Petitioner's records. Id. at 26-27. Counsel also brought out on cross-examination that the specialist rank was a common rank in the reserves and that at least twenty percent of the reservists at his base held that rank. Id. at 29.

62.    Similarly, the prosecution asked Sgt. Wohlmeguth a number of questions regarding

21

weapons qualifications and elicited testimony that Petitioner was required to qualify on a yearly basis. NT 10/31/96 at 14-15. The prosecution then argued that Petitioner's familiarity with weapons in his service in the reserves was evidence supporting its contention that Petitioner shot the decedent. NT 11/12/96 at 69. While counsel did elicit testimony from Sgt. Wohlgemuth that the weapons training did not involve pistols, (such as the automatic pistol used in the murder in this case), NT 10/31/96 at 23, and there was brief testimony that Petitioner was assigned to the medic unit, not an infantry position, counsel failed to present any other evidence regarding the extent of Petitioner's work and assignments in the reserves.

63.    Had counsel contacted Petitioner's commanding officer, Delores Sapp, he would have learned that Petitioner was in the medic unit because it was his desire to go into the medical field. See Exhibit 23 (Statement of Delores Sapp). Ms. Sapp further states Petitioner had no interest whatsoever in weapons of any kind. Instead, he was concerned with healing and his focus in training was in the medical field, not infantry or any other combat training. Id. Accordingly, contrary to the obvious inferences from the prosecution's evidentiary presentation and argument, Mr. Manley's reserve service fails to even remotely connect Petitioner to this murder and counsel's failure to develop and present evidence demonstrating this constitutes deficient performance.

### 4.    Counsel's Failure to Investigate, Develop and Present Available Evidence Disputing the Prosecution Theory That Petitioner was the Shooter.

64.    As described above, it was the prosecution's theory that Petitioner shot the decedent on behalf of co-defendant Stevenson. The prosecution contended that Petitioner and Stevenson, went to the Cavalier apartments, that Petitioner shot the decedent, and, that Petitioner and Stevenson were returning to Stevenson's home when the Wilmington police found them.

22

65.    As a result of counsel's failure to conduct a constitutionally required investigation, compelling evidence supporting Petitioner's innocence and directly disputing the prosecution's theory was not presented to the fact-finder. For example, counsel knew of other witnesses identifying persons other than Petitioner as the perpetrator through the police paperwork, but failed to present those witnesses. For example, Jessica Wing, also a resident of the Cavalier Apartments at the time of the murder, looked out of her window shortly after hearing shots and saw a dark car leaving the parking lot. While she was unable to identify the individuals within the car, she did observe that the driver of the vehicle had white hands. See Exhibit 4 (Supplemental Report, Det. Donovan, 11/20/95; Summary of Statement of Jessica Wing). Carol Schweda, also a former resident of Cavalier Apartments, told the police that shortly before the shooting, (at 7:15 am), she was leaving for work and saw a white male in a dark colored vehicle in the parking lot. Marlene Farmer, also a resident of Cavalier Apartments at the time of the murder, told the police that, after hearing shots, she looked out of her window and saw a white male walking quickly away from the decedent and then get into a dark colored car and exit the scene. See Exhibit 5 (Report of Det. Watson, 12/2/95; Summary of Statement of Marlene Farmer). Finally, Susan Brown told the police that she observed a black male, tall, slender, wearing a blue cap that goes over the ears and navy blue clothes commit the shooting and then go, (on foot), towards the rear of Building 10A. See Exhibit 37. Thus, there existed evidence from which the factfinder could conclude that someone of a completely different race than Petitioner actually shot the decedent, yet counsel failed to investigate or present that evidence. Counsel's failure to do so constitutes deficient performance.

66.    Moreover, the police paperwork provided counsel with another individual with closer ties to the co-defendant, the individual with the purported motive, who also had ties to the military,

and, thus access to military clothing and familiarity with weapons, who lived and worked near the scene of the murder, and, acknowledged being at the scene of the murder shortly before 8:00 a.m. on the date of the murder. That individual was George Stevenson, David Stevenson's cousin. See Exhibit 6 (Interview of George Stevenson, 11/21/95). George told the police that he lived near the Cavalier Apartments and worked at Champs in the Christiana Mall and that, on the date of the murder, he was scheduled to appear at work at 8:00 am. Id. George also told the police that he was in the Army Reserves. Id. He also told the police that he and David grew up together and were very close. He also told the police that David was looking for him (George) shortly before the murder and that they got together on that Thursday evening. Finally, he told the police that he was scheduled to work at 8:00 am on the date of the murder and that he was in the vicinity of the murder site that morning. Id. Moreover, Petitioner will demonstrate at an evidentiary hearing that George meets the descriptions of a number of the eyewitnesses. Thus, the police handed to defense counsel someone with much closer ties to the co-defendant, (and, thus, someone with much more reason to help the co-defendant avoid the theft prosecution), who had similar ties to the military, similar access to the military clothing found in Stevenson's car and similar familiarity with weapons.

67.    The police paperwork also indicated that Tiarra Koston saw David Stevenson on the morning of the murder shortly after 8:00 am driving (alone) at a normal rate of speed on Washington Street in Wilmington going from 17th Street towards 18th Street. Mr. Stevenson's home was located in the 200 block of West 20th Street. See Exhibit 7.

68.    Presented with this evidence, a factfinder could have concluded that, contrary to the prosecution's theory, David Stevenson was accompanied by George Stevenson, not Petitioner, at the time of the murder. And, once the murder was completed, David Stevenson dropped George off at

24

his home, located nearby, so that George could go on to work as scheduled, then returned to Wilmington where he picked up Petitioner. Counsel's failure to investigate, develop and present this evidence constitutes deficient performance.

### C.    Prejudice.

69.    The prejudice prong of the <u>Strickland</u> test requires the defendant to show that "there is a *reasonable* probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694. The evidence described above demonstrates far more than a preponderance of the evidence that counsel's failure to adequately investigate, develop and present evidence of Petitioner's innocence and directly disputing the prosecution's contention that Petitioner was involved in the murder compromised the reliability of the verdict. As described above, while it was counsel's theory that Petitioner was not involved, they did little to contest the prosecution's evidence, although compelling evidence existed that would have done so. Also as described above, despite the existence of additional evidence demonstrating that someone other than Petitioner committed the shooting, counsel failed to marshal that evidence or present it to the factfinder. Had that evidence been presented, there is at least a reasonable probability that the verdict would have been different.

70.    The above-described errors, individually and cumulatively, provide compelling bases for doubting the reliability of the verdict. Indeed, as the above-described evidence demonstrates, there is more than a reasonable probability that Petitioner is innocent and, but for the abject failures of counsel, that would have been palpable to the jury. Where, as here, the prosecution had no physical evidence – or any other competent evidence – directly connecting Petitioner to the murder, the denial of Petitioner's federal constitutional rights is manifest and requires grant of relief, or at

a minimum, an evidentiary hearing.

### D.    The State Court Proceedings.

71.    This claim has been raised in the presently-pending *Motion for Postconviction Relief Pursuant to Superior Court Criminal Rule 61, and Consolidated Memorandum of Law* which was filed in the Delaware Superior Court on January 25, 2008.

**CLAIM II.**    **TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE, DEVELOP AND PRESENT AVAILABLE EVIDENCE DISPUTING AGGRAVATION IN VIOLATION OF PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.**

72.    The claims and factual allegations set forth in all other sections of this *Petition* are incorporated by reference and realleged as if set forth entirely herein.

73.    As described below, counsel failed to investigate, develop and present readily available evidence directly disputing the aggravation presented by the prosecution and found by the sentencer in reaching the determination that death was the appropriate verdict in violation of Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

### A.    The Legal Standard

74.    Sixth Amendment ineffective assistance of counsel claims are evaluated under the two-prong test of Strickland v. Washington, 466 U.S. 668 (1984).[14] Petitioner must show: (a) counsel's deficient performance, i.e., that his attorney's performance fell below "an objective standard of reasonableness," id. at 688; and (b) prejudice, i.e., that confidence in the result of the original sentencing proceeding is undermined due to counsel's deficiencies, id. at 694.

### B.    Deficient Performance.

_____

[14] See also Williams v. Taylor, 529 U.S. 362 (2000), Wiggins v. Smith, 539 U.S. 510 (2003), and Rompilla v. Beard, 545 U.S. 374 (2005).

26

75. Defense counsel in a capital case has a fundamental duty to make "efforts to discover all reasonably available . . . evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES 11.4.1.C (1989), quoted in Rompilla v. Beard, 545 U.S. 374, 387 n.7 (2005); Wiggins v. Smith, 539 U.S. 510, 524 (2003). Similarly, the fundamental right of an accused to present witnesses in his own defense is an essential attribute of our adversary system of justice." Government of the Virgin Islands v. Mills, 956 F.2d 443, 445 (3d Cir. 1992) Indeed, there is no question that the Constitution guarantees an accused "a meaningful opportunity to present a complete defense." California v. Trombetta, 467 U. S. 479, 485 (1984). That right is grounded in the Due Process, Compulsory Process, and Confrontation Clauses. See Chambers v. Mississippi, 476 U.S. 683, 690 (1986); Washington v.Texas, 388 U.S. 14, 23 (1967); Davis v. Alaska, 415 U.S. 308 (1974); In re Oliver 333 U. S. 257, 273 (1914).

76. As described below, there existed a plethora of evidence directly disputing the aggravation presented by the prosecution, yet counsel failed to investigate, develop or present that evidence during the sentencing hearing. Counsel's failure to develop and present the readily available evidence directly challenging the aggravation pursued by the prosecution violated these fundamental principles.

### 1. Failure to Challenge Unreliable Forensic Expert Evidence.

77. During the penalty hearing, the prosecution presented the prior testimony of William Kinard, a forensics expert from the Alcohol, Tobacco and Firearms Agency in support of the statutory aggravators. Mr. Kinard conducted testing on clothing submitted by the police for purposes of determining the presence of gunshot residue. Mr. Kinard found no elements consistent with

27

gunshot residue on any of Petitioner's (or co-defendant Stevenson's) clothing. In fact, the only clothing found to contain gunshot residue was the blue coat that belonged to the decedent. Residue was found on the right, left sleeve and the inside pocket area of that coat. NT 11/21/05 at 43. This coat was inside the open rear area of the jeep at the time of the shooting and then briefly placed on top of the decedent after the shooting.

78.    During his testimony, the prosecution asked Mr. Kinard to make a number of speculations in order to explain the absence of residue on Petitioner's (and the co-defendant's) person and clothes. For example, Mr. Kinard testified that there is a higher likelihood that residue will be found if the shots are fired inside as opposed to outside, speculating that wind or other weather conditions can dissipate gunshot residue. Id. at 33-36. Of course, there was no testimony that there were sufficient weather conditions to do so in this case. Similarly, Mr. Kinard testified that you can remove gunshot residue from your hands by washing them or sweating. Id. While there was testimony that Petitioner and the co-defendant ran from the police and that they were sweating, there is no indication that their hands were so soaked in sweat that any residue was completely eliminated. Nor was there any testimony that Petitioner or the co-defendant stopped to wash their hands at any time prior to the arrest and the taking of samples for evaluation. Mr. Kinard also testified that the amount of gunshot residue expelled from an automatic weapon is less than a revolver. Id.

79.    While counsel did cross-examine Mr. Kinard on the presence of gunshot residue on clothing and during that cross-examination Mr. Kinard did acknowledge that residue on clothing would not dissipate until laundered; that is the extent of counsel's challenge of Mr. Kinard's opinions. Id. at 43-44.

80.     Petitioner has obtained the services of a forensics specialist, Dr. Albert Harper, Director of the Henry C. Lee Institute of the University of New Haven. Dr. Harper has reviewed Mr. Kinard's testimony as well as the photographs, police reports and diagrams and other records from this murder. Dr. Harper is troubled by a number of aspects of Mr. Kinard's testimony. First, Mr. Kinard was permitted to speculate on ways in which the gunshot residue might be removed from the hands without any evidence that those speculative methods actually occurred. More importantly, however, while it is true that an automatic weapon would expel less residue than a revolver, in this case, the automatic was fired at least five times in rapid succession. The number of times the weapon was fired was sufficient to cause residue to spread to the area of the jeep, thus explaining the presence of residue on the blue coat inside that jeep.[15] Thus, Dr. Harper would expect to see residue on the clothing of the shooter, particular the cuff area of that clothing, regardless of the presence or absence of any residue on the hands of the shooter.

81.     Accordingly, the forensic testimony presented by the prosecution was incomplete and inherently unreliable. Had counsel been effective, he would have offered a forensic expert to dispute those conclusions.

**2.      Counsel's Elicitation of Affirmatively Harmful, and False, Testimony Regarding the Camouflage Jacket and Counsel's Failure to Develop and Present Available Evidence Disputing the Prosecution's Contention that the Camouflage Jacket Belonged to Petitioner or that Petitioner's Reserve Status Made Him More Likely to Have Committed the Murder.**

82.     The police found a camouflage jacket in the trunk of Stevenson's car. The jacket had a pin on it that indicated a specialist rank. Inside a pocket of that jacket was a blue pouch that

---

[15] As Dr. Harper will testify, it is unlikely that the residue on the blue coat was the result of putting the coat on the decedent after the shooting, particularly in light of the location where the residue was found.

contained a clip with bullets of the same caliber and make used in the murder. It was the prosecution's theory that, because Petitioner was in the Reserves, (as a medic), this jacket belonged to Petitioner and, therefore, Petitioner was the shooter. The prosecution presented two witnesses in an effort to prove its contention: the prior testimony of Sergeant Richard Wohlgemuth, (who, at the time of his testimony, was assigned to the personnel administration of the 348th General Hospital Unit at Pedricktown, New Jersey, where Petitioner had been stationed prior to his arrest), NT 11/18/05 at 209-18; and the testimony of Lieutenant Colonel Henry Kemp Vye, of the Delaware National Guard, NT 11/18/05 at 35-48.

83.    Sgt. Wohlgemuth's prior testimony involved Petitioner's records, including his rank, (specialist), and clothing records indicating his size. NT 11/18/05 at 213; id. at 218. Sgt. Wohlgemuth also testified that the camouflage coat seized by the police was not available until approximately two to three years before Petitioner's first trial in 1996, and, as a result, was not available when Petitioner was issued clothing. NT 11/18/05 at 215-16. Indeed, the witness testified that the coat seized by the state was not indicated in any of Petitioner's records. Id. at 227. Counsel also brought out on cross-examination that the specialist rank was a common rank in the reserves and that at least twenty percent of the reservists at his base held that rank. Id. at 229.

84.    The prosecution called Lieutenant Colonel Henry Kemp Vye, of the Delaware National Guard to testify that the pin on the camouflage jacket seized by the state indicated a Specialist rank. NT 11/18/05 at 37-38. Remarkably, during cross-examination, counsel actually elicited testimony from this witness indicating that the camouflage jacket seized by the state was one of the jackets referenced on Petitioner's reserve clothing form. Id. at 44. Thus, whatever efforts made by prior counsel during the 1996 testimony of Sgt. Wohlgemuth was effectively sabotaged by

Petitioner's own attorney. As a result of counsel's reckless cross-examination, the prosecution was able to, and did, argue that the coat found in the car was issued to Petitioner by the reserves. See NT 12/5/05 at 34.

85.     Moreover, despite Lt. Col. Vye's speculation, the truth is that the coat seized by the state was not issued to Petitioner. Had counsel merely spoken with persons familiar with the clothing issued to Petitioner and the relevant paperwork, including the exhibit admitted by counsel during Lt. Col. Vye's testimony, they would have learned that neither of the coats indicated on Petitioner's clothing form were the coat seized by the state. See Exhibit 8 (Affidavit of Jacqueline Armstead). Thus, contrary to the testimony of Lt. Col. Vye and the prosecution's argument, that coat was never issued to Petitioner and the prosecution's view that it belonged to Petitioner was not supported in any document in Petitioner's reserve records.

86.     Counsel's failure to marshal the readily available evidence demonstrating that this coat was not issued to Petitioner, in and of itself, constitutes prejudicially deficient performance. Counsel's reckless cross-examination, eliciting speculative testimony indicating that the coat was actually issued to Petitioner when, in fact, it was not, transcended mere deficient performance and sank to the level of actually *advocating against his client's interest*. See, e.g. United States v. Swanson, 943 F.2d 1070, 1074 (9th Cir. 1991) (telling jury during closing that there was no reasonable doubt regarding defendant's identity as the perpetrator resulted in constructive denial of counsel); Rickman v. Bell, 131 F.3d 1150, 1160 (6th Cir. 1997) (repeated statements in direct contravention of client's interests during murder trial constitutes "the evisceration of the right-to-counsel").

87.     Similarly, during the prior testimony of Sgt. Wohlgemuth, the prosecution made a

31

great deal of Petitioner's Reserve status and his yearly weapons qualifications, contending that this experience supported the prosecution theory that Petitioner committed the murder. See NT 11/18/05 at 214-15. See also NT 12/5/05 at 21 (noting Petitioner's reserve experience and arguing that Petitioner was "doing recon"). While counsel during the 1996 trial did elicit testimony from Sgt. Wohlgemuth that the weapons training did not involve pistols, (such as the automatic pistol used in the murder in this case), and there was brief testimony that Petitioner was assigned to the medic unit, not an infantry position, 2005 counsel failed to present any other evidence regarding the extent of Petitioner's work and assignments in the reserves.

88.    Had counsel contacted Petitioner's commanding officer, Delores Sapp, he would have learned that Petitioner was in the medic unit because it was his desire to go into the medical field. See Exhibit 23 (Statement of Delores Sapp). Ms. Sapp further states Petitioner had no interest whatsoever in weapons of any kind. Instead, he was concerned with healing and his focus in training was in the medical field, not infantry or any other combat training. Id. Accordingly, contrary to the obvious inferences from the prosecution's evidentiary presentation and argument, Mr. Manley's reserve service fails to even remotely connect Petitioner to this murder and counsel's failure to develop and present evidence demonstrating this constitutes deficient performance.

**3.    Counsel's Elicitation of Affirmatively Harmful, And Materially Misleading, Testimony Regarding Phillip Hudson's Purported Identification of Petitioner.**

89.    Phillip Hudson, a resident of the Cavalier Apartments, testified during the guilt-phase in 1996. The prosecution admitted the transcript of his testimony during the 2005 trial. NT 11/17/05 at 33-37. On direct examination, Mr. Hudson testified that, after hearing shots, he saw a stocky black male wearing a blue sweatshirt, jeans, white high-top sneakers and what appeared to be a

baseball hat running across the parking lot. NT 11/17/05 at 33-37. He further testified that he saw the male get into the passenger side of a car in the lot. When asked, he stated that the car was either a ford escort, tempo or mercury topaz. Id. at 37. On cross-examination, Mr. Hudson acknowledged that he had told the police shortly after the shooting that the man he saw was six feet tall and 225-250 pounds. NT 11/17/05 at 56-57. In an apparent attempt to further impeach Mr. Hudson's prior testimony, counsel called Detective Weldon to testify regarding the contents of the police report of the interview of Mr. Hudson. NT 11/29 05 at 64-65.[16] Rather than focusing Detective Weldon on only those aspects of the report relevant to the intended impeachment, counsel asked the detective to read the entire summary. As a result, the detective read the part of the summary indicating that Mr. Hudson had identified Petitioner from a photographic lineup, a fact not previously admitted by the prosecution. Thus, while counsel did elicit descriptive discrepancies, (already presented in the cross-examination of Mr. Hudson), he also brought out affirmatively harmful, and *otherwise inadmissible* hearsay testimony connecting Petitioner to the crime.

90.    Moreover, had counsel conducted even a cursory investigation, they would have learned that, although the police report contended that Mr. Hudson identified Petitioner's photograph, when asked by the defense investigator hired by prior trial counsel, Mr. Hudson told that investigator that he was only "pretty sure" that Petitioner was the individual he saw on the date of the murder. Thus, contrary to the testimony erroneously and ineffectively elicited by counsel, Mr.

---

[16] Mr. Hudson's police interview was taped. There is no indication that the tape was ever provided to counsel. Petitioner will be requesting this tape and other items that were never turned over in a separate discovery motion. The prosecution did, apparently, provide a purported transcript of that interview (although there appear to be gaps). For reasons known only to counsel, counsel did not ask the detective to read from the transcript but, instead, the police summary.

Hudson's identification was no identification at all. Nevertheless, because of counsel's ineffectiveness, the jury was left with a very clear impression that Mr. Hudson did identify Petitioner.

91.    Once again, counsel's conduct transcended mere deficient performance and sank to the level of actually *advocating against his client's interest. See, e.g.* Swanson, 943 F.2d at 1074; Rickman v. Bell, 131 F.3d at 1160.

### 4.    Counsel's Failure to Investigate, Develop and Present Evidence Challenging the Reliability of Prosecution Witnesses Purporting To Connect Petitioner to the Murder.

92.    The prosecution's theory was that Petitioner was the actual shooter. In support of that contention, the prosecution relied on the testimony of three witnesses: Susan Butler, Phillip Hudson, and Debra Dorsey. As described below, there existed evidence directly challenging any connection these witnesses made between Petitioner and the actual shooter and counsel's failure to develop and present that evidence constituted prejudicially deficient performance.

a.    *Evidence Disputing Any Connection Between the Individual Susan Butler Described and Petitioner.*

93.    Susan Butler described the individual she saw shortly after hearing the shots as a black male, average height, not heavyset, but "a little bit more muscular around his shoulder and chest area." NT 11/16/05 at 214. The individual that she saw was wearing a royal blue shirt and dark pants. Id. at 221. The prosecution argued that Ms. Butler's testimony identified Petitioner as the shooter. NT 12/5/05 at 24; id. at 119.

94.    What the prosecution, (and defense counsel), failed to inform the sentencer, however, was that Ms. Butler *failed to identify Petitioner as the individual she saw on that date* in a photographic lineup conducted a week after the murder. The best she could say was that Petitioner's

34

photograph had the "closest profile" (or the same "shape of head"), of those in the photographic lineup and that, on a scale of one to ten, his photo was a "four." See Exhibit1 (Report of Det. McClaren, 11/20/95 Interview of Susan Butler); id. (notes from interview of Susan Butler). Thus, contrary to the prosecution's contention, the individual that Ms. Butler saw was *not* Petitioner.

95.    Although counsel asked Ms. Butler if she was shown photographs by the police, when she said that she did not view any photographs other than what was in the newspapers, counsel did nothing to impeach her testimony or bring out her prior failure to identify Petitioner as the individual she saw on the date of the murder. Counsel's failure to present readily available evidence directly disputing any contention that Ms. Butler connected Petitioner to the murder constitutes deficient performance.

        *b.    Evidence Disputing any Purported Identification by Phillip Hudson*

96.    As described above, the "identification" by Phillip Hudson was brought out by *Petitioner's counsel*, during questioning of Detective Weldon. Also as described above, counsel's presentation of that hearsay was in, and of itself, deficient. Nevertheless, once the cat was out of the bag, counsel was obliged to present the correct information about that identification. While the police summary indicated that Mr. Hudson "identified" Petitioner's photograph, when asked by the defense investigator, Mr. Hudson stated that he was "pretty sure," that Petitioner was the individual he saw on the date of the murder. In light of the vast discrepancies in his description and Petitioner's appearance, "pretty sure" may be close, but it is hardly a positive identification.

97.    Moreover, there were other aspects of Mr. Hudson's testimony that bear against any finding that his "identification" was reliable. For example, while Mr. Hudson's prior testimony indicated that the car he saw was either a ford escort, a tempo or a mercury topaz, notes from his

initial interview with the police indicates that he described the vehicle he saw the individual get into as a ford escort *hatchback*, quite a different make and model car from a tempo. See Exhibit 9 (Report of Det. Donovan). It was not until after Petitioner's and the co-defendant's arrest that Mr. Hudson's statement changed to include a tempo or topaz. See Exhibit 10 (Statement of Phillip Hudson).

98.     Thus, Mr. Hudson's initial description was of an entirely different person and an entirely different vehicle. Yet, counsel did nothing to present this evidence and, as a result, the prosecution was able to argue that Mr. Hudson identified Petitioner when that was not the truth, and also was able to argue that Mr. Hudson put Petitioner in a vehicle similar to that owned by the co-defendant when that was not the case. Counsel's failure to present this evidence constitutes deficient performance.

         c.     *Evidence Disputing Ms. Dorsey-Crowell's Testimony*

99.     Debra Dorsey-Crowell, the decedent's fiancee, testified that the night before the murder a black male knocked on her door around 7 pm. At trial, she described the individual as stocky, not tall, wearing a black baseball cap or "hat of some sort," and black coat. NT 11/16/05 at 156. She also testified that the individual had a "scruffy" face, "like a beard or just a scruffy face." Id. She described the coat as "puffy"[17] and agreed with counsel when he asked if it was "fiber-filled, kind of Michelin tire guy." Id. at 181-82. Ms. Dorsey testified that the next day she heard shots, looked out of her window and saw a black male wearing "all dark clothing" running from the body. Id. at 162. She further testified that the individual was short and stocky. When asked, she testified

---

[17] Ms. Dorsey also characterized the coat as a "shoplifting coat," NT 11/16/05 at 181-82. Counsel failed to object or request a curative instruction.

36

that the clothing was black. Id. at 163. It was the prosecution's theory that the same man who knocked on the door the night before was the individual that she saw running from the decedent's body on the date of the murder and that the description matched Petitioner. NT 12/5/05 at 21-23. Other than confirming that the coat was a Michelin-type, counsel asked little or nothing of Ms. Dorsey regarding her description of the individual she saw the night before or day of the murder.

100.    There was, however, a plethora of avenues of cross-examination arising from Ms. Dorsey's contacts with the police directly disputing the reliability and credibility of her at-trial testimony.

101.    First, following the arrest of Petitioner and Stevenson, the police (Officer Henderson Worthy), created two photographic line-ups, one containing a photograph of Petitioner and one containing a photograph of David Stevenson. At approximately 10:13 am, the police presented these photo arrays to Ms. Dorsey. While she indicated recognizing Stevenson's photograph, (and noted that she worked with him),[18] *she did not identify Petitioner as the individual that she saw on the evening before the murder or the morning of the murder.* See Exhibit 2 (Notes from Police Photo Line-up). Yet, counsel failed to bring out her failure to identify Petitioner during cross-examination of Ms. Dorsey, or through any of the police witnesses.

102.    Similarly, in her statement, Ms. Dorsey told the police that the individual she saw outside her door the night before the murder was *6 feet tall*. See Exhibit 3 (Transcript of Statement of Debra Dorsey taken by Detective McLaren, 11/13/95). She did not describe the individual as "stocky," or any other build and, instead, could only describe the clothing the individual wore.

---

[18]  When asked for a scale regarding whether or not Mr. Stevenson's picture was the person she saw, Ms. Dorsey said it was a 6 out of 10 that he was the person at the door. Nothing even close is noted regarding the photo array containing Petitioner's photograph.

Moreover, Ms. Dorsey told the police that *the individual did not have any facial hair*. Id.

Photographs of Petitioner on the date of his arrest indicate that Petitioner did, indeed, have facial

hair. See Exhibit 11 (Photograph of Michael Manley). Thus, her description changed from the date

of the offense to the time of trial in a manner that was very convenient for the prosecution's theory.

Yet, counsel brought out none of these discrepancies.

103.    Also contained in Ms. Dorsey's statement to the police is clear indicia of Ms.

Dorsey's personal bias against African Americans, further calling into question the reliability and

credibility of her purported "identification" testimony. For example, when the police asked if the

individual she saw the night before was the same person she saw the morning of the murder, Ms.

Dorsey responded:        I, I think it was the same person cause he looked like
                         the same height, but *they all look the same*, so

Exhibit 3. Other references display, at a minimum, questionable racial bias on Ms. Dorsey's part.

For example, when she was describing what the individual who knocked on her door did as he left,

she stated, "You know *how they kind of go?* . . . You know *how they do that with their hands*

sometimes?" Later, she stated:

> And I waited for him to call back and I said, do you know a black guy named Tim?
> *A big black guy* because he was wearing a big, one of those big Polar Bear coats
> *whatever they wear*.

Id. And, finally, as she did at Petitioner's trial, Ms. Dorsey described the coat as a "shoplifting coat."

While not as blatant as the "all look alike" comment, these other characterizations (and

generalizations) are clear inferences of racial bias, further diminishing the reliability and credibility

of her testimony. Yet, the sentencer did not hear this evidence because trial counsel ineffectively

failed to cross-examine Ms. Dorsey on these issues.

38

**5.    Counsel's Failure to Investigate, Develop and Present Available Evidence Disputing the Prosecution Theory That Petitioner was the Shooter.**

104.    As described above, it was the prosecution's aggravation theory that Petitioner shot the decedent on behalf of co-defendant Stevenson.  The prosecution contended that Petitioner and Stevenson, went to the Cavalier Apartments, that Petitioner shot the decedent, and, that Petitioner and Stevenson were returning to Stevenson's home when the Wilmington police found them.  The prosecution argued that there was no evidence of anyone else being involved.  NT 12/5/05 at 109-110.

105.    As a result of counsel's failure to conduct a constitutionally required investigation, compelling evidence directly disputing the prosecution's theory that Petitioner was the shooter was not presented to the fact-finder.  First, counsel failed to present the testimony of Dorothy Hackett, a resident of the Cavalier Apartments, who looked out of her window shortly after hearing the shots fired and observed an individual she identified as David Stevenson armed with a handgun and wearing all dark clothing, including dark shoes, cross the parking lot and then get into the driver's side of a car and drive off.  She could not tell if there was anyone else in the car.  While she did not get the entire plate number, she did see the numbers 6, 8 and 9 on the license plate.  See NT Video Trial Testimony, D. Hackett, 11/8/96 at 7-11.  See also Exhibit 12    (Statement of Dorothy Hackett, 11/13/95); Exhibit 13 (Notes of Photo Lineup of Dorothy Hackett).  Counsel had the benefit of both the police statements and a videotaped deposition of Ms. Hackett from the prior trial, but failed to make any arrangements to bring Ms. Hackett in to testify before the sentencer.  Counsel's failure to present a witness identifying someone other than Petitioner as the shooter, particularly where the aggravation pursued by the prosecution was based on the theory that Petitioner was the actual

39

shooter, constitutes deficient performance.

106.    Counsel also knew of other witnesses identifying persons other than Petitioner as the perpetrator through the police paperwork, but failed to present those witnesses. For example, Jessica Wing, also a resident of the Cavalier Apartments at the time of the murder, looked out of her window shortly after hearing shots and saw a dark car leaving the parking lot. While she was unable to identify the individuals within the car, she did observe that the driver of the vehicle had white hands. See Exhibit 4 (Supplemental Report, Det. Donovan, 11/20/95; Summary of Statement of Jessica Wing). Carol Schweda, also a former resident of Cavalier Apartments, told the police that shortly before the shooting, (at 7:15 am), she was leaving for work and saw a white male in a dark colored vehicle in the parking lot. Marlene Farmer, also a resident of Cavalier Apartments at the time of the murder, told the police that, after hearing shots, she looked out of her window and saw a white male walking quickly away from the decedent and then get into a dark colored car and exit the scene. See Exhibit 5 (Report of Det. Watson, 12/2/95; Summary of Statement of Marlene Farmer). Thus, there existed evidence from which the factfinder could conclude that someone other than Petitioner shot the decedent, yet counsel failed to investigate or present that evidence to dispute the prosecution's aggravation. Counsel's failure to do so constitutes deficient performance.

107.    Moreover, the police paperwork provided counsel with another individual with closer ties to the co-defendant, the individual with the purported motive, who also had ties to the military, and, thus access to military clothing and familiarity with weapons, who lived and worked near the scene of the murder, and, acknowledged being at the scene of the murder shortly before 8:00 on the date of the murder. That individual was George Stevenson, David Stevenson's cousin. See Exhibit 6 (Interview of George Stevenson, 11/21/95).

40

108.    George told the police that he lived near the Cavalier Apartments and worked at Champs in the Christiana Mall and that, on the date of the murder, he was scheduled to appear at work at 8:00 am. Id. George also told the police that he was in the Army Reserves. Id. He also told the police that he and David grew up together. He also told the police that David was looking for him (George) shortly before the murder and that they got together on that Thursday evening. Finally, he told the police that he was scheduled to work at 8:00 am on the date of the murder and that he was in the vicinity of the murder site that morning. Id. Moreover, Petitioner will demonstrate at an evidentiary hearing that George meets the descriptions of a number of the eyewitnesses. Thus, the police handed to defense counsel someone with much closer ties to the co-defendant, (and, thus, someone with much more reason to help the co-defendant avoid the theft prosecution), who had similar ties to the military, similar access to the military clothing found in Stevenson's car and similar – if not more – familiarity with weapons.

109.    The police paperwork also indicated that Tiarra Koston saw David Stevenson on the morning of the murder shortly after 8:00 am driving (alone) at a normal rate of speed on Washington Street in Wilmington going from 17th Street towards 18th Street. Mr. Stevenson's home was located in the 200 block of West 20th Street.

110.    Presented with this evidence, a factfinder could have concluded that, contrary to the prosecution's theory, David Stevenson was accompanied by George Stevenson, not Petitioner, at the time of the murder. And, once the murder was completed, David Stevenson dropped George off at his home, located nearby, so that George could go on to work as scheduled, then returned to Wilmington where he picked up Petitioner. Counsel's failure to investigate, develop and present this evidence constitutes deficient performance.

41

### C.    Prejudice.

111.    The evidence described above demonstrates far more than a preponderance of the evidence that counsel's failure to adequately investigate, develop and present compelling evidence directly disputing the aggravation pursued by the prosecution compromised the reliability of the sentencing verdict.  As described above, while it was counsel's theory that Petitioner was not the shooter, they did little or nothing to contest the prosecution's evidence purporting to establish that Petitioner was the shooter, although compelling evidence existed that would have done so.  Also as described above, despite the existence of additional evidence demonstrating that someone other than Petitioner committed the shooting, counsel failed to marshal that evidence or present it to the factfinder.  Had that evidence been presented, there is at least a reasonable probability that the sentencing determination would have been different.  Thus, Petitioner has demonstrated prejudice.

### D.    Conclusion

112.    The above-described errors, individually and cumulatively, provide compelling bases for doubting the reliability of the sentencing verdict.  Indeed, as the above-described evidence demonstrates, there is more than a reasonable probability that Petitioner was not the shooter and, but for the abject failures of counsel, that would have been palpable to the sentencer.  Accordingly, the denial of Petitioner's federal constitutional rights is manifest and requires grant of relief, or at a minimum, an evidentiary hearing.

### E.    The State Court Proceedings.

113.    This claim has been raised in the presently-pending *Motion for Postconviction Relief Pursuant to Superior Court Criminal Rule 61, and Consolidated Memorandum of Law* which was filed in the Delaware Superior Court on January 25, 2008.

42

**CLAIM III.    THE STATE'S FAILURE TO DISCLOSE EXCULPATORY IMPEACHMENT EVIDENCE IN ITS POSSESSION VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS. COUNSEL WAS INEFFECTIVE IN FAILING TO REQUEST MATERIAL IMPEACHMENT EVIDENCE AFTER THE PROSECUTION WITNESSES TESTIFIED ON DIRECT EXAMINATION IN VIOLATION OF PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.**

114.    The claims and factual allegations set forth in all other sections of this *Petition* are incorporated by reference and realleged as if set forth entirely herein.

115.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires a prosecutor to disclose favorable evidence to the accused that is material to either guilt or punishment. Brady v. Maryland, 373 U.S. 83, 87 (1963); Giglio v. United States, 405 U.S. 150, 153-56 (1972); United States v. Bagley, 473 U.S. 667, 676 (1985); Kyles v. Whitley, 514 U.S. 419, 437 (1995). See also ABA STANDARDS FOR CRIMINAL JUSTICE PROSECUTION FUNCTION AND DEFENSE FUNCTION 3-3.11(a)(3d ed. 1993). This duty to disclose continues past a defendant's arrest, conviction and sentencing. Imbler v. Pachtman, 424 U.S. 409, 427 n.25 (1976).

116.    'Favorable evidence' under Brady includes evidence that impeaches the prosecution's theory or witnesses. Bagley, 473 U.S. at 676 (Brady's disclosure requirements apply to any materials that, whatever their other characteristics, can be used to develop impeachment of a prosecution witness); Napue, 360 U.S. at 269 ("[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence"); see also Wilson v. Beard, 2006 WL 2346277, *17 (E.D. Pa. 2006) (Padova, J.) (finding that the prosecution's failure to disclose impeachment evidence violated Brady and its progeny).

117.    Materiality exists when there is a reasonable probability that the withheld evidence could have provided a "reasonable doubt" about Petitioner's guilt. California v. Trombetta, 467 U.S.

479, 485 (1984) ("the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt"); United States v. Hill, 976 F.2d 132, 135 (3d Cir. 1992) (same); or when the withheld evidence had "*any adverse effect*" upon the defendant's ability to prepare for trial or present a defense. Bagley, 473 U.S. at 683 ("the reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case").

118.    As the Third Circuit noted:

> A defendant is entitled to a new trial where there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is [defined as] a probability sufficient to undermine confidence in the outcome. This court has recognized that the Bagley inquiry requires consideration of the totality of the circumstances, *including possible effects of non-disclosure on the defense's trial preparation.*

United States v. Perdomo, 929 F.2d 967, 972 (3d Cir. 1991) (internal citations omitted).[19]

119.    Indeed, defense counsel is entitled to rely on the presumption that prosecutors will fairly "discharge[] their official duties," United States v. Mezzanatto, 513 U.S. 196, 210 (1995), and that the prosecutor shall act as the "representative not of an ordinary party to a controversy, but of a sovereignty whose obligation [is] to govern impartially . . . and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." Berger v. United States, 295 U.S. 78, 88 (1935).

---

[19]    See also Wilson v. Whitley, 28 F.3d 433, 438 (10th Cir. 1994) ("Bagley evidences concern with any adverse effect that the prosecutor's failure to respond [to the discovery request] might have had on the preparation or presentation of the defendant's case") (quotations and citations omitted); United States v. Spagnoulo, 960 F.2d 990, 994 (11th Cir. 1992) (Brady violation found when withheld evidence "could have" altered defense strategy); Smith v. Secretary, 50 F.3d 801, 827 (10th Cir. 1995) (same).

120.    During the course of the police investigation of the murder in this case, the police taped interviews with a number of witnesses, including: Phillip Hudson, Susan Butler, George Stevenson, and Tiarra Koston. While the prosecution did turn over police-generated "transcripts" of the taped statements of Susan Butler, Phillip Hudson and George Stevenson, those "transcripts" contain blanks and omissions and, therefore, are not a complete and accurate reflection of the taped statement. Similarly, the state failed to even turn over a "transcript" of the statement provided by Ms. Koston.

121.    Similarly, as described above, the tape of the statement provided by Ms. Dorsey-Crowell included a number of facts that were exculpatory to Petitioner. Likewise, there are discrepancies in the police reports of the statements by Stevenson, Koston, Butler, and Hudson. Petitioner avers that the tapes contain exculpatory information, including both impeachment evidence as to Hudson and Butler as well as independent exculpatory evidence contained in the statements of Koston and Stevenson. Accordingly, the state was required to disclose these tapes and the failure to do so denied Petitioner of his Sixth, Eighth and Fourteenth Amendment rights. Where, as described above, the contents of these tapes include impeachment of critical prosecution witnesses (Butler and Hudson) purporting to connect Petitioner to this murder, materiality is demonstrated and relief is required. Moreover, where, as described above, the contents of the statements of both Koston and Stevenson include evidence disputing the prosecution's theory that Petitioner was involved in the murder, materiality is demonstrated and relief is required.

122.    Even if the state was not required to disclose the contents of these tapes under Brady and its progeny, and it was, counsel was entitled to disclosure of the tapes once the prosecution witnesses (Butler and Hudson) took the witness stand and testified on direct. See Super. Ct. Crim.

R. 26.2 (requiring disclosure of prior statements once the witness testifies on direct examination). See also Jencks v. United States, 353 U.S. 657 (1957). Although counsel was aware that both of these witnesses had provided a taped statement to the police, counsel failed to request disclosure once these witnesses testified on direct. Counsel's failure to request disclosure constitutes prejudicially deficient performance in violation of Petitioner's Sixth, Eighth and Fourteenth Amendment rights. Counsel could have no reasonable strategic basis for failing to request bases for impeaching witnesses that the prosecution contended connected Petitioner to the murder. As described above, as there is a reasonable likelihood that these taped statements contain critical impeachment evidence of these key prosecution witnesses, prejudice is demonstrated and relief is required.

123.    Moreover, as described elsewhere in this *Petition*, at the time of Petitioner's resentencing, Phillip Hudson, a critical prosecution witness, was under sentence for theft and other crimen falsi convictions. See Exhibit 26. Nevertheless, the prosecution failed to disclose those convictions to counsel prior to submitting his testimony. As described above, impeachment evidence falls squarely within the Brady requirements. The prosecution's failure to disclose this evidence violated Petitioner's Sixth, Eighth and Fourteenth Amendments and for this reason as well, relief is required.

**The State Court Proceedings.**

124.    This claim has been raised in the presently-pending *Motion for Postconviction Relief Pursuant to Superior Court Criminal Rule 61, and Consolidated Memorandum of Law* which was filed in the Delaware Superior Court on January 25, 2008.

46

CLAIM IV.    TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE, DEVELOP AND PRESENT AVAILABLE MITIGATING EVIDENCE IN VIOLATION OF PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.

125.    The claims and factual allegations set forth in all other sections of this *Petition* are incorporated by reference and realleged as if set forth entirely herein.

126.    As described below, counsel failed to investigate, develop and present readily available evidence of Petitioner's background and history that were necessary to the sentencer's informed decision regarding the appropriate verdict. Counsel's failure to adequately investigate, develop, and present this compelling mitigating evidence violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

A.    **The Legal Standard**

127.    The importance of mitigating evidence in capital sentencing proceedings is a fundamental tenet of capital jurisprudence. [20]    A capital defendant has "a right – indeed, a constitutionally protected right," Williams v. Taylor, 529 U.S. 362, 393 (2000) – to present mitigating evidence to the capital sentencing jury. This evidence is critical to the reliability of the capital sentencing proceeding, and without it the sentencer cannot render the individualized decision that the Eighth Amendment constitutionally requires. Gregg v. Georgia, 428 U.S. 153, 206 (1976).

128.    Sixth Amendment ineffective assistance of counsel claims are evaluated under the two-prong test of Strickland v. Washington, 466 U.S. 668 (1984).[21]    Petitioner must show: (a)

---

[20]    Rompilla v. Beard, 545 U.S. 374 (2005); Wiggins v. Smith, 539 U.S. 510 (2003); Williams v. Taylor, 529 U.S. 362 (2000); Perry v. Lynaugh, 492 U.S. 302, 307 (1989); Eddings v. Oklahoma, 455 U.S. 104, 110-12 (1982); Lockett v. Ohio, 438 U.S. 586, 605 (1978).

[21]    See also Williams v. Taylor, 529 U.S. 362 (2000), Wiggins v. Smith, 539 U.S. 510 (2003), and Rompilla v. Beard, 545 U.S. 374 (2005).

counsel's deficient performance, i.e., that his attorney's performance fell below "an objective standard of reasonableness," id. at 688; and (b) prejudice, i.e., that confidence in the result of the original sentencing proceeding is undermined due to counsel's deficiencies, id. at 694.

**B.    Deficient Performance.**

129.    Counsel's performance at capital sentencing must be evaluated in light of the fundamental principle, set forth above, that a capital defendant has "a right – indeed, a constitutionally protected right – to provide the [sentencer] with the mitigating evidence." Williams v. Taylor, 529 U.S. 362, 393 (2000). Under Strickland and its progeny, the adequacy of counsel's mitigation investigation is "measured against an 'objective standard of reasonableness,' 'under prevailing professional norms.'" Rompilla, 545 U.S. at 380 (quoting Strickland, 466 U.S. at 688); Wiggins, 539 U.S. at 521. The Court has long referred to professional standards of conduct – such as the American Bar Association (ABA) Standards for Criminal Justice and the ABA Guidelines for the Appointment and Performance of Counsel in Capital Cases – in assessing the reasonableness of counsel's conduct.

130.    The ABA Guidelines dovetail with the broad scope of evidence the Constitution says counsel must investigate and the defendant must be able to present. Lockett v. Ohio, 438 U.S. 586, 602-05 (1978); Eddings v. Oklahoma, 455 U.S. 104, 110 (1982). Accordingly, both the caselaw and the professional norms recognize that capital counsel have an "obligation to conduct a thorough investigation of the defendant's background" for mitigating evidence. Williams, 529 U.S. at 396 (citing 1 ABA STANDARDS FOR CRIMINAL JUSTICE 4-4.1, commentary, at 4-55 (2d ed. 1980)), quoted in Wiggins v. Smith, 539 U.S. 510, 522 (2003). Thus, counsel's "investigations into mitigating evidence should comprise efforts to discover *all reasonably available* mitigating evidence and

48

evidence to rebut any aggravating evidence that may be introduced by the prosecutor," <u>Wiggins v.</u>
<u>Smith</u>, 539 U.S. at 524 (quoting ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF
COUNSEL IN DEATH PENALTY CASES 11.4.1.c, at 93 (1989) (emphasis in <u>Wiggins</u>), <u>quoted in</u>
<u>Rompilla</u>, 545 U.S. at 387 n.7.

131.    Counsel's duty to thoroughly investigate and present all reasonable mitigating
evidence has several distinct components:

- an obligation to investigate, develop and present records that may contain relevant
mitigating evidence.[22]

- an obligation to investigate, develop and present lay-witness testimony regarding the
client's background and history;[23]

- an obligation to work closely with a mental health expert and present expert

---

[22]  <u>E.g.</u> ABA GUIDELINES 11.4.1, Investigation, §§ 2C & 2D (counsel should obtain
hospital, treatment, school and mental health records); <u>Williams v. Taylor</u>, 529 U.S. at 395-96
(failure to obtain juvenile and social services records "graphically describing Williams'
nightmarish childhood" and prison records describing his good conduct and favorable adjustment
to prison); <u>see also</u> <u>Outten v. Kearney</u>, 464 F.3d 401, 416 (3d Cir. 2006) (counsel ineffective
where, <i>inter alia</i>, "they neither acquired nor reviewed readily available school and medical health
records"); <u>Carter v. Bell</u>, 218 F.3d 581 (6th Cir. 2000) (failure to obtain prison, welfare and
mental health records); <u>Glenn v. Tate</u>, 71 F.3d 1204 (6th Cir. 1995) (failure to obtain school
records evidencing mental retardation); <u>Clabourne v. Lewis</u>, 64 F.3d 1373, 1385 (9th Cir. 1995)
(failure to obtain institutional records from mental hospital and prison treatment facility); <u>Hill v.</u>
<u>Lockhart</u>, 28 F.3d 832, 845 (8th Cir. 1994) (failure to obtain records from mental hospital).

[23]  ABA GUIDELINES, 11.4.1, Investigation, §§ D.2.C, D.3.B & D.3.C (counsel should
seek out information regarding "family and social history (including physical, sexual or
emotional abuse)" by interviewing family and others familiar with defendant's life); Guideline
11.8.3 § F (same); <u>Williams</u>, 529 U.S. at 415-16 (O'Connor, J., concurring) (counsel failed to
fully interview and present evidence from all relevant friends, neighbors, and family); <u>see also</u>
<u>Jermyn v. Horn</u>, 266 F.3d 257, 306-07 (3d Cir. 2001) (finding that counsel's failure to adequately
investigate background and mental health mitigation in preparation for trial constituted deficient
performance).

testimony regarding mental health-related mitigating circumstances;[24]

- an obligation to prepare all witnesses to testify to all relevant mitigating evidence within their knowledge, and at trial, to elicit all relevant mitigating evidence that the witness is able to present, whether the witness is an expert or lay witness;[25]

- an obligation to present a closing argument that actually informs the jury how it can give effect to the available mitigating evidence to spare the defendant's life.[26]

132.    Counsel must conduct this investigation and preparation for capital sentencing

---

[24] ABA GUIDELINES, 11.8.6 (counsel should always investigate and consider presenting the client's "[f]amily and social history (including physical, sexual or emotional abuse, neighborhood surroundings" as well as "[e]xpert testimony concerning [such a background] and the resulting impact on the client"); see also Ake v. Oklahoma, 470 U.S. 68 (1985) (stressing importance of expert mental health assistance in capital cases); Williams, 529 U.S. at 399 (counsel must make an evidentiary presentation that "explain[s to the jury] the significance of all the available evidence"); Magill v. Dugger, 824 F.2d 879, 889 (11th Cir. 1987) (counsel ineffective at capital sentencing when he fails to call mental health expert at the sentencing hearing, when expert testimony "would have provided the jury with a more long-term view of [the defendant's] emotional problems"); Middleton v. Dugger, 849 F.2d 491, 495 (11th Cir. 1988) (counsel ineffective for failing to present expert mental health testimony that "could well have met the standard for statutory mitigating factors); Antwine v. Delo, 54 F.3d 1357, 1366-7 (8th Cir. 1995) (counsel ineffective at penalty-phase where he relied on mental health evaluation that was prepared for purposes of guilt-phase defenses); Glenn v. Tate, 71 F.3d 1204, 1210, n.5 (6th Cir. 1995) ("defense counsel should obviously have worked closely with anyone retained as a defense expert to insure that the expert was fully aware of all facts that might be helpful to the defendant").

[25] E.g., Collins, id.; Wallace v. Stewart, 184 F.3d 1112, 1115-18 (9th Cir. 1999) (counsel has duty to provide mental health expert with necessary background information); Collier v. Turpin, 177 F.3d 1184, 1199-1204 (11th Cir. 1999) (counsel failed to elicit all of the mitigating evidence from the ten witnesses that were called).

[26] E.g., Kubat v. Thieret, 867 F.2d 351, 369 (7th Cir. 1989) (counsel must make a significant effort to ably present the defendant's fate to the jury and to focus the attention of the jury on any mitigating factors); Buehl v. Vaughn, No. 95-CV-5917, 1997 WL 752959, at 40 (E.D. Pa. Dec. 31, 1996) (Padova, J.) (failure to present reasoned argument for life at penalty phase was "a very serious and inexcusable lapse"); cf. Herring v. New York, 422 U.S. 853, 862 (1975) ("[n]o aspect of [trial] advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment").

significantly prior to the trial.[27] Counsel managed to breach each of these professional obligations. Deficient performance can be seen by comparing the evidence presented at trial with the evidence that counsel failed to present as a result of his failure to investigate.

### 1.    The evidence presented by counsel

133.    During the penalty trial, counsel presented eight lay witnesses[28] in support of the case for life:  Petitioner's mother, Rita Manley, (NT 11/29/05 at 73-83); Debra Norris, a friend of Petitioner's mother, (NT 11/29/05 at 45-56); Reginald Graham, Petitioner's cousin, (NT 11/30/05 at 8-15); Cimani Green, a friend, (NT 11/30/05 at 17-24); Chenequa Green, another friend and the sister of Cimani, (NT 11/30/05 at 25-32); Cormell Green, a close friend of Petitioner's mother and the mother of Cimani and Chenequa Green, (NT 11/30/05 at 33-38); and, Reginald Speir, an Assistant Principal at Central High School who was the coach of the tennis team that Petitioner managed, (NT 11/30/05 at 44-53). The sum and substance of the lay testimony involved little more than general descriptions of Petitioner's devotion to his family; the absence of his father; his academic accomplishments, including attending Central High School; his employment and desire to work to get himself and his mother out of the projects; and, his kindness to others.[29] Other than

---

[27] E.g., Williams, 529 U.S. at 395 (capital counsel's actions "fell short of professional standards" when they "did not begin to prepare for [the penalty phase] until a week before trial"); ABA GUIDELINES, 11.4.1 ("Counsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase .... Both investigations should begin immediately upon counsel's entry into the case"); id., 11.8.3 ("preparation for the sentencing phase, in the form of investigation, should begin immediately upon counsel's entry into the case").

[28] Counsel presented two fewer witnesses than prior counsel presented at the first sentencing hearing. See NT 11/14/96.

[29] While Debra Norris did testify that in the projects, there was "drug activity, killing, all kinds of violence," NT 11/29/05 at 53, counsel never asked whether Petitioner was exposed to that violence and/or how it impacted him, nor did counsel make any efforts to present to the jury

his age [30] and lack of any prior criminal record, counsel presented nothing more in an effort to save

Petitioner's life. The state court summarized the mitigation as follows:

> In 1995 he was 21. He had attended a prestigious and competitive public high school
> in Philadelphia. He had been in the Army Reserves. He grew up without a father but
> was much loved in his family. His mother kept tight reins on him and loves him still.
> He did well in a school that is competitive to get and stay into. Prior to Heath's
> murder he had no criminal record. He was not involved in the Macy's fraud.

State v. Manley, Criminal Action Numbers IN95111323R3; IN95111324R3; IN95111325R3;

IN95120684R3; IN95120685R3; IN95120686R3 (Del. Super. 2/3/06) (Sentencing Decision, Herlihy,

J) at 38. As described more fully below, the picture presented by counsel was a far cry from the truth

about Petitioner's background and history and the mitigation evidence counsel presented was a mere

drop in an ocean of other, compelling mitigation evidence.

### 2.    The Unpresented Evidence.

#### a.    Unpresented Lay and Record Evidence Regarding Petitioner's Background and History.

134.    While there is no question that Michael did, indeed, excel and make great strides in

his life, what counsel failed to adequately investigate and present was the clear and compelling

evidence of what Michael actually had to overcome in order to do that. As described below, while

his mother was, indeed, very strict and made sure that the children were inside by dark, through no

fault of her own, that did not insulate the children from a chaotic and violent environment that clearly

---

a clear picture of the struggles involved in living in such an environment. As described below,
such evidence was readily available, as well as expert evidence explaining the impact of living in
such a highly stressful, violent environment as that suffered by Petitioner.

[30] Counsel did not present any affirmative evidence of Petitioner's age, although his date
of birth did come out during the prosecution's case. Nor did counsel highlight Petitioner's youth,
although this trial was ten years later.

had an impact on Michael's development.

135.    Michael Manley was the second son of Rita Manley. Ms. Manley herself came from a very difficult background. She was one of 13 children. Her mother raised the children alone and, not surprising, the family experienced poverty and dysfunction. There were times that Rita Manley was placed in foster care and, at various times, the family went without, including food, lights and heat. Rita met Allen Manley while they were in high school. She became pregnant with Michael's step-brother, Allen, and the two married. As Allen readily acknowledged, neither were ready for marriage, they were too young. See Exhibit 14 (Declaration of Allen Manley, Sr.). As a result, the marriage soon went down-hill. He would leave the home on Friday morning for work and not return until Monday after work. Id. As Allen notes, "[i]t got to the point where we were married however we were doing our own thing." Id. It was during this period that Rita became involved with Melvin Carr. When Mr. Carr met Rita, she was around 19 years old, still young. See Exhibit 15 (Declaration of Melvin Carr). Eventually Rita and Allen separated and Rita moved back with her mother. She became pregnant with Michael when she was 20 years old. While Allen did try to maintain contact with the children, he acknowledges that he did not do "as much as he should have." Exhibit 14 (Declaration of Allen Manley).

136.    After Michael was born, Rita and the children moved to the Passyunk Homes housing project. Melvin lived with Rita for a short time, about a year. Id. That relationship was hardly stable. Melvin admits that they had a "lot of problems," and that he was involved with other women during their relationship. Id. He also acknowledges that after they split, he was hardly there for his child, Michael, and that, after their separation, things were difficult for Rita. See Exhibit 15 (Declaration of Melvin Carr). Rita recalls that, originally, they had plans to stay in the projects only

temporarily until Melvin could get things together to move the family out to a home. As the relationship deteriorated, that didn't happen and Rita was essentially left to fend for herself and the children. Not surprising, Melvin's leaving, (and not fulfilling the promise to get the family out of the projects), had a considerable impact on Petitioner throughout his life and explains his taking on the role of caretaker for his mother, particularly his life-long goal to get his mother out of the projects. Rita describes how Michael was hurt and angry about his father's abandoning the family and felt the need to prove himself to his father and others as a result.

137.    Melvin also recalls that, while he and Rita were together, they "hosted and attended a lot of parties." The "partying lifestyle" escalated. Id. During these parties, the children remained upstairs. Id. Mr. Carr also describes how the situation at Passyunk Homes deteriorated. Drugs, including crack and cocaine, became prevalent. Even the family was affected by the crack scourge. Id.

138.    Rita then became involved with Keith "Chico" Roland. Chico was a violent man who assaulted her on a number of occasions. As often occurs in an abusive relationship, it was some time before Rita could escape the abuse. They were involved for almost seven years. The relationship began when Michael was two years old and finally ended when he was eight or nine years old.

139.    Rita Manley describes the fear and anxiety the children suffered as a result of Chico's abuse. They were usually present during the violent episodes. Even though they were small, they were well-aware of what was going on and, when the fighting began, the children became upset and cried. On a number of occasions, when the fights escalated, Michael, still a toddler would suddenly run to her and grab her leg. When she picked up the child, Chico stopped hitting her. Rita suspected that even though Michael was very young, he realized that he could protect her and put himself in

54

harms way to do that. The fights and violence happened at all times, even after the children went to bed. Allen, Jr. still has vivid memories of hearing Rita and Chico fighting when he was in bed and then seeing his mother with bruises and other injuries the next morning. Even when Rita and the children tried to keep Chico out of the house, Chico would kick the door in. Allen has memories of shoving the couch in front of the door to keep Chico out. There is no question that violence escalating to such a degree traumatized both the children and their mother.

140.    After Chico's sister died, things got even worse. He turned to drugs and started associating with the less-than-desirable members of the neighborhood. Not surprising, his entire personality changed and the violence became more frequent. It seemed to Rita that he was looking for a confrontation at every corner. As other family members recall, the violence was not limited to Rita. At least on one occasion, Melvin Carr received a call that Chico was "hitting on" Michael. He and some friends went to the projects to confront him. While Mr. Carr did not locate Chico, he did leave the clear message to Chico to stop. See Exhibit 15 (Declaration of Melvin Carr).

141.    Things ended for good when Chico, once again, came home, pounding and beating on the door and it was obvious to Rita that he was high. He became so enraged when they wouldn't let him in that he threw a brick through the window. Rita and the children were terrified.

142.    As happens often, Michael became close to Chico, despite the abuse and violence. As experts Petitioner will call at an evidentiary hearing will testify, it is not unusual for children to have conflicted feelings about caretakers who are also abusers. That is why children often try to return to their abusers, despite the violence and chaos. Thus, it's not surprising that, despite the abuse, Michael developed a bond with Chico. As a result, even though the violence ended when Chico left, Michael was sad and hurt. It was obvious to Rita that he was experiencing the loss of his

father all over again. While Michael always put on a tough exterior and never said how he felt, Rita knew that he was upset and hurt. After the relationship with Chico ended, Rita vowed never again to subject her children to a situation where they would get attached to a man only to have the man leave, like Allen Manley, Sr., Melvin Carr and Chico had done.

143.    Thus, the home situation was hardly stable. Despite his mother's attempts to insulate the children, Michael nevertheless was subjected to abandonment by his father, Melvin Carr, Chico, and his step-father, Allen Manley; the fear and trauma of witnessing violence against his mother, the sole caretaker he could, and did, trust; and violence by someone who was supposed to protect him, Chico. And, the domestic violence that Petitioner witnessed was not limited to that suffered by his mother. When Petitioner was a small child, a neighbor also was the victim of spousal abuse and Petitioner heard the fighting, the woman's screams, and the sounds of the woman being beaten through his bedroom wall. These beatings occurred nightly until the woman was finally killed by her abuser. Not surprising, the impact of what Petitioner heard, combined with what he witnessed regarding his own mother left Petitioner traumatized and following the neighbor's death, Petitioner suffered nightmares for some time thereafter.

144.    Moreover, with the exception of Ms. Norris' passing reference that the projects was a place where there was "drug activity, killing, all kinds of violence," (NT 11/29/05 at 53), counsel failed to develop any evidence regarding the extent of the violence and chaos in the projects or the impact it had on the children, despite Ms. Manley's enormous efforts to insulate her children from those horrifying experiences. As witnesses who knew the circumstances of the Passyunk Homes will testify, drugs were everywhere. Dealers were on the corners selling crack and other drugs. See Exhibit 16 (Declaration of Allen Manley, Jr.); see also Exhibit 14 (Affidavit of Allen Manley, Sr.);

Exhibit 15 (Affidavit of Melvin Carr). The children were forced to step over crack vials on their way to school. See Exhibit 16 (Declaration of Allen Manley, Jr.).

145.    Not surprising, the influx of drugs also meant exposure to horrifying violence. As Ms. Manley recalls, it "became like the OK corral." Knife fights were a common occurrence and Petitioner witnessed a number of such fights, at least one of which ended in a death. It was not unusual for the children to hear multiple gunshots near their home at night and after a night of gunfire they would hear the next day that someone was shot, and often killed. The children were never allowed near the windows for fear that they may be hit by a stray bullet. Indeed, a friend of Petitioner's who visited the same projects, Russell Mosley, confirms the frightening violence. Petitioner had warned him against going to the projects at night, because of the violence. He describes occasions where he and his girlfriend would hear gunfire and have to 'drop to the floor' to avoid the possibility of being shot from a stray bullet. See Exhibit 17 (Declaration of Russell Mosley).

146.    Thus, the children were not only exposed to fear and anxiety *at the time of the gunfire*, they were also in a constant state of fear and anxiety associated with *the anticipation of that gunfire*. There is no question that such an environment takes a toll on the emotional and cognitive development of children. And, it's not surprising that, as a number of witnesses testified at the penalty hearing, Ms. Manley insisted that her children be inside the home by dark. What the sentencer did not hear, however, was that her "strictness" was not merely just her way of disciplining her children. It was, instead, a mother trying to protect her children from death or serious injury. Thus, Ms. Manley's strict rules take on an entirely different theme when considered in light of the truth regarding the conditions of the projects.

147.    In addition to the violence and exposure to drugs and other criminal conduct, the Passyunk Homes was also plagued with pollution from oil spills from a nearby oil refinery. The area was designated as a "Superfund Site" and an enormous clean-up operation was conducted that ultimately resulted in the closing of the projects in 2000. An Environmental Protection Report from 1999-2000 indicated that "[a]pproximately one million gallons of petroleum sits on top of the groundwater" of the project property. See Exhibit 18 (ENVIRONMENTAL JUSTICE 2000 BIENNIAL REPORT: *Continuing to Move Towards Collaborative and Constructive Problem Solving*, EPA/300-R-01-005, October, 2001 at 2.28). An agreement between Sun Oil, the Defense Supply Center of Philadelphia, (DSCP), and the Pennsylvania Department of Environmental Protection, (DEP), resulted in a joint agreement to "remediate the oil plume." Id. While the agreement expired in 1999, the "removal of oil from the groundwater" continued under an order from the DEP. The report further indicated that the Philadelphia Housing Authority "had a stake in the oil recovery project because of the potential health effects on the residents and the fact that the hydrocarbon recovery system [was] located on PHA property." Id.

148.    Exposure to toxins can result in a host of health problems, including cognitive impairments, especially where the exposure occurs, as it did in this case, during Michael's developmental years. As described below and as expert testimony Petitioner will present at an evidentiary hearing demonstrates, Michael suffers from cognitive impairments, particularly impairments in the frontal lobe area, the area that controls judgment and impulse control. Had counsel conducted a mere internet search, they would have learned that the projects were closed because of the contamination of the water table by the nearby oil refinery. Had counsel obtained these records and presented them to a mental health expert, any mental health professional would

have told counsel of the risks of such pollution to cognitive development and the need for further evaluation.

149.    Children who suffer the kind of abandonment suffered by Petitioner are left scarred. They cannot trust; they have problems with interpersonal relationships; they often suffer from lack of self-esteem; they have poor judgment; they often suffer from depression; they suffer from cognitive impairments; they have difficulties learning to cope with their own emotions; and they have difficulty understanding their place in the world. E.g., Helfer & Kempe, THE BATTERED CHILD, Chapters 9-10, 17-20 (4th ed. University of Chicago Press); Kaplan & Sadock, COMPREHENSIVE TEXTBOOK OF PSYCHIATRY, at 1365-67 (5th ed.) at 1964-66 (results of childhood abuse and neglect include cognitive and developmental impairment; post-traumatic stress disorder; impaired impulse control; poor self-concept; difficulties in school adjustment; and central nervous system impairment).

150.    Even exposure to violence during the developmental years takes a toll on children. Children who witness domestic violence are likely to feel personally guilty and responsible for the violence and blame themselves for it.   Children exposed to violence develop school-related problems; they develop internalizing behaviors (e.g., withdrawal); externalizing problems (e.g., aggression); and deficits in social competence. E.g., Jaffe, Sudermann & Reitzel, Child Witnesses of Marital Violence, ASSESSMENT OF FAMILY VIOLENCE: A CLINICAL AND LEGAL SOURCEBOOK, Chapter 15 (1992); Berman, Impact of Abusive Marital Relationships on Children, BATTERING AND FAMILY THERAPY, Chapter 11 (1993).

151.    School records and descriptions of Petitioner as a child are consistent with the impact of the exposure to the horrifying violence.  School records indicate that in the early years he had difficulties controlling his temper, remaining silent and getting along with other children.  See

59

Exhibit 19 (Philadelphia School Records). Prior counsel from the 1996 trial obtained a portion of Petitioner's school records. While not complete, these records provide counsel with a number of indicia that life was not "rosy" for Petitioner from a very young age and that Petitioner overcame enormous obstacles to be accepted to a prestigious high school. For example, those records indicate large blocks of absences attributed to "parental neglect," meaning that there was no communication from Petitioner's mother regarding the reason for the absences. Such references provide strong indicators that the student is suffering some type of dysfunction. Similarly, the school records indicate conduct displays by Petitioner that would have provided a mental health expert with indicia once again that the home situation was far from ideal and that Petitioner may suffer from cognitive impairments, including impulse control issues. Indeed, the timing of these notations are consistent with the time in which "Chico" was in the home.

152.    Indeed, had counsel merely asked Rita Manley, Petitioner's mother, he would have discovered a plethora of indicators in Petitioner's conduct consistent with exposure to dysfunction and violence. As Ms. Manley would have told the sentencer, had counsel asked, as a child, Petitioner was particularly reckless, taking risks at play. He was, in Ms. Manley's words, a "dare-devil" as a child. He climbed trees, often falling out. He and his brother played risk-games involving jumping out of the closet onto the bed in their room and Michael, once again, missed on at least one occasion, hitting the floor. Reckless behavior like that exhibited by Michael as a toddler is consistent with those who experience abuse and exposure to violence. As described below, the resulting head injuries are also consistent with the cognitive brain impairments found by a neuropsychologist who recently evaluated Petitioner.

153.    Similarly, those who knew him describe Michael withdrawing to his books. One

classmate indicates that he was the "class clown," a trait completely consistent with the violence he witnessed and suffered. See Exhibit 17 (Affidavit of Russell Mosley). A counselor who took Petitioner under his wing, Carlos Jones, describes Petitioner as exhibiting classic signs of a child from a dysfunctional environment. See Exhibit 20 (Affidavit of Carlos Jones). Mr. Jones met Petitioner through the Diamond Youth Program, an inner city camp for children. Id. Petitioner arrived early and found excuses to stay late, a sign to Mr. Jones, a product of a broken home himself, that Petitioner was avoiding going home. Id. Petitioner was very "clingy" with Mr. Jones, insisting on being included in his group for various functions. It was clear to Mr. Jones that Petitioner considered the camp and his relationship with Mr. Jones a safe haven from the violence and dysfunction found in the Passyunk Homes. Id.

154.    Thus, the undeveloped lay and record mitigation evidence paints quite a different picture of the truth about Petitioner's background and life history that the sentencer should have learned before reaching a determination that death was the appropriate sentence. Not only does the above involve multiple additional mitigators, it also provides more strength and meaning to the mitigation actually pursued by counsel. Understanding the mountains of obstacles that Petitioner had to overcome in order to do well in school, his acceptance to the prestigious Central High School becomes even more remarkable. Understanding Petitioner's exposure to devastating violence, his goal of becoming a medic in the Reserves and desire to pursue a medical career becomes even more significant. Understanding the debilitating impact of the abuse suffered by his family, (including Petitioner), at the hands of one paramour and the difficulties Ms. Manley (and the family) had as a result of the abandonment by others, the close, protective relationship Petitioner had with his mother becomes even more compelling.

155.   As Petitioner will prove at an evidentiary hearing, the witnesses and record evidence described above were readily available, had counsel conducted a constitutionally adequate investigation. Indeed, had counsel merely conducted full and thorough interviews of those witnesses counsel did present, they would have learned of the plethora of additional mitigation described above. Counsel did not and, instead, relied on brief, cursory and superficial interviews that, in some cases involved little more than asking the witness to fill out a questionnaire.[31]   Counsel is not effective simply because she/he does <u>some</u> investigation and presents <u>some</u> mitigating evidence, where, as here, counsel has not <u>thoroughly</u> investigated and there is additional unexplored mitigation. <u>Williams</u>, 829 U.S. at 396. <u>See also</u> <u>Wiggins</u>, 539 U.S. at 527 ("In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further").

156.   Nor can counsel rely on any "strategic" decision as a basis for failing to investigate, develop and present the compelling life-history evidence described above that would have provided the sentencer with both additional mitigation and more force for the mitigation pursued.  To be "strategic" counsel's decision must be an informed one. <u>See</u> <u>Wiggins</u> 539 U.S. at 527 ("*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy"); <u>Outten v. Kearney</u>, 464 F.3d at 421 (counsel "were not in a position to make a reasonable decision" on the focus of their penalty-phase case when "their investigation in

---

[31]  Setting aside the problematic nature of using a questionnaire as a method of eliciting highly personal and painful family history information, the questionnaire itself failed to even attempt to obtain a full and thorough description of Petitioner's life-history, as required by the Sixth, Eighth and Fourteenth Amendments.

preparation for sentencing was itself unreasonably deficient"); United States v. Gray, 878 F.2d 702, 712 (3d Cir. 1989) ("counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when she/he has not yet obtained the facts on which such a decision could be made"); Pursell v. Horn, 187 F. Supp. 2d 260, 383-84 (W.D. Pa. 2002) ("No strategy, no reasoned judgment, and no tactical maneuvering supported counsel's failure to explore the mounds of mitigating evidence that was readily available to him"); Thomas v. Beard, 388 F. Supp. 2d 489, 508 (E.D. Pa. 2005) ("Here counsel's deficient performance was not due to any pursuit of a particular trial strategy--there was simply no investigation at all, and thus no foundation on which to base any strategic choice") (citing Gray). Having not investigated the information about Petitioner's background and history, counsel was hardly in a position to make an informed decision regarding the failure to present that evidence. Counsel's performance was deficient.

> b.    *Unpresented Expert Evidence.*

157.    Counsel presented no expert evidence in support of the plea to spare Petitioner's life. The co-defendant's counsel presented an expert who testified that the co-defendant was not psychotic, not anti-social and would adjust well in a structured prison environment. See NT 11/22/05 at 31-87 (Testimony of Dr. Dougherty). Thus, while the sentencer had such evidence about the co-defendant, it had nothing about Petitioner to evaluate his mental status or the impact of his background on his development.

158.    Petitioner has now been evaluated by a neuropsychologist, (Dr. Carol Armstrong), and a psychiatrist, (Dr. Julie Kessel). After conducting a thorough battery of neuropsychological testing, a clinical evaluation and a review of background materials, including the trial record, institutional records, (including school records and Department of Correction records), Dr.

Armstrong concludes to a reasonable degree of certainty that Petitioner suffers now, and suffered at the time of the offense and sentencing, from cognitive impairments, particularly impairments in the frontal lobe area of the brain that controls judgment and impulsivity. As Dr. Armstrong will explain in an evidentiary hearing, while Petitioner is, indeed, very bright and intelligent, he nevertheless is impaired and the impairments may be even more prominent due to his intelligence and corresponding ability to mask symptomotology. Also as Dr. Armstrong will describe in an evidentiary hearing, these impairments are consistent with his background and life-history. There are a number of potential sources of the brain impairments, including injuries suffered as a child and while playing sports as well as the environmental impact of the pollution in the Passyunk Homes.

159.    It is unquestionable that evidence of brain damage is mitigating. See Penry v. Lynaugh, 492 U.S. 302 (1989) (evidence of brain damage, in addition to retardation is mitigating); Caro v. Calderon, 165 F.3d 1223, 1225 (9th Cir. 1999) (failure to investigate defendant's organic brain damage or other mental impairments constitutes ineffective assistance of counsel); Middleton v. Dugger, 849 F.2d 491, 495 (11th Cir. 1988) ( counsel was ineffective for failing to adequately investigate and present mitigating evidence of defendant's brain damage).

160.    In addition, as Dr. Armstrong will testify in an evidentiary hearing, Petitioner's age at the time of the offense, 21 years, is also psychologically significant in light of the impairments indicated by the testing she conducted. Scientific studies demonstrate that brain development does not complete until the mid-twenties.[32] As a result, Petitioner's age, falling squarely within the time-

---

[32] See e.g. United States v. Gall, 374 F. Supp. 2d 758, 762, n.2 (D.C. Iowa 2005) (noting reports from the National Institutes of Health suggesting that the part of the brain controlling inhibition does not fully develop until around the age of 25), subsequent history, Gall v. United States, __ U.S. __, 128 S. Ct. 586, 601 (2007) (citing with approval the District Court's discussion regarding the impact of brain development on maturity).

period wherein the brain is not fully developed, is more significant than mere years. Because Petitioner suffered cognitive impairments, his 21 years was an inflated view of his actual cognitive maturity. Thus, when evaluating the combined impact of Petitioner's impairments, particularly his impairments in the frontal lobe region, and the under-development of his brain, it is clear that his chronological age is not the full picture of mitigation and Petitioner's culpability.

161.    Julie Kessel, M.D., also evaluated Petitioner. Dr. Kessel found that as a result of the chaotic, violent, and abusive environment Petitioner endured from birth until adulthood, he still suffers from post traumatic anxiety symptoms. As Dr. Kessel notes, despite being exposed to such an extreme amount of violence throughout his life, Petitioner has still managed to function at a high level. Dr. Kessel will testify that this is the type of avoidance behavior one would expect from an individual such as Petitioner who was constantly exposed to violence as a child and was so traumatized by it. In spite of his anxiety around violence and weapons, this anxiety didn't keep Petitioner from doing things that were ultimately very adaptable. In some ways, the violence around him drove his adaptation. The fact that Petitioner was such an avid reader and student, and remained inside studying rather than risking exposure to the violence outside is an example of this type of adaptation.

162.    Dr. Kessel will also testify that the abandonment of Petitioner's biological father was especially significant to his psychological development. The combined impact of his father's abandonment, the family's remaining in the projects as a result of his father's failure to follow through on his promise to get the family out of that horrific environment, and the subsequent violent relationship with Chico resulted in Petitioner developing a defense mechanism called reaction formation, that is, to engage in behavior that is the exact opposite of the violent, irresponsible male

role models he had been exposed to in his life. As a result, Petitioner became an intensely loyal individual, who, even at a young age, took on the personal responsibility of caring for his family, particularly his mother. Petitioner's most important goal was taking care of his mother and pleasing her. He wanted to do his best so that his mother could be proud of him. Dr. Kessel will also testify that Petitioner had no pattern of antisocial behavior or history of psychosis or any other major mental illness.

163.    While Petitioner minimizes the horrific experiences he had as a child and youth as an emotional coping mechanism, the trauma and anxiety can rise to the surface if provoked. Dr. Kessel will testify this is likely what happened when Petitioner was placed into the prison setting for the first time in his life. The dangerous environment of the prison setting likely caused the same type of fear reactions as the environment of the Passyunk Homes projects and provoked his post traumatic anxiety. However, as he has all his life, Petitioner managed to adjust and overcame this anxiety, and now functions well in a prison setting.

164.    Thus, the unpresented expert evidence paints quite a different picture of the truth about Petitioner that the sentencer should have learned before reaching a determination that death was the appropriate sentence. As with the unpresented lay and record testimony, not only does the above involve additional mitigators surrounding Petitioner's emotional, cognitive and psychological make-up, it also provides more strength and meaning to the mitigation actually presented by counsel. For example, understanding the cognitive and emotional obstacles that Petitioner had to overcome in order to do well in school, his acceptance to the prestigious Central High School becomes even more remarkable. Understanding the emotional, cognitive and psychological impact of Petitioner's exposure to devastating violence, his goal of becoming a medic in the Reserves and desire to pursue

66

a medical career becomes even more significant. Understanding the emotional, cognitive and psychological impact of the abuse suffered by his mother, (and Petitioner), at the hands of one paramour and the difficulties she (and Petitioner) had as a result of the abandonment by others, the close, protective relationship Petitioner had with his mother becomes even more compelling.

165.    Counsel's failure to consult with any mental health expert constitutes deficient performance. Even the superficial family interviews counsel did conduct (ineffectively) contained a myriad of reasons to consult with mental health professionals, including the descriptions of the abandonment of Petitioner's natural father. Likewise, records counsel had at the time of trial also included a plethora of indicators that mental health assessment would provide additional relevant mitigation. For example, as described above, the school records indicated multiple instances of unexplained absences from school as well as impulse control problems, indicators of cognitive impairments and emotional impairments. Prison records also included references indicating that Petitioner could be "impulsive" although the overall assessment was that Petitioner was adjusting satisfactorily. As described above, impulsivity is a classic sign of cognitive impairments.

166.    Of course, had counsel conducted a constitutionally adequate investigation, they would have learned even more compelling reasons to consult with mental health professionals, including the exposure to domestic and other violence and dysfunction, the repeated instances of trauma and the loss and abandonment suffered by Petitioner as well as the environmental hazards in the Passyunk Homes projects. In short, had counsel conducted a full and thorough investigation into Petitioner's background and history, counsel would have known that expert assistance would have provided additional mitigation and further support and weight for the mitigation pursued. Finally, counsel was aware that co-defendant's counsel intended to call an expert for the purpose of

67

providing opinion testimony regarding the co-defendant's ability to adjust well in prison as well as the co-defendant's lack of any history of anti-social behavior, psychosis or other major mental illness. At a minimum, counsel was obliged to pursue similar expert assistance for Petitioner.

>    c.    *The Unpresented Evidence Supporting the Mitigators Counsel Pursued.*

167.    Prior to the sentencing, counsel filed a letter with notice of the mitigating circumstances counsel expected to present. See Exhibit 21 (Letter of Joseph M. Bernstein, Esquire, filed 2/2/05). Those mitigators were:

1)    Lack of any prior criminal record

2)    Age of defendant at the time of commission of offense

3)    Potential for rehabilitation

4)    Positive contributions to community/society prior to incarceration

5)    Impact of death sentence on defendant's family

6)    Evidence that Manley did not actually kill Kristopher Heath

7)    Mercy

8)    Any other evidence developed during the penalty hearing which tends to mitigate the possible punishment.

Id.[33]

168.    As described above, counsel presented only eight lay witnesses in support of these mitigators. Also as described above, other than general statements by these witnesses, counsel provided the sentencer with little or nothing to find the mitigation counsel actually pursued. There was, however, compelling evidence both supporting a finding that these mitigators exist as well as

---

[33] This list omits two mitigators presented by prior counsel. See Exhibit 22 (Letter, Thomas A. Foley, Esquire, Filed November 14, 1996).

providing the sentencer with bases for finding that these mitigators must be given substantial weight.

169.    As described elsewhere in this Petition, (see Claim II), counsel's "presentation" that Petitioner was not the individual who shot Kristopher Heath fell woefully below reasonable standards. Despite the existence of lay witness and forensic expert evidence directly disputing the prosecution's theory that it was Petitioner who shot Mr. Heath, counsel ineffectively failed to investigate, develop and present that evidence.

170.    As described above, counsel did little or nothing to support the age mitigator, although substantial evidence existed and was available. Indeed, had the prosecution not presented Petitioner's date of birth during its presentation of *aggravation*, counsel would have had no evidence supporting this mitigator. Moreover, as described above, had counsel conducted a constitutionally adequate investigation and preparation, he would have learned that the issue of age, in Petitioner's case, involves more than a chronological calculation. When confronted with the evidence explaining the impact of Petitioner's age on brain development as well as the impairments Petitioner already suffered, this mitigator takes on a completely different posture both in nature and quality, impacting both the finding of the mitigation and the weighing of that mitigation against the aggravation. See Section b.

171.    Similarly, while counsel pursued a mitigator involving positive contributions to society or the community prior to incarceration, other than the testimony that when Petitioner was a child he assisted a sick friend, counsel presented nothing. There existed, however, available evidence supporting a number of other instances that would have provided the sentencer with more substantial bases for finding this mitigator and for giving that mitigation greater weight. For example, as described above, Petitioner participated in the summer Diamond Youth Program. As

69

Petitioner got older, he took on a leadership role in the camp, even becoming a Junior Aid. See Exhibit 32 (Affidavit of Barbara Baynard). As a result, the counselors, including Carlos Jones, relied on Petitioner to mentor the younger children and assist in the supervision. Id. Indeed, had counsel merely read the testimony from the first penalty hearing, he would have learned that, although Allen Manley, Jr., was his older brother, it was Petitioner who mentored and tried to assist Allen when he went through difficulties. See NT 11/14 /96 at 82-83 (Testimony of Allen Manley, Jr.).

172.    While counsel elicited general testimony regarding Petitioner's service in the Reserves, he presented no witness who actually worked with Petitioner or who could speak to Petitioner's contributions while serving. As Ms. Sapp describes, Petitioner not only excelled, but was given added responsibility because of his exceptional conduct and his proven skills. See Exhibit 23 (Statement of Delores Sapp). For that reason, she recommended him for promotion and he was asked to serve as the Non Commissioned Officer for one tour and excelled in that position. As Ms. Sapp notes, he held the respect of his peers, the Non Commissioned Officers and the Officers. Id. Ms. Sapp also describes Petitioner's strong desire to pursue a career in the medical field, as opposed to combat service, because of his desire to help rather than hurt, and the determination with which he pursued that goal. Id. Once again, when considered in light of the enormous obstacles that Petitioner was forced to overcome, these instances of community and personal support take on a completely different picture than the meager presentation by counsel.

173.    Likewise, while the prosecution presented a number of Department of Corrections records in support of aggravation, counsel failed to admit or present documentation indicating that Petitioner had, despite the write-ups, actually adjusted well overall in the onerous conditions of the

70

restrictive death row environment. Indeed, prior to the Departments' change in policy ending monthly reviews, there were a plethora of records indicating that Petitioner's adjustment was proceeding completely within normal expectations. See Exhibit 24 (MSU Semi-Monthly Behavior Reports).[34] While counsel did note the few incidents compared with the time Petitioner was in prison, and did question the prison official about Petitioner's overall good adjustment, the sentencer was only provided *records* of Petitioner's misconduct. Confronted with records indicating the number of times the prison characterized Petitioner's adjustment as acceptable compared with the few write-ups, there is no question that the sentencer would have weighed the aggravation and mitigation surrounding Petitioner's prison adjustment differently.

> d.    *Counsel's Failure to Focus the Jury's Mitigation Consideration During Closing Arguments.*

174.    In addition to failing to marshal the readily available mitigation evidence described above, counsel also failed to focus the jury on the mitigation presented or explain to the sentencer how it can give effect to the available mitigating evidence. While counsel did discuss the aggravation in general terms during closing and discussed why counsel contended that the prosecution failed to establish the aggravation; and, while counsel also told the jury that it was required to weigh aggravation found against mitigation, at no time did counsel actually explain to the jury what mitigation is or how the jury should weigh that mitigation against any aggravation found. Indeed, counsel never actually explained to the jury what mitigators the defense was relying

---

[34] Indeed, one of these documents even notes mitigation (from a Corrections Officer), for the incident where Petitioner purportedly flooded his cell. See Exhibit 24 (Staff Observation Report, 5/28/97(Noting that Petitioner is "Normally a quiet person" and that it was "quite possible" that the "flood was caused to bring attention to the commode constantly running")). Thus, the sentencer was denied the opportunity to fully assess this incident, even from the perspective of the Department of Corrections.

on in support of a life sentence. Where, as here, the jury was never instructed regarding what mitigators counsel pursued, (while it was instructed on the list of aggravators), and where, as here, the verdict form did not indicate what those mitigators were, (although it did indicate the list of aggravators), it was incumbent on counsel during closing argument to, at a minimum, tell the jury what mitigators applied in Petitioner's case. Yet, counsel never made *one reference* to any of the mitigators listed in counsel's notice. Having not even told the jury what mitigators applied, counsel did not explain to the jury the meaning of these mitigators or how the jury should consider that mitigation in the weighing process. As a result, the jury was left with a list of statutory aggravators and a foggy, general impression that there might be mitigation out there that applied to Petitioner, but no way of knowing what that mitigation was or how to apply it during the weighing process. Counsel's failure to focus the jury on the actual mitigation presented or explain how that mitigation should be considered against any aggravation found constitutes deficient performance.

## C.   Prejudice.

175.   Prejudice is *not* an outcome-determinative test. Strickland, 466 U.S. at 693-94. The question is *not* whether representation by effective counsel would have actually changed the jury's ultimate sentencing verdict, nor even whether representation by effective counsel would "more likely than not" have changed the sentence. Id. Instead, prejudice is established when *confidence in the outcome is undermined* because of counsel's deficiencies. Id. at 694. This "undermines confidence" standard for prejudice "is not a stringent one. It is less demanding than the preponderance standard."[35]

---

[35] Hull v. Kyler, 190 F.3d 88, 110 (3d Cir. 1999) (internal quotation marks and citations omitted) (citing Nix v. Whiteside, 475 U.S. 157, 175 (1986); Baker v. Barbo, 177 F.3d 149, 154 (3d Cir. 1999)); accord Williams, 529 U.S. at 405-06 (requiring proof of prejudice by a

176.    As explained in <u>Strickland</u> and the trilogy of capital-case ineffectiveness cases recently decided by the Supreme Court,[36] prejudice is present whenever "there is a ***reasonable*** probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694; <u>Williams</u>, 529 U.S. at 371; <u>Wiggins</u>, 539 U.S. at 534; <u>Rompilla</u>, 545 U.S. at 390. The Supreme Court has stressed that "the adjective is important." <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995): "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." <u>Id.</u>; <u>see also</u> <u>Strickland</u>, 466 U.S. at 693 ("a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case"). The reasonable probability standard is met when the capital sentencer reasonably might have returned a life verdict.[37]

177.    Prejudice occurs whenever the petitioner presents evidence not presented by counsel that is sufficient to establish mitigation the sentencer did not find; when the Petitioner presents evidence supporting mitigation not pursued by counsel; or, when the Petitioner demonstrates that the evidence that could have been presented was reasonably sufficient to change the sentencer's

---

preponderance of the evidence would be "contrary to" <u>Strickland</u>).

[36] <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003), and <u>Rompilla v. Beard</u>, 545 U.S. 374 (2005).

[37] <u>Williams v. Taylor</u>, 529 U.S. at 398 (prejudice established where unpresented mitigating evidence "might well have influenced the jury's appraisal of his moral culpability"); <u>Rompilla</u>, 545 U.S. at 393; <u>Wiggins</u>, 539 U.S. at 538; <u>see also</u> <u>Glenn v. Tate</u>, 71 F.3d 1204, 1210 (6th Cir. 1995).

balancing of aggravating and mitigating circumstances.[38]

178.    Here, Petitioner has demonstrated each type of prejudice. As described above, the unpresented evidence would have provided the sentencer with multiple additional mitigating factors; with compelling evidence in support of mitigation pursued; and with substantial evidence supporting a different balance of aggravation versus mitigation.

179.    Several years ago (and five years before the trial in this case), the United States Supreme Court granted penalty phase relief in a capital case, Williams v. Taylor, 529 U.S. 362 (2000), on the grounds that trial counsel rendered ineffective assistance of counsel. In so doing, the Court reaffirmed the basic principles governing the assessment of a claim of ineffective assistance of counsel articulated in Strickland v. Washington, 466 U.S. 668 (1984).

180.    A comparison between Petitioner's case and Williams demonstrates that, if the efforts of trial counsel in Williams constituted prejudicially deficient performance, then without question the efforts of Petitioner's counsel also satisfy the prejudice requirement. In Williams, counsel had the client evaluated by three mental health experts (who concluded that Williams did not have mental problems) – counsel called one at sentencing to describe his view that Williams lacked intent to injure others during his crimes. Williams, 529 U.S. at 369. Counsel interviewed Williams' mother, Williams himself and several other family members about Williams' life, asking if they had any evidence that would help (the witnesses did not disclose neglect or abuse). Id.; Williams v. Taylor,

---

[38] E.g. Armstrong v. Dugger, 833 F.2d 1430, 1433 (11th Cir. 1987) (the presence of mitigating evidence undiscovered by trial counsel "clearly [meets] the prejudice requirement"); Blanco v. Singletary, 943 F.2d 1477, 1505 (11th Cir. 1981) (same, quoting Armstrong); Hill v. Lockhart, 28 F.3d 832, 845 (8th Cir. 1994) (if a juror could find "at least one" mitigating factor on the basis of the evidence that counsel did not present, there is prejudice); Cave v. Singletary, 971 F.2d 1513, 1518-19 (11th Cir. 1992) (prejudice exists if a juror could have found mitigation based on the evidence trial counsel failed to present).

74

163 F.3d 860, 872 (4th Cir. 1998); <u>Williams v. Warden</u>, 487 S.E.2d 194, 196 (Va. 1997). Counsel then called Williams' mother and two lay witnesses, in addition to the doctor, as mitigating witnesses at the penalty phase. <u>Williams</u>, 529 U.S. at 369. Terry Williams' counsel also elicited from a state forensic witness evidence that Williams suffered from "borderline level of intellectual functioning," which "is between mild mental retardation and low normal intellectual level." <u>Williams v. Warden</u>, 487 S.E.2d at 196.

181.    Thus, Terry Williams' trial counsel's *preparation* for sentencing was considerably *more extensive* than that of Petitioner's counsel's. And Terry Williams' trial counsel's *presentation* at sentencing was also far *more extensive* than that of Petitioner's counsel.

182.    If counsel's representation was prejudicially deficient in <u>Williams</u>, as the Supreme Court held, prejudice is established here by the compelling evidence outlined above that Petitioner's counsel failed to investigate, develop, and present (evidence that is considerably more weighty than the evidence that Terry Williams' counsel failed to present). As was the Appellant in <u>Williams</u>, Petitioner is entitled to relief.

**D.    The State Court Proceedings.**

183.    This claim has been raised in the presently-pending *Motion for Postconviction Relief Pursuant to Superior Court Criminal Rule 61, and Consolidated Memorandum of Law* which was filed in the Delaware Superior Court on January 25, 2008.

75

CLAIM V.    AS A RESULT OF INEFFECTIVE ASSISTANCE OF COUNSEL AND PROSECUTORIAL MISCONDUCT, PRIOR TESTIMONY AND OTHER RANK HEARSAY STATEMENTS WERE ADMITTED IN PETITIONER'S SENTENCING HEARING IN VIOLATION OF HIS SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.

184.    The claims and factual allegations set forth in all other sections of this *Petition* are incorporated by reference and realleged as if set forth entirely herein.

185.    Throughout the 2005 sentencing hearing, the prosecution admitted prior testimony and other rank hearsay statements against Petitioner without providing a sufficient basis warranting admission and, in some cases, misrepresenting the status of certain absent witnesses. Counsel's failure to hold the prosecution to its burden of demonstrating admissibility constitutes prejudicially deficient performance in violation of the Sixth, Eighth and Fourteenth Amendments. Moreover, the prosecution's presentation of materially misleading and false proffers regarding the status of the witnesses not presented at Petitioner's penalty hearing constitutes prosecutorial misconduct in violation of Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

A.    **The Admission of Prior Testimony.**

1.    **The Facts.**

186.    Prior to trial, the prosecution noted its intent to present prior testimony in lieu of live witnesses. See NT 11/3/05 at 14. During the subsequent discussion, Petitioner's counsel as well as co-defendant's counsel raised the issue of the violation of Due Process and Confrontation. Id. at 16 (Mr. Capone indicating a confrontation issue); id. at 17-18 (Mr. Gabay raising Due Process concerns). The court referred the prosecution to Delaware Rule 804(a) (4)-(5) and noted its expectation that the prosecution would make "some showing" regarding "why [a particular] witness is unavailable." Id. at 19- 20.

76

187.    On the first day of trial, the subject of the admission of prior testimony came up again and, once again, counsel raised concerns regarding the presentation of transcripts as opposed to live witness testimony. NT 11/16/05 at 12-13. This Court agreed that the prosecution should make a record on unavailability pursuant to Rule 804. Id. at 13.

188.    Ultimately, the prosecution admitted prior testimony of at least eight witnesses that it claimed were "unavailable" for various reasons. See NT 11/17/05 at 8-29 (Michael Chandler); id. at 30-58 (Phillip Hudson); id. at 59-69 (Lance Thompson); NT 11/18/05 at 171-76 (Anna Hawley); id. at 208-229 (Richard Wohlgemuth); id. at 196-207 (Mario Cruz); 11/21/05 at 29-51 (William Kinard); id. at 51-55 (Rand Townley). The prosecution's proffers were conclusory and provided no details on what efforts, if any, the state made in order to locate these witnesses. Counsel conducted no inquiry, nor did counsel otherwise challenge these proffers. Had counsel conducted even a minimal inquiry, they would have learned that many of the prosecution's representations fell far short of any hint of due diligence and, in some cases, were patently false.

     **a.    Phillip Hudson**

189.    Prior to admitting the testimony of Phillip Hudson,[39] the prosecution stated:

---

[39] Mr. Hudson, a resident of the Cavalier Apartments, testified during the guilt-phase in 1996 on direct examination that, after hearing shots, he saw a stocky black male wearing a blue sweatshirt, jeans, white high-top sneakers and what appeared to be a baseball hat running across the parking lot. NT 11/17/05 at 33-37. He further testified that he saw the male get into the passenger side of a car in the lot. When asked, he stated that the car was either a ford escort, tempo or mercury topaz. Id. at 37. When confronted with the police report, he acknowledged that he had told the police shortly after the shooting that the man he saw was six feet tall and 225-250 pounds. NT 11/17/05 at 56. Notes from the police officer who interviewed him, indicated that Mr. Hudson described the vehicle as a ford escort hatchback, (see Exhibit 27 (Det. Donovan notes)). While counsel did present Officer Lee's notes from the police interview of Mr. Hudson through Detective Weldon, indicating some discrepancies, in the course of doing that, he also brought out that Mr. Hudson purportedly identified Petitioner. However, as described elsewhere in this Petition, (see Claim II), Mr. Hudson made a statement to the first trial defense

Phillip Hudson is unavailable. His last known location was in Arizona and that was in 2002. We have been unable to locate him.

NT 11/17/05 at 5-6. There was no further inquiry by counsel or the court and counsel did not object. The truth, however, was that Phillip Hudson was in the custody of the Department of Corrections in Arizona at the time of Petitioner's trial, following conviction for felony theft offenses and his presence would have been attainable through standard legal process. See Exhibit 25 (Affidavit/Declaration of Phillip Hudson); Exhibit 26 (State of Arizona v. Phillip Hudson, CR-2003-006251-001 DT (Superior Court of Arizona, Maricopa County)). Moreover, this was not Mr. Hudson's first arrest. The prosecution acknowledged knowing of Hudson's whereabouts in Arizona in 2002. At that time, Mr. Hudson was under a sentence of probation for drug related offenses. If, as the prosecution stated, the state was aware of Mr. Hudson's whereabouts a year after Hudson was placed on probation, it is reasonably likely that the state also was aware that Hudson had been involved in the Arizona criminal justice system. Thus, the state was also aware that a criminal records check was in order prior to Petitioner's 2005 sentencing in order to determine Hudson's whereabouts. In short, the state's actions fell far below any concept of due diligence.

**b.    William Kinard**[40]

190.    The prosecution told the Court and counsel that his "information" was that Mr.

---

investigator indicating that he was "pretty sure" that Petitioner was the person and, as a result of counsel's ineffectiveness, that information was never presented to the jury. Of course, had Mr. Hudson been present, the qualification of his identification, as well as all the other discrepancies involved in his prior testimony could have been presented to the jury.

[40] Mr. Kinard, a forensic chemist, conducted an evaluation of samples sent to him by the police for purposes of determining the presence of gunshot residue. NT 11/21/05 at 31-32. As described elsewhere in this Petition, the conclusions he reached regarding the results, particularly the absence of any evidence of gunshot residue from samples taken from Petitioner, were highly questionable and scientifically invalid. See Claim I.

Kinard, an employee of the Bureau of Alcohol, Tobacco and Firearms, was deceased. NT 11/18/05 at 77. Counsel affirmatively stated that there was no objection to reading Mr. Kinard's testimony into evidence. 11/21/05 at 28. Once again, the prosecution's representation to the Court was false. As described in Mr. Kinard's Declaration, see Exhibit 28, rumors of his death have been greatly exaggerated. Indeed, while he retired from the Treasury Department in 2000, a matter of a call to that agency would have obtained the accurate information and his whereabouts.

### c.    Mario Cruz[41]

191.    The prosecution told the court that Mario Cruz was "living at the Wilmington address [of Mr. Stevenson] or staying at the Wilmington address the night before the murder," and that "[h]is whereabouts are unknown." NT 11/18/05 at 75. Even the transcripts from the 1996 trial, read into evidence at Petitioner's 2005 sentencing, demonstrate that the state's representation was, at a minimum, misleading. Mr. Cruz testified that he lived in Sicklersville, New Jersey, and gave his street address. Id. at 196. Thus, the state knew or should have known that it was likely that Mr. Cruz lived in New Jersey at the time of Petitioner's sentencing in 2005. Mr. Cruz further testified that he worked for Sun Oil Company in Philadelphia. Thus, the state knew, or should have known, that his whereabouts could be ascertained through his employment. Indeed, as Mr. Cruz states in his declaration, at the time of the 2005 trial, he was still living in New Jersey and still working for Sun Oil Company. See Exhibit 29. Indeed, the record demonstrates that the state failed to conduct even

---

[41] Mr. Cruz was the boyfriend of David Stevenson's mother at the time of the murder. During his 1996 testimony, the prosecution called him presumably to have him testify that he saw Stevenson and Petitioner leave the Stevenson home around 6:45 a.m, and then impeached him, with his purported statement to the police when Mr. Cruz testified that while he saw Mr. Stevenson on the porch of the home at 7:00 am he was not sure he saw Mr. Stevenson leave. NT 11/18/05 at 204-07,

minimal efforts, such as a driver's license check, in order to obtain Mr. Cruz's appearance. Had they done so, they would have learned of Mr. Cruz's location and, as Mr. Cruz states he would have cooperated, Petitioner would not have been required to rely on the prior testimony.

### d.    Richard Wohlgemuth[42]

192.    Prior to admitting the prior testimony of Mr. Wohlgemuth, the prosecution proffered to the Court and counsel that Mr. Wohlgemuth "was somewhere in upstate New York," that he had retired from the Army and that the only information the prosecution had was that he "was some sort of private investigator." NT 11/18/05 at 75-76. Once again, counsel asked no questions and lodged no objections. As described in his declaration, Mr. Wohlgemuth did retire from the Army Reserves and was living in Ithaca, New York, but was also available to testify in the 2005 trial and would have appeared had someone asked him. The record demonstrates that the state's inquiry was cursory, at best. There is no indication the state sought Mr. Wohlgemuth's address through the Army, although, as his retirement most assuredly included receipt of benefits, there is no question that the Army was aware of his location. Moreover, having knowledge that he was in upstate New York, it was incumbent on the state to make reasonable records checks to locate him. Mr. Wohlgemuth was certainly not hiding his whereabouts. He held a driver's license in 2005, owned vehicles that were

---

[42] Mr. Wohlgemuth was an employee of the Army Reserves on active duty and assigned to personnel administration at the time of the 1996 trial. On direct examination, he testified about Petitioner's Reserve records, including records of Petitioner's clothing (and the size of the clothing), and his rank. Mr. Wohlgemuth also identified the camouflage jacket found in the trunk of the Mercury Topaz on the date of the murder as one issued by the Army. Finally, Mr. Wohlgemuth was also asked about weapons training, to which he responded that reservists receive weapons training in basic training and also have to qualify once a year. NT 11/18/05 at 209-18. On cross-examination, however, Mr. Wohlgemuth testified about Petitioner's medical assignment, the commonality of the E-4 ranks, and also testified that there were no records in Petitioner's files indicating that he had been issued the jacket seized by the police. NT 11/18/05 at 221-29.

registered, and owned a home. Thus, even if the state would not have been able to obtain his location from the Army, and it would have, there were other, simple, means of discovering this information and obtaining his appearance at Petitioner's trial.

e.     **Lance S. Thompson**[43]

193.   The state proffered that it had a cellphone and residential phone number for Mr. Thompson. While the cellphone did not accept messages, the state did leave messages on the residential number and did not hear from Mr. Thompson. NT 11/17/05 at 6. There was no indication that the state ever went to Mr. Thompson's home or business in order to serve a subpoena, although if they had a residential phone number, they certainly also had an address. Id. Moreover, as stated in his declaration, Mr. Thompson indicates that while he did receive a call that there would be another trial and his appearance would be needed, he never heard back from the police or prosecution regarding when his appearance would be needed. He also indicates that, had he been asked, he would have cooperated as he did in 1996. Nor was Mr. Thompson hiding his whereabouts. He was licensed to drive, possessed licensed vehicles and owned property. Yet the prosecution

---

[43] Lance Thompson was the resident of Cavalier Apartments who was also a friend of Police Officer Meadows. During the 1996 trial, Mr. Thompson testified that he took down the license number of the vehicle he saw leave the parking lot after the shots were fired. When the police arrived, he recognized Officer Meadows and gave him the piece of paper. NT 11/17/05 at 67-68. When asked what happened to the piece of paper, he testified: "I – I – I just – it got discarded."Id. at 68. When the prosecution suggested in the next question that it may have been lost "when he moved," the witness responded, "Probably." Id. The prosecution also called Officer Meadows in the 2005 trial. Officer Meadows testified to what Mr. Thompson purportedly told him and also testified that Mr. Thompson handed him the piece of paper with the license number on it. NT 11/17/05 at 69. Inexplicably, counsel did not cross-examine Officer Meadows about the paper or Mr. Thompson's statement to the police indicating that he may have transposed the numbers. As described elsewhere, counsel was ineffective in failing to elicit these discrepancies during Officer Meadow's testimony. See Claim II. That, however, does not cure the prosecution's erroneous admission of the prior testimony.

failed to pursue these resources. The prosecution was aware that Mr. Thompson was employed at MBNA,[44] yet the state failed to seek his location from his employer. Thus, even if the prosecution did not have his address, and all indicators are that they did, his location was obtainable with little or no effort.

### f.    Michael Chandler[45]

194.    The state proffered that, during their last contact, (time, place or circumstances unidentified), Mr. Chandler was "hostile and uncooperative." NT 11/17/05 at 5. The prosecution then claimed that the state was "unable to locate him." NT 11/17/05. Once again, the state made no proffer regarding what efforts it made to "locate him," nor did the state indicate that it even made simple checks, (for example, a driver's license or other records check), although Mr. Chandler owned a home in Wilmington at the time of Petitioner's trial and retained a driver's license. Nor did the prosecution make inquiries with Mr. Chandler's employer, Amtrak. Indeed, Mr. Chandler remained employed with Amtrak in 2005. Thus, the state could have obtained Mr. Chandler's whereabouts through his employer.

195.    Nor is the state's view that Mr. Chandler was "hostile and uncooperative" availing. He complied with the service of process requiring his attendance in 1996 and the prosecution presented absolutely no evidence that he would not have similarly complied in 2005.

---

[44]  NT 11/17/05 at 59.

[45]  Mr. Chandler testified in 1996 that he saw two black males in a car in the parking lot. He was unable to give any further description except that the passenger was wearing a blue wool hat, not a baseball cap. NT 10/31/96 at 43-50. See also NT 11/17/05 at 9-30.

g.    **Rand Townley**[46]

196.    The prosecution proffered to the Court and counsel that former Detective Townley

had retired from the force and was living in Washington state. NT 11/18/06 at 78. There was no

indication that Mr. Townley was unable or unwilling to appear, nor was there any indication that the

state was unable to locate him. Id. Indeed, the clear implication from the state's proffer was that the

prosecution was fully aware of his location and simply did not want to bother to attempt to obtain

his presence.

2.    **Habeas Relief is Required Because The Admission of the Prior Testimony
        Absent Demonstration of Unavailability Violated Petitioner's State and Federal
        Rights to Due Process, Confrontation and Cross-examination.**

197.    It is clearly established Sixth and Fourteenth Amendment law that, "the right of

confrontation and cross-examination is an essential and fundamental requirement for the kind of fair

trial which is this country's constitutional goal." Pointer v. Texas, 380 U.S. 400, 405 (1965). See

also Barber v. Page, 390 U.S. 719, 721 (1968) (citing Pointer, 380 U.S. at 405). As the United States

Supreme Court noted over two centuries ago, the heart of this constitutional guarantee provides the

accused with

> [A]n opportunity, not only of testing the recollection and sifting the conscience of the
> witness, but of compelling him to stand face to face with the jury in order that they
> may look at him, and judge by his demeanor upon the stand and the manner in which
> he gives his testimony whether he is worthy of belief.

Mattox v. United States, 156 U.S. 237, 242-43 (1895). See also Crawford v. Washington, 541 U.S.

36, 43 (2004) (noting that, while the confrontation right has roots stemming as far back as ancient

---

[46]    Former Detective Townley's prior transcript was read into evidence regarding his
interview with Mario Cruz. 11/21/05 at 53-55. On direct Mr. Townley testified that Mr. Cruz
told him that Petitioner and Mr. Stevenson pulled out ahead of him the morning of the murders at
6:45 a.m. Id. No cross-examination was presented by the defense. Id.

Rome, the Framers' "immediate source" for incorporating the confrontation requirement in the Sixth Amendment was the English common law "tradition [] of live testimony in court subject to adversarial testing." (citing 3 W. Blackstone, Commentaries on the Laws of England 373-374 (1768)).

198.    For these reasons, Sixth and Fourteenth Amendment law precludes the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Crawford, 541 U.S. at 53-54. Thus, the prosecution must prove *both* unavailability and opportunity to cross-examine in order to admit prior testimony of a purported unavailable witness. See Crawford, 541 U.S. at 59 ("Our cases have thus remained faithful to the Framers' understanding:  Testimonial statements of witnesses absent from trial have been admitted *only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine*"). See also Barber v. Page, 390 U.S. 719, 725 (1968) (noting that prosecution's failure to demonstrate constitutional unavailability rendered preliminary hearing testimony inadmissible, regardless of the existence or absence of an opportunity to cross-examine at the preliminary hearing); Motes v. United States, 178 U.S. 458, 471-72 (1900) (finding prosecution's inadequate efforts to secure witness' presence rendered the admission of preliminary hearing testimony of an absent witness in violation of the Sixth Amendment, even though the witness was cross-examined at that preliminary hearing); McCandless v. Vaughn, 172 F.3d 255, 265, n.6 (3d Cir. 1999) (same).

199.    Similarly, constitutional 'unavailability' is not demonstrated merely by a witness' failure to appear. Instead, clearly established Sixth and Fourteenth Amendment law requires that the prosecution demonstrate that it "made a good-faith effort to obtain [the witness'] presence at trial."

Barber v. Page, 390 U.S. at 724-25. See also California v. Green, 399 U.S. 149, 189, n. 22 (1970)

(Harlan, J. concurring) (noting that "[a] good-faith effort is, of course, necessary, and added expense

or inconvenience is no excuse"). "Good faith" turns on the reasonableness of the prosecution's

efforts and "[t]he reasonableness of the prosecution's efforts must be evaluated with a sensitivity to

the surrounding circumstances and the defendant's interest in confronting the absent witness."

McCandless, 172 F.3d at 265-266.[47] Accordingly, it is the *quality* of the effort made by the state that

counts, not the quantity.  See McCandless, 172 F.3d at 265 (noting that "good faith" involves

---

[47] To the extent the state contends that these Sixth and Fourteenth Amendment rights are not applicable to Petitioner's penalty hearing, it is wrong for a number of reasons. First, in light of the "qualitative difference of death from all other punishments," (California v. Ramos, 463 U.S. 992, 998-99 (1983)), heightened – not diminished – procedural safeguards are required in capital cases. Lockett v. Ohio, 438 U.S. 586, 604 (1978); Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (plurality opinion) (noting that, because of the unparalleled severity and irreversibility of the death penalty, the Eighth Amendment imposes a heightened standard "for reliability in the determination that death is the appropriate punishment in a specific case"); see also Godfrey v. Georgia, 446 U.S. 420, 427-28 (1980); Mills v. Maryland, 486 U.S. 367, 383-84 (1988). Cross-examination has been placed on the same footing as notice and the opportunity to be heard, and the right to counsel, fundamental requirements of Due Process. Chambers v. Mississippi, 410 U.S. 284, 294-95 (1973) (quoting In re Oliver, 333 U.S. 257, 273 (1948); Pointer v. Texas, 380 U.S. 400, 405 (1965) (same).

Second, because capital eligibility requires additional factual/legal findings (the presence of a statutory aggravator beyond a reasonable doubt), Petitioner was entitled to the full panoply of federal due process protections, including the right to confront and cross-examine witnesses. See Specht v. Patterson, 386 U.S. 605, 610-11 (1967) (finding that the Colorado Sex Offender's Act which involved a separate proceeding wherein the factfinder was required to make additional factual determinations for purposes of imposing enhanced sentencing implicated Due Process protections including the right to confront and cross-examine witnesses). See also Engle v. State, 438 So.2d 803, 813-14 (Fla. 1983) (concluding that the right to confrontation and cross-examination applied to the guilt/innocence phase, the penalty hearing before the jury, and the sentencing before the judge; Rodgers v. State, 948 So.2d 655, 663-65 (Fla. 2006) (applying Crawford v. Washington, 541 U.S. 36, 43 (2004), to admission of hearsay statements during the penalty hearing). In addition, because the penalty hearing in a Delaware capital sentencing hearing has sufficient "hallmarks of the trial on guilt or innocence," (Bullington v. Missouri, 451 U.S. 430, 439 (1981)), the protections under the Sixth and Fourteenth Amendments are implicated.

determining the reasonableness of the prosecution's conduct). Failing to pursue or ignoring leads that would reasonably glean accurate and reliable results of the witness' location; failing to seek a witness' attendance where the state is aware of that witness' location; and, relying on unverified, and patently false, information hardly constitutes "good faith" efforts."

200.    As described above, that is precisely what occurred (or more accurately did not occur) in this case. A fair reading of the record indicates that the state was well-aware of the whereabouts of former detective Rand Townley and Michael Chandler but failed to present these witnesses for unreasonable reasons: Mr. Townley's relocation to Washington state and Mr. Chandler's uncooperativeness. Even if the state was not aware of the location of these witnesses, and the evidence indicates that it was, it held sufficient information to find those witnesses but failed to do so because one was out of state and the other was uncooperative. Thus, the state failed to demonstrate unavailability and the admission of their transcripts violated Petitioner's state and federal Due Process and Confrontation rights.

201.    While the prosecution claimed not to know the whereabouts of Phillip Hudson, in light of the above-described facts, that claim is, at best, questionable. Moreover, even if the prosecution was not aware of Mr. Hudson's whereabouts in Arizona, it was only due to a woeful lack of diligence. As described above, Mr. Hudson was in prison and, therefore, hardly in a position to conceal his whereabouts from any inquiry by the state. The state's conduct was equally unreasonable as to Mario Cruz, Richard Wohlgemuth, and Lance Thompson. As described above, the state possessed more than sufficient information to locate these individuals but, as the record demonstrates, did little or nothing and, instead, merely contended that these witnesses were unavailable. Thus, the admission of the prior testimony violated Petitioner's Sixth and Fourteenth

Amendment rights.

202.    Finally, the prosecution's "proffer" that Mr. Kinard was deceased was false. As described above, not only was he alive at the time of Petitioner's trial, but he is still alive. While he had retired by the time of Petitioner's trial, that does not render him unavailable for purposes of overcoming the constitutional requirements. A simple search of readily available sources would have resulted in locating Mr. Kinard and, as he states in his declaration, he would have been more than willing to appear, if asked. Thus, the admission of the prior testimony violated Petitioner's Sixth and Fourteenth Amendment rights.

### 3.    Habeas Relief is Required Because The Prosecution's Presentation of Materially Misleading and/or False Information In Proffers Regarding Witness Unavailability Violated Petitioner's Sixth, Eighth and Fourteenth Amendment Rights.

203.    As the Supreme Court noted long-ago, the state's "interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done. . . . It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." Berger v. United States, 295 U.S. 78, 88 (1935).

204.    Likewise, fundamental state and federal Due Process does not tolerate state action intentionally designed to mislead opposing counsel or the factfinder regarding material issues. E.g. Mooney v. Holohan, 294 U.S. 103, 112 (1935)("deliberate deception of court and jury . . . is inconsistent with rudimentary demands of justice"); see also Napue v. Illinois, 360 U.S. 264, 269 (1959) ("implicit in the concept of ordered liberty" is the due process requirement that the state not premise its case on the veracity of a particular witness who testifies falsely, while thwarting the

87

defense's effort to challenge the witness' credibility); <u>United States v. Agurs</u>, 427 U.S. 97, 104 (1976) (the prosecution's knowing use of false testimony involves "a corruption of the truth-seeking function of the trial process"). These principles are even more compelling in light of the heightened safeguards required in capital cases. <u>See, e.g.</u>, <u>Beck v. Alabama</u>, 447 U.S. 625 (1980); <u>Caldwell v. Mississippi</u>, 472 U.S. 320 (1985).

205.    Here, the state provided materially misleading and, in at least one case, patently false, information regarding the status of certain purported (but not actually) unavailable witnesses as support for its contention that it was duly diligent in obtaining those witnesses' presence at Petitioner's trial. As described above, the prosecution told the Court and counsel that Mr. Kinard was deceased. Also as described above, he was not deceased in 2005, and is, indeed, even now, alive and well. The Court relied on the false proffer in deeming the prior testimony admissible and counsel relied on the same false proffer in failing to object to the admissibility.

206.    Also as described above and elsewhere in this Petition, the admission of Mr. Kinard's prior testimony, restricted by prior counsel's inadequate and ineffective cross-examination resulted in presentation of misleading and scientifically inaccurate forensic expert evidence in violation of Petitioner's Sixth, Eighth and Fourteenth Amendment rights. <u>See</u> Claim II. Accordingly, prejudice is demonstrated and Petitioner is entitled to relief.

207.    Likewise, the prosecution's proffers as to other witnesses were, at a minimum, misleading. First, the prosecution claimed that it left numerous messages for Lance Thompson but he failed to respond to those messages. In addition to failing to satisfy any standard for diligence or reasonableness, as simply leaving a message is insufficient for either the constitutional standard, (<u>see</u> <u>supra</u>), or the standard under Rule 804, (<u>see</u> <i>infra</i>), the state's claim that someone left multiple

messages was false. As Mr. Thompson states in his declaration, while he did receive one phone call informing him that his appearance would be required again, he never received any another contact indicating when and where he was needed. Once again, both the Court, in deeming the prior testimony admissible, and counsel, in reaching their (ineffective) decision not to object to admission, relied on the prosecution's materially misleading proffer. Similarly, as described above, as a result of the presentation of the prior testimony, restricted by prior counsel's inadequate and ineffective cross-examination, Petitioner was denied the opportunity to confront Mr. Thompson regarding the once existent, but soon thereafter missing, paper with the purported license number, in the presence of the jury so that the jury could assess Mr. Thompson's demeanor and reliability, nor was Petitioner able to further confront Mr. Thompson about that piece of paper along with other inconsistencies within his testimony. Accordingly, Petitioner has demonstrated that the prosecution's misconduct violated his Petitioner's Sixth, Eighth and Fourteenth Amendment rights, and prejudiced him.

### 4.    Habeas Relief Is Required Because Counsel Was Ineffective in Failing to Challenge the Admission of the Prior Testimony Under Delaware Rule 804.

208.    As the trial court noted during preliminary discussions, (see NT 11/3/05 at 19-20), in order to admit prior testimony, the state was required under Rule 804 to provide a basis for unavailability. See D.R.E. Rule 804(a); id. 804(b). Under Rule 804(a)(5), a witness is unavailable, if the proponent of admitting prior testimony demonstrates that the witness:

> Is absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance by process or other reasonable means.

Rule 804(a)(5) tracks the federal rules of evidence. See DRE Rule 804, Comment. "[I]t is the proponent of the statement offered under Rule 804 who bears the burden of proving the unavailability of the declarant." Kirk v. Raymark Indus., Inc., 61 F.3d 147, 165 (3d Cir. 1995).

While the determination of whether or not the proponent exercised "reasonable means," is a case-by-case determination, there is no question that the proponent must make some effort, to obtain the witness' presence,[48] including attempt to serve the witness with the appropriate process,[49] or, if service of process is unavailable, attempt to obtain the witness' voluntary presence.[50]

209.  The state failed on all counts.  As described above, where the prosecution acknowledged knowing where the witnesses were located, it failed to demonstrate that it attempted to secure that witness' presence through service of process.  For example, all indicators were that the state knew the location of Mr. Townley, but the state failed to either utilize service methods available, see U.L.A. 1, nor did it attempt to obtain Mr. Townley's voluntary presence.  Kirk. Similarly, the prosecution obviously knew of Mr. Thompson's whereabouts, but failed to present any evidence that it served, or even attempted to serve, him with a subpoena. See e.g., United States v. Williams, 1991 WL 55468 at *3 (9th Cir. 1991) (finding insufficient evidence of reasonableness where "[t]he excerpts of record include a subpoena for Smith's attendance at the second trial, but there is nothing to show that the subpoena was ever served on Smith").

---

[48]  See e.g. Kirk v. Raymark Indus., Inc., 61 F.3d 147, 165 (3d Cir.1995) (noting that mere absence of a witness is insufficient), citing 2 John William Strong et al., MCCORMICK ON EVIDENCE § 253, at 134 (4th ed. 1992).

[49]  Perricone v. Kansas City Southern Railway Company, 630 F.2d 317, 321 (5th Cir. 1980) ("It must be noted that although, for weeks, Fontenot's name had, at the instance of plaintiff's counsel, been on the witness list, no witness subpoena had been issued for him"); MCCORMICK ON EVIDENCE § 253 (6th ed. 2006) (noting that "[t]he relevant process is subpoena, or in appropriate situations, writ of habeas corpus ad testificandum").

[50]  See Kirk, 61 F.3d at 165 (noting counsel's failure to obtain expert witness' voluntary appearance where that expert was located out of state and beyond subpoena process). Of course, here, the state has no basis for claiming that service of process is unavailable because, as this is a criminal case, witnesses are subject to the Uniform Act to Secure the Attendance of Witnesses. 11 ULA 1.

210.    Nor, as described above, did the state make reasonable efforts to locate these, or the other witnesses. For example, as described above, while the state was aware of the employment of all the witnesses,[51] it made no efforts to locate and/or obtain service through this information. E.g. United States v. Quinn, 901 F.2d 522, 528 (6th Cir. 1990) (finding failure to check with employers in search of witness' location one of other factors that were "singularly unenthusiastic"). Similarly, the prosecution failed to articulate any other attempts to locate witnesses through common means, such as driver's licenses or property ownership. Cf. United States v. Berry, 1986 WL 18321 at *1 (4th Cir. 1986) (noting that the government "ran credit and motor vehicle checks" in attempting to locate witness). Indeed, as described above, a simple criminal records check for Mr. Hudson would have resulted in obtaining his location in the custody of the Arizona Department of Corrections and that his appearance was attainable through service of process. E.g. Quinn, 901 F.2d at 528 ("No testimony was offered that any county or city records were checked").

211.    Finally, as described above, the admission of the prior testimony resulted in prejudice. The prosecution relied on each of these witnesses as various bases for finding the existence of statutory and non-statutory aggravating factors. Thus, the failure to require the prosecution to meet its burden of reasonableness resulted in prejudice.

212.    The Sixth Amendment right to effective assistance of counsel is violated when counsel's performance is deficient, i.e., falls below "an objective standard of reasonableness;" and

---

[51]    As described above, the state knew that Mario Cruz worked for Sun Oil and, as he states in his declaration, he remained so employed in 2005. Likewise, the state was aware that Mr. Chandler was employed with Amtrak, and he remained so employed in 2005. While both Mr. Wohlgemuth and Mr. Kinard had retired from their federal agency positions, the prosecution failed to check with those agencies to determine these witnesses' whereabouts, although, as each receive retirement payments from their employers, there is no question that those agencies had current information. At a minimum, the state would have learned that Mr. Kinard was not dead.

the defendant is prejudiced, i.e., when confidence is undermined in the outcome of the proceeding. Wiggins v. Smith, 539 U.S. 510, 521 (2003); Williams v. Taylor 529 U.S. 362 (2000); Strickland v. Washington, 466 U.S. 668, 694 (1984). In evaluating counsel's performance, the Court should consider professional norms such as the American Bar Association's Standards for Criminal Justice ("ABA STANDARDS") and Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989) ("ABA GUIDELINES"), which articulate "reasonable" professional "standards for capital defense work" and are the "norms" and "standards to which [the Supreme Court] long ha[s] referred as 'guides to determining what is reasonable'" under the Sixth Amendment. Wiggins, 539 U.S. at 522-25 (citing Strickland; Williams). See also Outten v. Kearney, 464 F.3d 401, 417 (3d Cir. 2006). One critical aspect of counsel's performance in a capital case involves the duty to challenge aggravation evidence presented by the prosecution.[52]

213.    Thus, where counsel fails to rebut or otherwise challenge evidence in support of aggravation, deficient performance is demonstrated. Here, as described above, counsel's failures resulted in the admission of prior testimony on which the prosecution relied in support of statutory and non-statutory aggravation in violation of Petitioner's state and federal constitutional rights and in violation of the Rules of Evidence. Thus, counsel's performance was deficient.

214.    Also as described above, the testimony presented was neither cumulative nor diminmus. Indeed, the prior testimony involved: a witness purportedly connecting the murderer to

---

[52] See e.g., ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES 11.4.1.C (1989) (charging defense counsel with the duty to make "efforts to discover all reasonably available . . . evidence to rebut any aggravating evidence that may be introduced by the prosecutor") (quoted in Rompilla v. Beard, 545 U.S. 374, 387 n.7 (2005)); Wiggins v. Smith, 539 U.S. 510, 524 (2003); Outten v. Kearney, 464 F.3d 401, 417 (3d Cir. 2006).

92

a car owned by co-defendant Stevenson, (Lance Thompson); a witness purporting to connect forensic evidence to Petitioner, (William Kinard); a witness purporting to identify Petitioner and co-defendant Stevenson's car to the murder, (Phillip Hudson); a witness purporting to indicate that Petitioner accompanied co-defendant Stevenson from the Stevenson home shortly before the murder, (Mario Cruz); and, a witness purporting to place co-defendant Stevenson's car in the parking lot of the murder scene shortly before the murder, (Michael Chandler). Also as described above, absent live presentation, critical and material impeachment and confrontation was unavailable and, as a result, the jury's consideration of the reliability and credibility of these witnesses was constitutionally skewed.

215.    Where, as here, there is a reasonable likelihood that the jury's determination of statutory aggravation; the jury's weight afforded aggravation; and the ultimate sentencing determination would have been different had counsel properly challenged the admission of the prior testimony, prejudice is demonstrated and relief is required.

**5.    Counsel's Failure to Object to the Admission of the Co-Defendant's Statements or, at a Minimum, Request a Proper Limiting Instruction Informing the Jury that It Could Not Consider the Contents of That Statement Against Petitioner Constitutes Prejudicially Deficient Performance in Violation of the Sixth, Eighth and Fourteenth Amendments.**

216.    During the testimony of Parminder Chona, a former investigator for Macy's, the prosecution admitted and presented to the jury a written statement that co-defendant Stevenson gave to the decedent, also an investigator for Macy's, and Mr. Chona. NT 11/21/05 at 60-64. That statement included Stevenson's confession to the thefts and his contention that he committed the thefts at the demand of an individual he identified as "Pooger" on behalf of another individual he identified as "Buckey" to whom Stevenson owed $2500.00. The statement also indicated that others

93

(unidentified) were involved along with "Pooger" and "Buckey." Counsel failed to object to the admission of that statement, nor did counsel request that the court instruct the jury that it could not consider that statement against Petitioner.

217.    As described above, clearly established Sixth Amendment law precludes the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Crawford, 541 U.S. at 53-54. Stevenson's written statement to the Macy's investigators was testimonial under the Sixth Amendment. See e.g., Crawford, 541 U.S. at 53 ("In sum, even if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object, and interrogations by law enforcement officers fall squarely within that class"). It is also clearly established Sixth and Fourteenth Amendment law that, "where two defendants are tried jointly, the pretrial confession of one cannot be admitted against the other unless the confessing defendant takes the stand." Richardson v. Marsh, 481 U.S. 200, 206 (1987). Accordingly, the jury was precluded from considering Stevenson's statement against Petitioner. Nevertheless, counsel failed to object to the admission of that statement. Counsel's failure to object constitutes prejudicially deficient performance in violation of the Sixth, Eighth and Fourteenth Amendments.

218.    Nor did counsel request a limiting instruction admonishing the jury that it could not use that statement against Petitioner. In Richardson v. Marsh, the question involved the admission of a statement by the non-testifying co-defendant that did not directly inculpate Marsh, but when combined with other evidence and the prosecution's argument, did inculpate him. "At the time the confession was admitted, the jury was admonished not to use it in any way against [Marsh]." Id. 481 U.S. at 204. The Supreme Court concluded that there was no error in admitting the statement

94

because the court gave the jury a proper limiting instruction directing the jury that it could not use that statement against Marsh. Id. 481 U.S. at 211 ("We hold that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession *with a proper limiting instruction* when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence).

219.    As in Richardson v. Marsh, while Stevenson's statement did not directly implicate Petitioner, the prosecution was able to argue to the jury that the combined evidence of the Macy's thefts, including Stevenson's statement, supported its contentions regarding both statutory and non-statutory aggravation. Accordingly, a limiting instruction admonishing the jury that it could not use Stevenson's statement against Petitioner was required under the Confrontation Clause and counsel's failure to request proper instructions constitutes prejudicially deficient performance in violation of the Sixth, Eighth and Fourteenth Amendments.

**6.    Counsel's Failure to Raise and/or Litigate These Issues During the Prior Proceedings Constitutes Prejudicially Deficient Performance in Violation of the Sixth, Eighth and Fourteenth Amendments.**

220.    As described above, the admission of the prior testimony violated Petitioner's federal constitutional rights as well as Delaware law. Also as described above, the prosecution relied on each of these witnesses as various bases for finding the existence of statutory and non-statutory aggravating factors. Counsel's failure to raise and litigate the improper admission of the prior testimony under both federal constitutional grounds and the state-law grounds constitutes prejudicially deficient performance in violation of the Sixth, Eighth and Fourteenth Amendments. Where, as here, counsel permitted the prosecution to admit prior testimony that the prosecution relied on as support for aggravation, despite the prosecution's failure to meet either the constitutional

or the state law standards for admission, counsel could have no reasonable strategic basis for failing to object or raise these claims post-trial and on appeal. Counsel's performance was deficient. Similarly, the testimony presented was neither cumulative nor diminmus and, instead, went to the very heart of the prosecution's aggravation. Accordingly, counsel's deficient performance resulted in prejudice and relief is required.

221.    Similarly, counsel's failure to raise these claims on appeal constitutes prejudicially deficient performance. The same standards apply to claims of appellate ineffectiveness. See, e.g. Roe v. Flores-Ortega, 528 U.S. 420 (2000) (applying Strickland standard to consideration of appellate counsel's ineffectiveness); United States v. Mannino, 212 F.3d 835 (3d Cir. 2000); Orazio v. Dugger, 876 F.2d 1508, 1513 (11th Cir. 1989); Matire v. Wainwright, 811 F.2d 1430, 1435 (11th Cir. 1987). Where, as in this case, there is a "reasonable probability that the neglected claim[s] would have succeeded on appeal, [] counsel's failure to raise the claim f[alls] outside the range of reasonably competent assistance." Claudio v. Scully, 982 F.2d 798, 799 (2d Cir. 1992); Jackson v. Leonardo, 162 F3d. 81 (2d Cir. 1998) (appellate counsel's failure to raise "sure winner" constituted ineffective assistance: "In the instant case, we believe that appellate counsel's failure to raise a well-established, straightforward, and obvious . . . [claim] . . . constitutes ineffective performance."); Starr v. Lockhart, 23 F.3d 1280 (8th Cir. 1993 ) (finding trial and appellate counsel ineffective for failing to object to and raise an erroneous jury instruction); Freeman v. Lane, 962 F.2d 1252 (7th Cir. 1992) (appellate counsel ineffective for failing to raise a meritorious claim that was "presented squarely" at trial regarding a violation of the defendant's Fifth Amendment rights); Murphy v. Puckett, 893 F.2d 94 (5th Cir. 1990) (counsel's failure to raise valid defense at trial and on direct appeal constituted ineffective assistance). Accordingly, for this reason as well, relief is required.

B.    **The State Court Proceedings.**

222.    This claim has been raised in the presently-pending *Motion for Postconviction Relief Pursuant to Superior Court Criminal Rule 61, and Consolidated Memorandum of Law* which was filed in the Delaware Superior Court on January 25, 2008.

CLAIM VI.    PETITIONER IS ENTITLED TO RELIEF FROM HIS CONVICTION AND SENTENCE BECAUSE THE COURT AND COUNSEL FAILED TO CONDUCT VOIR DIRE TO DETERMINE THE RACIAL ATTITUDES OF THE JURORS IN VIOLATION OF PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.

223.    The claims and factual allegations set forth in all other sections of this *Petition* are incorporated by reference and realleged as if set forth entirely herein.

224.    The Sixth and Fourteenth Amendments guarantee a defendant on trial for his life the right to an impartial jury. Ross v. Oklahoma, 487 U.S. 81, 85 (1988); Irvin v. Dowd, 366 U.S. 717, 722 (1961). Where a juror harbors prejudice against the defendant or in favor of the prosecution the impartiality of a sitting jury is compromised. E.g. Turner v. Murray, 476 U.S. 28 (1986) (court must allow voir dire on racial prejudice); Ristaino v. Ross, 424 U.S. 589, 596 (1976) (same). In order to sufficiently protect the right to an impartial jury, there must be "an adequate voir dire to identify unqualified jurors" -- "[w]ithout an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." Morgan v. Illinois, 504 U.S. 719, 729-30 (1992) (*citing* Dennis v. United States, 339 U.S. 162, 171-172 (1950); Morford v. United States, 339 U.S. 258, 259 (1950); and *quoting* Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981)); see also King v. Lynaugh, 828 F.2d 257, 259 (5th Cir. 1987) ("Limits on voir dire that create an unreasonable risk of bias or prejudice infecting the trial process violate due process.").

97

225.    Moreover, the requirement of adequate voir dire takes on even greater importance in a capital case because of the "the qualitative difference of death from all other punishments," California v. Ramos, 463 U.S. 992, 998-99 (1983), and because capital juries are required to make a "highly subjective 'unique individualized judgment regarding the punishment that a particular person deserves,'" Caldwell v. Mississippi, 472 U.S. 320, 340-41 n.7 (1985).  Because of the heightened protections due capital defendants and the "unique opportunity [which] exists for bias to operate undetected," at capital sentencing, King v. Lynaugh, 828 F.2d 257, 259 (5th Cir. 1987), adequate voir dire of potential jurors becomes even more important.

A.    **Habeas Relief is Required Because the Failure to Voir Dire Potential Jurors During the 2005 Sentencing Hearing Regarding Racial Bias Violated the Sixth, Eighth and Fourteenth Amendments.**

226.    "It remains an unfortunate fact in our society that violent crimes perpetrated against members of other racial or ethnic groups often raise [a reasonable possibility that racial prejudice would influence the jury]." Rosales-Lopez v. United States,  451 U.S. 182, 192 (1981).  In a capital case, this concern is even more compelling:

> Because of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected. On the facts of this case, a juror who believes that blacks are violence prone or morally inferior might well be influenced by that belief in deciding whether petitioner's crime involved the aggravating factors specified under Virginia law. Such a juror might also be less favorably inclined toward petitioner's evidence of mental disturbance as a mitigating circumstance. More subtle, less consciously held racial attitudes could also influence a juror's decision in this case. Fear of blacks, which could easily be stirred up by the violent facts of petitioner's crime, might incline a juror to favor the death penalty.

Turner v. Murray, 476 U.S. at 35.

227.    Petitioner, (and his co-defendant), is an African American.  The victim was white.

The witnesses purporting to identify Petitioner and/or the co-defendant were white. The prosecution referenced "gangs" in Philadelphia in its evidentiary presentation and argument and characterized the murder as a "senseless, cowardly . . ." crime. NT 11/16/05 at 37, 45-6, 103-05. Thus, there is no question that race was a prominent and compelling aspect of Petitioner's trial. There is also no question that there existed a strong likelihood that one or more jurors might be influenced by even the most subtle racial attitude to sentence an accused to death on less than the requisite standard of proof. See e.g. United States v. Robinson, 485 F.2d 1157, 1160 (3d Cir. 1973) (reversible error to decline defense request for voir dire into racial bias, because "[a]ssuming that a given juror believed all black witnesses to be less credible than white witnesses, that prejudice operated in the juror's evaluation of [defendant's] testimony . . . [defendant] was entitled to have his testimony evaluated free from the taint of such prejudice."). Nevertheless, counsel did not request, and the Court did not ask, any questions even touching the surface of this issue, let alone sufficiently probe the venire's potential biases in order to ensure a fair and impartial jury.[53] The failure to do so denied Petitioner his Sixth, Eighth and Fourteenth Amendment rights.

---

[53] While one juror did indicate in response to a general bias question that race would impact his decision-making, (see NT 11/14/05 at 329-39; Matthew M. Cox, was a victim of racially motivated attack by African Americans, felt penalty they received was lenient, not sure could be impartial), that does not cure the constitutional harm in failing to conduct a full and adequate voir dire. The general 'bias' question did not begin to address the potential biases inherent in a case such as this one. Turner, 476 U.S. at 36-7 (because of broad discretion given juries in capital sentencing proceedings, where interracial crime involved, defendant entitled to have jurors queried on racial bias and also informed of race of the victim); Filmore v. State, 813 A.2d 1112, 1116 (holding that Delaware Constitution requires state trial courts to adhere to same higher standard of federal trial courts announced in Rosales-Lopez and Ristaino, requiring a voir dire question on race whenever the defendant and victim of a violent crime are members of different race).

**B.    Habeas Relief is Required Because the Failure to Voir Dire Potential Jurors During the 1996 Trial Regarding Racial Bias Violated the Sixth, Eighth and Fourteenth Amendments.**

228.    Once again, Petitioner, an African American, was charged with the first degree murder of Kristopher Heath, a white male. The purported identifications of Petitioner and his codefendant, also an African American, were cross-racial identifications. Most of the witnesses called on behalf of Petitioner were persons of color, while many of the witnesses called on behalf of the prosecution were white. Despite the obvious potential for race to improperly enter into the jury's consideration, Petitioner's counsel failed to request, and the Court failed to ask, any questions regarding potential bias during the voir dire in violation of Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

**C.    Habeas Relief is Required Because Counsel was Ineffective.**

229.    The Sixth Amendment right to effective assistance of counsel is violated when counsel's performance is deficient, _i.e._, falls below "an objective standard of reasonableness;" and the defendant is prejudiced, _i.e._, when confidence is undermined in the outcome of the proceeding. Wiggins v. Smith, 539 U.S. 510, 521 (2003); Williams v. Taylor 529 U.S. 362 (2000); Strickland v. Washington, 466 U.S. 668, 694 (1984). In evaluating counsel's performance, the Court should consider professional norms such as the American Bar Association's Standards for Criminal Justice ("ABA STANDARDS") and Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989) ("ABA GUIDELINES"), which articulate "reasonable" professional "standards for capital defense work" and are the "norms" and "standards to which [the Supreme Court] long ha[s] referred as 'guides to determining what is reasonable'" under the Sixth Amendment. Wiggins, 539 U.S. at 522-25 (citing Strickland; Williams). See also Outten v. Kearney, 464 F.3d 401, 417 (3d

Cir. 2006).

230.    The Guidelines in effect at the time of Petitioner's 1996 trial included charging counsel with a duty to "be familiar with the precedents relating to questioning and challenging of potential jurors." ABA GUIDELINE 11.7.2.B (1989), at 117. The Guidelines in effect at the time of Petitioner's 2005 trial similarly note that counsel in a capital case "is entitled to *voir dire* to discover those potential jurors poisoned by racial bias, and should do so when appropriate." ABA GUIDELINES FOR APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES *(Rev. Ed. 2003)*, ABA Guideline 10.10.2, Commentary, at 107. Thus, at the time of both trials, reasonable professional standards included a duty to ensure adequate voir dire in order to determine potential juror bias and counsel's failure to do so in either trial constitutes deficient performance. Filmore, 813 A.2d at 1117 ("A broad antiseptic question seeking to explore bias for or against the defendant or the state . . .falls woefully short" of the inquiry necessary to expose the potential racial bias inherent in every case of interracial violence) (quoting Feddiman, 558 A.2d at 282).  As counsel's errors created an unacceptable risk that racial prejudice may have infected Petitioner's trial and capital sentencing proceeding, in violation of the Sixth, Eighth Amendment and Fourteenth Amendments, prejudice is demonstrated and relief is required.

231.    Similarly, counsel's failure to raise these claims on appeal or during prior proceedings constitutes prejudicially deficient performance. The same standards apply to claims of appellate ineffectiveness. See, e.g. Roe v. Flores-Ortega, 528 U.S. 420 (2000) (applying Strickland standard to consideration of appellate counsel's ineffectiveness); United States v. Mannino, 212 F.3d 835 (3d Cir. 2000); Orazio v. Dugger, 876 F.2d 1508, 1513 (11th Cir. 1989); Matire v. Wainwright, 811 F.2d 1430, 1435 (11th Cir. 1987).  Where, as in this case, there is a "reasonable probability that the

neglected claim[s] would have succeeded on appeal, [] counsel's failure to raise the claim f[alls]

outside the range of reasonably competent assistance." <u>Claudio v. Scully</u>, 982 F.2d 798, 799 (2d Cir.

1992); <u>Jackson v. Leonardo</u>, 162 F3d. 81 (2d Cir. 1998) (appellate counsel's failure to raise "sure

winner" constituted ineffective assistance: "In the instant case, we believe that appellate counsel's

failure to raise a well-established, straightforward, and obvious . . . [claim] . . . constitutes ineffective

performance."); <u>Starr v. Lockhart</u>, 23 F.3d 1280 (8th Cir. 1993 ) (finding trial and appellate counsel

ineffective for failing to object to and raise an erroneous jury instruction); <u>Freeman v. Lane</u>, 962 F.2d

1252 (7th Cir. 1992) (appellate counsel ineffective for failing to raise a meritorious claim that was

"presented squarely" at trial regarding a violation of the defendant's Fifth Amendment rights);

<u>Murphy v. Puckett</u>, 893 F.2d 94 (5th Cir. 1990) (counsel's failure to raise valid defense at trial and

on direct appeal constituted ineffective assistance).  Accordingly, for this reason as well, relief is

required.

### D.   The State Court Proceedings.

232.   This claim has been raised in the presently-pending *Motion for Postconviction Relief*

*Pursuant to Superior Court Criminal Rule 61, and Consolidated Memorandum of Law* which was

filed in the Delaware Superior Court on January 25, 2008.

**CLAIM VII.   PETITIONER IS ENTITLED TO RELIEF FROM HIS CONVICTION AND SENTENCE BECAUSE THE PROSECUTION'S USE OF PEREMPTORY STRIKES AGAINST WOMEN AND MINORITIES DURING JURY SELECTION DEPRIVED PETITIONER OF HIS RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

233.   The claims and factual allegations set forth in all other sections of this *Petition* are

incorporated by reference and realleged as if set forth entirely herein.

234.   The Equal Protection Clause of the Fourteenth Amendment governs the exercise of

102

peremptory challenges by a prosecutor in a criminal trial. Petitioner has a Sixth and Fourteenth Amendment right to be tried by a jury whose members are selected in a non-discriminatory manner and potential jurors have an equal protection right, enforceable by the defendant, to jury selection procedures that are non-discriminatory. Batson v. Kentucky, 476 U.S. 79, 85-86 (1986); J.E.B. v. Alabama ex rel T.B., 511 U.S. 127, 128 (1994); see also Powers v. Ohio, 499 U.S. 400 (1991). Thus, prosecutors cannot strike potential jurors on the basis of race or gender. Such discrimination violates the defendant's right to equal protection, it harms the excluded juror and it taints the integrity of the entire judicial process.

235.    Petitioner is an African-American man. The prosecution exercised its peremptory strikes in a racially discriminatory manner to exclude African Americans and women from participation on this jury, in violation of the Sixth and Fourteenth Amendments. The State had no race/gender-neutral reason for striking these prospective jurors, and any purported race and/or gender neutral reasons proffered for the exclusion of black and female jurors in this case are pretextual. Accordingly, Petitioner is entitled to a new trial under Batson,  J.E.B, and Swain v. Alabama, 380 U.S. 202 (1965).

A.    **Habeas Relief is Required Because the State Exercised Peremptory Challenges in Discriminatory Manner.**

236.    Batson sets forth a three-part test to determine whether a prosecutor has used their peremptory strikes in a discriminatory manner. Batson, 476 U.S. at 96-98. First, Petitioner must establish a prima facie case of discrimination by showing that the prosecutor has exercised peremptory challenges to remove prospective jurors from the venire on the basis of race or gender. Id. at 96; J.E.B., 511 U.S. at 144-5. Second, the prosecutor must supply a race-neutral reason for

excluding each prospective juror. <u>Batson</u>, 476 U.S. at 98; <u>J.E.B.</u>, 511 U.S. at 145. Third, the court

must determine whether the reasons provided by the prosecution are, in fact, race/gender-neutral.

If the court deems any explanations provided by the prosecution insufficient, *even as to one juror*,

Petitioner has met his burden. <u>Batson,</u> 476 U.S. at 97-98.

237.    Meeting this burden is not an onerous task. As the United States Supreme Court

recently reiterated, a *prima facie* case of discrimination in jury selection is established if there is a

"suspicion" of discrimination.    <u>Johnson v. California</u>, 545 U.S. 162, 170 (2005) (rejecting

preponderance of the evidence standard and holding that a *prima facie* case is established by

"producing evidence sufficient to permit the trial judge to draw an inference that discrimination

occurred . . . The <u>Batson</u> framework is designed to provide actual answers to suspicions and

inferences that discrimination may have infected the jury selection process"). <u>See also</u> <u>Texas Dept.</u>

<u>of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981); <u>St. Mary's Honor Ctr. v. Hicks</u>, 509

U.S. 502, 506 (1993) ("The burden of establishing a prima facie case" is "minimal" and "not

onerous.").[54] Petitioner need show only that there is "<u>some reason to believe</u> that discrimination

<u>might</u> be at work." <u>Johnson v. Love</u>, 40 F.3d 658, 663 (3d Cir. 1994).

>    *1.    Petitioner has established a prima facie case of discriminatory intent in the*
>    *peremptory challenges exercised by the prosecution.*

238.    Petitioner has established a *prima facie* showing of discrimination as to both race and

gender. In Petitioner's case, the prosecution exercised ten peremptory strikes.[55]    The first six

---

[54]  <u>Burdine</u> and <u>Hicks</u> were "Title VII" cases that "explained the operation of prima facie
burden of proof rules." <u>Batson</u> at 94 n.18.

[55]  The trial court granted twelve peremptory strikes to the prosecution, and twelve to each
defendant, for a total of twenty-four for the defense. NT 11/03/05 at 35-7.

peremptories by the prosecution were against women, three of whom were persons of color. With the exception of one strike, every single prosecution peremptory was against a woman or a person of color, or both. Five strikes were exercised against African Americans, three women and two men, and four strikes were exercised against Caucasian women. As established at trial, the pattern of strikes by the prosecutor in this case clearly demonstrates a prima facie case of discrimination as required by the first step of the <u>Batson</u> analysis.

239.    After the prosecution's fourth peremptory strike - all of which had been against women at that point, the last two against women of color - counsel for co-defendant Stevenson objected on the basis of <u>Batson</u> that a discriminatory pattern was emerging on the part of the prosecution in its use of peremptory strikes. NT 11/14/05 at 67-8. The prosecutor profferedpurported "race neutral"reasons for these strikes, as required under step two of the <u>Batson</u> analysis. These "race neutral" reasons were clearly pretextual.

2.    *The prosecutor's purported "race neutral" reasons for his peremptory strikes were pretextual.*

240.    The prosecution's first strike was against Caucasian female, Kathy Dube. There was no apparent gender-neutral reason for this strike. Indeed, she exhibited characteristics traditionally favored by the prosecution. When asked where she would rank her feelings on the death penalty on a scale of one to ten, with one being least in favor and ten being most in favor, she stated she was an eight. NT 11/9/05 a.m. at 103. The prosecution's purported reason for striking her was because when asked whether she could recommend a sentence of death, she said "I think so." <u>Id.</u> at 115. This explanation by the prosecution is clearly specious and pretextual, particularly where the record demonstrates that Fred Dobrzynski, a white male accepted by the prosecution seated on the jury,

provided the exact response to that same question. NT 11/14/05 at 274.

241.    With regard to its second peremptory strike, of white female Anna Bartling, the prosecution provided no gender-neutral reason whatsoever, noting only that because she was white, and "[t]his is a race-based challenge," no explanation was necessary. NT 11/14/05 at 69. The prosecution was wrong. Discrimination on the basis of gender violates the Equal Protection Clause just as surely as discrimination on the basis of race. J.E.B., 511 U.S. at 129, 146 ("[G]ender, like race, is an unconstitutional proxy for juror competence and impartiality").

242.    The prosecution's third strike was against Myrtle Jackson, an African American woman. The sole reason the prosecution proffered for striking her was that "she appeared confused" when asked whether she could impose the death penalty. NT 11/14/05 at 69. Ms. Jackson, a licensed practical nurse, had previously served on a civil jury. NT 11/10/05 at 120. She rated her feelings on the death penalty a five on a scale of one to ten. Id. at 117. Ms. Jackson answered all of the voir dire questions appropriately, including a firm "yes" when asked if she could recommend a sentence of death. Id. at 125. The prosecution's explanation that "she appeared confused" when asked whether she could impose the death penalty is contradicted by the record, and pretextual.

243.    In explaining his reasons for striking Carola Crowder, also an African American female, the prosecutor claimed that she had a driving record from 2002, and also a conviction in 2000 for not having her child properly buckled into the seatbelt. The prosecutor claimed that this indicated " a lack of common sense." NT 11/14/05 at 70. The court noted it was satisfied that no improper pattern had been established, but put the State on notice that the court is "aware of this." Id.

244.    The defense then requested that the prosecution share the information in its files

regarding the convictions and motor vehicle violations, or lack thereof, of the one hundred plus potential jurors that had already been through voir dire to that point, in order to determine whether the prosecution had accepted white or male jurors with similar records. The court refused to order the prosecution to turn over the information on the previous jurors, because the state had only exercised three[56] peremptory challenges at that point, and no "unconstitutional pattern" had been established, but noted that from that point forward, the prosecution would have to share the information.[57] Id. at 74-76.

245.    By denying the defense access to this information, or reviewing the information itself, the court had no way of knowing whether the prosecution had indeed accepted white and/or male jurors with similar backgrounds. Miller-El v. Dretke, 545 U.S. 231, 241 (2005) ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step."); Riley v. Taylor, 277 F.3d 261, 285 (3d Cir. 2001) ("A comparison between a stricken black juror and a sitting white juror is relevant to determining whether the prosecution's asserted justification for striking the black juror is pretextual."); Hardcastle v. Horn, 521 F. Supp. 2d 388, 394 (E.D. Pa. 2007) (side-by-side comparison of stricken jurors with jurors accepted by the prosecution is "powerful tool" in determining validity of purported

---

[56] The prosecution had actually exercised four peremptory challenges at that point, but apparently the court, like the prosecutor, failed to consider the Equal Protection violations implicated by discriminating against women. J.E.B. v. Alabama, 511 U.S. at 146.

[57] Both the court and the prosecution repeatedly stated that no "pattern" had been established. However, constitutional error occurs and a new trial and sentencing are required if *just one potential juror is excluded on the basis of race*, regardless of whether and how many other persons of color are actually seated as jurors.   Harrison v. Ryan, 909 F.2d 84, 88 (3d Cir. 1990); see also Hardcastle v. Horn, ___ F. Supp. 2d ___, 2007 WL 3102221, *3 (E.D. Pa.).

race neutral explanations); <u>McClain v. Prunty</u>, 217 F.3d 1209, 1220 (9th Cir. 2000) (prosecutor's motives pretextual when the reason provided can be equally applied to a juror of a different race or gender who was not stricken, citing <u>Caldwell v. Maloney</u>, 159 F.3d 639, 651 (1st Cir.1998)).

246.     The prosecution exercised its fifth peremptory strike against Judith A. Burns, a white female. Ms. Burns was a teacher with a post-graduate level of education. She rated her feelings about the death penalty a five. NT 11/14/05 at 81-93. Initially, the prosecution challenged her for cause because she responded "I would try" when asked if she could recommend a sentence of death. <u>Id.</u> at 92, 94. After the cause challenge was denied, the prosecutor exercised a peremptory. The defense objected to this strike. <u>Id.</u> at 96.

247.     The prosecutor's eighth peremptory strike was against Samuel Brown, Jr., an African American male. While Mr. Brown ranked his feelings about the death penalty a one, he was very clear in his response that he would follow the law and recommend a sentence of death if the evidence and law required. NT 11/14/05 at 209-21. Mr. Brown also initially responded that he would be more likely to accept a police officer's testimony over a civilian witness (he then amended this statement to say he would hear both sides out). The prosecution struck Mr. Brown without any explanation.

248.     When the prosecution exercised its ninth peremptory strike against Brad C. Thomas, an African American male, the court *sua sponte* took notice and admonished the prosecutor:

> Mr. Conner, I feel constrained to say this. I do not know the racial makeup of the remaining jurors to be interviewed in this case. I would be extremely - - my concern expressed when this Batson issue arose yesterday is heightened. *The State needs to be very careful where it goes from here.*

NT 11/15/05 at 19-20.

249.    When the prosecution attempted to explain this strike based on the juror's initial

response that he would most likely vote in favor of a life sentence, and again argued that there was

no pattern of discrimination, the court again noted its concern:

> Let me end that discussion. I'm suggesting if there's another one, there will be a
> pattern . . . Or a stronger suggestion, let me put it this way, that there could be a
> pattern.
>
> My problem with the State's exercise of the peremptory here, and I do not believe a
> prior pattern has been established nor do I believe a pattern has been established with
> your use of a peremptory challenge with this particular juror, my problem with the
> strike of this particular juror is that he said his feelings ranked a six, that he could
> both do life imprisonment and the death sentence, but he was concerned how the
> death sentence had been imposed, perhaps, unequally on persons of certain
> socioeconomic classifications . . . Okay, I'm just alerting you.

Id. at 21-2.

250.    Thus, even the trial court appeared to believe that there was discriminatory intent on

the part of the prosecutor with the striking of Mr. Thomas, but permitted the strike because of the

mistaken belief that discriminatory intent with regard to just one juror, in the absence of a "pattern"

of discrimination, was permissible.

> 3.    *Petitioner has established that the prosecution's peremptory strikes were
> motivated by discriminatory intent, and the prosecutor's race-neutral reasons
> were pretextual.*

251.    Petitioner has clearly met his burden under Batson in proving that the prosecution had

discriminatory intent in exercising at least one of it peremptory challenges. The race neutral reasons

provided by the prosecution are simply not supported by the record in this case. Where, as here, the

purported race neutral reasons provided by the prosecutor contradict the facts in the record, they must

be questioned. See, e.g., Johnson v. Vasquez, 3 F.3d 1327, 1330-31 (9th Cir.1993) (finding that

several of the prosecutor's reasons, including the juror's alleged experience working for a defense

attorney, were contradicted by the record).

252.    The race neutral reasons provided by the prosecutor in Petitioner's case are simply not credible, and in such cases, the lower court decision is not entitled to the usual deference. Riley v. Taylor, 277 F.3d at 285; see also McClain, 217 F.3d at 1221 ("'[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.'") (quoting Purkett v. Elem, 514 U.S. 765, 768 (1995)); United States v. Griffin, 194 F.3d 808, 826 (7th Cir.1999) (noting that a basis for reversal of state court exists where "the reason given [by the prosecutor] is completely outlandish or there is other evidence which demonstrated its falsity"); Caldwell v. Maloney, 159 F.3d at 651 (stating that serious questions of pretext arise when the facts in the record are "objectively contrary to" the prosecutor's explanations).

253.    The court is also required to review the "totality of the relevant facts" in determining whether the prosecutor acted in a discriminatory manner. Miller-El v. Dretke, 545 U.S. 231, 239 (2005) (quoting Batson, 476 U.S. at 94, 96). See also Lark v. Beard, 495 F.Supp.2d 488, 500 (E.D. Pa. 2007) ("if any facially neutral reason sufficed to answer a Batson challenge, then Batson would not amount to much more than Swain. Some stated reasons are false, and although some false reasons are shown up within the four corners of a given case, sometimes a court may not be sure unless it looks beyond the case at hand. Hence Batson's explanation that a defendant may rely on 'all relevant circumstances' to raise an inference of purposeful discrimination."). Here, the "totality of the facts" is manifest: the prosecution exercised nine of its ten challenges against minorities and women; only one challenge was exercised against a white male.[58] With the exception of one juror -

_____

[58] State peremptory number seven was used against David R. Barnwell. NT 11/14/05 at 183.

the second to last peremptory challenge exercised by the prosecution - the court failed to look "beyond the case at hand," and accepted the explanation provided, no matter how weak or contradictory.

254.    Even if the court finds that the prosecution's race neutral explanations were not pretextual - and they were - no reasons were provided for at least two of the jurors who were struck by the prosecution. As set forth in more detail above, the prosecution provided no explanation for striking Samuel Brown, Jr., an African American male who initially responded that he would be more likely to believe a police officer over a civilian because his/her job is to uphold the law, a viewpoint that favors the prosecution. NT 11/14/05 at 209-21. The state also provided no race or gender neutral reason for its strike of Anna Marie Bartling, apparently because of the mistaken assumption that because she is white, no such explanation is required. NT 11/10/05 a.m. at 35-6.

255.    While the prosecution attempted to provide a race neutral reason for its strike of Brad Thomas, even the court felt compelled to *sua sponte* admonish the prosecutor for its actions in striking this juror. NT 11/15/05 at 19-23. If even one venire person is excluded on the basis of race, as clearly occurred here, a new trial and sentencing is required under Batson. Harrison v. Ryan, 909 F.2d 84,88 (3d Cir. 1990); Lark, 495 F.Supp.2d at 502. Petitioner is entitled to such relief.

       *4.    Conclusion.*

256.    The prosecution's exercise of peremptory challenges in this case on the basis of race and gender violated Petitioner's right to due process and the equal protection of the law guaranteed by the Sixth, Eighth and Fourteenth Amendments.

**B.     Habeas Relief is Required Because Counsel's Failure to Raise and/or Litigate This Claim Constitutes Prejudicially Deficient Performance in Violation of the Sixth, Eighth and Fourteenth Amendments.**

111

257.    As set forth above, Petitioner has presented a meritorious jury discrimination that was obvious from the face of the record in this case. Any failure on the part of trial/direct appeal counsel to properly raise, preserve, and litigate this issue in state court constitutes prejudicially deficient performance in violation of Petitioner's state and federal constitutional rights.

258.    The ABA GUIDELINES FOR APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES – performance standards to which the United States Supreme Court has long referred "as 'guides to determining what is reasonable'" attorney conduct, Wiggins v. Smith, 539 U.S. 510, 524 (2003); Rompilla v. Beard, 545 U.S. 374, 387 (2005) – clearly called for counsel to "be familiar with the precedents relating to questioning and challenging of potential jurors." ABA Guideline 11.7.2.B, at 117. The commentary specifically highlights Batson "and its progeny" as an example of "an important" voir dire issue. Id., Commentary, at 118 n.5. Counsel's failure to discharge their duty to ensure that Petitioner's jury selection was not the result of discrimination constitutes deficient performance. Similarly, counsel's deficient performance denied Petitioner the right to be tried by an impartial jury selected in conformity with the federal constitution. Because this is structural error, prejudice is presumed. E.g., Williams v. Woodford, 396 F.3d 1059, 1069 (9th Cir. 2005).

259.    Likewise, appellate counsel (the same as trial counsel) was ineffective for failing to raise and litigate these issues on direct appeal. The failure to raise and litigate a meritorious issue arising out of the prosecution's discriminatory jury selection constitutes prejudicially deficient performance. E.g., Eagle v. Linahan, 279 F.3d 926, 943-44 (11th Cir. 2001) (finding counsel ineffective for failing to litigate Batson claim in state court appeal). In this capital case, these failures also violated Petitioner's Eighth Amendment rights to a reliable capital·trial and to

112

meaningful appellate review of his capital conviction and death sentence.

### C.    The State Court Proceedings.

260.    This claim has been raised in the presently-pending *Motion for Postconviction Relief Pursuant to Superior Court Criminal Rule 61, and Consolidated Memorandum of Law* which was filed in the Delaware Superior Court on January 25, 2008.

### CLAIM VIII. PETITIONER IS ENTITLED TO RELIEF FROM HIS CONVICTION BECAUSE THE PROSECUTION DELIBERATELY EXERCISED A PEREMPTORY STRIKE AGAINST A MINORITY JUROR DURING JURY SELECTION AT THE 1996 TRIAL IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

261.    The claims and factual allegations set forth in all other sections of this *Petition* are incorporated by reference and realleged as if set forth entirely herein.

262.    As set forth in more detail in Claim VII, the Equal Protection Clause of the Fourteenth Amendment prohibits a prosecutor from exercising peremptory strikes in a manner that discriminates on the basis of race or gender, and when such discrimination occurs, a new trial is required. Batson v. Kentucky, Batson v. Kentucky, 476 U.S. 79 (1986); J.E.B. v. Alabama ex rel T.B., 511 U.S. 127 (1994); and, Swain v. Alabama, 380 U.S. 202 (1965). See Claim VII.

### A.    Habeas Relief is Required Because the Prosecutor Exercised a Peremptory Strike in a Racially Discriminatory Manner.

263.    The prosecution's peremptory strike of prospective juror Phyllis J. Stewart, constituted a blatant violation of Batson and its progeny. The prosecutor admitted as much when confronted by the Court and asked to provide a reason for this peremptory:

The Court:    Did I understand the state to exercise a peremptory challenge?

The State:    Yes.

The Court:    Could you explain why?

The State:   Well, I'd be happy to, Your honor. We're going to get into this issue. *I think there ought to be some reciprocity in light of Mr. Manley's strikes. If you'll note, all of his strikes have been against what appear to be all of the same race.* If the court has detected a pattern in - -

The Court:   I had detected no pattern, but what I - - here's what I want to - -

The State:   Okay.

The Court:   - - I guess have answered. The juror answered all the questions properly. She's certainly educated by virtue of her post-graduate degree. She's certainly intelligent. There's no reason for her not to be a juror and I'm just curious, in light of her race.

NT 10/23/96 at 198-99. The prosecutor then stated that the juror was struck because her brother had been incarcerated for armed robbery, and that, because the juror's brother had been rehabilitated, the juror might favor a life sentence over the death penalty for Petitioner and his codefendant because they too are young men like her brother was at the time of his crime. Id. at 199-200.

264.   This explanation is patently pretextual. Aside from the fact that the prosecutor later accepted a white juror whose brother had also been incarcerated for the exact same offense as Ms. Stewart's brother (Juror No. 7, Maria Way, NT 10/23/96 at 238-59), as well as a white juror who himself had been convicted of assault and had to perform 30 days of community service (Juror No. 9, Daniel Kelleher, NT 10/25/96 at 23-37), the prosecutor's initial response to the Court about "reciprocity" because Petitioner had dismissed white jurors must negate any purported race neutral reason for this strike. The prosecutor's motivation behind the strike of Ms. Stewart is obvious. The prosecutor was annoyed by what he believed to be race-based strikes on the part of the defense, and, in an attempt to play "tit for tat," thought he had carte blanche to strike persons of color. Even the Court noted that there was nothing wrong with this juror, she answered all the voir dire questions

114

appropriately, and "there was no reason for her not to be a juror." NT 10/23/96 at 199.

**B.**    **Petitioner Has Met the Three Prong Test for Proving Discrimination Under Batson.**

265.    As set forth in Claim VII, there are three facets to determine whether the prosecution exercised its peremptory challenges in a racially discriminatory manner in violation of <u>Batson</u> and its progeny. First, Petitioner must prove a *prima facie* case of discrimination by showing that the prosecutor removed a juror or jurors from the venire based solely on their race. Once a *prima facie* case is established, the prosecutor must then provide a race neutral reason for the strike. Third, the court then must determine whether the reasons provided by the prosecution are in fact race neutral.

266.    Petitioner has clearly made a *prima facie* showing of discrimination in the strike of Ms. Stewart. The racial motivation behind this strike was so transparent that the Court itself felt compelled to query the prosecutor as to the reasons for this strike, without any prompting by the defense. As the Court itself pointed out, there was nothing wrong with this juror. She answered all questions properly and was well educated and "certainly intelligent." And, most telling, when initially asked by the Court the reason for his strike, the prosecutor himself admitted it was racially motivated because of a desire for "reciprocity" based on alleged racially motivated strikes by the defense.

267.    The explanation provided by the prosecutor that he was concerned because the juror's brother had been incarcerated and rehabilitated, and thus the juror might be sympathetic to the defendants, is patently pretextual. Aside from the fact that when first asked for a reason for the strike, the prosecutor's response was a demand for "racial reciprocity," the fact that the prosecutor accepted a white juror whose brother had been incarcerated for the same type of offense, and also

115

accepted a juror who himself had been convicted of assault and felt he was wrongly convicted makes the strike of Ms. Stewart even more suspicious. See McClain v. Prunty, 217 F.3d 1209, 1220 (9th Cir. 2000) (prosecutor's motives pretextual when the reason provided can be equally applied to a juror of a different race or gender who was not stricken, citing Caldwell v. Maloney, 159 F.3d 639, 651 (1st Cir.1998)). Further, Ms. Stewart clearly stated that she would be fair and impartial and could impose a sentence of death if the evidence and law permitted. The prosecutor's purported reason for striking Ms. Stewart was pretextual.

268.    While the Court ultimately accepted the prosecutor's explanation for striking Ms. Stewart, that explanation is not supported by the facts in the record. The prosecutor admitted up front that he wanted "reciprocity" for strikes by the defense that appeared to be motivated by race. Also, as the Court noted, based on her responses to the voir dire questions, this juror appeared to be ideal and perfectly acceptable. Where, as here, the purported race neutral reason provided by the prosecutor contradict the facts in the record, it must be questioned. See, e.g., Johnson v. Vasquez, 3 F.3d 1327, 1330-31 (9th Cir.1993) (finding that several of the prosecutor's reasons, including the juror's alleged experience working for a defense attorney, were contradicted by the record).

269.    The race neutral reason provided by the prosecutor for the strike of Phyllis Stewart is simply not credible, and the state court decision is not entitled to the usual deference. Riley v. Taylor, 277 F.3d at 285; see also  McClain, 217 F.3d at 1221 ("'[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.'") (quoting Purkett v. Elem, 514 U.S. 765, 768 (1995)).

270.    If even one venire person is excluded on the basis of race, as clearly occurred here, a new trial is required under Batson. Harrison v. Ryan, 909 F.2d 84,88 (3d Cir. 1990); Lark v.

Beard, 495 F. Supp. 2d 488, 502 (E.D. Pa. 2007). Petitioner is entitled to relief.

**C.    Habeas Relief is Required Because Counsel's Failure to Raise and/or Litigate This Claim Constitutes Prejudicially Deficient Performance in Violation of the Sixth, Eighth and Fourteenth Amendments.**

271.    The Sixth Amendment right to effective assistance of counsel is violated when counsel's performance is deficient, i.e., falls below "an objective standard of reasonableness;" and the defendant is prejudiced, i.e., when confidence is undermined in the outcome of the proceeding. Wiggins v. Smith, 539 U.S. 510, 521 (2003);  Williams v. Taylor 529 U.S. 362 (2000); Strickland v. Washington, 466 U.S. 668, 694 (1984). In evaluating counsel's performance, the Court should consider professional norms such as the American Bar Association's Standards for Criminal Justice ("ABA STANDARDS") and Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989) ("ABA GUIDELINES"), which articulate "reasonable" professional "standards for capital defense work" and are the "norms" and "standards to which [the Supreme Court] long ha[s] referred as 'guides to determining what is reasonable'" under the Sixth Amendment. Wiggins, 539 U.S. at 522-25 (citing Strickland; Williams). See also Outten v. Kearney, 464 F.3d 401, 417 (3d Cir. 2006).

272.    The Guidelines in effect at the time of Petitioner's 1996 trial clearly called for counsel to "be familiar with the precedents relating to questioning and challenging of potential jurors." ABA GUIDELINE 11.7.2.B (1989) at 117. The commentary specifically highlights Batson "and its progeny" as an example of "an important" voir dire issue. Id., Commentary, at 118 n.5.[59] At the conclusion of the prosecutor's alleged race neutral rationale for striking Ms. Stewart, the Court asked

---

[59] These Guidelines have since been revised. See *ABA Guidelines for Appointment and Performance of Counsel in Death Penalty Cases (Revised Edition 2003)*, Guideline 10.10.2 (based on Guideline 11.7.2 of the original edition), and Commentary, at 104-07.

if counsel had any comments. Counsel stood silent, merely stating, "No, your Honor. I think the Court's covered it." NT 10/23/96 at 200.    Competent counsel would have objected to the prosecutor's strike, and pointed out the inconsistencies in the explanation for striking this juror. Counsel's failure to discharge their duty to ensure that Petitioner's jury selection was not the result of discrimination constitutes deficient performance. Similarly, counsel's deficient performance denied Petitioner the right to be tried by an impartial jury selected in conformity with the federal constitution. Because this is structural error, prejudice is presumed. E.g., Williams v. Woodford, 396 F.3d 1059, 1069 (9th Cir. 2005).

273.    Similarly, counsel's failure to raise these claims on appeal or during prior proceedings constitutes prejudicially deficient performance. The same standards apply to claims of appellate ineffectiveness. See, e.g. Roe v. Flores-Ortega, 528 U.S. 420 (2000) (applying Strickland standard to consideration of appellate counsel's ineffectiveness); United States v. Mannino, 212 F.3d 835 (3d Cir. 2000); Orazio v. Dugger, 876 F.2d 1508, 1513 (11th Cir. 1989); Matire v. Wainwright, 811 F.2d 1430, 1435 (11th Cir. 1987).    Where, as in this case, there is a "reasonable probability that the neglected claim[s] would have succeeded on appeal, [] counsel's failure to raise the claim f[alls] outside the range of reasonably competent assistance." Claudio v. Scully, 982 F.2d 798, 799 (2d Cir. 1992); Jackson v. Leonardo, 162 F3d. 81 (2d Cir. 1998) (appellate counsel's failure to raise "sure winner" constituted ineffective assistance: "In the instant case, we believe that appellate counsel's failure to raise a well-established, straightforward, and obvious . . . [claim] . . . constitutes ineffective performance."); Starr v. Lockhart, 23 F.3d 1280 (8th Cir. 1993 ) (finding trial and appellate counsel ineffective for failing to object to and raise an erroneous jury instruction); Freeman v. Lane, 962 F.2d 1252 (7th Cir. 1992) (appellate counsel ineffective for failing to raise a meritorious claim that was

118

"presented squarely" at trial regarding a violation of the defendant's Fifth Amendment rights);

Murphy v. Puckett, 893 F.2d 94 (5th Cir. 1990) (counsel's failure to raise valid defense at trial and

on direct appeal constituted ineffective assistance).

274.    The failure to raise and litigate a meritorious issue arising out of the prosecution's

discriminatory jury selection constitutes prejudicially deficient performance. E.g., Eagle v. Linahan,

279 F.3d 926, 943-44 (11th Cir. 2001) (finding counsel ineffective for failing to litigate Batson claim

in state court appeal).    In this capital case, these failures also violated Petitioner's Eighth

Amendment rights to a reliable capital trial and to meaningful appellate review of his capital

conviction.

275.    As set forth above, Petitioner has presented a meritorious jury discrimination claim

that was obvious from the face of the record in this case.    Any failure on the part of trial and

appellate counsel to properly raise, preserve, and litigate this issue in state court constitutes

prejudicially deficient performance in violation of Petitioner's federal constitutional rights.

**D.    The State Court Proceedings.**

276.    This claim has been raised in the presently-pending *Motion for Postconviction Relief*

*Pursuant to Superior Court Criminal Rule 61, and Consolidated Memorandum of Law* which was

filed in the Delaware Superior Court on January 25, 2008.

**CLAIM IX.    AS A RESULT OF COUNSEL'S INEFFECTIVENESS, JURORS WERE PERMITTED TO VIEW PETITIONER IN PRISON CLOTHING IN VIOLATION OF PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.[60]**

277.    The claims and factual allegations set forth in all other sections of this *Petition* are incorporated by reference and realleged as if set forth entirely herein.

278.    On the first day of jury selection at his trial in 1996, as the result of a mix up at the prison, Petitioner was not provided with civilian clothing. Prior to the prospective jurors being brought into the courtroom, the court recognized the problem and asked counsel if they had a problem going forward, or if they would prefer to recess and have the civilian clothing brought over so Petitioner could change clothes. NT 10/22/96 at 4. Remarkably, counsel opted to move forward, and as a result the venire panel witnessed Petitioner in his prison garb. Three members of the actual jury were selected that day.[61]

279.    Due process has long required that the jury's verdict must be based on the evidence developed at trial as opposed to information from outside resources. Chandler v. Florida, 449 U.S. 560, 575 (1981). More importantly, "the presumption of innocence . . . is a basic component of a fair trial under our system of criminal justice." Estelle v. Williams, 425 U.S. 501, 503 (1976). Over a hundred years ago, the Supreme Court declared that:

> The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law.

---

[60] This claim has been raised in the presently-pending *Motion for Postconviction Relief Pursuant to Superior Court Criminal Rule 61, and Consolidated Memorandum of Law* which was filed in the Delaware Superior Court on January 25, 2008.

[61] Juror No. 1, Karen L. Haney, NT 10/22/96 at 122-33; Juror No. 2, Rebecca A. Keesler, id. at 1147-55; and Juror No. 3, Terrence William Pendergast, id. at 161-80.

Coffin v. United States, 156 U.S. 432, 453 (1895). For these reasons, "courts must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." Estelle, 425 U.S. at 503. Requiring a defendant to appear before the jury in prison clothing creates an unreasonable risk of diluting the presumption of innocence and, therefore, deprives an accused of his clearly established Fourteenth Amendment rights. See Estelle, 425 U.S. at 504-05. See also Gaito v. Brierly, 485 F.2d 86, 88 (3d Cir. 1973).

280.    Counsel's failure to accept the court's offer of a recess to allow Petitioner to change into civilian clothes resulted in three jurors seeing Petitioner in his orange prison jumpsuit. Counsel could have no reasonable strategic basis for subjecting Petitioner to the view of these jurors in a manner that is inherently prejudicial and unreasonably risks the dilution of Petitioner's fundamental right to the presumption of innocence.

281.    Moreover, there is no indication that the jurors exposed to Petitioner in prison clothing were instructed not to discuss their observations with the other jurors who were seated on Petitioner's case and not to impose any conclusions on the basis of Petitioner's appearance. In light of these circumstances, there is more than a reasonable likelihood that the jurors' impartiality and Petitioner's right to the presumption of innocence was compromised in violation of Petitioner's clearly established Fourteenth Amendment rights. Thus, prejudice is demonstrated and relief is required.

**CLAIM X.    PETITIONER WAS DENIED HIS RIGHT TO A FAIR AND IMPARTIAL JURY AT HIS CAPITAL TRIAL IN 1996 IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

282.    The claims and factual allegations set forth in all other sections of this *Petition* are incorporated by reference and realleged as if set forth entirely herein.

121

A.    **The Legal Standard.**

283.    As Chief Justice Marshall noted over a century ago:

The great value of the trial by jury certainly consists in its fairness and impartiality. Those who most prize the institution, prize it because it furnishes a tribunal which may be expected to be uninfluenced by an undue bias of the mind.

United States v. Burr, 25 F. Cas. 49, 50 (1807).

284.    Bias may be actual or presumed. Actual bias is demonstrated when "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright v. Witt, 469 U.S. 412, 424 (1985) (quoting Adams v. Texas, 448 U.S. 38, 45 (1980)). See also, Smith v. Phillips, 455 U.S. 209, 217 (1982); United States v. Wood, 299 U.S. 123, 133-34 (1936); United States v. Torres, 128 F.3d 38, 43 (2d Cir. 1997); Hunley v. Godinez, 975 F. 2d 316, 318 (7th Cir. 1992); United States v. Nell, 526 F.2d 1223, 1229 (5th Cir. 1976); United States v. Haynes, 398 F. 2d 980, 984-85 (2d Cir. 1968).

285.    Where actual bias is at issue, due process is satisfied so long as the trial court conducts a probing inquiry into the nature of the bias, and the record supports the conclusion that the juror can set the beliefs or experiences aside and consider the matter on the basis of the evidence alone. Adams v. Texas, 448 U.S. 38, 45 (1980) ("unless [the juror's] views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath," due process is not violated); Smith v. Phillips, 455 U.S. at 217 ("Due process means a jury capable and willing to decide the case solely on the evidence before it").

286.    Where, however, a juror has a close relationship with a participant or the issues in the trial, there exists a "conclusive presumption of implied bias." Smith v. Phillips, 455 U.S. at 222 (O'Connor, J. concurring). Under these circumstances, regardless of the existence of an actual bias,

the juror must be struck as a matter of law in order to preserve a defendant's rights to due process and a fair and impartial jury. E.g. Leonard v. United States, 378 U.S. 544 (1964) (per curiam) (automatic disqualification required where prospective jurors heard the defendant's guilty verdict in another trial); Taylor v. Louisiana, 379 U.S. 466, 473-74 (1965) (juror's association with deputy sheriffs who were also key prosecution witnesses deprived the defendant of his rights to due process and a fair and impartial jury).[62]

287.    The rationale behind this rule is well-settled. A juror "may declare that he feels no prejudice in the case; and yet the law cautiously incapacitates him from serving on the jury because it suspects prejudice, because in general persons in a similar situation would feel prejudice" United States v. Burr, 25 F. Cas. 49, 50 (1807). Indeed, as Justice O'Connor aptly recognized, "partly because a juror may have an interest in concealing his own bias and partly because the juror may be unaware of it" a finding of implied bias is justified in order to avoid a miscarriage of justice where a juror has a close relationship with the participants or the issues in a trial. Smith v. Phillips, 455

---

[62] See also, Gonzales v. Beto, 405 U.S. 1052 (1972) (*Per curiam* reversal on the basis of Taylor v. Louisiana where the sheriff who was the key prosecution witness also served as bailiff during the trial); Tumey v. Ohio, 273 U.S. 510, 523 (1927) (mayor who received benefit of fines and costs disqualified from determining defendant's guilt in trial for unlawfully possessing intoxicating liquors); Hunley v. Godinez, 975 F. 2d 316, 320 (7th Cir. 1992) (bias presumed where juror victims of burglary in hotel were sequestered during murder and burglary trial); Burton v. Johnson, 948 F. 2d 1150, 1159 (11th Cir. 1991) (juror who failed to disclose during voir dire that she was involved in an abusive family situation where the defense was battered spouse syndrome constituted implied bias); United States v. Eubanks, 591 F. 2d 513, 517 (9th Cir. 1979) (presumed bias where juror's sons imprisoned for heroin related crimes in heroin conspiracy trial); United States v. Allsup, 566 F. 2d 68, 71 (9th Cir. 1977) (implied bias where jurors worked for same bank at different branch in bank robbery trial); United States ex rel. Steward v. Hewitt, 517 F. 2d 993, 997 (3d Cir. 1975) (presumptive bias where father of deceased served as tipstaff during trial); Jackson v. United States, 395 F. 3d 615, 617-18 (D.C. Cir. 1968) (implied bias where juror involved in "love-triangle" similar to one at issue at trial); United States ex rel. DeVita v. McCorkle, 248 F. 2d 1, 8 (3d Cir. 1957) (en banc) (implied bias where juror was victim of robbery prior to trial in robbery case).

U.S. at 221-22 (O'Connor, J. concurring). <u>See also</u>, <u>Irvin v. Dowd</u>, 366 U.S. at 728 (recognizing that under certain circumstances, the "psychological impact requiring [a declaration by the juror that he or she can be fair] before one's fellows is often its father" and, as a result, "such a statement of impartiality can be given little weight").

**B.      The Failure to Exclude Three Jurors Violated Petitioner's Sixth, Eighth and Fourteenth Amendment Rights.**

**1.      Juror Number 2, Rebecca Keesler**

288.    Juror Number 2, Rebecca Keesler, should have been struck for cause because of her fragile emotional state at the prospect of having to serve on a capital jury.

289.    When Ms. Keesler was voir dired on the first day of jury selection of Petitioner's capital trial in 1996, she answered all of the court's questions appropriately, and was accepted as a juror. NT 10/22/96 at 147-55. However, three days later, the prosecutor, Mr. Wharton, informed the court and the defense that he had been approached by a deputy attorney general, Tom Stevens, who was on trial in the neighboring courtroom, who told him that his wife was a nurse for a Dr. Borrin, and that a nineteen year old juror had come into his office and asked for a medical excuse because she was "devastated" at the possibility of sitting on a capital murder case, and that she had been crying every night since being selected. NT 10/15/96 at 75-6.

290.    After confirming that there were no other capital cases with juries being selected at the same time, and also confirming that Ms. Keesler, was in fact nineteen years old, the court agreed to have her come in the following Monday to inquire into the matter. <u>Id.</u> at 78-9. The court then continued with jury selection.

291.    The next day of jury selection, the court asked the juror whether she was having

124

problems sleeping. The juror responded that "My mother is nuts. She told me she called my doctor . . . [a]nd I guess my doctor knew somebody or something and it got back here. I have no clue." NT 10/28/96 at 21-2. The juror denied sobbing at night, and when asked if she preferred to get off the jury, said she was "fine." Id. at 22. When the prosecution requested further inquiry, the juror admitted that she had been "a little upset" initially, but then was fine, and denied ever having seen her doctor. Id. at 24-5. No further questions were asked, and no opportunity was provided by the Court, or requested by either party, to continue the inquiry.

292.    Given the potential fragile emotional and psychological state of mind of this juror, the Court was obliged to conduct further inquiry. Given the significant consequences involved in a capital case, the Court erred in merely taking the juror at her word, especially after she admitted how upset she had been. Moreover, the juror's version of events contradicted that of the deputy attorney general and his wife, a nurse, who stated that the juror had actually come into the doctor's office. At the least, the Court was obligated to inquire of these two individuals to find out what actually took place, and whether the juror was being candid with the Court.

293.    The presence of a biased juror, like that of a biased judge, constitutes a "structural defect in the constitution of the trial mechanism" and is not subject to harmless error analysis. Johnson v. Armontrout, 961 F.2d 748, 756 (8th Cir. 1992) (quoting Arizona v. Fulminante, 499 U.S. 279, 309 (1991). Hence, the Sixth Amendment right to a trial by an impartial jury cannot be waived by counsel or the court, as both parties share in the duty to ensure that biased jurors are dismissed. Hughes v. United States, 258 F.3d 453, 463-64 (6th Cir. 2001). The Court should have required additional voir dire of Ms. Keesler, as well as the nurse who made the allegation, to ensure that Ms. Keesler was being truthful with the court, and to ensure that a juror with a fragile and unstable

psyche was not given the awesome responsibility of determining the guilt or innocence of Petitioner, or whether he should live or die.

### 2.    Juror Number 3, Terrence Pendergast

294.    Terrence Pendergast should have been dismissed for a number of reasons. In addition to being exposed to Petitioner in his prison clothing without any voir dire or curative instructions to determine whether this adversely affected Petitioner's presumption of innocence, (see Claim IX), the court expressed concern that Mr. Pendergast had walked in and out of the courtroom a few times that morning during jury selection. NT 10/22/96 at 162. Mr. Pendergast said he was confused about where to go, and that he had asked several people who were coming into the courtroom about where to go.

295.    While the court asked Mr. Pendergast whether he was "influenced in any way by what [he] heard when he was in court [that] morning," the court failed to inquire specifically as to what exactly Mr. Pendergast had heard and seen. Also, when asked whether he had any "yes" responses to the questions that the Court had asked the previous day, the juror indicated that he didn't recall the questions the court was talking about, and the court had to actually provide Mr. Pendergast with a list of the questions. Id. at 162. Upon being provided with the list, Mr. Pendergast said he remembered reading an article about a shooting at Cavalier Apartments about a year prior to the trial, but that he didn't recall discussing it with anybody and that he hadn't formed an opinion based on what he read. Id. at 163. Mr. Pendergast did not answer yes to any of the remaining questions.

296.    At the conclusion of voir dire, the prosecutor pointed out that Mr. Pendergast failed to answer yes to the question about being a convicted felon, and informed the Court, and counsel, that Mr. Pendergast had been arrested for possession of drug paraphernalia, conspiracy, a weapons

charge and possession with intent to deliver. Mr. Pendergast ultimately plead guilty to possession of marijuana. Id. at 174-5. At this point, co-defendant's counsel indicated he may have represented the juror in a guilty plea ten years before for possession of marijuana.[63] When queried further about this conviction, the juror explained that the police found drugs under his mother's bed that she had taken from a student on her school bus, his mother was on vacation at the time, and he claimed the drugs were his and pled guilty. Id. at 176.

297.    Given the juror's lack of candor about his prior conviction, as well as his apparent willingness to lie under oath in the guilty plea proceeding for that case,[64] the Court should have *sua sponte* removed this juror for cause. Since his responses confirmed a history of lying under oath, there was a strong likelihood that Mr. Pendergast lied about not forming an opinion from the article he had read about the case, or about any number of questions about which the Court had previously questioned him. Simply put, this juror could not be trusted to provide an honest answer. The Court's failure to remove this juror, and counsel's failure to make a challenge for cause on this basis prejudiced Petitioner.

### 3.    Juror Number 5, Patricia Romanoski

298.    The Court also erred in failing to grant Petitioner's challenge for cause of Juror No. 5, Patricia Romanoski. Ms. Romanoski admitted that two years before, she sat as a juror on another murder case. The circumstances of that trial were very similar to those in Petitioner's case. It happened at an apartment complex, two defendants were involved, and a man was killed. The jury

---

[63] Upon further inquiry, it appeared this was not the case, as the juror indicated he had been represented by Jim Natalie. NT 10/22/96 at 177.

[64] Unless, of course, the marijuana really was his, in which case he lied to the Court in these proceedings.

127

found the defendants guilty, but handed down a life sentence instead of the death penalty. Ms. Romanoski also recalled that one of the attorneys on this case was the attorney on that case  NT 10/23/96 at 53-55. The Court then asked Ms. Romanoski to leave the courtroom, at which time Mr. Figliola informed the Court that he had been the attorney on that case, and that his client had in fact been given a life sentence. Id. at 55.

299.    Mr. Figliola then requested that the prospective juror be struck for cause, at which point the prosecution requested additional voir dire. Id. The Court then asked Ms. Romanoski whether Mr. Figliola's participation in the case would prevent her from being fair and impartial, to which she responded it would not, and that her prior juror experience would not affect her partiality either. Id. at 57.[65] The Court continued with the remaining voir dire questions asked of all jurors, and at the conclusion of voir dire, called the question, at which no party issued a challenge for cause or utilized a peremptory. Id. at 65.

300.    A court should not simply rely on a juror's assurances of impartiality. Kirk v. Raymark Industries, Inc., 61 F.3d 147, 156 (3d Cir. 1995). In this instance, Ms. Romanoski clearly remembered the details of the prior case, which were strikingly similar to the factual scenario in Petitioner's case. She also clearly remembered that Attorney Figliola had represented one of the defendants in that case (who the jury had ultimately found guilty of first degree murder but spared his life). Given her prior experience with Petitioner's counsel in a trial with a virtually identical factual scenario, a "conclusive presumption of implied bias" existed and Ms. Romanoski should have been excused. Smith v. Phillips, 455 U.S. at 222 (O'Connor, J. concurring). The Court's and

---

[65] Ms. Romanoski also expressed concern that she would have to miss a month of work. NT 10/23/96 at 57-8.

128

counsel's failure to remove these biased jurors from the panel violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

### D.    Counsel Was Ineffective.

301.    The Sixth Amendment right to effective assistance of counsel is violated when counsel's performance is deficient, i.e., falls below "an objective standard of reasonableness;" and the defendant is prejudiced, i.e., when confidence is undermined in the outcome of the proceeding. Wiggins v. Smith, 539 U.S. 510, 521 (2003); Williams v. Taylor 529 U.S. 362 (2000); Strickland v. Washington, 466 U.S. 668, 694 (1984). In evaluating counsel's performance, the Court should consider professional norms such as the American Bar Association's Standards for Criminal Justice ("ABA STANDARDS") and Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989) ("ABA GUIDELINES"), which articulate "reasonable" professional "standards for capital defense work" and are the "norms" and "standards to which [the Supreme Court] long ha[s] referred as 'guides to determining what is reasonable'" under the Sixth Amendment. Wiggins, 539 U.S. at 522-25 (citing Strickland; Williams). See also Outten v. Kearney, 464 F.3d 401, 417 (3d Cir. 2006).

302.    Despite the obvious constitutional errors described above and the impact of those errors on Petitioner's right to a fair and impartial jury at his capital trial in 1996, counsel failed to develop and raise these claims during trial, post-trial and appellate proceedings in violation of the Sixth, Eighth and Fourteenth Amendments. Moreover, as these issues involve Petitioner's basic Sixth Amendment right to an impartial jury, counsel could have no sound trial strategy to support their waiver of this constitutional right. See Hughes v. State, 258 F.3d 453, 463 (6th Cir. 2001). Counsel's failure to raise a cause challenge, object to the Court's failure to grant the cause challenges

129

when they were alleged, or, exercise a peremptory strike when the challenge for cause was denied, constituted prejudicially deficient performance.

303.    Similarly, counsel's failure to raise these claims on appeal or during prior proceedings constitutes prejudicially deficient performance. The same standards apply to claims of appellate ineffectiveness. See, e.g. Roe v. Flores-Ortega, 528 U.S. 420 (2000) (applying Strickland standard to consideration of appellate counsel's ineffectiveness); United States v. Mannino, 212 F.3d 835 (3d Cir. 2000); Orazio v. Dugger, 876 F.2d 1508, 1513 (11th Cir. 1989); Matire v. Wainwright, 811 F.2d 1430, 1435 (11th Cir. 1987). Where, as in this case, there is a "reasonable probability that the neglected claim[s] would have succeeded on appeal, [] counsel's failure to raise the claim f[alls] outside the range of reasonably competent assistance." Claudio v. Scully, 982 F.2d 798, 799 (2d Cir. 1992); Jackson v. Leonardo, 162 F.3d. 81 (2d Cir. 1998) (appellate counsel's failure to raise "sure winner" constituted ineffective assistance: "In the instant case, we believe that appellate counsel's failure to raise a well-established, straightforward, and obvious . . . [claim] . . . constitutes ineffective performance."); Starr v. Lockhart, 23 F.3d 1280 (8th Cir. 1993) (finding trial and appellate counsel ineffective for failing to object to and raise an erroneous jury instruction); Freeman v. Lane, 962 F.2d 1252 (7th Cir. 1992) (appellate counsel ineffective for failing to raise a meritorious claim that was "presented squarely" at trial regarding a violation of the defendant's Fifth Amendment rights); Murphy v. Puckett, 893 F.2d 94 (5th Cir. 1990) (counsel's failure to raise valid defense at trial and on direct appeal constituted ineffective assistance). Accordingly, for this reason as well, relief is required.

E.    **The State Court Proceedings.**

304.    This claim has been raised in the presently-pending *Motion for Postconviction Relief*

130

*Pursuant to Superior Court Criminal Rule 61, and Consolidated Memorandum of Law* which was

filed in the Delaware Superior Court on January 25, 2008.

**CLAIM XI.** **AS THE RESULT OF TRIAL COURT ERROR AND INEFFECTIVE ASSISTANCE OF COUNSEL DURING THE JURY SELECTION FOR PETITIONER'S 2005 RESENTENCING TRIAL, PETITIONER WAS DENIED HIS SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.**

305.    The claims and factual allegations set forth in all other sections of this *Petition* are

incorporated by reference and realleged as if set forth entirely herein.

306.    It is well settled that the Sixth and Fourteenth Amendments "guarantee a defendant

on trial for his life the right to an impartial jury." Ross v. Oklahoma, 487 U.S. 81, 85 (1988); Irvin

v. Dowd, 366 U.S. 717, 722 (1961). Part of the guaranty of this right "is an adequate voir dire to

identify unqualified jurors." Morgan v. Illinois, 504 U.S. 719, 730 (1992); Dennis v. United States,

339 U.S. 162, 171-172 (1950); Morford v. United States, 339 U.S. 258, 259 (1950). It is also well

settled that the Sixth Amendment right to an impartial jury is violated when a jury is empaneled that

is "uncommonly willing to condemn a man to die." Witherspoon v. Illinois, 391 U.S. 510, 521

(1968).

307.    Moreover, the requirement of adequate voir dire takes on even greater importance in

a capital case, because of the "the qualitative difference of death from all other punishments,"

California v. Ramos, 463 U.S. 992, 998-99 (1983), and because capital juries are required to make

a "highly subjective 'unique individualized judgment regarding the punishment that a particular

person deserves,'" Caldwell v. Mississippi, 472 U.S. 320, 340-41 n.7 (1985). Because of the

heightened protections due capital defendants and the "unique opportunity [which] exists for bias

to operate undetected" at capital sentencing, King v. Lynaugh, 828 F.2d 257, 259 (5th Cir. 1987),

adequate voir dire of potential jurors becomes even more important.

308.    The constitutional standard for determining juror bias is no different in a capital case than it is in any other case. Wainwright v. Witt, 469 U.S. 412, 423 (1984) ("there is nothing talismanic about juror exclusion" in capital cases). Under the Sixth Amendment, a juror is considered biased if "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Gray v. Mississippi, 481 U.S. 648, 657 (1987) (quoting Adams v. Texas, 448 U.S. 38, 45 (1980)).

309.    In Witt, the United States Supreme Court stated, "As with any other trial situation where an adversary wishes to exclude a juror because of bias, . . . the adversary seeking exclusion . . . must demonstrate, through questioning, that the potential juror lacks impartiality." Then the trial judge "determine[s] whether the challenge is proper." Witt, 469 U.S. at 423-24; id. at 429 ("excluding prospective capital sentencing jurors because of their opposition to capital punishment is no different from excluding jurors for innumerable other reasons which result in bias").

310.    In determining a juror's fitness to serve on a capital jury, the Supreme Court has ruled that "the State may bar from jury service those whose beliefs about capital punishment would lead them to *ignore the law or violate their oaths*." Adams v. Texas, 448 U.S. at 51. See Gray v. Mississippi, 481 U.S. at 657; Morgan v. Illinois, 504 U.S. at 728. The right to an impartial jury entitles a capital defendant to a sentencing jury that is capable of following the law and imposing a life sentence, no less than the state is entitled to a jury that is capable of following the law and imposing a death sentence. See Stroud v. United States, 251 U.S. 15 (1919); Ross v. Oklahoma, 487 U.S. 81 (1988); Morgan v. Illinois, 504 U.S. at 728-29 (reiterating Ross). Thus, the applicable standard is "whether the juror's views would 'prevent or substantially impair the performance of his

132

duties as a juror in accordance with his instructions and his oath.'" See Morgan, 504 U.S. at 728

(quoting Wainwright v. Witt, 469 U.S. at 424, and Adams v. Texas, 448 U.S. at 45). Where even

a single juror harbors a prejudice against the defendant or in favor of the prosecution, the impartiality

of the entire jury is compromised. Ross v. Oklahoma, 487 U.S. at 85; Turner v. Murray, 476 U.S.

28 (1986); Ristaino v. Ross, 424 U.S. 589, 596 (1976); Irvin v. Dowd, 366 U.S. at 722; United States

v. Evans, 917 F.2d 800, 809 (4th Cir. 1990). Where the court's voir dire fails to adequately inquire

into these potential biases, the Sixth, Eighth and Fourteenth Amendments are violated.

A.    **Two Jurors Should Have Been Struck for Cause at the Jury Selection of Petitioner's Capital Resentencing Proceedings in 2005.**

311.    As set forth above, due process and the Sixth Amendment right to an impartial jury

are violated when even one biased juror is empaneled. When the death sentence is implicated, courts

and counsel must exercise even greater care to ensure to remove biased jurors. See California v.

Ramos, 463 U.S. at 998-99 ("the qualitative difference of death from all other punishments requires

a correspondingly greater degree of scrutiny of the capital sentencing determination.").

312.    Capital juries are required to make a "highly subjective 'unique individualized

judgment regarding the punishment that a particular person deserves'." Caldwell v. Mississippi,

472 U.S. at 340-341, n.7 (1985). Where a juror's bias is of the nature that it precludes him or her

from considering, as a mitigating factor, any aspect of a defendant's character or record and any of

the circumstances of the offense that the defendant proffers as a basis for a sentence less than death,

the resulting verdict violated the Eighth and Fourteenth Amendments. Lockett v. Ohio, 438 U.S.

586, 604 (1978).

313.    Since the United States Supreme Court's landmark decision in Witherspoon v.

133

Illinois, 391 U.S. at 522, it has been established that the Sixth Amendment right to an impartial jury is violated when a jury is empaneled that is "uncommonly willing to condemn a man to die." Witherspoon v. Illinois, 391 U.S. 510, 521 (1968).

314.    Because of the heightened protections due capital defendants and the "unique opportunity [which] exists for bias to operate undetected" at capital sentencing, King v. Lynaugh, 828 F.2d 257, 259 (5th Cir. 1987), adequate voir dire of potential jurors becomes even more important.  As a result of court error and ineffective assistance of counsel, two biased jurors were empaneled during Petitioner's resentencing in 2005, in violation of the Sixth, Eighth, and Fourteenth Amendments.

### 1.    The Failure to Excuse A Juror Who Would Favor the Testimony of Police Officers Over Civilian Witnesses.

315.    Stephen Roberts, the first juror selected at Petitioner's resentencing proceedings in 2005 and appointed as Jury Foreman by the Court, initially indicated that while it would depend on the circumstances, he would tend to give greater weight to the credibility of a police officer over a civilian witness simply because the person was a police officer.  Id. at 47.  The Court then asked if that was always the case, to which Mr. Roberts replied, "I don't want to say that's always the case, but I'll have to observe and listen and see if there's any contradiction - - any contradiction going on there."  Id. at 48.

316.    Rather than follow up on this patently biased response, the Court simply moved on to the next question on the list.  Counsel failed to make a challenge for cause, despite the fact that it was clear from the face of the record that Mr. Roberts was unequivocal in his response that if there was a dispute in the testimony between a police officer and a civilian witness, he would favor the

officer.

317.    Mr. Roberts meets the criteria of a biased juror under any definition of the term. Mr. Roberts expressly revealed his actual bias in favoring the credibility of police over other witnesses; he should have been disqualified. See United States v. Torres, 128 F.3d 38, 43 (2nd Cir. 1997) ("[a]ctual bias is 'bias in fact' - the existence of a state of mind that leads to an inference that the person will not act with entire impartiality."). Mr. Roberts' presence on the jury - especially as jury foreman - violated Petitioner's constitutional guarantee to an impartial jury, and a new resentencing proceeding is required.

**2.    The Failure to Excuse a Juror Who had an Implied Bias Against Petitioner.**

318.    Joyce Lennon was selected as Juror Number 2. During voir dire, Ms. Lennon noted that she had two very close friends who were murdered, that the person responsible received a sentence of life imprisonment, and that as a result the juror has "very strong opinions in that way." NT 11/09/05 a.m. at 10. Ms. Lennon then indicated that on a scale of one to ten as to how strongly she favored the death penalty, she would rate a five, and it would depend on the evidence. Id. No further questions were asked of Ms. Lennon concerning her "strong opinions" about the death penalty.

319.    Ms. Lennon also indicated that she worked as a certified grief counselor, and that she had counseled families of crime victims in the course of her duties. Id. at 16. While Ms. Lennon claimed that she could still be impartial based on these circumstances, a finding of implied bias is justified in order to avoid a miscarriage of justice where a juror has a close relationship with the participants or the issues in a trial. Smith v. Phillips, 455 U.S. at 221-22 (O'Connor, J. concurring).

320.    While Ms. Lennon stated she could evaluate the evidence without referring to her own

personal experience with two murder victims, in certain situations bias must be presumed, regardless of a juror's expressed sentiments, because often the juror may not even be aware she is harboring bias. Id. Because of the gravity of the job of the jury in this case - to determine whether to or not to recommend the death penalty - and the circumstances of having two close friends murdered, a finding of implied bias was required. While counsel did raise a challenge, it was primarily based on Ms. Lennon's concern over her job and school responsibilities, although counsel did note his concern with Ms. Lennon's involvement with the families of victims of crime. The court denied Petitioner's challenge, and likewise refused to inquire into the issue of financial hardship as requested by the defense.

321.    The Court erred in refusing to excuse Ms. Lennon. Counsel's subsequent failure to exercise a peremptory strike to remove this juror resulted in a biased juror being seated in violation of Petitioner's clearly established federal constitutional rights.

**B.    The Court Improperly Excluded Prospective Jurors Who Expressed a Concern About the Death Penalty, But Did Not State that They Could Not Follow the Law, in Violation of Petitioner's Rights under the Sixth, Eighth and Fourteenth Amendments.**

322.    Petitioner's death sentence must be vacated because the trial court improperly struck for cause three jurors who were not "substantially impaired" by their views on the death penalty. The Court's exclusion of these prospective jurors without conducting a full inquiry into whether or not their beliefs would have substantially impaired their ability to follow the law as instructed by the Court, and counsel's ineffective failure to request additional voir dire of these jurors to rehabilitate them violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

323.    In capital cases, "a criminal defendant has the right to an impartial jury drawn from

a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause." Uttecht v. Brown, 127 S.Ct. 2218, 2224 (2007). A prospective capital juror is "partial" and should be struck for cause if his or her views on capital punishment "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Adams v. Texas, 448 U.S. at 45; Witt, 469 U.S. at 424. The responsibility lies with the trial court to determine whether a challenge for cause is proper. "Thus, before it can sustain the exclusion, the judge must make a factual determination that the prospective juror would be biased." Szuchon v. Lehman, 273 F.3d 299, 328 (3d. Cir. 2001).

324.    Life-qualification refers to instances of excluding jurors who are partial to the state because their pro-death penalty views prevent or substantially impair them from returning a life sentence. Death qualification refers to instances when the state seeks to exclude jurors who are partial to the defense because their anti-death penalty views would prevent or substantially impair them from returning a death sentence. Our system of justice recognizes that individuals can harbor specific beliefs yet still be able to fairly consider the evidence presented and apply the law as instructed by the court. It is not the belief which renders the juror incapable of serving. The question is whether that belief would substantially impair the juror's ability to be fair. Where an individual can set that belief aside and apply the law to the facts, exclusion is improper. For this reason, the court's inquiry of a juror who expresses reservations about or beliefs against the death penalty is critical to a defendant's right to a fair and impartial jury. Where the court's voir dire fails to adequately inquire into these potential biases, the Sixth, Eighth and Fourteenth Amendments are violated. Indeed, views on the death penalty can favor the prosecution as well as the defendant, and the trial court may not conduct voir dire on this issue in a one-sided manner.

325.    Thus, a new sentencing proceeding is required whenever the court improperly dismisses jurors who expressed doubt or opposition to the death penalty or questioned the death penalty but are not substantially impaired. These actions violate Witherspoon, 391 U.S. at 521; see Szuchon v. Lehman, 273 F.3d 299 (3d Cir. 2001) (reversing death sentence because exclusion for cause of prospective juror who stated that he did not believe in death penalty, but was not asked whether he could be impartial, warranted grant of habeas relief).

326.    The use of voir dire to eliminate potential jurors should be even handed, treating fairly both the defendant and the prosecution, *especially* in a situation where the trial court, not counsel, poses questions on individual voir dire. Under Witherspoon and its progeny, the prosecution may challenge for cause any potential juror whose anti-capital punishment views would "prevent or substantially impair" him or her from voting for a death sentence in an appropriate case. The recent Supreme Court case, Uttecht v. Brown, 127 S.Ct 2218 (2007), reaffirmed this principle. Although the Supreme Court deferred to the trial court's finding of death-qualification in Uttecht, that case can be distinguished from the instant case by the extensive voir dire conducted (a period of eighteen days, as opposed to five days in Petitioner's case) and the "vigor" and "tenacity" of Uttecht's trial counsel in objecting to prosecution motions to strike for cause.

1.    **Improper Excusals of Death-Qualified Venirepersons**

327.    The Court conducted all group and individual voir dire at Petitioner's capital resentencing trial in 2005, asking only pre-approved questions submitted to the court by counsel. NT 9/07/05 at 17-29.[66] On three occasions, at the conclusion of the Court's inquiry, prospective

---

[66]  See DE ST SUPER CT JUROR USE Standard 7 (b): The clerk or trial judge shall direct to the array standard voir dire questions, supplemented with questions submitted by counsel and approved by the court. The trial judge should conduct the initial follow-up voir dire

138

jurors were improperly excused based on their apparent negative responses to the Court's questions about whether they could recommend the death penalty. Petitioner's counsel ineffectively failed to object to the disqualifications of these jurors or make any attempt whatsoever to rehabilitate the jurors and, in one case, actually *joined* the prosecution's motion to strike a prospective juror despite the absence of a fully inquiry.

        *a.*    *Ann Hostetter*

328.    Venireperson Ann Hostetter was asked whether she could recommend a sentence of death and initially responded that she wasn't sure. When asked how strong this view was, she stated "I'm sitting on the fence halfway." NT 11/15/05 at 96-8. When asked again, Ms. Hostetter said she thought she'd have difficulty considering a sentence of death, then qualified that to "*might* have difficulty deciding of a death penalty," but then ultimately answered that she would be able to recommend the death sentence if the law and evidence permitted, regardless of her feelings. Id. at 98-9.[67] Despite this affirmative response, the Court again asked Ms. Hostetter whether she would be able to recommend the death penalty, at which point she appeared confused and asked that the Court repeat the question. Id. at 99. When the Court asked for the final time whether Ms. Hostetter could recommend the death penalty, and whether she understood the question, she responded, "I

---

examination of individual jurors. Counsel may be permitted to ask additional questions in the discretion of the court.

[67] The Court: Okay. Well, let me ask you a couple of questions going back with that earlier question. Would you be able to recommend the death penalty at the end of this penalty hearing if the law and evidence permits regardless of your feeling about the death penalty that you just expressed?

Hostetter:    *Yes, I would.*

NT 11/15/05 at 98-9.

139

think so. No." Id. Despite Ms. Hostetter's earlier positive responses to this exact question, as well as her apparent confusion with the court's final questions, the Court did not clarify the question, and simply ended voir dire at this point. Most significantly, despite asking multiple times whether Ms. Hostetter could recommend the death penalty, the Court never asked the one specific question required by law, whether Ms. Hostetter's views would substantially impair her ability to follow the law or the Court's instructions on the law. Adams v. Texas, 448 U.S. at 45; Witt, 469 U.S. at 424. The Court erred in failing to make this inquiry of Ms. Hostetter, and counsel was ineffective for failing to request such an inquiry.

329.    The trial court erred in excusing for cause these venirepersons whose views on the death penalty did not substantially impair their ability to follow the law.  Trial counsel was ineffective for failing to attempt to rehabilitate these venirepersons and for failing to object to the prosecution's motions to strike for cause. These errors by the Court and counsel denied Petitioner his rights under the Sixth, Eighth and Fourteenth Amendments.

> b.    *Sultana Diamanty*

330.    Venireperson Sultana Diamanty, in response to the Court's question as to whether she would be able to recommend the death penalty if the law and evidence permitted, regardless of her beliefs, stated that "there would be a possibility, but it would be awfully strong for me to say "no" or "yes." NT 11/08/05 p.m. at 6-7. Upon further questioning, Ms. Diamanty stated that while her preference would be a life sentence, she could impose the death penalty under certain circumstances. Ms. Diamanty's final response was that she "would like to hear the sentencing, but the ultimate thing would be life sentence." Id. at 8. When the Court asked her to explain that answer, Ms. Diamanty admitted some confusion, and again stated that she strongly believed that she

"wish[ed] not to take a life," and that she did not know what could be said or done to make her change her mind. Id. Given Ms. Diamanty's initial response, that she could recommend the death penalty but "it would have to be awfully strong," as well as her apparent confusion with the Court's final question, the Court should have conducted additional voir dire, and counsel should have requested same, to ensure that Ms. Diamanty's beliefs truly would substantially impair her duties as a juror.

331.    Also, at no point did the Court ever explain that aggravating and mitigating circumstances would be presented, and that only upon a finding of the existence of an aggravating circumstance, would the death penalty even be a consideration. Had Ms. Diamanty been aware of the requirement of finding the presence of an aggravating factor before being permitted to even consider the death penalty, this may have been just the sort of "awfully strong" evidence she alluded to in her earlier responses to the Court. Counsel's failure to request additional voir dire of this juror, and specifically to have the Court explain aggravating and mitigating circumstances to her, constituted deficient performance.[68]

c.    Jermar Congo

332.    When asked to rank on a scale of one to ten his feelings on the death penalty, venireperson Jermar Congo stated that he "wasn't with the death penalty." When the Court asked if Mr. Congo had any religious, conscientious or other opposition to the death penalty, Mr. Congo responded that he had none, but he "just d[id]n't agree with it." NT 11/09/05 a.m. at 72-3. When the Court inquired further, Mr. Congo said he thought the death penalty was an easy way out. The

---

[68]    In fact, the Court failed to explain to any of the dismissed jurors that prior to even being able to consider a possible recommendation of death, they would first have to find the existence of an aggravating circumstance.

Court then asked Mr. Congo if he could recommend the death sentence under the evidence and circumstances presented to him, to which he initially answered no, but then stated it would depend upon the situation. Id. at 73. The Court's final question to Mr. Congo was whether he would be able to recommend the death penalty at the end of the hearing if the law and evidence permitted, regardless of his feelings. Mr. Congo answered "not really" to this question. Id. at 74. Without any further follow up, the prosecution made a challenge for cause, to which Petitioner's counsel took no position, except to say he "tend[s] to lean with the state." Id.

333.    The trial court failed to make the legally required inquiry as to whether Mr. Congo's views would substantially impair his ability to follow the law or the Court's instructions on the law. Adams v. Texas, 448 U.S. at 45; Witt, 469 U.S. at 424.   Defense counsel's failure to request that the Court attempt to rehabilitate Mr. Congo by asking him to clarify what he meant by "not really," and to request that the Court ask whether Mr. Congo's views would "substantially impair" his ability to follow the law constituted ineffective assistance.

   C.    **Counsel was Ineffective.**

334.    When counsel's performance falls below "an objective standard of reasonableness," it is considered deficient, in violation of the Sixth Amendment right to effective assistance of counsel. Petitioner is prejudiced when that deficient performance undermines confidence in the outcome of the proceeding. Wiggins v. Smith, 539 U.S. 510, 521 (2003); Williams v. Taylor 529 U.S. 362 (2000); Strickland v. Washington, 466 U.S. 668, 694 (1984).

335.    The proper standard for attorney performance is that of "reasonably effective assistance," as defined by "prevailing professional norms." Outten v. Kearney, 464 F.3d 401, 417 (3d Cir. 2006), quoting Strickland v. Washington, 466 U.S. 668, 687-88 (1984). Counsel's failure

to raise a cause challenge to the seating of the biased jurors as discussed above, object to the Court's failure to grant the cause challenges when they were alleged, or, exercise a peremptory strike when the challenge for cause was denied, constituted prejudicially deficient performance.

336.    With regard to the improper excusals for cause of the three venirepersons who expressed a concern about the death penalty but were not substantially impaired in their ability to follow the law, counsel's failure to request additional voir dire and attempt to rehabilitate these jurors was objectively unreasonable and prejudiced Petitioner, in violation of the Sixth Amendment right to effective assistance of counsel. See Wiggins, Williams, and Strickland, 466 U.S. at 694. The American Bar Association's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (Rev. Ed. 2003), the "prevailing professional norms" in effect at the time of Petitioner's resentencing in 2005, mandate that counsel in death penalty cases "develop a strategy for rehabilitating those prospective jurors who have indicated opposition to the death penalty." *ABA Guidelines for Appointment and Performance of Counsel in Death Penalty Cases (Rev. Ed. 2003)*, ABA Guideline 10.10.2, Commentary, at 106. In addition to comporting with the "prevailing professional norms," effective counsel is also charged with being aware of "the state of the applicable law." Everett v. Beard, 290 F.3d 500, 509 (3d Cir. 2002). At the time of jury selection (November 2005), the United States Supreme Court had long recognized a capital defendant's constitutional right to a properly death-qualified and life-qualified jury. See Morgan, Wainwright, Witt. There is no possible strategic reason for failing to object to the prosecution's challenges for cause or to request follow up questions to rehabilitate these jurors.

337.    As these issues involve Petitioner's basic Sixth Amendment right to an impartial jury, counsel could have no sound trial strategy to support their waiver of this constitutional right. See

143

Hughes v. State, 258 F.3d 453, 463 (6ᵗʰ Cir. 2001). As demonstrated above, the failure of both the Court to conduct a constitutionally adequate voir dire, and counsel's subsequent failure to make appropriate challenges for cause, request additional voir dire, and/or to object to the prosecution's challenges for cause, resulted in the empaneling of two biased jurors and the improper excusal for cause of three venirepersons, demonstrating prejudice.

**D.      The State Court Proceedings.**

338.    This claim has been raised in the presently-pending *Motion for Postconviction Relief Pursuant to Superior Court Criminal Rule 61, and Consolidated Memorandum of Law* which was filed in the Delaware Superior Court on January 25, 2008.

**CLAIM XII.    HABEAS RELIEF IS REQUIRED BECAUSE THE COURT'S INSTRUCTIONS ON ACCOMPLICE LIABILITY VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.[69]**

339.    The claims and factual allegations set forth in all other sections of this *Petition* are incorporated by reference and realleged as if set forth entirely herein.

340.    Due process requires the Commonwealth to prove beyond a reasonable doubt every element of the offense. In re Winship, 397 U.S. 358, 364 (1970). Jury instructions that lessen this burden violate due process. Cage v. Louisiana, 498 U.S. 39 (1990); Osborne v. Ohio, 495 U.S. 103, 122-23 (1990); Carella v. California, 491 U.S. 263, 265 (1989); Francis v. Franklin, 471 U.S. 307, 313 (1985); Sandstrom v. Montana, 442 U.S. 510 (1979 ); Smith v. Horn, 120 F.3d 400, 414-15 (3d Cir. 1997).

---

[69] These claims were exhausted in the state-court proceedings. See State v. Manley, 2003 WL 23511875 at *19-22 (Del.Super. 2003), *affirmed*, State v. Manley, 846 A.2d 238 (Del. 2004). In an exercise of caution, Petitioner will also be presenting these claims in his amended Rule 61 Petition.

341.    In evaluating a claim that jury instructions violate due process, the Court "must focus initially on the specific language challenged." Francis, 471 U.S. at 315; Smith, 120 F.3d at 411. The Court then considers the "constitutionally infirm language ... in the context of the charge as a whole." Smith at 411. Due process is violated if "there is a reasonable likelihood that the jury has applied the challenged instructions in a way" that lessens the Commonwealth's burden. Boyde v. California, 494 U.S. 370, 380 (1990); Smith at 411.

342.    In Delaware, a jury verdict in criminal cases must be unanimous. Fountain v. State, 275 A.2d 251 (Del. 1971) ("It is of course fundamental under our law that the verdict of a jury must be unanimous"). See also Del. Const. Art. I § 4; Del. Super. Crim. R. 31(a) ("The verdict shall be unanimous"). In order to meet its burden of proof beyond a reasonable doubt as to first degree murder, the state was required to prove that Petitioner "intentionally caused the death of [Kristopher Heath]." 11 Del. C. § 636 (a)(1). If, the prosecution seeks a conviction on the basis of accomplice liability, it must nevertheless prove beyond a reasonable doubt that the defendant held the required intent for first degree murder. See 11 Del. C. § 271(2).

343.    When a state mandates certain capital sentencing procedures, it creates Fourteenth Amendment life and liberty interests in those procedures. Evitts v. Lucey, 469 U.S. 387, 393 (1985) (due process interest in state created right to direct appeal).[70] Although the right to the particular procedure is established by state law, the violation of the life and liberty interest it creates is

---

[70] See also Hicks v. Oklahoma, 447 U.S. 343, 346 (1980) (liberty interest in state-created capital sentencing procedures); Ford v. Wainwright, 447 U.S. 399, 427-31 (1986) (O'Connor, J., concurring) (liberty interest in state-created right to proceedings to determine competency to be executed); Ohio Adult Parole Authority v. Woodard, 118 S. Ct. 1244, 1254 (1998) (O'Connor, J, with Souter, Ginsburg & Breyer, JJ., concurring) (life interest in state-created right to capital clemency proceedings); id. at 1254-55 (Stevens, J., concurring).

governed by *federal* constitutional law. Hicks v. Oklahoma, 447 U.S. 343, 346 (1980); Ford v. Wainwright, 447 U.S. 399, 428- 29; see Evitts, 469 U.S. at 393 (state procedures employed "as 'an integral part of the . . . system for finally adjudicating the guilt or innocence of a defendant'" must comport with due process). See also Fetterly v. Paskett, 997 F.2d 1295, 1300 (9th Cir. 1993) ("There is, of course, nothing in the Constitution of the United States that requires Idaho's legislature to approach [capital sentencing] as it has done . . . . However, the failure of a state to abide by its own statutory commands may implicate a liberty interest protected by the Fourteenth Amendment against arbitrary deprivation by a state."); Foster v. Delo, 39 F.3d 873, 882 (8th Cir. 1994) ("Where a state creates a right, such as a defendant's right to a review of his sentence, the Fourteenth Amendment of course entitles him to procedures to ensure that the right is not arbitrarily denied."). Thus, having defined first degree murder to include a required intent, state procedures, including court instructions, that relieve the prosecution of that burden violate federal due process. As described below, the court's instructions violated each of these clearly established federal constitutional requirements.

### A.    The Court's Unconstitutional Instructions Require Habeas Relief

344.    The court instructed the jury on accomplice liability as follows:

So in order to find either of the defendants guilty of an *offense* committed by another person, you must find that all three of the following elements have been proven to your satisfaction beyond a reasonable doubt:

First, another person committed the *offenses* charged; namely, murder first degree, two counts of possession of a firearm during the commission of a felony, and one count of aggravated act of intimidation, as I will explain these *offenses* for you.

And second, the named defendant intended to promote or facilitate the commission of the *offenses*. In other words, it was his conscious object or purpose to further or assist the commission of the *offenses*.

146

And third, the named defendant aided, counseled, or agreed to aid another person in planning or committing the *offense*.

NT 11/12/96 at 131.

345.    The court further told the jury that "there is no requirement that the jury be unanimous as to which of the parties was the principal and which was the accomplice, so long as you are all agreed as to guilt." Id. at 132. Finally, during its subsequent instructions on the individual charges, the court added to each instruction that the jury could find Petitioner guilty if it found that "the other defendant committed all of the elements of the offense and the defendant was an accomplice to those acts as I have defined that term for you..." NT 11/12/96 at 134. See also id. at 136; id. at 140-41; id. at 142-42.

346.    For a number of reasons, these instructions confused and conflated the requirements for first degree murder resulting in a reasonable likelihood that the jurors misapprehended those instructions in a manner that relieved the state of its burden of proving the required intent for first degree murder.

347.    First, by lumping together all the *offenses* in defining the elements of accomplice liability, there is a reasonable likelihood that the jurors, or a juror, interpreted those instructions to mean that, should the jury find sufficient evidence to demonstrate that Petitioner was an accomplice to a lesser offense, he was also guilty of murder, regardless of the presence or absence of evidence of the required intent. The court's instructions on murder did not cure the constitutional error and, instead, exacerbated the constitutional error. Rather than specifying that, in order for Petitioner to be an accomplice to murder, he must have held the requisite intent, the court merely told the jury that it should apply the (unconstitutional) accomplice instruction previously given.

147

348.    The constitutional errors were further compounded and exacerbated by the court's instruction that the jury's determination need not be unanimous so long as the jurors "agreed as to guilt," because the court failed to specify what it meant by "guilt," whether that be guilt as to murder or one of the lesser offenses. Thus, without clarification, it is reasonable likely that the jury could have interpreted the court's instructions to mean that it could find Petitioner guilty of first degree murder where some jurors concluded Petitioner was an accomplice to murder, some jurors concluded Petitioner was an accomplice to lesser offenses, and some jurors concluded that Petitioner was the principal.

349.    While a state may obtain a verdict where the jury is non-unanimous on the theory of the charge, so long as it is unanimous that the defendant is guilty of the specific charge, nothing in federal constitutional precedent "suggests that the Due Process Clause would permit a State to convict anyone under a charge of "Crime" so generic that any combination of jury findings of embezzlement, reckless driving, murder, burglary, tax evasion, or littering, for example, would suffice for conviction." Schad v. Arizona, 501 U.S. 624, 633 (1991) (*plurality*). The court's instructions here resulted in the reasonable and probable risk that this is precisely how the jury interpreted and applied those instructions. Accordingly, habeas relief is required.

**B.    Habeas Relief is Required Because Counsel Was Ineffective.**

350.    As described above, the court's instructions, when considered in total, unconstitutionally relieved the state of its burden of proving to a unanimous jury beyond a reasonable doubt that Petitioner held the requisite intent to commit first degree murder. Counsel's failure to object or request proper instructions constitutes prejudicially deficient performance in violation of the Sixth, Eighth and Fourteenth Amendments. While Strickland "did not 'establish mechanical

148

rules'" for determining ineffectiveness, "counsel must not neglect to suggest instructions that represent the law that would be favorable to his or her client." Everett v. Beard, 290 F.3d 500, 514 (3d Cir. 2002). See also Carpenter v. Vaughn, 296 F. 3d 138, 158-50 (3d Cir. 2002) (holding that counsel provided ineffective assistance in a Pennsylvania capital case by failing to ensure that jury receive an accurate instruction on parole ineligibility).

351.    Where, as here, counsel failed to ensure that the jury was properly instructed on the requirements for finding Petitioner guilty of first degree murder and the court's instructions unconstitutionally relieved the state of proving beyond a reasonable doubt to a unanimous jury critical elements of that charge, deficient performance is demonstrated. Similarly, Petitioner has demonstrated prejudice. There is more than a reasonable likelihood that the jury interpreted the court's instructions in an unconstitutional manner that resulted in both a non-unanimous verdict regarding the murder charge and also resulted in a finding that Petitioner was guilty of murder on the basis of less than the required proof. Thus, prejudice is demonstrated and relief is required.

352.    Similarly, counsel's failure to raise these claims on appeal constitutes prejudicially deficient performance. The same standards apply to claims of appellate ineffectiveness. See, e.g. Roe v. Flores-Ortega, 528 U.S. 420 (2000) (applying Strickland standard to consideration of appellate counsel's ineffectiveness); United States v. Mannino, 212 F.3d 835 (3d Cir. 2000); Orazio v. Dugger, 876 F.2d 1508, 1513 (11th Cir. 1989); Matire v. Wainwright, 811 F.2d 1430, 1435 (11th Cir. 1987).    Where, as in this case, there is a "reasonable probability that the neglected claim[s] would have succeeded on appeal, [] counsel's failure to raise the claim f[alls] outside the range of reasonably competent assistance."    Claudio v. Scully, 982 F.2d 798, 799 (2d Cir. 1992). Accordingly, for this reason as well, relief is required.

**C.**    **Habeas Relief is Required Because the Court's Instructions on Accomplice Liability During the Penalty Hearing Violated Petitioner's Sixth, Eighth and Fourteenth Amendment Rights.**

353.    Under Delaware law, the prosecution must prove the existence of aggravating factors beyond a reasonable doubt and the jury's determination on aggravation must be unanimous. 11 Del. C. § 4209 (b) (1). It was the prosecution's theory in aggravation that Petitioner shot the decedent at the behest of Stevenson. As a result, one aggravating factor pursued by the prosecution was that Petitioner "committed the murder as an agent of defendant David Stevenson." NT 12/5/07 at 140.

354.    During its charge at the penalty hearing, the trial court gave the identical, (unconstitutional), accomplice instruction, described above, as that which was given during Petitioner's guilt-phase. NT 12/5/05 at 149-51. For the reasons described previously, because that instruction confused and conflated the principles of accomplice liability and the requisite intent, the submission of that instruction during the penalty hearing violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

355.    Also as described above, the accomplice charge including an instruction that the jury's determination of who was the principal and who was the accomplice did not have to be unanimous, so long as they "agreed as to guilt." NT 12/5/07 at 151. Thus, there is a reasonable likelihood that the sentencing jury interpreted these instructions to mean that, although each juror had to reach a determination regarding who was the principal and who was the accomplice, the jury did not have to be unanimous on those questions in order to find the prosecution met its burden of proof as to that aggravation. As a result, the instruction unconstitutionally relieved the prosecution of its burden and deprived Petitioner of his right to a unanimous jury determination of critical facts in violation of Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

150

356. Although the jury found other aggravating factors, prejudice is nevertheless demonstrated. The jury considered the invalid aggravation in weighing aggravation against mitigation. Likewise, the sentencing court considered, and relied on, the jury's sentencing recommendation, finding by a vote of eleven to one that the mitigation was outweighed by the aggravation in finding death the appropriate sentence. See State v. Manley, Criminal Action Numbers IN95111323R3; IN95111324R3; IN95111325R3; IN95120684R3; IN95120685R3; IN95120686R3 (Del. Super. 2/3/06) (Sentencing Decision, Herlihy, J) at 40. Where, as here, the jury's determination was skewed by the constitutionally flawed instructions, the Court's reliance on that determination also violated Petitioner's clearly established federal constitutional rights. Thus, prejudice is demonstrated and relief is required.

**D.    The State Court Decision.**

357. To the extent the state court adjudicated these claims, that determination was contrary to and an unreasonable application of clearly established federal constitutional law and an unreasonable determination of the facts. Limiting its consideration of the guilt-phase instructions to the "non-unanimity" section of the accomplice charge as opposed to the entire charge, and relying on state-law standards, the court concluded that the non-unanimity instruction in the accomplice charge was not erroneous on the basis of state-law. See State v. Manley, 2003 WL 23511875 at *19-22 (Del.Super. 2003), *affirmed*, State v. Manley, 846 A.2d 238 (Del. 2004). Similarly, the state court applied state-law standards in determining that the instruction during the penalty hearing was not error. See State v. Manley, 918 A.2d 321, 325-26 (Del. 2007). As the state court failed to adjudicate Petitioner's federal constitutional claims, this Court's review is *de novo* and, for the reasons described above, relief is required.

151

To the extent the state court did adjudicate Petitioner's federal claims, for the reasons described above, that determination was objectively unreasonable and an unreasonable determination of the facts.

**CLAIM XIII.  PETITIONER IS ENTITLED TO A NEW SENTENCING HEARING BECAUSE THE COURT'S INSTRUCTIONS SKEWED AND LIMITED THE JURY'S CONSIDERATION OF MITIGATION IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

358.    The claims and factual allegations set forth in all other sections of this *Petition* are incorporated by reference and realleged as if set forth entirely herein.

359.    Because of the unparalleled severity and irreversibility of the death penalty, the Eighth Amendment imposes a heightened standard "for reliability in the determination that death is the appropriate punishment in a specific case," Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (plurality opinion); see also Mills v. Maryland, 486 U.S. 367, 383-84 (1988); Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985); California v. Ramos, 463 U.S. 992, 998-99 (1983); Beck v. Alabama, 447 U.S. 625, 637-38 (1980); Godfrey v. Georgia, 446 U.S. 420, 427-28 (1980). This principle is so central to the Eighth Amendment that within a decade of Furman every Justice of the Court had written or joined at least one opinion endorsing the proposition that because death is different, death sentences must be accompanied by commensurate procedural safeguards. See Spaziano v. Florida, 468 U.S. 447, 468 (1984) (Stevens, J., concurring in part & dissenting in part).

360.    This heightened need for reliability requires the provision of "accurate sentencing information [as] an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die," Gregg v. Georgia, 428 U.S. 153, 190 (1976). As part of the requirement that capital juries must receive accurate sentencing information, the jury must be properly instructed as

to all material elements in its sentencing-stage deliberations, including the meaning of legal terms such as "mitigation." See Walton v. Arizona, 497 U.S. 639, 647 (1990) ("When a jury is the final sentencer, it is essential that the jurors be properly instructed regarding all facets of the sentencing process."); see also Simmons, 512 U.S. at 172 (Souter, J., concurring) ("That same need for heightened reliability also mandates recognition of a capital defendant's right to require instructions on the meaning of the legal terms used to describe the sentences (or sentencing recommendations) a jury is required to consider, in making the reasoned moral choice between sentencing alternatives.").

361.    "It is beyond dispute that in a capital case the sentencer [may] not be precluded from considering, as a mitigating factor, *any aspect of a defendant's character or record* and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. The corollary that the sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence is equally well established." Mills v. Maryland, 486 U.S. 367, 374-75 (1988) (citing and following Eddings v. Oklahoma, 455 U.S. 104 (1982); Lockett v. Ohio, 438 U.S. 586 (1978); Skipper v. South Carolina, 476 U.S. 1 (1986)).

362.    Thus, jury instructions that create a "barrier to the sentencer's consideration of all mitigating evidence," Mills, 486 U.S. at 375, results in an arbitrary and capricious sentencing determination in violation of the Eighth and Fourteenth Amendments. McKoy v. North Carolina, 494 U.S. 433, 442 (1990), in violation of the Eighth and Fourteenth Amendments. ("Mills requires that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death").

363.    As described below, the instructions in this case restricted the jury's consideration

153

of mitigation evidence to the circumstances of the offense and Petitioner's conduct during the offense in violation of the Eighth and Fourteenth Amendments and counsel's failure to object and request proper instructions constituted prejudicially deficient performance in violation of Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

### A. The Court's Instructions Unconstitutionally Restricted The Jury's Consideration of Mitigation.

364.    In its closing instructions to the jury, the Court "defined" mitigation as follows:

A mitigating circumstance is any factor which bears upon the particular circumstances or details of the offense or the character and propensities of the particular defendant which tends to make that particular defendant's conduct less serious and, thus, makes the imposition of the penalty of life imprisonment without benefit of probation, parole or any other sentence reduction more appropriate.

NT 12/5/05 at 139-40.

365.    By instructing the jury that mitigation must make the *defendant's conduct less serious*, the Court's instruction limited the evidence the jury may consider mitigating to evidence directly related to the crime itself. But the Eighth Amendment does not limit mitigating factors to factors relating to the crime.  On the contrary, nothing in Eighth Amendment jurisprudence "countenance[s] the suggestion that . . . evidence is not relevant mitigating evidence . . . unless the defendant also establishes a nexus to the crime." Tennard v. Dretke, 124 S. Ct. 2570, 2572 (2004). Any nexus requirement "has no basis in our precedents and, indeed, is inconsistent with the standard we have adopted for relevance in the capital sentencing context." Id.

366.    Far from any nexus requirement, the Court has consistently required that a jury at the penalty phase be allowed to consider a wide range of information concerning the background of the defendant. . . . Evidence extraneous to the crime itself is deemed relevant and indeed, constitutionally

154

so . . . ." <u>South Carolina v. Gathers</u>, 490 U.S. 805, 817-18 (1989) (O'Connor, J.); <u>see also</u> <u>Skipper</u> <u>v. South Carolina</u>, 476 U.S. 1, 4-5 (1986) ("there is no question" that defendant's favorable post-arrest prison conduct/adjustment is relevant mitigating evidence even though it does not "relate specifically to petitioner's culpability for the crime he committed").

367.    Indeed, hornbook Eighth Amendment law establishes the unconstitutionality of the limiting instruction given by the court. One of the most fundamental requirements of capital sentencing is that the jury must undertake an exhaustive review of both the criminal offense *and the offender*. The jury must be able to consider *and give effect to* the character, background, and record of the defendant himself. <u>E.g.</u>, <u>Tennard v. Dretke</u>, 124 S. Ct. 2562, 2570 (2004); <u>Penry v. Lynaugh</u>, 492 U.S. 302, 322, 324 (1989). At its essence, the Eighth Amendment constitutionally mandates *individualized* capital sentencing. <u>Woodson v. North Carolina</u>, 428 U.S. 280, 304 (1976); <u>Sumner</u> <u>v. Shuman</u>, 483 U.S. 66, 75-76 (1987). This requires a reasoned moral response to the personal culpability and *the unique personal circumstances of the defendant*.

368.    While the circumstances of the offense, and the defendant's conduct related to the offense are unquestionably relevant in determining whether a defendant should live or be sentenced to die, that does not alter the fundamental fact that *evidence need not have any causal connection to the crime for it to be mitigating*, and that exclusion of such evidence violates the Eighth Amendment. <u>See</u>, <u>e.g.</u>, <u>Skipper v. South Carolina</u>, 476 U.S. 1, 4-5 (1986) (defendant's post-arrest conduct in prison "would not relate specifically to petitioner's culpability for the crime he committed" but "there is no question but that such inferences would be 'mitigating.'"); <u>Penry v.</u>

155

Lynaugh, 492 U.S. 302 (1989) (brain damage and mental retardation);[71] Eddings v. Oklahoma, 455

U.S. 104 (1982) (evidence of defendant's turbulent family history); see also Tennard, 124 S. Ct. at

2569-70 (rejecting requirement that defendant's low IQ must have contributed to criminal act to be

mitigating).

369.    Here, the trial court's instruction that mitigating circumstances involve any factor

"which tends to make that particular defendant's conduct less serious," placed the focus of mitigating

evidence squarely on the circumstances of the offense at the expense of those aspects of the

defendant's character, background, or record that make him a "uniquely individual human being."

Woodson, 428 U.S. at 304.

370.    Moreover, the instruction that mitigation must make the defendant's conduct less

serious involves not only *what* constitutes mitigating evidence but also *how* the jury evaluates it.

Where, as here, the mitigating evidence included background evidence that could have had some

relation to the offense, as well as background evidence that did not, the jury's "ability to consider

and give effect to [Petitioner's] mitigating evidence . . . was 'shackled and confined,'" Penry v.

Johnson, 532 U.S. 782, 798 (2001) (Penry II), by the instruction that the mitigating value of evidence

was dependent upon whether it made the defendant's conduct during the murder less serious. Under

that instruction, "[a] reasonable juror could well have believed that there was no vehicle for

---

[71]  In Atkins v. Virginia, 536 U.S. 304, 316 (2002), the Court indicated that "mentally
retarded offenders [are viewed] as categorically less culpable than the average criminal." This
categorically lesser culpability of persons with mental retardation, extrinsic of the circumstances
of the offense, now prevents the State from applying the death penalty against a mentally retarded
defendant. But for the years preceding Atkins, "it [was] precisely because the punishment should
be directly related to the personal culpability of the defendant that the jury [was required] to
consider and give effect to mitigating evidence" of mental retardation, irrespective of the
circumstances of the offense. Penry v. Lynaugh, 492 U.S. 302, 327-28 (1989).

expressing the view that [Petitioner] did not deserve to be sentenced to death based upon his mitigating evidence." Id. at 804 (quoting Penry I, 492 U.S. at 326).

371.    In addition, the "defendant's conduct less serious" instruction erected an unconstitutional *qualitative* requirement, at the expense of the constitutionally required "reasoned moral response" to the defendant. Penry II, 532 U.S. at 788 (quoting Penry I, 492 U.S. at 319). The evidence must go to the "seriousness" of the defendant's conduct [in committing the murder] and cross a threshold of somehow reducing its seriousness. However, the Eighth Amendment has never required a substantive threshold screening test before mitigating evidence can be considered constitutionally relevant. The requirement is – and has always been – that "a State cannot bar the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death." Tennard, 542 U.S. at 285 (quoting McKoy v. North Carolina, 494 U.S. 433, 441 (1990)).

372.    Finally, even the nature of the qualitative test required by the jury instruction was unconstitutional. The Court's instruction injected passion, prejudice, and arbitrary considerations into the jury's deliberations that inflated its consideration of aggravating evidence while impairing its ability to find and give effect to mitigating circumstances. The explicit focus on how serious the defendant's conduct was during the murder blatantly distorts the consideration of mitigating evidence by injecting an emotional response to the "seriousness" of murder itself, at the expense of the "reasoned moral response" to the defendant required by the constitution. Penry, 492 U.S. at 319.

373.    Finally, as described more fully below, (see Section B), prejudice is demonstrated because, as there is a reasonable likelihood that the jury interpreted the Court's instructions in an unconstitutional manner that resulted in the jury's failure to consider and give full effect to relevant

157

mitigation evidence, the jury's determination, and the Court's reliance on that determination demonstrates prejudice.

**B.    The Court's Failure to Articulate What Mitigation the Defense Pursued Unconstitutionally Precluded the Jury From Giving Effect to Relevant Mitigation Evidence.**

374.    Prior to the penalty hearing, counsel served notice on the state and the Court of those mitigating factors the defense expected to prove in support of a life sentence. See Exhibit 21 (Letter of Joseph M. Bernstein, Esquire, filed 2/2/05). Those mitigators were:

1)    Lack of any prior criminal record

2)    Age of defendant at the time of commission of offense

3)    Potential for rehabilitation

4)    Positive contributions to community/society prior to incarceration

5)    Impact of death sentence on defendant's family

6)    Evidence that Manley did not actually kill Kristopher Heath

7)    Mercy

8)    Any other evidence developed during the penalty hearing which tends to mitigate the possible punishment.

Id. While the Court listed the statutory aggravating factors for the jury during its instructions, the sole discussion of mitigation was limited to the general statement, described above, that "mitigation" constitutes "any factor which bears upon the particular circumstances or details of the offense or the character and propensities of the particular defendant which tends to make that particular defendant's conduct less serious." NT 12/5/05 at 139-40. In addition to unconstitutionally restricting the jury's mitigation consideration to only those factors implicating the circumstances of the offense, the

158

Court's failure to outline those mitigators the defense sought, while listing those aggravators the prosecution sought, the Court further limited the jury's mitigation consideration in violation of the Sixth, Eighth and Fourteenth Amendment rights.

375.    As noted above, one fundamental requirement in capital sentencing is that the sentencer must undertake an exhaustive review of, and give effect to, factors relevant to the character, background, and record of the defendant himself. E.g., Tennard v. Dretke, 124 S. Ct. 2562, 2570 (2004); Penry v. Lynaugh, 492 U.S. 302, 322, 324 (1989). As part of this fundamental requirement, the jury must be properly instructed as to all material elements in its sentencing-stage deliberations, including the meaning of legal terms such as "mitigation." See Walton v. Arizona, 497 U.S. 639, 647 (1990). Thus, in order to ensure that the jury would give full effect to all relevant mitigation, at a minimum, the Court was required to inform the jury what mitigating factors the defense submitted, and also instruct the jury that if it found that mitigation to exist, it must consider those factors in determining the weighing process. Absent any instruction specifying the mitigating factors pursued by the defense, there is a reasonable likelihood that the jury or a juror disregarded one or more relevant factors presented by the defense simply because the jury, or a juror, did not know that particular factor was mitigating. Thus, for this reason as well, the Court's instructions unconstitutionally restricted the jury's consideration of mitigation and violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

### C.    Counsel Was Ineffective.

376.    Counsel's failure to properly raise and litigate these claims constitutes prejudicially deficient performance in violation of the Sixth, Eighth, and Fourteenth Amendments. While Strickland "did not 'establish mechanical rules'" for determining ineffectiveness, "counsel must not

neglect to suggest instructions that represent the law that would be favorable to his or her client."

Everett v. Beard, 290 F.3d 500, 514 (3d Cir. 2002). See also Carpenter v. Vaughn, 296 F. 3d 138, 158-50 (3d Cir. 2002) (holding that counsel provided ineffective assistance in a Pennsylvania capital case by failing to ensure that jury receive an accurate instruction on parole ineligibility).

377.    Where, as here, counsel failed to ensure that the jury was properly instructed on its consideration of mitigation evidence and the Court's instructions unconstitutionally restricted and precluded the jury from giving full effect to proper, relevant mitigation evidence, deficient performance is demonstrated. Similarly, Petitioner has demonstrated prejudice. There is more than a reasonable likelihood that the jury failed to consider relevant mitigation in its weighing process, or that the jury applied less weight to relevant mitigation because it was not connected to Petitioner's conduct at the time of the murder. Likewise, the sentencing court considered, and relied on, the jury's sentencing recommendation, finding by a vote of eleven to one that the mitigation was outweighed by the aggravation in finding death the appropriate sentence. See State v. Manley, Criminal Action Numbers IN95111323R3; IN95111324R3;  IN95111325R3; IN95120684R3; IN95120685R3; IN95120686R3 (Del. Super. 2/3/06) (Sentencing Decision, Herlihy, J) at 40. Where, as here, the jury's determination was skewed by the constitutionally flawed instructions, the Court's reliance on that determination also violated Petitioner's clearly established federal constitutional rights. Thus, prejudice is demonstrated and relief is required.

378.    Similarly, counsel's failure to raise these claims on appeal constitutes prejudicially deficient performance. The same standards apply to claims of appellate ineffectiveness. See, e.g. Roe v. Flores-Ortega, 528 U.S. 420 (2000) (applying Strickland standard to consideration of appellate counsel's ineffectiveness); United States v. Mannino, 212 F.3d 835 (3d Cir. 2000); Orazio

160

v. Dugger, 876 F.2d 1508, 1513 (11th Cir. 1989); Matire v. Wainwright, 811 F.2d 1430, 1435 (11th

Cir. 1987).   Where, as in this case, there is a "reasonable probability that the neglected claim[s]

would have succeeded on appeal, [] counsel's failure to raise the claim f[alls] outside the range of

reasonably competent assistance." Claudio v. Scully, 982 F.2d 798, 799 (2d Cir. 1992); Jackson v.

Leonardo, 162 F3d. 81 (2d Cir. 1998) (appellate counsel's failure to raise "sure winner" constituted

ineffective assistance: "In the instant case, we believe that appellate counsel's failure to raise a

well-established, straightforward, and obvious . . . [claim] . . . constitutes ineffective performance.");

Starr v. Lockhart, 23 F.3d 1280 (8th Cir. 1993 ) (finding trial and appellate counsel ineffective for

failing to object to and raise an erroneous jury instruction); Freeman v. Lane, 962 F.2d 1252 (7th Cir.

1992) (appellate counsel ineffective for failing to raise a meritorious claim that was "presented

squarely" at trial regarding a violation of the defendant's Fifth Amendment rights); Murphy v.

Puckett, 893 F.2d 94 (5th Cir. 1990) (counsel's failure to raise valid defense at trial and on direct

appeal constituted ineffective assistance).  Accordingly, for this reason as well, relief is required.

**CLAIM XIV.  THE TRIAL COURT'S INSTRUCTION REGARDING THE APPLICATION OF EVIDENCE OF STEVENSON'S BAD ACTS AGAINST PETITIONER IN DETERMINING WHETHER THE PROSECUTION MET ITS BURDEN OF PROOF AS TO PETITIONER VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS. [72]**

379.    The claims and factual allegations set forth in all other sections of this *Petition* are

incorporated by reference and realleged as if set forth entirely herein.

380.    During the joint trial, it was the prosecution's theory that Stevenson's pending

charges of theft and related offenses as a result of his employment with Macy's department store was

---

[72] These claims were exhausted in state court post-conviction proceedings. See State v. Manley, 2003 WL 23511875, *27-28 (Del. Super. 2003), *affirmed* Manley v.State, 846 A.2d 238 (Del. 2004).

the sole motive for the murder of the decedent, an investigator for Macy's who investigated those thefts and charged Stevenson with those thefts. There was not *one scintilla of evidence* presented by the prosecution that Petitioner was involved in the thefts; was aware that Stevenson was charged with the thefts; or, was even aware that any theft had occurred. Nevertheless, the trial court permitted the admission of this evidence during the joint trial.

381.    Included in this evidence was the testimony of Parminder Chona. Mr. Chona, also an investigator for Macy's, was present when the decedent took a written statement from Stevenson admitting his involvement in the thefts. In that statement, Stevenson claimed that he committed the thefts because he owed $2500.00 to an individual named "Buckey," and that another individual named "Pooger" told Stevenson to commit the fraudulent transactions. The statement also indicated that others (unidentified) were involved along with "Pooger" and "Buckey." NT 11/4/96 at 48-52. Other than rank speculation, there was no evidence presented by the prosecution connecting Petitioner to the conduct described in Stevenson's statement, or any knowledge of the conduct described by Stevenson. And, as described above, the prosecution presented not *one scintilla of evidence* indicating that Petitioner was involved in the thefts; that Petitioner was aware that Stevenson was charged with the thefts; or, that Petitioner was even aware that the thefts had occurred. Counsel did not object to the admission of the evidence, but did request that the court instruct the jury that it could not apply that evidence against Petitioner. NT 11/4/96 at 63.

382.    During the charging conference, counsel again requested that the court provide a limiting instruction. The court agreed to remove Petitioner's name from the first paragraph of its charge regarding that evidence, but left references to Petitioner in the following paragraphs. NT 11/7/96 at 121-22. Remarkably, counsel agreed to the subsequent language despite the clear and

probable result that the jury would consider that evidence against Petitioner, despite the absence of any evidence whatsoever that Petitioner was involved, connected or otherwise knowledgeable of the motive purported to Stevenson.

383.    As a result, the trial court charged as follows:

Ladies and Gentleman of the Jury. You have heard evidence that one of the defendants, namely, David Stevenson, allegedly committed thefts while an employee at Macy's and that the deceased, Kristopher Heath, participated in the investigation which led to the theft charges being placed against Stevenson.

You may not use this evidence as proof that David Stevenson is a bad person and therefore probably committed the offenses contained in the indictment. You may use this evidence only to help you in deciding whether David Stevenson *or Michael Manley* was one of the persons who committed the offenses contained in the indictment.

The State claims that the prior alleged theft evidence might tend to show a motive on Stevenson's part or on *Manley's part* to commit the offenses contained in the indictment.

You may consider the prior alleged theft evidence to help you decide whether or not such evidence tends to show a motive on Stevenson's part *or on Manley's part* to commit the offenses and to help you decide whether or not such evidence tends to identify them as the perpetrators of the offenses contained in the indictment for which the defendants are now on trial.

You are instructed that you may not use the prior alleged theft evidence for any other purpose whatsoever. Further, the fact that defendant Stevenson had been indicted for the alleged offenses arising out of the Macy's internal theft investigation is not evidence as of his guilt with regard to those offenses. As previously stated, an indictment is a mere accusation and is not evidence of guilt.

NT 11/12/96 at 146-48.

384.    This error was followed by the court's further instruction that it could "use this evidence only to help you in deciding whether David Stevenson **or Michael Manley** was one of the persons who committed the offenses contained in the indictment." Id.

163

**A.    Habeas Relief is Required Because The Court's Instructions Violated Petitioner's Clearly Established Federal Constitutional Rights.**

385.    Clearly established federal due process law requires the Commonwealth to prove beyond a reasonable doubt every element of the offense. In re Winship, 397 U.S. 358, 364 (1970). See also Jackson v. Virginia, 443 U.S. 307, 316 (1979) (Federal Due Process guarantees that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof – defined as evidence necessary to convince a trier of fact beyond reasonable doubt of the existence of every element of the offense"). Proof beyond a reasonable doubt precludes a jury verdict based on mere speculation. See e.g., Juan H. v. Allen, 408 F.3d 1262, 1277 (9th Cir. 2005) ("Speculation and conjecture cannot take the place of reasonable inferences and evidence . . ."). Thus, due process affords a criminal defendant the "right to a verdict based solely upon the evidence and the relevant law." Chandler v. Florida, 449 U.S. 560, 574 (1981). That right is protected not just by due process, but by the Sixth Amendment, which requires a determination of the relevant and material facts and a guilty verdict based solely upon an application of the relevant law to the relevant facts. United States v. Gaudin, 515 U.S. 506, 514 (1995).

386.    And when a defendant is on trial for his life, the Eighth Amendment requires the State to "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'" Godfrey v. Georgia, 446 U.S. 420, 428 (1980). Because the State "has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty," id., a death sentence that is based on the consideration of improper evidence or speculation is unconstitutionally arbitrary and capricious.

164

387.    Here, the court's instructions directed the jury to consider evidence regarding Stevenson of which the prosecution failed to present any connection whatsoever to Petitioner. There was no evidence Petitioner was involved in the thefts or had knowledge of the thefts, let alone any evidence that Petitioner knew that Stevenson had a motive arising out of the theft charges.  By instructing the jury that it could consider Stevenson's conduct, statements and motive against Petitioner, despite the absence of any evidence connecting Petitioner to Stevenson's conduct, statements and/or motive, the court unconstitutionally relieved the prosecution of its burden of proving Petitioner's guilt beyond a reasonable doubt on the basis of competent evidence; permitted the jury to rely on speculation and conjecture in reaching its verdict; and deprived Petitioner of his federal due process right to a fair trial as well as the heightened procedures required in this capital case in violation of the Sixth, Eighth and Fourteenth Amendments.  Relief is required.

**B.     Habeas Relief is Required Because Counsel Was Ineffective in Failing to Object to this Improper Instruction or Litigate this Issue on Direct Appeal.**

388.    The Sixth Amendment right to effective assistance of counsel is violated when counsel's performance is deficient, _i.e._, falls below "an objective standard of reasonableness;" and the defendant is prejudiced, _i.e._, when confidence is undermined in the outcome of the proceeding. Wiggins v. Smith, 539 U.S. 510, 521 (2003); Williams v. Taylor 529 U.S. 362 (2000); Strickland v. Washington, 466 U.S. 668, 694 (1984).  In evaluating counsel's performance, the Court should consider professional norms such as the American Bar Association's Standards for Criminal Justice ("ABA STANDARDS") and Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989) ("ABA GUIDELINES"), which articulate "reasonable" professional "standards for capital defense work" and are the "norms" and "standards to which [the Supreme Court] long

ha[s] referred as 'guides to determining what is reasonable'" under the Sixth Amendment. Wiggins,

539 U.S. at 522-25 (citing Strickland; Williams). See also Outten v. Kearney, 464 F.3d 401, 417 (3d

Cir. 2006).

389.    One critical aspect of counsel's performance in a capital case involves the duty to

"consider, when deciding whether to object to legal error and whether to assert on the record a

position regarding any procedure or ruling, that post judgment review in the event of conviction and

sentence is likely, and counsel should take steps where appropriate to preserve, on all applicable state

and Federal grounds, any given question for review." See e.g., ABA GUIDELINES FOR THE

APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES 11.7.3 (1989). Even if

counsel believes the issue is not addressed by existing law - and here, it clearly was - "counsel should

not refrain from objecting or otherwise bringing to the attention of the court the perceived injustice

not addressed by existing law . . . [and] should not hesitate to try and change the law, or at least its

application in the client's case." Id., Commentary to 11.7.3.

390.    As set forth above, when the evidence about the Macy's thefts was initially

introduced, counsel properly asked that any limiting instruction provided by the court under Getz v.

State only refer to co-defendant Stevenson. NT 11/04/96 at 63. The court did not issue any limiting

instruction. At the close of trial, the court issued the instruction set forth above and specifically

instructed the jury that they could consider the evidence to infer motive on the part of Petitioner as

well as Stevenson despite the absence of any evidence that Petitioner knew about the thefts,

Stevenson's charges, or his motive. Counsel failed to object to the instruction and likewise failed

to raise this issue on direct appeal.

391.    Counsel can have no reasonable strategic basis for failing to object to an instruction

166

that directed the jury to apply evidence regarding Stevenson's acts, conduct and words, to a motive

on Petitioner's part where there was absolutely no evidence that Petitioner knew of those acts,

conduct and words. Indeed, counsel offered no strategic reason and, instead, merely stated that he

"didn't consider it to be an issue," and "it never went off as a red flag during the appeal process as

here's something I'd better raise." NT 1/11/02 at 29-30. Counsel's failure to recognize an issue is

not an objectively reasonable basis for failing to raise that issue.

392.   Likewise, counsel's deficient performance resulted in prejudice. As described above,

the court's instructions unconstitutionally relieved the prosecution of its burden of proving

Petitioner's guilt beyond a reasonable doubt on the basis of competent evidence; permitted the jury

to rely on speculation and conjecture in reaching its verdict; and deprived Petitioner of his federal

due process right to a fair trial as well as the heightened procedures required in this capital case.

Thus, prejudice is demonstrated and relief is required.

393.   Counsel's failure to raise these claims on appeal or during prior proceedings also

constitutes prejudicially deficient performance. The same standards apply to claims of appellate

ineffectiveness. See, e.g. Roe v. Flores-Ortega, 528 U.S. 420 (2000) (applying Strickland standard

to consideration of appellate counsel's ineffectiveness); United States v. Mannino, 212 F.3d 835 (3d

Cir. 2000); Orazio v. Dugger, 876 F.2d 1508, 1513 (11th Cir. 1989); Matire v. Wainwright, 811 F.2d

1430, 1435 (11th Cir. 1987).   Where, as in this case, there is a "reasonable probability that the

neglected claim[s] would have succeeded on appeal, [] counsel's failure to raise the claim f[alls]

outside the range of reasonably competent assistance." Claudio v. Scully, 982 F.2d 798, 799 (2d Cir.

1992); Jackson v. Leonardo, 162 F3d. 81 (2d Cir. 1998) (appellate counsel's failure to raise "sure

winner" constituted ineffective assistance: "In the instant case, we believe that appellate counsel's

failure to raise a well-established, straightforward, and obvious . . . [claim] . . . constitutes ineffective performance."); Starr v. Lockhart, 23 F.3d 1280 (8th Cir. 1993 ) (finding trial and appellate counsel ineffective for failing to object to and raise an erroneous jury instruction); Freeman v. Lane, 962 F.2d 1252 (7th Cir. 1992) (appellate counsel ineffective for failing to raise a meritorious claim that was "presented squarely" at trial regarding a violation of the defendant's Fifth Amendment rights); Murphy v. Puckett, 893 F.2d 94 (5th Cir. 1990) (counsel's failure to raise valid defense at trial and on direct appeal constituted ineffective assistance). Accordingly, for this reason as well, relief is required.

### C.    The State Court Proceedings.

394.    The state court failed to adjudicate Petitioner's federal constitutional claims. Accordingly, this Court's review is *de novo*. To the extent the state court adjudicated these claims, that determination was contrary to and an unreasonable application of clearly established federal constitutional law and an unreasonable determination of the facts for a number of reasons. Relying on state-law standards, the state court found no error and that Petitioner failed to demonstrate prejudice. See State v. Manley, 2003 WL 23511875, *27-28 (Del. Super. 2003), *affirmed* Manley v.State, 846 A.2d 238 (Del. 2004). In reaching its conclusion that there was no error in permitting the jury to consider Stevenson's conduct against Petitioner, the court found "the evidence was relevant because it tended to show that Manley had a motive to eliminate Heath, to help his friend avoid a conviction [or] imprisonment." Id. at 27. This conclusion is objectively unreasonable and an unreasonable determination of the facts. While there was evidence presented by the prosecution that Petitioner and Stevenson were friends, there was no evidence presented that Petitioner knew of the Macy's thefts, Stevenson's charges or his desire to "avoid conviction [or] imprisonment." Thus,

any conclusion that Petitioner had a motive arising out of Stevenson's desire to "avoid conviction [or] imprisonment" is nothing more than speculation and conjecture and, while an instruction that the jury could consider Petitioner's friendship as motive would have been proper, an instruction directing the jury to consider a motive known only to Stevenson was constitutionally improper.

395.    The court's determination that counsel was not ineffective was similarly objectively unreasonable and an unreasonable determination of the facts.    Relying on its objectively unreasonable determination that the evidence was admissible against Petitioner, the court found that trial counsel was not ineffective for failing to request a proper instruction and that Petitioner failed to demonstrate prejudice. Finally, the court concluded that counsel was not ineffective for failing to raise this claim on appeal because, in its view, counsel "counsel testified there was no merit to the argument." Id. at *28. As described above, that was not what counsel testified. Although counsel initially testified that "at the time, we didn't consider it to be an issue," he later admitted:

> I can't tell you honestly whether I even considered it as an issue to tell you the truth, but it never went off as a red flag during the appeal process as here's something I'd better raise.

NT 1/11/02 at 29-30. Not considering the issue is not a reasonable strategic basis for failing to raise the claim. To be "strategic" counsel's decision must be an informed one. See Wiggins 539 U.S. at 527. Counsel's actions were objectively unreasonable and resulted in prejudice.   The state court's conclusion to the contrary is itself objectively unreasonable and contrary to clearly established federal constitutional law. The state court's finding also constituted an unreasonable determination of the facts and is entitled to no deference by this Court. Relief is required.

169

CLAIM XV.    PETITIONER SHOULD BE AFFORDED A NEW SENTENCING HEARING BECAUSE THE REASONABLE DOUBT INSTRUCTION VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.

396.    The claims and factual allegations set forth in all other sections of this *Petition* are incorporated by reference and realleged as if set forth entirely herein.

397.    At the 2005 sentencing proceeding, the trial court instructed the jury on reasonable doubt in a way that unconstitutionally diminished the prosecution's burden of proof and caused Petitioner to be sentenced to death by a jury that was misinformed about the prosecution's burden of proof, violating due process and the Eighth Amendment.

398.    Due process prohibits the criminal conviction of any person "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).  Trial courts are not permitted to define reasonable doubt in a manner that may lead the jury to convict on standard of proof below that which due process requires. Victor v. Nebraska, 511 U.S. 1, 22 (1994). Here, the jury instructions violated Petitioner's due process rights by defining "reasonable doubt" in a way that unconstitutionally diminished the prosecution's burden of proof and infringed upon the presumption of innocence of the aggravating circumstances.

A.    The Erroneous Instructions.

399.    At the conclusion of Petitioner's 2005 sentencing trial, the trial court gave the following reasonable doubt instruction:

> As I just mentioned, the State has the burden of proving beyond a reasonable doubt all of the elements of any statutory aggravating circumstance it claims exists in this case as applicable to a particular defendant.  Reasonable doubt is a practical standard.
>
> Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the

existence of a statutory aggravating circumstance. Therefore, based upon your consideration of the evidence, if you are firmly convinced as to a particular defendant of the existence of any of the four statutory aggravating circumstances which the State contends exists in this case, you should find that such circumstance has been proven beyond a reasonable doubt as to that defendant. If, on the other hand, you think there's a real possibility or, in other words, a reasonable doubt about a particular statutory aggravating circumstance relating to a particular defendant, you must give the defendant the benefit of that doubt by finding that such statutory aggravating circumstance has not been proven as to that defendant.

NT 12/05/05 at 147-48.

400.    The instruction fails to define what quantum of proof is necessary on the part of the prosecution. For example, a juror may have been "firmly convinced" that the evidence showed it was merely "more likely than not" that an aggravating circumstance existed. The juror may have been "firmly convinced" that his or her determination was supported by the evidence, but if the juror applied the wrong constitutional standard in making that determination, i.e., the preponderance of the evidence standard, then Petitioner's constitutional rights have been violated. The instruction also fails to inform the jury that the prosecution must prove its case by more than a mere preponderance of the evidence. Victor, 511 U.S. at 27 (Ginsburg, J., concurring). The court also failed to make clear to the jury that doubt may arise either from the evidence or the absence of evidence. Id. at 18.

401.    Also, the court defined reasonable doubt as a "real possibility," without defining or providing to the jury an example of what a "real possibility" of doubt would constitute. See, e.g., Sandoval v. California, 511 U.S. 1, 16 (1994) (distinguishing use of term "moral certainty" in Cage v. Louisiana, 498 U.S. 39 (1990), with that in Sandoval's instruction, and noting the Cage definition was unconstitutional because the court failed to provide any other language in instruction to provide meaning to the term). As a result of the court's failure to define the term "real possibility," there is a reasonable likelihood that the jury applied an unconstitutional standard in determining whether a

171

reasonable doubt did, in fact, exist.

402.    Taken as a whole, there is far more than a "reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the Winship standard." Victor, 511 U.S. at 6. Indeed, this instruction constitutes far less than the absence of "an abiding conviction, to a moral certainty, of the truth of the charge," or a doubt that "would cause a reasonable and prudent person, in one of the graver and more important transactions of life, to pause and hesitate before taking the represented facts as true and relying and acting thereon." Victor, 511 U.S. at 18. The prosecution was relieved of its burden of proving each and every element of the aggravating circumstances beyond a reasonable doubt. Petitioner is entitled to a new penalty proceeding.

403.    The inaccurate instruction also created special constitutional infirmities because this is a capital case, where heightened procedural safeguards, greater protection for the defendant and a heightened scope of judicial review are required by the Eighth Amendment. The trial court's instructions, however, diminished – rather than heightened – the procedural protections afforded Petitioner, and denied him the protections available to defendants who receive a proper reasonable doubt instruction.

### B.    Counsel was Ineffective.

404.    The Sixth Amendment right to effective assistance of counsel is violated when counsel's performance is deficient, i.e., falls below "an objective standard of reasonableness;" and the defendant is prejudiced, i.e., when confidence is undermined in the outcome of the proceeding. Wiggins v. Smith, 539 U.S. 510, 521 (2003); Williams v. Taylor 529 U.S. 362 (2000); Strickland v. Washington, 466 U.S. 668, 694 (1984). Counsel's failure to object to the reasonable doubt

172

instruction at the 2005 resentencing trial was objectively unreasonable and prejudiced Petitioner.

405.    Similarly, counsel's failure to raise these claims on appeal or during prior proceedings constitutes prejudicially deficient performance. The same standards apply to claims of appellate ineffectiveness. See, e.g. Roe v. Flores-Ortega, 528 U.S. 420 (2000) (applying Strickland standard to consideration of appellate counsel's ineffectiveness); United States v. Mannino, 212 F.3d 835 (3d Cir. 2000); Orazio v. Dugger, 876 F.2d 1508, 1513 (11th Cir. 1989); Matire v. Wainwright, 811 F.2d 1430, 1435 (11th Cir. 1987).    Where, as in this case, there is a "reasonable probability that the neglected claim[s] would have succeeded on appeal, [] counsel's failure to raise the claim f[alls] outside the range of reasonably competent assistance." Claudio v. Scully, 982 F.2d 798, 799 (2d Cir. 1992); Jackson v. Leonardo, 162 F3d. 81 (2d Cir. 1998) (appellate counsel's failure to raise "sure winner" constituted ineffective assistance: "In the instant case, we believe that appellate counsel's failure to raise a well-established, straightforward, and obvious . . . [claim] . . . constitutes ineffective performance."); Starr v. Lockhart, 23 F.3d 1280 (8th Cir. 1993 ) (finding trial and appellate counsel ineffective for failing to object to and raise an erroneous jury instruction); Freeman v. Lane, 962 F.2d 1252 (7th Cir. 1992) (appellate counsel ineffective for failing to raise a meritorious claim that was "presented squarely" at trial regarding a violation of the defendant's Fifth Amendment rights); Murphy v. Puckett, 893 F.2d 94 (5th Cir. 1990) (counsel's failure to raise valid defense at trial and on direct appeal constituted ineffective assistance).

406.    Trial counsel's failure to object and request proper instructions and  appellate counsel's failure to properly raise and litigate this claim in subsequent proceedings constitutes prejudicially deficient performance in violation of the Sixth, Eighth and Fourteenth Amendments.

**D.    The State Court Proceedings.**

407.    This claim has not yet been exhausted in state court.  Petitioner requests that this Court stay this habeas proceeding so that Petitioner's counsel have an opportunity to return to state court and exhaust this claim.

**CLAIM XVI.    COUNSEL'S FAILURE TO MOVE FOR JUSTICE RIDGELY'S RECUSAL FROM PETITIONER'S PANEL ON DIRECT APPEAL WHERE JUSTICE RIDGELY HAD PREVIOUSLY BEEN PRESIDENT JUDGE IN NEW CASTLE COUNTY AND SUBMITTED FACTUAL AVERMENTS IN RESPONSE TO THE DELAWARE SUPREME COURT'S INQUIRY REGARDING THE ISSUE OF JUDGE BARRON'S RECUSAL VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.**

408.    The claims and factual allegations set forth in all other sections of this *Petition* are incorporated by reference and realleged as if set forth entirely herein.

409.    During the appeal proceedings on Petitioner's prior post-conviction petition, the Delaware Supreme Court remanded Petitioner's and the co-defendant's cases to the Superior Court in order for the President Judge and Judge Barron to answer specific questions posed by the Supreme Court regarding the circumstances surrounding the assignment of Judge Barron to Petitioner's case. Both Judge Barron and the President Judge complied with the Supreme Court, providing factual statements regarding those circumstances as well as legal bases for Judge Barron's assignment.  On the basis of those reports and subsequent briefing, the Supreme Court concluded that the circumstances surrounding Judge Barron's assignment created an appearance of impropriety and ordered that Petitioner be given a new sentencing hearing before a different judge.  Stevenson v. State, 782 A.2d 249, 260-61 (Del. 2001).   The Court also directed that the newly assigned judge reconsider Petitioner's guilt-phase claims in his Rule 61 petition.  Id. 782 A.2d at 261.

410.    At the time Petitioner's case was initiated, Justice Ridgely was the President Judge

of the Superior Court, New Castle County. It was Justice Ridgely who had the pre-indictment conversation with Judge Barron regarding his (Judge Barron's) assignment to Petitioner's case and it was Justice Ridgely who issued the memorandum directing Judge Barron's assignment. Finally, it was Justice Ridgely who issued the Report to the Supreme Court Pursuant to Supreme Court Rule 19(c).

411. On appeal from Petitioner's resentencing hearing, Justice Ridgely sat on the panel that decided Petitioner's legal issues and wrote the opinion affirming Petitioner's death sentence. Manley v. State, 918 A.2d 321 (Del. 2003). In light of Justice Ridgely's role in Petitioner's case, more particularly, his presentation of factual averments and legal positions in favor of Judge Barron's assignment to Petitioner's case, recusal was appropriate in order to avoid, at a minimum, an appearance of impropriety.

### A. Habeas Relief is Required Because Justice Ridgely's Disqualification Was Required.

412. Canon 3C of the Delaware Judges Code of Judicial Conduct requires disqualification in cases where "the judge's impartiality might reasonably be questioned." The Canon goes on to list specific circumstances in which a judge may be required to recuse himself or herself, including circumstances where the judge had "been a material witness concerning" the matter in controversy. DE R CJC Canon 3C(1)(b). Justice Ridgely's presentation of factual averments and legal positions in favor of Judge Barron's assignment to Petitioner's case implicates this section of Canon 3(c).

413. The Delaware Supreme Court has noted that, even in cases where bad faith is not implicated, where there is an appearance of impropriety that implicates an accused's right to a fair hearing, due process is violated. Stevenson v. State, 782 A.2d 249, 256 (Del. 2001) (noting that "the

appearance of impropriety may arise where the judge is acting in utmost good faith" and further noting that the United States Supreme Court "has cast the rationale for the appearance of partiality in due process terms"). Moreover, Federal Due Process is violated where an accused is denied a fair and impartial tribunal. See also Tumey v. Ohio, 273 U.S. 510, 532 (1927) ("Every procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law"); In re Murchison, 349 U.S. 133, 136 (1955) (same). Where, as here, there is a clear appearance of impropriety impacting the partiality of Petitioner's appellate tribunal, due process is violated and relief is required.

414. Similarly, by creating a statutory and constitutional right to appeal in capital cases, the state vested in Petitioner a Fourteenth Amendment life and liberty interests in those procedures. Evitts v. Lucey, 469 U.S. 387, 393 (1985) (due process interest in state created right to direct appeal).[73] Although the right to the particular procedure is established by state law, the violation of the life and liberty interest it creates is governed by *federal* constitutional law. Hicks v. Oklahoma, 447 U.S. 343, 346 (1980); Ford v. Wainwright, 447 U.S. 399, 428- 29; see Evitts, 469 U.S. at 393 (state procedures employed "as 'an integral part of the . . . system for finally adjudicating the guilt or innocence of a defendant'" must comport with due process). See also Fetterly v. Paskett, 997 F.2d 1295, 1300 (9th Cir. 1993) ("There is, of course, nothing in the Constitution of the United States that

---

[73] See also Hicks v. Oklahoma, 447 U.S. 343, 346 (1980) (liberty interest in state-created capital sentencing procedures); Ford v. Wainwright, 447 U.S. 399, 427-31 (1986) (O'Connor, J., concurring) (liberty interest in state-created right to proceedings to determine competency to be executed); Ohio Adult Parole Authority v. Woodard, 118 S. Ct. 1244, 1254 (1998) (O'Connor, J, with Souter, Ginsburg & Breyer, JJ., concurring) (life interest in state-created right to capital clemency proceedings); id. at 1254-55 (Stevens, J., concurring).

requires Idaho's legislature to approach [capital sentencing] as it has done . . . . However, the failure of a state to abide by its own statutory commands may implicate a liberty interest protected by the Fourteenth Amendment against arbitrary deprivation by a state."); Foster v. Delo, 39 F.3d 873, 882 (8th Cir. 1994) ("Where a state creates a right, such as a defendant's right to a review of his sentence, the Fourteenth Amendment of course entitles him to procedures to ensure that the right is not arbitrarily denied.").

415.    Thus, having vested in Petitioner a state statutory and constitutional right to appeal, the state was required to ensure that the procedures for that appeal conform with federal due process. Subjecting Petitioner to review where the impartiality of the tribunal is compromised, denied Petitioner of these separate and distinct life and liberty rights under the Fourteenth Amendment.

416.    For each of these reasons, habeas relief is required.

**B.    Habeas Relief is Required Because Counsel was Ineffective.**

417.    Counsel's failure to raise and litigate Justice Ridgely's disqualification constitutes prejudicially deficient performance in violation of the Sixth, Eight and Fourteenth Amendments. Counsel was well-aware of Justice Ridgely's involvement in the prior appellate proceedings and his factual and legal arguments in support of the assignment of Judge Barron. Yet, counsel failed to object or move for a recusal when counsel learned that Justice Ridgely would sit in judgment on Petitioner's appeal from his invalid death sentence.    In light of the substantial constitutional violations, counsel could have no reasonable strategic reason for failing to raise these issues. Where, as here, the appearance of impropriety required recusal, prejudice is demonstrated and relief is required.

177

C.      **The State Court Proceedings.**

418.    This claim has been raised in the presently-pending *Motion for Postconviction Relief Pursuant to Superior Court Criminal Rule 61, and Consolidated Memorandum of Law* which was filed in the Delaware Superior Court on January 25, 2008.

**CLAIM XVII.    COUNSEL'S FAILURE TO RAISE AND LITIGATE THE DENIAL OF PETITIONER'S RIGHTS TO A FAIR AND IMPARTIAL SENTENCING TRIBUNAL ON THE BASIS OF THE TRIAL COURT'S CONSIDERATION OF, AND DISPOSITION OF PETITIONER'S PRIOR POST-CONVICTION CLAIMS VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.**

419.    The claims and factual allegations set forth in all other sections of this *Petition* are incorporated by reference and realleged as if set forth entirely herein.

A.      **Introduction**

420.    As described previously, after finding that the circumstances of Judge Barron's assignment to Petitioner's case created an appearance of impropriety, the Delaware Supreme Court vacated Petitioner's sentence and remanded for resentencing and consideration of Petitioner's initial Rule 61 guilt-phase claims before a different judge. As a result, Petitioner's case was re-assigned to Judge Herlihy.

421.    Prior to the resentencing, Judge Herlihy considered the merits of Petitioner's and the co-defendant's Rule 61 Petitions that included claims of ineffective assistance of counsel. In the course of the hearings on those claims, Judge Herlihy heard testimony from Petitioner's prior trial counsel that exposed Judge Herlihy to information the Court would not have known prior to sentencing in the normal course that prejudiced Petitioner. Such information includes: counsel's strategic decisions for certain trial decisions and the basis of those decisions, including conversations counsel had with Petitioner; see NT 01/11/02 at 11-13; id. at 26-33; counsel's evaluation of key

178

prosecution witnesses, including Debra Dorsey, see id. at 34-40; and counsel's evaluation of defense witnesses, including Dorothy Hackett, see id. at 66-67. In reaching its decision that relief was not required, Judge Herlihy also necessarily conducted an evaluation of the evidence presented in the prior proceedings. See e.g. State v. Manley, 2003 WL 23511875 at *28 (Del. Super. 10/2/03) (Memorandum Opinion, Herlihy, J) (indicating the court's conclusion that the evidence against Petitioner was "overwhelming" in denying relief on the basis of the instructions regarding the Macy's theft); id. at *35 (noting that the evidence was overwhelming in denying co-defendant's ineffectiveness claim).

**B.      Habeas Relief is Required Because the Court Was Required to Disqualify Itself After Determining the Issues in Petitioner's Initial Rule 61 Petition.**

422.    While it was clearly necessary and appropriate for the court to hear the above-described evidence and analyze the above-described issues, and, while there is no question that the unique posture of Petitioner's case was the result of the irregularities on the part of Judge Barron as opposed to anything Judge Herlihy did, that does not alter the prospective impact on Judge Herlihy's impartiality in determining the appropriate sentence.

423.    As described previously, where "the judge's impartiality might reasonably be questioned," disqualification is required. DE R CJC Canon 3C. Where, as here, the court heard confidential communications between Petitioner and his prior counsel and made evaluations and judgments of witnesses and evidence that would be presented during the resentencing hearing, Petitioner has met this standard and disqualification was required.

424.    Moreover, Federal Due Process is violated where an accused is denied a fair and impartial tribunal. See also Tumey v. Ohio, 273 U.S. 510, 532 (1927) ("Every procedure which

179

would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law"); In re Murchison, 349 U.S. 133, 136 (1955) (same).  Where an appearance of impropriety implicates an accused's right to a fair hearing, due process is violated regardless of the good or bad faith on the part of the judge. Stevenson v. State, 782 A.2d 249, 256 (Del. 2001) (noting that "the appearance of impropriety may arise where the judge is acting in utmost good faith" and further noting that the United States Supreme Court "has cast the rationale for the appearance of partiality in due process terms").

425.    Similarly, there is no question that a capital defendant has a state and federal constitutional right to a sentencing determination by a fair and impartial sentencer. United States v. Burr, 25 F. Cas. 49, 50 (1807); Wainwright v. Witt, 469 U.S. 412, 424 (1985); Adams v. Texas, 448 U.S. 38, 45 (1980); Ross v. Oklahoma, 487 U.S. 81, 85 (1988).  Due Process has long required that the factfinder's verdict must be based on the evidence developed at trial as opposed to information from outside resources. Chandler v. Florida, 449 U.S. 560, 575 (1981).  Likewise, because of the "qualitative difference of death from all other punishments," (California v. Ramos, 463 U.S. 992, 998-99 (1983)), heightened procedural safeguards are required in capital cases. Lockett v. Ohio, 438 U.S. 586, 604 (1978); Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (plurality opinion) (noting that, because of the unparalleled severity and irreversibility of the death penalty, the Eighth Amendment imposes a heightened standard "for reliability in the determination that death is the appropriate punishment in a specific case"); see also Godfrey v. Georgia, 446 U.S. 420, 427-28 (1980); Mills v. Maryland, 486 U.S. 367, 383-84 (1988).

426.    Where, as here, the Court was presented with information not admissible and not

180

presented during the resentencing and the Court was forced to make evaluations and judgments regarding evidence that was presented during the resentencing during the Rule 61 proceedings, recusal was required and Judge Herlihy's failure to disqualify himself and request assignment to another judge for purposes of the resentencing determination violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

### C.    Habeas Relief is Required Because Counsel Was Ineffective.

427.    Trial counsel unsuccessfully raised this claim, at least in part, prior to the resentencing, but failed to present the claim on direct appeal. Such a failure is self-evidently ineffective – there can be no reasonable basis not to raise a meritorious legal challenge that would bar prosecution and therefore prevent conviction. The Fourteenth Amendment extends the right to effective counsel to a criminal defendant's first appeal as of right. Evitts v. Lucey, 469 U.S. 387 (1985). Counsel's prejudicially deficient failure to raise this claim on appeal violated Petitioner's Fourteenth Amendment right to effective appellate counsel, requiring relief. In this capital case, it also violated his Eighth Amendment right to meaningful appellate review of his capital conviction and death sentence.

### D.    The State Court Proceedings.

428.    This claim has been raised in the presently-pending *Motion for Postconviction Relief Pursuant to Superior Court Criminal Rule 61, and Consolidated Memorandum of Law* which was filed in the Delaware Superior Court on January 25, 2008.

CLAIM XVIII. COUNSEL'S FAILURE TO RAISE AND LITIGATE THE PETITIONER'S ENTITLEMENT TO A NEW TRIAL ON THE BASIS OF THE IRREGULARITIES AND STRUCTURAL DEFECTS ARISING OUT OF THE CIRCUMSTANCES OF JUDGE BARRON'S ASSIGNMENT TO PETITIONER'S CASE VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.

429.    The claims and factual allegations set forth in all other sections of this *Petition* are incorporated by reference and realleged as if set forth entirely herein.

A.    **Introduction**

430.    As described previously, after finding that the circumstances of Judge Barron's assignment to Petitioner's case created an appearance of impropriety, the Delaware Supreme Court vacated Petitioner's sentence and remanded for resentencing and consideration of Petitioner's initial Rule 61 guilt-phase claims before a different judge. The Delaware Supreme Court found that Judge Barron "should not have requested the murder case assignment prior to indictment in view of his prior contact with the victim in the suppression hearing." Stevenson v. State, 782 A.2d 249, 257 (Del. 2001).

431.    The Court further found Judge Barron's failure to disclose the circumstances of the assignment particularly troubling because "disclosure of the trial judge's December 27, 1995 memorandum likely would have prompted a recusal motion." Id. 782 A.2d at 257. Noting that the trial court's sentencing decision demonstrated that the judge "harbored strong feelings about the murder of Heath whom he had observed as a witness in the suppression hearing," the Supreme Court found it particularly concerning that the trial court "viewed the murder of Heath as an attack on the judicial process-*the very process in which the trial judge had personally participated as the judge handling the suppression hearing*." Id. 782 A.2d at 259. Vacating the death sentence, the Supreme Court left for further development the question regarding whether or not the trial court's misconduct

required grant of a new trial. Id. 782 A.2d at 261.

432.    Despite the obvious breakdown of the judicial process, counsel failed to effectively raise or litigate Petitioner's entitlement to a new trial. Counsel's failure to do so constitutes prejudicially deficient performance in violation of the Sixth, Eighth and Fourteenth Amendments.

**B.    Habeas Relief is Required Because Judge Barron's Conduct Required Grant of a New Trial.**

433.    Judge Barron presided over the Macy's theft case against co-defendant Stevenson and heard testimony from the decedent during a suppression motion. Upon learning that the decedent was killed and that Stevenson and Petitioner were charged, Judge Barron requested assignment of the case prior to the grand jury indictment. As described above, Judge Barron failed to notify counsel or Petitioner of the circumstances of his assignment to Petitioner's case, even after co-defendant Stevenson raised the question of recusal. Finally, as described above, there is no question based on Judge Barron's opinion regarding the death sentence that the judge held strong feelings about the circumstances of the murder and the perceived affront to the judicial system, particularly that system presided over by this very judge. The language and tenor of Judge Barron's sentencing determination indicates both a strong prejudice in favor of the decedent and a strong prejudice against Petitioner. Stevenson v. State, 782 A.2d 249, 259 (Del. 2001)

434.    "It is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling." Starr v. United States, 153 U.S. 614, 626 (1894) (citing Hicks v. U. S., 150 U. S. 442, 452, 14 Sup. Ct. 144 (1893).[74] For this reason, judicial conduct

---

[74] See also United States v. Barbour, 420 F.2d 1319, 1322 (D.C. Cir. 1969)("jurors hold the robed trial judge in great awe and reverence . . . his lightest word or intimation is received with deference

183

that "preclude[s] a fair and dispassionate consideration of the evidence" violates due process. Quercia v. United States, 289 U.S. 466, 472 (1933) (citations omitted).[75] Here, the trial court's strong prejudices against Petitioner were clear. More importantly, however, the court's conduct in arranging to be assigned to this case pre-indictment, combined with the court's failure to disclose the circumstances of the court's assignment, even when confronted with a question of recusal, compromised the integrity of the judicial system and constitutes structural error impacting the very accuracy and reliability of the trial process. Arizona v. Fulminate, 499 U.S. 279, 309-10 (1991) ("'Structural errors,' on the other hand, call into question the very accuracy and reliability of the trial process"). Under these circumstances a new trial is mandated.

435. Similarly, the trial court's biases against Petitioner and in favor of the decedent impacted the court's determination of critical pretrial and trial issues, including the court's determination of Petitioner's severance motion, Petitioner's request for proper instructions on accomplice liability, and the court's instructions connecting Petitioner to the Macy's thefts where there was absolutely no evidence connecting Petitioner even to any knowledge that co-defendant Stevenson had been charged or that the decedent was a witness against Stevenson. For these reasons as well, a new trial was required under the Sixth, Eighth and Fourteenth Amendments.

**C.     Habeas Relief is Required Because Counsel Was Ineffective.**

436. Trial counsel failed to fully raise or litigate this claim during the post-conviction proceedings, nor did counsel raise this claim on appeal from the denial of post-conviction relief.

---

and may prove controlling").

[75] See also Billeci v. United States, 184 F.2d 394, 402 (1950) ("there is a constitutional line across which [the trial court] cannot go"); United States v. Donato, 99 F.3d 426, 435 (D.C. Cir. 1997); United States v. Navarro, 472 F.2d 302, 303 (2d Cir. 1973).

184

Such a failure is self-evidently ineffective – there can be no reasonable basis not to raise a meritorious legal challenge that would bar prosecution and therefore prevent conviction.

437.    While there is no right to effective assistance of post-conviction counsel, when a state mandates certain capital sentencing procedures or establishes the right to particular appellate, post-conviction, or post-sentencing review in capital cases, it creates Fourteenth Amendment life and liberty interests in those procedures. Evitts v. Lucey, 469 U.S. 387, 393 (1985) (due process interest in state created right to direct appeal).[76] Although the right to the particular procedure is established by state law, the violation of the life and liberty interest it creates is governed by *federal* constitutional law. Hicks v. Oklahoma, 447 U.S. 343, 346 (1980); Ford v. Wainwright, 447 U.S. 399, 428- 29; see Evitts, 469 U.S. at 393 (state procedures employed "as 'an integral part of the . . . system for finally adjudicating the guilt or innocence of a defendant'" must comport with due process). See also Fetterly v. Paskett, 997 F.2d 1295, 1300 (9th Cir. 1993) ("There is, of course, nothing in the Constitution of the United States that requires Idaho's legislature to approach [capital sentencing] as it has done . . . . However, the failure of a state to abide by its own statutory commands may implicate a liberty interest protected by the Fourteenth Amendment against arbitrary deprivation by a state."); Foster v. Delo, 39 F.3d 873, 882 (8th Cir. 1994) ("Where a state creates a right, such as a defendant's right to a review of his sentence, the Fourteenth Amendment of course entitles him to procedures to ensure that the right is not arbitrarily denied.").

---

[76]    See also Hicks v. Oklahoma, 447 U.S. 343, 346 (1980) (liberty interest in state-created capital sentencing procedures); Ford v. Wainwright, 447 U.S. 399, 427-31 (1986) (O'Connor, J., concurring) (liberty interest in state-created right to proceedings to determine competency to be executed); Ohio Adult Parole Authority v. Woodard, 118 S. Ct. 1244, 1254 (1998) (O'Connor, J, with Souter, Ginsburg & Breyer, JJ., concurring) (life interest in state-created right to capital clemency proceedings); id. at 1254-55 (Stevens, J., concurring).

438.    In Delaware, a criminal defendant has two separate and distinct avenues of obtaining relief from an invalid conviction. These rights are: the opportunity to appeal directly from the initial judgment of sentence; and, once the direct appeal becomes final, challenge the conviction under Rule 61, wherein the litigant has an opportunity to raise additional bases for relief and also litigate the ineffective assistance of trial counsel and appellate counsel. Likewise, in capital cases, a post-conviction litigant is entitled to appointment of counsel. See D.R. 61(l)(3).

439.    Fundamental due process and equal protection require that one cannot have a right without a remedy. See Marbury v. Madison, 1 Cranch 137, 163, 2 L.Ed. 60 (1803) ("The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right"). By creating a right to post-conviction counsel and review on post-conviction, Delaware was constitutionally obliged to also provide Petitioner with the "basic tools," including effective counsel, to demonstrate the denial of his federal constitutional rights and invalid conviction. Here, counsel's failure to raise and litigate these claims involving the denial of Petitioner's most basic rights, including the right to a fair trial before a fair and impartial tribunal, violated Petitioner's federal Due Process and Equal Protection rights. Accordingly, relief is required.

**D.    The State Court Proceedings.**

440.    This claim has been raised in the presently-pending *Motion for Postconviction Relief Pursuant to Superior Court Criminal Rule 61, and Consolidated Memorandum of Law* which was filed in the Delaware Superior Court on January 25, 2008.

186

**CLAIM XIX.** **HABEAS RELIEF IS REQUIRED BECAUSE THE PROSECUTION WAS PERMITTED TO ADMIT HEARSAY STATEMENTS OF CO-DEFENDANT STEVENSON AGAINST PETITIONER IN VIOLATION OF PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.**[77]

441.    The claims and factual allegations set forth in all other sections of this *Petition* are incorporated by reference and realleged as if set forth entirely herein.

442.    The prosecution presented absolutely no evidence connecting Petitioner to the Macy's thefts, the purported motive for co-defendant Stevenson to murder Kristopher Heath, an investigator for Macy's who charged and sought prosecution of Stevenson for those thefts. In support of their theory, the prosecution admitted into evidence the contents of Stevenson's written statement to Kristopher Heath and Parminda Chona, (another investigator for Macy's). NT 11/4/96 at 48-52. That statement included Stevenson's confession to the thefts and his contention that he committed the thefts at the demand of an individual he identified as "Pooger" on behalf of another individual he identified as "Buckey" to whom Stevenson owed $2500.00. The statement also indicated that others (unidentified) were involved along with "Pooger" and "Buckey." Id. at 49-50.

443.    Rather than limiting that statement to only Stevenson, the trial court instructed the jury that it could consider the evidence regarding the Macy's theft, including co-defendant Stevenson's written statement, as evidence of Petitioner's motive or intent for the first degree murder of the decedent. See NT 11/12/96 at 147.

444.    Similarly, during the testimony of Officer Danese, the prosecution elicited testimony indicating that, following his apprehension, co-defendant Stevenson stated: "I don't know why you

---

[77] These claims were exhausted, at least in part, in the state-court proceedings. See State v. Manley, 709 A.2d 643 (Del. 1998). In an exercise of caution, Petitioner will also be presenting these claims in his amended Rule 61 Petition.

were chasing me from my car." NT 11/4/96 at 102. Once again, no limiting instruction was provided by the court instructing the jury that it could not consider that statement as evidence against Petitioner.[78] As described below, the admission of each of these statements without a proper limiting instruction violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

445.    Finally, the prosecution also presented the testimony of Kevin Powlette, a friend of Stevenson's, who testified about a statement Stevenson made a week before the crime in which Stevenson expressed a desire to obtain a gun for protection. NT 11/4/96 at 214-15. The prosecution did not present any evidence that Petitioner participated in that conversation, was present during that conversation, had any knowledge of the conversation or any knowledge of Stevenson's desire to obtain a gun.

### A.    Habeas Relief is Required Because the Admission of Statements by the Non-Testifying Co-defendant as Evidence Against Petitioner Violated the Sixth, Eighth and Fourteenth Amendments.

446.    It is clearly established Sixth and Fourteenth Amendment law that, "the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." Pointer v. Texas, 380 U.S. 400, 405 (1965). See also Barber v. Page, 390 U.S. 719, 721 (1968) (citing Pointer, 380 U.S. at 405). As the United States Supreme Court noted over two centuries ago, the heart of this constitutional guarantee provides the accused with

---

[78] Counsel objected to the admission of this statement on Confrontation grounds, NT 11/4/96 at 101, but failed to request a limiting instruction. As described below, the trial court found the statement was not hearsay under Delaware Rule 801 and, therefore, admissible because it was a statement "against a party." Id. Also as described below, while that may be correct as to Stevenson, it most assuredly was not as to Petitioner. Finally, as described below, to the extent counsel was required to request that which is mandated by the Confrontation Clause, counsel was ineffective.

[A]n opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

Mattox v. United States, 156 U.S. 237, 242-43 (1895). It is also clearly established Sixth and Fourteenth Amendment law that, "where two defendants are tried jointly, the pretrial confession of one cannot be admitted against the other unless the confessing defendant takes the stand." Richardson v. Marsh, 481 U.S. 200, 206 (1987).

447. In Richardson v. Marsh, the question involved the admission of a statement by the non-testifying co-defendant that did not directly inculpate Marsh, but when combined with other evidence and the prosecution's argument, did inculpate him. "At the time the confession was admitted, the jury was admonished not to use it in any way against [Marsh]." Id. 481 U.S. at 204. The Supreme Court concluded that there was no error in admitting the statement because the court gave the jury a proper limiting instruction directing the jury that it could not use that statement against Marsh. Id. 481 U.S. at 211 ("We hold that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession *with a proper limiting instruction* when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence).

448. As to Stevenson's statement regarding the Macy's thefts, while Stevenson did not directly inculpate Petitioner, he did make reference to the nicknames of others who were involved in the thefts. Moreover, the prosecution repeatedly presented evidence regarding a purported close association between Stevenson and Petitioner. Thus, absent a stipulation by the prosecution that Petitioner was not one of the "others," there is a reasonable probability that the jury would infer that

Petitioner was one of the "others," involved in the thefts.

449.    More importantly, despite the absence of one scintilla of evidence that Petitioner was involved in the thefts; that Petitioner knew Stevenson was involved in the thefts; or, that Petitioner even knew that the Macy's thefts had occurred, the trial court *specifically told the jury that it could consider Stevenson's statement about the Macy's theft in determining the presence of a motive on Petitioner's part*. The court's failure to give a proper limiting instruction and, instead, actually telling the jury to consider that statement against Petitioner violated the Confrontation Clause requiring relief.

450.    The statement by Stevenson following his apprehension was similarly connected to Petitioner through other evidence. Indeed, the state supreme court found as much. See Manley v. State, 709 A.2d 643, 657 (1998) ("Stevenson's statement is incriminating as to Manley only when it is linked to other evidence in the State's case"). Nevertheless, the trial court did not give any instruction telling the jury that it could not consider that statement against Petitioner.[79] The admission of that statement without a "proper limiting instruction" violated Petitioner's federal Confrontation rights. For this reason as well, relief is required.

451.    Finally, the prosecution relied on Stevenson's statement to Powlette regarding his desire to obtain a gun as evidence against Petitioner. Absent any corrective instruction informing

---

[79] Indeed, the trial court did not even consider the statement hearsay as to Petitioner, nor did the trial court recognize that the statement implicated Petitioner's Confrontation rights. See NT 11/4/96 at 101. Instead, the trial court found the statement admissible as non-hearsay under Delaware Rule 801(d)(2) as a statement "used against a party." Presumably, the court was referring to the provision finding that a statement of a party opponent against his or her interest is not hearsay, D. R. E. Rule 801(d)(2), as no other subsections of that section apply. While the "statement against interest" section makes the statement non-hearsay as to Stevenson, it nevertheless remains hearsay against Petitioner since he was not the declarant.

the jury that it could not consider that statement against Petitioner, the admission of that statement violated Petitioner's Confrontation rights. Indeed, as a result of the absence of any instruction precluding the jury from considering that evidence as to Petitioner and, in light of the court's unconstitutional instructions informing that the jury could consider the above-described evidence regarding the Macy's thefts against Petitioner, there is more than a reasonable probability that the jury's verdict was the result of speculation and a finding of guilt as to Petitioner on the basis of conduct and statements by Stevenson in violation of Petitioner's clearly established federal constitutional rights. Accordingly, for this reason as well, relief is required.

**B.    Habeas Relief is Required Because Counsel was Ineffective**

452.    Counsel's failure to raise and litigate the above-described claims at trial and during subsequent proceedings constitutes prejudicially deficient performance in violation of the Sixth, Eighth and Fourteenth Amendments. While Strickland "did not 'establish mechanical rules'" for determining ineffectiveness, "counsel must not neglect to suggest instructions that represent the law that would be favorable to his or her client." Everett v. Beard, 290 F.3d 500, 514 (3d Cir. 2002). See also Carpenter v. Vaughn, 296 F. 3d 138, 158-50 (3d Cir. 2002) (holding that counsel provided ineffective assistance in a Pennsylvania capital case by failing to ensure that jury receive an accurate instruction on parole ineligibility). Here, counsel failed to request an instruction that was required under the Confrontation Clause. As a result the jury was permitted to consider evidence that was patently, and *constitutionally*, inadmissible against Petitioner. Counsel's performance was deficient. In light of the nature of the evidence, statements from the mouth of the co-defendant purporting to connect Petitioner to the murder, prejudice is demonstrated and relief is required.

453.    Similarly, counsel's failure to adequately raise these claims on appeal constitutes

191

prejudicially deficient performance. The same standards apply to claims of appellate ineffectiveness. See, e.g. Roe v. Flores-Ortega, 528 U.S. 420 (2000) (applying Strickland standard to consideration of appellate counsel's ineffectiveness); United States v. Mannino, 212 F.3d 835 (3d Cir. 2000); Orazio v. Dugger, 876 F.2d 1508, 1513 (11th Cir. 1989); Matire v. Wainwright, 811 F.2d 1430, 1435 (11th Cir. 1987).    Where, as in this case, there is a "reasonable probability that the neglected claim[s] would have succeeded on appeal, [] counsel's failure to raise the claim f[alls] outside the range of reasonably competent assistance." Claudio v. Scully, 982 F.2d 798, 799 (2d Cir. 1992). Accordingly, for this reason as well, relief is required.

   **C.    The State Court Decision.**

   454.    To the extent the state court adjudicated these claims, that determination was contrary to and an unreasonable application of clearly established federal constitutional law and an unreasonable determination of the facts.  In finding that relief was not warranted, the state court concluded that the trial court "carefully instruct[ed] the jury in an effort to eliminate any potential "spillover" effect in the evidence resulting from the joint trial of Stevenson and Manley." Manley v. State, 709 A.2d 643, 657 (Del. 1998).  The instructions relied on by the court were:

> Two separate defendants are on trial in this case.  You must judge each defendant separately as you deliberate upon your verdicts.  In other words, a conclusion reached with regard to one defendant does not mean that the same conclusion will apply with regard to the other defendant.
>
>         Again, the charges against each defendant are separate and distinct, and you must judge the evidence separately with regard to each defendant.

NT 11/12/96 at 129-30. Nowhere in these instructions was the jury "admonished not to use [the co-defendant's statements] in any way against [Petitioner]." Marsh, 481 U.S. at 204.  Thus, the instruction did not constitute the constitutionally required "proper limiting instruction," and the state

court's conclusion is contrary to clearly established federal constitutional law, objectively unreasonable and an unreasonable determination of the facts. Accordingly, the state court decision is entitled to no deference and, for the reasons described above, relief is required.

**CLAIM XX.    PETITIONER IS ENTITLED TO RELIEF BECAUSE JOINING HIS GUILT-PHASE TRIAL WITH CO-DEFENDANT STEVENSON VIOLATED HIS SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS.[80]**

455.    The claims and factual allegations set forth in all other sections of this *Petition* are incorporated by reference and realleged as if set forth entirely herein.

456.    Clearly established federal due process law requires the state must prove beyond a reasonable doubt every element of the offense. In re Winship, 397 U.S. 358, 364 (1970). See also Jackson v. Virginia, 443 U.S. 307, 316 (1979) (Federal Due Process guarantees that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof – defined as evidence necessary to convince a trier of fact beyond reasonable doubt of the existence of every element of the offense"). Proof beyond a reasonable doubt precludes a jury verdict based on mere speculation. See e.g., Juan H. v. Allen, 408 F.3d 1262, 1277 (9th Cir. 2005) ("Speculation and conjecture cannot take the place of reasonable inferences and evidence . . ."). Thus, due process affords a criminal defendant the "right to a verdict based solely upon the evidence and the relevant law." Chandler v. Florida, 449 U.S. 560, 574 (1981). That right is protected not just by due process, but by the Sixth Amendment. When a defendant is afforded a jury trial, "the jury's constitutional responsibility is not merely to determine the facts, but to apply the law to those facts and draw the ultimate conclusion." United States v. Gaudin, 515 U.S. 506, 514 (1995).

---

[80]   These claims were raised in the state court direct appeal and Rule 61 proceedings. State v. Manley, 709 A.2d 643, 653 (Del. 1998); State v. Manley, 2003 WL 23511875 at *25 (Del.Super. 2003), *affirmed*, State v. Manley, 846 A.2d 238 (Del. 2004).

457.    Similarly, it is clearly established Sixth and Fourteenth Amendment law that, "the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." Pointer v. Texas, 380 U.S. 400, 405 (1965). See also Barber v. Page, 390 U.S. 719, 721 (1968) (citing Pointer, 380 U.S. at 405). See also Crawford v. Washington, 541 U.S. 36, 43 (2004) (noting that, while the confrontation right has roots stemming as far back as ancient Rome, the Framers' "immediate source" for incorporating the confrontation requirement in the Sixth Amendment was the English common law "tradition [] of live testimony in court subject to adversarial testing." (citing 3 W. Blackstone, Commentaries on the Laws of England 373-374 (1768)).

458.    And when a defendant is on trial for his life, the Eighth Amendment requires the State to "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'" Godfrey v. Georgia, 446 U.S. 420, 428 (1980).  Because the State "has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty," id., a death sentence that is based on the consideration of improper evidence or speculation is unconstitutionally arbitrary and capricious.

A.    **Habeas Relief is Required Because the Improper Joinder of Petitioner and Co-Defendant Stevenson for Trial Violated Petitioner's Sixth, Eighth and Fourteenth Amendment Rights.**

459.    The joinder of Petitioner with the co-defendant during the guilt-phase trial violated these clearly established federal constitutional rights.  While joinder, in and of itself, does not

194

implicate the federal constitution,[81] where, as in this case, improper joinder, combined with the trial

court's failure to properly instruct the jury that evidence regarding Stevenson's conduct and

statements was not admissible as to Petitioner, resulted in the denial of Petitioner's specific federal

trial constitutional rights, relief is required.[82]

      **1.**    **Joinder Permitted the Prosecution to Admit, and the Jury to Consider, Prior Conduct of Stevenson – With Absolutely No Connection to Petitioner – as a Basis for Finding Petitioner's Guilt.**

460.    During the joint trial, it was the prosecution's theory that Stevenson's pending

charges of theft and related offenses as a result of his employment with Macy's department store,

was the sole motive for the murder of the decedent, an investigator for Macy's who investigated

those thefts and charged Stevenson with those thefts. There was not *one scintilla of evidence*

presented by the prosecution that Petitioner was involved in the thefts; was aware that Stevenson was

charged with the thefts; or was even aware that any theft had occurred. Nevertheless, the trial court

permitted the admission of this evidence during the joint trial and instructed the jury that it should

consider that evidence against Petitioner in determining his guilt. In light of the absence of any

evidence connecting Petitioner to either involvement with the thefts, knowledge of the thefts or

knowledge that Stevenson had been charged with the thefts, the application of that evidence in

support of a verdict against Petitioner was nothing more than speculation and conjecture in violation

---

[81] E.g. United States v. Lane, 474 U.S. 438, 446 n.8 (1986) (noting that improper joinder "does not, in itself, violate the Constitution").

[82] E.g. United States v. Lane, 474 U.S. 438, 446 n.8 (1986) (noting that misjoinder rises to the level of a constitutional violation if it denies a defendant of his right to a fair trial); Zafiro v. United States, 506 U.S. 534, 539 (1993) (noting that severance is required where there is a "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence").

of Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

### 2. Joinder Permitted the Prosecution to Admit, and the Jury to Consider, Pretrial Statements By Stevenson in Violation of Petitioner's Confrontation Rights.

461. As described elsewhere in this *Petition*, the prosecution admitted pretrial statements by Stevenson and the trial court permitted the jury to consider these statements as evidence against Petitioner although Petitioner had no opportunity to cross-examine Stevenson. First, the state admitted Stevenson's formal written statement given as a result of the interrogation by the decedent and Parminder Chona. Mr. Chona read into the record a statement provided by Stevenson to Mr. Chona wherein Stevenson confessed to the thefts, and stated that he committed the thefts because he owed $2500.00 to an individual named "Buckey," and that another individual named "Pooger" told Stevenson to commit the fraudulent transactions. The statement also indicated that others (unidentified) were involved along with "Pooger" and "Buckey." NT 11/4/96 at 48-52. Other than rank speculation, there was no evidence presented by the prosecution connecting Petitioner to the conduct described in Stevenson's statement, or any knowledge of the conduct described by Stevenson. And, as described above, the prosecution presented not *one scintilla of evidence* indicating that Petitioner was involved in the thefts; that Petitioner was aware that Stevenson was charged with the thefts; or, that Petitioner was even aware that the thefts had occurred.

462. As described elsewhere in this *Petition*, even if the statement was admissible, the Confrontation Clause required, at a minimum, that the trial court admonish the jury that it could not consider that statement against Petitioner in any way. See Richardson v. Marsh, 481 U.S. 200, 211 (1987). Not only did the trial court fail to provide a proper limiting instruction, the court *actually told the jury that it should consider this evidence in determining Petitioner's motive and his guilt.*

196

<u>See</u> NT 11/12/96 at 147.

463.  Similarly, during the testimony of Officer Danese, the prosecution elicited testimony indicating that, following his apprehension, co-defendant Stevenson stated: "I don't know why you were chasing me from my car." NT 11/4/96 at 102. Once again, no limiting instruction was provided by the court instructing the jury that it could not consider that statement as evidence against Petitioner, although the state court found that the statement, when combined with other evidence was inculpatory as to Petitioner.

464.  The trial court's response to counsel's objection to the admission of the statement on the basis of confrontation grounds exemplifies the clear constitutional error in failing to sever these cases. When counsel objected, the trial court found that the statement was admissible as non-hearsay under Delaware Rule 801(d)(2) as a statement "used against a party." Presumably, the court was referring to the provision finding that a statement of a party opponent against his or her interest is not hearsay, D. R. E. Rule 801(d)(2) as no other subsections of that section apply. While the "statement against interest" section makes the statement non-hearsay as to *Stevenson*, it nevertheless remained hearsay against Petitioner. Thus, even the trial court was confused by the joinder and, as a result, permitted the prosecution to admit evidence against Petitioner that was patently inadmissible under clearly established federal constitutional law.

465.  Accordingly, misjoinder resulted in the denial of Petitioner's Sixth, Eighth and Fourteenth Amendment right, most particularly, his rights under the Confrontation Clause.

3.  **Joinder Permitted the Prosecution to Admit, and the Jury to Consider, Evidence that Stevenson Possessed Parminder Chona's Name and Address as Evidence Against Petitioner Despite the Absence of Any Evidence of Petitioner's Knowledge of that Information or Any Other Information Regarding the Macy's Theft Case.**

466.    Also during the testimony of Officer Danese, the prosecution elicited testimony that the police found a piece of paper with Mr. Chona's address in the cruiser in which Stevenson had been transported. NT 11/4/96 at 104-7. Mr. Chona was also scheduled to testify against Stevenson in his theft trial. NT 11/4/96 at 54. There was absolutely no evidence connecting Petitioner to that piece of paper. Indeed, Petitioner had not been in the police vehicle where the paper was found and the sole fingerprint found on the paper did not match Petitioner's. Nor was there any evidence admitted that Petitioner had any knowledge that Mr. Chona was a witness against Stevenson; that Petitioner was in any way involved in the thefts; that Petitioner knew that Stevenson was charged with theft; or that Petitioner even knew that the thefts had occurred.

467.    Nevertheless, not only was the prosecution permitted to admit that evidence, but the trial court specifically told the jury that it should consider that evidence against Petitioner in violation of Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

4.  **Joinder Permitted the Prosecution to Admit Statements by Stevenson Regarding His Desire to Obtain a Gun as Evidence Against Petitioner Despite the Absence of Any Evidence Connecting Petitioner to those Statements or Stevenson's Desire to Obtain a Weapon.**

468.    The prosecution also present ed the testimony of Kevin Powlette, a friend of Stevenson's, who testified about a conversation he had with Stevenson about a week before the crime during which Stevenson told him he wanted to get a gun for protection. NT 11/4/96 at 214-15. The prosecution did not present any evidence that Petitioner participated in that conversation, was

198

present during that conversation, had any knowledge of the conversation or any knowledge of Stevenson's desire to obtain a gun. Nevertheless, the prosecution was permitted to admit that statement against Petitioner and the trial court failed to give any instruction to the jury admonishing it not to consider that statement against Petitioner in violation of Petitioner's clearly established federal confrontation rights. In light of the absence of any evidence connecting Petitioner to either knowledge of the conversation or Stevenson's desire to obtain a weapon, the application of that evidence in support of a verdict against Petitioner was nothing more than speculation and conjecture in violation of Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

### 5.    Prejudice

469.    There is no question that the admission of the above-described evidence, under auspices of joinder, resulted in prejudice. As described above, Petitioner was denied his federal Confrontation Clause rights as to critical evidence the prosecution claimed established motive for the murder. Likewise, the jury was barraged with evidence exclusive to Stevenson, Stevenson's motive, and Stevenson's conduct, that the court and the prosecution told the jury that it could apply to Petitioner. Moreover, the admissible, proper evidence purporting to connect Petitioner to this murder was questionable and contradicted. As described elsewhere in this *Petition*, the best that can be said about the prosecution's case against Petitioner is that various witnesses gave varying descriptions of the perpetrator and Petitioner was found in Stevenson's car well after the murder occurred. Thus, absent the above-described evidence, there is a reasonable probability that the jury would have concluded that the prosecution failed to meet its burden and acquitted Petitioner. Accordingly, prejudice is demonstrated and relief is required.

199

**B.     Habeas Relief is Required Because Counsel was Ineffective.**

470.     The Sixth Amendment right to effective assistance of counsel is violated when counsel's performance is deficient, i.e., falls below "an objective standard of reasonableness;" and the defendant is prejudiced, i.e., when confidence is undermined in the outcome of the proceeding. Wiggins v. Smith, 539 U.S. 510, 521 (2003);  Williams v. Taylor 529 U.S. 362 (2000); Strickland v. Washington, 466 U.S. 668, 694 (1984).

471.     Trial counsel moved pretrial for severance and raised the issue of improper joinder on direct appeal.  Counsel limited the bases for severance to the "mutually antagonistic defenses" basis which was denied by the state courts.  At no time did trial/appellate counsel articulate the above-described denials of Petitioner's trial constitutional rights arising from the court's order of joinder.  Counsel's failure to raise these claims constitutes prejudicially deficient performance. There can be no reasonable basis for failing to raise bases in support of a motion pursued by counsel. E.g. Jacobs v. Horn, 395 F.3d 92, 104 (3d Cir. 2005) (finding counsel's failure to investigate "and discover evidence to support the defense he pursued" unreasonable).

472.     As described above, as a result of counsel's deficient performance, the prosecution was permitted to admit, and the jury was instructed to consider, evidence that was patently – and constitutionally – inadmissible against Petitioner in violation of his clearly established Sixth, Eighth and Fourteenth Amendment rights.  Where, as here, counsel's failures denied Petitioner of the most basic fundamental constitutional rights, prejudice is demonstrated and relief is required.

**C.     The State Court Proceedings.**

473.     To the extent the state court adjudicated these claims, that determination was contrary to and an unreasonable application of clearly established federal constitutional law and an

200

unreasonable determination of the facts. The state court denied Petitioner's claim on direct appeal on the basis of state-law standards. See State v. Manley, 709 A.2d 643, 653 (Del. 1998) Accordingly, this Court's review is *de novo* and for the reasons described above, relief is required.

474.    To the extent the state court decision constitutes an adjudication of Petitioner's federal constitutional claims, that determination is objectively unreasonable and an unreasonable determination of the facts for a number of reasons. In denying relief, the state court relied on its evaluation of the evidence, including that "neither Manley nor Stevenson testified, and neither presented evidence that directly implicated the other in their own defenses." Id. 709 A. 2d at 653. This factual determination misses the mark entirely. While Stevenson did not testify, multiple pretrial statements by Stevenson were admitted and the jury was permitted to consider those statements as evidence against Petitioner in direct contravention with his clearly established federal constitutional rights. Next, the state court concluded that "[t]he record reflects that Manley has failed to sustain his burden of establishing substantial injustice and unfair prejudice." Id. The state court's conclusion ignores the overwhelming record evidence, described above, demonstrating the admission of evidence against Petitioner that was patently, and constitutionally, inadmissible. Indeed, the sum and substance of the record is that the jury was permitted to convict Petitioner on the basis of actions, words, and conduct of Stevenson of which the prosecution had absolutely no evidence that Petitioner had any knowledge or involvement. Under these circumstances, the state court's evaluation of the "record" is objectively unreasonable and an unreasonable determination of the facts and entitle to no deference.

475.    During the Rule 61 proceedings, counsel raised the issue of trial/appellate counsel's ineffectiveness in failing to renew their request for a severance after additional evidence, including

the evidence described above, supporting severance was presented at trial. The court denied relief on the basis of its conclusion that the state supreme court considered this evidence in reaching its conclusion that relief was not warranted. See State v. Manley, 2003 WL 23511875 at *25 (Del.Super. 2003), *affirmed*, State v. Manley, 846 A.2d 238 (Del. 2004). On that basis, the court concluded that counsel was not ineffective. Id. As described above, to the extent the state supreme court did consider these bases, that determination was contrary to and an unreasonable application of clearly established federal constitutional law and an unreasonable determination of the facts. Accordingly, the state court decision denying relief on the basis of counsel's ineffectiveness is entitled to no deference and, for the reasons described above, relief is required.

CLAIM XXI. **PETITIONER IS ENTITLED TO RELIEF BECAUSE HIS 2005 TRIAL WAS IMPROPERLY JOINED WITH THAT OF HIS CO-DEFENDANT IN VIOLATION OF PETITIONER'S SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS.**

476.    The claims and factual allegations set forth in all other sections of this *Petition* are incorporated by reference and realleged as if set forth entirely herein.

477.    Petitioner's constitutional right to due process, an individualized determination of sentence, and his right to be free from cruel and unusual punishment, as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, were violated by trial counsel's failure to request, and the trial court's failure to order, severance of the capital resentencing proceedings in 2005. The failure to sever Petitioner's resentencing proceeding from that of his co-defendant violated the Eighth and Fourteenth Amendments to the United States Constitution. Petitioner is entitled to a new sentencing.

478.    Petitioner was significantly prejudiced when the prosecution conducted a joint sentencing with Petitioner's co-defendant David Stevenson. Petitioner's co-defendant presented

evidence and argument in support of mitigating circumstances that were not presented by Petitioner's counsel. As a result, the evidence and argument presented on behalf of the co-defendant invited the jury to compare the relative culpability of each defendant, rather than evaluating each defendant individually.

## A.    The Legal Standard.

479.    It is well-settled that the Eighth and Fourteenth Amendments to the United States Constitution establish a "constitutional mandate of individualized determinations in capital-sentencing proceedings" based upon the character, background, and record of the individual and the circumstances of the offense. Sumner v. Shuman, 483 U.S. 66, 75 (1987); Lockett v. Ohio, 438 U.S. 586, 605 (1978) ("individualized consideration [is] a constitutional requirement in imposing the death sentence"); see also Stringer v. Jackson, 503 U.S. 222, 231 (1992) (noting the "requirement of individualized sentencing"); Zant v. Stephens, 462 U.S. 862, 879 (1983) (describing requirement of "*individualized* determination on the basis of the character of the individual and the circumstances of the crimes"); Enmund v. Florida, 458 U.S. 782, 798 (1982) ("we insist on 'individualized consideration as a constitutional requirement in imposing the death sentence'" (quoting Lockett)). "[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." Woodson v. North Carolina, 428 U.S. 280, 304 (1976). As such "the use of a vague aggravating factor in the weighing process creates the possibility not only of randomness but also of bias in favor of the death penalty" and may require a death sentence to be invalidated. Stringer, 503 U.S. at 236.

480.    While joinder, in and of itself, does not implicate the federal constitution,[83] where, as in this case, improper joinder resulted in the denial of Petitioner's specific federal constitutional rights, relief is required.[84]

### B.    The Evidence and Argument that was Presented.

481.    Co-defendant Stevenson presented the mental health testimony of Edward Dougherty, Ph.D., which demonstrated that Mr. Stevenson had no pattern of behavior problems in school or other acting out behaviors, and thus did not have antisocial personality disorder; there were no indications of psychopathology or any other type of serious mental illness; because he can think clearly and has above average intelligence, he would be able to adjust well in prison; that he had no problem with anger management, and that Mr. Stevenson would not be a danger to himself or others while incarcerated.  NT 11/22/05 at 43-53.

482.    Dr. Dougherty also spoke in detail about Mr. Stevenson's educational history, and how he was involved in the basketball program at Central High School.  Id. at 42.  Dr. Dougherty also testified that Mr. Stevenson rarely used drugs, except for smoking marijuana on occasion at social events, and that while he was a social drinker, did not drink heavily.  Id. at 42-3.  Dr. Dougherty discussed Mr. Stevenson's long term goals of wanting to complete college, and explained that he was interested in anthropology and chemistry.  Id. at 45.  Dr. Dougherty also informed the

---

[83]  E.g. United States v. Lane, 474 U.S. 438, 446 n.8 (1986) (noting that improper joinder "does not, in itself, violate the Constitution").

[84]  E.g. United States v. Lane, 474 U.S. 438, 446 n.8 (1986) (noting that misjoinder rises to the level of a constitutional violation if it denies a defendant of his right to a fair trial); Zafiro v. United States, 506 U.S. 534, 539 (1993) (noting that severance is required where there is a "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence").

jury that Mr. Stevenson had worked his way through school, and was working two jobs while he attended college, and used scholarship and grant money to pay for the remainder of his educational expenses. Id. at 45-6.

483.    Counsel for Mr. Stevenson reiterated the findings of Dr. Dougherty during his closing argument to the jury. NT 12/5/05 at 49-50 (discussing how Stevenson "was a college boy . . . no criminal background;" discussing how hard it was to get into Central and how dedicated and focused Stevenson was to do so; described Stevenson as a leader, and how he was a "hard-working guy," holding down two jobs while attending college full time); id. at 51-52 ("He was not a sociopath. He was not a psychopath. He wasn't a danger to anyone . . . David won't be violent in prison. David can be rehabilitated, he can help other guys in prison. He's a smart guy.").

484.    Conversely, despite the existence of readily available mental health testimony demonstrating that Petitioner is neither a psychopath or a sociopath and that Petitioner would do well in a structured environment, (see Claim IV), Petitioner's counsel put on no mental health evidence whatsoever before the sentencing jury. As a result, the co-defendant's evidence of no-major mental illness and positive adjustment to a structured environment became aggravation for Petitioner because the jury could not help but have been adversely influenced by the absence of such evidence from Petitioner's case for life.

485.    The jury is not permitted to deem a defendant more death-worthy because he does not present evidence of any particular mitigating factor. When one co-defendant at a joint sentencing proceeding highlights his own mental stability in order to demonstrate to the jury that he will adapt well in prison and will not be a danger to himself or others if his life is spared, a constitutionally unacceptable risk arises that the jury will impose death on the other co-defendant for not putting on

205

similar mitigating evidence, even if factors exist "that may call for a less severe penalty." Lockett, 438 U.S. at 605. Yet, given the presentation of substantial mitigating mental health evidence by David Stevenson, the failure to present such mental health mitigation by Petitioner had that exact effect. Moreover, the joint resentencing invited the jury to engage in an assessment of the comparative involvement of the co-defendants in the offense. However, any such unfavorable comparison with a less involved co-defendant denies a defendant his constitutional right to an individualized sentencing determination.

486.    When a different mix of mitigating circumstances is applied to each of the defendants, it inevitably invites jury comparison of the defendants in the weighing process. Indeed, it is hard to imagine that the jury did not do precisely that: Co-defendant Stevenson presented a mental health expert to demonstrate that Mr. Stevenson had been an intelligent, hard working college student who wanted to make a better life for himself, was not antisocial, psychotic, or otherwise mentally ill, and would do well while incarcerated; the jury could not help but wonder why Petitioner failed to present similar evidence on his own behalf. As a result of counsel's ineffective failure to investigate, develop, and present such mental health mitigating evidence to the jury, the mitigating evidence presented on behalf of Mr. Stevenson was turned into non-statutory aggravation against Petitioner.

487.    The failure of counsel to request a severance of the resentencing proceedings deprived Petitioner of his constitutional right to an individualized sentencing determination. This failure constituted ineffective assistance of counsel and prejudiced Petitioner, in violation of the Sixth, Eighth, and Fourteenth Amendments.

**C.    Counsel's Failure to Raise and/or Litigate These Issues Constitutes Prejudicially Deficient Performance in Violation of the Sixth, Eighth and Fourteenth Amendments.**

488.    The Sixth Amendment right to effective assistance of counsel is violated when counsel's performance is deficient, i.e., falls below "an objective standard of reasonableness;" and the defendant is prejudiced, i.e., when confidence is undermined in the outcome of the proceeding. Wiggins v. Smith, 539 U.S. 510, 521 (2003); Williams v. Taylor 529 U.S. 362 (2000); Strickland v. Washington, 466 U.S. 668, 694 (1984). In evaluating counsel's performance, the Court should consider professional norms such as the American Bar Association's Standards for Criminal Justice ("ABA STANDARDS") and Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA GUIDELINES"), which articulate "reasonable" professional "standards for capital defense work" and are the "norms" and "standards to which [the Supreme Court] long ha[s] referred as 'guides to determining what is reasonable'" under the Sixth Amendment. Wiggins, 539 U.S. at 522-25 (citing Strickland; Williams). See also Outten v. Kearney, 464 F.3d 401, 417 (3d Cir. 2006). Under the Guidelines in effect at the time of Petitioner's capital resentencing trial, counsel had a duty to consider all legal claims potentially available, thoroughly investigate the basis for each claim before concluding whether or not it should be asserted, and thoroughly evaluate each potential claim. ABA GUIDELINES FOR APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES (Rev. Ed. 2003), ABA Guideline 10.8; see also Commentary, at 91 ("Because of the possibility that the client will be sentenced to death, counsel must be significantly more vigilant about litigating all potential issues at all levels in a capital case than in any other case.").

489.    Considering the fact that on appeal of Petitioner's Amended Rule 61 Motion, counsel actually raised the issue of 1996 trial counsel's ineffectiveness in failing to renew their motion for

severance during the 1996 trial after the trial court had previously denied their request during a pretrial proceeding, see Appellant's Opening Brief, December 5, 2003, at 30-33, counsel was well aware of the constitutional ramifications of a joinder of the 2005 resentencing proceedings.[85] Their failure to investigate, prepare, and properly litigate this issue constitutes prejudicially deficient performance, and violated Petitioner's rights under the Sixth, Eighth, and Fourteenth Amendments.

### D.    The State Court Proceedings.

490.    This claim has been raised in the presently-pending *Motion for Postconviction Relief Pursuant to Superior Court Criminal Rule 61, and Consolidated Memorandum of Law* which was filed in the Delaware Superior Court on January 25, 2008.

### CLAIM XXII  THE ADMISSION OF VICTIM IMPACT TESTIMONY VIOLATED PETITIONER'S SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS.

491.    The claims and factual allegations set forth in all other sections of this *Petition* are incorporated by reference and realleged as if set forth entirely herein.

492.    At Petitioner's resentencing trial in 2005, the prosecution presented inflammatory, emotional, and cumulative evidence and argument about the decedent's personal characteristics, his relationship with family members, and the effect his death and the shooting itself had on his family. The jury's consideration of this victim impact evidence violated state law, and Petitioner's rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

---

[85] On February 1, 2005, counsel for Petitioner wrote a letter to the Court advising that they would not be filing a motion for severance, but reserved the right to raise the issue during the resentencing trial "should adverse petitions come to the fore between defendants." See Superior Court Criminal Docket, State of Delaware v. Michael R. Manley, p. 29. Despite the presentation by Petitioner's co-defendant that was clearly adverse to Petitioner, counsel for Petitioner failed to raise the severance issue, or present his own mental health expert.

A.    **The Improper Victim Impact Evidence that was Presented.**

493.    The prosecution presented *six* witnesses to present evidence of "victim impact." All of these witnesses testified about the impact the decedent's death had on them personally, as well as other members of their family, and provided detailed personal descriptions of the decedent's personality traits and details of his life. In his closing argument, the prosecutor summarized the testimony presented by these witnesses. In addition to being cumulative, the shear number of witnesses presented by the prosecution rendered the evidence far more than a "quick glimpse of the life" of the decedent.

494.    The decedent's girlfriend, Deborah Dorsey Crowell, provided a detailed account about how she and the decedent had talked about getting married, but didn't want to tell her parents because they had just spent a large sum of money on her siblings' weddings. NT 11/16/05 at 166. Even though she had since married another, she described the pain of losing the decedent ten years before as a " wound in your heart that can never heal." Id. at 167. She then talked about how memories would pop into her head out of the blue, and how "great" his family is but how it's hard to see them now. Id. Ms. Crowell went on to talk about what a great guy the decedent was, how his niece and nephew "loved him to death," and how he'd insist on stopping for quarters on the way to Sunday dinners to make sure he had something to give his niece and nephew. Id. at 168. She also talked about how helpful he was to others at work, and then displayed a picture of the decedent and described for the jury the events surrounding the photograph. Id. at 169-70. Ms. Crowell described how the decedent always made her laugh, always told jokes, and how much she enjoyed visiting the decedent's parents house and hear them tell stories about when they were young. Id. at 170. She concluded her eulogy with a story about a visit that she and the decedent made to Disney World and

Miami to visit the decedent's aunt, and expressed her regret that there would be no more trips like that. Id.

495.    The decedent's aunt, Ruth Mixon, picked up where Ms. Crowell left off and talked about the decedent's visit to she and her children in Florida, and described how her twenty-five year old son looked like the decedent. She also talked about the decedent's relationship with her children, and the family get-togethers at the holidays and during family reunions, and how the decedent's many aunts and uncles were still really upset about his death. NT 11/21/05 at 103-04. She ended her testimony by expressing her fear that something similar could happen to her own children, that she worries about everything, and that while the family is moving forward, certain things happen that bring the memories back and "you never get over it" and "don't realize how it affects your whole life." Id. at 105.

496.    Another aunt of the decedent, Joan Startt, also talked about the family gatherings, and testified how special the decedent was to the family, described the decedent as fun loving, that he had a gift of bringing a smile to everyone's face, that he had a great future and "was going to make a difference in the world," and that everyone missed him dearly.[86] NT 11/21/05 at 107-08. Ms. Startt went on to talk about how the decedent was pursuing a career in law enforcement, how he loved helping people, and of the wonderful relationship he had with her two children. Id. at 108-09. She also provided additional details about the large, close-knit family surrounding the decedent, and how he always attended the many family gatherings. Id. at 109. Ms. Startt concluded her testimony with a vivid depiction about how hard the murder was on she and her children, and how fearful they

---

[86] It appears that Ms. Startt became emotional during her testimony, as there are pauses indicated during her answers, and in the middle of her testimony, the prosecutor told her to "take [her] time." NT 11/21/05 at 108.

210

became after the murder.  She described how she is still afraid to go anywhere alone, that she won't go to shopping malls, and how she is "always looking over [her] shoulder." Id. at 110.

497.    The decedent's younger brother, Kenneth Heath, talked about how close he and his brother were, the experiences they shared together, and all the family vacations and celebrations. NT 11/21/05 at 112.  He spoke in detail about the Sunday dinners at their parents' home, watching the Eagles' games, and how much he missed those times.[87]

498.    The decedents' parents, Marion and Edward Heath, also provided victim impact testimony about their son.  The prosecution produced yet another photograph of the decedent with his siblings, and Mrs. Heath described the circumstances surrounding the photo.  She then went on to talk about how close the decedent was with his brother and sister, and talked more about the family Sunday dinners already described by Deborah Dorsey Crowell, the decedent's two aunts, and his brother. NT 11/21/05 at 116-18.  Mrs. Heath also testified about how her daughter's youngest child, who was just an infant when the decedent was killed, often heard family members discussing the death of her uncle, and when she visited his grave with her grandparents insisted that they go buy flowers to place on it. Id. at 118.  Mrs. Heath also testified about the devastation of learning about the decedent's death and how difficult it was to tell her other children about it. Id.

499.    Mrs. Heath finished her testimony by talking about the decedent's educational and work history, how much he loved his job and his fellow employees, how much they liked him, and how an old school friend had recently contacted Mrs. Heath to see how they were and tell her how much he still missed the decedent. Id. at 118-20.  At the conclusion of Mrs. Heath's testimony, the

---

[87] Like Ms. Startt, Mr. Heath appears to have become emotional when he began talking about the family gatherings, as the prosecutor interrupted and told him to "take [his] time."  NT 11/21/05 at 113.

prosecution produced for the jury's examination yet a third picture of the decedent taken when he was promoted to security manager at the Baltimore store Owings [sic.] Mills. Id. at 120.

500.    The final victim impact witness presented by the prosecution was the decedent's father, Edward Heath. Mr. Heath testified about how "devastating" it was to lose a son, how it's "like a piece of you going out of your body," and that piece is still missing. NT 11/21/05 at 121-22. Mr. Heath reiterated how close the family was, and how involved his children and the whole family had been in activities such as music, sports, vacations, fishing, and hunting. Id. at 122. Mr. Heath told the jury that the decedent was buried behind the family church just eleven miles from their home, and that they visited the grave every Sunday. Id. When the prosecutor asked Mr. Heath if he ever talked to his son, he said yes, but became emotional when asked to describe what he said to him. Id. at 123.

501.    As if the testimony of these six witnesses wasn't sufficient, the prosecutor made sure to hammer home the point to the jury during his closing argument:

> You heard what kind of person Kristopher Heath was. He wanted to do something positive with his life. He went to Pennsville High School, graduated University of Delaware. He had plans to marry Debbie Dorsey and he was working on getting into the DEA. When the defendants executed Kristopher Heath, they stole a lot from a lot of people. He came from a large, tight-knit family. Most of them you will see back there. Their lives are not the same. When Mr. Heath visits his son, it is at his grave. He doesn't get telephone calls or letters and he can't visit him, his son, with a plexiglass window between them. After ten years it still hurts. You saw the pain and anguish that they are suffering ten years later. Time does not heal old wounds.

NT 12/05/05 at 38-9.[88] And, during the rebuttal section of his closing, the prosecutor stated:

---

[88] The prosecutor also made a victim impact argument during his opening statement. NT 11/16/05 at 43 ("They had time to think about the fact that they were taking the life of a 25-year old young man in the prime of his life, a son and a brother, friend to people, and they didn't care.").

How they murdered Kristopher Heath, who was merely doing his job- - you heard that he was a valued employee, he was just promoted.

. . .

(Referring to the victim) . . . "Please don't do this. I have a girlfriend I'm engaged to. I have a brother Ken and a sister. I'm the son of Mr. and Mrs. Heath. I'm a great uncle to my nieces and nephews." They didn't give him a chance to do any of that or say any of that. They just gunned him down in a cold parking lot.

NT 12/05/05 at 127, 128.

## B.    The Constitutional Standard.

502.    In Payne v. Tennessee, 501 U.S. 808, 827 (1991), the United States Supreme Court held that the Eighth Amendment "erects no *per se* bar" to the admission of "evidence about the victim and about the impact of the murder on the victim's family." Determining that victim impact evidence is admissible under certain specific circumstances, however, does not mean that the 'floodgates have opened' for the prosecution to present highly inflammatory, emotionally charged evidence regarding the decedent. Indeed, the Payne Court recognized that due process prohibits evidence which "is so unduly prejudicial that it renders the trial fundamentally unfair." Payne v. Tennessee, 501 U.S. at 825. As Justice O'Connor noted:

> We do not hold today that victim impact evidence must be admitted, or even that it should be admitted. We hold merely that if a State decides to permit consideration of this evidence, "the Eighth Amendment erects no *per se* bar." *Ante,* at 2609. *If, in a particular case, a witness' testimony or a prosecutor's remark so infects the sentencing proceeding as to render it fundamentally unfair, the defendant may seek appropriate relief under the Due Process Clause of the Fourteenth Amendment.*

Payne, 501 U.S. at 831 (O'Connor concurring).

503.    Delaware law permits the presentation of victim impact evidence, but recognizes the

213

Payne holding and the limitations on the presentation of such evidence and argument.[89] See Petition

of State of Delaware, 597 A.2d 1, 3 (Del. 1991) ("We noted, however, that '[i]f, in a particular case,

a witness's testimony or a prosecutor's remark so infects the sentencing proceeding as to render it

fundamentally unfair, the defendant may seek appropriate relief under the Due Process Clause of the

Fourteenth Amendment.'") (quoting Payne v. Tennessee, 501 U.S. at 831.

504.    When a defendant's life is at stake, courts must be "particularly sensitive to insure

that every safeguard is observed." Gregg v. Georgia, 428 U.S. 153, 187 (1976). This heightened

standard of reliability is "a natural consequence of the knowledge that execution is the most

irremediable and unfathomable of penalties; that death is different." Ford v. Wainwright, 477 U.S.

399, 411 (1986). See also Woodson v. North Carolina, 428 U.S. 280, 305 (1976) ("Because of that

qualitative difference [between death and any other punishment], there is a corresponding difference

in the need for reliability in the determination that death is the appropriate punishment in a specific

case"). Because of the exceptional and irrevocable nature of the death penalty, "extraordinary

measures" are required by the Eighth and Fourteenth Amendments to ensure the reliability in capital

proceedings. Eddings v. Oklahoma, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring). See also

Beck v. Alabama, 447 U.S. 625, 637-38 (1980); Lockett v. Ohio, 438 U.S. 586, 604 (1978); and

Gardner v. Florida, 430 U.S. 349, 357-58 (1977).

505.    Thus, the proposed evidence must be no more than a "quick glimpse" of the life of

the decedent, rather than an emotional plea on behalf of the bereaved, Payne 501 U.S. at 821, 830,

---

[89] Other states require a pretrial determination of the admissibility of victim impact
testimony, in part, to limit similar emotionally charged presentations before the sentencing jury.
E.g. Livingston v. State, 444 S.E.2d 748, 752 (Ga. 1994) ("the trial court must hear and rule prior
to trial on the admissibility of victim impact evidence sought to be offered"); Cargle v. State,
909 P.2d 806, 828 (Okla. 1996).

and, in considering admissibility, there must be exacting limits delineating the scope and nature of the testimony.

### C.    The Emotionally-Charged Testimony was Cumulative and Consisted of Much More than the "Quick Glimpse" Into the Life of the Decedent, in Violation of the Eighth and Fourteenth Amendments.

506.    The presentation of *six* victim impact witnesses by the prosecution, all testifying to substantially the same information, went far beyond the bounds of what Payne and the Eighth and Fourteenth Amendment permit. The witness presentation was also riddled with emotionality. In questioning two of the six witnesses, the prosecution felt compelled to tell the witnesses to "take their time," indicating that the witnesses were having difficulty keeping their composure.

The emotionally charged nature of an inordinate number of witnesses, in and of itself, far exceeded the "glimpse of the life" contemplated by Payne in violation of the Fourteenth Amendment.

### D.    Counsel was Ineffective In Failing to Object to Improper Victim Impact Evidence to Request a Limiting Instruction, and for Failing to Raise these Issues in the Prior Proceedings.

507.    Petitioner is entitled to relief from his sentence because counsel were ineffective under the Sixth and Fourteenth Amendments. Counsel made no objection to the victim impact evidence, and also failed to seek appropriate limiting instructions. This constituted deficient performance, and counsel could not have had a reasonable tactical or strategic reason for failing to object to such cumulative, prejudicial, irrelevant evidence, or to seek appropriate limiting instructions. Petitioner was prejudiced because the jury's unguided consideration of this prejudicial evidence undermines confidence in the verdict.

508.    The Sixth Amendment right to effective assistance of counsel is violated when counsel's performance is deficient, i.e., falls below "an objective standard of reasonableness;" and

215

the defendant is prejudiced, i.e., when confidence is undermined in the outcome of the proceeding. Wiggins v. Smith, 539 U.S. 510, 521 (2003); Williams v. Taylor 529 U.S. 362 (2000); Strickland v. Washington, 466 U.S. 668, 694 (1984). In evaluating counsel's performance, the Court should consider professional norms such as the American Bar Association's Standards for Criminal Justice ("ABA STANDARDS") and Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA GUIDELINES"), which articulate "reasonable" professional "standards for capital defense work" and are the "norms" and "standards to which [the Supreme Court] long ha[s] referred as 'guides to determining what is reasonable'" under the Sixth Amendment. Wiggins, 539 U.S. at 522-25 (citing Strickland; Williams). See also Outten v. Kearney, 464 F.3d 401, 417 (3d Cir. 2006). One critical aspect of counsel's performance in a capital case involves the duty to challenge aggravation evidence presented by the prosecution.[90]

509.    The Guidelines in effect at the time of Petitioner's 2005 trial specifically note that in jurisdictions which permit the introduction of victim impact evidence, "counsel, mindful that such evidence is often very persuasive to the sentencer, should ascertain what, if any, victim-impact evidence the prosecution intends to introduce at penalty phase and evaluate all available strategies for contesting the admissibility of such evidence and minimizing its effect on the sentencer." ABA GUIDELINES FOR APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES (Rev. Ed. 2003), ABA Guideline 10.11, Commentary, at 117. Thus, at the time of Petitioner's

---

[90]  See e.g., ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES 11.4.1.C (1989) (charging defense counsel with the duty to make "efforts to discover all reasonably available . . . evidence to rebut any aggravating evidence that may be introduced by the prosecutor") (quoted in Rompilla v. Beard, 545 U.S. 374, 387 n.7 (2005)); Wiggins v. Smith, 539 U.S. 510, 524 (2003); Outten v. Kearney, 464 F.3d 401, 417 (3d Cir. 2006).

resentencing proceeding, reasonable professional standards included a duty to attempt to contest improper victim impact evidence, and, at a minimum, reduce its effect. Counsel's failure to do either in this case constitutes deficient performance. Here, as described above, counsel's failures resulted in the admission of victim impact argument and testimony that far exceeded the bounds of Due Process, and which the prosecution relied on in support of statutory and non-statutory aggravation.

510.    The "undermines confidence" prejudice standard for ineffectiveness claims is satisfied if there is a "reasonable probability" of a different result. Wiggins, 539 U.S. at 534. This prejudice standard "is not a stringent one. It is less demanding than the preponderance standard." Hull v. Kyler, 190 F.3d 88, 110 (3d Cir. 1999) (quotation marks and citations omitted); accord Williams, 529 U.S. at 406. Where, as here, there is a reasonable likelihood that the jury's determination of statutory aggravation; the jury's weight afforded aggravation; and the ultimate sentencing determination would have been different had counsel properly challenged the admission of the victim impact testimony and argument, or at least requested a limiting instruction, prejudice is demonstrated and relief is required.

511.    Similarly, counsel's failure to raise these claims on appeal constitutes prejudicially deficient performance. The same standards apply to claims of appellate ineffectiveness. See, e.g. Roe v. Flores-Ortega, 528 U.S. 420 (2000) (applying Strickland standard to consideration of appellate counsel's ineffectiveness); United States v. Mannino, 212 F.3d 835 (3d Cir. 2000); Orazio v. Dugger, 876 F.2d 1508, 1513 (11th Cir. 1989); Matire v. Wainwright, 811 F.2d 1430, 1435 (11th Cir. 1987). Where, as in this case, there is a "reasonable probability that the neglected claim[s] would have succeeded on appeal, [] counsel's failure to raise the claim f[alls] outside the range of reasonably competent assistance." Claudio v. Scully, 982 F.2d 798, 799 (2d Cir. 1992); Jackson v.

217

Leonardo, 162 F3d. 81 (2d Cir. 1998) (appellate counsel's failure to raise "sure winner" constituted ineffective assistance: "In the instant case, we believe that appellate counsel's failure to raise a well-established, straightforward, and obvious . . . [claim] . . . constitutes ineffective performance."); Starr v. Lockhart, 23 F.3d 1280 (8th Cir. 1993 ) (finding trial and appellate counsel ineffective for failing to object to and raise an erroneous jury instruction); Freeman v. Lane, 962 F.2d 1252 (7th Cir. 1992) (appellate counsel ineffective for failing to raise a meritorious claim that was "presented squarely" at trial regarding a violation of the defendant's Fifth Amendment rights); Murphy v. Puckett, 893 F.2d 94 (5th Cir. 1990) (counsel's failure to raise valid defense at trial and on direct appeal constituted ineffective assistance). Accordingly, for this reason as well, relief is required.

512.    As a result of these failures, Petitioner was denied his right to due process of law under the state and federal constitutions and his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

### E.    The State Court Proceedings.

513.    This claim has been raised in the presently-pending *Motion for Postconviction Relief Pursuant to Superior Court Criminal Rule 61, and Consolidated Memorandum of Law* which was filed in the Delaware Superior Court on January 25, 2008.

### CLAIM XXIII THE PROSECUTION'S CONTINUOUS MISCONDUCT THROUGHOUT PETITIONER'S CAPITAL TRIAL VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.

514.    The claims and factual allegations set forth in all other sections of this *Petition* are incorporated by reference and realleged as if set forth entirely herein.

515.    The duty of the prosecution in a criminal case is not to win the case, but to seek justice. Berger v. United States, 295 U.S . 78, 88 (1935). As part of this duty, the prosecutor has

a special obligation to avoid improper conduct. Because of the prosecutor's prominent courtroom role as representative of the State -- and the mantle of respect and authority this creates in the eyes of the jury -- the jurors are predisposed to give great deference to the prosecutor's words and actions, and improper prosecutorial arguments "are apt to carry much weight against the accused when they should properly carry none." Berger, 295 U.S. at 88; accord Drake v. Kemp, 762 F.2d 1449, 1459 (11th Cir. 1985) ("Arguments delivered while wrapped in the cloak of state authority have a heightened impact on the jury." (citing Berger)). "For this reason, misconduct by the prosecutor ... must be scrutinized carefully." Id.

516.   The prosecutor in Petitioner's case completely ignored this constitutional admonition in his opening statement and closing argument of Petitioner's 1996 capital trial, making comments and argument that destroyed the jury's objectivity and impartiality, and infected the trial with unfairness, in violation of due process.   Counsel's failure to challenge this improper and inflammatory argument constituted prejudicially deficient performance.

**A.    The Prosecutor's Prejudicial, Inflammatory, and Misleading Remarks and Argument.**

517.   In the opening statement, the prosecutor made inflammatory comments about the nature of the offense itself, describing it as "a sneaky act" that constituted a "frontal assault on the criminal justice system." NT 10/30/96 at 37. Aside from constituting improper argument during the opening statement, when the prosecutor's duty is to explain to the jury the *evidence* that will be presented in the case, see ABA Standard 3-5.5 for the Prosecution Function ("The prosecutor's opening statement should be confined to a statement of the issues in the case and the evidence the prosecutor intends to offer which the prosecutor believes in good faith will be available and

admissible."), the description of the crime as "sneaky" and editorial comment that the crime was a "frontal assault on the criminal justice system" served no legitimate purpose other than to improperly inflame the jury against Petitioner.

518.    The prosecutor continued this diatribe at the conclusion of the trial, when, during his closing argument, he committed additional misconduct by making false and misleading comments to the jury about the evidence that had been presented.

519.    A prosecutor may not misstate the record. Hughes v. State, 437 A2d 559 (Del. 1981); ABA Standard 3-5.8 for the Prosecution Function: (a) In closing argument to the jury, the prosecutor may argue all reasonable inferences from evidence in the record. The prosecutor should not intentionally misstate the evidence or mislead the jury as to the inferences it may draw.

520.    During his closing argument, the prosecutor misled the jury as to the testimony of prosecution witness Malvern Slawter, a police officer on the New Castle County Police evidence detection squad who processed the crime scene.  The prosecutor committed misconduct when he told the jury that Slawter testified that a camouflage jacket containing 24 nine millimeter bullets in the pocket and which the prosecutor contended belonged to Petitioner, was found in the backseat of the codefendant's vehicle. NT 11/12/96 at 66. In fact, Slawter testified the jacket was found in the trunk of the vehicle, not the backseat.  NT 10/30/96 at 144.  This fact was critical to the determination of whether Petitioner was involved in the crime or was the actual shooter, since earlier testimony had placed Petitioner in the front passenger seat of the vehicle and running from the vehicle. If the jury believed the prosecutor's false claim that the jacket was, in fact, found in the backseat, it lends much more credibility to the argument that the jacket did, in fact, belong to Petitioner, since he would have had easy access to it (and the ammunition) from the inside of the

220

vehicle.

521.    Trial counsel failed to object to this false and misleading statement, or request a curative instruction to ensure that the jury was reminded of the actual location of the jacket. While counsel did attempt to correct the prosecutor's misstatement later in his own closing argument, NT 11/12/96 at 82, this was insufficient to cure the damage committed by the prosecutor and certainly no substitution for an instruction and admonition by the court itself to the jury to disregard this false statement.

522.    The prosecutor also engaged in the following inflammatory and prejudicial oratory:

Ladies and gentlemen, tomorrow will be one year to the day from the time Kristopher Heath was killed and shot in cold blood because he was doing nothing more than his job, in trying to enforce what was right. *One year to the day.*

. . .

And it will be your function to finish what was started one year ago today, when Kristopher Heath set out to come to this courtroom and to do justice.

NT 11/12/96 at 123-24.

523.    At the conclusion of the prosecutor's argument, counsel for codefendant Stevenson asked to approach the bench and objected to the prosecutor's final comments and his accent on the word justice, although neither counsel for Petitioner or the codefendant objected specifically to the prosecutor's egregious command to the jury that it was their function to "finish what was started." The trial court found that the prosecutor did not "overreach" in his closing remarks, and denied the defense request for a curative instruction.

524.    The prosecutor committed misconduct when he told the jury that its function was to "finish what was started one year ago today." These comments served absolutely no purpose except

221

to invoke passion and sympathy in the minds of the jury. Also, by in effect ordering the jury to "do justice" and convict the defendants, undue and improper pressure was placed on the jury, and "that kind of pressure ... has no place in the administration of criminal justice," United States v. Young, 470 U.S. 1, 18 (1985); citing ABA Standards for Criminal Justice, 3-5.8(c) and 4-7.8(c); see also United States v. Sanchez, 176 F.3d 1214, 1224 (9th Cir. 1999) (vacating conviction where prosecutor argued: "I would ask your consideration, as every jury has done, and that is that after the marshal's service has done their duty and the court has done its duty and lawyers on both sides have done their duty, that you as jurors do your duty and well consider this matter and find these defendants guilty"); United States v. Manning, 23 F.3d 570, 572 (1st Cir. 1994) (vacating conviction where prosecutor vouched for government's case by telling jury government witnesses were "bound by their oath"). For the prosecutor to suggest to the jury that loyalty to the state or to the victim required a guilty verdict was completely improper.

### B. Counsel's Failure to Object to the Prosecutor's Improper and Inflammatory Remarks, Request a Curative Instruction, and Raise and/or Litigate This Claim Constitutes Prejudicially Deficient Performance in Violation of the Sixth, Eighth and Fourteenth Amendments.

525.    As set forth above, Petitioner has presented a meritorious claim of prosecutor misconduct. Any failure on the part of trial and/or appellate counsel to properly raise, preserve, and litigate this issue in state court constitutes prejudicially deficient performance in violation of Petitioner's state and federal constitutional rights.

526.    The ABA GUIDELINES FOR APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES – performance standards to which the United States Supreme Court has long referred "as 'guides to determining what is reasonable'" attorney conduct, Wiggins v. Smith, 539

222

U.S. 510, 524 (2003); <u>Rompilla v. Beard</u>, 545 U.S. 374, 387 (2005) – clearly called for counsel to "consider, when deciding whether to object to legal error and whether to assert on the record a position regarding any procedure or ruling, that post judgment review in the event of conviction and sentence is likely, and counsel should take steps where appropriate to preserve, on all applicable state and Federal grounds, any given question for review." ABA Guideline 11.7.3.

527. The Delaware Supreme Court also recognizes the necessity for competent counsel to object to improper comment by the prosecutor. "Almost as often as we have admonished the State for improper comments like those described in this instance, we have similarly admonished the defense bar for failing to object to prosecutorial misconduct. <u>Ayers v. State</u>, 802 A.2d 278, 282-83 (Del. 2002) (while ultimately finding no prejudice because of the totality of unchallenged evidence, notes that counsel's failure to object to improper and inflammatory argument by prosecutor "may well fall below an objective standard of reasonable conduct."); <u>Trump v. State</u>, 753 A.2d 963, 969-70 (Del.2000) ( "Despite separate admonitions by this Court, some members of the defense bar still fail to assert timely objections to such prosecutorial conduct.").

528. Similarly, Petitioner has demonstrated prejudice. There is more than a reasonable likelihood that the jury was inflamed by the prosecutor's improper commentary, and believed the prosecutor's false argument that the camouflage jacket was found in the backseat of the vehicle, within easy reach of Petitioner if he indeed were in the car. Finally, because no curative instruction was issued to correct the prosecutor's final statements that it was the jury's "function to finish what was started one year ago today," there is more than a reasonable likelihood that the jury believed it was compelled to find Petitioner guilty on this basis rather than on the evidentiary presentation.

529. Counsel's failure to object to these prejudicial and inflammatory comments and

223

argument by the prosecutor, or at the minimum request a curative instruction from the Court, constitutes prejudicially deficient performance, in violation of the Sixth, Eighth, and Fourteenth Amendments.

530.    Similarly, counsel's failure to raise these claims on appeal or during prior proceedings constitutes prejudicially deficient performance. The same standards apply to claims of appellate ineffectiveness. See, e.g. Roe v. Flores-Ortega, 528 U.S. 420 (2000) (applying Strickland standard to consideration of appellate counsel's ineffectiveness); United States v. Mannino, 212 F.3d 835 (3d Cir. 2000); Orazio v. Dugger, 876 F.2d 1508, 1513 (11th Cir. 1989); Matire v. Wainwright, 811 F.2d 1430, 1435 (11th Cir. 1987). Where, as in this case, there is a "reasonable probability that the neglected claim[s] would have succeeded on appeal, [] counsel's failure to raise the claim f[alls] outside the range of reasonably competent assistance." Claudio v. Scully, 982 F.2d 798, 799 (2d Cir. 1992); Jackson v. Leonardo, 162 F3d. 81 (2d Cir. 1998) (appellate counsel's failure to raise "sure winner" constituted ineffective assistance: "In the instant case, we believe that appellate counsel's failure to raise a well- established, straightforward, and obvious . . . [claim] . . . constitutes ineffective performance."); Starr v. Lockhart, 23 F.3d 1280 (8th Cir. 1993 ) (finding trial and appellate counsel ineffective for failing to object to and raise an erroneous jury instruction); Freeman v. Lane, 962 F.2d 1252 (7th Cir. 1992) (appellate counsel ineffective for failing to raise a meritorious claim that was "presented squarely" at trial regarding a violation of the defendant's Fifth Amendment rights); Murphy v. Puckett, 893 F.2d 94 (5th Cir. 1990) (counsel's failure to raise valid defense at trial and on direct appeal constituted ineffective assistance). Accordingly, for this reason as well, relief is required.

224

### C.    The State Court Proceedings.

531.    This claim has been raised in the presently-pending *Motion for Postconviction Relief Pursuant to Superior Court Criminal Rule 61, and Consolidated Memorandum of Law* which was filed in the Delaware Superior Court on January 25, 2008.

### CLAIM XXIV THE PROSECUTION'S CONTINUOUS MISCONDUCT THROUGHOUT PETITIONER'S CAPITAL RESENTENCING PROCEEDINGS VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.

532.    The claims and factual allegations set forth in all other sections of this *Petition* are incorporated by reference and realleged as if set forth entirely herein.

533.    As described above, the duty of the prosecution in a criminal case is not to win the case, but to seek justice. Berger v. United States, 295 U.S. 78, 88 (1935). As part of his duty to see that justice is done, the prosecutor has a special duty to avoid improper argument to the jury. Because of the prosecutor's prominent courtroom role as representative of the State -- and the mantle of respect and authority this role creates in the eyes of the jury -- the jurors are predisposed to give great deference to the prosecutor's words, and improper prosecutorial arguments "are apt to carry much weight against the accused when he should properly carry none." Berger, 295 U.S. at 88; accord Drake v. Kemp, 762 F.2d 1449, 1459 (11th Cir. 1985) ("Arguments delivered while wrapped in the cloak of state authority have a heightened impact on the jury.") (citing Berger). "For this reason, misconduct by the prosecutor...must be scrutinized carefully." Id.; see also United States v. Young, 470 U.S. 1, 7-8 (1985). The prosecutor's obligations and the court's scrutiny are never greater than in capital proceedings.

534.    When the prosecutor's argument infects the trial with unfairness, due process is violated. Donnelly v. DeChristoforo, 416 U.S. 637 (1974). Prosecutors have a "heightened duty to

225

refrain from conduct designed to inflame the sentencing jury's passions and prejudices," Lesko v. Lehman, 925 F.2d 1527, 1541 (3d Cir. 1991). Even where individual remarks by themselves do not create a due process violation, their cumulative effect may. Id. at 1546.

535.    Moreover, a criminal defendant has a due process right to be tried solely on the basis of admissible evidence and a Sixth and Fourteenth Amendment right not to be convicted except upon a jury determination based upon proof of every element of the offense proven by record evidence beyond a reasonable doubt. Chandler v. Florida, 449 U.S. 560, 574 (1981); United States v. Gaudin, 515 U.S. 506, 514 (1995).

536.    The very nature of a capital case demands heightened scrutiny. "Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, the Eighth Amendment requires heightened "reliability in the determination that death is the appropriate punishment in a specific case," Woodson v. North Carolina, 428 U.S. 280, 305 (1976); and that the sentencing process must "minimize the risk of wholly arbitrary and capricious action" by the sentencing jury. Gregg v. Georgia, 428 U.S. 153, 189 (1976). As a result, special scrutiny be given to prosecutorial argument in the penalty phase. See Osborn v. Shillinger, 861 F.2d 612, 626 n.12 (10th Cir. 1988) ("minimized state interest in finality when resentencing alone is the remedy, combined with the acute interest of a defendant facing death," justify even closer scrutiny for error at the sentencing phase than at the guilt phase); see also Lesko, 925 F.2d at 1541; Christy v. Horn, 28 F. Supp.2d 307, 319 (W.D. Pa. 1998).

537.    The prosecutor's commentary and argument throughout the 2005 resentencing proceeding in Petitioner's case violated these fundamental tenets of capital jurisprudence. These actions by the prosecutor, both individually and collectively, violated Petitioner's constitutional

rights.

### A.     The Prosecutor's Improper and Inflammatory Opening and Closing Remarks Far Exceeded the Bounds of Permissible Oratorical Flair.

538.     During opening statements, the prosecutor's duty is to explain to the jury the *evidence*

that will be presented in the case.  See ABA Standard 3-5.5 for the Prosecution Function ("The

prosecutor's opening statement should be confined to a statement of the issues in the case and the

evidence the prosecutor intends to offer which the prosecutor believes in good faith will be available

and admissible.").  Yet, right out of the gate during his opening statement, the prosecutor defied this

rule, and went about biasing the jury against Petitioner with irrelevant and inflammatory remarks that

had absolutely nothing to do with the case, such as describing the offense as "senseless" and

"cowardly," NT 11/16/05 at 37, and invoking the jury's sympathy for the victim, id. at 43 ("They

had time to think about the fact that they were taking the life of a 25-year-old young man in the

prime of his life, a son and a brother, friend to the people, and they didn't care.").

539.     During closing argument and rebuttal, the prosecution continued to ignore these

standards and Petitioner's right to due process and repeatedly inundated the jury with rhetoric

designed for the obvious and impermissible purpose of prejudicing the jury against Petitioner:

> Everyone in this room, except the defendants in this case, make this system work,
> make our society work.

NT 12//05/05 at 36.[91]

. . .

> When a witness is executed in cold blood just because he is a witness and will testify
> against a participant in a murder plot, ladies and gentlemen, it is a *full frontal attack
> on the foundation of our criminal justice system.  That's what makes this crime so*

---

[91] Counsel actually did object to this remark, but the court overruled Petitioner's objection and permitted the prosecutor to continue.

*bad.*"

NT 12/05/05 at 36-7.

540.    The prosecutor continued this inflammatory theme in rebuttal:

You heard us say it several times, and I'm going to say it one more time.  They attacked, attacked the foundations of the criminal justice system.

. . .

By shooting an innocent 25-year-old in the prime of his life, just starting his career, trying to start a family, getting ready to get married - - five shots in the back is an assassination of Kristopher Heath, *an assassination of the criminal justice system as a whole. The worst of the worst, right here.*

NT 12/05/05 at 129-30.

541.    These arguments gave the jury the false (and unconstitutional) impression that the homicide of the decedent was somehow an affront to the entire justice system, and it was the jury's duty to protect that system.   These arguments by the prosecution in this capital case also go far beyond permissible "oratorical flair" and impact the very nature of the Eighth and Fourteenth Amendment protections.

**B.    The Prosecution Repeatedly Mis-characterized and Misled the Jury as to the Evidence that was Actually Presented.**

542.    In addition to the inflammatory, irrelevant, and prejudicial comments and argument discussed above, the prosecution also repeatedly mis-characterized and made outright false statements about the evidence that was admitted.

**1.    The camouflage jacket**

543.    One of the more critical pieces of evidence in this case was a camouflage jacket, containing 24 live rounds of nine millimeter ammunition.  This jacket was found in the trunk of the

228

co-defendant's car, far out of easy reach of anyone who was in the passenger area of the vehicle. The prosecution was well aware of where the jacket was found, yet throughout the opening, closing, and rebuttal, repeatedly told the jury that the camouflage jacket was actually found in the backseat of the vehicle, see NT 11/16/05 at 53, NT 12/05/05 at 34, when in fact the prosecution had itself put on the testimony of Detective Craig Weldon, who confirmed the camouflage jacket had actually been found in the trunk of the car.

**2.    Susan Brown**

544.    The prosecution also mischaracterized the testimony of Susan Brown. Ms. Brown testified that the person she witnessed commit the shooting was wearing a blue jacket, not a pullover sweatshirt which was what Petitioner was wearing when he was apprehended shortly after the offense. See NT 11/17/05 at 92 (testimony of Officer Weldon); NT 11/29/05 at 41.

**3.    The prosecution's false implication that Petitioner was involved in the Macy's thefts and was a member of a gang and sold drugs**

545.    In addition to mis-characterizing the evidence that was actually presented, the prosecution also, without any supporting evidence whatsoever, insinuated that Petitioner was involved in the Macy's theft that was the purported motive for the shooting, and that he was a gang member and sold drugs:

> Are they good guys - - do good guys steal from their employer to the tune of $4500, maybe get involved in a Philadelphia gang selling drugs, plan and premeditate an execution style murder? Does that sound like a good guy to you?

NT 12/05/05 at 125.

546.    This argument by the prosecution including Petitioner in the Macy's thefts and putting in the minds of the jury the idea that he was a drug-dealing gang member from Philadelphia - despite

not an iota of evidence on the record to support this allegation, while a plethora of evidence existed to the contrary - could not have been more blatantly prejudicial.

547.    A prosecutor may not misstate the record. Hughes v. State, 437 A2d 559 (Del. 1981); ABA STANDARD 3-5.8 for the Prosecution Function: "(a) In closing argument to the jury, the prosecutor may argue all reasonable inferences from evidence in the record. The prosecutor should not intentionally misstate the evidence or mislead the jury as to the inferences it may draw." These arguments by the prosecution violate these standards of jurisprudence, as well as Petitioner's due process rights.

C.    **Conclusion.**

548.    The prosecutor's comments and arguments in this case were not simply isolated instances of prosecutorial excess. Individually and cumulatively, the prosecutor's comments resulted in the denial of due process. Moreover, neither counsel nor the court took any steps to cure any of these errors. The trial court's failure to correct any of the above errors, or to immediately instruct the jury as to their impropriety, contributes to and enhances the due process violation.

549.    These errors compromised the reliability of the verdict and sentencing determination and deprived Petitioner of his rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Counsel's failure to object, request a limiting instruction, or properly raise and preserve these issues at trial, during post-verdict proceedings, on direct appeal and in prior post-conviction proceedings denied petitioner his right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 694 (1984); Williams v. Taylor 529 U.S. 362 (2000).

230

### D.    Counsel was Ineffective.

550.    As set forth above, Petitioner has presented a meritorious claim of prosecutor misconduct. Any failure on the part of trial and/or appellate counsel to properly raise, preserve, and litigate this issue in state court constitutes prejudicially deficient performance in violation of Petitioner's state and federal constitutional rights.

551.    The Sixth Amendment right to effective assistance of counsel is violated when counsel's performance is deficient, i.e., falls below "an objective standard of reasonableness;" and the defendant is prejudiced, i.e., when confidence is undermined in the outcome of the proceeding. Wiggins v. Smith, 539 U.S. 510, 521 (2003);  Williams v. Taylor 529 U.S. 362 (2000); Strickland v. Washington, 466 U.S. 668, 694 (1984).  In evaluating counsel's performance, the Court should consider professional norms such as the American Bar Association's Standards for Criminal Justice ("ABA STANDARDS") and Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989) ("ABA GUIDELINES"), which articulate "reasonable" professional "standards for capital defense work" and are the "norms" and "standards to which [the Supreme Court] long ha[s] referred as 'guides to determining what is reasonable'" under the Sixth Amendment. Wiggins, 539 U.S. at 522-25 (citing Strickland; Williams). See also Outten v. Kearney, 464 F.3d 401, 417 (3d Cir. 2006).

552.    The Guidelines in effect at the time of Petitioner's resentencing trial clearly mandate that "[o]ne of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review. Failure to preserve an issue may result in the client being executed even though reversible error occurred at trial.  For this reason, trial counsel in a death penalty case must be especially aware not

only of strategies for winning at trial, but also of the heightened need to fully preserve all potential issues for later review." ABA GUIDELINES FOR APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES *(Rev. Ed. 2003)*, 10.8, Commentary at 89.

553.    Similarly, Petitioner has demonstrated prejudice.  There is more than a reasonable likelihood that the jury was inflamed by the prosecutor's improper commentary, and likewise believed the prosecutor's false arguments about the camouflage jacket, the mis-characterization of Susan Brown's testimony, and Petitioner's involvement in the Macy's charges and a Philadelphia gang.  Counsel's failure to object to these prejudicial and inflammatory comments and argument by the prosecutor, or at a minimum request a curative instruction from the court, constitutes prejudicially deficient performance, in violation of the Sixth, Eighth, and Fourteenth Amendments.

554.    Counsel's failure to raise these claims on appeal or during prior proceedings constitutes prejudicially deficient performance.  The same standards apply to claims of appellate ineffectiveness.  See, e.g. Roe v. Flores-Ortega, 528 U.S. 420 (2000) (applying Strickland standard to consideration of appellate counsel's ineffectiveness); United States v. Mannino, 212 F.3d 835 (3d Cir. 2000); Orazio v. Dugger, 876 F.2d 1508, 1513 (11th Cir. 1989); Matire v. Wainwright, 811 F.2d 1430, 1435 (11th Cir. 1987).  Where, as in this case, there is a "reasonable probability that the neglected claim[s] would have succeeded on appeal, [] counsel's failure to raise the claim f[alls] outside the range of reasonably competent assistance." Claudio v. Scully, 982 F.2d 798, 799 (2d Cir. 1992); Jackson v. Leonardo, 162 F3d. 81 (2d Cir. 1998) (appellate counsel's failure to raise "sure winner" constituted ineffective assistance: "In the instant case, we believe that appellate counsel's failure to raise a well- established, straightforward, and obvious . . . [claim] . . . constitutes ineffective performance."); Starr v. Lockhart, 23 F.3d 1280 (8th Cir. 1993 ) (finding trial and

232

appellate counsel ineffective for failing to object to and raise an erroneous jury instruction); Freeman v. Lane, 962 F.2d 1252 (7th Cir. 1992) (appellate counsel ineffective for failing to raise a meritorious claim that was "presented squarely" at trial regarding a violation of the defendant's Fifth Amendment rights); Murphy v. Puckett, 893 F.2d 94 (5th Cir. 1990) (counsel's failure to raise valid defense at trial and on direct appeal constituted ineffective assistance). Accordingly, for this reason as well, relief is required.

### E.    The State Court Proceedings.

555.    This claim has been raised in the presently-pending *Motion for Postconviction Relief Pursuant to Superior Court Criminal Rule 61, and Consolidated Memorandum of Law* which was filed in the Delaware Superior Court on January 25, 2008.

### CLAIM XXV    TRIAL COUNSEL'S FAILURE TO REQUEST A CHANGE OF VENUE OR VENIRE FOR PETITIONER'S 1996 CAPITAL TRIAL PREJUDICED PETITIONER IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

556.    The matters set forth in all other sections of this *Petition* and in the supporting affidavits are repeated and realleged as if set forth entirely herein.

### A.    The Legal Standard.

557.    An accused has the right to an impartial jury that decides the case based upon the evidence at trial, free from the influence of pretrial publicity. Where pretrial publicity is pervasive, a change of venue is required in order to preserve that right. Irvin v. Dowd, 366 U.S. 717 (1961); Rideau v. Louisiana, 373 U.S. 723, 726-27 (1963); Sheppard v. Maxwell, 384 U.S. 333, 351 (1966); Murphy v. Florida, 421 U.S. 794, 798-99 (1975); Coleman v. Kemp, 778 F.2d 1487, 1489-90 (11th Cir. 1985).

558.    Delaware law also requires a change of venue in such circumstances, "if the court is

satisfied that there exists in the county where the prosecution is pending a reasonable probability of so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial in that county." Del. Super.Ct.Crim.R., Rule 21(a). Prejudice may be presumed upon a showing of inflammatory, pre-trial media coverage. McBride v. State, 477 A.2d 174 (Del. 1984); State v. Biter, 119 A.2d 894 (Del. 1955).

**B.    A Change of Venue or Venire was Required in Petitioner's Case.**

559.    There was a barrage of print, television, and radio media coverage surrounding this case prior to trial. Moreover, as is evident from the venire panel, New Castle County is a small, tight knit community, encompassing a small geographic area. As was seen from several responses of the venirepersons, people attend the same churches and schools, play on the same sports teams, and do business with one another. In addition to having heard about the case through some media outlet, several prospective jurors knew one or more of the attorneys or witnesses involved in the case, and many had at one point actually lived at or visited the Cavalier Apartments, the scene of the homicide. Despite these factors, trial counsel failed to request a change of venue or venire in this case.

560.    Of the 204 prospective jurors on Petitioner's panel, 33 had some knowledge about the case;[92] 16 had at some point either lived at or near the Cavalier Apartments where the crime

---

[92] See NT 10/22/96 at 40 (Claudia Dorman), 78-9 (Ellen Laucius), 197-99 (Catherine Mills), 208-09 (Nancy McBride), 237-39 (Elaine Brenchley); NT 10/23/96 at 42-5 (Walter Hancock), 120-22 (Kim Houben), 153-55 (Fred Shoop), 234-36 (Macie Dickerson); NT 10/24/96 at 57-9 (Karen Beare), 71-2 (Chris Weyd), 89 (Marcus Frieberg), 116-17 (Elwood Keplinger), 149-51 (John Klaczkiewicz), 206-08 (Shari Dixon), 228-29 (Elaine Pepper), 238 (Virginia Fedele), 280-81 (Francis McDowell); NT 10/25/96 at 10-11 (Jennifer Shaffer), 104 (James Henry), 126-28 (Roy Ferrell); NT 10/28/96 at 30-2 (Dorothy Fleming), 47-8 (Theresa Barlow), 81-2 (Susan Lyle), 97 ( Margaret Atkins), 121 (Nancy Bartoshesky), 152-54 (Darin McClain), 197-99 (Theodore Patten); NT 10/29/96 at 19-20 (Andrea Hartman), 78 (Alan Stone), 105-06 (John Scholato), 146-48 (Lawrence Wilson), and 176-77 (Marie Rawle).

234

occurred or knew someone who had lived there and had visited the location;[93] and 12 knew either

a witness or one of the parties involved with the case.[94]  Five of these individuals actually sat on

Petitioner's jury.[95]

561.    The need for a change of venue is especially acute in cases such as Petitioner's, where

the publicity regarding the case has created a hostile, anti-defendant atmosphere in the community

and the courtroom, thus exposing the jurors to improper, extraneous, anti-defendant influences and

subjecting the defense to intimidating hostility. Mattox v. United States, 146 U.S. 140, 150 (1892);

Frank v. Mangum, 237 U.S. 309, 332 (1915); Remmer v. United States, 347 U.S. 227, 229 (1954);

United States v. Maree, 934 F.2d 196, 202 (9th Cir. 1991); Stockton v. Virginia, 852 F.2d 740, 743

(4th Cir. 1988); Norris v. Risley, 918 F.2d 828, 831-32 (9th Cir. 1990); Woods v. Dugger, 923 F.2d

---

[93]  See NT 10/22/96 at 252 (Robin Barnes); NT 10/23/96 at 120 (Kim Houben), 135-36 (David White), 152 (Fred Shoop), 244 (Maria Way), 266 (Diane Riffee), 234-35 (Macie Dickerson), 278-80 (Scott Tamblyn); 59-60 (Karen Beare), 159, 161-62 (Paul Craven), 194 (Jane Vierolf), 248-49 (Henry Clampitt); NT 10/25/96 at 129-30 (Roy Ferrell, Sr.); NT 10/28/96 at 127 (Dewey Smith); NT 10/29/96 at 64 (Gloria Park-Bennett), and 103-06 (John Scholato).

[94]  For instance, Walter Hancock was friends with Detective Art Lee, who he met through his wife's business, NT 10/23/96 at 40-2; Timothy McFeeley had at one time employed witness Charles Burke, id. at 94; Diane Riffee got to know Detective McLaren "pretty well" as a result of doing his mortgage the year before, id. at 264-66; John Kendall had known Patrolman William Murray and his family for nearly 30 years, id. at 293-95; George Robertsion went to elementary school with Dallas Winslow, NT 10/24/96 at 284; and Margaret Atkins, James Bates, and John Scholato also knew Mr. Winslow, id. at 95-6, NT 10/28/96 at 169-70, and NT 10/29/96 at 104-05; Anthony Grillo was a neighbor of both Mr. Wharton and Mr. Weiler, NT 10/24/96 at 192-94; Thomas Fort knew Mr. Figliola as their sons had attended the same schools for years, NT 10/28/96 at 212; Gloria Park-Bennett knew witness Norvello Brown, as well as the decedent's mother Marion Heath, NT 10/29/96 at 60-1; and Lawrence Wilson lived in the same development as and carpooled with Stuart Sklut. Id. at 148.

[95]  Juror Number 3, Terrence Pendergast, Juror Number 10, Dorothy Fleming, and Juror Number 11, Theresa Barlow, all had read or heard about the case; Juror Number 7, Maria Way, knew two people who had lived at Cavalier Apartments, and Juror Number 10, Dorothy Fleming, in addition to having read about the case, lived nearby the Cavalier Apartments.

1454, 1460 (11th Cir. 1991).

562.    Television, news and radio reports after the offense were patently hostile and misleading against Petitioner. For example, television news stories and newspaper articles about the incident described the decedent as being "ambushed and executed." See Exhibit 33, Action News 11 pm WPVI-TV, Philadelphia Radio TV Reports, November 13, 1995; "Student Charged with NCCo. murder," The Review, November 17, 1995. Another television report mistakenly identified Petitioner as being involved in the Macy's theft incident and stated that the decedent was scheduled to testify against Petitioner as well as his co-defendant. Exhibit 34, Channel Ten News Update, WCAU-TV, Philadelphia, November 13, 1995, 11:00 pm.  Several of the print news articles provided great detail about the homicide itself, the car and foot chase afterwards, and the subsequent apprehension of Petitioner and his codefendant. See, e.g., Exhibit 35, "Witness slain before he can testify," The News Journal, November 14, 1995; "Macy's mystery: what killing accomplished," The News Journal, Nov. 15, 1995; "Second Macy guard may have been target," The News Journal, Nov. 21, 1995. Several of the prospective jurors admitted remembering several details of what they had read or heard, and that they would not be able to put what they had heard or read out of their minds.[96] Despite the obvious prejudice resulting from the prospective jurors' exposure to inflammatory and misleading pretrial publicity about the case, knowledge of the crime scene, and relationships with many of those involved with the case, counsel failed to request a change of venue or venire.

---

[96]  See, e.g., NT 10/22/96 at 197-99 (Catherine Mills), 237-39 (Elaine Brenchley); NT 10/23/96 at 42-5 (Walter Hancock), 234-36 (Macie Dickerson); NT 10/24/96 at 71-2 (Chris Weyd), 228-29 (Elaine Pepper); and NT 10/29/96 at 176-77 (Marie Rawle).

C.    **Habeas Relief is Required Because Counsel was Ineffective in Failing to Request a Change of Venue or Venire.**

563.    The Sixth Amendment right to effective assistance of counsel is violated when counsel's performance is deficient, i.e., falls below "an objective standard of reasonableness;" and the defendant is prejudiced, i.e., when confidence is undermined in the outcome of the proceeding. Wiggins v. Smith, 539 U.S. 510, 521 (2003); Williams v. Taylor 529 U.S. 362 (2000); Strickland v. Washington, 466 U.S. 668, 694 (1984).

564.    There is no possible strategic reason for trial counsel's failure to seek a change of venire or venue in this case. It is clear from the responses of members of the venire panel that the pretrial publicity, combined with the fact that so many of the prospective jurors had prior relationships with those involved with the case and were familiar with the crime scene itself, resulted in actual prejudice from the seating of jurors who were exposed to improper extraneous influences prior to trial. Counsel's failure to request a change of venue or venire was objectively unreasonable, and Petitioner was prejudiced as a result of counsel's failure. Counsel's ineffective failure deprived Petitioner of his constitutional rights to due process, a fair and impartial jury, and equal protection as guaranteed by the Sixth, Eighth, and Fourteenth Amendments.

565.    Similarly, counsel's failure to raise these claims on appeal or during prior proceedings constitutes prejudicially deficient performance. The same standards apply to claims of appellate ineffectiveness. See, e.g. Roe v. Flores-Ortega, 528 U.S. 420 (2000) (applying Strickland standard to consideration of appellate counsel's ineffectiveness); United States v. Mannino, 212 F.3d 835 (3d Cir. 2000); Orazio v. Dugger, 876 F.2d 1508, 1513 (11th Cir. 1989); Matire v. Wainwright, 811 F.2d 1430, 1435 (11th Cir. 1987). Where, as in this case, there is a "reasonable probability that the

237

neglected claim[s] would have succeeded on appeal, [] counsel's failure to raise the claim f[alls] outside the range of reasonably competent assistance." Claudio v. Scully, 982 F.2d 798, 799 (2d Cir. 1992); Jackson v. Leonardo, 162 F3d. 81 (2d Cir. 1998) (appellate counsel's failure to raise "sure winner" constituted ineffective assistance: "In the instant case, we believe that appellate counsel's failure to raise a well-established, straightforward, and obvious . . . [claim] . . . constitutes ineffective performance."); Starr v. Lockhart, 23 F.3d 1280 (8th Cir. 1993 ) (finding trial and appellate counsel ineffective for failing to object to and raise an erroneous jury instruction); Freeman v. Lane, 962 F.2d 1252 (7th Cir. 1992) (appellate counsel ineffective for failing to raise a meritorious claim that was "presented squarely" at trial regarding a violation of the defendant's Fifth Amendment rights); Murphy v. Puckett, 893 F.2d 94 (5th Cir. 1990) (counsel's failure to raise valid defense at trial and on direct appeal constituted ineffective assistance). Accordingly, for this reason as well, relief is required.

### D.    The State Court Proceedings.

566.    This claim has not yet been exhausted in state court.  Petitioner requests that this Court stay this habeas proceeding so that Petitioner's counsel have an opportunity to return to state court and exhaust this claim.

### CLAIM XXVI RELIEF IS REQUIRED BECAUSE DELAWARE'S CAPITAL SENTENCING STATUTE VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS

567.    The claims and factual allegations set forth in all other sections of this *Petition* are incorporated by reference and realleged as if set forth entirely herein.

568.    In United States v. Gaudin, 515 U.S. 506, 522-23 (1995), the Supreme Court held that the "Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable

238

doubt, his guilt of every element of the crime with which he is charged." See also Apprendi v. New

Jersey, 530 U.S. 466, 477 (2000). In Ring v. Arizona, 536 U.S. 584, 609 (2002), the Court held that

"[t]he right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if

it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the

factfinding necessary to put him to death." See Sattazahn v. Pennsylvania, 537 U.S. 101, 111 (2003)

(capital sentencing determination constitutes distinct offense "for purposes of the Sixth

Amendment's jury-trial guarantee"); Walton v. Arizona, 497 U.S. 639, 709 (1990) (Sixth

Amendment requires "jury determination of facts that must be established before the death penalty

may be imposed") (Stevens, J., dissenting), quoted favorably in Ring, 536 U.S. at 600; see also

Turner v. Murray, 476 U.S. 28, 51 (1986) (Powell, J., dissenting); Schiro v. Farley, 510 U.S. 222,

243 (1994) (Stevens, J., dissenting).  The Court has further declared that "If a State makes an

increase in a defendant's authorized punishment contingent on the finding of a fact, that fact -- no

matter how the State labels it -- must be found by a jury beyond a reasonable doubt." Ring, 536 U.S.

at 603.

569.    Delaware's Capital Sentencing Statute requires that:

If a jury has been impaneled and if the existence of at least 1 statutory aggravating circumstance as enumerated in subsection (e) of this section has been found beyond a reasonable doubt by the jury, *the Court*, after considering the findings and recommendation of the jury and without hearing or reviewing any additional evidence, *shall impose a sentence of death if the Court finds* by a preponderance of the evidence, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, *that the aggravating circumstances found by the Court to exist outweigh the mitigating circumstances found by the Court to exist.*

11 Del. Code § 4209 (d)(1). "Otherwise, the Court shall impose a sentence of imprisonment for the

239

remainder of the defendant's natural life without benefit of probation or parole or any other reduction." Id. § 4209 (d)(2).

570.    Accordingly, the maximum penalty for first degree murder is life imprisonment without parole and death is not appropriate unless two *findings* are made: (1) that there exists at least one aggravating circumstance; and (2) that the aggravating circumstances found outweigh mitigating circumstances found. **Death cannot be imposed without *both* predicate findings**. Although the statute requires a unanimous jury determination of the first finding beyond a reasonable doubt, it provides that the court, *not the jury* make the second finding necessary for a death sentence and further provides that the court apply the lesser, preponderance of the evidence standard.

571.    The Delaware Supreme Court has held that the statute conforms with Ring and the Sixth Amendment. Brice v. State, 815 A.2d 314 (Del. 2003).[97] Noting that the Delaware legislature amended the capital statute in response to Ring, the Brice Court concluded that those amendments satisfied the Sixth Amendment jury requirements. Brice,   815 A.2d at 320.   In reaching its conclusion that the statute conforms with Ring, the Brice Court reached two conclusions that are contrary to clearly established federal constitutional law and objectively unreasonable. First, the Brice Court found that Ring's holding that a unanimous jury determination beyond a reasonable doubt was limited to the "eligibility phase" of the capital sentencing determination, i.e., the determination of whether or not the prosecution has proven the existence of at least one aggravating

---

[97] For this reason, it would appear that any attempt by Petitioner to raise this claim in state court proceedings would be futile, thus excusing exhaustion. See e.g., Lynce v. Mathis, 519 U.S. 433, 436, n.4 (1997) (Court is "satisfied . . . that exhaustion would have been futile" because the Florida Supreme Court previously rejected the claim in other cases and there is no indication that the "Florida courts would have decided Petitioner's case differently"). Nevertheless, in an exercise of caution, Petitioner will be amending his previously filed Rule 61 Petition to include this claim.

factor. Brice, 815 A.2d at 322. Second, the Brice Court found that the statutory requirement that

the court must "find" by a preponderance of the evidence that "the aggravating circumstances found

by the Court to exist outweigh the mitigating circumstances found by the Court to exist" is not a

factual determination implicating the Sixth Amendment's requirement of a unanimous jury

determination beyond a reasonable doubt. Id. For a number of reasons, the Brice Court is wrong.

572.    Although the specific fact-finding at issue in Ring was the finding of aggravating

circumstances under Arizona's capital sentencing scheme, neither Ring nor Apprendi v. New Jersey,

530 U.S. 466 (2000) come close to supporting the limited view that this is the only type of fact

relating to sentencing that the Sixth Amendment requires be made by a unanimous jury beyond a

reasonable doubt.   On the contrary, both Ring and Apprendi explicitly hold that the Sixth

Amendment requirement of a unanimous jury finding beyond a reasonable doubt applies with respect

to any facts that are required for an increase in the authorized sentence. See Apprendi, 530 U.S. at

490 ("any fact that increases the penalty for a crime beyond the prescribed statutory maximum must

be submitted to a jury, and proved beyond a reasonable doubt"); Ring, 536 U.S. at 602 ("If a State

makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that

fact – no matter how the State labels it – must be found by a jury beyond a reasonable doubt"). Ring

meant what it said when the Court stated "no matter how the State labels" the factfinding. Whether

an aggravating circumstance, an eligibility fact, a selection fact, or "Mary Jane,"[98] what is actually

material is that the finding was a prerequisite to increasing the defendant's sentence.

---

[98] Ring, 536 U.S. at 610 (Scalia, J., concurring) ("I believe that the fundamental meaning of the jury-trial guarantee of the Sixth Amendment is that all facts essential to imposition of the level of punishment that the defendant receives--whether the statute calls them elements of the offense, sentencing factors, or Mary Jane--must be found by the jury beyond a reasonable doubt.").

573.    Thus, that the particular factual determination in <u>Ring</u> involved a fact-finding of at least one aggravating factor at the eligibility-stage of a capital sentencing proceeding is incidental to the material fact that such a finding was a prerequisite to increasing the defendant's sentence from life to death. The stage in the proceedings in which the fact-finding occurred in no way alters or limits the scope or applicability of the Sixth Amendment requirement that it be found by a jury unanimously and beyond a reasonable doubt.

574.    Accordingly, the <u>Brice</u> Court's determination that <u>Ring</u> (and <u>Apprendi</u>) limited the Sixth Amendment jury requirement in capital cases to only "eligibility factors" as opposed to facts which increase a penalty beyond the prescribed statutory maximum, is contrary to clearly established federal constitutional law because it is "substantially different from the relevant precedent of [the Supreme Court]"; seeks to apply "a rule that contradicts the governing law set forth in [Supreme Court] cases"; and is "diametrically different," "opposite in character or nature," and "mutually opposed" to established Supreme Court precedent. <u>Williams v. Taylor</u> 529 U.S. at 405-06.

575.    Because "'it is a paradigmatic abuse of discretion for a court to base its judgment on an erroneous view of the law,'" <u>Lonchar v. Thomas</u>, 517 U.S. 314, 341-42 (1996) (quoting <u>Schlup v. Delo</u>, 513 U.S. 298, 333 (1995) (O'Connor, J., concurring)), the state court's interpretation based upon the wrong legal standard was necessarily unreasonable as well. Thus, the state court's determination that the Sixth Amendment jury requirement in capital sentencing proceedings is limited to the determination of "selection criteria" as opposed to facts which increase the statutory maximum punishment was also objectively unreasonable.

576.    Similarly, the state court's determination that Delaware's statutory requirement that the court must "find" by a preponderance of the evidence that "the aggravating circumstances found

by the Court to exist outweigh the mitigating circumstances found by the Court to exist" before the maximum sentence can be increased from life imprisonment without parole to death is not a factual determination implicating the Sixth Amendment's jury requirements is objectively unreasonable and an unreasonable determination of the facts. The Court's conclusion is belied by the statute, logic, common sense and controlling Supreme Court precedent.

577.    Any suggestion that what the Court did was not "factfinding" is itself objectively unreasonable and belied by the statute, because the legislature in fact assigned an evidentiary burden of proof (albeit an unconstitutionally low burden) to the factual determination of whether the aggravation previously found outweighed the mitigation previously found. In addition, the weighing determination is by logic and its very nature a factual determination. The court must first make findings on the existence of aggravation and mitigation.    To determine whether or not the aggravation category outweighs the mitigation category, a second fact-finding is necessary that involves balancing one set of facts against another.[99]  Absent this second fact-finding, the death sentence is not applicable.

578.    In reaching its objectively unreasonable conclusion that the factual determination of the relative weight of aggravation versus mitigation is not implicated by the Sixth Amendment, the Brice court misperceived and misapprehended the statutory requirements and Sixth Amendment law. The court concluded that the second determination does not increase the punishment because once the jury finds the existence of an aggravating factor, a defendant becomes "death eligible." Brice, 815 A.2d at 322. But while it is true that a finding of death-eligibility is a necessary prerequisite to

---

[99]  No reasonable person would suggest that the determination that four pounds of lumber outweigh two pounds of bricks is anything but a determination of fact.  A decision on the relative weight of aggravation and mitigation is analytically no different.

increasing the punishment that may be imposed in a capital case, that finding alone is not sufficient to increase the punishment. Under the statute, death is neither an authorized nor an appropriate sentence on the finding of aggravation alone. The statute requires a second factual predicate for the sentence to be increased to death, a subsequent factual finding that the aggravation outweighs the mitigation. Attempting to characterize this second statutory requirement as nothing more than "ensur[ing] that the punishment imposed is appropriate and proportional," Brice, 815 A.2d at 322, disregards the plain meaning of the statute and puts the rabbit in the hat.[100] The imposition of the greater punishment is only appropriate and proportional upon a fact-finding that aggravation outweighs mitigation.

579.    Because the state court misperceived and misapprehended the constitutional import of Delaware's statutorily required fact-findings for imposing a death sentence, the state court decision is objectively unreasonable and an unreasonable determination of the facts.

580.    The state court's (mis)characterization also disregards, and unreasonably applies, clearly established Sixth Amendment law. The sum and substance of the state court's conclusion is that the second requirement is nothing more than a consideration of "sentencing factors." As Ring held, such a conclusion "overlooks Apprendi's instruction that 'the relevant inquiry is one not of form, but of effect.'" Ring 536 U.S. at 604 (citing Apprendi, 530 U.S. at 494). The *effect* of the

---

[100]   Indeed, following the Ring decision, the Arizona Supreme Court found that the weighing of aggravation and mitigation is essentially fact-finding. See State v. Ring, 65 P. 3d 915, 942,43 (Ariz. 2003) (*en banc*). Similarly, the Nevada Supreme Court has also concluded that the determination of whether aggravation outweighs mitigation is a factual determination requiring the Sixth Amendment jury protections. Johnson v. State, 59 P.3d 450, 460 (Nev. 2002) ("This second finding regarding mitigating circumstances is necessary to authorize the death penalty in Nevada, and we conclude that it is in part a factual determination, not merely discretionary weighing").

required finding that aggravation outweighs mitigation under Delaware's capital statute increases punishment from life imprisonment without parole to death. Because the state court ignored the *effect* of the statutory required finding, its determination was contrary to and an unreasonable application of clearly established Sixth Amendment law.

581.    For each of these reasons, subjecting Petitioner to a sentencing scheme that permitted the court to find that aggravation outweighed mitigation by a preponderance of the evidence violated Petitioner's Sixth Amendment right to a unanimous jury determination of essential facts increasing the statutory punishment beyond a reasonable doubt. Relief is required.

**CLAIM XXVII**      **PETITIONER IS ENTITLED TO RELIEF BECAUSE OF THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN THIS CASE.**

582.    The claims and factual allegations set forth in all other sections of this *Petition* are incorporated by reference and realleged as if set forth entirely herein.

583.    Constitutional claims of error are to be considered cumulatively as well as individually and cumulative error or prejudice may provide a basis for relief whether or not the effect of individual errors warrants relief. Kyles v. Whitley, 514 U.S. 419, 437-38 (1995); Taylor v. Kentucky, 436 U.S. 478, 488 (1978); Lesko v. Lehman, 925 F.2d 1527, 1541 (3d Cir. 1991); Berryman v. Morton, 100 F.3d 1089 (3d Cir. 1996).

584.    If the Court finds cumulative prejudice, it eliminates the need to analyze the individual prejudicial effect of each deficiency. Moreover, if the Court finds itself in equipoise as to the effect of these cumulative errors, such that it "merely ha[s] 'grave doubt' as to the existence of prejudice," relief must be granted. Glenn v. Tate, 71 F.3d 1204, 1211 (6th Cir. 1995) (quoting O'Neal v. McAninch, 115 S. Ct. 992 (1995)).

585.    Each of the claims presented herein individually entitles Petitioner to relief from his conviction and/or sentence. However, even if this court finds that Petitioner is not entitled to relief based on any particular error, he is nevertheless entitled to relief because the cumulative effect of these errors was to deny him a fair trial and the heightened procedural safeguards constitutionally required in capital cases.

586.    The circumstances of this case demonstrate that the cumulative effect of counsel's serious failures, and the constitutional errors committed by the court and the prosecutor, so undermined the fairness of the trial and sentencing proceedings that Petitioner's conviction must be overturned and his sentence of death must be vacated. As the Sixth Circuit has explained:

> Viewing the total picture, and considering both the nature of the material presented to the jury that should not have been and the nature of the material not presented to the jury that should have been, we cannot have much confidence in the jury's weighing of the factors relevant to the issue of whether [the defendant] should be sentenced to death.

Glenn v. Tate, 71 F.3d at 1210.

587.    Collectively and cumulatively, these errors denied Petitioner due process and violated the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Relief is required.

246

## REQUEST FOR RELIEF

WHEREFORE, based upon the foregoing, all other proceedings and submissions, Petitioner,

MICHAEL R. MANLEY, respectfully requests that the Court grant him the following relief:

A)   That Petitioner be granted such discovery as is necessary for full and fair resolution of the claims contained in this Petition;

B)   That leave to amend this Petition be granted;

C)   That an evidentiary hearing be conducted on all claims involving disputed issues of fact;

D)   That Respondents be Ordered to respond to this Petition; and

E)   That Petitioner's convictions and sentences be vacated.

Respectfully submitted,


s/ ANNE L. SAUNDERS
ANNE L. SAUNDERS, ESQUIRE
Asst. Federal Public Defender
Attorney ID # PA 48458
Federal Public Defender
Middle District of Pennsylvania
Capital Habeas Unit
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
Tel. No. (717) 782-3843
Fax. No. (717) 782-3966
(Anne_Saunders@fd.org)

s/ BETH ANN MUHLHAUSER,
BETH ANN MUHLHAUSER, ESQUIRE
Asst. Federal Public Defender
Attorney ID #PA 74181
Federal Public Defender
Middle District of Pennsylvania
Capital Habeas Unit
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
Tel. No. (717) 782-3843
Fax. No. (717) 782-3966
(Beth_Muhlhauser@fd.org)


Counsel for Michael Manley


Dated: February 5, 2008


247

## CERTIFICATE OF SERVICE

I, Beth A. Muhlhauser, of the Federal Public Defender's Office do hereby certify that on this

date I served a copy of the foregoing via ECF or by placing a copy in the United States mail, first

class, in Harrisburg, Pennsylvania, addressed to the following:

Loren C. Meyers, Esquire
Deputy Attorney General
820 North French Street,
7th Floor
Wilmington, DE 19801

Respectfully submitted,

Beth Ann Muhlhauser
BETH ANN MUHLHAUSER, ESQUIRE
Asst. Federal Public Defender
Attorney ID #PA 74181
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
Tel. No. (717) 782-3843
Fax. No. (717) 782-3966
Email: Beth_Muhlhauser@fd.org
Attorney for Michael Manley

February 5, 2008

JS 44   (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS
MICHAEL MANLEY

**DEFENDANTS**
CARL C. DANBERG, Commissioner, Delaware Department of Corrections; and THOMAS L. CARROLL, Warden, Delaware Correctional Center at Smyrna

**(b)**  County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**©**  Attorney's (Firm Name, Address, and Telephone Number)
**Anne L. Saunders, Esquire, Beth A. Muhlhauser, Esquire, Federal Defender's Office, 100 Chestnut Street, Suite 306, Harrisburg, PA 17101   (717) 782-3843**

Attorneys (If Known)
Loren C. Meyers, Esquire, Deputy Attorney General, Carvel State Office Building, 820 North French Street, 7th Floor, Wilmington, DE 19801

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

**X** 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | **X** 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN   (Place an "X" in One Box Only)

**X** 1  Original Proceeding   ☐ 2  Removed from State Court   ☐ 3  Remanded from Appellate Court   ☐ 4  Reinstated or Reopened   ☐ 5  Transferred from another district (specify)   ☐ 6  Multidistrict Litigation   ☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. § 2254
Brief description of cause:
Violation of Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23
DEMAND $ _____
CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE _____   DOCKET NUMBER _____

DATE
**02/05/2008**

SIGNATURE OF ATTORNEY OF RECORD
**s/ Anne L. Saunders, Esquire**

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| _____ | : | |
| MICHAEL MANLEY, | : | CIVIL ACTION |
| | : | |
| Petitioner, | : | No. 1:07-CV-00472 |
| | : | |
| v. | : | **THIS IS A CAPITAL CASE.** |
| CARL C. DANBERG, Commissioner, | : | |
| Delaware Department of Correction; and | : | GREGORY M. SLEET, USDJ |
| THOMAS L. CARROLL, Warden, | : | |
| Delaware Correctional Center at Smyrna, | | |
| Respondents | | |
| _____ | | |

## APPENDIX TO CONSOLIDATED PETITION FOR WRIT OF HABEAS CORPUS BY A PRISONER IN STATE CUSTODY AND MEMORANDUM OF LAW

ANNE L. SAUNDERS, ESQUIRE
Asst. Federal Public Defender
Federal Public Defender
Middle District of Pennsylvania
Capital Habeas Unit
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
Tel. No. (717) 782-3843
Fax. No. (717) 782-3966
(Anne_Saunders@fd.org)

BETH ANN MUHLHAUSER, ESQUIRE
Asst. Federal Public Defender
Federal Public Defender
Middle District of Pennsylvania
Capital Habeas Unit
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
Tel. No. (717) 782-3843
Fax. No. (717) 782-3966
(Beth_Muhlhauser@fd.org)

Dated: February 5, 2008

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | DUC # 9511007022 |
| | ) | |
| | ) | Criminal Action Numbers: |
| | ) | |
| | ) | IN95111323R3 - Murder - 1st |
| | ) | IN95111324R3 - PFDCF |
| | ) | IN95111325R3 - Consp. - 1st |
| v. | ) | IN95120684R3 - Agg/Act-Intim. |
| | ) | IN95120685R3 - PFDCF |
| MICHAEL R. MANLEY, | ) | IN95120686R3 - Consp-2nd |
| | ) | |
| Defendant. | ) | ID No. 9511007022 |

### NOTICE OF MOTION

TO:    Loren C. Meyers, Esquire
       Department of Justice
       820 North French Street, 7th Floor
       Wilmington, DE 19801

**PLEASE TAKE NOTICE** that the attached Motion For Postconviction Relief Pursuant to

Superior Court Criminal Rule 61 and Consolidated Points of Law will be presented to the Honorable

Jerome O. Herlihy for consideration at the earliest convenience of the Court and counsel.

_____
Christopher Koyste, Esquire
709 Brandywine Boulevard
Bellefonte, DE 19809
(302) 762-5195
Attorney for Defendant/Petitioner
  Michael R. Manley

Christopher D. Tease. Esquire
1232 N. King Street
Suite 300
Wilmington, DE 19801-3236
(302) 652-4550
Attorney for Defendant/Petitioner
  Michael R. Manley

DATED:    January 25, 2008

# MOTION

1. County in which you were convicted: ____New Castle County_____

2. Judge who imposed sentence: _____The Honorable Jerome O. Herlihy_____

3. Date sentence was imposed: _____February 3, 2006_____

4. · Offense(s) for which you were sentenced and length of sentence(s):

   Murder in the first degree - death sentence; possession of a firearm during the commission

   of a felony - 20 years; conspiracy in the first degree - 5 years; aggravated act of intimidation -

   8 years; possession of a firearm during the commission of a felony - 20 years; and conspiracy

   in the second degree - 2 years_____

5. Do you have any sentence(s) to serve other than the sentence(s) imposed because of the
   judgment(s) under attack in this motion? Yes ( )   No  ( X )
   If your answer is "yes", give the following information:
   Name and location of court(s) which imposed the other sentence(s):

   _____

   _____

   Date sentence(s) imposed: _____

   Length of sentence(s): _____

6. What was the basis for the judgment(s) of conviction?  (Check one)
       Plea of guilty  ( )
       Plea of guilty without admission of guilt ("Robinson plea")  ( )
       Plea of nolo contendere  ( )
       Verdict of jury  ( X )
       Finding of judge (non-jury trial)  ( )

7. Judge who accepted plea or presided at trial: ___The Honorable Jerome O. Herlihy_____

8. Did you take the witness stand and testify?  (Check one)
   No trial  ( )   Yes  ( )   No  ( X )

1

9.  Did you appeal from the judgment of conviction?  Yes  ( X )   No  ( )
    If your answer is "yes", give the following information:

    Case number of appeal: Manley v. State, 918 A.2d 321 (Del. 2007); and Manley v. Delaware,

    U.S. , 127 S. Ct. 2885 (5/29/07)

    Date of court's final order or opinion: __May 29, 2007

10. Other than a direct appeal from the judgment(s) of conviction, have you filed any other
    motion(s) or petition(s) seeking relief from the judgment(s) in state or federal court?
    Yes (X)  No ( )  **Federal Proceedings Pending**
    If your answer is "yes", give the following information as to each:

    Nature of proceeding(s): Petitioner's Motion for Appointment of Federal Habeas Corpus

    Counsel Pursuant to 21 U.S.C. §848(q) and McFarland v. Scott, and for an Order Permitting

    Petitioner to Proceed In Forma Pauperis

    Grounds raised: _____

    Was there an evidentiary hearing? _____

    Case number of proceeding(s): _____

    Date(s) of court's final order(s) or opinion(s): _____

    Did you appeal the result(s)? _____

11. Give the name of each attorney who represented you at the following stages of the
    proceedings relating to the judgment(s) under attack in this motion:

    At plea of guilty or trial: Anthony Figliola and Thomas Foley

    Second penalty hearing: Joseph A. Gabay and Joseph Bernstein

12. State every ground on which you claim that your rights were violated. If you fail to set forth
    all grounds in this motion, you may be barred from raising additional grounds at a later date.
    You must state facts in support of the ground(s) which you claim. For your information, the
    following is a list of frequently raised grounds for relief (you may also raise grounds that are
    not listed here): double jeopardy, illegal detention, arrest or search and seizure, coerced
    confession or guilty plea; uninformed waiver of the right to counsel, to remain silent, or to

speedy trial; denial of the right to confront witnesses, to subpoena witnesses, to testify, or to effective assistance of counsel; suppression of favorable evidence; unfulfilled plea agreement.

Ground one:  Claim I

Supporting facts (state the facts briefly without citing cases):

AS A RESULT OF COUNSEL'S INEFFECTIVENESS AND PROSECUTORIAL MISCONDUCT, READILY AVAILABLE EVIDENCE DEMONSTRATING PETITIONER'S INNOCENCE WAS NOT PRESENTED TO THE JURY IN VIOLATION OF PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS AND HIS RIGHTS UNDER ARTICLE I, §§ 4, 7, 9, 11, 12 and 13 OF THE DELAWARE CONSTITUTION.

Ground two:  Claim II

Supporting facts (state the facts briefly without citing cases):

TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE, DEVELOP AND PRESENT AVAILABLE EVIDENCE DISPUTING AGGRAVATION IN VIOLATION OF PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS AND HIS RIGHTS UNDER ARTICLE I, §§ 4, 7, 9, 11, 12 AND 13 OF THE DELAWARE CONSTITUTION.

Ground three:  Claim III

Supporting facts (state the facts briefly without citing cases)

THE STATE'S FAILURE TO DISCLOSE EXCULPATORY IMPEACHMENT EVIDENCE IN ITS POSSESSION VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS. COUNSEL WAS INEFFECTIVE IN FAILING TO REQUEST MATERIAL IMPEACHMENT EVIDENCE AFTER THE PROSECUTION WITNESSES TESTIFIED ON DIRECT EXAMINATION IN VIOLATION OF PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.

## SEE ATTACHED MEMO FOR ADDITIONAL CLAIMS

If any of the grounds listed were not previously raised, state briefly what grounds were not raised, and give your reason(s) for not doing so: 

Wherefore, movant asks that the court grant him all relief to which he may be entitled in this proceeding.

_____
Signature of attorney (if any)

I declare the truth of the above under penalty of perjury.

_____        _____
Date Signed                     Signature of Movant
                                (Notarization not required)

3

# ATTACHMENT TO MOTION FOR POSTCONVICTION RELIEF

## Question 12 (Continuation of Claims)

CLAIM IV.  TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE, DEVELOP AND PRESENT AVAILABLE MITIGATING EVIDENCE IN VIOLATION OF PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS AND HIS RIGHTS UNDER ARTICLE I, §§ 4, 7, 9, 11, 12 AND 13 OF THE DELAWARE CONSTITUTION.

CLAIM V.  AS A RESULT OF INEFFECTIVE ASSISTANCE OF COUNSEL AND PROSECUTORIAL MISCONDUCT, PRIOR TESTIMONY AND OTHER RANK HEARSAY STATEMENTS WERE ADMITTED IN PETITIONER'S SENTENCING HEARING IN VIOLATION OF HIS SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.

CLAIM VI.  PETITIONER IS ENTITLED TO RELIEF BECAUSE HIS 2005 TRIAL WAS IMPROPERLY JOINED WITH THAT OF HIS CO-DEFENDANT IN VIOLATION OF PETITIONER'S SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS AND ARTICLE I, SECTIONS 4, 7, 11 AND 13 OF THE DELAWARE CONSTITUTION.

CLAIM VII.  PETITIONER IS ENTITLED TO A NEW SENTENCING HEARING BECAUSE THE COURT'S INSTRUCTIONS SKEWED AND LIMITED THE JURY'S CONSIDERATION OF MITIGATION IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS AND ARTICLE I, §§ 4, 7, 9, 11, 12 AND 13 OF THE DELAWARE CONSTITUTION.

CLAIM VIII.  PETITIONER IS ENTITLED TO RELIEF FROM HIS CONVICTION AND SENTENCE BECAUSE THE COURT AND COUNSEL FAILED TO CONDUCT VOIR DIRE TO DETERMINE THE RACIAL ATTITUDES OF THE JURORS IN THIS CAPITAL CASE IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 4, 7, 11, AND 13 OF THE DELAWARE CONSTITUTION.

CLAIM IX.  PETITIONER IS ENTITLED TO RELIEF FROM HIS CONVICTION AND SENTENCE BECAUSE THE PROSECUTION'S USE OF PEREMPTORY STRIKES AGAINST WOMEN AND MINORITIES DURING JURY SELECTION DEPRIVED PETITIONER OF HIS RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTIONS 4, 7, 11 AND 13 OF THE DELAWARE CONSTITUTION.

CLAIM X.     PETITIONER IS ENTITLED TO RELIEF FROM HIS CONVICTION BECAUSE THE PROSECUTION DELIBERATELY EXERCISED A PEREMPTORY STRIKE AGAINST A MINORITY JUROR DURING JURY SELECTION AT THE 1996 TRIAL IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTIONS 4, 7, 11 AND 13 OF THE DELAWARE CONSTITUTION.

CLAIM XI.    AS THE RESULT OF TRIAL COURT ERROR AND INEFFECTIVE ASSISTANCE OF COUNSEL DURING THE JURY SELECTION FOR PETITIONER'S 2005 RESENTENCING TRIAL, PETITIONER WAS DENIED HIS SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS AND HIS RIGHTS UNDER ARTICLE I, SECTIONS 4, 7, 11 AND 13 OF THE DELAWARE CONSTITUTION.

CLAIM XII.   PETITIONER WAS DENIED HIS RIGHT TO A FAIR AND IMPARTIAL JURY AT HIS CAPITAL TRIAL IN 1996 IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS AND ARTICLE I, SECTIONS 4, 7, 11 AND 13 OF THE DELAWARE CONSTITUTION.

CLAIM XIII.  THE ADMISSION OF VICTIM IMPACT TESTIMONY VIOLATED PETITIONER'S SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS, AND HIS RIGHTS UNDER ARTICLE I, SECTIONS 4, 7, 11, AND 13 OF THE DELAWARE CONSTITUTION.

CLAIM XIV.   THE PROSECUTION'S CONTINUOUS MISCONDUCT THROUGHOUT PETITIONER'S CAPITAL TRIAL VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS AND HIS RIGHTS UNDER ARTICLE I, SECTIONS 4, 7, 11 AND 13 OF THE DELAWARE CONSTITUTION.

CLAIM XV.    THE PROSECUTION'S CONTINUOUS MISCONDUCT THROUGHOUT PETITIONER'S CAPITAL RESENTENCING PROCEEDINGS VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS AND ARTICLE I, SECTIONS 4, 7, 11 AND 13 OF THE DELAWARE CONSTITUTION.

CLAIM XVI.   COUNSEL'S FAILURE TO MOVE FOR JUSTICE RIDGELY'S RECUSAL FROM PETITIONER'S PANEL ON DIRECT APPEAL WHERE JUSTICE RIDGELY HAD PREVIOUSLY BEEN PRESIDENT JUDGE IN NEW CASTLE COUNTY AND SUBMITTED FACTUAL AVERMENTS IN RESPONSE TO THE DELAWARE SUPREME COURT'S INQUIRY REGARDING THE ISSUE OF JUDGE BARRON'S RECUSAL VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.

CLAIM XVII.     COUNSEL'S FAILURE TO RAISE AND LITIGATE THE DENIAL OF PETITIONER'S RIGHTS TO A FAIR AND IMPARTIAL SENTENCING TRIBUNAL ON THE BASIS OF THE TRIAL COURT'S CONSIDERATION OF, AND DISPOSITION OF PETITIONER'S PRIOR POST-CONVICTION CLAIMS VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS AND HIS RIGHTS UNDER ARTICLE I, SECTIONS 4, 7, 11, AND 13 OF THE DELAWARE CONSTITUTION.

CLAIM XVIII.    COUNSEL'S FAILURE TO RAISE AND LITIGATE THE PETITIONER'S ENTITLEMENT TO A NEW TRIAL ON THE BASIS OF THE IRREGULARITIES AND STRUCTURAL DEFECTS ARISING OUT OF THE CIRCUMSTANCES OF JUDGE BARRON'S ASSIGNMENT TO PETITIONER'S CASE VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS AND HIS RIGHTS UNDER ARTICLE I, SECTIONS 4, 7, 11, AND 13 OF THE DELAWARE CONSTITUTION.

CLAIM XIX.      PETITIONER IS ENTITLED TO RELIEF BECAUSE OF THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN THIS CASE.

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

# IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | DUC # 9511007022 |
| | ) | |
| | ) | Criminal Action Numbers: |
| | ) | |
| | ) | IN95111323R3 - Murder - 1st |
| | ) | IN95111324R3 - PFDCF |
| | ) | IN95111325R3 - Consp. - 1st |
| v. | ) | IN95120684R3 - Agg/Act-Intim. |
| | ) | IN95120685R3 - PFDCF |
| MICHAEL R. MANLEY, | ) | IN95120686R3 - Consp-2nd |
| | ) | |
| Defendant/Petitioner. | ) | ID No. 9511007022 |

## MOTION FOR POSTCONVICTION RELIEF
## PURSUANT TO SUPERIOR COURT CRIMINAL RULE 61,
## AND CONSOLIDATED MEMORANDUM OF LAW

Christopher Koyste, Esquire
709 Brandywine Boulevard
Bellefonte, DE 19809
(302) 762-5195
Attorney for Defendant/Petitioner
   Michael R. Manley

DATED:    January 25, 2008

Christopher D. Tease. Esquire
1232 N. King Street
Suite 300
Wilmington, DE 19801-3236
(302) 652-4550
Attorney for Defendant/Petitioner
   Michael R. Manley

## PRELIMINARY STATEMENT

All emphasis herein is supplied unless otherwise indicated.  References to the record are "NT" followed by the date and page number.  All other citations are either self-explanatory or are explained.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

I.    PROCEDURAL HISTORY.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   ENTITLEMENT TO RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A.    JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      1.    None of the Claims Presented in this Post-conviction Petition are Barred.. . . . . . 3

      2.    Petitioner Is Entitled to an Evidentiary Hearing.    . . . . . . . . . . . . . . . . . . . . . 11

B.    CLAIMS FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

CLAIM I.    AS A RESULT OF COUNSEL'S INEFFECTIVENESS AND PROSECUTORIAL
            MISCONDUCT, READILY AVAILABLE EVIDENCE DEMONSTRATING PETITIONER'S
            INNOCENCE WAS NOT PRESENTED TO THE JURY IN VIOLATION OF PETITIONER'S
            SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS AND HIS RIGHTS UNDER
            ARTICLE I, §§ 4, 7, 9, 11, 12 AND 13 OF THE DELAWARE CONSTITUTION.. . . . . . . 13

CLAIM II.   TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE, DEVELOP AND
            PRESENT AVAILABLE EVIDENCE DISPUTING AGGRAVATION IN VIOLATION OF
            PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS AND HIS
            RIGHTS UNDER ARTICLE I, §§ 4, 7, 9, 11, 12 AND 13 OF THE DELAWARE
            CONSTITUTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CLAIM III.  THE STATE'S FAILURE TO DISCLOSE EXCULPATORY IMPEACHMENT EVIDENCE IN
            ITS POSSESSION VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH
            AMENDMENT RIGHTS. COUNSEL WAS INEFFECTIVE IN FAILING TO REQUEST
            MATERIAL IMPEACHMENT EVIDENCE AFTER THE PROSECUTION WITNESSES
            TESTIFIED ON DIRECT EXAMINATION IN VIOLATION OF PETITIONER'S SIXTH,
            EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.. . . . . . . . . . . . . . . . . . . . 43

CLAIM IV.   TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE, DEVELOP AND
            PRESENT AVAILABLE MITIGATING EVIDENCE IN VIOLATION OF PETITIONER'S
            SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS AND HIS RIGHTS UNDER
            ARTICLE I, §§ 4, 7, 9, 11, 12 AND 13 OF THE DELAWARE CONSTITUTION.. . . . . . 47

CLAIM V.    AS A RESULT OF INEFFECTIVE ASSISTANCE OF COUNSEL AND PROSECUTORIAL
MISCONDUCT, PRIOR TESTIMONY AND OTHER RANK HEARSAY STATEMENTS
WERE ADMITTED IN PETITIONER'S SENTENCING HEARING IN VIOLATION OF HIS
SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.................... 77

CLAIM VI.   PETITIONER IS ENTITLED TO RELIEF BECAUSE HIS 2005 TRIAL WAS IMPROPERLY
JOINED WITH THAT OF HIS CO-DEFENDANT IN VIOLATION OF PETITIONER'S SIXTH,
EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS AND ARTICLE I, SECTIONS 4, 7,
11 AND 13 OF THE DELAWARE CONSTITUTION.......................... 97

CLAIM VII.  PETITIONER IS ENTITLED TO A NEW SENTENCING HEARING BECAUSE THE COURT'S
INSTRUCTIONS SKEWED AND LIMITED THE JURY'S CONSIDERATION OF
MITIGATION IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH
AMENDMENTS AND ARTICLE I, §§ 4, 7, 9, 11, 12 AND 13 OF THE DELAWARE
CONSTITUTION.. ................................................. 103

CLAIM VIII. PETITIONER IS ENTITLED TO RELIEF FROM HIS CONVICTION AND SENTENCE
BECAUSE THE COURT AND COUNSEL FAILED TO CONDUCT VOIR DIRE TO
DETERMINE THE RACIAL ATTITUDES OF THE JURORS IN THIS CAPITAL CASE IN
VIOLATION OF PETITIONER'S RIGHTS UNDER THE SIXTH, EIGHTH AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE
I, SECTIONS 4, 7, 11, AND 13 OF THE DELAWARE CONSTITUTION.. ........... 113

CLAIM IX.   PETITIONER IS ENTITLED TO RELIEF FROM HIS CONVICTION AND SENTENCE
BECAUSE THE PROSECUTION'S USE OF PEREMPTORY STRIKES AGAINST WOMEN
AND MINORITIES DURING JURY SELECTION DEPRIVED PETITIONER OF HIS RIGHTS
UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED
STATES CONSTITUTION, AND ARTICLE I, SECTIONS 4, 7, 11 AND 13 OF THE
DELAWARE CONSTITUTION.. ....................................... 120

CLAIM X.    PETITIONER IS ENTITLED TO RELIEF FROM HIS CONVICTION BECAUSE THE
PROSECUTION DELIBERATELY EXERCISED A PEREMPTORY STRIKE AGAINST A
MINORITY JUROR DURING JURY SELECTION AT THE 1996 TRIAL IN VIOLATION OF
THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION, AND ARTICLE I, SECTIONS 4, 7, AND 11 OF THE DELAWARE
CONSTITUTION..................................................... 131

CLAIM XI.   AS THE RESULT OF TRIAL COURT ERROR AND INEFFECTIVE ASSISTANCE OF
COUNSEL DURING THE JURY SELECTION FOR PETITIONER'S 2005 RESENTENCING
TRIAL, PETITIONER WAS DENIED HIS SIXTH, EIGHTH AND FOURTEENTH
AMENDMENT RIGHTS AND HIS RIGHTS UNDER ARTICLE I, SECTIONS 4, 7, 11 AND
13 OF THE DELAWARE CONSTITUTION.. ............................... 138

CLAIM XII.    PETITIONER WAS DENIED HIS RIGHT TO A FAIR AND IMPARTIAL JURY AT HIS
CAPITAL TRIAL IN 1996 IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH
AMENDMENTS AND ARTICLE I, SECTIONS 4, 7, 11 AND 13 OF THE DELAWARE
CONSTITUTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

CLAIM XIII.    THE ADMISSION OF VICTIM IMPACT TESTIMONY VIOLATED PETITIONER'S SIXTH,
EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS, AND HIS RIGHTS UNDER
ARTICLE I, SECTIONS 4, 7, 11, AND 13 OF THE DELAWARE CONSTITUTION... . . . 166

CLAIM XIV    THE PROSECUTION'S CONTINUOUS MISCONDUCT THROUGHOUT PETITIONER'S
CAPITAL TRIAL VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH
AMENDMENT RIGHTS AND HIS RIGHTS UNDER ARTICLE I, SECTIONS 4, 7, 11 AND
13 OF THE DELAWARE CONSTITUTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

CLAIM XV.    THE PROSECUTION'S CONTINUOUS MISCONDUCT THROUGHOUT PETITIONER'S
CAPITAL RESENTENCING PROCEEDINGS VIOLATED PETITIONER'S SIXTH, EIGHTH
AND FOURTEENTH AMENDMENT RIGHTS AND ARTICLE I, SECTIONS 4, 7, 11 AND
13. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

CLAIM XVI.    COUNSEL'S FAILURE TO MOVE FOR JUSTICE RIDGELY'S RECUSAL FROM
PETITIONER'S PANEL ON DIRECT APPEAL WHERE JUSTICE RIDGELY HAD
PREVIOUSLY BEEN PRESIDENT JUDGE IN NEW CASTLE COUNTY AND SUBMITTED
FACTUAL AVERMENTS IN RESPONSE TO THE DELAWARE SUPREME COURT'S
INQUIRY REGARDING THE ISSUE OF JUDGE BARRON'S RECUSAL VIOLATED
PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.. . . . . . 193

CLAIM XVII.    COUNSEL'S FAILURE TO RAISE AND LITIGATE THE DENIAL OF PETITIONER'S
RIGHTS TO A FAIR AND IMPARTIAL SENTENCING TRIBUNAL ON THE BASIS OF THE
TRIAL COURT'S CONSIDERATION OF, AND DISPOSITION OF PETITIONER'S PRIOR
POST-CONVICTION CLAIMS VIOLATED PETITIONER'S SIXTH, EIGHTH AND
FOURTEENTH AMENDMENT RIGHTS AND HIS RIGHTS UNDER ARTICLE I, SECTIONS
4, 7, 11, AND 13 OF THE DELAWARE CONSTITUTION. . . . . . . . . . . . . . . . . . . . . . 197

CLAIM XVIII    COUNSEL'S FAILURE TO RAISE AND LITIGATE THE PETITIONER'S ENTITLEMENT TO
A NEW TRIAL ON THE BASIS OF THE IRREGULARITIES AND STRUCTURAL DEFECTS
ARISING OUT OF THE CIRCUMSTANCES OF JUDGE BARRON'S ASSIGNMENT TO
PETITIONER'S CASE VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH
AMENDMENT RIGHTS AND HIS RIGHTS UNDER ARTICLE I, SECTIONS 4, 7, 11, AND
13 OF THE DELAWARE CONSTITUTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

CLAIM XIX.    PETITIONER IS ENTITLED TO RELIEF BECAUSE OF THE CUMULATIVE PREJUDICIAL
EFFECT OF THE ERRORS IN THIS CASE... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207

iv

## I.    PROCEDURAL HISTORY

Defendant/Petitioner, Michael R. Manley, (hereinafter Petitioner or Mr. Manley), was found guilty of murder and related offenses following a joint trial with co-defendant David Stevenson on November 13, 1996. NT 11/13/96 at 3-4. On November 15, 1996, the jury found that the prosecution met its burden as to four aggravating factors and, after conducting the weighing process of aggravation and non-statutory aggravation against mitigation, seven jurors found the aggravation outweighed the mitigation while five found that the aggravation did not outweigh the mitigation. NT 11/15/96 at 92-94. On January 10, 1997, the trial court sentenced Mr. Manley to death on the murder count, (IN95111323R3); a term of incarceration at Level V for twenty years on the possession of a firearm during the commission of a felony count, (IN95111324R3); incarceration at Level V for five years on the conspiracy in the first degree count, (IN95111325R3); incarceration at Level V for eight years on the aggravated act of intimidation count, (IN95120684R3); incarceration at Level V for twenty years on the possession of a firearm during the commission of a felony count, (IN95120685R3); and, incarceration at Level V for two years on the conspiracy in the second degree count, (IN95120686R3).

The Delaware Supreme Court affirmed Mr. Manley's convictions and sentences, including his death sentence, on April 14, 1998. Manley v. State, 709 A.2d 643 (Del. 1998). Mr. Manley's petition for a writ of certiorari to the United States Supreme Court was denied on October 5, 1998. Manley v. Delaware, 525 U.S. 893 (1998). On January 25, 1999, Mr. Manley filed a motion pursuant to Superior Court Rule 61, for Post-Conviction Relief. On appeal from the denial of relief, the Delaware Supreme Court found the circumstances of the trial judge's request for assignment to Petitioner's case – after having presided over the suppression hearing in co-defendant Stevenson's

1

criminal proceedings involving theft-related offenses in which the decedent testified – created an unacceptable risk of bias and required a new penalty hearing before a different judge. Manley v. State, 782 A.2d 249, 258-59 (Del. 2001). On remand, Petitioner's case was reassigned to the Honorable Jerome O. Herlihy.

On October 2, 2003, the Honorable Jerome O. Herlihy Court denied Petitioner's guilt-phase Rule 61 claims and his Motion to Preclude a New Penalty Hearing. State v. Manley, 2003 WL 23511875 (Del. Super. 10/2/03) (Memorandum Opinion, Herlihy, J). That decision was affirmed by the Delaware Supreme Court on April 7, 2004. Manley v. State, 846 A.2d 238 (Del. 2004). On October 18, 2004, this Court denied Petitioner's Motion for Recusal as well as his motions arising out of the Supreme Court's decision in Ring v. Arizona, 536 U.S. 584 (2002), and the state legislature's subsequent amendment of Delaware's capital sentencing statute, (11 Del. C. § 4209).

Following the second penalty hearing, on December 6, 2005, the jury unanimously found three of the four proposed statutory aggravating factors. NT 12/6/05 at 9-10. Eleven jurors concluded that the statutory and non-statutory aggravators outweighed the mitigation while one juror concluded that aggravation did not outweigh the mitigation presented. Id. at 10. On February 3, 2006, this Court issued its opinion sentencing Petitioner to death and ordered that the sentences for the underlying offenses be continued as previously imposed. State v. Manley, Criminal Action Numbers IN95111323R3; IN95111324R3; IN95111325R3; IN95120684R3; IN95120685R3; IN95120686R3 (Del. Super. 2/3/06) (Sentencing Decision, Herlihy, J). The Delaware Supreme Court affirmed Petitioner's sentences on January 3, 2007. Manley v. State, 918 A.2d 321 (Del. 2007). The United States Supreme Court denied Petitioner's petition for a writ of certiorari on May 29, 2007. Manley v. Delaware, __ U.S. __, 127 S. Ct. 2885 (5/29/07).

2

On September 24, 2007, this Court appointed undersigned counsel to represent Petitioner in his Rule 61 proceedings. Counsel's request for an extension of time in order to file Petitioner's petition pursuant to Rule 61 was granted and counsel was directed to file the petition on or before January 25, 2008.

## II. ENTITLEMENT TO RELIEF

### A. JURISDICTION

Petitioner, Michael R. Manley, is a death sentenced prisoner seeking to set aside his judgment of conviction and sentence.

Petitioner raises colorable claims, described in full below, alleging that his convictions and death sentence resulted from violations of Article I, §§ 4, 7, 9, 11, 12 and 13 of the Delaware Constitution and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

This Court has jurisdiction to entertain the merits of each claim. The instant Petition is made pursuant to Superior Court Rule of Criminal Procedure 61 which states in relevant part:

> This rule governs the procedure on an application by a person in custody or subject to future custody under a sentence of death on the ground that the court lacked jurisdiction or on *any other ground that is a sufficient factual and legal basis for a collateral attack upon a criminal conviction or capital sentence.*

Super. Ct.Crim. R. 61(a)(1).

### 1. None of the Claims Presented in this Post-Conviction Petition are Barred.

Rule 61(i) sets forth the following regarding possible bars to post-conviction relief:

(1) *Time Limitation.* A motion for postconviction relief may not be filed more than one year after the judgment of conviction is final or, if it asserts a retroactively applicable right that is newly recognized after the judgment of conviction is final, more than one year after the right is first recognized by the Supreme Court of Delaware or by the United States Supreme

Court.

(2) *Repetitive Motion.* Any ground for relief that was not asserted in a prior postconviction proceeding, as required by subdivision (b)(2) of this rule, is thereafter barred, unless consideration of the claim is warranted in the interest of justice.

(3) *Procedural Default.* Any ground for relief that was not asserted in the proceedings leading to the judgment of conviction, as required by the rules of this court, is thereafter barred, unless the movant shows

    (A)    Cause for relief from the procedural default and
    (B)    Prejudice from violation of the movant's rights.

(4) *Former adjudication.* Any ground for relief that was formally adjudicated, whether in the proceedings leading to the judgment of conviction, in an appeal, in a postconviction proceeding, or in a federal habeas corpus proceeding, is thereafter barred, unless reconsideration of the claim is warranted in the interest of justice.

The application of these bars must be considered in conjunction with the well-settled federal constitutional principle that in light of the "qualitative difference of death from all other punishments," (California v. Ramos, 463 U.S. 992, 998-99 (1983)), heightened procedural safeguards are required in capital cases. Lockett v. Ohio, 438 U.S. 586, 604 (1978); Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (plurality opinion) (noting that, because of the unparalleled severity and irreversibility of the death penalty, the Eighth Amendment imposes a heightened standard "for reliability in the determination that death is the appropriate punishment in a specific case"); see also Godfrey v. Georgia, 446 U.S. 420, 427-28 (1980); Mills v. Maryland, 486 U.S. 367, 383-84 (1988). Where, as described more fully below, Petitioner raised significant and compelling claims involving constitutional violations impacting the reliability of the capital verdict and sentencing determination, the bars contemplated under Rule 61 must give way to the heightened reliability requirement of the Eighth and Fourteenth Amendments. Nevertheless, as described below, none of these bars are applicable to Petitioner's case.

4

### a.    This Petition Meets the Timeliness Requirements

A "judgment of conviction" does not occur until a defendant is sentenced. See e.g., Jackson v. State, 654 A.2d 829, 831-32 (Del. 1995) (noting that a "criminal conviction becomes final at the time of sentencing"). A "judgment of conviction" is not final for purposes of the timing requirements under Rule 61 until appellate review from sentencing is complete. Id.654 A. 2d at 833 (finding that the period for filing a Rule 61 petition does not begin to run until appellate review is complete). See also Rule 61(m). Where a defendant is resentenced, the trigger-date is the date of the resentencing, not the original (invalid) sentencing. State v. Pusey, 2002 WL 31007901 at *2 (Del.Super. 2002) (Carpenter, J.) (*unpublished opinion*)(finding that the time for filing the Rule 61 petition did not begin to run until defendant's resentencing); see also, State v. Morales, 2001 WL 1486169 at *2 (Del.Super. 2001) (Carpenter, J.) (*unpublished opinion*) (calculating the timing for the Rule 61 petition from the resentencing date); State v. Hickman, 2007 WL 127774 at *1 (Del.Super. 2007) (*unpublished opinion*) (same).

Here, Petitioner's judgment of conviction occurred on February 3, 2006, (the date of his resentencing), and the judgment of conviction did not become final until the denial of his petition for a writ of certiorari on May 29, 2007. Accordingly, there are no time-bars to the claims raised in this Petition.

### b.    The *Repetitive Motion* Bar is Not Applicable

Rule 61(i)(2) bars consideration of claims "not asserted in a prior postconviction proceeding, as required by subdivision (b)(2) of this rule." Even if Rule 61(i)(5) does not render this bar inapplicable to Petitioner's claim, and it does, this bar is nevertheless inapplicable here. "Postconviction relief is a collateral remedy which provides an avenue for upsetting judgments *that*

*otherwise have become final.*" Flamer v. State, 585 A.2d 736, 745 (Del. 1990). See also Jackson v. State, 654 A.2d at 832 (*citing* Flamer). As described above, the order for resentencing invalidated the original judgment of conviction and, for purposes of Rule 61, his judgment was not final until May 29, 2007. As the timing and filing requirements of Rule 61, including those contained in subdivision (b)(2), were not applicable to Petitioner before May 29, 2007, any failure to raise the below-described claims is not barred by Rule 61(i)(2).[1]

Similarly, when a state mandates certain capital sentencing procedures or establishes the right to particular appellate, post-conviction, or post-sentencing review in capital cases, it creates Fourteenth Amendment life and liberty interests in those procedures. Evitts v. Lucey, 469 U.S. 387, 393 (1985) (due process interest in state created right to direct appeal).[2] Although the right to the particular procedure is established by state law, the violation of the life and liberty interest it creates is governed by *federal* constitutional law. Hicks v. Oklahoma, 447 U.S. 343, 346 (1980); Ford v. Wainwright, 447 U.S. 399, 428- 29; see Evitts, 469 U.S. at 393 (state procedures employed "as 'an integral part of the . . . system for finally adjudicating the guilt or innocence of a defendant'" must comport with due process). See also Fetterly v. Paskett, 997 F.2d 1295, 1300 (9th Cir. 1993) ("There is, of course, nothing in the Constitution of the United States that requires Idaho's legislature to

---

[1]Moreover, as provided in the discussion of the specific claims, even if Petitioner was somehow required to present these grounds for relief previously, and as his conviction was not final he was not, Petitioner provides reasons why consideration of the merits is warranted in the interests of justice.

[2]See also Hicks v. Oklahoma, 447 U.S. 343, 346 (1980) (liberty interest in state-created capital sentencing procedures); Ford v. Wainwright, 447 U.S. 399, 427-31 (1986) (O'Connor, J., concurring) (liberty interest in state-created right to proceedings to determine competency to be executed); Ohio Adult Parole Authority v. Woodard, 118 S. Ct. 1244, 1254 (1998) (O'Connor, J, with Souter, Ginsburg & Breyer, JJ., concurring) (life interest in state-created right to capital clemency proceedings); id. at 1254-55 (Stevens, J., concurring).

approach [capital sentencing] as it has done . . . . However, the failure of a state to abide by its own statutory commands may implicate a liberty interest protected by the Fourteenth Amendment against arbitrary deprivation by a state."); Foster v. Delo, 39 F.3d 873, 882 (8th Cir. 1994) ("Where a state creates a right, such as a defendant's right to a review of his sentence, the Fourteenth Amendment of course entitles him to procedures to ensure that the right is not arbitrarily denied.").

In Delaware, a criminal defendant has two separate and distinct avenues of obtaining relief from an invalid conviction. These rights are:  the opportunity to appeal directly from the initial judgment of sentence; and, once the direct appeal becomes final, challenge the conviction under Rule 61, wherein the litigant has an opportunity to raise additional bases for relief and also litigate the ineffective assistance of trial counsel and appellate counsel.  Likewise, in capital cases, a post-conviction litigant is entitled to appointment of counsel.  See D.R. 61(l)(3).

Fundamental due process and equal protection require that one cannot have a right without a remedy.  See Marbury v. Madison, 1 Cranch 137, 163, 2 L.Ed. 60 (1803) ("The government of the United States has been emphatically termed a government of laws, and not of men.  It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right").  Where, as here, the state has created two distinct and separate rights and processes to challenge the validity of a criminal conviction, the procedures for each of these rights must comport with the demands of Due Process and Equal Protection.  Evits v. Lucey, 469 U.S. 387, 393 (1985).

By creating a right to post-conviction counsel and review on post-conviction, Delaware was constitutionally obliged to also provide Petitioner with the "basic tools," including effective counsel, to demonstrate the denial of his federal constitutional rights and invalid conviction.  Here, counsel's failure to raise and litigate multiple claims of the denial of his state and federal constitutional rights

7

directly impacting the reliability of Petitioner's conviction deprived him of his federal Due Process and Equal Protection rights. Accordingly, for this reason as well, to the extent counsel was required to raise any of these claims in prior post-conviction proceedings, those claims are not barred and this Court is free to consider the merits and grant the required relief.

### c.    The Procedural Default Bar is Not Applicable

Rule 61(i)(3) bars claims that were not asserted in the proceedings leading up to the judgment of conviction unless the petitioner demonstrates cause and prejudice for the default. This rule is not applicable to Petitioner's claims involving prior counsel's ineffectiveness for failing to raise valid and meritorious claims that would have required grant of relief during the prior proceedings. See Cobb v. State, 2007 WL 2069823 at *3 (Del. 1996) ("Rule 61(i)(3) bars from consideration any claim, *other than the claim of ineffective assistance of counsel*, that was not raised in the proceedings leading to the judgment of conviction unless 'cause for relief from the procedural default' and 'prejudice' are established"); State v. Muzzi, 2007 WL 2069823 at *3 (Del. Super. 2007) (finding the petitioner's ineffective assistance of counsel claim not barred by Rule 61(i)(3)).

Moreover, as described below in the discussion of the individual claims, Petitioner demonstrates cause and prejudice for any default for a number of reasons, including: counsel's constitutional ineffectiveness in failing to raise meritorious issues in the prior proceedings that require relief from his invalid conviction and death sentence, (see Flamer v. State, 585 A.2d at 758 ("if a counsel's failure to pursue a reasonably available claim is so egregious as to constitute ineffective assistance of counsel under the Sixth Amendment, that failure is not only cause to excuse the procedural default, but also an independent ground to reverse the prior convictions"); Cobb v. State, 2007 WL 2069823 at *3 (Del. 1996) ("ineffective assistance of counsel claim, might, if

8

proven, establish "cause" for relief from the procedural bar of Rule 61(i)(3)"); the state's failure to disclose exculpatory evidence; Banks v. Dretke, 540 U.S. 668, 692-93 (2004); Strickler v. Greene, 527 U.S. 263, (1999)). Accordingly, review is not barred by Rule 61(i)(3).

### d.    The Bars in Rule 61(i)(1)-(3) Are Not Applicable

Rule 61(i)(5) precludes application of the bars in subsections (i)(1)-(3) where a petitioner demonstrates "a colorable claim that there was a miscarriage of justice because of a constitutional violation that undermined the fundamental legality, reliability, integrity or fairness of the proceedings leading to the judgment of conviction." This subdivision "[i]s a general default provision, and permits a petitioner to seek relief if he or she was otherwise procedurally barred under Rules 61(i)(1)-(3)." Bailey v. State, 588 A.2d 1121, 1129 (Del.1991). See also Younger v. State, 580 A.2d 552, 555 (Del. 1990) (fundamental fairness exception of Rule 61(i)(5) applies where petitioner shows he was deprived of a substantial constitutional right).

The "miscarriage of justice" provision is not limited solely to claims of actual innocence, but encompasses all instances of fundamental unfairness. Webster v. State, 604 A.2d 1364, 1366 (Del.1992) ("we believe [actual innocence] standard would be inappropriate in a case such as this" mistaken waiver of constitutional right sufficient to meet the "miscarriage of justice" standard). See also Younger, 580 A.2d at 555 (newly recognized right qualifies under (i)(5) "fundamental fairness exception"); State v. Crawford, 2005 WL 2841652, 1 (Del. Super. 2005) (where potentially exculpatory DNA evidence was lost or destroyed, destruction of evidence claim was colorable and warranted review of the substantive merits); State v. Hacket, 2005 WL 3060976, 1 n.10 (Del. Super.2005) (claim of ineffective assistance of counsel in violation of the Sixth Amendment, "by its very nature," qualifies under the (i)(5) exception); State v. Wilson, 2005 WL 3006781, 1 (Del.

9

Super. 2005) (same); <u>State v. Briggs</u>, 1998 WL 1029256, 2 (Del.Super.,1998) (newly discovered evidence "potentially present[s] 'a colorable claim that there was a miscarriage of justice'"); <u>Deputy v. State</u>, 1993 WL 332667, 1 (Del.Super.1993) (confrontation clause violation potentially "constitutional basis triggering the fundamental fairness exception under Rule 61(i)(5)"); <u>State v. Rosa</u>, 1992 WL 302295 (Del. Super. 1992)(jury instruction lessening state's burden of proof colorable claim that there was a miscarriage of justice). As the Delaware Supreme Court noted in a related context, "we decline to adopt a formal static test." <u>Bailey v. State</u>, 588 A.2d 1121, 1128-29 (Del. 1991) (discussing "new rule" doctrine in miscarriage of justice cases).

All of Petitioner's claims fall under the bar-exception provisions of Rule 61(i)(5). "Colorable" claims encompass any constitutional violation that, if proven, would arguably require vacating the judgment of conviction or capital sentence. <u>Webster</u>, 604 A.2d at 1367 (where defendant alleged mistaken waiver of constitutional rights, merits review required where constitutional violation appears "on the face of [the] petition" and claim was supported with factual proffer). As described more fully below, this Petition raises several grounds of constitutional violations, including the denial of his Fifth, Sixth, Eighth and Fourteenth Amendment rights, as well as his rights under Article I, §§ 4, 7, 9, 11, 12 and 13 of the Delaware Constitution, which individually or collectively require vacating the judgment of conviction and capital sentence in this case. Petitioner supports these grounds with detailed factual proffers and citations to relevant precedent. Accordingly, Petitioner meets the bar-exception under Rule 61(i)(5) and review is required.

### e.    The Former Adjudication Bar is Not Applicable

Rule 61(i)(4) precludes consideration of claims formally adjudicated in prior proceedings,

"unless reconsideration of the claim is warranted in the interest of justice." As described below in the discussion of the individual claims, this bar is not applicable for at least two reasons. First, the claims presented in this Petition were not formally adjudicated in any prior proceedings. Second, to the extent any facets of the claims were raised in prior proceedings, Petitioner demonstrates that this Court's consideration is required in the interests of justice.

Our Supreme Court has concluded that this bar "is based on the 'law of the case' doctrine." Weedon v. State, 750 A.2d 521, 527 (Del. 2000). As a result, the Court found two exceptions under the "law of the case" doctrine applicable to the "interests of justice" exception under Rule 61(i)(4). The first involves those cases where the prior "ruling was clearly in error or there has been an important change in circumstances, in particular, the factual basis for issues previously posed." Weedon 750 A.2d at 527-28 (citing Kenton v. Kenton, Del.Supr., 571 A.2d 778, 784 (1990)). The second involves those cases where "the equitable concern of preventing injustice may trump the 'law of the case' doctrine." Weedon 750 A.2d at 528 (citing Brittingham v. State, Del.Supr., 705 A.2d 577, 579 (1998)). Here, to the extent any claim or aspect of a claim is deemed adjudicated in the prior proceedings, Petitioner provides detailed factual or legal circumstances demonstrating that review is required in the interests of justice or sufficient factual and legal bases demonstrating that equitable concerns require consideration of the merits of the claim. Accordingly, this bar is inapplicable to preclude review.

## 2. Petitioner Is Entitled to an Evidentiary Hearing.

As Petitioner has pleaded colorable claims and submitted supporting facts, his Petition may not be summarily dismissed; an evidentiary hearing is appropriate.

Super. Ct.Crim. R. 61(d)(4) states:

**Summary dismissal**. If it plainly appears from the motion for postconviction relief and the record of prior proceedings in the case that the movant is not entitled to relief, the judge may enter an order for its summary dismissal and cause the movant to be notified.

Super. Ct.Crim. R. 61(h) states in part:

**Evidentiary hearing**. (1) Determination by court. After considering the motion for postconviction relief, the state's response, the movant's reply, if any, the record of prior proceedings in the case, and any added materials, the judge shall determine whether an evidentiary hearing is desirable ⋯ (3) Summary Disposition. If it appears that an evidentiary hearing is not desirable, the judge shall make such disposition of the motion as justice dictates.

Our Supreme Court has made clear that once a "colorable" claim is pleaded, the trial court may not summarily dismiss the petition, and should conduct an evidentiary hearing. In <u>Webster</u>, 604 A.2d at 1366, the post-conviction court summarily dismissed the defendant's claim that he mistakenly waived his trial rights when pleading guilty. The State urged that the lower court be upheld as the defendant did not claim he was actually innocent. The Supreme Court rejected such a narrow reading of the "miscarriage of justice" exception and stated:

> We believe this standard would be inappropriate in a case such as this. Here, Webster's claims are not an attempt to show an error in the trial or evidentiary procedures by which guilt was determined and thereby raise doubt as to the reliability of the conviction. Rather, he seeks to withdraw his guilty plea. His claim therefore is that he mistakenly waived his entitlement to all the processes by which guilt is determined, a right all criminal defendants enjoy. It is true that the Superior Court need not indulge every claim of mistaken waiver of rights. But *when a petitioner makes a colorable claim to a mistaken waiver of important constitutional rights Rule 61(i)(5) is available to him*. Cf. <u>Younger v. State</u>, Del.Supr., 580 A.2d 552, 555 (1990) (fundamental fairness exception of Rule 61(i)(5) applies where petitioner shows he was deprived of a substantial constitutional right).

<u>Id</u>. Consequently, the Court remanded the case for an evidentiary hearing.

As described below, Petitioner's claims, demonstrating violations of his state and federal

constitutional rights that compromised the reliability of the verdict and sentencing decision are even more compelling than those presented in <u>Webster</u>. Petitioner is entitled to an evidentiary hearing.

**B.    CLAIMS FOR RELIEF.**

**CLAIM I.    AS A RESULT OF COUNSEL'S INEFFECTIVENESS AND PROSECUTORIAL MISCONDUCT, READILY AVAILABLE EVIDENCE DEMONSTRATING PETITIONER'S INNOCENCE WAS NOT PRESENTED TO THE JURY IN VIOLATION OF PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS AND HIS RIGHTS UNDER ARTICLE I, §§ 4, 7, 9, 11, 12 AND 13 OF THE DELAWARE CONSTITUTION.**

As described below, counsel failed to investigate, develop and present readily available evidence directly disputing the prosecution's contention that Petitioner was involved in the murder in violation of Petitioner's Sixth, Eighth and Fourteenth Amendment rights as well as his rights under Article I, §§ 4, 7, 9, 11, 12 and 13 of the Delaware Constitution.

**A.    The Legal Standard**

Sixth Amendment ineffective assistance of counsel claims are evaluated under the two-prong test of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).[3]  Petitioner must show:  (a) counsel's deficient performance, <u>i.e.</u>, that his attorney's performance fell below "an objective standard of reasonableness," <u>id</u>. at 688; and (b) prejudice, <u>i.e.</u>, that confidence in the result of the original sentencing proceeding is undermined due to counsel's deficiencies, <u>id</u>. at 694.

**B.    Deficient Performance.**

The duty to investigate is fundamental to counsel's role as an advocate.  Counsel has "a duty to bring to bear such skill and knowledge as will render the [proceeding] a reliable adversarial testing process." <u>Strickland</u>, 466 U.S. at 688.  This can be done only if counsel <u>investigates</u>, <u>id</u>. at 691.  This

---

[3]<u>See also</u> <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003), and <u>Rompilla v. Beard</u>, 545 U.S. 374 (2005).

duty to investigate is especially exacting in a capital case, where "counsel's duty to investigate all reasonable lines of defense is strictly observed." Williamson v. Ward, 110 F.3d 1508, 1514 (10th Cir. 1997).

Moreover, a criminal defendant may not be denied the right to a fair opportunity to defend against the state's accusations. Chambers v. Mississippi, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process."); Davis v. Alaska, 415 U.S. 308 (1974); United States v. Cronic, 466 U.S. 648, 656 (1984); Strickland v. Washington, 466 U.S. 668, 684-685 (1984); California v. Trombetta, 467 U.S. 479, 485 (1984)); Rock v. Arkansas, 483 U.S. 44, 51 (1987). Furthermore, the Eighth Amendment requires that the defendant's rights to be heard and present a defense be given even greater protection in a capital case. See e.g. Beck v. Alabama, 447 U.S. 625 (1980); Ake v. Oklahoma, 470 U.S. 68 (1985); Lockett v. Ohio, 438 U.S. 586, 604 (1978); Hitchcock v. Dugger, 481 U.S. 393, 394 (1987). Whether by court or prosecution error or trial counsel's ineffectiveness, the denial of these fundamental rights requires relief.

As described below, there existed a plethora of evidence directly disputing the prosecution's contentions that Petitioner was involved in the murder, yet counsel failed to investigate, develop or present that evidence. Counsel's failure to develop and present the readily available evidence demonstrating Petitioner's innocence constitutes deficient performance.

**1.    Failure to Challenge Unreliable Forensic Expert Evidence.**

The prosecution presented the testimony of William Kinard, a forensics expert from the

14

Alcohol, Tobacco and Firearms Agency who conducted testing on clothing submitted by the police for purposes of determining the presence of gunshot residue. Mr. Kinard found no elements consistent with gunshot residue on any of Petitioner's (or co-defendant Stevenson's) clothing. In fact, the only clothing found to contain gunshot residue was the blue coat that belonged to the decedent. Residue was found on the right, left sleeve and the inside pocket area of that coat. NT 10/31/96 at 138. This coat was inside the open rear area of the jeep at the time of the shooting and then briefly placed on top of the decedent after the shooting.

During his testimony, the prosecution asked Mr. Kinard to make a number of speculations in order to explain the absence of residue on Petitioner's (and the co-defendant's) person and clothes. For example, Mr. Kinard testified that there is a higher likelihood that residue will be found if the shots are fired inside as opposed to outside, speculating that wind or other weather conditions can dissipate gunshot residue. Id. at 132-35. Of course, there was no testimony that there were sufficient weather conditions to do so in this case. Similarly, Mr. Kinard testified that you can remove gunshot residue from your hands by washing them or sweating. Id. While there was testimony that Petitioner and the co-defendant ran from the police and that they were sweating, there is no indication that their hands were so soaked in sweat that any residue was completely eliminated. Nor was there any testimony that Petitioner or the co-defendant stopped to wash their hands at any time prior to the arrest and the taking of samples for evaluation. Mr. Kinard also testified that the amount of gunshot residue expelled from an automatic weapon is less than a revolver. Id.

While counsel did cross-examine Mr. Kinard on the presence of gunshot residue on clothing and during that cross-examination Mr. Kinard did acknowledge that residue on clothing would not dissipate until laundered, that is the extent of counsel's challenge of Mr. Kinard's opinions. Id. at

141-44.

Petitioner has obtained the services of a forensics specialist, Dr. Albert Harper, Director of the Henry C. Lee Institute of the University of New Haven. Dr. Harper has reviewed Mr. Kinard's testimony as well as the photographs, police reports and diagrams and other records from this murder. Dr. Harper is troubled by a number of aspects of Mr. Kinard's testimony. First, Mr. Kinard was permitted to speculate on ways in which the gunshot residue might be removed from the hands without any evidence that those speculative methods actually occurred. More importantly, however, as Dr. Harper notes, while it is true that an automatic weapon would expel less residue than a revolver, in this case, the automatic was fired at least five times in rapid succession. The number of times the weapon was fired was sufficient to cause residue to spread to the area of the jeep, thus explaining the presence of residue on the blue coat inside that jeep.[4] Thus, Dr. Harper would expect to see residue on the clothing of the shooter, particular the cuff area of that clothing, regardless of the presence or absence of any residue on the hands of the shooter.

Accordingly, the forensic testimony presented by the prosecution was incomplete and inherently unreliable. Had counsel been effective, he would have offered a forensic expert to dispute those conclusions.

> **2.    Counsel's Failure to Investigate, Develop and Present Evidence Challenging the Reliability of Prosecution Witnesses Purporting To Connect Petitioner to the Murder.**

The prosecution's theory at trial was that Petitioner was the actual shooter. In support of that contention, the prosecution relied on the testimony of three witnesses: Susan Butler, Phillip Hudson,

---

[4]As Dr. Harper will testify, it is unlikely that the residue on the blue coat was the result of putting the coat on the decedent after the shooting, particularly in light of the location where the residue was found.

and Debra Dorsey. As described below, there existed evidence directly challenging any connection

these witnesses made between Petitioner and the actual shooter and counsel's failure to develop and

present that evidence constituted prejudicially deficient performance.

> a.    *Evidence Disputing Any Connection Between the Individual Susan Butler
> Described and Petitioner.*

At trial, Susan Butler described the individual she saw shortly after hearing the shots as a

black male, "not overly tall" and "somewhat stocky build." NT 10/31/96 at 59. The individual that

she saw was wearing a blue shirt and dark pants. Id. at 221. The prosecution argued that Ms.

Butler's testimony identified Petitioner as the shooter.

What the prosecution, (and defense counsel), failed to inform the sentencer, however, was

that Ms. Butler *failed to identify Petitioner as the individual she saw on that date* in a photographic

lineup conducted a week after the murder. The best she could say was that Petitioner's photograph

had the "closest profile" (or the same "shape of head"), of those in the photographic lineup and that,

on a scale of one to ten, his photo was a "four." See Exhibit 1 (Report of Det. McClaren, 11/20/95

Interview of Susan Butler); id. (notes from interview of Susan Butler). Thus, contrary to the

prosecution's contention, the individual that Ms. Butler saw was *not* Petitioner.

Counsel's only cross-examination of Ms. Butler involved whether she was presented with

any clothing by the police to identify. She answered that she did not. Counsel did not, however, ask

Ms. Butler if she was shown any photographs, nor did counsel ever present police testimony that she

was presented with a photo array containing a picture of Petitioner and failed to identify Petitioner

as the individual she saw on the date of the murder. Counsel's failure to present readily available

evidence directly disputing any contention that Ms. Butler connected Petitioner to the murder

constitutes deficient performance.

     *b.*    *Evidence Disputing Ms. Dorsey-Crowell's Testimony*

Debra Dorsey-Crowell, the decedent's fiancee, testified that the night before the murder a black male knocked on her door around 7 pm. At trial, she described the individual was larger than her, but shorter than the decedent, stocky build, wearing a black hat, not a baseball hat, and a black "puffy" coat. NT 10/30/96 at 89-90. She also testified that the next morning, after hearing the gunshots, she saw a stocky man wearing dark clothes running from the decedent. Id. at 102. It was the prosecution's theory that the same man who knocked on the door the night before was the individual that she saw running from the decedent's body on the date of the murder and that the description matched Petitioner. Counsel cross-examined Ms. Dorsey regarding how tall she had told the police the individual was and Ms. Dorsey was unable to recall her statement to the police. During the defense case, counsel presented Detective McClaren who testified that Ms. Dorsey's description of the individual was a black male, six feet tall, no facial hair, wearing a thick insulated type black coat and carrying gloves. NT 11/6/96 at 82.[5]

Moreover, there were a number of avenues of cross-examination arising from Ms. Dorsey's prior statement to the police directly challenging the reliability and credibility of her at-trial testimony. First, following the arrest of Petitioner and Stevenson, the police (Officer Henderson Worthy), created two photographic line-ups, one containing a photograph of Petitioner and one containing a photograph of David Stevenson. At approximately 10:13 am on the date of the murder, the police presented these photo arrays to Ms. Dorsey. While she indicated that she recognized

---

[5]Petitioner's arrest photograph, admitted into evidence by the prosecution, indicates that he had facial hair on the date of the murder.

Stevenson's photograph, (and noted that she worked with him), *she did not identify Petitioner as the individual that she saw on the evening before the murder or the morning of the murder*. See Exhibit 2 (Notes from Police Photo Line-up). Yet, counsel failed to bring out her failure to identify Petitioner during cross-examination of Ms. Dorsey, or through any of the police witnesses.

Also contained in Ms. Dorsey's statement to the police are clear indicia of Ms. Dorsey's personal bias against African Americans, further calling into question the reliability and credibility of her purported "identification" testimony. For example, when the police asked if the individual she saw the night before was the same person she saw the morning of the murder, Ms. Dorsey responded:

> I, I think it was the same person cause he looked like the same height, but *they all look the same*, so

Exhibit 3. Other references display, at a minimum, questionable racial bias on Ms. Dorsey's part. For example, when she was describing what the individual who knocked on her door did as he left, she stated, "You know *how they kind of go*? . . . You know *how they do that with their hands sometimes*?" Later, she stated:

> And I waited for him to call back and I said, do you know a black guy named Tim? *A big black guy* because he was wearing a big, one of those big Polar Bear coats *whatever they wear*.

Id. And, finally, as she did at Petitioner's trial, Ms. Dorsey described the coat as a "shoplifting coat." While not as blatant as the "all look alike" comment, these other characterizations (and generalizations) are clear inferences of racial bias, further diminishing the reliability and credibility of her testimony. Yet, the jury did not hear this evidence because trial counsel ineffectively failed to cross-examine Ms. Dorsey on these issues.

3.    **Counsel's Failure to Develop and Present Available Evidence Disputing the Prosecution's Contention that Petitioner's Reserve Status Made Him More Likely to Have Committed the Murder.**

Sgt. Wohlgemuth was called by the prosecution to testify regarding contents of Petitioner's reserve records, including his rank, (specialist), and clothing records indicating his size. NT 10/31/96 at 13; id. at 17. Sgt. Wohlgemuth also testified that the camouflage coat seized by the police was not available until approximately two to three years before Petitioner's first trial in 1996, and, as a result, was not available when Petitioner was issued clothing. Id. at 15. Indeed, the witness testified that the coat seized by the state was not indicated in any of Petitioner's records. Id. at 26-27. Counsel also brought out on cross-examination that the specialist rank was a common rank in the reserves and that at least twenty percent of the reservists at his base held that rank. Id. at 29.

Similarly, the prosecution asked Sgt. Wohlmeguth a number of questions regarding weapons qualifications and elicited testimony that Petitioner was required to qualify on a yearly basis. NT 10/31/96 at 14-15. The prosecution then argued that Petitioner's familiarity with weapons in his service in the reserves was evidence supporting its contention that Petitioner shot the decedent. NT 11/12/96 at 69. While counsel did elicit testimony from Sgt. Wohlgemuth that the weapons training did not involve pistols, (such as the automatic pistol used in the murder in this case), NT 10/31/96 at 23, and there was brief testimony that Petitioner was assigned to the medic unit, not an infantry position, counsel failed to present any other evidence regarding the extent of Petitioner's work and assignments in the reserves.

Had counsel contacted Petitioner's commanding officer, Delores Sapp, he would have learned that Petitioner was in the medic unit because it was his desire to go into the medical field. See Exhibit 23 (Affidavit of Delores Sapp). Ms. Sapp further states Petitioner had no interest

20

whatsoever in weapons of any kind. Instead, he was concerned with healing and his focus in training was in the medical field, not infantry or any other combat training. Id. Accordingly, contrary to the obvious inferences from the prosecution's evidentiary presentation and argument, Mr. Manley's reserve service fails to even remotely connect Petitioner to this murder and counsel's failure to develop and present evidence demonstrating this constitutes deficient performance.

### 4.    Counsel's Failure to Investigate, Develop and Present Available Evidence Disputing the Prosecution Theory That Petitioner was the Shooter.

As described above, it was the prosecution's theory that Petitioner shot the decedent on behalf of co-defendant Stevenson. The prosecution contended that Petitioner and Stevenson, went to the Cavalier apartments, that Petitioner shot the decedent, and, that Petitioner and Stevenson were returning to Stevenson's home when the Wilmington police found them.

As a result of counsel's failure to conduct a constitutionally required investigation, compelling evidence supporting Petitioner's innocence and directly disputing the prosecution's theory was not presented to the fact-finder. For example, counsel knew of other witnesses identifying persons other than Petitioner as the perpetrator through the police paperwork, but failed to present those witnesses. For example, Jessica Wing, also a resident of the Cavalier Apartments at the time of the murder, looked out of her window shortly after hearing shots and saw a dark car leaving the parking lot. While she was unable to identify the individuals within the car, she did observe that the driver of the vehicle had white hands. See Exhibit 4 (Supplemental Report, Det. Donovan, 11/20/95; Summary of Statement of Jessica Wing). Carol Schweda, also a former resident of Cavalier Apartments, told the police that shortly before the shooting, (at 7:15 am), she was leaving for work and saw a white male in a dark colored vehicle in the parking lot. Marlene Farmer, also

21

a resident of Cavalier Apartments at the time of the murder, told the police that, after hearing shots, she looked out of her window and saw a white male walking quickly away from the decedent and then get into a dark colored car and exit the scene. See Exhibit 5 (Report of Det. Watson, 12/2/95; Summary of Statement of Marlene Farmer). Thus, there existed evidence from which the factfinder could conclude that someone of a completely different race than Petitioner actually shot the decedent, yet counsel failed to investigate or present that evidence. Counsel's failure to do so constitutes deficient performance.

Moreover, the police paperwork provided counsel with another individual with closer ties to the co-defendant, the individual with the purported motive, who also had ties to the military, and, thus access to military clothing and familiarity with weapons, who lived and worked near the scene of the murder, and, acknowledged being at the scene of the murder shortly before 8:00 on the date of the murder. That individual was George Stevenson, David Stevenson's cousin. See Exhibit 6 (Interview of George Stevenson, 11/21/95). George told the police that he lived near the Cavalier Apartments and worked at Champs in the Christiana Mall and that, on the date of the murder, he was scheduled to appear at work at 8:00 am. Id. George also told the police that he was in the Army Reserves. Id. He also told the police that he and David grew up together and were very close. He also told the police that David was looking for him (George) shortly before the murder and that they got together on that Thursday evening. Finally, he told the police that he was scheduled to work at 8:00 am on the date of the murder and that he was in the vicinity of the murder site that morning. Id. Moreover, Petitioner will demonstrate at an evidentiary hearing that George meets the descriptions of a number of the eyewitnesses. Thus, the police handed to defense counsel someone with much closer ties to the co-defendant, (and, thus, someone with much more reason to help the

22

co-defendant avoid the theft prosecution), who had similar ties to the military, similar access to the military clothing found in Stevenson's car and similar familiarity with weapons.

The police paperwork also indicated that Tiarra Koston saw David Stevenson on the morning of the murder shortly after 8:00 am driving (alone) at a normal rate of speed on Washington Street in Wilmington going from 17th Street towards 18th Street. Mr. Stevenson's home was located in the 200 block of West 20th Street. See Exhibit 7.

Presented with this evidence, a factfinder could have concluded that, contrary to the prosecution's theory, David Stevenson was accompanied by George Stevenson, not Petitioner, at the time of the murder. And, once the murder was completed, David Stevenson dropped George off at his home, located nearby, so that George could go on to work as scheduled, then returned to Wilmington where he picked up Petitioner. Counsel's failure to investigate, develop and present this evidence constitutes deficient performance.

### C.    Prejudice.

The prejudice prong of the Strickland test requires the defendant to show that "there is a *reasonable* probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. As the United States Supreme Court has stressed, "the adjective is important." Kyles v. Whitley, 514 U.S. 419, 434 (1995).[6] *"The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."* Id.; see also Strickland, 466 U.S. at 693 ("a defendant need not show

---

[6]In Kyles, the Court applied the identical prejudice standard in the Brady context, granting a new trial in a capital case as a result of government suppression of exculpatory information. See Brady v. Maryland, 373 U.S. 83 (1963).

23

that counsel's deficient conduct more likely than not altered the outcome in the case"); Nix v. Whiteside, 475 U.S. 157, 175 (1986) ("a defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice").  A "reasonable probability of a different result" is thus *less than a preponderance of the evidence*.  It is present when an evaluation of all of the evidence that should have been before the jury is "sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 693.

The evidence described above demonstrates far more than a preponderance of the evidence that counsel's failure to adequately investigate, develop and present evidence of Petitioner's innocence and directly disputing the prosecution's contention that Petitioner was involved in the murder compromised the reliability of the verdict. As described above, while it was counsel's theory that Petitioner was not involved, they did little to contest the prosecution's evidence, although compelling evidence existed that would have done so. Also as described above, despite the existence of additional evidence demonstrating that someone other than Petitioner committed the shooting, counsel failed to marshal that evidence or present it to the factfinder.  Had that evidence been presented, there is at least a reasonable probability that the verdict would have been different.

The above-described errors, individually and cumulatively, provide compelling bases for doubting the reliability of the verdict.  Indeed, as the above-described evidence demonstrates, there is more than a reasonable probability that Petitioner is innocent and, but for the abject failures of counsel, that would have been palpable to the jury.  Where, as here, the prosecution had no physical evidence – or any other competent evidence – directly connecting Petitioner to the murder, the denial of Petitioner's federal constitutional rights is manifest and requires grant of relief, or at a minimum, an evidentiary hearing.

24

**D.    There Are No Bars to This Court's Review of These Claims.**

Rule 61(i)(1)-(2) and (4) are clearly inapplicable to these claims. These claims are timely,

having been filed within one year of final judgment of sentence; as these claims arise out of the 2005

sentencing proceeding, this is clearly the first post-conviction proceeding available to Petitioner; and,

there have been no previous adjudications of these claims. Nor does Rule 61(i)(3) apply to these

claims for a number of reasons. First, as described above, see Section II.A.1.c., this subsection is

not applicable to ineffective assistance of counsel claims. Second, the failure to raise these claims

was the result of counsel's constitutional ineffectiveness, thus demonstrating cause, Flamer v. State,

585 A.2d at 758, and, as described above, prejudice is demonstrated because, as described above,

had these claims been raised in the prior proceedings there is a reasonable likelihood that the

outcome would have been different. Finally, as described above, Petitioner meets the exception to

application of Rule 61(i) (1) - (3) outlined in Subsection 61(i)(5). Petitioner has presented colorable

claims involving multiple constitutional violations that would arguably require vacating Petitioner's

capital sentence. Webster, 604 A.2d at 1367. Accordingly, there are no bars to this Court's merits

consideration and, for the reasons described above, relief is required.

**CLAIM II.    TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE, DEVELOP AND PRESENT AVAILABLE EVIDENCE DISPUTING AGGRAVATION IN VIOLATION OF PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS AND HIS RIGHTS UNDER ARTICLE I, §§ 4, 7, 9, 11, 12 AND 13 OF THE DELAWARE CONSTITUTION.**

As described below, counsel failed to investigate, develop and present readily available

evidence directly disputing the aggravation presented by the prosecution and found by the sentencer

in reaching the determination that death was the appropriate verdict in violation of Petitioner's

Sixth, Eighth and Fourteenth Amendment rights as well as his rights under Article I, §§ 4, 7, 9, 11,

12 and 13 of the Delaware Constitution.

### A.    The Legal Standard

Sixth Amendment ineffective assistance of counsel claims are evaluated under the two-prong test of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).[7]  Petitioner must show:  (a) counsel's deficient performance, <u>i.e.</u>, that his attorney's performance fell below "an objective standard of reasonableness," <u>id.</u> at 688; and (b) prejudice, <u>i.e.</u>, that confidence in the result of the original sentencing proceeding is undermined due to counsel's deficiencies, <u>id.</u> at 694.

### B.    Deficient Performance.

Defense counsel in a capital case has a fundamental duty to make "efforts to discover all reasonably available . . . evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES 11.4.1.C (1989), <u>quoted in</u> <u>Rompilla v. Beard</u>, 545 U.S. 374, 387 n.7 (2005); <u>Wiggins v. Smith</u>, 539 U.S. 510, 524 (2003).  Similarly, the fundamental right of an accused to present witnesses in his own defense is an essential attribute of our adversary system of justice." <u>Government of the Virgin Islands v. Mills</u>, 956 F.2d 443, 445 (3d Cir. 1992)  Indeed, there is no question that the Constitution guarantees an accused "a meaningful opportunity to present a complete defense." <u>California v. Trombetta</u>, 467 U. S. 479, 485 (1984).  That right is grounded in the Due Process, Compulsory Process, and Confrontation Clauses.  <u>See</u> <u>Chambers v. Mississippi</u>, 476 U.S. 683, 690 (1986); <u>Washington v.Texas</u>, 388 U.S. 14, 23 (1967); <u>Davis v. Alaska</u>, 415 U.S. 308 (1974); <u>In re Oliver</u> 333 U. S. 257, 273 (1914).

---

[7]<u>See also</u> <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003), and <u>Rompilla v. Beard</u>, 545 U.S. 374 (2005).

As described below, there existed a plethora of evidence directly disputing the aggravation presented by the prosecution, yet counsel failed to investigate, develop or present that evidence during the sentencing hearing. Counsel's failure to develop and present the readily available evidence directly challenging the aggravation pursued by the prosecution violated these fundamental principles.

### 1.    Failure to Challenge Unreliable Forensic Expert Evidence.

During the penalty hearing, the prosecution presented the prior testimony of William Kinard, a forensics expert from the Alcohol, Tobacco and Firearms Agency in support of the statutory aggravators. Mr. Kinard conducted testing on clothing submitted by the police for purposes of determining the presence of gunshot residue. Mr. Kinard found no elements consistent with gunshot residue on any of Petitioner's (or co-defendant Stevenson's) clothing. In fact, the only clothing found to contain gunshot residue was the blue coat that belonged to the decedent. Residue was found on the right, left sleeve and the inside pocket area of that coat. NT 11/21/05 at 43. This coat was inside the open rear area of the jeep at the time of the shooting and then briefly placed on top of the decedent after the shooting.

During his testimony, the prosecution asked Mr. Kinard to make a number of speculations in order to explain the absence of residue on Petitioner's (and the co-defendant's) person and clothes. For example, Mr. Kinard testified that there is a higher likelihood that residue will be found if the shots are fired inside as opposed to outside, speculating that wind or other weather conditions can dissipate gunshot residue. Id. at 33-36. Of course, there was no testimony that there were sufficient weather conditions to do so in this case. Similarly, Mr. Kinard testified that you can remove gunshot residue from your hands by washing them or sweating. Id. While there was testimony that Petitioner

27

and the co-defendant ran from the police and that they were sweating, there is no indication that their hands were so soaked in sweat that any residue was completely eliminated. Nor was there any testimony that Petitioner or the co-defendant stopped to wash their hands at any time prior to the arrest and the taking of samples for evaluation. Mr. Kinard also testified that the amount of gunshot residue expelled from an automatic weapon is less than a revolver. Id.

While counsel did cross-examine Mr. Kinard on the presence of gunshot residue on clothing and during that cross-examination Mr. Kinard did acknowledge that residue on clothing would not dissipate until laundered; that is the extent of counsel's challenge of Mr. Kinard's opinions. Id. at 43-44.

Petitioner has obtained the services of a forensics specialist, Dr. Albert Harper, Director of the Henry C. Lee Institute of the University of New Haven. Dr. Harper has reviewed Mr. Kinard's testimony as well as the photographs, police reports and diagrams and other records from this murder. Dr. Harper is troubled by a number of aspects of Mr. Kinard's testimony. First, Mr. Kinard was permitted to speculate on ways in which the gunshot residue might be removed from the hands without any evidence that those speculative methods actually occurred. More importantly, however, as Dr. Harper notes, while it is true that an automatic weapon would expel less residue than a revolver, in this case, the automatic was fired at least five times in rapid succession. The number of times the weapon was fired was sufficient to cause residue to spread to the area of the jeep, thus explaining the presence of residue on the blue coat inside that jeep.[8] Thus, Dr. Harper would expect to see residue on the clothing of the shooter, particular the cuff area of that clothing, regardless of

---

[8]As Dr. Harper will testify, it is unlikely that the residue on the blue coat was the result of putting the coat on the decedent after the shooting, particularly in light of the location where the residue was found.

the presence or absence of any residue on the hands of the shooter.

Accordingly, the forensic testimony presented by the prosecution was incomplete and inherently unreliable. Had counsel been effective, he would have offered a forensic expert to dispute those conclusions.

> 2. **Counsel's Elicitation of Affirmatively Harmful, and False, Testimony Regarding the Camouflage Jacket and Counsel's Failure to Develop and Present Available Evidence Disputing the Prosecution's Contention that the Camouflage Jacket Belonged to Petitioner or that Petitioner's Reserve Status Made Him More Likely to Have Committed the Murder.**

The police found a camouflage jacket in the trunk of Stevenson's car. The jacket had a pin on it that indicated a specialist rank. Inside a pocket of that jacket was a blue pouch that contained a clip with bullets of the same caliber and make used in the murder. It was the prosecution's theory that, because Petitioner was in the Reserves, (as a medic), this jacket belonged to Petitioner and, therefore, Petitioner was the shooter. The prosecution presented two witnesses in an effort to prove its contention: the prior testimony of Sergeant Richard Wohlgemuth, (who, at the time of his testimony, was assigned to the personnel administration of the 348th General Hospital Unit at Pedricktown, New Jersey, where Petitioner had been stationed prior to his arrest), NT 11/18/05 at 209-18; and the testimony of Lieutenant Colonel Henry Kemp Vye, of the Delaware National Guard, NT 11/18/05 at 35-48.

Sgt. Wohlgemuth's prior testimony involved Petitioner's records, including his rank, (specialist), and clothing records indicating his size. NT 11/18/05 at 213; id. at 218. Sgt. Wohlgemuth also testified that the camouflage coat seized by the police was not available until approximately two to three years before Petitioner's first trial in 1996, and, as a result, was not available when Petitioner was issued clothing. NT 11/18/05 at 215-16. Indeed, the witness testified

that the coat seized by the state was not indicated in any of Petitioner's records. Id. at 227. Counsel

also brought out on cross-examination that the specialist rank was a common rank in the reserves

and that at least twenty percent of the reservists at his base held that rank. Id. at 229.

The prosecution called Lieutenant Colonel Henry Kemp Vye, of the Delaware National

Guard to testify that the pin on the camouflage jacket seized by the state indicated a Specialist rank.

NT 11/18/05 at 37-38. Remarkably, during cross-examination, counsel actually elicited testimony

from this witness indicating that the camouflage jacket seized by the state was one of the jackets

referenced on Petitioner's reserve clothing form. Id. at 44. Thus, whatever efforts made by prior

counsel during the 1996 testimony of Sgt. Wohlgemuth was effectively sabotaged by Petitioner's

own attorney. As a result of counsel's reckless cross-examination, the prosecution was able to, and

did, argue that the coat found in the car was issued to Petitioner by the reserves. See NT 12/5/05 at

34.

Moreover, despite Lt. Col. Vye's speculation, the truth is that the coat seized by the state was

not issued to Petitioner. Had counsel merely spoken with persons familiar with the clothing issued

to Petitioner and the relevant paperwork, including the exhibit admitted by counsel during Lt. Col.

Vye's testimony, they would have learned that neither of the coats indicated on Petitioner's clothing

form were the coat seized by the state. See Exhibit 8 (Affidavit of Jacqueline Armstead). Thus,

contrary to the testimony of Lt. Col. Vye, and the prosecution's argument, that coat was never issued

to Petitioner and the prosecution's view that it belonged to Petitioner was not supported in any

document in Petitioner's reserve records.

Counsel's failure to marshal the readily available evidence demonstrating that this coat was

not issued to Petitioner, in and of itself, constitutes prejudicially deficient performance. Counsel's

reckless cross-examination, eliciting speculative testimony indicating that the coat was actually issued to Petitioner when, in fact, it was not, transcended mere deficient performance and sank to the level of actually *advocating against his client's interest.* See, e.g. United States v. Swanson, 943 F.2d 1070, 1074 (9th Cir. 1991) (telling jury during closing that there was no reasonable doubt regarding defendant's identity as the perpetrator resulted in constructive denial of counsel); Rickman v. Bell, 131 F.3d 1150, 1160 (6th Cir. 1997) (repeated statements in direct contravention of client's interests during murder trial constitutes "the evisceration of the right-to-counsel").

Similarly, during the prior testimony of Sgt. Wohlgemuth, the prosecution made a great deal of Petitioner's Reserve status and his yearly weapons qualifications, contending that this experience supported the prosecution theory that Petitioner committed the murder. See NT 11/18/05 at 214-15. See also NT 12/5/05 at 21 (noting Petitioner's reserve experience and arguing that Petitioner was "doing recon"). While counsel during the 1996 trial did elicit testimony from Sgt. Wohlgemuth that the weapons training did not involve pistols, (such as the automatic pistol used in the murder in this case), and there was brief testimony that Petitioner was assigned to the medic unit, not an infantry position, 2005 counsel failed to present any other evidence regarding the extent of Petitioner's work and assignments in the reserves. Had counsel contacted Petitioner's commanding officer, Delores Sapp, he would have learned that Petitioner was in the medic unit because it was his desire to go into the medical field. See Exhibit 23 (Affidavit of Delores Sapp). Ms. Sapp further states Petitioner had no interest whatsoever in weapons of any kind. Instead, he was concerned with healing and his focus in training was in the medical field, not infantry or any other combat training. Id. Accordingly, contrary to the obvious inferences from the prosecution's evidentiary presentation and argument, Mr. Manley's reserve service fails to even remotely connect Petitioner to this murder and counsel's

failure to develop and present evidence demonstrating this constitutes deficient performance.

3.    **Counsel's Elicitation of Affirmatively Harmful, And Materially Misleading, Testimony Regarding Phillip Hudson's Purported Identification of Petitioner**

Phillip Hudson, a resident of the Cavalier Apartments, testified during the guilt-phase in 1996. The prosecution admitted the transcript of his testimony during the 2005 trial. NT 11/17/05 at 33-37. On direct examination, Mr. Hudson testified that, after hearing shots, he saw a stocky black male wearing a blue sweatshirt, jeans, white high-top sneakers and what appeared to be a baseball hat running across the parking lot. NT 11/17/05 at 33-37. He further testified that he saw the male get into the passenger side of a car in the lot. When asked, he stated that the car was either a ford escort, tempo or mercury topaz. Id. at 37. On cross-examination, Mr. Hudson acknowledged that he had told the police shortly after the shooting that the man he saw was six feet tall and 225-250 pounds. NT 11/17/05 at 56-57. In an apparent attempt to further impeach Mr. Hudson's prior testimony, counsel called Detective Weldon to testify regarding the contents of the police report of the interview of Mr. Hudson. NT 11/29 05 at 64-65.[9] Rather than focusing Detective Weldon on only those aspects of the report relevant to the intended impeachment, counsel asked the detective to read the entire summary. As a result, the detective read the part of the summary indicating that Mr. Hudson had identified Petitioner from a photographic lineup, a fact not previously admitted by the prosecution. Thus, while counsel did elicit descriptive discrepancies, (already presented in the cross-examination of Mr. Hudson), he also brought out affirmatively harmful, and *otherwise*

_____

[9]Mr. Hudson's police interview was taped. There is no indication that the tape was ever provided to counsel. Petitioner will be requesting this tape and other items that were never turned over in a separate discovery motion. The prosecution did, apparently, provide a purported transcript of that interview (although there appear to be gaps). For reasons known only to counsel, counsel did not ask the detective to read from the transcript but, instead, the police summary.

*inadmissible* hearsay testimony connecting Petitioner to the crime.[10]

Moreover, had counsel conducted even a cursory investigation, they would have learned that, although the police report contended that Mr. Hudson identified Petitioner's photograph, when asked by the defense investigator hired by prior trial counsel, Mr. Hudson told that investigator that he was only "pretty sure" that Petitioner was the individual he saw on the date of the murder. Thus, contrary to the testimony erroneously and ineffectively elicited by counsel, Mr. Hudson's identification was no identification at all. Nevertheless, because of counsel's ineffectiveness, the jury was left with a very clear impression that Mr. Hudson did identify Petitioner.

Once again, counsel's conduct transcended mere deficient performance and sank to the level of actually *advocating against his client's interest*. See, e.g. United States v. Swanson, 943 F.2d 1070, 1074 (9th Cir. 1991) (telling jury during closing that there was no reasonable doubt regarding defendant's identity as the perpetrator resulted in constructive denial of counsel); Rickman v. Bell, 131 F.3d 1150, 1160 (6th Cir. 1997) (repeated statements in direct contravention of client's interests during murder trial constitutes "the evisceration of the right-to-counsel").

**4.    Counsel's Failure to Investigate, Develop and Present Evidence Challenging the Reliability of Prosecution Witnesses Purporting To Connect Petitioner to the Murder.**

The prosecution's theory at trial was that Petitioner was the actual shooter. In support of that contention, the prosecution relied on the testimony of three witnesses: Susan Butler, Phillip Hudson, and Debra Dorsey. As described below, there existed evidence directly challenging any connection these witnesses made between Petitioner and the actual shooter and counsel's failure to develop and

---

[10]Mr. Hudson never made an in-court identification of Petitioner. That is likely because, as Mr. Hudson told the defense investigator in 1996, he was "pretty sure" rather than positive about his identification of Petitioner's picture.

33

present that evidence constituted prejudicially deficient performance.

> a.    *Evidence Disputing Any Connection Between the Individual Susan Butler Described and Petitioner.*

At trial, Susan Butler described the individual she saw shortly after hearing the shots as a black male, average height, not heavyset, but "a little bit more muscular around his shoulder and chest area." NT 11/16/05 at 214. The individual that she saw was wearing a royal blue shirt and dark pants. Id. at 221. The prosecution argued that Ms. Butler's testimony identified Petitioner as the shooter. NT 12/5/05 at 24; id. at 119.

What the prosecution, (and defense counsel), failed to inform the sentencer, however, was that Ms. Butler *failed to identify Petitioner as the individual she saw on that date* in a photographic lineup conducted a week after the murder. The best she could say was that Petitioner's photograph had the "closest profile" (or the same "shape of head"), of those in the photographic lineup and that, on a scale of one to ten, his photo was a "four." See Exhibit1 (Report of Det. McClaren, 11/20/95 Interview of Susan Butler); id. (notes from interview of Susan Butler). Thus, contrary to the prosecution's contention, the individual that Ms. Butler saw was *not* Petitioner.

Although counsel asked Ms. Butler if she was shown photographs by the police, when she said that she did not view any photographs other than what was in the newspapers, counsel did nothing to impeach her testimony or bring out her prior failure to identify Petitioner as the individual she saw on the date of the murder. Counsel's failure to present readily available evidence directly disputing any contention that Ms. Butler connected Petitioner to the murder constitutes deficient performance.

*b.*    *Evidence Disputing any Purported Identification by Phillip Hudson*

As described above, the "identification" by Phillip Hudson was brought out by *Petitioner's counsel*, during questioning of Detective Weldon. Also as described above, counsel's presentation of that hearsay was in, and of itself, deficient. Nevertheless, once the cat was out of the bag, counsel was obliged to present the correct information about that identification. While the police summary indicated that Mr. Hudson "identified" Petitioner's photograph, when asked by the defense investigator, Mr. Hudson stated that he was "pretty sure," that Petitioner was the individual he saw on the date of the murder. In light of the vast discrepancies in his description and Petitioner's appearance, "pretty sure" may be close, but it is hardly a positive identification. Moreover, there were other aspects of Mr. Hudson's testimony that bear against any finding that his "identification" was reliable. For example, while Mr. Hudson's prior testimony indicated that the car he saw was either a ford escort, a tempo or a mercury topaz, notes from his initial interview with the police indicates that he described the vehicle he saw the individual get into as a ford escort *hatchback*, quite a different make and model car from a tempo. See Exhibit 9 (Report of Det. Donovan). It was not until after Petitioner's and the co-defendant's arrest that Mr. Hudson's statement changed to include a tempo or topaz. See Exhibit 10 (Statement of Phillip Hudson). Thus, Mr. Hudson's initial description was of an entirely different person and an entirely different vehicle. Yet, counsel did nothing to present this evidence and, as a result, the prosecution was able to argue that Mr. Hudson identified Petitioner when that was not the truth, and also was able to argue that Mr. Hudson put Petitioner in a vehicle similar to that owned by the co-defendant when that was not the case. Counsel's failure to present this evidence constitutes deficient performance.

35

      *c.*    *Evidence Disputing Ms. Dorsey-Crowell's Testimony*

Debra Dorsey-Crowell, the decedent's fiancee, testified that the night before the murder a black male knocked on her door around 7 pm. At trial, she described the individual as stocky, not tall, wearing a black baseball cap or "hat of some sort," and black coat. NT 11/16/05 at 156. She also testified that the individual had a "scruffy" face, "like a beard or just a scruffy face." Id. She described the coat as "puffy"[11] and agreed with counsel when he asked if it was "fiber-filled, kind of Michelin tire guy." Id. at 181-82. Ms. Dorsey testified that the next day she heard shots, looked out of her window and saw a black male wearing "all dark clothing" running from the body. Id. at 162. She further testified that the individual was short and stocky. When asked, she testified that the clothing was black. Id. at 163. It was the prosecution's theory that the same man who knocked on the door the night before was the individual that she saw running from the decedent's body on the date of the murder and that the description matched Petitioner. NT 12/5/05 at 21-23. Other than confirming that the coat was a Michelin-type, counsel asked little or nothing of Ms. Dorsey regarding her description of the individual she saw the night before or day of the murder.

There was, however, a plethora of avenues of cross-examination arising from Ms. Dorsey's contacts with the police directly disputing the reliability and credibility of her at-trial testimony.

First, following the arrest of Petitioner and Stevenson, the police (Officer Henderson Worthy), created two photographic line-ups, one containing a photograph of Petitioner and one containing a photograph of David Stevenson. At approximately 10:13 am, the police presented these photo arrays to Ms. Dorsey. While she indicated recognizing Stevenson's photograph, (and noted

---

[11]Ms. Dorsey also characterized the coat as a "shoplifting coat," NT 11/16/05 at 181-82. Counsel failed to object or request a curative instruction.

that she worked with him),[12] *she did not identify Petitioner as the individual that she saw on the evening before the murder or the morning of the murder.* See Exhibit 2 (Notes from Police Photo Line-up). Yet, counsel failed to bring out her failure to identify Petitioner during cross-examination of Ms. Dorsey, or through any of the police witnesses.

Similarly, in her statement, Ms. Dorsey told the police that the individual she saw outside her door the night before the murder was *6 feet tall.* See Exhibit 3 (Transcript of Statement of Debra Dorsey taken by Detective McLaren, 11/13/95). She did not describe the individual as "stocky," or any other build and, instead, could only describe the clothing the individual wore. Moreover, Ms. Dorsey told the police that *the individual did not have any facial hair.* Id. Photographs of Petitioner on the date of his arrest indicate that Petitioner did, indeed, have facial hair. See Exhibit 11 (Photograph of Michael Manley). Thus, her description changed from the date of the offense to the time of trial in a manner that was very convenient for the prosecution's theory. Yet, counsel brought out none of these discrepancies.

Also contained in Ms. Dorsey's statement to the police is clear indicia of Ms. Dorsey's personal bias against African Americans, further calling into question the reliability and credibility of her purported "identification" testimony. For example, when the police asked if the individual she saw the night before was the same person she saw the morning of the murder, Ms. Dorsey responded:

> I, I think it was the same person cause he looked like the same height, but *they all look the same*, so

---

[12]When asked for a scale regarding whether or not Mr. Stevenson's picture was the person she saw, Ms. Dorsey said it was a 6 out of 10 that he was the person at the door. Nothing even close is noted regarding the photo array containing Petitioner's photograph.

Exhibit 3.  Other references display, at a minimum, questionable racial bias on Ms. Dorsey's part.

For example, when she was describing what the individual who knocked on her door did as he left,

she stated, "You know *how they kind of go?* . . . You know *how they do that with their hands*

sometimes?"  Later, she stated:

> And I waited for him to call back and I said, do you know a black guy named Tim?
> *A big black guy* because he was wearing a big, one of those big Polar Bear coats
> *whatever they wear.*

Id.  And, finally, as she did at Petitioner's trial, Ms. Dorsey described the coat as a "shoplifting coat."

While not as blatant as the "all look alike" comment, these other characterizations (and

generalizations) are clear inferences of racial bias, further diminishing the reliability and credibility

of her testimony.  Yet, the sentencer did not hear this evidence because trial counsel ineffectively

failed to cross-examine Ms. Dorsey on these issues.

### 5.    Counsel's Failure to Investigate, Develop and Present Available Evidence Disputing the Prosecution Theory That Petitioner was the Shooter.

As described above, it was the prosecution's aggravation theory that Petitioner shot the

decedent on behalf of co-defendant Stevenson.  The prosecution contended that Petitioner and

Stevenson, went to the Cavalier Apartments, that Petitioner shot the decedent, and, that Petitioner

and Stevenson were returning to Stevenson's home when the Wilmington police found them.  The

prosecution contended there was no one other than Petitioner and Stevenson involved and argued

that there was no evidence of anyone else being involved.  NT 12/5/05 at 109-110.

As a result of counsel's failure to conduct a constitutionally required investigation,

compelling evidence directly disputing the prosecution's theory that Petitioner was the shooter was

not presented to the fact-finder.  First, counsel failed to present the testimony of Dorothy Hackett,

38

a resident of the Cavalier Apartments, who looked out of her window shortly after hearing the shots

fired and observed an individual she identified as David Stevenson armed with a handgun and

wearing all dark clothing, including dark shoes, cross the parking lot and then get into the driver's

side of a car and drive off. She could not tell if there was anyone else in the car. While she did not

get the entire plate number, she did see the numbers 6, 8 and 9 on the license plate. See NT Video

Trial Testimony, D. Hackett, 11/8/96 at 7-11. See also Exhibit 12  (Statement of Dorothy Hackett,

11/13/95); Exhibit 13 (Notes of Photo Lineup of Dorothy Hackett). Counsel had the benefit of both

the police statements and a videotaped deposition of Ms. Hackett from the prior trial, but failed to

make any arrangements to bring Ms. Hackett in to testify before the sentencer. Counsel's failure to

present a witness identifying someone other than Petitioner as the shooter, particularly where the

aggravation pursued by the prosecution was based on the theory that Petitioner was the actual

shooter, constitutes deficient performance.

Counsel also knew of other witnesses identifying persons other than Petitioner as the

perpetrator through the police paperwork, but failed to present those witnesses. For example, Jessica

Wing, also a resident of the Cavalier Apartments at the time of the murder, looked out of her window

shortly after hearing shots and saw a dark car leaving the parking lot.  While she was unable to

identify the individuals within the car, she did observe that the driver of the vehicle had white hands.

See Exhibit 4 (Supplemental Report, Det. Donovan, 11/20/95; Summary of Statement of Jessica

Wing). Carol Schweda, also a former resident of Cavalier Apartments, told the police that shortly

before the shooting, (at 7:15 am), she was leaving for work and saw a white male in a dark colored

vehicle in the parking lot.  Marlene Farmer, also a resident of Cavalier Apartments at the time of the

murder, told the police that, after hearing shots, she looked out of her window and saw a white male

walking quickly away from the decedent and then get into a dark colored car and exit the scene. See Exhibit 5 (Report of Det. Watson, 12/2/95; Summary of Statement of Marlene Farmer). Thus, there existed evidence from which the factfinder could conclude that someone other than Petitioner shot the decedent, yet counsel failed to investigate or present that evidence to dispute the prosecution's aggravation. Counsel's failure to do so constitutes deficient performance.

Moreover, the police paperwork provided counsel with another individual with closer ties to the co-defendant, the individual with the purported motive, who also had ties to the military, and, thus access to military clothing and familiarity with weapons, who lived and worked near the scene of the murder, and, acknowledged being at the scene of the murder shortly before 8:00 on the date of the murder. That individual was George Stevenson, David Stevenson's cousin. See Exhibit 6 (Interview of George Stevenson, 11/21/95). George told the police that he lived near the Cavalier Apartments and worked at Champs in the Christiana Mall and that, on the date of the murder, he was scheduled to appear at work at 8:00 am. Id. George also told the police that he was in the Army Reserves. Id. He also told the police that he and David grew up together. He also told the police that David was looking for him (George) shortly before the murder and that they got together on that Thursday evening. Finally, he told the police that he was scheduled to work at 8:00 am on the date of the murder and that he was in the vicinity of the murder site that morning. Id. Moreover, Petitioner will demonstrate at an evidentiary hearing that George meets the descriptions of a number of the eyewitnesses. Thus, the police handed to defense counsel someone with much closer ties to the co-defendant, (and, thus, someone with much more reason to help the co-defendant avoid the theft prosecution), who had similar ties to the military, similar access to the military clothing found in Stevenson's car and similar familiarity with weapons.

The police paperwork also indicated that Tiarra Koston saw David Stevenson on the morning of the murder shortly after 8:00 am driving (alone) at a normal rate of speed on Washington Street in Wilmington going from 17th Street towards 18th Street. Mr. Stevenson's home was located in the 200 block of West 20th Street.

Presented with this evidence, a factfinder could have concluded that, contrary to the prosecution's theory, David Stevenson was accompanied by George Stevenson, not Petitioner, at the time of the murder. And, once the murder was completed, David Stevenson dropped George off at his home, located nearby, so that George could go on to work as scheduled, then returned to Wilmington where he picked up Petitioner. Counsel's failure to investigate, develop and present this evidence constitutes deficient performance.

### C.    Prejudice.

The prejudice prong of the Strickland test requires the defendant to show that "there is a *reasonable* probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. As the United States Supreme Court has stressed, "the adjective is important." Kyles v. Whitley, 514 U.S. 419, 434 (1995).[13] *"The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."* Id.; see also Strickland, 466 U.S. at 693 ("a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case"); Nix v. Whiteside, 475 U.S. 157, 175 (1986) ("a defendant need not establish that the attorney's deficient

---

[13]In Kyles, the Court applied the identical prejudice standard in the Brady context, granting a new trial in a capital case as a result of government suppression of exculpatory information. See Brady v. Maryland, 373 U.S. 83 (1963).

performance more likely than not altered the outcome in order to establish prejudice"). A "reasonable probability of a different result" is thus *less than a preponderance of the evidence*. It is present when an evaluation of all of the evidence that should have been before the jury is "sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 693.

The evidence described above demonstrates far more than a preponderance of the evidence that counsel's failure to adequately investigate, develop and present compelling evidence directly disputing the aggravation pursued by the prosecution compromised the reliability of the sentencing verdict. As described above, while it was counsel's theory that Petitioner was not the shooter, they did little or nothing to contest the prosecution's evidence purporting to establish that Petitioner was the shooter, although compelling evidence existed that would have done so. Also as described above, despite the existence of additional evidence demonstrating that someone other than Petitioner committed the shooting, counsel failed to marshal that evidence or present it to the factfinder. Had that evidence been presented, there is at least a reasonable probability that the sentencing determination would have been different. Thus, Petitioner has demonstrated prejudice.

### D.    Conclusion

The above-described errors, individually and cumulatively, provide compelling bases for doubting the reliability of the sentencing verdict. Indeed, as the above-described evidence demonstrates, there is more than a reasonable probability that Petitioner was not the shooter and, but for the abject failures of counsel, that would have been palpable to the sentencer. Where, as here, the prosecution had no physical evidence – or any other competent evidence – directly connecting Petitioner to the murder, the denial of Petitioner's federal constitutional rights is manifest and requires grant of relief, or at a minimum, an evidentiary hearing.

**E.     There Are No Bars to This Court's Review of These Claims.**

Rule 61(i)(1)-(2) and (4) are clearly inapplicable to these claims.  These claims are timely, having been filed within one year of final judgment of sentence; as these claims arise out of the 2005 sentencing proceeding, this is clearly the first post-conviction proceeding available to Petitioner; and, there have been no previous adjudications of these claims.  Nor does Rule 61(i)(3) apply to these claims for a number of reasons.  First, as described above, see Section II.A.1.c., this subsection is not applicable to ineffective assistance of counsel claims.  Second, the failure to raise these claims was the result of counsel's constitutional ineffectiveness, thus demonstrating cause, Flamer v. State, 585 A.2d at 758, and, as described above, prejudice is demonstrated because, as described above, had these claims been raised in the prior proceedings there is a reasonable likelihood that the outcome would have been different.  Finally, as described above, Petitioner meets the exception to application of Rule 61(i)(3) outlined in Subsection 61(i)(5).  Petitioner has presented colorable claims involving multiple constitutional violations that would arguably require vacating Petitioner's capital sentence.  Webster, 604 A.2d at 1367.  Accordingly, there are no bars to this Court's merits consideration and, for the reasons described above, relief is required.

**CLAIM III.     THE STATE'S FAILURE TO DISCLOSE EXCULPATORY IMPEACHMENT EVIDENCE IN ITS POSSESSION VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.  COUNSEL WAS INEFFECTIVE IN FAILING TO REQUEST MATERIAL IMPEACHMENT EVIDENCE AFTER THE PROSECUTION WITNESSES TESTIFIED ON DIRECT EXAMINATION IN VIOLATION OF PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.**

The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires a prosecutor to disclose favorable evidence to the accused that is material to either guilt or punishment. Brady v. Maryland, 373 U.S. 83, 87 (1963); Giglio v. United States, 405 U.S. 150, 153-

56 (1972); United States v. Bagley, 473 U.S. 667, 676 (1985); Kyles v. Whitley, 514 U.S. 419, 437

(1995). See also ABA STANDARDS FOR CRIMINAL JUSTICE PROSECUTION FUNCTION AND DEFENSE

FUNCTION 3-3.11(a)(3d ed. 1993); Pa. Rules Prof. Conduct 3.8(d). This duty to disclose continues

past a defendant's arrest, conviction and sentencing. Imbler v. Pachtman, 424 U.S. 409, 427 n.25

(1976).

'Favorable evidence' under Brady includes evidence that impeaches the prosecution's theory

or witnesses. Bagley, 473 U.S. at 676 (Brady's disclosure requirements apply to any materials that,

whatever their other characteristics, can be used to develop impeachment of a prosecution witness);

Napue, 360 U.S. at 269 ("[t]he jury's estimate of the truthfulness and reliability of a given witness

may well be determinative of guilt or innocence"); see also Wilson v. Beard, 2006 WL 2346277, *17

(E.D. Pa. 2006) (Padova, J.) (finding that the prosecution's failure to disclose impeachment evidence

violated Brady and its progeny).

Materiality exists when there is a reasonable probability that the withheld evidence could

have provided a "reasonable doubt" about Petitioner's guilt. California v. Trombetta, 467 U.S. 479,

485 (1984) ("the prosecution has a constitutional duty to turn over exculpatory evidence that would

raise a reasonable doubt about the defendant's guilt"); United States v. Hill, 976 F.2d 132, 135 (3d

Cir. 1992) (same); or when the withheld evidence had "*any adverse effect*" upon the defendant's

ability to prepare for trial or present a defense. Bagley, 473 U.S. at 683 ("the reviewing court may

consider directly any adverse effect that the prosecutor's failure to respond might have had on the

preparation or presentation of the defendant's case"). As the Third Circuit noted:

> A defendant is entitled to a new trial where there is a reasonable probability that, had
> the evidence been disclosed to the defense, the result of the proceeding would have
> been different. A reasonable probability is [defined as] a probability sufficient to

44

undermine confidence in the outcome. This court has recognized that the Bagley inquiry requires consideration of the totality of the circumstances, *including possible effects of non-disclosure on the defense's trial preparation.*

United States v. Perdomo, 929 F.2d 967, 972 (3d Cir. 1991) (internal citations omitted).[14]

Indeed, defense counsel is entitled to rely on the presumption that prosecutors will fairly "discharge[] their official duties," United States v. Mezzanatto, 513 U.S. 196, 210 (1995), and that the prosecutor shall act as the "representative not of an ordinary party to a controversy, but of a sovereignty whose obligation [is] to govern impartially . . . and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." Berger v. United States, 295 U.S. 78, 88 (1935).

During the course of the police investigation of the murder in this case, the police taped interviews with a number of witnesses, including: Phillip Hudson, Susan Butler, George Stevenson, and Tiarra Koston. While the prosecution did turn over police-generated "transcripts" of the taped statements of Susan Butler, Phillip Hudson and George Stevenson, those "transcripts" contain blanks and omissions and, therefore, are not a complete and accurate reflection of the taped statement. Similarly, the state failed to even turn over a "transcript" of the statement provided by Ms. Koston.

Similarly, as described above, the tape of the statement provided by Ms. Dorsey-Crowell included a number of facts that were exculpatory to Petitioner. Likewise, there are discrepancies in the police reports of the statements by Stevenson, Koston, Butler, and Hudson. Petitioner avers that

---

[14]See also Wilson v. Whitley, 28 F.3d 433, 438 (10th Cir. 1994) ("Bagley evidences concern with any adverse effect that the prosecutor's failure to respond [to the discovery request] might have had on the preparation or presentation of the defendant's case") (quotations and citations omitted); United States v. Spagnuolo, 960 F.2d 990, 994 (11th Cir. 1992) (Brady violation found when withheld evidence "could have" altered defense strategy); Smith v. Secretary, 50 F.3d 801, 827 (10th Cir. 1995) (same).

45

the tapes contain exculpatory information, including both impeachment evidence as to Hudson and Butler as well as independent exculpatory evidence contained in the statements of Koston and Stevenson. Accordingly, the state was required to disclose these tapes and the failure to do so denied Petitioner of his Sixth, Eighth and Fourteenth Amendment rights. Where, as described above, the contents of these tapes include impeachment of critical prosecution witnesses (Butler and Hudson) purporting to connect Petitioner to this murder, materiality is demonstrated and relief is required. Moreover, where, as described above, the contents of the statements of both Koston and Stevenson include evidence disputing the prosecution's theory that Petitioner was involved in the murder, materiality is demonstrated and relief is required.

Moreover, even if the state was not required to disclose the contents of these tapes under Brady and its progeny, and it was, counsel was entitled to disclosure of the tapes once the prosecution witnesses (Butler and Hudson) took the witness stand and testified on direct. See Super. Ct. Crim. R. 26.2 (requiring disclosure of prior statements once the witness testifies on direct examination). See also Jencks v. United States, 353 U.S. 657 (1957). Although counsel was aware that both of these witnesses had provided a taped statement to the police, counsel failed to request disclosure once these witnesses testified on direct. Counsel's failure to request disclosure constitutes prejudicially deficient performance in violation of Petitioner's Sixth, Eighth and Fourteenth Amendment rights. Counsel could have no reasonable strategic basis for failing to request bases for impeaching witnesses that the prosecution contended connected Petitioner to the murder. Moreover, as described above, as there is a reasonable likelihood that these taped statements contain critical impeachment evidence of these key prosecution witnesses, prejudice is demonstrated and relief is required.

46

**There Are No Bars to This Court's Review of These Claims.**

Rule 61(i)(1)-(2) and (4) are clearly inapplicable to these claims. These claims are timely, having been filed within one year of final judgment of sentence; as these claims arise out of the 2005 sentencing proceeding, this is clearly the first post-conviction proceeding available to Petitioner; and, there have been no previous adjudications of these claims. Nor does Rule 61(i)(3) apply to these claims for a number of reasons. First, as described above, see Section II.A.1.c., this subsection is not applicable to ineffective assistance of counsel claims. Second, the failure to raise these claims was the result of counsel's constitutional ineffectiveness, thus demonstrating cause, Flamer v. State, 585 A.2d at 758, and, as described above, prejudice is demonstrated because, as described above, had these claims been raised in the prior proceedings there is a reasonable likelihood that the outcome would have been different. Finally, as described above, Petitioner meets the exception to application of Rule 61(i)(1) - (3) outlined in Subsection 61(i)(5). Petitioner has presented colorable claims involving multiple constitutional violations that would arguably require vacating Petitioner's capital sentence. Webster, 604 A.2d at 1367. Accordingly, there are no bars to this Court's merits consideration and, for the reasons described above, relief is required.

**CLAIM IV.    TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE, DEVELOP AND PRESENT AVAILABLE MITIGATING EVIDENCE IN VIOLATION OF PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS AND HIS RIGHTS UNDER ARTICLE I, §§ 4, 7, 9, 11, 12 AND 13 OF THE DELAWARE CONSTITUTION.**

As described below, counsel failed to investigate, develop and present readily available evidence of Petitioner's background and history that were necessary to the sentencer's informed decision regarding the appropriate verdict. Counsel's failure to adequately investigate, develop, and present this compelling mitigating evidence violated Petitioner's Sixth, Eighth and Fourteenth

Amendment rights as well as his rights under Article I, §§ 4, 7, 9, 11, 12 and 13 of the Delaware Constitution.

### A.     The Legal Standard

The importance of mitigating evidence in capital sentencing proceedings is a fundamental tenet of capital jurisprudence.[15]   A capital defendant has "a right – indeed, a constitutionally protected right," Williams v. Taylor, 529 U.S. 362, 393 (2000) – to present mitigating evidence to the capital sentencing jury.   This evidence is critical to the reliability of the capital sentencing proceeding, and without it the sentencer cannot render the individualized decision that the Eighth Amendment constitutionally requires.   Gregg v. Georgia, 428 U.S. 153, 206 (1976).

Sixth Amendment ineffective assistance of counsel claims are evaluated under the two-prong test of Strickland v. Washington, 466 U.S. 668 (1984).[16]   Petitioner must show:   (a) counsel's deficient performance, i.e., that his attorney's performance fell below "an objective standard of reasonableness," id. at 688; and (b) prejudice, i.e., that confidence in the result of the original sentencing proceeding is undermined due to counsel's deficiencies, id. at 694.

### B.     Deficient Performance.

Counsel's performance at capital sentencing must be evaluated in light of the fundamental principle, set forth above, that a capital defendant has "a right – indeed, a constitutionally protected right – to provide the [sentencer] with the mitigating evidence." Williams v. Taylor, 529 U.S. 362,

---

[15]Rompilla v. Beard, 545 U.S. 374 (2005); Wiggins v. Smith, 539 U.S. 510 (2003); Williams v. Taylor, 529 U.S. 362 (2000); Perry v. Lynaugh, 492 U.S. 302, 307 (1989); Eddings v. Oklahoma, 455 U.S. 104, 110-12 (1982); Lockett v. Ohio, 438 U.S. 586, 605 (1978).

[16]See also Williams v. Taylor, 529 U.S. 362 (2000), Wiggins v. Smith, 539 U.S. 510 (2003), and Rompilla v. Beard, 545 U.S. 374 (2005).

48

393 (2000). Under Strickland and its progeny, the adequacy of counsel's mitigation investigation is "measured against an 'objective standard of reasonableness,' 'under prevailing professional norms.'" Rompilla, 545 U.S. at 380 (quoting Strickland, 466 U.S. at 688); Wiggins, 539 U.S. at 521. The Court has long referred to professional standards of conduct – such as the American Bar Association (ABA) Standards for Criminal Justice and the ABA Guidelines for the Appointment and Performance of Counsel in Capital Cases – in assessing the reasonableness of counsel's conduct.

The ABA Guidelines dovetail with the broad scope of evidence the Constitution says counsel must investigate and the defendant must be able to present. Lockett v. Ohio, 438 U.S. 586, 602-05 (1978); Eddings v. Oklahoma, 455 U.S. 104, 110 (1982). Accordingly, both the caselaw and the professional norms recognize that capital counsel have an "obligation to conduct a thorough investigation of the defendant's background" for mitigating evidence. Williams, 529 U.S. at 396 (citing 1 ABA STANDARDS FOR CRIMINAL JUSTICE 4-4.1, commentary, at 4-55 (2d ed. 1980)), quoted in Wiggins v. Smith, 539 U.S. 510, 522 (2003). Thus, counsel's "investigations into mitigating evidence should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor," Wiggins v. Smith, 539 U.S. at 524 (quoting ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES 11.4.1.c, at 93 (1989) (emphasis in Wiggins), quoted in Rompilla, 545 U.S. at 387 n.7.

Counsel's duty to thoroughly investigate and present all reasonable mitigating evidence has several distinct components:

- an obligation to investigate, develop and present records that may contain relevant

mitigating evidence.[17]

- an obligation to investigate, develop and present lay-witness testimony regarding the client's background and history;[18]

- an obligation to work closely with a mental health expert and present expert testimony regarding mental health-related mitigating circumstances;[19]

---

[17] E.g. ABA GUIDELINES 11.4.1, Investigation, §§ 2C & 2D (counsel should obtain hospital, treatment, school and mental health records); Williams v. Taylor, 529 U.S. at 395-96 (failure to obtain juvenile and social services records "graphically describing Williams' nightmarish childhood" and prison records describing his good conduct and favorable adjustment to prison); see also Outten v. Kearney, 464 F.3d 401, 416 (3d Cir. 2006) (counsel ineffective where, inter alia, "they neither acquired nor reviewed readily available school and medical health records"); Carter v. Bell, 218 F.3d 581 (6th Cir. 2000) (failure to obtain prison, welfare and mental health records); Glenn v. Tate, 71 F.3d 1204 (6th Cir. 1995) (failure to obtain school records evidencing mental retardation); Clabourne v. Lewis, 64 F.3d 1373, 1385 (9th Cir. 1995) (failure to obtain institutional records from mental hospital and prison treatment facility); Hill v. Lockhart, 28 F.3d 832, 845 (8th Cir. 1994) (failure to obtain records from mental hospital).

[18] ABA GUIDELINES, 11.4.1, Investigation, §§ D.2.C, D.3.B & D.3.C (counsel should seek out information regarding "family and social history (including physical, sexual or emotional abuse)" by interviewing family and others familiar with defendant's life); Guideline 11.8.3 § F (same); Williams, 529 U.S. at 415-16 (O'Connor, J., concurring) (counsel failed to fully interview and present evidence from all relevant friends, neighbors, and family); see also Jermyn v. Horn, 266 F.3d 257, 306-07 (3d Cir. 2001) (finding that counsel's failure to adequately investigate background and mental health mitigation in preparation for trial constituted deficient performance).

[19] ABA GUIDELINES, 11.8.6 (counsel should always investigate and consider presenting the client's "[f]amily and social history (including physical, sexual or emotional abuse, neighborhood surroundings" as well as "[e]xpert testimony concerning [such a background] and the resulting impact on the client"); see also Ake v. Oklahoma, 470 U.S. 68 (1985) (stressing importance of expert mental health assistance in capital cases); Williams, 529 U.S. at 399 (counsel must make an evidentiary presentation that "explain[s to the jury] the significance of all the available evidence"); Magill v. Dugger, 824 F.2d 879, 889 (11th Cir. 1987) (counsel ineffective at capital sentencing when he fails to call mental health expert at the sentencing hearing, when expert testimony "would have provided the jury with a more long-term view of [the defendant's] emotional problems"); Middleton v. Dugger, 849 F.2d 491, 495 (11th Cir. 1988) (counsel ineffective for failing to present expert mental health testimony that "could well have met the standard for statutory mitigating factors"); Antwine v. Delo, 54 F.3d 1357, 1366-7 (8th Cir. 1995) (counsel ineffective at penalty-phase where he relied on mental health evaluation that was prepared for purposes of guilt-phase defenses); Glenn v. Tate, 71 F.3d 1204, 1210, n.5

50

- an obligation to prepare all witnesses to testify to all relevant mitigating evidence within their knowledge, and at trial, to elicit all relevant mitigating evidence that the witness is able to present, whether the witness is an expert or lay witness;[20]

- an obligation to present a closing argument that actually informs the jury how it can give effect to the available mitigating evidence to spare the defendant's life.[21]

Counsel must conduct this investigation and preparation for capital sentencing significantly prior to the trial.[22] Counsel managed to breach each of these professional obligations. Deficient performance can be seen by comparing the evidence presented at trial with the evidence that counsel failed to present as a result of his failure to investigate.

---

(6th Cir. 1995) ("defense counsel should obviously have worked closely with anyone retained as a defense expert to insure that the expert was fully aware of all facts that might be helpful to the defendant").

[20]E.g., Collins, id.; Wallace v. Stewart, 184 F.3d 1112, 1115-18 (9th Cir. 1999) (counsel has duty to provide mental health expert with necessary background information); Collier v. Turpin, 177 F.3d 1184, 1199-1204 (11th Cir. 1999) (counsel failed to elicit all of the mitigating evidence from the ten witnesses that were called).

[21]E.g., Kubat v. Thieret, 867 F.2d 351, 369 (7th Cir. 1989) (counsel must make a significant effort to ably present the defendant's fate to the jury and to focus the attention of the jury on any mitigating factors); Buehl v. Vaughn, No. 95-CV-5917, 1997 WL 752959, at 40 (E.D. Pa. Dec. 31, 1996) (Padova, J.) (failure to present reasoned argument for life at penalty phase was "a very serious and inexcusable lapse"); cf. Herring v. New York, 422 U.S. 853, 862 (1975) ("[n]o aspect of [trial] advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment").

[22]E.g., Williams, 529 U.S. at 395 (capital counsels' actions "fell short of professional standards" when they "did not begin to prepare for [the penalty phase] until a week before trial"); ABA GUIDELINES, 11.4.1 ("Counsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase .... Both investigations should begin immediately upon counsel's entry into the case"); id., 11.8.3 ("preparation for the sentencing phase, in the form of investigation, should begin immediately upon counsel's entry into the case").

1.    **The evidence presented by counsel**

During the penalty trial, counsel presented eight lay witnesses[23] in support of the case for life: Petitioner's mother, Rita Manley, (NT 11/29/05 at 73-83); Debra Norris, a friend of Petitioner's mother, (NT 11/29/05 at 45-56); Reginald Graham, Petitioner's cousin, (NT 11/30/05 at 8-15); Cimani Green, a friend, (NT 11/30/05 at 17-24); Chenequa Green, another friend and the sister of Cimani, (NT 11/30/05 at 25-32); Cormell Green, a close friend of Petitioner's mother and the mother of Cimani and Chenequa Green, (NT 11/30/05 at 33-38); and, Reginald Speir, an Assistant Principal at Central High School who was the coach of the tennis team that Petitioner managed, (NT 11/30/05 at 44-53). The sum and substance of the lay testimony involved little more than general descriptions of Petitioner's devotion to his family; the absence of his father; his academic accomplishments, including attending Central High School; his employment and desire to work to get himself and his mother out of the projects; and, his kindness to others.[24] Other than his age [25] and lack of any prior criminal record, counsel presented nothing more in an effort to save Petitioner's life. This Court summarized the mitigation as follows:

---

[23]Counsel presented two fewer witnesses than prior counsel presented at the first sentencing hearing. See NT 11/14/96.

[24]While Debra Norris did testify that in the projects, there was "drug activity, killing, all kinds of violence," NT 11/29/05 at 53, counsel never asked whether Petitioner was exposed to that violence and/or how it impacted him, nor did counsel make any efforts to present to the jury a clear picture of the struggles involved in living in such an environment. As described below, such evidence was readily available, as well as expert evidence explaining the impact of living in such a highly stressful, violent environment as that suffered by Petitioner.

[25]Counsel did not present any affirmative evidence of Petitioner's age, although his date of birth did come out during the prosecution's case. Nor did counsel highlight Petitioner's youth, although this trial was ten years later.

In 1995 he was 21. He had attended a prestigious and competitive public high school in Philadelphia. He had been in the Army Reserves. He grew up without a father but was much loved in his family. His mother kept tight reins on him and loves him still. He did well in a school that is competitive to get and stay into. Prior to Heath's murder he had no criminal record. He was not involved in the Macy's fraud.

State v. Manley, Criminal Action Numbers IN95111323R3; IN95111324R3; IN95111325R3; IN95120684R3; IN95120685R3; IN95120686R3 (Del. Super. 2/3/06) (Sentencing Decision, Herlihy, J) at 38. As described more fully below, the picture presented by counsel was a far cry from the truth about Petitioner's background and history and the mitigation evidence counsel presented was a mere drop in an ocean of other, compelling mitigation evidence.

### 2.    The Unpresented Evidence.

#### a.    Unpresented Lay and Record Evidence Regarding Petitioner's Background and History

While there is no question that Michael did, indeed, excel and make great strides in his life, what counsel failed to adequately investigate and present was the clear and compelling evidence of what Michael actually had to overcome in order to do that. As described below, while his mother was, indeed, very strict and made sure that the children were inside by dark, through no fault of her own, that did not insulate the children from a chaotic and violent environment that clearly had an impact on Michael's development.

Michael Manley was the second son of Rita Manley. Ms. Manley herself came from a very difficult background. She was one of 13 children. Her mother raised the children alone and, not surprising, the family experienced poverty and dysfunction. There were times that Rita Manley was placed in foster care and, at various times, the family went without, including food, lights and heat. Rita met Allen Manley while they were in high school. She became pregnant with Michael's step-

brother, Allen, and the two married.  As Allen readily acknowledged, neither were ready for marriage, they were too young.  See Exhibit 14 (Declaration of Allen Manley, Sr.).  As a result, the marriage soon went down-hill.  He would leave the home on Friday morning for work and not return until Monday after work.  Id.  As Allen notes, "[i]t got to the point where we were married however we were doing our own thing."  Id.  It was during this period that Rita became involved with Melvin Carr.  When Mr. Carr met Rita, she was around 19 years old, still young.  See Exhibit 15 (Declaration of Melvin Carr).  Eventually Rita and Allen separated and Rita moved back with her mother.  She became pregnant with Michael when she was 20 years old.  While Allen did try to maintain contact with the children, he acknowledges that he did not do "as much as he should have." Exhibit 14 (Declaration of Allen Manley).

After Michael was born, Rita and the children moved to the Passyunk Homes housing project.  Melvin lived with Rita for a short time, about a year.  Id.  That relationship was hardly stable.  Melvin admits that they had a "lot of problems," and that he was involved with other women during their relationship.  Id.  He also acknowledges that after they split, he was hardly there for his child, Michael, and that, after their separation, things were difficult for Rita.  See Exhibit 15 (Declaration of Melvin Carr).  Rita recalls that, originally, they had plans to stay in the projects only temporarily until Melvin could get things together to move the family out to a home.  As the relationship deteriorated, that didn't happen and Rita was essentially left to fend for herself and the children.  Not surprising, Melvin's leaving, (and not fulfilling the promise to get the family out of the projects), had a considerable impact on Petitioner throughout his life and explains his taking on the role of caretaker for his mother, particularly his life-long goal to get his mother out of the projects. Rita describes how Michael was hurt and angry about his father's abandoning the family

54

and felt the need to prove himself to his father and others as a result.

Melvin also recalls that, while he and Rita were together, they "hosted and attended a lot of parties." The "partying lifestyle" escalated. Id. During these parties, the children remained upstairs. Id. Mr. Carr also describes how the situation at Passyunk Homes deteriorated. Drugs, including crack and cocaine, became prevalent. Even the family was affected by the crack scourge. Id.

Rita then became involved with Keith "Chico" Roland. Chico was a violent man who assaulted her on a number of occasions. As often occurs in an abusive relationship, it was some time before Rita could escape the abuse. They were involved for almost seven years. The relationship began when Michael was two years old and finally ended when he was eight or nine years old.

Rita Manley describes the fear and anxiety the children suffered as a result of Chico's abuse. They were usually present during the violent episodes. Even though they were small, they were well-aware of what was going on and, when the fighting began, the children became upset and cried. On a number of occasions, when the fights escalated, Michael, still a toddler would suddenly run to her and grab her leg. When she picked up the child, Chico stopped hitting her. Rita suspected that even though Michael was very young, he realized that he could protect her and put himself in harms way to do that. The fights and violence happened at all times, even after the children went to bed. Allen, Jr. still has vivid memories of hearing Rita and Chico fighting when he was in bed and then seeing his mother with bruises and other injuries the next morning. Even when Rita and the children tried to keep Chico out of the house, Chico would kick the door in. Allen has memories of shoving the couch in front of the door to keep Chico out. There is no question that violence escalating to such a degree traumatized both the children and their mother.

After Chico's sister died, things got even worse. He turned to drugs and started associating

55

with the less-than-desirable members of the neighborhood. Not surprising, his entire personality changed and the violence became more frequent. It seemed to Rita that he was looking for a confrontation at every corner. As other family members recall, the violence was not limited to Rita. At least on one occasion, Melvin Carr received a call that Chico was "hitting on" Michael. He and some friends went to the projects to confront him. While Mr. Carr did not locate Chico, he did leave the clear message to Chico to stop. See Exhibit 15 (Declaration of Melvin Carr).

Things ended for good when Chico, once again, came home, pounding and beating on the door and it was obvious to Rita that he was high. He became so enraged when they wouldn't let him in that he threw a brick through the window. Rita and the children were terrified.

As happens often, Michael became close to Chico, despite the abuse and violence. As experts Petitioner will call at an evidentiary hearing will testify, it is not unusual for children to have conflicted feelings about caretakers who are also abusers. That is why children often try to return to their abusers, despite the violence and chaos. Thus, it's not surprising that, despite the abuse, Michael developed a bond with Chico. As a result, even though the violence ended when Chico left, Michael was sad and hurt. It was obvious to Rita that he was experiencing the loss of his father all over again. While Michael always put on a tough exterior and never said how he felt, Rita knew that he was upset and hurt. After the relationship with Chico ended, Rita vowed never again to subject her children to a situation where they would get attached to a man only to have the man leave, like Allen Manley, Sr., Melvin Carr and Chico had done.

Thus, the home situation was hardly stable. Despite his mother's attempts to insulate the children, Michael nevertheless was subjected to abandonment by his father, Melvin Carr, Chico, and his step-father, Allen Manley, the fear and trauma of witnessing violence against his mother, the sole

56

caretaker he could, and did, trust; and violence by someone who was supposed to protect him, Chico. And, the domestic violence that Petitioner witnessed was not limited to that suffered by his mother. When Petitioner was a small child, a neighbor also was the victim of spousal abuse and Petitioner heard the fighting, the woman's screams, and the sounds of the woman being beaten through his bedroom wall. These beatings occurred nightly until the woman was finally killed by her abuser. Not surprising, the impact of what Petitioner heard, combined with what he witnessed regarding his own mother left Petitioner traumatized and following the neighbor's death, Petitioner suffered nightmares for some time thereafter.

Moreover, with the exception of Ms. Norris' passing reference that the projects was a place where there was "drug activity, killing, all kinds of violence," (NT 11/29/05 at   ), counsel failed to develop any evidence regarding the extent of the violence and chaos in the projects or the impact it had on the children, despite Ms. Manley's enormous efforts to insulate her children from those horrifying experiences. As witnesses who knew the circumstances of the Passyunk Homes will testify, drugs were everywhere. Dealers were on the corners selling crack and other drugs. See Exhibit 16 (Declaration of Allen Manley, Jr.); see also Exhibit 14 (Affidavit of Allen Manley, Sr.); Exhibit 15 (Affidavit of Melvin Carr). The children were forced to step over crack vials on their way to school. See Exhibit 16 (Declaration of Allen Manley, Jr.).

Not surprising, the influx of drugs also meant exposure to horrifying violence. As Ms. Manley recalls, it "became like the OK corral." Knife fights were a common occurrence and Petitioner witnessed a number of such fights, at least one of which ended in a death. It was not unusual for the children to hear multiple gunshots near their home at night and after a night of gunfire they would hear the next day that someone was shot, and often killed. The children were

57

never allowed near the windows for fear that they may be hit by a stray bullet. Indeed, a friend of Petitioner's who visited the same projects, Russell Mosley, confirms the frightening violence. Petitioner had warned him against going to the projects at night, because of the violence. He describes occasions where he and his girlfriend would hear gunfire and have to 'drop to the floor' to avoid the possibility of being shot from a stray bullet. See Exhibit 17 (Declaration of Russell Mosley).

Thus, the children were not only exposed to fear and anxiety *at the time of the gunfire*, they were also in a constant state of fear and anxiety associated with *the anticipation of that gunfire*. There is no question that such an environment takes a toll on the emotional and cognitive development of children. And, it's not surprising that, as a number of witnesses testified at the penalty hearing, Ms. Manley insisted that her children be inside the home by dark. What the sentencer did not hear, however, was that her "strictness" was not merely just her way of disciplining her children. It was, instead, a mother trying to protect her children from death or serious injury. Thus, Ms. Manley's strict rules take on an entirely different theme when considered in light of the truth regarding the conditions of the projects.

In addition to the violence and exposure to drugs and other criminal conduct, the Passyunk Homes was also plagued with pollution from oil spills from a nearby oil refinery. The area was designated as a "Superfund Site" and an enormous clean-up operation was conducted that ultimately resulted in the closing of the projects in 2000. An Environmental Protection Report from 1999-2000 indicated that "[a]pproximately one million gallons of petroleum sits on top of the groundwater" of the project property. See Exhibit 18 (ENVIRONMENTAL JUSTICE 2000 BIENNIAL REPORT: *Continuing to Move Towards Collaborative and Constructive Problem Solving*, EPA/300-

58

R-01-005, October, 2001 at 2.28). An agreement between Sun Oil, the Defense Supply Center of Philadelphia, (DSCP), and the Pennsylvania Department of Environmental Protection, (DEP), resulted in a joint agreement to "remediate the oil plume." Id. While the agreement expired in 1999, the "removal of oil from the groundwater" continued under an order from the DEP. The report further indicated that the Philadelphia Housing Authority "had a stake in the oil recovery project because of the potential health effects on the residents and the fact that the hydrocarbon recovery system [was] located on PHA property." Id. Exposure to toxins can result in a host of health problems, including cognitive impairments, especially where the exposure occurs, as it did in this case, during Michael's developmental years. As described below and as expert testimony Petitioner will present at an evidentiary hearing demonstrates, Michael suffers from cognitive impairments, particularly impairments in the frontal lobe area, the area that controls judgment and impulse control. Had counsel conducted a mere internet search, they would have learned that the projects were closed because of the contamination of the water table by the nearby oil refinery. Had counsel obtained these records and presented them to a mental health expert, any mental health professional would have told counsel of the risks of such pollution to cognitive development and the need for further evaluation.

Children who suffer the kind of abandonment suffered by Petitioner are left scarred. They cannot trust; they have problems with interpersonal relationships; they often suffer from lack of self-esteem; they have poor judgment; they often suffer from depression; they suffer from cognitive impairments; they have difficulties learning to cope with their own emotions; and they have difficulty understanding their place in the world. E.g., Helfer & Kempe, THE BATTERED CHILD, Chapters 9-10, 17-20 (4th ed. University of Chicago Press); Kaplan & Sadock, COMPREHENSIVE

TEXTBOOK OF PSYCHIATRY, at 1365-67 (5th ed.) at 1964-66 (results of childhood abuse and neglect include cognitive and developmental impairment; post-traumatic stress disorder; impaired impulse control; poor self-concept; difficulties in school adjustment; and central nervous system impairment).

Even exposure to violence during the developmental years takes a toll on children. Children who witness domestic violence are likely to feel personally guilty and responsible for the violence and blame themselves for it. Children exposed to violence develop school-related problems; they develop internalizing behaviors (e.g., withdrawal); externalizing problems (e.g., aggression); and deficits in social competence. E.g., Jaffe, Sudermann & Reitzel, Child Witnesses of Marital Violence, ASSESSMENT OF FAMILY VIOLENCE: A CLINICAL AND LEGAL SOURCEBOOK, Chapter 15 (1992); Berman, Impact of Abusive Marital Relationships on Children, BATTERING AND FAMILY THERAPY, Chapter 11 (1993).

School records and descriptions of Petitioner as a child are consistent with the impact of the exposure to the horrifying violence. School records indicate that in the early years he had difficulties controlling his temper, remaining silent and getting along with other children. See Exhibit 19 (Philadelphia School Records). Prior counsel from the 1996 trial obtained a portion of Petitioner's school records. While not complete, these records provide counsel with a number of indicia that life was not "rosy" for Petitioner from a very young age and that Petitioner overcame enormous obstacles to be accepted to a prestigious high school. For example, those records indicate large blocks of absences attributed to "parental neglect," meaning that there was no communication from Petitioner's mother regarding the reason for the absences. Such references provide strong indicators that the student is suffering some type of dysfunction. Similarly, the school records indicate conduct displays by Petitioner that would have provided a mental health expert with indicia once again that

the home situation was far from ideal and that Petitioner may suffer from cognitive impairments, including impulse control issues. Indeed, the timing of these notations are consistent with the time in which "Chico" was in the home.

Indeed, had counsel merely asked Rita Manley, Petitioner's mother, he would have discovered a plethora of indicators in Petitioner's conduct consistent with exposure to dysfunction and violence. As Ms. Manley would have told the sentencer, had counsel asked, as a child, Petitioner was particularly reckless, taking risks at play. He was, in Ms. Manley's words, a "dare-devil" as a child. He climbed trees, often falling out. He and his brother played risk-games involving jumping out of the closet onto the bed in their room and Michael, once again, missed on at least one occasion, hitting the floor. Reckless behavior like that exhibited by Michael as a toddler is consistent with those who experience abuse and exposure to violence. As described below, the resulting head injuries are also consistent with the cognitive brain impairments found by a neuropsychologist who recently evaluated Petitioner.

Similarly, those who knew him describe him withdrawing to his books. One classmate indicates that he was the "class clown," a trait completely consistent with the violence he witnessed and suffered. See Exhibit 17 (Affidavit of Russel Mosley). A counselor who took Petitioner under his wing, Carlos Jones, describes Petitioner as exhibiting classic signs of a child from a dysfunctional environment. See Exhibit 20 (Affidavit of Carlos Jones). Mr. Jones met Petitioner through the Diamond Youth Program, an inner city camp for children. Id. Petitioner arrived early and found excuses to stay late, a sign to Mr. Jones, a product of a broken home himself, that Petitioner was avoiding going home. Id. Petitioner was very "clingy" with Mr. Jones, insisting on being included in his group for various functions. It was clear to Mr. Jones that Petitioner considered the camp and

61

his relationship with Mr. Jones a safe haven from the violence and dysfunction found in the Passyunk Homes. Id.

Thus, the undeveloped lay and record mitigation evidence paints quite a different picture of the truth about Petitioner's background and life history that the sentencer should have learned before reaching a determination that death was the appropriate sentence. Not only does the above involve multiple additional mitigators, it also provides more strength and meaning to the mitigation actually pursued by counsel. Understanding the mountains of obstacles that Petitioner had to overcome in order to do well in school, his acceptance to the prestigious Central High School becomes even more remarkable. Understanding Petitioner's exposure to devastating violence, his goal of becoming a medic in the Reserves and desire to pursue a medical career becomes even more significant. Understanding the debilitating impact of the abuse suffered by his family, (including Petitioner), at the hands of one paramour and the difficulties Ms. Manley (and the family) had as a result of the abandonment by others, the close, protective relationship Petitioner had with his mother becomes even more compelling.

As Petitioner will prove at an evidentiary hearing, the witnesses and record evidence described above were readily available, had counsel conducted a constitutionally adequate investigation. Indeed, had counsel merely conducted full and thorough interviews of those witnesses counsel did present, they would have learned of the plethora of additional mitigation described above. Counsel did not and, instead, relied on brief, cursory and superficial interviews that, in some cases involved little more than asking the witness to fill out a questionnaire.[26] Counsel is not

---

[26]Setting aside the problematic nature of using a questionnaire as a method of eliciting highly personal and painful family history information, the questionnaire itself failed to even attempt to obtain a full and thorough description of Petitioner's life-history, as required by the

effective simply because she/he does <u>some</u> investigation and presents <u>some</u> mitigating evidence, where, as here, counsel has not <u>thoroughly</u> investigated and there is additional unexplored mitigation. <u>Williams</u>, 829 U.S. at 396. <u>See also Wiggins</u>, 539 U.S. at 527 ("In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further").

Nor can counsel rely on any "strategic" decision as a basis for failing to investigate, develop and present the compelling life-history evidence described above that would have provided the sentencer with both additional mitigation and more force for the mitigation pursued. To be "strategic" counsel's decision must be an informed one. <u>See Wiggins</u> 539 U.S. at 527 ("*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy"); <u>Outten v. Kearney</u>, 464 F.3d at 421 (counsel "were not in a position to make a reasonable decision" on the focus of their penalty-phase case when "their investigation in preparation for sentencing was itself unreasonably deficient"); <u>United States v. Gray</u>, 878 F.2d 702, 712 (3d Cir. 1989) ("counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when she/he has not yet obtained the facts on which such a decision could be made"); <u>Pursell v. Horn</u>, 187 F. Supp. 2d 260, 383-84 (W.D. Pa. 2002) ("No strategy, no reasoned judgment, and no tactical maneuvering supported counsel's failure to explore the mounds of mitigating evidence that was readily available to him"); <u>Thomas v. Beard</u>, 388 F. Supp. 2d 489, 508 (E.D. Pa. 2005) ("Here counsel's deficient performance was not due to any pursuit of a particular trial strategy--there was simply no investigation at all, and thus no foundation on which

---

Sixth, Eighth and Fourteenth Amendments.

to base any strategic choice") (citing Gray).   Having not investigated the information about Petitioner's background and history, counsel was hardly in a position to make an informed decision regarding the failure to present that evidence.   Counsel's performance was deficient.

b.      Unpresented Expert Evidence.

Counsel presented no expert evidence in support of the plea to spare Petitioner's life.   The co-defendant's counsel presented an expert who testified that the co-defendant was not psychotic, not anti-social and would adjust well in a structured prison environment.   See NT 11/22/05 at 31-87 (Testimony of Dr. Dougherty).   Thus, while the sentencer had such evidence about the co-defendant, it had nothing about Petitioner to evaluate his mental status or the impact of his background on his development.

Petitioner has now been evaluated by a neuropsychologist, (Dr. Carol Armstrong), and a psychiatrist, (Dr. Julie Kessel).   After conducting a thorough battery of neuropsychological testing, a clinical evaluation and a review of background materials, including the trial record, institutional records, (including school records and Department of Correction records), Dr. Armstrong concludes to a reasonable degree of certainty that Petitioner suffers now, and suffered at the time of the offense and sentencing, from cognitive impairments, particularly impairments in the frontal lobe area of the brain that controls judgment and impulsivity.   As Dr. Armstrong will explain in an evidentiary hearing, while Petitioner is, indeed, very bright and intelligent, he nevertheless is impaired and the impairments may be even more prominent due to his intelligence and corresponding ability to mask symptomotology.   Also as Dr. Armstrong will describe in an evidentiary hearing, these impairments are consistent with his background and life-history.   There are a number of potential sources of the brain impairments, including injuries suffered as a child and while playing sports as well as the

64

environmental impact of the pollution in the Passyunk Homes.

It is unquestionable that evidence of brain damage is mitigating. See Penry v. Lynaugh, Penry v. Lynaugh, 492 U.S. 302 (1989) (evidence of brain damage, in addition to retardation is mitigating); Caro v. Calderon, 165 F.3d 1223, 1225 (9th Cir. 1999) (failure to investigate defendant's organic brain damage or other mental impairments constitutes ineffective assistance of counsel); Middleton v. Dugger, 849 F.2d 491, 495 (11th Cir. 1988) ( counsel was ineffective for failing to adequately investigate and present mitigating evidence of defendant's brain damage).

In addition, as Dr. Armstrong will testify in an evidentiary hearing, Petitioner's age at the time of the offense, 21 years, is also psychologically significant in light of the impairments indicated by the testing she conducted. Scientific studies demonstrate that brain development does not complete until the mid-twenties.[27] As a result, Petitioner's age, falling squarely within the time-period wherein the brain is not fully developed, is more significant than mere years. Because Petitioner suffered cognitive impairments, his 21 years was an inflated view of his actual cognitive maturity. Thus, when the combined impact of Petitioner's impairments, particularly his impairments in the frontal lobe region, and the under-development of his brain, it is clear that his chronological age is not the full picture of mitigation and Petitioner's culpability.

Julie Kessel, M.D., also evaluated Petitioner. Dr. Kessel found that as a result of the chaotic, violent, and abusive environment Petitioner endured from birth until adulthood, he still suffers from post traumatic anxiety symptoms. As Dr. Kessel notes, despite being exposed to such an extreme

---

[27]See e.g. United States v. Gall, 374 F. Supp. 2d 758, 762, n.2 (D.C. Iowa 2005) (noting reports from the National Institutes of Health suggesting that the part of the brain controlling inhibition does not fully develop until around the age of 25), *subsequent history*, Gall v. United States, __ U.S. __, 128 S. Ct. 586, 601 (2007) (citing with approval the District Court's discussion regarding the impact of brain development on maturity).

amount of violence throughout his life, Petitioner has still managed to function at a high level. Dr. Kessel will testify that this is the type of avoidance behavior one would expect from an individual such as Petitioner who was constantly exposed to violence as a child and was so traumatized by it. In spite of his anxiety around violence and weapons, this anxiety didn't keep Petitioner from doing things that were ultimately very adaptable. In some ways, the violence around him drove his adaptation. The fact that Petitioner was such an avid reader and student, and remained inside, studying rather than risking exposure to the violence outside is an example of this type of adaptation.

Dr. Kessel will also testify that the abandonment of Petitioner's biological father was especially significant to his psychological development. The combined impact of his father's abandonment, the family's remaining in the projects as a result of his father's failure to follow through on his promise to get the family out of that horrific environment, and the subsequent violent relationship with Chico resulted in Petitioner developing a defense mechanism called reaction formation, that is, to engage in behavior that is the exact opposite of the violent, irresponsible male role models he had been exposed to in his life. As a result, Petitioner became an intensely loyal individual, who, even at a young age, took on the personal responsibility of caring for his family, particularly his mother. Petitioner's most important goal was taking care of his mother and pleasing her. He wanted to do his best so that his mother could be proud of him.

Dr. Kessel will also testify that Petitioner had no pattern of antisocial behavior or history of psychosis or any other major mental illness.

While Petitioner minimizes the horrific experiences he had as a child and youth as an emotional coping mechanism, the trauma and anxiety can rise to the surface if provoked. Dr. Kessel will testify this is likely what happened when Petitioner was placed into the prison setting for the

66

first time in his life. The dangerous environment of the prison setting likely caused the same type of fear reactions as the environment of the Passyunk Homes projects and provoked his post traumatic anxiety. However, as he has all his life, Petitioner managed to adjust and overcame this anxiety, and now functions well in a prison setting.

Thus, the unpresented expert evidence paints quite a different picture of the truth about Petitioner that the sentencer should have learned before reaching a determination that death was the appropriate sentence. As with the unpresented lay and record testimony, not only does the above involve additional mitigators surrounding Petitioner's emotional, cognitive and psychological make-up, it also provides more strength and meaning to the mitigation actually presented by counsel. For example, understanding the cognitive and emotional obstacles that Petitioner had to overcome in order to do well in school, his acceptance to the prestigious Central High School becomes even more remarkable. Understanding the emotional, cognitive and psychological impact of Petitioner's exposure to devastating violence, his goal of becoming a medic in the Reserves and desire to pursue a medical career becomes even more significant. Understanding the emotional, cognitive and psychological impact of the abuse suffered by his mother, (and Petitioner), at the hands of one paramour and the difficulties she (and Petitioner) had as a result of the abandonment by others, the close, protective relationship Petitioner had with his mother becomes even more compelling.

Counsel's failure to consult with any mental health expert constitutes deficient performance. Even the superficial family interviews counsel did conduct (ineffectively) contained a plethora of reasons to consult with mental health professionals, including the descriptions of the abandonment of Petitioner's natural father. Likewise, records counsel had at the time of trial also included a plethora or indicators that mental health assessment would provide additional relevant mitigation.

67

For example, as described above, the school records indicated multiple instances of unexplained absences from school as well as impulse control problems, indicators of cognitive impairments and emotional impairments. Prison records also included references indicating that Petitioner could be "impulsive" although the overall assessment was that Petitioner was adjusting satisfactorily. As described above, impulsivity is a classic sign of cognitive impairments.

Of course, had counsel conducted a constitutionally adequate investigation, they would have learned even more compelling reasons to consult with mental health professionals, including the exposure to domestic and other violence and dysfunction, the repeated instances of trauma and the loss and abandonment suffered by Petitioner as well as the environmental hazards in the Passyunk Homes projects. In short, had counsel conducted a full and thorough investigation into Petitioner's background and history, counsel would have known that expert assistance would have provided additional mitigation and further support and weight for the mitigation pursued. Finally, counsel was aware that co-defendant's counsel intended to call an expert for the purpose of providing opinion testimony regarding the co-defendant's ability to adjust well in prison as well as the co-defendant's lack of any history of anti-social behavior, psychosis or other major mental illness. At a minimum, counsel was obliged to pursue similar expert assistance for Petitioner.

         *c.*     *The Unpresented Evidence Supporting the Mitigators Counsel Pursued.*

Prior to the sentencing, counsel filed a letter with notice of the mitigating circumstances counsel expected to present. <u>See</u> Exhibit 21 (Letter of Joseph M. Bernstein, Esquire, filed 2/2/05). Those mitigators were:

    1)     Lack of any prior criminal record

    2)     Age of defendant at the time of commission of offense

3)    Potential for rehabilitation

4)    Positive contributions to community/society prior to incarceration

5)    Impact of death sentence on defendant's family

6)    Evidence that Manley did not actually kill Kristopher Heath

7)    Mercy

8)    Any other evidence developed during the penalty hearing which tends to mitigate the possible punishment.

Id.[28]

As described above, counsel presented only eight lay witnesses in support of these mitigators. Also as described above, other than general statements by these witnesses, counsel provided the sentencer with little or nothing to find the mitigation counsel actually pursued. There was, however, compelling evidence both supporting a finding that these mitigators exist as well as providing the sentencer with bases for finding that these mitigators must be given substantial weight.

As described elsewhere in this Petition, (see Claim II), counsel's "presentation" that Petitioner was not the individual who shot Kristopher Heath fell woefully below reasonable standards. Despite the existence of lay witness and forensic expert evidence directly disputing the prosecution's theory that it was Petitioner who shot Mr. Heath, counsel ineffectively failed to investigate, develop and present that evidence.

As described above, counsel did little or nothing to support the age mitigator, although substantial evidence existed and was available. Indeed, had the prosecution not presented

---

[28]This list omits two mitigators presented by prior counsel. See Exhibit 22 (Letter, Thomas A. Foley, Esquire, Filed November 14, 1996).

Petitioner's date of birth during its presentation of *aggravation*, counsel would have had no evidence supporting this mitigator. Moreover, as described above, had counsel conducted a constitutionally adequate investigation and preparation, he would have learned that the issue of age, in Petitioner's case, involves more than a chronological calculation. When confronted with the evidence explaining the impact of Petitioner's age on brain development as well as the impairments Petitioner already suffered, this mitigator takes on a completely different posture both in nature and quality, impacting both the finding of the mitigation and the weighing of that mitigation against the aggravation. See Section b.

Similarly, while counsel pursued a mitigator involving positive contributions to society or the community prior to incarceration, other than the testimony that when Petitioner was a child he assisted a sick friend, counsel presented nothing. There existed, however, available evidence supporting a number of other instances that would have provided the sentencer with more substantial bases for finding this mitigator and for giving that mitigation greater weight. For example, as described above, Petitioner participated in the summer Diamond Youth Program. As Petitioner got older, he took on a leadership role in the camp, even becoming a Junior Aid. See Exhibit 32 (Affidavit of Barbara Baynard). As a result, the counselors, including Carlos Jones, relied on Petitioner to mentor the younger children and assist in the supervision. Id. Indeed, had counsel merely read the testimony from the first penalty hearing, he would have learned that, although Allen Manley, Jr., was his older brother, it was Petitioner who mentored and tried to assist Allen when he went through difficulties. See NT 11/14 /96 at 82-83 (Testimony of Allen Manley, Jr.).

While counsel elicited general testimony regarding Petitioner's service in the Reserves, he presented no witness who actually worked with Petitioner or who could speak to Petitioner's

contributions while serving. As Ms. Sapp describes, Petitioner not only excelled, but was given added responsibility because of his exceptional conduct and his proven skills. See Exhibit 23 (Affidavit of Delores Sapp). For that reason, she recommended him for promotion and he was asked to serve as the Non Commissioned Officer for one tour and excelled in that position. As Ms. Sapp notes, he held the respect of his peers, the Non Commissioned Officers and the Officers. Id. Ms. Sapp also describes Petitioner's strong desire to pursue a career in the medical field, as opposed to combat service, because of his desire to help rather than hurt, and the determination with which he pursued that goal. Id. Once again, when considered in light of the enormous obstacles that Petitioner was forced to overcome, these instances of community and personal support take on a completely different picture than the meager presentation by counsel.

Likewise, while the prosecution presented a number of Department of Corrections records in support of aggravation, counsel failed to admit or present documentation indicating that Petitioner had, despite the write-ups, actually adjusted well overall in the onerous conditions of the restrictive death row environment. Indeed, prior to the Departments' change in policy ending monthly reviews, there were a plethora of records indicating that Petitioner's adjustment was proceeding completely within normal expectations. See Exhibit 24 (MSU Semi-Monthly Behavior Reports).[29]  While counsel did note the few incidents compared with the time Petitioner was in prison, and did question the prison official about Petitioner's overall good adjustment, the sentencer was only provided

---

[29]Indeed, one of these documents even notes mitigation (from a Corrections Officer), for the incident where Petitioner purportedly flooded his cell. See Exhibit 24 (Staff Observation Report, 5/28/97(Noting that Petitioner is "Normally a quiet person" and that it was "quite possible" that the "flood was caused to bring attention to the commode constantly running")). Thus, the sentencer was denied the opportunity to fully assess this incident, even from the perspective of the Department of Corrections.

71

*records* of Petitioner's misconduct. Confronted with records indicating the number of times the prison characterized Petitioner's adjustment as acceptable compared with the few write-ups, there is no question that the sentencer would have weighed the aggravation and mitigation surrounding Petitioner's prison adjustment differently.

      d.    *Counsel's Failure to Focus the Jury's Mitigation Consideration During Closing Arguments.*

In addition to failing to marshal the readily available mitigation evidence described above, counsel also failed to focus the jury on the mitigation presented or explain to the sentencer how it can give effect to the available mitigating evidence. While counsel did discuss the aggravation in general terms during closing and discussed why counsel contended that the prosecution failed to establish the aggravation; and, while counsel also told the jury that it was required to weigh aggravation found against mitigation, at no time did counsel actually explain to the jury what mitigation is or how the jury should weigh that mitigation against any aggravation found. Indeed, counsel never actually explained to the jury what mitigators the defense was relying on in support of a life sentence. Where, as here, the jury was never instructed regarding what mitigators counsel pursued, (while it was instructed on the list of aggravators), and where, as here, the verdict form did not indicate what those mitigators were, (although it did indicate the list of aggravators), it was incumbent on counsel during closing argument to, at a minimum, tell the jury what mitigators applied in Petitioner's case. Yet, counsel never made *one reference* to any of the mitigators listed in counsel's notice. Having not even told the jury what mitigators applied, counsel did not explain to the jury the meaning of these mitigators or how the jury should consider that mitigation in the weighing process. As a result, the jury was left with a list of statutory aggravators and a foggy,

general impression that there might be mitigation out there that applied to Petitioner, but no way of knowing what that mitigation was or how to apply it during the weighing process. Counsel's failure to focus the jury on the actual mitigation presented or explain how that mitigation should be considered against any aggravation found constitutes deficient performance.

### C.    Prejudice.

Prejudice is *not* an outcome-determinative test. Strickland, 466 U.S. at 693-94. The question is *not* whether representation by effective counsel would have actually changed the jury's ultimate sentencing verdict, nor even whether representation by effective counsel would "more likely than not" have changed the sentence. Id. Instead, prejudice is established when *confidence in the outcome is undermined* because of counsel's deficiencies. Id. at 694. This "undermines confidence" standard for prejudice "is not a stringent one. It is less demanding than the preponderance standard."[30]

As explained in Strickland and the trilogy of capital-case ineffectiveness cases recently decided by the Supreme Court,[31] prejudice is present whenever "there is a ***reasonable*** probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694; Williams, 529 U.S. at 371; Wiggins, 539 U.S. at 534; Rompilla, 545 U.S. at 390. The Supreme Court has stressed that "the adjective is important." Kyles v. Whitley, 514 U.S. 419, 434 (1995): "The question is not whether the defendant would more likely than not

---

[30]Hull v. Kyler, 190 F.3d 88, 110 (3d Cir. 1999) (internal quotation marks and citations omitted) (citing Nix v. Whiteside, 475 U.S. 157, 175 (1986); Baker v. Barbo, 177 F.3d 149, 154 (3d Cir. 1999)); accord Williams, 529 U.S. at 405-06 (requiring proof of prejudice by a preponderance of the evidence would be "contrary to" Strickland).

[31]Williams v. Taylor, 529 U.S. 362 (2000), Wiggins v. Smith, 539 U.S. 510 (2003), and Rompilla v. Beard, 545 U.S. 374 (2005).

73

have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id.; see also Strickland, 466 U.S. at 693 ("a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case"). The reasonable probability standard is met when the capital sentencer reasonably might have returned a life verdict.[32]

Prejudice occurs whenever the Petitioner presents evidence not presented by counsel that is sufficient to establish mitigation the sentencer did not find; when the Petitioner presents evidence supporting mitigation not pursued by counsel; or, when the Petitioner demonstrates that the evidence that could have been presented was reasonably sufficient to change the sentencer's balancing of aggravating and mitigating circumstances.[33]

Here, Petitioner has demonstrated each type of prejudice. As described above, the unpresented evidence would have provided the sentencer with multiple additional mitigating factors; with compelling evidence in support of mitigation pursued; and with substantial evidence supporting a different balance of aggravation versus mitigation.

Several years ago (and five years before the trial in this case), the United States Supreme

---

[32]Williams v. Taylor, 529 U.S. at 398 (prejudice established where unpresented mitigating evidence "might well have influenced the jury's appraisal of his moral culpability"); Rompilla, 545 U.S. at 393; Wiggins, 539 U.S. at 538; see also Glenn v. Tate, 71 F.3d 1204, 1210 (6th Cir. 1995).

[33]E.g. Armstrong v. Dugger, 833 F.2d 1430, 1433 (11th Cir. 1987) (the presence of mitigating evidence undiscovered by trial counsel "clearly [meets] the prejudice requirement"); Blanco v. Singletary, 943 F.2d 1477, 1505 (11th Cir. 1981) (same, quoting Armstrong); Hill v. Lockhart, 28 F.3d 832, 845 (8th Cir. 1994) (if a juror could find "at least one" mitigating factor on the basis of the evidence that counsel did not present, there is prejudice); Cave v. Singletary, 971 F.2d 1513, 1518-19 (11th Cir. 1992) (prejudice exists if a juror could have found mitigation based on the evidence trial counsel failed to present).

Court granted penalty phase relief in a capital case, <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), on the grounds that trial counsel rendered ineffective assistance of counsel. In so doing, the Court reaffirmed the basic principles governing the assessment of a claim of ineffective assistance of counsel articulated in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

A comparison between Petitioner's case and <u>Williams</u> demonstrates that, if the efforts of trial counsel in <u>Williams</u> constituted prejudicially deficient performance, then without question the efforts of Petitioner's counsel also satisfy the prejudice requirement. In <u>Williams</u>, counsel had the client evaluated by three mental health experts (who concluded that Williams did not have mental problems) – counsel called one at sentencing to describe his view that Williams lacked intent to injure others during his crimes. <u>Williams</u>, 529 U.S. at 369. Counsel interviewed Williams' mother, Williams himself and several other family members about Williams' life, asking if they had any evidence that would help (the witnesses did not disclose neglect or abuse). <u>Id.</u>; <u>Williams v. Taylor</u>, 163 F.3d 860, 872 (4th Cir. 1998); <u>Williams v. Warden</u>, 487 S.E.2d 194, 196 (Va. 1997). Counsel then called Williams' mother and two lay witnesses, in addition to the doctor, as mitigating witnesses at the penalty phase. <u>Williams</u>, 529 U.S. at 369. Terry Williams' counsel also elicited from a state forensic witness evidence that Williams suffered from "borderline level of intellectual functioning," which "is between mild mental retardation and low normal intellectual level." <u>Williams v. Warden</u>, 487 S.E.2d at 196.

Thus, Terry Williams' trial counsel's *preparation* for sentencing was considerably *more extensive* than that of Petitioner's counsel's. And Terry Williams' trial counsel's *presentation* at sentencing was also far *more extensive* than that of Petitioner's counsel.

75

If counsel's representation was prejudicially deficient in <u>Williams</u>, as the Supreme Court held, prejudice is established here by the compelling evidence outlined above that Petitioner's counsel failed to investigate, develop, and present (evidence that is considerably more weighty than the evidence that Terry Williams' counsel failed to present). As was the Appellant in <u>Williams</u>, Petitioner is entitled to relief.

### D.    There Are No Bars to This Court's Review of These Claims.

Rule 61(i)(1)-(2) and (4) are clearly inapplicable to these claims. These claims are timely, having been filed within one year of final judgment of sentence; as these claims arise out of the 2005 sentencing proceeding, this is clearly the first post-conviction proceeding available to Petitioner; and, there have been no previous adjudications of these claims. Nor does Rule 61(i)(3) apply to these claims for a number of reasons. First, as described above, <u>see</u> Section II.A.1.c., this subsection is not applicable to ineffective assistance of counsel claims. Second, the failure to raise these claims was the result of counsel's constitutional ineffectiveness, thus demonstrating cause, <u>Flamer v. State</u>, 585 A.2d at 758, and, as described above, prejudice is demonstrated because, as described above, had these claims been raised in the prior proceedings there is a reasonable likelihood that the outcome would have been different. Finally, as described above, Petitioner meets the exception to application of Rule 61(i)(3) outlined in Subsection 61(i)(5). Petitioner has presented colorable claims involving multiple constitutional violations that would arguably require vacating Petitioner's capital sentence. <u>Webster</u>, 604 A.2d at 1367. Accordingly, there are no bars to this Court's merits consideration and, for the reasons described above, relief is required.

CLAIM V.    AS A RESULT OF INEFFECTIVE ASSISTANCE OF COUNSEL AND PROSECUTORIAL MISCONDUCT, PRIOR TESTIMONY AND OTHER RANK HEARSAY STATEMENTS WERE ADMITTED IN PETITIONER'S SENTENCING HEARING IN VIOLATION OF HIS SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.

Throughout the 2005 sentencing hearing, the prosecution admitted prior testimony and other rank hearsay statements against Petitioner without providing a sufficient basis warranting admission and, in some cases, misrepresenting the status of certain absent witnesses. Counsel's failure to hold the prosecution to its burden of demonstrating admissibility constitutes prejudicially deficient performance in violation of the Sixth, Eighth and Fourteenth Amendments and Article I, §§ 4, 7, 9, 11, 12 and 13 of the Delaware Constitution. Moreover, the prosecution's presentation of materially misleading and false proffers regarding the status of the witnesses not presented at Petitioner's penalty hearing constitutes prosecutorial misconduct in violation of Petitioner's Sixth, Eighth and Fourteenth Amendment rights and Article I, §§ 4, 7, 9, 11, 12 and 13.

A.    **The Admission of Prior Testimony.**

1.    **The Facts.**

Prior to trial, the prosecution noted its intent to present prior testimony in lieu of live witnesses. See NT 11/3/05 at 14. During the subsequent discussion, Petitioner's counsel as well as co-defendant's counsel raised the issue of the violation of Due Process and Confrontation. Id. at 16 (Mr. Capone indicating a confrontation issue); id. at 17-18 (Mr. Gabay raising Due Process concerns). This Court referred the prosecution to Delaware Rule 804(a) (4)-(5) and noted its expectation that the prosecution would make "some showing" regarding "why [a particular] witness is unavailable." Id. at 19- 20.

On the first day of trial, the subject of the admission of prior testimony came up again and,

77

once again, counsel raised concerns regarding the presentation of transcripts as opposed to live witness testimony. NT 11/16/05 at 12-13. This Court agreed that the prosecution should make a record on unavailability pursuant to Rule 804. Id. at 13.

Ultimately, the prosecution admitted prior testimony of at least eight witnesses that it claimed were "unavailable" for various reasons. See NT 11/17/05 at 8-29 (Michael Chandler); id. at 30-58 (Phillip Hudson); id. at 59-69 (Lance Thompson); NT 11/18/05 at 171-76 (Anna Hawley); id. at 208-229 (Richard Wohlgemuth); id. at 196-207 (Mario Cruz); 11/21/05 at 29-51 (William Kinard); id. at 51-55 (Rand Townley). The prosecution's proffers were conclusory and provided no details on what efforts, if any, the state made in order to locate these witnesses. Counsel conducted no inquiry, nor did counsel otherwise challenge these proffers. Had counsel conducted even a minimal inquiry, they would have learned that many of the prosecution's representations fell far short of any hint of due diligence and, in some cases, were patently false.

a.    **Phillip Hudson**[34]

Prior to admitting the testimony of Phillip Hudson, the prosecution stated:

Phillip Hudson is unavailable. His last known location was in Arizona and that was in 2002. We have been unable to locate him.

NT 11/17/05 at 5-6. There was no further inquiry by counsel or the court and counsel did not object.

The truth, however, was that Phillip Hudson was in the custody of the Department of Corrections

in Arizona at the time of Petitioner's trial, following conviction for felony theft offenses and his

presence would have been attainable through standard legal process.    See Exhibit 25

(Affidavit/Declaration of Phillip Hudson); Exhibit 26 (State of Arizona v. Phillip Hudson, CR-2003-

006251-001 DT (Superior Court of Arizona, Maricopa County)).    Moreover, this was not Mr.

Hudson's first arrest. The prosecution acknowledged knowing of Hudson's whereabouts in Arizona

in 2002. At that time, Mr. Hudson was under a sentence of probation for drug related offenses. If,

as the prosecution stated, the state was aware of Mr. Hudson's whereabouts a year after Hudson was

---

[34]Mr. Hudson, a resident of the Cavalier Apartments, testified during the guilt-phase in 1996 on direct examination that, after hearing shots, he saw a stocky black male wearing a blue sweatshirt, jeans, white high-top sneakers and what appeared to be a baseball hat running across the parking lot. NT 11/17/05 at 33-37. He further testified that he saw the male get into the passenger side of a car in the lot. When asked, he stated that the car was either a ford escort, tempo or mercury topaz. Id. at 37. On cross-examination, however, when confronted with the police report, he acknowledged that he had told the police shortly after the shooting that the man he saw was six feet tall and 225-250 pounds. NT 11/17/05 at 56. Notes from the police officer who interviewed him, indicated that Mr. Hudson described the vehicle as a ford escort hatchback, (see Exhibit 27 (Det. Donovan notes)). While counsel did present Officer Lee's notes from the police interview of Mr. Hudson through Detective Weldon, indicating some discrepancies, in the course of doing that, he also brought out that Mr. Hudson purportedly identified Petitioner. However, as described elsewhere in this Petition, (see Claim III), Mr. Hudson made a statement to the first trial defense investigator indicating that he was "pretty sure" that Petitioner was the person and, as a result of counsel's ineffectiveness, that information was never presented to the jury. Of course, had Mr. Hudson been present, the qualification of his identification, as well as all the other discrepancies involved in his prior testimony could have been presented to the jury.

placed on probation, it is reasonably likely that the state also was aware that Hudson had been involved in the Arizona criminal justice system. Thus, the state was also aware that a criminal records check was in order prior to Petitioner's 2005 sentencing in order to determine Hudson's whereabouts. In short, the state's actions fell far below any concept of due diligence.

### b.    William Kinard[35]

The prosecution told the Court and counsel that his "information" was that Mr. Kinard, an employee of the Bureau of Alcohol, Tobacco and Firearms, was deceased. NT 11/18/05 at 77. Counsel affirmatively stated that there was no objection to reading Mr. Kinard's testimony into evidence. 11/21/05 at 28. Once again, the prosecution's representation to the Court was false. As described in Mr. Kinard's Declaration, see Exhibit 28, rumors of his death have been greatly exaggerated. Indeed, while he retired from the Treasury Department in 2000, a matter of a call to that agency would have obtained the accurate information and his whereabouts.

### c.    Mario Cruz[36]

The prosecution told the court that Mario Cruz was "living at the Wilmington address [of Mr. Stevenson] or staying at the Wilmington address the night before the murder," and that "[h]is

---

[35]Mr. Kinard, a forensic chemist, conducted an evaluation of samples sent to him by the police for purposes of determining the presence of gunshot residue. NT 11/21/05 at 31-32. As described elsewhere in this Petition, the conclusions he reached regarding the results, particularly the absence of any evidence of gunshot residue from samples taken from Petitioner, were highly questionable and scientifically invalid. See Claim I.

[36]Mr. Cruz was the boyfriend of David Stevenson's mother at the time of the murder. During his 1996 testimony, the prosecution called him presumably to have him testify that he saw Stevenson and Petitioner leave the Stevenson home around 6:45 a.m, and then impeached him, with his purported statement to the police when Mr. Cruz testified that while he saw Mr. Stevenson on the porch of the home at 7:00 am he was not sure he saw Mr. Stevenson leave. NT 11/18/05 at 204-07,

whereabouts are unknown." NT 11/18/05 at 75. Even the transcripts from the 1996 trial, read into evidence at Petitioner's 2005 sentencing, demonstrate that the state's representation was, at a minimum, misleading. Mr. Cruz testified that he lived in Sicklersville, New Jersey, and gave his street address. Id. at 196. Thus, the state knew or should have known that it was likely that Mr. Cruz lived in New Jersey at the time of Petitioner's sentencing in 2005. Mr. Cruz further testified that he worked for Sun Oil Company in Philadelphia. Thus, the state knew, or should have known, that his whereabouts could be ascertained through his employment. Indeed, as Mr. Cruz states in his declaration, at the time of the 2005 trial, he was still living in New Jersey and still working for Sun Oil Company. See Exhibit 29. Indeed, the record demonstrates that the state failed to conduct even minimal efforts, such as a driver's license check, in order to obtain Mr. Cruz' appearance. Had they done so, they would have learned of Mr. Cruz's location and, as Mr. Cruz states he would have cooperated, Petitioner would not have been required to rely on the prior testimony.

### d.    Richard Wohlgemuth[37]

Prior to admitting the prior testimony of Mr. Wohlgemuth, the prosecution proffered to the Court and counsel that Mr. Wohlgemuth "was somewhere in upstate New York," that he had retired from the Army and that the only information the prosecution had was that he "was some sort of

---

[37]Mr. Wohlgemuth was an employee of the Army Reserves on active duty and assigned to personnel administration at the time of the 1996 trial. On direct examination, he testified about Petitioner's Reserve records, including records of Petitioner's clothing (and the size of the clothing), and his rank. Mr. Wohlgemuth also identified the camouflage jacket found in the trunk of the Mercury Topaz on the date of the murder as one issued by the Army. Finally, Mr. Wohlgemuth was also asked about weapons training, to which he responded that reservists receive weapons training in basic training and also have to qualify once a year. NT 11/18/05 at 209-18. On cross-examination, however, Mr. Wohlgemuth testified about Petitioner's medical assignment, the commonality of the E-4 ranks, and also testified that there were no records in Petitioner's files indicating that he had been issued the jacket seized by the police. NT 11/18/05 at 221-29.

private investigator." NT 11/18/05 at 75-76. Once again, counsel asked no questions and lodged no objections. As described in his declaration, Mr. Wohlgemuth did retire from the Army Reserves and was living in Ithaca, New York, but was also available to testify in the 2005 trial and would have appeared had someone asked him. The record demonstrates that the state's inquiry was cursory, at best. There is no indication the state sought Mr. Wohlgemuth's address through the Army, although, as his retirement most assuredly included receipt of benefits, there is no question that the Army was aware of his location. Moreover, having knowledge that he was in upstate New York, it was incumbent on the state to make reasonable records checks to locate him. Mr. Wohlgemuth was certainly not hiding his whereabouts. He held a driver's license in 2005, owned vehicles that were registered, and owned a home. Thus, even if the state would not have been able to obtain his location from the Army, and they would have, there were other, simple, means of discovering this information and obtaining his appearance at Petitioner's trial.

e.    **Lance S. Thompson**[38]

The state proffered that it had a cellphone and residential phone number for Mr. Thompson.

---

[38]Lance Thompson was the resident of Cavalier Apartments who was also a friend of Police Officer Meadows. During the 1996 trial, Mr. Thompson testified that he took down the license number of the vehicle he saw leave the parking lot after the shots were fired. When the police arrived, he recognized Officer Meadows and gave him the piece of paper. NT 11/17/05 at 67-68. When asked what happened to the piece of paper, he testified: "I – I – I just – it got discarded."Id. at 68. When the prosecution suggested in the next question that it may have been lost "when he moved," the witness responded, "Probably." Id. The prosecution also called Officer Meadows in the 2005 trial. Officer Meadows testified to what Mr. Thompson purportedly told him and also testified that Mr. Thompson handed him the piece of paper with the license number on it. NT 11/17/05 at 69. Inexplicably, counsel did not cross-examine Officer Meadows about the paper or Mr. Thompson's statement to the police indicating that he may have transposed the numbers. As described elsewhere, counsel was ineffective in failing to elicit these discrepancies during Officer Meadow's testimony. See Claim II. That, however, does not cure the prosecution's erroneous admission of the prior testimony.

While the cellphone did not accept messages, the state did leave messages on the residential number and did not hear from Mr. Thompson. NT 11/17/05 at 6. There was no indication that the state ever went to Mr. Thompson's home or business in order to serve a subpoena, although if they had a residential phone number, they certainly also had an address. Id.   Moreover, as stated in his declaration, Mr. Thompson indicates that while he did receive a call that there would be another trial and his appearance would be needed, he never heard back from the police or prosecution regarding when his appearance would be needed. He also indicates that, had he been asked, he would have cooperated as he did in 1996. Nor was Mr. Thompson hiding his whereabouts. He was licensed to drive, possessed licensed vehicles and owned property. Yet the prosecution failed to pursue these resources. The prosecution was aware that Mr. Thompson was employed at MBNA,[39] yet the state failed to seek his location from his employer.   Thus, even if the prosecution did not have his address, and all indicators are that they did, his location was obtainable with little or no effort.

### f.   Michael Chandler[40]

The state proffered that, during their last contact, (time, place or circumstances unidentified), Mr. Chandler was "hostile and uncooperative." NT 11/17/05 at 5. The prosecution then claimed that the state was "unable to locate him." NT 11/17/05. Once again, the state made no proffer regarding what efforts it made to "locate him," nor did the state indicate that it even made simple checks, (for example, a driver's license or other records check), although Mr. Chandler owned a home in Wilmington at the time of Petitioner's trial and retained a driver's license. Nor did the

---

[39]NT 11/17/05 at 59.

[40]Mr. Chandler testified in 1996 that he saw two black males in a car in the parking lot. He was unable to give any further description except that the passenger was wearing a blue wool hat, not a baseball cap. NT 10/31/96 at 43-50. See also NT 11/17/05 at 9-30.

prosecution make inquiries with Mr. Chandler's employer, Amtrak. Indeed, Mr. Chandler remained employed with Amtrak in 2005. Thus, the state could have obtained Mr. Chandler's whereabouts through his employer.

Nor is the state's view that Mr. Chandler was "hostile and uncooperative" availing. He complied with the service of process requiring his attendance in 1996 and the prosecution presented absolutely no evidence that he would not have similarly complied in 2005.

### g.    Rand Townley[41]

The prosecution proffered to the Court and counsel that former Detective Townley had retired from the force and was living in Washington state. NT 11/18/06 at 78. There was no indication that Mr. Townley was unable or unwilling to appear, nor was there any indication that the state was unable to locate him. Id. Indeed, the clear implication from the state's proffer was that the prosecution was fully aware of his location and simply did not want to bother to attempt to obtain his presence.

### 2.    The Admission of the Prior Testimony Absent Demonstration of Unavailability Violated Petitioner's State and Federal Rights to Due Process, Confrontation and Cross-examination.

It is clearly established Sixth and Fourteenth Amendment law that, "the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." Pointer v. Texas, 380 U.S. 400, 405 (1965). See also Barber v. Page, 390 U.S. 719, 721 (1968) (citing Pointer, 380 U.S. at 405). As the United States Supreme

---

[41]Former Detective Townley's prior transcript was read into evidence regarding his interview with Mario Cruz. 11/21/05 at 53-55. On direct Mr. Townley testified that Mr. Cruz told him that Petitioner and Mr. Stevenson pulled out ahead of him the morning of the murders at 6:45 a.m. Id. No cross-examination was presented by the defense. Id.

Court noted over two centuries ago, the heart of this constitutional guarantee provides the accused with

> [A]n opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

Mattox v. United States, 156 U.S. 237, 242-43 (1895). See also Crawford v. Washington, 541 U.S. 36, 43 (2004) (noting that, while the confrontation right has roots stemming as far back as ancient Rome, the Framers' "immediate source" for incorporating the confrontation requirement in the Sixth Amendment was the English common law "tradition [] of live testimony in court subject to adversarial testing." (citing 3 W. Blackstone, Commentaries on the Laws of England 373-374 (1768)).

For these reasons, Sixth and Fourteenth Amendment law precludes the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Crawford, 541 U.S. at 53-54. Thus, the prosecution must prove *both* unavailability and opportunity to cross-examine in order to admit prior testimony of a purported unavailable witness. See Crawford, 541 U.S. at 59 ("Our cases have thus remained faithful to the Framers' understanding:  Testimonial statements of witnesses absent from trial have been admitted *only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine*"). See also Barber v. Page, 390 U.S. 719, 725 (1968) (noting that prosecution's failure to demonstrate constitutional unavailability rendered preliminary hearing testimony inadmissible, regardless of the existence or absence of an opportunity to cross-examine at the preliminary hearing); Motes v. United States, 178 U.S. 458, 471-72 (1900)

(finding prosecution's inadequate efforts to secure witness' presence rendered the admission of preliminary hearing testimony of an absent witness in violation of the Sixth Amendment, even though the witness was cross-examined at that preliminary hearing); McCandless v. Vaughn, 172 F.3d 255, 265, n.6 (3d Cir. 1999) (same).

Similarly, constitutional 'unavailability' is not demonstrated merely by a witness' failure to appear. Instead, clearly established Sixth and Fourteenth Amendment law requires that the prosecution demonstrate that it "made a good-faith effort to obtain [the witness'] presence at trial." Barber v. Page, 390 U.S. at 724-25. See also California v. Green, 399 U.S. 149, 189, n. 22 (1970) (Harlan, J. concurring) (noting that "[a] good-faith effort is, of course, necessary, and added expense or inconvenience is no excuse"). "Good faith" turns on the reasonableness of the prosecution's efforts and "[t]he reasonableness of the prosecution's efforts must be evaluated with a sensitivity to the surrounding circumstances and the defendant's interest in confronting the absent witness." McCandless, 172 F.3d at 265-266.[42] Accordingly, it is the *quality* of the effort made by the state that

---

[42]To the extent the state contends that these Sixth and Fourteenth Amendment rights are not applicable to Petitioner's penalty hearing, it is wrong for a number of reasons. First, in light of the "qualitative difference of death from all other punishments," (California v. Ramos, 463 U.S. 992, 998-99 (1983)), heightened – not diminished – procedural safeguards are required in capital cases. Lockett v. Ohio, 438 U.S. 586, 604 (1978); Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (plurality opinion) (noting that, because of the unparalleled severity and irreversibility of the death penalty, the Eighth Amendment imposes a heightened standard "for reliability in the determination that death is the appropriate punishment in a specific case"); see also Godfrey v. Georgia, 446 U.S. 420, 427-28 (1980); Mills v. Maryland, 486 U.S. 367, 383-84 (1988). Cross-examination has been placed on the same footing as notice and the opportunity to be heard, and the right to counsel, fundamental requirements of Due Process. Chambers v. Mississippi, 410 U.S. 284, 294-95 (1973) (quoting In re Oliver, 333 U.S. 257, 273 (1948); Pointer v. Texas, 380 U.S. 400, 405 (1965) (same).

Second, because capital eligibility requires additional factual/legal findings (the presence of a statutory aggravator beyond a reasonable doubt), Petitioner was entitled to the full panoply of federal due process protections, including the right to confront and cross-examine witnesses.

counts, not the quantity. See McCandless, 172 F.3d at 265 (noting that "good faith" involves determining the reasonableness of the prosecution's conduct). Failing to pursue or ignoring leads that would reasonably glean accurate and reliable results of the witness' location; failing to seek a witness' attendance where the state is aware of that witness' location; and, relying on unverified, and patently false, information hardly constitutes "good faith" efforts."

As described above, that is precisely what occurred (or more accurately did not occur) in this case. A fair reading of the record indicates that the state was well-aware of the whereabouts of former detective Rand Townley and Michael Chandler but failed to present these witnesses for unreasonable reasons: Mr. Townley's relocation to Washington state and Mr. Chandler's uncooperativeness. Even if the state was not aware of the location of these witnesses, and the evidence indicates that it was, it held sufficient information to find those witnesses but failed to do so because one was out of state and the other was uncooperative. Thus, the state failed to

---

See Specht v. Patterson, 386 U.S. 605, 610-11 (1967) (finding that the Colorado Sex Offender's Act which involved a separate proceeding wherein the factfinder was required to make additional factual determinations for purposes of imposing enhanced sentencing implicated Due Process protections including the right to confront and cross-examine witnesses). See also Engle v. State, 438 So.2d 803, 813-14 (Fla. 1983) (concluding that the right to confrontation and cross-examination applied to the guilt/innocence phase, the penalty hearing before the jury, and the sentencing before the judge); Rodgers v. State, 948 So.2d 655, 663-65 (Fla. 2006) (applying Crawford v. Washington, 541 U.S. 36, 43 (2004), to admission of hearsay statements during the penalty hearing). In addition, because the penalty hearing in a Delaware capital sentencing hearing has sufficient "hallmarks of the trial on guilt or innocence," (Bullington v. Missouri, 451 U.S. 430, 439 (1981)), the protections under the Sixth and Fourteenth Amendments are implicated.

Finally, even if the Sixth and Fourteenth Amendment confrontation and cross-examination protections are not applicable to a penalty hearing, and they are, the admission of the prior testimony without first making the required showing of unavailability and due diligence violated Petitioner's separate and distinct rights under Article I, Section 7. See Van Arsdall v. State, 524 A.2d 3, 5, n.7 (Del. 1987) (recognizing more expansive rights under this section of the Delaware Constitution.

demonstrate unavailability and the admission of their transcripts violated Petitioner's state and federal Due Process and Confrontation rights.

While the prosecution claimed not to know the whereabouts of Phillip Hudson, in light of the above-described facts, that claim is, at best, questionable. Moreover, even if the prosecution was not aware of Mr. Hudson's whereabouts in Arizona, it was only due to a woeful lack of diligence. As described above, Mr. Hudson was in prison and, therefore, hardly in a position to conceal his whereabouts from any inquiry by the state. The state's conduct was equally unreasonable as to Mario Cruz, Richard Wohlgemuth, and Lance Thompson. As described above, the state possessed more than sufficient information to locate these individuals but, as the record demonstrates, did little or nothing and, instead, merely contended that these witnesses were unavailable. Thus, the admission of the prior testimony violated Petitioner's Sixth and Fourteenth Amendment rights and his rights under Article I, Section 7 of the Delaware Constitution.

Finally, the prosecution's "proffer" that Mr. Kinard was deceased was false. As described above, not only was he alive at the time of Petitioner's trial, but he is still alive. While he had retired by the time of Petitioner's trial, that does not render him unavailable for purposes of overcoming the constitutional requirements. A simple search of readily available sources would have resulted in locating Mr. Kinard and, as he states in his declaration, he would have been more than willing to appear, if asked. Thus, the admission of the prior testimony violated Petitioner's Sixth and Fourteenth Amendment rights and his rights under Article I, Section 7 of the Delaware Constitution.

3.   **The Prosecution's Presentation of Materially Misleading and/or False Information In Proffers Regarding Witness Unavailability Violated Petitioner's Sixth, Eighth and Fourteenth Amendment Rights and His Rights Under Article I, §§ 4, 7, 9, 11, 12 and 13 of the Delaware Constitution.**

As the Supreme Court noted long-ago, the state's "interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done. . . . It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." Berger v. United States, 295 U.S. 78, 88 (1935). Likewise, fundamental state and federal Due Process does not tolerate state action intentionally designed to mislead opposing counsel or the factfinder regarding material issues. E.g. Mooney v. Holohan, 294 U.S. 103, 112 (1935)("deliberate deception of court and jury . . . is inconsistent with rudimentary demands of justice"); see also Napue v. Illinois, 360 U.S. 264, 269 (1959) ("implicit in the concept of ordered liberty" is the due process requirement that the state not premise its case on the veracity of a particular witness who testifies falsely, while thwarting the defense's effort to challenge the witness' credibility); United States v. Agurs, 427 U.S. 97, 104 (1976) (the prosecution's knowing use of false testimony involves "a corruption of the truth-seeking function of the trial process"). These principles are even more compelling in light of the heightened safeguards required in capital cases. See, e.g., Beck v. Alabama, 447 U.S. 625 (1980); Caldwell v. Mississippi, 472 U.S. 320 (1985).

Here, the state provided materially misleading and, in at least one case, patently false, information regarding the status of certain purported (but not actually) unavailable witnesses as support for its contention that it was duly diligent in obtaining those witnesses' presence at Petitioner's trial. As described above, the prosecution told the Court and counsel that Mr. Kinard

89

was deceased. Also as described above, he was not deceased in 2005, and is, indeed, even now, alive and well. The Court relied on the false proffer in deeming the prior testimony admissible and counsel relied on the same false proffer in failing to object to the admissibility.

Also as described above and elsewhere in this Petition, the admission of Mr. Kinard's prior testimony, restricted by prior counsel's inadequate and ineffective cross-examination resulted in presentation of misleading and scientifically inaccurate forensic expert evidence in violation of Petitioner's Sixth, Eighth and Fourteenth Amendment rights as well as his rights under Article I, §§ 4, 7, 9, 11, 12 and 13 of the Delaware Constitution. See Claim II. Accordingly, prejudice is demonstrated and Petitioner is entitled to relief.

Likewise, the prosecution's proffers as to other witnesses were, at a minimum, misleading. First, the prosecution claimed that it left numerous messages for Lance Thompson but he failed to respond to those messages. In addition to failing to satisfy any standard for diligence or reasonableness as simply leaving a message is insufficient for either the constitutional standard, (see supra), or the standard under Rule 804, (see infra), the state's claim that someone left multiple messages was false. As Mr. Thompson states in his declaration, while he did receive one phone call informing him that his appearance would be required again, he never received any another contact indicating when and where he was needed. Once again, both the Court in deeming the prior testimony admissible, and counsel, in reaching their (ineffective) decision not to object to admission, relied on the prosecution's materially misleading proffer. Similarly, as described above, as a result of the presentation of the prior testimony, restricted by prior counsel's inadequate and ineffective cross-examination, Petitioner was denied the opportunity to confront Mr. Thompson regarding the once existent, but soon thereafter missing, paper with the purported license number, in the presence

90

of the jury so that the jury could assess Mr. Thompson's demeanor and reliability, nor was Petitioner

able to further confront Mr. Thompson about that piece of paper along with other inconsistencies

within his testimony. Accordingly, Petitioner has demonstrated that the prosecution's misconduct

violated his Petitioner's Sixth, Eighth and Fourteenth Amendment rights as well as his rights under

Article I, §§ 4, 7, 9, 11, 12 and 13 of the Delaware Constitution, and prejudiced him. Relief is

required.

> **4.    Even if the Admission of the Prior Testimony Did not Violate the State and Federal Constitutions, and It Did, The State Failed to Meet Its Burden of Admission Under Delaware Rule 804.**

As this Court noted during preliminary discussions, (see NT 11/3/05 at 19-20), in order to

admit prior testimony, the state was required under Rule 804 to provide a basis for unavailability.

See D.R.E. Rule 804(a); id. 804(b). Under Rule 804(a)(5), a witness is unavailable, if the proponent

of admitting prior testimony demonstrates that the witness:

> Is absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance by process or other reasonable means.

Rule 804(a)(5) tracks the federal rules of evidence. See DRE Rule 804, Comment. "[I]t is the

proponent of the statement offered under Rule 804 who bears the burden of proving the

unavailability of the declarant." Kirk v. Raymark Indus., Inc., 61 F.3d 147, 165 (3d Cir.1995).

While the determination of whether or not the proponent exercised "reasonable means," is a case-by-

case determination, there is no question that the proponent must make some effort, to obtain the

witness' presence,[43] including attempt to serve the witness with the appropriate process,[44] or, if service of process is unavailable, attempt to obtain the witness' voluntary presence.[45]

The state failed on all counts. As described above, where the prosecution acknowledged knowing where the witnesses were located, it failed to demonstrate that it attempted to secure that witness' presence through service of process. For example, all indicators were that the state knew the location of Mr. Townley, but the state failed to either utilize service methods available, see U.L.A. 1, nor did it attempt to obtain Mr. Townley's voluntary presence. Kirk. Similarly, the prosecution obviously knew of Mr. Thompson's whereabouts, but failed to present any evidence that it served, or even attempted to serve, him with a subpoena. See e.g., United States v. Williams, 1991 WL 55468 at *3 (9th Cir. 1991) (finding insufficient evidence of reasonableness where "[t]he excerpts of record include a subpoena for Smith's attendance at the second trial, but there is nothing to show that the subpoena was ever served on Smith").

Nor, as described above, did the state make reasonable efforts to locate these, or the other witnesses. For example, as described above, while the state was aware of the employment of all the

---

[43]See e.g. Kirk v. Raymark Indus., Inc., 61 F.3d 147, 165 (3d Cir.1995) (noting that mere absence of a witness is insufficient), citing 2 John William Strong et al., MCCORMICK ON EVIDENCE § 253, at 134 (4th ed. 1992).

[44]Perricone v. Kansas City Southern Railway Company, 630 F.2d 317, 321 (5th Cir. 1980) ("It must be noted that although, for weeks, Fontenot's name had, at the instance of plaintiff's counsel, been on the witness list, no witness subpoena had been issued for him"); MCCORMICK ON EVIDENCE § 253 (6th ed. 2006) (noting that "[t]he relevant process is subpoena, or in appropriate situations, writ of habeas corpus ad testificandum").

[45]See Kirk, 61 F.3d at 165 (noting counsel's failure to obtain expert witness' voluntary appearance where that expert was located out of state and beyond subpoena process). Of course, here, the state has no basis for claiming that service of process is unavailable because, as this is a criminal case, witnesses are subject to the Uniform Act to Secure the Attendance of Witnesses. 11 ULA 1.

witnesses,[46] it made no efforts to locate and/or obtain service through this information. E.g. United States v. Quinn, 901 F.2d 522, 528 (6th Cir. 1990) (finding failure to check with employers in search of witness' location one of other factors that were "singularly unenthusiastic").  Similarly, the prosecution failed to articulate any other attempts to locate witnesses through common means, such as driver's licenses or property ownership. Cf. United States v. Berry, 1986 WL 18321 at *1 (4th Cir. 1986) (noting that the government "ran credit and motor vehicle checks" in attempting to locate witness). Indeed, as described above, a simple criminal records check for Mr. Hudson would have resulted in obtaining his location in the custody of the Arizona Department of Corrections and that his appearance was attainable through service of process.  E.g. Quinn, 901 F.2d at 528 ("No testimony was offered that any county or city records were checked").

Finally, as described above, the admission of the prior testimony resulted in prejudice. The prosecution relied on each of these witnesses as various bases for finding the existence of statutory and non-statutory aggravating factors. Thus, the failure to require the prosecution to meet its burden of reasonableness resulted in prejudice and relief is required.

**5.    Counsel's Failure to Raise and/or Litigate These Issues During the Prior Proceedings Constitutes Prejudicially Deficient Performance in Violation of the Sixth, Eighth and Fourteenth Amendments and Article I, §§ 4, 7, 9, 11, 12 and 13 of the Delaware Constitution.**

The Sixth Amendment right to effective assistance of counsel is violated when counsel's

---

[46]As described above, the state knew that Mario Cruz worked for Sun Oil and, as he states in his declaration, he remained so employed in 2005. Likewise, the state was aware that Mr. Chandler was employed with Amtrak, and he remained so employed in 2005. While both Mr. Wohlgemuth and Mr. Kinard had retired from their federal agency positions, the prosecution failed to check with those agencies to determine these witnesses' whereabouts, although, as each receive retirement payments from their employers, there is no question that those agencies had current information. At a minimum, the state would have learned that Mr. Kinard was not dead.

performance is deficient, i.e., falls below "an objective standard of reasonableness;" and the defendant is prejudiced, i.e., when confidence is undermined in the outcome of the proceeding. Wiggins v. Smith, 539 U.S. 510, 521 (2003); Williams v. Taylor 529 U.S. 362 (2000); Strickland v. Washington, 466 U.S. 668, 694 (1984). In evaluating counsel's performance, the Court should consider professional norms such as the American Bar Association's Standards for Criminal Justice ("ABA STANDARDS") and Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989) ("ABA GUIDELINES"), which articulate "reasonable" professional "standards for capital defense work" and are the "norms" and "standards to which [the Supreme Court] long ha[s] referred as 'guides to determining what is reasonable'" under the Sixth Amendment. Wiggins, 539 U.S. at 522-25 (citing Strickland; Williams). See also Outten v. Kearney, 464 F.3d 401, 417 (3d Cir. 2006). One critical aspect of counsel's performance in a capital case involves the duty to challenge aggravation evidence presented by the prosecution.[47]

Thus, where counsel fails to rebut or otherwise challenge evidence in support of aggravation, deficient performance is demonstrated. Here, as described above, counsel's failures resulted in the admission of prior testimony on which the prosecution relied in support of statutory and non-statutory aggravation in violation of Petitioner's state and federal constitutional rights and in violation of the Rules of Evidence. Thus, counsel's performance was deficient.

Also as described above, the testimony presented was neither cumulative nor diminmus.

---

[47]See e.g., ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES 11.4.1.C (1989) (charging defense counsel with the duty to make "efforts to discover all reasonably available . . . evidence to rebut any aggravating evidence that may be introduced by the prosecutor") (quoted in Rompilla v. Beard, 545 U.S. 374, 387 n.7 (2005)); Wiggins v. Smith, 539 U.S. 510, 524 (2003); Outten v. Kearney, 464 F.3d 401, 417 (3d Cir. 2006).

94

Indeed, the prior testimony involved: a witness purportedly connecting the murderer to a car owned by co-defendant Stevenson, (Lance Thompson); a witness purporting to connect forensic evidence to Petitioner, (William Kinard); a witness purporting to identify Petitioner and co-defendant Stevenson's car to the murder, (Phillip Hudson); a witness purporting to indicate that Petitioner accompanied co-defendant Stevenson from the Stevenson home shortly before the murder, (Mario Cruz); a witness purporting to corroborate Mr. Thompson's testimony regarding the license number of the vehicle involved in the murder, (Rand Townley); and, a witness purporting to place co-defendant Stevenson's car in the parking lot of the murder scene shortly before the murder, (Michael Chandler). Also as described above, absent live presentation, critical and material impeachment and confrontation was unavailable and, as a result, the jury's consideration of the reliability and credibility of these witnesses was constitutionally skewed.

The "undermines confidence" prejudice standard for ineffectiveness claims is satisfied if there is a "reasonable probability" of a different result. Wiggins, 539 U.S. at 534. This prejudice standard "is not a stringent one. It is less demanding than the preponderance standard." Hull v. Kyler, 190 F.3d 88, 110 (3d Cir. 1999) (quotation marks and citations omitted); accord Williams, 529 U.S. at 406. Where, as here, there is a reasonable likelihood that the jury's determination of statutory aggravation; the jury's weight afforded aggravation; and the ultimate sentencing determination would have been different had counsel properly challenged the admission of the prior testimony, prejudice is demonstrated and relief is required.

Similarly, counsel's failure to raise these claims on appeal constitutes prejudicially deficient performance. The same standards apply to claims of appellate ineffectiveness. See, e.g. Roe v. Flores-Ortega, 528 U.S. 420 (2000) (applying Strickland standard to consideration of appellate

95

counsel's ineffectiveness); <u>United States v. Mannino</u>, 212 F.3d 835 (3d Cir. 2000); <u>Orazio v.</u>

<u>Dugger</u>, 876 F.2d 1508, 1513 (11th Cir. 1989); <u>Matire v. Wainwright</u>, 811 F.2d 1430, 1435 (11th

Cir. 1987).    Where, as in this case, there is a "reasonable probability that the neglected claim[s]

would have succeeded on appeal, [] counsel's failure to raise the claim f[alls] outside the range of

reasonably competent assistance." <u>Claudio v. Scully</u>, 982 F.2d 798, 799 (2d Cir. 1992); <u>Jackson v.</u>

<u>Leonardo</u>, 162 F3d. 81 (2d Cir. 1998) (appellate counsel's failure to raise "sure winner" constituted

ineffective assistance: "In the instant case, we believe that appellate counsel's failure to raise a well-

established, straightforward, and obvious . . . [claim] . . . constitutes ineffective performance."); <u>Starr</u>

<u>v. Lockhart</u>, 23 F.3d 1280 (8th Cir. 1993 ) (finding trial and appellate counsel ineffective for failing

to object to and raise an erroneous jury instruction); <u>Freeman v. Lane</u>, 962 F.2d 1252 (7th Cir. 1992)

(appellate counsel ineffective for failing to raise a meritorious claim that was "presented squarely"

at trial regarding a violation of the defendant's Fifth Amendment rights); <u>Murphy v. Puckett</u>, 893

F.2d 94 (5th Cir. 1990) (counsel's failure to raise valid defense at trial and on direct appeal

constituted ineffective assistance).    Accordingly, for this reason as well, relief is required.

   **6.    There Are No Bars to This Court's Consideration of the Merits of This Claim.**

   Rule 61(i)(1)-(2) and (4) are clearly inapplicable to these claims.    These claims are timely,

having been filed within one year of final judgment of sentence; as these claims arise out of the 2005

sentencing proceeding, this is clearly the first post-conviction proceeding available to Petitioner; and,

there have been no previous adjudications of these claims.    Nor does Rule 61(i)(3) apply to these

claims for a number of reasons.    First, as described above, <u>see</u> Section II.A.1.c., this subsection is

not applicable to ineffective assistance of counsel claims.    Second, the failure to raise these claims

was the result of counsel's constitutional ineffectiveness, thus demonstrating cause, <u>Flamer v. State</u>,

585 A.2d at 758, and, as described above, prejudice is demonstrated because, as described above, had these claims been raised in the prior proceedings there is a reasonable likelihood that the outcome would have been different. Finally, as described above, Petitioner meets the exception to application of Rule 61(i)(3) outlined in Subsection 61(i)(5). Petitioner has presented colorable claims involving multiple constitutional violations that would arguably require vacating Petitioner's capital sentence. Webster, 604 A.2d at 1367. Accordingly, there are no bars to this Court's merits consideration and, for the reasons described above, relief is required.

**Claim VI.    Petitioner is entitled to relief because his 2005 Trial was improperly joined with that of his co-defendant in violation of Petitioner's Sixth, Eighth, and Fourteenth Amendment Rights and Article I, Sections 4, 7, 11 and 13 of the Delaware Constitution.**

Petitioner's constitutional right to due process, an individualized determination of sentence, and his right to be free from cruel and unusual punishment, as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, were violated by trial counsel's failure to request, and the trial court's failure to order, severance of the capital resentencing proceedings in 2005. The failure to sever Petitioner's resentencing proceeding from that of his co-defendant violated the Eighth and Fourteenth Amendments to the United States Constitution. Petitioner is entitled to a new sentencing.

Petitioner was significantly prejudiced when the prosecution conducted a joint sentencing with Petitioner's co-defendant David Stevenson. Petitioner's co-defendant presented evidence and argument in support of mitigating circumstances that were not presented by Petitioner's counsel. As a result, the evidence and argument presented on behalf of the co-defendant invited the jury to compare the relative culpability of each defendant, rather than evaluating each defendant

individually.

## A.    The Legal Standard.

Misjoinder itself is a constitutional violation when "it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." Laird v. Horn, 159 F. Supp. 2d 58, 96 (E.D. Pa. 2001) (quoting United States v. Lane, 474 U.S. 438, 446 n.8 (1986)).   It is well-settled that the Eighth and Fourteenth Amendments to the United States Constitution establish a "constitutional mandate of individualized determinations in capital-sentencing proceedings" based upon the character, background, and record of the individual and the circumstances of the offense.  Sumner v. Shuman, 483 U.S. 66, 75 (1987); Lockett v. Ohio, 438 U.S. 586, 605 (1978) ("individualized consideration [is] a constitutional requirement in imposing the death sentence"); see also Stringer v. Jackson, 503 U.S. 222, 231 (1992) (noting the "requirement of individualized sentencing"); Zant v. Stephens, 462 U.S. 862, 879 (1983) (describing requirement of "*individualized* determination on the basis of the character of the individual and the circumstances of the crimes"); Enmund v. Florida, 458 U.S. 782, 798 (1982) ("we insist on 'individualized consideration as a constitutional requirement in imposing the death sentence'" (quoting Lockett)).  "[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." Woodson v. North Carolina, 428 U.S. 280, 304 (1976).  As such "the use of a vague aggravating factor in the weighing process creates the possibility not only of randomness but also of bias in favor of the death penalty" and may require a death sentence to be invalidated.  Stringer, 503 U.S. at 236.

The balance of mitigating factors and the type of evidence presented by each defendant pitted

one against the other and impugned Petitioner's right to an individualized determination of sentence.

**B.    The Evidence and Argument that was Presented.**

Co-defendant Stevenson presented the mental health testimony of Edward Dougherty, Ph.D., which demonstrated that Mr. Stevenson had no pattern of behavior problems in school or other acting out behaviors, and thus did not have antisocial personality disorder; there were no indications of psychopathology or any other type of serious mental illness; because he can think clearly and has above average intelligence, he would be able to adjust well in prison; that he had no problem with anger management, and that Mr. Stevenson would not be a danger to himself or others while incarcerated. NT 11/22/05 at 43-53.

Dr. Dougherty also spoke in detail about Mr. Stevenson's educational history, and how he was involved in the basketball program at Central High School. Id. at 42. Dr. Dougherty also testified that Mr. Stevenson rarely used drugs, except for smoking marijuana on occasion at social events, and that while he was a social drinker, did not drink heavily. Id. at 42-3. Dr. Dougherty discussed Mr. Stevenson's long term goals of wanting to complete college, and explained that he was interested in anthropology and chemistry. Id. at 45. Dr. Dougherty also informed the jury that Mr. Stevenson had worked his way through school, and was working two jobs while he attended college, and used scholarship and grant money to pay for the remainder of his educational expenses. Id. at 45-6.

Counsel for Mr. Stevenson reiterated the findings of Dr. Dougherty during his closing argument to the jury. NT 12/5/05 at 49-50 (discussing how Stevenson "was a college boy . . . no criminal background;" discussing how hard it was to get into Central and how dedicated and focused Stevenson was to do so; described Stevenson as a leader, and how he was a "hard-working guy,"

99

holding down two jobs while attending college full time); id. at 51-52 ("He was not a sociopath. He was not a psychopath. He wasn't a danger to anyone . . . David won't be violent in prison. David can be rehabilitated, he can help other guys in prison. He's a smart guy.").

Conversely, despite the existence of readily available mental health testimony demonstrating that Petitioner is neither a psychopath or a sociopath and that Petitioner would do well in a structured environment, (see Claim III), Petitioner's counsel put on no mental health evidence whatsoever before the sentencing jury. As a result, the co-defendant's evidence of no-major mental illness and positive adjustment to a structured environment became aggravation for Petitioner because the jury could not help but have been adversely influenced by the absence of such evidence from Petitioner's case for life.

The jury is not permitted to deem a defendant more death-worthy because he does not present evidence of any particular mitigating factor. When one co-defendant at a joint sentencing proceeding highlights his own mental stability in order to demonstrate to the jury that he will adapt well in prison and will not be a danger to himself or others if his life is spared, a constitutionally unacceptable risk arises that the jury will impose death on the other co-defendant for not putting on similar mitigating evidence, even if factors exist "that may call for a less severe penalty." Lockett, 438 U.S. at 605. Yet, given the presentation of substantial mitigating mental health evidence by David Stevenson, the failure to present such mental health mitigation by Petitioner had that exact effect. Moreover, the joint resentencing invited the jury to engage in an assessment of the comparative involvement of the co-defendants in the offense. However, any such unfavorable comparison with a less involved co-defendant denies a defendant his constitutional right to an individualized sentencing determination.

100

When a different mix of mitigating circumstances is applied to each of the defendants, it inevitably invites jury comparison of the defendants in the weighing process. Indeed, it is hard to imagine that the jury did not do precisely that: Co-defendant Stevenson presented a mental health expert to demonstrate that Mr. Stevenson had been an intelligent, hard working college student who wanted to make a better life for himself, was not antisocial, psychotic, or otherwise mentally ill, and would do well while incarcerated; the jury could not help but wonder why Petitioner failed to present similar evidence on his own behalf. As a result of counsel's ineffective failure to investigate, develop, and present such mental health mitigating evidence to the jury, the mitigating evidence presented on behalf of Mr. Stevenson was turned into non-statutory aggravation against Petitioner.

The failure of counsel to request a severance of the resentencing proceedings deprived Petitioner of his constitutional right to an individualized sentencing determination. This failure constituted ineffective assistance of counsel and prejudiced Petitioner, in violation of the Sixth, Eighth, and Fourteenth Amendments, and Article I, Sections 4, 7, 9, 11 and 13.

**C.    Counsel's Failure to Raise and/or Litigate These Issues During the Prior Proceedings Constitutes Prejudicially Deficient Performance in Violation of the Sixth, Eighth and Fourteenth Amendments and Article I, §§ 4, 7, 9, 11, 12 and 13 of the Delaware Constitution.**

The Sixth Amendment right to effective assistance of counsel is violated when counsel's performance is deficient, i.e., falls below "an objective standard of reasonableness;" and the defendant is prejudiced, i.e., when confidence is undermined in the outcome of the proceeding. Wiggins v. Smith, 539 U.S. 510, 521 (2003); Williams v. Taylor 529 U.S. 362 (2000); Strickland v. Washington, 466 U.S. 668, 694 (1984). In evaluating counsel's performance, the Court should consider professional norms such as the American Bar Association's Standards for Criminal Justice

("ABA STANDARDS") and Guidelines for the Appointment and Performance of Counsel in Death

Penalty Cases ("ABA GUIDELINES"), which articulate "reasonable" professional "standards for

capital defense work" and are the "norms" and "standards to which [the Supreme Court] long ha[s]

referred as 'guides to determining what is reasonable'" under the Sixth Amendment. Wiggins, 539

U.S. at 522-25 (citing Strickland; Williams). See also Outten v. Kearney, 464 F.3d 401, 417 (3d Cir.

2006). Under the Guidelines in effect at the time of Petitioner's capital resentencing trial, counsel

had a duty to consider all legal claims potentially available, thoroughly investigate the basis for each

claim before concluding whether or not it should be asserted, and thoroughly evaluate each potential

claim. *ABA Guidelines for Appointment and Performance of Counsel in Death Penalty Cases (Rev.

Ed. 2003)*, ABA Guideline 10.8; see also Commentary, at 91 ("Because of the possibility that the

client will be sentenced to death, counsel must be significantly more vigilant about litigating all

potential issues at all levels in a capital case than in any other case.").

Considering the fact that on appeal of Petitioner's Amended Rule 61 Motion, counsel

actually raised the issue of 1996 trial counsel's ineffectiveness in failing to renew their motion for

severance during the 1996 trial after the trial court had previously denied their request during a

pretrial proceeding, see Appellant's Opening Brief, December 5, 2003, at 30-33, counsel was well

aware of the constitutional ramifications of a joinder of the 2005 resentencing proceedings.[48] Their

failure to investigate, prepare, and properly litigate this issue constitutes prejudicially deficient

---

[48]On February 1, 2005, counsel for Petitioner wrote a letter to the Court advising that they would not be filing a motion for severance, but reserved the right to raise the issue during the resentencing trial "should adverse petitions come to the fore between defendants." See Superior Court Criminal Docket, State of Delaware v. Michael R. Manley, p. 29. Despite the presentation by Petitioner's co-defendant that was clearly adverse to Petitioner, counsel for Petitioner failed to raise the severance issue, or present his own mental health expert.

performance, and violated Petitioner's rights under the Sixth, Eighth, and Fourteenth Amendments and Article I, Sections 4, 7, 11 and 13 of the Delaware Constitution.

**D.    There Are No Bars to This Court's Consideration of the Merits of This Claim.**

Rule 61(i)(1)-(2) and (4) are clearly inapplicable to these claims. These claims are timely, having been filed within one year of final judgment of sentence; as these claims arise out of the 2005 sentencing proceeding, this is clearly the first post-conviction proceeding available to Petitioner; and, there have been no previous adjudications of these claims. Nor does Rule 61(i)(3) apply to these claims for a number of reasons. First, as described above, see Section II.A.1.c., this subsection is not applicable to ineffective assistance of counsel claims. Second, the failure to raise these claims was the result of counsel's constitutional ineffectiveness, thus demonstrating cause, Flamer v. State, 585 A.2d at 758, and, as described above, prejudice is demonstrated because, as described above, as a result of the constitutional violations, structural error has occurred and the reliability of Petitioner's death sentence was compromised. Finally, as described above, Petitioner meets the exception to application of Rule 61(i)(3) outlined in Subsection 61(i)(5). Petitioner has presented colorable claims involving multiple constitutional violations that would arguably require vacating Petitioner's capital sentence. Webster, 604 A.2d at 1367. Accordingly, there are no bars to this Court's merits consideration and, for the reasons described above, relief is required.

**CLAIM VII.    PETITIONER IS ENTITLED TO A NEW SENTENCING HEARING BECAUSE THE COURT'S INSTRUCTIONS SKEWED AND LIMITED THE JURY'S CONSIDERATION OF MITIGATION IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS AND ARTICLE I, §§ 4, 7, 9, 11, 12 AND 13 OF THE DELAWARE CONSTITUTION.**

Because of the unparalleled severity and irreversibility of the death penalty, the Eighth Amendment imposes a heightened standard "for reliability in the determination that death is the

103

appropriate punishment in a specific case," <u>Woodson v. North Carolina</u>, 428 U.S. 280, 305 (1976) (plurality opinion); <u>see also</u> <u>Mills v. Maryland</u>, 486 U.S. 367, 383-84 (1988); <u>Caldwell v. Mississippi</u>, 472 U.S. 320, 328-29 (1985); <u>California v. Ramos</u>, 463 U.S. 992, 998-99 (1983); <u>Beck v. Alabama</u>, 447 U.S. 625, 637-38 (1980); <u>Godfrey v. Georgia</u>, 446 U.S. 420, 427-28 (1980). This principle is so central to the Eighth Amendment that within a decade of <u>Furman</u> every Justice of the Court had written or joined at least one opinion endorsing the proposition that because death is different, death sentences must be accompanied by commensurate procedural safeguards. <u>See</u> <u>Spaziano v. Florida</u>, 468 U.S. 447, 468 (1984) (Stevens, J., concurring in part & dissenting in part).

This heightened need for reliability requires the provision of "accurate sentencing information [as] an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die," <u>Gregg v. Georgia</u>, 428 U.S. 153, 190 (1976). As part of the requirement that capital juries must receive accurate sentencing information, the jury must be properly instructed as to all material elements in its sentencing-stage deliberations, including the meaning of legal terms such as "mitigation." <u>See</u> <u>Walton v. Arizona</u>, 497 U.S. 639, 647 (1990) ("When a jury is the final sentencer, it is essential that the jurors be properly instructed regarding all facets of the sentencing process."); <u>see also</u> <u>Simmons</u>, 512 U.S. at 172 (Souter, J., concurring) ("That same need for heightened reliability also mandates recognition of a capital defendant's right to require instructions on the meaning of the legal terms used to describe the sentences (or sentencing recommendations) a jury is required to consider, in making the reasoned moral choice between sentencing alternatives.").

"It is beyond dispute that in a capital case the sentencer [may] not be precluded from considering, as a mitigating factor, *any aspect of a defendant's character or record* and any of the

104

circumstances of the offense that the defendant proffers as a basis for a sentence less than death. The corollary that the sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence is equally well established." Mills v. Maryland, 486 U.S. 367, 374-75 (1988) (citing and following Eddings v. Oklahoma, 455 U.S. 104 (1982); Lockett v. Ohio, 438 U.S. 586 (1978); Skipper v. South Carolina, 476 U.S. 1 (1986)).

Thus, jury instructions that create a "barrier to the sentencer's consideration of all mitigating evidence," Mills, 486 U.S. at 375, results in an arbitrary and capricious sentencing determination in violation of the Eighth and Fourteenth Amendments. McKoy v. North Carolina, 494 U.S. 433, 442 (1990), in violation of the Eighth and Fourteenth Amendments. ("Mills requires that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death").

As described below, the instructions in this case restricted the jury's consideration of mitigation evidence to the circumstances of the offense and Petitioner's conduct during the offense in violation of the Eighth and Fourteenth Amendments and counsel's failure to object and request proper instructions constituted prejudicially deficient performance in violation of Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

A.   **The Court's Instructions Unconstitutionally Restricted The Jury's Consideration of Mitigation.**

In its closing instructions to the jury, the Court "defined" mitigation as follows:

A mitigating circumstance is any factor which bears upon the particular circumstances or details of the offense or the character and propensities of the particular defendant which tends to make that particular defendant's conduct less serious and, thus, makes the imposition of the penalty of life imprisonment without benefit of probation, parole or any other sentence reduction more appropriate.

105

NT 12/5/05 at 139-40.

By instructing the jury that mitigation must make the *defendant's conduct less serious*, the Court's instruction limited the evidence the jury may consider mitigating to evidence directly related to the crime itself. But the Eighth Amendment does not limit mitigating factors to factors relating to the crime. On the contrary, nothing in Eighth Amendment jurisprudence "countenance[s] the suggestion that . . . evidence is not relevant mitigating evidence . . . unless the defendant also establishes a nexus to the crime." Tennard v. Dretke, 124 S. Ct. 2570, 2572 (2004). Any nexus requirement "has no basis in our precedents and, indeed, is inconsistent with the standard we have adopted for relevance in the capital sentencing context." Id.

Far from any nexus requirement, the Court has consistently required that a jury at the penalty phase be allowed to consider a wide range of information concerning the background of the defendant. . . . Evidence extraneous to the crime itself is deemed relevant and indeed, constitutionally so . . . ." South Carolina v. Gathers, 490 U.S. 805, 817-18 (1989) (O'Connor, J.); see also Skipper v. South Carolina, 476 U.S. 1, 4-5 (1986) ("there is no question" that defendant's favorable post-arrest prison conduct/adjustment is relevant mitigating evidence even though it does not "relate specifically to petitioner's culpability for the crime he committed").

Indeed, hornbook Eighth Amendment law establishes the unconstitutionality of the limiting instruction given by the court. One of the most fundamental requirements of capital sentencing is that the jury must undertake an exhaustive review of both the criminal offense *and the offender*. The jury must be able to consider *and give effect to* the character, background, and record of the defendant himself. E.g., Tennard v. Dretke, 124 S. Ct. 2562, 2570 (2004); Penry v. Lynaugh, 492 U.S. 302, 322, 324 (1989). At its essence, the Eighth Amendment constitutionally mandates

106

*individualized* capital sentencing. <u>Woodson v. North Carolina</u>, 428 U.S. 280, 304 (1976); <u>Sumner v. Shuman</u>, 483 U.S. 66, 75-76 (1987). This requires a reasoned moral response to the personal culpability and *the unique personal circumstances of the defendant*.

While the circumstances of the offense, and the defendant's conduct related to the offense are unquestionably relevant in determining whether a defendant should live or be sentenced to die, that does not alter the fundamental fact that *evidence need not have any causal connection to the crime for it to be mitigating*, and that exclusion of such evidence violates the Eighth Amendment. <u>See</u>, <u>e.g.</u>, <u>Skipper v. South Carolina</u>, 476 U.S. 1, 4-5 (1986) (defendant's post-arrest conduct in prison "would not relate specifically to petitioner's culpability for the crime he committed" but "there is no question but that such inferences would be 'mitigating.'"); <u>Penry v. Lynaugh</u>, 492 U.S. 302 (1989) (brain damage and mental retardation);[49] <u>Eddings v. Oklahoma</u>, 455 U.S. 104 (1982) (evidence of defendant's turbulent family history); <u>see also</u> <u>Tennard</u>, 124 S. Ct. at 2569-70 (rejecting requirement that defendant's low IQ must have contributed to criminal act to be mitigating).

Here, the trial court's instruction that mitigating circumstances involve any factor "which tends to make that particular defendant's conduct less serious," placed the focus of mitigating evidence squarely on the circumstances of the offense at the expense of those aspects of the defendant's character, background, or record that make him a "uniquely individual human being."

---

[49]In <u>Atkins v. Virginia</u>, 536 U.S. 304, 316 (2002), the Court indicated that "mentally retarded offenders [are viewed] as categorically less culpable than the average criminal." This categorically lesser culpability of persons with mental retardation, extrinsic of the circumstances of the offense, now prevents the State from applying the death penalty against a mentally retarded defendant. But for the years preceding <u>Atkins</u>, "it [was] precisely because the punishment should be directly related to the personal culpability of the defendant that the jury [was required] to consider and give effect to mitigating evidence" of mental retardation, irrespective of the circumstances of the offense. <u>Penry v. Lynaugh</u>, 492 U.S. 302, 327-28 (1989).

Woodson, 428 U.S. at 304.

Moreover, the instruction that mitigation must make the defendant's conduct less serious involves not only *what* constitutes mitigating evidence but also *how* the jury evaluates it. Where, as here, the mitigating evidence included background evidence that could have had some relation to the offense, as well background evidence that did not, the jury's "ability to consider and give effect to [Petitioner's] mitigating evidence . . . was 'shackled and confined,'" Penry v. Johnson, 532 U.S. 782, 798 (2001) (Penry II), by the instruction that the mitigating value of evidence was dependent upon whether it made the defendant's conduct during the murder less serious. Under that instruction, "[a] reasonable juror could well have believed that there was no vehicle for expressing the view that [Petitioner] did not deserve to be sentenced to death based upon his mitigating evidence." Id. at 804 (quoting Penry I, 492 U.S. at 326).

In addition, the "defendant's conduct less serious" instruction erected an unconstitutional *qualitative* requirement, at the expense of the constitutionally required "reasoned moral response" to the defendant. Penry II, 532 U.S. at 788 (quoting Penry I, 492 U.S. at 319). The evidence must go to the "seriousness" of the defendant's conduct [in committing the murder] and cross a threshold of somehow reducing its seriousness. However, the Eighth Amendment has never required a substantive threshold screening test before mitigating evidence can be considered constitutionally relevant. The requirement is – and has always been – that "a State cannot bar the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death." Tennard, 542 U.S. at 285 (quoting McKoy v. North Carolina, 494 U.S. 433, 441 (1990)).

Finally, even the nature of the qualitative test required by the jury instruction was unconstitutional. The Court's instruction injected passion, prejudice, and arbitrary considerations

into the jury's deliberations that inflated its consideration of aggravating evidence while impairing its ability to find and give effect to mitigating circumstances. The explicit focus on how serious the defendant's conduct was during the murder blatantly distorts the consideration of mitigating evidence by injecting an emotional response to the "seriousness" of murder itself, at the expense of the "reasoned moral response" to the defendant required by the constitution. Penry, 492 U.S. at 319.

Finally, as described more fully below, (see Section B), prejudice is demonstrated because, as there is a reasonable likelihood that the jury interpreted the Court's instructions in an unconstitutional manner that resulted in the jury's failure to consider and give full effect to relevant mitigation evidence, the jury's determination, and the Court's reliance on that determination demonstrates prejudice.

**B.     The Court's Failure to Articulate What Mitigation the Defense Pursued Unconstitutionally Precluded the Jury From Giving Effect to Relevant Mitigation Evidence.**

Prior to the penalty hearing, counsel served notice on the state and the Court of those mitigating factors the defense expected to prove in support of a life sentence. See Exhibit 21 (Letter of Joseph M. Bernstein, Esquire, filed 2/2/05). Those mitigators were:

1)     Lack of any prior criminal record

2)     Age of defendant at the time of commission of offense

3)     Potential for rehabilitation

4)     Positive contributions to community/society prior to incarceration

5)     Impact of death sentence on defendant's family

6)     Evidence that Manley did not actually kill Kristopher Heath

7)     Mercy

109

8)    Any other evidence developed during the penalty hearing which tends
to mitigate the possible punishment.

Id.  While the Court listed the statutory aggravating factors for the jury during its instructions, the

sole discussion of mitigation was limited to the general statement, described above, that "mitigation"

constitutes "any factor which bears upon the particular circumstances or details of the offense or the

character and propensities of the particular defendant which tends to make that particular defendant's

conduct less serious." NT 12/5/05 at 139-40.  In addition to unconstitutionally restricting the jury's

mitigation consideration to only those factors implicating the circumstances of the offense, the

Court's failure to outline those mitigators the defense sought, while listing those aggravators the

prosecution sought, the Court further limited the jury's mitigation consideration in violation of the

Sixth, Eighth and Fourteenth Amendment rights.

As noted above, one fundamental requirement in capital sentencing is that the sentencer must

undertake an exhaustive review of, and give effect to, factors relevant to the character, background,

and record of the defendant himself.  E.g., Tennard v. Dretke, 124 S. Ct. 2562, 2570 (2004); Penry

v. Lynaugh, 492 U.S. 302, 322, 324 (1989).  As part of this fundamental requirement, the jury must

be properly instructed as to all material elements in its sentencing-stage deliberations, including the

meaning of legal terms such as "mitigation."  See Walton v. Arizona, 497 U.S. 639, 647 (1990).

Thus, in order to ensure that the jury would give full effect to all relevant mitigation, at a minimum,

the Court was required to inform the jury what mitigating factors the defense submitted, and also

instruct the jury that if it found that mitigation to exist, it must consider those factors in determining

the weighing process.  Absent any instruction specifying the mitigating factors pursued by the

defense, there is a reasonable likelihood that the jury or a juror disregarded one or more relevant

110

factors presented by the defense simply because the jury, or a juror, did not know that particular factor was mitigating. Thus, for this reason as well, the Court's instructions unconstitutionally restricted the jury's consideration of mitigation and violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

### C.    Counsel Was Ineffective.

Counsel's failure to properly raise and litigate these claims constitutes prejudicially deficient performance in violation of the Sixth, Eighth, and Fourteenth Amendments and Article I, §§ 4, 7, 9, 11, 12 and 13 of the Delaware Constitution. While Strickland "did not 'establish mechanical rules'" for determining ineffectiveness, "counsel must not neglect to suggest instructions that represent the law that would be favorable to his or her client." Everett v. Beard, 290 F.3d 500, 514 (3d Cir. 2002). See also Carpenter v. Vaughn, 296 F. 3d 138, 158-50 (3d Cir. 2002) (holding that counsel provided ineffective assistance in a Pennsylvania capital case by failing to ensure that jury receive an accurate instruction on parole ineligibility). Where, as here, counsel failed to ensure that the jury was properly instructed on its consideration of mitigation evidence and the Court's instructions unconstitutionally restricted and precluded the jury from giving full effect to proper, relevant mitigation evidence, deficient performance is demonstrated. Similarly, Petitioner has demonstrated prejudice. There is more than a reasonable likelihood that the jury failed to consider relevant mitigation in its weighing process, or that the jury applied less weight to relevant mitigation because it was not connected to Petitioner's conduct at the time of the murder. Likewise, this Court considered, and relied on, the jury's sentencing recommendation, finding by a vote of eleven to one that the mitigation was outweighed by the aggravation in finding death the appropriate sentence. See State v. Manley, Criminal Action Numbers IN95111323R3; IN95111324R3; IN95111325R3;

IN95120684R3; IN95120685R3; IN95120686R3 (Del. Super. 2/3/06) (Sentencing Decision, Herlihy, J) at 40. Where, as here, the jury's determination was skewed by the constitutionally flawed instructions, the Court's reliance on that determination also violated Petitioner's state and federal constitutional rights. Thus, prejudice is demonstrated and relief is required.

Similarly, counsel's failure to raise these claims on appeal constitutes prejudicially deficient performance. The same standards apply to claims of appellate ineffectiveness. See, e.g. Roe v. Flores-Ortega, 528 U.S. 420 (2000) (applying Strickland standard to consideration of appellate counsel's ineffectiveness); United States v. Mannino, 212 F.3d 835 (3d Cir. 2000); Orazio v. Dugger, 876 F.2d 1508, 1513 (11th Cir. 1989); Matire v. Wainwright, 811 F.2d 1430, 1435 (11th Cir. 1987). Where, as in this case, there is a "reasonable probability that the neglected claim[s] would have succeeded on appeal, [] counsel's failure to raise the claim f[alls] outside the range of reasonably competent assistance." Claudio v. Scully, 982 F.2d 798, 799 (2d Cir. 1992); Jackson v. Leonardo, 162 F3d. 81 (2d Cir. 1998) (appellate counsel's failure to raise "sure winner" constituted ineffective assistance: "In the instant case, we believe that appellate counsel's failure to raise a well-established, straightforward, and obvious . . . [claim] . . . constitutes ineffective performance."); Starr v. Lockhart, 23 F.3d 1280 (8th Cir. 1993 ) (finding trial and appellate counsel ineffective for failing to object to and raise an erroneous jury instruction); Freeman v. Lane, 962 F.2d 1252 (7th Cir. 1992) (appellate counsel ineffective for failing to raise a meritorious claim that was "presented squarely" at trial regarding a violation of the defendant's Fifth Amendment rights); Murphy v. Puckett, 893 F.2d 94 (5th Cir. 1990) (counsel's failure to raise valid defense at trial and on direct appeal constituted ineffective assistance). Accordingly, for this reason as well, relief is required.

112

**D.    There Are No Bars to This Court's Consideration of the Merits of This Claim.**

Rule 61(i)(1)-(2) and (4) are clearly inapplicable to these claims.  These claims are timely, having been filed within one year of final judgment of sentence; as these claims arise out of the 2005 sentencing proceeding, this is clearly the first post-conviction proceeding available to Petitioner; and, there have been no previous adjudications of these claims.  Nor does Rule 61(i)(3) apply to these claims for a number of reasons.  First, as described above, see Section II.A.1.c., this subsection is not applicable to ineffective assistance of counsel claims.  Second, the failure to raise these claims was the result of counsel's constitutional ineffectiveness, thus demonstrating cause, Flamer v. State, 585 A.2d at 758, and, as described above, prejudice is demonstrated because, as described above, had these claims been raised in the prior proceedings there is a reasonable likelihood that the outcome would have been different.  Finally, as described above, Petitioner meets the exception to application of Rule 61(i) (1) - (3) outlined in Subsection 61(i)(5).  Petitioner has presented colorable claims involving multiple constitutional violations that would arguably require vacating Petitioner's capital sentence.  Webster, 604 A.2d at 1367.  Accordingly, there are no bars to this Court's merits consideration and, for the reasons described above, relief is required.

**CLAIM VIII.  PETITIONER IS ENTITLED TO RELIEF FROM HIS CONVICTION AND SENTENCE BECAUSE THE COURT AND COUNSEL FAILED TO CONDUCT VOIR DIRE TO DETERMINE THE RACIAL ATTITUDES OF THE JURORS IN THIS CAPITAL CASE IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 4, 7, 11, AND 13 OF THE DELAWARE CONSTITUTION.**

The Sixth and Fourteenth Amendments and Article I, Section 7 of the Delaware Constitution guarantee a defendant on trial for his life the right to an impartial jury.  Ross v. Oklahoma, 487 U.S. 81, 85 (1988); Irvin v. Dowd, 366 U.S. 717, 722 (1961).  Where a juror harbors prejudice against

the defendant or in favor of the prosecution the impartiality of a sitting jury is compromised. E.g. Turner v. Murray, 476 U.S. 28 (1986) (court must allow voir dire on racial prejudice); Ristaino v. Ross, 424 U.S. 589, 596 (1976) (same). In order to sufficiently protect the right to an impartial jury, there must be "an adequate voir dire to identify unqualified jurors" -- "[w]ithout an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." Morgan v. Illinois, 504 U.S. 719, 729-30 (1992) (citing Dennis v. United States, 339 U.S. 162, 171-172 (1950); Morford v. United States, 339 U.S. 258, 259 (1950); and quoting Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981)); see also King v. Lynaugh, 828 F.2d 257, 259 (5th Cir. 1987) ("Limits on voir dire that create an unreasonable risk of bias or prejudice infecting the trial process violate due process.").

Moreover, the requirement of adequate voir dire takes on even greater importance in a capital case because of the "the qualitative difference of death from all other punishments," California v. Ramos, 463 U.S. 992, 998-99 (1983), and because capital juries are required to make a "highly subjective 'unique individualized judgment regarding the punishment that a particular person deserves,'" Caldwell v. Mississippi, 472 U.S. 320, 340-41 n.7 (1985). Because of the heightened protections due capital defendants and the "unique opportunity [which] exists for bias to operate undetected," at capital sentencing, King v. Lynaugh, 828 F.2d 257, 259 (5th Cir. 1987), adequate voir dire of potential jurors becomes even more important.

A.    **The Failure to Voir Dire Potential Jurors During the 2005 Sentencing Hearing Regarding Racial Bias Violated the Sixth, Eighth and Fourteenth Amendments and Article I, Sections 4, 7, 11, and 13 of the Delaware Constitution.**

"It remains an unfortunate fact in our society that violent crimes perpetrated against members of other racial or ethnic groups often raise [a reasonable possibility that racial prejudice would

influence the jury]." Rosales-Lopez v. United States, 451 U.S. 182, 192 (1981). In a capital case,

this concern is even more compelling:

> Because of the range of discretion entrusted to a jury in a capital sentencing hearing,
> there is a unique opportunity for racial prejudice to operate but remain undetected.
> On the facts of this case, a juror who believes that blacks are violence prone or
> morally inferior might well be influenced by that belief in deciding whether
> petitioner's crime involved the aggravating factors specified under Virginia law.
> Such a juror might also be less favorably inclined toward petitioner's evidence of
> mental disturbance as a mitigating circumstance. More subtle, less consciously held
> racial attitudes could also influence a juror's decision in this case. Fear of blacks,
> which could easily be stirred up by the violent facts of petitioner's crime, might
> incline a juror to favor the death penalty.

Turner v. Murray, 476 U.S. at 35.

Petitioner, (and his co-defendant), is an African American. The victim was white. The

witnesses purporting to identify Petitioner and/or the co-defendant were white. The prosecution

referenced "gangs" in Philadelphia in its evidentiary presentation and argument and characterized

the murder as a "senseless, cowardly . . ." crime. NT 11/16/05 at 37, 45-6, 103-05. Thus, there is

no question that race was a prominent and compelling aspect of Petitioner's trial. There is also no

question that there existed a strong likelihood that one or more jurors might be influenced by even

the most subtle racial attitude to sentence an accused to death on less than the requisite standard of

proof. See e.g. United States v. Robinson, 485 F.2d 1157, 1160 (3d Cir. 1973) (reversible error to

decline defense request for voir dire into racial bias, because "[a]ssuming that a given juror believed

all black witnesses to be less credible than white witnesses, that prejudice operated in the juror's

evaluation of [defendant's] testimony . . . [defendant] was entitled to have his testimony evaluated

free from the taint of such prejudice."). Nevertheless, counsel did not request, and the Court did not

ask, any questions even touching the surface of this issue, let alone sufficiently probe the venire's

potential biases in order to ensure a fair and impartial jury.[50] The failure to do so denied Petitioner

his Sixth, Eighth and Fourteenth Amendment rights and his rights under Article I, Sections 4, 7, 11,

and 13 of the Delaware Constitution.

**B.    The Failure to Voir Dire Potential Jurors During the 1996 Trial Regarding Racial Bias.**

While the Turner ruling may involve a capital proceeding, id. at 33, Delaware law adheres

to the higher standard announced in Rosales-Lopez v. United States, 451 U.S. 182, 192 (1981),

requiring the trial court to honor the defense request to question prospective jurors on possible racial

prejudice at the trial stage of any criminal proceeding where a person is accused of a violent crime

against another of a different race. Feddiman v. State, 558 A.2d 278, 283 (Del. 1989), citing

Rosales-Lopez, 451 U.S. at 192; Article I, § 7 of Delaware Constitution;[51] see also Filmore v. State,

813 A.2d 1112, 1116 (Del. 2003). Failure to do so violates due process and the right to an impartial

---

[50]While one juror did indicate in response to a general bias question that race would impact his decision-making, (see NT 11/14/05 at 329-39; Matthew M. Cox, was a victim of racially motivated attack by African Americans, felt penalty they received was lenient, not sure could be impartial), that does not cure the constitutional harm in failing to conduct a full and adequate voir dire. The general 'bias' question did not begin to address the potential biases inherent in a case such as this one. Turner, 476 U.S. at 36-7 (because of broad discretion given juries in capital sentencing proceedings, where interracial crime involved, defendant entitled to have jurors queried on racial bias and also informed of race of the victim); Filmore v. State, 813 A.2d 1112, 1116 (holding that Delaware Constitution requires state trial courts to adhere to same higher standard of federal trial courts announced in Rosales-Lopez and Ristaino, requiring a voir dire question on race whenever the defendant and victim of a violent crime are members of different race).

[51]In Feddiman, the defendant argued that the trial court's refusal to ask the specific questions posed by his attorney constituted an abuse of discretion. The Delaware Supreme Court ultimately did not find an abuse of discretion by the trial court for failing to ask the specific questions framed by the defense because there the trial court did ask its own questions that adequately inquired into the possibility of racial prejudice, and which resulted in the excusal of a juror on this basis. Feddiman, 558 A.2d at 283. In Petitioner's case, neither counsel nor the court asked a single question of the jurors concerning possible racial bias.

jury. Feddiman, 558 A.2d at 283; Weddington v. State, 545 A.2d 607, 613, 615 (Del. 1988). Accordingly, where, as in this case, race was a prominent factor in the evidentiary presentation and argument, voir dire on potential racial bias was required.

Once again, Petitioner, an African American, was charged with the first degree murder of Kristopher Heath, a white male. The purported identifications of Petitioner and his codefendant, also an African American, were cross-racial identifications. Most of the witnesses called on behalf of Petitioner were persons of color, while many of the witnesses called on behalf of the prosecution were white. Despite the obvious potential for race to improperly enter into the jury's consideration, Petitioner's counsel failed to request, and the Court failed to ask, any questions regarding potential bias during the voir dire in violation of Petitioner's Sixth, Eighth and Fourteenth Amendment rights and his rights under Article I, Sections 4, 7, 11, and 13 of the Delaware Constitution.

### C.    Counsel was Ineffective.

The Sixth Amendment right to effective assistance of counsel is violated when counsel's performance is deficient, i.e., falls below "an objective standard of reasonableness;" and the defendant is prejudiced, i.e., when confidence is undermined in the outcome of the proceeding. Wiggins v. Smith, 539 U.S. 510, 521 (2003); Williams v. Taylor 529 U.S. 362 (2000); Strickland v. Washington, 466 U.S. 668, 694 (1984). In evaluating counsel's performance, the Court should consider professional norms such as the American Bar Association's Standards for Criminal Justice ("ABA STANDARDS") and Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989) ("ABA GUIDELINES"), which articulate "reasonable" professional "standards for capital defense work" and are the "norms" and "standards to which [the Supreme Court] long ha[s] referred as 'guides to determining what is reasonable'" under the Sixth Amendment. Wiggins,

117

539 U.S. at 522-25 (citing Strickland; Williams). See also Outten v. Kearney, 464 F.3d 401, 417 (3d

Cir. 2006).

The Guidelines in effect at the time of Petitioner's 1996 trial included charging counsel with

a duty to "be familiar with the precedents relating to questioning and challenging of potential jurors."

ABA GUIDELINE 11.7.2.B (1989), at 117. The Guidelines in effect at the time of Petitioner's 2005

trial similarly note that counsel in a capital case "is entitled to *voir dire* to discover those potential

jurors poisoned by racial bias, and should do so when appropriate." *ABA Guidelines for*

*Appointment and Performance of Counsel in Death Penalty Cases (Rev. Ed. 2003)*, ABA Guideline

10.10.2, Commentary, at 107. Thus, at the time of both trials, reasonable professional standards

included a duty to ensure adequate voir dire in order to determine potential juror bias and counsel's

failure to do so in either trial constitutes deficient performance. Filmore, 813 A.2d at 1117 ("A

broad antiseptic question seeking to explore bias for or against the defendant or the state . . .falls

woefully short" of the inquiry necessary to expose the potential racial bias inherent in every case of

interracial violence) (quoting Feddiman, 558 A.2d at 282). As counsel's errors created an

unacceptable risk that racial prejudice may have infected Petitioner's trial and capital sentencing

proceeding, in violation of the Sixth, Eighth Amendment and Fourteenth Amendments and Article

I, §§ 4, 7, 11 and 13, prejudice is demonstrated and relief is required.

Similarly, counsel's failure to raise these claims on appeal or during prior proceedings

constitutes prejudicially deficient performance. The same standards apply to claims of appellate

ineffectiveness. See, e.g. Roe v. Flores-Ortega, 528 U.S. 420 (2000) (applying Strickland standard

to consideration of appellate counsel's ineffectiveness); United States v. Mannino, 212 F.3d 835 (3d

Cir. 2000); Orazio v. Dugger, 876 F.2d 1508, 1513 (11th Cir. 1989); Matire v. Wainwright, 811 F.2d

1430, 1435 (11th Cir. 1987). Where, as in this case, there is a "reasonable probability that the neglected claim[s] would have succeeded on appeal, [] counsel's failure to raise the claim f[alls] outside the range of reasonably competent assistance." Claudio v. Scully, 982 F.2d 798, 799 (2d Cir. 1992); Jackson v. Leonardo, 162 F3d. 81 (2d Cir. 1998) (appellate counsel's failure to raise "sure winner" constituted ineffective assistance: "In the instant case, we believe that appellate counsel's failure to raise a well-established, straightforward, and obvious . . . [claim] . . . constitutes ineffective performance."); Starr v. Lockhart, 23 F.3d 1280 (8th Cir. 1993 ) (finding trial and appellate counsel ineffective for failing to object to and raise an erroneous jury instruction); Freeman v. Lane, 962 F.2d 1252 (7th Cir. 1992) (appellate counsel ineffective for failing to raise a meritorious claim that was "presented squarely" at trial regarding a violation of the defendant's Fifth Amendment rights); Murphy v. Puckett, 893 F.2d 94 (5th Cir. 1990) (counsel's failure to raise valid defense at trial and on direct appeal constituted ineffective assistance). Accordingly, for this reason as well, relief is required.

**D.    There Are No Bars to This Court's Consideration of the Merits of This Claim.**

Rule 61(i)(1)-(2) and (4) are clearly inapplicable to these claims. These claims are timely, having been filed within one year of final judgment of sentence; as these claims arise out of the 2005 sentencing proceeding, this is clearly the first post-conviction proceeding available to Petitioner; and, there have been no previous adjudications of these claims. Nor does Rule 61(i)(3) apply to these claims for a number of reasons. First, as described above, see Section II.A.1.c., this subsection is not applicable to ineffective assistance of counsel claims. Second, the failure to raise these claims was the result of counsel's constitutional ineffectiveness, thus demonstrating cause, Flamer v. State, 585 A.2d 736, 758 (Del. 1990), and, as described above, prejudice is demonstrated because, had

these claims been raised in the prior proceedings there is a reasonable likelihood that the outcome would have been different. Finally, as described above, Petitioner meets the exception to application of Rule 61(i)(1)-(3) outlined in Subsection 61(i)(5). Petitioner has presented colorable claims involving multiple constitutional violations that would arguably require vacating Petitioner's capital sentence. Webster v. State, 604 A.2d 1364, 1367 (Del. 1992). Accordingly, there are no bars to this Court's merits consideration and, for the reasons described above, relief is required.

**CLAIM IX.  PETITIONER IS ENTITLED TO RELIEF FROM HIS CONVICTION AND SENTENCE BECAUSE THE PROSECUTION'S USE OF PEREMPTORY STRIKES AGAINST WOMEN AND MINORITIES DURING JURY SELECTION DEPRIVED PETITIONER OF HIS RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTIONS 4, 7, 11 AND 13 OF THE DELAWARE CONSTITUTION.**

The Equal Protection Clause of the Fourteenth Amendment governs the exercise of peremptory challenges by a prosecutor in a criminal trial. Petitioner has a Sixth and Fourteenth Amendment right to be tried by a jury whose members are selected in a non-discriminatory manner and potential jurors have an equal protection right, enforceable by the defendant, to jury selection procedures that are non-discriminatory. Batson v. Kentucky, 476 U.S. 79, 85-86 (1986); J.E.B. v. Alabama ex rel T.B., 511 U.S. 127, 128 (1994); see also Powers v. Ohio, 499 U.S. 400 (1991). Thus, prosecutors cannot strike potential jurors on the basis of race or gender. Such discrimination violates the defendant's right to equal protection, it harms the excluded juror and it taints the integrity of the entire judicial process.

Petitioner is an African-American man. The prosecution exercised its peremptory strikes in a racially discriminatory manner to exclude African Americans and women from participation on this jury, in violation of the Sixth and Fourteenth Amendments and Article, I, §§ 4, 7, 11, and 13.

The State had no race/gender-neutral reason for striking these prospective jurors, and any purported race and/or gender neutral reasons proffered for the exclusion of black and female jurors in this case are pretextual. Accordingly, Petitioner is entitled to a new trial under Batson, J.E.B, and Swain v. Alabama, 380 U.S. 202 (1965).

### A.    The Legal Standard in Proving Discriminatory Intent in Jury Selection.

Batson sets forth a three-part test to determine whether a prosecutor has used their peremptory strikes in a discriminatory manner. Batson, 476 U.S. at 96-98. First, Petitioner must establish a prima facie case of discrimination by showing that the prosecutor has exercised peremptory challenges to remove prospective jurors from the venire on the basis of race or gender. Id. at 96; J.E.B., 511 U.S. at 144-5. Second, the prosecutor must supply a race-neutral reason for excluding each prospective juror. Batson, 476 U.S. at 98; J.E.B., 511 U.S. at 145. Third, the court must determine whether the reasons provided by the prosecution are, in fact, race/gender-neutral. If the court deems any explanations provided by the prosecution insufficient, *even as to one juror*, Petitioner has met his burden. Batson, 476 U.S. at 97-98.

Meeting this burden is not an onerous task. As the United States Supreme Court recently reiterated, a *prima facie* case of discrimination in jury selection is established if there is a "suspicion" of discrimination. Johnson v. California, 545 U.S. 162, 170 (2005) (rejecting preponderance of the evidence standard and holding that a *prima facie* case is established by "producing evidence sufficient to permit the trial judge to draw an inference that discrimination occurred . . . The Batson framework is designed to provide actual answers to suspicions and inferences that discrimination may have infected the jury selection process"). See also  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993) ("The

121

burden of establishing a prima facie case" is "minimal" and "not onerous.").[52] Petitioner need show only that there is "some reason to believe that discrimination might be at work." Johnson v. Love, 40 F.3d 658, 663 (3d Cir. 1994).

> 1.    *Petitioner has established a prima facie case of discriminatory intent in the peremptory challenges exercised by the prosecution.*

Petitioner has established a *prima facie* showing of discrimination as to both race and gender. In Petitioner's case, the prosecution exercised ten peremptory strikes.[53] The first six peremptories by the prosecution were against women, three of whom were persons of color. With the exception of one strike, every single prosecution peremptory was against a woman or a person of color, or both. Five strikes were exercised against African Americans, three women and two men, and four strikes were exercised against Caucasian women. As established at trial, the pattern of strikes by the prosecutor in this case clearly demonstrates a prima facie case of discrimination as required by the first step of the Batson analysis.

After the prosecution's fourth peremptory strike - all of which had been against women at that point, the last two being against women of color - counsel for co-defendant Stevenson objected on the basis of Batson that a discriminatory pattern was emerging on the part of the prosecution in its use of peremptory strikes. NT 11/14/05 at 67-8. The prosecutor then provided purported "race neutral" reasons for these strikes, as required under step two of the Batson analysis. These "race neutral" reasons were clearly pretextual.

---

[52]Burdine and Hicks were "Title VII" cases that "explained the operation of prima facie burden of proof rules." Batson at 94 n.18.

[53]The trial court granted twelve peremptory strikes to the prosecution, and twelve to each defendant, for a total of twenty-four for the defense. NT 11/03/05 at 35-7.

2.    *The prosecutor's purported "race neutral" reasons for his peremptory strikes were pretextual.*

The prosecution's first strike was against Caucasian female, Kathy Dube. There was no apparent gender-neutral reason for this strike. Indeed, she exhibited characteristics traditionally favored by the prosecution. When asked where she would rank her feelings on the death penalty on a scale of one to ten, with one being least in favor and ten being most in favor, she stated she was an eight. NT 11/9/05 a.m. at 103. The prosecution's purported reason for striking her was because when asked whether she could recommend a sentence of death, she said "I think so." Id. at 115. This explanation by the prosecution is clearly specious and pretextual, however, when considering that Fred Dobrzynski, a white male who the prosecution found acceptable and who was selected as Juror No. 10, provided the exact response to that same question. NT 11/14/05 at 274.

With regard to its second peremptory strike, of white female Anna Bartling, the prosecution provided no gender-neutral reason whatsoever, noting only that because she was white, and "[t]his is a race-based challenge," no explanation was necessary. NT 11/14/05 at 69. The prosecution was wrong on this count. Discrimination on the basis of gender violates the Equal Protection Clause just as surely as discrimination on the basis of race. J.E.B., 511 U.S. at 129, 146 ("[G]ender, like race, is an unconstitutional proxy for juror competence and impartiality").

The prosecution's third strike was against Myrtle Jackson, an African American woman. The sole reason the prosecution could come up with for striking her was that "she appeared confused" when asked whether she could impose the death penalty. NT 11/14/05 at 69. Ms. Jackson, a licensed practical nurse, had previously served on a civil jury. NT 11/10/05 at 120. She rated her feelings on the death penalty a five on a scale of one to ten. Id. at 117. Ms. Jackson answered all

123

of the voir dire questions appropriately, including a firm "yes" when asked if she could recommend a sentence of death. Id. at 125. The prosecution's explanation that "she appeared confused" when asked whether she could impose the death penalty is completely contradicted by the record, and blatantly pretextual.

In explaining his reasons for striking Carola Crowder, also an African American female, the prosecutor claimed that she had a driving record from 2002, and also a conviction in 2000 for not having her child properly buckled into the seatbelt. The prosecutor claimed that this indicated " a lack of common sense." NT 11/14/05 at 70. The court noted it was satisfied that no improper pattern had been established, but put the State on notice that the court is "aware of this." Id.

The defense then requested that the prosecution share the information in its files regarding the convictions and motor vehicle violations, or lack thereof, of the one hundred plus potential jurors that had already been through voir dire to that point, in order to determine whether the prosecution had accepted white or male jurors with similar records. The court refused to order the prosecution to turn over the information on the previous jurors, because the state had only exercised three[54] peremptory challenges at that point, and no "unconstitutional pattern" had been established, but noted that from that point forward, the prosecution would have to share the information.[55] Id. at 74-

---

[54]The prosecution had actually exercised four peremptory challenges at that point, but apparently the court, like the prosecutor, failed to consider the Equal Protection violations implicated by discriminating against women, regardless of their race. J.E.B. v. Alabama, 511 U.S. at 146.

[55]Both the court and the prosecution repeatedly stated that no "pattern" had been established. However, constitutional error occurs and a new trial and sentencing are required if just one potential juror is excluded on the basis of race, regardless of whether and how many other persons of color are actually seated as jurors. Harrison v. Ryan, 909 F.2d 84, 88 (3d Cir. 1990); see also Hardcastle v. Horn, ___ F. Supp. 2d ___, 2007 WL 3102221, *3 (E.D. Pa.).

76.

By denying the defense access to this information, or reviewing the information itself, the court had no way of knowing whether the prosecution had indeed accepted white and/or male jurors with similar backgrounds. <u>Miller-El v. Dretke</u>, 545 U.S. 231, 241 (2005) ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step."); <u>Riley v. Taylor</u>, 277 F.3d 261, 285 (3d Cir. 2001) ("A comparison between a stricken black juror and a sitting white juror is relevant to determining whether the prosecution's asserted justification for striking the black juror is pretextual."); <u>Hardcastle v. Horn</u>, ___ F. Supp. 2d ___, 2007 WL 310221, *14 (side-by-side comparison of stricken jurors with jurors accepted by the prosecution is "powerful tool" in determining validity of purported race neutral explanations); <u>McClain v. Prunty</u>, 217 F.3d 1209, 1220 (9th Cir. 2000) (prosecutor's motives pretextual when the reason provided can be equally applied to a juror of a different race or gender who was not stricken, citing <u>Caldwell v. Maloney</u>, 159 F.3d 639, 651 (1st Cir.1998)).

The prosecution exercised its fifth peremptory strike against Judith A. Burns, a white female. Ms. Burns was a teacher with a post-graduate level of education. She rated her feelings about the death penalty a five. NT 11/14/05 at 81-93. Initially, the prosecution challenged her for cause because she responded "I would try" when asked if she could recommend a sentence of death. <u>Id.</u> at 92, 94. After the cause challenge was denied, the prosecutor exercised a peremptory. The defense objected to this strike. <u>Id.</u> at 96.

The prosecutor's eighth peremptory strike was against Samuel Brown, Jr., an African

American male.  While Mr. Brown ranked his feelings about the death penalty a one, he was very

clear in his response that he would follow the law and recommend a sentence of death if the evidence

and law required.  NT 11/14/05 at 209-21.  Mr. Brown also initially responded that he would be

more likely to accept a police officer's testimony over a civilian witness (he then amended this

statement to say he would hear both sides out).  The prosecution struck Mr. Brown without any

explanation.

When the prosecution exercised its ninth peremptory strike against Brad C. Thomas, an

African American male, the court *sua sponte* took notice and admonished the prosecutor:

> Mr. Conner, I feel constrained to say this.  I do not know the racial makeup of the
> remaining jurors to be interviewed in this case.  I would be extremely - - my concern
> expressed when this Batson issue arose yesterday is heightened.  *The State needs to
> be very careful where it goes from here.*

NT 11/15/05 at 19-20.

When the prosecution attempted to explain this strike based on the juror's initial response

that he would most likely vote in favor of a life sentence, and again argued that there was no pattern

of discrimination, the court again noted its concern:

> Let me end that discussion.  I'm suggesting if there's another one, there will be a
> pattern . . . Or a stronger suggestion, let me put it this way, that there could be a
> pattern.

> My problem with the State's exercise of the peremptory here, and I do not believe a
> prior pattern has been established nor do I believe a pattern has been established with
> your use of a peremptory challenge with this particular juror, my problem with the
> strike of this particular juror is that he said his feelings ranked a six, that he could
> both do life imprisonment and the death sentence, but he was concerned how the
> death sentence had been imposed, perhaps, unequally on persons of certain
> socioeconomic classifications . . . Okay, I'm just alerting you.

Id. at 21-2.

Thus, even the trial court appeared to believe that there was discriminatory intent on the part of the prosecutor with the striking of Mr. Thomas, but permitted the strike because of the mistaken belief that discriminatory intent with regard to just one juror, in the absence of a "pattern" of discrimination, was permissible.

> 3.    *Petitioner has established that the prosecution's peremptory strikes were motivated by discriminatory intent, and the prosecutor's race-neutral reasons were spurious.*

Petitioner has clearly met his burden under Batson in proving that the prosecution had discriminatory intent in exercising at least one of it peremptory challenges. The race neutral reasons provided by the prosecution are simply not supported by the record in this case. Where, as here, the purported race neutral reasons provided by the prosecutor contradict the facts in the record, they must be questioned. See, e.g., Johnson v. Vasquez, 3 F.3d 1327, 1330-31 (9th Cir.1993) (finding that several of the prosecutor's reasons, including the juror's alleged experience working for a defense attorney, were contradicted by the record).

The race neutral reasons provided by the prosecutor in Petitioner's case are simply not credible, and in such cases, the lower court decision is not entitled to the usual deference. Riley v. Taylor, 277 F.3d at 285; see also McClain, 217 F.3d at 1221 ("'[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.'") (quoting Purkett v. Elem, 514 U.S. 765, 768 (1995)); United States v. Griffin, 194 F.3d 808, 826 (7th Cir.1999) (noting that a basis for reversal of state court exists where "the reason given [by the prosecutor] is completely outlandish or there is other evidence which demonstrated its falsity"); Caldwell v. Maloney, 159 F.3d at 651 (stating that serious questions of pretext arise when the facts in the record are "objectively contrary to" the prosecutor's explanations).

The court is also required to review the "totality of the relevant facts" in determining whether the prosecutor acted in a discriminatory manner. Miller-El v. Dretke, 545 U.S. 231, 239 (2005) (quoting Batson, 476 U.S. at 94, 96). See also Lark v. Beard, 495 F.Supp.2d 488, 500 (E.D. Pa. 2007) ("if any facially neutral reason sufficed to answer a Batson challenge, then Batson would not amount to much more than Swain. Some stated reasons are false, and although some false reasons are shown up within the four corners of a given case, sometimes a court may not be sure unless it looks *beyond the case at hand.* Hence Batson's explanation that a defendant may rely on 'all relevant circumstances' to raise an inference of purposeful discrimination."). Here, the "totality of the facts" is manifest: the prosecution exercised nine of its ten challenges against minorities and women; only one challenge was exercised against a white male.[56] With the exception of one juror - the second to last peremptory challenge exercised by the prosecution - the court failed to look "beyond the case at hand," and accepted the explanation provided, no matter how weak or contradictory.

Even if the court finds that the prosecution's race neutral explanations were not pretextual - and they were - no reasons were provided for at least two of the jurors who were struck by the prosecution. As set forth in more detail above, the prosecution provided no explanation for striking Samuel Brown, Jr., and African American male who initially responded that he would be more likely to believe a police officer over a civilian because his/her job is to uphold the law, a viewpoint that favors the prosecution. NT 11/14/05 at 209-21. The state also provided no race or gender neutral reason for its strike of Anna Marie Bartling, apparently because of the mistaken assumption that

---

[56]State peremptory number seven was used against David R. Barnwell. NT 11/14/05 at 183.

because she is white, no such explanation is required. NT 11/10/05 a.m. at 35-6.

While the prosecution attempted to provide a race neutral reason for its strike of Brad Thomas, even the court felt compelled to *sua sponte* admonish the prosecutor for its actions in striking this juror. NT 11/15/05 at 19-23. If even one venire person is excluded on the basis of race, as clearly occurred here, a new trial and sentencing is required under <u>Batson</u>. <u>Harrison v. Ryan</u>, 909 F.2d 84,88 (3d Cir. 1990); <u>Lark</u>, 495 F.Supp.2d at 502. Petitioner is entitled to such relief.

**B.    Conclusion.**

The prosecution's exercise of peremptory challenges in this case on the basis of race and gender violated Petitioner's right to due process and the equal protection of the law guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, and Article I, §§ 4, 7 and 11 of the Delaware Constitution.

**C.    Counsel's Failure to Raise and/or Litigate This Claim Constitutes Prejudicially Deficient Performance in Violation of the Sixth, Eighth and Fourteenth Amendments and Article I, §§ 4, 7, and 11.**

As set forth above, Petitioner has presented a meritorious jury discrimination that was obvious from the face of the record in this case. Any failure on the part of trial/direct appeal counsel to properly raise, preserve, and litigate this issue in state court constitutes prejudicially deficient performance in violation of Petitioner's state and federal constitutional rights.

The *ABA Guidelines for Appointment and Performance of Counsel in Death Penalty Cases* – performance standards to which the United States Supreme Court has long referred "as 'guides to determining what is reasonable'" attorney conduct, <u>Wiggins v. Smith</u>, 539 U.S. 510, 524 (2003); <u>Rompilla v. Beard</u>, 545 U.S. 374, 387 (2005) – clearly called for counsel to "be familiar with the precedents relating to questioning and challenging of potential jurors." ABA Guideline 11.7.2.B, at

117. The commentary specifically highlights <u>Batson</u> "and its progeny" as an example of "an important" voir dire issue. <u>Id.</u>, *Commentary*, at 118 n.5. Counsel's failure to discharge their duty to ensure that Petitioner's jury selection was not the result of discrimination constitutes deficient performance. Similarly, counsel's deficient performance denied Petitioner the right to be tried by an impartial jury selected in conformity with the federal constitution. Because this is structural error, prejudice is presumed. <u>E.g.</u>, <u>Williams v. Woodford</u>, 396 F.3d 1059, 1069 (9th Cir. 2005).

Likewise, counsel (the same counsel) was ineffective for failing to raise and litigate these issues on direct appeal. The failure to raise and litigate a meritorious issue arising out of the prosecution's discriminatory jury selection constitutes prejudicially deficient performance. <u>E.g.</u>, <u>Eagle v. Linahan</u>, 279 F.3d 926, 943-44 (11th Cir. 2001) (finding counsel ineffective for failing to litigate <u>Batson</u> claim in state court appeal). In this capital case, these failures also violated Petitioner's Eighth Amendment rights to a reliable capital trial and to meaningful appellate review of his capital conviction and death sentence.

### D.    There Are No Bars to This Court's Consideration of the Merits of This Claim.

Rule 61(i)(1)-(2) and (4) are clearly inapplicable to these claims. These claims are timely, having been filed within one year of final judgment of sentence; as these claims arise out of the 2005 sentencing proceeding, this is clearly the first post-conviction proceeding available to Petitioner; and, there have been no previous adjudications of these claims. Nor does Rule 61(i)(3) apply to these claims for a number of reasons. First, as described above, <u>see</u> Section II.A.1.c., this subsection is not applicable to ineffective assistance of counsel claims. Second, the failure to raise these claims was the result of counsel's constitutional ineffectiveness, thus demonstrating cause, <u>Flamer v. State</u>, 585 A.2d at 758, and, as described above, prejudice is demonstrated because, as described above,

as a result of the constitutional violations, structural error has occurred and the reliability of Petitioner's death sentence was compromised. Finally, as described above, Petitioner meets the exception to application of Rule 61(i)(3) outlined in Subsection 61(i)(5). Petitioner has presented colorable claims involving multiple constitutional violations that would arguably require vacating Petitioner's capital sentence. Webster, 604 A.2d at 1367. Accordingly, there are no bars to this Court's merits consideration and, for the reasons described above, relief is required.

CLAIM X.   PETITIONER IS ENTITLED TO RELIEF FROM HIS CONVICTION BECAUSE THE PROSECUTION DELIBERATELY EXERCISED A PEREMPTORY STRIKE AGAINST A MINORITY JUROR DURING JURY SELECTION AT THE 1996 TRIAL IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTIONS 4, 7, 11, AND 13 OF THE DELAWARE CONSTITUTION.

As set forth in more detail in Claim VIII, *supra,* the Equal Protection Clause of the Fourteenth Amendment prohibits a prosecutor from exercising peremptory strikes in a manner that discriminates on the basis of race or gender, and when such discrimination occurs, a new trial is required. Batson v. Kentucky, Batson v. Kentucky, 476 U.S. 79 (1986); J.E.B. v. Alabama ex rel T.B., 511 U.S. 127 (1994); and, Swain v. Alabama, 380 U.S. 202 (1965). See Claim VIII.

### A.   The Prosecutor Exercised a Peremptory Strike in a Racially Discriminatory Manner.

The prosecution's peremptory strike of prospective juror Phyllis J. Stewart, constituted a blatant violation of Batson and its progeny. The prosecutor admitted as much when confronted by the Court and asked to provide a reason for this peremptory:

The Court:    Did I understand the state to exercise a peremptory challenge?

The State:    Yes.

The Court:    Could you explain why?

131

| The State: | Well, I'd be happy to, Your honor. We're going to get into this issue. *I think there ought to be some reciprocity in light of Mr. Manley's strikes. If you'll note, all of his strikes have been against what appear to be all of the same race.* If the court has detected a pattern in - - |
|---|---|
| The Court: | I had detected no pattern, but what I - - here's what I want to - - |
| The State: | Okay. |
| The Court: | - - I guess have answered. The juror answered all the questions properly. She's certainly educated by virtue of her post-graduate degree. She's certainly intelligent. There's no reason for her not to be a juror and I'm just curious, in light of her race. |

NT 10/23/96 at 198-99. The prosecutor then went on to explain that the real reason for the strike

was because the juror's brother had been incarcerated for armed robbery, and that because the juror's

brother had been rehabilitated, the juror might favor a life sentence over the death penalty for

Petitioner and his codefendant because they too are young men like her brother was at the time of

his crime. Id. at 199-200. This explanation by the prosecutor for striking Ms. Stewart is patently

specious. Aside from the fact that the prosecutor later accepted a white juror whose brother had also

been incarcerated for the exact same offense as Ms. Stewart's brother (Juror No. 7, Maria Way, NT

10/23/96 at 238-59), as well as a white juror who himself had been convicted of assault and had to

perform 30 days of community service (Juror No. 9, Daniel Kelleher, NT 10/25/96 at 23-37), the

prosecutor's initial response to the Court about "reciprocity" because Petitioner had dismissed white

jurors must negate any purported race neutral reason for this strike. The prosecutor's motivation

behind the strike of Ms. Stewart is obvious. The prosecutor was annoyed by what he believed to be

race-based strikes on the part of the defense, and, in an attempt to play "tit for tat," thought he had

carte blanche to strike persons of color. Even the Court noted that there was nothing wrong with this

juror, she answered all the voir dire questions appropriately, and "there was no reason for her not to be a juror." NT 10/23/96 at 199.

**B.    Petitioner Has Met the Three Prong Test for Proving Discrimination Under Batson.**

As set forth in Claim VIII, there are three facets to determine whether the prosecution exercised its peremptory challenges in a racially discriminatory manner in violation of Batson and its progeny. First, Petitioner must prove a *prima facie* case of discrimination by showing that the prosecutor removed a juror or jurors from the venire based solely on their race. Once a *prima facie* case is established, the prosecutor must then provide a race neutral reason for the strike. Third, the court then must determine whether the reasons provided by the prosecution are in fact race neutral.

Petitioner has clearly made a *prima facie* showing of discrimination in the strike of Ms. Stewart. The racial motivation behind this strike was so transparent that the Court itself felt compelled to query the prosecutor as to the reasons for this strike, without any prompting by the defense. As the Court itself pointed out, there was nothing wrong with this juror. She answered all questions properly and was well educated and "certainly intelligent." And, most telling, when initially asked by the Court the reason for his strike, the prosecutor himself admitted it was racially motivated because of a desire for "reciprocity" based on alleged racially motivated strikes by the defense.

The explanation provided by the prosecutor that he was concerned because the juror's brother had been incarcerated and rehabilitated, and thus the juror might be sympathetic to the defendants, is patently pretextual. Aside from the fact that when first asked for a reason for the strike, the prosecutor's gut reaction was to demand racial "reciprocity," the fact that the prosecutor accepted

133

a white juror whose brother had been incarcerated for the same type of offense, and also accepted a juror who himself had been convicted of assault and felt he was wrongly convicted makes the strike of Ms. Stewart even more suspicious. See McClain v. Prunty, 217 F.3d 1209, 1220 (9th Cir. 2000) (prosecutor's motives pretextual when the reason provided can be equally applied to a juror of a different race or gender who was not stricken, citing Caldwell v. Maloney, 159 F.3d 639, 651 (1st Cir. 1998)). Further, Ms. Stewart clearly stated that she would be fair and impartial and could impose a sentence of death if the evidence and law permitted. The prosecutor's purported reason for striking Ms. Stewart was pretextual.

While the Court ultimately accepted the prosecutor's purported race neutral explanation for striking Ms. Stewart, that explanation is not supported by the facts in the record. The prosecutor admitted up front that he wanted "reciprocity" for strikes by the defense that appeared to be motivated by race. Also, as the Court noted, based on her responses to the voir dire questions, this juror appeared to be ideal and perfectly acceptable. Where, as here, the purported race neutral reason provided by the prosecutor contradict the facts in the record, it must be questioned. See, e.g., Johnson v. Vasquez, 3 F.3d 1327, 1330-31 (9th Cir. 1993) (finding that several of the prosecutor's reasons, including the juror's alleged experience working for a defense attorney, were contradicted by the record).

The race neutral reason provided by the prosecutor for the strike of Phyllis Stewart is simply not credible, and in such cases, the lower court decision is not entitled to the usual deference. Riley v. Taylor, 277 F.3d at 285; see also McClain, 217 F.3d at 1221 ("'[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.'") (quoting Purkett v. Elem, 514 U.S. 765, 768 (1995)).

134

The prosecution's peremptory challenge of Phyllis Stewart on the basis of race violated Petitioner's right to due process and the equal protection of the law guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, and Article I, §§ 4, 7, 11, and 13 of the Delaware Constitution. If even one venire person is excluded on the basis of race, as clearly occurred here, a new trial is required under Batson. Harrison v. Ryan, 909 F.2d 84,88 (3d Cir. 1990); Lark v. Beard, 495 F. Supp. 2d 488, 502 (E.D. Pa. 2007). Petitioner is entitled to such relief.

### C.    Counsel's Failure to Raise and/or Litigate This Claim Constitutes Prejudicially Deficient Performance in Violation of the Sixth, Eighth and Fourteenth Amendments and Article I, §§ 4, 7, 11, and 13.

The Sixth Amendment right to effective assistance of counsel is violated when counsel's performance is deficient, i.e., falls below "an objective standard of reasonableness;" and the defendant is prejudiced, i.e., when confidence is undermined in the outcome of the proceeding. Wiggins v. Smith, 539 U.S. 510, 521 (2003); Williams v. Taylor 529 U.S. 362 (2000); Strickland v. Washington, 466 U.S. 668, 694 (1984). In evaluating counsel's performance, the Court should consider professional norms such as the American Bar Association's Standards for Criminal Justice ("ABA STANDARDS") and Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989) ("ABA GUIDELINES"), which articulate "reasonable" professional "standards for capital defense work" and are the "norms" and "standards to which [the Supreme Court] long ha[s] referred as 'guides to determining what is reasonable'" under the Sixth Amendment. Wiggins, 539 U.S. at 522-25 (citing Strickland; Williams). See also Outten v. Kearney, 464 F.3d 401, 417 (3d Cir. 2006).

The Guidelines in effect at the time of Petitioner's 1996 trial clearly called for counsel to "be familiar with the precedents relating to questioning and challenging of potential jurors." ABA

135

Guideline 11.7.2.B (1989) at 117. The commentary specifically highlights <u>Batson</u> "and its progeny" as an example of "an important" voir dire issue. <u>Id.</u>, *Commentary*, at 118 n.5.[57] At the conclusion of the prosecutor's alleged race neutral rationale for striking Ms. Stewart, the Court asked if counsel had any comments. Counsel stood silent, merely stating, "No, your Honor. I think the Court's covered it." NT 10/23/96 at 200. Competent counsel would have objected to the prosecutor's strike, and pointed out the inconsistencies in the explanation for striking this juror. Counsel's failure to discharge their duty to ensure that Petitioner's jury selection was not the result of discrimination constitutes deficient performance. Similarly, counsel's deficient performance denied Petitioner the right to be tried by an impartial jury selected in conformity with the federal constitution. Because this is structural error, prejudice is presumed. <u>E.g.</u>, <u>Williams v. Woodford</u>, 396 F.3d 1059, 1069 (9th Cir. 2005).

Similarly, counsel's failure to raise these claims on appeal or during prior proceedings constitutes prejudicially deficient performance. The same standards apply to claims of appellate ineffectiveness. <u>See</u>, <u>e.g.</u> <u>Roe v. Flores-Ortega</u>, 528 U.S. 420 (2000) (applying Strickland standard to consideration of appellate counsel's ineffectiveness); <u>United States v. Mannino</u>, 212 F.3d 835 (3d Cir. 2000); <u>Orazio v. Dugger</u>, 876 F.2d 1508, 1513 (11th Cir. 1989); <u>Matire v. Wainwright</u>, 811 F.2d 1430, 1435 (11th Cir. 1987). Where, as in this case, there is a "reasonable probability that the neglected claim[s] would have succeeded on appeal, [] counsel's failure to raise the claim f[alls] outside the range of reasonably competent assistance." <u>Claudio v. Scully</u>, 982 F.2d 798, 799 (2d Cir. 1992); <u>Jackson v. Leonardo</u>, 162 F3d. 81 (2d Cir. 1998) (appellate counsel's failure to raise "sure

---

[57]These Guidelines have since been revised. <u>See</u> *ABA Guidelines for Appointment and Performance of Counsel in Death Penalty Cases (Revised Edition 2003)*, Guideline 10.10.2 (based on Guideline 11.7.2 of the original edition), and Commentary, at 104-07.

winner" constituted ineffective assistance: "In the instant case, we believe that appellate counsel's failure to raise a well-established, straightforward, and obvious . . . [claim] . . . constitutes ineffective performance."); Starr v. Lockhart, 23 F.3d 1280 (8th Cir. 1993 ) (finding trial and appellate counsel ineffective for failing to object to and raise an erroneous jury instruction); Freeman v. Lane, 962 F.2d 1252 (7th Cir. 1992) (appellate counsel ineffective for failing to raise a meritorious claim that was "presented squarely" at trial regarding a violation of the defendant's Fifth Amendment rights); Murphy v. Puckett, 893 F.2d 94 (5th Cir. 1990) (counsel's failure to raise valid defense at trial and on direct appeal constituted ineffective assistance).

The failure to raise and litigate a meritorious issue arising out of the prosecution's discriminatory jury selection constitutes prejudicially deficient performance. E.g., Eagle v. Linahan, 279 F.3d 926, 943-44 (11th Cir. 2001) (finding counsel ineffective for failing to litigate Batson claim in state court appeal). In this capital case, these failures also violated Petitioner's Eighth Amendment rights to a reliable capital trial and to meaningful appellate review of his capital conviction.

As set forth above, Petitioner has presented a meritorious jury discrimination claim that was obvious from the face of the record in this case. Any failure on the part of trial and appellate counsel to properly raise, preserve, and litigate this issue in state court constitutes prejudicially deficient performance in violation of Petitioner's state and federal constitutional rights.

**D.     There Are No Bars to This Court's Consideration of the Merits of This Claim.**

Rule 61(i)(1)-(2) and (4) are clearly inapplicable to these claims. These claims are timely, having been filed within one year of final judgment of sentence, and, there have been no previous adjudications of these claims. Nor does Rule 61(i)(3) apply to these claims for a number of reasons.

First, as described above, see Section II.A.1.c., this subsection is not applicable to ineffective assistance of counsel claims. Second, the failure to raise these claims was the result of counsel's constitutional ineffectiveness, thus demonstrating cause, Flamer v. State, 585 A.2d 736, 758 (Del. 1990), and, as described above, prejudice is demonstrated because, had these claims been raised in the prior proceedings there is a reasonable likelihood that the outcome would have been different. Finally, as described above, Petitioner meets the exception to application of Rule 61(i)(1) - (3) outlined in Subsection 61(i)(5). Petitioner has presented colorable claims involving multiple constitutional violations that would arguably require vacating Petitioner's capital sentence. Webster v. State, 604 A.2d 1364, 1367 (Del.1992). Accordingly, there are no bars to this Court's merits consideration and, for the reasons described above, relief is required.

**CLAIM XI.**    **AS THE RESULT OF TRIAL COURT ERROR AND INEFFECTIVE ASSISTANCE OF COUNSEL DURING THE JURY SELECTION FOR PETITIONER'S 2005 RESENTENCING TRIAL, PETITIONER WAS DENIED HIS SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS AND HIS RIGHTS UNDER ARTICLE I, SECTIONS 4, 7, 11 AND 13 OF THE DELAWARE CONSTITUTION.**

It is well settled that the Sixth and Fourteenth Amendments "guarantee a defendant on trial for his life the right to an impartial jury." Ross v. Oklahoma, 487 U.S. 81, 85 (1988); Irvin v. Dowd, 366 U.S. 717, 722 (1961). Part of the guaranty of this right "is an adequate voir dire to identify unqualified jurors." Morgan v. Illinois, 504 U.S. 719, 730 (1992); Dennis v. United States, 339 U.S. 162, 171-172 (1950); Morford v. United States, 339 U.S. 258, 259 (1950)). It is also well settled that the Sixth Amendment right to an impartial jury is violated when a jury is empaneled that is "uncommonly willing to condemn a man to die." Witherspoon v. Illinois, 391 U.S. 510, 521 (1968).

Moreover, the requirement of adequate voir dire takes on even greater importance in a capital case, because of the "the qualitative difference of death from all other punishments," California v.

138

Ramos, 463 U.S. 992, 998-99 (1983), and because capital juries are required to make a "highly subjective 'unique individualized judgment regarding the punishment that a particular person deserves,'" Caldwell v. Mississippi, 472 U.S. 320, 340-41 n.7 (1985). Because of the heightened protections due capital defendants and the "unique opportunity [which] exists for bias to operate undetected" at capital sentencing, King v. Lynaugh, 828 F.2d 257, 259 (5th Cir. 1987), adequate voir dire of potential jurors becomes even more important.

The constitutional standard for determining juror bias is no different in a capital case than it is in any other case. Wainwright v. Witt, 469 U.S. 412, 423 (1984) ("there is nothing talismanic about juror exclusion" in capital cases). Under the Sixth Amendment, a juror is considered biased if "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Gray v. Mississippi, 481 U.S. 648, 657 (1987) (quoting Adams v. Texas, 448 U.S. 38, 45 (1980)).

In Witt, the United States Supreme Court stated, "As with any other trial situation where an adversary wishes to exclude a juror because of bias, . . . the adversary seeking exclusion . . . must demonstrate, through questioning, that the potential juror lacks impartiality." Then the trial judge "determine[s] whether the challenge is proper." Witt, 469 U.S. at 423-24; id. at 429 ("excluding prospective capital sentencing jurors because of their opposition to capital punishment is no different from excluding jurors for innumerable other reasons which result in bias").

In determining a juror's fitness to serve on a capital jury, the Supreme Court has ruled that "the State may bar from jury service those whose beliefs about capital punishment would lead them to *ignore the law or violate their oaths*." Adams v. Texas, 448 U.S. at 51. See Gray v. Mississippi, 481 U.S. at 657; Morgan v. Illinois, 504 U.S. at 728. The right to an impartial jury entitles a capital

defendant to a sentencing jury that is capable of following the law and imposing a life sentence, no less than the state is entitled to a jury that is capable of following the law and imposing a death sentence. See Stroud v. United States, 251 U.S. 15 (1919); Ross v. Oklahoma, 487 U.S. 81 (1988); Morgan v. Illinois, 504 U.S. at 728-29 (reiterating Ross). Thus, the applicable standard is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" See Morgan, 504 U.S. at 728 (quoting Wainwright v. Witt, 469 U.S. at 424, and Adams v. Texas, 448 U.S. at 45). Where even a single juror harbors a prejudice against the defendant or in favor of the prosecution, the impartiality of the entire jury is compromised. Ross v. Oklahoma, 487 U.S. at 85; Turner v. Murray, 476 U.S. 28 (1986); Ristaino v. Ross, 424 U.S. 589, 596 (1976); Irvin v. Dowd, 366 U.S. at 722; United States v. Evans, 917 F.2d 800, 809 (4th Cir. 1990). Where the court's voir dire fails to adequately inquire into these potential biases, the Sixth, Eighth and Fourteenth Amendments are violated.

**A.    Two Jurors Should Have Been Struck for Cause at the Jury Selection of Petitioner's Capital Resentencing Proceedings in 2005.**

As set forth above, due process and the Sixth Amendment right to an impartial jury are violated when even one biased juror is empaneled. When the death sentence is implicated, courts and counsel must exercise even greater care to ensure to remove biased jurors. See California v. Ramos, 463 U.S. at 998-99 ("the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination.").

Capital juries are required to make a "highly subjective 'unique individualized judgment regarding the punishment that a particular person deserves'." Caldwell v. Mississippi, 472 U.S. at 340-341, n.7 (1985). Where a juror's bias is of the nature that it precludes him or her from

140

considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death, the resulting verdict violated the Eighth and Fourteenth Amendments. Lockett v. Ohio, 438 U.S. 586, 604 (1978).

Since the United States Supreme Court's landmark decision in Witherspoon v. Illinois, 391 U.S. at 522, it has been established that the Sixth Amendment right to an impartial jury is violated when a jury is empaneled that is "uncommonly willing to condemn a man to die." Witherspoon v. Illinois, 391 U.S. 510, 521 (1968).

Because of the heightened protections due capital defendants and the "unique opportunity [which] exists for bias to operate undetected" at capital sentencing, King v. Lynaugh, 828 F.2d 257, 259 (5th Cir. 1987), adequate voir dire of potential jurors becomes even more important.

_____As a result of court error and ineffective assistance of counsel, two biased jurors were empaneled during Petitioner's resentencing in 2005, in violation of the Sixth, Eighth, and Fourteenth Amendments and Article I.

**1.    The Failure to Excuse A Juror Who Would Favor the Testimony of Police Officers Over Civilian Witnesses.**

Stephen Roberts, the first juror selected at Petitioner's resentencing proceedings in 2005 and appointed as Jury Foreman by the Court, initially indicated that while it would depend on the circumstances, he would tend to give greater weight to the credibility of a police officer over a civilian witness simply because the person was a police officer. Id. at 47. The Court then asked if that was always the case, to which Mr. Roberts replied, "I don't want to say that's always the case, but I'll have to observe and listen and see if there's any contradiction - - any contradiction going on

there." Id. at 48.

Incredibly, rather than follow up on this patently biased response, the Court simply moved on to the next question on the list. Perhaps even more incredibly, counsel failed to make a challenge for cause, despite the fact that it was clear from the face of the record that Mr. Roberts was unequivocal in his response that if there was a dispute in the testimony between a police officer and a civilian witness, he would favor the officer.

Mr. Roberts meets the criteria of a biased juror under any definition of the term. Mr. Roberts expressly revealed his actual bias in favoring the credibility of police over other witnesses; he should have been disqualified. See United States v. Torres, 128 F.3d 38, 43 (2nd Cir. 1997) ("[a]ctual bias is 'bias in fact' - the existence of a state of mind that leads to an inference that the person will not act with entire impartiality."). Mr. Roberts' presence on the jury - especially as jury foreman - violated Petitioner's constitutional guarantee to an impartial jury, and a new resentencing proceeding is required.

## 2.    The Failure to Excuse a Juror Who had an Implied Bias Against Petitioner.

Joyce Lennon was selected as Juror Number 2. During voir dire, Ms. Lennon noted that she had two very close friends who were murdered, that the person responsible received a sentence of life imprisonment, and that as a result the juror has "very strong opinions in that way." NT 11/09/05 a.m. at 10. Ms. Lennon then indicated that on a scale of one to ten as to how strongly she favored the death penalty, she would rate a five, and it would depend on the evidence. Id. No further questions were asked of Ms. Lennon concerning her "strong opinions" about the death penalty.

Ms. Lennon also indicated that she worked as a certified grief counselor, and that she had counseled families of crime victims in the course of her duties. Id. at 16. While Ms. Lennon

claimed that she could still be impartial based on these circumstances, a finding of implied bias is justified in order to avoid a miscarriage of justice where a juror has a close relationship with the participants or the issues in a trial. Smith v. Phillips, 455 U.S. at 221-22 (O'Connor, J. concurring). While Ms. Lennon stated she could evaluate the evidence without referring to her own personal experience with two murder victims, in certain situations bias must be presumed, regardless of a juror's expressed sentiments, because often, the juror may not even be aware she is harboring bias. Id. In spite of Ms. Lennon's responses that she could be fair and impartial, because of the gravity of the job of the jury in this case - to determine whether to or not to recommend the death penalty - and the circumstances of having two close friends murdered, a finding of implied bias was required, and Ms. Lennon should have been excused from the panel on this basis. While counsel did exercise a cause challenge, it was primarily based on Ms. Lennon's concern over her job and school responsibilities, although counsel did note his concern with Ms. Lennon's involvement with the families of victims of crime. The Court denied Petitioner's cause challenge, and likewise refused to inquire into the issue of financial hardship as requested by the defense.

The Court erred in refusing to grant Petitioner's challenge for cause of Ms. Lennon on the basis of implied bias. Counsel's subsequent failure to exercise a peremptory strike to remove this juror resulted in a biased juror being seated on Petitioner's resentencing jury.

**B.    The Court Improperly Excluded Prospective Jurors Who Expressed a Concern About the Death Penalty, But Did Not State that They Could Not Follow the Law, in Violation of Petitioner's Rights under the Sixth, Eighth and Fourteenth Amendments and Article I, Sections 4, 7, 11 and 13 of the Delaware Constitution.**

Petitioner's death sentence must be vacated because the trial court improperly struck for cause three jurors who were not "substantially impaired" by their views on the death penalty. The

143

Court's exclusion of these prospective jurors without conducting a full inquiry into whether or not their beliefs would have substantially impaired their ability to follow the law as instructed by the Court, and counsel's ineffective failure to request additional voir dire of these jurors to rehabilitate them violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights and Article I, Sections 4, 7, 11 and 13. Relief is required.

In capital cases, "a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause." Uttecht v. Brown, 127 S.Ct. 2218, 2224 (2007). A prospective capital juror is "partial" and should be struck for cause if his or her views on capital punishment "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Adams v. Texas, 448 U.S. at 45; Witt, 469 U.S. at 424. The responsibility lies with the trial court to determine whether a challenge for cause is proper. "Thus, before it can sustain the exclusion, the judge must make a factual determination that the prospective juror would be biased." Szuchon v. Lehman, 273 F.3d 299, 328 (3d. Cir. 2001).

Life-qualification refers to instances of excluding jurors who are partial to the state because their pro-death penalty views prevent or substantially impair them from returning a life sentence. Death qualification refers to instances when the state seeks to exclude jurors who are partial to the defense because their anti-death penalty views would prevent or substantially impair them from returning a death sentence. Our system of justice recognizes that individuals can harbor specific beliefs yet still be able to fairly consider the evidence presented and apply the law as instructed by the court. It is not the belief which renders the juror incapable of serving. The question is whether that belief would substantially impair the juror's ability to be fair. Where an individual can set that

144

belief aside and apply the law to the facts, exclusion is improper. For this reason, the court's inquiry of a juror who expresses reservations about or beliefs against the death penalty is critical to a defendant's right to a fair and impartial jury. Where the court's voir dire fails to adequately inquire into these potential biases, the Sixth, Eighth and Fourteenth Amendments are violated. Indeed, views on the death penalty can favor the prosecution as well as the defendant, and the trial court may not conduct voir dire on this issue in a one-sided manner.

Thus, a new sentencing proceeding is required whenever the court improperly dismisses jurors who expressed doubt or opposition to the death penalty or questioned the death penalty but is not substantially impaired. These actions violate Witherspoon, 391 U.S. at 521; see Szuchon v. Lehman, 273 F.3d 299 (3d Cir. 2001) (reversing death sentence because exclusion for cause of prospective juror who stated that he did not believe in death penalty, but was not asked whether he could be impartial, warranted grant of habeas relief).

The use of voir dire to eliminate potential jurors should be even handed, treating fairly both the defendant and the prosecution, *especially* in a situation where the trial court, not counsel, poses questions on individual voir dire. Under Witherspoon and its progeny, the prosecution may challenge for cause any potential juror whose anti-capital punishment views would "prevent or substantially impair" him or her from voting for a death sentence in an appropriate case. The recent Supreme Court case, Uttecht v. Brown, 127 S.Ct 2218 (2007), reaffirmed this principle. Although the Supreme Court deferred to the trial court's finding of death-qualification in Uttecht, that case can be distinguished from the instant case by the extensive voir dire conducted (a period of eighteen days, as opposed to five days in Petitioner's case) and the "vigor" and "tenacity" of Uttecht's trial counsel in objecting to prosecution motions to strike for cause.

1.    **Improper Excusals of Death-Qualified Venirepersons**

The Court conducted all group and individual voir dire at Petitioner's capital resentencing trial in 2005, asking only pre-approved questions submitted to the court by counsel. NT 9/07/05 at 17-29.[58] On three occasions, at the conclusion of the Court's inquiry, prospective jurors were improperly excused based on their apparent negative responses to the Court's questions about whether they could recommend the death penalty. Petitioner's counsel ineffectively did not object to the disqualifications of these jurors or make any attempt whatsoever to rehabilitate these jurors prior to their excusals. Even more egregious is the fact that counsel actually *joined* the prosecution's motion to strike prospective juror Lemar Congo.

a.    *Sultana Diamanty*

Venireperson Sultana Diamanty, in response to the Court's question as to whether she would be able to recommend the death penalty if the law and evidence permitted, regardless of her beliefs, stated that "there would be a possibility, but it would be awfully strong for me to say "no" or "yes." NT 11/08/05 p.m. at 6-7. Upon further questioning, Ms. Diamanty stated that while her preference would be a life sentence, she could impose the death penalty under certain circumstances. Ms. Diamanty's final response was that she "would like to hear the sentencing, but the ultimate thing would be life sentence." Id. at 8.[59] When the Court asked her to explain that answer, Ms. Diamanty

---

[58]See DE ST SUPER CT JUROR USE Standard 7 (b): The clerk or trial judge shall direct to the array standard voir dire questions, supplemented with questions submitted by counsel and approved by the court. The trial judge should conduct the initial follow-up voir dire examination of individual jurors. Counsel may be permitted to ask additional questions in the discretion of the court.

[59]The Court:    Would your opposition to the death penalty prevent or substantially impair the performance of your duties as a juror to decide the facts impartially in accordance with your oath?

admitted some confusion, and again stated that she strongly believed that she "wish[ed] not to take

a life," and that she did not know what could be said or done to make her change her mind.  Id.

---

| | |
|---|---|
| Diamanty: | It may. |
| The Court: | Would your opposition to the death penalty prevent or substantially impair the performance of your duties as a juror to conscientiously apply the law as charged by the Court in accordance with your oath? |
| Diamanty: | I believe so, yeah. |
| The Court: | I'm sorry? |
| Diamanty: | Yes. |
| The Court: | Would you be able to recommend the death penalty at the end of this penalty hearing if the law and evidence so permits regardless of your beliefs concerning the death penalty? |
| Diamanty: | There would be a possibility, *but it would be awfully strong for me to say "no" or "yes."*  They can take a person's life, I just don't think we should. I would rather see them serve their sentence rather than take their life. |
| The Court: | Are there any circumstances under which you could not impose the death penalty - - or could impose the death penalty? |
| Diamanty: | Could?  Yeah. |
| The Court: | Sorry? |
| Diamanty: | No. |
| The Court: | In spite of your opinions about the death penalty, could you nevertheless recommend it at the end of this hearing if the evidence warrants it, knowing that that recommendation could influence me in deciding what sentence to impose on the defendant or defendants? |
| Diamanty: | *It would have to be awfully strong.*  Like I said, so far I don't know that I had an occasion where I could say well they should have taken his or her life. |

NT 11/08/05 at 6-8.

147

Given Ms. Diamanty's initial response, that she could recommend the death penalty but "it would have to be awfully strong," as well as her apparent confusion with the Court's final question, the Court should have conducted additional voir dire, and counsel should have requested same, to ensure that Ms. Diamanty's beliefs truly would substantially impair her duties as a juror. Also, at no point did the Court ever explain that aggravating and mitigating circumstances would be presented, and that only upon a finding of the existence of an aggravating circumstance, would the death penalty even be a consideration. Had Ms. Diamanty been aware of the requirement of finding the presence of an aggravating factor before being permitted to even consider the death penalty, this may have been just the sort of "awfully strong" evidence she alluded to in her earlier responses to the Court. Counsel's failure to request additional voir dire of this juror, and specifically to have the Court explain aggravating and mitigating circumstances to her, constituted deficient performance.[60]

> b.    Jermar Congo

When asked to rank on a scale of one to ten his feelings on the death penalty, venireperson Jermar Congo stated that he "wasn't with the death penalty." When the Court asked if Mr. Congo had any religious, conscientious or other opposition to the death penalty, Mr. Congo responded that he had none, but he "just d[id]n't agree with it." NT 11/09/05 a.m. at 72-3. When the Court inquired further, Mr. Congo said he thought the death penalty was an easy way out. The Court then asked Mr. Congo if he could recommend the death sentence under the evidence and circumstances presented to him, to which he initially answered no, but then when pushed further, said it would depend upon the situation. Id. at 73. The Court's final question to Mr. Congo was whether he would

---

[60]In fact, the Court failed to explain to any of the dismissed jurors that prior to even being able to consider a possible recommendation of death, they would first have to find the existence of an aggravating circumstance.

be able to recommend the death penalty at the end of the hearing if the law and evidence permitted, regardless of his feelings. Mr. Congo answered "not really" to this question. Id. at 74. Without any further follow up, the prosecution made a challenge for cause, to which Petitioner's counsel took no position, except to say he "tend[s] to lean with the state." Id.

The trial court failed to make the legally required inquiry as to whether Mr. Congo's views would substantially impair his ability to follow the law or the Court's instructions on the law. Adams v. Texas, 448 U.S. at 45; Witt, 469 U.S. at 424. Defense counsel's failure to request that the Court attempt to rehabilitate Mr. Congo by asking him to clarify what he meant by "not really," and to request that the Court ask whether Mr. Congo's views would "substantially impair" his ability to follow the law constituted ineffective assistance.

      *c.*   *Ann Hostetter*

The excusal for cause of venireperson Ann Hostetter is perhaps the most perplexing and most improper of the dismissals. When asked whether she could recommend a sentence of death, Ms. Hostetter initially responded that she wasn't sure, and when asked how strong this view was, she stated "I'm sitting on the fence halfway." NT 11/15/05 at 96-8. When asked again, Ms. Hostetter said she thought she'd have difficulty considering a sentence of death, then qualified that to "*might have difficulty deciding of a death penalty*," but then ultimately answered that she would be able to recommend the death sentence if the law and evidence permitted, regardless of her feelings. Id. at 98-9.[61] Despite this affirmative response, the Court again asked Ms. Hostetter whether she would

---

[61]The Court:   Okay. Well, let me ask you a couple of questions going back with that earlier question. Would you be able to recommend the death penalty at the end of this penalty hearing if the law and evidence permits regardless of your feeling about the death penalty that you just expressed?

149

be able to recommend the death penalty, at which point she appeared confused and asked that the Court repeat the question. Id. at 99. When the Court asked for the final time whether Ms. Hostetter could recommend the death penalty, and whether she understood the question, she responded, "I think so. No." Id. Despite Ms. Hostetter's earlier positive responses to this exact question, as well as her apparent confusion with the court's final questions, the Court did not clarify the question, and simply ended voir dire at this point. Most significantly, despite asking multiple times whether Ms. Hostetter could recommend the death penalty, the Court never asked the one specific question required by law, whether Ms. Hostetter's views would substantially impair her ability to follow the law or the Court's instructions on the law. Adams v. Texas, 448 U.S. at 45; Witt, 469 U.S. at 424. The Court erred in failing to make this inquiry of Ms. Hostetter, and counsel was ineffective for failing to request such an inquiry.

The trial court erred in excusing for cause these venirepersons whose views on the death penalty did not substantially impair their ability to follow the law. Trial counsel was ineffective for failing to attempt to rehabilitate these venirepersons and for failing to object to the prosecution's motions to strike for cause. These errors by the Court and counsel denied Petitioner his rights under the Sixth, Eighth and Fourteenth Amendments as well as Article I, Sections 4, 7, 11, and 13 of the Delaware Constitution.

## C.    Counsel was Ineffective.

When counsel's performance falls below "an objective standard of reasonableness," it is considered deficient, in violation of the Sixth Amendment right to effective assistance of counsel.

---

Hostetter:        *Yes, I would.*

NT 11/15/05 at 98-9.

150

Petitioner is prejudiced when that deficient performance undermines confidence in the outcome of the proceeding. <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003); <u>Williams v. Taylor</u> 529 U.S. 362 (2000); <u>Strickland v. Washington</u>, 466 U.S. 668, 694 (1984).

The proper standard for attorney performance is that of "reasonably effective assistance," as defined by "prevailing professional norms." <u>Outten v. Kearney</u>, 464 F.3d 401, 417 (3d Cir. 2006), quoting <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88 (1984). Counsel's failure to raise a cause challenge to the seating of the biased jurors as discussed above, object to the Court's failure to grant the cause challenges when they were alleged, or, exercise a peremptory strike when the challenge for cause was denied, constituted prejudicially deficient performance.

With regard to the improper excusals for cause of the three venirepersons who expressed a concern about the death penalty but were not substantially impaired in their ability to follow the law, counsel's failure to request additional voir dire and attempt to rehabilitate these jurors was objectively unreasonable and prejudiced Petitioner, in violation of the Sixth Amendment right to effective assistance of counsel and Article I. <u>See</u> <u>Wiggins</u>, <u>Williams</u>, and <u>Strickland</u>, 466 U.S. at 694. The American Bar Association's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (Rev. Ed. 2003), the "prevailing professional norms" in effect at the time of Petitioner's resentencing in 2005, mandate that counsel in death penalty cases "develop a strategy for rehabilitating those prospective jurors who have indicated opposition to the death penalty." *ABA Guidelines for Appointment and Performance of Counsel in Death Penalty Cases (Rev. Ed. 2003)*, ABA Guideline 10.10.2, Commentary, at 106. In addition to comporting with the "prevailing professional norms," effective counsel is also charged with being aware of "the state of the applicable law." <u>Everett v. Beard</u>, 290 F.3d 500, 509 (3d Cir. 2002). At the time of jury selection

151

(November 2005), the United States Supreme Court had long recognized a capital defendant's constitutional right to a properly death-qualified and life-qualified jury. See Morgan, Wainwright, Witt. There is no possible strategic reason for failing to object to the prosecution's challenges for cause or to request follow up questions to rehabilitate these jurors.

As these issues involve Petitioner's basic Sixth Amendment right to an impartial jury, counsel could have no sound trial strategy to support their waiver of this constitutional right. See Hughes v. State, 258 F.3d 453, 463 (6th Cir. 2001). As demonstrated above, the failure of both the Court to conduct a constitutionally adequate voir dire, and counsel's subsequent failure to make appropriate challenges for cause, request additional voir dire, and/or to object to the prosecution's challenges for cause, resulted in the empaneling of two biased jurors and the improper excusal for cause of three venirepersons, demonstrating prejudice.

**D.      There Are No Bars to This Court's Consideration of the Merits of This Claim.**

Rule 61(i)(1)-(2) and (4) are clearly inapplicable to these claims. These claims are timely, having been filed within one year of final judgment of sentence; as these claims arise out of the 2005 sentencing proceeding, this is clearly the first post-conviction proceeding available to Petitioner; and, there have been no previous adjudications of these claims. Nor does Rule 61(i)(3) apply to these claims for a number of reasons. First, as described above, see Section II.A.1.c., this subsection is not applicable to ineffective assistance of counsel claims. Second, the failure to raise these claims was the result of counsel's constitutional ineffectiveness, thus demonstrating cause, Flamer v. State, 585 A.2d 736, 758 (Del. 1990), and, as described above, prejudice is demonstrated because, had these claims been raised in the prior proceedings there is a reasonable likelihood that the outcome would have been different. Finally, as described above, Petitioner meets the exception to application

152

of Rule 61(i)(3) outlined in Subsection 61(i)(5). Petitioner has presented colorable claims involving multiple constitutional violations that would arguably require vacating Petitioner's capital sentence. Webster v. State, 604 A.2d 1364, 1367 (Del.1992). Accordingly, there are no bars to this Court's merits consideration and, for the reasons described above, relief is required.

**CLAIM XII.** **PETITIONER WAS DENIED HIS RIGHT TO A FAIR AND IMPARTIAL JURY AT HIS CAPITAL TRIAL IN 1996 IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS AND ARTICLE I, SECTIONS 4, 7, 11 AND 13 OF THE DELAWARE CONSTITUTION.**

Due process has long required that the jury's verdict must be based on the evidence developed at trial as opposed to information from outside resources. Chandler v. Florida, 449 U.S. 560, 575 (1981). More importantly, it is fundamental that jurors cannot allow their prejudices or emotions to affect their ability to render a fair and impartial verdict. Ross v. Oklahoma, 487 U.S. 81, 85 (1988); Irvin v. Dowd, 366 U.S. 717, 722 (1961); Turner v. Murray, 476 U.S. 28 (1986); Ristaino v. Ross, 424 U.S. 589, 596 (1976); United States v. Evans, 917 F.2d 800, 809 (4th Cir. 1990).

Where even a single juror harbors a prejudice against the defendant or in favor of the prosecution, the impartiality of the entire jury is compromised. Ross v. Oklahoma, 487 U.S. 81, 85 (1988); Turner v. Murray, 476 U.S. 28 (1986); Ristaino v. Ross, 424 U.S. 589, 596 (1976); Irvin v. Dowd, 366 U.S. 717, 722 (1961); United States v. Evans, 917 F.2d 800, 809 (4th Cir. 1990). Delaware law comports with federal constitutional law on this issue. Lovett v. State, 516 A.2d 455, 475 (Del. 1986) ("If only one juror is improperly influenced, a defendant in a criminal case is denied his Sixth Amendment right to an impartial jury."); see also Massey v. State, 541 A.2d 1254, 1256 (Del. 1988) (juror bias not tolerated under Delaware law).

153

"It is well settled that the Sixth and Fourteenth Amendments guarantee a defendant on trial for his life the right to an impartial jury." Ross v. Oklahoma, 487 U.S. 81, 85 (1988) (citing Wainwright v. Witt. 412 (1985); Irvin v. Dowd, 366 U.S. 717, 722 (1961)).

> [P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors. Dennis v. United States, 339 U.S. 162, 171-172 (1950); Morford v. United States, 339 U.S. 258, 259 (1950). "Voir dire plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate voir dire the **trial judge's responsibility** to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981) (plurality opinion).

Morgan v. Illinois, 504 U.S. 719, 729-730 (1992). In Morgan and in Rosales-Lopez, the Supreme Court explicitly stated that the responsibility to identify and remove prospective jurors who will not be impartial lies with the trial court.

The constitutional standard for determining juror bias is no different in a capital case than it is in any other case. Wainwright v. Witt, 469 U.S. 412, 423 (1984) ("there is nothing talismanic about juror exclusion" in capital cases). Under the Sixth Amendment, a juror is considered biased if "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Gray v. Mississippi, 481 U.S. 648, 657 (1987) (quoting Adams v. Texas, 448 U.S. 38, 45 (1980)).

In Witt, the United States Supreme Court stated, "As with any other trial situation where an adversary wishes to exclude a juror because of bias, . . . the adversary seeking exclusion . . . must demonstrate, through questioning, that the potential juror lacks impartiality." Then the trial judge "determine[s] whether the challenge is proper." Witt, 469 U.S. at 423-24; id. at 429 ("excluding prospective capital sentencing jurors because of their opposition to capital punishment is no different

154

from excluding jurors for innumerable other reasons which result in bias").

As described below, the court permitted a number of jurors at Petitioner's 1996 capital trial to remain on the jury despite clear evidence of presumed and actual biases. In addition, Petitioner's right to an impartial jury and presumption of innocence was violated when jurors saw him in his orange prison jumpsuit. Counsel was ineffective in failing to object to the court's failure to dismiss these jurors, and in failing to raise and litigate these claims at trial, during post-trial proceedings and in appellate proceedings. Relief is required.

### A.    Petitioner was Prejudiced by Counsel's Ineffective Failure in Allowing Jurors to See Petitioner in his Prison Clothing.

On the first day of jury selection at his capital trial in 1996, as the result of a mix up at the prison, Petitioner was not provided with civilian clothing. Prior to the prospective jurors being brought into the courtroom, the court recognized the problem and asked counsel if they had a problem going forward, or if they would prefer to recess and have the civilian clothing brought over so Petitioner could change clothes. NT 10/22/96 at 4. Counsel opted to move forward, and as a result the venire panel witnessed Petitioner in his prison garb. Three members of the actual jury were selected that day.[62] As the result of counsel's ineffective failure, these jurors saw Petitioner in his bright orange jumpsuit, which clearly identified him as a prisoner.

Where a court compels a defendant to appear before a jury in identifiable prison clothes, the Fourteenth Amendment due process right of presumption of innocence is violated. Estelle v. Williams, 425 U.S. 501, 518-19 (1976); Gaito v. Brierley, 485 F.2d 86, 88 (3d Cir. 1973). Similarly, where counsel fails to protect his or her client's presumption of innocence, counsel is ineffective,

---

[62]Juror No. 1, Karen L. Haney, NT 10/22/96 at 122-33; Juror No. 2, Rebecca A. Keesler, id. at 1147-55; and Juror No. 3, Terrence William Pendergast, id. at 161-80.

in violation of the Sixth Amendment right to counsel. Counsel's failure to accept the Court's offer of a recess and allow Petitioner to change into civilian clothes resulted in three jurors seeing Petitioner in his orange prison jumpsuit, resulting in bias and thus violating Petitioner's presumption of innocence.

Prison clothing is inherently prejudicial because it informs the jury of "impermissible factors," such as the fact that a defendant already has been deprived of his liberty. See Estelle v. Williams, 425 U.S. at 503-05. When a jury's attention is drawn to irrelevant factors (such as why a defendant is incarcerated pretrial, since he's wearing obvious prison attire), the impartiality may be undermined. U.S. v. Stewart, 20 F.3d 911, 915 (8th Cir. 1994); see also Holbrook v. Flynn, 475 U.S. 560, 567 (1986) ("An impartial jury should determine guilt or innocence based on the evidence presented at trial, not on irrelevant factors such as "official suspicion, indictment, [or] continued custody."). The Delaware Supreme Court has similarly found error when a defendant was forced to participate in jury selection in clearly identifiable prison clothing. Smith v. State, 719 A.2d 490 (Del. 1988) (finding trial court erred in not allowing defendant to change into civilian clothes prior to jury selection, but held error harmless because voir dire question and curative instruction on this topic rendered the error harmless). While the Court in Petitioner's case was willing to take a recess and permit Petitioner to change clothes, as a result of counsel's ineffectiveness, three members of Petitioner's jury saw him in his prison garb. Counsel's failure constituted deficient performance, and Petitioner was prejudiced as a result.

**B.    The Legal Standard in Establishing Juror Bias.**

As Chief Justice Marshall noted over a century ago:

The great value of the trial by jury certainly consists in its fairness and impartiality.

Those who most prize the institution, prize it because it furnishes a tribunal which may be expected to be uninfluenced by an undue bias of the mind.

United States v. Burr, 25 F. Cas. 49, 50 (1807).

Bias may be actual or presumed.  Actual bias is demonstrated when "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"  Wainwright v. Witt, 469 U.S. 412, 424 (1985) (quoting Adams v. Texas, 448 U.S. 38, 45 (1980)).  See also, Smith v. Phillips, 455 U.S. 209, 217 (1982); United States v. Wood, 299 U.S. 123, 133-34 (1936); United States v. Torres, 128 F.3d 38, 43 (2d Cir. 1997); Hunley v. Godinez, 975 F. 2d 316, 318 (7th Cir. 1992); United States v. Nell, 526 F.2d 1223, 1229 (5th Cir. 1976); United States v. Haynes, 398 F. 2d 980, 984-85 (2d Cir. 1968).

Where actual bias is at issue, due process is satisfied so long as the trial court conducts a probing inquiry into the nature of the bias, and the record supports the conclusion that the juror can set the beliefs or experiences aside and consider the matter on the basis of the evidence alone.  Adams v. Texas, 448 U.S. 38, 45 (1980) ("unless [the juror's] views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath," due process is not violated); Smith v. Phillips, 455 U.S. at 217 ("Due process means a jury capable and willing to decide the case solely on the evidence before it").

Where, however, a juror has a close relationship with a participant or the issues in the trial, there exists a "conclusive presumption of implied bias."  Smith v. Phillips, 455 U.S. at 222 (O'Connor, J. concurring).  Under these circumstances, regardless of the existence of an actual bias, the juror must be struck as a matter of law in order to preserve a defendant's rights to due process and a fair and impartial jury.  E.g. Leonard v. United States, 378 U.S. 544 (1964) (per curiam)

157

(automatic disqualification required where prospective jurors heard the defendant's guilty verdict in another trial); Taylor v. Louisiana, 379 U.S. 466, 473-74 (1965) (juror's association with deputy sheriffs who were also key prosecution witnesses deprived the defendant of his rights to due process and a fair and impartial jury).[63]

The rationale behind this rule is well-settled. A juror "may declare that he feels no prejudice in the case; and yet the law cautiously incapacitates him from serving on the jury because it suspects prejudice, because in general persons in a similar situation would feel prejudice" United States v. Burr, 25 F. Cas. 49, 50 (1807). Indeed, as Justice O'Connor aptly recognized, "partly because a juror may have an interest in concealing his own bias and partly because the juror may be unaware of it" a finding of implied bias is justified in order to avoid a miscarriage of justice where a juror has a close relationship with the participants or the issues in a trial. Smith v. Phillips, 455 U.S. at 221-22 (O'Connor, J. concurring). See also, Irvin v. Dowd, 366 U.S. at 728 (recognizing that under certain circumstances, the "psychological impact requiring [a declaration by the juror that he or she can be

---

[63]See also, Gonzales v. Beto, 405 U.S. 1052 (1972) (Per curiam reversal on the basis of Taylor v. Louisiana where the sheriff who was the key prosecution witness also served as bailiff during the trial); Tumey v. Ohio, 273 F. 510, 523 (1927) (mayor who received benefit of fines and costs disqualified from determining defendant's guilt in trial for unlawfully possessing intoxicating liquors); Hunley v. Godinez, 975 F. 2d 316, 320 (7th Cir. 1992) (bias presumed where juror victims of burglary in hotel were sequestered during murder and burglary trial); Burton v. Johnson, 948 F. 2d 1150, 1159 (11th Cir. 1991) (juror who failed to disclose during voir dire that she was involved in an abusive family situation where the defense was battered spouse syndrome constituted implied bias); United States v. Eubanks, 591 F. 2d 513, 517 (9th Cir. 1979) (presumed bias where juror's sons imprisoned for heroin related crimes in heroin conspiracy trial); United States v. Allsup, 566 F. 2d 68, 71 (9th Cir. 1977) (implied bias where jurors worked for same bank at different branch in bank robbery trial); United States ex rel. Steward v. Hewitt, 517 F. 2d 993, 997 (3d Cir. 1975) (presumptive bias where father of deceased served as tipstaff during trial); Jackson v. United States, 395 F. 2d 615, 617-18 (D.C. Cir. 1968) (implied bias where juror involved in "love-triangle" similar to one at issue at trial); United States ex rel. DeVita v. McCorkle, 248 F. 2d 1, 8 (3d Cir. 1957) (en banc) (implied bias where juror was victim of robbery prior to trial in robbery case).

fair] before one's fellows is often its father" and, as a result, "such a statement of impartiality can be given little weight").

### C.    The Court and Counsel's Failure to Exclude Three Jurors Who Demonstrated Bias.

In addition to the three jurors selected on the first day of jury selection who witnessed Petitioner in his orange prison jumpsuit, clearly giving the impression that he was incarcerated and thus creating a presumption of guilt in their minds, the Court and counsel failed to remove three other jurors who exhibited bias.

#### 1.    Juror Number 2, Rebecca Keesler

Juror Number 2, Rebecca Keesler, should have been struck for cause because of her fragile emotional state at the prospect of having to serve on a capital jury.

When Ms. Keesler was voir dired on the first day of jury selection of Petitioner's capital trial in 1996, she answered all of the Court's questions appropriately, and all parties thus found her acceptable as a juror. NT 10/22/96 at 147-55. However, three days later, the prosecutor, Mr. Wharton, informed the Court and the defense that he had been approached by a deputy attorney general, Tom Stevens, who was on trial in the neighboring courtroom, who told him that his wife was a nurse for a Dr. Borrin, and that a nineteen year old juror had come into his office and asked for a medical excuse because she was "devastated" at the possibility of sitting on a capital murder case, and that she had been crying every night since being selected. NT 10/15/96 at 75-6. After confirming that there were no other capital cases with juries being selected at the same time, and also confirming that Ms. Keesler, was in fact nineteen years old, the Court agreed to have her come in the following Monday to inquire into the matter. Id. at 78-9. The Court then continued with jury

159

selection.

The next day of jury selection, the Court asked the juror whether she was having problems sleeping. The juror responded that "My mother is nuts. She told me she called my doctor . . . [a]nd I guess my doctor knew somebody or something and it got back here. I have no clue." NT 10/28/96 at 21-2. The juror denied sobbing at night, and when asked if she preferred to get off the jury, said she was "fine." Id. at 22. When the prosecution requested further inquiry, the juror admitted that she had been "a little upset" initially, but then was fine, and denied ever having seen her doctor. Id. at 24-5. No further questions were asked, and no opportunity was provided by the Court, or requested by either party, to continue the inquiry.

Given the potential fragile emotional and psychological state of mind of this juror, the Court was obliged to conduct further inquiry. Given the significant consequences involved in a capital case, the Court erred in merely taking the juror at her word, especially after she admitted how upset she had been. Moreover, the juror's version of events contradicted that of the deputy attorney general and his wife the nurse, who stated that the juror had actually come into the doctor's office. At the least, the Court was obligated to inquire of these two individuals to find out what actually took place, and whether the juror was being candid with the Court.

The presence of a biased juror, like that of a biased judge, constitutes a "structural defect in the constitution of the trial mechanism" and is not subject to harmless error analysis. Johnson v. Armontrout, 961 F.2d 748, 756 (8th Cir. 1992) (quoting Arizona v. Fulminante, 499 U.S. 279, 309 (1991). Hence, the Sixth Amendment right to a trial by an impartial jury cannot be waived by counsel or the court, as both parties share in the duty to ensure that biased jurors are dismissed. Hughes v. United States, 258 F.3d 453, 463-64 (6th Cir. 2001). The Court should have required

160

additional voir dire of Ms. Keesler, as well as the nurse who made the allegation, to ensure that Ms. Keesler was being truthful with the Court, and to ensure that a juror with a fragile and unstable psyche was not given the awesome responsibility of determining the guilt or innocence of Petitioner, or whether he should live or die.

_____ **2.    Juror Number 3, Terrence Pendergast**

Terrence Pendergast should have been dismissed for a number of reasons. In addition to being exposed to Petitioner in his prison garb without any voir dire or curative instructions to determine whether this adversely affected Petitioner's presumption of innocence, the Court expressed concern that Mr. Pendergast had walked in and out of the courtroom a few times that morning during jury selection. NT 10/22/96 at 162. Mr. Pendergast said he was confused about where to go, and that he had asked several people who were coming into the courtroom about where to go. While the Court asked Mr. Pendergast whether he was "influenced in any way by what [he] heard when he was in court [that] morning," the Court failed to inquire specifically as to what exactly Mr. Pendergast had heard and seen. Also, when asked whether he had any "yes" responses to the questions that the Court had asked the previous day, the juror indicated that he didn't recall the questions the Court was talking about, and the Court had to actually provide Mr. Pendergast with a list of the questions. Id. at 162. Upon being provided with the list, Mr. Pendergast said he remembered reading an article about a shooting at Cavalier Apts. about a year prior to the trial, but that he didn't recall discussing it with anybody and that he hadn't formed an opinion based on what he read. Id. at 163. Mr. Pendergast did not answer yes to any of the remaining questions.

At the conclusion of voir dire, the prosecutor pointed out that Mr. Pendergast failed to answer yes to the question about being a convicted felon, and informed the Court and counsel that Mr.

161

Pendergast had been arrested for possession of drug paraphernalia, conspiracy, a weapon charge, maintaining a dwelling, and possession with intent to deliver. Mr. Pendergast ultimately plead guilty to possession of marijuana. Id. at 174-5. At this point, codefendant's counsel Winslow indicated he may have represented the juror in a guilty plea ten years before for possession of marijuana.[64] When queried further about this conviction, the juror explained that the police found drugs under his mother's bed that she had taken from a student on her school bus, his mother was on vacation at the time, and he claimed the drugs were his and plead guilty. Id. at 176.

Given the juror's lack of candor about his prior conviction, as well as his apparent willingness to lie under oath in the guilty plea proceeding for that case,[65] the Court should have *sua sponte* removed this juror for cause. Since his responses confirmed a history of lying under oath, there was a very good likelihood that Mr. Pendergast lied about not forming an opinion from the article he had read about the case, or about any number of questions about which the Court had previously questioned him. Simply put, this juror could not be trusted to provide an honest answer. The Court's failure to remove this juror, and counsel's failure to make a challenge for cause on this basis (or, in the alternative, exercise a peremptory if the challenge for cause was denied), prejudiced Petitioner.

### 3.    Juror Number 5, Patricia Romanoski

The Court also erred in failing to grant Petitioner's challenge for cause of Juror No. 5, Patricia Romanoski. Ms. Romanoski admitted that two years before, she had sat as a juror on

---

[64]Upon further inquiry, it appeared this was not the case, as the juror indicated he had been represented by Jim Natalie. NT 10/22/96 at 177.

[65]Unless, of course, the marijuana really was his, in which case he lied to the Court in these proceedings.

another murder case. The circumstances of that trial were very similar to those in Petitioner's case.

It happened at an apartment complex, two defendants were involved, and a man was killed. The jury

found the defendants guilty, but handed down a life sentence instead of the death penalty. Ms.

Romanoski also recalled that one of the attorneys on this case was the attorney on that case NT

10/23/96 at 53-55. The Court then asked Ms. Romanoski to leave the courtroom, at which time Mr.

Figliola informed the Court that he had been the attorney on that case, and that his client had in fact

been given a life sentence. Id. at 55. Mr. Figliola then requested that the prospective juror be struck

for cause, at which point the prosecution requested additional voir dire. Id. The Court then asked

Ms. Romanoski whether Mr. Figliola's participation in the case would prevent her from being fair

and impartial, to which she responded it would not, and that her prior juror experience would not

affect her partiality either. Id. at 57.[66] The Court continued with the remaining voir dire questions

asked of all jurors, and at the conclusion of voir dire, called the question, at which no party issued

a challenge for cause or utilized a peremptory. Id. at 65.

A court should not simply rely on a juror's assurances of impartiality. Kirk v. Raymark

Industries, Inc., 61 F.3d 147, 156 (3d Cir. 1995). In this instance, Ms. Romanoski clearly

remembered the details of the prior case, which were strikingly similar to the factual scenario in

Petitioner's case. She also clearly remembered that Attorney Figliola had represented one of the

defendants in that case (who the jury had ultimately found guilty of first degree murder but spared

his life). Given her prior experience with Petitioner's counsel in a trial with a virtually identical

factual scenario, a "conclusive presumption of implied bias" existed and Ms. Romanoski should

---

[66]Ms. Romanoski also expressed concern that she would have to miss a month of work.
NT 10/23/96 at 57-8.

163

have been excused. <u>Smith v. Phillips</u>, 455 U.S. at 222 (O'Connor, J. concurring).

The Court's and counsel's failure to remove these biased jurors from the panel violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights, as well as his rights under Article I, sections 4, 7, 11 and 13 of the Delaware Constitution.

## D.     Counsel Was Ineffective.

The Sixth Amendment right to effective assistance of counsel is violated when counsel's performance is deficient, <u>i.e.</u>, falls below "an objective standard of reasonableness;" and the defendant is prejudiced, <u>i.e.</u>, when confidence is undermined in the outcome of the proceeding. <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003);  <u>Williams v. Taylor</u> 529 U.S. 362 (2000); <u>Strickland v. Washington</u>, 466 U.S. 668, 694 (1984).  In evaluating counsel's performance, the Court should consider professional norms such as the American Bar Association's Standards for Criminal Justice ("ABA STANDARDS") and Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989) ("ABA GUIDELINES"), which articulate "reasonable" professional "standards for capital defense work" and are the "norms" and "standards to which [the Supreme Court] long ha[s] referred as 'guides to determining what is reasonable'" under the Sixth Amendment. <u>Wiggins</u>, 539 U.S. at 522-25 (citing <u>Strickland</u>; <u>Williams</u>). <u>See also</u> <u>Outten v. Kearney</u>, 464 F.3d 401, 417 (3d Cir. 2006).

Despite the obvious constitutional errors described above and the impact of those errors on Petitioner's right to a fair and impartial jury at his capital trial in 1996, counsel failed to develop and raise these claims during trial, post-trial and appellate proceedings in violation of the Sixth, Eighth and Fourteenth Amendments and Article I.  Moreover, as these issues involve Petitioner's basic Sixth Amendment right to an impartial jury, counsel could have no sound trial strategy to support

their waiver of this constitutional right. See Hughes v. State, 258 F.3d 453, 463 (6th Cir. 2001).

Counsel's failure to raise a cause challenge, object to the Court's failure to grant the cause challenges

when they were alleged, or, exercise a peremptory strike when the challenge for cause was denied,

constituted prejudicially deficient performance.

Similarly, counsel's failure to raise these claims on appeal or during prior proceedings

constitutes prejudicially deficient performance. The same standards apply to claims of appellate

ineffectiveness. See, e.g. Roe v. Flores-Ortega, 528 U.S. 420 (2000) (applying Strickland standard

to consideration of appellate counsel's ineffectiveness); United States v. Mannino, 212 F.3d 835 (3d

Cir. 2000); Orazio v. Dugger, 876 F.2d 1508, 1513 (11th Cir. 1989); Matire v. Wainwright, 811 F.2d

1430, 1435 (11th Cir. 1987).  Where, as in this case, there is a "reasonable probability that the

neglected claim[s] would have succeeded on appeal, [] counsel's failure to raise the claim f[alls]

outside the range of reasonably competent assistance." Claudio v. Scully, 982 F.2d 798, 799 (2d Cir.

1992); Jackson v. Leonardo, 162 F.3d. 81 (2d Cir. 1998) (appellate counsel's failure to raise "sure

winner" constituted ineffective assistance: "In the instant case, we believe that appellate counsel's

failure to raise a well- established, straightforward, and obvious . . . [claim] . . . constitutes

ineffective performance."); Starr v. Lockhart, 23 F.3d 1280 (8th Cir. 1993) (finding trial and

appellate counsel ineffective for failing to object to and raise an erroneous jury instruction); Freeman

v. Lane, 962 F.2d 1252 (7th Cir. 1992) (appellate counsel ineffective for failing to raise a meritorious

claim that was "presented squarely" at trial regarding a violation of the defendant's Fifth

Amendment rights); Murphy v. Puckett, 893 F.2d 94 (5th Cir. 1990) (counsel's failure to raise valid

defense at trial and on direct appeal constituted ineffective assistance). Accordingly, for this reason

as well, relief is required.

165

**E.      There Are No Bars to This Court's Consideration of the Merits of These Claims.**

Rule 61(i)(1)-(2) and (4) are clearly inapplicable to these claims.  These claims are timely, having been filed within one year of final judgment of sentence; and, there have been no previous adjudications of these claims.  Nor does Rule 61(i)(3) apply to these claims for a number of reasons.  First, as described above, see Section II.A.1.c., this subsection is not applicable to ineffective assistance of counsel claims.  Second, the failure to raise these claims was the result of counsel's constitutional ineffectiveness, thus demonstrating cause, Flamer v. State, 585 A.2d 736, 758 (Del. 1990), and, as described above, prejudice is demonstrated because, had these claims been raised in the prior proceedings there is a reasonable likelihood that the outcome would have been different.  Finally, as described above, Petitioner meets the exception to application of Rule 61(i)(1) - (3) outlined in Subsection 61(i)(5).  Petitioner has presented colorable claims involving multiple constitutional violations that would arguably require vacating Petitioner's capital sentence.  Webster v. State, 604 A.2d 1364, 1367 (Del.1992).  Accordingly, there are no bars to this Court's merits consideration and, for the reasons described above, relief is required.

**CLAIM XIII.  THE ADMISSION OF VICTIM IMPACT TESTIMONY VIOLATED PETITIONER'S SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS, AND HIS RIGHTS UNDER ARTICLE I, SECTIONS 4, 7, 11, AND 13 OF THE DELAWARE CONSTITUTION.**

At Petitioner's resentencing trial in 2005, the prosecution presented inflammatory, emotional, and cumulative evidence and argument about the decedent's personal characteristics, his relationship with family members, and the effect his death and the shooting itself had on his family.  The jury's consideration of this victim impact evidence violated state law, and Petitioner's rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and Article I, Sections 4, 7, 11, and 13 of the Delaware Constitution.

A.    **The Improper Victim Impact Evidence that was Presented.**

The prosecution presented *six* witnesses to present evidence of "victim impact." All of these witnesses testified about the impact the decedent's death had on them personally, as well as other members of their family, and provided detailed personal descriptions of the decedent's personality traits and details of his life.  In his closing argument, the prosecutor summarized the testimony presented by these witnesses.  In addition to being cumulative, the shear number of witnesses presented by the prosecution rendered the evidence far more than a "quick glimpse of the life" of the decedent.

The decedent's girlfriend, Deborah Dorsey Crowell, provided a detailed account about how she and the decedent had talked about getting married, but didn't want to tell her parents because they had just spent a large sum of money on her siblings' weddings. NT 11/16/05 at 166.  Even though she had since married another, she described the pain of losing the decedent ten years before as a " wound in your heart that can never heal." Id. at 167.  She then talked about how memories would pop into her head out of the blue, and how "great" his family is but how it's hard to see them now.  Id.  Ms. Crowell went on to talk about what a great guy the decedent was, how his niece and nephew "loved him to death," and how he'd insist on stopping for quarters on the way to Sunday dinners to make sure he had something to give his niece and nephew. Id. at 168.  She also talked about how helpful he was to others at work, and then displayed a picture of the decedent and described for the jury the events surrounding the photograph. Id. at 169-70.  Ms. Crowell described how the decedent always made her laugh, always told jokes, and how much she enjoyed visiting the decedent's parents house and hear them tell stories about when they were young. Id. at 170.  She concluded her eulogy with a story about a visit that she and the decedent made to Disney World and

167

Miami to visit the decedent's aunt, and expressed her regret that there would be no more trips like that. Id.

The decedent's aunt, Ruth Mixon, picked up where Ms. Crowell left off and talked about the decedent's visit to she and her children in Florida, and described how her twenty-five year old son looked like the decedent. She also talked about the decedent's relationship with her children, and the family get-togethers at the holidays and during family reunions, and how the decedent's many aunts and uncles were still really upset about his death. NT 11/21/05 at 103-04. She ended her testimony by expressing her fear that something similar could happen to her own children, that she worries about everything, and that while the family is moving forward, certain things happen that bring the memories back and "you never get over it" and "don't realize how it affects your whole life." Id. at 105.

Another aunt of the decedent, Joan Startt, also talked about the family gatherings, and testified how special the decedent was to the family, described the decedent as fun loving, that he had a gift of bringing a smile to everyone's face, that he had a great future and "was going to make a difference in the world," and that everyone missed him dearly.[67] NT 11/21/05 at 107-08. Ms. Startt went on to talk about how the decedent was pursuing a career in law enforcement, how he loved helping people, and of the wonderful relationship he had with her two children. Id. at 108-09. She also provided additional detail about the large, close-knit family surrounding the decedent, and how he always attended the many family gatherings. Id. at 109. Ms. Startt concluded her testimony with a vivid depiction about how hard the murder was on she and her children, and how fearful they

---

[67]It appears that Ms. Startt became emotional during her testimony, as there are pauses indicated during her answers, and in the middle of her testimony, the prosecutor told her to "take [her] time." NT 11/21/05 at 108.

became after the murder. She described how she is still afraid to go anywhere alone, that she won't

go to shopping malls, and how she is "always looking over [her] shoulder." Id. at 110.

The decedent's younger brother, Kenneth Heath, talked about how close he and his brother

were, the experiences they shared together, and all the family vacations and celebrations. NT

11/21/05 at 112. He spoke in detail about the Sunday dinners at their parents' home, watching the

Eagles' games, and how much he missed those times.[68]

The decedents' parents, Marion and Edward Heath, also provided victim impact testimony

about their son. The prosecution produced yet another photograph of the decedent with his siblings,

and Mrs. Heath described the circumstances surrounding the photo. She then went on to talk about

how close the decedent was with his brother and sister, and talked more about the family Sunday

dinners already described by Deborah Dorsey Crowell, the decedent's two aunts, and his brother.

NT 11/21/05 at 116-18. Mrs. Heath also testified about how her daughter's youngest child, who was

just an infant when decedent was killed, often heard family members discussing the death of her

uncle, and when she visited his grave with her grandparents insisted that they go buy flowers to place

on it. Id. at 118. Mrs. Heath also testified about the devastation of learning about the decedent's

death and how difficult it was to tell her other children about it. Id. Mrs. Heath finished her

testimony by talking about the decedent's educational and work history, how much he loved his job

and his fellow employees, how much they liked him, and how an old school friend had recently

contacted Mrs. Heath to see how they were and tell her how much he still missed the decedent. Id.

at 118-20. At the conclusion of Mrs. Heath's testimony, the prosecution produced for the jury's

---

[68]Like Ms. Startt, Mr. Heath appears to have become emotional when he began talking
about the family gatherings, as the prosecutor interrupted and told him to "take [his] time." NT
11/21/05 at 113.

examination yet a third picture of the decedent taken when he was promoted to security manager at the Baltimore store Owings [sic.] Mills. Id. at 120.

The final victim impact witness presented by the prosecution was the decedent's father, Edward Heath. Mr. Heath testified about how "devastating" it was to lose a son, how it's "like a piece of you going out of your body," and that piece is still missing. NT 11/21/05 at 121-22. Mr. Heath reiterated how close the family was, and how involved his children and the whole family had been in activities such as music, sports, vacations, fishing, and hunting. Id. at 122. Mr. Heath told the jury that the decedent was buried behind the family church just eleven miles from their home, and that they visited the grave every Sunday. Id. When the prosecutor asked Mr. Heath if he ever talked to his son, he said yes, but became emotional when asked to describe what he said to him. Id. at 123.

As if the testimony of these six witnesses wasn't sufficient, the prosecutor made sure to hammer home the point to the jury during his closing argument:

> You heard what kind of person Kristopher Heath was. He wanted to do something positive with his life. He went to Pennsville High School, graduated University of Delaware. He had plans to marry Debbie Dorsey and he was working on getting into the DEA. When the defendants executed Kristopher Heath, they stole a lot from a lot of people. He came from a large, tight-knit family. Most of them you will see back there. Their lives are not the same. When Mr. Heath visits his son, it is at his grave. He doesn't get telephone calls or letters and he can't visit him, his son, with a plexiglass window between them. After ten years it still hurts. You saw the pain and anguish that they are suffering ten years later. Time does not heal old wounds.

NT 12/05/05 at 38-9.[69] And, during the rebuttal section of his closing, the prosecutor stated:

---

[69] The prosecutor also made a victim impact argument during his opening statement. NT 11/16/05 at 43 ("They had time to think about the fact that they were taking the life of a 25-year old young man in the prime of his life, a son and a brother, friend to people, and they didn't care.").

How they murdered Kristopher Heath, who was merely doing his job- - you heard that he was a valued employee, he was just promoted.

. . .

(Referring to the victim) . . . "Please don't do this. I have a girlfriend I'm engaged to. I have a brother Ken and a sister. I'm the son of Mr. and Mrs. Heath. I'm a great uncle to my nieces and nephews." They didn't give him a chance to do any of that or say any of that. They just gunned him down in a cold parking lot.

NT 12/05/05 at 127, 128.

## B.    The Constitutional Standard.

In Payne v. Tennessee, 501 U.S. 808, 827 (1991), the United States Supreme Court held that

the Eighth Amendment "erects no *per se* bar" to the admission of "evidence about the victim and

about the impact of the murder on the victim's family." Determining that victim impact evidence is

admissible under certain specific circumstances, however, does not mean that the 'floodgates have

opened' for the prosecution to present highly inflammatory, emotionally charged evidence regarding

the decedent. Indeed, the Payne Court recognized that due process prohibits evidence which "is so

unduly prejudicial that it renders the trial fundamentally unfair." Payne v. Tennessee, 501 U.S. at

825. As Justice O'Connor noted:

> We do not hold today that victim impact evidence must be admitted, or even that it should be admitted. We hold merely that if a State decides to permit consideration of this evidence, "the Eighth Amendment erects no *per se* bar." *Ante*, at 2609. *If, in a particular case, a witness' testimony or a prosecutor's remark so infects the sentencing proceeding as to render it fundamentally unfair, the defendant may seek appropriate relief under the Due Process Clause of the Fourteenth Amendment.*

Payne, 501 U.S. at 831 (O'Connor concurring).

Delaware law permits the presentation of victim impact evidence, but recognizes the Payne

171

holding and the limitations on the presentation of such evidence and argument.[70] See Petition of State of Delaware, 597 A.2d 1, 3 (Del. 1991) ("We noted, however, that '[i]f, in a particular case, a witness's testimony or a prosecutor's remark so infects the sentencing proceeding as to render it fundamentally unfair, the defendant may seek appropriate relief under the Due Process Clause of the Fourteenth Amendment.'") (quoting Payne v. Tennessee, 501 U.S. at 831.

When a defendant's life is at stake, courts must be "particularly sensitive to insure that every safeguard is observed." Gregg v. Georgia, 428 U.S. 153, 187 (1976). This heightened standard of reliability is "a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different." Ford v. Wainwright, 477 U.S. 399, 411 (1986). See also Woodson v. North Carolina, 428 U.S. 280, 305 (1976) ("Because of that qualitative difference [between death and any other punishment], there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case"). Because of the exceptional and irrevocable nature of the death penalty, "extraordinary measures" are required by the Eighth and Fourteenth Amendments to ensure the reliability in capital proceedings. Eddings v. Oklahoma, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring). See also Beck v. Alabama, 447 U.S. 625, 637-38 (1980); Lockett v. Ohio, 438 U.S. 586, 604 (1978); and Gardner v. Florida, 430 U.S. 349, 357-58 (1977).

Thus, the proposed evidence must be no more than a "quick glimpse" of the life of the decedent, rather than an emotional plea on behalf of the bereaved, Payne 501 U.S. at 821, 830, and,

---

[70]Other states require a pretrial determination of the admissibility of victim impact testimony, in part, to limit similar emotionally charged presentations before the sentencing jury. E.g. Livingston v. State, 444 S.E.2d 748, 752 (Ga. 1994) ("the trial court must hear and rule prior to trial on the admissibility of victim impact evidence sought to be offered"); Cargle v. State, 909 P.2d 806, 828 (Okla. 1996).

in considering admissibility, there must be exacting limits delineating the scope and nature of the testimony.

**C.    The Emotionally-Charged Testimony was Cumulative and Consisted of Much More than the "Quick Glimpse" Into the Life of the Decedent, in Violation of the Eighth and Fourteenth Amendments.**

The presentation of *six* victim impact witnesses by the prosecution, all testifying to substantially the same information, went far beyond the bounds of what Payne and the Eighth and Fourteenth Amendment permit. The witness presentation was also riddled with emotionality. In questioning two of the six witnesses, the prosecution felt compelled to tell the witnesses to "take their time," indicating that the witnesses were having difficulty keeping their composure.

The emotionally charged nature of an inordinate number of witnesses, in and of itself, far exceeded the "glimpse of the life" contemplated by Payne in violation of the Fourteenth Amendment.

**D.    Counsel was Ineffective In Failing to Object to Improper Victim Impact Evidence to Request a Limiting Instruction, and for Failing to Raise these Issues in the Prior Proceedings.**

Petitioner is entitled to relief from his sentence because counsel were ineffective under the Sixth and Fourteenth Amendments and Article I. Counsel made no objection to the victim impact evidence, and also failed to seek appropriate limiting instructions. This constituted deficient performance, and counsel could not have had a reasonable tactical or strategic reason for failing to object to such cumulative, prejudicial, irrelevant evidence, or to seek appropriate limiting instructions. Petitioner was prejudiced because the jury's unguided consideration of this prejudicial evidence undermines confidence in the verdict.

The Sixth Amendment right to effective assistance of counsel is violated when counsel's performance is deficient, i.e., falls below "an objective standard of reasonableness;" and the

173

defendant is prejudiced, i.e., when confidence is undermined in the outcome of the proceeding. Wiggins v. Smith, 539 U.S. 510, 521 (2003); Williams v. Taylor 529 U.S. 362 (2000); Strickland v. Washington, 466 U.S. 668, 694 (1984). In evaluating counsel's performance, the Court should consider professional norms such as the American Bar Association's Standards for Criminal Justice ("ABA STANDARDS") and Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA GUIDELINES"), which articulate "reasonable" professional "standards for capital defense work" and are the "norms" and "standards to which [the Supreme Court] long ha[s] referred as 'guides to determining what is reasonable'" under the Sixth Amendment. Wiggins, 539 U.S. at 522-25 (citing Strickland; Williams). See also Outten v. Kearney, 464 F.3d 401, 417 (3d Cir. 2006). One critical aspect of counsel's performance in a capital case involves the duty to challenge aggravation evidence presented by the prosecution.[71]

The Guidelines in effect at the time of Petitioner's 2005 trial specifically note that in jurisdictions which permit the introduction of victim impact evidence, "counsel, mindful that such evidence is often very persuasive to the sentencer, should ascertain what, if any, victim-impact evidence the prosecution intends to introduce at penalty phase and evaluate all available strategies for contesting the admissibility of such evidence and minimizing its effect on the sentencer." *ABA Guidelines for Appointment and Performance of Counsel in Death Penalty Cases (Rev. Ed. 2003)*, ABA Guideline 10.11, Commentary, at 117. Thus, at the time of Petitioner's resentencing

---

[71]See e.g., ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES 11.4.1.C (1989) (charging defense counsel with the duty to make "efforts to discover all reasonably available . . . evidence to rebut any aggravating evidence that may be introduced by the prosecutor") (quoted in Rompilla v. Beard, 545 U.S. 374, 387 n.7 (2005)); Wiggins v. Smith, 539 U.S. 510, 524 (2003); Outten v. Kearney, 464 F.3d 401, 417 (3d Cir. 2006).

proceeding, reasonable professional standards included a duty to attempt to contest improper victim impact evidence, and, at a minimum, reduce its effect. Counsel's failure to do either in this case constitutes deficient performance. Here, as described above, counsel's failures resulted in the admission of victim impact argument and testimony that far exceeded the bounds of Due Process, and which the prosecution relied on in support of statutory and non-statutory aggravation.

The "undermines confidence" prejudice standard for ineffectiveness claims is satisfied if there is a "reasonable probability" of a different result. Wiggins, 539 U.S. at 534. This prejudice standard "is not a stringent one. It is less demanding than the preponderance standard." Hull v. Kyler, 190 F.3d 88, 110 (3d Cir. 1999) (quotation marks and citations omitted); accord Williams, 529 U.S. at 406. Where, as here, there is a reasonable likelihood that the jury's determination of statutory aggravation; the jury's weight afforded aggravation; and the ultimate sentencing determination would have been different had counsel properly challenged the admission of the victim impact testimony and argument, or at least requested a limiting instruction, prejudice is demonstrated and relief is required.

Similarly, counsel's failure to raise these claims on appeal constitutes prejudicially deficient performance. The same standards apply to claims of appellate ineffectiveness. See, e.g. Roe v. Flores-Ortega, 528 U.S. 420 (2000) (applying Strickland standard to consideration of appellate counsel's ineffectiveness); United States v. Mannino, 212 F.3d 835 (3d Cir. 2000); Orazio v. Dugger, 876 F.2d 1508, 1513 (11th Cir. 1989); Matire v. Wainwright, 811 F.2d 1430, 1435 (11th Cir. 1987). Where, as in this case, there is a "reasonable probability that the neglected claim[s] would have succeeded on appeal, [] counsel's failure to raise the claim f[alls] outside the range of reasonably competent assistance." Claudio v. Scully, 982 F.2d 798, 799 (2d Cir. 1992); Jackson v.

175

Leonardo, 162 F3d. 81 (2d Cir. 1998) (appellate counsel's failure to raise "sure winner" constituted ineffective assistance: "In the instant case, we believe that appellate counsel's failure to raise a well-established, straightforward, and obvious . . . [claim] . . . constitutes ineffective performance."); Starr v. Lockhart, 23 F.3d 1280 (8th Cir. 1993 ) (finding trial and appellate counsel ineffective for failing to object to and raise an erroneous jury instruction); Freeman v. Lane, 962 F.2d 1252 (7th Cir. 1992) (appellate counsel ineffective for failing to raise a meritorious claim that was "presented squarely" at trial regarding a violation of the defendant's Fifth Amendment rights); Murphy v. Puckett, 893 F.2d 94 (5th Cir. 1990) (counsel's failure to raise valid defense at trial and on direct appeal constituted ineffective assistance).  Accordingly, for this reason as well, relief is required.

As a result of these failures, Petitioner was denied his right to due process of law under the state and federal constitutions and his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments and Article I, Sections 4, 7, 11 and 13.  Relief is required.

**E.    There Are No Bars to This Court's Consideration of the Merits of This Claim.**

Rule 61(i)(1)-(2) and (4) are clearly inapplicable to these claims.  These claims are timely, having been filed within one year of final judgment of sentence; as these claims arise out of the 2005 sentencing proceeding, this is clearly the first post-conviction proceeding available to Petitioner; and, there have been no previous adjudications of these claims.  Nor does Rule 61(i)(3) apply to these claims for a number of reasons.  First, as described above, see Section II.A.1.c., this subsection is not applicable to ineffective assistance of counsel claims.  Second, the failure to raise these claims was the result of counsel's constitutional ineffectiveness, thus demonstrating cause, Flamer v. State, 585 A.2d at 758, and, as described above, prejudice is demonstrated because, as described above, had these claims been raised in the prior proceedings there is a reasonable likelihood that the

176

outcome would have been different. Finally, as described above, Petitioner meets the exception to application of Rule 61(i)(3) outlined in Subsection 61(i)(5). Petitioner has presented colorable claims involving multiple constitutional violations that would arguably require vacating Petitioner's capital sentence. Webster, 604 A.2d at 1367. Accordingly, there are no bars to this Court's merits consideration and, for the reasons described above, relief is required.

**CLAIM XIV    THE PROSECUTION'S CONTINUOUS MISCONDUCT THROUGHOUT PETITIONER'S CAPITAL TRIAL VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS AND HIS RIGHTS UNDER ARTICLE I, SECTIONS 4, 7, 11 AND 13 OF THE DELAWARE CONSTITUTION.**

The duty of the prosecution in a criminal case is not to win the case, but to seek justice. Berger v. United States, 295 U.S . 78, 88 (1935). As part of this duty, the prosecutor has a special obligation to avoid improper conduct. Because of the prosecutor's prominent courtroom role as representative of the State -- and the mantle of respect and authority this creates in the eyes of the jury -- the jurors are predisposed to give great deference to the prosecutor's words and actions, and improper prosecutorial arguments "are apt to carry much weight against the accused when they should properly carry none." Berger, 295 U.S. at 88; accord Drake v. Kemp, 762 F.2d 1449, 1459 (11th Cir. 1985) ("Arguments delivered while wrapped in the cloak of state authority have a heightened impact on the jury." (citing Berger)). "For this reason, misconduct by the prosecutor ... must be scrutinized carefully." Id.

The prosecutor in Petitioner's case completely ignored this constitutional admonition in his opening statement and closing argument of Petitioner's 1996 capital trial, making comments and argument that destroyed the jury's objectivity and impartiality, and infected the trial with unfairness, in violation of due process. Counsel's failure to challenge this improper and inflammatory argument

177

constituted prejudicially deficient performance.

### A. The Prosecutor's Prejudicial, Inflammatory, and Misleading Remarks and Argument.

In the opening statement, the prosecutor made inflammatory comments about the nature of the offense itself, describing it as "a sneaky act" that constituted a "frontal assault on the criminal justice system." NT 10/30/96 at 37. Aside from constituting improper argument during the opening statement, when the prosecutor's duty is to explain to the jury the *evidence* that will be presented in the case, <u>see</u> ABA Standard 3-5.5 for the Prosecution Function ("The prosecutor's opening statement should be confined to a statement of the issues in the case and the evidence the prosecutor intends to offer which the prosecutor believes in good faith will be available and admissible."), the description of the crime as "sneaky" and editorial comment that the crime was a "frontal assault on the criminal justice system" served no legitimate purpose other than to improperly inflame the jury against Petitioner.

The prosecutor continued this diatribe at the conclusion of the trial, when, during his closing argument, he committed additional misconduct by making false and misleading comments to the jury about the evidence that had been presented.

A prosecutor may not misstate the record. <u>Hughes v. State</u>, 437 A2d 559 (Del. 1981); ABA Standard 3-5.8 for the Prosecution Function: (a) In closing argument to the jury, the prosecutor may argue all reasonable inferences from evidence in the record. The prosecutor should not intentionally misstate the evidence or mislead the jury as to the inferences it may draw.

During his closing argument, the prosecutor misled the jury as to the testimony of prosecution witness Malvern Slawter, a police officer on the New Castle County Police evidence detection squad

178

who processed the crime scene.  The prosecutor committed misconduct when he told the jury that

Slawter testified that a camouflage jacket containing 24 nine millimeter bullets in the pocket and

which the prosecutor contended belonged to Petitioner, was found in the backseat of the

codefendant's vehicle. NT 11/12/96 at 66.  In fact, Slawter testified the jacket was found in the trunk

of the vehicle, not the backseat.  NT 10/30/96 at 144.  This fact was critical to the determination of

whether Petitioner was involved in the crime or was the actual shooter, since earlier testimony had

placed Petitioner in the front passenger seat of the vehicle and running from the vehicle.  If the jury

believed the prosecutor's false claim that the jacket was, in fact, found in the backseat, it lends much

more credibility to the argument that the jacket did, in fact, belong to Petitioner, since he would have

had easy access to it (and the ammunition) from the inside of the vehicle.

Trial counsel failed to object to this false and misleading statement, or request a curative

instruction to ensure that the jury was reminded of the actual location of the jacket.  While counsel

did attempt to correct the prosecutor's misstatement later in his own closing argument, NT 11/12/96

at 82, this was insufficient to cure the damage committed by the prosecutor and certainly no

substitution for an instruction and admonition by the Court itself to the jury to disregard this false

statement.

The prosecutor also engaged in the following inflammatory and prejudicial oratory:

> Ladies and gentlemen, tomorrow will be one year to the day from the
> time Kristopher Heath was killed and shot in cold blood because he
> was doing nothing more than his job, in trying too enforce what was
> right. *One year to the day.*
>
> . . .
>
> And it will be your function to finish what was started one year ago
> today, when Kristopher Heath set out to come to this courtroom and

to do justice.

NT 11/12/96 at 123-24.

At the conclusion of the prosecutor's argument, counsel for codefendant Stevenson asked to approach the bench and objected to the prosecutor's final comments and his accent on the word justice, although neither counsel for Petitioner or the codefendant objected specifically to the prosecutor's egregious command to the jury that it was their function to "finish what was started." The trial court found that the prosecutor did not "overreach" in his closing remarks, and denied the defense request for a curative instruction.

The prosecutor committed misconduct when he told the jury that its function was to "finish what was started one year ago today." These comments served absolutely no purpose except to invoke passion and sympathy in the minds of the jury. Also, by in effect ordering the jury to "do justice" and convict the defendants, undue and improper pressure was placed on the jury, and "that kind of pressure ... has no place in the administration of criminal justice," United States v. Young, 470 U.S. 1, 18 (1985); citing ABA Standards for Criminal Justice, 3-5.8(c) and 4-7.8(c); see also United States v. Sanchez, 176 F.3d 1214, 1224 (9th Cir. 1999) (vacating conviction where prosecutor argued: "I would ask your consideration, as every jury has done, and that is that after the marshal's service has done their duty and the court has done its duty and lawyers on both sides have done their duty, that you as jurors do your duty and well consider this matter and find these defendants guilty"); United States v. Manning, 23 F.3d 570, 572 (1st Cir. 1994) (vacating conviction where prosecutor vouched for government's case by telling jury government witnesses were "bound by their oath"). For the prosecutor to suggest to the jury that loyalty to the state or to the victim required a guilty verdict was completely improper.

**B.** **Counsel's Failure to Object to the Prosecutor's Improper and Inflammatory Remarks, Request a Curative Instruction, and Raise and/or Litigate This Claim Constitutes Prejudicially Deficient Performance in Violation of the Sixth, Eighth and Fourteenth Amendments and Article I, §§ 4, 7, 11 and 13.**

As set forth above, Petitioner has presented a meritorious claim of prosecutor misconduct. Any failure on the part of trial and/or appellate counsel to properly raise, preserve, and litigate this issue in state court constitutes prejudicially deficient performance in violation of Petitioner's state and federal constitutional rights.

The *ABA Guidelines for Appointment and Performance of Counsel in Death Penalty Cases* – performance standards to which the United States Supreme Court has long referred "as 'guides to determining what is reasonable'" attorney conduct, Wiggins v. Smith, 539 U.S. 510, 524 (2003); Rompilla v. Beard, 545 U.S. 374, 387 (2005) – clearly called for counsel to "consider, when deciding whether to object to legal error and whether to assert on the record a position regarding any procedure or ruling, that post judgment review in the event of conviction and sentence is likely, and counsel should take steps where appropriate to preserve, on all applicable state and Federal grounds, any given question for review." ABA Guideline 11.7.3.

The Delaware Supreme Court also recognizes the necessity for competent counsel to object to improper comment by the prosecutor. "Almost as often as we have admonished the State for improper comments like those described in this instance, we have similarly admonished the defense bar for failing to object to prosecutorial misconduct. Ayers v. State, 802 A.2d 278, 282-83 (Del. 2002) (while ultimately finding no prejudice because of the totality of unchallenged evidence, notes that counsel's failure to object to improper and inflammatory argument by prosecutor "may well fall below an objective standard of reasonable conduct."); Trump v. State, 753 A.2d 963, 969-70

181

(Del.2000) ( "Despite separate admonitions by this Court, some members of the defense bar still fail to assert timely objections to such prosecutorial conduct.").

Similarly, Petitioner has demonstrated prejudice. There is more than a reasonable likelihood that the jury was inflamed by the prosecutor's improper commentary, and believed the prosecutor's false argument that the camouflage jacket was found in the backseat of the vehicle, within easy reach of Petitioner if he indeed were in the car. Finally, because no curative instruction was issued to correct the prosecutor's final statements that it was the jury's "function to finish what was started one year ago today," there is more than a reasonable likelihood that the jury believed it was compelled to find Petitioner guilty on this basis rather than on the evidentiary presentation.

Counsel's failure to object to these prejudicial and inflammatory comments and argument by the prosecutor, or at the minimum request a curative instruction from the Court, constitutes prejudicially deficient performance, in violation of the Sixth, Eighth, and Fourteenth Amendments and Article I, Sections 4, 7, 11, and 13 of the Delaware Constitution..

Similarly, counsel's failure to raise these claims on appeal or during prior proceedings constitutes prejudicially deficient performance. The same standards apply to claims of appellate ineffectiveness. See, e.g. Roe v. Flores-Ortega, 528 U.S. 420 (2000) (applying Strickland standard to consideration of appellate counsel's ineffectiveness); United States v. Mannino, 212 F.3d 835 (3d Cir. 2000); Orazio v. Dugger, 876 F.2d 1508, 1513 (11th Cir. 1989); Matire v. Wainwright, 811 F.2d 1430, 1435 (11th Cir. 1987). Where, as in this case, there is a "reasonable probability that the neglected claim[s] would have succeeded on appeal, [] counsel's failure to raise the claim f[alls] outside the range of reasonably competent assistance." Claudio v. Scully, 982 F.2d 798, 799 (2d Cir. 1992); Jackson v. Leonardo, 162 F3d. 81 (2d Cir. 1998) (appellate counsel's failure to raise "sure

winner" constituted ineffective assistance: "In the instant case, we believe that appellate counsel's failure to raise a well- established, straightforward, and obvious . . . [claim] . . . constitutes ineffective performance."); Starr v. Lockhart, 23 F.3d 1280 (8th Cir. 1993 ) (finding trial and appellate counsel ineffective for failing to object to and raise an erroneous jury instruction); Freeman v. Lane, 962 F.2d 1252 (7th Cir. 1992) (appellate counsel ineffective for failing to raise a meritorious claim that was "presented squarely" at trial regarding a violation of the defendant's Fifth Amendment rights); Murphy v. Puckett, 893 F.2d 94 (5th Cir. 1990) (counsel's failure to raise valid defense at trial and on direct appeal constituted ineffective assistance). Accordingly, for this reason as well, relief is required.

**C.    There Are No Bars to This Court's Consideration of the Merits of This Claim.**

Rule 61(i)(1)-(2) and (4) are clearly inapplicable to these claims. These claims are timely, having been filed within one year of final judgment of sentence; and, there have been no previous adjudications of these claims. Nor does Rule 61(i)(3) apply to these claims for a number of reasons. First, as described above, see Section II.A.1.c., this subsection is not applicable to ineffective assistance of counsel claims. Second, the failure to raise these claims was the result of counsel's constitutional ineffectiveness, thus demonstrating cause, Flamer v. State, 585 A.2d at 758, and, as described above, prejudice is demonstrated because, as described above, as a result of the constitutional violations, structural error has occurred and the reliability of Petitioner's death sentence was compromised. Finally, as described above, Petitioner meets the exception to application of Rule 61(i)(3) outlined in Subsection 61(i)(5). Petitioner has presented colorable claims involving multiple constitutional violations that would arguably require vacating Petitioner's capital sentence. Webster, 604 A.2d at 1367. Accordingly, there are no bars to this Court's merits

183

consideration and, for the reasons described above, relief is required.

CLAIM XV.    THE PROSECUTION'S CONTINUOUS MISCONDUCT THROUGHOUT PETITIONER'S
CAPITAL RESENTENCING PROCEEDINGS VIOLATED PETITIONER'S SIXTH, EIGHTH
AND FOURTEENTH AMENDMENT RIGHTS AND ARTICLE I, SECTIONS 4, 7, 11 AND
13.

The duty of the prosecution in a criminal case is not to win the case, but to seek justice.

Berger v. United States, 295 U.S. 78, 88 (1935). As part of his duty to see that justice is done, the

prosecutor has a special duty to avoid improper argument to the jury. Because of the prosecutor's

prominent courtroom role as representative of the State -- and the mantle of respect and authority this

role creates in the eyes of the jury -- the jurors are predisposed to give great deference to the

prosecutor's words, and improper prosecutorial arguments "are apt to carry much weight against the

accused when he should properly carry none." Berger, 295 U.S. at 88; accord Drake v. Kemp, 762

F.2d 1449, 1459 (11th Cir. 1985) ("Arguments delivered while wrapped in the cloak of state

authority have a heightened impact on the jury.") (citing Berger).   "For this reason, misconduct by

the prosecutor...must be scrutinized carefully." Id.; see also United States v. Young, 470 U.S. 1, 7-8

(1985).  The prosecutor's obligations and the court's scrutiny are never greater than in capital

proceedings.

Delaware courts, acknowledging Berger, note that while it is the prosecution's duty to ensure

the State's case is put forth with "earnestness and vigor," the prosecution also has the duty to "see

that justice be done by giving [the] defendant a fair and impartial trial." Hughes v. State, 437 A.2d

559, 568 (Del. 1981), quoting Bennett v. State, 164 A.2d 442, 446 (Del. 1960).  These requirements

apply with equal force to a prosecutor's remarks during closing argument as well the rest of the trial.

Hughes, 437 A.2d at 568.

When the prosecutor's argument infects the trial with unfairness, due process is violated. Donnelly v. DeChristoforo, 416 U.S. 637 (1974).  Prosecutors have a "heightened duty to refrain from conduct designed to inflame the sentencing jury's passions and prejudices," Lesko v. Lehman, 925 F.2d 1527, 1541 (3d Cir. 1991).  Even where individual remarks by themselves do not create a due process violation, their cumulative effect may. Id. at 1546.

Moreover, a criminal defendant has a due process right to be tried solely on the basis of admissible evidence and a Sixth and Fourteenth Amendment right not to be convicted except upon a jury determination based upon proof of every element of the offense proven by record evidence beyond a reasonable doubt.  Chandler v. Florida, 449 U.S. 560, 574 (1981); United States v. Gaudin, 515 U.S. 506, 514 (1995).

The very nature of a capital case demands heightened scrutiny.  "Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, the Eighth Amendment requires heightened "reliability in the determination that death is the appropriate punishment in a specific case," Woodson v. North Carolina, 428 U.S. 280, 305 (1976); and that the sentencing process must "minimize the risk of wholly arbitrary and capricious action" by the sentencing jury. Gregg v. Georgia, 428 U.S. 153, 189 (1976).  As a result, special scrutiny be given to prosecutorial argument in the penalty phase.  See Osborn v. Shillinger, 861 F.2d 612, 626 n.12 (10th Cir. 1988) ("minimized state interest in finality when resentencing alone is the remedy, combined with the acute interest of a defendant facing death," justify even closer scrutiny for error at the sentencing phase than at the guilt phase); see also Lesko, 925 F.2d at 1541; Christy v. Horn, 28 F. Supp.2d 307, 319 (W.D. Pa. 1998).

The prosecutor's commentary and argument throughout the 2005 resentencing proceeding

185

in Petitioner's case violated these fundamental tenets of capital jurisprudence. These actions by the prosecutor, both individually and collectively, violated Petitioner's constitutional rights.

### A.    The Prosecutor's Improper and Inflammatory Opening and Closing Remarks Far Exceeded the Bounds of Permissible Oratorical Flair.

During opening statements, the prosecutor's duty is to explain to the jury the *evidence* that will be presented in the case.  See ABA Standard 3-5.5 for the Prosecution Function ("The prosecutor's opening statement should be confined to a statement of the issues in the case and the evidence the prosecutor intends to offer which the prosecutor believes in good faith will be available and admissible."). Yet, right out of the gate during his opening statement, the prosecutor defied this rule, and went about biasing the jury against Petitioner with irrelevant and inflammatory remarks that had absolutely nothing to do with the case, such as describing the offense as "senseless" and "cowardly." NT 11/16/05 at 37, and invoking the jury's sympathy for the victim, id. at 43 ("They had time to think about the fact that they were taking the life of a 25-year-old young man in the prime of his life, a son and a brother, friend to the people, and they didn't care.").

During closing argument and rebuttal, the prosecution continued to ignore these standards and Petitioner's right to due process and repeatedly inundated the jury with rhetoric designed for the obvious and impermissible purpose of prejudicing the jury against Petitioner:

> "Everyone in this room, except the defendants in this case, make this system work, make our society work."

NT 12//05/05 at 36.[72]

. . .

---

[72]Counsel actually did object to this remark, but the court overruled Petitioner's objection and permitted the prosecutor to continue.

> When a witness is executed in cold blood just because he is a witness and will testify against a participant in a murder plot, ladies and gentlemen, it is a *full frontal attack on the foundation of our criminal justice system. That's what makes this crime so bad.*"

NT 12/05/05 at 36-7.

The prosecutor continued this inflammatory theme in rebuttal:

> You heard us say it several times, and I'm going to say it one more time. They attacked, attacked the foundations of the criminal justice system.
>
> . . .
>
> By shooting an innocent 25-year-old in the prime of his life, just starting his career, trying to start a family, getting ready to get married - - five shots in the back is an assassination of Kristopher Heath, *an assassination of the criminal justice system as a whole. The worst of the worst, right here.*

NT 12/05/05 at 129-30.

These arguments gave the jury the false (and unconstitutional) impression that the homicide of the decedent was somehow an affront to the entire justice system, and it was the jury's duty to protect that system. These arguments by the prosecution in this capital case also go far beyond permissible "oratorical flair" and impact the very nature of the Eighth and Fourteenth Amendment protections.

> **B.**    **The Prosecution Repeatedly Mis-characterized and Misled the Jury as to the Evidence that was Actually Presented.**

In addition to the inflammatory, irrelevant, and prejudicial comments and argument discussed above, the prosecution also repeatedly mis-characterized and made outright false statements about the evidence that was admitted.

187

### 1.    The camouflage jacket

One of the more critical pieces of evidence in this case was a camouflage jacket, containing 24 live rounds of nine millimeter ammunition. This jacket was  found in the trunk of the co-defendant's car, far out of easy reach of anyone who was in the passenger area of the vehicle. The prosecution was well aware of where the jacket was found, yet throughout the opening, closing, and rebuttal, repeatedly told the jury that the camouflage jacket was actually found in the backseat of the vehicle, see NT 11/16/05 at 53, NT 12/05/05 at 34, when in fact the prosecution had itself put on the testimony of Detective Craig Weldon, who confirmed the camouflage jacket had actually been found in the trunk of the car.

### 2.    Susan Brown

The prosecution also mischaracterized the testimony of Susan Brown.  Ms.Brown testified that the person she witnessed commit the shooting was wearing a blue jacket, not a pullover sweatshirt which was Petitioner was wearing when he was apprehended shortly after the offense. See NT 11/17/05 at 92 (testimony of Officer Weldon); NT 11/29/05 at 41.

### 3.    The prosecution's false implication that Petitioner was involved in the Macy's thefts and was a member of a gang and sold drugs

In addition to mis-characterizing the evidence that was actually presented, the prosecution also, without any supporting evidence whatsoever, insinuated that Petitioner was involved in the Macy's theft that was the purported motive for the shooting, and that he was a gang member and sold drugs:

> Are they good guys - - do good guys steal from their employer to the tune of $4500, maybe get involved in a Philadelphia gang selling drugs, plan and premeditate an execution style murder?  Does that sound like a good guy to you?  NT 12/05/05 at 125.

188

This argument by the prosecution including Petitioner in the Macy's thefts and putting in the minds of the jury the idea that he was a drug-dealing gang member from Philadelphia - despite not an iota of evidence on the record to support this allegation, while a plethora of evidence existed to the contrary - could not have been more blatantly prejudicial.

A prosecutor may not misstate the record. Hughes v. State, 437 A2d 559 (Del. 1981); ABA Standard 3-5.8 for the Prosecution Function: (a) In closing argument to the jury, the prosecutor may argue all reasonable inferences from evidence in the record. The prosecutor should not intentionally misstate the evidence or mislead the jury as to the inferences it may draw. These arguments by the prosecution violate these standards of jurisprudence, as well as Petitioner's due process rights.

### C.    Conclusion.

The prosecutor's comments and arguments in this case were not simply isolated instances of prosecutorial excess. Individually and cumulatively, the prosecutor's comments resulted in the denial of due process. Moreover, neither counsel or the court took no steps to cure any of these errors. The trial court's failure to correct any of the above errors, or to immediately instruct the jury as to their impropriety, contributes to and enhances the due process violation.

These errors compromised the reliability of the verdict and sentencing determination and deprived Petitioner of his rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Counsel's failure to object, request a limiting instruction, or properly raise and preserve these issues at trial, during post-verdict proceedings, on direct appeal and in prior post-conviction proceedings denied petitioner his right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 694 (1984); Williams v. Taylor 529 U.S. 362 (2000).

**D.    Counsel was Ineffective.**

As set forth above, Petitioner has presented a meritorious claim of prosecutor misconduct. Any failure on the part of trial and/or appellate counsel to properly raise, preserve, and litigate this issue in state court constitutes prejudicially deficient performance in violation of Petitioner's state and federal constitutional rights.

The Sixth Amendment right to effective assistance of counsel is violated when counsel's performance is deficient, i.e., falls below "an objective standard of reasonableness;" and the defendant is prejudiced, i.e., when confidence is undermined in the outcome of the proceeding. Wiggins v. Smith, 539 U.S. 510, 521 (2003); Williams v. Taylor 529 U.S. 362 (2000); Strickland v. Washington, 466 U.S. 668, 694 (1984). In evaluating counsel's performance, the Court should consider professional norms such as the American Bar Association's Standards for Criminal Justice ("ABA STANDARDS") and Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989) ("ABA GUIDELINES"), which articulate "reasonable" professional "standards for capital defense work" and are the "norms" and "standards to which [the Supreme Court] long ha[s] referred as 'guides to determining what is reasonable'" under the Sixth Amendment. Wiggins, 539 U.S. at 522-25 (citing Strickland; Williams). See also Outten v. Kearney, 464 F.3d 401, 417 (3d Cir. 2006).

The Guidelines in effect at the time of Petitioner's resentencing trial clearly mandate that "[o]ne of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review. Failure to preserve an issue may result in the client being executed even though reversible error occurred at trial. For this reason, trial counsel in a death penalty case must be especially aware not

only of strategies for winning at trial, but also of the heightened need to fully preserve all potential issues for later review." *ABA Guidelines for Appointment and Performance of Counsel in Death Penalty Cases (Rev. Ed. 2003)*, 10.8, Commentary at 89.

The Delaware Supreme Court also recognizes the necessity for competent counsel to object to improper comment by the prosecutor. "Almost as often as we have admonished the State for improper comments like those described in this instance, we have similarly admonished the defense bar for failing to object to prosecutorial misconduct. Ayers v. State, 802 A.2d 278, 282-83 (Del. 2002) (while ultimately finding no prejudice because of the totality of unchallenged evidence, notes that counsel's failure to object to improper and inflammatory argument by prosecutor "may well fall below an objective standard of reasonable conduct."); Trump v. State, 753 A.2d 963, 969-70 (Del.2000) ("Despite separate admonitions by this Court, some members of the defense bar still fail to assert timely objections to such prosecutorial conduct.").

Similarly, Petitioner has demonstrated prejudice. There is more than a reasonable likelihood that the jury was inflamed by the prosecutor's improper commentary, and likewise believed the prosecutor's false arguments about the camouflage jacket, the mis-characterization of Susan Brown's testimony, and Petitioner's involvement in the Macy's charges and a Philadelphia gang was found in the backseat of the vehicle. Counsel's failure to object to these prejudicial and inflammatory comments and argument by the prosecutor, or at the minimum request a curative instruction from the Court, constitutes prejudicially deficient performance, in violation of the Sixth, Eighth, and Fourteenth Amendments and Article I, Sections 4, 7, 11, and 13 of the Delaware Constitution..

Counsel's failure to raise these claims on appeal or during prior proceedings constitutes prejudicially deficient performance. The same standards apply to claims of appellate ineffectiveness.

191

See, e.g. Roe v. Flores-Ortega, 528 U.S. 420 (2000) (applying Strickland standard to consideration of appellate counsel's ineffectiveness); United States v. Mannino, 212 F.3d 835 (3d Cir. 2000); Orazio v. Dugger, 876 F.2d 1508, 1513 (11th Cir. 1989); Matire v. Wainwright, 811 F.2d 1430, 1435 (11th Cir. 1987). Where, as in this case, there is a "reasonable probability that the neglected claim[s] would have succeeded on appeal, [] counsel's failure to raise the claim f[alls] outside the range of reasonably competent assistance." Claudio v. Scully, 982 F.2d 798, 799 (2d Cir. 1992); Jackson v. Leonardo, 162 F3d. 81 (2d Cir. 1998) (appellate counsel's failure to raise "sure winner" constituted ineffective assistance: "In the instant case, we believe that appellate counsel's failure to raise a well-established, straightforward, and obvious . . . [claim] . . . constitutes ineffective performance."); Starr v. Lockhart, 23 F.3d 1280 (8th Cir. 1993 ) (finding trial and appellate counsel ineffective for failing to object to and raise an erroneous jury instruction); Freeman v. Lane, 962 F.2d 1252 (7th Cir. 1992) (appellate counsel ineffective for failing to raise a meritorious claim that was "presented squarely" at trial regarding a violation of the defendant's Fifth Amendment rights); Murphy v. Puckett, 893 F.2d 94 (5th Cir. 1990) (counsel's failure to raise valid defense at trial and on direct appeal constituted ineffective assistance). Accordingly, for this reason as well, relief is required.

E.    **There Are No Bars to This Court's Consideration of the Merits of This Claim.**

Rule 61(i)(1)-(2) and (4) are clearly inapplicable to these claims. These claims are timely, having been filed within one year of final judgment of sentence; as these claims arise out of the 2005 sentencing proceeding, this is clearly the first post-conviction proceeding available to Petitioner; and, there have been no previous adjudications of these claims. Nor does Rule 61(i)(3) apply to these claims for a number of reasons. First, as described above, see Section II.A.1.c., this subsection is not applicable to ineffective assistance of counsel claims. Second, the failure to raise these claims

was the result of counsel's constitutional ineffectiveness, thus demonstrating cause, Flamer v. State, 585 A.2d at 758, and, as described above, prejudice is demonstrated because, as described above, had these claims been raised in the prior proceedings there is a reasonable likelihood that the outcome would have been different. Finally, as described above, Petitioner meets the exception to application of Rule 61(i)(3) outlined in Subsection 61(i)(5). Petitioner has presented colorable claims involving multiple constitutional violations that would arguably require vacating Petitioner's capital sentence. Webster, 604 A.2d at 1367. Accordingly, there are no bars to this Court's merits consideration and, for the reasons described above, relief is required.

**CLAIM XVI.    COUNSEL'S FAILURE TO MOVE FOR JUSTICE RIDGELY'S RECUSAL FROM PETITIONER'S PANEL ON DIRECT APPEAL WHERE JUSTICE RIDGELY HAD PREVIOUSLY BEEN PRESIDENT JUDGE IN NEW CASTLE COUNTY AND SUBMITTED FACTUAL AVERMENTS IN RESPONSE TO THE DELAWARE SUPREME COURT'S INQUIRY REGARDING THE ISSUE OF JUDGE BARRON'S RECUSAL VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.**

During the appeal proceedings on Petitioner's prior post-conviction petition, the Delaware Supreme Court remanded Petitioner's and the co-defendant's cases to the Superior Court in order for the President Judge and Judge Barron to answer specific questions posed by the Supreme Court regarding the circumstances surrounding the assignment of Judge Barron to Petitioner's case. Both Judge Barron and the President Judge complied with the Supreme Court, providing factual statements regarding those circumstances as well as legal bases for Judge Barron's assignment. On the basis of those reports and subsequent briefing, the Supreme Court concluded that the circumstances surrounding Judge Barron's assignment created an appearance of impropriety and ordered that Petitioner be given a new sentencing hearing before a different judge. Stevenson v. State, 782 A.2d 249, 260-61 (Del. 2001). The Court also directed that the newly assigned judge

193

reconsider Petitioner's guilt-phase claims in his Rule 61 petition. Id. 782 A.2d at 261.

At the time Petitioner's case was initiated, Justice Ridgely was the President Judge of the Superior Court, New Castle County. It was Justice Ridgely who had the pre-indictment conversation with Judge Barron regarding his (Judge Barron's) assignment to Petitioner's case and it was Justice Ridgely who issued the memorandum directing Judge Barron's assignment. Finally, it was Justice Ridgely who issued the Report to the Supreme Court Pursuant to Supreme Court Rule 19(c).

On appeal from Petitioner's resentencing hearing, Justice Ridgely sat on the panel that decided Petitioner's legal issues and wrote the opinion affirming Petitioner's death sentence. Manley v. State, 918 A.2d 321 (Del. 2003). In light of Justice Ridgely's role in Petitioner's case, more particularly, his presentation of factual averments and legal positions in favor of Judge Barron's assignment to Petitioner's case, recusal was appropriate in order to avoid, at a minimum, an appearance of impropriety.

### A.    Justice Ridgely's Disqualification Was Required.

Canon 3C of the Delaware Judges Code of Judicial Conduct requires disqualification in cases where "the judge's impartiality might reasonably be questioned." The Canon goes on to list specific circumstances in which a judge may be required to recuse himself or herself, including circumstances where the judge had "been a material witness concerning" the matter in controversy. DE R CJC Canon 3C(1)(b). Justice Ridgely's presentation of factual averments and legal positions in favor of Judge Barron's assignment to Petitioner's case implicates this section of Canon 3(c).

Moreover, the Delaware Supreme Court has noted that, even in cases where bad faith is not implicated, where there is an appearance of impropriety that implicates an accused's right to a fair hearing, due process is violated. Stevenson v. State, 782 A.2d 249, 256 (Del. 2001) (noting that "the

194

appearance of impropriety may arise where the judge is acting in utmost good faith" and further

noting that the United States Supreme Court "has cast the rationale for the appearance of partiality

in due process terms"). See also Tumey v. Ohio, 273 U.S. 510, 532 (1927) ("Every procedure which

would offer a possible temptation to the average man as a judge . . . not to hold the balance nice,

clear, and true between the state and the accused denies the latter due process of law"); In re

Murchison, 349 U.S. 133, 136 (1955) (same). Where, as here, there is a clear appearance of

impropriety impacting the partiality of Petitioner's appellate tribunal, due process is violated and

relief is required.

Similarly, by creating a statutory and constitutional right to appeal in capital cases, the state

vested in Petitioner a Fourteenth Amendment life and liberty interests in those procedures. Evitts

v. Lucey, 469 U.S. 387, 393 (1985) (due process interest in state created right to direct appeal).[73]

Although the right to the particular procedure is established by state law, the violation of the life and

liberty interest it creates is governed by *federal* constitutional law. Hicks v. Oklahoma, 447 U.S. 343,

346 (1980); Ford v. Wainwright, 447 U.S. 399, 428-29; see Evitts, 469 U.S. at 393 (state procedures

employed "as 'an integral part of the . . . system for finally adjudicating the guilt or innocence of a

defendant'" must comport with due process). See also Fetterly v. Paskett, 997 F.2d 1295, 1300 (9th

Cir. 1993) ("There is, of course, nothing in the Constitution of the United States that requires Idaho's

legislature to approach [capital sentencing] as it has done . . . . However, the failure of a state to

---

[73]See also Hicks v. Oklahoma, 447 U.S. 343, 346 (1980) (liberty interest in state-created capital sentencing procedures); Ford v. Wainwright, 447 U.S. 399, 427-31 (1986) (O'Connor, J., concurring) (liberty interest in state-created right to proceedings to determine competency to be executed); Ohio Adult Parole Authority v. Woodard, 118 S. Ct. 1244, 1254 (1998) (O'Connor, J, with Souter, Ginsburg & Breyer, JJ., concurring) (life interest in state-created right to capital clemency proceedings); id. at 1254-55 (Stevens, J., concurring).

abide by its own statutory commands may implicate a liberty interest protected by the Fourteenth Amendment against arbitrary deprivation by a state."); Foster v. Delo, 39 F.3d 873, 882 (8th Cir. 1994) ("Where a state creates a right, such as a defendant's right to a review of his sentence, the Fourteenth Amendment of course entitles him to procedures to ensure that the right is not arbitrarily denied.").

Thus, having vested in Petitioner a state statutory and constitutional right to appeal, the state was required to ensure that the procedures for that appeal conform with federal due process. Subjecting Petitioner to review where the impartiality of the tribunal is compromised, denied Petitioner of these separate and distinct life and liberty rights under the Fourteenth Amendment.

For each of these reasons, Justice Ridgely's disqualification was required.

**B.      Counsel was Ineffective.**

Counsel's failure to raise and litigate Justice Ridgely's disqualification constitutes prejudicially deficient performance in violation of the Sixth, Eight and Fourteenth Amendments. Counsel was well-aware of Justice Ridgely's involvement in the prior appellate proceedings and his factual and legal arguments in support of the assignment of Judge Barron. Yet, counsel failed to object or move for a recusal when counsel learned that Justice Ridgely would sit in judgment on Petitioner's appeal from his invalid death sentence.   In light of the substantial constitutional violations, counsel could have no reasonable strategic reason for failing to raise these issues. Where, as here, the appearance of impropriety required recusal, prejudice is demonstrated and relief is required.

196

C.     **There Are No Bars to This Court's Consideration of the Merits of This Claim.**

Rule 61(i)(1)-(2) and (4) are clearly inapplicable to these claims.  These claims are timely, having been filed within one year of final judgment of sentence; as these claims arise out of the 2005 sentencing proceeding, this is clearly the first post-conviction proceeding available to Petitioner; and, there have been no previous adjudications of these claims.  Nor does Rule 61(i)(3) apply to these claims for a number of reasons.  First, as described above, <u>see</u> Section II.A.1.c., this subsection is not applicable to ineffective assistance of counsel claims.  Second, the failure to raise these claims was the result of counsel's constitutional ineffectiveness, thus demonstrating cause, <u>Flamer v. State</u>, 585 A.2d at 758, and, as described above, prejudice is demonstrated because, as described above, had these claims been raised in the prior proceedings there is a reasonable likelihood that the outcome would have been different.  Finally, as described above, Petitioner meets the exception to application of Rule 61(i)(3) outlined in Subsection 61(i)(5).  Petitioner has presented colorable claims involving multiple constitutional violations that would arguably require vacating Petitioner's capital sentence.  <u>Webster</u>, 604 A.2d at 1367.  Accordingly, there are no bars to this Court's merits consideration and, for the reasons described above, relief is required.

**CLAIM XVII. COUNSEL'S FAILURE TO RAISE AND LITIGATE THE DENIAL OF PETITIONER'S RIGHTS TO A FAIR AND IMPARTIAL SENTENCING TRIBUNAL ON THE BASIS OF THE TRIAL COURT'S CONSIDERATION OF, AND DISPOSITION OF PETITIONER'S PRIOR POST-CONVICTION CLAIMS VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS AND HIS RIGHTS UNDER ARTICLE I, SECTIONS 4, 7, 11, AND 13 OF THE DELAWARE CONSTITUTION.**

A.     **Introduction**

As described previously, after finding that the circumstances of Judge Barron's assignment to Petitioner's case created an appearance of impropriety, the Delaware Supreme Court vacated

197

Petitioner's sentence and remanded for resentencing and consideration of Petitioner's initial Rule 61 guilt-phase claims before a different judge. As a result, Petitioner's case was re-assigned to this Court.

Prior to the resentencing, this Court considered the merits of Petitioner's and the co-defendant's Rule 61 Petitions that included claims of ineffective assistance of counsel. In the course of the hearings on those claims, this Court heard testimony from Petitioner's prior trial counsel that exposed this Court to information the Court would not have known prior to sentencing in the normal course that prejudiced Petitioner. Such information includes: counsel's strategic decisions for certain trial decisions and the basis of those decisions, including conversations counsel had with Petitioner; see NT 01/11/02 at 11-13; id. at 26-33; counsel's evaluation of key prosecution witnesses, including Debra Dorsey, see id. at 34-40; and counsel's evaluation of defense witnesses, including Dorothy Hackett, see id. at 66-67. In reaching its decision that relief was not required, this Court also necessarily conducted an evaluation of the evidence presented in the prior proceedings. See e.g. State v. Manley, 2003 WL 23511875 at *28 (Del. Super. 10/2/03) (Memorandum Opinion, Herlihy, J) (indicating the Court's conclusion that the evidence against Petitioner was "overwhelming" in denying relief on the basis of the instructions regarding the Macy's theft); id. at *35 (noting that the evidence was overwhelming in denying co-defendant's ineffectiveness claim).

**B.    This Court Was Required to Disqualify Itself After Determining the Issues in Petitioner's Initial Rule 61 Petition.**

While it was clearly necessary and appropriate for the Court to hear the above-described evidence and analyze the above-described issues, and, while there is no question that the unique posture of Petitioner's case was the result of the irregularities on the part of Judge Barron as opposed

198

to anything this Court did, that does not alter the prospective impact on this Court's impartiality in determining the appropriate sentence.

As described previously, where "the judge's impartiality might reasonably be questioned," disqualification is required. DE R CJC Canon 3C. Where, as here, the Court heard confidential communications between Petitioner and his prior counsel and made evaluations and judgments of witnesses and evidence that would be presented during the resentencing hearing, Petitioner has met this standard and disqualification was required.

Moreover, as described previously, where an appearance of impropriety implicates an accused's right to a fair hearing, due process is violated regardless of the good or bad faith on the part of the judge. Stevenson v. State, 782 A.2d 249, 256 (Del. 2001) (noting that "the appearance of impropriety may arise where the judge is acting in utmost good faith" and further noting that the United States Supreme Court "has cast the rationale for the appearance of partiality in due process terms"). See also Tumey v. Ohio, 273 U.S. 510, 532 (1927) ("Every procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law"); In re Murchison, 349 U.S. 133, 136 (1955) (same).

Similarly, there is no question that a capital defendant has a state and federal constitutional right to a sentencing determination by a fair and impartial sentencer. United States v. Burr, 25 F. Cas. 49, 50 (1807); Wainwright v. Witt, 469 U.S. 412, 424 (1985); Adams v. Texas, 448 U.S. 38, 45 (1980); Ross v. Oklahoma, 487 U.S. 81, 85 (1988). Due Process has long required that the factfinder's verdict must be based on the evidence developed at trial as opposed to information from outside resources. Chandler v. Florida, 449 U.S. 560, 575 (1981). Likewise, because of the

199

"qualitative difference of death from all other punishments," (California v. Ramos, 463 U.S. 992, 998-99 (1983)), heightened procedural safeguards are required in capital cases. Lockett v. Ohio, 438 U.S. 586, 604 (1978); Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (plurality opinion) (noting that, because of the unparalleled severity and irreversibility of the death penalty, the Eighth Amendment imposes a heightened standard "for reliability in the determination that death is the appropriate punishment in a specific case"); see also Godfrey v. Georgia, 446 U.S. 420, 427-28 (1980); Mills v. Maryland, 486 U.S. 367, 383-84 (1988).

Where, as here, the Court was presented with information not admissible and not presented during the resentencing and the Court was forced to make evaluations and judgments regarding evidence that was presented during the resentencing during the Rule 61 proceedings, recusal was required and this Court's failure to disqualify itself and request assignment to another judge for purposes of the resentencing determination violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights as well as his rights under Article I, Sections 4, 7, 11, and 13 of the Delaware Constitution.

### C.    Counsel Was Ineffective.

Trial counsel unsuccessfully raised this claim, at least in part, prior to the resentencing, but failed to present the claim on direct appeal. Such a failure is self-evidently ineffective – there can be no reasonable basis not to raise a meritorious legal challenge that would bar prosecution and therefore prevent conviction. The Fourteenth Amendment extends the right to effective counsel to a criminal defendant's first appeal as of right. Evitts v. Lucey, 469 U.S. 387 (1985). Counsel's prejudicially deficient failure to raise this claim on appeal violated Petitioner's Fourteenth Amendment right to effective appellate counsel, requiring relief. In this capital case, it also violated

his Eighth Amendment right to meaningful appellate review of his capital conviction and death sentence.

**D.    There Are No Bars to This Court's Consideration of the Merits of This Claim.**

Rule 61(i)(1)-(2) and (4) are clearly inapplicable to these claims. These claims are timely, having been filed within one year of final judgment of sentence; as these claims arise out of the 2005 sentencing proceeding, this is clearly the first post-conviction proceeding available to Petitioner; and, there have been no previous adjudications of these claims. Nor does Rule 61(i)(3) apply to these claims for a number of reasons. First, as described above, see Section II.A.1.c., this subsection is not applicable to ineffective assistance of counsel claims. Second, the failure to raise these claims was the result of counsel's constitutional ineffectiveness, thus demonstrating cause, Flamer v. State, 585 A.2d at 758, and, as described above, prejudice is demonstrated because, as described above, had these claims been raised in the prior proceedings there is a reasonable likelihood that the outcome would have been different. Finally, as described above, Petitioner meets the exception to application of Rule 61(i)(3) outlined in Subsection 61(i)(5). Petitioner has presented colorable claims involving multiple constitutional violations that would arguably require vacating Petitioner's capital sentence. Webster, 604 A.2d at 1367. Accordingly, there are no bars to this Court's merits consideration and, for the reasons described above, relief is required.

201

CLAIM XVIII COUNSEL'S FAILURE TO RAISE AND LITIGATE THE PETITIONER'S ENTITLEMENT TO A NEW TRIAL ON THE BASIS OF THE IRREGULARITIES AND STRUCTURAL DEFECTS ARISING OUT OF THE CIRCUMSTANCES OF JUDGE BARRON'S ASSIGNMENT TO PETITIONER'S CASE VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS AND HIS RIGHTS UNDER ARTICLE I, SECTIONS 4, 7, 11, AND 13 OF THE DELAWARE CONSTITUTION.

## A.    Introduction

As described previously, after finding that the circumstances of Judge Barron's assignment to Petitioner's case created an appearance of impropriety, the Delaware Supreme Court vacated Petitioner's sentence and remanded for resentencing and consideration of Petitioner's initial Rule 61 guilt-phase claims before a different judge. The Delaware Supreme Court found that Judge Barron "should not have requested the murder case assignment prior to indictment in view of his prior contact with the victim in the suppression hearing." Stevenson v. State, 782 A.2d 249, 257 (Del. 2001). The Court further found Judge Barron's failure to disclose the circumstances of the assignment particularly troubling because "disclosure of the trial judge's December 27, 1995 memorandum likely would have prompted a recusal motion." Id. 782 A.2d at 257. Noting that the trial court's sentencing decision demonstrated that the judge "harbored strong feelings about the murder of Heath whom he had observed as a witness in the suppression hearing," the Supreme Court found it particularly concerning that the trial court "viewed the murder of Heath as an attack on the judicial process-*the very process in which the trial judge had personally participated as the judge handling the suppression hearing*." Id. 782 A.2d at 259. Vacating the death sentence, the Supreme Court left for further development the question regarding whether or not the trial court's misconduct required grant of a new trial. Id. 782 A.2d at 261.

Despite the obvious breakdown of the judicial process, counsel failed to effectively raise or

202

litigate Petitioner's entitlement to a new trial. Counsel's failure to do so constitutes prejudicially deficient performance in violation of the Sixth, Eighth and Fourteenth Amendments and Article I, Sections 4, 7, 11, and 13 of the Delaware Constitution.

**B.    Judge Barron's Conduct Required Grant of a New Trial.**

Judge Barron presided over the Macy's theft case against co-defendant Stevenson and heard testimony from the decedent during a suppression motion. Upon learning that the decedent was killed and that Stevenson and Petitioner were charged, Judge Barron requested assignment of the case prior to the grand jury indictment. As described above, Judge Barron failed to notify counsel or Petitioner of the circumstances of his assignment to Petitioner's case, even after co-defendant Stevenson raised the question of recusal. Finally, as described above, there is no question based on Judge Barron's opinion regarding the death sentence that the judge held strong feelings about the circumstances of the murder and the perceived affront to the judicial system, particularly that system presided over by this very judge. The language and tenor of Judge Barron's sentencing determination indicates both a strong prejudice in favor of the decedent and a strong prejudice against Petitioner.

"It is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling." Starr v. United States, 153 U.S. 614,626 (1894) (citing Hicks v. U. S., 150 U. S. 442, 452, 14 Sup. Ct. 144 (1893).[74]  For this reason, judicial conduct that "preclude[s] a fair and dispassionate consideration of the evidence" violates due process. Quercia

---

[74]See also United States v. Barbour, 420 F.2d 1319, 1322 (D.C. Cir. 1969)("jurors hold the robed trial judge in great awe and reverence . . . his lightest word or intimation is received with deference and may prove controlling").

v. United States, 289 U.S. 466, 472 (1933) (citations omitted).[75] Here, the trial court's strong prejudices against Petitioner were clear. More importantly, however, the court's conduct in arranging to be assigned to this case pre-indictment, combined with the court's failure to disclose the circumstances of the court's assignment, even when confronted with a question of recusal, compromised the integrity of the judicial system and constitutes structural error impacting the very accuracy and reliability of the trial process. Arizona v. Fulminate, 499 U.S. 279, 309-10(1991) ("'Structural errors,' on the other hand, call into question the very accuracy and reliability of the trial process"). Under these circumstances a new trial is mandated.        Similarly, the trial court's biases against Petitioner and in favor of the decedent impacted the court's determination of critical pretrial and trial issues, including the court's determination of Petitioner's severance motion, Petitioner's request for proper instructions on accomplice liability, and the court's instructions connecting Petitioner to the Macy's thefts where there was absolutely no evidence connecting Petitioner even to any knowledge that co-defendant Stevenson had been charged or that the decedent was a witness against Stevenson. For these reasons as well, a new trial was required under the Sixth, Eighth and Fourteenth Amendments and and Article I, Sections 4, 7, 11, and 13 of the Delaware Constitution.

### C.    Counsel Was Ineffective.

Trial counsel failed to fully raise or litigate this claim during the prior post-conviction proceedings, nor did counsel raise this claim on appeal from the denial of post-conviction relief. Such a failure is self-evidently ineffective – there can be no reasonable basis not to raise a meritorious legal challenge that would bar prosecution and therefore prevent conviction. While there

---

[75]See also Billeci v. United States, 184 F.2d 394, 402 (1950) ("there is a constitutional line across which [the trial court] cannot go"); United States v. Donato, 99 F.3d 426, 435 (D.C. Cir. 1997); United States v. Navarro, 472 F.2d 302, 303 (2d Cir. 1973).

is no right to effective assistance of post-conviction counsel, when a state mandates certain capital sentencing procedures or establishes the right to particular appellate, post-conviction, or post-sentencing review in capital cases, it creates Fourteenth Amendment life and liberty interests in those procedures. Evitts v. Lucey, 469 U.S. 387, 393 (1985) (due process interest in state created right to direct appeal).[76]  Although the right to the particular procedure is established by state law, the violation of the life and liberty interest it creates is governed by *federal* constitutional law. Hicks v. Oklahoma, 447 U.S. 343, 346 (1980); Ford v. Wainwright, 447 U.S. 399, 428- 29; see Evitts, 469 U.S. at 393 (state procedures employed "as 'an integral part of the . . . system for finally adjudicating the guilt or innocence of a defendant'" must comport with due process).  See also Fetterly v. Paskett, 997 F.2d 1295, 1300 (9th Cir. 1993) ("There is, of course, nothing in the Constitution of the United States that requires Idaho's legislature to approach [capital sentencing] as it has done . . . . However, the failure of a state to abide by its own statutory commands may implicate a liberty interest protected by the Fourteenth Amendment against arbitrary deprivation by a state."); Foster v. Delo, 39 F.3d 873, 882 (8th Cir. 1994) ("Where a state creates a right, such as a defendant's right to a review of his sentence, the Fourteenth Amendment of course entitles him to procedures to ensure that the right is not arbitrarily denied.").

In Delaware, a criminal defendant has two separate and distinct avenues of obtaining relief from an invalid conviction.  These rights are:  the opportunity to appeal directly from the initial

---

[76]See also Hicks v. Oklahoma, 447 U.S. 343, 346 (1980) (liberty interest in state-created capital sentencing procedures); Ford v. Wainwright, 447 U.S. 399, 427-31 (1986) (O'Connor, J., concurring) (liberty interest in state-created right to proceedings to determine competency to be executed); Ohio Adult Parole Authority v. Woodard, 118 S. Ct. 1244, 1254 (1998) (O'Connor, J, with Souter, Ginsburg & Breyer, JJ., concurring) (life interest in state-created right to capital clemency proceedings); id. at 1254-55 (Stevens, J., concurring).

205

judgment of sentence; and, once the direct appeal becomes final, challenge the conviction under Rule 61, wherein the litigant has an opportunity to raise additional bases for relief and also litigate the ineffective assistance of trial counsel and appellate counsel. Likewise, in capital cases, a post-conviction litigant is entitled to appointment of counsel. See D.R. 61(l)(3).

Fundamental due process and equal protection require that one cannot have a right without a remedy. See Marbury v. Madison, 1 Cranch 137, 163, 2 L.Ed. 60 (1803) ("The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right"). By creating a right to post-conviction counsel and review on post-conviction, Delaware was constitutionally obliged to also provide Petitioner with the "basic tools," including effective counsel, to demonstrate the denial of his federal constitutional rights and invalid conviction. Here, counsel's failure to raise and litigate these claims involving the denial of Petitioner's most basic rights, including the right to a fair trial before a fair and impartial tribunal, violated Petitioner's federal Due Process and Equal Protection rights. Accordingly, relief is required.

**D.    There Are No Bars to This Court's Consideration of the Merits of This Claim.**

Rule 61(i)(1)-(2) and (4) are clearly inapplicable to these claims. These claims are timely, having been filed within one year of final judgment of sentence; as these claims arise out of the 2005 sentencing proceeding, this is clearly the first post-conviction proceeding available to Petitioner; and, there have been no previous adjudications of these claims. Nor does Rule 61(i)(3) apply to these claims for a number of reasons. First, as described above, see Section II.A.1.c., this subsection is not applicable to ineffective assistance of counsel claims. Second, the failure to raise these claims was the result of counsel's constitutional ineffectiveness, thus demonstrating cause, Flamer v. State,

206

585 A.2d at 758, and, as described above, prejudice is demonstrated because, as described above, had these claims been raised in the prior proceedings there is a reasonable likelihood that the outcome would have been different. Finally, as described above, Petitioner meets the exception to application of Rule 61(i)(3) outlined in Subsection 61(i)(5). Petitioner has presented colorable claims involving multiple constitutional violations that would arguably require vacating Petitioner's capital sentence. Webster, 604 A.2d at 1367. Accordingly, there are no bars to this Court's merits consideration and, for the reasons described above, relief is required.

**CLAIM XIX.    PETITIONER IS ENTITLED TO RELIEF BECAUSE OF THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN THIS CASE.**

Constitutional claims of error are to be considered cumulatively as well as individually and cumulative error or prejudice may provide a basis for relief whether or not the effect of individual errors warrants relief. Kyles v. Whitley, 514 U.S. 419, 437-38 (1995); Taylor v. Kentucky, 436 U.S. 478, 488 (1978); Lesko v. Lehman, 925 F.2d 1527, 1541 (3d Cir. 1991); Berryman v. Morton, 100 F.3d 1089 (3d Cir. 1996).

If the Court finds cumulative prejudice, it eliminates the need to analyze the individual prejudicial effect of each deficiency. Moreover, if the Court finds itself in equipoise as to the effect of these cumulative errors, such that it "merely ha[s] 'grave doubt' as to the existence of prejudice," relief must be granted. Glenn v. Tate, 71 F.3d 1204, 1211 (6th Cir. 1995) (quoting O'Neal v. McAninch, 115 S. Ct. 992 (1995)).

Each of the claims presented herein individually entitles Petitioner to relief from his conviction and/or sentence. However, even if this court finds that Petitioner is not entitled to relief based on any particular error, he is nevertheless entitled to relief because the cumulative effect of

these errors was to deny him a fair trial and the heightened procedural safeguards constitutionally required in capital cases.

The circumstances of this case demonstrate that the cumulative effect of counsel's serious failures, and the constitutional errors committed by the court and the prosecutor, so undermined the fairness of the trial and sentencing proceedings that Petitioner's conviction must be overturned and his sentence of death must be vacated. As the Sixth Circuit has explained:

> Viewing the total picture, and considering both the nature of the material presented to the jury that should not have been and the nature of the material not presented to the jury that should have been, we cannot have much confidence in the jury's weighing of the factors relevant to the issue of whether [the defendant] should be sentenced to death.

Glenn v. Tate, 71 F.3d at 1210.

Collectively and cumulatively, these errors denied Petitioner due process and violated the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Relief is required.

WHEREFORE, Petitioner respectfully requests that this Honorable Court vacate his convictions and death sentences and order a new trial.

Respectfully submitted,

Christopher Koyste, Esquire
709 Brandywine Boulevard
Bellefonte, DE 19809
(302) 762-5195
Attorney for Defendant/Petitioner
   Michael R. Manley

Christopher D. Tease. Esquire
1232 N. King Street
Suite 300
Wilmington, DE 19801-3236
(302) 652-4550
Attorney for Defendant/Petitioner
   Michael R. Manley

209

# CERTIFICATE OF SERVICE

I, Christopher Koyoste, Esquire do hereby certify that on this date I served a copy of the

*HAND SERVICE TO:*

foregoing by ~~placing a copy in the United States mail, first class, addressed to the~~ following:

> Loren C. Meyers, Esquire
> Deputy Attorney General
> 820 North French Street,
> 7th Floor
> Wilmington, DE 19801

Respectfully submitted,

Christopher Koyste, Esquire
709 Brandywine Boulevard
Bellefonte, DE 19809
(302) 762-5195
Attorney for Defendant/Petitioner
   Michael R. Manley

Dated: January 25, 2008