# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| _____ | : | |
| MICHAEL MANLEY, | : | CIVIL ACTION |
| | : | |
| Petitioner, | : | No. 1:07-CV-00472 |
| | : | |
| v. | : | **THIS IS A CAPITAL CASE.** |
| CARL C. DANBERG, Commissioner, | : | |
| Delaware Department of Correction; and | : | GREGORY M. SLEET, USDJ |
| THOMAS L. CARROLL, Warden, | : | |
| Delaware Correctional Center at Smyrna, | | |
| Respondents | | |
| _____ | | |

## EXHIBITS TO CONSOLIDATED PETITION FOR WRIT OF HABEAS CORPUS BY A PRISONER IN STATE CUSTODY AND MEMORANDUM OF LAW

ANNE L. SAUNDERS, ESQUIRE
Asst. Federal Public Defender
Federal Public Defender
Middle District of Pennsylvania
Capital Habeas Unit
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
Tel. No. (717) 782-3843
Fax. No. (717) 782-3966
(Anne_Saunders@fd.org)

BETH ANN MUHLHAUSER, ESQUIRE
Asst. Federal Public Defender
Federal Public Defender
Middle District of Pennsylvania
Capital Habeas Unit
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
Tel. No. (717) 782-3843
Fax. No. (717) 782-3966
(Beth_Muhlhauser@fd.org)

Dated: February 5, 2008



**SUPP: HEATH, KRISTOPHER**                          **32-95-134010**
**DET. W. SCOTT MCLAREN 2275 CIU**

in the evening hours.

Monday 11-20-95 at 1515 hrs writer contacted Melissa Magalong via public service. The witness advised that the victim use to live at the same house where she currently lives at. The witness stated that she moved in the house when the victim moved out in October '94. The witness was home alone when she heard a knock at the front door at approximately 1830 hrs. The witness did not answer the door. The witness was not expecting company that evening. The witness heard two male voices talking outside the door. The witness could not tell if the subject were black or white males. The door knob was not tried according to the witness. A vehicle was not observed by the witness. For additional refer to writers notes.

Monday 11-20-95 at 1640 hrs writer contacted a Tiarra Koston B/F 06-05-71 via public service. Through investigation it was established that Koston had seen the victim the day of the crime. This interview was taped. The witness stated she observed David Stevenson drive by her house in a black or blue car. The car was further described as having a roof that was "messed up". The vehicle was northbound on Washington Street traveling from 17th street to 18th. The witness observed the car approximately 0800 - 0815 hrs. The witness could not tell what the exact time was.

On Monday 11-20-95 at 1938 hrs writer interviewed a witness by the name of Susan Butler W/F 02-29-56. The witness lives in the Cavalier Apartment complex in the area where the victim was shot. The witness knwe the victim and his girlfriend The witness lives on the ground floor apartment which faces the front of the parking lot. The witness advised that she was awake at the time of the shooting. The witness heard 4-5 shot's being fired. The witness looked out her front spare bedroom window and observed a B/M that she first thought was the maintenance man. The angle of view was slightly to the right and was not obstructed. The witness described the B/M as wearing jeans, a royal blue top which was possibly some type of jacket / shirt. The suspect was 5'6" stocky built and was possibly wearing a hat. The suspect was seen walking at a fast rate away from the victim. The witness then heard a female scream. That female was found to be Debra Dorsey, the victims girlfriend. The witness then heard a knock at the door while she was calling 911. Debra Dorsey was at the door, and was hysterical. The witness gave the phone to Debra who attempted to talk to the 911 call-taker. The witness boyfriend, David Finkle woke up during the commotion and went outside. The boyfriend went to the aid of the victim who told the witness that the victim was dead. The witness was shown the two separate photo line-up for the defendants. The witness could not identify anyone in the Stevenson line-up. Writer then displayed Defendant Manley line-up to the

SUPP: HEATH, KRISTOPHER                      32-95-134010
DET. W. SCOTT MCLAREN 2275 CIU

witness. After viewing the complete line for 30 second's the
witness advised that the photo of Manly was the closest based on
the profile that she remembered. The witness advised that she
observed the B/M running from the area where the victim was later
found. For additional information refer to the transcribed taped
statement.

This concluded the writer involvement in this case to date.


INTERVIEWS:


Dorsey, Debra W/F
~~##~~ Capano Drive Apt. ~~###~~
Cavalier Apartment's Newark De. 19702
(H)  ~~###-####~~
(W)  ~~###-####~~
(parents) ~~###-####~~ (Pauline & Lou Dorsey)

D/T  Monday 11-13-95 0840 hrs

Writer conducted the formal taped statement on the above date and
time at the New Castle County Police HQ in interview room #2. The
witness advised that she was the girlfriend of the victim and that
they lived together at the apartment. The witness observed a B/M
standing over the victim who was laying in the parking lot. For
additional information refer to the transcribed taped statement and
to the investigative section of this report.



Van Vechten, Steven M.
W/M 31  10-21-64
~~### ##### ### ########~~
Bear De. 19701
(H)  ~~###-####~~
(W)  ~~###-####~~ (Macy's)
(parents) ~~###-####~~ (Paul & Catherine)

D/T  Monday 11-13-95 0935 hrs

Writer interviewed the above witness on the above date and time at
NCCPD HQ. The witness was a close friend and co-worker of the
victim. The witness was aware that the victim was due in superior
court on Monday 11-13-95 to testify against a David Stevenson. For
additional information refer to the investigative section of this
report.

8



1635 HRS

DEBBIE        (UK. GIRLFRIEND)

S-1

- POSS. # 3
- DID WORK W/ # 3    work
- HAD A HAT ON  AND  BIG JACKET
- SCALE 1-10    (6) - BEING @ DOOR


S-2

NO ID


HAD A PHONE CALL  AFTER 2030 HRS
DID NOT SAY ANYTHING , JUST HUNG UP



BY DETECTIVE McLAREN:

> Today's date is Monday, 11/13/95. The following will be a witness interview. The location will be New Castle County police building, interview room number two. This is Detective W. Scott McLaren, 2275 CIU. The following will be a witness statement from a Deborah Dorsey, white female, 12/28/70.

Q    Is that your correct date of birth, Deborah?

BY MS. DORSEY:

A    Yes.

Q    And do you go by Debbie or –

A    Debbie.

Q    The time is 0840. Okay. What's your current address, Debbie?

A    Uh, 13 Capano Drive, Apartment 3-C, Newark Delaware 19702.

Q    And home phone number?

A    Uh, 368-1140.

Q    And work number?

A    366-5800.

Q    And what about your parents' number?

A    478-7228.

Q    And what's their names?

A    Uh, Pauline and Mark (??) Dorsey.

Q    Okay. And you're aware the County police is investigating a shooting incident that happened in front of your building? Can you tell me if you – do you live with anyone?

A    I live with my boyfriend, Chris Heath.

Q    And do you know Chris' date of birth by any chance?

A    Um, April 5, 1970 also, because we're the same – he's a little older than me.

Q    How long have you two been living together?

A    Since October 7th of last year and our lease runs up November 30th.

Q    Okay. As you're well aware, Chris was attacked this morning and we understand you might have witnessed part of this. Can you – number one, tell me what kind of job Chris has?

A    He is a security manager for Macy's in the Owings Mill store. And he used to be in security in the Christiana Mall store.

Q    Okay. What's the name of his company again?

A    Ah, Macy's. But it's the Owings Mill store.

Q    Owings Mill?

A    Yeah. Macy's Owings Mill.

Q    And how long has he been with them?

A    He's been there probably, I'm sorry, like five or six. I think five. I'm not sure exactly.

Q    Okay. Can you tell me what made you call 911 this morning?

A    He was shot in the back of the head and I saw him laying on the ground.

Q    Okay. You're saying he was shot in the back of the head. Did you –

A    I don't know if he was shot. I mean, I saw him laying on the ground and there was blood coming out of his head. So I assumed it was – but I didn't get there. I called 911 when I heard – when I looked out and saw Chris on the ground.

Q    Okay. Let's back up a little bit.

A    Sorry.

Q    This morning when you two woke up --

A    Um hm.

Q    – about what time did you wake up?

A    I woke up about 7:15. He had already woken up.

2

Q     Okay. What time does he usually wake up?

A     Uh, depending, it all depends on his work schedule. Like if he has to be to work by 8:00, he's usually up like at 5:00. Because it takes him an hour and fifteen minutes to get to work. So it depends on what schedule –

Q     How long does it take?

A     An hour and fifteen minutes to get to work. Yeah. That's why we were kind of moving out of our apartment.

Q     Okay. Did you guys talk this morning?

A     We were just like joking and stuff. I mean nothing – I mean he was just saying that, because I ate spaghetti for breakfast, and making fun of me. But I mean nothing, like anything that I can remember, that's all.

Q     Did you remember about what time he left the apartment?

A     Probably, like about – he wanted to be at work by 8:00, so he probably left at like, it must have been like 7:45. Because the last time I looked at the clock was when I was getting ready to dry my hair and it was like about 7:30, 7:39 or something and then he left like a couple of minutes after that.

Q     Okay. Um, your apartment is on the second floor?

A     Um hm.

Q     And it faces the parking lot?

A     Yes. It had, they both have windows on each side.

Q     Okay. When you look out into the parking lot, what kind of car does Chris have?

A     It's a Jeep. A Jeep Wrangler.

Q     Okay. Can you look out your second floor window and look directly down at the Jeep?

A     Yeah. Because of the way he was parked last night, I could see like directly at the Jeep.

Q     Okay. So, this morning, was it light enough for you to see out there?

A     Oh, yes. It was bright. I mean I saw his body laying on the ground.

3

Q     Were there any trees there to obstruct your vision at all?

A     There's trees above, but like there's no branches by the windows. They're up. They're over the windows.

Q     Okay. When you looked outside –

A     Um hm.

Q     – well, first, what drew your attention to the window?

A     Well, the thing that drew my attention was the two, I heard two gunshots. That's – and I ran over to the window to see what it was and I saw a black guy running and then I just saw Chris on the ground.

Q     You heard two shots?

A     Um hum.

Q     And you went to the window?

A     Because I was like, I was saying, gosh, that noise sounds like somebody had just been shot. And I saw the black guy running and then I saw Chris' body on the ground.

Q     Um, when you looked out there, you saw, you said a black guy?

A     Yes.

Q     Okay. And I know a lot of things are going on very quickly. How about his dress? His overall dress.

A     It's just all, like, it looked like he was wearing just dark. Like I didn't look at him that much, but it looked like he was wearing dark clothing. Dark jeans and a dark sweatshirt. And I couldn't tell if he was wearing a hat.

Q     You couldn't tell if he had a hat on?

A     No. I couldn't tell. But he, it looked like he was all, in all dark clothes.

Q     Okay. How about his skin? Would you consider him very dark, light, medium?

A     Uh, dark.

4

Q     Did you see him holding anything in his hand?

A     No. Because he was – like he – it was like his back side or his side was facing me in the front. Like where his hands would be facing, like he was running out of the parking lot because I didn't see like anything in front of him.

Q     Okay. Was he standing still over your boyfriend?

A     No. He, he kind of did like a little gesture or like hesitated and then he ran.

Q     Did you see anyone else out there?

A     No.

Q     When he ran, which direction did he go to?

A     Uh, if you're looking, if you're coming out my apartment door, he was running towards like the left exit of the parking lot.

Q     I guess that's the only exit out of your parking lot?

A     Well, there's an exit on the, like, there's one on either side. But he ran towards the one on the left. There's an exit to the right and to the left and he ran to the left.

Q     Let me pull this map out for you here. There's an exit on this side too?

A     Yeah, there's like –

Q     Here's your apartment here.

A     – okay. There is my apartment and then –

Q     This is 13?

A     Yes.

Q     Okay. And –

A     There's an exit right here and an exit right here.

Q     Your boyfriend's car is there and pointed that way and there's an exit here?

A     Yes. Because there's a , like apartments here, here, here.

5

Q    Okay. We'll make this the left and the right.

A    Right.

Q    Why don't you draw which way you saw him run?

A    Like that. To the left.

Q    Okay. And did you see him get in any vehicle at all?

A    No.

Q    Did you hear him yell to anyone?

A    No. Nothing.

Q    Okay. So just a little background. You said your boyfriend is a security guard.

A    He was a security manager.

Q    Security manager. Now, is there anything, such as last night, was there anything that happened at your residence that –

A    Um. Well, last night I got home, actually it must have been a little after 6:30 and, um, around 7:00 or maybe a little before 7:00, a black man knocked on the door. And, well he didn't knock on the door, he rang the doorbell and the doorbell never rings in our apartment. That's when – like who is at the door and I opened it up a little bit and he said, is Chris there and I said, um, no he's not. He said well, can you just tell him Tim stopped by. And he kind of, the way he walked, like he was being like he was friendly with Chris. Cause he kind of did a move like this. You know how they kind of go? He had gloves in his hands and he said tell him Tim stopped by and he walked as if he was saying hi. You know how they do that with their hands sometimes?

Q    Um hm.

A    He did that. So I called Chris on the phone right away cause Chris wasn't home. I called him on the phone at his brothers', or his parents' house in New Jersey. Well, I beeped him so I didn't call him. And I waited for him to call back and I said, do you know a black guy named Tim? A big black guy because he was wearing a big, one of those big Polar Bear coats, whatever they wear. And he goes, no, I don't. I said well hold on the other phone is ringing, let me call you right back. And, um, in the meantime, when I was on the phone, he got in the car and he just drove right to our apartment. And he was home by like 7:00. It must have been like 7:30 cause he was home to watch Mad About you at 8:00.

6

Q      So he got home about 7:30?

A      Yeah.  Cause we watch TV at 8:00, I know that, together.

Q      Okay.

A      And we had spaghetti before that.

Q      This guy knocking on the door, who identified himself as Tim, was around 7:00?

A      I think it was around then.

Q      Okay.  Did he look familiar to you at all?

A      No.  Cause I know all of Chris' friends and very rarely somebody comes to our door cause we both work retail and we're never home.  And he was, alright.  He seemed probably around my age or maybe a little – I'm 24 so he's probably around that age.  Maybe a little younger.  I mean, cause he looked young, like the guy.

Q      Um hm.

A      He looked about our age is what I mean.

Q      About 24?

A      Yeah.

Q      Can you describe him to me?

A      Um, his height is like, like a little more than me.  The one guy we measured him with –

Q      Right.

A      – he was about six foot.

Q      Six foot?

A      Six foot or whatever.  And then he was a black male wearing like a dark black – either dark black or a really dark blue bear jacket with dark jeans and dark sneakers, cause I was afraid cause he was all in dark.

Q      Right.

A    That's why I was scared.

Q    Can you describe the coat?  Was it a fluffy coat?

A    It's one of those like, I call it a shoplifting coat.  It looks like it's got all the insulate stuff. It's one of those big polar bear coats.  And he had gloves in his hand.  Black gloves.  Black gloves in his hand.

Q    But he didn't have them on?

A    No, he didn't have them on.

Q    Did you see any facial hair or anything?

A    No.  And he had a, he had a hat on.  I don't know if it was a baseball cap or one of those like – he had a hat on.  And I didn't see like any hair coming down out of the hat.  It was one of those snow hats, I guess it would be.

Q    Do you know what color the hat was?

A    It was dark also.  I think it was black.  I think it was all black.

Q    Was there anything about his face that kind of sticks out, like a real prominent nose or –

A    No.  There's really nothing I can really think of.

Q    – okay.  When he knocked on your door, do you have a peephole?

A    Yeah.  And when I, I looked through the peephole, it's a very bad peephole, I didn't see anything so I said, who is it?  And he didn't answer and so I just opened it up a little bit cause I shouldn't have opened the door because I was scared.  And, um, so I thought it might be like there's this little kid, the little kid who lives upstairs because he would come down and knock on my door all the time.  So I thought maybe, and you couldn't never see him.

Q    Right.

A    So, I opened it up and he asked if Chris was there, and I said he wasn't.

Q    He didn't ask you to come in or anything like that?

A    No and he just walked away, like all casual.

Q    Okay.  The guy who knocked on the door last night.  Okay?  Keep him in mind –

8

A    Um hm.

Q    – and the guy that you saw this morning standing over your boyfriend –

A    I, I think it was the same person cause he looked like the same height, but they all look the same, so –

Q    – okay. Your boyfriend was going to work today. Did he have anything scheduled today?

A    He was going, he, um, he usually goes to Owings Mill but today he was going to the Christiana store because they had a court case.

Q    Um hm.

A    And I think it was in Superior Court.

Q    And what kind of case was that?

A    It was something that, it was some kind of, I don't want to call it shoplifting, but the person that he was going to court for was an employee and he was doing something like, ah, using customers' credit cards to buy money or buy, gift certificates, I'm sorry. And then he would give them to his friends. And they caught this guy about sometime in October last year cause Chris was still in the Christiana store. And then he got promoted to the Owings Mill store at the end of October.

Q    Um hm.

A    So, the court case that he was going to today was for a guy in the Christiana store. And he's gone to court a couple times for it.

Q    Um hm.

A    But it's always been postponed or something.

Q    Do you guys have your name listed in the phone book?

A    It's just his name.

Q    And does it give apartment number and all that?

A    You know, I don't, I don't know.

Q    Okay. What about your mailbox? Is that clearly labeled?

9

A      It says door C-3 on it.

Q      Okay.  What about apartment number?

A      Yeah, um hm.

Q      Okay.  Can you remember anything else?

A      Not really.

Q      Okay.  We're going to give you a little rest.  I want you to talk to someone else.

A      Okay.

Q      I'm sure your parents might be here by now.  If you remember anything whatsoever, I don't care how little it is, I want you to bring it to my attention.

A      I'll tell you.

Q      Okay?

A      Um hm.

Q      That concludes this interview.  The time is 0952.

10



**NEW CASTLE COUNTY**
**DEPARTMENT OF PUBLIC SAFETY**

**SUPPLEMENT REPORT**

**VICTIM:**   Heath, Kristopher   W/M   04-05-70

**ADDRESS:**   11~Capano Dr, Apt 11-A, Cavalier Apts, Newark   19702

**PLACE OF OCCURRENCE:**   S.A.A

**DAY, DATE & TIME OF OCCURRENCE:**   Mo   11-13-95   0740 hrs.

**COMPLAINT NUMBER:**   32-95-134010

**CORRECT OFFENSE:**   MURDER 1ST   11/636

**OFFENSE CHANGED FROM:**   N/A

**REPORTING OFFICER:**   Det. Gerard Donovan #2341/CIU   CO #2341

**CASE STATUS:**   PENDING ACTIVE/ASSIST DET WELDON

**DAY, DATE & TIME OF REPORT:**   Mo 11-20-95   1600 hrs.

---

**ASSIGNMENT:**

On Mo 11-13-95, writer while on duty, responded to the above location to assist with a shooting, just occurred.

**CRIME SCENE:**

Refer to original report.

**INVESTIGATION:**

Upon arrival writer was directed by Lt. Hedrick to interview two potential witnesses.  Writer interviewed Angela Davis (W/F 05-09-91)who stated she did not witness the incident (refer to witness interview).  Writer then interviewed Phillip Hudson (W/M 08-29-72)who stated he did witness the incident (refer to witness interview).  Writer tot'd Mr. Hudson to Det Lee for transport to HQ.

Writer was then instructed to begin a neighborhood canvas.  Writer began a canvass at #11-A Capano Drive (Refer to neighborhood canvass).

SUPP: HEATH, KRISTOPHER          3          32-95-134010
DET G. DONOVAN #2341
================================================================

WING, JESSICA  W/F
CAPANO DR, NEWARK  19702

Wing stated that at approx 0740 hrs, she heard 5 shots. looked out
of her window, saw a blue car next to her m/v, in the parking lot.
Wing stated she saw the blue m/v flee and did not see it's
occupants, but believes she saw white hands operating the m/v, she
then heard a woman scream, and called 9-1-1.

No response at apt #1 and 2, Det. Lee covered apt #6.


**SUSPECT/CHARGES:**

Refer to original report.

**FURTHER INVESTIGATION:**

Refer to original report.

**WITNESSES NEEDED FOR COURT:**

Refer to original report.



**Kristopher Heath Investigation**                          32-95-134010
**Det. Q. Watson, #2255, CIU**
=====================================================================
===

Era, Valerie W/F., 01/30/71
~~10804~~ Capano Dr., Newark, De., 19702.
(H) ~~434-8184~~

On 11/13/95 at 0851 hrs., writer spoke with Valerie in the hallway
of her apartment building. Valerie stated that she saw five shots
then looked out of her window and saw a black colored car drive
away. Valerie stated that the vehicle was a med size vehicle and
she thought it was a four door vehicle. Valerie stated that she had
called her roommate Carol Schweda at work after finding out what
happened. Valerie stated that her roommate stated that she saw a
white male sitting in a small dark colored vehicle parked next to
her's when she left for work this morning.


Demchak, Mark W/M., 05/26/69
~~20102~~ Capano Dr., Newark, De., 19702
(H) ~~454-8010~~

On 11/13/95 at 1053 hrs., writer spoke with Mark at his residence.
Mark stated he heard nothing this morning.


Farmer, Marlene B/F., 12/14/48
~~10104~~ Capano Dr., Newark, De., 19702
(H) ~~454-4092~~ / ~~(W) 454-2809~~

On 11/13/95 at 0855 hrs., writer spoke with Marlene  at her
residence. Marlene stated that around 0739 hrs., she heard five
shots then went to a window and saw a subject who she describes as
a white male wearing a dark jacket and light colored pants, short
haircut. Marlene stated that she doesn't feel that the subject was
wearing a hat. The subject was about 5'8", med., build with no
facial hair. Marlene stated that she saw the subject walk very
quickly away from the guy lying on the ground. Marlene stated that
the subject looked back at the guy on the ground before getting
into a small dark colored vehicle that drove by the window that she
was looking out of. Marlene stated that the car had Delaware tags
but that she could not get the tag number. Marlene stated that she
did not see anything in the subject's left hand and that he opened
the vehicle door with his left hand and that his right hand was
down and she couldn't see that hand.

6



NEW CASTLE COUNTY
DEPARTMENT OF PUBLIC SAFETY
DIVISION OF POLICE
CRIMINAL INVESTIGATION UNIT

STATEMENT

CASE 32-95-134010

MADE BY:  George Stevenson

ADDRESS:

PHONE:

DATE:  11/21/95

TIME:  1225 hours

TAKEN BY:  Det. C. Weldon

LOCATION:  Outside the Christiana Mall, Newark, DE

OTHERS IN ATTENDANCE:  N/A
-------------------------------------------------------------

Q    All right.  The following is a taped interview with one George
     Stevenson.  The date is 11/21/95.  The time is 1225 hours.  We
     are outside of the Christiana Mall in ah Newark, Delaware.
     This is in reference to a homicide investigation which I,
     Craig A. Weldon, of New Castle County Police am conducting.
     Victim is a Kristopher Heath.  Ah defendants in the case are
     a David Stevenson and Michael Manley.

     George I'd like to begin by you are related to David Stevenson
     is that correct?

A    Yes.

Q    Okay and, and that relationship is you are a cousin to him?

A    Yes.

Q    Okay.  Um tell me the last time that you saw David Stevenson.

A    It was um last Thursday.  I don't know the date.

     Okay.

A    It was ah, but it was Thursday.

Q    Okay.  Was it during the day or at nighttime?

STATEMENT:   GEORGE STEVENSON                PAGE -2-
DET. WELDON/ybs                              CASE 32-95-134010

A    It was at night.

Q    And, and how did you, how did you come into contact with him?
     What happened?

A    Well previous the couple days before that my mom and them were
     saying, was calling for me and the girl Carey she just tell me
     that he was, he called over there for me but she told him like
     I was at work all the time you know I usually work.

Q    Um-hum.

A    But on Thursday, that day I was over there he called and um he
     asked me how I was doing and I saying to him I was all right
     and I, I heard that he was calling for me and he just said you
     never hang around me that much no more and stuff like that.
     I said well I've, then I just told him like you know I work,
     work all the time but I said you know where I'm at I'm usually
     over here on Thursdays and Fridays.  So you could of came, you
     never came and see me or whatever.  Then after that he, he,
     like I guess he was like with some other people so he said
     well I'm, I'm getting ready to go.  So he hung up the phone
     and that was it.  And then I'd say about maybe about 2, 2 or
     3 hours later he came over and I didn't know he was coming.
     Nobody knew he was coming, so he just showed up.  So he sat
     down, he said hi to everybody, then Mike came in he said hi
     and they all left.

Q    Okay Michael be Michael Manley?

A    Yes.

Q    Do you know Mike?

A    I met Mike about 2 times.  I met him, I met him when I, when
     I had, I met Mike last year when I had my um, when I had my
     son and I met him after that one time again cause he, he was
     over Dave's house.  And _____ I guess they,
     you know I guess they went to school together or something
     like that.  I don't know how far their relationship go but I
     just you know know they were friends.

Q    Okay.

A    So.

Q    So they came in did, ah to Carey's apartment down at the
     University of Delaware?

STATEMENT:  GEORGE STEVENSON                    PAGE  -3-
DET. WELDON/ybs                                 CASE 32-95-134010

A    Yes it's her's and Tarra and Karen's she's _____ and
     Bethy them the people that stay.  Like their the people that
     suppose to be staying there, live there.

Q    Okay.

A    But I usually um um stay there Friday go chill over there with
     them and stuff.

Q    Okay.

A    But Dave came and sat up at the table.  Mike came and sat on
     the couch and I was like hi, hi and they were speaking to
     everybody.  And Dave was talking to everybody for a while.  He
     talked to me but he, all he just was just like just hi that's
     all, he didn't really say to much he just hi then can I use
     the phone to um, to one of the girls who was there and they
     was like okay.  So he was using the, he got on the phone.
     Then ah.

Q    Was he on the phone a lot?

A    Yeah he was on the phone about, he got on the phone about 2 or
     3 times.

Q    Um.

A    And um and then it was just I, it just I, I took my attention
     off him cause he you know he was just on the phone so I
     started talking to Mike and I asked him how you doing and how
     long he, he told me he just came down for the weekend.  And um
     then I was talking to him about cause I, cause I'm in the
     reserves and stuff.  I was telling him I would like probably
     switch over to the air force reserve or something and he like
     want to know if I'm gonna do that you know we just was talking
     about the military for a little while.

Q    He's in the military also?

A    Yeah he's, he's in the um reserves.

Q    Um-hum.

A    And um then, then we was start _____ a movie, a
     preview of a movie that came on that came on TV and I was
     telling him I wanted to see it and he was telling me it seems
     like a good movie and stuff.

Q    Um-hum.

A    And um then after I finished you know talked to him a little
     bit I, I think um some it was just a, it was just a, I guess
     somebody else was talking to him, cause I stopped talking to
     him for a while and I was just looking at the TV.    But
     everybody was just like in a social, their social thing just
     you know and Dave he, then he got off the phone he started
     talking about he said well I'll be back and you know he got
     up, nobody would ask him what was going he just got up well
     I'll be back and stuff like that.   And I well I asked Mike
     where he was going but when when he got up you know Mike said
     he's probably just going over one of the other friends house
     that's in the Towers and stuff.   Cause I'm, ah we was over at
     the West Towers and he know alot of people at the East Towers.

Q    Okay.

A    So he left and he was gone for about, I'd say about probably
     about 20, 30 minutes or something like that and then he came
     back, he just sat back where he was sitting then he wanted to
     get on the phone again and he got on, he got on the phone
     after a while cause somebody was using the computer, they was
     doing like E mail or something with the computer they had the
     phone with that.   So um after they got off he got on the phone
     and then he was talking for a while.    Then after a little
     while he just, they just got up and left, he said well lets
     get, go Michael so and Mike was like all right well.   I said
     well I'll see you all and stuff like that.

Q    How late was it do you remember?

A    Let me see.   I can't remember exact time, cause I was drinking
     beer that night.

Q    Um-hum.

A    But um I can't remember the time, it was probably around
     about, probably about I think probably when they left probably
     maybe about like 10:30 or some, 10:30, 11 when they left.
     Cause they came, they probably came over around about 8 or
     some, they was there for a little while.

Q    Okay.

A    I mean but it was just you know it wasn't, it wasn't really to
     much said cause I was wondering why.

Q    Did Dave seem like his normal self when he was there?

STATEMENT:  GEORGE STEVENSON                    PAGE  -5-
DET. WELDON/ybs                                 CASE 32-95-134010

A    Well kinda he, I mean he look like he about worried about
     school and stuff cause he always was talking about like school
     and stuff you know.

Q    Was he pretty good in school?

A    Yeah.

Q    Was he?

A    Yeah he always he was a good student.   Always was a good
     student.

Q    Okay.

A    But he, he acted normal, I mean he didn't really, get the
     point you know.

Q    Um-hum.

A    Like I was just thinking cause he wanted to see me is what he,
     you know like wow what's up you know you know something like
     that.

Q    Yeah but he didn't even talk to you.

A    No he just, he just said a couple things to me and well he was
     mostly on the phone.

Q    Um-hum.

A    So other than that I was like okay I'll see you later so.
     Then I forgot it, and then I just forgot all about it until
     like Monday when I was going, I, I you know I come to work at
     8:00 on Mondays so when I came to work I drove, I drove past,
     I go past like the things over there cause I go to you know
     from New Castle to get here it's like you know how long just
     cut back that way.

Q    Um-hum.

A    So I went on I seen all these cop cars out there and stuff
     with like the cops and they had a like some kind of black
     Bronco pickup or something out there that they were blocking
     off the roadway so.  So I went, when I came back home from
     work my mom asked said she had something to tell me and stuff
     and I said what, what is it, I, I didn't know what it was
     thought she was trying to scare me cause she like I got
     something important to tell you.  I rush, I rushed over to the
     house, her house and then she said well Dave, Dave got in some

trouble today.  I was like what, what happened?  And she said
um about the case up here you know him and Michael and stuff.
So I was like well he didn't really, you know Dave like well
_____ say nothing to me you know cause I, I
mean, I thought he would be, I don't know, like I said I don't
know what he was, when he was calling me what he want maybe he
just wanted to see me or something but.

Q     Um-hum.

A     I, I just don't know cause he never said nothing about it __
      _____.

Q     He never said anything about how mad he was at the case or?

A     No.

Q     How upset it bothered him that he was getting arrested for
      this or?

A     No.  Now with the case, that case, I didn't know nothing till,
      I didn't know nothing until he had to go to, to, he had to go
      to um to get his bond filled out.  You know when, I guess when
      they register get your bond.

Q     Yeah.

A     He had to in turn give 'em the license and stuff like that.

Q     Um-hum.

A     Since they was right down the street with him and I was over
      his house that, at the time when he had his girlfriend down
      there, he asked me to walk 'em down to his house, I mean walk
      'em down from his house to the thing and I went over there
      with her.  And then I just asked him you know what happened
      and stuff.  And he didn't really like get into what it was I
      mean you know what I'm saying.  Cause I didn't know, I, I
      thought he like, I thought he quit Macey's or something you
      know.

Q     Um-hum.

A     Or something you know cause he didn't really get into ah what,
      or what happened he was just you know I had to go to court for
      this and.

Q     Um-hum.

STATEMENT:  GEORGE STEVENSON                    PAGE -7-
DET. WELDON/ybs                                 CASE 32-95-134010

A    And stuff like that. So I, I wondered you know they, him and
     his mother probably just trying to keep it you know in a down
     low between, with them.

Q    Um-hum.

A    Don't let it get outta hand.

Q    Um-hum.  Had he ever been in trouble before that you know of?

A    No.

Q    Had.

A    You know I mean he um.

Q    How long have you been talking with him?

A    All his life he use to live with me when I was younger, we use
     to live together.

Q    Okay.

A    I mean we use to be like, like you know real close like this.

Q    Um-hum.

A    But I guess as we, as we got, as we get older and stuff and I
     moved down here.

Q    Um-hum.

A    And then he use to come down state to come visit me and stuff.
     But when we lived in Philly he use to stay with me but then I
     moved and we, we just moved down here but we kept in contact
     and everytime I come up me and him we hang around but I guess
     you know I mean since I, I guess about you know since I had my
     kid and stuff you know.

Q    Um-hum.

A    And ah I mean I got to work and I don't, I don't, I really
     don't, I don't have time to you know do to, to much like go
     out with him you know what I mean.

Q    Um-hum.

A    Stuff like that.

Q    You know anybody name Poohgar?

A    Poohgar.

Q    Yeah.

A    No.

Q    Anybody nickname Poohgar?

A    No.

Q    From up in Philly?

A    No.  I don't know nobody name Poohgar.  No.

Q    Something like that Poohgy, Poohgar, nothing like that at all?

A    No.  Poohgar, Poohgy.  No

Q    Did he, did he ever tell you if he got involved in any drug
     activity up in Philly?

A    No.

Q    Had you ever heard anything like that?

A    No, not with him.  Not with him.

Q    He wouldn't do that?

A    No.  I, I'm not saying I can't be no judge.

Q    I understand, I understand, I'm just asking if you ever heard.

A    I never, but me myself I never heard of him you know doing
     stuff like that like you know.

Q    Not, not necessarily doing the drugs but maybe like making a
     little money on the side by running 'em for somebody or doing
     something like that?

A    No.

Q    How about Michael?

A    Mike, I don't, well I only can say from the impression that I
     got when I first, when I met him, Mike seems not quiet but he
     was just like he was sociable like you know he'll talk he'll
     be, be like you know some, like some people do like yeah man
     and cussing you know he seemed like you know kind of
     respectful guy and always talk decent and stuff like that.  He

didn't come off as a person that had a nasty attitude or
something like that you know.

Q    Okay.

A    But with Dave um, with him um he just use to just like go out
     and party all the time.  You know what I mean him and Mike
     whoever else.

Q    Up in Philly or down here?

A    Well up in Philly he use to go back and forth hang out, came
     out, he'll go to another college campus where he know somebody
     that you know at the college and go party, go to a couple
     games they had there and stuff like that you know.

Q    Um-hum.

A    But I don't, I don't, I don't know about like any drugs or
     nothing.  I'm just saying from impression that I, he gave to
     me you know just about the drugs and stuff like that but.

Q    Okay.  Well I'm just, I'm just asking you if, if he did or was
     involved in.

A    Yeah.

Q    I mean I, there were some statements that were made by him a
     while ago that about drugs, not that he did 'em but that he
     had some knowledge about 'em and things like that.  You know
     if, if you know or he had told you that he was trying to get
     out of it or trying to get away from it or if he owed somebody
     some money as a result of it.

A    I'm saying to me like when he was younger and he use to like
     I'd say he'd get in trouble and stuff like _____
     _____ one time it was just like somebody took his
     like took his tapes and stuff he would tell me and I, you know
     I'd be there be like this is my cousin.

Q    Um-hum.

A    You know but he never really mentioned any like if somebody
     was, if somebody was like out there you know what I mean or
     trying to get something out of him or something like that
     cause he I mean he could of came and talked to me about this
     wouldn't nobody try to get over on my cousin or something like
     that you know.

Q    Um-hum.

A    But I'm like, I mean as far as I know that he's like, he was
     like going back to school you know.  I guess you know getting
     back in the school mode and stuff cause he was going up
     college up in Pennsylvania and then, Bennsalem it was further
     out.

Q    Bennsalem?

A    Yeah.  Cause he had um a basketball scholarship for there and
     um.

Q    And what happened there?

A    Um on the next, on the next um thing he couldn't, he couldn't
     afford to pay for all of his books, I guess his you know
     scholarship don't cover everything.

Q    Um-hum.

A    So he had to um drop out and so then he came down here and was
     living with his mom and um he was working, he was was working
     at the Acme you know different spots around and then he was,
     he started um he was _____ I think he, I don't know, to
     sure I think he was gonna go to Del Tech, no matter of fact he
     was, he was going to Del Tech and studying from for biochem,
     for chemistry or something like that something.  And then he
     was telling me well I might switch over to the university or
     some cause I guess he start meeting people that was at the
     university and stuff so he made that transition so to me I, I
     just thought like a lot of things was getting a little more
     better for him you know what I mean.

Q    Um-hum.

A    And you know then when he was going to school.  Then he
     finally got you know his car and stuff you know what I mean he
     just.

Q    Was that his car or his sister's car?

A    Well to my knowledge the car was his but the.

Q    He always drove it?

A    Yeah cause I, I only seen the car one time.

Q    Oh really.

A    I seen it like, I seen it the night that he got it.  That day,
     the night when he bought it.

Q   Um-hum.

A   I seen it later that night cause I drove by their house.

Q   Okay.

A   And he's like this is my new car, I was like oh.  But other
    than that I never, I never seen his car besides that.

Q   Okay.

A   But from my knowledge it was his car that's his car.

Q   Okay.  Um had he ever talked to you about what happened at
    Macey's I mean you know how it all came about what happened?

A   No he never.  I mean the Macey, actually on the Macey like the
    Macey's thing first time I really heard about it was like you
    know on the news cause he didn't really say like about what,
    what happened why he got bond and stuff you know.

Q   Uh-huh.

A   He just was like well I just got in a little trouble or
    something you know he didn't really go into detail.  And I
    would just tell and I told him the time _____
    _____ well what happened and stuff like that.

Q   Um-hum.

A   And he would just like kinda change the subject or something
    like that but he was well I just got in some trouble you know
    I'll be okay or whatever.  So I but I guess you know he just
    don't want you know just don't want nobody to know you know
    what happened or something like that.  But when I seen it on
    the news that was the first time cause I thought he, I thought
    he like quit, quit Macey's or something.

Q   Um-hum.

A   Thought he just got tired of it and wanted to go back to
    school or something like that.

Q   Okay.  So the last time you saw him was Thursday?  You didn't
    see him Friday, Saturday or Sunday?

A   No.

Q   Not at all?

STATEMENT:  GEORGE STEVENSON                 PAGE -12-
DET. WELDON/ybs                               CASE 32-95-134010

A    Uh-uh.

Q    Didn't hear from him?

A    Cause I, lets see Thursday, like I said Thursday and Friday I,
     I usually just stay over Kerris' and them and I didn't go home
     Saturday either I stayed over there till Saturday then I left
     Saturday, no I left Sunday morning and came home cause I come
     home to watch you know my son and stuff.  So I, I came home,
     then after that on Monday I had to be to work at eight _____
     _____ went to work and that's how _____
     _____.

Q    Who stays home with your son?

A    During the day is um, is my mom but I, my ex-girlfriend she
     stays over there.  I let her move in cause she had no other
     place to go.  So I told her she can come stay with me.  And
     but usually since she works during the day and I work during
     the day, my mom take care of the baby during the day and just
     since I'm not talking to her and since I talk to someone else
     I just you know I go out on Thursdays and Fridays to see the
     person I talk to talk to her and stuff like that but I try to
     you know just stay home during the week you know just so I can
     be around my son.

Q    Um-hum.

A    You know.

Q    Okay.  All right.  Is there anything more you can think about
     that you and David talked about or you knew about Mike?  What,
     what did he do in the reserves, you know?

A    Well Mike was, I just found out on Thursday what he did, he's
     a, he's a combat medic _____.

Q    Combat medic?

A    Yeah.

Q    He told you that?

A    Yeah.

Q    You know where he was stationed?

A    Um no.  He just, I think it's somewhere up Philadelphia, I
     don't, I don't know.

Q    He didn't say when his next weekend was did he?

A    I think it was um this, this, the weekend, the weekend that
     was following.  Cause he had, he told me he already had drill
     the week before he came down here.

Q    Um-hum.

A    The weekend before so he, I think he was saying that um it was
     coming up like the week after or something like that.

Q    Okay.

A    So we, we was basically like just talking about switching
     over, then he was telling me about the air force from, from
     where what base he was on cause he was up on um Fort McGuire.

Q    Are you the one that's talking about switching over?

A    Yeah.

Q    From Army to Air Force?

A    Yeah.

Q    Okay.  George what's your date of birth?

A    Um 01.

Q    Um-hum.

A    09/71.

Q    Okay.  All right.  Anything else you can think of?

A    Not really cause, I mean, like I said on the Macey thing he,
     he don't want to tell nobody.  I mean you know I mean none of
     'em him or his sister or anybody really said anything about
     that all I know he got bonded for something.

Q    Um-hum.

A    And they was going to court you know.

Q    Um-hum.

A    So I don't, I don't really know what he got, got, got you know
     got in trouble for so I guess he was not letting anybody else
     know in the family.  You know they were just keeping it in the
     house about what happened.

STATEMENT:  GEORGE STEVENSON                    PAGE -14-
DET. WELDON/ybs                                 CASE 32-95-134010

Q    Okay.

A    Until I just seen like, like in the papers about Macey's and
     stuff Macey's where they got you know you know.

Q    Um-hum.

A    It's the same and stuff.

Q    All right.  Okay.  We're gonna end the interview at 1240
     hours.

A    Okay.

STATEMENT:  GEORGE STEVENSON                    PAGE -15-
DET. WELDON/ybs                                 CASE 32-95-134010


HAVING READ THE FOREGOING STATEMENT CONSISTING OF FOURTEEN PAGES,
I FIND IT TO BE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND
BELIEF.  I HAVE INITIALED EACH PRECEDING PAGE JUST BELOW THE LAST
ANSWER GIVEN BY ME AND PLACE MY SIGNATURE BELOW.

                                SIGNED _____
                                       George Stevenson

TIME COMPLETED:  1240 hours

WITNESSES:


S_____
 Det. C. Weldon



SUPP: HEATH, KRISTOPHER                        32-95-134010
DET. W. SCOTT MCLAREN 2275 CIU

in the evening hours.

Monday 11-20-95 at 1515 hrs writer contacted Melissa Magalong via public service. The witness advised that the victim use to live at the same house where she currently lives at. The witness stated that she moved in the house when the victim moved out in October '94. The witness was home alone when she heard a knock at the front door at approximately 1830 hrs. The witness did not answer the door. The witness was not expecting company that evening. The witness heard two male voices talking outside the door. The witness could not tell if the subject were black or white males. The door knob was not tried according to the witness. A vehicle was not observed by the witness. For additional refer to writers notes.

Monday 11-20-95 at 1640 hrs writer contacted a Tiarra Koston B/F 06-05-71 via public service. Through investigation it was established that Koston had seen the victim the day of the crime. This interview was taped. The witness stated she observed David Stevenson drive by her house in a black or blue car. The car was further described as having a roof that was "messed up". The vehicle was northbound on Washington Street traveling from 17th street to 18th. The witness observed the car approximately 0800 - 0815 hrs. The witness could not tell what the exact time was.

On Monday 11-20-95 at 1938 hrs writer interviewed a witness by the name of Susan Butler W/F 02-29-56. The witness lives in the Cavalier Apartment complex in the area where the victim was shot. The witness knwe the victim and his girlfriend The witness lives on the ground floor apartment which faces the front of the parking lot. The witness advised that she was awake at the time of the shooting. The witness heard 4-5 shot's being fired. The witness looked out her front spare bedroom window and observed a B/M that she first thought was the maintenance man. The angle of view was slightly to the right and was not obstructed. The witness described the B/M as wearing jeans, a royal blue top which was possibly some type of jacket / shirt. The suspect was 5'6" stocky built and was possibly wearing a hat. The suspect was seen walking at a fast rate away from the victim. The witness then heard a female scream. That female was found to be Debra Dorsey, the victims girlfriend. The witness then heard a knock at the door while she was calling 911. Debra Dorsey was at the door, and was hysterical. The witness gave the phone to Debra who attempted to talk to the 911 call-taker. The witness boyfriend, David Finkle woke up during the commotion and went outside. The boyfriend went to the aid of the victim who told the witness that the victim was dead. The witness was shown the two separate photo line-up for the defendants. The witness could not identify anyone in the Stevenson line-up. Writer then displayed Defendant Manley line-up to the

7

**SUPP: HEATH, KRISTOPHER**
**DET. W. SCOTT MCLAREN 2275 CIU**

32-95-134010

Chona, Par
O/M 03-04-61
~~296 Teresa Steet~~
~~Wilmington Expected~~ 21009
(H) ~~302 555-2222~~
(W) ~~302 555-3333~~

Monday 11-13-95 1145 hrs

Writer interviewed the above witness on the above date and time at
NCCPD HQ.  The witness is a co-worker and personal friend of the
victim.  The witness advised that he was also the co-investigator
in the internal theft case involving David Stevenson.

This witness was later contacted the same day, via public service
and told that we found a piece of paper with his home address on
same that was on Stevenson's person.


Magalong, Melissa
W/F 05-23-72
~~Lutorenerco~~
~~Wuvode~~ Newark De.
(H) ~~3025555~~

Monday 11-20-95 1515 hrs

Writer interviewed the above witness via public service.  The
witness currently lives in the house where the victim use to live
at.  The witness had two males knock on her door on Sunday 11-12-
95, the night before the incident.  The witness did not answer the
door.  For additional information refer to the investigative
section.


Koston, Tiarra
B/F 06-05-71
~~van Buren 544~~ St.
Wilmington De. 19805
(H) ~~3025555~~

D/T Monday 11-20-95 1640 -1647 hrs

On the above date and time writer contacted the above witness via
public service.  This conversation was taped in it's entirety.
Through investigation it was established that the witness observed

9

SUPP: HEATH, KRISTOPHER                    32-95-134010
DET. W. SCOTT MCLAREN 2275 CIU


Chona, Par
O/M 03-04-61
~~~~~~~~~~~~ 21009
(H) ~~~~~~~~~~
(W) ~~~~~~~~~~

Monday 11-13-95 1145 hrs

Writer interviewed the above witness on the above date and time at
NCCPD HQ.  The witness is a co-worker and personal friend of the
victim.  The witness advised that he was also the co-investigator
in the internal theft case involving David Stevenson.

This witness was later contacted the same day, via public service
and told that we found a piece of paper with his home address on
same that was on Stevenson's person.


Magalong, Melissa
W/F 05-23-72
~~~~~~~~~~~~
~~~~~ Newark De.
(H) ~~~~~~~

Monday 11-20-95 1515 hrs

Writer interviewed the above witness via public service.  The
witness currently lives in the house where the victim use to live
at.  The witness had two males knock on her door on Sunday 11-12-
95, the night before the incident.  The witness did not answer the
door.  For additional information refer to the investigative
section.


Koston, Tiarra
B/F 06-05-71
~~~~~~~~~~~~~~~~.
Wilmington De. 19805
(H) ~~~~~~~~~

D/T Monday 11-20-95 1640 -1647 hrs

On the above date and time writer contacted the above witness via
public service.  This conversation was taped in it's entirety.
Through investigation it was established that the witness observed

9



## AFFIDAVIT/DECLARATION OF JACQUELINE ARMSTEAD

I, Jacqueline Armstead , pursuant to 28 U.S.C. § 1746, hereby swear, affirm and state that the following is true and correct:

1.        My name is Jacqueline Armstead.  I am currently a Master Sergeant in the Army Reserves 7301ˢᵗ MTSB unit located in Fort Dix, New Jersey.

2.        I was interviewed by Janel Trivelpiece and Allyson Phillip, where I was shown a photograph of a coat that is attached to this affidavit.  That particular coat is a Gortex Parka, all weather.  All clothing issued to soldiers has their name, rank, and insignia stitched on.

3.        All army issued property is maintained through formal records.  If this particular coat had been issued to Michael Manley, the army would have come after him for the coat or the cost of the coat when he was discharged.  Gortex Parka all weather coats are very expensive.  I have also reviewed the attached clothing request form for Michael Manley and this coat is not listed as requested or issued to Mr. Manley.  In fact, the army didn't begin to issue this type of coat until the late 1990's, early 2000's, after Mr. Manley was issued his clothing.

4.        Army clothing and accessories are very easy to obtain from stores, such as Ranger Joe's, or even flea markets.  Many of the stores carry and sell unissued items, without names and rank stamped or stitched on the clothing, even before the army starts to issue them.

5.        In addition, the Army National Guard and the Army Reserve are issued the exact same clothing.

6.        No one contacted me to see if I was available to testify.  Had I been contacted to testify I would have been available and willing to testify.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Jacqueline Armstead

31 JAN 08

# PERSONAL CLOTHING REQUEST

For use of this form, see AR 700-84; the proponent agency is DCSLOG
(SEE REVERSE FOR PRIVACY ACT STATEMENT)

| 1. DOCUMENT NO. | 2. VOUCHER NO. | 3. DATE |
|---|---|---|
| 5-290 0006 | | 18 Sept. 95 |

| 4. NAME (Last, First, MI) | 8. DODAAC | 9. PRIORITY | 10. ARMY MILITARY CLOTHING SALES STORE |
|---|---|---|---|
| MANLEY, MICHAEL R | W25APN | 13 | FT. DIX, NJ |

| 5. SSN | 6. GRADE | 11. CATEGORY (Check one) | 12. TYPE OF TRANSACTION |
|---|---|---|---|
| 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 | E-4 | | |

11. CATEGORY (Check one)
- [ ] Active Army
- [ ] NG
- [X] USAR
- [ ] IMA
- [ ] AGR
- [ ] IRR

12. TYPE OF TRANSACTION
- [ ] Initial
- [ ] Gratuitous
- [ ] Replacement
- [ ] Supplemental
- [X] Exchange
- [ ] Temporary
- [ ] Individual Charge Sale

| 7. ORGANIZATION |
|---|
| 348th Gen Hospital |

| 13. INVENTORY | | 14. PHONE NO. | 15. POSTED | | 16. AUTHORIZED BY |
|---|---|---|---|---|---|
| DATE | BY | 609 299-5154 | DATE | BY | AR 700-84 Para 5-11 |

17. APPROVED BY  Paul R. Grehan, COL, MS

18. DATE APPROVED  18 Sept. 95

| 19. QNTY. | | 20. ARTICLES (Common) | 21. SIZE | 22. UNIT PRICE | 23. TOTAL COST | 24. QNTY. | | 25. ARTICLES (Male) | 26. SIZE | 27. UNIT PRICE | 28. TOTAL COST |
|---|---|---|---|---|---|---|---|---|---|---|---|
| REQ. | ISS | | | | | REQ. | ISS | | | | |
| | | Bag, Duffel | | | | | | Buckle, Brass | | | |
| | | Belt, Trousers | | | | | | Cap, Garrison, AG | | | |
| | | Boot, Combat | | | | | | Coat, All Weather | | | |
| | | Buckle, Black | | | | | | Coat, Poly/Wool, AG | LGR | 101.5 | 101.5 |
| | | Cap, Camouflage | | | | | | Drawers, Brown | | | |
| 3 | 1 | Coat, Camou, HW | XLR | 27.10 | 27.10 | | | Necktie, Black | | | |
| 2 | 1 | Coat, Camou, Temp | XLR | 31.75 | 31.50 | | 1 | Shirt, LS, AG | 17.5 | 11.15 | 11.15 |
| | | Coat, Camou, CW | | | | | 1 | Shirt, SS, AG | 17.5 | 10.15 | 10.15 |
| 1 | | Gloves, Blk, Unisox | 4 | | | | | Shoes, Oxford | | | |
| 1 | | Glove, Inserts | BU | 7 | | | | Socks, Cotton/Nylon | | | |
| 1 | | Glove, Shells | 100 | 7 | | | 1 | Trousers, Poly/Wool, AG | 40 | 27.05 | 27.05 |
| | | Handkerchief, Brown | | | | | | Undershirt, White | | | |
| | | Socks, Wool | | | | | | | | | |
| | | Sweatpants, Gray | | | | | | 29. ARTICLES (Female) | | | |
| | | Sweatshirt, Gray | | | | | | Cap, Garrison, AG | | | |
| | | T Shirt, Gray | | | | | | Coat, All Weather | | | |
| | | Towel, Bath | | | | | | Coat, Poly/Wool, AG | | | |
| 2 | 1 | Trousers, Camou, H | | | 125 | | | Handbag, Black | | | |
| | | Trunks, GP, Gray | | | | | | Necktab, Universal | | | |
| 2 | 2 | Trousers, Camou, Temp | | 22.35 | 44.70 | | | Shirt, LS, AG | | | |
| | | Undershirt, Brown | | | | | | Shirt, SS, AG | | | |
| | | | | | | | | Shoes, Oxford | | | |
| | | | | | | | | Skirt, Poly/Wool, AG | | | |
| | | | | | | | | Slacks, Poly/Wool, AG | | | |
| | | | | | | | | | | | |
| | | | | | | | | TOTAL VALUE | | | |

| 30. REMARKS | 31. SIGNATURE OF RECIPIENT |
|---|---|
| | |

DA FORM 3078, JUN 91            EDITION OF JAN 82 IS OBSOLETE

## ISSUE-IN-KIND-PERSONAL CLOTHING RECORD

For use of this form, see 700-84; the proponent agency is ODCSLOG          AR

MALE

### DATA REQUIRED BY THE PRIVACY ACT OF 1974

AUTHORITY:          TITLE 10, USC 3012.

PRINCIPAL PURPOSE:  The issue-in-kind personal clothing records provide an accountable document for
clothing received by Reserve component enlisted soldier.

ROUNTINE USES:      The information furnished is used solely for the purposes of identifying the
individual so that the clothing record will be filed in the correct Military
Personal Record Jacket.

DISCLOSURE:         Voluntary.

### THIS IS A PERMANENT RECORD

| NAME (Last, First, MI) GRADE AND SSN | SIZE | AUTH ALW | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PERSONAL CLOTHING ITEMS (Common) | | | | | | | | | | | | | | | | | |
| Bag, Duffle | | | 1 | | | | | | | | | | | | | | |
| Belt Trousers | | | 2 | 2 | | | | | | | | | | | | | |
| Boot Combat | | | 2 | 2 | | | | | | | | | | | | | |
| Buckle Black | | | 1 | | | | | | | | | | | | | | |
| Cap Camou | | | 1 | | | | | | | | | | | | | | |
| Cap Garrison, AG | | | 1 | | | | | | | | | | | | | | |
| Coat All Weather | | | 1 | | | | | | | | | | | | | | |
| Coat Camou HW | | | 1 | 2 | | | | | | | | | | | | | |
| Coat Camou Temp | | | 2 | 2 | | | | | | | | | | | | | |
| Coat Camou CW | | | 1 | | | | | | | | | | | | | | |
| Coat AG | | | 1 | | | | | | | | | | | | | | |
| Gloves Blk Unisex | | | 1 | | | | | | | | | | | | | | |
| Glove, Flexor, Light Duty | | | 1 | | | | | | | | | | | | | | |
| Glove, Insert | | | 6 | | | | | | | | | | | | | | |
| Handkerchief | | | 1 | | | | | | | | | | | | | | |
| Shirt LS, AG | | | 1 | | | | | | | | | | | | | | |
| Shirt SS, AG | | | 1 | | | | | | | | | | | | | | |
| Shoes, Oxford | | | 1 | | | | | | | | | | | | | | |
| Socks, Wool | | | 3 | | | | | | | | | | | | | | |
| Sweatpants, Gray | | | 1 | | | | | | | | | | | | | | |
| Sweatshirt, Gray | | | 1 | | | | | | | | | | | | | | |
| T Shirt, Gray | | | 2 | 2 | | | | | | | | | | | | | |
| Towel Bath | | | 1 | | | | | | | | | | | | | | |
| Trousers, Camou, HW | | | 1 | 2 | | | | | | | | | | | | | |
| Trousers, Camou, Temp | | | 2 | 2 | | | | | | | | | | | | | |
| Trunks, GP, Gray | | | 2 | 2 | | | | | | | | | | | | | |
| Undershirt Brown | | | 3 | 3 | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |

INSTRUCTIONS:        Entries in ink: name,
SSN, quantity, date,
and signature.

DA FORM 4886, MAY 93

EDITION OF JUN 91 IS OBSOLETE





**NEW CASTLE COUNTY**
**DEPARTMENT OF PUBLIC SAFETY**

**SUPPLEMENT REPORT**

**VICTIM:**  Heath, Kristopher  W/M  04-05-70

**ADDRESS:**  *No*-Capano Dr, Apt *No*, Cavalier Apts, Newark  19702

**PLACE OF OCCURRENCE:**    S.A.A

**DAY, DATE & TIME OF OCCURRENCE:**    Mo  11-13-95  0740 hrs.

**COMPLAINT NUMBER:**  32-95-134010

**CORRECT OFFENSE:**   MURDER 1ST  11/636

**OFFENSE CHANGED FROM:**   N/A

**REPORTING OFFICER:**  Det. Gerard Donovan #2341/CIU   *#2341*

**CASE STATUS:**   PENDING ACTIVE/ASSIST DET WELDON

**DAY, DATE & TIME OF REPORT:**   Mo 11-20-95  1600 hrs.

---

**ASSIGNMENT:**

On Mo 11-13-95, writer while on duty, responded to the above location to assist with a shooting, just occurred.

**CRIME SCENE:**

Refer to original report.

**INVESTIGATION:**

Upon arrival writer was directed by Lt. Hedrick to interview two potential witnesses.  Writer interviewed Angela Davis (W/F 05-09-91)who stated she did not witness the incident (refer to witness interview).  Writer then interviewed Phillip Hudson (W/M 08-29-72)who stated he did witness the incident (refer to witness interview).  Writer tot'd Mr. Hudson to Det Lee for transport to HQ.

Writer was then instructed to begin a neighborhood canvas.  Writer began a canvass at #11-A Capano Drive (Refer to neighborhood canvass).

Writer was then directed to call the victims place of employment in an attempt to develop background information. Writer made contact with Larry Seachuck, Macy's Regional manager. Mr. Seachuck confirmed that the victim was to testify reference a fraud case involving a former Macy's employee.

Writer did advise Det. Weldon reference writer's findings.

Writer took no further action.

**PHYSICAL EVIDENCE:**

Refer to original report.

**INTERVIEWS:**

### WITNESS INTERVIEW:
### DAVIS, ANGELA MARIE  W/F  05-09-71
#### 14208 CAPANO DR, NEWARK  19702
#### #7712002

Davis stated she heard a woman screaming "is he ok", she then saw the victim lying on the ground, and noticed blood on him. Davis then walked up to the W/F, and made sure she was OK, until the police arrived.

### WITNESS INTERVIEWED:
### HUDSON, PHILLIP HAROLD  W/M  08-29-72
#### 49-0072 CAPANO DR, NEWARK 19702
#### #760-0459

Hudson stated he heard 6 or 7 shots, looked out his window and saw a B/M 6ft, 250 lbs, wearing a blue hat w/yellow brim, dark blue sweatshirt, blue jeans and white sneakers. Hudson saw the b/m ran to a 1986 or 1987 blue ford escort hatchback. Hudson observed the b/m enter the passenger side the vehicle. Hudson observed all of the above activity from his ground floor apartment.

================================================================

### NEIGHBORHOOD CANVASS:
### PATEL, MINAXI  O/F
#### 21203 CAPANO DR, NEWARK  19702
#### #00-0450

Patel stated she heard 3 or 4 shots, and was unsure what the noise was.

### PIERCE, GERALD  B/M
#### 11044 CAPANO DR, NEWARK 19702
#### #7004032

Pierce stated that he heard 3 or 4 thoughts and thought it was firecrackers.

# 10

NEW CASTLE COUNTY
DEPARTMENT OF PUBLIC SAFETY
DIVISION OF POLICE
CRIMINAL INVESTIGATION UNIT

STATEMENT

CASE 32-95-134010

MADE BY:  Phillip Hudson, W/M

ADDRESS:  ~~████ ███████ ███~~, Cavalier Apartments, Newark, DE 19702

PHONE:  ~~███ ████~~

DATE:  11/13/95

TIME:  0937-0950 hours

TAKEN BY:  Det. A. Lee

LOCATION:  New Castle County Police Headquarters, Interview Rm #3

OTHERS IN ATTENDANCE:  N/A
------------------------------------------------------------------

Q    Okay my name is Det. Lee with New Castle County Police
     Department.  Um I work in the um Detective Division.  Um we're
     here today to, we're investigating a homicide that occurred in
     the Cavalier's Apartments.  Um the victim's name is, is Kris
     Heath.  Um the complaint number that we are investigating is
     32-95-134010.  Um can you do me a favor and state your full
     name?

A    Phillip Hudson.

Q    Phillip Hudson?

A    Yes.

Q    Okay.  And ah Phillip what's your present address?

A    Ah ~~████~~

Q    ~~████~~ And that's ~~██████ ██████~~

A    Yeah.

Q    Is that Wilmington or New Castle?

A    Ah it's Newark.

Q    Newark.  What's your zip code there?

STATEMENT:   PHILLIP HUDSON   PAGE -2-
DET. LEE/ybs        CASE 32-95-134010

A 19702.

Q And your home telephone number?

A Ah ███████.

Q Do you have a work number?

A █████████.

Q And where do you work at?

A ███████████████.

Q █████████████████.   If you can describe for me um what type events you observed and from beginning to end this morning um using dates and times, try to be as detailled as possible, appreciate.

A Okay.  It was um, I would have to say probably about quarter of 8 in the morning.

Q Um-hum.

A I was getting up, putting on my jacket, getting ready to say good-bye to my girlfriend and I heard about 5 shots fired outside in the parking lot.  My girlfriend was like what, what was that so I was, it was a gun being fired.  So I ran over to the window and.

Q About how many shots?

A About 5.

Q Okay.

A Somewhere around 5, they were pretty close together so it sound, it sounded like a semi-automatic speed something like that.  Um so I ran over to the window, we live on the ground floor apartment and I pulled open the shade and ah about 5 to 10 seconds after the shots so a man came running across the parking lot and jumped into the passenger side of like a blue Escort or, or a Tempo and then took off and I heard a woman in the hallway screaming somebody help, call 911, my boyfriend was shot.

Q Okay so you saw a man, can you describe him to me the first, the man that?

STATEMENT:   PHILLIP HUDSON                    PAGE -3-
DET. LEE/ybs                                   CASE 32-95-134010

A     Uh-huh.  He looked like he was somewhere around 6 feet, it's
      hard to tell because we're, we're kinda like right at ground
      level so everything looks a little bit bigger.

Q     Um.

A     Um looked like he was wearing a baseball hat, blue, blue
      baseball hat with ah a sweatshirt, blue jeans and ah sneakers.

Q     And what type sneakers?

A     Ah they just like white sneakers.

Q     White sneakers?

A     Hi tops.

Q     So he had on a blue baseball hat.  Can you describe it at all?

A     Um it was like it was just blue and it, it might of had a
      yellow brim on it or it could of just been from the under,
      underneath of the and it's hard to see from, from that level
      there.

Q     Did you see any other subjects outside when you looked out the
      window?

A     No, nobody else.

Q     Just, just one subject?

A     Yeah.

Q     Okay.  And what direction was he coming from?

A     He was coming from my right to my left.  Which is towards the
      um toward the.

Q     Did, did you notice, did you notice the um, the victim laying
      on the ground or?

A     No I couldn't see that.  That was blocked by a bunch of cars.

Q     Couldn't see that, okay.  Okay.  Um was he coming from that
      area, that, now that you know that the area, he was coming
      from that area?

A     Yes, yes definitely.

Q     Okay.  And he was, he was he went towards a vehicle you said?

STATEMENT:   PHILLIP HUDSON
DET. LEE/ybs

PAGE -4-
CASE 32-95-134010

A    Yeah.

Q    Okay.  Can you describe that vehicle for me?

A    Ah it looked like about a '86 or '87 blue Escort, it looked
     like a hatchback but I didn't pay a whole lot of attention to
     whether it was a hatchback or four door, I was trying to get
     the license plate number but I couldn't get that.

Q    Did you get any part of the license plate number?

A    Um I know there was some sevens and some twos in it.

Q    Some sevens and twos?

A    Yeah.  I couldn't get a whole lot cause the windows are double
     paned and there was some fog in between the two of them so.

Q    Anything else that stood out about this car?

A    No.

Q    Any other, you know like um any dents or um shades of paint or
     primer or um anything of such sort?

A    No.

Q    Okay.  Do you remember how many subjects were in the car,
     could you tell?

A    Ah it looked like just 2.

Q    Just 2 subjects?

A    Yeah.

Q    Remember whether.

A    One driving and one that was in the passenger seat that, that
     jumped into the passenger seat.

Q    S  this subject got into the passenger seat?

A    Yes.

Q    Now is this vehicle facing you at this time or is it behind
     you or?

A    Yes it's facing towards me.

STATEMENT:  PHILLIP HUDSON                    PAGE -5-
DET. LEE/ybs                                  CASE 32-95-134010

Q    Towards you.  Okay.  How good of a description, ah how well
     did you see the subject's face?

A    Ah I saw it pretty well, if I saw him again I would, I would
     definitely know it.

Q    You would?

A    Yeah.

Q    Okay.  Is that, is that the subject that got in the car
     or both subjects?

A    Ah just the, the one that got in.  Looked like a pretty heavy
     set guy cause he wasn't moving real quick.

Q    A heavy set type guy?

A    Yeah.

Q    You described him as approximately 6 feet, heavy set?

A    Yeah right around, around 6 feet, probably around 2, 225,
     maybe 250.

Q    And he had on a base, base, a blue baseball hat, um white
     sneakers?

A    Yeah.

Q    And a possible yellow brim?

A    Yeah.

Q    Okay.  Um did you notice any, any other type of clothing?

A    Um.

Q    Was he.

A    He was just wearing a sweatshirt.

Q    Sweatshirt, do you know what color it was?

A    Ah it was, it looked like it was blue with some kind of
     writing on it.  Um yeah I'm not real sure about the colors
     cause every, everything happened so quick and I was paying
     attention to the car and you know that he was getting into and
     everything.

STATEMENT:  PHILLIP HUDSON                     PAGE -6-
DET. LEE/ybs                                   CASE 32-95-134010

Q   Did the car appear to leave in a hurry or just normal speed or
    could you tell?

A   Ah as fast as a Escort could get out of there.

Q   Okay.  What did you notice after that?

A   Ah the woman upstairs was screaming.  Um saying someone shot
    my boyfriend.  Can someone help me.  So I ran outside.  Ran
    up, upstairs and she was on the phone with, with ah 911.

Q   Um-hum.

A   And I took over the phone from there and she ran outside and
    then couple of the neighbors came out and were talking with
    her.  Trying to calm her down.

Q   Okay.  Did you observe a subject laying on the ground when you
    went over to that area?

A   Yeah.

Q   Okay.  Did you go over in that area to where the subject?

A   Excuse me.

Q   Did you go towards the subject?

A   Ah no by the time I got there there was a, there were a couple
    officers there and.

Q   Okay.

A   By the time I got off the phone.

Q   Okay.

A   And I was maybe about 30 or 40 feet away.

Q   Um anything else you observed that was unusual, that kinda
    stood out in this incident?

A   Not really.

Q   Not really?  Okay.  And you think you had, you heard
    approximately 5 shots?

A   It was hard to tell cause they were, they were pretty close
    together.

STATEMENT:  PHILLIP HUDSON                    PAGE -7-
DET. LEE/ybs                                  CASE 32-95-134010

Q    Um-hum.  Do you what the subject, know what type pants the
     subject had on by chance?

A    Ah it looked like he had, the, the subject.

Q    Um-hum.

A    That.

Q    The guy in the car.

A    Okay yeah he, he had either like blue jeans or blue sweat
     pants it's, they looked like jeans to me.

Q    And you recall whether it was a two door, a four door?

A    Ah it looked like a two door.

Q    A two door?

A    Um-hum, I didn't pay a whole lot of attention of how many
     doors it had.

Q    And which, which area did, which direction did the um vehicle
     leave towards?

A    Um towards the, the exit for the apartments.

Q    The first, you mean the first exit coming in from the?

A    Coming in from, from ah Capano Drive the first exit there,
     yeah that's where they went out at.

Q    And they went out towards the entrance or did, could you tell
     which way?

A    I didn't, you can't really, I couldn't really tell which way
     I saw 'em go out the, out the ah the entrance there and then
     which ever way they went from there.

Q    Couldn't tell from there?  Okay.  So how much time after you
     heard the shots did you open, did you look out the window?

A    Ah probably about 3 or 4 seconds.

Q    3 or 4 seconds.  Okay you have anything else you, you'd like
     to add to this statement?

A    No.

STATEMENT:  PHILLIP HUDSON                     PAGE -8-
DET. LEE/ybs                                   CASE 32-95-134010

Q    Okay and want to conclude at ah approximately 0947 a.m.  How
     long you been living there?

A    Ah about 2 months.

Q    2 months.  Okay.  All right.  Thank you very much I'm gonna
     get you a ride back home.


HAVING READ THE FOREGOING STATEMENT CONSISTING OF EIGHT PAGES, I
FIND IT TO BE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND
BELIEF.   I HAVE INITIALED EACH PRECEDING PAGE JUST BELOW THE LAST
ANSWER GIVEN BY ME AND PLACE MY SIGNATURE BELOW.

                         SIGNED _____
                                Phillip Hudson

TIME COMPLETED:   0947 a.m.

WITNESSES:

S_____
  Det. A. Lee

HUDSON

- fair to say that when you woke up November 13th, you weren't planning on having a shooting in your parking lot?  Fair to say that you weren't on the lookout for spotting and identifying a shooter, correct?

- Shots startle you?

- After the shooting, do you recall speaking w/ Det Gerry Donovan at 8:10 AM in the parking lot?  Fair to say that was within 30 minutes of the shooting?  You did your best to be as cooperative as possible, correct?  You answered his questions to the best of your ability?

- intereviewed hour later at the police station by Det Lee, correct?

- Pinpoint vantage point and time of observation?

- never seen that man before, correct?

- Could you see Mr. Heath from your vantage point?  Cars blocking ... see page 3

- Cars that man got into....  which row was it in .... cars parked in front off that car, correct?


- 5-10 seconds ... see page 2

- blue shirt had writing on it, correct?  see p. 5

- 6 feet .... 250?

IF W ID's Manley in courtroom, establish that
- already picked out photo
- already seen photo in newspaper
- figure he would be sitting at table
- did you pretty much rule out me and Figs





# 12

DEPARTMENT OF PUBLIC SAFETY
DIVISION OF POLICE
CRIMINAL INVESTIGATION UNIT

STATEMENT

CASE 32-95-134010

MADE BY:  Dorothy Hackett, W/F

ADDRESS:  ~~█████████~~, ~~█████~~, Cavalier Apts.

PHONE:  ~~█████~~

DATE:  11/13/95

TIME:  0928-1008 hours

TAKEN BY:  Det. R. McLucas

LOCATION:  New Castle County Police Headquarters, Interview Rm 1

OTHERS IN ATTENDANCE:  N/A
--------------------------------------------------------------

Q    Um I'm Det. Robert McLucas.

A    Um-hum.

Q    Um you know why you're here.

A    Um-hum.

Q    I just need to get some basic information from you name, date
     of birth, that type of thing.  You have a middle name?

A    Um-hum.  Mae.

Q    That's H-A-C-K.

A    E-T-T.

Q    E-T-T?

A    Um-hum.

Q    Dorothy Mae Hackett?

A    Um-hum.

Q    Ah your date of birth?

A    5/28/60.

STATEMENT:  DOROTHY HACKETT                    PAGE -2-
DET. McLUCAS/ybs                               CASE 32-95-134010

Q    And your home address?

A    ████████████, Apartment ██.

Q    ██ as in ████

A    Um-hum.

Q    Your zip code down there?

A    19702.

Q    And your home phone number?

A    ████ ████.

Q    And do you have a work number?

A    No.  I'm on disability.  I'm at home all the time.

Q    What I want to do is ah it's my, my understanding that, that
     you witnessed some things this morning and I want to start
     from, from the very beginning what you, what first brought
     your attention to it.  Um so why don't we start there.  What,
     what first led you to find out something was happening?

A    Um I heard shots, like a firecracker.

Q    And how many ah shots did you hear?

A    4.  I didn't really count them at first it just, when you hear
     them you, you remember the sequence.  There kind of a bang,
     bang, bang, bang like right in a row.

Q    Real quick?

A    Um-hum.

Q    One after another?

A    Um-hum.  Like the first one then a small hesitation, then 3
     shots after that.

Q    And where were you at when you heard this?

A    Well I was in my bedroom, I was laying in bed.  My bedroom is,
     my head is right by the window.

Q    And your bedroom does this face the back of the building or
     the front of the building?

A    In the front.  I showed the, the officer um where I was ah when I heard the shots in my bedroom and my window is, it's just a straight corridor right down to where the ah gentleman got shot.

Q    Okay.

A    It was all open.

Q    Was your window open or closed?

A    Um-hum, it was opened.  I had it opened part way and then I opened it the rest of the way.  See if I heard the shots, I immediately jumped up, looked out the window saw the gentleman lying on the ground and my phone is right by the bed.  I grabbed it and I just, I hit 911 and I have a real long cord and I just hit 911 and jumped back to the window again.

Q    When, when you heard the shots and, and you looked out the window what did you see?

A    There was um the gentleman laying on, the, I believe that was the jeep, the back was open, there was a gentleman lying on the ground and I only know he had black pants and a white shirt on.

Q    Did you see what color the jeep was?  Could you tell it?

A    Um brown I believe, it was, it was parked.  With just the tail, the tail end was opened up.

Q    And the subject lying on the ground, white male or black male?

A    White.

Q    And in regards to the jeep where was the person when you say the back?

A    He was lying if this was the jeep tail end or tail gate was open this way the gentleman was lying feet this way and his head this way.  All I could tell was a white male and he had black pants on with a white shirt.  I really couldn't see who he was, all I could see is that he was a white male.

Q    And did you see anybody else around?

A    There was a figure about 2 cars down from him but that was like when I, when I first looked out and _____ _____.

STATEMENT:  DOROTHY HACKETT                  PAGE  -4-
DET. McLUCAS/ybs                             CASE 32-95-134010

Q    Um-hum.

A    And when I jumped back to grab the phone I hit the 911 real
     quick and jumped back before it even started ringing then
     that's when I noticed the black gentleman and he was just
     turning around.  He wasn't really standing about but when I
     came back he was actually standing out, like if these were the
     cars lined up.

Q    Um-hum.

A    Like this.  When I originally looked out the first time I saw
     someone standing about here.

Q    So towards the front of the vehicles?

A    More so yeah, I would say about the first third of the vehicle
     he was kinda like.  This was the front of the vehicle, he was
     about 2 vehicles, there was the jeep, another vehicle, another
     vehicle.  I saw a figure standing right about here.

Q    Okay.

A    And then that's when I saw this gentleman along in here.  I
     jumped back, grabbed the phone real quick, came back and I
     came to the window the figure wasn't here, he was out here
     now.

Q    So now he's out between, between your view from your window
     and the subject laying on the ground?  He was between.

A    Yeah.

Q    Between . . .

A    I like, I'm here if I were looking out my window.

Q    Um-hum.

A    That's where the victim was and the jeep.

Q    But how many cars away do you think he was?

A    He was 2.

Q    2 cars away.

A    This is the jeep, this car, and another vehicle here.

Q    And could you describe the person at all?

STATEMENT:  DOROTHY HACKETT                PAGE -5-
DET. McLUCAS/ybs                           CASE 32-95-134010

A    Um at this point he had his back and he was just turning.

Q    Turning towards you?

A    Yeah turning around this way, turning around to this way and
     I was about here, he was turning this way and um as he was
     coming towards me he held his head, head down, didn't hold it
     straight up, he held it down and he had, he had a gun in his
     hand.  He was holding the gun like this and this hand was ___
     _____ the way he was walking toward he turned
     around, he had the gun like this and this hand was was
     covering the barrel, you could still see a little bit of the
     gun sticking out cause he was like this.  He had it here and
     he was walking like this real fast.  And once he got closer to
     the car that he jumped in, he came around, I believe it was a
     white car.  When he got around this car he walked very fast.
     When he got to the this car he did a skip, jump run.  Then he
     came over to the blue, got into the driver's side and drove
     off.

Q    He was driving, he was driving?

A    He drove off, he got into the driver's side.

Q    Okay.

A    I could not see if there was anybody else in, in the vehicle.

Q    And you can say for sure that he had a gun in his hand?

A    Um-hum.

Q    Could you describe the gun at all?

A    No but it was dark.  It wasn't anything bright or shinny, it
     was dark, course his skin was dark so it um it kinda blended
     in quite a bit with his skin but I could see some of it
     between the part that stuck out here.

Q    Um-hum.

A    I could see that part.  Where he had his hand over here I
     could just see a little bit sticking out from here.

Q    And that was dark also?

A    Um-hum.  But he pretty much had it covered up with both hands.

Q    Are you familiar with guns at all?  Have you ever handled
     guns, seen guns?

A    Um some, um-hum.

Q    Do you know the difference between say a revolver and like a
     semi-automatic type gun?

A    Um revolver aren't they like a little short.

Q    No revolvers have like a ah a barrel that, that rotates in the
     gun when you fire and would say hold like 6 shots and when you
     fire the gun it continues to turn where.

A    Yeah that, that part really I couldn't see that much he had
     his hand on the I guess the part that you grip and all I could
     see was the area right in here and then part of the barrel
     sticking out here.

Q    Okay.

A    I really couldn't see the, wherever the bullets went that,
     that part.

Q    Now could you describe that ah that subject to me, that had
     the gun?

A    Ah he was about 5 I guess 5'8", 5'9".

Q    And he was a black male you said?

A    Black pretty dark, dark black.  Um he had, I didn't see any
     kind of any beardit seemed to be, if it was it would have been
     very close to his skin but when he turned he had a short
     haircut, appeared to be kinda flat on the top.  He was about
     me--, medium build.

Q    And when you say medium build what would you, about how much
     would you say that was?

A    I would say um I would guess he probably would of weighed was
     weighing around 165.  Cause he wasn't that tall, about 5'8",
     5'9" about 165.  Ah he had on dark pants, appeared to be kind
     of like a dark blue jeans.  I'm not really sure of the
     material but they were dark.  They look, I think they were
     like a blue jean that dark blue.  Ah he had on a dark shirt ah
     with a ah really dark navy blue or a black.  I can remember
     seeing um his forearms because I noticed with him having a gun
     I could see skin from about here, here down, I don't know
     whether he had it pushed up, his shirt or whether it was cut
     off there.  But I do remember I could see this much of his
     forearms both of 'em.  His clothes fit very, the clothes he

had on fit very close to his body, there was nothing baggy or
loose about them.  And it's hard remembering.

Q    Was he wearing glasses or anything?

A    I did not see any glasses on him, no.

Q    Um he wasn't wearing gloves, he had his hand were out?

A    No it appeared to be his skin that I was seeing.

Q    Could you see ah shoes if he was wearing sneakers, boots?

A    Um everything was very, everything he had on was very dark.
     I believe, I don't remember seeing, I definitely didn't see
     the white, white on top of white sneaker.  Um I do know they
     were dark, I'm not sure if it was a sneaker or if it was a
     hard shoe but they were dark.  All of his clothes were so
     dark.

Q    Was he carrying anything besides the bag?  Did he have any or
     anything besides the gun?

A    No.

Q    Did he have any bags, any?

A    I didn't see anything else, on him or anything hanging from
     him.

Q    So he wasn't, he wasn't wearing any jacket, anything like
     that?

A    No, when he was walking towards me from and walking towards
     the car I didn't see any, he didn't have a jacket or anything
     else on him.

Q    Did you see the front, front of his ah shirt?  Could you tell
     whether it was button down or whether it was a pullover type?

A    I think it was, I think it was a pullover.  It was kinda yeah
     if they were little buttons I, I wouldn't of seen 'em.  It
     wasn't an open type shirt, there was a collar.  Believe it was
     kind of a pullover.  Because also when he was walking he had
     like he had his arms when he was holding the gun with his hand
     on it, he had his arms kind of like, he was kind of like
     hunched around this way.

Q    When he walked back um he was walking quickly you said?

STATEMENT:  DOROTHY HACKETT                    PAGE -8-
DET. McLUCAS/ybs                               CASE 32-95-134010

A    Yeah he was walking quickly from where I told you about the
     second car.  He walks up into There was another car here, I
     believe it was a white one kind of but not real fast but say
     as your walked not walked to be noticed or whatever when he
     got closer to this white car he started speeding up and then
     at this car, white car which is right here then there's an
     open space his car was up here.  When he got to this car kind
     of when he turned and did a skip, run kind of thing and ran to
     the, to the um car that he jumped into.

Q    So he went behind the ah the white car?

A    Yeah, yeah I didn't see him, he came, he just came straight
     down towards me and at this white car turned and then his
     vehicle was in the opposite parking space in front of that
     white car.  My first instinct was to yell stop but I was
     afraid, since I saw the gun I was afraid that if he looked up
     and he saw me yell I was so close all he'd have to do is just
     raise, raise the gun and I was right there.

Q    You did the best thing you could ah just watching him and get
     as many details as you can and relay it to 911.  When he went
     around the car where was his car parked now in relation to the
     white car?

A    He, let me see this again.  This is the last car okay just
     come down, this is the white car, this is where he did that
     little skip turn real quick and then ran.

Q    Um-hum.

A    Then there's an empty space there's no vehicle here.

Q    Okay.

A    Okay his car was in this space right there.

Q    So the, the, this is the jeep and the victim is here, um and
     then there's a a row of cars down here.

A    Um-hum, okay.

Q    Um and also a row of cars up here.  Your building is down
     here?

A    I'm right here my window is right here.  Well actually the
     front of the building.

Q    The front of the building.

A    I'm right there.

Q    Um so he comes down say there's a car here.

A    Um-hum.

Q    These are parking spaces.

A    Um-hum.

Q    And he's standing, initially somewhere along, around here?

A    Right, well yeah, when I first looked out there he was like
     standing there was a figure standing here and I did, it was a
     black male.

Q    And that was between 2 cars?

A    Um-hum, yeah and then when I went and grabbed the phone, came
     back, when I came back I think he was standing right out here
     and he was just turning around.

Q    And he started.

A    As a matter of fact I caught him when he was kind of like
     facing that direction just turning around, he ran, well not
     ran he walked very fast down here, as he got here which is
     where the white car was in.

Q    Um-hum.

A    _____ the white car
     was about here this was open.  Um that would _____
     _____ parked here.  Facing in that direction so he
     turned here and he got a little skip jump and he crossed here
     over to here and got into that side and pulled out and left.

Q    Okay.

A    And then as I was trying to see his license plate there was
     another vehicle right here so I couldn't see his license plate
     until he actually pulled around here and then there's a tree,
     once he got past that tree, there's a tree right there, once
     he got to the side of that is when I looked to try to look at
     the plate to see if it's Delaware but um all I can remember is
     an 889 or there was a 2 in the middle. _____
     at that point it was kind of far away I remembering seeing an
     8, 6 and a 9 or a 2.

Q    Now could you describe the, the blue vehicle to me that he got
     into?

A    When it comes to make ah it's kind of ah the shape of like I
     guess it's like a Cavalier, kind of a squared box type
     vehicle.  Dark blue or a navy blue.  Um what I noticed about
     it it had a lot of um silver in it, patches all over as if
     somebody had been like sanding it as they were going to
     repaint it and they were touching up spots.

Q    It was a dark blue car?

A    Yes.  Almost a navy blue.  I'm pretty familiar with a lot of
     the vehicles out there and I'm always having trouble finding
     places to park, I have never, and that car was very obvious
     that I've never seen it in there before.

Q    You saw, do you know if it was 2 door, 4 door?

A    Um.

Q    Do you . . .

A    Believe it was a four door, cause it was hard to, there was a
     vehicle right here, because I couldn't get a good look at the,
     that license plate until he pulled out, when he did pull out
     I think it was a 4 door.

Q    So it was backed into it's parking space?

A    Yes, uh-huh.

Q    Did you see anyone else in the vehicle?

A    No I couldn't see any, I couldn't see um, there could have
     been but that part of that vehicle I couldn't see if there was
     anyone in the seat or not cause I was up high and I could only
     see the driver's side.

Q    You could only see what side of it?

A    The driver.

Q    The driver's side?

A    Um-hum.  Cause the height that I was at I'm on the third floor
     the passenger side was just obstructed see it.

Q    Could you see if the, did the vehicle have like a hatch back
     or anything like that?

A    Just a trunk.

Q    Just a trunk?

A    Um-hum.  It wasn't a new car.

Q    Um are you any good with the years, could you guesstimate what
     year it was?

A    No.

Q    No.

A    I'm really bad when it comes to years.  All I know it was just
     um it was more of not the newer models this was very boxed
     looking.

Q    Did you see any damage to the car besides the, the gray?

A    as far as dents or.

Q    Yeah anything that, anything other than the gray spots that,
     that?

A    No there was nothing that really stuck out.

Q    Stick out.

A    Just the, the condition of the paint job on it.

Q    How about the windows were they tinted at all, did you notice
     any tinting?

A    Um not I don't recall.

Q    Okay.  Um any antennas anything?

A    No I don't recall that.

Q    Okay.

A    Although the driver's window was down.

Q    Could you see what the um black male did with the gun when he
     was getting in the car?

A    I remember him going, opening the door, he opened the door
     with his left hand.  I believe the arm _____ his
     right he opened the door with his left hand and he got, just
     got in.  All I remember seeing besides him getting in the car

was the gun still in his hand, no I, I honest to God don't know.

Q    Okay.

A    If he propped it or what he did with it.

Q    And you could, you could see the tag as it was pulling out of the, the?

A    Yeah, yeah.

Q    And it was definitely a Delaware tag?

A    Um-hum.

Q    Did you um see the numbers on the tag?

A    Ah the numbers seemed as though there was an 8, 69 and 2. seems to me the 2 would of been, the 2 may have been in the middle whether it was 869 or 968 at the end.  Those, those numbers stick in my mind.  Um I couldn't get all of 'em though.  Cause of like there's a tree here and I was trying to read them and I was pushing on my screen so I could see them.

Q    Did you write those down at all?

A    I didn't have anything to write with.

Q    Did, did you tell the person on ah 911 what you ah, were you looking at it and telling them what you saw on the tag?

A    No.

Q    No.

A    I remember the phone rang and rang, three, four times before they picked up and that's why, that's why I was watching all of this um.

Q    Yeah at what point did they come on, on the telephone?

A    They got on the phone, when they, they got on the phone when he was getting into the vehicle, the vehicle starts pulling out.  Because I was watching, I was watching all of this I remember holding the phone and I was telling them that, at this point some, some man came over and um he had turquoise on a really bright blue he put a jacket over the victim's head. And hear them yelling the cops are coming and I was, I saw that and also I was watch, I was watching this person, this

_____ watching all of this.  I think it was just, I think it was when he was just getting into the vehicle when they picked up.  I said someone had been shot, I gave the address.

Q    So at, I guess at any point were, were you on the phone relaying information to the 911 Center as it was happening? Did they have you stay on the line?

A    Um-hum, um-hum, yeah they told me that somebody has coming and um at that point she said that they when she told me that they were on there, okay well she told me that they're on their way.  He had already left the lot he had just left like maybe a few minutes before ah the time, the time frame was that close it was I can remember thinking you your just missing him I know I didn't say that but I remember thinking to myself you're just missing him, you're just missing him he was just leaving, leaving the apartment.  And so I wanted to run downstairs to get I wanted to run down to get them to get a better look at the license plate and I remember being on the phone with 911 with them and her saying, saying and asking me for information um if I hadn't been waiting I could of ran out.

Q    Or, or you could of possibly missed a lot of the stuff that you did see.

A    Um-hum.

Q    Um so I think um under the circumstances you, you had a good vantage point and that's probably where I would of stayed too.

A    Um-hum.

Q    Cause you can see a lot more.  Um the time it would of taken you to run downstairs.

A    Um-hum.

Q    Most likely that car would of, could of been gone and you wouldn't of seen half the things you did see.  Um now the, the, did you see prior to this, this other guy that came out and we'll talk about him in a second, prior to him coming out did you see anyone else in this area when this black male was out here with the gun?

A    No.  because what um, no cause I looked out and the, I can only remember just seeing him, no I don't remember seeing any other in this area.

Q   So it was just the black male and the victim laying on the
    ground.

A   And um-hum, um-hum.  And then of course them people started
    coming out from wherever.

Q   Was this vehicle still the, the suspects vehicle was that
    still in the parking lot when this, when this other ah male
    subject came over to the victim?

A   Yes um-hum.

Q   And this subject that came over was he white or black?

A   He was a white male and chunky.

Q   Have you ever seen him before?

A   No.

Q   Do you know if he lives in there?

A   I really didn't get a good look at his face all I can remember
    is that he had on like a turquoise just really bright blue and
    he was kinda on the chunky side.

Q   You know if that was a shirt, jacket, pants?

A   It was either a shirt or jacket.  He, I'm not sure where he
    got the, he had a black jacket that he put over the victim
    except I'm not sure where he got that from.  I think I saw him
    reach into the jeep.  That may have been the victim's black,
    the jacket to whatever, cause he had on black pants and a
    white shirt.  Um.

Q   And where did he reach into the jeep, in the back of the jeep?

A   Yeah, yeah cause it was open.  Well cause I remember him
    standing there and ah I remember he looked in, he looked into
    the jeep and then like I said the jacket must of been there
    and then I saw him just open it up and lay it over the
    victim's face.  I believe he had on a light colored pants.

Q   And what was he saying?

A   Who?

Q   The, the white male that was you said.

A   Ah I didn't, he didn't say anything.

Q    Oh he didn't say anything?

A    No, I, I had no conversation with him I just observed him.

Q    Could you hear, could you hear anybody yelling anything out in this area?

A    Just, I heard some woman, I heard, some woman came out here, I just heard her say something um she said oh he's shot and I heard crying and then it seemed like whoever that was they ran back into um into the building.  I didn't see who it was, who _____.  I was still on the phone.

Q    Did a lot of people go over to where the victim was?  Or.

A    Um there was another gentleman who walked over there.  I remember him walking up and, and he's looking at, at the victim on the ground and the gentleman who had the turquoise jacket or shirt, whatever on, he was still there.  Most of the people um that started coming out.

Q    Um-hum.

A    Basically stood way back.  No one really came up close to him except for that other gentleman who walked up on him.

Q    Was that a white male also?

A    He's a white male.  I believe he had on a um short black leather jacket and dark hair and that's all I can remember. But those, those were the only two people that were close to the victim the others basically stayed away.  No one really came that close.  And by that time _____ the police cars start coming in.

Q    Did you hear, did you hear the black male saying anything when he was out there?

A    No, uh-uh.

Q    The suspect?

A    No.  It was very quiet, I heard no voices at all, just the shots.

Q    Okay and prior to the shots did you hear any, any talk, anything out there?

A    Uh-uh, no.

STATEMENT:  DOROTHY HACKETT                    PAGE -16-
DET. McLUCAS/ybs                               CASE 32-95-134010

Q    Nothing at all?

A    Nothing.

Q    Okay.

A    My son had just left for school a few minutes before this
     happened.  And I was just awake laying there and I could, I
     just had the window open part way and usually you can hear
     everything that goes on out there.

Q    How old's your son?

A    Ah he'll be eighteen in May.

Q    18?

A    Um-hum.  He's, he'll be 18 then, he's 17.

Q    What's his name?

A    Jason.

Q    Same last name?

A    Um-hum, yes.

Q    Okay.  That's H-A-C-K-E-T?

A    T-T.

Q    T-T?

A    Um-hum.

Q    And he's 17 right now?

A    Yes, um-hum.

Q    What's his date of birth?

A    5/09/78.

Q    Where does he go to school at?

A    ~~███████, ███ ███████~~ High School.

Q    Does he drive to school?

A    Um-hum.

Q   Um what time does he leave for school?

A   Um he was running late for school.  He usually leave anywhere
    between ah quarter to 7 to about 20 of 8.   Anywhere in that
    time frame.

Q   Do you know about what time he left today?

A   Yes he was running late, but he left I remember looking at the
    clock 7:35 when he left.

Q   How long after he left did you hear these shots?

A   I would say probably about 15, 15 minutes.

Q   What kind of vehicle does your son drive?

A   He drives a ah Cavalier S-10.

Q   What color is that?

A   It's dark brown.

Q   Is that a 2 or 4 door?

A   A 4 door.

Q   Have you had any contact with him since in--, since the
    incident happened?

A   No, no he knows nothing.

Q   So he knows nothing about it?

A   Uh-uh, uh-uh.

Q   Cause I was thinking maybe he ah he could of possibly seen a
    vehicle coming in or seen those guys parked out there or seen
    somebody parked out there, the victim out there or somebody
    when he was leaving.

A   No.  He's, I was thinking the same thing, I was just wondering
    if he was um if he would have noticed.  Cause usually he, he's
    pretty observant, he usually checks around and well he's sit
    in the car for a few minutes while it's warming up and I
    believe he would of been parked, he would of been, I bet he
    would of been parked in here.  In here somewhere.  He might of
    been in one of these open spaces I'm parked over here,
    underneath the pole.  He may have been parked in one of the
    empty spaces here.   I was thinking the same thing I was

wondering if he would of seen you know someone just sitting
there in the vehicle.  Not to say I'm racial or anything, but
usually if there're blacks hanging around.  He's pretty
observant to the kind of people that hang around over there.

Q      Okay.  Um does he work at all?

A      Ah yeah he's working part-time.

Q      Where does he work part-time at?

A      Um ~~████~~ ~~██████~~ ~~███████~~, Newport.

Q      Do you know how to spell that?

A      ~~████████~~.

Q      Um-hum.

A      And the second word ~~███████████~~.

Q      Do you know the phone number there?

A      No I don't.

Q      Okay.  Um will he be working today there or?

A      Yeah he works 5:30 to to 8:30 today.  I'm suppose to go in at
       2:30 to 7:30.

Q      He works 5:30 to?

A      He works 5:30 to 8:30.

Q      Okay.  And you work?

A      Yeah I'm suppose to work 2:30, 2:30 to 7:30, I just go in
       maybe 2 days a week sometimes to help her out.

Q      Okay.

A      So I'm scheduled between shifts, she asked me to come in today
       at 2:30, it's just a ~~█████~~ ~~████~~ place.  _____
       _____.

Q      Okay.  Um what I'm gonna do is run back out real quick and
       talk to one of the investigating officers and if there's
       nothing else for them then we'll ah get you out of here.

A      Okay.

STATEMENT:  DOROTHY HACKETT                PAGE -19-
DET. McLUCAS/ybs                           CASE 32-95-134010

Q    I appreciate you talking to me.  Is there any, is there
     anything else that you can think of that may be able to help
     me that maybe I've missed um and if something comes to mind
     because you have a very good memory and I'm sure while you're
     sitting here you'll be thinking about it.

A    Um-hum.

Q    If something does come to your mind, no matter how small or
     how trivial you think it may be um just let me know ah before
     you do leave here.

A    Okay.

Q    Something small like that could be a big detail.

A    I can picture some of his face um.

Q    Do you think you could ah recognize him again.  If you were to
     see say an array of photos say 7 or 8 photos um do you think
     you could point him out of the photos?

A    Um-hum, yah.

Q    Or is that distinctive.

A    He had a face shaped something like yours, wasn't long, wasn't
     real round, it had it was kind of um, just a young face,
     shaped like yours.

Q    Okay.  What I'm gonna try and do is I'm gonna try and, and see
     if we can get ah if they do have any, any suspects if we can
     get ah an array of photos before you do leave here.

A    Um-hum.

Q    I don't want to keep you here you know very long but if we can
     show you a photo lineup there maybe you can ah point to the,
     to the guy that you saw.  Okay.

A    Um-hum.

Q    So I'll be back in just a few minutes.  Is there anything I
     can get you?

A    I'm fine thank you.

Q    Um.

A    I had a soda, I'm fine.

STATEMENT:  DOROTHY HACKETT                    PAGE -20-
DET. McLUCAS/ybs                               CASE 32-95-134010

Q     Okay I'll be right back.


HAVING READ THE FOREGOING STATEMENT CONSISTING OF TWENTY PAGES, I
FIND IT TO BE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND
BELIEF.  I HAVE INITIALED EACH PRECEDING PAGE JUST BELOW THE LAST
ANSWER GIVEN BY ME AND PLACE MY SIGNATURE BELOW.

                        SIGNED _____
                               Dorothy Hackett

TIME COMPLETED:  N/A

WITNESSES:


S_____
  Det. R. McLucas

13

SUPP: HEATH, KRISTOPHER                           32-95-134010
DET. W. SCOTT MCLAREN 2275 CIU

she turned it off. The rear hatch window of the victims car was up
which was not unusual. The victim would start his vehicle and
place items in the rear, such as his coat. On this date the
victims coat was found on the front seat along with his briefcase
which was found to contained the court file. The witness stated
that the victim name and address is in the phone book and that
their name is also on the mailbox in the apartment building. The
interview ended at 0952 hours. For additional information refer to
the transcribed taped statement included in the master case file.

On Monday 11-13-95 at 0905 hrs writer made contact with the victims
parents in New Jersey via public service. The facts of the case
were not discussed with the parents. Writer arranged for the
Delaware Memorial Bridge Police to meet the family as soon as they
came through the toll's. The family was then escorted to the NCCPD
HQ.

On Monday 11-13-95 at 0935 hrs writer conducted the formal
interviewed of a friend and fellow employee of the victim by the
name of Steven Van Vechten W/M 31. The witness stated that he
worked with the victim in the Christiana Mall store and was good
friends with him. The witness was also involved with the internal
investigation and advised that the accused employee name was David
Stevenson. The witness stated that the Stevenson confessed to the
crime and told security that a gang member from Philadelphia was
making him do it. The interview ended at 0940 hrs. For additional
information refer to the transcribed taped statement.

On Monday 11-13-95 at 0950 hrs writer escorted the victims parents
to interview room #2 along with victim service workers, Elaine
Aviola and Marki Mosley. Det. Kelly was also present. The parents
were told that their son was physically assaulted in front of his
apartment and shot several times and that he had died as a result
of the injuries. The parents were left with the victim assistance
workers. The mother stated shortly thereafter that Debra had
called their house the night before and said that someone was at
the apartment door. This interview was not taped.

On Monday 11-13-95 at 1014 hrs writer and Det. Craig Weldon
displayed a photo line-up to a direct witness by the name of
Dorothy Hackett. The witness picked out David Stevenson as the
subject that she observed walking away from the victim. The
witness put the identification as a 9, on a scale of 1-10. For
additional information as to the photo line-up refer to Det. Weldon
report.

On Monday 11-13-95 at 1024 hrs writer advised Michael Manley B/M
07-29-74 that he was under arrest for murder.

4

14

## AFFIDAVIT/DECLARATION OF ALLEN MANLEY

I, Allen Manley, pursuant to 28 U.S.C. § 1746, hereby swear, affirm and state that the following is true and correct:

1.  My name is Allen Manley and I am Michael Manley's step-father. I currently live in Bear Delaware, however for most of my life I lived in Philadelphia, PA.

2.  I met Michael's mother Rita, sometime around 1968 when we were both in high school. Rita had a hard life growing up. When I met her, she was living in a girls' home. Life was hard for both her and her siblings. I got to know the family very well. Her mom had 13 children. Things were so rough for them mainly because her mother had to try and take care of all of her kids. A lot of them had different fathers and I don't think any of them played a part in raising them.

3.  I dated Rita for less than a year before she became pregnant with our son, Allen Manley. I wanted to be a responsible father, so we got married and bought a house on 55th St. in Philadelphia.

4.  We were very young when we got married. The marriage was good for about 1 ½ years. We both knew the marriage was going downhill, so it was decided by us that Rita would be the one to move out. She moved in with her mom and I remained in our home until I moved to Delaware in 2000. Although we no longer lived together, our divorce didn't become final until around 1991.

5.  We really didn't know what being married meant. We shouldn't have gotten married so young. We both weren't ready to settle down. There were plenty of times when I would leave home to go to work on a Friday and not return home until Monday night after work. It got to the point where we were married however we were doing our own thing.

6.  After I spit up with Rita, I continued to be involved in Little Allen 'sand Michael's

lives. I also maintained some contact with Rita and her side of the family primarily because my brother, Leonard Manley married Rita's sister, Mary.

7.    I continued to have some type of relationship with the boys, however not as much as I should have. There were times when Rita was overwhelmed with dealing with them. Every once in awhile she would call me up and I would stop by and chat with the boys to find out what was going on. Rita was still living in the projects at that time. If they weren't living there, then I would have never have stepped foot in there. The Passyunk projects was a tough area. There was a lot of drug dealing and other criminal activity and shootings going on. If you were an outsider and it was clear that you didn't belong there, then you'd really have to be careful when you went there.

8.    I was not contacted by anyone on Michael's behalf for his 1996 trial or the one in 2005. Had I would have been asked to testify, I would have done so.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Allen Manley

15

## AFFIDAVIT/DECLARATION OF MELVIN CARR

I, Melvin Carr, pursuant to 28 U.S.C. § 1746, hereby swear, affirm and state that the following is true and correct:

1.    My name is Melvin Carr and I am Michael Manley's biological father. I currently live in New Castle, Delaware, however for most of my life I lived in Philadelphia, PA.

2.    I was born in North Carolina. I moved to Brooklyn, NY when I was 12 years old. A year later, I moved to Philadelphia to be with my father. In 1965, I started working for the Philadelphia County Prison. I retired from there in 1997.

3.    I met Michael's mother, Rita Manley some time in 1970 when she lived on 55th St. with her husband, Allen Manley. A guy I worked with lived across the street from Rita introduced me to her. When I met Rita, she was around 19 years old and I was around 28. I was also married at the time. We saw each other on and off for about 4 or 5 years.

4.    After Rita left her husband, she moved to the projects. Michael was already born, but he was just a baby then. We lived together for only about a year before we broke up. We had a lot of problems back then. We started seeing other people. Rita met and started dating a guy named Chico.

5.    When we were together we attended and hosted a lot of parties. There was a lot of drinking, weed smoking, and dancing going on at these parties. The partying lifestyle got worse. More powerful drugs besides weed were being used. Crack and coke had just started to be a big thing in the projects. They were being sold and used by a lot of people. Even one of Rita's cousins fell victim to the drugs in the projects.

6.    Some time after I broke up with Rita, I received a phone call that Chico was abusing Michael, he was hitting on him. I took a friend with me to confront Chico. We looked all over the

neighborhood for him, but we couldn't find him. I told a group of guys that were hanging on the corner to tell Chico to stop hitting on Michael and to not come around the neighborhood for a few days.

7.    I didn't have too much contact with Michael after Rita and I broke up, however I know things were difficult for her. Rita asked me for help with the rent a couple of times after I left. The first time I gave her the money but found out the rent wasn't paid. I don't know why. The second time she asked me, I paid the rent myself. I tried to buy Michael clothes and things for Christmas, but heard that Rita didn't want Michael to wear them. I heard she gave the clothes away. I don't know if Michael ever knew that I had bought these things for him.

8.    I attended most of Michael's trial in 1996. Although I met with Michael's attorneys, I didn't have a say in what was going on and his lawyers never asked me about what I knew about Michael's upbringing. Had his lawyers asked me, I would have told them the above. Had they asked me to testify, I would have. I didn't know Michael had a new sentencing hearing in 2005. No attorneys contacted me. I knew Michael had been found guilty, but no one told me he was on death row.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.


_____
Melvin Carr

16

## AFFIDAVIT/DECLARATION OF ALLEN MANLEY

I, Allen Manley, pursuant to 28 U.S.C. § 1746, hereby swear, affirm and state that the following is true and correct:

1.      My name is Allen Manley. I am Michael Manley's older brother. We are four years apart in age. I currently live in Philadelphia, PA with my wife and children.

2.      We grew up in the Passyunk Projects. As I got older the grounds became more trashy, and there would be guys on the corners dealing drugs. On our way to and from school, we would step over crack vials. Drugs were everywhere. Because the neighborhood was so bad, we always had to be home before dark. There were plenty of times when we would hear gunshots at night. We were never allowed to stand in front of the windows for fear of getting hit by a stray bullet. After a night of gunfire, we'd often hear the next day that someone had gotten shot, and many were killed.

3.      Our mother was very strict. We grew up with a healthy fear of our mother. My mother always told both Michael and me that because we lived in the ghetto, didn't mean we had to act the way everyone else acted. While most kids were wearing the latest fashionable clothes and sneakers, we weren't allowed to be caught in those type of clothes. My mother always made Michael and me wear penny loafers, dress pants, button down shirts, and sweaters to school. We weren't allowed to wear sneakers and jeans to school. All of the kids would make fun of us because of the way we dressed. I can remember others making comments about me when I was walking home from the bus stop. I always wanted to fit in.

4.      Life was hard for both me and my brother and my mom. I have a different father than Michael. After my parents separated, my father continued to be involved in my life. In fact, he was more of a father to Michael than Michael's real father was to him. Although my father was still around, I know it was hard for Michael to not have his biological father around. There were times

when his real father was suppose to come and pick him, but he would never show. Michael would never talk about it, but I could tell that it really bothered him. I think not having our fathers physically there with us made it hard for my mom as well. She tried her best to protect us and raise us as best as she could.

5.    When we were very young, Michael and I spent a lot of time going to the library in our neighborhood. We spent most of our time outside of school reading books. My mom wanted to make sure she was raising respectable educated boys. Doing well in school was a big thing in our household. As I started to get older, I sort of started to rebel against my mother. Doing that well in school was no longer a big deal to me. Michael was just the opposite. He continued to do well in school and was one of the few students to actually get accepted to Central High School. While at Cental High School Michael wrestled, played tennis, and was active in debate.

6.    Michael's father was never really involved in his life. My father was really the only dad he knew. For a while, my mom dated a guy by the name Chico. They were together for about 6 or 7 years. I know that he was abusing her. When I would be in bed at night, I would hear them fighting. Then in the morning, my mom would have black eyes and sometimes she would have busted open lips. My mom would be very upset and withdrawn. Chico was a very jealous man. I remember that he used to kick the door in and stuff, so we would have to move the couch over in front of the door to keep him out of the house. Michael and I were really scared when this happened.

7.    I remember Chico always carried a flask with him. He told us that it had fire water in it. After Chico's sister died, he had a hard time coping with everything and he started using drugs. It was not long after that, that my mom and he split up.

8.    I testified on Michael's behalf in the original penalty hearing. I also spoke with the attorneys' investigators in 2005. The lawyers never asked me about the above. Had I been asked,

I would have told them the same thing and would have gladly testified on Michael's behalf.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Allen Manley



## AFFIDAVIT/DECLARATION OF RUSSELL MOSELY

I, Russell Mosely, pursuant to 28 U.S.C. § 1746, hereby swear, affirm and state that the following is true and correct:

1.    My name is Russell Mosely. I currently live in Philadelphia, PA, and was living here in 1996 and from April, 2005 to the present.

2.    I attended Central High with Michael, and we both served as medics in the Army Reserves. My girlfriend, and the mother of my daughter, lived in the same projects as Michael.

3.    I remember how horrible things were for Michael in the projects. It was a really bad neighborhood, a truly scary place to be. Michael often warned me not to go to the projects at night because of how dangerous it was, and to be careful whenever I was there. He was right; it definitely wasn't the type of place a person wanted to be after dark. I personally recall several occasions when I was visiting my girlfriend and baby, and we'd hear gunfire right outside the window and have to drop to the floor until it stopped.

4.    Despite the horrible place where Michael lived, he always had a sense of humor and kept things positive. Michael was the class clown, and was a pretty popular guy in school. In fact, I was surprised when he joined the military, because he didn't seem like the type, he clowned around so much. But once he joined the Reserves, he took his duties very seriously.

5.    Michael never showed any interest in guns, and, like me, his only access to weapons as a Medic in the Reserves would have been at the yearly required training.

6.    I knew who David Stevenson was from Central High, but never hung around with him. I do recall that Stevenson commuted to Central from Delaware.

7.    Michael's lawyers did contact me for the first trial in 1996. They only talked to me

once and that was over the phone. They didn't really ask me too many questions about Michael, and never asked me to testify. They did not ask me about the above and had they asked, I would have told them what I knew. At the time of the second trial, I was deployed to Germany from February, 2004 until April, 2005, but was in the Philadelphia area after that. I considered myself a good friend of Michael's, and would have been more than willing to testify at either trial had I been asked.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.


_Russell J Mosely_
Russell Mosely

# 18



United States
Environmental Protection
Agency

# Environmental Justice 2000 Biennial Report:

*Continuing to Move Towards Collaborative and Constructive Problem-Solving*



| United States | Enforcement and | EPA/300-R-01-005 |
| Environmental Protection | Compliance Assurance | October 2001 |
| Agency | (2201A) | http://www.epa.gov/compliance |

Office of Environmental Justice

# To Obtain Copies

Copies of this 1999-2000 biennial report may be obtained by writing or calling:

> U.S. Environmental Protection Agency
> National Service Center for Environmental Publications (NSCEP)
> P.O. Box 42419
> Cincinnati, OH 45242
> Telephone:    513-489-8190
>
> and requesting Report No. EPA/300-R-01-005.

You may also review it, along with the previously published reports, on the web site:
http://www.epa.gov/compliance/environmentaljustice

## Annual Reports

- Environmental Justice Initiatives - 1993 (EPA 200-R-93-001)
- Environmental Justice 1994 Annual Report - Focusing on Environmental Protection for All People (EPA/200-R-95-003)
- Environmental Justice: 1996 Biennial Report - Working Towards Solutions (EPA/300-R-97-004)
- Environmental Justice: 1998 Biennial Report: Moving Towards Collaborative and Constructive Problem-Solving (EPA 300/R-00-004)
- Environmental Justice: 2000 Biennial Report: Continuing To Move Towards Collaborative and Constructive Problem-Solving (EPA 300/R-01-005)

*Inside Front Cover*



# ENVIRONMENTAL JUSTICE
# 2000 BIENNIAL REPORT:
### Continuing To Move Towards
### Collaborative and
### Constructive Problem-Solving

**Prepared by**
**Office of Environmental Justice**
**Office of Enforcement and Compliance Assurance**
**U.S. Environmental Protection Agency**

# *Contents*

*PREFACE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **v**

*INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **vii**

*CHAPTER 1:*     *Environmental Justice at the Federal Level* . . . . . . . . . . . . . . . . . . . . . 1

White House Council on Environmental Quality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1.2
Interagency Working Group on Environmental Justice . . . . . . . . . . . . . . . . . . . . . . . . . 1.3
    Integrated Federal Interagency EJ Action Agenda . . . . . . . . . . . . . . . . . . . . . . . . . 1.4
    Demonstration Projects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1.4
    Highlights of Projects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1.5
    Completed Projects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1.6
Other Interagency Cooperation Effects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1.7
National Environmental Policy Act Implementation . . . . . . . . . . . . . . . . . . . . . . . . . . 1.10

*CHAPTER 2:*     *Addressing Environmental Justice Problems* . . . . . . . . . . . . . . . . . . . . . 2

Lead Problems and Solutions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2.1
Permit Problems and Solutions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2.5
Pesticide Problems and Solutions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2.6
Persistent Bio-Accumulative Toxins Problems and Solutions . . . . . . . . . . . . . . . . . . . 2.9
Fish Contamination Problems and Solutions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2.9
Drinking Water Problems and Solutions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2.12
Concentrated Animal Feeding Operations Problems and Solutions . . . . . . . . . . . . . . . 2.12
Communities with Multiple Problems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2.13
Children's Health Problems and Solutions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2.16
State Efforts to Address Problems and Find Solutions . . . . . . . . . . . . . . . . . . . . . . . . 2.20
Tribal Efforts to Address Problems and Find Solutions . . . . . . . . . . . . . . . . . . . . . . . 2.24
Federal Facilities Problems and Solutions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2.24
Using Supplemental Environmental Projects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2.25
Alternative Dispute Resolution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2.25
Solid and Hazardous Waste Sites/Brownfields Cleanup Problems and Solutions . . . . . 2.26
International Problems and Solutions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2.33
Mexican Border Problems and Solutions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2.34

*CHAPTER 3:*     *Public Participation and Training Initiatives* . . . . . . . . . . . . . . . . . . . . . 3

Public Participation Initiatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3.1
Environmental Justice Training Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3.2
Interagency Environmental Justice Training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3.3
State Training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3.4
Tribal Training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3.5

# *Contents*

*CHAPTER 4:*    *Outreach Initiatives* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

Outreach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.1
Tribal Consultation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.5
International Outreach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.6

*CHAPTER 5:*    *Assessment Methodologies, Assessment Guidance, and Community*
                *Assessments* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

Assessment Methodologies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5.1
Community/Site Specific Assessments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5.3

*CHAPTER 6:*    *Targeting, Environmental Health, and Exposure Studies* . . . . . . . . . . **6**

Targeting Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6.1
Environmental Health Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6.3
Exposure Studies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6.7

*APPENDIX:*  *EPA Environmental Justice Coordinators* . . . . . . . . . . . . . . . . . . . . . . . . A1

*Preface*

---

The Environmental Protection Agency (EPA) is firmly committed to integrating environmental justice into all of our programs, policies, and activities. This report highlights the Agency's determination to pursue environmental justice in a manner consistent with existing environmental laws and their implementing regulations. We will do so in coordination with our partners at all levels of government and throughout the public and private sectors to be sure that protection from environmental hazards is universal.

Environmental justice is achieved when every American, regardless of race, culture, education or income enjoys not only the same degree of protection from environmental threats, but also equal access to the decision making process that ensures a healthy environment in which to live, learn, play, and work. To achieve this goal, we will include all stakeholders in an open, creative, and cooperative effort to effectively address the environmental, health, economic, and social challenges facing our communities.

To assist you in obtaining additional information on any of the issues contained in this report, a list of the Environmental Justice Coordinators for EPA headquarters and each regional office is included as an appendix. I encourage you to take advantage of this resource.

Through the Agency's ongoing work, we will ensure that environmental protection reaches all of our communities. By doing so, we can pass along cleaner air, purer water, and healthier land to future generations in every corner of America.

Barry E. Hill, Director
Office of Environmental Justice

---

*Introduction*



The mission of the U.S. Environmental Protection Agency (EPA) is to safeguard the natural environment–the air, land, and water–upon which all life depends, to protect human health, and ensure a sound environment for all Americans. Through the leadership of the Office of Environmental Justice (OEJ), EPA is working to ensure all communities are afforded equal environmental and public health protection. This is being accomplished through efforts to enhance community access to information and environmental education, so the public may better understand their environment and the opportunities they have to participate in the protection of their health and quality of life. The public can take responsibility for its community by participating in decision-making processes that directly affect their environment and public health. The EPA defines the term "environmental justice" as follows:

> Environmental justice is the <u>fair treatment</u> and <u>meaningful involvement</u> of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies. <u>Fair treatment</u> means that no group of people, including a racial, ethnic, or socioeconomic group, should bear a disproportionate share of the negative environmental consequences resulting from industrial, municipal, and commercial operations or the execution of federal, state and local, and tribal programs and policies. <u>Meaningful involvement</u> means that: (1) potentially affected community residents have an appropriate opportunity to participate in decisions about a proposed activity

## *Introduction*

that will affect their environment and/or health; (2) the public's contribution can influence the regulatory agency's decision; (3) the concerns of all participants involved will be considered in the decisionmaking process; and (4) the decisionmakers seek out and facilitate the involvement of those potentially affected.

As described in the definition, environmental justice is the goal to be achieved for all communities, so that: (1) people of all races, colors, cultures, income, and educational levels are treated fairly with respect to the development and enforcement of environmental laws, regulations, and policies, and (2) residents can be meaningfully involved in the decisions that will affect their environment and health. Environmental justice is about real people facing real problems, and designing practical solutions to address challenging environmental, public health, and quality-of-life issues.

Environmental justice emerged as a significant national issue in the mid 1980s. Since then, proponents of environmental justice have advocated programs that promote environmental protection in the context of sustainable development. From the time that EPA produced the report, "Reducing Risk in All Communities" in 1991, the scope of environmental justice has been one of identifying legal and technical tools, targeting resources, engaging all stakeholders in the environmental justice dialogue, and going beyond merely analyzing problems. The primary objective of environmental justice is to find solutions. Over the past decade, many communities have found that building partnerships is a key way of achieving environmental justice for all communities. Many of these partnerships result in solutions where everybody wins.

As a result, OEJ has adopted the theme, "Continuing to Move Towards Collaborative and Constructive Problem-Solving" for the 2000 Biennial Report. Over the past two years, this concept has matured significantly. There is now a seasoned staff within the environmental justice program at EPA, not only in OEJ and other national program offices, but most importantly within the regions. It is in the regions that the Agency comes into direct contact with the communities and other stakeholders confronting environmental justice issues. Three items stand out as important elements of this evolution:

1. OEJ has developed with others, and is aggressively implementing, a model for collaborative problem-solving that is holistic, proactive and comprehensive, includes all federal agencies, and builds partnerships with all stakeholders, including communities, state, local and tribal governments, faith and philanthropic organizations, the academic world, and business and industry. This model is captured in the Integrated Federal Interagency Environmental Justice Action Agenda. The goals of the Action Agenda are: (1) To promote greater coordination and cooperation among federal departments and agencies; (2) To make government more accessible and responsive to communities; (3) To initiate environmental justice demonstration projects to develop models for addressing community livability issues; and (4) To ensure integration of environmental justice in policies, programs and activities of federal government agencies.

Such a model is based upon several premises: (1) It promotes federal government support of solutions that "begin in the community and remain in the community;" (2) It envisions a holistic approach that addresses environmental, public health, economic, and social/cultural concerns in an integrated manner; (3) It links federal, state and local, and tribal governments with comprehensive community-based planning processes; (4) It seeks better targeting and leveraging of public and private resources; (5) It seeks to develop a template for holistic community-based solutions to environmental justice issues; and (6) It serves as a platform for advocacy of a new way for government to do business.

*Introduction*

2. Another hallmark is the thoughtful use of facilitators to help with consensus-building and use alternative dispute resolution. EPA recognizes that collaborative and constructive problem-solving requires partnerships, often between groups who have traditionally seen themselves as adversaries. Moreover, environmental injustice allegations create challenges for collaborative and constructive problem-solving due to severe power imbalances, questions about who speaks for an affected community, and cross-cultural differences. OEJ has established a program, through the Agency's Alternative Dispute Resolution Office, to help facilitate consultative decision-making processes that result in just and equitable resolutions of environmental justice controversies.

3. A third important hallmark of a maturing approach toward collaborative and constructive problem-solving is a new method to environmental justice training. During the past year, the Agency has established an Environmental Justice Training Collaborative. This effort evolved in response to the EPA regional and headquarters environmental justice programs' recognition of the need for training of EPA staff, other federal agencies, states, tribes, business, industry and others. The Collaborative is built on partnerships among those with the most direct knowledge of environmental justice issues (i.e. affected communities.) The Collaborative has begun to develop a basic environmental justice curriculum that is being field tested.

As we look to the future, EPA is seeking to build more partnerships with all stakeholders in the environmental justice dialogue deliberation. This will require a great deal of patience and it means learning about each other as well as issues. It demands that we listen carefully and have the will to work through our differences. It demands that we learn not only about the facts at hand, but also inquire about what is valued, honored and needs to be protected or sustained. It demands that we continually educate each other. These challenges are extraordinary, but we are determined to confront and overcome them.

*Chapter 1*

*Environmental Justice at the Federal Level*



**WORKING
TOGETHER
TOWARD
COLLABORATIVE
AND
INNOVATIVE
SOLUTIONS**

## Chapter 1
### Environmental Justice at the Federal Level

Over these past two years, EPA has made a concerted effort to enhance its coordination with other federal agencies to address issues of environmental justice. Through the Federal Interagency Working Group on Environmental Justice (IWG), EPA has seen the achievements possible when federal agencies commit themselves to form partnerships to address issues of environmental injustice. These federal partnerships have proven essential to address the wide range of environmental, public health, and economic concerns which tend to cut across agency missions and responsibilities. This chapter describes specific environmental justice projects, programs, and activities of EPA undertaken in collaboration with other governmental agencies or community organizations. This chapter demonstrates the need for Federal, state and local, and tribal governments to work together in order to effectively address the multi-faceted environmental, public health, and economic concerns facing minority, low-income and tribal communities.

### White House Council on Environmental Quality (CEQ)

**Environmental Justice Dialogue in Los Angeles.** In tackling matters of environmental justice, EPA Region 9 has worked jointly with a variety of agencies and organizations. One of the most effective collaborative efforts was the White House Council on Environmental Quality (CEQ) Environmental Justice Dialogue in Los Angeles. The dialogue took place on July 10 and 11, 1998, and was coordinated by CEQ and Region 9 with the following federal agencies: Department of Agriculture (USDA), Department of Commerce (DOC), Department of the Interior (DOI), Department of Justice (DOJ), Department of Housing and Urban Development (HUD), Department of Transportation (DOT), and the Agency for Toxic Substances and Disease Registry (ATSDR). The dialogue resulted in a series of commitments made by CEQ and the Federal agencies to the community. A number of these commitments have led to significant accomplishments for environmental justice.

One of the concerns raised at the meeting was a potential problem with cancer deaths in the Bell Gardens Area, a predominantly Latino community in Southeast Los Angeles. Investigations and soil removal action showed low concentration of hexavalent chromium in the school yard, due to a near-by chrome plating facility. California's Department of Toxic Substances Control (DTSC) issued an order to require the facility, Chrome Chrankshaft, to reduce the potential dust migration from the facility. In January of 1999, the facility permanently closed. EPA worked with the State to develop an investigation of the work plan and community outreach plan. EPA is also facilitating the process of bringing the state and local agencies together to address health concerns such as cancer, fertility problems, asthma, and birth defects.

## Chapter 1
### Environmental Justice at the Federal Level

Another commitment made to the community involved the potential sale of contaminated fish in Asian communities. The possible risks associated with the consumption of contaminated fish have been recognized in Los Angeles for about 15 years. A number of actions have been taken to advise fishermen and consumers of the risks and prevent the sale of contaminated fish in retail markets. EPA has dedicated funds to have the California Department of Health Services (CDHS) develop a public outreach and education plan.

In March 1999, EPA (as co-chair of the CEQ Interagency Task Force on environmental justice for Los Angeles) convened a meeting that focused on transportation and enforcement issues identified by the community as priority issues. The meeting was well attended with approximately 65 people representing community organizations, and local, state and federal agencies. A majority of the 15 federal commitments have been accomplished.

**New York City Interagency Environmental Justice Task Force.** Federal agencies, including the Department of Housing and Urban Development, the Department of Justice, the Army Corps of Engineers, and EPA made several commitments to address environmental justice concerns at the March 6, 1999 White House Council on Environmental Quality forum in New York City. In response to concerns raised by environmental organizations, an Interagency Task Force was formed to implement commitments dealing with air quality, waste transfer stations, public health and open space. Foremost among the concerns of the environmental organizations was the need for funding sources. Therefore, the Community Grants Workgroup, coordinated with the Interagency Task Force, sponsored an environmental grants workshop held on December 8, 1999. The purpose of the grants fair was to identify grants, loans and other support available to environmental organizations in the New York City metropolitan area. Workshop participants received information on how to apply for a variety of federal and private grants. In addition, participants attended workshops that provided information and tools to assist in writing successful proposals.

## Interagency Working Group on Environmental Justice

Executive Order 12898 established a Federal Interagency Working Group on Environmental Justice (IWG) chaired by EPA and comprised of eleven departments and agencies and several White House offices. These include EPA, Departments of Defense, Energy, Labor, Interior, Transportation, Agriculture, Housing and Urban Development, Commerce, and Health and Human Services, the Council on Environmental Quality, Office of Management and Budget, Office of Science and Technology Policy, Domestic Policy Council, and Council of Economic Advisors. EPA's Office of Environmental Justice (OEJ) serves as the lead on the Interagency Working Group to incorporate environmental justice into all federal agencies.

*Chapter 1*
*Environmental Justice at the Federal Level*

**Integrated Action Agenda**

In FY 2000, the IWG developed the "Integrated Federal Interagency Environmental Justice Action Agenda" (Action Agenda) that is rooted in building proactive and dynamic partnerships committed to integrated collaborative and constructive problem-solving at the local level. The Action Agenda results in better utilization of existing federal resources through better targeting and leveraging of such resources in partnership with local groups and all stakeholders. The Action Agenda is a new effort, begun in 2000, and is built around fifteen demonstration projects in diverse urban and rural communities in virtually all regions of the nation, including Puerto Rico and Alaska. Thus far, these demonstration projects have leveraged between $12 to $15 million in public/private resources. The goal of these projects range from environmental cleanup, brownfields and economic development, public health and children's health, to community education and capacity building. To help the public better access the federal government, the IWG produced a directory of federal environmental justice contacts. (see below) All stakeholders, including community groups, faith based organizations, states and local government, and industry have voiced support for the IWG's "win-win" approach. The premises of the Agenda are the following:

1.  Promotes federal support of solutions that "begin in the community and remain in the community,"
2.  Links federal, state and local, and tribal government with community based comprehensive planning processes,
3.  Seeks collaboration and integration so that resources can be better targeted and leveraged,
4.  Develops a template for holistic community based solutions to environmental justice issues, and
5.  Serves as a platform for advocating a new way of doing business.

**Demonstration Projects**

The interagency environmental justice demonstration projects are a great example of how the federal agencies and other stakeholders, including communities, businesses, and state and local governments, and tribal governments can work together to develop and implement meaningful, effective and desirable solutions. The federal government is establishing a new baseline from which to build future progress and policies to address environmental injustices. The demonstration projects are:

1. Greater Boston Urban Resources Partnership: "Connecting Community and Environment" (Boston, MA/) *Lead Agency: EPA*
2. Camden - City of Children Partnering for a Better Future (Camden, NJ) Lead Agency: HUD
3. New York City Alternative Fuel Vehicle Summit (New York, NY) *Lead Agency: DOE*

*Chapter 1*
*Environmental Justice at the Federal Level*

4. Addressing Asthma in Puerto Rico–A Multi-Faceted Partnership for Results (Puerto Rico) *Lead Agency: HHS/HRSA*
5. Bridges to Friendship Nurturing Environmental Justice in Southeast and Southwest Washington, DC (Washington, DC) *Lead Agency: DOD (Navy)*
6. Community Cleanup and Revitalization in Arkwright/Forest Park (Spartanburg, SC) *Lead Agency: EPA*
7. Protecting Children's Health and Reducing Lead Exposure through Collaborative Partnerships (East St. Louis, IL) *Lead Agencies: EPA & HUD*
8. Bethel New Life Power Park Assessment (Chicago, IL) *Lead Agency: DOE*
9. New Madrid County Tri-Community Child Health Champion Campaign (New Madrid County, MO) Lead Agencies: EPA & USDA-NRCS
10. Easing Troubled Waters: Ensuring Safe Drinking Water Sources in Migrant Farmworker Communities in Colorado (Colorado) *Lead Agency: EPA*
11. Environmental Justice and Public Participation Through Technology: Defeating the Digital Divide and Building Community Capacity (Savannah, GA and Fort Belknap Indian Reservation, MT) *Lead Agency: DOE*
12. Protecting Community Health and Reducing Toxic Air Exposure through Collaborative Partnerships in Barrio Logan (San Diego, CA) *Lead Agency: EPA*
13. Oregon Environmental Justice Initiative (Portland and Rural Communities, Oregon) *Lead Agency: DOJ*
14. Metlkatla Indian Community Unified Interagency Environmental Management Task Force (Ketchikan, AK) *Lead Agency: DOD*
15. Environmental Justice in Indian Country: A Roundtable to Address Conceptual, Political and Statutory Issues *Lead Agency: DOE*

**Highlights of Projects**

The Interagency Environmental Justice Action Agenda is a new effort, begun in 2000. Fifteen National Interagency Environmental Justice Demonstration Projects were announced in May 2000. Goals of these projects range from environmental cleanup, public health, children's health, economic development, to community capacity building. The IWG has also produced a directory of environmental justice contacts and a website to ensure better access to federal agencies. The Environmental Justice Action Agenda involves eleven federal agencies and has created partnerships with all stakeholder groups, including communities; research, health, and philanthropic institutions; tribal, state and local government; and business and industry. The Action Agenda can be found on EPA's web site at the following address:
http://www.epa.gov/oeca/main/ej/iwg/actionagenda.pdf  Specific accomplishments include:

- Environmental Justice Demonstration Projects have leveraged between $12 to $15 million in public/private resources, thus far.

# Chapter 1
## *Environmental Justice at the Federal Level*

- Re-Genesis, a community-based organization, is leading community cleanup and revitalization effort in two African American neighborhoods of Spartanburg, South Carolina.

- Children's health project in Camden, New Jersey is conducting outreach and education on lead and asthma through innovative efforts like a Lead Exploratorium.
- US Postal Service has committed $1.93 million for purchase of electric and alternative fuel vehicles for use in New York City's South Bronx.
- Bethel New Life, faith-based community development corporation in the West Garfield section of Chicago, Illinois is using innovative "green" technology to turn abandoned industrial area into a revitalized economic center.
- Bridges to Friendship seeks to ensure that the local community benefits from Naval base cleanup and conversion in Washington, DC.
- East St. Louis, Illinois project has leveraged more than $4 million for lead assessment and abatement.
- California Air Resources Board selected Barrio Logan (San Diego, CA) as a model for its Neighborhood Assessment and Children's Health programs.
- Puerto Rico Asthma Coalition held a strategic planning conference of more than 700 participants.
- Three rural communities in New Madrid County, Missouri has built a unique partnership to protect children's health in areas of lead, asthma/allergies and water quality.
- Community technology centers are being established in Savannah, Georgia & Fort Belknap, Montana through utilization of surplus government computers.
- Metlakatla, Alaska and East St. Louis, Illinois have been selected as National Brownfields Showcase Communities.
- Colorado farmworker project is developing GIS maps of migrant farmworker camps and drinking water sources.

**Completed Demonstration Projects**

**American Indian/Alaskan Native Environmental Justice Roundtable.** Federal agencies in collaboration with tribes, tribal organizations and others held a National Tribal Environmental Justice Roundtable, August 3 and 4, 2000, in Albuquerque, New Mexico to identify the broad range of cultural, religious, economic, social, legal and other issues related to environmental justice in Indian country. This effort grew out of a commitment by Federal agencies to tribal groups at the June 1999 environmental justice conference in Hilton Head, SC.

The Roundtable is one of 15 initial demonstration projects under the Environmental Justice Action

*Chapter 1*
*Environmental Justice at the Federal Level*

Agenda, developed by the Interagency Working Group. DOE was the lead agency for this effort with assistance and support from EPA, DOJ, DOI, HHS, HUD, DOD and USDA. Region 8, with the assistance of Region 6 environmental justice staff, organized a site tour of the Petroglyph National Monument in conjunction with the Roundtable.

A report on the proceedings and recommendations created during the meeting can be obtained by contacting EPA's Office of Environmental Justice.

## Other Interagency Cooperation Efforts

**Urban Resources Partnership**. The Urban Resources Partnership (URP) brings together a number of Federal and state agencies, non-profit organizations, local businesses, and other foundations in selected cities across the country to provide funding and on-site technical assistance for community-led environmental projects. EPA has been an active partner since URP's inception in 1994, providing resources and assistance to a number of local projects which target under-served communities. Projects include transforming blighted vacant areas into community gardens, parks, and green community spaces, teaching young people environmental awareness, and restoring wildlife habitats. EPA's Office of Water provided assistance throughout 1999/2000 through serving on URP's National Steering Committee as well as providing continued technical and program guidance and assistance. URP is an excellent example of partners coming together at all levels to successfully accomplish on-the-ground projects in disadvantaged communities.

**Region 1**

**Greater Boston Urban Resources Partnership**. A model for interagency cooperation, coordination and partnership is the Greater Boston Urban Resources Partnership (GB-URP) "Connecting Community and Environment". This is an extraordinary place based model which demonstrates Region 1's efforts to build community coalitions. This Partnership was initiated in 1995 by Region 1 with the specific purpose of encouraging Federal agencies to target their resources to local communities to resolve public health and environmental issues. The GB-URP includes community organizations and agencies, business, and Federal, state and local governments. A major aspect of the Partnership has been its sustainability and its ability to help urban communities carry out strategies that link social, economic, and environmental concerns. Since its inception, the Partnership has periodically assessed its goals and reassessed its priorities and currently has a strong focus on livability issues.

The GB-URP consists of 39 agencies, organizations, businesses, academia and local, state and Federal government entities that have signed a Memorandum of Understanding committing

# *Chapter 1*
## *Environmental Justice at the Federal Level*

either financial or technical resources to the activities of the GB-URP. The partners consist of seven (7) local non-profits, ten (10) regional non-profits, six (6) individuals or organizations from the private sector, two (2) academic institutions, five (5) representatives of local government, five (5) representatives of state government, and four federal government agencies including the Forest Service, Natural Resources Conservation Service, Region 1's Urban Environmental Initiative, and Housing and Urban Development. The GB-URP has an Executive Committee consisting of a Chair, Co-chair, Treasurer and Clerk, as well as six at-large members.

The GB-URP started out as a meeting between government agencies and community groups seeking an explanation of the permitting process. It has evolved into a Partnership which:

1. Encourages community involvement, serves community needs, and provides community benefits.
2. Fosters cooperation among residents and government officials for the enhancement of the urban environment.
3. Serves and involves low-income communities and those of color that have traditionally had little access to environmental resources.
4. Plans for long term sustainability and improvements that address community needs.

The GB-URP model is improving efforts and strengthening relationships. While the goals lie in the achievement of livable communities as communities define them, the process ensures collaboration among parties with the resources and expertise to enhance a resident's quality of life.

## Region 2

**Asthma Summit.** In May, 2000 Region 2 hosted a summit on asthma entitled the Environmental Justice Children's Initiative along with the Department of Housing and Urban Development and the Department of Health and Human Services. Officials from state agencies were invited to develop a strategy for filling the gaps in current action on asthma. Building on the national Cabinet-level initiative to reduce environmental impacts of children's health, this regional strategy is focusing on youngsters. In order to complement rather than duplicate other regional initiatives (e.g., the collaboration between public health officials and managed care organizations), the summit emphasized prevention of exposure to known asthma triggers, in homes, schools and the outside environment, instead of medical treatment of asthma.

The goals of the summit were to identify opportunities for each agency to use its unique leverage and capacity to reduce rates and severity of asthma, and selecting one or two initiatives that could benefit specifically from a regional approach and cooperation across public health, environment, education and housing. This is an example of the federal partnerships the Region has

## *Chapter 1*
### *Environmental Justice at the Federal Level*

been involved in and continues to be involved in relative to environmental justice. For each project, the Region is focusing on their sustainability and a replication by other communities.

**Region 5**

**Protecting Children's Health and Reducing Lead Exposure through Collaborative Partnerships.** This collaborative partnership seeks to protect children's health by reducing lead exposure in East St. Louis, IL and the St. Clair County region. Lead poisoning is an especially devastating problem in East St. Louis, where children have been tested for rates four times the national average. This collaboration consists of St. Mary's Hospital, Neighbors United for Progress, Illinois Department of Public Health, St. Clair County (Intergovermental Grants Department), Department of Housing and Urban Development, Army Corps of Engineers, and the EPA. It will target environmental justice areas for outreach, screening, testing and housing rehabilitation. Through this collaborative effort, the groups will be able to avoid redundancy and maximize the use of grant dollars.

**Region 7**

**Partnership with Department of Housing and Urban Development.** Region 7 and the Department of Housing and Urban Development (HUD), Great Plains Region have formed an informal but strong partnership on issues of mutual responsibility and interest in environmental justice communities. HUD has been a supporter and active participant in Region 7's Diversity and Environmental Justice activities. The Region has supported HUD on fair housing, civil rights, and community building activities. HUD and the Region are putting into action the commitment federal agencies have made to partner and leverage resources as we serve the public.

**Region 8**

**Migrant Farm Worker Communities.** This project serves as one of 15 national demonstration projects selected by the Environmental Justice Federal Interagency Action Agenda Working Group. The project strives to identify and assess the drinking water sources of migrant farmworker camps in Colorado. The project brings together various governmental agencies as well as health and environmental groups to work collaboratively to address the problems encountered with the assessment. EPA is the lead agency for this effort. Other active government agencies include the Departments of Health and Human Service, Labor, State, and Agriculture.

**Region 9**

*Chapter 1*
*Environmental Justice at the Federal Level*

**Federal Regional Council.** The Region 9 Federal Regional Council (FRC) is a partnership between the Departments of Health and Human Services, Labor, Housing and Urban Development, Justice, Interior, Transportation, Energy, and EPA. The FRC consists of three (3) committees: (1) Pacific Island, (2) Tribal, and (3) Border. The FRC' purpose is to address the persistent problems in impoverished areas throughout the region. Region 9 chairs the Border Committee and the East Palo Alto Subcommittee. The FRC has adopted two (2) geographic focus areas: North Richmond and East Palo Alto, and has established two (2) task forces, one for each community. The East Palo Alto task force focuses on directing federal attention toward issues such as redevelopment, crime, and transportation. Currently the FRC meets bi-monthly with the local government to discuss these issues and to try to match need with resources.

Through the efforts of the FRC, many sites have been cleaned up, training and employment opportunities have increased, transportation services have improved, and community redevelopment projects have been initiated. These successes are due to the partnerships that have been developed between the federal, state, county, and local agencies, as well as the private sector.

**Border Air Monitoring Project.** The Border Air monitoring project was recently initiated by the Environmental Health Coalition (EHC) in a low-income, Latino community in San Diego. This community, called Barrio Logan, borders an industrialized section of the San Diego Bay and is considered by many to be one of the most polluted communities in the county. Barrio Logan is surrounded by freeways, and is subject to the annual release of three million pounds of toxic air pollution from multiple small industrial sources. The respiratory health hazard index for the Barrio Logan area is 100-200 times above acceptable levels, and up to 20 percent of children in the area suffer from severe breathing problems. Despite this, there were no air monitors in the area to assess the extent of the air pollution.

Representing the Barrio Logan community, the Environmental Health Coalition (EHC) worked with the San Diego Air Pollution Control District (APCD) to obtain a temporary air monitoring station (initially 6 months) to be placed at Memorial Academy, a local Barrio Logan high school. EHC, along with a coalition of stakeholders which included the San Diego American Lung Association, the Industry Alliance, the San Diego Unified School District, the Board of County Supervisors, the local Perkins Elementary School, and Community Family Health Centers persuaded the California Air Resources Board (CARB) to finance a six month air monitoring station to measure the pollutants impacting the community.

## National Environmental Policy Act Implementation

### Region 3

# Chapter 1
## Environmental Justice at the Federal Level

**King William Reservoir, Virginia.** The Regional Raw Water Study Group (RRWSG), a consortium of local governments on Virginia's Lower Peninsula, are proposing the construction of a dam, fresh water reservoir, and a pumping station in rural King William County, Virginia. The dam would create a 1,500 acre reservoir on Cohoke Creek by pumping water from the Mattaponi River. The proposed project may impact the social structure and sense of community of the Mattaponi, Upper Mattaponi and Pamunkey Indian tribes. The reservoir would be located between the tribes' reservations. Construction of the reservoir and it's potential secondary impacts such as residential development, raise issues related to the preservation of the cultural, spiritual, and archaeological integrity of the tribes. The project will result in the loss of 437 acres of wetlands in the Cohoke Mill Creek watershed. The construction of the reservoir will take place within the three mile buffer zone of the Mattaponi Indian Reservation. The tribes opposition relies, in part, on a state recognized treaty which does not allow any encroachment within a 3 mile radius of the reservation. The tribes are contending that if the reservoir is allowed they will lose a vital part of their cultural heritage. The Mattaponi maintain that the reservoir will threaten their historical use of the river and the land within the Cohoke watershed. Both tribes rely heavily on the land and water as a source of food, economic benefit and spiritual identity. The tribes met with EPA Region 3 on several occasions to solicit the Agency's assistance in ensuring their environmental justice issues were understood and addressed in the Final Environmental Impact Statement (FEIS).

In a July 1997 letter, Region 3 stated that the FEIS did not contain a full and complete analysis of the impact of the reservoir's construction on the environmental justice communities in the area, in accordance with the President's Executive Order on Environmental Justice (EO 12898), or contain a valid wetlands replacement plan. As a result, Region 3 requested that the Norfolk District of the Army Corps of Engineers require a supplement to the FEIS focusing on the wetland mitigation issues and the Native American cultural issues. On June 4, 1999, the Army Corps issued a preliminary decision to deny the Clean Water Act §404 Permit for lack of a demonstrated need to destroy 437 acres of wetlands, and potentially cause cumulative adverse environmental impacts, particularly to the American Indian population. The Army Corps extended the public comment period to July 16, 1999 on their decision to deny the permit. Region 3 will continue to work closely with the Army Corps to enhance its understanding of the environmental justice issues of concern pertaining to this project

## Region 8

**Zortman-Landusky Mine Reclamation.** A 1992 proposed expansion of two gold mines, which had been operating since the late 1970s near the Fort Belknap Reservation in Montana, prompted

*Chapter 1*
*Environmental Justice at the Federal Level*

the involvement of EPA's National Environmental Policy Act (NEPA) and National Pollution Discharge Elimination System (NPDES) programs. The mines are located on lands that were originally part of the Reservation. The mines underwent a series of prior expansions before Bureau of Land Management (BLM) officials required an environmental impact statement. In November 1998, the Interior Board of Land Appeals remanded the Final Environmental Impact Statement (FEIS) to BLM based, in part, on BLM's inadequate consultation with the Fort Belknap Tribes and the lack of sufficient information about ground water at the sites. Region 8 provided technical comments on a ground-water study developed since the FEIS, and will encourage BLM to effectively consult with the Fort Belknap Community Council, and larger tribal community on the selection of the reclamation alternative. Environmental justice program staff were part of the NEPA review team and also successfully sought funding to allow the Fort Belknap Community Council to use independent technical expertise in the review of water quality monitoring data. Environmental justice program staff also facilitated efforts to design a tribal consultation plan to allow the BLM to meet the intent of a recent Interior Board of Land Appeals decision remanding the EIS to the BLM based, in part, on inadequate tribal consultation.

**Master Manual for Operations of the Missouri River.** The Army Corps of Engineers (Corps) is in the process of revising its Master Control Manual for operation of the Pick Sloan system of dams along the Missouri River. The Missouri River Basin is home to 19 tribal nations, many which are impacted by the management of the Missouri River. The environmental justice program has devoted resources to an internal team formed to review the NEPA documentation produced by the Corps associated with the review of the Master Manual. Environmental justice program staff also serve on a community based environmental protection (CBEP) team devoted to the Missouri River, and administer grants to the Mni Sose Intertribal Water Rights Coalition, a consortia of tribal governments in the Basin.

**Devils Lake Study.** Region 8 assisted the Army Corps of Engineers in providing a qualitative assessment of the social impacts and potential environmental justice concerns of the proposed Emergency Outlet to control flooding at Devils Lake, North Dakota. Data were collected during 1999 by means of telephone interviews with respondents from various communities throughout the Devils Lake region. This study has attracted the interest of the Canadian government, the Office of Federal Activities, the Office of International Affairs and other agencies.

**Transportation.** Environmental justice staff are currently working with the I-70 Project Team to provide environmental justice and social impact assessment assistance for the proposed I-70 Highway expansion in Colorado. Staff members are working with the Colorado Department of Transportation, the Federal Highway Administration, and its contractors to develop an assessment methodology for environmental justice to be included in the programmatic EIS for the expansion.

# *Chapter 2*
## *Addressing Environmental Justice Problems*

This chapter highlights a wide variety of allegations of environmental injustice and the efforts taken to find solutions to these environmental and public health problems. The allegations described here include those that communities have identified and those which EPA has identified through its own assessments or through the assessments of others concerned about issues of environmental justice.

In many instances, EPA is working collaboratively and in partnership with the communities and other stakeholders, including federal agencies, as well as state and tribal governments, to develop solutions to the problems identified. EPA recognizes that impacted communities frequently have critical knowledge and ability to help resolve local environmental and public health issues. Therefore, the Agency is working to ensure the active participation of concerned community organizations and individuals in their efforts to address environmental justice concerns. This chapter describes some of the unique partnerships which have formed between EPA and various stakeholders to achieve environmental justice for all communities.

### Lead Problems and Solutions

**Spanish Public Education Campaign on Lead.** Through a cooperative agreement, the Office of Pollution Prevention and Toxics/National Program Chemicals Division (OPPT/NPCD) supported EVS Communications and its public health partner, the National Council of LaRaza's Center for Health Promotion, in the development of the nation's first Spanish-language television public education campaign on the problem of lead poisoning in the home. As a result of this award-winning effort, millions of Latino families were given their first exposure to general information about the most common places where lead can be found, and about the serious health consequences suffered by children and adults who come into contact with this dangerous environmental hazard.

**Department of Justice Lead Educational Materials**. OPPT/NPCD worked with the Department of Justice (DOJ) to assist communities in educating the public about the health risks of lead paint, identifying safe remediation methods and conducting blood lead level screenings in young children. Lead education information packets were sent to 250 coordinators of the DOJ's Weed & Seed program, one of DOJ's most extensive community-based programs to prevent, control, and reduce violent crime, drug abuse, and gang activity in targeted high-crime neighborhoods across the country. These lead education packets were also sent to FBI Adopt-A-School Programs, Regional Community Policing Institutes and to Environmental Coordinators in each of the 94 United States Attorneys Offices.

*Chapter 2*

*Addressing Environmental Justice Problems*

**Region 1**

**Lead Safe Yard Project, Boston.** Through the Environmental Monitoring Public Access and Community Tracking (EMPACT) program, Region 1 funded the Community-Based Environmental Lead Assessment and Educational Demonstration Program (a.k.a. Dorchester Lead Safe Yard Project - DLSYP.) This project was initiated with community partners to implement a pilot study to demonstrate how low cost/no cost techniques can reduce the exposure risk of preschool children to elevated levels of lead in soil within the target community and to set up a template which other communities could use to address this persistent lead issue. The community partners include Boston University School of Public Health, the Bowdoin Street Community Health Center (BSHC), and Dorchester Gardenlands, a Boston-based landscape company. The target community is the Bowdoin Street area in the North Dorchester section of Boston. There are roughly 150 homes in this target community.

Three important tasks were established to complete this project: (1) a community lead education and outreach program, conducted through community organizers to further develop community awareness of the dangers of lead poisoning and to enroll property owners into the project, (2) a sampling and analysis program to characterize enlisted properties, and (3) an abatement program to mitigate residential soils that contain high concentrations of lead.

The pilot was initially funded in two phases which took place during the summers of 1998 and 1999. At the completion of the second phase of this project in the fall of 1999, 42 residences had been addressed by the program, a template (tool kit that provides the basic materials necessary to initiate a lead safe yard project) had been developed, the team had conducted numerous seminars on lead safe yard work, and Lead Safe Boston, an office within the Boston Public Facilities Department, had begun plans to implement a lead safe yard program using the DLSYP template.

The DLSYP project was funded to deliver relevant environmental data to the public and to develop communication tools that might sustain the activity beyond the specific EMPACT funded program. These objectives have been largely achieved at the conclusion of Phase Two, although the third phase of the project has been funded. This phase will be used to demonstrate a coordinated effort between city-funded structural abatement and a lead safe yard program with the goal of achieving a more holistic solution. In this final phase of the project, EPA proposes a supplemental effort to quantify the effectiveness of low-cost residential soil intervention. The Agency has partnered with the National Center for Lead Safe Housing (NCLSH), the Lead-Safe Boston program office within the Boston Department of Neighborhood Development (LSB), and the Boston Health Department (BHD) to file for Housing and Urban Development (HUD) funding to leverage a new phase of the EMPACT project.

**Safe Housing Lead Task Force Steering Committee, Rhode Island.**    A mayoral task force created a comprehensive set of recommendations to eliminate lead poisoning in Providence, Rhode Island–including enforcement, securing financial resources, and education and outreach. The Lead

# Chapter 2
## Addressing Environmental Justice Problems

Task Force Steering Committee, consisting of representatives from community groups, the Providence Housing Authority, the U.S. Department of Housing and Urban Development, the Rhode Island Department of Public Health, Region 1 and the Attorney General's Office, has developed and are currently tracking implementation of the task force recommendations through a Goals Management Plan. The Steering Committee meets quarterly to track progress against specific goals and tasks outlined in the Goals Management Plan. The Steering Committee has also developed a public reporting process to keep residents informed on progress to date.

**Lead Abatement Project for Rhode Island Daycare Centers.** As a result of a nearly $500,000 lead abatement initiative launched by Region 1 and Rhode Island, children will be safer at dozens of day-care facilities. The initiative was made possible through an enforcement case brought by the EPA against the Rhode Island Department of Transportation (DOT).

The lead-abatement project was initiated in response to severe lead poisoning among Rhode Island's children. Although rates of childhood lead poisoning declined from 22% of children screened in 1994 to just over 12 % in 1997, Rhode Island's rates are still three times greater than the national average. The problem is especially critical in cities like Providence and Central Falls, where more than 25 % of kindergarten-aged children tested by the Rhode Island Department of Health had lead poisoning!

The project, which will be implemented over the next 18 months, is being funded by the Rhode Island DOT as part of an enforcement settlement initiated by EPA last spring for widespread environmental violations at a DOT facility in downtown Providence.

The settlement stems from numerous environmental violations that EPA inspectors discovered in 1997 at the DOT complex at 90 Calverley Street, including improper storage and handling of large amounts of hazardous waste. Investigators also discovered violations of the Clean Water Act, including the failure to take spill-prevention measures and the illegal discharge of oil into the Woonasquatucket River.

DOT also has agreed under the settlement to pay a $100,000 civil penalty and to spend $15,000 to fund two one-day environmental compliance training sessions for Rhode Island's municipalities. One of several lead-abatement projects EPA has initiated in Rhode Island, includes the investment of $438,500 by DOT, as part of the settlement, to remove lead-contaminated paint and soils from licensed day-care facilities all across the state.

The project, administered by the Rhode Island Housing and Mortgage Finance Corp., will provide matching funds for facilities identified as posing a health risk based on a recent survey by the state Health Department. Completed in December 1999, the Health Department surveyed about 220 licensed day-care facilities, of which roughly half are considered to be lead safe. Just over 100 of the facilities-including 27 in Providence alone-had some sort of lead contamination problem, such as elevated lead levels in the soil or peeling/chipping lead paint inside or outside the buildings.

*Chapter 2*
*Addressing Environmental Justice Problems*

## Region 2

**Lead in Older Homes.** Lead poisoning is an issue of high priority for Region 2's Pesticides and Toxic Substances Branch since low-income families, Asians, Hispanics and African Americans living in older housing or urban centers are disproportionately impacted. Region 2 has one of the largest percentages of old housing stock in the United States. Approximately three quarters of U.S. homes constructed before 1978 contain some kind of lead paint. However, in New Jersey, that number is closer to 85%, and that number rises to 90% in New York. Additionally, 14% of the children of New Jersey are from poor families, and the percentage rises to 25% of children in New York State.

The health affects of lead on children, even at low levels can cause nervous system and kidney damage, learning disabilities, Attention Deficit Disorder (ADD), and decreased intelligence. Speech, language and behavior problems, poor muscle coordination, decreased muscle and bone growth and hearing damage. As a result, EPA knows it is critical that an effort be made by multiple agencies to effect a change with regard to this environmental hazard. Region 2 has taken the following steps. An interagency group was initiated by the Office of the Regional Administrator to use the strengths and resources of different agencies to ensure that low-income, and disproportionately impacted communities are receiving maximum attention. Region 2 partnered with the New Jersey Interagency Task Force on the Prevention of Lead Poisoning, and the University of Medicine and Dentistry of New Jersey in collaboration with Ramapo College to identify, consolidate, compile, prepare and disseminate information on lead issues for inner city New Jersey schools; and awarded grant pilots for projects in Syracuse, NY, New York City and Camden, NJ.

Additional information is provided at the following web address: www.epa.gov/region02/health/leadpoisoning

## Region 3

**City of Chester Lead Initiative - Supplemental Environmental Project.** As part of the Office of Enforcement, Compliance and Environmental Justice's Chester Initiative, supported by community organizations, work continues on the Chester Lead Poisoning Prevention Project funded by a supplemental environmental project (SEP). The SEP is a project which is attempting to complete a children's blood-lead survey and massive public education about the effects of lead on residents, especially children, in Chester, Pennsylvania. The SEP also includes the removal of lead contamination from homes.

**Lead in Logan Community, Philadelphia.** The Logan section of Philadelphia is predominately African American. For years, many of the homes were sinking because the homes were constructed on top of a filled in streambed. Eventually these homes were condemned and the residents relocated. The City of Philadelphia tore down many of these homes in a 17 block area. Sampling by Region

*Chapter 2*

*Addressing Environmental Justice Problems*

3 found soil in the now vacant lots to have unacceptable concentrations of lead. Region 3 and the City entered into a Memorandum of Agreement in October 2000, whereby the City would perform the necessary soil removal, and other activities, with Region 3's Office of Enforcement, Compliance and Environmental Justice in an oversight role. The community has been very active in pursuing a remedy for the lead problem.

**Region 10**

**Childhood Lead Poisoning, Oregon.** A study conducted by the Oregon Health Division revealed that nearly 1 in 10 Latino, Native American and African American children residing in Oregon have lead concentrations in their blood greater than the Federal acceptable level. Region 10 funded the Urban League of Portland through the Environmental Justice Small Grants Program to inform and educate the low-income and people of color communities in Portland about the problems of childhood lead poisoning, its sources, and how to reduce exposure, increase the number of high-risk children tested for exposure to lead, and to develop the capacity of community leaders, and policymakers to advocate for and implement effective lead poisoning prevention programs.

On January 18, 2000, members of Region 10's Office of Civil Rights and Environmental Justice, the City of Portland, the Portland Health Department and numerous community groups (Environmental Justice Action Group, Urban League of Portland), held the first of what are now quarterly Lead Summits. The summit identified those areas of Portland most impacted by lead poisoning, the roles and responsibilities of the community groups and agencies working on the issue, and began to identify the gaps in current lead poisoning prevention programs. One of the biggest issues identified at the summit was the limited number of certified lead abatement companies.

### Permitting Problems and Solutions

**Region 6**

**Citizens' Air Permitting Workshop, Louisiana.** On April 8, 2000, in order to further the Agency's environmental justice initiative, Region 6 participated in a "first ever" Air Permits Workshop, in Sulphur, Louisiana, with the Louisiana Department of Environmental Quality (LDEQ), to introduce citizens to the complicated procedures of applying for and receiving an air permit. LDEQ and Region 6's Air Permits staff set up shop in the Holiday Inn Express, in Sulphur, Louisiana, with exhibits, charts and computers, to explain what a company must do to obtain an air permit, emphasizing the roles of the two agencies as well as the roles of citizens. The idea of a permit workshop evolved from the October Calcasieu Parish Community Quarterly Meeting that Region 6 and LDEQ hosted in order to solve the environmental problems of that area. Approximately 35 citizens attended and seemed to appreciate the effort and good will of the two agencies in this first

*Chapter 2*

*Addressing Environmental Justice Problems*

major citizens' outreach effort. LDEQ and Region 6 are discussing the success of the workshop and evaluating it along with future outreach commitments.

**Water Discharge Permit Evaluations, Louisiana.** The Region 6 National Pollutant Discharge Elimination System (NPDES) Permits Branch has reviewed existing permit applications of four industrial dischargers (Olin, Conoco, Condea Vista and PPG) located in the Calcasieu Parish area, point sources determined by NPDES Branch to be potential dischargers of dioxin. Although the reviewed applications cited no discharge of dioxin at levels harmful to aquatic life and human health, the facilities are not required to routinely test for dioxin during the NPDES application renewal process. Correspondence (dated, December 21 and 22, 1999) directed LDEQ to follow procedures which give Region 6 an expanded role in permit review. Oversight of permits for minor discharges to impaired waters are now under the oversight of EPA where previously only major discharges were being reviewed. The process makes permit issuance for dischargers to impaired water bodies the top priority. Discussions between Region 6 and LDEQ target the impaired Calcasieu Parish basin as a very high priority for permit issuance and direct EPA review.

**Region 9**

**South Phoenix RCRA Facilities, Arizona.** The efforts of three facilities in the South Phoenix area to obtain permits has raised the concerns of residents. The first facility, Innovative Waste Utilization (IWU) has drawn high levels of attention. Over 150 people attended a public meeting that was held in November 1999. Concerns included opposition to the expansion of the facility, siting of the facility in an environmental justice community, the cumulative impacts of other industrial facilities in the area, the lack of public knowledge that the facility was operating for 20 years under interim status, and the distrust of government environmental agencies. The other facilities include Onyx Environmental Services which is seeking renewal of their current storage permit; and Safety Kleen Southwest which is seeking a permit to store, treat and recycle hazardous waste. Region 9 has been working closely with the Arizona Department of Environmental Quality (ADEQ) to ensure that environmental justice is a priority in the decisionmaking process.

**California Energy Commission (CEC) Permitting of Power Plants in California.** Region 9 has been working with the California Energy Commission (CEC) on environmental justice issues surrounding the permitting of over 30 new power generating facilities in California. Region 9 is working closely with CEC to ensure that environmental justice issues are addressed. An Environmental Justice Roundtable was held in Sacramento, CA in April 2000 that brought major stakeholder groups together, including EPA, CEC, developers, environmental justice advocates, community leaders, and other government entities. The purpose of the dialogue was to discuss issues such as demographics, risk assessments, public participation and disproportionate impacts.

*Chapter 2*

*Addressing Environmental Justice Problems*

## Pesticide Problems and Solutions

**Worker Protection Training.** The Office of Pollution Prevention (OPP) has provided funding to several farmworker organizations to develop pesticide safety training and education programs, and to test the effectiveness of different approaches and materials. OPP has developed and tested the use of posters, handbooks, videos, pocket guides, flip charts, radio programs, audio tapes, pocket guides and laminated cards. Since farmworkers are predominantly non-English speaking, with low education levels, and high migrant and seasonal populations, outreach to this community has been challenging. OPP has worked with farmworker outreach and service organizations, as well as the grower organizations and state agencies, to distribute materials and make training resources available.

Through assistance from OPP, the Association of Farmworker Opportunity Programs (AFOP) has conducted a national pesticide safety education program working with 37 community-based farmworker organizations in 19 states. Working with the AmeriCorps programs, they have conducted training primarily in Spanish, but also in English, Vietnamese, Tagalog and Creole. With assistance from OPP, AFOP has developed, tested, and evaluated pesticide education materials, including radio programs, for English as a second language curriculum on pesticide safety and interactive approaches to protect farmworkers from pesticide hazards. They have trained more than 200,000 workers, families, children, and community members about pesticide safety and are expanding their outreach to children and their families with new programs and materials.

OPP has also funded other organizations to develop outreach programs to farmworkers and conduct training about pesticide safety. The Farmworker Health and Safety Institute, the National Center for Farmworker Health, the Farmworker Women's Leadership Project, Hispanic Radio Network and the Yakima Valley Farm Workers' Clinic are working with OPP to develop different approaches to reach farmworkers for pesticides safety that comply with Worker Protection Standard training requirements.

**National Strategies for Health Care Providers.** In April 1998, OPP held a workshop to initiate a multi-agency effort to create a national plan for increased training and awareness among health care providers of pesticides-related health conditions-"Pesticides and National Strategies for Health Care Providers." It is essential that health care providers recognize, manage and prevent pesticide-related health conditions in their patients and communities.

This initiative is led by OPP in partnership with the Department of Labor (DOL), Health and Human Services (HHS), and the Department of Agriculture (USDA). Workshop proceedings were distributed and a working group developed a draft implementation strategy. The draft Implementation Plan is available for public review and comment. A national meeting is anticipated in early 2001 to provide a forum for public discussion of the final recommendations.

*Chapter 2*

*Addressing Environmental Justice Problems*

**Region 4**

**Protecting the Elderly From Pesticide Misuse, Kentucky.** Kentucky, through partial funding from Region 4, conducts project Reach Out to Protect the Elderly (ROPE) in Southeast Kentucky. ROPE educates the elderly on pesticide issues in order to reduce pesticide misuse and pesticide application from unlicenced applicators. In addition to the Cumberland Valley Health Department, home health care services and community action agencies have committed to assist in the distribution of material developed under this grant. The grant dollars are spent for the development of brochures and other educational materials, inspection supplies, site presentations and visits. A brochure stressing the proper use of pesticides and how to hire a pest control operator is in draft format. The Structural Branch Manager, has met with the Kentucky State Police and community leaders and is getting a listing of key groups in Harlan County to help publicize this effort. The Attorney General has expressed interest and support for Project ROPE and would like to see it implemented on a statewide basis. Region 4 anticipates the balance of the funding for Project ROPE will be awarded this fiscal year.

**Region 9**

**Reducing Pesticide Misuse, California.** Region 9 is supporting a national initiative on urban misuse of pesticides. Two unregistered products have been targeted for their risks to children: insecticidal chalk and unregistered moth repellents. Insecticidal chalk is a special concern because it looks like ordinary blackboard chalk and the public may mistakenly believe it is safe. Poison Control Centers nationwide have received hundreds of reports of children exposed to these chalks. Region 9 is working with state partners to develop an enforcement and public outreach strategy to eliminate the import, sale, and use of this product. An educational brochure, highlighting the hazard to children, has been developed and translated into Spanish, Vietnamese, and Chinese. Region 9 is also concerned about possible use of this product at school sites and has initiated a compliance assistance campaign to educate school maintenance personnel about the importance of using only registered products and of following label directions for safe use. Region 9 issued a press release to publicize the risks these products pose to children and has filed civil complaints against two companies selling insecticidal chalk and three companies selling unregistered moth repellents.

**Farmworker Safety in San Luis Obispo, California.** The Environmental Center of San Luis Obispo (ECOSLO) is working to minimize environmental health risks facing farmworkers and to facilitate and improve communication and coordination among farmworker support groups and the county's environmental health stakeholders. Beginning in June 2000, 200 hundred farmworkers and their families will be surveyed by the California Department of Health Services (CDHS) and

*Chapter 2*

*Addressing Environmental Justice Problems*

community health workers from Promotoras Comunitarias and Head Start. The purpose of this effort is to determine the impact of California's worker safety regulations on farmworker health. Survey participants will be drawn from outreach efforts in San Luis Obispo County.

## Persistent Bio-Accumulative Toxins Problems and Solutions

**Persistent Bio-Accumulative Toxins (PBT) Initiative and Alaskan Tribes.** EPA is increasingly concerned about a set of toxic chemicals that don't break down easily in the environment – chemicals known for their high toxicity, and for their ability to build up in the foodchain, and is making these chemicals a high priority for further reductions in the environment. This effort, named the Persistent, Bio-accumulative, and Toxic Pollutants (PBT) Initiative, will pay particular attention to human populations and ecosystems that have high exposures to PBT contaminants.

Alaska and Alaska Natives are particularly challenged by PBTs, because PBTs tend to accumulate in cold climates like Alaska, and Alaska Natives are heavily dependent on Alaskan wildlife, which accumulate elevated amounts of PBT's in their fatty tissues. Alaska Natives have been very interested in having analysis done to learn what the PBT concentrations are in the subsistence foods they rely on. A few years ago, Region 10 and the Office of Indoor Air and Radiation (OAR) launched the Traditional Knowledge Project, an effort that aims to build the capacity among Alaska Native tribes to address their own concerns about toxic and radionuclides contamination and changes in their environment. In FY 2000, Region 10, OAR, along with several more EPA offices, have provided resources to Alaska Native tribes along the Pacific coast to complete laboratory analysis of sea gull eggs they've collected to assess the level of PBT contamination. This may be only the second time that such laboratory analysis has been conducted in Alaska, and the first time that tribes have had significant control in terms of designing the analysis. The tribes have been trained to collect samples for analysis, using a tribal consensual process for choosing species of animals for analysis, and the tribes have determined which contaminants to analyze. Members of Alaska Native tribes from southeast Alaska to the western tip of the Aleutian Island Chain will be able to participate in this initiative. The information collected will also become a part of the international environmental data collection on the Arctic and near-Arctic regions.

In addition, Region 10 and OPPT are working together on the FY 2000 tribal budget initiative. The first year of the project has been supported by Region 10's multi-year Tradition Knowledge Project. Program directions for later years are currently being explored.

———

*Chapter 2*
## *Addressing Environmental Justice Problems*

### **Fish Contamination Problems and Solutions**

**Alaskan Watershed Assistance.** The Office of Wetlands, Oceans, and Watersheds, through a cooperative agreement with the River Network, has supported two Watershed Assistance Grants (WAGs) in Alaskan communities to support watershed-wide networks of community-based groups and to help strengthen their capacities to secure long-term watershed protection strategies.

One WAG supported activities in the Cook Inlet basin in Homer, Alaska, with special focus in the Alaska Native villages. Cook Inlet communities receive technical support with Geographic Information Systems (GIS) projects, volunteer water quality monitoring support, and networking support by building the capacity of community-based watershed groups. Another WAG in the Native Village of Kwinhagak (NVK) helped establish key partnerships and build capacity for NVK to manage watershed concerns by supporting activities such as: hiring watershed technical support staff, and providing assistance with issues relating to water rights and management responsibilities in the Topiak National Wildlife Refuge (which encompasses NVK).

**Washington, D.C. Volunteer Water Monitoring Workshop.** In October, 2000 the Coastal Management Branch conducted a two-day Volunteer Water Monitoring Workshop in Washington, D.C. The Workshop provided a forum for training volunteer water monitor leaders in the Washington, D.C. area. The key partner was the Earth Conservation Corps, which includes low-income minority residents of the Washington, D.C. area. The Workshop provided training in all aspects of monitoring, including data collection, analysis, and quality assurance/quality control. Related issues such as publicity, fund-raising, and partnerships were also covered, and to accommodate the needs of young adult leaders, a roundtable on water monitoring careers was conducted. One of the goals of this effort is to have a positive influence and focus on building the capacity of at-risk young adults so that they will become future leaders and role models for other disadvantaged youth in the area.

### **Region 9**

**DDT and PCB Contamination in Fish, California.** A large deposit of contaminated sediment off the coast of the Palos Verdes Shelf is responsible for elevated DDT and PCB levels in white croaker and other fish from that area that are popular within the Asian community. Region 9's Superfund Program began its investigation of the Palos Verdes Shelf in July 1996. The investigation is ongoing, but the results of the human health risk evaluation indicate that the consumption of certain fish from this area, particularly white croaker, may pose serious health risks to recreational anglers and their families. Also, despite the commercial fishing ban on white croaker from the Palos Verdes Shelf area, contaminated white croaker continue to turn up in local fish markets (primarily in Asian communities). In March 2000, Region 9 issued a Proposed Plan for institutional controls (enforcement, public outreach/education and monitoring) as an interim response action for the area.

*Chapter 2*
*Addressing Environmental Justice Problems*

In July 2000, Region 9 began field work on a 3 month pilot capping project at the Palos Verdes Shelf that is designed to evaluate methods of cap construction and the associated short-term impacts. California Department of Health Services (CDHS) will oversee and evaluate the field testing of outreach materials and programs. After evaluating public comments, Region 9 will issue a decision on implementing the institutional controls described in the Proposed Plan. The Agency has also provided funds to the CDHS to develop a pilot public outreach and education plan on the fish consumption advisories. CDHS is currently working with several community-based organizations to develop pilot outreach materials and programs that will be tested.

**Region 10**

**Asian and Pacific Islander Fish and Shellfish Consumption Studies, Washington.** A study was conducted by Region 10, the University of Washington, National Institute for Environmental Health Sciences, and the Refugee Federation Service Center in Seattle, Washington to describe and quantify the seafood consumption habits of the Asian and Pacific Islander (API) communities within King County. The study was a first step towards gathering necessary information to determine what risks the API communities may face from consuming contaminated seafood and to balance such risks with the significant health and cultural benefits associated with seafood consumption. Results of the study indicate that the API communities consumed seafood at a very high rate with the predominate seafood consumed being shellfish. First generation APIs consumed more fish than the second generation APIs and members of the Vietnamese and Japanese communities had the highest consumption and the Mien, Hmong  and Samoan communities consumed the least seafood. The study results also indicated that members of the Mien, Hmong and Laotian communities consumed more seafood that was harvested from local waters, rather than purchased commercially, and that members of the API community were interested in learning more about health issues surrounding eating fish, the safety of seafood harvested from local waters, and the safe preparation methods of seafood.

*Chapter 2*

*Addressing Environmental Justice Problems*

**Tribal Fish Consumption Studies, Washington**. The Tulalip and Squaxin Island Tribes of the Puget Sound Region of Washington, in cooperation with Region 10's Office of Water, conducted a survey of their communities to determine their fish and shellfish consumption rates. The survey included all age groups and obtained information on the species and fish parts consumed, preparation methods, and sources of fish. Information from the interviews was utilized to develop weight-adjusted consumption rates by tribe, age, gender, income and species groups. The results of the surveys indicated that the consumption rates were high with adult males having the highest consumption rates and the fish were prepared and eaten in a manner that tended to reduce intake of contaminants.

<u>**Drinking Water Problems and Solutions**</u>

**Region 6**

**Comprehensive Performance Evaluation (CPE) of Drinking Water in Mossville, Louisiana.**
In response to citizen concerns regarding drinking water quality in Mossville, LA, Region 6 sampled the Mossville system in 1998 for Volatile Organic Compounds (VOCs), and in 1999 for dioxin. No compounds were detected above the drinking water standards for any compound tested. The first ever CPE at the Mossville public water system was conducted in 1999 by Region 6 and the Louisiana Department of Health and Hospitals (LDHH-the primacy agency responsible for implementing the Safe Drinking Water Act (SDWA) in LA). The Mossville system is in compliance with all SDWA standards, but the CPE identified some performance limiting factors that the operator began working on immediately to correct.

**Region 10**

**Contaminated Drinking Water in Alaska Native Villages.** Office of Water is currently funding a pilot program, at the request of Alaska villages, that is assessing the quality of traditional sources of drinking water and the potable water transport mechanisms, in three rural Alaska villages. The goal of the program is to raise awareness of possible sources and routes of contamination, and help the Native Villages make informed decisions about their drinking water. Initial assessment results indicate that the majority of the sources and transport mechanisms are contaminated with coliform bacteria at levels that can pose serious health effects._____

<u>**Concentrated Animal Feeding Operations**</u>

**Region 6**

Concentrated Animal Feeding Operations (CAFOs) in Region 6 are being evaluated with a cumulative risk screening methodology created by the Region. The methodology accesses

*Chapter 2*

*Addressing Environmental Justice Problems*

demographic information regarding population, proximity of residents to potential pollution sources, minority representation, and economic status of evaluated rural communities, which is of use to the CAFO industries. The CAFO industries in Oklahoma are using the risk - environmental justice analysis to assess their present locations and to evaluate future corporate farm sites. The information has been incorporated into industry environmental impact statements submitted to Region 6.

> **Animal Feeding Operations**
> "Feedlots" have been at the center of a number of environmental justice complaints and highly visible ecological problems (e.g., new hog operations in poor African-American communities in eastern North Carolina and the possibility of pfiesteria. outbreaks).

## Communities with Multiple Problems

**Anacostia River Cleanup, Washington, D.C.** The Ocean, Coastal Protection Division, of EPA' Office of Water, has partnered with the Center for Marine Conservation (CMC) to establish and maintain the annual International Coastal Cleanup Campaign (ICCC). The ICCC has the largest volunteer environmental data gathering and associated cleanup of coastal and underwater areas in the world. It is designed to increase public awareness about the impact of trash on our aquatic environments. The ICCC provides inspiration to hundreds of thousands of people who will mobilize along our waterways and beaches for the annual cleanup on the third Saturday of every September. Since 1986, the cleanup has grown from 2,800 volunteers on the coast of Texas to more than 500,000 volunteers in 55 states and territories of the U.S. and more than 90 countries annually. In 1998, over 509,000 volunteers from 74 countries cleaned up 5,300,484 pounds of trash from 12,169 miles of beaches and underwater sites. Once the trash has been collected, it is cataloged and the data is sent to the CMC for compilation and dissemination. Since 1986, EPA has provided financial, technical, and volunteer support to this effort. One of the locations EPA has focused on to address aquatic debris in the Washington, DC area is a tributary of the Anacostia River. The cleanup site is located in a minority neighborhood near the Anacostia River and has been popular for EPA employees and local communities for many years. Since this particular effort is designed to address the impact of debris in this impoverished area and help create local sustainability of the Anacostia River, EPA, CMC, and the National Park Service will continue to partner to increase local neighborhood participation in this event.

# Chapter 2

## Addressing Environmental Justice Problems

### Region 1

**Alternatives for Community & Environment (ACE) Smart Redevelopment for Roxbury, Massachusetts.** Based in Roxbury, Boston's poorest neighborhood of color, ACE works with low-income communities and communities of color throughout Massachusetts to solve environmental and public health problems and build environmental leadership. This project brought together ACE's neighborhood partners to create strategies to integrate transportation, economic, and environmental concerns into proposed developments. To capitalize on the unprecedented economic boom in Boston, ACE has been working to ensure that development is accompanied by transportation and environmental improvements. These improvements will provide long-lasting benefits for those who live, learn, work, and play in Roxbury. Funding from Region 1 supports development of strategies for educating residents about the current development process, ensuring that resident concerns are addressed during the development planning and review process, and assessing the cumulative impacts of proposed projects.

**South Branch of the Park River - Urban Greenspace Revitalization Project, Connecticut.** The Eastern Connecticut Resource Conservation and Development Area (CTRC&D) program was created to assist local citizens in developing and carrying out action plans for the social, economic, and environmental betterment of their communities. The goal of the Region 1 Urban Environmental Initiative Community Grant project is to restore, maintain and enhance the ecological integrity and social viability of the South Branch of the Park River

Watershed, in the Behind the Rock neighborhood. This revitalization project will improve the environment of the Behind the Rock neighborhood by converting an overgrown dumping area into an open space for public use by removal of trash and undesirable species. The park will be landscaped with benches and flower pots. The area will be converted into a public park with the installation of walking trails and bikeways for the community.



**Public Health Burdens in Chelsea, Massachusetts.**
Region 1's Urban Environmental Initiative (UEI) has worked with community partners to address the disproportionate environment and public health burdens in the cities of Chelsea and East Boston, MA. There are 21 towns within the 120 square mile Mystic River Watershed which is home to the Chelsea River and Mill Creek. The Chelsea River is home to 50% of the New England petroleum fuel needs and 100% of Logan Airport's fuel needs. 173,061,000 gallons of fuel are transported through the Chelsea River Bridge each month. On June 8, 2000 the largest oil spill in Boston history

*Chapter 2*

*Addressing Environmental Justice Problems*

occurred in the Chelsea River – a total of 58,000 gallons of #6 fuel oil were dumped into the river due to a tug boat collision with the 591 foot long oil tanker Posavina. Member organizations of the Chelsea Creek Action Group applied jointly to EPA for funding in January 1998 to undertake a comparative risk assessment.

When this project was first proposed and presentations were made to the community, there was very little interest. The scope and magnitude of the project, like the environmental issues themselves, had overwhelmed and demoralized community residents. Outreach and support from the UEI helped unite the community and empower organizations to apply and secure funding to initiate a two year process to conduct a first-of-its-kind community-based comparative risk assessment to identify and evaluate targeted environmental, social, and public health issues affecting local residents in Chelsea and East Boston.

UEI also worked with community partners to organize and mobilize a movement of youth and citizens in the cities of Revere and Chelsea who are committed to the development of wetland conservation, education, and collaborative programming to address wetland restoration and preservation in the areas of the Rumney Marsh in Revere, and the Mill Creek in Chelsea. Utilizing the energy and enthusiasm of 10 full-time Youth STAR members, between the ages of 16 and 24, work is being done to develop wetland education workshops and community forums to target the greater populations of Chelsea and Revere, create and provide wetland activities and education projects for elementary and middle school age children from both cities, and design and implement outreach campaigns targeting wetland perimeter households.

——————

**Significant, Sustained Enforcement and Compliance Assistance Presence in the Woonasquatucket River area of Providence, Rhode Island.** In 1998 and 1999, Region 1 undertook an intensive enforcement sweep of potential pollution sources to the Woonasquatucket River, and initiated an ambitious pollution prevention assistance effort targeted to auto body shops, auto repair facilities and junkyards along and near the river. Following up on information gathered by Region 1's Urban Enforcement Team, the Region conducted inspections at various types of manufacturing facilities in the Woonasquatucket River watershed, which includes the towns of Smithfield, Johnston, North Providence, North Smithfield and Providence. The inspections focused on underground storage tanks, wastewater discharges, hazardous waste storage and handling, and various other environmental compliance issues.

Region 1 also boosted its pollution prevention and technical assistance efforts in the area. The region's technical assistance team visited three-dozen auto body and auto repairs facilities to offer technical assistance on various environmental issues, including storm drain practices, hazardous waste storage and handling procedures and air emission requirements concerning auto body work. The region also conducted a cooperative effort with the Rhode Island Department of Environmental Management to inform dozens of junkyard owners in the watershed about regulatory requirements for developing and implementing stormwater management plans.

*Chapter 2*

*Addressing Environmental Justice Problems*

**Region 8**

**Health Concerns in North Denver, Colorado.**  The North Denver environmental justice community has multiple problems and Region 8 has begun several projects, in coordination with other organizations, to begin to solve these problems. The Vasquez Blvd./I 70 Superfund project and related health studies are addressing health concerns and health risks from elevated arsenic and lead levels in North Denver residents' yards and gardens, through removals of contaminated soils in residential areas.  The North Denver Environmental Initiative is addressing North Denver residents' non-Vasquez Blvd./I-70 Superfund health concerns, such as asthma, respiratory problems, increased cancer risk, through increased enforcement, compliance assistance, and pollution prevention activities. The Northeast Metro Pollution Prevention Alliance is also addressing North Denver residents' non-Superfund health concerns, through increased pollution prevention activities for industries such as trucking facilities and automotive repair shops.

## Children's Health Problems and Solutions

**Region 4**

**Region 4 Child Health Champion (CHC) Campaign Pilot.**  The CHC Campaign is a program initiated by EPA's Office of Children's Health Protection to empower local citizens and communities to take steps toward protecting their children from environmental health threats. Region 4 selected Prichard, Alabama, an environmental justice area, for this campaign.  A community team, representing health care, education, local government, and business has developed and is implementing an action plan to address two environmental health hazards of greatest concern to their community; childhood asthma and lead poisoning. The community team has developed partnerships with an elementary school to gather absenteeism statistics due to asthma and to implement several education and outreach programs.  The community team has established an information hotline and repository and has conducted several education and outreach activities. As a result of the screening programs that are being conducted, children with elevated blood lead levels have been identified.  The community team is also implementing EPA's "Tools for Schools" program in both the public and private schools with special emphasis on reducing children's exposure to asthma triggers and pesticides.

**Children's Pesticide, Asbestos and Lead (PAL) Environmental Health Education and Outreach Initiative.**  The PAL Initiative is a community-based program designed to minimize children's exposures to environmental health hazards which include lead-based paint, pesticides, secondhand smoke, radon, polychlorinated biphenyls (PCBs), and asbestos. In collaboration with

*Chapter 2*

*Addressing Environmental Justice Problems*

community organizations, Region 4's Pesticides and Toxic Substances Branch has conducted the Children's PAL Initiative in Baldwin County, Georgia and is now implementing this Initiative in Birmingham, Alabama, a community which has significant concerns with children's environmental hazards. The inner city area of Birmingham, Alabama is an environmental justice area with high percentages of housing with lead-based paint, asbestos, and significant Toxic Release Inventory (TRI) emissions in the area.

The program includes development and implementation of community specific educational programs for parents, children, educators, and decision-makers. Opportunities will be explored to implement interventions that will address several children's health issues and address the needs and interests of the community (i.e., childhood lead poisoning, asthma, pesticide poisoning). The program will utilize resources in the community and government to help empower families and neighborhoods to take better care of their children's environment. This project will also incorporate many ongoing Agency voluntary initiatives including the Tools for Schools Program, Integrated Pest Management in Schools, and other programs (i.e. asbestos, PCB's, asthma, radon) which address children's environmental health hazards. Information on the process to develop this community-based education and outreach project has been presented at national clinical and public health conferences.

**Children's Health Issues in Anniston, Alabama.** Region 4's Children's Environmental Health Program has provided education and outreach material for the community in Anniston, Alabama impacted by the superfund site and other sources. The Region is planning to coordinate with the Pediatric Environmental Health Speciality Unit (PEHSU) to provide education to physicians in Anniston, Alabama.

**Pediatric Environmental Health Speciality Unit (PEHSU).** Region 4 and the Agency for Toxic Substances and Disease Registry (ATSDR) have established a Pediatric Environmental Health Speciality Unit (PEHSU) at Emory University. The PEHSU will provide medical education, expert consultation, and training to evaluate the potential adverse health impacts to young children exposed to environmental contaminants. The PEHSU will serve as a regional resource for pediatricians, other health care providers, parents, teachers, the public, and the Region 4 and ATSDR staff. The PEHSU will also focus on pediatric environmental medicine as well as clinical specialty referrals for children.

**Region 6**

**Healthy Kids, Healthy Communities Project, Albuquerque, New Mexico.** A Region 6 community-based children's health project is being piloted in the community of Sawmill, a predominately Hispanic neighborhood, located in Albuquerque, New Mexico. The neighborhood is part of an area that has been identified as the "pocket of poverty" of Albuquerque. Hispanics

# Chapter 2

## Addressing Environmental Justice Problems

comprise approximately 77% of the population in this community. Sawmill also has a higher than average percentage of elderly, when compared with the rest of the city. The project centers around training residents of the community to perform indoor environmental assessments of homes, home-based day care, and schools. Indoor environmental risks that children are exposed to are identified, and recommendations are made for risk reduction. All environmental media are included; however, the project centers on issues that are within the control of the care-giver. Environmental risks to be evaluated include lead-based paint, radon, environmental tobacco smoke, pesticides, hazardous household chemicals, and asthma triggers. The American Lung Association of New Mexico is administering the project, with guidance from a community coalition that includes the City of Albuquerque Environmental Health Department, and other local agencies and non-profit groups concerned with children health.

### Region 7

**New Madrid County Tri-Community Health Campaign.** In a partnership with Region 7 and the U.S. Department of Agriculture, the New Madrid County Tri-Community Child Health Champion Campaign was developed to increase efforts to identify, mobilize, and make use of Federal resources to benefit environmentally and economically distressed communities. The major focus of the project has centered around improving the health of the children in the communities. Lead poisoning, asthma/allergies, and water quality are specific areas of concern to children's health. Region 7 is facilitating efforts to help coordinate others joining this partnership to provide assistance to the communities of New Madrid.

### Region 9

**Childhood Champion Pilots - Asthma.** Region 9 has two pilot projects, one in Los Angeles and the second in Nogales, Arizona. Both projects are focusing on asthma and the use of education and outreach tools that can help children and parents understand the disease, and the actions they can take to address asthma. The Los Angeles project involves a cooperative effort between Mothers's of East Los Angeles (a local community group), the American Lung Association (a national NGO) and the City of LA. The Nogales project pays for *promotoras,* locally known, Spanish-speaking, home health care workers, to visit the homes of families with asthmatic children and help reduce exposure to asthmagens.

**Pesticides in Schools, California.** Region 9 has awarded a $30,500 grant to the Pajaro Valley Unified School District to assist them in reducing the use of chemicals for pest management on school grounds. The District is a predominately Latino farmworker community. This District has assembled a committee of parents, teachers, and district staff to work with Region 9 to find alternative methods for controlling indoor and outdoor pests at all school sites.

*Chapter 2*
*Addressing Environmental Justice Problems*

**National Lead-Safe Kids Coalition Project.** Through a cooperative agreement with the National Lead-Safe Kids Coalition, the Office of Pollution Prevention and Toxics' (OPPT) National Program Chemical Division supported the national distribution of the EPA publication Lead In Your Home: A Parent's Reference Guide (the Parent's Guide) through retail grocery stores in targeted communities. The National Lead-Safe Kids Coalition has also worked with dairies to place a lead awareness message on milk cartons at stores across the country. The message emphasizes the importance of calcium as an inhibitor of lead absorption in the body.

**Lead Poisoning Prevention.** The Region 9 Lead Program works closely with the California state and county lead programs and the state lead programs in Arizona and Hawaii. Lead hazard materials are made available for lead screening, home visits, and community programs and fairs. Last year Region 9 worked with the U.S. Department of Agriculture's Women, Infants and Children Program (WIC) to provide 18,000 copies of lead materials for distribution to WIC clients. The lead program also worked with Head Start, providing materials to 94 Head Start centers in Los Angeles County and 83 in Sacramento County. Region 9 plans on expanding this approach to other California counties in the future.

**Expanding Adoption of Indoor Air Quality (IAQ) Tools for Schools.** Region 9 Indoor Environments Team has an ambitious program to encourage schools to adopt the IAQ Tools for Schools program. The Team has trained more than 800 school district personnel and is now focusing on individual pilot schools within selected districts, and assisting the schools through initial implementation. Partners include state agencies, educational organizations, and the American Lung Association, which has created a model pilot "Mentor" program with the American Industrial Hygiene Association. The focus in 1999 was on four implementing districts: San Francisco, Oakland, Saugus Union, and Beverly Hills.

**Urban Particulate Matter and Ozone Air Monitoring Project.** Childhood asthma is dramatically increasing in urban areas and is a leading cause of school absences and hospital admissions for children. Castlemont High School in Oakland, California is one of two schools receiving an EPA Environmental Monitoring Public Access and Community Tracking (EMPACT) grant for the installation of particulate and ozone monitors and a weather station. The project focuses on empowering kids of color who normally would not have the opportunity to learn about particulate and ozone levels and the associated monitoring equipment. Data from the monitors will be available to the public via a Web site. The project will provide the students with hands-on experiences and the community will have access to information about air quality.

*Chapter 2*

*Addressing Environmental Justice Problems*

**Pesticides at the U.S./Mexico Border**. Region 9 is participating on the San Diego Advisory Committee for the California Department of Health Services (CHDS) outreach project on their report on "Pesticide Use in California" which analysed pesticide use levels around schools in Imperial and San Diego Counties. In 1998, EPA Headquarters contracted with CDHS to participate in Phase 1 of a three phase EPA research effort on pesticides' health affects on children at the Mexico Border, with Phase 1 focused on collecting information about pesticide use along the whole US Mexico Border. CDHS is planning an outreach effort to educate the public about their report, and has established advisory committees in both Imperial and San Diego counties to formulate the outreach strategy. The group is proposing outreach to land use planners and city officials to encourage them to use this information in land use planning decisions, particularly in the siting of schools and day care centers.

**Asthma Training for Border Schools.** The American Lung Association of San Diego and Imperial counties received an EPA grant to conduct asthma education for children along the U.S. Mexico border. Asthma hospitalization rates for children living in Imperial County, California and in Mexicali, Mexico are two to three times higher than those for California as a whole. Pesticide exposure, unhealthful levels of ozone and particulate air pollution, and poor asthma control may be contributing to these higher rates. Under this grant, Open Airways for Schools training will be held in fifteen low income schools in San Diego and Imperial Counties. The grant will also build capacity for similar programs in Mexicali.

**Children's Environmental Health Network (CEHN)**. Region 9 awarded a grant to CEHN to expand and revise their web site focused on children's health issues. The site introduces and guides newcomers to children's health issues and helps organizations incorporate children's environmental health concerns into their ongoing activities. It includes pointers to 222 other organizations. Currently the site is visited by 30,000 users each month. The web site address is: http://www.cehn.org

**Region 10**

**Children's Health Protection Workshop, Washington.** A Children's Health Protection workshop was held on January 18, 2000 at the Region 10 EPA office. The workshop's goals were to inform, network, brainstorm, and link the resources of Region 10, the University of Washington (UW), and other children's health representatives. Discussions focused on the UW Institute for Risk Analysis and Risk Communication's activities, Fred Hutchinson Cancer Research Center's community intervention project, Yakima Valley asthma monitoring, lead poisoning programs, the Urban

*Chapter 2*

*Addressing Environmental Justice Problems*

Pesticide Initiative, and the Infant Mortality Project - Shoal water Tribe, Washington. The Office of Civil Rights and Environmental Justice highlighted the grantee's work addressing children's health protection, including projects related to asthma, lead poisoning, and contaminated drinking water.

## State Efforts

**Oregon Environmental Justice Initiative**. Region 10's Oregon Operations Office, Office for Civil Rights and Environmental Justice, Office of Enforcement and Compliance, and Office of Waste and Chemical Management, along with the US Attorney's Office for the District of Oregon partnered to sponsor an environmental justice initiative in Oregon. The Oregon Environmental Justice Initiative is a three year project (2000-2003) designed to identify and mobilize federal resources to benefit environmental justice communities in Oregon. A major focus of this project is to improve public health through outreach, education, and enforcement. Federal, tribal, state, and local government partners will work with community groups to accomplish three community identified needs in Oregon: (1) reduce lead exposure in urban areas, (2) reduce pesticide exposure in rural areas, and (3) support tribal efforts to reduce illegal dumping on tribal lands. It is hoped that this approach to environmental problem solving, using the tools of enforcement and community-based research and education, will be implemented in other regions. The Initiative's goals for 2001 are: (1) develop one significant judicial lead enforcement case, (2) develop one significant judicial pesticides enforcement case, and (3) develop one significant dumping case in Indian country.

**Vermont Department of Environmental Conservation.** Vermont received a $100,000 grant from EPA to achieve both compliance with environmental standards and remediation of adverse environmental conditions at mobile home parks while meeting the affordable housing needs of thousands of low-income Vermonters. The two specific goals of the project are: (1) Obtain compliance and reduce or prevent disproportionate adverse environmental and health effects on mobile home park residents, and (2) Develop enabling infrastructure at the state and local level with technical and legal resources available to assist mobile home park residents. This project seeks to address the unique environmental and public health concerns which impact mobile home park residence. Five state agencies have formed a mobile home park compliance group to share information, expertise, and authority to develop and implement solutions for mobile home park problems that previously seemed unsolvable from an individual agency perspective. The greatest need remains to be the implementation of technically practicable, as well as cost-effective, solutions to sewage disposal problems and water supply problems which plague many mobile home parks.

*Chapter 2*
*Addressing Environmental Justice Problems*

**New Jersey Department of Environmental Protection.**    The New Jersey Department of Environmental Protection (DEP) developed the New Jersey Environmental Equity Community Partnership Program, through a $100,000 grant from EPA, to establish and incorporate an "Environmental Justice Screening Process" for evaluating environmental justice issues of affected communities with respect to Air, Water, and/or Federal Hazardous Waste facility permits. Based upon the results from the environmental justice Screening Process, the DEP is working to establish an Environmental Equity Community Partnership (EECP) Program in those minority and/or low-income communities that may be experiencing a cumulative environmental burden. The State also created an "Environmental Equity" Policy which is available on their web site at: www.state.nj.us/dep/equity/

**Tennessee Environmental Policy Office.** Tennessee developed an environmental justice strategic plan, with a $100,000 grant awarded by EPA. The State created its strategic plan, with significant community involvement, that is to guide all environmental justice activities of the Tennessee Department of Environment and Conservation (TDEC) and serve as a state and national model. The State is addressing environmental justice through three major components: (1) Achieving an integrated system of meaningful community involvement and participation through networks, such as Tennessee' regional Minority Health Coalitions and other organizations, (2) Integrating environmental justice strategies with a major ongoing initiative to re-engineer the Department's environmental regulatory programs, and (3) Developing and strengthening partnerships with other state and federal agencies. The State's Environmental Justice Strategic Plan can be found at the following web address: www.state.tn.us/environment/epo/ej/index.

**Texas Natural Resource Conservation Commission.** The Texas Natural Resource Commission (TNRCC) is working to enhance its effectiveness in complying with Title VI of the 1964 Civil Rights Act, with assistance from a $100,000 grant from EPA. This effort is being made through the creation and guidance of a stakeholder advisory panel. The State developed the project goals with input from various communities that have filed Title VI complaints against the TNRCC or which have raised issues of environmental justice with the agency in order to determine the best course of action to reduce the possibility for future complaints. The advisory panel, made up of the partnering community representatives from Beaumont, Corpus Christi, Houston, and Wichita Falls--along with the TNRCC Chairman or his appointee, Public Interest Counsel, Office of Legal Services--Supplemental Environmental Projects, and a representative from a regional field office, are helping develop model programs to be piloted in their respective areas to address enforcement and compliance concerns.

*Chapter 2*
*Addressing Environmental Justice Problems*

**State of Connecticut Department of Environmental Protection.** Connecticut is developing a "Model Multi-Cultural Public Participation Plan," through the assistance of a $100,000 grant from EPA. The state created and is working with a review team, comprised of state agency representatives and to include community-based grantee organizations, once they are selected through a competitive process. CTDEP is conducting training workshops with local zoning and planning officials, CTDEP staff, and the review team to: (1) familiarize the community-based organizations about the existing siting, public notification, and public participation procedures, and (2) engage in facilitated discussions of specific notification and informational needs within their communities. Through the review team's analysis of the state's existing public notification and participation process, the state will develop recommendations on how to implement a program to increase public notice and participation among low-income and minority communities. The result will be a model statewide public participation plan designed to improve public participation and to prevent discriminatory effects from Connecticut's permitting and other regulatory processes. The Connecticut model will be made available for distribution to other communities throughout the country.

**New York State Department of Environmental Conservation (NYSDEC).** New York is working to develop an Environmental Justice policy, with support from a $100,000 EPA grant. NYSDEC has: (1) formed a multi-stakeholder Environmental Justice Advisory Group that reports to the Commissioner, (2) is developing an environmental justice permit policy that would articulate guidelines for addressing environmental justice issues which arise in permitting, (3) has enhanced the Department's Web site which enables the state to provide better and more timely information to the public, such as receipt of permit applications, among other things, (4) are conducting a series of legislative hearings throughout the state (to identify environmental justice concerns, to enhance public participation in development and implementation of the state's environmental justice program, encourage communities in planning for environmental and economic enhancement, and integrate environmental justice concerns into local land use planning, and related state and local activities); and (5) are seeking recommendations, from the Advisory Group, for a strategic environmental justice plan for the Department and the State of New York. Information on the state's environmental justice program can be found at the following web address:
www.dec.state.ny.us/website/ej/index.html

**Indiana Department of Environmental Management (IDEM).** Through the assistance of a $100,000 grant from EPA, the state is working directly, and in partnership, with Indiana communities to develop an environmental justice strategy to integrate environmental justice goals into the Department's policies, programs and activities. The program is based on the following principles: (1) awareness & sensitivity, (2) public participation, (3) inclusiveness, (4) pro-activity, and (5) sustainability. Through this project, IDEM is doing the following: (1) Supporting a diverse Environmental Justice Advisory Committee which is developing the Environmental Justice Strategic

*Chapter 2*

*Addressing Environmental Justice Problems*

Plan, (2) Mapping concentrations of low income/minority populations and environmental impacts, (3) Educating communities about environmental issues and how they can get involved, (4) Developing a training program to train IDEM staff on environmental justice issues and how they can be more responsive to environmental justice concerns, (5) Determining how to include the implementation of the Strategic Plan into the Performance Partnership Agreement, (6) Establishing a single point of contact within IDEM to respond to environmental justice concerns, (7) Developing a protocol for facilitation of environmental disputes so that disputes can be resolved prior to decision making, (8) Evaluating, with community input, existing IDEM decision making processes regarding rule making & permitting, enhancing public participation opportunities, and the way in which IDEM communicates with the public, (9) Preparing a written commitment by IDEM to implement the strategy, including a time-line for implementation, and 10) Evaluating whether the strategy is being implemented within IDEM and how well it is being implemented.

**Minnesota Pollution Control Agency (MPCA).** The state is developing a strategic framework to incorporate environmental justice into its programs, which is being supported by an EPA grant of $100,000. The state is working directly with communities to improve consideration of environmental justice concerns and compliance with Title VI in the state's environmental programs. Specifically, MPCA is: (1) Working with an advisory task force, consisting of representatives from multiple organizations representing minority communities where most environmental injustices are found, (2) Developing and disseminating environmental, geographic and demographic data to support outreach efforts and environmental program implementation, and (3) Developing a plan to integrate environmental justice considerations into MPCA's decision-making and communication strategies. MPCA is also committed to initiating a network of other state agencies to collaborate and address environmental justice issues.

### Tribal Efforts

**Kalispel Tribe of Indians.** The Kalispel Tribe obtained a grant of $100,000 to develop and implement an ISO 14001 conforming Environmental Management System (EMS) that integrates environmental justice goals with environmental performance objectives for the Kalispel reservation. The Kalispel Tribe developed the proposal with the support and advice of grassroots organizations, the Director of the Washington Department of Ecology and his staff, Pend Oreille County, and the Coeur D'Alene, Colville and Spokane Tribes. The ISO 14001 standard, establishes an internationally accepted framework for EMSs which can serve as a sustainable program that: (1) allows meaningful involvement of all members of the tribe in the development of goals for an environmental program, (2) prevents impacts from being disproportionately borne by subgroups within the tribe, (3) goes above and beyond compliance with environmental laws, (4) reduces pollution and pro-actively prevents pollution, and (5) ensures fair treatment.

*Chapter 2*

*Addressing Environmental Justice Problems*

**Maniilaq Association.** The Maniilaq Association, a consortium of 11 Tribes of Northwest Arctic Region, received a $100,000 grant from EPA to identify, investigate, and document the environmental burdens placed on the Native people of the Alaska region. In addition, through the education of regional village representatives on how environmental justice issues are relevant to tribal concerns, this serves to evaluate the environmental injustices experienced by the native people of the Northwest Arctic over the last few decades, and to inform tribes on the importance of implementing environmental justice in tribal activities. An environmental justice guide is being developed and shared with the tribes of the Association. The document will serve as a tool to be used by tribes for evaluating environmental violations and as an environmental justice outreach and education tool. The guide will also be available to private, state and federal agencies as a reference to examine their compliance with environmental mandates.

## Federal Facilities Problems and Solutions

### Region 6

**Contamination at Kelly Air Force Base.** Kelly Air Force Base (KAFB) has been targeted for realignment and closure beginning in 2001. The KAFB soil contaminants include solvents, metals, petroleum, paint products and various other products used for aircraft maintenance and repair. Contaminants in shallow groundwater beneath KAFB and off-base include metals, solvents, and fuel constituents. A large chlorinated solvent plume has been identified offsite of the east KAFB boundary. Delineation efforts indicate the plume extends at least three miles to the east and two miles southeast. Region 6 has worked with the Kelly Gardens community to address environmental justice concerns. The agency has participated in site tours of communities adjoining KAFB and other San Antonio areas as well. Community-based organization representatives lead by the Southwest Public Workers Union, PODER and the Southwest Network have met with EPA and Texas Natural Resources Conservation commission on numerous occasions to discuss concerns and possible actions to address those concerns. ATSDR was petitioned by the late Congressman Frank Tejeda to perform a health assessment of the neighborhoods north and southeast of KAFB. ATSDR prepared a Public Health Assessment (PHA) - Phase I of KAFB and the surrounding community which was released on August 24, 1999. This report indicated that the community is not currently exposed to levels of contamination from KAFB that would cause citizens to become ill; however, the community may have been exposed to higher levels in the past. Since April 2000, the Air Force has been hosting public forums to discuss shallow groundwater contamination due to past activities. Currently 60-70 foram have been held for various community groups as well as interested businesses and political groups, additional forums are anticipated.

*Chapter 2*

*Addressing Environmental Justice Problems*

## Using Supplemental Environmental Projects to Address Problems

**Region 5**

**Supplemental Environmental Projects in the Greater Chicago Area.** Representatives of Illinois EPA and U.S. EPA hosted a meeting with approximately 20 representatives of environmental groups to discuss supplemental environmental projects (SEPs), and the development of a SEP bank related to enforcement cases in the Greater Chicago area. Citizens for a Better Environment coordinated outreach to environmental groups, and encouraged attendance. After providing some background information regarding SEPs, including the federal SEP policy, and responding to questions, the group brainstormed on developing SEP projects. The agencies committed to circulating a list of project ideas for development by environmental groups. The meeting was well received by the groups in attendance. A similar meeting is planned for municipal representatives.

## Alternative Dispute Resolutions - A Tool for Finding Solutions

The Office of Environmental Justice (OEJ) initiated a pilot program to provide low or no-cost access to dispute resolution professionals to stakeholders involved in conflicts involving environmental justice issues. Through this program, OEJ hopes to understand better the value and appropriate use of dispute resolution techniques (e.g. mediation, facilitated dialogue, etc.) to environmental justice disputes. In addition, OEJ hopes to help parties bring specific conflicts to and equitable and just conclusion.

Environmental justice issues frequently demand complex decisions on equity, social and economic revitalization, health, and maintenance or improvement of a clean, safe environment. Frequently, these disputes are made even more complex by lack of information, lack of understanding of stakeholder concerns, lack of trust among parties, and frequently a longstanding history of uneasy relationships. Dispute resolution techniques have helped resolve disputes having these attributes in other contexts, and they hold promise for environmental justice disputes, as well.

However, before dispute resolution techniques are used widely it will be important to understand better how to address: cross-cultural differences; ability of a single or small number of individuals to "speak for a community;" and severe differences in power among parties. Through attention to these issues, OEJ seeks to create a record of experience that will help parties better understand how non-adversarial techniques can be used in an appropriate and effective manner.

Thus far, the pilot program has provided assistance to the implementation of a Superfund Administrative Order on Consent in Alabama, and in the implementation of measures to address air quality and land use concerns in the community of Barrio Logan in San Diego, California. OEJ welcomes written requests for assistance.

## *Chapter 2*

### *Addressing Environmental Justice Problems*

### Solid and Hazardous Waste Problems and Solutions and Brownfields Cleanup

**Social Aspects of Siting RCRA Hazardous Waste Facilities - Booklet.** This booklet was developed for industry and state and local government's use to heighten their awareness of quality of life concerns faced by communities who live near RCRA hazardous waste management facilities. The document offers examples of quality of life concerns raised by environmental justice communities when facilities are sited. The document also shares experiences and creative mechanisms that have been developed in order to work effectively with communities, as well as encourages businesses and government agencies to address community concerns early, collaboratively and compassionately. In developing this document, the Office of Solid Waste held a one-day stakeholder forum "RCRA Subtitle C Waste Facility Social Siting Criteria Stakeholders' Roundtable" to get feedback from various groups (environmental and community, state agencies, industry and national organizations) to obtain relevant and accurate information on the draft booklet's contents. The booklet was then revised and publicized in April, 2000. The booklet can be found on the web at the following address:
www.epa.gov/epaoswer/hazwaste/tsds/site/k00005.pdf

**Region 3**

**Abex Superfund Site, Virginia.** The Abex Corporation Superfund site is located in the eastern section of Portsmouth, Virginia, and centers around a two-acre property containing a former brass and bronze foundry. The primary contaminant of concern is lead, however, other contaminants are present as well. The site includes the former foundry as well as adjacent contaminated soils. The largest residential area impacted is a portion of the Washington Park Public Housing Project which is home to approximately 160 predominately African American families. In January, 1999, EPA and Abex began the temporary residential relocation of the first group of Washington Park residents for the remedial action at the site (residents were previously relocated for the purpose of removing soil contamination "hot spots"). These relocations have since been completed. Also, the temporary residential relocations for heating duct cleaning in the Washington Park Housing Development were completed in February 2000. The air ducts were cleaned in 160 residential units where unacceptable concentrations of lead were detected. Soil removal in the adjacent private neighborhood is also progressing. The results of blood analysis, from samples taken from a number of Washington Park residents, did not detect lead above the health based concentration.

The site is one of the more complex sites in the region. Concerns about elevated blood lead levels in children lead Region 3 to bring in both the Centers for Disease Control (CDC) and the Agency for Toxic Substances and Disease Registry (ATSDR) to provide information, consultation, and support regarding lead poisoning and other public health issues. ATSDR and CDC participated

*Chapter 2*

*Addressing Environmental Justice Problems*

with the EPA in a series of public meetings and information sessions held for the residents. These agencies reviewed and assessed blood lead test results which were collected and analyzed by the Commonwealth of Virginia. The Department of Housing and Urban Development (HUD) was brought into the case by EPA, first because of questions regarding permanent relocation of Washington Park residents, then because of temporary housing issues, and finally because of renewed concern for permanent relocation. HUD has now assumed the lead on the relocation issue. The Army Corps of Engineers (COE) assisted EPA with the temporary relocation of residents during the remedial cleanup of the site, including finding lodging for the residents during their temporary relocation. The Department of Justice has provided significant legal assistance during the hearing process. The complex nature of this site makes it clear that the engagement of all the federal partners is vital in addressing issues EPA has neither the expertise nor legal authority which to address.

**Fuel Contamination at Passyunk Homes Housing Project, Philadelphia.** The Passyunk Homes Housing Project was a low-income housing project located in South Philadelphia. The property is owned by the Philadelphia Housing Authority (PHA). Approximately one million gallons of petroleum sits on top of the groundwater at this property, attributed to the use of the area by Sun Oil Company and the Defense Supply Center Philadelphia (DSCP). DSCP is a federal facility which is operated by the Defense Logistics Agency. The oil plume was caused by past industrial practices in the area. Sun Oil Company, DSCP and the Pennsylvania Department of Environmental Protection (PADEP) signed an Agreement in 1997 whereby DSCP and Sun Oil would jointly remediate the oil plume beneath South Philadelphia. The Agreement between DSCP, Sun Oil and PADEP expired on August 1, 1999, however, the removal of the oil from the groundwater continues under a PADEP Order issued to DSCP, the U.S. Army, and the Defense Logistics Agency. The military has appealed the PADEP Order. PHA and HUD were concerned about petroleum vapors and any potential health affects on the Passyunk Home residents, and the fact that the agreement had expired during the summer of 1999. PHA had a stake in the oil recovery project because of the potential health affects on the residents and the fact that the hydrocarbon recovery system is located on PHA property.

Region 3 worked with PHA and HUD to ensure that the environmental justice concerns of the residents were addressed. Region 3 wanted to ensure that the oil recovery project did not intensify environmental stressors on the residents. During the summer of 2000, PHA and HUD completed the closure of the homes and the relocation of all the residents.

**Region 4**

**IMC and Arkwright Landfill Superfund Sites, South Carolina.** Spartensburg, SC has two adjacent Superfund sites which after  being neglected for years, underwent EPA-lead site assessments in 1999 and 2000. Environmental justice staff provided extensive supporting activities to the community and to the Agency's remediation program. Specifically, the Region's

# Chapter 2
## Addressing Environmental Justice Problems

environmental justice staff: (1) interviewed former workers on disposal areas and operations; (2) exchanged information with the community; (3) assisted the community in developing its Environmental Justice Small Grant Work Plan; (4) attended internal strategy meetings with the site team; (5) held numerous conference calls and meetings/presentation with Re-Genesis environmental justice group representatives; (6) commented on technical documents (e.g. ATSDR documents); and (7) continued to ensure public input in the remediation process involving two adjacent Superfund sites. One of the sites may be selected for the Recycling Superfund Sites Initiative. A special local "Superfund Process" training added value to the community knowledge. Regional environmental justice staff worked with Re-Genesis, the lead community organization, to create a "Responsive Revitalization" forum, held with 60 diverse stakeholders (e.g. City, County, landowners, banks,

developers, and EPA). Subsequently, the community was chosen for a Federal Interagency Environmental Justice Demonstration Pilot, called "Cleanup and Revitalization through Collaborative Partnerships, Arkwright and Forest Park Community." The first meeting lead by the federal partners was held in August, 2000 and achieved a participation of 11 other partner groups.



**National Relocation Pilot, Escambia Wood Preserving Superfund Site, Florida.** The Escambia Treating Company Superfund Site is part of a National Relocation Pilot. To date, EPA has relocated over 90% of single family housing residents. EPA has reimbursed homeowners for the fair market value of their homes plus a differential to help them buy a new home of their choice. Additionally, EPA has provided moving expense payments to everyone. As for the Escambia Arms Apartments (a government subsidized apartment complex with 200 two and three bedroom units), EPA has provided relocation assistance to about 40% of the residents, as negotiations continue with the owner of the complex.

EPA's relocation assistance has taken the form of down-payment assistance for several residents who elected to move away from the complex on their own, and were found to be eligible for relocation assistance under provisions of the Uniform Relocation Act. A public meeting was held on August 29, 2000 with residents of the Escambia Arms Apartments. The meeting was hosted by the Army Corps of Engineers, EPA and the Pensacola Housing Authority. Agencies discussed the progress of the acquisition of the apartments and the government's plans to commence with the relocation of the remaining residents. The agencies updated residents on the relocation assistance program being offered. Regarding the actual cleanup of the superfund site, to ensure that whatever remedial options proposed are consistent with the beneficial future redevelopment of the area (revitalization and reuse

## Chapter 2

### *Addressing Environmental Justice Problems*

plans are currently being developed by the Escambia County Community Redevelopment Agency through an EPA grant), EPA postponed issuing a proposed plan for the remedial action for Operable Unit 1 (former facility, the residential neighborhood).

**American Creosote Superfund Site, Mississippi.** The American Creosote Removal Action is within a predominately low-income, minority community. There was a removal action at the site in the 1980s. A hazard ranking package was prepared to propose the site to the NPL. However, the site did not rank. In 1999, the Emergency Response and Removal Branch (ERRB) began a removal action. As a result of intensive community involvement and valuable input from the community, the site was easily ranked. The primary concern at the site is creosote. Children from the nearby housing project had played in a creosote contaminated pond on the site. The ponds on the site had also been used in the past by a church for baptism. Citizens have voiced concerns because creosote is apparent in the creek that runs next to the site (no longer used for fishing or swimming). A door-to-door campaign was launched to inform the community because the majority of the residents near the site do not receive the local newspaper. The residents are pleased that a superfund removal action has taken place to clean up the site and that there will be a remedial action to clean up the groundwater at the site.

**Brownfields Pilot in Columbia, Mississippi.** A community partnership between the City, local activists and an environmental justice advocacy group (Jesus People Against Pollution) was formed to implement the Brownfields Assessment Pilot Grant. The partnership created the forum to reunite parties polarized by the Superfund cleanup process which took place at the former Newsom Brothers Site. The partners expanded to include the EPA, Agency for Toxic Substances and Disease Registry, U.S. Housing and Urban Development (HUD), Mississippi Department of Environmental Quality, Mississippi Department of Health, Corps of Engineers, Fannie Mae and the Partnership of Sustainable Brownfields Redevelopment. A charrette (or visioning) workshop was hosted that included a professional planner/facilitator, the residential and business community, local civic leaders, city personnel, HUD and EPA. A master plan for sustainable redevelopment is still under an area where the income level of seventy percent of the residents is below poverty. The community partners applied for "Brownfields Showcase" status for their rural community, in the Spring, 2000. They continue to heighten the need for continued funding.

**Opa-Locka Brownfields Task Force, Florida.** Region 4's South Florida Office is an active member of the Opa-Locka Brownfields Task Force which has been functioning for approximately three years. Early efforts of the task force were to identify the many parcels of abandoned or underutilized properties within this low-income, predominantly Hispanic and black community. Region 4 has provided targeted site assessments at nine of these parcels and one has received a Phase 2 detailed assessment of contamination which has enabled the city to pursue third party interest in cleanup and redevelopment. The city has also successfully applied for, and been awarded, a

*Chapter 2*
___

*Addressing Environmental Justice Problems*

Brownfields Assessment Pilot which will allow them to continue their Brownfields efforts to restore their city. As part of their Brownfields efforts, Region 4 encouraged the city to establish a community outreach subgroup which has had a number of meetings with the public surrounding these sites to encourage input/participation from the public on their concerns relating to the potential contamination and their ideas on reuse.

**Region 5**

**Superfund Jobs Training Initiative in Chicago, Illinois.** The Superfund Jobs Training Initiative completed another session in Region 5 at the Dutch Boy Landfill Site in Chicago, IL. This Initiative was made possible through a grant program from the Environmental Protection Agency (EPA) and the National Institute of Environmental Health Sciences (NIEHS) and was the result of collaboration between the EPA, NIEHS, DePaul University, and a number of community training partners.
The success of the program was based on the wisdom and foresight of educators at DePaul University and EPA staff. Through the partnerships and diligent efforts, twenty-eight students received specialized training including: 40-hour HAZWOPER certification, Lead and Asbestos Worker training, Superfund Regulatory Overview, Hazardous Site Cleanup Simulations, Critical Thinking and Employability Skills Development, and Life Skills Training (i.e. conflict resolution, team building, self esteem, job readiness, logical reasoning, and environmental vocabulary development). The trainees will be licensed in the State of Illinois (and in Indiana by reciprocity) as asbestos abatement workers and lead abatement workers. This multiple licensing will enhance each trainee's employability and work regularity. The students trained in the Initiative were ethnic minorities between the ages of 18-25 years. After training was completed, EPA and DePaul University hosted a job fair for trainees to provide an opportunity for the qualified community residents to meet and interact with local contractors. This real-life simulated training prepared the students not only for an opportunity to secure jobs in the environmental field, but also provided a decided advantage to persevere in all aspects of their lives.

**Region 6**

**Minority Worker Training Program.** The National Institute for Environmental Health Sciences (NIEHS), using EPA funding, has awarded funding to Xavier University in New Orleans, as a subgrantee of Clark Atlanta University, under two cooperative agreements to development and implement two Minority Worker Training Program (MWTP) grants. Both projects have two main goals: (1) work in partnership with unions via apprenticeship programs, local community-based organizations, and local academic institutions to implement a comprehensive education and job training program that will address clean-up and redevelopment in the target areas, and (2) assist the local community colleges and Historical Black Colleges and Universities in promoting worker health and safety through education and training delivered by these academic institutions.

*Chapter 2*

*Addressing Environmental Justice Problems*

**Final Closure and Completion of Post-Closure Plan for Pueblo of Taos Pueblo.** The Taos Pueblo has completed closing a 5.4 acre dump utilizing EPA Region 6 Solid Waste Closure/Post Closure Guidance (which is now being used by other Regions). Coordination for the funding, planning, and closing of the dump, technical assistance and review of all documents regarding the final cover and post closure care plan was provided by the Solid Waste Section staff. The coordination effort of this dump was a very significant action because it sets a model for working with several federal agencies and tribes to physically close a dump and have an alternative to open dumping. The Pueblo of Taos Tribal Council has recently approved the construction of a community transfer station as an alternative to operating a landfill.

**Tribal Health Issues, Tar Creek Superfund Site, Oklahoma.** The Tar Creek Superfund Site is a former lead and zinc mining area of 40 square miles within the former Quapaw Indian Reservation boundary. Approximately 25% of the children have elevated blood lead levels compared to a statewide average of 2%. Major efforts are underway to clean up the Site and protect the population from lead exposures and mining waste. Approximately $50 million has been spent removing lead-contaminated soil from 1500 residential yards and 28 high access areas (e.g., playgrounds, schoolyards, parks, and other areas where children congregate), plugging 83 abandoned wells to protect the drinking water supply, and constructing diversion diking to protect the surface water. Another approximately $20 million requiring a state cost share is needed in the next year for remediation of an additional 500 yards and for other remaining work to protect the populace from exposure to lead-contaminated soil.

The Quapaw Tribe powwow grounds and campgrounds were contaminated from mine tailings (locally know as chat) used to floor the camp shelters and to cover walkways and roads. Remediation, consisting of removal of the lead-contaminated soil from the campground, was conducted in late Winter and early Spring 2000. Remediation was completed in the Spring. EPA is funding ATSDR for an extensive lead education and blood-lead screening program at the Site. These efforts include coordination with a health coalition, health care representatives and from local communities and tribes.

**Region 8**

**Arsenic and Lead Contamination in Denver, Colorado.** Residential communities in the Vasquez Boulevard/I-70 area are contaminated with arsenic and lead. The residential cleanup was added to the Superfund National Priorities List in July 1999. It is the largest current soil remediation in the national Superfund program with more than 4000 homes, 20,000 residents, largely Hispanic and African American communities. The northern neighborhoods sit in the most polluted zip code in the Denver metropolitan area. There is active community participation through monthly meetings with community representatives and other key stakeholders to review progress. A cleanup plan will

*Chapter 2*

*Addressing Environmental Justice Problems*

be completed by Fall 2001 and remediation of the soils will likely commence in the Summer of 2002. To address environmental justice concerns at this site, the Environmental Justice Program conducted a day-long workshop on environmental justice for the VB-I70 Working Group. The Environmental Justice Program also participates in the majority of Superfund meetings.

**Casper Corrective Action Management Unit, Wyoming.** An area adjacent to the Midwest Heights neighborhood in Casper, Wyoming, was the location for oil refining operations from 1913 to 1991. As part of facility closure under a consent decree, BP Amoco proposed to locate a corrective action management unit (CAMU) within 1000 feet of this low-income residential area. The CAMU would serve as a landfill for wastes derived from facility clean up. These wastes would include hazardous wastes, among other types, such as construction debris. The State of Wyoming requested consultation from Region 8's Environmental Justice Program. The region provided a number of consultation and guidance activities, including demographic and environmental justice analyses, consultation with the state and Amoco directly regarding environmental justice and its relationship to Title VI of the Civil Rights Act, guidance on community participation in public meetings and provision of an Environmental Justice Workshop for the community group involved with the clean up effort at the former refinery location. As a result of these consultation activities and community feedback, BP Amoco chose another location for the CAMU, which fit with overall goals for corrective action at the site.

**Region 9**

**Proposed Gregory Canyon Landfill, California.** Gregory Canyon Limited proposes to construct and operate a new municipal solid waste landfill and recycling collection center in San Diego County. The landfill was sited based on a San Diego County ballot measure. Previous to the measure, the site had been reviewed twice, and was turned down based on environmental concerns. The proposed landfill is located south of State Route 76 approximately three miles east of Interstate 15, near the San Luis Rey River in San Diego County, California. California law requires that an environmental impact report be prepared to identify all of the potential environmental impacts associated with construction and operation of a landfill at the Gregory Canyon site. There is considerable opposition to the project from the local community, including the Luiseño tribal communities. The proposed landfill would negatively impact tribal sacred sites as well as potentially degrade the last scenic river in southern California. The tribal communities have asked for Region 9 assistance in ensuring that the landfill is not detrimental to the environment. In addition, the Tribes raised this proposed siting as an environmental justice concern. Region 9 is working with the Army Corps of Engineers (Corps) to assist in consultation and coordination between the entities involved. In order for the project to continue, the Corps will need to issue a Clean Water Act Wetlands permit for a portion of the site.

## *Chapter 2*

### *Addressing Environmental Justice Problems*

### International Problems and Solutions

**African Chemicals Management Capacity Building Program.** In partnership with U.S. Aid for International Development (AID) and the United Nations Environmental Program (UNEP), EPA developed the African Chemicals Management Capacity Building Program. This program provides chemicals information exchange in Africa to provide Internet access and training to chemicals management decision-makers in Mali, Nigeria, Cote d'Ivoire and Tanzania.

**Region 9**

**Safety Kleen Hazardous Waste Facility- Westmoreland, California.** In the second quarter of FY 1999, Region 9 was alerted by environmental justice advocates and organizations of a waste shipment from Cambodia which may have been improperly characterized. The shipment of waste to the Westmoreland, CA Safety Kleen hazardous waste facility (subject of a Title VI Complaint), raised environmental justice concerns with respect to how the Agency handles international waste issues. For several months, Region 9's Environmental Justice Program and Waste Division worked closely with the State Department of Toxic Substances Control (DTSC) and the community to address the environmental justice issues surrounding shipment of waste from Cambodia to a facility in Westmoreland, CA. Ultimately, the waste was not shipped to Westmoreland. A subsequent community meeting was conducted by Region 9, DTSC, and Imperial County Planning and Health Agencies, at the request of the Westmoreland residents. The meeting focused on public participation in permitting process, international waste issues, and Title VI.

**Phase out of Lead in Gasoline Project for Sub/Saharan Africa.** The Office of International Activities (OIA) is working with the Alliance to End Childhood Lead Poisoning, the World Bank and other partners to encourage the phase out of lead in gasoline in Sub-Saharan Africa. Gasoline used in Africa has the highest content of lead of any in the world. Used in the aging vehicle fleets common in the region, the health impacts, particularly on children and street vendors, are severe. EPA's partnership with the United Nations Environmental Program (UNEP) provides Internet access to officials tasked with managing pesticides and other chemicals. OIA is piloting this effort in four countries: Mali, Nigeria, C'ote d'Ivoire and Tanzania. While the pilots will improve information capacity for the sound management of chemicals to government officials only, later stages of the program will bring in many more African countries, a wide range of stakeholders, and will include a public education component.

*Chapter 2*

*Addressing Environmental Justice Problems*

## Mexican Border Problems and Solutions

**Training of Health Professionals Along the US/Mexico Border.** As part of the effort to improve the quality of health related environmental issues along the border, EPA entered into an Interagency Agreement to support environmental health training and surveillance activities on the U.S.-Mexico border. Through training, lay community health workers (promotoras) and multi-disciplinary primary care clinicians will learn to better recognize, understand, and manage illnesses related to exposure to environmental health hazards. This training will provide information on exposure to toxic substances found in air, water, soil, as well as basic sanitation practices. The program will be accomplished by developing a two-track training curriculum, one for promotoras, and one for multi-disciplinary clinicians, which includes implementing a variety of didactic and clinical training activities.

### Region 6

**Texas and New Mexico Colonia Programs.** Beginning in FY 93 through FY 98, Region 6 awarded $40.2 million to the New Mexico Environment Department and $315.3 million to the Texas Water Development Board. The funds were awarded to construct Colonia drinking water and wastewater treatment facilities as well as provide low interest loans to colonia residents for installing indoor plumbing. Public health and environmental problems have been created by the lack of safe drinking water and sewer services of unincorporated communities located along the U.S./Mexico Border. These small communities, referred to as "colonia," are often highly impoverished areas, characterized by substandard housing and poor living conditions. They often lack basic services, including drinking water, sewer, drainage, electricity and paved roads. To date, approximately 444 colonia in Texas alone, have been assisted with these funds. A considerable number of colonia are now in the planning stages for infrastructure projects.

**Texas and New Mexico Colonia Strike Force Grants.** To date, Region 6 has provided more than $450,000 in grant funds to the Texas and New Mexico Attorney General's offices which takes action against unlawful development along the U.S./Mexico Border where developers fail to provide proper infrastructure for development which results in poor living conditions and potential health hazards in the colonia. These funds are used to conduct investigations of this type of activity. The strike force brings lawsuits against colonia developers under a variety of laws in order to protect the public health of colonia residents. The colonia strike force also seeks monetary judgement against developers to compensate local governments for the cost of providing infrastructure neglected by the developers.

*Chapter 2*

*Addressing Environmental Justice Problems*

**Support for Mexico Border Communities.** To increase awareness of environmental justice outside of the Agency, Region 9 has worked closely with communities in the Border Region (San Diego, Tijuana, Ensenada, El Paso-Ciudad Juarez, Nogales, AZ, Douglas, AZ). Region 9 continues to conduct regular face-to-face meetings with various community groups, to discuss environmental justice concerns. Grants have been awarded to two organizations working on environmental justice issues in the Border Region. The Imperial Valley College Project New River/New Hope is an environmental education project, and the Tucson, Arizona BorderLinks project Developing Grassroots Leaders in Response to Cross Border Environmental Crisis focuses on the development of women's leadership.

# *Chapter 3*
## *Public Participation and Training Initiatives*

EPA-sponsored public participation and environmental justice training programs seek to improve federal, state and local, and tribal governments, industry, and community stakeholders' understanding of what and how the environmental laws are working to protect the environment and public health of all communities in our nation. With this increased understanding, the various stakeholders are better positioned to identify the opportunities for collaborative problem-solving to address the environmental justice concerns. EPA has witnessed the growth in the number of stakeholders who recognize the benefits of, and, therefore, seek opportunities to work collaboratively in the decision-making processes. The following is a discussion of some of the public participation and environmental justice training initiatives which support this approach to problem- solving.

## Public Participation Initiatives

**Public Involvement In Environmental Permits: A Reference Guide.** This document, completed August 2000, was developed to provide a resource for state program staffs to enhance their public participation efforts. However, it can also be used by the public as a resource to learn about how they can engage themselves in the permitting process. This reference guide summarizes the major permitting programs under the Clean Air Act, Clean Water Act, Safe Drinking Water Act, and the Resource Conservation and Recovery Act. It also gives an overview of the core public involvement requirements in the various permitting programs. Included in the reference guide are best practices and a model plan for implementing effective public participation activities under the various programs, a compendium of additional resources, and contacts for use in implementation. In drafting the reference guide, the Agency consulted with key partners, including advisory groups, on early drafts. Stakeholder meetings were held in the District of Columbia and Houston, Texas to obtain comments from a variety of interests, such as, environmental and community groups, state associations, national associations, state and regional regulators, and industry. The Guide can be found at the following web address: www.epa.gov/permits

**The University-based Hazardous Substance Research Centers Program.** The university-based Hazardous Substance Research Centers Program has been supporting two (2) outreach and education initiatives for several years. The Technical Outreach Services for Communities Program (TOSC) began in 1995 and the Technical Assistance to Brownfields Program (TAB) formally began in 1998. Funded jointly by the Office of Research and Development (ORD) and the Superfund Office, these ongoing programs provide independent, scientific information to many under-served, overburdened, and low-income communities across the country through a network of over 25 colleges and universities. The goal is to build the community's capacity to participate in environmental

*Chapter 3*

*Public Participation and Training Initiatives*

decisionmaking. For a listing of participating universities, communities, and educational modules, please visit the following web address: www.toscprogram.org

## Environmental Justice Training Activities

**EPA Training Collaborative.** A new Environmental Justice Training Collaborative is being organized. The Office of Environmental Justice (OEJ) has played a leadership role in founding and funding the newly established Environmental Justice Training Collaborative. This organization provides quality environmental justice training, and consultative assistance in development of environmental justice related curriculum. It also serves a central networking and information dissemination hub for states and tribes, EPA, other federal agencies, community groups, academics, and increasingly industry. Thus far membership include all ten EPA regions, headquarters offices, and eight states (including, California, New York, and New Hampshire), among others.

**Region 4**

**Teacher Environmental Institute.** Region 4 staff and universities under EPA grants coordinated five (5) Teachers Environmental Institutes to provide educators with environmental and environmental justice knowledge and skills. About 230 educators were trained, and as a result, potentially 180,000 students will be affected. Florida A & M University; North Carolina State University- Medical University of South Carolina and Spelman College played a lead role over the past two years. Region 4 staff from cross-divisional programs participated as guest lecturers. environmental justice staff coordinated a site tour visit to the Anniston polychlorinated biphenyls Superfund site for teachers in June 2000.

**EPA/Shaw University Research Apprenticeship Program for Culturally Diverse High School Students.** The objective of the EPA/Shaw University Research Apprenticeship Program for Culturally Diverse High School Students is to encourage students from culturally diverse backgrounds to pursue advanced degrees in math, science, and engineering. The program was initiated in 1990 as a cooperative agreement. Students in the Research Apprenticeship Program must live in Wake County, NC and be in grades 9 through 12. There are currently 31 students in the program, and eight rising 9th graders are accepted into the program annually. In the spring of 1999, there were 78 applicants for the eight positions. The students must maintain high academic performance in high school in order to remain in the program. As of June 1999, 40 students had completed the program and graduated from high school, and 100% of these students have entered college. Nearly 90% of the students in college are majoring in either science, math, or engineering; and more than a half a million dollars has been awarded to program participants in college

## *Chapter 3*
### *Public Participation and Training Initiatives*

scholarships and grants. The rising 12th graders serve as apprentices with mentors at EPA during the 6 week summer program, during which time they work in an actual research setting with an EPA scientist. Student projects in 1999 included: Comparison of 3 Buffer Systems for the Extraction of ACHE Activity from Rat Tissues; Role of the *GSTT1-1* Gene and the Risk for Stomach Cancer; Immunohistochemical Localization of Proteins in Embryos; Analysis of Heart Rate, Concentration, and Temperature versus Time Through Matlab; The Conversion of the EPA Annex Waste Management Storage Facility from a Conditionally Exempt Small Quantity Generator to a Large Quantity Generator; The Analysis of Shaped Behavior in Laboratory Rats; and Genotoxicity of Bromobenzene in Mouse Splenocytes as Measured by the Cytochalasin B Binucleate and Comet Assays.

**Region 10**

**Environmental Justice Law and Policy Seminar.** The Office of Civil Rights and Environmental Justice (OCREJ) and The Urban League of Portland team-taught an Environmental Justice Law and Policy seminar at Northwestern School of Law, Lewis and Clark College during Winter Term 1999. The 15-week seminar emphasized public participation, and community members were invited to attend and develop collaborative relationships with the 20 law students enrolled in the class. Legal research and field studies projects, proposed by OCREJ's environmental justice community contacts (representing community and neighborhood groups, community service organizations, universities, industry, government, medical/health, legal and media stakeholders) were selected by students who worked with community mentors. The seminar helped to: (1) develop the environmental justice knowledge base of the community residents and students; (2) facilitate environmental justice networking between communities and law school graduates; (3) meet the requests of universities for increased EPA involvement in their programs; and (4) support the Region 9 recruitment strategy.

### Interagency Training

**Region 3**

**Interagency Environmental Justice Training.** As part of the Environmental Issues Seminars, and interagency cooperation, Region 3's Office of Enforcement, Compliance and Environmental Justice (OECEJ), and a representative from the Superfund program, conducted a series of environmental justice training sessions at the Environmental Policy Institute. During these sessions, Region 3 case studies and experiences were used as a backdrop for discussions of the history of the environmental justice movement in the U.S., different perspectives on the environmental justice movement, and policy and guidance issues. The audience for these sessions were managers from most federal Agencies. Since this training began, more than 500 managers have taken the training.

*Chapter 3*

*Public Participation and Training Initiatives*

**GIS Demographic Mapper.** The user friendly GIS mapping tool, developed by Region 3 in 1996, continues to be refined. This Arc View-based screening tool provides vital demographic information for any area in question, and allows the user to better understand and characterize areas of concern. Presentations on the mapper and its various applications in the environmental justice arena have been made for the states of Maryland, Delaware, and Pennsylvania; the cities of Philadelphia and Wilmington; EPA Region 7; the Federal Law Enforcement Training Center; and the Republic of South Africa. Copies of the application were requested by the Department of the Interior, which has in turn forwarded the application to other Federal agencies for evaluation and comment.

**Region 8**

**Environmental Justice Workshop.** The Region 8 Workshop is designed to increase understanding of a complex issue and improve clarity about environmental justice concepts and applications. To date, Region 8 has presented it 37 times, to a total of 748 participants. Between 1/99-8/00, the workshop was presented to a total of 394 participants, including other federal agencies such as the US Army Corps of Engineers, the US Fish and Wildlife Service, and the Southwest Strategy, a coalition of federal and state agencies. Other participants included representatives of community organizations, industry, and the Environmental Council of States. Region 8 continues to conduct the environmental justice workshop in response to external requests and collaborates with other regions when the requests come from outside of the region.

**Region 10**

**Interagency Regulatory Analysis Committee.** A representative from Region 10, OCREJ was a presenter at the Interagency Regulatory Analysis Committee (IRAC) of King County, Washington on October 27, 1999. The mission of IRAC is to create a more effective and efficient means of protecting public health and safety through coordination of regulatory agencies. Approximately 30 representatives attended. The presentation focused on education and understanding various levels of environmental problems and regulations, environmental justice, the environmental justice grants programs, and the work of environmental justice grantees.

**Forest Service Environmental Justice Training/Workshop.** A member of the Environmental Justice Core Group, stationed in the Region 10 Alaska Operations Office, participated in an environmental justice workshop in Ketchikan, Alaska, hosted by the Central Council of the Tlingit and Haida Indian Tribes of Alaska and the U.S. Forest Service. The workshop focused on identifying and addressing disproportionately high and adverse human health or environmental affects of federal agency policies and decisions on minority and low income populations. The Region 10 representative

*Chapter 3*

*Public Participation and Training Initiatives*

participated on a panel discussion focusing on subsistence hunting and fishing by Native Americans and the potential disproportionate impacts from such a lifestyle.

## State Training

### Region 3

**All-States Environmental Justice Conferences.** During 1999 and 2000, Region 3's Office of Enforcement, Compliance and Environmental Justice (OECEJ) convened two (2) All-States Environmental Justice Conferences with all of the states, and the District of Columbia, in Region 3. The purpose of the conference was to create a forum to discuss environmental justice guidance, policies, real world problems and solutions. The conferences were a success in that they opened a continuing dialogue between EPA and the states on issues of environmental justice. Since July 1999, EPA and the states have held regularly scheduled monthly conference calls to continue the dialogue, share experiences and identify and find solutions to real environmental justice issues.

### Region 8

**State Agencies.** Region 8 provided environmental justice training to several state agencies, including Utah Department of Transportation, Colorado Department of Public Health and Environment, and Wyoming Department of Environmental Quality. Participants in these workshops included state employees, industry, and community representatives.

## Tribal Training

**Environmental Planning for Small Native American Communities.** This three (3) day seminar covers all aspects of environmental planning, including wastewater treatment, drinking water, solid waste management, non-point source pollution, pollution prevention, and compliance. There are also modules on identifying environmental problems in the community and promoting community participation in environmental issues. In addition to standard lecture, the course includes hands-on laboratory experiments, tours of local environmental facilities, and exchange of ideas and experiences among participants. The class was developed and delivered by Montana Tech University, with guest lecturers from state environmental agencies, EPA, and tribal personnel. The target audience is small Native American tribes without sophisticated infrastructure or extensive staff. The seminar was offered in Albuquerque, NM in 1999 and Muskogee, OK in 2000, with plans for offering it a third time in Alaska. All seminar modules and materials are available through the Montana Tech Environmental Learning Community at http://multimedia.mtech.edu/elc.

*Chapter 3*

*Public Participation and Training Initiatives*

**Tribal Training Module on Watershed Monitoring Design.** Under a cooperative agreement with the River Network, EPA is currently in the process of producing a training module (expected by the end of 2000) consisting of a guidebook and workshop materials to introduce tribes to the principles of designing a water quality monitoring program, generating credible data, and using their data effectively. The goal of this project is to build capacity within tribes to design, manage, and implement their own water quality monitoring programs, and to generate data they can use to make their own planning decisions and better meet assessment requirements under the Clean Water Act. The training module will be integrated into other existing tribal training programs, such as Tribal Nonpoint Source Pollution Workshops and Tribal Watershed Training.

### Region 1

**Tribal Environmental Training Conference - 3rd Annual.** Region 1 is continuing to develop and foster integrated federal agency initiatives and build partnerships to address environmental justice issues of concern. On March 27-29, 2000, the 3rd Annual New England Tribal Environmental Training Conference was held in Hyannis, MA on Cape Cod. The conference provided a unique opportunity for tribes to meet with federal agencies to build partnerships that will work toward common goals in protecting the environment. The goal of the conference was to enhance protection of the health and environment of Indian Country through partnering, science, and education on traditional Indian values.

The conference was hosted by the Wampanoag Tribe of Gay Head (Aquinnah) and entitled "Integrating Native Culture with Modern Technology: Protecting Mother Earth for our Children". Participants included the Passamaquoddy Indian Township, Passamaquoddy Pleasant Point, Penobscot Nation, Houlton Band of Maliseet, Aroostook Band of Micmac, Narragansett Tribe, Mashantucket Pequot Tribe, Mohegan Tribe, the US EPA-New England, Natural Resource Conservation Service, Fish and Wildlife Service and the Department of Defense.

### Region 8

**Tribal Elders NEPA/Environmental Justice Training.** At the request of the Lower Brule Sioux Tribe, in February 1999, Region 8 staff from environmental justice and NEPA offices presented information on environmental justice and NEPA to a gathering of about 70 tribal elders representing the Sioux Tribes along the main stem of the Missouri River.

*Chapter 4*

*Outreach Initiatives*

EPA-sponsored outreach initiatives build on the Agency's public participation and training initiatives. The wide variety of outreach efforts serve to stimulate stakeholder involvement in the efforts to provide for environmental justice. For the past couple of years, the OEJ and regional environmental justice programs have been sponsoring these outreach programs. The majority of current projects involve EPA outreach to, and the involvement of, local communities, joint investigations of specific areas of concern, community capacity-building, and development of workable solutions. The following is a discussion of some of these environmental justice initiatives.

## Outreach

**Environmental Justice: Strengthening the Bridge Between Economic Development and Sustainable Communities.** With support from the Congressional Black Caucus (CBC), EPA partnered with the Department of Justice to coordinate this major conference. Over 220 multi-stakeholders attended, and as a result of this meeting, proceedings and a videotape were published and presented at the 29th Annual CBC Legislative Session (Fall, 1999). The Medical University of South Carolina and South Carolina University were the academic partners who helped plan and coordinate the meeting. The CBC subsequently established an EJ Braintrust and as an outgrowth of recommendations, a National Environmental Policy Commission was formed to identify environmental issues and to articulate a range of policy alternatives for consideration by policy makers. Also, regional "Listening Sessions" on EJ issues were started during FY 2000. Another result was the renewed interest in the re-establishment of the Federal Interagency Working Group, coordinated by EPA, Headquarters.

**National Watershed Outreach Conference.** The Office of Wetlands, Oceans, and Watersheds and the Office of Ground Water and Drinking Water cosponsored the National Watershed Outreach Conference from April 17-19, 2000 in San Diego, California. This conference was also sponsored by the Aquatic Outreach Institute (Richmond, California), the University of California Cooperative Extension/Sea Grant Extension Program, and the County of San Diego Watershed Working Group. The conference provided a forum for a variety of stakeholders to share various outreach techniques related to a wide range of watershed issues and motivated attendees to explore both traditional and nontraditional outreach techniques. There were a number of sessions at the conference that focused on outreach techniques that target minority or disadvantaged communities. For example, one session focused on developing strategies for soliciting Latino communities in watershed education by learning how to adapt resources to Latino needs and interests; and another session focused on involving at-risk urban youth, many of which who have been through the juvenile court system, in wetland restoration activities.

*Chapter 4*

*Outreach Initiatives*

**Wetlands Education Activities.** Wetlands Division staff presented Environmental Education programs to several groups of disadvantaged students, including Junior Rangers and students from Virginia and Washington, DC schools. The Wetlands Division also staffed exhibits and several events in the area, including the Kingman Lake dedication project which is staffed by Community Conservation Corps youth. The Wetlands Division also participated in EPA's partnership with the Cesar Chavez School on environmental projects.

### Region 1

**Hartford, CT.** Hartford has a population of approximately 130,000 people living in an area of 18.4 square miles, sub-divided into 17 neighborhoods. Minority residents in Hartford comprise 70% of the population and also has the lowest per capita income in Connecticut at $24,000. Childhood lead poisoning rates in Hartford are at 13 percent, twice the State average. The City of Hartford declared an Asthma Emergency due to alarming asthma rates and the fact that childhood asthma is the leading cause of school absenteeism and hospitalization. Region 1 worked with community partners to host an Asthma Education Forum on June 22, 2000 that brought over 100 people together to discuss the issue and identify opportunities to improve community access to information and services. Region 1 is also working with community and academic partners in Hartford to create an interactive, multi-lingual environmental education and information web page to provide increased public access to critical environmental and public health problems facing local residents.

### Region 2

**Environmental Justice Enforcement Workshop in NYC.** This educational workshop was designed to empower local citizens in New York City (NYC) to recognize and report environmental violations and demonstrate how citizen complaints can result in enforcement actions against violators. Citizens can have a positive impact on their communities by helping to deter violators through the citizen complaint process. In addition, workshop handouts were provided to promote community awareness of the strong EPA/State inspection and enforcement presence in the afore-mentioned five targeted NYC communities. Regulatory agency program contacts, hotline numbers, and Internet web sites were also provided to the community. Hosted by Region 2 and the Department of Justice, the workshop was held in fulfillment of an EPA commitment made at the March 6, 1999 EPA/White House Council on Environmental Quality forum on environmental justice in NYC. Very positive feedback was received from the public and workshop panelists.

*Chapter 4*

*Outreach Initiatives*

**Community Based Environmental Protection (CBEP) Program.**  Region 2 is committed to supporting environmental protection at the local level. In this matter, we have developed a web site that provides easy access to a broad set of resources for communities, including tools for learning about and improving the environment, directories of community grants and financial assistance, as well as links to EPA contacts and other information sources.  The web site can be found at: http://www.epa.gov/region02/cgp/cgphmpg

**Mercury Reduction and Pollution Prevention for Federal Facilities in the Health Care Sector Roundtable.**  Region 2 has undertaken an initiative to implement a memorandum of agreement with federal agencies throughout the region to address mercury concerns. In order to start this effort, EPA elected to do a Federal Facilities Roundtable on February 22, 2000. EPA staff also developed a work group which consisted of EPA, state, county and local government, medical school environmental health and safety staff, university medical school staff, and professional and trade organizations in the health care sector.  This group was instrumental in providing information sources, and concepts that were used in developing the first program and plans for future programs.  The group became a conduit for information in the field, sources of documents and experts, and ultimately sources for future events to be held throughout New York State.

**Region 4**

**Environmental Justice Workshop: Making Environmental Justice Work in Georgia.**  Region 4's Air, Pesticides, and Toxics Management Division (APTMD) periodically coordinates with the regional transportation partners on environmental justice issues related to transportation plans and air quality.  As part of this coordination and cooperation, APTMD participated in an environmental justice workshop hosted by the United States Department of Transportation, Federal Highway Administration - Georgia Division, and the Georgia Department of Transportation.  The purpose of this workshop was to provide transportation decision-makers with conceptual tools for effectively implementing environmental justice principles in day-to-day decision-making.  The Federal Highway Administration Southern Resource Center Director provided a history of transportation-related activities that involved environmental justice issues.  The presentation chronicled how, although the elements of environmental justice have long been incorporated into the planning regulation, interpretation of this regulation has been flexible enough that environmental justice has not always been considered.  A video was shown which demonstrated how an environmental "injustice" was mitigated through the use of county funds and compromises to address citizens concerns.  Other presentations provided examples of how to incorporate environmental justice considerations into the transportation planning process.  Many of the presentations emphasized that environmental justice considerations are a necessary component of good public involvement.

*Chapter 4*

*Outreach Initiatives*

**Citizen Training on Title V Air Permitting.** Region 4 co-hosted a workshop on October 21-22, 2000 in Atlanta, GA to train citizens on public participation opportunities in the Title V air permit issuance process. Planning for the Region 4 workshop was coordinated by a diverse committee consisting of representatives from EPA, the State of Georgia, and seven citizens and environmental groups located in the Southeast. The purpose of the workshop was to introduce citizens to the Title V air permitting process; give citizens tools, skills, and reference materials to help them review proposed Title V permits and offer meaningful comments; explain the options available to citizens to participate in the Title V process; and, explain the tribal, state and federal roles in Title V permitting. Notice of this workshop was mailed to approximately 100 environmental justice citizens, and environmental organizations throughout the eight states in Region 4 to encourage attendance.

**Brownfields Outreach in Southeast Florida.** Region 4's South Florida Office, in coordination with the Regional Planning Councils, Florida Department of Environmental Protection, and local county Brownfields Coordinators, has been meeting with local officials, community leaders, and the public in numerous cities throughout the Southeast Florida Eastward Ho! corridor to inform them of the many incentives available and potential benefits to the community through federal, state, and local Brownfields assistance into their overall community revitalization efforts. This increased awareness has resulted in the successful award of several Brownfields Assessment Pilots to local government and the completion of numerous Targeted Brownfields Assessments to clarify contamination levels at sites throughout the corridor. This information enables the communities to pursue third party cleanup and redevelopment of these abandoned parcels.

**Environmental Health Fair.** Environmental justice staff spearheaded a cross-divisional team to participate in a community health fair in a local disadvantaged community (Carver Homes area, Atlanta). The fair was coordinated by Morehouse School of Medicine and had several nonprofits and government agencies performing outreach (August 1999).

**Region 7**

**Environmental Justice Forum.** Over 200 participants attended the Environmental Justice Forum held on August 10, 2000 in Kansas City, Kansas. Among the stakeholders in attendance at the forum included: federal, state, and local governments; non-profit organizations; environmental grassroot organizations; academia; tribal groups; transportation associations; and engineering firms. The Forum also included displays by current and past EPA environmental justice grant recipients and EPA programs. Exhibits included: Metropolitan Energy Center, Operation SafeStreet, Nebraska Recycling Center, Bridging the Gap, the Wyman Center, Inc., LeadBusters, and EPA's Environmental Justice Program, Brownfields Program, and the Toxic Substances and Control Act

*Chapter 4*

*Outreach Initiatives*

Program. The purpose of the Environmental Justice Forum was to allow the EPA an opportunity to assert its belief that partnerships between stakeholder groups is vital in the pursuit of environmental justice. The Forum was a result of two meetings held in May 2000 with two different stakeholder groups: (1) community environmental health organizations; and (2) federal agencies with environmental justice responsibility, and their request to continue to engage in dialogue. The goal of the Forum was to bring together various regional stakeholders, policy and decisionmakers, and community members to learn about environmental justice and to build partnerships

## Region 8

**Natural Resources Environmental Justice Symposium.** This symposium was presented by the Natural Resources Law Center (NRLC) of the University of Colorado at Boulder, in cooperation with Region 8's Environmental Justice Program and Colorado People's Environmental and Economic Network (COPEEN). The symposium focused on environmental justice and natural resources management. The program consisted of a colloquium series, a book of collected essays, and a conference/workshop. Region 8's environmental justice Program provided advice to the NRLC and views the issue of natural resources and environmental justice as critical for the West. The Symposium represents an important outcome of the developing partnership between Region 8 and the Law Center. Additionally, an environmental justice analysis of a proposed flood control project at Devils Lake, North Dakota, prepared by a Region 8 post-doctoral sociologist intern, was among the presentations delivered at the workshop.

## Region 10

**Initiative on Asian American and Pacific Islanders.** On May 10, 2000, as part of the White House Initiative on Asian Americans and Pacific Islanders, Region 10 hosted a meeting with members of various Asian and Pacific Islander community groups. Also attending the meeting were representatives from Washington State's Governor's office, the Presidential Commission on Asian/Pacific Islander Affairs, the Washington State Commission on Asian and Pacific American Affairs, along with Region 10 staff and managers. EPA reported on a study conducted to determine the effect of toxic substances on seafood resources used by Asian/Pacific Islander communities.

**Networking for Communities.** Region 10's Office of Civil Rights and Environmental Justice hosted a networking meeting designed for environmental justice advocates in Western Washington to expand their professional resources and connections regarding environmental justice in the Seattle and Tacoma area, entitled "Environmental Justice Partners Joining Together." The purpose of the meeting was to learn how environmental justice professionals throughout Western Washington can work together to address environmental justice issues. In attendance were representatives from Washington Department of Ecology, Washington Toxics Coalition, Washington Department of

*Chapter 4*

*Outreach Initiatives*

Transportation, Seattle King County Department of Health, Community Coalition for Environmental Justice, El Centro De la Raza, and Refugee Federation Services Center.

## Tribal Consultation

**Guide on Tribal Consultation and Public Participation.** The National Environmental Justice Advisory Council, a federal advisory council to the EPA, prepared a Guide on "Consultation and Collaboration with Indian Tribal governments and the Public Participation of Indigenous Groups and Tribal Members in Environmental Decision Making," for EPA and other stakeholders to better understand the unique political status of federally recognized tribes, and how federal agencies and other governments are to work with tribes on a government to government basis. The document also explains the differences between consultation with tribal governments and public participation. A copy of the Guide can be found at the following web address:
http://www.epa.gov/occa/main/ej/fgconsult.html

## International Outreach

**Roundtable on Environmental Justice on the U.S. Mexico Border.** On August 19-21, 1999, EPA sponsored the Roundtable on Environmental Justice on the U. S. Mexico Border, in National City, California. Over two hundred participants from U.S.-Mexico border communities and organizations, the National Environmental Justice Advisory Council's International and Enforcement Subcommittees, EPA and other U.S. government officials along with Mexican counterparts dialogued on quality of life issues on the border. The Roundtable included an all day site tour, public comment periods, a senior EPA panel, a panel of the Region 6 and Region 9 border offices, and four (4) breakout sessions: (1) Environmental Justice and Labor; (2) Immigration; (3) Trade and Environment; and (4) Indigenous Peoples Issues and Health. The last morning included the presentation of recommendations from the break-out groups.

Categorizing the recommendations into short, medium and long term goals, EPA responded to over 40 of the recommendations within 30 days after the Roundtable and continues to work on the more complex recommendations, several involving negotiations with the government of Mexico. Subcommittee members and environmental justice representatives have worked closely with EPA invoking the concerns of the environmental justice community and offering comments in the early developing stages of newly formed work plans, projects and policies that address Roundtable recommendations.

**South Africa Work Group.** EPA implemented the recommendation of the South Africa Work Group (SAWG) of the International Subcommittee of the National Environmental Justice Advisory Council (NEJAC) to "link environmental justice groups in the U.S. with South Africa Groups who

## Chapter 4

### Outreach Initiatives

are addressing similar issues." In May 2000, EPA hosted delegates representing the South Africa environmental justice community for an intensive program in the southeastern United States. The delegates spent ten days visiting communities that face environmental justice challenges similar to those in South Africa. There was a one day "Lessons Learned " session from the U.S. experience and a discussion of what still needs to be achieved. After the session on the history of NEJAC, delegates attended the entire NEJAC meeting where they observed the process and met experts and activists from around the country. The Agency is assisting the South Africans in developing proposals and conducting other follow-up work.

*Chapter 5*
___
*Assessment Methodologies, Assessment Guidance, and*
*Community Assessments*

Over the last two years, EPA has seen a growth in the number and type of environmental justice assessment methodologies and community-based studies which are beginning to help the Agency, and other interested parties, better understand the extent and nature of the environmental and public health concerns facing low-income and/or minority communities. These assessment methodologies and community-based studies are helping the EPA and other federal agencies improve their efforts to identify, assess, prioritize, and allocate resources to review those concerns.

The Agency is also working to enhance the usefulness and delivery of its environmental information to all segments of the public. By continuing to seek opportunities to provide information through various database systems, educational materials, and analytic tools, the Agency expects these data and tools to be used by communities to participate more meaningfully in the environmental decision- making process.

The following chapter presents a brief synopsis of activities that have been performed or are currently in place to build upon the Agency's ability to quantitatively identify and address allegations of environmental injustice.

## Assessment Methodologies

**Air Screening Manual for Communities.** EPA is embarking on a cross-program collaborative effort to develop a manual to help communities interested in conducting a risk-based air-screening exercise. The Air Screening How-To Manual will help communities develop a better understanding of their local air quality and identify priorities for making improvements. The manual will lay out a step-by-step process for improving local air quality, from forming a partnership to identifying pollution prevention opportunities for addressing community priorities. The manual will be designed to build the long-term capacity of communities to understand and address air quality issues.

Work on the manual will be based on the experiences of the Air Committee of the Baltimore Community Environmental Partnership. The Air Committee, a broad partnership of Baltimore residents, industry, and governments, worked together for three (3) years to develop and implement a six-step (6) screening methodology to review the toxic releases from the multiple facilities located in and around the industrial neighborhoods of south Baltimore. The manual will incorporate the lessons learned in Baltimore and the comments of peer reviewers to refine and expand the methodology developed by the Air Committee. A case study summarizing the work of the Air Committee in both printed and electronic versions is now available.

The development of an effective manual will require further community input. The Agency team working on the manual is now looking for community stakeholders and other partners to help with the development of the manual.

*Chapter 5*
*Assessment Methodologies, Assessment Guidance, and*
*Community Assessments*

**Region 2**

**Chicago Cumulative Risk Initiative**. In response to a Chicago Legal Clinic Petition filed in 1996 on behalf of 11 community advocacy groups, EPA began the Chicago Cumulative Risk Initiative (CCRI). This effort is designed to identify and address issues of cumulative environmental loading and health risks from multiple sources in Cook County, Illinois and Lake County, Indiana. Several useful tools for this initiative will be developed in partnership with both the community stakeholders as well as the regulatory stakeholders, including federal, state and local government agencies. One of the tools to be developed will be an environmental loadings profile, which summarizes all available multimedia data, including emissions and ambient data. This loadings profile is currently undergoing peer review. In addition, a user-friendly database is being developed that will facilitate integration of available environmental data for the two (2) county area. The partnership is also developing a Cumulative Risk Screening tool that will focus on air sources only. This cumulative risk screening tool will evaluate environmental databases of both air emissions and ambient air data, along with toxicity weighting factors, to identify areas characterized by high hazard. The screening tool will also consider available health data in order to identify susceptible populations, focusing on children, especially those with asthma, elevated blood lead concentrations or leukemia. This cumulative risk screening document will tentatively be available for peer review by the end of calendar year 2000. The stakeholders are also currently developing communication, outreach and utilization strategies for the tools developed by the initiative.

**Environmental Justice GIS Application.**
The Region 2 Environmental Justice Application is an evolving ArcView application that provides a step-by-step tool for evaluating selected areas for potential environmental justice concern based on a demographic criteria and a suite of indicators of environmental burden (environmental load profile). Environmental justice potential based on demographic characteristics is determined based on statistical comparison between the selected community of concern and a series of statistical reference areas. 1990 Census block group data are used for this determination. Assessment of disproportionate burden is based on a set of indicators in the Environmental Load Profile, which currently contains the following elements: (1) Relative Burden Analysis based on data from TRI; (2) Facility Density vs Population Density; (3) Ambient Air Quality; and (4) Land Use. Additional indicators will be added as data become available. The application is a work in progress pending public release of the Region 2 Policy on Identifying environmental justice areas and development of a statistical methodology for defining environmental justice areas. Statistical method development is a cooperative effort among Region 2 staff, and researchers from EMSL Las Vegas and Hunter College. Eventually the tool will be migrated from an ArcView application to a web-based tool.

## Chapter 5
### *Assessment Methodologies, Assessment Guidance, and*
### *Community Assessments*

## Region 6

**Federal Facilities Assessments.** Evaluation of environmental risks from federal facilities require assessments of several unique issues. Toxicities from spent munitions, low level nuclear waste, air and water emissions from aircraft operations and maintenance, and land destruction are a few of these issues. Part of the assessment of federal facilities includes the region's Environmental Justice Index. The economics, housing, and minority representation of service personnel is different from the general population. The Region's Environmental Justice Index is used to identify these different stressors and demographics. In partnership with Region 6, the Department of Defense will have two Army facilities pilot the environmental assessment GIS screening methodology, which includes evaluation of environmental justice and other socioeconomic parameters.

**Healthy Environments and Living Places (HELP) For Kids:** The methodologies and material for the Healthy Environments and Living Places (HELP) for Kids Project were finalized. HELP for Kids is a program that supplies local community organizations with the material and training to assist community members in evaluating their homes, home-based child care, or schools for the environmental threats their children are exposed to on a day-to-day basis. All environmental issues inside these three (3) environments are evaluated, including indoor air quality, lead-based paint, asthma, pesticides, mold, hazardous household materials, and radon. The program was pilot tested in Albuquerque, New Mexico with the American Lung Association where training and several investigations were conducted. A grant was given to a local non-profit organization, the Community Health Partnership, to continue the program in a low-income, Spanish-speaking area of Albuquerque.

## Region 10

**Geo-referenced Environmental and Health Databases.** In support of efforts to identify communities that receive disproportionate impacts, the Office of Civil Rights and Environmental Justice (OCREJ) has worked with Oregon Department of Environmental Quality (ODEQ), Washington Department of Health and OEA to identify and acquire geo-referenced environmental and health databases for the states of Oregon and Washington. This information will augment databases currently available through the Regional GIS mapping program, providing information on health and environmental impacts normally residing in state and local environmental agency databases.

## *Chapter 5*

### *Assessment Methodologies, Assessment Guidance, and Community Assessments*

### Community/Site Specific Assessments

**Region 4**

**Project XL - Atlantic Steel Redevelopment.** Environmental justice staff created a special Environmental Justice Focus Group (comprised of local environmental and environmental justice advocates) to ensure compliance with the Executive Order on Environmental Justice 12898 and help identify/address community concerns regarding the proposed redevelopment plan and the Project XL Agreement. The Project XL Team (Region 4 management and staff) responded to a couple of key issues: water management, and revisiting the Superfund assessment of an adjacent EPA Removal site. Environmental justice staff contributed to the development of an environmental justice methodology that was used in the NEPA Environmental Assessment

**Region 5**

**Stormwater Management Effort in the Metro East Area.** - In August, September, and October 1999, Gateway Team members attended a series of meetings of the Metro East Regional Stormwater Committee. The Committee, made up of representatives from local, state, and federal government, exists to solve water quantity and quality problems that are a result of stormwater in the Metro East St. Louis area. The Gateway Team has facilitated the process of creating a strategic plan which not only represents the Committee's goals but strives to create a regional stormwater implementation plan. This document will: (1) educate and bring a vision to the greater community; (2) initiate assistance in carrying out stormwater goals; (3) serve as the Committee's recommendation at the state and county levels; and (4) showcase past collaborative stormwater efforts initiated by Committee members. The document is planned for completion by the end of 2000 and the objective is to disseminate the document to the larger community for input via public meetings and forums which the Gateway Team will facilitate. The Gateway Team began concentrating on the stormwater effort due to community concerns and as part of its overall work to pursue sustainable growth principles in the Metro East St. Louis area.

**Region 6**

**Dioxin Exposure Investigation.** In December 1998, the Agency for Toxic Substances and Disease

### Chapter 5
# Assessment Methodologies, Assessment Guidance, and Community Assessments

Registry (ATSDR) conducted an Exposure Investigation (EI). The purpose of the EI was to determine if there was evidence of exposure to dioxins in Mossville, Louisiana residents. Blood samples were collected from 28 community residents and were analyzed for chlorinated dibenzodioxins (CDDs), chlorinated dibenzofurans (CDFs), and coplaner polychlorinated biphenyls (PCBs). A limited investigation of environmental contamination was also conducted: four surface soil samples and two chicken eggs were collected and analyzed for CDDs and CDFs. A breast milk sample from one resident was also analyzed. ATSDR, the Louisiana Department of Health and Hospitals (LDHH), LDEQ, and EPA is currently involved in a multi-agency effort to determine the source and extent of the high serum dioxin levels.

**Citizens' Air Monitoring "Bucket Brigade."** Region 6 awarded a grant to a Calcasieu Parish environmental action group in FY99 in the amount of $50,000 to be used for activities related to air monitoring and analyses via the bucket brigade. The bucket brigade is a community-based air sampling program that uses special buckets to capture air samples during industrial accidents or emissions or when residents smell chemical odors. The samples will be sent to Region 6's Houston lab to be tested and determine whether neighbors of local industrial plants were exposed to toxic chemicals. This effort empowers residents to execute their own air monitoring program and assess potential effects of emissions on their health and environment.

---

**Region 8**

**North Park Hill Community Assessment.** This community is in northeast Denver, immediately east of the VB/I-70 Superfund site. The residents of North Park Hill are primarily low-income with mixed ethnicity (largely African American with some Hispanic and white populations). The National Association of Black Environmentalists (NABE) received an Environmental Justice Through Pollution Prevention grant to identify possible sources of pollution in the neighborhood and identify mitigation measures. To achieve these goals, several residential yards were sampled for arsenic. From the 30 yards sampled, five (5) to seven (7) showed arsenic concentrations in excess of 400 parts per million. The source of the arsenic was not identified. These findings have raised a number of issues for Region 8. Are these findings associated with the contamination in the VB/I-70 Superfund site? What potential exposure do residents face? How extensive is this contamination? What are the probable sources (airborne smelter wastes, fill material from nearby smelters, pesticides/herbicides)? What should Region 8 do about this problem? Who is responsible for paying for any follow-up actions? Region 8 is coordinating follow-up activities with the State of

---

*Chapter 5*

*Assessment Methodologies, Assessment Guidance, and*
*Community Assessments*

Colorado and the City and County of Denver.

**Region 10**

**Environmental Impact Statement Environmental Justice Reviews.** OCREJ performed Environmental Impact Statements (EIS) reviews for three projects in Washington state: (1) Central Link Light Rail Transit Project in Seattle; (2) Service Road 167 Corridor in Tacoma; and (3) White River (Muckleshoot Indian Reservation) Amphitheater in Auburn. Each EIS was reviewed to determine if appropriate measures were taken to identify environmental justice communities, if environmental justice communities were subject to disproportionate impacts, and, if public participation was adequate and meaningful. Of particular importance is the involvement by OCREJ in the Central Link Light Rail Transit Project in Seattle. OCREJ has been the Regional point of contact for citizen concerns regarding the disproportionate environmental, health and quality of life impacts in low-income and minority neighborhoods. In addition, OCREJ is a member of the EIS development team for the Pogo Mine project in Alaska.

**Assessing Impacts to Communities from Facilities Regulated by Title V.** Region 10 OCREJ, worked with the Office of Air Quality (OAQ), the Office of Environmental Assessment (OEA), and the Oregon Operations Office (OOO), to identify potential environmental justice communities in Portland, Oregon, that may be affected by a facility regulated under Title V of the Clean Air Act. OCREJ and the OOO were contacted by residents of the area indicating that their concerns about air toxics, odor and particulate impacts on environmental justice communities were not adequately addressed by Oregon Department of Environmental Quality in their review of the facility's Title V permit. OCREJ has identified the communities in the area that meet national income and people of color population criteria, and will be working with OAQ and OEA to determine if those communities meeting national environmental justice criteria are disproportionately impacted by the facilities in the area.

*Chapter 6*
_____
*Targeting, Environmental Health, and Exposure Studies*

EPA has long been involved in studies to identify contaminates in the environment and understand their impact on public health. The Agency also recognizes the importance of compliance assistance and enforcement in preventing and reducing unlawful emissions of contaminants into the environment.

Protecting the health of all communities represents a formidable challenge to the Agency. However, this responsibility does not rest solely with EPA, but is shared with other federal agencies (e.g. Department of Health and Human Services, Centers for Disease Control, Agency for Toxic Substances and Disease Registry, National Institute for Environmental Health Sciences.) In January 2000, the U.S. Surgeon General issued the publication, "Healthy People 2010: Understanding and Improving Health." The second goal presented in this report is to eliminate health disparities among different segments of the population. According to the report, there is clear evidence of health disparities among under-served minority groups. The report identifies environmental quality as a leading health indicator.

EPA is working with other agencies to secure disease prevention and health improvements in communities where health disparities exist that may result from, or be exacerbated by, disproportionate effects of environmental pollutants and certain racial, ethnic and socioeconomic factors. The Agency is seeking to accomplish this goal in a couple of ways: (1) targeting compliance assistance and enforcement of environmental laws; and (2) conducting studies which look at environmental health and exposure of minority and low-income communities. The following chapter discusses some of these compliance efforts and specific studies.

## Targeting Studies

**Region 4**

**Using Compliance Activity Tracking System (CATS) Data to Target Farm Worker Protection Efforts.** CATS Worker Protection Standard data and farm worker Department of Agriculture data were compared and presented to state pesticide program leaders at their semiannual meeting. Comparisons/analyses such as these help states target specific geographic areas for increases in farm worker protection efforts. Additionally, regional project officers gain insight into a state's worker protection program which can be valuable during grant negotiations and assessing state needs.

*Chapter 6*
*Targeting, Environmental Health, and Exposure Studies*

## Region 8

**North Denver Environmental Initiative.** In partnership with the state, counties, and cities, the Environmental Justice Program has initiated a three year effort to focus enforcement, compliance assistance and pollution prevention activities in the North Denver area. During public meetings sponsored by Region 8, as part of the Vasquez Boulevard/I-70 Superfund project, numerous non-Superfund environmental concerns were voiced by the North Denver environmental justice communities. Citizens described concerns about negative health effects that they believe to be the result of the saturation of industrial and other pollution generating uses in the area. The North Denver Environmental Initiative (NDEI) is Region 8's response to these concerns. The NDEI is envisioned to be a cooperative partnership utilizing federal, state, county, and local government authorities to proactively address community concerns regarding potentially harmful environmental consequences of the industrial and transportation developments in their neighborhoods. Region 8 seeks to work with the Colorado Department of Public Health and Environment, the City and County of Denver, Tri-County Health Department, and Commerce City on this initiative. NDEI goals are to: (1) get NDEI industrial facilities into compliance through increased enforcement and compliance assistance; (2) get NDEI industrial facilities above and beyond compliance through pollution prevention; and (3) effectively work with all NDEI partners. The NDEI area includes the Vasquez Boulevard/I-70 Superfund site and almost 500 industrial sources within and surrounding the Vasquez Boulevard/I-70 site. The environmental justice communities involved include Swansea/Elyria, Globeville, Cole and Clayton. Region 8 has conducted 35 inspections as part of the NDEI.

## Region 9

**Lead Inspections.** The Department of Housing and Urban Development (HUD) and the Department of Justice (DOJ) selected three large, metropolitan areas of the country which have large inner-city areas where lead poisoning from lead-based painting was expected to be prevalent. Los Angeles was selected in Region 9. Based on information provided by the state and county, Region 9 joined HUD and DOJ to target and conduct inspections of apartment complexes where children with elevated blood lead levels were living. The three agencies conducted 44 inspections in large, older apartment complexes. The potential cases were divided between HUD and EPA. Region 9 has since issued three notices of noncompliance or violations of the lead disclosure rule.

**Environmental Justice Enforcement Strategy.** Region 9 completed an environmental justice enforcement strategy as the first step in integrating environmental justice into its enforcement activities. Targeting inspections and utilizing Supplemental Environmental Projects have been highlighted as potential means to apply an environmental justice enforcement strategy. For FY 2000, the Region focused on environmental justice communities in the Los Angeles area. Three communities have been identified (South Central Los Angeles, East Los Angeles, Southeast Los

*Chapter 6*

## *Targeting, Environmental Health, and Exposure Studies*

Angeles.) Each media division has developed an environmental justice enforcement work plan for environmental justice communities in Los Angeles. The environmental justice enforcement work plans include the participation of state, county and local agencies in the implementation of enforcement related efforts.

### Environmental Health Assessments/Studies

**Centers of Excellence in Children's Environmental Health Research.** The Office of Pesticides Programs and the Department of Health and Human Services have funded eight "Centers of Excellence in Children's Environmental Health Research." Two of these centers involve farm worker's children. The University of California at Berkeley will evaluate pesticide exposures and growth/developmental status in the Salinas area, and the University of Washington will study the health of children living in the farm worker community in the Yakima Valley.

**Neural Tube Defect (NTD) Assessment Along The US-Mexican Border.** The project purpose is to document and reduce the prevalence of NTD on both sides of the border and elsewhere in Mexico through case-control and epidemiological studies, fortification of flour and grain food products, training of health professionals in the border region, and education of at-risk populations.

**Region 1**

**Lawrence Risk-Based Air Screening.** To identify the tools and actions that can best reduce the risks to human health posed by air pollution in the city of Lawrence, MA, EPA seeks to identify the most significant contributors to human health risk from air pollution. EPA has funded a project through an Environmental Monitoring for Public Access and Community Tracking (EMPACT) grant that is being used to support community outreach and participation in Lawrence, MA.

This project uses a combination of existing data on ambient air quality, modeling of Hazardous Air Pollutants (HAPs), and other information to identify the chemicals (HAPs) and sources of air pollution that are contributing the most to human health risk and decreased quality of life in the city of Lawrence, MA. The project essentially seeks to assess the impact of air pollution from stationary and mobile sources on human health, and to prioritize the contributors to that risk in order to determine what chemicals or sources make ideal targets for community and government response. The project is conducted in collaboration with key community partners, and incorporates feedback and guidance from these stakeholders. The prioritization of pollution sources is being used to develop an "action agenda" to identify community-based measures that can be taken to reduce the impact of the most hazardous chemicals or sources.

The first major task is the development of a list of chemicals, facilities, and other sources of air pollution ranked according to impacts on human health and other criteria identified by stakeholders. The second major task is the communication of these results to the larger community.

*Chapter 6*

*Targeting, Environmental Health, and Exposure Studies*

The third task is the identification of action items necessary to reduce the most significant hazards, and the development of a community-based action agenda.

To accomplish this project Region 1 has partnered with EPA Headquarters, OPPTS (technical assistance), Lawrence Environmental Justice Committee, Community Health Network Area 11 - Environmental Committee, Massachusetts Department of Environmental Protection, and the Massachusetts Department of Public Health. Other stakeholders involved in this project are the Lawrence community residents, business and industry, the City of Lawrence, MA, academic institutions (including Merrimack College and Northern Essex Community College).

**Region 3**

**South/Southwest Philadelphia Environmental Health Characterization.**   Region 3, in partnership with Johns Hopkins University, the Agency for Toxic Substances and Disease Registry (ATSDR), the Commonwealth of Pennsylvania, the City of Philadelphia, academics who serve on a science advisory board, and local communities in the City of Philadelphia are working to develop strategies to measure the level of key pollutants in the environment. The citizens of the study area continue to request that EPA address their environmental concerns, specifically the air emissions from the numerous auto repair body shops located in South Philadelphia. Di-isocyanates, an air emission from auto repair shops, is one of the main pollutants of concern to the South Philadelphia residents. Johns Hopkins University and ATSDR had recommended that further study be conducted on the potential impact of di-isocyanates on the community. The partners associated with this effort continue to work together to address concerns, and serve on the City of Philadelphia's Ad Hoc Air Advisory Committee, as a result of the collaborative effort.

**Chester, Pennsylvania Environmental Risk Study.**   Located approximately 15 miles south of Philadelphia, the City of Chester's minority population is approximately 70 percent. Chester has the highest concentration of industrial facilities in Pennsylvania, including two oil refineries, a large medical waste facility, the Delaware County wastewater treatment plant, a large trash to steam facility, and other waste facilities. Residents of Chester have long been concerned about the health effects of living and working among toxic substances. Chester has the highest infant mortality rate coupled with the lowest birth rate in the state. Since the early 1990s, Region 3 has been working, in cooperation with the Commonwealth of Pennsylvania, to address the environmental risks, health, and regulatory issues in Chester.

The Chester Implementation Workgroup, made up of representatives from the stakeholder groups in Chester, was created to address issues identified by the community relating to health, quality of life and land use. Representatives from 30 different federal, state, county or city agencies/departments, and citizens groups participated in this workgroup. The workgroup distilled the fifty (50) identified problem areas into five (5) key areas that predominantly impact the children and youth of the City of Chester. The first area to be addressed was the reduction of children's blood

lead levels. Region 3, the Department of Housing and Urban Development, Center for Disease Control (CDC), Health and Human Services, and the Agency for Toxic Substances and Disease Registry participated in the planning and strategy sessions, along with the Health Department of the City of Chester and the Commonwealth of Pennsylvania. The City of Chester obtained additional funding for its Childhood Lead Poisoning Program from the CDC and Delaware County. Region 3's Office of Enforcement, Compliance and Environmental Justice has provided the partners with insights and perspectives on risk assessment, community and stakeholder involvement, public participation, and various aspects of environmental justice including; historical perspectives, trends, models, and strategy development. A Supplemental Environmental Project (SEP), resulting from an EPA enforcement action taken in Chester, is on-going. The SEP is administrated by Chester Residents Concerned for Quality Living. The group, as part of the SEP, is attempting to complete an extensive blood lead survey of children in Chester. Also, as part of the SEP, the group is also involved in the cleaning of homes in Chester to remove lead contamination.

**Region 8**

**North Casper Community Alliance.** A community-based organization in Casper approached the State of Wyoming and Region 8 for assistance in addressing health issues that residents believe to be the result of air, water, and soil contamination in their neighborhood. Studies conducted in the North Casper neighborhood detected groundwater plumes containing PCE and other compounds, and soil and indoor air contamination. EPA and the State of Wyoming requested involvement from the Agency for Toxic Substances and Disease Registry (ATSDR) to conduct health-based investigations. ATSDR and EPA are discussing the formation of a "community alliance" to address the health concerns expressed by the residents. Region 8, ATSDR personnel, state and city representatives, and community members have committed to work together to address the range of concerns raised.

**Region 9**

**Tucson, AZ.** Residents of the south side of Tucson, AZ were exposed to unsafe levels of an industrial solvent, trichloroethylene (TCE), which was discovered in their drinking water supply by EPA and the City of Tucson in 1981. EPA listed a large section of Tucson's south side as a Federal Superfund Site in 1982 and since then, work to investigate and cleanup the TCE contamination has been on-going. The affected community is 50 to 75% Latino (according to the 1990 census) and low-to-medium income. Community concern has always focused on potential adverse health effects caused by historic TCE exposure and obtaining access to health care for potential TCE-related illnesses.

     Other community concerns include access to health and technical information about TCE and EPA's TCE cleanup actions, eliminating any potential on-going exposure to TCE, addressing

negative economic impacts caused by the contamination, and taking legal action against the companies responsible for the TCE contamination. Several grassroots community groups have formed to provide a voice to these community concerns and several of these groups established ties with the Southwest Network for Economic and Environmental Justice (SNEEJ).

On November 4, 1999, SNEEJ met with Region 9 management to express their dissatisfaction with the level of community involvement in the negotiation of the Airport Property Consent Decree which was lodged on June 17, 1999. They were concerned that: (1) the community was not given adequate notice that EPA was entering into negotiations with the potentially responsible parties (PRPs); (2) EPA did not keep the community apprised of the Consent Decree negotiations while they were occurring; and (3) a representative of the community did not participate in the Consent Decree negotiations. SNEEJ also raised concerns about the existing Unified Community Advisory Board (UCAB) bylaws not meeting environmental justice principles.

As requested by SNEEJ, EPA will continue to update the Community Involvement Plan for the site. As part of this effort, EPA conducted community interviews to assess the Tucson community needs and how the Agency can address them. EPA is continuing to explore available resources to provide technical support to the community. The local community continues to be frustrated by the lack of federal action regarding access to health care.

**Ritualistic Uses of Mercury.** Certain ritualistic, cultural and ethnic uses of elemental mercury may pose a significant health risk. EPA is leading the multi-agency Ritualistic Use of Mercury Task Force to address concerns of potential elemental mercury exposure in some Latin American and Caribbean communities in the United States. The Task Force includes representatives from EPA, the Agency for Toxic Substances and Disease Registry (ATSDR), State and local health departments, State environmental agencies and national Hispanic and Caribbean organizations.

The Task Force will: (1) Gather and share information about efforts to evaluate the extent of the problem; (2) Design a community-based strategic plan for education and outreach to reduce use of, and exposure to, mercury; (3) Develop a research agenda to better define the extent of distribution and problems resulting from ritualistic uses of mercury; and (4) Draft a proposed Public Health and Environmental Management Protocol for Dealing with Ritualistic Uses of Mercury, if needed. This protocol would be developed as information becomes available about the extent of the problem and populations at risk. The protocol would cover outreach to affected populations, health education activities and identify tiers of action to follow if a response is needed.

**U.S.-Mexico Border Environmental Health Surveillance Demonstrations: Air Pollution and Childhood Asthma.** As part of the effort to improve the quality of health related to environmental issues along the border, EPA in partnership with other agencies, is supporting the binational data gathering of asthma prevalence in elementary school children. Once adequate data bases are established and analyzed, this information will be linked to air pollution levels/environmental conditions at the time of increases in asthma reporting. Having baseline data on childhood asthma

*Chapter 6*
*Targeting, Environmental Health, and Exposure Studies*

related illnesses and the linkage with air pollution/environmental conditions from the binational U.S.-Mexico border states will assist state and federal agencies with future planning of health services and environmental health surveillance activities.

## Exposure Studies

**Pesticide Exposure**. The Office of Pesticides Programs (OPP) is collecting data on pesticides exposures by co-funding and providing consultation to the National Institute for Occupational Safety and Health (NIOSH) for pesticide case reporting projects (surveillance systems) in five (5) states: California, New York, Texas, Oregon and Florida. The surveillance systems, located in the state health departments, include the collection of reports on human incidents of pesticide intoxication, review of trends in disease over time and the response to outbreaks of disease. There is emphasis placed on outreach and training to involved groups within the community (industry/farmers, workers, community residents, health care providers and local government). Whenever possible, information is obtained on take-home exposures to children as well as an evaluation of child or adolescent farm work. It is anticipated that preliminary data on the first year of pesticide case reports for these five states will be available in early 2001.

**Characterizing the Unique Aspects of Human Exposure in Low SES Communities in the Research Triangle Park, NC Area**. This partnership is intended to improve the scientific community's ability to conduct human exposure research in low socioeconomic status (SES) communities. This project will contribute to the advancement of knowledge for conducting human exposure research in low SES communities and communicating the results of such studies to the affected communities. The results of this project will also benefit the local community where the studies are conducted by improving outreach into the community. The project will focus on four issues:  1) Identifying environmental justice issues in the community; 2) Linking community members with researchers and health care providers through a series of research, education, and outreach strategies designed to assess the environmental and health conditions of low SES communities and to work toward improving these conditions; 3) Developing improved techniques that will increase participant recruitment and retention rates for human exposure studies in low SES communities; and 4) Developing improved techniques for communicating the results of studies in low SES communities to the targeted populations.

### Region 3

**Baltimore Urban Environmental Initiative (BUEI)**. The BUEI is a major project being conducted in Baltimore in cooperation with Maryland Department of the Environment (MDE), the Baltimore City Health Department, and the Baltimore City Planning Department. This project is a cooperative effort being conducted to identify and rank areas of disproportionate risk in the City of Baltimore

*Chapter 6*
*Targeting, Environmental Health, and Exposure Studies*

for purposes of implementing risk reduction, pollution prevention, public awareness and other activities to effectively eliminate, or at least minimize these risks. A two track approach was taken in order to achieve these goals. An action oriented Short-Term Track, and a Long-Term Track which incorporates risk screening and the development of focus groups to achieve project goals. In the Short-Term Track, grants awarded to the City of Baltimore and MDE have led to the development of a number of projects designed to address environmental concerns in the areas of lead, hazardous materials incidents, indoor air quality, fish consumption/toxins in the Baltimore Harbor, ground-level ozone pollution, and air toxins.

**Region 6**

**Monitoring Activities for Ponca Tribe of Indians of Oklahoma:** Region 6 is providing monitoring support for the Ponca Tribe of Indians (Ponca) of Oklahoma by providing grant funding for the Oklahoma Tribal consortium, Inter-Tribal Environmental Council of Oklahoma (ITEC) to place and run air monitors on Tribal lands. The Ponca lands are between the Conoco, Inc., refinery and the Continental Carbon Company, a carbon black plant. The monitors are measuring five criteria pollutants, PM10, and PM2.5, and have been in place since April 1999. Tribal members have previously complained of respiratory problems and grey/black particles that cover their cars and homes, to Region 6. Once ITEC accumulates sufficient monitoring data, the region will make its determination as to the most appropriate action to pursue.

**Region 8**

**Vasquez Boulevard/I-70.** The Vasquez Boulevard/I-70 Superfund site contains high levels of arsenic and lead in residential soils. Region 8 and the Agency for Toxic Substances and Disease Registry (ATSDR), in conjunction with the affected North Denver communities, are looking at the exact nature and extent of the contamination and are assessing the extent of community exposure. The site comprises more than four thousand houses surrounded by significant heavy and light industry and bisected by a major Interstate highway. The neighborhoods are acutely aware of the proximity of industry and its impacts on their way of life and their health.

The community has come together to work on the removal of contaminated soils with the EPA, ATSDR, the State of Colorado and the City and County of Denver. As a part of this effort, the community has brought their concern over commonly-observed incidences of asthma, thyroid disorders, cancer and skin irritations to the various agencies. ATSDR is performing a Public Health Assessment as a part of its obligations under Superfund. Additional health and epidemiological studies have been discussed by all parties as possible follow-ups to Superfund remediation.

## *EPA Environmental Justice Coordinators*

**For Headquarters:**

Use this address and the Mail Code (MC)
1200 Pennsylvania Avenue NW
Washington, DC 20460

## **HEADQUARTERS**

| CONTACTS: | E-MAIL | OFFICE # | FAX # |
|---|---|---|---|

**OFFICE OF ADMINISTRATION AND RESOURCES MANAGEMENT - MC-3102-A**

| | | | |
|---|---|---|---|
| Carolyn Levine | levine.carolyn@epa.gov | **202-564-1859** | F: 202-564-1887 |

**OFFICE OF AIR AND RADIATION**
**MC-6101-A**

| Wil Wilson | wilson.wil@epa.gov | **202-564-1954** | F: 202-564-1549 |
|---|---|---|---|

**AMERICAN INDIAN ENVIRONMENTAL**
**OFFICE - MC-4104**

| Bob Smith | smith.bob@epa.gov | **202-564-0278** | F: 202-564-1836 |
|---|---|---|---|

**OFFICE OF CIVIL RIGHTS - MC-1201-A**

| Mike Mattheisen | mattheisen.michael@epa.gov | **202-564-7291** | F: 202-501-1836 |
|---|---|---|---|

**OFFICE OF COMMUNICATION,**
**EDUCATION & MEDIA RELATIONS - MC-1702-A**

| Doretta Reaves | reaves.doretta@epa.gov | **202-564-7829** | F: 202-501-1773 |
|---|---|---|---|

**OFFICE OF ENFORCEMENT AND**
**COMPLIANCE ASSURANCE - MC-2201-A**

| Shirley Pate | pate.shirley@epa.gov | **202-564-2607** | F: 202-501-0284 |
|---|---|---|---|

**OFFICE OF ENVIRONMENTAL INFORMATION**
**MC-2812-A**

| Janice Jablonski | jablonski.janice@epa.gov | **202-564-6663** | F: 202-501-1627 |
|---|---|---|---|

**OFFICE OF ENVIRONMENTAL JUSTICE - MC 2201A**

| Mustafa Ali | ali.mustafa@epa.gov | **202-564-2606** | F: 202-501-0740 |
|---|---|---|---|

**OFFICE OF GENERAL COUNSEL - MC-2322-A**

| Jeff Keohane | Keohane.jeff@epa.gov | **202-564-5548** | F: 202-564-554 |
|---|---|---|---|

**OFFICE OF INTERNATIONAL ACTIVITIES - MC-2610R**

| Wendy Graham | graham.wendy@epa.gov | **202-564-6602** | F: 202-565-2408 |
|---|---|---|---|

*Appendix*

## *EPA Environmental Justice Coordinators*

| CONTACTS: | E-MAIL | OFFICE # | FAX # |
|---|---|---|---|

**OFFICE OF POLICY, ECONOMICS & INNOVATION - MC-1802**

| | | | |
|---|---|---|---|
| Katherine Dawes | dawes.katherine@epa.gov | **202-260-8394** | F: 202-260-3125 |
| Daria Willis | willis.daria@epa.gov | **202-260-7424** | |

**OFFICE OF PREVENTION, PESTICIDES & TOXIC SUBSTANCES - MC-7101-M**

| | | | |
|---|---|---|---|
| Elaine Lyon | lyon.elaine@epa.gov | **202-564-0547** | F: 202-564-0660 |

**OFFICE OF REGIONAL OPERATIONS - MC-1108**

| | | | |
|---|---|---|---|
| Rochele Kadish | kadish.rochele@epa.gov | **202-564-3106** | F: 202-501-0062 |

**OFFICE OF RESEARCH AND DEVELOPMENT - MC-8103-R**

| | | | |
|---|---|---|---|
| Brenda E. Washington | washington.brenda@epa.gov | **202-564-6781** | F: 202-565-2912 |

**OFFICE OF SOLID WASTE AND EMERGENCY RESPONSE - MC-5101**

| | | | |
|---|---|---|---|
| Rey Rivera | rivera.reiniero@epa.gov | **202-260-1910** | F: 202-260-6606 |

**OFFICE OF WATER - MC-4102**

| | | | |
|---|---|---|---|
| Alice Walker | walker.alice@epa.gov | **202-564-0498** | F: 202-269-3597 |

---

## REGIONAL CONTACTS:

**USEPA, REGION 1**
Kathy Castagna
One Congress Street, 11th Floor
Boston, MA 02203-0001

castagna.katherine@epa.gov    **617-918-1429**    F: 617-918-1029

**USEPA, REGION 2**
Terry Wesley
290 Broadway, 26th Floor
New York, NY 10007

wesley.terry@epa.gov    **212-637-5027**    F: 212-637-4943

**USEPA, REGION 3**
Reginald Harris
1650 Arch St. (MC-3ECOO)
Philadelphia, PA 19103

harris.reggie@epa.gov    **215-814-2988**    F: 215-814-2905

**USEPA, REGION 4**
Cynthia Peurifoy
61 Forsyth Street
Atlanta, GA 30303

peurifoy.cynthia@epa.gov    **404-562-9649**    F: 404-562-9664

# Appendix

## *EPA Environmental Justice Coordinators*

| CONTACTS: | E-MAIL | OFFICE # | FAX # |
|---|---|---|---|
| **USEPA, REGION 5**<br>Karla Owens<br>77 West Jackson Blvd. T-16J<br>Chicago, IL 60604-3507 | ownes.karla@epa.gov | **312-886-5993** | F: 312-886-2737 |
| **USEPA, REGION 6**<br>Olivia R. Balandran<br>Fountain Place, 12th Floor.<br>1445 Ross Ave., (RA-D)<br>Dallas, TX 75202-2733 | balandran.olivia-r@epa.gov | **214-665-7257** | F: 214-665-6648 |
| **USEPA, REGION 7**<br>Althea Moses<br>901 North 5th Street (ECORA)<br>Kansas City, KS 66101 | Moses.althea@epa.gov | **913-551-7649** | F: 913-551-7941 |
| **USEPA, REGION 8**<br>Elisabeth Evans<br>999 18th Street, Suite 500<br>Denver, CO 80202-2405 | evans.elisabeth@epa.gov | **303-312-6053** | F: 303-312-6409 |
| **USEPA, REGION 9**<br>Willard Chin<br>75 Hawthorne Street<br>San Francisco, CA 94105 | Chin.willard@epa.gov | **415-972-3797** | F: 415-947-3562 |
| **USEPA, REGION 10**<br>Michael Letourneau<br>Victoria Plata<br>1200 Sixth Avenue (CEJ-163)<br>Seattle, WA 98101 | letourneau.mike@epa.gov<br>plata.victoria@epa.gov | **206-553-1687**<br>**206-553-8580** | F: 206-553-7176<br>F: 206-553-7176 |

# 19

| MANLEY | ○ MICHAEL | RODAMIAN | 7 | 29 | 74 |
|--------|-----------|----------|---|----|----|
| LAST NAME (PLEASE PRINT) | FIRST NAME | MIDDLE NAME | MO. | DAY | YEAR |
| | | | DATE OF BIRTH | | |

| GRADE | PM | 1 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | | |
|-------|----|---|---|---|---|---|---|---|---|---|---|----|----|----|---|---|
| ROOM NO. | K-1 | 5 | 6 | 7 | 19 | 23 | 16 | 27 | G | A | 412 | 311 | 209 | 108 | | |

| GRADE | | | | | | | | | | | | | | | | |
|-------|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ROOM NO. | | | | | | | | | | | | | | | | |

**GRADUATED** 9-1-88

Date entered this _____ School

From _____

Case 1:07-cv-00472-GMS   Document 12-4   Filed 02/05/2008   Page 3 of 61

CARR, MELVIN - RITA    291-1181

LAST NAME: Manley   FIRST NAME AND INITIALS: Michael
PRESENT GROUP: 8A   PRESENT ADVISER: E.D. PALADINO
RESIDENCE: 2307 HOYT TER   ZIP CODE: 45
PARENT SCHOOL: Vare Middle
DATE OF BIRTH: MONTH 7 DAY 29 YEAR 7(?)
PRESENT CURRICULUM: ACAD   PUPIL I.D.: 804 244 2
DATE OF ENTRANCE TO GRADE 1: 9  8(?)

| YEAR ENDING JUNE 19__ | PREVIOUS YEAR | FIRST REPORT | END OF YEAR |
|---|---|---|---|
| DAYS ABSENT – EXCUSED | 6 | 3 | |
| – UNEXCUSED | 4 | 2 | |

| SUBJECT | MARK | MARK | MARK |
|---|---|---|---|
| ENGLISH | A | A | |
| READING | | | |
| SOCIAL STUDIES | A | A | |
| PA. & AMER. HISTORY AND GOVT. | | | |
| WORLD HISTORY & GOVTS. | | | |
| MATH. *( ) | A | B | |
| SCIENCE | C | A | |
| FOR. LANG. SPANISH I | B | A | |
| INTRO. TO BUSINESS | | | |
| TYPING | B | | |
| ART | B | C | |
| MUSIC | B | A | |
| HOME EC. *( ) | B | | |
| SHOP *( Print ) | A | | |
| DRAWING-MECH. | | | |
| PHYSICAL EDUCATION | C | C | |
| HEALTH EDUCATION | B | D | |
| Computer Sc. | A | B | |

NEXT YEAR'S OBJECTIVES
SENIOR HIGH CURRICULUM:
AREA VOC.-TECH. CURRICULUM FIRST CHOICE:
SECOND CHOICE:
THIRD CHOICE:

SUBJECTS SELECTED

| CODE NO. | SUBJECT | YEAR OF SUBJ. | PERIOD |
|---|---|---|---|
| | ENGLISH | 1 | |
| | HEALTH EDUCATION | | |
| | PHYSICAL EDUCATION | | |
| | MATH. *( A/2 ) | 1 | |
| | FOR. LANG.*( Sp. ) | 1 | |
| | Gen. Science | | |
| | World History | | |
| | PE/Music | | |
| | TOTAL | | |

*INSERT INITIAL LETTER AND YEAR OF SUBJECT

ROSTER FOR NEW YEAR
NEW SCHOOL: Central   NEW GRADE: 9
NEW ADVISER:
NEW GROUP NO.:

| DAY | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| M | | | | | | | | | | |
| T | | | | | | | | | | |
| T | | | | | | | | | | |
| F | | | | | | | | | | ✓ |

H-86 (11/82) DATA FOR DETERMINING ROSTER FOR NEXT YEAR - BOY & GIRL - SDSN 445424

TEST SCORE PROFILE____ GRADE _8_

### CALIFORNIA ACHIEVEMENT TESTS CITY-WIDE PROGRAM

_Nov. 87_

| READING | | | MATHEMATICS | | | LANGUAGE | | | | TOTAL BATT-E |
|---|---|---|---|---|---|---|---|---|---|---|
| VOCAB | COMPR | TOTAL | COMPU | CONCPT & PROB | TOTAL | MECH | USG & ST | TOTAL | SPELL | |
| | | _94_ | | | _95_ | | | | | _97_ |

NATIONAL PERCENTILE RANK (ENTER SCORES ABOVE)

EXPLANATION OF ANY SPECIAL REASONS FOR CURRICULUM CHOICE

EXPLANATION OF EXTENDED ABSENCE

OTHER SIGNIFICANT INFORMATION

### ENTRIES BY AREA VOCATIONAL-TECHNICAL SCHOOL ONLY

DATE APPLICATION RECEIVED_____ 19_____ DATE RETURNED_____ 19____

| DIRECTIONS TO SENDING SCHOOL | CHOICE | | |
|---|---|---|---|
| | FIRST | SECOND | THIRD |
| SEND APPLICANT FOR TESTS AND INTERVIEW | | | |
| AREA VOC.-TECH. SCHOOL WILL ENROLL APPLICANT | | | |
| NAME WILL BE PLACED ON WAITING LISTS | | | |

NOT ACCEPTED _____ 19_____ FOR REASONS CHECKED BELOW:

| | | | | |
|---|---|---|---|---|
| | PAST SCHOOL RECORD | | HEALTH | CLASS ALREADY FILLED |
| OTHER TESTS | VOCATIONAL APTITUDE | | ATTENDANCE | |

| ID. | LAST NAME | FIRST NAME AND INITIAL | BIRTHDATE MO. DAY YR. | PARENT'S FIRST NAMES OR GUARDIAN'S FULL NAME |
|---|---|---|---|---|
| 8042442 | MANLEY MICHAEL | | 07 29 74 | RITA-MELVIN CARR |

| | RESIDENCE | ZIP CODE | TELEPHONE | SCHOOL | NO. | GR. | RM. RK. NO. |
|---|---|---|---|---|---|---|---|
| | 2307 HOYT TER | 45 | 271-1181 | VARE | 212 | 8 | A |

| EMERGENCY CONTACT | NAME | RELATIONSHIP | ADDRESS | TELEPHONE |
|---|---|---|---|---|
| | *Lorraine Upshur* | | | 755-9475 |

## RECORD OF ATTENDANCE - SEPTEMBER 1987 - JUNE 1988

**ABSENCE FOR PREVIOUS YEAR**

| | |
|---|---|
| EXC'SD | 6 |
| UNEXC'SD | 4 |
| TOTAL | 10 |

INDICATE BY CROSS IF SINGLE SESSION CONSTITUTES A SCHOOL DAY

CAUSES OF ABSENCE AND CODE NUMBERS

EXCUSED
4 - ILLNESS OF PUPIL
5 - ILLNESS IN FAMILY
6 - DEATH IN FAMILY
7 - QUARANTINE
8 - INCLEMENT WEATHER
9 - RELIGIOUS HOLIDAY
10 - OTHER URGENT REASONS

UNEXCUSED
1 - PARENTAL NEGLECT
2 - ILLEGAL EMPLOYMENT
3 - TRUANCY

T = TEACHER RECORD
V = VERIFIED REPORT

| ATTENDANCE SUMMARIES ‡ | SCHOOL YEAR ENDING JUNE 30, 1988 | FIRST REPORT | SECOND REPORT | THIRD REPORT | YEAR | TOTAL DAYS ABSENT FOR YEAR |
|---|---|---|---|---|---|---|
| | DAYS PRESENT | 42 | 83 | 130 | 170 | |
| | DAYS ABSENT | 5 | 8 | 10 | 14 | 14 |
| | TIMES LATE | 0 | 1 | 3 | 3 | 3 |

‡ CUMULATIVE    ‡ TOTALS MUST AGREE

### DAYS OF ABSENCE

IN SUMMARIZING TYPES OF ABSENCE, THE "VERIFIED REPORT" IS TO BE TAKEN IN PREFERENCE TO THE "TEACHER RECORD." IF NO "VERIFIED REPORT" HAS BEEN MADE, THE "TEACHER RECORD" IS TO BE TAKEN.

| SCHOOL YEAR ENDING JUNE 30, 1988 | TOTAL FOR YEAR ALL PUPILS | | |
|---|---|---|---|
| EXCUSED (CODES 4 to 10) | 8 | No. OF R's ABOVE | 0 |
| UNEXCUSED (CODES 1, 2, 3) | 6 | ABSENCE CODE 2 | 0 |
| TOTAL | 14 | ‡ ABSENCE CODE 3 | 0 |

H101C    -ROLLBOOK LEAF, SECONDARY, BOYS    SCHOOL DISTRICT OF PHILA.    REV. 3/87

A04676    212 07 007G

SUSPENDED — 12/7/87
REINSTATED — 12/8/87
SUSPENDED   2-2
REINSTATED   2-8

6/9/88
not late or absent
S. Lischin



Suspended   3/25/67
Rein'd      3/31



| LAST NAME | FIRST NAME AND INITIALS | | | | |
|-----------|-------------------------|---|---|---|---|
| Manley | Michael | | | | |

| PERSONAL AND SOCIAL GROWTH* | FIRST REPORT | SECOND REPORT | THIRD REPORT | END OF YEAR | |
|---|---|---|---|---|---|
| **CITIZENSHIP PRACTICES:** Assumes responsibility, cooperates in rules, plays well, respects property, is courteous | | | | | |
| **WORK HABITS:** Uses time and materials well, does neat and careful work, completes assignments | | | | | |

## TEACHER'S COMMENTS

FIRST REPORT

### ACHIEVEMENT IN SCHOOL SUBJECTS*

| | | | | | |
|---|---|---|---|---|---|
| * MATHEMATICS | 42 | | | | |
| ART | | | | | |
| HEALTH EDUCATION | | | | | |
| LANGUAGE ARTS SPEAKING | | | | | |
| * READING | 42 | | | | |
| WRITTEN EXPRESSION | | | | | |
| SPELLING | | | | | |
| HANDWRITING | | | | | |
| MUSIC | | | | | |
| PHYSICAL EDUCATION | | | | | |
| SCIENCE | | | | | |
| SOCIAL STUDIES | | | | | |

SECOND REPORT

THIRD REPORT

* MAKE NO ENTRIES FOR GRADES 7 AND 8. USE FORM H 101A/H 102A IN YEAR I MAKE SUBJECT ENTRIES FOR MATHEMATICS READING SPEAKING AND HANDWRITING ONLY - OMIT SPEAKING AND HANDWRITING ON FIRST REPORT
* ENTER LEVELS IN CONTINUOUS PROGRESS PRIMARY
* ENTER LEVEL END OF PREVIOUS YEAR

END OF YEAR

### ATTENDANCE SUMMARIES (CUMULATIVE)

| SCHOOL YEAR ENDING JUNE 30, 1986 | FIRST REPORT | SECOND REPORT | THIRD REPORT | TOTAL FOR YEAR |
|---|---|---|---|---|
| DAYS PRESENT ‡ | 58 | 106 | 174 | 174 |
| DAYS ABSENT ‡ | 1 | 5 | 9 | 9 § |
| TIMES LATE | 0 | 1 | 2 | 2 |

‡ TWO-SESSION CLASSES USE FRACTIONS FOR HALF DAYS
§ TOTALS MUST AGREE

### DAYS OF ABSENCE FOR YEAR

| SCHOOL YEAR ENDING JUNE 30, 1986 | TOTAL FOR YEAR |
|---|---|
| EXCUSED (CODES 4 to 10) | 9 |
| UNEXCUSED (CODES 1,2,3) | 0 |
| TOTAL | 9 § |

NAME OF TEACHER

### MEDICAL EXAMINATION

| DATE | DEFECTS NOT YET REPORTED AS TREATED | | |
|---|---|---|---|
| | | | |



| LAST NAME | FIRST NAME AND INITIALS | | | | | TEACHER'S COMMENTS |
|---|---|---|---|---|---|---|

**Manley** **Michael**

| | FIRST REPORT | SECOND REPORT | THIRD REPORT | END OF YEAR | |
|---|---|---|---|---|---|

## PERSONAL AND SOCIAL GROWTH

FIRST REPORT

CITIZENSHIP PRACTICES: Accepts responsibility, cooperates in group plans, work. Observes standards of conduct.

WORK HABITS: Uses time and materials well, does neat and careful work. Completes assignments.

## ACHIEVEMENT IN SCHOOL SUBJECTS

SECOND REPORT

| MATHEMATICS | 9 | | | |
|---|---|---|---|---|
| ART | | | | |
| HEALTH EDUCATION | | | | |
| LANGUAGE ARTS SPEAKING | | | | |
| READING | 10 | | | |
| WRITTEN EXPRESSION | | | | |
| SPELLING | | | | |
| HANDWRITING | | | | |
| MUSIC | | | | |
| PHYSICAL EDUCATION | | | | |
| SCIENCE | | | | |
| SOCIAL STUDIES | | | | |

THIRD REPORT

END OF YEAR

## ATTENDANCE SUMMARIES (CUMULATIVE)

| SCHOOL YEAR ENDING JUNE 30 198_ | FIRST REPORT | SECOND REPORT | THIRD REPORT | TOTAL FOR YEAR |
|---|---|---|---|---|
| DAYS PRESENT | 57 | 112 | 162 | |
| DAYS ABSENT | 4 | 3 | 23 | |
| TIMES LATE | 1 | 3 | 12 | |

‡ TWO-SESSION CLASSES USE FRACTIONS FOR HALF DAYS
§ TOTAL MUST AGREE

## DAYS OF ABSENCE FOR YEAR

| SCHOOL YEAR ENDING JUNE 30 198_ | TOTAL FOR YEAR |
|---|---|
| EXCUSED (CODES 1 to 10) | 9 14 |
| UNEXCUSED (CODES 1-3) | 14 9 |
| TOTAL | 23 |

NAME OF TEACHER  *S. Becker*

| MEDICAL EXAMINATION | | | |
|---|---|---|---|
| DATE | DEFECTS NOT YET REPORTED AS TREATED | | |
| | | | |
| | | | |
| | | | |



## TEACHER'S COMMENTS

FIRST REPORT

MANLEY     MICHAEL

| PERSONAL AND SOCIAL GROWTH | FIRST REPORT | SECOND REPORT | THIRD REPORT | END OF YEAR |
|---|---|---|---|---|
| | | | | |

SECOND REPORT

### ACHIEVEMENT IN SCHOOL SUBJECTS

| MATHEMATICS | 6 |
|---|---|
| HEALTH | 8 |

THIRD REPORT

SPELLING

HANDWRITING

MUSIC

PHYSICAL EDUCATION

SCIENCE

SOCIAL STUDIES

END OF YEAR

### ATTENDANCE SUMMARIES (CUMULATIVE)

| SCHOOL YEAR ENDING JUNE 30, 1984 | FIRST REPORT | SECOND REPORT | THIRD REPORT | TOTAL FOR YEAR |
|---|---|---|---|---|
| DAYS PRESENT | 67 | 109 | 150 | 150 |
| DAYS ABSENT | 4 | 17 | 35 | 35 |
| TIMES LATE | 0 | | 2 | 2 |

### DAYS OF ABSENCE FOR YEAR

| SCHOOL YEAR ENDING JUNE 30, 1984 | TOTAL FOR YEAR |
|---|---|
| | 23 |
| | 35 |
| TOTAL | 35 |

### MEDICAL EXAMINATION

| DATE | DEFECTS NOT YET REPORTED AS TREATED | | |
|---|---|---|---|
| | — | | |

NAME OF TEACHER

*Joan Wesley*



| LAST NAME | FIRST NAME | INITIAL | | | | | | TEACHER'S COMMENTS |
|---|---|---|---|---|---|---|---|---|

**Manley  Michael**



| | FIRST REPORT | SECOND REPORT | THIRD REPORT | END OF YEAR | | FIRST REPORT |
|---|---|---|---|---|---|---|

PERSONAL AND SOCIAL GROWTH

CITIZENSHIP PRACTICES

WORK HABITS

ACHIEVEMENT IN SCHOOL SUBJECTS

SECOND REPORT

| MATHEMATICS | 5 |
| ART | |
| HEALTH EDUCATION | |
| LANGUAGE ARTS | |
| READING | 5 |
| WRITTEN EXPRESSION | |
| SPELLING | |
| HANDWRITING | |
| MUSIC | |
| PHYSICAL EDUCATION | |
| SCIENCE | |
| SOCIAL STUDIES | |

THIRD REPORT

END OF YEAR

*See report card copy in pupil pocket.*

### ATTENDANCE SUMMARIES (CUMULATIVE)

| | FIRST REPORT | SECOND REPORT | THIRD REPORT | TOTAL FOR YEAR |
|---|---|---|---|---|
| DAYS PRESENT | 58 | 106 | | 156 |
| DAYS ABSENT | 4 | 16 | | 20 |
| TIMES TARDY | 0 | 0 | | 0 |

### CAUSES OF ABSENCE FOR YEAR

| | TOTAL FOR YEAR |
|---|---|
| EXCUSED | 12 |
| UNEXCUSED | 17 |
| TOTAL | 29 |

*Elizabeth Warrick*

### MEDICAL EXAMINATION

| DATE | DEFECTS NOT YET REPORTED AS TREATED | TREAT BEGUN | CASE CLOSED |
|---|---|---|---|
| 4/80 | VISION | | |



Manley, Michael

| | | | | | |
|---|---|---|---|---|---|
| | | | B | B | B |
| | | | B | B | B |
| | 4 | | | | 5 |
| | 3 | | | | 3 |
| | | | B | B | B |
| | | | B | B | B |
| | | | B | B | B |
| | | | | | U |

## ATTENDANCE SUMMARIES (CUMULATIVE)

| | | SECOND REPORT | THIRD REPORT | TOTAL FOR YEAR |
|---|---|---|---|---|
| DAYS PRESENT | | 54 | 13 | 157 |
| DAYS ABSENT | | 8 | 5 | 18 |
| TIMES TARDY | | 0 | 1 | 1 |

### DAYS OF ABSENCE FOR YEAR

| | TOTAL FOR YEAR |
|---|---|
| EXCUSED | 16 |
| UNEXCUSED | 2 |
| | 18 |

Mrs. Simon

### TEACHER'S COMMENTS

**FIRST REPORT** Michael is progressing at a very satisfactory level in both reading and math. He has an excellent understanding of phonics, he is beginning, middle, & middle sounds.

**SECOND REPORT** He can also take his phonetic sounds and form words that he is not sure of or unfamiliar with. I am very pleased with his progress.

**THIRD REPORT** Michael is doing well and is progressing nicely. He applies his knowledge of the basic skills of reading & math to his daily work. I can talk to him about talking constantly

**END OF YEAR** Michael has done well this year.

3rd grade R-19

### MEDICAL EXAMINATION

| DATE | DEFECTS NOT YET REPORTED AS TREATED | TREAT BEGUN | CASE CLOSED |
|---|---|---|---|
| 9/80 | Vision | | |

FORM E 83 Boys    ROLLBOOK LEAF, ELEMENTRY   –SCHOOL DISTRICT OF PHILA.    (Rev. 4/78)

| LAST NAME | FIRST NAME AND INITIALS |
|---|---|
| Manley | Micheal |

| PERSONAL AND SOCIAL GROWTH* | FIRST REPORT | SECOND REPORT | THIRD REPORT | END OF YEAR |
|---|---|---|---|---|
| CITIZENSHIP PRACTICES: Assumes responsibility; cooperation in rules; plays well; respects property; is courteous. | | | | |
| WORK HABITS: Uses time and materials well; does neat and careful work; completes assignments. | | | | |

| ACHIEVEMENT IN SCHOOL SUBJECTS* | | | | |
|---|---|---|---|---|
| †MATHEMATICS | I \| 1 ¶ | | | |
| ART | | | | |
| HEALTH EDUCATION | | | | |
| LANGUAGE ARTS SPEAKING | | | | |
| †READING | I \| 1 ¶ | | | |
| WRITTEN EXPRESSION | | | | |
| SPELLING | | | | |
| HANDWRITING | | | | |
| MUSIC | | | | |
| PHYSICAL EDUCATION | | | | |
| SCIENCE | | | | |
| SOCIAL STUDIES | | | | |

* MAKE NO ENTRIES FOR GRADES 7 AND 8. USE FORM H 101A/H 102A. IN YEAR I MAKE SUBJECT ENTRIES FOR MATHEMATICS, READING, SPEAKING, AND HANDWRITING ONLY. OMIT SPEAKING AND HANDWRITING ON FIRST REPORT.
†ENTER LEVELS IN CONTINUOUS PROGRESS PRIMARY
¶ENTER LEVEL END OF PREVIOUS YEAR

### ATTENDANCE SUMMARIES [CUMULATIVE]

| SCHOOL YEAR ENDING JUNE 30, 1980 | FIRST REPORT | SECOND REPORT | THIRD REPORT | TOTAL END OF YEAR |
|---|---|---|---|---|
| DAYS PRESENT ‡ | 38 | 30 | 41 | 152 |
| DAYS ABSENT ‡ | 9 | 10 | 8 | 32§ |
| TIMES LATE | 0 | 0 | 0 | 0 |

‡ TWO SESSION CLASSES USE FRACTIONS FOR HALF DAYS.
§ TOTALS MUST AGREE

### DAYS OF ABSENCE FOR YEAR

| SCHOOL YEAR ENDING JUNE 30,1980 | TOTAL FOR YEAR | |
|---|---|---|
| EXCUSED (CODES 4 to 10) | 32 | |
| UNEXCUSED (CODES 1, 2, 3) | 0 | |
| TOTAL | 32 | § |

NAME OF TEACHER
Alice Smith

### TEACHER'S COMMENTS

FIRST REPORT:

SECOND REPORT:

THIRD REPORT:

END OF YEAR:

| MEDICAL EXAMINATION | | TREAT BEGUN | CASE CLOSED |
|---|---|---|---|
| DATE | DEFECTS NOT YET REPORTED AS TREATED | | |
| | | | |
| | | | |
| | | | |



| LAST NAME | FIRST NAME AND INITIALS |
|---|---|
| Manley | Michael |

## PERSONAL AND SOCIAL GROWTH*

| | FIRST REPORT | SECOND REPORT | THIRD REPORT | END OF YEAR |
|---|---|---|---|---|
| CITIZENSHIP PRACTICES: Assumes responsibility, cooperates in rules, plays well, respects property, is courteous. | A | A | A | A |
| WORK HABITS: Uses time and materials well, does neat and careful work, completes assignments | A | A | A | A |

## ACHIEVEMENT IN SCHOOL SUBJECTS*

| | | | | |
|---|---|---|---|---|
| MATHEMATICS | 1 | 2 | 3 | 3 | 4 |
| ART | | | | |
| HEALTH EDUCATION | | | S | |
| LANGUAGE ARTS SPEAKING | | | S | |
| READING | 1 | 2 | 3 | 3 | 3 |
| WRITTEN EXPRESSION | | | | |
| SPELLING | | | A | A |
| HANDWRITING | | B | B | B | B |
| MUSIC | | | | S |
| PHYSICAL EDUCATION | | | S | S |
| SCIENCE | | | S | |
| SOCIAL STUDIES | (Italian) | | | S |

* MAKE NO ENTRIES FOR GRADES 7 AND 8 USE FORM H 101A H 102A IN YEAR 1 MAKE SUBJECT ENTRIES FOR MATHEMATICS READING, SPEAKING AND HANDWRITING ONLY - OMIT SPEAKING AND HANDWRITING ON FIRST REPORT
‡ ENTER LEVELS IN CONTINUOUS PROGRESS PRIMARY
§ ENTER LEVEL END OF PREVIOUS YEAR

## ATTENDANCE SUMMARIES [CUMULATIVE]

| SCHOOL YEAR ENDING JUNE 30 198 | FIRST REPORT | SECOND REPORT | THIRD REPORT | TOTAL FOR YEAR |
|---|---|---|---|---|
| DAYS PRESENT ‡ | 43 | 78 | 122 | 169 |
| DAYS ABSENT ‡ | 0 | 4 | 6 | 11 |
| TIMES LATE | 0 | 0 | 0 | 0 |

‡ TWO SESSION CLASSES USE FRACTIONS FOR HALF DAYS.
§ TOTALS MUST AGREE

## DAYS OF ABSENCE FOR YEAR

| SCHOOL YEAR ENDING JUNE 30, 198 | TOTAL FOR YEAR |
|---|---|
| EXCUSED (CODES 4 to 10) | 6 |
| UNEXCUSED (CODES 1, 2, 3) | 5 |
| TOTAL | 11 |

NAME OF TEACHER  Marie Di Giorgio

### TEACHER'S COMMENTS

FIRST REPORT  M. is a very good student - knows all of the beg. sounds and is putting them together to make words. Very good in math - Has passed to level 35 in math - reading. Works well and slowly. cont.

Michael is progressing beautifully. Please encourage him to read at home. mDg.

THIRD REPORT  Michael shows much interest in his work and continues to make very good progress in all areas. He is working in Macmillan Pre-Primer 3. He reads aloud well but needs to think a bit more carefully about what he is reading (comprehension skills.) His work is good in other language areas - sentences, rhyming words, alphabetical order. Michael's progress in arithmetic is excellent - adds, subtracts and tells time very well.

Michael is assigned to grade 2, Room 7. It has been a pleasure having Michael in my class. I wish him much success and a happy summer!

### MEDICAL EXAMINATION

| DATE | DEFECT IS NOT YET REPORTED AS TREATED | TREAT BEGUN | CASE CLOSED |
|---|---|---|---|
| 6/80 | eye defect | ✓ | |

## Testing for Essential Learning and Literacy Skills

DISTRICT **PHILADELPHIA SCHOOL DIS**

SCHOOL **BREGY EL SCH    224**

*TELLS*
Grade 5

| STUDENT | **MANLEY** | **MICHAEL** |
| --- | --- | --- |
| D.O.B. 07/29/74 | | SEX **M** |
| I.D. NO. **804244216** | | |

| TEST SCORES | READING | MATH |
| --- | --- | --- |
| **TEST SCORES**<br>NUMBER OF ITEMS ANSWERED CORRECTLY<br>PERCENT OF ITEMS ANSWERED CORRECTLY | 53 OF 65<br>82 | 54 OF 66<br>82 |
| **DISTRICT AVERAGE**<br>PERCENT OF ITEMS ANSWERED CORRECTLY | 56 | 57 |
| **NATIONAL AVERAGE**<br>ESTIMATED PERCENT OF ITEMS ANSWERED CORRECTLY | 73 | 77 |



### READING

| Objective | NUMBER OF ITEMS PER OBJECTIVE | NUMBER OF ITEMS CORRECT PER OBJECTIVE |
| --- | --- | --- |
| LIFE/STUDY AND REFERENCE — COMPLETING AN OUTLINE | 4 | 4 |
| LIFE/STUDY AND REFERENCE — READING TABLES OR CHARTS | 4 | 3 |
| LIFE/STUDY AND REFERENCE — USING AN INDEX | 4 | 1 |
| LIFE/STUDY AND REFERENCE — READING MAPS | 2 | 2 |
| LIFE/STUDY AND REFERENCE — USING DICTIONARY SKILLS | 4 | 3 |
| INFERENTIAL/CRITICAL COMPRE'N — IMPLIED CAUSE AND EFFECT | 5 | 4 |
| INFERENTIAL/CRITICAL COMPRE'N — DRAWING CONCLUSIONS | 4 | 3 |
| INFERENTIAL/CRITICAL COMPRE'N — DISTINGUISHING FACT/OPINION | 3 | 3 |
| INFERENTIAL/CRITICAL COMPRE'N — PREDICTING OUTCOMES | 3 | 2 |
| INFERENTIAL/CRITICAL COMPRE'N — SEQUENCE OF EVENTS | 4 | 1 |
| INFERENTIAL/CRITICAL COMPRE'N — MAIN IDEA, PARAPHRASE | 4 | 3 |
| LITERAL COMPREHENSION — STATED CAUSE AND EFFECT | 4 | 4 |
| LITERAL COMPREHENSION — RECOGNIZING DETAILS | 5 | 5 |
| VOCABULARY — CATEGORIZING | | |
| VOCABULARY — MULTIPLE MEANINGS | | |
| VOCABULARY — WORD MEANINGS FROM CONTEXT | | |



### MATHEMATICS

| Objective | NUMBER OF ITEMS PER OBJECTIVE | NUMBER OF ITEMS CORRECT PER OBJECTIVE |
| --- | --- | --- |
| GEOMETRY — POINT/LINE/ANGLE/PLANE FIGURE | 3 | 1 |
| GEOMETRY — SOLID FIGURES | 3 | 1 |
| GRAPHING — PICTURE GRAPHS | 3 | 3 |
| GRAPHING — BAR GRAPHS | 3 | 2 |
| PROBLEM SOLVING — STORY PROBLEMS/CONSUMER MATH | 3 | 3 |
| PROBLEM SOLVING — STORY PROBLEMS/MONEY | 3 | 3 |
| PROBLEM SOLVING — STORY PROBLEMS/BASIC OPERATION | 3 | 3 |
| MEASUREMENT — PERIMETER | 3 | 2 |
| MEASUREMENT — CONVERSIONS/CUSTOMARY | 3 | 2 |
| MEASUREMENT — CONVERSIONS/METRIC | 3 | 3 |
| MEASUREMENT — TIME | 3 | 2 |
| FRACTIONS — SUBTRACTING FRACTIONS | 3 | 3 |
| FRACTIONS — ADDING FRACTIONS | 3 | 3 |
| FRACTIONS — FRACTIONAL PART OF A NUMBER | 3 | 2 |
| FRACTIONAL REGIONS | 3 | 2 |
| NUMERATION — PLACE VALUE/WHOLE NUMBERS | 3 | 3 |
| NUMERATION — READ/WRITE STANDARD NUMERALS | 2 | 2 |
| WHOLE NUMBERS — DIVISION/1 DIGIT DIVISORS | 3 | 2 |
| WHOLE NUMBERS — MULTIPLY BY 2 OR 3 DIGITS | 3 | 3 |
| WHOLE NUMBERS — MULTIPLICATION BY 1 DIGIT | 3 | 1 |
| WHOLE NUMBERS — SUBTRACTION/RENAMING | 3 | 3 |
| WHOLE NUMBERS — ADDITION/RENAMING | 3 | 2 |



Charles E. Merrill Publishing Co., A Bell & Howell Co., Columbus, Ohio 43216

Copyright (C) 1984, Educational Computer Software, Inc., Trenton, N.J.

B0744N-2333061392        CENTRAL                        JUNE 1992

MANLEY MICHAEL              GRP 108   ID NO 804-244-2   GRD 12   CURR A

|         |             |     |     |    |        | WGHT.  | COMPUTATION | |
| SUB-SEC | DESCRIPTION | TI  | P/W | LV | RATING | VALUE  | MAJOR | ADJ. |
|---------|-------------|-----|-----|----|--------|--------|-------|------|
| 050-22  | ENGLISH 4   | ERM | 05  | 4  | 78     | 85.800 | 85.800 |      |
| 110-52  | SOC SCI     | HJL | 05  | 4  | 81     | 89.100 | 89.100 |      |
| 142-31  | AF AM HIS   | HRJ | 05  | 4  | 84     | 92.400 | 92.400 | .737 |
| 220-12  | ALGEBRA 2   | MSW | 05  | 4  | 67     | 73.700 |       |      |
| 320-72  | PHYSICS     | SJO | 06  | 4  | 80     | 88.000 | 88.000 + |   |
| 959-63  | PHYS ED     | PDK | 04  | 0  | 80     | .000   |       |      |
| 979-63  | HEALTH      | PDK | 01  | 0  | 80     | .000   |       |      |

SUMMARY OF AVERAGE AND RANK

|          | INPUT DATA | COMPUTED AVERAGE | RANK |
|----------|------------|------------------|------|
| GRADE 09 |            |                  |      |
| GRADE 10 | 77.737     |                  |      |
| GRADE 10 CUM. |        |                  |      |
| GRADE 11 | 73.150     |                  |      |
| GRADE 11 CUM. | 74.985 |                  |      |
| GRADE 12 |            | 89.562           |      |
| GRADUATION |          | 80.451           | 461  |

( 81.420 )

| ID | LAST NAME | FIRST NAME AND INITIAL | BIRTHDATE | | | PARENTS FIRST NAMES OR GUARDIANS FULL NAME |
|---|---|---|---|---|---|---|
| | | | MO | DAY | YR | |
| 8042442 | MANLEY MICHAEL | | 07 | 29 | 74 | RITA-MELVIN CARR |

| | RESIDENCE | | | ZIP CODE | TELEPHONE | SCHOOL | NO | GR |
|---|---|---|---|---|---|---|---|---|
| 2307 | HCYT | TER | 45 | 271-1181 | CENTRAL | 601 | 12 |

| EMERGENCY CONTACT | NAME | RELATIONSHIP | ADDRESS | TELEPHONE |
|---|---|---|---|---|
| | Lorraine Upshire | Aunt | | 755-9475 |

## RECORD OF ATTENDANCE - SEPTEMBER 1991 - JUNE 1992

ABSENCE FOR PREVIOUS YEAR

| EXC DS | 2 |
|---|---|
| UNEXC DS | 53 |
| TOTAL | 55 |

INDICATE BY CROSS, IF SINGLE SESSION CONSTITUTES A SCHOOL DAY

SEPT 6 - SCHOOLS OPEN FOR 9th GRADE ONLY

SECOND - last Cards Issued
Second - Report Cards Issued

CAUSES OF ABSENCE AND CODE NUMBERS

EXCUSED
4 - ILLNESS OF PUPIL
5 - ILLNESS IN FAMILY
6 - DEATH IN FAMILY
7 - QUARANTINE
8 - INCLEMENT WEATHER
9 - RELIGIOUS HOLIDAY
0 - OTHER URGENT REASONS

UNEXCUSED
1 - PARENTAL NEGLECT
2 - ILLEGAL EMPLOYMENT
3 - TRUANCY

| | | FIRST REPORT | SECOND REPORT | THIRD REPORT | YEAR | TOTAL DAYS ABSENT FOR YEAR |
|---|---|---|---|---|---|---|
| SCHOOL YEAR ENDING JUNE 30, 1992 | DAYS PRESENT | 31 | 66 | 100 | 143 | |
| | DAYS ABSENT | 4 | 12 | 24 | 34 | 34 |
| | TIMES LATE | 1 | 1 | 1 | 1 | |

DAYS OF ABSENCE

| SCHOOL YEAR ENDING JUNE 30, 1992 | TOTAL FOR YEAR ALL PUPILS | |
|---|---|---|
| EXCUSED (CODES 4 to 0) | 4 | ON DAYS ABOVE |
| UNEXCUSED (CODES 1, 2, 3) | 30 | ABSENCE CODE 3 |
| Total | 34 | ABSENCE CODE 4 |

ROLLBOOK LEAF, SECONDARY, SCHOOL DISTRICT OF PHILA.

H101C (Rev 6/91)
A29848    P - 326    A - 102    L - 5    601 11 209    M

| ID | LAST NAME | FIRST NAME AND MIDDLE | BIRTHDATE | PARENT'S FIRST NAME OR GUARDIAN'S FULL NAME | | | |
|---|---|---|---|---|---|---|---|
| | | | MO DAY YR | | | | |
| 804 2442 | MANLEY MICHAEL | | 07 29 74 | RITA-MELVIN CARR | | | J-1 |

| | RESIDENCE | | ZONE | TELEPHONE | SCHOOL | NO | GR | RM NO |
|---|---|---|---|---|---|---|---|---|
| | 2307 HOYT | | TER 45 | 271-1181 | CENTRAL | 601 | 10 | 31 |

| EMERGENCY CONTACT | ADDRESS | RELATIONSHIP | | TELEPHONE |
|---|---|---|---|---|
| | Louane Upshur | Aunt 2316 Hartrouft | | 755-94?? |

### RECORD OF ATTENDANCE · SEPTEMBER 1989 · JUNE 1990

| ABSENCE FOR PREVIOUS YEAR | | |
|---|---|---|
| EXC 20 | 0 | |
| UNEX 20 | 21 | |
| TOTAL | 21 | |

| SCHOOL YEAR ENDING JUNE 30, 1990 | FIRST REPORT | SECOND REPORT | THIRD REPORT | YEAR | TOTAL DAYS ABSENT FOR YEAR |
|---|---|---|---|---|---|
| DAYS PRESENT | 32 | 15 | 112 | 163 | |
| DAYS ABSENT | 1 | 9 | 15 | 21 | |
| TIMES LATE | 1 | 5 | 4 | 5 | |
| | ‡ CUMULATIVE | | ‡ TOTALS MUST AGREE | | |

IN SUMMARIZING TYPES OF ABSENCE, THE VERIFIED REPORT IS TO BE TAKEN IN PREFERENCE TO THE TEACHER RECORD. IF NO VERIFIED REPORT HAS BEEN MADE, THE TEACHER RECORD IS TO BE TAKEN

| SCHOOL YEAR ENDING JUNE 30, 1990 | | TOTAL FOR YEAR ALL PUPILS | NO DAYS ABOVE | 0 |
|---|---|---|---|---|
| EXCUSED (CODES 4 to 10) | | 6 | ABSENCE CODE 2 | 0 |
| UNEXCUSED (CODES 1, 2, 3) | | 15 | ABSENCE CODE 3 | 0 |
| TOTAL | | 21 | | |

—ROLLBOOK LEAF, SECONDARY, SCHOOL DISTRICT OF PHILA.

H101C (Rev 6/91)

A27841      P - 161      A - 21          601 09  412   SEX  M



$CEH - 1|8|91$

# CENTRAL HIGH SCHOOL
Ogontz and Olney Avenues
Philadelphia, PA 19141
224-6015

February, 1990

Dear Parent of _____ Michael Moseley III _____,

The second report period is now over. Unfortunately, if the marks that your child achieved as of this date continue through the last report period, he/she will be recommended to the office of School Operations for dismissal from Central High School.

It is urgent and necessary that you utilize all available resources including contacting your child's teachers and/or counselor to set up an appointment at the earliest mutual convenience. Additionally, you are urged to come to parent visitation on Monday, February 5th from 7:00 - 9:00 PM.

The School District of Philadelphia, in its written statements, indicates that a minimum of 3 majors must be passed each year of attendance at Central High School. It also indicates that, if a student fails 2 majors for any 2 years, the student will also be asked to leave.

It is my wish to retain as many students as I possibly can at the end of the year, however, it would be a disservice to the child and the school to continue a situation which is resulting in failure.

I know that your child has the potential to succeed, otherwise admission would not have been originally granted. Please do whatever is necessary to intervene in order to create the desired and positive changes of behavior which, hopefully, will result in your child being able to remain at Central High School.

Sincerely,

Dr. Sheldon S. Pavel
President

SSP/ jeb
cc:   Pupil Pocket
      Counselor

# CENTRAL HIGH SCHOOL
OGONTZ AND OLNEY AVENUES
PHILADELPHIA, PA 19141

PHONE: 224-6015

TO: _____

DATE: _____     TIME: _____

SUBJECT: **SUSPENSION**

MESSAGE: **TO THE PARENT**

_____ Bk. _____ has been suspended from school for a

period not to exceed five school days.

The suspension resulted from the following violation(s) of the <u>CODE PROHIBITING SERIOUS MISCONDUCT</u>:

_____

_____

<u>PARENT</u>: Please bring your child to my office on _____ during the hours of 8:00 a.m. and 9:00 a.m. for the purpose of reinstatement. If this time or day is inconvenient for you please call me at 224-6015.

<u>STUDENT</u>: Please discuss this matter with your parents as soon as possible and accompany them to a conference to be held in my office between 8:00 a.m. and 9:00 a.m.

Finish this day by attending all classes. Starting tomorrow and until you are reinstated, you may <u>not</u> attend classes or loiter in the building.

<u>DISCIPLINARIAN</u>: Place copy in discipline pocket.

<u>ADVISOR</u>: Please code this absence (10). Send the student to ROOM 139 if s/he returns to advisory without a reinstatement slip. <u>DO NOT REMOVE THIS SLIP.</u>

Code  0  1  2  3  4

BC

**EH - 38** (REV. 5/87)
**THE SCHOOL DISTRICT OF PHILADELPHIA**
**APPLICATION FOR ADMISSION**
VIA TRANSFER

PUPIL'S NUMBER: 8 1 0 4 2 4 4 2

PUPIL'S AGE: 13

## STUDENT INFORMATION - TO BE COMPLETED BY ☐ PARENT / ☐ GUARDIAN

DATE OF BIRTH — DAY 29 / MONTH 07 / YEAR 74

PUPIL'S NAME: LAST **MANLEY** FIRST **MICHAEL** M.I. **JR**

PUPIL'S ADDRESS: HOUSE NO. **2307** DIR. STREET NAME **HOYT TERRACE** St.,Ave.,etc. APART NO. ZIP CODE **19145-7118** TELEPHONE NO.

☑ MALE ☐ FEMALE    CHECK ONE BLOCK ONLY:    1. ☑ BLACK    2. ☐ HISPANIC    3. ☐ AMERICAN INDIAN    4. ☐ ASIAN    0. ☐ WHITE

PARENT / GUARDIAN: PRINT YOUR NAME HERE: **Rita Manley**    SIGN YOUR NAME HERE: **Rita Manley**    DATE: **10/22/87**

## TO BE COMPLETED BY - INITIATING SCHOOL    CHAPTER I    ☐ YES    ☑ NO

NAME OF PRESENT SCHOOL **Vare Middle**    SCHOOL CODE **2120008**    GRADE

NEIGHBORHOOD SCHOOL - SEPTEMBER ASSIGNMENT **SPHS**    SCHOOL CODE **2000009**    GRADE

CHECK ONE: ☑ CITY-WIDE TEST SCORES — ☐ OTHER STD. TEST    NAME OF TEST    DATE OF TEST MO. **4** YR. **87**

NOTE: CITY-WIDE TEST USE: LOCAL PERCENTILE — OTHER STANDARDIZED TEST USE: NATIONAL PERCENTILE RANKING

| READING | MATHEMATICS | | | SCIENCE | SOC. STUDY | TOTAL BATTERY |
| | COMP | CON. & APP | TOTAL | | | |
|---|---|---|---|---|---|---|
| 96 | 98 | 97 | 98 | 90 | 99 | 99 |

### ATTENDANCE RECORD

| | TOTAL ABSENT | TOTAL UNEXCUSED | TOTAL LATE |
|---|---|---|---|
| PREVIOUS YEAR | 10 | 4 | 3 |
| CURRENT YEAR | 4 | One | None |

### SPECIAL EDUCATION

REFERRAL TO C.S.E.T.? ☐ YES ☑ NO    CURRENTLY RECEIVING SPECIAL ED.? ☐ YES ☑ NO

PLEASE SPECIFY (Special Ed.) ☐ FULL TIME ☐ PART TIME ☐ RESOURCE ROOM ☐ ITINERANT SERVICES

PRIMARY EXCEPTIONALITY? **N.A.**

SEE BACK OF FORM

## FINAL REPORT OF GRADES FOR PREVIOUS TWO YEARS

| YR. 1 DATE: 6/87 GRADE: 7 | SUBJ. | BEH. | YR. 2 DATE: 6/86 GRADE: 6 | SUBJ. | BEH. |
|---|---|---|---|---|---|
| ENGLISH | A | 1 | ENGLISH | A | 1 |
| READING LEVEL ( ) | | | READING LEVEL ( 6 ) | A | 1 |
| SOCIAL STUDIES | A | 2 | SOCIAL STUDIES | A | 1 |
| MATH (LEVEL/TYPE) | A | 1 | MATH (LEVEL/TYPE) | A | 1 |
| SCIENCE | C | 2 | SCIENCE | A | 1 |
| FOREIGN LANGUAGE (SPECIFY Sp. ) | B | 1 | FOREIGN LANGUAGE (SPECIFY ) | | |
| ART | B | 2 | ART | B | 1 |
| MUSIC | B | 1 | MUSIC | B | 1 |
| PHYS. ED. | C | 2 | PHYS. ED. | A | 1 |
| SHOPS (SPECIFY Foods ) | B | 2 | SHOPS (SPECIFY ) | | |
| COMMENTS: | | | COMMENTS: | | |

SIGNATURE OF INITIATING PRINCIPAL ➡ **S. Lindner (SB)**    DATE **10-28-87**

## APPLICATION TO

LIST THE SCHOOL(S) OF YOUR CHOICE IN ALPHA ORDER. DO NOT LIST CHOICES IN ORDER OF PREFERENCE.
NOTE: FOUR (4) DIGIT SCHOOL CODE NUMBERS ARE LISTED ON THE REVERSE SIDE.

| NAME OF SCHOOL | SCHOOL CODE NO. | GRADE | PROGRAM 1. | PROGRAM 2. |
|---|---|---|---|---|
| **Bok** | 2090 | 009 | | |
| **Central** | 6010 | 009 | | |
| **Franklin Lng Center** | 2290 | 009 | | |

## RECEIVING SCHOOL RECOMMENDATION - School Must Complete

SCHOOL CODE NO. **6010**    GRADE **009**    ADMISSION Month **09** Year **88**    APPROVAL/WAITING LIST ONLY    PROGRAM    WAITING LIST

NOT RECOMMENDED REASONS:

RECEIVING SCHOOL PRINCIPAL SIGNATURE: **Helen Stauel**    DATE **11/9/87**

RECEIVING SCHOOL COPY

THE 7TH COPY IS YOURS

| ID | LAST NAME | FIRST NAME AND INITIAL | BIRTHDATE | PARENT'S FIRST NAMES OR GUARDIAN'S FULL NAME |
|---|---|---|---|---|

| | | | MO | DAY | YR | |

**8042442** | MANLEY MICHAEL | | 07 | 29 | 74 | RITA-MELVIN CARR

| RESIDENCE | ZIP CODE | TELEPHONE | SCHOOL | NO | GR | FAM BY NO |
|---|---|---|---|---|---|---|
| 2307    HOYT | TER 45271-1181 | CENTRAL | 601 09 | 41 |

| NAME | RELATIONSHIP | ADDRESS | TELEPHONE |
|---|---|---|---|

EMERGENCY CONTACT

## RECORD OF ATTENDANCE - SEPTEMBER 1988 - JUNE 1989

| ABSENCE FOR PREVIOUS YEAR | |
|---|---|
| EXC'SD | |
| UNEXC'SD | |
| TOTAL | 14 |



| SCHOOL YEAR ENDING JUNE 30, 1989 | FIRST REPORT | SECOND REPORT | THIRD REPORT | YEAR | TOTAL DAYS ABSENT FOR YEAR |
|---|---|---|---|---|---|
| DAYS PRESENT | 33 | 71 | 112 | 161 | 21 |
| DAYS ABSENT | 3 | 10 | 11 | 21 | |
| TIMES LATE | 3 | 8 | 10 | 12 | 12 |

IN SUMMARIZING TYPES OF ABSENCE, THE 'VERIFIED REPORT' IS TO BE TAKEN, IN PREFERENCE TO THE 'TEACHER RECORD'. IF NO 'VERIFIED REPORT' HAS BEEN MADE, THE 'TEACHER RECORD' IS TO BE TAKEN.

| DAYS OF ABSENCE | SCHOOL YEAR ENDING JUNE 30, 1989 | TOTAL FOR ALL PUPILS | N° OF R's ABOVE | 0 |
|---|---|---|---|---|
| | EXCUSED (CODES 4 to 10) | 0 | ABSENCE CODE 2 | 0 |
| | UNEXCUSED (CODES 1, 2, 3) | 21 | ABSENCE CODE 3 | 0 |
| | TOTAL | 21 | | |

H101C    ROLLBOOK LEAF, SECONDARY, BOYS    SCHOOL DISTRICT OF PHILA.    REV. 3/88

A15566    601 09

| LAST NAME | FIRST NAME AND INITIALS | | ASSIGNED SEPT. 19 _88_ | | |
|---|---|---|---|---|---|
| | | | GRADE | GROUP NO. | |

Manley, Michael   WARE MID. SCH

**RECORD OF MARKS** — SEPTEMBER 19 _87_ — JUNE 19 _88_

| ADVISER'S NAME | SCHOOL | DIST. | GRADE | GROUP |
|---|---|---|---|---|
| E.D. PALADINO | 1. | 2 | 8 | A |
| | 2. | | | |
| | 3. | | | |

| SUBJECT | INSERT SUBJECT NAME WHEN NECESSARY, AND GRADE OF SUBJECT, WHEN DIFFERENT FROM GRADE OF PUPIL | TEACHER'S NAME | FIRST REPORT | | | SECOND REPORT | | | THIRD REPORT | | | FINAL REPORT | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | ACHIEVEMENT | EFFORT | BEHAVIOR | ACHIEVEMENT | EFFORT | BEHAVIOR | ACHIEVEMENT | EFFORT | BEHAVIOR | ACHIEVEMENT | EFFORT | BEHAVIOR |
| Language Arts | | Rybcinski | A | 1 | 1 | A | 2 | 3 | 1 | 1 | 1 | A | A | 1 |
| English | | | | | | | | | | | | | | |
| Reading | | | | | | | | | | | | | | |
| Social Studies | B. Fogelman | | A | 1 | 1 | A | A | 1 | A | B | 2 | A | C | 2 |
| Mathematics | | Bennett | B | 1 | 1 | B | B | 1 | B | A | 1 | B | A | 1 |
| Science | | Bedden | A | 1 | 1 | A | A | 2 | A | A | 1 | C | C | 1 |
| Esol/Bilingual | | | | | | | | | | | | | | |
| Foreign Lang. | SPANISH | E.D. PALADINO | A | 1 | 2 | A | A | 2 | A | A | 2 | A | B | 2 |
| Computer Science | | 31M | B | 2 | 2 | A | A | 2 | | | | B | B | 2 |
| T | DIP | 3PD | | | | | | | C | A | 1 | | | |
| Art | | ZARRA | C | 2 | 2 | A | A | 1 | B | B | 1 | A | A | 2 |
| Music | | | A | 1 | 1 | A | B | 1 | | | | B | B | 1 |
| Home Economics | | Chapman | | | | | | | B | B | 2 | | | |
| Industrial Arts | | A. VOLPE | | | | | | | | | | | | |
| Physical Education | Bertolico | Jones | C | C | 3 | B | B | 2 | B | B | 2 | A | B | 1 |
| Health Education | almost | Jones | D | 3 | 3 | C | C | 2 | B | B | 1 | B | A | 1 |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |

| | ADVISER'S RATING | 1st REPORT | 2 | 2nd REPORT | 2 | 3rd REPORT | 2 | FINAL REPORT | 3 |
|---|---|---|---|---|---|---|---|---|---|

**TEACHERS' COMMENTS**

FIRST REPORT:

SECOND REPORT:

THIRD REPORT: _Lates to advisory._

FINAL REPORT: _I'm sorry to report that Michael has not followed the rules in advisory._

H-1015 (Rev. 9-86) MIDDLE/JR. HIGH — GRADES 5-8 (BOYS)

| LAST NAME | FIRST NAME AND INITIALS | | ASSIGNED SEPT. 19_____ GRADE | GROUP NO. |

*MANLEY, MICHAEL*

**RECORD OF MARKS** — SEPTEMBER 19 *86* — JUNE 19 *87*

ADVISER'S NAME: *A. CHAPMAN*

SCHOOL: VARE ... | DIST. *2* | GRADE *7* | GROUP *G*

1.
2.
3.

| SUBJECT | INSERT SUBJECT NAME WHEN NECESSARY, AND GRADE OF SUBJECT, WHEN DIFFERENT FROM GRADE OF PUPIL. | TEACHER'S NAME | FIRST REPORT | | | SECOND REPORT | | | THIRD REPORT | | | FINAL REPORT | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | ACHIEVE-MENT | EFFORT | BEHAVIOR | ACHIEVE-MENT | EFFORT | BEHAVIOR | ACHIEVE-MENT | EFFORT | BEHAVIOR | ACHIEVE-MENT | EFFORT | BEHAVIOR |
| Language Arts | | | | | | | | | | | | | | |
| English | | Rybcinski | A | 1 | 1 | A | 2 | 1 | A | 1 | 1 | A | 1 | 1 |
| Reading | | | | | | | | | | | | | | |
| Social Studies | | | A | 2 | 2 | A | 1 | 2 | A | 1 | 2 | A | 1 | 2 |
| Mathematics | | Rossi | B | 1 | 2 | B | 1 | 2 | B | 1 | 2 | A | 1 | 1 |
| Science | | Qum | B | 2 | 2 | B | 2 | 2 | C | 3 | 3 | C | 3 | 2 |
| Esol/Bilingual | | | | | | | | | | | | | | |
| Foreign Lang. | SPANISH | E.D. PALADINO | A | 1 | 1 | B | 2 | 2 | B | 2 | 2 | B | 1 | 1 |
| Computer Science | | CN | | | | A | 1 | 1 | B | 1 | 1 | A | 1 | 1 |
| Typing | | Baxon | C | 2 | 2 | B | 1 | 2 | A | 1 | 2 | B | 2 | 2 |
| Art | | ZARR | B | 2 | 2 | A | 2 | 2 | D | 2 | 3 | B | 2 | 2 |
| Music | | A. CLARK | B | 1 | 2 | B | 1 | 1 | B | | | B | | |
| Home Economics | | Chapman | | | | | | | A | 2 | 2 | B | 2 | 2 |
| Industrial Arts | | Wolpe | B | 2 | 2 | A | 1 | 1 | | | | | | |
| Physical Education | | Wolpe | C | 1 | 1 | B | 1 | 1 | C | 1 | 1 | C | 3 | 2 |
| Health Education | | Wolpe | B | 1 | 1 | C | 2 | 1 | B | 3 | 2 | C | 3 | 2 |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | ADVISER'S RATING | | 1st REPORT | 2 | | 2nd REPORT | 2 | | 3rd REPORT | 2 | | FINAL REPORT | 2 | |

**TEACHERS' COMMENTS**

FIRST REPORT

SECOND REPORT

THIRD REPORT

FINAL REPORT

H-101A (Rev. 9/86) MIDDLE/JR. HIGH — GRADES 5-8 (BOYS)



SCHOOL DISTRICT OF PHILADELPHIA
PUPIL DIRECTORY INFORMATION
(S-68 REV. 9/85)

SCHOOL/PACK CENTER NO.: 224    NAME: BREGY, F. AMEDEE SCHOOL

PAGE 033058

| PUPIL I.D. | LAST NAME | FIRST NAME | MIDDLE INITIAL | BIRTH DATE MO. DAY YR. | RACE |
| --- | --- | --- | --- | --- | --- |
| 804-244-2 | MANLEY | MICHAEL | | 07 29 74 | BLACK |

NAMES OF PARENTS OR GUARDIANS
RITA-MELVIN CARR

| SEX | CUR. INST. LVL | | PROGRAM CODE | SCHOOL/GROUP | ROOM |
| --- | --- | --- | --- | --- | --- |
| M | | | | | |

| HOUSE NO. | STREET NAME | STREET TYPE | APT NO OR BUILDING DESIG. | TELEPHONE NO. | GRADE | RSR | DROP CODE | DATE DROP REPORTED MO. DAY YR. |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 2307 | HOYT | TER | | 271-1181 | 06 | 027 | | |

804-244-2  224        07/29/74    804-244-2  224        07/29/74
MANLEY MICHAEL                    MANLEY MICHAEL

804-244-2  224        07/29/74    804-244-2  224        07/29/74
MANLEY MICHAEL                    MANLEY MICHAEL

804-244-2  224        07/29/74    804-244-2  224        07/29/74
MANLEY MICHAEL                    MANLEY MICHAEL

804-244-2  224        07/29/74    804-244-2  224        07/29/74
MANLEY MICHAEL                    MANLEY MICHAEL

# APPLICATION FOR ADMISSION OF CHILD TO SCHOOL

**TO THE PARENT OR GUARDIAN:**

THE PHILADELPHIA PUBLIC SCHOOLS ARE OPEN FOR THE REGISTRATION OF NEW PUPILS AT LEAST ONE DAY BEFORE THE REGULAR SESSION BEGINS. FOR REGISTRATION DATES, SEE PLACARDS OUTSIDE THE SCHOOL BUILDING AND NOTICES IN THE DAILY PAPERS. YOU ARE URGED TO REGISTER YOUR CHILD ON THIS DAY.

YOUR TIME WILL BE SAVED WHEN REGISTERING YOUR CHILD IN A PHILADELPHIA PUBLIC SCHOOL FOR THE FIRST TIME, IF YOU WILL FILL OUT THIS FORM AND PRESENT IT AT THE OFFICE OF THE NEAREST SCHOOL.

PLEASE READ THE DIRECTIONS ON THE BACK OF THIS FORM BEFORE ANSWERING THE QUESTIONS BELOW. PLEASE USE INK.

SUPERINTENDENT OF SCHOOLS

| LAST NAME OF PUPIL (PRINT) | FIRST NAME | MIDDLE NAME | DATE OF BIRTH | | | BOY / GIRL |
|---|---|---|---|---|---|---|
| Manley | Michael | Rodamian | MONTH 7 | DAY 29 | YEAR 74 | X / IND. BY X |

**RESIDENCE OF CHILD** _2307 Hoyt Terrace_   ZIP CODE _19145_   HOME TELEPHONE _271-1181_   IF NO HOME TELEPHONE GIVE NO. OF NEAREST TEL.

**WHAT PROOF OF DATE OF BIRTH HAVE YOU?** (READ ITEM 1, OTHER SIDE.) MARK "X" AFTER THE DOCUMENTARY PROOF YOU ARE OFFERING.

OFFICIAL BIRTH CERTIFICATE _____ SOURCE (CITY AND STATE) _____

BAPTISMAL CERTIFICATE _____ PASSPORT _____ OTHER DOCUMENTARY EVIDENCE (SPECIFY) _____

**COUNTRY OF BIRTH**
CHILD (IF U.S., GIVE CITY AND STATE) _N. Carolina_   FATHER _____   MOTHER _Phila_

| | FATHER | CHK. IF DEC. | MOTHER | CHK. IF DEC. | STEPPARENT OR GUARDIAN |
|---|---|---|---|---|---|
| FIRST NAME (GIVE FULL NAME IF LAST NAME IS DIFFERENT FROM LAST NAME OF CHILD) | Melvin Carr | | Rita Manley | | |
| PLACE OF EMPLOYMENT (ADDRESS) | Holmesburg Prison | | Housewife | | |
| TELEPHONE NUMBER AT PLACE OF EMPLOYMENT | 6083725 Ext 263 | | | | |
| NAME OF EMPLOYER | City of Phila | | | | |
| ADDRESS OF EMPLOYER (IF DIFFERENT FROM PLACE OF EMPLOYMENT) | | | | | |

\* IF NOT EMPLOYED, WRITE "NOT EMPLOYED."
† IF MOTHER STAYS AT HOME, WRITE "HOMEMAKER."

**HAS THE CHILD EVER ATTENDED SCHOOL** (INCLUDING KINDERGARTEN)? _no_ (YES OR NO) IF "YES" WRITE NAME OF SCHOOL AND DATE BELOW.   DATE LAST ATTENDED   GRADE

A PHILADELPHIA PUBLIC SCHOOL   NAME _____

A PHILADELPHIA PAROCHIAL OR PRIVATE SCHOOL   NAME _____

A SCHOOL OUTSIDE OF PHILADELPHIA   CITY ____ STATE ____ KIND (PUBLIC, PAROCHIAL, PRIVATE) ____

WHEN DID PUPIL FIRST ATTEND GRADE 1? MONTH ____ YEAR ____

## IMMUNIZATION AND DIAGNOSTIC PROCEDURES

| DIPHTHERIA TETANUS | DATE | SCHOOL | PRIV PHYS | OTHER | ORAL POLIO | DATE | SCHOOL | PRIV PHYS | OTHER |
|---|---|---|---|---|---|---|---|---|---|
| BASIC | 9-11-74 | | | | I | 1-11-74 | | T.J.H | |
| BASIC | 9-25-74 | T.J.H | | | II | 2-27-74 | | | |
| BASIC | 12-27-74 | | | | BOOSTER | 1-29-76 | | | |
| BOOSTER | 1-19-76 | | | | BOOSTER | 7-10-79 | | | |
| BOOSTER | 7-10-79 | | | | TESTS | DATE | | TYPE | |
| MEASLES | 7-30-75 | | | | TUBERCULIN TEST | 7-10-79 | | | |
| MUMPS | 7-10-79 | | | | CHEST X-RAY | | | | |
| GERMAN MEASLES | | | | | | | | | |

### HEALTH HISTORY

| | YES | NO |
|---|---|---|
| HAS YOUR CHILD HAD GERMAN MEASLES? | | ✓ |
| HAS YOUR CHILD HAD MEASLES? | | ✓ |
| HAS YOUR CHILD HAD MUMPS? | | ✓ |

NAME OF PRIVATE PHYSICIAN OR CLINIC _Thomas Jefferson H_
ADDRESS _11th Walnut_
VACCINATION SITE   ARM: R—L   LEG: R—L   OTHER:

IS EITHER PARENT (OR GUARDIAN) EMPLOYED ON FEDERALLY-OWNED PROPERTY, OR DOES THE CHILD RESIDE ON SUCH PROPERTY? (DO NOT INCLUDE POSTAL EMPLOYES.) _no_ (YES OR NO)

IS EITHER PARENT (OR GUARDIAN) IN THE UNIFORMED SERVICES OF THE UNITED STATES? _no_ (YES OR NO)

_September 7_ 19 _79_   SIGNATURE _Rita Manley_   _Mother_ RELATIONSHIP TO CHILD

CHILD ADMITTED TO _Bregy_ SCHOOL   GRADE _K_   ROOM GROUP NO. _KPM_

_Sept 11_ 19 _79_   BY _Alice Smith_   TEACHER-ADVISER

(FILE IN PUPIL POCKET)

FORM EH 40—APPLICATION FOR ADMISSION—SCHOOL DISTRICT OF PHILADELPHIA (9/75)   (OVER)

BC744N-1312C93C91      CENTRAL                    JUNE 1991

MANLEY MICHAEL              GRP 209   ID NO 804-244-2   GRD 11   CURR A      C12

| SUB-SEC | DESCRIPTION | TI | P/W | LV | RATING | WGHT. VALUE | COMPUTATION MAJOR | ADJ. | 681 |
|---------|-------------|-----|-----|-----|--------|-------------|-------------------|------|-----|
| 040-71 | ENGLISH 3 | EGB | C5 | 4 | 70 | 77.CCC | 77.00C | | |
| 1CC-21 | AMER HIST | HLB | 05 | 4 | 76 | 83.6C0 | 83.60C | | |
| 210-41 | GECMETRY | MSD | 05 | 4 | 66 | 72.6C0 | 72.60C | | |
| 351-31 | ANAT/PHYS | SMM | C5 | 4 | 50 | 55.CC0 | 55.00C + | .550 | |
| 414-11 | SPANISH 3 | LMP | C5 | 4 | 68 | 74.8CC | 74.80C | | |
| 966-51 | PHYS ED | PDJ | C5 | 0 | 8C | .CC0 | | | |
| 986-51 | HEALTH | PDJ | C1 | 0 | 7C | .CC0 | | | |

SUMMARY OF AVERAGE AND RANK

|  | INPUT DATA | COMPUTED AVERAGE | RANK |
|--|-----------|------------------|------|
| GRADE 10 | 77.737 | | |
| GRADE 11 | | 73.150 | |
| GRADE 11 CUM. | | 74.985 | 5C8 |
| GRADE 12 | | | |
| GRADUATION | | | |
| SCHOLARSHIP | | | |
| ECLATED SAT | | | |
| RAW SAT | | | |

( 68.5CC )

```
B0744N-2107061690      CENTRAL                    JUNE 1990

MANLEY MICHAEL              GRP 311   ID NO 804-244-2   GRD 10   CURR A

                                              WGHT.        COMPUTATION
SUB-SEC   DESCRIPTION   TI  P/W   LV   RATING  VALUE     MAJOR      ADJ.

030-63    ENGLISH 2     EAC  05    4     70    77.000    77.000
076-71    PUB SPKG      HES  05    4     78    85.800    85.800
210-52    GEOMETRY      MYW  05    4     50    55.000    55.000
299-31    CP SCI 1/2    MKT  04    3     90    90.000    90.000
310-43    CHEMISTRY     SSW  06    4     70    77.000    77.000
412-11    SPANISH 2     LMB  05    4     70    77.000    77.000 +    .770
967-31    PHYS ED       PAL  04    0     90     .000
```

                    SUMMARY OF AVERAGE AND RANK

```
                          INPUT          COMPUTED
                          DATA       AVERAGE  RANK

GRADE 10                             77.737   514  483

GRADE 11

GRADE 11 CUM.

GRADE 12

GRADUATION

SCHOLARSHIP

EQUATED SAT

RAW SAT

   ( 72.033 )
```

MANLEY MICHAEL
CENTRAL
ID. NO. 804-244-2   GROUP 412
CURR A   GRADE 9   YR END JUNE 89
LEVIN B

| SUBJECT | CR | TCH | MARK | BEH |
|---|---|---|---|---|
| ENGLISH 1 | 1.0 | BE | 70 | 3 |
| WRLD HIS | 1.0 | RV | 88 | 1 |
| ALGEBRA 1 | | DK | 61 | |
| BIOLOGY | 1.0 | ME | 78 | 1 |
| SPANISH 1 | 1.0 | EN | 73 | |
| INTRC MUS | | DC | 61 | |
| PE-MUSIC | .50 | PZ | 80 | |

PRESENT 161
ABSENT 21
LATE 12
BEHAVIOR
GRADE NEXT YEAR

CUMULATIVE RECORD COPY - H2C

SENIOR (OR JUNIOR) HIGH

CLASS SIZE

---

MANLEY MICHAEL
CENTRAL
ID. NO. 804-244-2   GROUP 311
CURR A   GRADE 10   YR END JUNE 90
LEVIN B   MS. R. JOHNSON

| SUBJECT | CR | TCH | MARK | BEH |
|---|---|---|---|---|
| ENGLISH 2 | 1.0 | EAC | 70 | |
| PUB SPKG | 1.0 | HES | 78 | |
| GEOMETRY | MYW | 50 | 3 |
| CP SCI 1/2 | .50 | MKT | 90 |
| CHEMISTRY | 1.0 | SSW | 70 |
| SPANISH 2 | 1.0 | LME | 70 |
| PHYS ED | .50 | PAL | 90 |

PRESENT 163
ABSENT 21
LATE 5
BEHAVIOR
GRADE NEXT YEAR

CUMULATIVE RECORD COPY - H2C

SENIOR HIGH

RANK
CENTRAL HIGH SCHOOL

GRADUATION RECORD

GRADUATED

---

MANLEY MICHAEL
CENTRAL
ID. NO. 804-244-2   GROUP 209
CURR A   GRADE 11   YR END   91
I. GRIFFIN

| SUBJECT | CR | TCH | MARK | BEH |
|---|---|---|---|---|
| ENGLISH 3 | 1.0 | EGB | 70 | 3 |
| AMER HIST | 1.0 | RLB | 76 |
| GEOMETRY | 1.0 | MSD | 66 |
| ANAT/PHYS | SMM | 50 |
| SPANISH 3 | 1.0 | LMP | 68 |
| PHYS ED | .50 | PDJ | 80 | 2 |
| HEALTH | .50 | PDJ | 70 | 2 |

129
53
4

CUMULATIVE RECORD COPY - H2C

SENIOR HIGH

GRADUATION RECORD

---

MANLEY MICHAEL
CENTRAL
ID. NO. 804-244-2   GROUP 108
CURR A   GRADE 12   YR END   92
I. GRIFFIN

| SUBJECT | CR | TCH | MARK | BEH |
|---|---|---|---|---|
| ENGLISH 4 | 1.0 | ERM | 7 |
| SOC SCI | 1.0 | HJL | 8 |
| AF AM HIS | 1.0 | HRJ | 8 |
| ALGEBRA 2 | 1.0 | MSW | 6 |
| PHYSICS | 1.0 | SJU | 8 |
| PHYS ED | .50 | PDK | 80 |
| HEALTH | .50 | PDK | 80 |

142
35   GRADE
7   NEXT YR
SENIOR HIGH

GRADUATION AVERAGE

LAST NAME: MANLEY   FIRST NAME: MICHAEL   MIDDLE NAME

NAME: VARE m 4t⁊
SCHOOL: VARE mich
ST. NO.          GROUP: 6
GRADE: 7   CURR.   JUNE 19 88   GROUP: 4
ADV. A. CHAPMAN   CURR. Pohaching

| SUBJECT | MK | PD/WK |
|---|---|---|
| ENGLISH | A | |
| READING | | |
| SOCIAL STUDIES | A | |
| PA. & AMER. HIST. & GOVT. | | |
| WORLD HIST. & GOVTS. | | |
| MATH* ( | A | |
| SCIENCE | C | |
| FOR. LANG.* ( Sp. ) | B | |
| INTRO. TO BUSINESS | B | |
| TYPING | B | |
| ART | B | |
| MUSIC | B | |
| HOME EC.* ( | B | |
| SHOP* ( | A | |
| DRAWING-MECH. | C | |
| PHYS. ED. | B | |
| HEALTH ED. | A | |
| OTHER Cm. Sc. | A | |

WORK HABITS: A   BEHAVIOR: A
PRES. 173   ABS. 10   LATE 3
GRADE NEXT YEAR: 8
JR. HIGH/MIDDLE

H 2 SCHOLASTIC RECORD

NAME: MANLEY MICHAEL
SCHOOL: CENTRAL
ST. NO. 304-244-2   GRD: 412
CURR. 200   GRADE: 09   YR PAN. JUNE 89
ADV. CENTRAL

| SUBJECT | CR | TCH | MARK | BEH |
|---|---|---|---|---|
| ALG 1 | 1.0FZ | 8C | | |

CUMULATIVE RECORD COPY   H2C
GRADE NEXT YEAR
JR. HIGH/MIDDLE

*INSERT INITIAL LETTER    YEAR OF SUBJECT.

OOL DISTRICT OF PHILADELPHIA (REV. 12/7.

ST. NO   DATE OF BIRTH: 7/24/74
MONTH: 7   DAY: 24   YEAR: 74
BOY: X   GIRL   INDICATE BY X
NAME
SCHOOL
ST. NO.   GROUP
GRADE   CURR.   JUNE 19   GROUP
ADV.

| SUBJECT | MK | PD/WK |
|---|---|---|
| ENGLISH | | |
| READING | | |
| SOCIAL STUDIES | | |
| PA. & AMER. HIST. & GOVT. | | |
| WORLD HIST. & GOVTS. | | |
| MATH* ( | | |
| SCIENCE | | |
| FOR. LANG.* ( | | |
| INTRO. TO BUSINESS | | |
| TYPING | | |
| ART | | |
| MUSIC | | |
| HOME EC.* ( | | |
| SHOP* ( | | |
| DRAWING-MECH. | | |
| PHYS. ED. | | |
| HEALTH ED. | | |
| OTHER | | |

WORK HABITS   BEHAVIOR
PRES.   ABS.   LATE
GRADE NEXT YEAR
JR. HIGH/MIDDLE

| LAST NAME | FIRST NAME AND INITIALS | | SEX (X) | DATE OF BIRTH | VACCINATION CERTIFICATE ....................19..... |
|---|---|---|---|---|---|
| MANLEY | MICHAEL, R. | | B X | MON. DAY YEAR 7 29 74 | I HEREBY CERTIFY FROM PERSONAL EXAMINATION THAT THE PERSON NAMED ON THIS CARD HAS BEEN SUCCESSFULLY VACCINATED OR HAS HAD SMALLPOX. |

ROOM OR GROUP NO. K-1 5 6 7 19 23 18  27 6 7G 8A
pm 1 1 2 3 4 5 6 7 A

SIGNATURE ........................ M.D.
PRINT NAME ........................

SCHOOL    Bregy    Vare Vare Middle Central

## SCREENING

| GROWTH RECORD | | | | | VISUAL ACUITY 15 - 20 FEET | | | | | | AUDIOMETRIC P – PASSED, OR DECIBEL LOSS | | | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DATE | HEIGHT | WEIGHT | | DEFECT | DATE | WITHOUT GLASSES | | WITH GLASSES | | DEFECT | DATE | | DEFECT | |
| | | ACTUAL | AVERAGE | O. WT. U. WT. | | RIGHT | LEFT | RIGHT | LEFT | | | RIGHT LEFT | | |
| 2-13-80 | 46 | 50 | 47 | | 2-13-80 | 20/70 | 20/70 | 20/20 | 20/20 | X | 1/2/80 | P | | |
| 12/8/80 | 48 | 56 | 58 | | 12/2/80 | 20/60 | 20/60 | / | / | X | 3/8/81 | P P | | |
| 4/24/84 | 54 | 78 | (At 76% u. wt 55°/0) | | 3-18-83 | 20/40 | 20/40 | / | / | X | 5-27-82 | P P | | |
| 2/14/85 | 56 | 88 | | | 4/24/84 | 20/85 | 20/60 | / | / | X | 2-17-83 | P P | | |
| 4-2-87 | 60 | 101 | | | 3/14/85 | 20/30 | 20/30 | / | / | X | 1/13/84 | P P | | |
| 4-2-87 | 60 | 111 | 74 | | 4-2-87 | 20/30 | 20/25 | / | / | | | | | |
| 11-17-87 | 61 | 119 | 70? | | 11-17-87 | 20/25 | 20/25 | / | / | | | | | |
| 10-24-88 | 65 ½ | 142 ½ | (14) | 126 | 10-24-88 | 20/20 | 20/20 | / | / | | 10-24-88 | P P | | |
| 11-28-89 | 66 ½ | 168 ½ | (15) | 122/80 | 11-28-89 | 20/25 | 20/25 | / | / | | | | | |
| 11/30/90 | 67 | 190 | (16) | 118/78 | 11/30/90 | 20/30 | 20/25 | / | / | | 11/30/90 | P P | | |
| 10-28-91 | 68 | 199 | (17) | 114/64 | 10/28/91 | 20/20 | 20/25 | / | / | | | | | |
| | | | | | | / | / | / | / | | | | | |
| | | | | | | / | / | / | / | | | | | |
| | | | | | | / | / | / | / | | | | | |

## PHYSICAL EXAMINATION

| DATE OF EXAMI-NATION | GRADE AT DATE OF EXAMI-NATION | EYE | | | NOSE & THROAT | | EAR | | | | | | CHEST | | ORTHOPEDIC | | | | GROWTH | | | | | | PARENT PRESENT (✓) | SIGNATURE OF PHYSICIAN (LEGIBLE) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | EYES | STRABISMUS | TONSILS* | NASAL OBSTRUCTION | DEFECTIVE HEARING | OTITIS MEDIA* | DEFECTIVE SPEECH* | SKIN* | NODES* | THYROID | BLOOD PRESSURE | HEART* | LUNGS* | POOR POSTURE | SCOLIOSIS | FLATFOOT | OTHER DEFORMITIES | UNDERWEIGHT | OVERWEIGHT | ABNORMAL NERVOUSNESS* | HERNIA* | UNDESCENDED TESTES | MISCELLANEOUS | | |
| 2-13-80 | K | X | | Physical assess | | | | | | | | | 78/52 | See P.O.H.R. | | | | | | None | | | | X | Nurse RN |
| 4/24/86 | 6 | | | | | | | | | | | | | 0 | | | | | | | | | | | | Nelson RNSc |
| 4-2-87 | 7 | | | | | | | | | | | | | 0 | | | | | | | | | | | | J. Cal. Supp |

| DATE | TEAM OR ACTIVITY EXAM. | PASS | FAIL | PHYSICIAN | *STATE SIGNS, SYMPTOMS, AND DIAGNOSIS UNDER "OTHER FINDINGS AND RECOMMENDATIONS" SEC. |
|---|---|---|---|---|---|
| | | | | | OTHER FINDINGS AND RECOMMENDATIONS OF SCHOOL PHYSICIAN (DATE AND SIGN) |
| | | | | | 2-13-80 Vision 2/1 OC |
| | | | | | |
| | | | | | |
| | | | | | |

DIRECTIONS TO SCHOOL PHYSICIAN: USE CODE AS FOLLOWS: O=NORMAL. /=SLIGHT DEFECT, NO NOTICE SENT TO PARENT. X=DEFECT, NOTICE SENT TO PARENT. ⊗=DEFECT TREATED. ⚊=DEFECT, NOT CORRECTIBLE. IF NOT CORRECTIBLE, STATE AUTHORITY IF OTHER THAN SCHOOL PHYSICIAN. (⋊=UNDER TREATMENT
DIRECTIONS TO NURSE: USE CODE AS FOLLOWS: ⊗=DEFECT HAS BEEN TREATED. ⊠=A PRIVATE PHYSICIAN OR CLINIC STATES THAT DEFECT RECOMMENDED FOR TREATMENT IS NON-CORRECTIBLE. ⊕=ATTENDING PHYSICIAN DISAGREES WITH THE DIAGNOSIS MADE BY THE SCHOOL PHYSICIAN, OR STATES THAT TREATMENT IS NOT DESIRABLE AT THE PRESENT TIME, EXPLAIN ON OTHER SIDE.

FORM MEH 3 – PUPIL HEALTH RECORD – SCHOOL DISTRICT OF PHILADELPHIA (OCT. 1970).

NAME OF PARENT                               PHONE

ADDRESS

FAMILY PHYSICIAN        7/1/14                          PHONE

### IMMUNIZATION AND DIAGNOSTIC PROCEDURES

| DPT/DT | DATE | SCHOOL | PRIV. PHYS. | OTHER | ORAL POLIO | DATE | SCHOOL | PRIV. PHYS. | OTHER | TUBERCULIN TEST | DATE | RESULT IN MM | SCHOOL | PRIV. PHYS. | OTH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BASIC | 9/11/74 | | | | TYPE I | 1/11/74 | | | | tine | 7/10/79 | neg | | | |
| BASIC | comp. | | | | TYPE II | comp. | | | | | 4-21-81 | neg | | | |
| BASIC | | | | | TYPE III | | | | | | | | | | |
| BOOSTER | 1/19/76 | | | | BOOSTER | 1/29/76 | | | | CHEST X-RAY | DATE | RESULT | SCHOOL | PRIV. PHYS. | OTHE |
| BOOSTER | 7/10/79 | | | | BOOSTER | 7/10/79 | | | | | | | | | |
| BOOSTER | | | | | BOOSTER | | | | | | | | | | |
| MEASLES | 7/30/75 | | | | TESTS | DATE | TYPE | | RESULT | | | | | | |
| MUMPS | 7/10/79 | | | | | | | | | | | | | | |
| Rubella OTHER | 7-30-75 | | | | | | | | | | | | | | |

| Antigen | Device | Control/ Lot # | Manuf. | Arm Tested | Date Given | Date Read | Result in mm |
|---|---|---|---|---|---|---|---|
| Tuberculin, Old | Tine | 1464v | Lederle | R Ⓛ | 10.14.88 | 10/26/88 | 0 |
| Aplisol-PPD 0.1 ml | Intra-dermal | | Parke-Davis | R L | | | |

### HEAL

| | FAMILY | CHILD | | | | | | ADDITIONAL DATA (CHECK) |
|---|---|---|---|---|---|---|---|---|
| ALLERGY | | | CHICKENPOX | | | TYPHOID FEVER | | MENSTRUAL CRAMPS |
| ASTHMA | | | DIPHTHERIA | | | WHOOPING COUGH | | BED-WETTING |
| ECZEMA | | | GERMAN MEASLES | | | WORMS (INTESTINAL) | | NIGHTMARES |
| OTHER | | | MEASLES | | | OPERATIONS | | CONSTIPATION |
| DIABETES | | | MIDDLE EAR DISEASE | | | APPENDIX | | INADEQUATE SLEEP |
| EPILEPSY | | | MENINGITIS | | | HERNIA | | POOR APPETITE |
| RHEUMATIC FEVER | | | MUMPS | | | TONSILS | | TIRES EASILY |
| CHOREA | | | PNEUMONIA | | | OTHER (SPECIFY) | | COLDS (FREQUENT) |
| (ST. VITUS DANCE) | | | POLIOMYELITIS | | | AGE WALKED | | PREMATURE BIRTH |
| TUBERCULOSIS | | | SCARLET FEVER | | | AGE TALKED | | NORMAL BIRTH |
| | | | | | | AGE TOILET TRAINED | | |

### NOTES BY SCHOOL NURSE OR PHYSICIAN  (Sign entries with full name.)

| DATE | NOTES | DATE | NOTES |
|---|---|---|---|
| 7/3/80 | Physical assess completed 295 form issued for DK. J. Canosa RN | | |
| 3-18-80 | Glasses obtained. Def term A Canosa RN | | |
| 3/14/83 | M.M.R. gave to student Mary Douglas | | |
| 3/9/80 | MEH-1 issued. Helen Owen SNP | | |
| 11-2-89 | MEH-1 Physical Exam form M. Elly HR+ | | |
| 11-30-90 | meh, issued. Elaine Geiger RN | | |
| 10/28/91 | meh, issued re: physical exam Elaine Geiger RN | | |

School District of Philadelphia — Cumulative Record Card (FORM EH 6—CUMULATIVE RECORD—SCHOOL DISTRICT OF PHILADELPHIA (SEPT. 1970))

| | |
|---|---|
| BOY / GIRL (IND. BY X) | MOTHER X |
| DATE ENTERED GRADE 1 IN ANY SCHOOL SYSTEM | 9/80 |
| COUNTRY OF BIRTH — FATHER | U.S. |
| MOTHER | U.S. |

EVIDENCE OF AGE: BIRTH CERTIFICATE (CHECK) X · OTHER (SPECIFY)

| DATE OF BIRTH | | |
|---|---|---|
| MONTH | DAY | YEAR |
| 7 | 29 | 74 |

CHILD, IF U.S. GIVE CITY AND STATE: North Carolina

| LAST NAME | FIRST NAME | MIDDLE NAME | CHK. IF DEC. |
|---|---|---|---|
| MANLEY | MICHAEL | RODAMIAN | |

FIRST NAME OF FATHER: Melvin Carr
FIRST NAME OF MOTHER: Rita Manley
FULL NAME OF STEPPARENT OR GUARDIAN:

## ENROLLMENT AND RESIDENCE RECORD

| DATE (MO. DAY YEAR) | SCHOOL—KINDERGARTEN TO GRADUATION. INCLUDE ALL SCHOOLS IN PA., PUBLIC, PRIVATE, AND PAROCHIAL. | CODE, GRADE, ETC. | | RESIDENCE |
|---|---|---|---|---|
| 9/1/79 | Kgn. | 0 | | 2307 Hoyt Terrace |
| 8-86 | Vare | 1 | 7 | " " |
| 91-83 | Central | 1 | 9 | " " |

### GRADE MARKS

| GRADE | 1 | 2 | 3 | 4 | 5 | 6 | REMARKS |
|---|---|---|---|---|---|---|---|
| MATHEMATICS | + | C | C | 12 | 12 | A | |
| READING | 3 | S | S | C+ | C+ | B | |
| WRITTEN EXPRESSION | B | B | B | C+ | C+ | B | |
| SPELLING | A | A | A | A | A | A | |
| HANDWRITING | B | B | B | B | B | A | |
| SOCIAL STUDIES | Fr. | C | C+ | C+ | A+ | A | |
| SCIENCE | | | | S | S | A | |
| Health | | | | S | S | A | |
| Music | S | | | S | S | B | |
| Phys. Ed. | S | | | A | S | A | |

FIRST COUNSELING CONTACT — DATE:
PSYCHOLOGICAL EXAMINATION:
PSYCHOLOGICAL EXAMINATION:
NON-APPARENT PHYS. DEFECTS:

*INDICATE SOURCE BY "BEGINNER" OR NAME OF LAST CITY OR STATE IN RESIDENCE COLUMN. INDICATE ALL SCHOOL, GRADE, AND RESIDENCE. INDICATE "GRADUATION."

"SCHOOL ATTENDED WITH TRANSFERS, GIVING NEW..."

# CUMULATIVE RECORD - MATHEMATICS

**DIRECTIONS:** Enter Year/Grade When Skills and Levels are Completed.

NAME OF PUPIL: Manley, Michael

SCHOOL

## MATHEMATICS INSTRUCTIONAL LEVELS

| (Pupil's Working Levels) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.10 Decimal System of Numeration | | 1 | 1 | 2 | 3 | 3 | | | | 5 | 5 | 5 | | | | | | | | | |
| 1.20 Numeration | | | | | | | | | | | | | | | | | | | | | |
| 1.30 Other Systems of Numeration | | | | | | | | | | 5 | | | | | | | | | | | |
| 2.20 Cardinal Numbers | | 1 | | | 3 | 3 | | | | 5 | | | | | | | | | | | |
| 2.30 Number/Numeral | | 1 | | | | | | | | 5 | | | | | | | | | | | |
| 2.40 Addition | | 1 | 1 | 2 | 3 | 3 | | | | 5 | 5 | 5 | | | | | | | | | |
| 2.50 Subtraction | | 1 | 1 | 2 | 2 | 3 | | | | 5 | 5 | 5 | | | | | | | | | |
| 2.60 Multiplication | | | | 2 | 3 | 3 | | | | 5 | 5 | 5 | | | | | | | | | |
| 2.70 Division | | | | 2 | 3 | 3 | | | | 5 | 5 | 5 | | | | | | | | | |
| 2.75 Vocab./Signs/Sym./Sentences | | 1 | 1 | 2 | 3 | 3 | | | | 5 | 5 | 5 | | | | | | | | | |
| 2.80 Problem Solving | | 1 | 1 | 1 | 2 | 3 | 3 | | | 5 | 5 | 5 | | | | | | | | | |
| 2.90 Pos. & Neg. Integers | | | | | | | | | | | | | | | | | | | | | |
| 3.10 Common Fractions | | 1 | 1 | 1 | 2 | 3 | 3 | | | 5 | 5 | 5 | | | | | | | | | |
| 3.20 Decimal Fractions | | | | | | | | | | | | | | | | | | | | | |
| 3.30 Ratio | | | | | | | | | | | | | | | | | | | | | |
| 3.40 Percent | | | | | | | | | | | | | | | | | | | | | |
| 3.60 Real Numbers | | | | | | | | | | | | | | | | | | | | | |
| 3.75 Number Sentences | | | | | | | | | | | | | | | | | | | | | |
| 3.80 Problem Solving | | | | | | | | | 5 | | | | | | | | | | | | |
| 4.20 Linear Measure | | 1 | 1 | 2 | 2 | 3 | 3 | | | 5 | 5 | 5 | | | | | | | | | |
| 4.30 Time | | 1 | 1 | 2 | 2 | 3 | 3 | | | 5 | 5 | 5 | | | | | | | | | |
| 4.40 Calendar | | 1 | 1 | 2 | 2 | 3 | 3 | | | 5 | | 5 | | | | | | | | | |
| 4.60 Temperature | | | 1 | 2 | 2 | 2 | 3 | | | 5 | | 5 | | | | | | | | | |
| 4.70 Money | | 1 | 1 | 2 | 2 | 3 | 3 | | | 5 | | | | | | | | | | | |
| 4.80 Liquid-Solid Measures | | 1 | 1 | 2 | 2 | 3 | 3 | | | 5 | 5 | 5 | | | | | | | | | |
| 5.10 Graphs | | 1 | 1 | 2 | 2 | 3 | 3 | | | 5 | 5 | 5 | | | | | | | | | |
| 5.20 Tables-Charts | | | | | | | | | | 5 | 5 | | | | | | | | | | |
| 5.30 Probability | | | | | | | | | | | | | | | | | | | | | |
| 5.40 Scale Drawings | | | | | | | | | | | | | | | | | | | | | |
| 5.50 Statistics | | | | | | | | | | | | | | | | | | | | | |
| 5.60 Ordered pairs | | | | | | | | | | | | | | | | | | | | | |
| 5.70 Flowcharts | | | | | | | | | | | | | | | | | | | | | |
| 5.75 Sets | | | | | | | | | | | | | | | | | | | | | |
| 6.10 Plane Figure | | | | | | | | | 5 | | | | | | | | | | | | |
| 6.20 Perimeter | | | | | | | | | | | | | | | | | | | | | |
| 6.30 Area | | | | | | | | | 5 | | | | | | | | | | | | |
| 6.40 Solid Figures | | | | | | | | | | | | | | | | | | | | | |
| 6.50 Volume | | | | | | | | | | | | | | | | | | | | | |
| 6.60 Tools of Geometry | | | | | | | | | | | | | | | | | | | | | |
| 6.70 Developing Geometric Concepts | | 1 | 1 | 2 | 3 | 3 | | | 5 | 5 | | | | | | | | | | | |
| 6.80 Angle Relationships | | | | | | | | | | | | | | | | | | | | | |
| 6.90 | | | | | | | | | | | | | | | | | | | | | |

| LAST NAME | | FIRST NAME AND INITIALS | | | | | | | | | | | | | | | | | SEX (x) | | DATE OF BIRTH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MANLEY | | MICHAEL, R. | | | | | | | | | | | | | | | | | | MONTH | DAY | YE |
| | | | | | | | | | | | | | | | | | | | B | x | 7 | 29 | 74 |
| ROOM OR GROUP NO. | K-1 pm | 4 1 | 5 1 | 7 2 | | | | | | | | | | | | | | | G | | |

## EXAMINATION--USING MOUTH MIRROR AND EXPLORER

| NO. | DATE | AGE | | GRADE | ROOM NO. | SCHOOL | NAME OF DENTIST | REMARKS |
|---|---|---|---|---|---|---|---|---|
| | | YRS. | MOS. | | | | | |
| 1 | 11-7-80 | 6 | 4 | 1 | 5 | | | Caries D |
| 2 | 2-9-82 | 7 | 7 | 2 | 7 | Bregy | Dr. Friedman | Caries #T-mesl.-fau filling |
| 3 | | | | 3 | | | | Caries (der) Corr Fau oth |
| 4 | OCT. 5 1983 | | | 4 | | BREGY SCHOOL | N. WOJIK R.D.H | Caries - (lost fly) - Corr |
| 5 | | | | | | | | |
| 6 | | | | | | | | |

**REMARKS:** _____

_____

-------- FOLD HERE --------

| EXAMI-NATION | NOTE BELOW ANY ABNORMAL OR PATHOLOGICAL CONDITIONS FOUND, SUCH AS CONGENITAL MALFORMATIONS, GROSS MALOCCLUSION, STOMATITIS, PROSTHETIC RESTORATIONS, ETC. ALSO NOTE ANY SPECIAL EXAMINATIONS REQUESTED, SUCH AS X-RAYS OR MOUTH SMEARS. |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |

FORM MEH 183—DENTAL EXAMINATION—SCHOOL DISTRICT OF PHILADELPHIA  (OCT. 1971)

| | | | | | |
|---|---|---|---|---|---|
| NAME MANLEY MICHAEL | | | | SEX | |
| CENTRAL | | | | HIGH SCHOOL | |
| ID 804-244-2 | | | GROUP 412 | | |
| COMP 200 GRADE 09 | | PENDING INS JURS 89 | | | |
| ADV OF CENTRAL | | | | | |

| SUBJECT | CREDITS | ISSU | END OF YEAR | | |
|---|---|---|---|---|---|
| | | | MARK | MERIT | ABS |
| | | | | | |
| | | | | | |
| | | | | | |
| ALG 1 | 1.0 | FZ | B | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| PRESENT | | | DECLAVR AB | | |
| ABSENT | | GRADS ACTV 09-H | | | |
| LATE | | | | | |

C0854N-1345081489

DATE OF TEST

USE SPACES BELOW FOR TESTING PROGRAM CUMULATIVE RECORD LABELS.
USE ONLY THAT PORTION OF LABEL DESCRIBED IN DIRECTIONS ACCOMPANYING SHEETS OF LABELS.

PHILADELPHIA CITY-WIDE TESTING PROGRAM

MANLEY   MICHAE
SCHOOL NAME: VARE HS
STUDENT ID: 8042442
MAR. 1988   GRADE 08

| | R/E/LA | MCMP | MC2A | MTOT | SCI | SOST | BTOT |
|---|---|---|---|---|---|---|---|
| RAW | 57 | 14 | 28 | 37 | 33 | 37 | 169 |
| ITEM | 89 | 38 | 61 | 40 | 40 | 40 | 203 |
| PCTC | 78 | 91 | 83 | 90 | 83 | 93 | 97 |
| LPCT | 94 | 46 | 91 | 71 | 90 | 97 | 94 |
| NPR | 96 | 66 | 90 | 82 | N/A | N/A | N/A |

1988 Tests of Essential Learning Skills
Pupil: MANLEY   MICHAEL R
Grade: 8 Sex: M  I.D. No.:8042442120081
Birth Date: 7/29/74
Dist:PHILADELPHIA SCHOOL DISTRICT
Schl:VARE JHS

| Test Scores | Reading | Math |
|---|---|---|
| No. of Items Correct | 64 of 67 | 60 of 71 |
| Pct. of Items Corr. | 95.5% | 84.5% |
| Dist. Avg. % Correct | 64.6% | 60.0% |
| State Avg. % Correct | 80.6% | 79.7% |
| Natl Avg. % Corr. | 80.6% | 77.2% |

Date Exited From Essential Skills Services    N/A    N/A

MANLEY        MICHAEL   R
STUDENT NAME        PSAT/NMSQT

| YEAR | GRADE | VERBAL | VERBAL %LE | MATH | MATH %LE | SELECTION INDEX | SEL. NO. %LE | OUT OF STATE | LABEL |
|---|---|---|---|---|---|---|---|---|---|
| 89 | SO | 45 | 65 | 44 | 46 | 134 * 61 | | | |

PHILADELPHIA CITY-WIDE TESTING PROGRAM
MANLEY   MICHAE
SCHOOL NAME: CENTRAL HS
STUDENT ID: 8042442
JAN 1990   GRADE 10

| | READING | VERBAL | MATH |
|---|---|---|---|
| RAW | 49 | | |
| ITEM | 56 | | |
| NPR | 89 | | |

CHAPTER I ELIGIBILITY
READ   MATH
NO     N/A
NPR 89   N/A

MANLEY        MIC AEL
STUDENT NAME        PSAT/NMSQT
DO NOT USE PASTE OR WATER.

| YEAR | GRADE | VERBAL | VERBAL %LE | MATH | MATH %LE | SELECTION INDEX | SEL. NO. %LE | BEL. |
|---|---|---|---|---|---|---|---|---|
| 90 | JR | 45 | 69 | 47 | 60 | 137 | 67 | |

PHILADELPHIA CITY-WIDE TESTING PROGRAM
MANLEY   MICHAE
SCHOOL NAME: CENTRAL HS
STUDENT ID: 8042442
JAN 1991   GRADE 11

| | READING | MATH |
|---|---|---|
| RAW | 47 | N/A |
| ITEM | 53 | N/A |
| NPR | 89 | N/A |

CHAPTER I ELIGIBILITY
READ   MATH
NO     N/A
NPR 89   N/A

| LAST NAME | FIRST NAME | MIDDLE NAME | SCHOOL | PUPIL ID |
|---|---|---|---|---|
| Manley | Michael | | Vare H.S. | |

DATE OF TEST

USE SPACES BELOW FOR TESTING PROGRAM CUMULATIVE RECORD LABELS.
USE ONLY THAT PORTION OF LABEL DESCRIBED IN DIRECTIONS ACCOMPANYING SHEETS OF LABELS.

XXXXXX
XXXXXX   8042442

PHILADELPHIA CITY-WIDE TESTING PROGRAM

MANLEY          MICHAEL          SC-BREG CL-02   NOV 1985   GR-06   PHIL 6

MANLEY NAME: MICHAEL
SCHOOL NAME: VARE MS
STUDENT ID: 8042442
GRADE 08

| | READ | MCMP | MC&A | MATH | SCI | SUST | BTOT | | CHAPTER I ELIGIBILITY | |
|---|---|---|---|---|---|---|---|---|---|---|
| RAH | 44 | 15 | 28 | 43 | 22 | 25 | 134 | | READ | MCMP |
| ITEM | 57 | 21 | 40 | 61 | 30 | 40 | 188 | | NO | NO |
| PCTC | 57 | 75 | 70 | 70 | 63 | 71 | | | | |
| LPCT | 71 | | | 63 | 79 | 89 | 84 | | NPR  80  96 | |

MANLEY          MICHAEL          SC-BREG CL-02   APR 1986   GR-06   PHIL 6

MANLEY NAME: MICHAE
SCHOOL NAME: VARE MS
STUDENT ID: 8042442
NOV. 1986   GRADE 07

READ MCMP

| | READ | MCMP | MC&A | MATH | SCI | SOST | BTOT | | CHAPTER I ELIGIBILITY | |
|---|---|---|---|---|---|---|---|---|---|---|
| RAH | 14 | 26 | 40 | 16 | 19 | 34 | 175 | | READ | MCMP |
| ITEM | 16 | 36 | 52 | 30 | 30 | 40 | 200 | | NO | NO |
| PCTC | 88 | 72 | 77 | 63 | 63 | 85 | 89 | | | |
| LPCT | 93 | 79 | 86 | 76 | 76 | 96 | 98 | | NPR  80  92 | |

DO NOT USE PASTE OR WATER.

MANLEY          MICHAEL          SC-BREG CL-02   APR 1986   GR-06   PHIL 6   CH I

| | R/E/LA | MCMP | MC&A | MTOT | SCI | SOST | BTOT | CHAPTER I ELIGIBILITY |
|---|---|---|---|---|---|---|---|---|
| RAH | 57 | 25 | 39 | 64 | 33 | 35 | 177 | |
| ITEM | 64 | 29 | 74 | 85 | 40 | 40 | 208 | READ   MCMP |
| PCTC | 89 | 92 | 91 | 83 | 88 | 88 | | NO    NO |
| LPCT | 94 | 96 | | 94 | 93 | 97 | N/A | |
| NPR | 80 | 96 | | | N/A | N/A | N/A | NPR  80  96 |

MANLEY NAME: MICHAEL
SCHOOL NAME: VARE MS
STUDENT ID: 8042442
APR. 1987   GRADE 07

| | R/E/LA | MCMP | MC&A | MTOT | SCI | SOST | BTOT | CHAPTER I ELIGIBILITY |
|---|---|---|---|---|---|---|---|---|
| RAH | 55 | 30 | 26 | 50 | 36 | 34 | 175 | |
| ITEM | 62 | 34 | 77 | 83 | 40 | 40 | 200 | READ   MCMP |
| PCTC | 88 | 88 | 92 | 90 | 85 | 89 | | NO    NO |
| LPCT | 94 | 96 | 92 | 94 | 96 | 98 | N/A | |
| NPR | 80 | 92 | 95 | 95 | N/A | N/A | N/A | NPR  80  92 |

| LAST NAME | FIRST NAME | MIDDLE NAME | SCHOOL |
|---|---|---|---|
| MANLEY | MICHAEL | RODNIAN | BREG  Vare Middle |

804 244 2
Pupil ID

VALE Michael
BRIGHT Central
SCHOOL

| LAST NAME | FIRST NAME | MIDDLE NAME |
|---|---|---|
| MANLEY | MICHAEL | RODAMIAN |

USE SPACES BELOW FOR TESTING PROGRAM CUMULATIVE RECORD LABELS.
USE ONLY THAT PORTION OF LABEL DESCRIBED IN DIRECTIONS ACCOMPANYING SHEETS OF LABELS.

DATE OF TEST

**2/80**

DATE TESTED FEB 80
STANFORD EARLY SCHOOL
ACHIEVEMENT TEST
CITY-WIDE PROGRAM
FORM 1 LEVEL 1

MANLEY MICHAEL
| | SCORE | NPR | | SCORE | NPR | | SCORE | NPR | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ENVIRONMENT | 38 | 94 | MATHEMATICS | 72 | 20 | | 86 | | | | TOTAL |

ID NO 8042442 SCHOOL 224 SCHOOL 00 CK1 099
S AND SOUNDS AURAL COMPREHENSION

**2/81**

DATE TESTED FEB 81
CALIFORNIA
ACHIEVEMENT TESTS
1970 EDITION
CITY-WIDE PROGRAM
FORM A LEVEL 1

MANLEY MICHAEL
ID NO 8C42442 SCHOOL 224 GRADE 01 RS9 G06
3117734855309872869532792287952811873459426229831184295381272251
| VOCAB | COMPU | TOTAL | ABSS | NPR | ABSS | NPR | ABSS | NPR | TOTAL |
| READING | | | MATHEMATICS | | MECH | USS & ST | SPELL | TOTAL |
| | | | | | LANGUAGE | | BATTERY |

**3/?2**

DATE TESTED MAR 82
CALIFORNIA
ACHIEVEMENT TESTS
1970 EDITION
CITY-WIDE PROGRAM
FORM A LEVEL 1

MANLEY MICHAEL
ID NO 8042442 SCHOOL 224 GRADE 02 RS9 007
3678139786363842805736588301809149743197421854379933967322590
| VOCAB | COMPU | TOTAL | ABSS | NPR | ABSS | NPR | ABSS | NPR | TOTAL |
| READING | | | MATHEMATICS | MECH | USS & ST | SPELL | TOTAL |
| | | | | | LANGUAGE | | BATTERY |

**?/83**

DATE TESTED MAR 83
CALIFORNIA
ACHIEVEMENT TESTS
1970 EDITION
CITY-WIDE PROGRAM
FORM A LEVEL 2

MANLEY MICHAEL
ID NO 8042442 SCHOOL 224 GRADE 03 RS9 019
401745049745794854854028316488416754828841479409685590
| VOCAB | COMPU | TOTAL | ABSS | NPR | ABSS | NPR | ABSS | NPR | TOTAL |
| READING | | | MATHEMATICS | MECH | USS & ST | SPELL | TOTAL |
| | | | | | LANGUAGE | | BATTERY |

**2/84**

DATE TESTED FEB 84
CALIFORNIA
ACHIEVEMENT TESTS
1970 EDITION
CITY-WIDE PROGRAM
FORM A LEVEL 2

MANLEY MICHAEL R
ID NO 8042442 SCHOOL 224 GRADE 04 RS9 023
343204828238443400854649342694500848461664828750691142083
| VOCAB | COMPU | TOTAL | ABSS | NPR | ABSS | NPR | ABSS | NPR | TOTAL |
| READING | | | MATHEMATICS | MECH | USS & ST | SPELL | TOTAL |
| | | | | | LANGUAGE | | BATTERY |

STUDENT MANLEY MICHAEL
NAME
BIRTHDATE 07/29/74 SEX M ID# 8042442 16 SCHOOL BREGY
GRADE 05

1984 TELLS

THE PUPIL'S LABEL
IN THIS SPACE.

| TEST SCORES | READING | MATHEMATICS |
|---|---|---|
| NUMBER OF ITEMS CORRECT | 53 of 65 | 54 of 66 |
| PERCENT OF ITEMS CORRECT | 82 | 82 |
| DISTRICT AVERAGE PERCENT CORRECT | 56 | 57 |
| NATIONAL AVERAGE PERCENT CORRECT | 73 | 77 |

FORM EH7 - CUMULATIVE RECORD LABEL CARD - SCHOOL DISTRICT OF PHILADELPHIA (JAN. 1969)

Case 1:07-cv-00472-GMS  Document 2-4  Filed 02/05/2008  Page 50 of 61

# Philadelphia City-Wide Testing Program

Philadelphia Profile

**MANLEY   MICHAEL**

SCHOOL  DaŁuol Zlaaaaaaal ,
CLASSROOM  GLASSMAN JEAN ,  027
STUDENT NUMBER  8042442  DATE OF BIRTH 07/29/74  GRADE 06  (ECS JOB NUM PHIL)
SEX M  · Nov 1985



## TEST TITLE

| | TEST SCORES | | | |
|---|---|---|---|---|
| | RAW | ITEM | PCTL | PCT |
| READING/ENGLISH | 44 | 51 | 71 | 71 |
| MATH COMPUTATION | 28 | 40 | 71 | 75 |
| MATH CONCEPTS & APPLICATIONS | 26 | 61 | 70 | 83 |
| TOTAL MATHEMATICS | 43 | 61 | 70 | 82 |
| SCIENCE/MATHEMATICS | 22 | 30 | 73 | 89 |
| SOCIAL STUDIES | 25 | 40 | 63 | 89 |
| TOTAL BATTERY | 134 | 188 | 71 | 84 |

Dear Parents:

The above chart gives you a set of scores your son received on the standardized tests he took in November, 1985. TEST SCORES indicates the total number of items on each test. The RAW SCORE shows the number of items he answered correctly. In the LPCT score column, the PCTL SCORE shows that PERCENT of items your child answered correctly. In the PHILADELPHIA PERCENTILE column shows how well your child scored relative to other Grade 06 students in the Philadelphia Public schools.

The best indication of your child's overall performance is the TOTAL BATTERY. His LPCT score of 84 in TOTAL indicates that 84 percent of the students in his grade scored lower than he did. This score can be considered above average performance. The PCTL score of 84 is shown by the "X" on the chart. Since test performance scores can vary, the dashed lines "---" show how much the TOTAL BATTERY score might vary for your child.

Your son's strongest performance was on the SOCIAL STUDIES test. The Philadelphia percentile score of 89 in SOCIAL STUDIES indicates that 89 percent of the students in his grade scored lower than he did. This score can be considered above average. His weakest performance was on the READING/ENGLISH test on which the students in his grade scored lower than he did. This score can be considered a high score within average performance.

We recommend that you meet with your son's teacher to discuss these results. Remember that test scores are only one indication of achievement before you make any conclusions, you should consider classroom performance, teacher comment, and your own observations.

---

Each test and the to...
Battery are listed in the le...
under the TEST...
heading.

For each entry under TEST...
TITLE, the TEST SCORE...
section displays informatio...
of performance on the test...

Farther to the right...
PERFORMANCE PROFI...
plots the PHILADELPH...
PERCENTILE score.

The next section dea...
the narrative interpretation...
the test scores listed ab...

The SKILLS PERFO...
MANCE CHART at the bott...
reports the observed perfo...
mance on each skill or object...
and its relationship to...
average performance of the...

---

# ECS  UNISCORE™

UNIFORM TEST SCORING
AND REPORTING SYSTEM

# STUDENT REPORT

PERFORMANCE ON SKILLS (OBJECTIVES) EXPRESSED AS NUMBER OF ITEMS ANSWERED CORRECTLY

## SKILLS

| | Philadelphia Average | Obtained Score |
|---|---|---|
| READING/ENGLISH | | |
| --- Litl & Interpret Comp | 2.8/ 4 | 3 |
| --- Details | 3.0/ 4 | 3 |
| --- Main Idea | 1.8/ 4 | 2 |
| --- Author's Purpose | | |
| --- Wrd Recog & Vocab Devel | 4.1/ 8 | 5 |
| --- Context Clues | 2.8/ 4 | 4 |
| Study Skills | | |
| --- Encyclopedia/Almanac | 2.4/ 4 | 4 |
| --- Dictionary | 2.5/ 4 | 3 |
| --- Card Catalog | 2.9/ 4 | 3 |
| Literature/Dedication | 3.1/ 4 | 4 |
| --- Plot | | |
| --- Characters | 2.3/ 5 | 3 |
| --- Setting | 3.1/ 5 | 4 |
| --- Theme | 2.5/ 4 | 4 |

## PERFORMANCE

| | Philadelphia Average | Obtained Score |
|---|---|---|
| TOTAL MATHEMATICS | | |
| Operations W/Whole Nos. | | |
| --- Cap Multiply By Hundreds | 2.1/ 4 | 2 |
| --- Cap Estimate Factor | 2.7/ 5 | 4 |
| Operations W/Fractnl No. | | |
| --- Cap Add/Subtract Decmls | 4.7/ 7 | 7 |
| --- Cap Add/Subt'n Fraction | 3.1/ 7 | 5 |
| --- CGa Decimal Numeration | | |
| --- CGa Cap Numeration | 3.5/ 5 | 4 |
| --- Read Numerl To 6 Places | | |
| Measurement | | |
| --- Time Area Metrics | 2.2/ 5 | 5 |
| --- Organize Interpret Data | | |
| --- Graphs, Thermometers | 2.9/ 5 | 5 |
| Geometry | | |
| --- Solid Fig/Detrm Radii | 3.5/ 6 | 5 |
| --- Problem Solving | 2.6/ 6 | 3 |
| --- Averages/Numb Sentences | | |
| SCIENCE | | |
| --- Electricity/Magnetism | 8.6/19 | 11 |
| --- Weather | 9.1/16 | 11 |

## CHART

| | Philadelphia Average | Obtained Score |
|---|---|---|
| SOCIAL STUDIES | | |
| --- Individual | 8.6/18 | |
| --- Group | 8.9/22 | |

ECS-3.1/85

Copyright ©1982

ECS-N·3.1/85

| MARKING SYSTEM |
| --- |
| A EXCELLENT  B GOOD  C AVERAGE  D AVERAGE  F FAILURE |
| EFFORT: + OUTSTANDING  ✓ SATISFACTORY  — UNSATISFACTORY |
| ACHIEVEMENT: A EXCELLENT B GOOD C AVERAGE D AVERAGE F FAILURE |

| SCHOOL | 516 | 05 |
| --- | --- | --- |
| MANLEY    MICHAEL    8042442 | | |
| 224  F. AMEDEE BREGY SCHOOL | YEAR ENDING JUNE, 19 85 | |
| PRINCIPAL | TEACHER | |
| MRS. MICHAEL N. IANNELLI | THE TEACHER | |

# THE SCHOOL DISTRICT OF PHILADELPHIA

# PUPIL REPORT

## TO THE PARENT OR GUARDIAN:

The School District of Philadelphia is committed to an instructional program based on high expectations for each pupil. This program respects both individual and group needs, is sequential, and provides for regular reports of effort and achievement during the school year. This personal reporting method indicates your child's progress and quality of work during each reporting period.

The Pupil Report will be given to you during your conference with the teacher twice during the school year. It will be sent home to you in June.

### CONSTANCE E. CLAYTON
Superintendent of Schools

| MARKING SYSTEM |
| --- |
| EFFORT: + OUTSTANDING  ✓ SATISFACTORY  — UNSATISFACTORY |

## PERSONAL AND SOCIAL GROWTH

| | EFFORT | | |
| --- | --- | --- | --- |
| REPORTING PERIODS: | 1 | 2 | 3 |
| DEMONSTRATES RESPONSIBILITY | + | ✓ | ✓ |
| GETS ALONG WELL WITH OTHERS | + | + | + |
| SHOWS RESPECT FOR OTHERS | + | + | — |
| DEMONSTRATES SELF-CONFIDENCE | + | + | + |
| RESPECTS MATERIALS AND SUPPLIES | + | + | + |
| FOLLOWS RULES | + | + | + |
| SHOWS APPROPRIATE BEHAVIOR IN CLASSROOM | ✓ | ✓ | ✓ |
| IN OTHER AREAS | + | + | ✓ |
| PUTS FORTH EFFORT | + | + | ✓ |
| COMPLETES ASSIGNMENTS | + | + | ✓ |

### ATTENDANCE:

| | *FIRST | SECOND | THIRD (*TOTAL TO DATE) |
| --- | --- | --- | --- |
| DAYS PRESENT | 57 | 112 | 102 |
| DAYS ABSENT | 4 | 13 | 23 |
| TIMES LATE | 1 | 13 | 13 |

SEPTEMBER
ASSIGNMENT:  GRADE  6  ROOM  27

THIS SPACE MAY BE USED TO REPORT ON PARTICIPATION IN PROGRAMS SUCH AS ESOL OR BILINGUAL EDUCATION OR IN ACTIVITIES SUCH AS SAFETY PATROL OR CHORUS.

6-27 C (7/82)

## LANGUAGE ARTS

Reading levels refer to the sequence of skills taught in grades 1 — 8 at a pace determined by the student's achievement. The following chart shows the average achievement range by grade.

| GRADE | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | OVER |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| LEVELS | 1-4 | 3-6 | 5-8 | 7-9 | 8-10 | 9-11 | 10-12 | 11-13 | 12-14 |

| | REPORTING PERIODS: | 1 | 2 | 3 |
| --- | --- | --- | --- | --- |
| READING LEVEL (Instructional) | | 10 | 11 | 12 |
| EFFORT | | + | + | + |
| STUDY SKILLS | | A | A+ | A+ |
| LITERATURE | | | | |
| WRITTEN WORK: | | | | |
| COMPOSITION SKILLS | | C+ | C+ | C+ |
| CREATIVE EXPRESSION | | B | B | B |
| HANDWRITING | | B | B | B |
| ORAL COMMUNICATION | | | | |
| SPELLING: | | | | |
| ASSIGNED WORDS | | A+ | A+ | A |
| WRITTEN WORK | | A | A | A |

## MATHEMATICS

Mathematics levels refer to the sequence of skills taught in grades 1 — 8 at a pace determined by the student's achievement. The following chart shows the average achievement range by grade.

| GRADE | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| LEVELS | 1-4 | 3-6 | 5-8 | 6-10 | 8-13 | 10-15 | 12-18 | 14-21 |

| | REPORTING PERIODS: | 1 | 2 | 3 |
| --- | --- | --- | --- | --- |
| OVERALL MATHEMATICS LEVEL (Instructional) | | 9 | 11 | 12 |
| UNDERSTANDING OF NUMBERS | | | | |
| WHOLE NUMBER OPERATIONS (Addition, Subtraction, Multiplication, Division) | | | | |
| FRACTIONS, DECIMALS AND PERCENTS | | | | |
| MEASUREMENT (including Metric Units) | | | | |
| TABLES, GRAPHS AND CHARTS | | | | |
| GEOMETRY | | | | |
| PROBLEM SOLVING | | + | + | + |
| EFFORT | | + | + | ✓ |

| | ACHIEVEMENT | EFFORT | ACHIEVEMENT | EFFORT | ACHIEVEMENT |
| --- | --- | --- | --- | --- | --- |
| REPORTING PERIODS: | 1 | | 2 | | 3 |
| SCIENCE | ✓ | | ✓ | | S—S |
| Understanding of concepts, use of science skills, interest, participation, use of materials, observation, experimentation and group cooperation | | | | | |
| SOCIAL STUDIES | | | A+ | | A+ |
| Understanding of concepts, understanding of subject matter, interest, participation and group cooperation | | | | | |
| ART | A+ | | A+ | | A+ |
| Use of materials, interest, participation and originality of expression | | | | | |
| MUSIC | | | | | |
| HEALTH EDUCATION | ✓ | | ✓ | | S |
| Understanding of subject matter, interest, participation and demonstration of good health habits | | | | | |
| PHYSICAL EDUCATION | | | | | |
| Physical fitness, basic movements, sports skills, team cooperation, game rules and safety procedures | | | | | |

COMMENTS: (First Report)

Homework: A+
CLASS MATH GRADE: A
ITALIAN: S+

PARENT SIGNATURE: [signature]  DATE 3/

COMMENTS: (Second Report)

"Michael is doing quite well.
At times he is a little too talkative."

Homework: B✓
CLASS MATH GRADE: A
Italian: A

PARENT SIGNATURE: [signature]  DATE 3/26/88

COMMENTS: (Third Report)

Michael continues to do very
well during this report period.

Homework: D
CLASS MATH GRADE: A—
ITALIAN: A

PARENT SIGNATURE: [signature]  DATE

SCHOOL COPY

THE SCHOOL DISTRICT OF PHILADELPHIA

## PUPIL REPORT

| SCHOOL | | |
|---|---|---|
| MANLEY | MICHAEL | 8042442 | 023 | 04 |
| 224 F-AMEDEE BREGY SCHOOL | | YEAR ENDING JUNE, 1984 |

PRINCIPAL
MR. MICHAEL N. IANNELLI

TEACHER
MR W FINNEGAN

CONSTANCE E. CLAYTON
Superintendent of Schools

### TO THE PARENT OR GUARDIAN:

The School District of Philadelphia is committed to an instructional program based on high expectations for each pupil. This program respects both individual and group needs, is sequential, and provides for regular reports of effort and achievement during the school year. This periodic reporting method indicates your child's progress and quality of work during each reporting period.

The Pupil Report will be given to you during your conference with the teacher twice during the school year. It will be sent home to you in June.

### MARKING SYSTEM
EFFORT:  + OUTSTANDING  √ SATISFACTORY  − UNSATISFACTORY

### PERSONAL AND SOCIAL GROWTH

| | EFFORT | | |
|---|---|---|---|
| REPORTING PERIODS: | 1 | 2 | 3 |
| DEMONSTRATES RESPONSIBILITY | √ | √ | √ |
| GETS ALONG WELL WITH OTHERS | √ | √ | √ |
| SHOWS RESPECT FOR OTHERS | √ | √ | √ |
| DEMONSTRATES SELF-CONFIDENCE | + | + | + |
| RESPECTS MATERIALS AND SUPPLIES | √ | √ | √ |
| FOLLOWS RULES | √ | √ | √ |
| SHOWS APPROPRIATE BEHAVIOR IN CLASSROOM | √ | √ | √ |
| IN OTHER AREAS | √ | √ | √ |
| PUTS FORTH EFFORT | + | + | + |
| COMPLETES ASSIGNMENTS | + | + | + |

### ATTENDANCE:

| | FIRST | SECOND | THIRD | TOTAL TO DATE |
|---|---|---|---|---|
| DAYS PRESENT | 60 | 109 | | |
| DAYS ABSENT | 1 | 77 | | |
| TIMES LATE | 0 | | | |

SEPTEMBER ASSIGNMENT: GRADE 5    ROOM 16

THIS SPACE MAY BE USED TO REPORT ON PARTICIPATION IN PROGRAMS SUCH AS ESOL OR BILINGUAL EDUCATION OR IN ACTIVITIES SUCH AS SAFETY PATROL OR CHORUS.

Italian

### MARKING SYSTEM
EFFORT:  + OUTSTANDING  √ SATISFACTORY  − UNSATISFACTORY

ACHIEVEMENT:  A EXCELLENT  B GOOD  C AVERAGE  D BELOW AVERAGE  F FAILURE

### LANGUAGE ARTS

Reading levels refer to the sequence of skills taught in grades 1 − 8 at a pace determined by the student's achievement. The following chart shows the average achievement range by grade.

| GRADE | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | OVER |
|---|---|---|---|---|---|---|---|---|---|
| LEVELS | 1-4 | 3-6 | 5-8 | 7,9 | 8,10 | 9-11 | 10-12 | 11-13 | 12-14 |

| | ACHIEVEMENT | | | EFFORT | | |
|---|---|---|---|---|---|---|
| REPORTING PERIODS: | 1 | 2 | 3 | 1 | 2 | 3 |
| READING LEVEL (Instructional) | | | | 9 | 9 | 10 |
| EFFORT | | | | √ | √ | √ |
| STUDY SKILLS | B | B | B | | | |
| LITERATURE | C | C | A | | | |
| WRITTEN WORK: | | | | | | |
| COMPOSITION SKILLS | B | B | B | | | |
| CREATIVE EXPRESSION | B | B | B | | | |
| HANDWRITING | A | B | B | | | |
| ORAL COMMUNICATION | B | B | B | | | |
| SPELLING: | | | | | | |
| ASSIGNED WORDS | A | A | A | | | |
| WRITTEN WORK | B | B | B | | | |

### MATHEMATICS

Mathematics levels refer to the sequence of skills taught in grades 1 − 8 at a pace determined by the student's achievement. The following chart shows the average achievement range by grade.

| GRADE | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| LEVELS | 1-4 | 3-6 | 5-8 | 6-10 | 8-13 | 10-15 | 12-18 | 14-21 |

| | ACHIEVEMENT | | | EFFORT | | |
|---|---|---|---|---|---|---|
| REPORTING PERIODS: | 1 | 2 | 3 | 1 | 2 | 3 |
| OVERALL MATHEMATICS LEVEL (Instructional) | | | | 7 | 8 | 9 |
| UNDERSTANDING OF NUMBERS | | | | | | |
| WHOLE NUMBER OPERATIONS (Addition, Subtraction, Multiplication, Division) | | | | 8 | | |
| FRACTIONS, DECIMALS AND PERCENTS | | | | 7 | | |
| MEASUREMENT (Including Metric Units) | | | | | | |
| TABLES, GRAPHS AND CHARTS | | | | √ | √ | √ |
| GEOMETRY | | | | | | |
| PROBLEM SOLVING | | | | 7 | 8 | 9 |
| EFFORT | | | | √ | √ | √ |

### REPORTING PERIODS:

| | ACHIEVEMENT | | | EFFORT | | |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 1 | 2 | 3 |

**SCIENCE**
Understanding of concepts, use of science skills, interest, participation, use of materials, observation, experimentation and group cooperation
B / B / B

**SOCIAL STUDIES**
Understanding of concepts, understanding of subject matter, interest, participation and group cooperation
B / B / B

**ART**
Use of materials, interest, participation and originality of expression
C / C / C

**MUSIC**
Understanding of concepts, participation − singing activities, participation − instrumental activities
B / C / B

**HEALTH EDUCATION**
Understanding of subject matter, interest, participation and demonstration of good health habits
B / B / A

**PHYSICAL EDUCATION**
Physical fitness, basic movements, sports skills, team cooperation, game rules and safety procedures
A / A / A

### COMMENTS: (First Report)
Michael is generally a good worker and shows a steady progress continuous to be satisfactory and people and
PARENT SIGNATURE: _____ DATE _____

### COMMENTS: (Second Report)
Michael's progress continues to be good. Hopefully he will try even harder to excel in his

PARENT SIGNATURE: _____ DATE _____

### COMMENTS: (Third Report)

SCHOOL COPY

E-27 C (7/82)

THE SCHOOL DISTRICT OF PHILADELPHIA

# PUPIL REPORT

SCHOOL
224  F. AMEDEE BREGY SCHOOL

MANLEY  MICHAEL  E0424462    YEAR ENDING JUNE, 19 83

PRINCIPAL
MR. MICHAEL A. IANNELLI

TEACHER
MRS E WARRICK

## TO THE PARENT OR GUARDIAN:

The School District of Philadelphia is committed to an instructional program based on high expectations for each pupil. This program respects both individual and group needs, is sequential, and provides for regular reports of effort and achievement during the school year. This personal reporting method indicates your child's progress and quality of work during each reporting period.

The Pupil Report will be given to you during your conference with the teacher twice during the school year. It will be sent home to you in June.

CONSTANCE E. CLAYTON
Superintendent of Schools

| MARKING | SYSTEM |
|---|---|
| + OUTSTANDING | ✓ SATISFACTORY |
| — UNSATISFACTORY | |

EFFORT: + OUTSTANDING  ✓ SATISFACTORY  — UNSATISFACTORY

## PERSONAL AND SOCIAL GROWTH

| | EFFORT | | |
|---|---|---|---|
| REPORTING PERIODS: | 1 | 2 | 3 |
| DEMONSTRATES RESPONSIBILITY | ✓ | ✓ | |
| GETS ALONG WELL WITH OTHERS | + | + | |
| SHOWS RESPECT FOR OTHERS | + | + | |
| DEMONSTRATES SELF-CONFIDENCE | ✓ | ✓ | |
| RESPECTS MATERIALS AND SUPPLIES | ✓ | ✓ | |
| FOLLOWS RULES | + | + | |
| SHOWS APPROPRIATE BEHAVIOR | | | |
| IN CLASSROOM | ✓ | ✓ | |
| IN OTHER AREAS | ✓ | ✓ | |
| PUTS FORTH EFFORT | ✓ | + | |
| COMPLETES ASSIGNMENTS | + | + | |

## ATTENDANCE:

| ( * TOTAL TO DATE ) | FIRST | SECOND * | THIRD * |
|---|---|---|---|
| DAYS PRESENT | 53 | 101 6 | 134 |
| DAYS ABSENT | 4 | 10 | 29 |
| TIMES LATE | 0 | 0 | 2 |

SEPTEMBER
ASSIGNMENT:  GRADE  4  ROOM  23

THIS SPACE MAY BE USED TO REPORT ON PARTICIPATION IN PROGRAMS SUCH AS ESOL OR BILINGUAL EDUCATION OR IN ACTIVITIES SUCH AS SAFETY PATROL OR CHORUS.

E-27 C (7/82)

## LANGUAGE ARTS

Reading levels refer to the sequence of skills taught in grades 1 – 8 at a pace determined by the student's achievement. The following chart shows the average achievement range by grade.

| GRADE | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | OVER |
|---|---|---|---|---|---|---|---|---|---|
| LEVELS | 1-4 | 3-6 | 5-8 | 7-9 | 8-10 | 9-11 | 10-12 | 11-13 | 12-14 |

| | EFFORT | | | REPORTING PERIODS: | 1 | 2 | 3 |
|---|---|---|---|---|---|---|---|
| READING LEVEL (Instructional) | | | | | 7 | 7 | 7 |
| EFFORT | | | | | ✓ | ✓ | ✓ |
| STUDY SKILLS | | | | | B | B | B |
| LITERATURE | | | | | B | B | B |
| WRITTEN WORK: | | | | | | | |
| COMPOSITION SKILLS | | | | | B | B | B |
| CREATIVE EXPRESSION | | | | | B | B | B |
| HANDWRITING | | | | | B | B | B |
| ORAL COMMUNICATION | | | | | B | B | B |
| SPELLING: | | | | | | | |
| ASSIGNED WORDS | | | | | A | A | A |
| WRITTEN WORK | | | | | B | B | B |

## MATHEMATICS

Mathematics levels refer to the sequence of skills taught in grades 1 – 8 at a pace determined by the student's achievement. The following chart shows the average achievement range by grade.

| GRADE | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| LEVELS | 1-4 | 3-6 | 5-8 | 6-10 | 8-13 | 10-15 | 12-18 | 14-21 |

| REPORTING PERIODS: | 1 | 2 | 3 |
|---|---|---|---|
| OVERALL MATHEMATICS LEVEL (Instructional) | 5 | 6 | 6 |
| UNDERSTANDING OF NUMBERS | 5 | ✓ | ✓ |
| WHOLE NUMBER OPERATIONS (Addition, Subtraction, Multiplication, Division) | 5 | ✓ | ✓ |
| FRACTIONS, DECIMALS AND PERCENTS | 5 | ✓ | ✓ |
| MEASUREMENT (Including Metric Units) | 5 | ✓ | ✓ |
| TABLES, GRAPHS AND CHARTS | 5 | ✓ | ✓ |
| GEOMETRY | 5 | ✓ | ✓ |
| PROBLEM SOLVING | 5 | ✓ | ✓ |
| EFFORT | ✓ | ✓ | ✓ |

| | REPORTING PERIODS: | 1 | 2 | 3 |
|---|---|---|---|---|
| | | ACHIEVEMENT | EFFORT | ACHIEVEMENT | EFFORT | ACHIEVEMENT | EFFORT |

SCIENCE
Understanding of concepts, use of science skills, interest, participation, use of materials, observation, experimentation and group cooperation
B / B / B

SOCIAL STUDIES
Understanding of concepts, understanding of subject matter, interest, participation and group cooperation
B / B / B

ART
Use of materials, interest, participation and originality of expression
NR / NR / NC

MUSIC
Understanding of concepts, participation – singing activities, participation – instrumental activities
B / B / C

HEALTH EDUCATION
Understanding of subject matter, interest, participation and demonstration of good health habits

PHYSICAL EDUCATION
Physical fitness, basic movements, sports skills, team cooperation, game rules and safety procedures
NR / NR / A

MARKING SYSTEM

| EFFORT: | + OUTSTANDING | ✓ SATISFACTORY | — UNSATISFACTORY |
|---|---|---|---|
| ACHIEVEMENT: | A EXCELLENT | B GOOD | C AVERAGE | D BELOW AVERAGE | F FAILURE |

COMMENTS: (First Report)

COMMENTS: (Second Report)
Encourage Michael to continue his commendable improvement. No must plan learn to respect the feelings of others.

PARENT SIGNATURE: [signature]  DATE 12/14/82

COMMENTS: (Third Report)
Michael didn't do as much improvement as he is capable of.
He is learning to respect the feelings of others.

PARENT SIGNATURE: [signature]  DATE

SCHOOL COPY



| PAINLET | MICHAEL | 807-72 | 02/06 |

| SCHOOL | | | |
| 224 | F. AMEDEE BREGY SCHOOL | YEAR ENDING JUNE, 19 | 86 |

| PRINCIPAL | TEACHER |
| MR. MICHAEL N. IANNELLI | MRS J GLASSMAN |



# THE SCHOOL DISTRICT OF PHILADELPHIA

# PUPIL REPORT

## TO THE PARENT OR GUARDIAN:

The School District of Philadelphia is committed to an instructional program based on high expectations for each pupil. This program respects both individual and group needs, has standardized content and provides for regular evaluation of pupil effort and achievement through Curriculum Referenced Testing and Progress Reporting. The Systemwide Student Promotion Program will help to ensure that uniform standards are met and assistance provided to those who need it.

The Pupil Report will be given to you during your conference with the teacher twice during the school year. It will be sent home to you in June.

**CONSTANCE E. CLAYTON**
Superintendent of Schools

## PROMOTION REQUIREMENTS

Pupils in grades 1-4 shall be required to earn a passing mark in Language Arts (includes Reading, Writing and Literature), Mathematics, and either Science or Social Studies.

Pupils in grades 5-8 shall be required to earn a passing mark in any three of the following four subject areas:

Language Arts (includes Reading, Writing and Literature)
Mathematics
Science
Social Studies

Determination of a pupil's mark shall be based upon evaluation which includes teacher observation, performance on teacher made tests, classwork, homework and mastery of the standardized curriculum as measured by Crowde Curriculum Referenced Tests.

THIS SPACE MAY BE USED TO REPORT ON PARTICIPATION IN PROGRAMS SUCH AS ESOL OR BILINGUAL EDUCATION OR IN ACTIVITIES SUCH AS SAFETY PATROL OR CHORUS.

*ITALIAN — B    A+*

*ITALIAN — B    A+*

### MARKING SYSTEM

| EFFORT: | + OUTSTANDING | √ SATISFACTORY | − UNSATISFACTORY |
| ACHIEVEMENT: | A EXCELLENT | B GOOD | C SATISFACTORY | D MEETS MINIMUM PROMOTION REQUIREMENTS | F FAILURE |

## PERSONAL AND SOCIAL GROWTH

| | REPORTING PERIODS | | EFFORT 1 | 2 | 3 |
| DEMONSTRATES RESPONSIBILITY | | | √ | √ | √ |
| GETS ALONG WELL WITH OTHERS | | | √ | √ | √ |
| SHOWS RESPECT FOR OTHERS | | | √ | √ | √ |
| DEMONSTRATES SELF-CONFIDENCE | | | + | √ | √ |
| RESPECTS MATERIALS AND SUPPLIES | | | √ | √ | √ |
| FOLLOWS RULES | | | √ | √ | √ |
| SHOWS APPROPRIATE BEHAVIOR IN CLASSROOM | | | + | √ | √ |
| IN OTHER AREAS | | | + | √ | √ |
| PUTS FORTH EFFORT | | | √ | √ | + |
| COMPLETES ASSIGNMENTS | | | √ | + | √ |

### ATTENDANCE:

| | FIRST | SECOND | THIRD | (*TOTAL TO DATE) |
| DAYS PRESENT | 53 | 106 | 47 | |
| DAYS ABSENT | 6 | 6 | 2 | |
| TIMES LATE | 0 | 1 | 2 | |

Evaluation of achievement is based in part on classroom participation. Work missed because of excessive absence may affect the mark.

SEPTEMBER ASSIGNMENT:    GRADE 7    ROOM Vare

COMMENTS: (First Report)

*Michael is an excellent student and a most responsible member of our class. He seems to be working better his temper but still has to work on this. He respects everyone.*

PARENT SIGNATURE: _____ DATE: 2/11

COMMENTS: (Second Report)

*I think Michael may be over tired. He is run rundown, and back on the track.*

PARENT SIGNATURE: _____

MAY BE REQUIRED TO REPEAT GRADE

PARENT SIGNATURE: _____ DATE: _____

COMMENTS: (Third Report)

*Report to Vare auditorium on Monday, September 8, 1986 at 1:00 PM.*

## ACHIEVEMENT / EFFORT

| | REPORTING PERIODS | 1 ACHIEVEMENT | EFFORT | 2 ACHIEVEMENT | EFFORT | 3 ACHIEVEMENT | EFFORT |
| **LANGUAGE ARTS** | | | | | | | |
| READING | | B | √ | B | A | A- | √ |
| LITERATURE | | B+ | + | A | A+ | A | A+ |
| WRITTEN COMMUNICATION | | B | √ | B | B | B | √ |
| ORAL COMMUNICATION | | B | √ | A | √ | A+ | √ |
| SPELLING | | A+ | + | A+ | + | A+ | + |
| HANDWRITING | | A+ | + | A+ | √ | A+ | + |
| BASAL READING LEVEL | 6.1 | | | | | | |
| BASAL READER PUBLISHER & SERIES | *McMillan Series R* | | | | | | |
| **MATHEMATICS** Understanding of numbers, whole number operations (Addition, Subtraction, Multiplication, Division), Fractions, Decimals, and Percents, Measurement (includes Metric Units), Tables, Graphs and Charts, Geometry, Problem Solving | | B | √ | B | A | A | A |
| **SCIENCE** Understanding of concepts, use of science skills, interest, participation, use of materials, observation, experimentation and group cooperation | | B | √ | B | B | A | A+ |
| **SOCIAL STUDIES** Understanding of concepts, understanding of subject matter, interest, participation and group cooperation | | A | √ | A | A | A | A+ |
| **ART** Understanding of subject matter and related concepts, creativity, quality of expression, observation, cooperation and group participation | | C | + | D | B | A | A |
| **MUSIC** Understanding of concepts, participation in singing activities, participation in instrumental activities | | N | G | B | + | B | √ |
| **HEALTH EDUCATION** Understanding of subject matter, interest, participation and demonstration of good health habits | | N | G | B | √ | A | √ |
| **PHYSICAL EDUCATION** Physical fitness, basic movements, sports skills, team cooperation, game rules and safety procedures | | B | + | B | A | A | + |

SCHOOL COPY

Philadelphia City-wide Testing Program

MANLEY        MICHAEL

TEST TITLE

| TEST TITLE | | | | | |
|---|---|---|---|---|---|
| READING/LANGUAGE | | | | | |
| BASIC CONCEPTS & APPLICATIONS | | | | | |
| MATHEMATICS | | | | | |
| COMPUTATION | | | | | |
| TOTAL BATTERY | | | | | |

TEST SCORES

PERFORMANCE PROFILE BASED ON PHILADELPHIA PERCENTILE

Philadelphia Profile

Each test and the tot...
Battery are listed to the le...
under the TEST TITL...
heading.

For each entry under TES...
TITLE, the TEST SCOR...
section displays indicatio...
of performance on the tes...

Farther to the right, th...
PERFORMANCE PROFIL...
plots the PHILADELPHI...
PERCENTILE score.

The next section do... giv...
the narrative interpretation ...
the test scores listed abov...

Dear Parent:

The above chart gives you a set of scores your son received on the standardized tests he took in...

We recommend that you meet with your son's teacher to discuss these results...

ECS   UNISCORE™   UNIFORM TEST SCORING AND REPORTING SYSTEM

STUDENT REPORT

PERFORMANCE OF SKILLS (OBJECTIVES) EXPRESSED AS NUMBER OF ITEMS ANSWERED CORRECTLY

Copyright © 1982          ECS N-3 11/85



## AFFIDAVIT/DECLARATION OF CARLOS JONES

I, Carlos Jones, pursuant to 28 U.S.C. § 1746, hereby swear, affirm and state that the following is true and correct:

1.    My name is Carlos Jones. I currently live in Philadelphia, PA, and was living here in 1996 and 2005. I was a counselor at Diamond Youth Program, an inner city summer day camp run by the Diamond Street Mennonite Church. I first met Michael Manley when Michael was 12 years old.

2.    I recall Michael Manley very fondly. Michael was capable of doing anything he put his mind to. He worked hard and was smart enough to get into Central High, which has very stringent admission requirements. My own son also graduated from Central High, but was two years younger than Michael.

3.    I remember that Michael's older brother, Allen, was definitely not a positive influence over Michael. In fact, I always had the sense that Allen was deliberately trying to influence Michael in a negative way. I recall there was constant tension between the two brothers, because Allen Manley was jealous of his younger brother's accomplishments. Michael often confided in me about Allen hassling him.

4.    I was in charge of discipline at the camp. While Michael did have a temper, and was prone to "blow ups," he never became violent, and once he got it out of his system, he was okay. Michael usually made the intelligent choice after one of his temper outbursts. Myself and the others in charge of the camp were so impressed with Michael and fond of him that we allowed him to continue attending the camp until he was fifteen years old, even though the cut off age was fourteen. As Michael got older, I even allowed him to assist me with camp activities. Michael was trustworthy

1

and always did a good job. I also remember that Michael was a positive influence on the other children in his group. He took the younger kids under his wing.

5. Michael's home situation was not pleasant. In fact, things were so bad that Michael would regularly arrive earlier than camp normally started, and always stayed long after camp was finished for the day. I got the sense he did this to avoid going home to the projects. He was very clingy, and would stay close to me as much as he could. Once, when the camp had an overnight activity, Michael insisted on staying in the same cabin as me, even though his group was assigned to a different cabin.

6. Michael viewed me as a father figure, since he didn't really have one in his own life. I took an interest in Michael because he reminded me a lot of myself when I was his age. We both had to overcome similar obstacles as children, such as being from a single parent household and living in an impoverished, crime- ridden neighborhood. I recognized right away the pattern of getting to a safe place outside the home early and staying there late. It was clear to me that he was trying to escape something at home and, having lived through that myself, I was able to recognize the signs and tried to make sure that he could rely on the camp as a safe haven.

7. Despite the many years that Michael attended the camp, his mother never attended any of the camp functions, and I never met any of Michael's relatives. That was unusual. Usually we met some member of the family. But, Michael always arrived on his own and left on his own and no one from his family ever came to the family functions.

8. I saw Michael twice after he went to Central High. He brought me his graduation and prom pictures. Michael told me that he wanted to attend college, and of course, I encouraged this. He was proud of the accomplishments he had made and had plans to better himself. He talked

2

about making things better for his mother.

9.    I was never contacted by anyone on Michael Manley's behalf in either 1996 or 2005. If I had been contacted, I would have told them the information above and would have gladly testified on Michael's behalf.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Carlos Jones

3

21

JOSEPH M. BERNSTEIN

ATTORNEY-AT-LAW

800 N. KING STREET • SUITE 302
WILMINGTON, DELAWARE 19801
(302) 656-9850
FAX (302) 656-9836

**RECEIVED**

FEB 0 2 2005

**JUDGE HERLIHY'S OFFICE**

February 1, 2005

James A. Rambo, Esquire
Mark H. Conner, Esquire
Department of Justice
820 N. French Street
Wilmington, DE 19801

**Re: State v. Michael Manley, ID No. 951007022**

Dear Jim and Mark:

In accordance with 11 *Del.C.* §4209(c)(1), please be advised that defendant Manley intends
to rely on the following mitigating circumstances:

> (1) Lack of any prior criminal record;
> (2) Age of defendant at time of commission of offense;
> (3) Potential for rehabilitation;
> (4) Positive contributions to community/society prior to incarceration;
> (5) Impact of death sentence on defendant's family;
> (6) Evidence that Manley did not actually kill Kristopher Heath;
> (7) Mercy
> (8) Any other evidence developed during the penalty hearing which tends to mitigate

the possible punishment.

Very truly yours,

Joseph M. Bernstein

JMB/jm
cc: Joseph A. Gabay, Esquire
   Jerome M. Capone, Esquire
   Michael C. Heyden, Esquire
   The Honorable Jerome O. Herlihy

22

THOMAS A. FOLEY
ATTORNEY AT LAW
1326 KING STREET
WILMINGTON, DELAWARE 19801

TEL. (302) 658-3077
FAX (302) 658-1993

ADMITTED IN DELAWARE
AND THE DISTRICT OF COLUMBIA

November 13, 1996

*51*

**BY FAX**

Ferris W. Wharton, Esquire
Robert H. Surles, Esquire
Deputy Attorneys General
820 North French Street, 8th Floor
Wilmington, Delaware 19801

RE:  **STATE v. MICHAEL MANLEY**
ID# 9511007022

Dear Ferris and Rob:

Pursuant to 11 Del. C. §4209(c), set forth below are the mitigating circumstances we will introduce evidence of:

1. No prior criminal record;
2. Michael's age/youth;
3. Family whom he loves and who love him;
4. Devastating impact of Death Sentence upon his family;
5. Exhibits positive personality traits;
6. Numerous positive contributions made to society and family throughout his life;
7. Rehabilitation potential;
8. Cares for, and has the ability to help others;
9. Michael's desire to better himself.

Sincerely,

Thomas A. Foley
Anthony A. Figliola, Jr.
Attorneys for Defendant Michael Manley

TAF:mdf
xc:  The Honorable Norman A. Barron
     J. Dallas Winslow, Esquire
     Timothy J. Weiler, Esquire
     Prothonotary
     Mr. Michael Manley

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## CRIMINAL TRIAL ACTIVITY SHEET

50

| ☑ Jury Trial ☐ Non-Jury Trial ☐ Special Jury | Date Jury Drawn: | Date Trial Begun: |
|---|---|---|
| Charges: 95-11-1323 - Murder 1st<br>95-11-1324 - PFDCF<br>95-11-1325 - Consp. 1st<br>95-12-0684 Aggr. Act of Intimidation<br>95-12-0685 - PFBCF<br>95-12-0686 - Consp. 2nd | 10/21/96 - 10/29/96 | 10/30/96 |

| State's Attorney<br>Wharton / Surles<br>Defense Attorney<br>Figliola / Foley | STATE OF DELAWARE<br>vs.<br>*Michael Manley* |
|---|---|
| Court Reporter<br>F. White McCaffery (cath)<br>Court Clerk<br>A. Brown | Case No.<br>9511007022 | Judge at Jury Selection: ✓ Barron<br>Judge Presiding at Trial: Barron |

| JUROR NAME | 10/30 | 10/31 | 11/4 | 11/6 | 11/7 | 11/12 | 11/13 | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 Karen Haney | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| 2 Rebecca Kraler | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | |
| 3 Terence Pendergast | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| 4 Annie Barnes | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | |
| 5 Patricia Romanoski | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| 6 Rosa Pasqualini | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | |
| 7 Maria Ivey | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| 8 Glen Heffner | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| 9 Daniel Kelleher | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| 10 Dorothy Fleming | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| 11 Theresa Barlow | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| 12 Michael Adams | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| 13 Danielle Bebrianna | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| 14 Sandy Friant | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| 15 Christine Campanella | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| 16 John Dellinger | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |

**Non-Jury Trials: Enter the Dates of all Days Trial was in Session:**

| NON JURY TRIAL: | | | | | | | | |
|---|---|---|---|---|---|---|---|---|

| Date | STATE'S WITNESSES |
|---|---|
| 10/30/96 | Michael Ludington |
| 10/30/96 | Deborah Dorsey |
| 10/30/96 | Malvern Slawter |
| 10/30/96 | Det. James Faedtke |
| 10/31/96 | Sgt 1st Class Richard Wohlgemuth |
| 10/31/96 | Michael Chandler |
| 10/31/96 | Susan Butler |
| 10/31/96 | Phillip Hudson |
| 10/31/96 | Lance Thompson |
| 10/31/96 | PH Daniel Meadows |

| Date | DEFENSE WITNESSES |
|---|---|
| 11/6/96 | Rita Manley |
| 11/6/96 | Michael Upshur |
| 11/6/96 | André Graham |
| 11/6/96 | Mary Manley |
| 11/6/96 | Karnell Green |
| 11/6/96 | Det. Scott McLaren |
| 11/7/96 | Reginald Graham |
| 11/7/96 | Myle Fisher |
| 11/7/96 | Det. Craig Weldon |
| 11/13/96 | Dorothy Hackett |

(more space available on reverse)

| STATE'S IDENTIFICATIONS | | Ret'd |
|---|---|---|
| A | Sketch of Parking Lot (Exh #6) | |
| B | Sketch of Scene (Exh #7) | |
| C | Laboratory Report (Exh #58) | |
| D | Laboratory Report (Exh #59) | |
| E | Police Report on Macys Theft | |
| F | | |
| G | | |
| H | | |
| I | | |
| J | | |

| DEFENSE IDENTIFICATIONS | | Ret'd |
|---|---|---|
| A | Supplemental Report | |
| B | | |
| C | | |
| D | | |
| E | | |
| F | | |
| G | | |
| H | | |
| I | | |
| J | | |

(more space available on reverse)

| STATE'S EXHIBITS | | Ret'd |
|---|---|---|
| 1 | See attached | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| 0 | | |

| DEFENSE EXHIBITS | | Ret'd |
|---|---|---|
| 1 | See attached | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |

(more space available on reverse)

| Motions: | Decision: |
|---|---|
| 10/28/96 Δ Mtn to Sever | Denied |
| 11/6/96 Δ Oral Mtn for Aquittal | Denied |

# Additional Data Sheet for Case No. _____

| Date | STATE'S WITNESSES |
|------|-------------------|
| 11/4/96 | Det. Rand Townley |
| 11/4/96 | Off. Peter Stark |
| 11/4/96 | Off. Steven DiVirgilio |
| 11/4/96 | Cpl Thomas Ford |
| 11/4/96 | Stephanie Kinder |
| 11/4/96 | Melissa Magalong |
| 11/4/96 | Anna Hawley |
| 11/4/96 | Off. Janet Hedrick |
| 11/4/96 | Kevin Powlette |
| 11/6/96 | Dr. Galicono Inguito |

| Date | DEFENSE WITNESSES |
|------|-------------------|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

(more space available on additional data sheet)

| JOINT EXHIBITS | | Ret'd |
|---|---|---|
| 1 | Stipulation |  |
| 2 | Stipulation |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

| COURT EXHIBITS | | Ret'd |
|---|---|---|
| 1 | Video Deposition of D. Hickott |  |
| 2 | Dispatch Report |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

(more space available on additional data sheet)

| STATE'S EXHIBITS | | Ret'd |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

| DEFENSE EXHIBITS | | Ret'd |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

# Additional Data Sheet for Case No. 95,100 7822

| Date | STATE'S WITNESSES |
|------|-------------------|
| 11/12/96 | Off. Peter Stark |
| 11/12/96 | Det. Rand Townky |
| | |
| | |
| | |
| | |
| | |
| | |

| Date | DEFENSE WITNESSES |
|------|-------------------|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

(more space available on additional data sheet)

| STATE'S IDENTIFICATIONS | | Ret'd |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| DEFENSE IDENTIFICATIONS | | Ret'd |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

(more space available on additional data sheet)

| STATE'S EXHIBITS | | Ret'd |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| DEFENSE EXHIBITS | | Ret'd |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

STATE OF DELAWARE VS. MICHAEL MANLEY AND DAVID STEVENSON

## STATE EXHIBITS

1. Photograph-Cavalier Apartments
2. Photograph-Cavalier Apartments
3. Photograph-Cavalier Apartments
4. Photograph-Cavalier Apartments
5. Photograph-Cavalier Apartments
6. Sketch of Parking Lot
7. Sketch of Scene
8. Photograph of Scene
9. Photograph of Scene
10. Photograph of Scene
11. Photograph of Scene
12. Photograph of Scene
13. Photograph of Scene
14. Photograph of Scene
15. Photograph of Scene
16. Photograph of Scene
17. 9 mm Shell
18. 9 mm Shell
19. 9 mm Shell
20. 9 mm Shell
21. 9 mm Shell
22. 9 mm Shell
23. Bullet Jacket
24. Bullet Fragment
25. Bullet Jacket
26. Bullet Fragment
27. Photograph of Car
28. Photograph of Car
29. Photograph of Car
30. Photograph of Car
31. Photograph of Car
32. Photograph of Car
33. Photograph of Car
34. Tassel from Car
35. Camouflage Jacket
36. 24 9mm Bullets
37. Blue Bag
38. Photograph of Bullets
39. Photograph of Bullets
40. Photograph of Bullets
41. Road Map
42. Latent Fingerprints
43. Fingerprints of David Stevenson
44. Fingerprints of Michael Manley
45. Photograph of Michael Manley
46. Photograph of Hands
47. Photograph of Hands
48. Photograph of David Stevenson
49. Photograph of Hands

50. Photograph of Hands
51. Bullet Jacket
52. Atomic Analysis Kit
53. Atomic Analysis Kit
54. Projectile
55. Projectile
56. Transfer Form for Michael Manley
57. Application for U.S. Army Id Card
58. Laboratory Report
59. Laboratory Report
60. Laboratory Report
61. Map of Wilmington
62. Photograph of Car
63. Photograph of Car
64. Report from Macys
65. Bus Ticket and Paper
66. Photograph of Bus Ticket
67. Photograph of Bus Ticket
68. Baseball Hat
69. Photocopy of Time Card
70. 8 Slides of Autopsy
71. Autopsy Protocol
72. Newspaper
73. Photograph of Car

## DEFENSE EXHIBITS FOR MICHAEL MANLEY

1. Basketball Schedule
2. Jacket
3. Wallet
4. Black Coat
5. University of Delaware Class Schedule

## DEFENSE EXHIBITS FOR DAVID STEVENSON

1. Dispatch Report
2. Green Sweatshirt
3. Blue Shirt

# Verdict.

Case Number: 95/1007022

State vs: Michael Manley

Date of Verdict: 11/13/96

| Jury found defendant as to Criminal Action Number: | | Guilty | Guilty of LIO | Pled Guilty at trial | Not Guilty | Dis-missed | Mis-trial | Hung Jury | Guilty Ment. Ill | Nolle Pros |
|---|---|---|---|---|---|---|---|---|---|---|
| (put LIO charge beneath charge) | Jury Trial / Non-Jury | TG TNJG | TGLI TNGL | TPG TNPG | TNG TNNG | DISM TNDS | TMIS | THG | TGMI | TNP TNNP |
| Charge Murder 1st Cr.A.# 95-11-1323 | | ✓ | | | | | | | | |
| Charge Cr.A.# 95-11-1324 | | ✓ | | | | | | | | |
| Charge Consp 1st Cr.A.# 95-11-1325 | | ✓ | | | | | | | | |
| Charge PFDWDCF Cr.A.# 95-12-0684 | | ✓ | | ✓ | | | | | | |
| Charge PFDCF Cr.A.# 95-12-0685 | | ✓ | | | | | | | | |
| Charge Consp 2nd Cr.A.# 95-12-0686 | | ✓ | | | | | | | | |
| Charge Cr.A.# | | | | | | | | | | |
| Charge Cr.A.# | | | | | | | | | | |

⊠ Defendant Sentenced.   ☐ PSI Ordered   ⊠ Sentencing Scheduled for : 1/10/97.

Bail Change: _____

OTHER: Penalty Hearing Begins 11/14/96

*(handwritten: 649)*

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

*(handwritten: Court Clerk's Copy)*

| | |
|---|---|
| STATE OF DELAWARE | ) |
| V. | ) |
| | ) |
| MICHAEL MANLEY | ) |
| DAVID STEVENSON | ) |
| | ) |
| Defendants | ) |

# *JURY INSTRUCTIONS*

Ferris W. Wharton, Esquire, Chief Prosecutor, New Castle County, and Robert Surles, Esquire, Deputy Attorney General, of Wilmington, Delaware, Attorneys for the State.

Anthony A. Figliola, Esquire, and Thomas A. Foley, Esquire, of Wilmington, Delaware, Attorneys for Defendant Manley.

J. Dallas Winslow, Jr., Esquire, and Timothy H. Weiler, Esquire, of Wilmington, Delaware, Attorneys for Defendant Stevenson.

*(stamp: '96 NOV 12 P4:21)*

*(stamp: FILED PROTHONOTARY)*

NORMAN A. BARRON, Judge
Date: 11/12/96

Ladies & Gentlemen of the Jury:

You have now heard all of the evidence that is going to be presented in this case, and you have heard the arguments of the attorneys for the State and for the defendants. I shall not review the evidence that has been presented, because you, the jury, are the sole and exclusive judges of the facts of the case; of the credibility of the witnesses; and of the weight and the value of their testimony.

I shall now instruct you as to the principles of the law governing this case. No single one of these instructions states all of the law applicable to this case; therefore, you should listen to and consider all of the instructions together in reaching your verdicts.

It is your duty as jurors to determine the facts, and to determine them only from the evidence in this case. You are to apply the law as I state it to you to the facts as you find them to be, and in this way decide the case.

Under our criminal law, crimes are defined by statute and many other matters pertaining to the criminal law are governed by statute. I shall explain to you the law defining the offenses, which these defendants are charged with having committed. I shall also explain to you the burden of proof which is imposed on the State in this case.

Counsel may sometimes present objections to some of the testimony or other evidence. It is the duty of a lawyer to object to evidence which he or she believes may not properly be offered, and you should not be prejudiced in any way against a lawyer who makes objections or the party he or she represents. At times I may sustain objections, or direct that you disregard certain testimony or exhibits. You must not consider any evidence to which an objection has been sustained or which I have instructed you to disregard. At other times, I may overrule objections, in which case you are free to consider the evidence which has been offered.

Often counsel will approach sidebar to discuss evidentiary and other matters. You are not to speculate on what may be said at such sidebar conferences.

The role of an attorney is to zealously and effectively advance the claims of the party he or she represents within the bounds of the law. An attorney may argue all reasonable inferences from evidence in the record.    However, it is not proper for an attorney to state his or her opinion as to the truth or falsity of any testimony or evidence or the guilt or innocence of an accused. What an attorney personally thinks or believes about the testimony or evidence in a case is not relevant, and you are instructed to disregard any personal opinion or belief concerning testimony or evidence which an attorney offers during opening or closing statements, or at any other time during the course of the trial.

Further, what an attorney states in his or her opening or closing arguments is not evidence. Evidence consists of testimony, whether live or by video deposition, from witnesses testifying from the witness stand and exhibits introduced through their testimony. Evidence also consists of any stipulations entered into among the parties.    It is this evidence only which you may consider in reaching your verdicts.

The defendants are charged in this Court by an indictment. The indictment is a mere accusation against the defendants. It is not in itself any evidence of the guilt of these defendants. You should not allow yourselves to be influenced in any way, however slight, by the fact that an indictment has been returned against these defendants.

Whether these defendants are guilty or not guilty is for you to determine solely from the testimony which has been presented during the trial. If your recollection of that evidence disagrees with anything said about it, either by counsel or by the Court, you should be guided entirely by your own recollection. The determination of the true facts, and the drawing of any inferences from the proven facts, are matters solely within your province.

**SEPARATE CONSIDERATION**

Two separate defendants are on trial in this case. You must judge each defendant separately as you deliberate upon your verdicts. In other words, a conclusion reached with regard to one defendant does not mean that the same conclusion will apply with regard to the other defendant. Again, the charges against each defendant are separate and distinct and you must judge the evidence separately with regard to each defendant.

A person indicted for committing an offense may be convicted either as a principal for acts which he committed himself or as an accomplice to another person who actually committed the offense. With respect to the charges of Murder First Degree, 2 counts of Possession of a Firearm During the Commission of a Felony, and 1 count of Aggravated Act of Intimidation, one or both of the defendants may be found guilty either as a principal for acts he committed himself or as an accomplice if he intended to aid another person in committing some or all of the acts necessary for the commission of the offenses. The pertinent section of our Criminal Code is as follows:

> A person is guilty of an offense committed by another person when intending to promote or facilitate the commission of the offense, he aids, counsels, or agrees . . . to aid the other person in planning or committing it.

So, in order to find either one of the defendants guilty of an offense committed by another person, you must find that all three of the following elements have been proven to your satisfaction beyond a reasonable doubt:

1.   Another person committed the offenses charged, namely, Murder First Degree, 2 counts of Possession of a Firearm During the Commission of a Felony and 1 count of Aggravated Act of Intimidation, as I will explain those offenses for you.

AND

2.   The named defendant intended to promote or facilitate the commission of the offenses.  In other words, it was his conscious object or purpose to further or assist the commission of the offenses.

AND

aid another person in planning or committing the offense.

Mere presence at the scene of a crime, without proof of those elements that I have outlined for you, does not support a finding of guilt under this section. You may find a defendant guilty of offenses committed by another person only if you are satisfied beyond a reasonable doubt that the offenses were within the scope of the agreed activity or were reasonably to be expected as incidental to that activity.

You should also be aware that in any prosecution for an offense in which the criminal liability of the accused is based upon the conduct of another person, it is no defense that the other person has not been prosecuted for or convicted of any offense based on the conduct in question.

Finally, the law provides that a person indicted as a principal for committing an offense may be convicted as an accomplice to another person guilty of committing the offense. Likewise, a person indicted as an accomplice to an offense committed by another person may be convicted as a principal.

Your verdicts must be unanimous, and the jury must unanimously find that a principal-accomplice relationship existed between the participants. However, there is no requirement that the jury be unanimous as to which of the parties was the principal and which was the accomplice as long as you are all agreed as to guilt.

THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| v. | ) | INDICTMENT BY THE GRAND JURY |
| | ) | |
| MICHAEL MANLEY | ) | |
| DAVID STEVENSON | ) | |

The Grand Jury charges MICHAEL MANLEY and DAVID STEVENSON with the following offenses:

**COUNT I.   A FELONY**          IN95-11-1323
                                  IN95-11-1047

MURDER FIRST DEGREE in violation of Title 11, Section 636 of the Delaware Code of 1974, as amended.

MICHAEL MANLEY and DAVID STEVENSON, on or about the 13th day of November, 1995, in the County of New Castle, State of Delaware, did intentionally cause the death of Kristopher Heath, by shooting him with a handgun.

**COUNT II.   A FELONY**         IN95-11-1324
                                  IN95-11-1048

POSSESSION OF A FIREARM DURING THE COMMISSION OF A FELONY in violation of Title 11, Section 1447A of the Delaware Code of 1974, as amended.

MICHAEL MANLEY and DAVID STEVENSON, on or about the 13th day of November, 1995, in the County of New Castle, State of Delaware, did knowingly possess a firearm, a handgun, during the commission of the felony of Murder First Degree as set forth in Count I of this Indictment and incorporated herein by reference.

**COUNT III.   A FELONY**        IN95-11-1325
                                  IN95-11-1049

CONSPIRACY FIRST DEGREE in violation of Title 11, Section 513(1) of the Delaware Code of 1974, as amended.

MICHAEL MANLEY and DAVID STEVENSON,

of November, 1995, in the County of New Castle, State of Delaware, when intending to promote the commission of a class A felony, did agree with each other than one or more of them would engage in the conduct constituting the felony of Murder First Degree and did commit an overt act in furtherance of the conspiracy, to wit: Murder in the First Degree as set forth in Count I of this Indictment and incorporated herein by reference.

| COUNT IV.   A FELONY | IN95-12-0684 |
|---|---|
| | IN95-12-0687 |

AGGRAVATED ACT OF INTIMIDATION in violation of Title 11, Section 3533 of the Delaware Code of 1974, as amended.

MICHAEL MANLEY and DAVID STEVENSON on or about the 13th day of November, 1995, in the County of New Castle, State of Delaware, did knowingly and with malice prevent Kristopher Heath, a witness, from attending the trial in *State v. David Stevenson*, I.D. No. 9409021492 and such act was in furtherance of a conspiracy.

| COUNT V.   A FELONY | IN95-12-0685 |
|---|---|
| | IN95-12-0688 |

POSSESSION OF A FIREARM DURING THE COMMISSION OF A FELONY in violation of Title 11, Section 1447A of the Delaware Code of 1974, as amended.

MICHAEL MANLEY and DAVID STEVENSON, on or about the 13th day of November, 1995, in the County of New Castle, State of Delaware, did knowingly possess a firearm, a handgun, during the commission of the felony of Aggravated Act of Intimidation as set forth in Count IV of this Indictment and incorporated herein by reference.

CONSPIRACY SECOND DEGREE in violation of Title 11, Section 512 of the Delaware Code of 1974, as amended.

MICHAEL MANLEY and DAVID STEVENSON, on or about the 13th day of November, 1995, in the County of New Castle, State of Delaware, when intending to promote the commission of a felony, did agree with each other that they would engage in conduct constituting the felony of Aggravated Act of Intimidation and commit an overt act in furtherance of said conspiracy, by committing same as set forth in Count IV of this Indictment, incorporated herein by reference.

A TRUE BILL

_____
FOREPERSON

_____
ATTORNEY GENERAL

_____
DEPUTY ATTORNEY GENERAL

## MURDER FIRST DEGREE

Delaware law defines the offense of Murder First Degree as follows:

> A person is guilty of murder in the first degree when:
>
> * * * * *
>
> (1) He intentionally causes the death of another person. . . .

In order to find the defendants guilty of Murder in the First Degree, you must find that all of the following elements have been established beyond a reasonable doubt:

1. That the defendant caused the death of Kristopher Heath. By this I mean that the defendant brought about his death, which would not have occurred but for the defendant's act.

### AND

2. The defendant acted intentionally. That is, it must have been his conscious object or purpose to cause the death of another person, in this case, Kristopher Heath, by shooting him with a handgun.

If, after considering all of the evidence, you find that the State has established beyond a reasonable doubt that the defendant acted in such a manner as to satisfy all of the elements which I have just stated, at or about the date and place stated in the indictment, or that the other defendant committed all of the elements of the offense and the defendant was an accomplice to those acts as I have defined that term for you, you should find

that defendant guilty of Murder First Degree. If, with regard to a particular defendant, you do not so find, or if you have a reasonable doubt as to any element of this offense as they apply to that defendant, you must find that defendant not guilty of Murder First Degree.

## POSSESSION OF A FIREARM DURING THE COMMISSION OF A FELONY

The law of Delaware provides that it is a separate and additional offense if a person, at the time that person commits a felony, is in possession of a firearm.

The statute reads, in pertinent part, as follows:

> A person who is in possession of a firearm during the commission of a felony is guilty of possession of a firearm during the commission of a felony.

In order to find the defendant guilty of Possession of a Firearm During the Commission of a Felony, you must find that all of the following elements have been established beyond a reasonable doubt:

1.   That the defendant committed a felony, in this case the felony charged is Murder First Degree.

AND

2.   That during the commission of the felony, the defendant knowingly possessed a firearm. "Firearm" includes any weapon from which a shot, projectile or other object may be discharged by force of combustion, explosive, gas and/or mechanical means, whether operable or inoperable, loaded or unloaded. It does not include a BB gun.

It is necessary to understand what is meant by "possession". By "possession" I do not mean merely that the firearm may have been in the area or vicinity of the defendant so that it might have been taken possession of if the defendant wanted to do so. Rather, in order for the defendant to be found in possession of a firearm, as that word is used in this statute, you must find that the firearm was in the immediate personal possession of, or under the immediate control of the defendant so that it was

physically available or accessible during the commission of the felony alleged.

Finally, a person acts "knowingly" when that person is aware of the firearm being in his possession at the time and place in question.

If, after considering all of the evidence, you find that the State has established beyond a reasonable doubt that the defendant acted in such a manner as to satisfy all of the elements which I have just stated, at or about the date and place stated in the indictment, or that another person committed all of the elements of the offense and the defendant was an accomplice to those acts as I have defined that term for you, you should find the defendant guilty of Possession of a Firearm During the Commission of a Felony. If you do not so find, or if you have a reasonable doubt as to any element of this offense, you must find the defendant not guilty of Possession of a Firearm During the Commission of a Felony.

## CONSPIRACY FIRST DEGREE

Delaware law defines the offense of Conspiracy First Degree, in pertinent part, as follows:

> A person is guilty of conspiracy in the first degree, when intending to promote or facilitate the commission of a class A felony, the person:

> ★ ★ ★ ★ ★

> (2) Agrees to aid another person or persons in the planning or commission of the felony . . . and the person or another person with whom the person conspired commits an overt act in pursuance of the conspiracy.

In order to find the defendant guilty of Conspiracy First Degree, you must find that all of the following elements have been established beyond a reasonable doubt:

1. The defendant intended, that is, it was his conscious object or purpose, to promote or facilitate the commission of a class A felony, in this case, Murder First Degree, as I have defined that offense for you.

AND

2. The defendant agreed to aid another person or persons in the planning or commission of the class A felony.

AND

3. The defendant or another person with whom he conspired committed an overt act in pursuance of the conspiracy. An overt act is any act in pursuance of or tending toward the accomplishment of the conspiratorial purpose.

If, after considering all of the evidence, you find that the State has established beyond a reasonable doubt that the defendant acted in such a manner as to satisfy all of the elements which I have just stated, at or about the date and place stated in the

First Degree.  If you do not so find, or if you have a reasonable doubt as to any element of this offense, you must find the defendant not guilty of Conspiracy First Degree.

## AGGRAVATED ACT OF INTIMIDATION

Delaware law defines the offense of Aggravated Act of Intimidation, in pertinent part, as follows:

> [E]very person who knowingly and with malice prevents . . . any witness . . . from attending . . . any trial when such act is in furtherance of a conspiracy is guilty of aggravated act of intimidation . . .

In order to find the defendant guilty of Aggravated Act of Intimidation, you must find that all of the following elements have been established beyond a reasonable doubt:

1.   That the defendant prevented Kristopher Heath from attending a trial.

AND

2.   That Kristopher Heath was a "witness" which in this context means a person who has knowledge of the existence or nonexistence of facts relating to any crime.

AND

3.   That the defendant acted knowingly; that is, that he was aware that Kristopher Heath was a witness, as defined above, and was aware that he was preventing a witness from attending a trial.

AND

4.   That the defendant acted with malice. "Malice" is defined in the statute as "an intent to vex, annoy, harm or injure in any way another person or to thwart or interfere in any manner with the orderly administration of justice." Consequently, you must find that it was the defendant's conscious object or purpose to vex, annoy, harm or injure in any way another person or to thwart or interfere in any manner with the orderly administration of justice.

5.  That the defendant's actions were in furtherance of, or, in other words, as a consequence of a conspiracy.

If, after considering all of the evidence, you find that the State has established beyond a reasonable doubt that the defendant acted in such a manner as to satisfy all of the elements which I have just stated, at or about the date and place stated in the indictment, or that another person committed all of the elements of the offense and the defendant was an accomplice to those acts as I have defined that term for you, you should find that defendant guilty of Aggravated Act of Intimidation.  If you do not so find, or if you have a reasonable doubt as to any element of this offense, you must find the defendant not guilty of Aggravated Act of Intimidation.

## POSSESSION OF A FIREARM DURING THE COMMISSION OF A FELONY

The law of Delaware provides that it is a separate and additional offense if a person, at the time that person commits a felony, is in possession of a firearm.

The statute reads, in pertinent part, as follows:

> A person who is in possession of a firearm during the commission of a felony is guilty of possession of a firearm during the commission of a felony.

In order to find the defendant guilty of Possession of a Firearm During the Commission of a Felony, you must find that all of the following elements have been established beyond a reasonable doubt:

1.  That the defendant committed a felony, in this case the felony charged is Aggravated Act of Intimidation.

AND

2.  That during the commission of the felony, the defendant knowingly possessed a firearm. "Firearm" includes any weapon from which a shot, projectile or other object may be discharged by force of combustion, explosive, gas and/or mechanical means, whether operable or inoperable, loaded or unloaded. It does not include a BB gun.

It is necessary to understand what is meant by "possession". By "possession" I do not mean merely that the firearm may have been in the area or vicinity of the defendant so that it might have been taken possession of if the defendant wanted to do so. Rather, in order for the defendant to be found in possession of a firearm, as that word is used in this statute, you must find that the firearm was in the immediate personal possession of, or under the immediate control of the defendant so that it was

physically available during the commission of the felony alleged.

Finally, a person acts "knowingly" when that person is aware of the firearm being in his possession at the time and place in question.

If, after considering all of the evidence, you find that the State has established beyond a reasonable doubt that the defendant acted in such a manner as to satisfy all of the elements which I have just stated, at or about the date and place stated in the indictment, or that another person committed all of the elements of the offense and the defendant was an accomplice to those acts as I have defined that term for you, you should find the defendant guilty of Possession of a Firearm During the Commission of a Felony, as the case may be. If you do not so find, or if you have a reasonable doubt as to any element of this offense, you must find the defendant not guilty of Possession of a Firearm During the Commission of a Felony.

Count VI

## CONSPIRACY SECOND DEGREE

Delaware law defines the offense of Conspiracy Second Degree, in part, as follows:

> A person is guilty of conspiracy in the second degree when, intending to promote . . . the commission of a felony, he:

> Agrees with another person or persons that they or 1 or more of them will engage in conduct constituting the felony . . .

> And he or another person with whom he conspired commits an overt act in pursuance of the conspiracy.

In order to find the defendant guilty of Conspiracy Second Degree, you must find that all of the following elements have been established beyond a reasonable doubt:

1.    The defendant intended, that is, it was his conscious object or purpose, to promote the commission of a felony, in this case, Aggravated Act of Intimidation, as I have defined that offense for you.

AND

2.    The defendant agreed to aid another person to engage in conduct which constitutes the offense of Aggravated Act of Intimidation, as I have defined that offense for you.

AND

3.    The defendant or another with whom he conspired committed an overt act in pursuance of the conspiracy.  An overt act is any act in pursuance of or tending toward, the accomplishment of the purpose of the conspiracy.

If, after considering all of the evidence, you find that the State has established beyond a reasonable doubt that the defendant acted in such a manner as to satisfy all of the elements which I

have just indicated or about the date asserted in the indictment, you should find that defendant guilty of Conspiracy Second Degree.  If you do not so find, or if you have a reasonable doubt as to any element of this offense, you must find that defendant not guilty of Conspiracy Second Degree.

An element of a criminal offense deals with the state of mind of the defendants. It is, of course, difficult to know what is going on in another person's mind. Therefore, you are permitted to draw an inference, or in other words to reach a conclusion, about a defendant's state of mind from the facts and circumstances surrounding the act the defendants are alleged to have done. In reaching this conclusion, you may consider whether a reasonable man in the defendants' circumstances would have had or lacked the requisite intention or knowledge. You should however, keep in mind at all times that it is the defendants' state of mind which is at issue, and in order to convict the defendants you are required to find beyond a reasonable doubt that they in fact had the intention or knowledge required for a finding of guilt.

The fact that our law permits you to draw an inference about a defendant's state of mind in no way relieves the State of its burden of proving beyond a reasonable doubt every element of an offense.

There are two types of evidence from which a jury may properly find the facts of a case.  One is direct evidence; such as the testimony of an eyewitness.  The other is indirect or circumstantial evidence, that is, the proof of facts or circumstances from which the existence or non-existence of other facts may reasonably be inferred.  In this case, the State has relied (in part) upon circumstantial evidence.

It is not unusual in a criminal case for either side to rely upon circumstantial evidence.

To warrant a conviction based, in part, on circumstantial evidence, all of the evidence, both direct and circumstantial, must lead you to conclude beyond a reasonable doubt that the accused committed the offenses charged.

Ladies and Gentlemen of the Jury. You have heard evidence that one of the defendants, namely, David Stevenson, allegedly committed thefts while an employee at Macy's and that the deceased, Kristopher Heath, participated in the investigation which led to the theft charges being placed against Stevenson.

You may not use this evidence as proof that David Stevenson is a bad person and therefore probably committed the offenses contained in the indictment. You may use this evidence only to help you in deciding whether David Stevenson or Michael Manley was one of the persons who committed the offenses contained in the indictment.

The State claims that the prior alleged theft evidence might tend to show a motive on Stevenson's part or on Manley's part to commit the offenses contained in the indictment.

You may consider the prior alleged theft evidence to help you decide whether or not such evidence tends to show a motive on Stevenson's part or on Manley's part to commit the offenses and to help you decide whether or not such evidence tends to identify them as the perpetrators of the offenses contained in the indictment for which the defendants are now on trial. You are instructed that you may not use the prior alleged theft evidence for any other purpose whatsoever. Further, the fact that defendant Stevenson had been indicted for the alleged offenses arising out of the Macy's internal theft investigation is not evidence of his guilt with regard to those offenses. As previously stated, an indictment is a mere accusation and is not evidence of guilt.

In this case, the State contends that the defendants evaded arrest and took flight following the commission of the offenses contained in the indictment. Evidence of evasion of arrest and flight is admissible in a criminal case as a circumstance tending to show identity and consciousness of guilt.

You may use this evidence for this purpose only. You may not consider this evidence as proof that the defendants are bad persons and therefore probably committed the offenses contained in the indictment. You may use this evidence only to help you in deciding whether the defendants were the persons who committed the offenses contained in the indictment.

The evidence of evasion of arrest or flight, if proved, may be considered by you in light of all other facts proved. Whether or not such evidence shows identity or consciousness of guilt and the significance to be attached to such evidence are matters solely for your determination.

## PRIOR OUT-OF-COURT STATEMENTS

You have heard evidence of unsworn statements claimed to have been made by certain witnesses prior to trial. Such testimony is permissible, under a provision of a Delaware statute, which reads, in pertinent part, as follows:

> (a)    In a criminal prosecution, the voluntary out-of-court prior statements of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value.

> (b)    The rule in subsection (a) of this section shall apply regardless of whether the witness' in-court testimony is consistent with the prior statement or not
> . . .

With regard to this provision, caution must be exercised by the jury when a conflict exists between the out-of-court statements and the in-court statements themselves. The jury should be particularly careful when there is no evidence to corroborate an inconsistent out-of-court statement. Nevertheless, the jury may convict on such statement if it is satisfied beyond a reasonable doubt that the statement is true.

## EXPERT WITNESSES

In this case, you have heard the testimony of expert witnesses.    Generally, witnesses cannot testify as to their opinions or conclusions.  Expert witnesses may state their opinions and reasons for their opinions because by their education and experience, they have become "expert" in their field.

You should give such expert testimony only the weight you feel it deserves.  If it is not based upon sufficient education or experience, or if the reasons given in support thereof are not sound, and you feel it is outweighed by other evidence, you may disregard it entirely.

## CREDIBILITY OF WITNESSES

Ladies & Gentlemen of the Jury:

You are the sole judges of the credibility of each witness and of the weight to be given to the testimony of each. In this connection, you should not give more weight to the testimony of a police officer merely because he is a police officer. You should take into consideration each witness' means of knowledge, strength of memory and opportunity for observation, the reasonableness or unreasonableness of the testimony, the consistency or inconsistency of the testimony, the motives actuating the witness, the fact, if it is a fact, that the testimony has been contradicted, the bias, prejudice or interest of the witness, if any, the manner or demeanor of the witness upon the witness stand, and all other facts and circumstances shown by the evidence which affect the credibility of the testimony.

## CONFLICTS IN TESTIMONY

If you find the testimony to be conflicting by reason of inconsistencies, it is your duty to reconcile it, if reasonably possible, so as to make one harmonious story of it all. But if you cannot do this, then it is your duty and privilege to give credit to that portion of the testimony which, in your judgment, is most worthy of credit and disregard any portion of the testimony which, in your judgment is unworthy of credit. In so doing, you should take into consideration the demeanor of the witnesses as they testified before you, their apparent fairness in giving their testimony, their opportunities for learning and knowing the facts about which they testified, and any bias or interest that they may have concerning the outcome of this case.

## IDENTIFICATION OF DEFENDANT

A matter which has been raised in this case is the identification of the defendants. You must be satisfied beyond a reasonable doubt that the defendants have been accurately identified, that the defendants were indeed the ones that did the acts charged and that these acts actually took place before you may find them guilty of any crime. If there is any reasonable doubt about their identification, you must give them the benefit of such doubt and find them not guilty.

## PRESUMPTION OF INNOCENCE / REASONABLE DOUBT

The law presumes every person charged with a crime to be innocent. This presumption of innocence requires a verdict of not guilty, unless you are convinced by the evidence that the defendants are guilty beyond a reasonable doubt.

Reasonable doubt is a practical standard.

On the one hand, in criminal cases the law imposes a greater burden of proof than in civil cases. Proof that a defendant is probably guilty is not sufficient.

On the other hand, the law recognizes that certainty is rarely possible in matters involving human behavior. The State is, therefore, not required to prove guilt to a certainty.

A reasonable doubt is a doubt based on reason and common sense. It must come from a fair and rational consideration of the evidence, or lack thereof, in a case. Reasonable doubt does not mean a vague or speculative doubt or a mere possible doubt. It is the kind of doubt that a fair, reasonable and intelligent juror would honestly entertain after a careful and conscientious consideration of all of the evidence.

If you have a reasonable doubt of either or both of the defendant's guilt, you must return a verdict of not guilty with regard to that defendant or those defendants, as the case may be.

## DEFENDANTS' CHOICE NOT TO TESTIFY

Ladies and gentlemen of the jury, the defendants have chosen not to testify. The defendants have a Constitutional right to testify or not to testify as they choose. The fact that the defendants did not testify must not be construed by you as an indication that the defendants are guilty of the crimes charged. Like every other person charged with an offense, these defendants are presumed innocent until proven guilty beyond a reasonable doubt.

Furthermore, because the burden of proof is upon the State to prove the existence of all elements of the crime beyond a reasonable doubt, the defendants are not required to present any evidence in their own behalf. You shall not draw any inference of guilt or innocence from a defendant's choice not to testify.

## CONDUCT DURING JURY DELIBERATIONS

How the jury conducts it deliberations is within the province of the jury itself. However, I would like to suggest that you discuss the issues fully, giving all jurors a fair opportunity to express their views, before committing yourself to a particular position. Jurors have a duty to consult with one another with an open mind and to deliberate with a view to reaching a verdict. Each of you should decide the case for yourself, but only after impartially considering the evidence with your fellow jurors. You should not surrender your own opinion or defer to the opinions of your fellow jurors for the mere purpose of returning a verdict, but you should not hesitate to re-examine your own view and change your opinion if you are persuaded by another view.

You are officers of the Court, and must act impartially. Throughout your deliberations you may not be influenced by passion, prejudice, sympathy, the consequences of a verdict, or any motive except a desire to declare the proper verdict upon the evidence and law.

## VERDICT

Members of the Jury:

There are 6 counts in this case and, therefore, 6 separate verdicts as to each defendant will be required.

1.   Count I - **MURDER FIRST DEGREE**

    **As to Defendant Manley**

        a.   Guilty as charged; or

        b.   Not guilty.

    **As to Defendant Stevenson**

        a.   Guilty as charged; or

        b.   Not guilty.

2.   Count II - **POSSESSION OF A FIREARM DURING THE COMMISSION OF A FELONY** (as it relates to Murder First Degree):

    **As to Defendant Manley**

        a.   Guilty as charged; or

        b.   Not guilty.

    **As to Defendant Stevenson**

        a.   Guilty as charged; or

        b.   Not guilty.

3.   Count III - **CONSPIRACY FIRST DEGREE**

    **As to Defendant Manley**

        a.   Guilty as charged; or

        b.   Not guilty.

    **As to Defendant Stevenson**

        a.   Guilty as charged; or

        b.   Not guilty.

4. Count IV — **AGGRAVATED ACT OF INTIMIDATION**

As to **Defendant Manley**

    a. Guilty as charged; or

    b. Not guilty.

As to **Defendant Stevenson**

    a. Guilty as charged; or

    b. Not guilty.

5. Count V — **POSSESSION OF A FIREARM DURING THE COMMISSION OF A FELONY** (as it relates to Aggravated Act of Intimidation):

As to **Defendant Manley**

    a. Guilty as charged; or

    b. Not guilty.

As to **Defendant Stevenson**

    a. Guilty as charged; or

    b. Not guilty.

6. Count VI — **CONSPIRACY SECOND DEGREE**

As to **Defendant Manley**

    a. Guilty as charged; or

    b. Not guilty.

As to **Defendant Stevenson**

    a. Guilty as charged; or

    b. Not guilty.


Of course, your verdicts must be unanimous.


EXCUSE ALTERNATE JUROR(S)
SWEAR BAILIFF



## AFFIDAVIT/DECLARATION OF BETH ANN MUHLHAUSER

I, Beth Ann Muhlhauser, pursuant to 28 U.S.C. § 1746, hereby swear, affirm and state that the following is true and correct:

1.      My name is Beth Ann Muhlhauser. I am an Assistant Federal Public Defender with the Capital Habeas Unit of the Federal Public Defender, Middle District of Pennsylvania. As part of my duties on the Michael Manley case, I interviewed Delores Sapp who was Michael Manley's Sergeant in the Army Reserves.

2.      Ms. Sapp told me that she knew Michael for about three years at the time of the crime, and, like the rest of their unit, was completely shocked when she heard the news that Michael had been charged with murder. There were at least 20 Army Reservists in tears of sadness and disbelief. Michael was a gentleman among gentlemen, who always offered to help anyone who needed it and never ran away from responsibility.

3.      Ms. Sapp also told me that Michael absolutely adored his mother, and his main goal in life was to make her happy. He often spoke to Ms. Sapp about how he worked so hard in school and the Reserves because he wanted a better quality of life for himself and his mother. He wanted to get himself and his mother out of the projects. He talked about this all the time, and how his mother raised him. He joined the Reserves to meet new people with common goals like himself. Michael realized the only way to reach his goals was through an education.

4.      Ms. Sapp stated that Michael's assignment in the Reserves was as a Medic. He never had access to guns, and the only time he ever handled a weapon was during the yearly weapons qualifications they all had to take. He never showed any interest in weapons to Ms. Sapp. Ms. Sapp also stated that other members of the Reserves were interested in guns, but Michael was looking to get the medical experience. He hoped to go into the medical field permanently. He was someone

more concerned with healing. That was the focus of his training and his work in the unit. He also knew that going into a medical field would help him get a better job and help out his mother. It was his dream to buy a nice home for his mother and get her out of the projects.

5.    Ms. Sapp also told me that at the time of Michael's first trial in 1996, she had just lost someone close to her to a murder. She was very upset at the time, but she also had a unique perspective regarding Michael's case. Ms. Sapp stated that she spoke with Michael's trial lawyers and that they only asked her general questions about Michael and never asked her about the above, but if they had, she would have told everything she knew about Michael. Even though she was under a great deal of stress because of her own loss, she would have been willing to do a videotape deposition in 1996, and thought that was what was going to happen, but no one contacted her. Ms. Sapp also stated that if she had been contacted in 2005, she would certainly have testified or otherwise cooperated because it was important to her that everyone understand how Michael was in the reserves.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Beth Ann Muhlhauser

24

**This form is to be considered contraband if in the possession of an inmate.**

Inmate's Name: MANLEY, MICHAEL    SBI# 00328480    Housing Unit MSB    Tier A-2

Evaluators: 12-8 C. Ward                     Return by Opss

8-4 D.F.Greer   W. M. Massey        5-29-98

4-12 G. ____ w ____ K.F. deSpar

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | | | |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | (no problems) | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | | nox |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | no problems | DG WM | JG |
| 24) Keeps room neat/clean, bed made | | DG | JG nox |
| 25) Keeps himself neat/clean | | DG WM | JG nox |
| 26) Volunteers for projects | | | JG |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | WM | JG |
| 29) Follows Inmate Housing Rules | | WM WM | nox |
| 30) Has positive attitude | | WM WM | JG daff |
| 31) Finds acceptable ways to keep busy | | DG | JG |
| 32) Approaches staff in open/honest way | | | 5-31-98 Lambowski |

Reviewed by Shift Lieutenant Harris Date 5/21/98 Sgn C. Ward Date      Sgn

Additional comments to be placed on back of form.     -1      +72

**Additional Comments:**_____

M.S.U.    SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANLEY MCKEL_____

Evaluators: _____

Shift: _____ Date Completed: _3/15/98_

Review Date: _5-15-98 — RETURN TO CAPT. BY 0700._

Shift Lt.: _____

INSTRUCTIONS:    Please indicate which of the following behaviors this
                 inmate exhibits.  If the behavior describes the inmate,
                 place your initials in the space preceding the describe
                 behavior.

_____ 1. Worried, anxious.              _____ 17. Displays negative
                                                            attitude.
_____ 2. Tense, unable                  _____ 18. Breach of Group
              to relax.                                     confidentiality.
_____ 3. Seems to take no               _____ 19. Speaks in detail
              pleasure in anything.                         goals, plans..
_____ 4. Cannot be trusted              _____ 20. Gets along with
              at all.                                       others.
_____ 5. Moody, brooding.               _____ 21. Accepts blame for
                                                            some of his troubles.
_____ 6. Continually tries              _____ 22. Accepts blame for
              to con staff.                                 all of his troubles.
_____ 7. Impulsive,                      _____ 23. Respects authorit
              unpredictable.
_____ 8. Seems to seek                  _____ 24. Keeps room neat,
              excitement.                                   clean and bed mad
_____ 9. Never seems happy.             _____ 25. Keeps himself nea
                                                            and clean.
_____ 10. Daydreams, seems              _____ 26. Volunteers for wo
               preoccupied.                                 projects.
_____ 11. Attempts to play              _____ 27. Likeable.
staff against one another.
_____ 12. Considers himself             _____ 28. Willing to discuss
               unjustly confined.                           personal problems w/staff.
_____ 13. Frequently upset              _____ 29. Follows the Inmate
               after visits.                                Housing Rules.
_____ 14. Frequently upset              _____ 30. Displays positive
               after receiving mail.                        attitude.
_____ 15. Participates in               _____ 31. Finds acceptable
               group demonstrations.                        ways to keep busy
_____ 16. Seems to think                _____ 32. Approaches some
               only of himself.                             staff in an open,
                                                            honest manner.

ADDITIONAL COMMENTS:    NUMBER: _____

_____

M.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _Manley Mekkel_____

Evaluators: _____ K.S, ___ ___ Cpl ___ .S. Morgan)

Shift: ___4/12_____ Date Completed: ____5-15-98

Review Date: _5-15-98 - RETURN TO CAPT. BY 0700.

Shift Lt.: _R.J. Tumlenski_____

**INSTRUCTIONS:**   Please indicate which of the following behaviors this inmate exhibits.  If the behavior describes the inmate, place your initials in the space preceding the describe behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

_____ 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

_____ 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy

_____ 10. Daydreams, seems preoccupied.

_____ 11. Attempts to play staff against one another.

_____ 12. Considers himself unjustly confined.

_____ 13. Frequently upset after visits.

_____ 14. Frequently upset after receiving mail.

_____ 15. Participates in group demonstrations.

_____ 16. Seems to think only of himself.

_____ 17. Displays negative attitude.

_____ 18. Breach of Group confidentiality.

_____ 19. Speaks in detail goals, plans..

_____ 20. Gets along with others.

_____ 21. Accepts blame for some of his troubles.

_____ 22. Accepts blame for all of his troubles.

_____ 23. Respects authorit

_____ 24. Keeps room neat, clean and bed mad

_____ 25. Keeps himself nea and clean.

_____ 26. Volunteers for wo projects.

_____ 27. Likeable.

_____ 28. Willing to discuss personal problems w/staff.

_____ 29. Follows the Inmate Housing Rules..

_____ 30. Displays positive attitude.

_____ 31. Finds acceptable ways to keep busy

_____ 32. Approaches some staff in an open, honest maner.

**ADDITIONAL COMMENTS:  NUMBER:** _____

_____

## M.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _Manley Michael_

Evaluators: _C. Wood_

Shift: _12-8_          Date Completed: _5/14/98_

Review Date: _5-15-98 — Return to Capt by 0700._

Shift Lt.: _Harris_

**INSTRUCTIONS:**   Please indicate which of the following behaviors this inmate exhibits.  If the behavior describes the inmate, place your initials in the space preceding the describe behavior.

|  |  |
|---|---|
| _____ 1. Worried, anxious. | _____ 17. Displays negative attitude. |
| _____ 2. Tense, unable to relax. | _____ 18. Breach of Group confidentiality. |
| _____ 3. Seems to take no pleasure in anything. | _____ 19. Speaks in detail goals, plans.. |
| _____ 4. Cannot be trusted at all. | _____ 20. Gets along with others. |
| _____ 5. Moody, brooding. | _____ 21. Accepts blame for some of his troubles. |
| _____ 6. Continually tries to con staff. | _____ 22. Accepts blame for all of his troubles. |
| _____ 7. Impulsive, unpredictable. | _____ 23. Respects authorit |
| _____ 8. Seems to seek excitement. | _____ 24. Keeps room neat, clean and bed mad |
| _____ 9. Never seems happy. | _____ 25. Keeps himself nea and clean. |
| _____ 10. Daydreams, seems preoccupied. | _____ 26. Volunteers for wo projects. |
| _____ 11. Attempts to play staff against one another. | _____ 27. Likeable. |
| _____ 12. Considers himself unjustly confined. | _____ 28. Willing to discuss personal problems w/staff. |
| _____ 13. Frequently upset after visits. | _____ 29. Follows the Inmate Housing Rules. |
| _____ 14. Frequently upset after receiving mail. | _____ 30. Displays positive attitude. |
| _____ 15. Participates in group demonstrations. | _____ 31. Finds acceptable ways to keep busy |
| _____ 16. Seems to think only of himself. | _____ 32. Approaches some staff in an open honest maner. |

**ADDITIONAL COMMENTS:   NUMBER:** _no problems_     (C.W.)

## DELAWARE CORRECTIONAL CENTER — MEMORANDUM

TO: Inmate *Michael Henly* , SBI# 3.38485 , Housing Unit *CL*
VIA: Counselor/ *Jih*
FROM: I.B.C.C.
DATE: *4/23/98*
RE: Classification Results

Your M.D.T. has recommended you for the following: *Continue May/HH (X Tiernan job*

The I.B.C.C.'s decision is to:

✓ Approve
_____ Not Approve
_____ Defer
_____ Recommend
_____ Not Recommend

**BECAUSE:**

_____ Lack of program participation
_____ Pending disciplinary action
_____ Gradual phasing indicated
_____ Open charges
_____ Prior criminal history
_____ Failure to follow your treatment plan in that you _____

_____ Time remaining on sentence
_____ Prior failure under supervision
_____ Poor institutional adjustment
_____ Serious nature of offense

_____ You present a current and continuous danger to the safety of staff, other inmates, or the good order of the Institution. Explanation: _____

**OTHER:** *Rev 6/98*

**ADDITIONAL COMMENTS:**

_____ Develop/continue treatment plan with counselor

You will be expected to address the following: _____

Copy to: Classification
Inmate
Institution File

Form #456 (3 Part NCR)
Revised 11/97

## BUREAU OF PRISONS RECLASSIFICATION FORM #004

DATE: _____

I.  **Vital Indicators/Sentencing Information**

Inmate name _MANLEY, MICHAEL_ AKA _NONE_    Institution _DCC/MSU_

Institution Number _____    SBI Number _00337405_  Date of Birth _2-22-74_

Present Offense(s) _MURDER F, AGG. ACT OF INTIMIDATION, P.P. W.D.C.F._
_CONSP. II_    Most Serious Offense _MURDER I_

Level V Sentence: Year(s) _88_ Month _88_ Day(s) _88_  (DEATH SENT + 55 YEARS) Truth in Sentence Yes _X_ No __

Sentence Effective Date _11/18/95_ STRD _NONE_ PE Date _NONE_ Rehearing Date _NONE_

Mandatory: Year(s) _NO_ Month(s) _NO_ Day(s) _NO_   Level IV Sentence? Yes___ No _X_

Detainer(s)? Yes___ No _X_  Open Charge(s)? Yes___ No _X_  4204K? Yes___ No _X_

Escape/Attempted Escape on Record? Yes___ No _X_ Category _____

II.  **Program Request/Change or Recommendation**

Request: Work Release____ Supervised Custody____ Work Release/Supervised Custody____

Halfway House Worker___ Highway Work Project___ Community/Governmental Service Project___

Furlough____ To See: Name(s)_____ Relationship_____

Address_____

Purpose_____

Comments_____

Off Grounds Status? Yes___ No _X_ If yes, state program/assignment for which status is being requested: _____

Change in Security Level and Institution? Yes___ No _X_ If yes, state security level and institution requested: _CONTINUE: MAX/HIGH; CONT. TIERMAN JOB_

Has inmate had prior participation in program requested? Yes _____ No _____

Program_____ Number of approvals_____

Reason(s)/date(s) for failure or return_____

_____

Is inmate eligible in accordance with program standards? Yes _____ No_____

Is exception to standards requested? Yes___ No___ If yes, give reasons for exception:

_____

III.  **Disciplinary ( summary last 3 months-include dates, offenses dispositions)**

_____

1-6-98- D./T. Behavior, F200, O/x. - Guilty

Most serious offense within last 3 months: _____

IV.  **Program Participation/Work Assignment**

MSW-TIER MAN   JOB - CONT.

_____

_____

_____

V.   **DUI Information (Complete if inmate is serving a sentence for DUI)**

Has information been verified via Motor Vehicle Records?  Yes___ No___ No. of DUI's ___

Date(s) of offense(s):  1st _____  2nd _____  3rd _____  4th _____

VI.  **Victim Notification**          Is victim notification required?  Yes _____  No _____

Name of Victim(s) _____

Last Known Address _____

_____          _____
Counselor Signature                 Supervisor's Signature

**Committee Review**

MDT:  Approved __X__  Disapproved _____   Vote Number _____   _____
                                                                MDT Chair Signature/Date

IBCC: Approved _____  Disapproved _____   Vote Number _____   _____
                                                                IBCC Chair Signature/Date

CICC: Approved _____  Disapproved _____   Vote Number _____   _____
                                                                CICC Chair Signature/Date

**Distribution After Final Committee Review**

**Central Classification Office**
**Institutional Classification File**
**Inmate's Record**

ADDENDUM TO BOP RECLASSIFICATION FORM #004

Use this sheet to record any additional information which could not be included in the designated spaces on Form BOP-004.

Inmate Name: _MANLEY, Michael_ SBI Number: _00338745_ Institution: _DCC/MSU_

The Team feels Michael has adjusted well to M.S.U. setting.

He is not viewed as a management problem for staff. The Team recommends he remain in MSU for a longer period of observation. Vote 2-0.

Recommended Review Date: 6/98

Form BOP 004

Inmate's Name: _Mawhey, Michael_____

Evaluators: _____

Shift: ____8-4_____ Date Completed: _3/30/98_____

Review Date: _3-30-98 — RETURN TO CAPT. BY 0700._____

Shift Lt.: ____MS_____

INSTRUCTIONS: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space preceding the described behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

_____ 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

_____ 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems preoccupied.

_____ 11. Attempts to play staff against one another.

_____ 12. Considers himself unjustly confined.

_____ 13. Frequently upset after visits.

_____ 14. Frequently upset after receiving mail.

_____ 15. Participates in group demonstrations.

_____ 16. Seems to think only of himself.

_____ 17. Displays negative attitude.

_____ 18. Breach of Group confidentiality.

_____ 19. Speaks in detail of goals, plans.

_____ 20. Gets along with others.

_____ 21. Accepts blame for some of his troubles.

_____ 22. Accepts blame for all of his troubles.

_____ 23. Respects authority.

_____ 24. Keeps room neat, clean and bed made.

_____ 25. Keeps himself neat and clean.

_____ 26. Volunteers for work projects.

_____ 27. Likeable.

_____ 28. Willing to discuss personal problems w/staff.

_____ 29. Follows the Inmate Housing Rules.

_____ 30. Displays positive attitude.

_____ 31. Finds acceptable ways to keep busy.

_____ 32. Approaches some staff in an open, honest maner.

ADDITIONAL COMMENTS: NUMBER: _____
_____

M.S.U.    SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: *MAYHEY, MICHAEL*

Evaluators: _____ K/b ___ C/lk __ Pic/o Spic __ Yo Morgan

Shift: _____ 9-10 _____    Date Completed: _____ 3-28-98

Review Date: 3-30-98 — RETURN TO CAPT. EX OFOO.

Shift Lt.: _____ P.J. Pemlauchi

**INSTRUCTIONS:**    Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space preceding the described behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

_____ 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

_____ 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems preoccupied.

_____ 11. Attempts to play staff against one another.

_____ 12. Considers himself unjustly confined.

_____ 13. Frequently upset after visits.

_____ 14. Frequently upset after receiving mail.

____15. Participates in group demonstrations.

_____ 16. Seems to think only of himself.

_____ 17. Displays negative attitude.

_____ 18. Breach of Group confidentiality.

_____ 19. Speaks in detail of goals, plans..

_____ 20. Gets along with others.

_____ 21. Accepts blame for some of his troubles.

_____ 22. Accepts blame for all of his troubles.

_____ 23. Respects authority

_____ 24. Keeps room neat, clean and bed made

_____ 25. Keeps himself neat and clean.

_____ 26. Volunteers for work projects.

_____ 27. Likeable.

_____ 28. Willing to discuss personal problems w/staff.

_____ 29. Follows the Inmate Housing Rules.

_____ 30. Displays positive attitude.

_____ 31. Finds acceptable ways to keep busy.

_____ 32. Approaches some staff in an open, honest maner.

**ADDITIONAL COMMENTS:**    **NUMBER:** _____

_____

**M.S.U.     SEMIMONTHLY BEHAVIOR REPORT**

Inmate's Name: *MANHEY, Michael*

Evaluators: *W EVANS*

Shift: *12-8*                    Date Completed: *3-25-98*

Review Date: *3-30-98 — RETURN TO CAPT. BY 0800.*

Shift Lt.: *HARRIS*

**INSTRUCTIONS:**   Please indicate which of the following behaviors this
inmate exhibits.  If the behavior describes the inmate,
place your initials in the space preceding the described
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
to relax.

_____ 3. Seems to take no
pleasure in anything.

_____ 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_____ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
preoccupied.

_____ 11. Attempts to play
staff against one another.

_____ 12. Considers himself
unjustly confined.

_____ 13. Frequently upset
after visits.

_____ 14. Frequently upset
after receiving mail.

_____ 15. Participates in
group demonstrations.

_____ 16. Seems to think
only of himself.

_____ 17. Displays negative
attitude.

_____ 18. Breach of Group
confidentiality.

_____ 19. Speaks in detail o
goals, plans..

_____ 20. Gets along with
others.

_____ 21. Accepts blame for
some of his troubles.

_____ 22. Accepts blame for
all of his troubles.

_____ 23. Respects authority

_____ 24. Keeps room neat,
clean and bed made

_____ 25. Keeps himself neat
and clean.

_____ 26. Volunteers for wor
projects.

_____ 27. Likeable.

_____ 28. Willing to discuss
personal problems w/staff.

_____ 29. Follows the Inmate
Housing Rules.

_____ 30. Displays positive
attitude.

_____ 31. Finds acceptable
ways to keep busy.

_____ 32. Approaches some
staff in an open.
honest manner.

**ADDITIONAL COMMENTS: NUMBER:** *NO PROBLEMS*

_____

K37

## M.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _Minkey Mikael R._

Evaluators: _____

Shift: _8-4_   Date Completed: _3/16/98_

Review Date: _3-16-98 - RETURN TO CAPT BY 0700._

Shift Lt.: _____

INSTRUCTIONS: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space preceding the describe behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

_MJ_ 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

_____ 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems preoccupied.

_____ 11. Attempts to play staff against one another.

_____ 12. Considers himself unjustly confined.

_____ 13. Frequently upset after visits.

_____ 14. Frequently upset after receiving mail.

_____ 15. Participates in group demonstrations.

_____ 16. Seems to think only of himself.

_____ 17. Displays negative attitude.

_____ 18. Breach of Group confidentiality.

_____ 19. Speaks in detail goals, plans..

_DSN_ 20. Gets along with others.

_____ 21. Accepts blame for some of his troubles.

_____ 22. Accepts blame for all of his troubles.

_____ 23. Respects authorit

_DSN_ 24. Keeps room neat, clean and bed mad

_DSN_ 25. Keeps himself nea and clean.

_____ 26. Volunteers for wo projects.

_____ 27. Likeable.

_____ 28. Willing to discuss personal problems w/staff.

_DSN MJ_ 29. Follows the Inmate Housing Rules.

_DSN_ 30. Displays positive attitude.

_DSN_ 31. Finds acceptable ways to keep busy

_____ 32. Approaches some staff in an open, honest maner.

_13_                    _T45_

ADDITIONAL COMMENTS: NUMBER: _____

_____

## M.S.U.  SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANLEY MICHAEL R._____

Evaluators: _Garrett 'O Morgan Kyte Gibbons, Sgt.___

Shift: _912_____ Date Completed: _3-12-98_

Review Date: _3-16-98 - RETURN TO CAPT. BY 0900._

Shift Lt.: _R.J. Paulaushi_____

INSTRUCTIONS:  Please indicate which of the following behaviors this
inmate exhibits.  If the behavior describes the inmate,
place your initials in the space preceding the describe
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
to relax.

_____ 3. Seems to take no
pleasure in anything.

_____ 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_____ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy

_____ 10. Daydreams, seems
preoccupied.

_____ 11. Attempts to play
staff against one another.

_____ 12. Considers himself
unjustly confined.

_____ 13. Frequently upset
after visits.

_____ 14. Frequently upset
after receiving mail

_____ 15. Participates in
group demonstrations.

_____ 16. Seems to think
only of himself.

_____ 17. Displays negative
attitude.

_____ 18. Breach of Group
confidentiality.

_____ 19. Speaks in detail
goals, plans..

_____ 20. Gets along with
others.

_____ 21. Accepts blame for
some of his troubles.

_____ 22. Accepts blame for
all of his troubles.

_____ 23. Respects authority

_____ 24. Keeps room neat,
clean and bed made

_____ 25. Keeps himself neat
and clean.

_____ 26. Volunteers for work
projects.

_____ 27. Likeable.

_____ 28. Willing to discuss
personal problems w/staff.

_____ 29. Follows the Inmate
Housing Rules.

_____ 30. Displays positive
attitude.

_____ 31. Finds acceptable
ways to keep busy

_____ 32. Approaches some
staff in an open,
honest maner.

ADDITIONAL COMMENTS:  NUMBER: _____

_____

## M.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANNEY MICHAEL R._

Evaluators: _W EVANS_

Shift: _12-8_ Date Completed: _3-11-98_

Review Date: _3-16-98 — RETURN TO CAPT. BY OTOO._

Shift Lt.: _HARRIS_

INSTRUCTIONS:   Please indicate which of the following behaviors this
inmate exhibits.   If the behavior describes the inmate,
place your initials in the space preceding the describe
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
to relax.

_____ 3. Seems to take no
pleasure in anything.

_____ 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_____ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
preoccupied.

_____ 11. Attempts to play
staff against one another.

_____ 12. Considers himself
unjustly confined.

_____ 13. Frequently upset
after visits.

_____ 14. Frequently upset
after receiving mail.

_____ 15. Participates in
group demonstrations.

_____ 16. Seems to think
only of himself.

_____ 17. Displays negative
attitude.

_____ 18. Breach of Group
confidentiality.

_____ 19. Speaks in detail
goals, plans..

_____ 20. Gets along with
others.

_____ 21. Accepts blame for
some of his troubles.

_____ 22. Accepts blame for
all of his troubles.

_____ 23. Respects authorit

_____ 24. Keeps room neat,
clean and bed mad

_____ 25. Keeps himself nea
and clean.

_____ 26. Volunteers for wo
projects.

_____ 27. Likeable.

_____ 28. Willing to discuss
personal problems w/staff.

_____ 29. Follows the Inmate
Housing Rules.

_____ 30. Displays positive
attitude.

_____ 31. Finds acceptable
ways to keep busy

_____ 32. Approaches some
staff in an open.
honest maner.

ADDITIONAL COMMENTS:   NUMBER: _NO PROBLEMS_

Reprove to lease 4

(37)

**M.S.U.   SEMIMONTHLY BEHAVIOR REPORT**

Inmate's Name: MATHEY, MICHAEL

Evaluators: _____

Shift: _____ 8-4 _____   Date Completed: 2/23/98

Review Date: 3-2-98 — RETURN TO CAPT BY 0700.

Shift Lt.: M Sq

**INSTRUCTIONS:** Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space preceding the describe behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

RyMSq 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

MSq 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems preoccupied.

_____ 11. Attempts to play staff against one another.

_____ 12. Considers himself unjustly confined.

_____ 13. Frequently upset after visits.

_____ 14. Frequently upset after receiving mail.

_____ 15. Participates in group demonstrations.

_____ 16. Seems to think only of himself.

_____ 17. Displays negative attitude.

_____ 18. Breach of Group confidentiality.

_____ 19. Speaks in detail goals, plans..

Ry08 20. Gets along with others.

_____ 21. Accepts blame for some of his troubles.

_____ 22. Accepts blame for all of his troubles.

Ry08 23. Respects authorit

Ry08 24. Keeps room neat, clean and bed mad.

Ry08 25. Keeps himself nea and clean.

_____ 26. Volunteers for wo projects.

_____ 27. Likeable.

_____ 28. Willing to discuss personal problems w/staff.

08 29. Follows the Inmate Housing Rules.

08 30. Displays positive attitude.

08 31. Finds acceptable ways to keep busy

_____ 32. Approaches some staff in an open. honest maner.

**ADDITIONAL COMMENTS: NUMBER:** Mosley does good but he lets words bother him. MSq

GSU. DELMO MONTHLY BEHAVIOR REPORT

Inmate's Name: _MATHEY MICHAEL_____

Evaluators: _Cpl _____ K Morgan _____

Shift: _____ Date Completed: ___2-26-98__

Review Date: _3-2-98_ - RETURN TO CAPT BY 3/6/98.

Shift Lt.: _CJ Budowski_____

<u>INSTRUCTIONS:</u>  Please indicate which of the following behaviors this
inmate exhibits.  If the behavior describes the inmate,
place your initials in the space preceding the describe
behavior.

| | |
|---|---|
| _____ 1. Worried, anxious. | _____ 17. Displays negative attitude. |
| _____ 2. Tense, unable to relax. | _____ 18. Breach of Group confidentiality. |
| _____ 3. Seems to take no pleasure in anything. | _____ 19. Speaks in detail goals, plans.. |
| _____ 4. Cannot be trusted at all. | _____ 20. Gets along with others. |
| _____ 5. Moody, brooding. | _____ 21. Accepts blame for some of his troubles. |
| _____ 6. Continually tries to con staff. | _____ 22. Accepts blame for all of his troubles. |
| _____ 7. Impulsive, unpredictable. | _____ 23. Respects authorit |
| _____ 8. Seems to seek excitement. | _____ 24. Keeps room neat, clean and bed mad |
| _____ 9. Never seems happy | _____ 25. Keeps himself nea and clean. |
| _____ 10. Daydreams, seems preoccupied. | _____ 26. Volunteers for wo projects. |
| _____ 11. Attempts to play staff against one another. | _____ 27. Likeable. |
| _____ 12. Considers himself unjustly confined. | _____ 28. Willing to discuss personal problems w/staff. |
| _____ 13. Frequently upset after visits. | _____ 29. Follows the Inmate Housing Rules. |
| _____ 14. Frequently upset after receiving m | _____ 30. Displays positive attitude. |
| _____ 15. Participates in group demonstrations. | _____ 31. Finds acceptable ways to keep busy |
| _____ 16. Seems to think only of himself. | _____ 32. Approaches some staff in an open, honest maner. |

<u>ADDITIONAL COMMENTS:</u>  <u>NUMBER:</u> _____

_____

(37)

## M.S.U.  SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: *MAYBEY MICHAEL*

Evaluators: _____

Shift: _____ Date Completed: *2-25-98*

Review Date: *3-28* — *RETURN TO CAPT BY 3/00.*

Shift Lt.: _____

INSTRUCTIONS:  Please indicate which of the following behaviors this
inmate exhibits.  If the behavior describes the inmate,
place your initials in the space preceding the describe
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

_____ 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

_____ 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems preoccupied.

_____ 11. Attempts to play staff against one another.

_____ 12. Considers himself unjustly confined.

_____ 13. Frequently upset after visits.

_____ 14. Frequently upset after receiving mail.

_____ 15. Participates in group demonstrations.

_____ 16. Seems to think only of himself.

_____ 17. Displays negative attitude.

_____ 18. Breach of Group confidentiality.

_____ 19. Speaks in detail goals, plans..

_____ 20. Gets along with others.

_____ 21. Accepts blame for some of his troubles.

_____ 22. Accepts blame for all of his troubles.

_____ 23. Respects authorit

_____ 24. Keeps room neat, clean and bed mad

_____ 25. Keeps himself nea and clean.

_____ 26. Volunteers for wo projects.

_____ 27. Likeable.

_____ 28. Willing to discuss personal problems w/staff.

_____ 29. Follows the Inmate Housing Rules.

_____ 30. Displays positive attitude.

_____ 31. Finds acceptable ways to keep busy

_____ 32. Approaches some staff in an open honest maner.

ADDITIONAL COMMENTS:  NUMBER: *No Probles*

_____

Inmate's Name: _MANLEY, MICHAEL R._____

Evaluators: _____

Shift: _____S-4_____ Date Completed: _2/16/98_

Review Date: _2-10-97 — RETURN TO CAPT BY 0900._

Shift Lt.: _____

INSTRUCTIONS: Please indicate which of the following behaviors this
inmate exhibits. If the behavior describes the inmate,
place your initials in the space preceding the describe
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
to relax.

_____ 3. Seems to take no
pleasure in anything.

_____ 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_____ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
preoccupied.

_____ 11. Attempts to play
staff against one another.

_____ 12. Considers himself
unjustly confined.

_____ 13. Frequently upset
after visits.

_____ 14. Frequently upset
after receiving mail.

_____ 15. Participates in
group demonstrations.

_____ 16. Seems to think
only of himself.

_____ 17. Displays negative
attitude.

_____ 18. Breach of Group
confidentiality.

_____ 19. Speaks in detail
goals, plans..

_____ 20. Gets along with
others.

_____ 21. Accepts blame for
some of his troubles.

_____ 22. Accepts blame for
all of his troubles.

_____ 23. Respects authority

_____ 24. Keeps room neat,
clean and bed made

_____ 25. Keeps himself neat
and clean.

_____ 26. Volunteers for work
projects.

_____ 27. Likeable.

_____ 28. Willing to discuss
personal problems w/staff.

_____ 29. Follows the Inmate
Housing Rules.

_____ 30. Displays positive
attitude.

_____ 31. Finds acceptable
ways to keep busy.

_____ 32. Approaches some
staff in an open,
honest maner.

ADDITIONAL COMMENTS: NUMBER: _____

_____

1(35)

M.S.U.    SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANLEY, MICHAEL R_

Evaluators: _Col _____ Chf Jo Glanett Sa Morgan Kyle_

Shift: _4·12_____ Date Completed: _2·12·98_

Review Date: _2·10·92 — RETURN TO CAPT·BY OPOS._

Shift Lt.: _R.J Paulemski_

**INSTRUCTIONS:**    Please indicate which of the following behaviors this inmate exhibits.  If the behavior describes the inmate, place your initials in the space preceding the describe behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

_____ 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

_____ 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems preoccupied.

_____ 11. Attempts to play staff against one another.

_____ 12. Considers himself unjustly confined.

_____ 13. Frequently upset after visits.

_____ 14. Frequently upset after receiving mail.

_____ 15. Participates in group demonstrations.

_____ 16. Seems to think only of himself.

_____ 17. Displays negative attitude.

_____ 18. Breach of Group confidentiality.

_____ 19. Speaks in detail goals, plans..

_____ 20. Gets along with others.

_____ 21. Accepts blame for some of his troubles.

_____ 22. Accepts blame for all of his troubles.

_____ 23. Respects authorit

_____ 24. Keeps room neat, clean and bed mad

_____ 25. Keeps himself nea and clean.

_____ 26. Volunteers for wor projects.

_____ 27. Likeable.

_____ 28. Willing to discuss personal problems w/staff

_____ 29. Follows the Inmat Housing Rules.

_____ 30. Displays positive attitude.

_____ 31. Finds acceptable ways to keep busy

_____ 32. Approaches some staff in an open, honest maner.

**ADDITIONAL COMMENTS:  NUMBER:** _____

_____

(35)

C.S.U. SEMI-MONTHLY BEHAVIOR REPORT

Inmate's Name: _MANLEY, MICHAEL R._____

Evaluators: _Pacnell_____

Shift: _12-8_____ Date Completed: _2-12-98_____

Review Date: _2-10-97 - RETURN TO CAPT. BY 0700._

Shift Lt.: _Harris_____

INSTRUCTIONS: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space preceding the describe behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

_____ 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

_____ 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____10. Daydreams, seems preoccupied.

_____11. Attempts to play staff against one another.

_____12. Considers himself unjustly confined.

_____13. Frequently upset after visits.

_____14. Frequently upset after receiving mail.

_____15. Participates in group demonstrations.

_____16. Seems to think only of himself.

_____17. Displays negative attitude.

_____18. Breach of Group confidentiality.

_____19. Speaks in detail goals, plans.

_____20. Gets along with others.

_____21. Accepts blame for some of his troubles.

_____22. Accepts blame for all of his troubles.

_____23. Respects authorit

_____24. Keeps room neat, clean and bed mad

_____25. Keeps himself nea and clean.

_____26. Volunteers for wor projects.

_____27. Likeable.

_____28. Willing to discuss personal problems w/staff.

_____29. Follows the Inmat Housing Rules.

_____30. Displays positive attitude.

_____31. Finds acceptable ways to keep busy

_____32. Approaches some staff in an open, honest maner.

ADDITIONAL COMMENTS: NUMBER: _No Problem_____

_____

SEMI-MONTHLY BEHAVIOR REPORT

Inmate's Name: MARKEY, MICHAEL

Evaluators: Cpl M____ Pick Spec ___ C/O MORGAN ____ K,15

Shift: 4 72 _____ Date Completed: 1-29-58

Review Date: 22 30 — RETURN TO CAPT. BY 0?00.

Shift Lt.: RJ Tumlumli

INSTRUCTIONS: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space preceding the describe behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

_____ 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

_____ 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems preoccupied.

_____ 11. Attempts to play staff against one another.

_____ 12. Considers himself unjustly confined.

_____ 13. Frequently upset after visits.

_____ 14. Frequently upset after receiving mail.

_____ 15. Participates in group demonstrations.

_____ 16. Seems to think only of himself.

_____ 17. Displays negative attitude.

_____ 18. Breach of Group confidentiality.

_____ 19. Speaks in detail goals, plans.

_____ 20. Gets along with others.

_____ 21. Accepts blame for some of his troubles.

_____ 22. Accepts blame for all of his troubles.

_____ 23. Respects authority

_____ 24. Keeps room neat, clean and bed mad

_____ 25. Keeps himself nea and clean.

_____ 26. Volunteers for wo projects.

_____ 27. Likeable.

_____ 28. Willing to discue personal problems w/staff

_____ 29. Follows the Inmat Housing Rules.

_____ 30. Displays positive attitude.

_____ 31. Finds acceptable ways to keep busy

_____ 32. Approaches some staff in an open, honest maner.

29

+54

ADDITIONAL COMMENTS: NUMBER: _____

_____

M.S.U. SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MONKEY, MICHAEL_

Evaluators: _W. EVANS_

Shift: _12-8_          Date Completed: _1/28/98_

Review Date: _2-28-98 RETURN TO CAPT BY 2-00_

Shift Lt.: _HARRIS_

INSTRUCTIONS: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space preceding the describe behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

_____ 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

_____ 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems preoccupied.

_____ 11. Attempts to play staff against one another.

_____ 12. Considers himself unjustly confined.

_____ 13. Frequently upset after visits.

_____ 14. Frequently upset after receiving mail.

_____ 15. Participates in group demonstrations.

_____ 16. Seems to think only of himself.

_____ 17. Displays negative attitude.

_____ 18. Breach of Group confidentiality.

_____ 19. Speaks in detail goals, plans..

_____ 20. Gets along with others.

_____ 21. Accepts blame for some of his troubles.

_____ 22. Accepts blame for all of his troubles.

_____ 23. Respects authorit

_____ 24. Keeps room neat, clean and bed mad

_____ 25. Keeps himself nea and clean.

_____ 26. Volunteers for wo projects.

_____ 27. Likeable.

_____ 28. Willing to discus: personal problems w/staff

_____ 29. Follows the Inmat Housing Rules.

_____ 30. Displays positive attitude.

_____ 31. Finds acceptabl: ways to keep busv

_____ 32. Approaches some staff in an open. honest maner.

ADDITIONAL COMMENTS: NUMBER: _N/O PROBLEMS_

(32)

W.S.U. SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: MANLEY, MICHAEL

Evaluators:

Shift: D-4                          Date Completed: 2-2-98

Review Date: 2-2-98 — RETURN TO CAPT. BY 0700.

Shift Lt.: MS

INSTRUCTIONS: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space preceding the describe behavior.

1. Worried, anxious.

2. Tense, unable to relax.

3. Seems to take no pleasure in anything.

4. Cannot be trusted at all.

5. Moody, brooding.

6. Continually tries to con staff.

7. Impulsive, unpredictable.

8. Seems to seek excitement.

9. Never seems happy.

10. Daydreams, seems preoccupied.

11. Attempts to play staff against one another.

12. Considers himself unjustly confined.

13. Frequently upset after visits.

14. Frequently upset after receiving mail.

15. Participates in group demonstrations.

16. Seems to think only of himself.

17. Displays negative attitude.

18. Breach of Group confidentiality.

19. Speaks in detail goals, plans..

20. Gets along with others.

21. Accepts blame for some of his troubles.

22. Accepts blame for all of his troubles.

23. Respects authorit

24. Keeps room neat, clean and bed mad

25. Keeps himself nea and clean.

26. Volunteers for wo projects.

27. Likeable.

28. Willing to discuss personal problems w/staff

29. Follows the Inmate Housing Rules.

30. Displays positive attitude.

31. Finds acceptable ways to keep busy

32. Approaches some staff in an open, honest maner.

ADDITIONAL COMMENTS: NUMBER:

M.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANLEY, MICHAEL_____

Evaluators: _____

Shift: _____ Date Completed: _1-13-98__

Review Date: _1-27-98_ - RETURN TO CAPT. EX OROD.

Shift Lt.: _____

INSTRUCTIONS: Please indicate which of the following behaviors this
inmate exhibits.  If the behavior describes the inmat
place your initials in the space preceding the descri
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
to relax.

_____ 3. Seems to take no
pleasure in anything.

_____ 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_____ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
preoccupied.

_____ 11. Attempts to play
staff against one another.

_____ 12. Considers himself
unjustly confined.

_____ 13. Frequently upset
after visits.

_____ 14. Frequently upset
after receiving mail.

_____ 15. Participates in
group demonstrations.

_____ 16. Seems to think
only of himself.

_____ 17. Displays negat:
attitude.

_____ 18. Breach of Group
confidentiality

_____ 19. Speaks in detai
goals, plans..

_____ 20. Gets along with
others.

_____ 21. Accepts blame f
some of his troubl

_____ 22. Accepts blame f
all of his troubles

_____ 23. Respects author

_____ 24. Keeps room neat
clean and bed m

_____ 25. Keeps himself n
and clean.

_____ 26. Volunteers for
projects.

_____ 27. Likeable.

_____ 28. Willing to disc
personal problems w/sta

_____ 29. Follows the Inm
Housing Rules.

_____ 30. Displays positi
attitude.

_____ 31. Finds acceptabl
ways to keep bu

_____ 32. Approaches some
staff in an ope
honest maner.

ADDITIONAL COMMENTS: NUMBER: _____

_____

(31)

## I.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANLEY, MICHAEL_

Evaluators: _Seward  Simon  Kights  GL____ RKAWD)_

Shift: _____ 4-12 _____    Date Completed: _____ 1-12-98 ___

Review Date: _1-12-98 — RETURN TO CAPT BY 0700._

Shift Lt.: _R.J. Pawlowski_

INSTRUCTIONS:    Please indicate which of the following behaviors this
inmate exhibits.  If the behavior describes the inmate,
place your initials in the space preceding the describe
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable ,
to relax.

_____ 3. Seems to take no
pleasure in anything.

_(P)_ 4. Cannot be trusted
at all.

_(P)_ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_(P)_ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
preoccupied.

_____ 11. Attempts to play
staff against one another.

_____ 12. Considers himself
unjustly confined.

_____ 13. Frequently upset
after visits.

_____ 14. Frequently upset
after receiving mail.

_____ 15. Participates in
group demonstrations.

_____ 16. Seems to think
only of himself.

_(C)_17. Displays negative
attitude.

_____18. Breach of Group
confidentiality.

_____19. Speaks in detail (
goals, plans.

_____20. Gets along with
others.

_____21. Accepts blame for
some of his troubles.

_____22. Accepts blame for
all of his troubles.

_(B)(M)_23. Respects authorit

_(C)(M)(M)_24. Keeps room neat,
clean and bed mad

_(D)(C)(M)_25. Keeps himself neat
and clean.

_____26. Volunteers for wor
projects.

_____27. Likeable.

_____28. Willing to discuss
personal problems w/staff.

_____29. Follows the Inmat
Housing Rules.

_____30. Displays positive
attitude.

_(D)(M)_31. Finds acceptabl
ways to keep bus.

_____32. Approaches some
staff in an open.
honest manner.

ADDITIONAL COMMENTS:  NUMBER: _Freed  From  Tier  For  Refusal to_
_lock in - Had to be physically subdued & locked in_
_his cell @_

BSU. BEHAVIOR REPORT / BI-MONTHLY BEHAVIOR REPORT

Inmate's Name: *MANLEY, MICHAEL*

Evaluators: *Lynn*

Shift: *12-8*                    Date Completed: *1-10-98*

Review Date: *1-12-98 — RETURN TO CAPT. BY 0700.*

Shift Lt.: *Harris 3*

**INSTRUCTIONS:**  Please indicate which of the following behaviors this inmate exhibits.  If the behavior describes the inmate, place your initials in the space preceding the describe behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

_____ 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

_____ 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems preoccupied.

_____ 11. Attempts to play staff against one another.

_____ 12. Considers himself unjustly confined.

_____ 13. Frequently upset after visits.

_____ 14. Frequently upset after receiving mail.

_____ 15. Participates in group demonstrations.

_____ 16. Seems to think only of himself.

_____ 17. Displays negative attitude.

_____ 18. Breach of Group confidentiality.

_____ 19. Speaks in detail of goals, plans.

_____ 20. Gets along with others.

_____ 21. Accepts blame for some of his troubles.

_____ 22. Accepts blame for all of his troubles.

_____ 23. Respects authority.

_____ 24. Keeps room neat, clean and bed made.

_____ 25. Keeps himself neat and clean.

_____ 26. Volunteers for work projects.

_____ 27. Likeable.

_____ 28. Willing to discuss personal problems w/staff.

_____ 29. Follows the Inmate Housing Rules.

_____ 30. Displays positive attitude.

_____ 31. Finds acceptable ways to keep busy.

_____ 32. Approaches some staff in an open, honest manner.

**ADDITIONAL COMMENTS:  NUMBER:** *no problem*
_____
_____

.S.U.    SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _Manley, Michael_____

Evaluators: _____

Shift: _____ 84 _____ Date Completed: _1/1/98___

Review Date: _1 ST — RETURN TO CAPT. BY 0700._____

Shift Lt.: _____M JR_____

**INSTRUCTIONS:** Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space preceding the describe behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

_____ 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

_____ 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems preoccupied.

_____ 11. Attempts to play staff against one another.

_____ 12. Considers himself unjustly confined.

_____ 13. Frequently upset after visits.

_____ 14. Frequently upset after receiving mail.

_____ 15. Participates in group demonstrations.

_____ 16. Seems to think only of himself.

_____ 17. Displays negative attitude.

_____ 18. Breach of Group confidentiality.

_____ 19. Speaks in detail of goals, plans.

_____ 20. Gets along with others.

_____ 21. Accepts blame for some of his troubles.

_____ 22. Accepts blame for all of his troubles.

_____ 23. Respects authority.

_____ 24. Keeps room neat, clean and bed made.

_____ 25. Keeps himself neat and clean.

_____ 26. Volunteers for work projects.

_____ 27. Likeable.

_____ 28. Willing to discuss personal problems w/staff.

_____ 29. Follows the Inmate Housing Rules.

_____ 30. Displays positive attitude.

_____ 31. Finds acceptable ways to keep busy.

_____ 32. Approaches some staff in an open, honest maner.

**ADDITIONAL COMMENTS: NUMBER:** _a little on edge lately (top)_____
_____

.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _Manley Michael_____

Evaluators: _Richard Carrett____ Diana Seward_____

Shift: _____4-12_____ Date Completed: __12-27-97___

Review Date: _1-15X - RETURN TO CAPT. BY 0100._

Shift Lt.: _R.J. Paulauski_____

INSTRUCTIONS:   Please indicate which of the following behaviors this
                inmate exhibits.  If the behavior describes the inmate,
                place your initials in the space preceding the described
                behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
              to relax.

_____ 3. Seems to take no
              pleasure in anything.

_____ 4. Cannot be trusted
              at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
              to con staff.

_____ 7. Impulsive,
              unpredictable.

_____ 8. Seems to seek
              excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
               preoccupied.

_____ 11. Attempts to play
               staff against one another.

_____ 12. Considers himself
               unjustly confined.

_____ 13. Frequently upset
               after visits.

_____ 14. Frequently upset
               after receiving mail.

_____ 15. Participates in
               group demonstrations.

_____ 16. Seems to think
               only of himself.

_____ 17. Displays negative
               attitude.

_____ 18. Breach of Group
               confidentiality.

_____ 19. Speaks in detail of
               goals, plans.

_____ 20. Gets along with
               others.

_____ 21. Accepts blame for
               some of his troubles.

_____ 22. Accepts blame for
               all of his troubles.

_____ 23. Respects authority

_____ 24. Keeps room neat,
               clean and bed made

_____ 25. Keeps himself neat
               and clean.

_____ 26. Volunteers for work
               projects.

_____ 27. Likeable.

_____ 28. Willing to discuss
               personal problems w/staff.

_____ 29. Follows the Inmate
               Housing Rules.

_____ 30. Displays positive
               attitude.

_____ 31. Finds acceptable
               ways to keep busy.

_____ 32. Approaches some
               staff in an open,
               honest maner.

ADDITIONAL COMMENTS:  NUMBER: 'D' SVC Ulieman DOTS
A Good Job

.S.U.    SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: *Manley Michael*

Evaluators: *W Evans*

Shift: *12-8* _____ Date Completed: *12-24-97*

Review Date: *1-50 — Return to Capt. by 0800.*

Shift Lt.: *Harris*

**INSTRUCTIONS:**   Please indicate which of the following behaviors this inmate exhibits.  If the behavior describes the inmate, place your initials in the space preceding the described behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

_____ 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

_____ 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems preoccupied.

_____ 11. Attempts to play staff against one another.

_____ 12. Considers himself unjustly confined.

_____ 13. Frequently upset after visits.

_____ 14. Frequently upset after receiving mail.

_____ 15. Participates in group demonstrations.

_____ 16. Seems to think only of himself.

_____ 17. Displays negative attitude.

_____ 18. Breach of Group confidentiality.

_____ 19. Speaks in detail o goals, plans..

_____ 20. Gets along with others.

_____ 21. Accepts blame for some of his troubles.

_____ 22. Accepts blame for all of his troubles.

_____ 23. Respects authority

_____ 24. Keeps room neat, clean and bed made

_____ 25. Keeps himself neat and clean.

_____ 26. Volunteers for wor projects.

_____ 27. Likeable.

_____ 28. Willing to discuss personal problems w/staff.

_____ 29. Follows the Inmate Housing Rules.

_____ 30. Displays positive attitude.

_____ 31. Finds acceptable ways to keep busy.

_____ 32. Approaches some staff in an open. honest maner.

**ADDITIONAL COMMENTS:**   **NUMBER:** *N/a Problems*

.S.U.    SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANLEY, Michael_____

Evaluators: _____

Shift: _____8-4_____ Date Completed: _10/9/97_____

Review Date: _12-16-97 - RETURN TO CAPT BY 0700._____

Shift Lt.: ____M.G._____

INSTRUCTIONS:  Please indicate which of the following behaviors this
               inmate exhibits.  If the behavior describes the inmate,
               place your initials in the space preceding the described
               behavior.

_____ 1. Worried, anxious.          _____ 17. Displays negative
                                                              attitude.
_____ 2. Tense, unable              _____ 18. Breach of Group
                 to relax.                                    confidentiality.
_____ 3. Seems to take no           _____ 19. Speaks in detail of
                 pleasure in anything.                        goals, plans.
_____ 4. Cannot be trusted          _____ 20. Gets along with
                 at all.                                      others.
_____ 5. Moody, brooding.           _____ 21. Accepts blame for
                                                              some of his troubles.
_____ 6. Continually tries          _____ 22. Accepts blame for
                 to con staff.                                all of his troubles.
_____ 7. Impulsive,                 _____ 23. Respects authority
                 unpredictable.
_____ 8. Seems to seek              _____ 24. Keeps room neat,
                 excitement.                                  clean and bed made
_____ 9. Never seems happy.         _____ 25. Keeps himself neat
                                                              and clean.
_____ 10. Daydreams, seems          _____ 26. Volunteers for work
                  preoccupied.                                projects.
_____ 11. Attempts to play          _____ 27. Likeable.
                  staff against one another.
_____ 12. Considers himself         _____ 28. Willing to discuss
                  unjustly confined.                          personal problems w/staff.
_____ 13. Frequently upset          _____ 29. Follows the Inmate
                  after visits.                               Housing Rules.
_____ 14. Frequently upset          _____ 30. Displays positive
                  after receiving mail.                       attitude.
_____ 15. Participates in           _____ 31. Finds acceptable
                  group demonstrations.                       ways to keep busy.
_____ 16. Seems to think            _____ 32. Approaches some
                  only of himself.                            staff in an open,
                                                              honest maner.

ADDITIONAL COMMENTS:  NUMBER:  Manley is not a management
problem nor has he been one.  M.G.

M.S.U.    SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANNEY, MICHAEL_____

Evaluators: RICHMON  Simon  Seward_____

Shift: ___4-12_____ Date Completed: ___12-113-92___

Review Date: 12-16-92 - RETURN TO CAPT. BY 0900.

Shift Lt.: _R/Cambunski_____

INSTRUCTIONS:    Please indicate which of the following behaviors this
                 inmate exhibits.  If the behavior describes the inmate.
                 place your initials in the space preceding the describe.
                 behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
              to relax.

_____ 3. Seems to take no
              pleasure in anything.

_____ 4. Cannot be trusted
              at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
              to con staff.

_____ 7. Impulsive,
              unpredictable.

_____ 8. Seems to seek
              excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
               preoccupied.

_____ 11. Attempts to play
           staff against one another.

_____ 12. Considers himself
               unjustly confined.

_____ 13. Frequently upset
               after visits.

_____ 14. Frequently upset
               after receiving mail.

_____ 15. Participates in
               group demonstrations.

_____ 16. Seems to think
               only of himself.

_____ 17. Displays negative
               attitude.

_____ 18. Breach of Group
               confidentiality.

_____ 19. Speaks in detail
               goals, plans..

_____ 20. Gets along with
               others.

_____ 21. Accepts blame for
               some of his troubles.

_____ 22. Accepts blame for
               all of his troubles.

_____ 23. Respects authority

_____ 24. Keeps room neat,
               clean and bed made

_____ 25. Keeps himself neat
               and clean.

_____ 26. Volunteers for work
               projects.

_____ 27. Likeable.

_____ 28. Willing to discuss
               personal problems w/staff.

_____ 29. Follows the Inmate
               Housing Rules.

_____ 30. Displays positive
               attitude.

_____ 31. Finds acceptable
               ways to keep busy.

_____ 32. Approaches some
               staff in an open.
               honest maner.

ADDITIONAL COMMENTS:    NUMBER: ___Tielman_____

--------------------------------------------------------

M.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: *MANNEY MICHAEL*

Evaluators: *C/O W. GREENE*

Shift: *2 2*                    Date Completed: *12-10-97*

Review Date: *12-16-97 - RETURN TO CAPT. BY 9PM*

Shift Lt.: *Harris*

INSTRUCTIONS:   Please indicate which of the following behaviors this
                inmate exhibits.  If the behavior describes the inmate.
                place your initials in the space preceding the describe
                behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
              to relax.

_____ 3. Seems to take no
pleasure in anything.

_____ 4. Cannot be trusted
              at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
              to con staff.

_____ 7. Impulsive,
              unpredictable.

_____ 8. Seems to seek
              excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
               preoccupied.

_____ 11. Attempts to play
staff against one another.

_____ 12. Considers himself
               unjustly confined.

_____ 13. Frequently upset
               after visits.

_____ 14. Frequently upset
               after receiving mail.

_____ 15. Participates in
               group demonstrations.

_____ 16. Seems to think
               only of himself.

_____ 17. Displays negative
               attitude.

_____ 18. Breach of Group
               confidentiality.

_____ 19. Speaks in detail
               goals, plans..

_____ 20. Gets along with
               others.

_____ 21. Accepts blame for
               some of his troubles.

_____ 22. Accepts blame for
               all of his troubles.

_____ 23. Respects authority

_____ 24. Keeps room neat,
               clean and bed made

_____ 25. Keeps himself neat
               and clean.

_____ 26. Volunteers for work
               projects.

_____ 27. Likeable.

_____ 28. Willing to discuss
personal problems w/staff.

_____ 29. Follows the Inmate
               Housing Rules.

_____ 30. Displays positive
               attitude.

_____ 31. Finds acceptable
               ways to keep busy.

_____ 32. Approaches some
               staff in an open.
               honest maner.

ADDITIONAL COMMENTS:   NUMBER: *No problem* _____
_____

DELAWARE CORRECTIONAL CENTER

*COUNSELOR*
*1-8-98*
DATE

MEMO TO: *Manley, Michael* BLDG. *W*
S.B.I. _____ *338485* _____

FROM: _____ I.B.C.C. _____

RE: **CLASSIFICATION**

Your M.D.T. has recommended you for the following:
*Cont. max/Wrgh, cont. Treatment Pat* _____

_____.

The I.B.C.C.'s decision is to:

__X__ Approve    _____ Not Approve    _____ Defer
_____ Recommend    _____ Not Recommend

**BECAUSE**

___ Lack of Program Participation    ___ Time remaining on sentence
___ Pending adjustment boards    ___ Prior failure under supervision
___ Gradual phasing indicated    ___ Poor institutional adjustment
___ Open Charges    ___ Serious natural of offense
___ Program does not meet your needs    ___ Prior criminal history
___ Lack of evidence you have addressed your problem in a serious manner
___ Failure to address treatment issues in relation to your offense
___ You present a current and continuous danger to the safety of staff,
    other inmates, or the good order of the institution.

OTHER *Nov. 3/98* _____

_____.

**ADDITIONAL COMMENTS:**

___ Develop treatment plan with counselor.

| APPROVED | RECOMMEND | |
|---|---|---|
| ___ N.A. | ___ S.A.R. | |
| ___ A.A. | ___ Highway Project | |
| ___ G.E.D. | ___ Family Problems | |
| ___ P.R.C. | (Write Mr. Wallitsch) | |
| ___ Laundry Outside/Ongrounds | ___ Greentree (See Counselor) | |
| ___ HS Education | ___ Delaware Vets Cemetary | |
| ___ W  Kitchen | ___ Town of Smyrna | |
| ___ Evening Greentree | ___ MCI | ___ PTA |
| ___ Central Supply | ___ SCI | ___ WR |
| ___ Construction Project | ___ MPCJF | ___ C/C |
| ___ Violent Offenders Program | ___ Medium | ___ Minimum |

cc: Original to Inmate
    Institutional File
    Treatment File

FORM #: 456 (3-partNCR)          mmr/ib.for/94

BUREAU OF PRISONS RECLASSIFICATION FORM #004

DATE: _____

I. **Vital Indicators/Sentencing Information**

Inmate name _MANLEY, MICHAEL_ AKA _NONE_____ Institution _DCC/MSU_

Institution Number _NONE___ SBI Number _00330485_ Date of Birth _7-28-74_

Present Offense(s) _MURDER I, AGG. ACT OF INTIMIDATION, P.O. W.P.C.F.,_
_CRNOR. II_____ Most Serious Offense _MURDER I_

Level V Sentence: Year(s) _DEATH + 25 YEARS_ Month _88_ Day(s) _88_ Truth in Sentence Yes _X_ No___

Sentence Effective Date_11/13/95_ STRD _NONE_ PE Date _NONE_ Rehearing Date _NONE_

Mandatory: Year(s) _NO_ Month(s) _NO_ Day(s) _NO_ Level IV Sentence? Yes___ No _X_

Detainer(s)? Yes___ No _X_ Open Charge(s)? Yes___ No _X_ 4204K? Yes___ No _X_

Escape/Attempted Escape on Record? Yes___ No _X_ Category_____

II. **Program Request/Change or Recommendation**

Request: Work Release____ Supervised Custody____ Work Release/Supervised Custody____
Halfway House Worker___ Highway Work Project___ Community/Governmental Service Project___
Furlough____ To See: Name(s)_____ Relationship_____

Address_____

Purpose_____

Comments_____

Off Grounds Status? Yes___ No _X_ If yes, state program/assignment for which status is being requested:_____

Change in Security Level and Institution? Yes___ No _X_ If yes, state security level and institution requested: _CONTINUE-MAX/MSU, TIERMAN DPB_

Has inmate had prior participation in program requested?    Yes _____ No _____

Program_____ Number of approvals_____

Reason(s)/date(s) for failure or return_____

_____

_____

Is inmate eligible in accordance with program standards?   Yes _____ No_____

Is exception to standards requested? Yes___ No___ If yes, give reasons for exception:

_____

_____

III. **Disciplinary ( summary last 3 months-include dates, offenses dispositions)**

_NONE_

Most serious offense within last 3 months: _NONE_

IV. **Program Participation/Work Assignment**

_MSU TIERMAN_

V. **DUI Information (Complete if inmate is serving a sentence for DUI)**

Has information been verified via Motor Vehicle Records? Yes___ No___ No. of DUI's___

Date(s) of offense(s): 1st_____ 2nd_____ 3rd_____ 4th_____

VI. **Victim Notification**     Is victim notification required?     Yes _____ No _____

Name of Victim(s) _____ N/A

Last Known Address _____

_____

Counselor Signature                         Supervisor's Signature

**Committee Review**

MDT: _RECOMMENDS_ X_ Disapproved _____ Vote Number _____     MDT Chair Signature/Date

IBCC: Approved _✓_ Disapproved _____ Vote Number _____     IBCC Chair Signature/Date

CICC: Approved____ Disapproved _____ Vote Number _____     CICC Chair Signature/Date

_Rev 3/98_

**Distribution After Final Committee Review**

Central Classification Office
Institutional Classification File
Inmate's Record

ADDENDUM TO BOP RECLASSIFICATION FORM 004

Use this sheet to record any additional information which could not be included in the
designated spaces on Form BOP-004.

Inmate Name: _MANLEY, MICHAEL_ SBI Number: _00.338405_ Institution: _Dcc / MSU_

It appears that Michael has not been a management
problem however we feel we recommend he remain
on Mod/High.

His Death Sentence is presently on automatic
appeal status.

Michael was classified to Mod/High on 4-3-97
because of the "Nature of his offense and Sentence."

The M.D.T. recommends he remain in MDA for
a longer period of observation. Vote 2-0

Recommended Review Date: 3/97

Form BOP-004

.S.U.  SEMIMONTHLY  BEHAVIO..  REPORT

Inmate's Name: MANLEY, MICHAEL E.

Evaluators: _____

Shift: _____ A 4 _____ Date Completed: 24 NOV 97  12/1/97

Review Date: 12-1-97 — RETURN TO CAPT. EX ODOD.

Shift Lt.: _____ MJ _____

INSTRUCTIONS:  Please indicate which of the following behaviors this
inmate exhibits.  If the behavior describes the inmate,
place your initials in the space preceding the described
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
to relax.

_____ 3. Seems to take no
pleasure in anything.

_____ 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_____ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
preoccupied.

_____ 11. Attempts to play
staff against one another.

_____ 12. Considers himself
unjustly confined.

_____ 13. Frequently upset
after visits.

_____ 14. Frequently upset
after receiving mail.

_____ 15. Participates in
group demonstrations.

_____ 16. Seems to think
only of himself.

_____ 17. Displays negative
attitude.

_____ 18. Breach of Group
confidentiality.

_____ 19. Speaks in detail o
goals, plans.

_____ 20. Gets along with
others.

_____ 21. Accepts blame for
some of his troubles.

_____ 22. Accepts blame for
all of his troubles.

_____ 23. Respects authority.

_____ 24. Keeps room neat,
clean and bed made.

_____ 25. Keeps himself neat
and clean.

_____ 26. Volunteers for work
projects.

_____ 27. Likeable.

_____ 28. Willing to discuss
personal problems w/staff.

_____ 29. Follows the Inmate
Housing Rules.

_____ 30. Displays positive
attitude.

_____ 31. Finds acceptable
ways to keep busy.

_____ 32. Approaches some
staff in an open.
honest maner.

ADDITIONAL COMMENTS:  NUMBER: Manley is doing good job as
tier man  MJ

(42)

## M.S.U.  SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MENKEY, Michael E._

Evaluators: _RIEHM Simon_

Shift: _4-12_     Date Completed: _____

Review Date: _12-1-87 — RETURN TO CAPT. BY 0800._

Shift Lt.: _____

INSTRUCTIONS: Please indicate which of the following behaviors this inmate exhibits.  If the behavior describes the inmate, place your initials in the space preceding the described behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

_____ 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

_____ 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems preoccupied.

_____ 11. Attempts to play staff against one another.

_____ 12. Considers himself unjustly confined.

_____ 13. Frequently upset after visits.

_____ 14. Frequently upset after receiving mail.

_____ 15. Participates in group demonstrations.

_____ 16. Seems to think only of himself.

_____ 17. Displays negative attitude.

_____ 18. Breach of Group confidentiality.

_____ 19. Speaks in detail of goals, plans..

_____ 20. Gets along with others.

_____ 21. Accepts blame for some of his troubles.

_____ 22. Accepts blame for all of his troubles.

_____ 23. Respects authority

_____ 24. Keeps room neat, clean and bed made

_____ 25. Keeps himself neat and clean.

_____ 26. Volunteers for work projects.

_____ 27. Likeable.

_____ 28. Willing to discuss personal problems w/staff.

_____ 29. Follows the Inmate Housing Rules.

_____ 30. Displays positive attitude.

_____ 31. Finds acceptable ways to keep busy

_____ 32. Approaches some staff in an open, honest maner.

ADDITIONAL COMMENTS:  NUMBER: _Thomas_ _____

_____



## M.S.U.  SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANLEY, MICHAEL R._____

Evaluators: _C/O W. Greene_____

Shift: _____12⁸_____ Date Completed: _1-26-97_

Review Date: _12-1-97 - RETURN TO CAPT-EY. OROO._

Shift Lt.: __Harris_____

**INSTRUCTIONS:** Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space preceding the described behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

_____ 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

_____ 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems preoccupied.

_____ 11. Attempts to play staff against one another.

_____ 12. Considers himself unjustly confined.

_____ 13. Frequently upset after visits.

_____ 14. Frequently upset after receiving mail.

_____ 15. Participates in group demonstrations.

_____ 16. Seems to think only of himself.

_____ 17. Displays negative attitude.

_____ 18. Breach of Group confidentiality.

_____ 19. Speaks in detail of goals, plans..

_____ 20. Gets along with others.

_____ 21. Accepts blame for some of his troubles.

_____ 22. Accepts blame for all of his troubles.

_____ 23. Respects authority

_____ 24. Keeps room neat, clean and bed made

_____ 25. Keeps himself neat and clean.

_____ 26. Volunteers for wor projects.

_____ 27. Likeable.

_____ 28. Willing to discuss personal problems w/staff.

_____ 29. Follows the Inmate Housing Rules.

_____ 30. Displays positive attitude.

_____ 31. Finds acceptable ways to keep busy

_____ 32. Approaches some staff in an open. honest maner.

**ADDITIONAL COMMENTS: NUMBER:** _No problem._____

_____

.S.U.    SEMIMONTHLY BEHAVIC  REPORT

Inmate's Name: _MANLEY, MICHAEL B._____

Evaluators: _____

Shift: _____  Date Completed: 11|17|97___

Review Date: 1/17/97 _ RETURN TO CAPT. EX OROO._

Shift Lt.: ___MSJ_____

INSTRUCTIONS:  Please indicate which of the following behaviors this
              inmate exhibits.  If the behavior describes the inmate,
              place your initials in the space preceding the described
              behavior.

_____ 1. Worried, anxious.              _____17. Displays negative
                                                           attitude.
_____ 2. Tense, unable
               to relax.                      _____18. Breach of Group
            3. Seems to take no                            confidentiality.
               pleasure in anything.          _____19. Speaks in detail o
            4. Cannot be trusted                           goals, plans..
               at all.                        _____20. Gets along with
_____ 5. Moody, brooding.                            others.
                                              _____21. Accepts blame for
_____ 6. Continually tries                           some of his troubles.
               to con staff.                  _____22. Accepts blame for-
            7. Impulsive,                                   all of his troubles.
               unpredictable.                 _____23. Respects authority
            8. Seems to seek
               excitement.                    _____24. Keeps room neat,
            9. Never seems happy.                          clean and bed made
                                              _____25. Keeps himself neat
_____10. Daydreams, seems                             and clean.
               preoccupied.                   _____26. Volunteers for wor
_____11. Attempts to play                             projects.
               staff against one another.    _____27. Likeable.
_____12. Considers himself
               unjustly confined.             _____28. Willing to discuss
_____13. Frequently upset                             personal problems w/staff.
               after visits.                  _____29. Follows the Inmate
_____14. Frequently upset                             Housing Rules.
               after receiving mail.          _____30. Displays positive
_____15. Participates in                              attitude.
               group demonstrations.          _____31. Finds acceptable
_____16. Seems to think                               ways to keep busy.
               only of himself.               _____32. Approaches some
                                                           staff in an open.
                                                           honest maner.

ADDITIONAL COMMENTS:  NUMBER: _____

_____

## M.S.U.    SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: *Manley, Michael B.*

Evaluators: *Gilliam Jr. Simon Picyus Seward*

Shift: *4-12*                Date Completed: *11-14-97*

Review Date: *141757 — Return to Capt. Ex Off 00.*

Shift Lt.: *R.J. Pawlowski*

INSTRUCTIONS:  Please indicate which of the following behaviors this
               inmate exhibits.  If the behavior describes the inmate,
               place your initials in the space preceding the described
               behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
to relax.

_____ 3. Seems to take no
pleasure in anything.

_____ 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_____ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
preoccupied.

_____ 11. Attempts to play
staff against one another.

_____ 12. Considers himself
unjustly confined.

_____ 13. Frequently upset
after visits.

_____ 14. Frequently upset
after receiving mail.

_____ 15. Participates in
group demonstrations.

_____ 16. Seems to think
only of himself.

_____ 17. Displays negative
attitude.

_____ 18. Breach of Group
confidentiality.

_____ 19. Speaks in detail o-
goals, plans..

_____ 20. Gets along with
others.

_____ 21. Accepts blame for
some of his troubles.

_____ 22. Accepts blame for-
all of his troubles.

_____ 23. Respects authority.

_____ 24. Keeps room neat,
clean and bed made.

_____ 25. Keeps himself neat
and clean.

_____ 26. Volunteers for work
projects.

_____ 27. Likeable.

_____ 28. Willing to discuss
personal problems w/staff.

_____ 29. Follows the Inmate
Housing Rules.

_____ 30. Displays positive
attitude.

_____ 31. Finds acceptable
ways to keep busy.

_____ 32. Approaches some
staff in an open,
honest maner.

ADDITIONAL COMMENTS:   NUMBER: *D-Thermos* _____

_____

## M.S.U.    SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANLEY, MICHAEL B._

Evaluators: _C/O W. GREEN_

Shift: _12-8_    Date Completed: _11-12-97_

Review Date: _11-17-97 — RETURN TO CAPT. BY 0900._

Shift Lt.: _HARRIS_

INSTRUCTIONS: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space preceding the described behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

_____ 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

_____ 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems preoccupied.

_____ 11. Attempts to play staff against one another.

_____ 12. Considers himself unjustly confined.

_____ 13. Frequently upset after visits.

_____ 14. Frequently upset after receiving mail.

_____ 15. Participates in group demonstrations.

_____ 16. Seems to think only of himself.

_____ 17. Displays negative attitude.

_____ 18. Breach of Group confidentiality.

_____ 19. Speaks in detail o goals, plans..

_____ 20. Gets along with others.

_____ 21. Accepts blame for some of his troubles.

_____ 22. Accepts blame for all of his troubles.

_____ 23. Respects authority.

_____ 24. Keeps room neat, clean and bed made.

_____ 25. Keeps himself neat and clean.

_____ 26. Volunteers for work projects.

_____ 27. Likeable.

_____ 28. Willing to discuss personal problems w/staff.

_____ 29. Follows the Inmate Housing Rules.

_____ 30. Displays positive attitude.

_____ 31. Finds acceptable ways to keep busy.

_____ 32. Approaches some staff in an open, honest maner.

ADDITIONAL COMMENTS: NUMBER: _No problem_

M.S.U. SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: MANLEY, MICHAEL R.

Evaluators: RICHMOND, Simon, [illegible] SEWELL

Shift: 4-12                    Date Completed: 11-1-97

Review Date: 11-3-97 RETURN TO CAPT BY OROO.

Shift Lt.: R. [illegible]

INSTRUCTIONS: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space preceding the described behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

_____ 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

_____ 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems preoccupied.

_____ 11. Attempts to play staff against one another.

_____ 12. Considers himself unjustly confined.

_____ 13. Frequently upset after visits.

_____ 14. Frequently upset after receiving mail.

_____ 15. Participates in group demonstrations.

_____ 16. Seems to think only of himself.

_____ 17. Displays negative attitude.

_____ 18. Breach of Group confidentiality.

_____ 19. Speaks in detail of goals, plans.

_____ 20. Gets along with others.

_____ 21. Accepts blame for some of his troubles.

_____ 22. Accepts blame for all of his troubles.

_____ 23. Respects authority.

_____ 24. Keeps room neat, clean and bed made.

_____ 25. Keeps himself neat and clean.

_____ 26. Volunteers for work projects.

_____ 27. Likeable.

_____ 28. Willing to discuss personal problems w/staff.

_____ 29. Follows the Inmate Housing Rules.

_____ 30. Displays positive attitude.

_____ 31. Finds acceptable ways to keep busy.

_____ 32. Approaches some staff in an open, honest maner.

ADDITIONAL COMMENTS: NUMBER: FIREMAN - D-TIER cleaning crew leader. Written up for having Bleach in his cell.

## M.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANhEY, MIchAEl R._____

Evaluators: _____

Shift: _____P-4_____ Date Completed: _11/3/97_

Review Date: _11-3-97 - RETURN TO CApT. By 0700._

Shift Lt.: _____MS_____

**INSTRUCTIONS:**   Please indicate which of the following behaviors this
inmate exhibits.  If the behavior describes the inmate,
place your initials in the space preceding the described
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
to relax.

_____MS____ 3. Seems to take no
pleasure in anything.

____MS____ 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_____ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____10. Daydreams, seems
preoccupied.

_____11. Attempts to play
staff against one another.

_____12. Considers himself
unjustly confined.

_____13. Frequently upset
after visits.

_____14. Frequently upset
after receiving mail.

_____15. Participates in
group demonstrations.

_____16. Seems to think
only of himself.

_____17. Displays negative
attitude.

_____18. Breach of Group
confidentiality.

_____19. Speaks in detail of
goals, plans..

____MS____20. Gets along with
others.

_____21. Accepts blame for
some of his troubles.

_____22. Accepts blame for
all of his troubles.

_____23. Respects authority.

____MS____24. Keeps room neat,
clean and bed made.

_____25. Keeps himself neat
and clean.

____MS____26. Volunteers for work
projects.

_____27. Likeable.

_____28. Willing to discuss
personal problems w/staff.

____MS____29. Follows the Inmate
Housing Rules.

_____30. Displays positive
attitude.

_____31. Finds acceptable
ways to keep busy.

_____32. Approaches some
staff in an open,
honest maner.

**ADDITIONAL COMMENTS:   NUMBER:** _____

_____

M. J.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: MANLEY, MICHAEL R.

Evaluators: C. Wood

Shift: B-8                         Date Completed: 10/30/97

Review Date: 11-3-97 — RETURN TO CAPT. BY 0800.

Shift Lt.: Harris

INSTRUCTIONS: Please indicate which of the following behaviors this
inmate exhibits. If the behavior describes the inmate,
place your initials in the space preceding the described
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
   to relax.

_____ 3. Seems to take no
   pleasure in anything.

_____ 4. Cannot be trusted
   at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
   to con staff.

_____ 7. Impulsive,
   unpredictable.

_____ 8. Seems to seek
   excitement.

_____ 9. Never seems happy.

_____10. Daydreams, seems
   preoccupied.

_____11. Attempts to play
   staff against one another.

_____12. Considers himself
   unjustly confined.

_____13. Frequently upset
   after visits.

_____14. Frequently upset
   after receiving mail.

_____15. Participates in
   group demonstrations.

_____16. Seems to think
   only of himself.

_____17. Displays negative
   attitude.

_____18. Breach of Group
   confidentiality.

_____19. Speaks in detail of
   goals, plans..

_____20. Gets along with
   others.

_____21. Accepts blame for
   some of his troubles.

_____22. Accepts blame for
   all of his troubles.

_____23. Respects authority.

_____24. Keeps room neat,
   clean and bed made.

_____25. Keeps himself neat
   and clean.

_____26. Volunteers for work
   projects.

_____27. Likeable.

_____28. Willing to discuss
   personal problems w/staff.

_____29. Follows the Inmate
   Housing Rules.

_____30. Displays positive
   attitude.

_____31. Finds acceptable
   ways to keep busy.

_____32. Approaches some
   staff in an open.
   honest maner.

ADDITIONAL COMMENTS: NUMBER: n'a problems ⟨C.W⟩

_____

_____

## M.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANLEY, MICHAEL_ _____

Evaluators: _____

Shift: _____ _A-4_ _____ Date Completed: _10/15/97_ ___

Review Date: _10-15-97 — RETURN TO CAPT. BY 0700._

Shift Lt.: _____ _MSJ_ _____

INSTRUCTIONS:    Please indicate which of the following behaviors this
                 inmate exhibits.  If the behavior describes the inmate,
                 place your initials in the space preceding the described
                 behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
                 to relax.

_____ 3. Seems to take no
pleasure in anything.

___MSJ_____ 4. Cannot be trusted
                 at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
                 to con staff.

_____ 7. Impulsive,
                 unpredictable.

_____ 8. Seems to seek
                 excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
                  preoccupied.

_____ 11. Attempts to play
staff against one another.

_____ 12. Considers himself
unjustly confined.

_____ 13. Frequently upset
                  after visits.

_____ 14. Frequently upset
after receiving mail.

_____ 15. Participates in
group demonstrations.

_____ 16. Seems to think
                  only of himself.

_____ 17. Displays negative
                  attitude.

_____ 18. Breach of Group
                  confidentiality.

_____ 19. Speaks in detail of
                  goals, plans..

___KW___ 20. Gets along with
                  others.

_____ 21. Accepts blame for
                  some of his troubles.

_____ 22. Accepts blame for
___KW___ all of his troubles.

_____ 23. Respects authority.

___KW___ 24. Keeps room neat,
                  clean and bed made.

___KW___ 25. Keeps himself neat
                  and clean.

_____ 26. Volunteers for work
                  projects.

___KW___ 27. Likeable.

_____ 28. Willing to discuss
___MSJ_ __KW_ personal problems w/staff.

_____ 29. Follows the Inmate
                  Housing Rules.

___KW___ 30. Displays positive
                  attitude.

___KW___ 31. Finds acceptable
                  ways to keep busy.

_____ 32. Approaches some
___KW__ staff in an open.
                  honest maner.

ADDITIONAL COMMENTS:   NUMBER: ___ Does a good job as tier man. MSJ

_____

M.S.U.    SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: *MANLEY, MICHAEL*

Evaluators: *RICHMON Swan Steward*

Shift: *4-12* _____ Date Completed: *10-11-97*

Review Date: *10-15-97 — RETURN TO CAPT. BY 0900.*

Shift Lt.: *RJ Cumberland*

**INSTRUCTIONS:**    Please indicate which of the following behaviors this
inmate exhibits.  If the behavior describes the inmate,
place your initials in the space preceding the described
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
to relax.

_____ 3. Seems to take no
pleasure in anything.

_____ 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_____ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
preoccupied.

_____ 11. Attempts to play
staff against one another.

_____ 12. Considers himself
unjustly confined.

_____ 13. Frequently upset
after visits.

_____ 14. Frequently upset
after receiving mail.

_____ 15. Participates in
group demonstrations.

_____ 16. Seems to think
only of himself.

_____ 17. Displays negative
attitude.

_____ 18. Breach of Group
confidentiality.

_____ 19. Speaks in detail of
goals, plans.

_____ 20. Gets along with
others.

_____ 21. Accepts blame for
some of his troubles.

22. Accepts blame for
all of his troubles.

23. Respects authority.

24. Keeps room neat,
clean and bed made.

25. Keeps himself neat
and clean.

26. Volunteers for work
projects.

27. Likeable.

28. Willing to discuss
personal problems w/staff.

29. Follows the Inmate
Housing Rules.

30. Displays positive
attitude.

31. Finds acceptable
ways to keep busy.

32. Approaches some
staff in an open,
honest maner.

**ADDITIONAL COMMENTS:    NUMBER:** _'D' BUC TDENAN_____

_____

**M.S.U.  SEMIMONTHLY BEHAVIOR REPORT**

Inmate's Name: _MANHEY, MICHAEL_____

Evaluators: ___W TSMANS_____

Shift: ___12 D_____ Date Completed: _10 10 97___

Review Date: _18-1597 — RETURN TO CAPT-BY OROD._

Shift Lt.: _HARRIS_____

INSTRUCTIONS:  Please indicate which of the following behaviors this
              inmate exhibits.  If the behavior describes the inmate,
              place your initials in the space preceding the described
              behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
              to relax.

_____ 3. Seems to take no
              pleasure in anything.

_____ 4. Cannot be trusted
              at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
              to con staff.

_____ 7. Impulsive,
              unpredictable.

_____ 8. Seems to seek
              excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
              preoccupied.

_____ 11. Attempts to play
              staff against one another.

_____ 12. Considers himself
              unjustly confined.

_____ 13. Frequently upset
              after visits.

_____ 14. Frequently upset
              after receiving mail.

_____ 15. Participates in
              group demonstrations.

_____ 16. Seems to think
              only of himself.

_____ 17. Displays negative
               attitude.

_____ 18. Breach of Group
               confidentiality.

_____ 19. Speaks in detail of
               goals, plans..

_____ 20. Gets along with
               others.

_____ 21. Accepts blame for
               some of his troubles.

_____ 22. Accepts blame for
               all of his troubles.

_____ 23. Respects authority.

_____ 24. Keeps room neat,
               clean and bed made.

_____ 25. Keeps himself neat
               and clean.

_____ 26. Volunteers for work
               projects.

_____ 27. Likeable.

_____ 28. Willing to discuss
               personal problems w/staff.

_____ 29. Follows the Inmate
               Housing Rules.

_____ 30. Displays positive
               attitude.

_____ 31. Finds acceptable
               ways to keep busy.

_____ 32. Approaches some
               staff in an open,
               honest maner.

ADDITIONAL COMMENTS:  NUMBER: ___NO PROBLems_____

_____

M.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: MANLEY, MICHAEL R.

Evaluators: _____

Shift: _____ 8-4 _____ Date Completed: 9/16/97

Review Date: 9-15-97 - RETURN TO CAPT. BY 0900.

Shift Lt.: _____ MJ _____

INSTRUCTIONS:  Please indicate which of the following behaviors this
               inmate exhibits.  If the behavior describes the inmate,
               place your initials in the space preceding the described
               behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
                 to relax.

_____ 3. Seems to take no
                 pleasure in anything.

_____ 4. Cannot be trusted
                 at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
                 to con staff.

_____ 7. Impulsive,
                 unpredictable.

_____ 8. Seems to seek
                 excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
                  preoccupied.

_____ 11. Attempts to play
                 staff against one another.

_____ 12. Considers himself
                  unjustly confined.

_____ 13. Frequently upset
                  after visits.

_____ 14. Frequently upset
                  after receiving mail.

_____ 15. Participates in
                  group demonstrations.

_____ 16. Seems to think
                  only of himself.

_____ 17. Displays negative
                  attitude.

_____ 18. Breach of Group
                  confidentiality.

_____ 19. Speaks in detail of
                  goals, plans.

_____ 20. Gets along with
                  others.

_____ 21. Accepts blame for
                  some of his troubles.

_____ 22. Accepts blame for
                  all of his troubles.

_____ 23. Respects authority.

_____ 24. Keeps room neat,
                  clean and bed made.

_____ 25. Keeps himself neat
                  and clean.

_____ 26. Volunteers for work
                  projects.

_____ 27. Likeable.

_____ 28. Willing to discuss
                  personal problems w/staff.

_____ 29. Follows the Inmate
                  Housing Rules.

_____ 30. Displays positive
                  attitude.

_____ 31. Finds acceptable
                  ways to keep busy.

_____ 32. Approaches some
                  staff in an open,
                  honest maner.

ADDITIONAL COMMENTS:   NUMBER: _____

_____

S.H.U. BEHAVIOR REPORT

Inmate's Name: MANLEY, MICHAEL R.

Evaluators: _____ Swan   RICHMOND Seward

Shift: _D_

Date Completed: _9-13-97_

Review Date: _7-15-97 — RETURN TO CAPT. BY 07.00._

Shift Lt.: _RJ Pankowski_

**INSTRUCTIONS:** Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space preceding the described behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

_____ 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

_____ 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems preoccupied.

_____ 11. Attempts to play staff against one another.

_____ 12. Considers himself unjustly confined.

_____ 13. Frequently upset after visits.

_____ 14. Frequently upset after receiving mail.

_____ 15. Participates in group demonstrations.

_____ 16. Seems to think only of himself.

_____ 17. Displays negative attitude.

_____ 18. Breach of Group confidentiality.

_____ 19. Speaks in detail of goals, plans..

_____ 20. Gets along with others.

_____ 21. Accepts blame for some of his troubles.

_____ 22. Accepts blame for all of his troubles.

_____ 23. Respects authority.

_____ 24. Keeps room neat, clean and bed made.

_____ 25. Keeps himself neat and clean.

_____ 26. Volunteers for work projects.

_____ 27. Likeable.

_____ 28. Willing to discuss personal problems w/staff.

_____ 29. Follows the Inmate Housing Rules.

_____ 30. Displays positive attitude.

_____ 31. Finds acceptable ways to keep busy.

_____ 32. Approaches some staff in an open, honest maner.

**ADDITIONAL COMMENTS:   NUMBER:** _Consider for job_ _____

S.U.    SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANLEY, MICHAEL R._

Evaluators: _% J WYATT_

Shift: _C 12-8_ _____ Date Completed: _8-11-97_

Review Date: _7-15-97 — RETURN TO CAPT. BY 0700._

Shift Lt.: _HARRIS_

<u>INSTRUCTIONS:</u>  Please indicate which of the following behaviors this
inmate exhibits.  If the behavior describes the inmate,
place your initials in the space preceding the described
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
to relax.

_____ 3. Seems to take no
pleasure in anything.

_____ 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_____ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____10. Daydreams, seems
preoccupied.

_____11. Attempts to play
staff against one another.

_____12. Considers himself
unjustly confined.

_____13. Frequently upset
after visits.

_____14. Frequently upset
after receiving mail.

_____15. Participates in
group demonstrations.

_____16. Seems to think
only of himself.

_____17. Displays negative
attitude.

_____18. Breach of Group
confidentiality.

_____19. Speaks in detail of
goals, plans.

_____20. Gets along with
others.

_____21. Accepts blame for
some of his troubles.

_____22. Accepts blame for
all of his troubles.

_____23. Respects authority.

_____24. Keeps room neat,
clean and bed made.

_____25. Keeps himself neat
and clean.

_____26. Volunteers for work
projects.

_____27. Likeable.

_____28. Willing to discuss
personal problems w/staff.

_____29. Follows the Inmate
Housing Rules.

_____30. Displays positive
attitude.

_____31. Finds acceptable
ways to keep busy.

_____32. Approaches some
staff in an open,
honest maner.

<u>ADDITIONAL COMMENTS:</u>  <u>NUMBER:</u>  _No PROBLEMS ON 12-8 JW_

## M.S.U. SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: MANLEY, MICHAEL

Evaluators: _____

Shift: _____ Date Completed: 9/30/97

Review Date: 10-1-97 — RETURN TO CAPT. BY 0700.

Shift Lt.: _____

INSTRUCTIONS: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space preceding the described behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

_____ 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

_____ 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems preoccupied.

_____ 11. Attempts to play staff against one another.

_____ 12. Considers himself unjustly confined.

_____ 13. Frequently upset after visits.

_____ 14. Frequently upset after receiving mail.

_____ 15. Participates in group demonstrations.

_____ 16. Seems to think only of himself.

_____ 17. Displays negative attitude.

_____ 18. Breach of Group confidentiality.

_____ 19. Speaks in detail of goals, plans.

_____ 20. Gets along with others.

_____ 21. Accepts blame for some of his troubles.

_____ 22. Accepts blame for all of his troubles.

_____ 23. Respects authority.

_____ 24. Keeps room neat, clean and bed made.

_____ 25. Keeps himself neat and clean.

_____ 26. Volunteers for work projects.

_____ 27. Likeable.

_____ 28. Willing to discuss personal problems w/staff.

_____ 29. Follows the Inmate Housing Rules.

_____ 30. Displays positive attitude.

_____ 31. Finds acceptable ways to keep busy.

_____ 32. Approaches some staff in an open, honest maner.

ADDITIONAL COMMENTS: NUMBER: Does good job! He cleans real good as tier man.

## M.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANLEY, MICHAEL_____

Evaluators: _Gallaudt__  Ricmond  Seward_____

Shift: _____7-12_____ Date Completed: ___9-27-97__

Review Date: _10-1-97 – RETURN TO CAPT. BY 0700._

Shift Lt.: ____R.J. Pawlowski_____

INSTRUCTIONS: Please indicate which of the following behaviors this
inmate exhibits. If the behavior describes the inmate,
place your initials in the space preceding the described
behavior.

_____  1. Worried, anxious.

_____  2. Tense, unable
to relax.

_____  3. Seems to take no
pleasure in anything.

_____  4. Cannot be trusted
at all.

_____  5. Moody, brooding.

_____  6. Continually tries
to con staff.

_____  7. Impulsive,
unpredictable.

_____  8. Seems to seek
excitement.

_____  9. Never seems happy.

_____ 10. Daydreams, seems
preoccupied.

_____ 11. Attempts to play
staff against one another.

_____ 12. Considers himself
unjustly confined.

_____ 13. Frequently upset
after visits.

_____ 14. Frequently upset
after receiving mail

_____ 15. Participates in
group demonstrations

_____ 16. Seems to think
only of himself.

_____ 17. Displays negative
attitude.

_____ 18. Breach of Group
confidentiality.

_____ 19. Speaks in detail of
goals, plans..

_____ 20. Gets along with
others.

_____ 21. Accepts blame for
some of his troubles.

_____ 22. Accepts blame for
all of his troubles.

_____ 23. Respects authority.

_____ 24. Keeps room neat,
clean and bed made.

_____ 25. Keeps himself neat
and clean.

_____ 26. Volunteers for work
projects.

_____ 27. Likeable.

_____ 28. Willing to discuss
personal problems w/staff.

_____ 29. Follows the Inmate
Housing Rules.

_____ 30. Displays positive
attitude.

_____ 31. Finds acceptable
ways to keep busy.

_____ 32. Approaches some
staff in an open,
honest maner.

ADDITIONAL COMMENTS:  NUMBER: _D-Tierman_____

_____

M.S.U.    SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANLEY, MICHAEL_____

Evaluators: _C/O W. GREENE_____

Shift: _____12-8_____ Date Completed: _9-27-97___

Review Date: _10-1-97 – RETURN TO CAPT. BY 0700._

Shift Lt.: _HARRIS_____

**INSTRUCTIONS:** Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space preceding the described behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

_____ 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

_____ 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____10. Daydreams, seems preoccupied.

_____11. Attempts to play staff against one another.

_____12. Considers himself unjustly confined.

_____13. Frequently upset after visits.

_____14. Frequently upset after receiving mail.

_____15. Participates in group demonstrations.

_____16. Seems to think only of himself.

_____17. Displays negative attitude.

_____18. Breach of Group confidentiality.

_____19. Speaks in detail of goals, plans..

_____20. Gets along with others.

_____21. Accepts blame for some of his troubles.

_____22. Accepts blame for all of his troubles.

_____23. Respects authority.

_____24. Keeps room neat, clean and bed made.

_____25. Keeps himself neat and clean.

_____26. Volunteers for work projects.

_____27. Likeable.

_____28. Willing to discuss personal problems w/staff.

_____29. Follows the Inmate Housing Rules.

_____30. Displays positive attitude.

_____31. Finds acceptable ways to keep busy.

_____32. Approaches some staff in an open, honest maner.

**ADDITIONAL COMMENTS:  NUMBER:** _No Problem_____

DELAWARE CORRECTIONAL CENTER

COUNSELOR

_Michael Manley_

DATE _10/2/97_

MEMO TO: _Michael Manley_ BLDG. _W_

S.B.I. _338455_

FROM: _I.B.C.C._

RE: **CLASSIFICATION**

Your M/D.T. has recommended you for the following:

_Continue MSU & Tehran_

The I.B.C.C.'s decision is to:

_X_ Approve _____ Not Approve _____ Defer

_____ Recommend _____ Not Recommend

**BECAUSE**

___ Lack of Program Participation ___ Time remaining on sentence
___ Pending adjustment boards ___ Prior failure under supervision
___ Gradual phasing indicated ___ Poor institutional adjustment
___ Open Charges ___ Serious natural of offense
___ Program does not meet your needs ___ Prior criminal history
___ Lack of evidence you have addressed your problem in a serious manner
___ Failure to address treatment issues in relation to your offense
___ You present a current and continuous danger to the safety of staff,
    other inmates, or the good order of the institution.

OTHER _& w/2/97_

**ADDITIONAL COMMENTS:**

___ Develop treatment plan with counselor.

| APPROVED | RECOMMEND | |
|---|---|---|
| ___ N.A. | ___ S.A.R. | |
| ___ A.A. | ___ Highway Project | |
| ___ G.E.D. | ___ Family Problems | |
| ___ P.R.C. | (Write Mr. Wallitsch) | |
| ___ Laundry Outside/Ongrounds | ___ Greentree (See Counselor) | |
| ___ HS Education | ___ Delaware Vets Cemetary | |
| ___ W Kitchen | ___ Town of Smyrna | |
| ___ Evening Greentree | ___ MCI | ___ PTA |
| ___ Central Supply | ___ SCI | ___ WR |
| ___ Construction Project | ___ MPCJF | ___ C/C |
| ___ Violent Offenders Program | ___ Medium | ___ Minimum |

cc: Original to Inmate
    Institutional File      FORM #: 456 (3-partNCR)     mmr/ib.for/94
    Treatment File

BUREAU OF PRISONS RECLASSIFICATION FORM #004

DATE: _____

I. **Vital Indicators/Sentencing Information**

Inmate name _MANKEY, MICHAEL_ AKA _NONE_ Institution _DCY/MSU_

Institution Number _____ SBI Number _00338485_ Date of Birth _2-27-74_

Present Offense(s) _MURDER I, ASO. ACT OF INTIMIDATION, (P.D.W.O.C.F.)_

_CONSP. II_ Most Serious Offense _MURDER I_

_(DEATH + 60 YRS)_

Level V Sentence: Year(s) _ST_ Month _ST_ Day(s) _ST_ Truth in Sentence Yes _X_ No___

Sentence Effective Date _11/3/75_ STRD _NONE_ PE Date _NONE_ Rehearing Date _NONE_

Mandatory: Year(s) _NO_ Month(s) _NO_ Day(s) _NO_ Level IV Sentence? Yes___ No _X_

Detainer(s)? Yes___ No _X_ Open Charge(s)? Yes___ No _X_ 4204K? Yes___ No _X_

Escape/Attempted Escape on Record? Yes___ No _✓_ Category _____

II. **Program Request/Change or Recommendation**

Request: Work Release___ Supervised Custody___ Work Release/Supervised Custody___

Halfway House Worker__ Highway Work Project__ Community/Governmental Service Project__

Furlough___ To See: Name(s) _____ Relationship_____

Address_____

Purpose_____

Comments_____

Off Grounds Status? Yes___ No _X_ If yes, state program/assignment for which status
is being requested:_____

Change in Security Level and Institution? Yes___ No _X_ If yes, state security level
and institution requested: _CONTINUE MAX/MEDIUM, MSU TIER MAN._

Has inmate had prior participation in program requested?   Yes _____ No _____

Program_____ Number of approvals_____

Reason(s)/date(s) for failure or return _____


Is inmate eligible in accordance with program standards?   Yes _____ No_____

Is exception to standards requested? Yes _/_ No _/_ If yes, give reasons for exception:

_____

_____

III. **Disciplinary ( summary last 3 months-include dates, offenses dispositions)**

_NONE SINCE His MDT Review._

Most serious offense within last 3 months: _NONE_

IV. **Program Participation/Work Assignment**

_NONE_

V. **DUI Information (Complete if inmate is serving a sentence for DUI)**

Has information been verified via Motor Vehicle Records? Yes___ No___ No. of DUI's___

Date(s) of offense(s): 1st_____ 2nd_____ 3rd_____ 4th_____

VI. **Victim Notification**     Is victim notification required?   Yes _____   No _____

Name of Victim(s) _____ N/A's _____

Last Known Address _____

_____     _____
Counselor Signature                   Supervisor's Signature

**Committee Review**

MDT: Approved _X_ Disapproved ____ Vote Number _2-0_

IBCC: Approved _X_ Disapproved ____ Vote Number _3-0_

CICC: Approved ____ Disapproved ____ Vote Number ____

_____
MDT Chair Signature/Date

_____
IBCC Chair Signature/Date

_____
CICC Chair Signature/Date

**Distribution After Final Committee Review**

Central Classification Office
Institutional Classification File
Inmate's Record

## ADDENDUM TO BOP RECLASSIFICATION FORM Y004

Use this sheet to record any additional information which could not be included in the designated spaces on Form BOP-004.

Inmate Name: _MANSEY, MICHAEL_  SBI Number: _0083845_  Institution: _DCI/NVU_

The ratings and lack of Disciplinary problems indicat Michael is making progress. He is following his treatment plan, he has maintained level 2 for sometime now. However, the team would like to observe him a while given the nature of his crime, sentence and the fact that he is new to the system.

Vote 20 to continue Max/High.

Recommended Review Date: 0/97

Removed Null +                    47

## H.S.U.  SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANLEY, MICHAEL R._____

Evaluators: _____

Shift: ___8-4_____ Date Completed: _9/1/97_

Review Date: _7-1-97—RETURN TO CAPT BY 0700._

Shift Lt.: _____

**INSTRUCTIONS:**  Please indicate which of the following behaviors this inmate exhibits.  If the behavior describes the inmate, place your initials in the space preceding the describe behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

_____ 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

_____ 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems preoccupied.

_____ 11. Attempts to play staff against one another.

_____ 12. Considers himself unjustly confined.

_____ 13. Frequently upset after visits.

_____ 14. Frequently upset after receiving mail.

_____ 15. Participates in group demonstrations.

_____ 16. Seems to think only of himself.

_____ 17. Displays negative attitude.

_____ 18. Breach of Group confidentiality.

_____ 19. Speaks in detail goals, plans..

_____ 20. Gets along with others.

_____ 21. Accepts blame for some of his troubles.

_____ 22. Accepts blame for all of his troubles.

_____ 23. Respects authorit

_____ 24. Keeps room neat, clean and bed mad

_____ 25. Keeps himself nea and clean.

_____ 26. Volunteers for wo projects.

_____ 27. Likeable.

_____ 28. Willing to discus personal problems w/staff

_____ 29. Follows the Inmat Housing Rules.

_____ 30. Displays positive attitude.

_____ 31. Finds acceptable ways to keep busy

_____ 32. Approaches some staff in an open. honest maner.

**ADDITIONAL COMMENTS:  NUMBER:** _____

_____

M. S. U. SEMIMONTHLY BEHAV. REPORT

Inmate's Name: _Manley Michael R._

Evaluators: _Cpl Cauett Seward Simon_

Shift: ___4-12___ Date Completed: __7-30-97__

Review Date: _7-1-97 — RETURN TO CAPT BY 0700._

Shift Lt.: _Cf Pamlumbi_

**INSTRUCTIONS:** Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space preceding the describe behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

_____ 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

_____ 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems preoccupied.

_____ 11. Attempts to play staff against one another.

_____ 12. Considers himself unjustly confined.

_____ 13. Frequently upset after visits.

_____ 14. Frequently upset after receiving mail.

_____ 15. Participates in group demonstrations.

_____ 16. Seems to think only of himself.

_____ 17. Displays negative attitude.

_____ 18. Breach of Group confidentiality.

_____ 19. Speaks in detail goals, plans..

_____ 20. Gets along with others.

_____ 21. Accepts blame for some of his troubles.

_____ 22. Accepts blame for all of his troubles.

_____ 23. Respects authorit.

_____ 24. Keeps room neat, clean and bed mad·

_____ 25. Keeps himself nea and clean.

_____ 26. Volunteers for wo· projects.

_____ 27. Likeable.

_____ 28. Willing to discuss personal problems w/staff

_____ 29. Follows the Inmat· Housing Rules.

_____ 30. Displays positive attitude.

_____ 31. Finds acceptable ways to keep busy

_____ 32. Approaches some staff in an open. honest maner.

**ADDITIONAL COMMENTS: NUMBER:** _Recommend for job:_ _____

44

**M.S.U. SEMI-MONTHLY BEHAVIOR REPORT**

Inmate's Name: *MANLEY, MICHAEL R.*

Evaluators: *W EVANS*

Shift: *12-8*       Date Completed: *8-27-97*

Review Date: *7-1-97 — RETURN TO CAPT. BY 9 NOV.*

Shift Lt.: *HARRIS*

**INSTRUCTIONS:** Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space preceding the describe behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

_____ 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

_____ 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____10. Daydreams, seems preoccupied.

_____11. Attempts to play staff against one another.

_____12. Considers himself unjustly confined.

_____13. Frequently upset after visits.

_____14. Frequently upset after receiving mail.

_____15. Participates in group demonstrations.

_____16. Seems to think only of himself.

_____17. Displays negative attitude.

_____18. Breach of Group confidentiality.

_____19. Speaks in detail goals, plans..

_____20. Gets along with others.

_____21. Accepts blame for some of his troubles.

_____22. Accepts blame for all of his troubles.

_____23. Respects authorit

_____24. Keeps room neat, clean and bed mad

_____25. Keeps himself nea and clean.

_____26. Volunteers for wc projects.

_____27. Likeable.

_____28. Willing to discus personal problems w/staff

_____29. Follows the Inmat Housing Rules.

_____30. Displays positive attitude.

_____31. Finds acceptable ways to keep busy

_____32. Approaches some staff in an open, honest maner.

**ADDITIONAL COMMENTS:** **NUMBER:** *N O PROBLEMS*

M.S.U. SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: MANLEY, MICHAEL R.

Evaluators: _____

Shift: _____ Date Completed: 8/18/97

Review Date: 8-18-97 - RETURN TO CAPT. BY OPOD.

Shift Lt.: _____

INSTRUCTIONS: Please indicate which of the following behaviors this
inmate exhibits.  If the behavior describes the inmate,
place your initials in the space preceding the describe
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
to relax.

_____ 3. Seems to take no
pleasure in anything.

_____ 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_____ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____10. Daydreams, seems
preoccupied.

_____11. Attempts to play
staff against one another.

_____12. Considers himself
unjustly confined.

_____13. Frequently upset
after visits.

_____14. Frequently upset
after receiving mail.

_____15. Participates in
group demonstrations.

_____16. Seems to think
only of himself.

_____17. Displays negative
attitude.

_____18. Breach of Group
confidentiality.

_____19. Speaks in detail
goals, plans..

_____20. Gets along with
others.

_____21. Accepts blame for
some of his troubles.

_____22. Accepts blame for
all of his troubles.

_____23. Respects authorit

_____24. Keeps room neat,
clean and bed mad

_____25. Keeps himself nea
and clean.

_____26. Volunteers for wc
projects.

_____27. Likeable.

_____28. Willing to discus
personal problems w/staff

_____29. Follows the Inmat
Housing Rules.

_____30. Displays positive
attitude.

_____31. Finds acceptable
ways to keep busy

_____32. Approaches some
staff in an open.
honest maner.

ADDITIONAL COMMENTS: NUMBER: Michael is very gesit

*44*

I.S.U. SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANLEY MICHAEL R._

Evaluators: _Cauell Simons RICHARD Seward_

Shift: _9 15_        Date Completed: _8-16-97_

Review Date: _9-18-97 – RETURN TO CAPT BY 0900._

Shift Lt.: _RJ Punchard_

INSTRUCTIONS:   Please indicate which of the following behaviors this
inmate exhibits. If the behavior describes the inmate,
place your initials in the space preceding the described
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
to relax.

_____ 3. Seems to take no
pleasure in anything.

_____ 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_____ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
preoccupied.

_____ 11. Attempts to play
staff against one another.

_____ 12. Considers himself
unjustly confined.

_____ 13. Frequently upset
after visits.

_____ 14. Frequently upset
after receiving mail.

_____ 15. Participates in
group demonstrations.

_____ 16. Seems to think
only of himself.

_____ 17. Displays negative
attitude.

_____ 18. Breach of Group
confidentiality.

_____ 19. Speaks in detail
goals, plans..

_____ 20. Gets along with
others.

_____ 21. Accepts blame for
some of his troubles.

_____ 22. Accepts blame for
all of his troubles.

_____ 23. Respects authority

_____ 24. Keeps room neat,
clean and bed made

_____ 25. Keeps himself neat
and clean.

_____ 26. Volunteers for work
projects.

_____ 27. Likeable.

_____ 28. Willing to discuss
personal problems w/staff.

_____ 29. Follows the Inmate
Housing Rules.

_____ 30. Displays positive
attitude.

_____ 31. Finds acceptable
ways to keep busy.

_____ 32. Approaches some
staff in an open,
honest maner.

ADDITIONAL COMMENTS: NUMBER: _____

_____

44

T.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANLEY MICHAEL R._____

Evaluators: ___W EVANS_____

Shift: _2nd_____ Date Completed: _8-16-97_

Review Date: _8-18-97 - RETURN TO CAPT. BY 8/20._

Shift Lt.: _____HARRIS_____

INSTRUCTIONS: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space preceding the described behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

_____ 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

_____ 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems preoccupied.

_____ 11. Attempts to play staff against one another.

_____ 12. Considers himself unjustly confined.

_____ 13. Frequently upset after visits.

_____ 14. Frequently upset after receiving mail.

_____ 15. Participates in group demonstrations.

_____ 16. Seems to think only of himself.

_____ 17. Displays negative attitude.

_____ 18. Breach of Group confidentiality.

_____ 19. Speaks in detail of goals, plans..

_____ 20. Gets along with others.

_____ 21. Accepts blame for some of his troubles.

_____ 22. Accepts blame for all of his troubles.

_____ 23. Respects authority

_____ 24. Keeps room neat, clean and bed made

_____ 25. Keeps himself neat and clean.

_____ 26. Volunteers for work projects.

_____ 27. Likeable.

_____ 28. Willing to discuss personal problems w/staff.

_____ 29. Follows the Inmate Housing Rules.

_____ 30. Displays positive attitude.

_____ 31. Finds acceptable ways to keep busy.

_____ 32. Approaches some staff in an open, honest maner.

ADDITIONAL COMMENTS: NUMBER: _N O   PROBLEM   ME_____

M.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: MANLEY, MICHAEL R.

Evaluators: KW HM

Shift: B-4            Date Completed: 7/29/97

Review Date: 7-31-97 — RETURN TO CAPT. BY 0700.

Shift Lt.: HM

INSTRUCTIONS:  Please indicate which of the following behaviors this
               inmate exhibits.  If the behavior describes the inmate,
               place your initials in the space preceding the described
               behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
              to relax.

_____ 3. Seems to take no
              pleasure in anything.

MM AH 4. Cannot be trusted
              at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
              to con staff.

_____ 7. Impulsive,
              unpredictable.

_____ 8. Seems to seek
              excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
               preoccupied.

_____ 11. Attempts to play
               staff against one another.

_____ 12. Considers himself
               unjustly confined.

_____ 13. Frequently upset
               after visits.

_____ 14. Frequently upset
               after receiving mail.

_____ 15. Participates in
               group demonstrations.

_____ 16. Seems to think
               only of himself.

_____ 17. Displays negative
               attitude.

_____ 18. Breach of Group
               confidentiality.

_____ 19. Speaks in detail o
               goals, plans..

AH KW 20. Gets along with
               others.

_____ 21. Accepts blame for
               some of his troubles.

AH KW 22. Accepts blame for
               all of his troubles.

_____ 23. Respects authority

_____ 24. Keeps room neat,
               clean and bed made

AH KW 25. Keeps himself neat
               and clean.

_____ 26. Volunteers for wor
               projects.

_____ 27. Likeable.

MM 28. Willing to discuss
               personal problems w/staff.

AH KW 29. Follows the Inmate
               Housing Rules.

AH KW 30. Displays positive
               attitude.

_____ 31. Finds acceptable
               ways to keep busy.

_____ 32. Approaches some
               staff in an open.
               honest maner.

—7                              +79

ADDITIONAL COMMENTS:  NUMBER: Manley has not been a
problem and seems to be of keeping to himself. MM

(145)

M.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MAWHEY, MICHAEL R._____

Evaluators: ___RICHARD SWAN Servery_____

Shift: ___4-12___   Date Completed: __7-26-97__

Review Date: _7-31-97 - RETURN TO CAPT. BY OROD._

Shift Lt.: ___R/Pawlewski___

INSTRUCTIONS:   Please indicate which of the following behaviors this
inmate exhibits.  If the behavior describes the inmate
place your initials in the space preceding the describe
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
to relax.

_____ 3. Seems to take no
pleasure in anything.

_____ 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_____ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
preoccupied.

_____ 11. Attempts to play
staff against one another.

_____ 12. Considers himself
unjustly confined.

_____ 13. Frequently upset
after visits.

_____ 14. Frequently upset
after receiving mail.

_____ 15. Participates in
group demonstrations.

_____ 16. Seems to think
only of himself.

_____ 17. Displays negative
attitude.

_____ 18. Breach of Group
confidentiality.

_____ 19. Speaks in detail
goals, plans.

_____ 20. Gets along with
others.

_____ 21. Accepts blame for
some of his troubles.

_____ 22. Accepts blame for
all of his troubles.

_____ 23. Respects authority

_____ 24. Keeps room neat,
clean and bed mac

_____ 25. Keeps himself nea
and clean.

_____ 26. Volunteers for wc
projects.

_____ 27. Likeable.

_____ 28. Willing to discus
personal problems w/staff

_____ 29. Follows the Inmat
Housing Rules.

_____ 30. Displays positive
attitude.

_____ 31. Finds acceptable
ways to keep busy

_____ 32. Approaches some
staff in an open,
honest maner.

ADDITIONAL COMMENTS:   NUMBER: _____

_____

## M.S.U. SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: *MAWHEY, MICHNEL R.*

Evaluators: *% Gilpptt*

Shift: *12-8* _____ Date Completed: *7/24/97*

Review Date: *7-31-97 — RETURN TO CAPT. BY 0700.*

Shift Lt.: *Harris*

INSTRUCTIONS: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space preceding the describe behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

_____ 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

_____ 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems preoccupied.

_____ 11. Attempts to play staff against one another.

_____ 12. Considers himself unjustly confined.

_____ 13. Frequently upset after visits.

_____ 14. Frequently upset after receiving mail.

_____ 15. Participates in group demonstrations.

_____ 16. Seems to think only of himself.

_____ 17. Displays negative attitude.

_____ 18. Breach of Group confidentiality.

_____ 19. Speaks in detail goals, plans..

_____ 20. Gets along with others.

_____ 21. Accepts blame for some of his troubles.

_____ 22. Accepts blame for all of his troubles.

_____ 23. Respects authorit

_____ 24. Keeps room neat, clean and bed mad

_____ 25. Keeps himself nea and clean.

_____ 26. Volunteers for wo projects.

_____ 27. Likeable.

_____ 28. Willing to discus personal problems w/staff

_____ 29. Follows the Inmat Housing Rules.

_____ 30. Displays positive attitude.

_____ 31. Finds acceptable ways to keep busy

_____ 32. Approaches some staff in an open. honest maner.

ADDITIONAL COMMENTS: NUMBER: *No problems on 12-8 %*

## M.S.U.  SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _Mauney Michael R._

Evaluators: _Respoli Ngli_

Shift: _____  Date Completed: _2/15/97_

Review Date: _7-15-99 — Return to Capt-Ex Onco._

Shift Lt.: _MSq_

INSTRUCTIONS:  Please indicate which of the following behaviors this
inmate exhibits.  If the behavior describes the inmate,
place your initials in the space preceding the described
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
to relax.

_____ 3. Seems to take no
pleasure in anything.

AHMoR 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

AHMoR 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
preoccupied.

_____ 11. Attempts to play
staff against one another.

_____ 12. Considers himself
unjustly confined.

_____ 13. Frequently upset
after visits.

_____ 14. Frequently upset
after receiving mail.

_____ 15. Participates in
group demonstrations.

_____ 16. Seems to think
only of himself.

_____ 17. Displays negative
attitude.

_____ 18. Breach of Group
confidentiality.

_____ 19. Speaks in detail o-
goals, plans..

20. Gets along with
others.

_____ 21. Accepts blame for
some of his troubles.

22. Accepts blame for
all of his troubles.

23. Respects authority.

24. Keeps room neat,
clean and bed made.

25. Keeps himself neat
and clean.

_____ 26. Volunteers for work
projects.

_____ 27. Likeable.

28. Willing to discuss
personal problems w/staff.

29. Follows the Inmate
Housing Rules.

30. Displays positive
attitude.

31. Finds acceptable
ways to keep busy.

32. Approaches some
staff in an open.
honest maner.

ADDITIONAL COMMENTS:  NUMBER: _I/m Mauney has not posed any
problems and he seems to be sticking to hisself. MTq_

M.S.U.    SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: *MAHEY MICHAEL Jr*

Evaluators: *SIMON Cowoff    RICHARD Seward*

Shift: *4-12*                          Date Completed: *2-12-97*

Review Date: *1-15-99 — RETURN TO CAPT. EX OFOS.*

Shift Lt.: *R.J. Pawluwski*

**INSTRUCTIONS:**    Please indicate which of the following behaviors this
inmate exhibits.  If the behavior describes the inmate,
place your initials in the space preceding the described
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
to relax.

_____ 3. Seems to take no
pleasure in anything.

_____ 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_____ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
preoccupied.

_____ 11. Attempts to play
staff against one another.

_____ 12. Considers himself
unjustly confined.

_____ 13. Frequently upset
after visits.

_____ 14. Frequently upset
after receiving mail.

_____ 15. Participates in
group demonstrations.

_____ 16. Seems to think
only of himself.

_____ 17. Displays negative
attitude.

_____ 18. Breach of Group
confidentiality.

_____ 19. Speaks in detail o
goals, plans..

_____ 20. Gets along with
others.

_____ 21. Accepts blame for
some of his troubles.

_____ 22. Accepts blame for
all of his troubles.

_____ 23. Respects authority

_____ 24. Keeps room neat,
clean and bed made

_____ 25. Keeps himself neat
and clean.

_____ 26. Volunteers for wor
projects.

_____ 27. Likeable.

_____ 28. Willing to discuss
personal problems w/staff.

_____ 29. Follows the Inmate
Housing Rules.

_____ 30. Displays positive
attitude.

_____ 31. Finds acceptable
ways to keep busy.

_____ 32. Approaches some
staff in an open.
honest maner.

**ADDITIONAL COMMENTS:**   **NUMBER:** *possibly Intergs to work*
*Should he consideered unless a job becomes available*

M.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MAUDE, MICHAEL R._____

Evaluators: _Yo Wyatt_____

Shift: _12-8_____ Date Completed: _7-9-99___

Review Date: _7-19-99 - RETURN TO CAPT-EY ON 00._

Shift Lt.: ___Harris_____

INSTRUCTIONS:  Please indicate which of the following behaviors this
inmate exhibits.  If the behavior describes the inmate,
place your initials in the space preceding the described
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
to relax.

_____ 3. Seems to take no
pleasure in anything.

_____ 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_____ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
preoccupied.

_____ 11. Attempts to play
staff against one another.

_____ 12. Considers himself
unjustly confined.

_____ 13. Frequently upset
after visits.

_____ 14. Frequently upset
after receiving mail.

_____ 15. Participates in
group demonstrations.

_____ 16. Seems to think
only of himself.

_____ 17. Displays negative
attitude.

_____ 18. Breach of Group
confidentiality.

_____ 19. Speaks in detail of
goals, plans..

_____ 20. Gets along with
others.

_____ 21. Accepts blame for
some of his troubles.

_____ 22. Accepts blame for
all of his troubles.

_____ 23. Respects authority

_____ 24. Keeps room neat,
clean and bed made

_____ 25. Keeps himself neat
and clean.

_____ 26. Volunteers for work
projects.

_____ 27. Likeable.

_____ 28. Willing to discuss
personal problems w/staff.

_____ 29. Follows the Inmate
Housing Rules.

_____ 30. Displays positive
attitude.

_____ 31. Finds acceptable
ways to keep busy.

_____ 32. Approaches some
staff in an open.
honest maner.

ADDITIONAL COMMENTS:   NUMBER: _No problems on 12-8 J._____

_____

M.S.U.    SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: MANLEY, MICHAEL

Evaluators: Rupoli, Hall

Shift: D-4 _____ Date Completed: _____

Review Date: 6-30-97 - RETURN TO CAPT. BY 0700.

Shift Lt.: _____

**INSTRUCTIONS:**  Please indicate which of the following behaviors this inmate exhibits.  If the behavior describes the inmate, place your initials in the space preceding the described behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

_AHMMR_ 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

_MMR_ 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems preoccupied.

_____ 11. Attempts to play staff against one another.

_____ 12. Considers himself unjustly confined.

_____ 13. Frequently upset after visits.

_____ 14. Frequently upset after receiving mail.

_____ 15. Participates in group demonstrations.

_____ 16. Seems to think only of himself.

_____ 17. Displays negative attitude.

_____ 18. Breach of Group confidentiality.

_____ 19. Speaks in detail of goals, plans..

_ANMMR_ 20. Gets along with others.

_____ 21. Accepts blame for some of his troubles.

_____ 22. Accepts blame for all of his troubles.

_ANMMR_ 23. Respects authority.

_ANMMR_ 24. Keeps room neat, clean and bed made.

_ANMMR_ 25. Keeps himself neat and clean.

_____ 26. Volunteers for work projects.

_____ 27. Likeable.

_____ 28. Willing to discuss personal problems w/staff.

_AH WMML_ 29. Follows the Inmate Housing Rules.

_AH MMR_ 30. Displays positive attitude.

_AH MMR_ 31. Finds acceptable ways to keep busy.

_____ 32. Approaches some staff in an open, honest maner.

**ADDITIONAL COMMENTS:  NUMBER:** _____

_____

M.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANLEY, MICHAEL_____

Evaluators: __RICHMOND / Gerrish / Seward_____

Shift: ____4-12_____ Date Completed: ___6-28-97___

Review Date: 6-30-97 — RETURN TO CAPT. BY 0900.

Shift Lt.: _R Penslowski_____

**INSTRUCTIONS:** Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space preceding the described behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

_____ 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

_____ 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems preoccupied.

_____ 11. Attempts to play staff against one another.

_____ 12. Considers himself unjustly confined.

_____ 13. Frequently upset after visits.

_____ 14. Frequently upset after receiving mail.

_____ 15. Participates in group demonstrations.

_____ 16. Seems to think only of himself.

_____ 17. Displays negative attitude.

_____ 18. Breach of Group confidentiality.

_____ 19. Speaks in detail of goals, plans..

_____ 20. Gets along with others.

_____ 21. Accepts blame for some of his troubles.

_____ 22. Accepts blame for all of his troubles.

_____ 23. Respects authority

_____ 24. Keeps room neat, clean and bed made

_____ 25. Keeps himself neat and clean.

_____ 26. Volunteers for work projects.

_____ 27. Likeable.

_____ 28. Willing to discuss personal problems w/staff.

_____ 29. Follows the Inmate Housing Rules.

_____ 30. Displays positive attitude.

_____ 31. Finds acceptable ways to keep busy.

_____ 32. Approaches some staff in an open, honest maner.

**ADDITIONAL COMMENTS:   NUMBER:** _____

_____

A.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANLEY, MICHAEL_____

Evaluators: _Wyatt_____

Shift: _____120_____ Date Completed: _6-26-97_____

Review Date: _6-30-97 - RETURN TO CAPT. EX 0100._

Shift Lt.: ___Harris_____

INSTRUCTIONS:   Please indicate which of the following behaviors this
                inmate exhibits.  If the behavior describes the inmate,
                place your initials in the space preceding the described
                behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
               to relax.

_____ 3. Seems to take no
               pleasure in anything.

_____ 4. Cannot be trusted
               at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
               to con staff.

_____ 7. Impulsive,
               unpredictable.

_____ 8. Seems to seek
               excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
                preoccupied.

_____ 11. Attempts to play
           staff against one another.

_____ 12. Considers himself
                unjustly confined.

_____ 13. Frequently upset
                after visits.

_____ 14. Frequently upset
                after receiving mail.

_____ 15. Participates in
                group demonstrations.

_____ 16. Seems to think
                only of himself.

_____ 17. Displays negative
                attitude.

_____ 18. Breach of Group
                confidentiality.

_____ 19. Speaks in detail c
                goals, plans..

_____ 20. Gets along with
                others.

_____ 21. Accepts blame for
                some of his troubles.

_____ 22. Accepts blame for
                all of his troubles.

_____ 23. Respects authority

_____ 24. Keeps room neat,
                clean and bed made

_____ 25. Keeps himself neat
                and clean.

_____ 26. Volunteers for wor
                projects.

_____ 27. Likeable.

_____ 28. Willing to discuss
                personal problems w/staff.

_____ 29. Follows the Inmate
                Housing Rules.

_____ 30. Displays positive
                attitude.

_____ 31. Finds acceptable
                ways to keep busy.

_____ 32. Approaches some
                staff in an open,
                honest maner.

ADDITIONAL COMMENTS:   NUMBER: _No problems on 12-8 Jo_____

_____

.ı.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _Mankey Michael R._

Evaluators: _Wilmore, Rispoli, Stephenson_

Shift: _8-4_ _____ Date Completed: _6/6/97_

Review Date: _6/6/97 — Return to Capt. Ex Prov._

Shift Lt.: _M Gay_

INSTRUCTIONS:   Please indicate which of the following behaviors this
                inmate exhibits.  If the behavior describes the inmate,
                place your initials in the space preceding the described
                behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
                 to relax.

_____ 3. Seems to take no
                 pleasure in anything.

MJG MvR _____ 4. Cannot be trusted
                 at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
                 to con staff.

MvR _____ 7. Impulsive,
                 unpredictable.

_____ 8. Seems to seek
                 excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
                  preoccupied.

_____ 11. Attempts to play
                  staff against one another.

_____ 12. Considers himself
                  unjustly confined.

_____ 13. Frequently upset
                  after visits.

_____ 14. Frequently upset
                  after receiving mail.

_____ 15. Participates in
                  group demonstrations.

_____ 16. Seems to think
                  only of himself.

_____ 17. Displays negative
                  attitude.

_____ 18. Breach of Group
                  confidentiality.

MvR KvW _____ 19. Speaks in detail o
                   goals, plans..

_____ 20. Gets along with
                    others.

_____ 21. Accepts blame for
                    some of his troubles.

_____ 22. Accepts blame for
                    all of his troubles.

MvR KvW _____ 23. Respects authority.

MJG KvW _____ 24. Keeps room neat,
                   clean and bed made.

MvR KvW _____ 25. Keeps himself neat
                   and clean.

_____ 26. Volunteers for work
                    projects.

_____ 27. Likeable.

_____ 28. Willing to discuss
                    personal problems w/staff.

MvR KvW _____ 29. Follows the Inmate
                   Housing Rules.

MvR KvW _____ 30. Displays positive
                   attitude.

MvR KvW _____ 31. Finds acceptable
                   ways to keep busy.

_____ 32. Approaches some
                    staff in an open.
                    honest maner.

13

ADDITIONAL COMMENTS:  NUMBER: _Mankey has not been a problem_
_is as of yet and M tries to stay to himself_

I.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANLEY, MICHAEL R._

Evaluators: _____ RICHMOND Simon MITCHELL_

Shift: _4-12_ _____ Date Completed: _6-14-97_

Review Date: _6-16-97 — RETURN TO CAPT. BY 0700._

Shift Lt.: _PJ Laughlin_

INSTRUCTIONS: Please indicate which of the following behaviors this
inmate exhibits.  If the behavior describes the inmate,
place your initials in the space preceding the described
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
to relax.

_____ 3. Seems to take no
pleasure in anything.

_____ 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_____ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
preoccupied.

_____ 11. Attempts to play
staff against one another.

_____ 12. Considers himself
unjustly confined.

_____ 13. Frequently upset
after visits.

_____ 14. Frequently upset
after receiving mail.

_____ 15. Participates in
group demonstrations.

_____ 16. Seems to think
only of himself.

_____ 17. Displays negative
attitude.

_____ 18. Breach of Group
confidentiality.

_____ 19. Speaks in detail
goals, plans..

_____ 20. Gets along with
others.

_____ 21. Accepts blame for
some of his troubles.

_____ 22. Accepts blame for
all of his troubles.

_____ 23. Respects authority

_____ 24. Keeps room neat,
clean and bed made

_____ 25. Keeps himself neat
and clean.

_____ 26. Volunteers for work
projects.

_____ 27. Likeable.

_____ 28. Willing to discuss
personal problems w/staff

_____ 29. Follows the Inmate
Housing Rules.

_____ 30. Displays positive
attitude.

_____ 31. Finds acceptable
ways to keep busy.

_____ 32. Approaches some
staff in an open,
honest maner.

ADDITIONAL COMMENTS:  NUMBER: _been without power for 6-8 days_
_and he has been extremely good about it._
_Power completely restored on D. Block P_

.,S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANLEY, MICHAEL R._____

Evaluators: _C/O W. Greene_____

Shift: _____12-8_____ Date Completed: _6-11-97____

Review Date: _6-16-97 — RETURN TO CAPT. BY 0700._

Shift Lt.: _J. Harris_____

INSTRUCTIONS:   Please indicate which of the following behaviors this
inmate exhibits.  If the behavior describes the inmate,
place your initials in the space preceding the described
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
to relax.

_____ 3. Seems to take no
pleasure in anything.

_____ 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_____ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____10. Daydreams, seems
preoccupied.

_____11. Attempts to play
staff against one another.

_____12. Considers himself
unjustly confined.

_____13. Frequently upset
after visits.

_____14. Frequently upset
after receiving mail.

_____15. Participates in
group demonstrations.

_____16. Seems to think
only of himself.

_____17. Displays negative
attitude.

_____18. Breach of Group
confidentiality.

_____19. Speaks in detail o
goals, plans..

_____20. Gets along with
others.

_____21. Accepts blame for
some of his troubles.

_____22. Accepts blame for
all of his troubles.

_____23. Respects authority

_____24. Keeps room neat,
clean and bed made

_____25. Keeps himself neat
and clean.

_____26. Volunteers for wor
projects.

_____27. Likeable.

_____28. Willing to discuss
personal problems w/staff.

_____29. Follows the Inmate
Housing Rules.

_____30. Displays positive
attitude.

_____31. Finds acceptable
ways to keep busy.

_____32. Approaches some
staff in an open.
honest maner.

ADDITIONAL COMMENTS:  NUMBER: ___No problem_____

_____

COUNSELOR _____

DATE *1/3/92*

MEMO TO: *Michael Manley* BLDG. *W*

S.B.I. _____ *238485*

FROM: _____ I.B.C.C. _____

RE: CLASSIFICATION

Your M.D.T. has recommended you for the following:

_____ *Continue Max/ww* _____

_____.

The I.B.C.C.'s decision is to:

_____✓ Approve    _____ Not Approve    _____ Defer
_____ Recommend    _____ Not Recommend

**BECAUSE**

___ Lack of Program Participation    ___ Time remaining on sentence
___ Pending adjustment boards    ___ Prior failure under supervision
___ Gradual phasing indicated    ___ Poor institutional adjustment
___ Open Charges    ___ Serious natural of offense
___ Program does not meet your needs ___ Prior criminal history
___ Lack of evidence you have addressed your problem in a serious manner
___ Failure to address treatment issues in relation to your offense
___ You present a current and continuous danger to the safety of staff, other inmates, or the good order of the institution.

OTHER ___ *Rw9/92* _____

_____.

**ADDITIONAL COMMENTS:**

___ Develop treatment plan with counselor.

| APPROVED | | RECOMMEND | | |
|---|---|---|---|---|
| ___ | N.A. | ___ | S.A.R. | |
| ___ | A.A. | ___ | Highway Project | |
| ___ | G.E.D. | ___ | Family Problems | |
| ___ | P.R.C. | | (Write Mr. Wallitsch) | |
| ___ | Laundry Outside/Ongrounds | ___ | Greentree (See Counselor) | |
| ___ | HS Education | ___ | Delaware Vets Cemetary | |
| ___ | W  Kitchen | ___ | Town of Smyrna | |
| ___ | Evening Greentree | ___ | MCI | ___ PTA |
| ___ | Central Supply | ___ | SCI | ___ WR |
| ___ | Construction Project | ___ | MPCJF | ___ C/C |
| ___ | Violent Offenders Program | ___ | Medium | ___ Minimum |

cc: Original to Inmate
    Institutional File
    Treatment File

FORM #: 456 (3-partNCR)    mmr/ib.for/94

III.   Disciplinary ( summary ( 3 months-include dates, offenses dispositions)

5-21-97 — CH8FH — Pending

5-21-97 - F.T.O.O. - Pending

Most serious offense within last 3 months: _____ F.T.O.O

IV.   Program Participation/Work Assignment

_____

_____

_____

_____

_____

V.   DUI Information (Complete if inmate is serving a sentence for DUI)

Has information been verified via Motor Vehicle Records?     Yes_____  No_____  No. of DUI's_____

Date(s) of offense(s):  1st _____  2nd _____  3rd _____  4th_____

VI.   Victim Notification.          Is victim notification required?     Yes _____     No _____

Name of Victim(s) _____

Last Known Address _____

_____                    _____
Counselor Signature                              Supervisor's Signature

Committee Review

MDT:  Approved X  Disapproved _____   Vote Number  2-0         _____
                                                                                          MDT Chair Signature/Date  6-16-97

IBCC:  Approved ✓  Disapproved _____   Vote Number  3-0        _____
                                                                                          IBCC Chair Signature/Date  7/3/97

CICC:  Approved_____  Disapproved _____  Vote Number _____     _____
                                                                                          CICC Chair Signature/Date

Distribution After Final Committee Review

Central Classification Office
Institutional Classification File
Inmate's Record

BOP-004/Page 2 of 2

## BUREAU OF PRISONS RECLASSIFICATION FORM #004

DATE:_____

**I.**  **Vital Indicators/Sentencing Information**

Inmate Name _MANLEY, MICHAEL R._ AKA _NONE_ Institution _DCC/MPU_

Institution Number _____ SBI Number _00338485_ Date of Birth _07-25-74_

Present Offense(s) _MURDER F, AGG. ACT OF INTIMIDATION, P.D.W.D.F., CONSP. II_

_____ Most Serious Offense _MURDER F_
_DEATH + 55 YEAR_

Level V Sentence: Year(s) _88_ Month _88_ Day(s) _88_ Truth in Sentence Yes _X_ No___

Sentence Effective Date _11-13-95_ STRD _NONE_ PE Date _NONE_ Rehearing Date _NONE_

Mandatory: Year(s) _NO_ Month(s) _NO_ Day(s) _NO_ Level IV Sentence? Yes___ No _X_

Detainer(s)? Yes___ No _X_ Open Charge(s)? Yes___ No _X_ 4204K? Yes___ No _X_

Escape/Attempted Escape on Record? Yes___ No _X_ Category _N/A_

**II.**  **Program Request/Change or Recommendation**

Request: Work Release_____ Supervised Custody_____ Work Release/Supervised Custody_____

Halfway House Worker___ Highway Work Project ___ Community/Governmental Service Project___

Furlough____ To See: Name(s)_____ Relationship_____

Address_____ N/A

Purpose_____

Comments_____

Off Grounds Status? Yes___ No _X_ If yes, state program/assignment for which status
is being requested:_____

Change in Security Level and Institution? Yes___ No _X_ If yes, state security level
and institution requested: _CRVIT - MAX/MMR - DCC MPU_

Has inmate had prior participation in program requested?    Yes _____ No _____

Program_____ N/A    Number of approvals _____

Reason(s)/date(s) for failure of return _____

Is inmate eligible in accordance with program standards?    Yes _____ No _____

Is exception to standards requested? Yes___ No _X_ If yes, give reasons for exception:
_____

## ADDENDUM TO BOP RECLASSIFICATION FORM #004

**USE THIS SHEET TO RECORD ANY ADDITIONAL INFORMATION WHICH COULD NOT BE INCLUDED IN THE DESIGNATED SPACES ON FORM BOP-004.**

INMATE NAME: _Manley, Michael R_ - SBI #: _00338405_    INST.: _Del/MSN_

Michael was classified to MSN due to the nature of his crime (Murder I) and because the crime was high profile.

He has not been a management problem, but we would like to observe him a while longer.

Vote 2-0 to continue MSN/High.

Recommended Review 8-9/97

## M.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _Madson, M_____

Evaluators: _RISPOLI, Wilmore, Holt_____

Shift: __8-4_____    Date Completed: _5/09/97_

Review Date: _5-29-97 — RETURN TO CAPT. BY 0900._

Shift Lt.: __M.S._____

INSTRUCTIONS:   Please indicate which of the following behaviors this
                inmate exhibits.   If the behavior describes the inmate,
                place your initials in the space preceding the described
                behavior.

_____ 1.  Worried, anxious.              _____17. Displays negative
                                                                attitude.
_____ 2.  Tense, unable                  _____18. Breach of Group
                 to relax.                                      confidentiality.
_____ 3.  Seems to take no               _____19. Speaks in detail of
MN  AH  MTR  pleasure in anything.                              goals, plans..
            4.  Cannot be trusted    AH  KON  20. Gets along with
                 at all.                                        others.
_____ 5.  Moody, brooding.               _____21. Accepts blame for
                                                                some of his troubles.
_____ 6.  Continually tries              _____22. Accepts blame for
                 to con staff.                   AH  KON  all of his troubles.
MN  MTR  7.  Impulsive,              _____23. Respects authority.
                 unpredictable.                  AH  KON  24. Keeps room neat,
_____ 8.  Seems to seek                                  clean and bed made.
                 excitement.                     AH  KON  25. Keeps himself neat
_____ 9.  Never seems happy.                             and clean.
_____10.  Daydreams, seems               _____26. Volunteers for work
                 preoccupied.                                   projects.
_____11.  Attempts to play               _____27. Likeable.
             staff against one another.
_____12.  Considers himself              _____28. Willing to discuss
                 unjustly confined.    MN AN KON personal problems w/staff.
_____13.  Frequently upset               _____29. Follows the Inmate
                 after visits.                                  Housing Rules.
_____14.  Frequently upset                AH  KON  30. Displays positive
                 after receiving mail.                          attitude.
_____15.  Participates in                 AH  KON  31. Finds acceptable
                 group demonstrations.                          ways to keep busy.
_____16.  Seems to think                 _____32. Approaches some
                 only of himself.                               staff in an open,
                                                                honest maner.

ADDITIONAL COMMENTS:  NUMBER: _M.A.B.  on 5/21/97_____
_usually no problem. MN_____

### .4.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _Marley, A_____

Evaluators: _RICHMON  Seward Came_____

Shift: ____4-12_____ Date Completed: _____5-28-97___

Review Date: 5-28-92 — RETURN TO CAPT. EX OROO.

Shift Lt.: _RJ Cembanti_____

**INSTRUCTIONS:** Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space preceding the described behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

_____ 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

_(LSS) MC (7.)_ Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems preoccupied.

_____ 11. Attempts to play staff against one another.

_____ 12. Considers himself unjustly confined.

_____ 13. Frequently upset after visits.

_____ 14. Frequently upset after receiving mail.

_____ 15. Participates in group demonstrations.

_____ 16. Seems to think only of himself.

_____ 17. Displays negative attitude.

_____ 18. Breach of Group confidentiality.

_____ 19. Speaks in detail o goals, plans..

_____ 20. Gets along with others.

_____ 21. Accepts blame for some of his troubles.

_____ 22. Accepts blame for all of his troubles.

_(LD) (23.)_ Respects authority

_(LSS) (24.)_ Keeps room neat, clean and bed made

_(LSS) (25.)_ Keeps himself neat and clean.

_____ 26. Volunteers for wor projects.

_____ 27. Likeable.

_____ 28. Willing to discuss personal problems w/staff.

_____ 29. Follows the Inmate Housing Rules.

_____ 30. Displays positive attitude.

_____ 31. Finds acceptable ways to keep busy.

_____ 32. Approaches some staff in an open, honest maner.

.3                              x 7

**ADDITIONAL COMMENTS:  NUMBER:** FLOODED HIS CELL; _____

Was Written up 2 Moved. Normally a quiet person. Quite possible the flood was caused to bring attention to the commode constantly running, per Sgt. Ripelt.

M.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _Madison A_____

Evaluators: C/O W. Greene_____

Shift: ____12-8_____ Date Completed: 5-24-97_____

Review Date: 5-21-52 - RETURN TO CAPT-BY APOO.

Shift Lt.: J. Harris_____

INSTRUCTIONS: Please indicate which of the following behaviors this
inmate exhibits.  If the behavior describes the inmate,
place your initials in the space preceding the described
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
to relax.

_____ 3. Seems to take no
pleasure in anything.

_____ 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_____ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____10. Daydreams, seems
preoccupied.

_____11. Attempts to play
staff against one another.

_____12. Considers himself
unjustly confined.

_____13. Frequently upset
after visits.

_____14. Frequently upset
after receiving mail.

_____15. Participates in
group demonstrations.

_____16. Seems to think
only of himself.

_____17. Displays negative
attitude.

_____18. Breach of Group
confidentiality.

_____19. Speaks in detail o
goals, plans..

_____20. Gets along with
others.

_____21. Accepts blame for
some of his troubles.

_____22. Accepts blame for
all of his troubles.

_____23. Respects authority

_____24. Keeps room neat,
clean and bed made

_____25. Keeps himself neat
and clean.

_____26. Volunteers for wor!
projects.

_____27. Likeable.

_____28. Willing to discuss
personal problems w/staff.

_____29. Follows the Inmate
Housing Rules.

_____30. Displays positive
attitude.

_____31. Finds acceptable
ways to keep busy.

_____32. Approaches some
staff in an open.
honest maner.

ADDITIONAL COMMENTS:  NUMBER: ____No problem_____---

------------------------------------------------------------------

F.S.U.    SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _Mankey, Michael_____

Evaluators: _Wilmore, Hall_____

Shift: _D-4_____ Date Completed: _5/14/97___

Review Date: _5-14-97 — RETURN TO CAPT. BY 0900._

Shift Lt.: _M Sy_____

**INSTRUCTIONS:** Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space preceding the described behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

MSy MmR 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

MmR 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems preoccupied.

_____ 11. Attempts to play staff against one another.

_____ 12. Considers himself unjustly confined.

_____ 13. Frequently upset after visits.

_____ 14. Frequently upset after receiving mail.

_____ 15. Participates in group demonstrations.

_____ 16. Seems to think only of himself.

_____ 17. Displays negative attitude.

_____ 18. Breach of Group confidentiality.

_____ 19. Speaks in detail of goals, plans.

MmR By AHKaw 20. Gets along with others.

_____ 21. Accepts blame for some of his troubles.

_____ 22. Accepts blame for all of his troubles.

MmR By AHKaw 23. Respects authority.

MmR By AHKaw 24. Keeps room neat, clean and bed made.

MmR By AHKaw 25. Keeps himself neat and clean.

_____ 26. Volunteers for work projects.

By AHKaw 27. Likeable.

_____ 28. Willing to discuss personal problems w/staff.

MmR By AHKaw 29. Follows the Inmate Housing Rules.

MmR By AHKaw 30. Displays positive attitude.

By AHKaw 31. Finds acceptable ways to keep busy.

By AHKaw 32. Approaches some staff in an open, honest maner.

**ADDITIONAL COMMENTS:** **NUMBER:** Mankey has not been a problem and we have not heard anything from him. MSy

...S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANLEY, MICHAEL_____

Evaluators: ___RICHMOND_ M.Clark_ Seward_____

Shift: ___4-12_____ Date Completed: ___5-10-97_____

Review Date: _5-14-97 - RETURN TO CAPT-EX OROO._

Shift Lt.: _RJ Dombrowski_____

INSTRUCTIONS: Please indicate which of the following behaviors this
inmate exhibits. If the behavior describes the inmate,
place your initials in the space preceding the described
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable ,
to relax.

_____ 3. Seems to take no
pleasure in anything.

_____ 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_____ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____10. Daydreams, seems
preoccupied.

_____11. Attempts to play
staff against one another.

_____12. Considers himself
unjustly confined.

_____13. Frequently upset
after visits.

_____14. Frequently upset
after receiving mail.

_____15. Participates in
group demonstrations.

_____16. Seems to think
only of himself.

_____17. Displays negative
attitude.

_____18. Breach of Group
confidentiality.

_____19. Speaks in detail of
goals, plans..

_____20. Gets along with
others.

_____21. Accepts blame for
some of his troubles.

_____22. Accepts blame for
all of his troubles.

__RS⊘__23. Respects authority.

__RS⊘⊘__24. Keeps room neat,
clean and bed made.

__RS⊘⊘__25. Keeps himself neat
and clean.

_____26. Volunteers for work
projects.

_____27. Likeable.

_____28. Willing to discuss
personal problems w/staff.

__RS⊘__29. Follows the Inmate
Housing Rules.

_____30. Displays positive
attitude.

__RS⊘__31. Finds acceptable
ways to keep busy.

_____32. Approaches some
staff in an open.
honest maner.

ADDITIONAL COMMENTS: NUMBER: _Quiet_____

_____

M.S.U.    SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _Mawhey, Michael_

Evaluators: _C/o W. Greene_

Shift: _12A_            Date Completed: _5-13-97_

Review Date: _5-14-97 — RETURN TO CAPT. BY 0700._

Shift Lt.: _Harris_

**INSTRUCTIONS:**    Please indicate which of the following behaviors this
inmate exhibits.  If the behavior describes the inmate,
place your initials in the space preceding the described
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
to relax.

_____ 3. Seems to take no
pleasure in anything.

_____ 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_____ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
preoccupied.

_____ 11. Attempts to play
staff against one another.

_____ 12. Considers himself
unjustly confined.

_____ 13. Frequently upset
after visits.

_____ 14. Frequently upset
after receiving mail.

_____ 15. Participates in
group demonstrations.

_____ 16. Seems to think
only of himself.

_____ 17. Displays negative
attitude.

_____ 18. Breach of Group
confidentiality.

_____ 19. Speaks in detail of
goals, plans.

_____ 20. Gets along with
others.

_____ 21. Accepts blame for
some of his troubles.

_____ 22. Accepts blame for
all of his troubles.

_____ 23. Respects authority.

_____ 24. Keeps room neat,
clean and bed made.

_____ 25. Keeps himself neat
and clean.

_____ 26. Volunteers for work
projects.

_____ 27. Likeable.

_____ 28. Willing to discuss
personal problems w/staff.

_____ 29. Follows the Inmate
Housing Rules.

_____ 30. Displays positive
attitude.

_____ 31. Finds acceptable
ways to keep busy.

_____ 32. Approaches some
staff in an open,
honest maner.

_B_

**ADDITIONAL COMMENTS:** **NUMBER:** _No problems_

_____

## M.S.U. SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANLEY, MICHAEL_____

Evaluators: _C. Ward_____

Shift: _____Cro_____ Date Completed: _3/26/97____

Review Date: _3-31-97 — RETURN TO CAPT. EX OROO._

Shift Lt.: _Harris_____

INSTRUCTIONS: Please indicate which of the following behaviors this
inmate exhibits. If the behavior describes the inmate,
place your initials in the space preceding the described
behavior.

_____1. Worried, anxious.

_____2. Tense, unable
to relax.

_____3. Seems to take no
pleasure in anything.

_____4. Cannot be trusted
at all.

_____5. Moody, brooding.

_____6. Continually tries
to con staff.

_____7. Impulsive,
unpredictable.

_____8. Seems to seek
excitement.

_____9. Never seems happy.

_____10. Daydreams, seems
preoccupied.

_____11. Attempts to play
staff against one another.

_____12. Considers himself
unjustly confined.

_____13. Frequently upset
after visits.

_____14. Frequently upset
after receiving mail.

_____15. Participates in
group demonstrations.

_____16. Seems to think
only of himself.

_____17. Displays negative
attitude.

_____18. Breach of Group
confidentiality.

_____19. Speaks in detail of
goals, plans..

_____20. Gets along with
others.

_____21. Accepts blame for
some of his troubles.

_____22. Accepts blame for
all of his troubles.

_____23. Respects authority.

_____24. Keeps room neat,
clean and bed made.

_____25. Keeps himself neat
and clean.

_____26. Volunteers for work
projects.

_____27. Likeable.

_____28. Willing to discuss
personal problems w/staff.

_____29. Follows the Inmate
Housing Rules.

_____30. Displays positive
attitude.

_____31. Finds acceptable
ways to keep busy.

_____32. Approaches some
staff in an open,
honest maner.

ADDITIONAL COMMENTS: NUMBER: _no problems (C.W)_____

----------------------------------------------------------------

- 9                        ⅃ 73

## M.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANhEY, MICHAEL_____

Evaluators: _WilMORE, BiSPOLT, HALL_____

Shift: _____ Date Completed: _3-31-97_____

Review Date: _3-31-97 — RETURN TO CAPT. BY 0400._

Shift Lt.: _____

INSTRUCTIONS:   Please indicate which of the following behaviors this
inmate exhibits.  If the behavior describes the inmate,
place your initials in the space preceding the described
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable ,
to relax.

_____ 3. Seems to take no
pleasure in anything.

_AH MSY MTR_ 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_RyMTR_ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
preoccupied.

_____ 11. Attempts to play
staff against one another.

_____ 12. Considers himself
unjustly confined.

_____ 13. Frequently upset
after visits.

_____ 14. Frequently upset
after receiving mail.

_____ 15. Participates in
group demonstrations.

_____ 16. Seems to think
only of himself.

_____ 17. Displays negative
attitude.

_____ 18. Breach of Group
confidentiality.

_____ 19. Speaks in detail of
goals, plans.

_RAH KW_ 20. Gets along with
others.

_____ 21. Accepts blame for
some of his troubles.

_____ 22. Accepts blame for
all of his troubles.

_RyAH KW_ 23. Respects authority.

_Ly AH KW_ 24. Keeps room neat,
clean and bed made.

_Ry AH KW_ 25. Keeps himself neat
and clean.

_____ 26. Volunteers for work
projects.

_____ 27. Likeable.

_KW_ 28. Willing to discuss
personal problems w/staff.

_Ry M KW_ 29. Follows the Inmate
Housing Rules.

_KW_ 30. Displays positive
attitude.

_KW_ 31. Finds acceptable
ways to keep busy.

_____ 32. Approaches some
staff in an open,
honest maner.

_18_

ADDITIONAL COMMENTS:   NUMBER: _NOT MUCH CONTACT YET-MTR_____

_____

M.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANLEY, MICHAEL_____

Evaluators: __RICHMOND CAASI Simon Seward_____

Shift: _____4 12_____ Date Completed: _3-28-97___

Review Date: _3-31-97 – RETURN TO CAPT. BY 0700._

Shift Lt.: __R.J. Cunningham_____

INSTRUCTIONS: Please indicate which of the following behaviors this
inmate exhibits.  If the behavior describes the inmate,
place your initials in the space preceding the described
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable ,
to relax.

_____ 3. Seems to take no
pleasure in anything.

_____ 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_____ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
preoccupied.

_____ 11. Attempts to play
staff against one another.

_____ 12. Considers himself
unjustly confined.

_____ 13. Frequently upset
after visits.

_____ 14. Frequently upset
after receiving mail.

_____ 15. Participates in
group demonstrations.

_____ 16. Seems to think
only of himself.

_____ 17. Displays negative
attitude.

_____ 18. Breach of Group
confidentiality.

_____ 19. Speaks in detail of
goals, plans.

_____ 20. Gets along with
others.

_____ 21. Accepts blame for
some of his troubles.

_____ 22. Accepts blame for
all of his troubles.

_____ 23. Respects authority.

_____ 24. Keeps room neat,
clean and bed made.

_____ 25. Keeps himself neat
and clean.

_____ 26. Volunteers for work
projects.

_____ 27. Likeable.

_____ 28. Willing to discuss
personal problems w/staff.

_____ 29. Follows the Inmate
Housing Rules.

_____ 30. Displays positive
attitude.

_____ 31. Finds acceptable
ways to keep busy.

_____ 32. Approaches some
staff in an open.
honest maner.

ADDITIONAL COMMENTS:   NUMBER: _____

_____

*NOT CLASSIFIED Adult - YET*

## m.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: MANLEY, MICHAEL _____

Evaluators: KW, M.A.R. _____

Shift: _____ Date Completed: 3/16/97

Review Date: 3/17/97 — RETURN TO CAPT. BY 0700.

Shift Lt.: ___M. Sg_____

INSTRUCTIONS: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space preceding the described behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable, to relax.

_____ 3. Seems to take no pleasure in anything.

AN MJ MAR 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

___MAR 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____10. Daydreams, seems preoccupied.

_____11. Attempts to play staff against one another.

_____12. Considers himself unjustly confined.

_____13. Frequently upset after visits.

_____14. Frequently upset after receiving mail.

_____15. Participates in group demonstrations.

_____16. Seems to think only of himself.

_____17. Displays negative attitude.

_____18. Breach of Group confidentiality.

_____19. Speaks in detail of goals, plans..

AN MAR 20. Gets along with others.

_____21. Accepts blame for some of his troubles.

_____22. Accepts blame for all of his troubles.

MAR AN KW 23. Respects authority.

MAR KW 24. Keeps room neat, clean and bed made.

MAR KW 25. Keeps himself neat and clean.

_____26. Volunteers for work projects.

_____27. Likeable.

_____28. Willing to discuss personal problems w/staff.

MAR MJ 29. Follows the Inmate Housing Rules.

MAR 30. Displays positive attitude.

_____31. Finds acceptable ways to keep busy.

MAR KW 32. Approaches some staff in an open, honest maner.

+35

M

ADDITIONAL COMMENTS: NUMBER: _____

_____

S.U.  SEMIMONTHLY BEHAVIO. REPORT

Inmate's Name: _MANLEY, MICHAEL_____

Evaluators: ___RICHMOND CAASI Simon  Seward_____

Shift: _____4/12_____ Date Completed: _____3-15-97_____

Review Date: 3/17/97 — RETURN TO CAPT. BY 0700.

Shift Lt.: ___C. Bombowski_____

INSTRUCTIONS: Please indicate which of the following behaviors this
inmate exhibits.  If the behavior describes the inmate,
place your initials in the space preceding the described
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
to relax.

_____ 3. Seems to take no
pleasure in anything.

_____ 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_____ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
preoccupied.

_____ 11. Attempts to play
staff against one another.

_____ 12. Considers himself
unjustly confined.

_____ 13. Frequently upset
after visits.

_____ 14. Frequently upset
after receiving mail.

_____ 15. Participates in
group demonstrations.

_____ 16. Seems to think
only of himself.

_____ 17. Displays negative
attitude.

_____ 18. Breach of Group
confidentiality.

_____ 19. Speaks in detail of
goals, plans..

_____ 20. Gets along with
others.

_____ 21. Accepts blame for
some of his troubles.

_____ 22. Accepts blame for
all of his troubles.

_____ 23. Respects authority.

_____ 24. Keeps room neat,
clean and bed made.

_____ 25. Keeps himself neat
and clean.

_____ 26. Volunteers for work
projects.

_____ 27. Likeable.

_____ 28. Willing to discuss
personal problems w/staff.

_____ 29. Follows the Inmate
Housing Rules.

_____ 30. Displays positive
attitude.

_____ 31. Finds acceptable
ways to keep busy.

_____ 32. Approaches some
staff in an open.
honest maner.

ADDITIONAL COMMENTS: NUMBER: _____

_____

S.U.  SEMIMONTHLY BEHAVIO. REPORT

Inmate's Name: _MANLEY, MICHAEL_____

Evaluators: _EVANS   W_____

Shift: ___12A_____ Date Completed: _3-12-07_____

Review Date: _3/17/07 — RETURN TO CAPT. BY 0700._

Shift Lt.: _J HARRIS_____

INSTRUCTIONS:   Please indicate which of the following behaviors this
inmate exhibits.  If the behavior describes the inmate,
place your initials in the space preceding the described
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
to relax.

_____ 3. Seems to take no
pleasure in anything.

_____ 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_____ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____10. Daydreams, seems
preoccupied.

_____11. Attempts to play
staff against one another.

_____12. Considers himself
unjustly confined.

_____13. Frequently upset
after visits.

_____14. Frequently upset
after receiving mail.

_____15. Participates in
group demonstrations.

_____16. Seems to think
only of himself.

_____17. Displays negative
attitude.

_____18. Breach of Group
confidentiality.

_____19. Speaks in detail o-
goals, plans..

_____20. Gets along with
others.

_____21. Accepts blame for
some of his troubles.

_____22. Accepts blame for
all of his troubles.

_____23. Respects authority.

_____24. Keeps room neat,
clean and bed made.

_____25. Keeps himself neat
and clean.

_____26. Volunteers for work
projects.

_____27. Likeable.

_____28. Willing to discuss
personal problems w/staff.

_____29. Follows the Inmate
Housing Rules.

_____30. Displays positive
attitude.

_____31. Finds acceptable
ways to keep busy.

_____32. Approaches some
staff in an open,
honest maner.

ADDITIONAL COMMENTS:  NUMBER: _NO PROBLEMS_____

## .I.S.U.    SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANREY, MICHAEL J_

Evaluators: _Seward Columb____ Pierr_

Shift: _4-12_                                    Date Completed: _4-30-97_

Review Date: _4-30-97 — RETURN TO CAPT. BY 0700._

Shift Lt.: _B/ Paul Smith_

INSTRUCTIONS:  Please indicate which of the following behaviors this
inmate exhibits.  If the behavior describes the inmate,
place your initials in the space preceding the described
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable ,
to relax.

_____ 3. Seems to take no
pleasure in anything.

_____ 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_____ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
preoccupied.

_____ 11. Attempts to play
staff against one another.

_____ 12. Considers himself
unjustly confined.

_____ 13. Frequently upset
after visits.

_____ 14. Frequently upset
after receiving mail.

_____ 15. Participates in
group demonstrations.

_____ 16. Seems to think
only of himself.

_____ 17. Displays negative
attitude.

_____ 18. Breach of Group
confidentiality.

_____ 19. Speaks in detail o
goals, plans..

_____ 20. Gets along with
others.

_____ 21. Accepts blame for
some of his troubles.

_____ 22. Accepts blame for
all of his troubles.

_____ 23. Respects authority

_____ 24. Keeps room neat,
clean and bed made

_____ 25. Keeps himself neat
and clean.

_____ 26. Volunteers for wor
projects.

_____ 27. Likeable.

_____ 28. Willing to discuss
personal problems w/staff.

_____ 29. Follows the Inmate
Housing Rules.

_____ 30. Displays positive
attitude.

_____ 31. Finds acceptable
ways to keep busy.

_____ 32. Approaches some
staff in an open.
honest maner.

ADDITIONAL COMMENTS:    NUMBER: _Very Quiet individual_

...S.U.    SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANLEY, MICHAEL_ _____

Evaluators: _SgA.Hall_ _____
Shift: _____ 8-4 _____ Date Completed: _4/30/07_ _____
Review Date: _4-30-07 — RETURN TO CAPT-BY ONDO._ _____
Shift Lt.: _M.Y_ _____

INSTRUCTIONS:  Please indicate which of the following behaviors this
inmate exhibits.  If the behavior describes the inmate,
place your initials in the space preceding the described
behavior.

_____ 1. Worried, anxious.
_____ 2. Tense, unable to relax.
_____ 3. Seems to take no pleasure in anything.
_MarK MJ Ly AH_ 4. Cannot be trusted at all.
_____ 5. Moody, brooding.
_____ 6. Continually tries to con staff.
_MarK_ 7. Impulsive, unpredictable.
_____ 8. Seems to seek excitement.
_____ 9. Never seems happy.
_____ 10. Daydreams, seems preoccupied.
_____ 11. Attempts to play staff against one another.
_____ 12. Considers himself unjustly confined.
_____ 13. Frequently upset after visits.
_____ 14. Frequently upset after receiving mail.
_____ 15. Participates in group demonstrations.
_____ 16. Seems to think only of himself.

_____ 17. Displays negative attitude.
_____ 18. Breach of Group confidentiality.
_____ 19. Speaks in detail of goals, plans..
_MarKW Ly AH_ 20. Gets along with others.
_____ 21. Accepts blame for some of his troubles.
_____ 22. Accepts blame for all of his troubles.
_MarKW Ly AH_ 23. Respects authority.
_MarK W Ly AN_ 24. Keeps room neat, clean and bed made.
_MarK W AV_ 25. Keeps himself neat and clean.
_____ 26. Volunteers for work projects.
_KW Ly_ 27. Likeable.
_MarKWAN_ 28. Willing to discuss personal problems w/staff.
_MarK KW_ 29. Follows the Inmate Housing Rules.
_MarK W AN_ 30. Displays positive attitude.
_MarK W AN_ 31. Finds acceptable ways to keep busy.
_KW_ 32. Approaches some staff in an open, honest maner.

ADDITIONAL COMMENTS:  NUMBER: _____

_____

.I.S.U.    SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MAWNEY, MICHAEL_ _____

Evaluators: __C.West_____

Shift: _____12-8_____ Date Completed: __4/24/97_____

Review Date: _4-30-97 — RETURN TO CAPT. BY 0400._

Shift Lt.: __Harris_____

INSTRUCTIONS:    Please indicate which of the following behaviors this
                 inmate exhibits.  If the behavior describes the inmate,
                 place your initials in the space preceding the described
                 behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable ,
               to relax.

_____ 3. Seems to take no
               pleasure in anything.

_____ 4. Cannot be trusted
               at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
               to con staff.

_____ 7. Impulsive,
               unpredictable.

_____ 8. Seems to seek
               excitement.

_____ 9. Never seems happy.

_____10. Daydreams, seems
               preoccupied.

_____11. Attempts to play
               staff against one another.

_____12. Considers himself
               unjustly confined.

_____13. Frequently upset
               after visits.

_____14. Frequently upset
               after receiving mail.

_____15. Participates in
               group demonstrations.

_____16. Seems to think
               only of himself.

_____17. Displays negative
               attitude.

_____18. Breach of Group
               confidentiality.

_____19. Speaks in detail o
               goals, plans..

_____20. Gets along with
               others.

_____21. Accepts blame for
               some of his troubles.

_____22. Accepts blame for
               all of his troubles.

_____23. Respects authority

_____24. Keeps room neat,
               clean and bed made

_____25. Keeps himself neat
               and clean.

_____26. Volunteers for work
               projects.

_____27. Likeable.

_____28. Willing to discuss
               personal problems w/staff.

_____29. Follows the Inmate
               Housing Rules.

_____30. Displays positive
               attitude.

_____31. Finds acceptable
               ways to keep busy.

_____32. Approaches some
               staff in an open.
               honest maner.

ADDITIONAL COMMENTS:    NUMBER: __no problems__ (C.W) _____ - - - -

_____ - -

M.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _Manley, Michael_____

Evaluators: _RISPOLI_____

Shift: _____A-4_____ Date Completed: 4/15/97____

Review Date: _4-16-97 — RETURN TO CAPT. BY 0800.__

Shift Lt.: _M. Joy_____

INSTRUCTIONS:  Please indicate which of the following behaviors this
inmate exhibits.  If the behavior describes the inmate,
place your initials in the space preceding the described
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable  ,
to relax.

_____ 3. Seems to take no
pleasure in anything.

_RyMoR_ 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_RyMoR_ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____10. Daydreams, seems
preoccupied.

_____11. Attempts to play
staff against one another.

_____12. Considers himself
unjustly confined.

_____13. Frequently upset
after visits.

_____14. Frequently upset
after receiving mail.

_____15. Participates in
group demonstrations.

_____16. Seems to think
only of himself.

_____17. Displays negative
attitude.

_____18. Breach of Group
confidentiality.

_____19. Speaks in detail of
goals, plans..

_RyMoR_20. Gets along with
others.

_____21. Accepts blame for
some of his troubles.

_____22. Accepts blame for·
all of his troubles.

_RyMoR_23. Respects authority.

_RyMoR_24. Keeps room neat,
clean and bed made.

_MoR_25. Keeps himself neat
and clean.

_____26. Volunteers for work
projects.

_____27. Likeable.

_____28. Willing to discuss
personal problems w/staff.

_RyMoR_29. Follows the Inmate
Housing Rules.

_MoR_30. Displays positive
attitude.

_MoR_31. Finds acceptable
ways to keep busy.

_____32. Approaches some
staff in an open,
honest maner.

ADDITIONAL COMMENTS: NUMBER: ___Manley is new but seems to_____
_be adjusting well._____

.S.U.    SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANLEY, MICHAEL_____

Evaluators: _Wentz  Edward Coen_____

Shift: ___4-12_____ Date Completed: ____4-14-97___

Review Date: _4-16-97 – RETURN TO CAPT. BY 0700.

Shift Lt.: __RJ Cumlaugh_____

INSTRUCTIONS: Please indicate which of the following behaviors this
inmate exhibits. If the behavior describes the inmate,
place your initials in the space preceding the described
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable   ,
to relax.

_____ 3. Seems to take no
pleasure in anything.

_____ 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_____ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____10. Daydreams, seems
preoccupied.

_____11. Attempts to play
staff against one another.

_____12. Considers himself
unjustly confined.

_____13. Frequently upset
after visits.

_____14. Frequently upset
after receiving mail.

_____15. Participates in
group demonstrations.

_____16. Seems to think
only of himself.

_____17. Displays negative
attitude.

_____18. Breach of Group
confidentiality.

_____19. Speaks in detail of
goals, plans..

_____20. Gets along with
others.

_____21. Accepts blame for
some of his troubles.

_____22. Accepts blame for
all of his troubles.

_____23. Respects authority.

_EW_ _WC_24. Keeps room neat,
clean and bed made.

_EW_ _WC_25. Keeps himself neat
and clean.

_____26. Volunteers for work
projects.

_____27. Likeable.

_____28. Willing to discuss
personal problems w/staff.

_EW_29. Follows the Inmate
Housing Rules.

_____30. Displays positive
attitude.

_EW_ _WC_31. Finds acceptable
ways to keep busy.

_____32. Approaches some
staff in an open,
honest maner.

ADDITIONAL COMMENTS:  NUMBER: _____

_____

.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANLEY, MICHAEL_____

Evaluators: _T. J. WYATT_____

Shift: _____RD_____ Date Completed: _4-7-97___

Review Date: _4-16-97 — RETURN TO CAPT. BY 0700.___

Shift Lt.: _MARRIS_____

INSTRUCTIONS: Please indicate which of the following behaviors this
inmate exhibits. If the behavior describes the inmate,
place your initials in the space preceding the described
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable  .
to relax.

_____ 3. Seems to take no
pleasure in anything.

_____ 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_____ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____10. Daydreams, seems
preoccupied.

_____11. Attempts to play
staff against one another.

_____12. Considers himself
unjustly confined.

_____13. Frequently upset
after visits.

_____14. Frequently upset
after receiving mail.

_____15. Participates in
group demonstrations.

_____16. Seems to think
only of himself.

_____17. Displays negative
attitude.

_____18. Breach of Group
confidentiality.

_____19. Speaks in detail of
goals, plans..

_____20. Gets along with
others.

_____21. Accepts blame for
some of his troubles.

_____22. Accepts blame for
all of his troubles.

_____23. Respects authority.

_____24. Keeps room neat,
clean and bed made.

_____25. Keeps himself neat
and clean.

_____26. Volunteers for work
projects.

_____27. Likeable.

_____28. Willing to discuss
personal problems w/staff.

_____29. Follows the Inmate
Housing Rules.

_____30. Displays positive
attitude.

_____31. Finds acceptable
ways to keep busy.

_____32. Approaches some
staff in an open.
honest maner.

ADDITIONAL COMMENTS: NUMBER: _No PROBLEMS JW_____

_____

**STATE OF DELAWARE**
**DEPARTMENT OF CORRECTION**
**BUREAU OF ADULT CORRECTION**
**DELAWARE CORRECTIONAL CENTER**
**SMYRNA, DELAWARE 19977**
**TELEPHONE:  (302)653-9261**

TO:    **Michael Manley**
       **00338485**

FROM:    **D.C.C./I.B.C.C.**

DATE:    **April 03, 1997**

RE:    **M.S.U. CLASSIFICATION**

On **04-03-97** the Institutional Based Classification Committee (I.B.C.C.) classified you to one of the following:

   **X**  Maximum/High Custody    ____ Maximum/Close Custody

The reason(s) for this classification are: **Nature of offense and sentence.**

You will be expected to address the following: **See Max/MDT.**

    You have the right to appeal this decision.  If you intend to appeal you should state your reasons for an appeal in writing to the Chairman of I.B.C.C.  The I.B.C.C. will review the case and forward its recommendation to the Warden or his designee, who will act on the appeal and forward his decision to you.

    An appeal of M.S.U. classification must be received by I.B.C.C. within 30 days of the I.B.C.C. decision to classify you to M.S.U.

                 I.B.C.C. Chairperson

mmr

cc:  Manager M.S.U.
     Classification Files
     Institutional Files
     M.S.U. Counselor
     Transfer Officer

msuclass/96

DELAWARE CORRECTIONAL CENTER

COUNSELOR _____
4-3-??
DATE

MEMO TO: _MANLEY MICHAEL_ BLDG. _W_
S.B.I. _____ _38PQ75_

FROM: _____ I.B.C.C. _____

RE: **CLASSIFICATION**

Your M.D.T. has recommended you for the following:

_CONT - MAX/HGH_ _____

_____

The I.B.C.C.'s decision is to:

____ _I_ Approve      _____ Not Approve    _____ Defer
____ Recommend               _____ Not Recommend

**BECAUSE**

___ Lack of Program Participation       ___ Time remaining on sentence
___ Pending adjustment boards           ___ Prior failure under supervision
___ Gradual phasing indicated           ___ Poor institutional adjustment
___ Open Charges                        ___ Serious natural of offense
___ Program does not meet your needs    ___ Prior criminal history
___ Lack of evidence you have addressed your problem in a serious manner
___ Failure to address treatment issues in relation to your offense
___ You present a current and continuous danger to the safety of staff,
    other inmates, or the good order of the institution.

OTHER _Rev. 6/97_ _____

_____

**ADDITIONAL COMMENTS:**

___ Develop treatment plan with counselor.

**APPROVED**                          **RECOMMEND**

___ N.A.                              ___ S.A.R.
___ A.A.                              ___ Highway Project
___ G.E.D.                            ___ Family Problems
___ P.R.C.                            ___ (Write Mr. Wallitsch)
___ Laundry Outside/Ongrounds         ___ Greentree (See Counselor)
___ HS Education                      ___ Delaware Vets Cemetary
___ W Kitchen                         ___ Town of Smyrna
___ Evening Greentree                 ___ MCI        ___ PTA
___ Central Supply                    ___ SCI        ___ WR
___ Construction Project              ___ MPCJF      ___ C/C
___ Violent Offenders Program         ___ Medium     ___ Minimum
___

cc: Original to Inmate
    Institutional File       FORM #: 456 (3-partNCR)      mmr/ib.for/94
    Treatment File

I. **Vital Indicators.** **Sentencing Information**

Inmate name _Manley, Michael_ AKA _____ Institution _____

Institution Number _____ SBI Number _338485_ Date of Birth _07/29/74_

Present Offense(s) _Murder 1st, PDWDCF_

_____ Most Serious Offense _____

Level V Sentence: Year(s) _Death_ Month(s) ____ Day(s) ____ Truth in Sentencing? Yes _✓_ No

Sentence Effective Date _11/13/95_ STRD _Death_ PE Date ____ - Rehearing Date _-_

Mandatory: Year(s) _-_ Month(s) _-_ Day(s) _-_ Level IV Sentence? Yes ____ No _✓_

Detainer(s)? Yes ____ No _✓_ Open Charge(s)? Yes ____ No _✓_ 4204K? Yes ____ No _✓_

Escape/Attempted Escape on Record? Yes ____ No _✓_ Category _____

II. **Program Request/Change or Recommendation**

Request: Work Release ____ Supervised Custody ____ Work Release/Supervised Custody ___

Halfway House Worker ___ Highway Work Project ___ Community/Governmental Service Project __

Furlough ____ To See: Name(s) _____ Relationship _____

Address _____

Purpose _____

Comments _____

Off Grounds Status? Yes ____ No ____ If yes, state program/assignment for which status is being requested: _____

Change in Security Level and Institution? Yes ____ No _✓_ If yes, state security level and institution requested: _Con't Max/High (msu)_

Has inmate had prior participation in program requested? Yes ____ No ____

Program _____ Number of approvals _____

Reason(s)/date(s) for failure or return _____

_____

Is inmate eligible in accordance with program standards? Yes _✓_ No ____

Is exception to standards requested? Yes ____ No _✓_ If yes, give reasons for exception

_____

_____

BOP-004/Page 1 of 2

III.   **Disciplinary (summary last 6 months—include dates, offenses dispositions)**

*None*

_____

_____

Most serious offense within last 6 months:_____

IV.   **Program Participation/Work Assignment**

*None*

_____

_____

_____

V.   **DUI Information (Complete if inmate is serving a sentence for DUI)**

Has information been verified via Motor Vehicle Records?   Yes___  No___  No. of DUI's___

Date(s) of offense(s):  1st_____  2nd_____  3rd_____  4th_____

VI.   **Victim Notification** - Is victim notification required?  Yes_____  No_____

Name of Victim(s)_____

Last Known Address_____

_____          _____
Counselor Signature                      Supervisor's Signature

**Committee Review**

MDT:  Approved____ ✓ Disapproved____   Vote Number  3-0      _____ 3-24-97
                                                                          MDT Chair Signature/Dat

IBCC: Approved____  Disapproved____   Vote Number  (3-0)     _____ 4/3/9
                                                                          IBCC Chair Signature/Dat

CICC: Approved____  Disapproved____   Vote Number _____      _____
                     4/97                                                 CICC Chair Signature/Dat

**Distribution After Final Committee Review**

Central Classification Office
Institutional Classification File
Inmate's Record

ADDENDUM TO BOP RECLASSIFICATION FORM #004

Use this sheet to record any additional information which could not be included in the ignated spaces on Form BOP-004.

ate Name: Manley, Michael   SBI Number: 338485   Institution: DCC

Michael Manley was sent to DCC classified to Medium High. He is presently housed in MSU. Based on the type of sentence imposed this MDT concurs with Maximum High Security.

BUREAU OF ADULT CORRECTION
CENTRAL INSTITUTIONAL CLASSIFICATION BOARD

Denial Form

Name _Michael Manley_ Date _2/27/97_ Institution _MPCJF_

SBI Number _338485_ On the above the CICB considered you for:

_Medium_

The Board's decision was to [X] Deny [ ] Not Recommend

The decision was based on the following reason(s).

__X__ The serious nature of your offense.

__X__ The brief time you have served on your sentence.

__X__ The time remaining on your sentence.

_____ Institutional Adjustment.

_____ Your prior criminal history.

_____ The lack of evidence that you have addressed your problems in a serious, mature manner.

_____ You do not meet the criteria.

_____ Your record indicates an open charge.

_____ We do not feel this would serve your program needs.

_____ Prior failure(s) under supervision.

_____ You have escapes on record.

_____ Increasingly serious pattern of criminal behavior.

_____ Gradual phasing indicated.

__X__ Other _Approved for MS11/High per_

Remarks: _DOC policy regarding death_
_sentences._

FOR THE CICB: _Lewis_

"The Department of Correction agrees that in all decisions involving inmate job placement, retention, suspension, or termination from any inmate job classification that it will not discriminate on the basis of sexual preference or a suspicion that the inmate is infected by or a carrier of AIDS. This agreement shall not limit the defendant's ability to make such decisions when the failure to act would otherwise constitute a deliberate or serious indifference to the protection of an inmate from serious bodily harm." U.S.D.C. C.A. No. 86-307-MMS

**DEPARTMENT OF CORRECTION TRAC**
**TRACKING, RISK ASSESS  IT, CLASSIFICATION**

| VITAL INDICATORS | | | |
|---|---|---|---|
| NAME-LAST  Mosley, | FIRST  Michael | MIDDLE  Rademac | SOC. SEC. NO.  17635-9409 |
| AKA(S) | | | D.O.B.-MO.  07  DAY  29  YEAR  74 |
| STREET ADDRESS  1528 S. 15th St. | | YEARS AT ADDRESS  20 mos. | TELEPHONE  (215) 271-1181 |
| CITY  Phila. | STATE  Pa. | ZIP  19148 | VETERAN  Y/N ☒ |

**SENTENCING INFORMATION**

| OFFENSE (TOTAL NO. ___ ) | | OPEN CHARGES (TOTAL NO. ___ ) | | PARAMETERS | INTERSTATE |
|---|---|---|---|---|---|
| CODE  murder 1st | COURT CODE | CODE | COURT CODE | MAXIMUM FULL TERM  YRS. death  MOS. + 50  DAYS yrs. | |
| PFBDCF | | | | EFFECTIVE DATE  MO. 11  DAY 13  YEAR 95 | |
| consp. 1st | | | | MAX. EXPIRATION DATE  MO. 88  DAY 88  YEAR 88 | |
| | | | | PAROLE ELIG.  MO.  DAY  YEAR 5 | |
| MANDATORY TIME  Y/N ☐ | EXPIRATION DATE  MO.  DAY  YEAR | 4204K  Y/N ☐ | COURT CODE | EXPIRATION DATE  MO.  DAY  YEAR | STRD.  MO. 88  DAY 8  YEAR 88 |

**CRIMINAL HISTORY SUMMARY**

Self reported

| | ADULT | | | JUVENILE | AGE AT FIRST ARREST | COMMUNITY EXPERIENCE | | | WORK RELEASE | SUP. CUSTODY |
|---|---|---|---|---|---|---|---|---|---|---|
| | ARRESTS | CONV. | INCAR. | ARRESTS | COMMENTS  date of execution  April 25, 97 | | | | | |
| VIOLENT OFFENSES | – | | | – | | | | | | |
| SEX OFFENSES | | | | – | | | COMPLETED SUCCESSFULLY | | | |
| NON-VIOLENT OFFENSES | – | | | – | codef. | | REVOKED/ RETURNED | | | |
| | | | | | David Stevenson | | NEW CHARGES | | | |
| ESCAPES | – | | | – | | | RULES/TECH. VIOLATIONS | | | |

☐ OFFICIAL   ☒ RESIDENT'S VERSION OF INSTANT OFFENSE(S) - USE OFFICIAL IF AVAILABLE.

allegedly, on Nov. 13, 95, accompanied by codef, the offend
traveled for the Caville Country Club apts, where they
were supposed to have confronted the victim, Christopher Heath
(states witness against Stevenson in an unrelated case)
Heath was fatally shot.

**CLASSIFICATION INFORMATION**

| | PRESENT | CODE | RECOMMENDATION | CODE | ICC ACTION | CODE |
|---|---|---|---|---|---|---|
| HOUSING | | MP | Max. hsg. | | Dr. Denied | |
| JOB | | | | | appd Max high | |
| EDUCATION | | | | | Dec MSU. | |
| THERAPY | | | | | | |
| OTHER | | | | | | |
| REVIEW DATE | | | MONTH  YEAR | | MONTH  YEAR | |

MDT MEMBERS PRESENT Sgt. Pritchett, Bruitt, Faulkner   VOTE 3-0

MDT CHAIRPERSON Sandra Pritchett   DATE 2-21-97

ICC CHAIRPERSON Lewis   DATE 2/26/97

ICC COMMENTS _____ Vote - 8-0

_____

_____

_____

_____

1

DOC. NO. 38-01-84-09-001

NAME-LAST _Morley_ FIRST _Offord_ MIDDLE _Paul Michael_  INSTITUTIONAL NO. _____ SBI NO. _____

**INST. ADJUSTMENT**

ADJUSTMENT CONCERNS _____
10-11-96 _disrespect_
_____
_____
_____
_____
_____

**FAMILY INFORMATION**

STATE BORN IN _Pa._ STATE RAISED IN _Pa._ BY WHOM _mother_
NEXT OF KIN _Odan Morley_ brother PARENT/GUARDIAN RESIDENCE: (215) 747-3188
SIBLINGS - NO. OF BROTHERS _-_ NO. OF SISTERS _-_ OFFENDER'S BIRTH ORDER _1_ OF _1_
MARITAL STATUS _single_ SPOUSE'S RESIDENCE _____ CODE
DEPENDENTS _0_ RESIDE WITH _____ SUPPORTED BY _____
FAMILY PROBLEMS _none mentioned_

**SOCIAL/PSYCH INFORMATION**

SUBSTANCE USE/ABUSE _denys drugs / alcohol socially_ Y/N ☑
TREATMENT (PLACES & DATES) _____
PSYCHOLOGICAL PROBLEM INDICATED-EXPLAIN _none indicated_ Y/N ☑
PSYCH. TREATMENT/TESTING (PLACE & DATE) _____
CHILD ABUSE INDICATED _no_ Y/N ☑ IF YES - 1. PHYSICAL, 2. EMOTIONAL, 3. BOTH ☑
COUNSELING INDICATED-EXPLAIN _none indicated_ Y/N ☑

**HEALTH**

PHYSICAL HEALTH - IF POOR, EXPLAIN _good_ G/P ☐

**EDUCATION**

HIGHEST ED. LEVEL ATTAINED _12th grade_ PLACE _Central High_ DATE _92_
ADDITIONAL ED. TRAINING _____ PLACE _____ DATE _____
EDUCATIONAL NEEDS _____
EDUCATIONAL INTERESTS _____

**EMPLOYMENT HISTORY**

OCCUPATION _____ CODE ____ SKILL LEVEL _____ CODE ____
EMPLOYER PRIOR TO INCARCERATION _Lional Washington & Assoc. Security Co._
POSITION _Security guard_ EMPLOYED AT TIME OF ARREST? Y/N ☑
PRIOR WORK EXPERIENCE _Hojo, Country fresh, Cowboys Bakes (8 mos.)_ _Pesco, meter reading (1yr)_
LONGEST PERIOD OF EMPLOYMENT (PLACE) _U.S. Army_ MOS. ___
VOCATIONAL TRAINING (PLACES & DATES) _U.S. Army_
VOCATIONAL INTERESTS _____

DOC. NO. 38-01-84-09-002

2

NAME-LAST _____ FIRST _____ MIDDLE _____

## INMATE PROFILE

**INMATE NEED PROFILE**

(CIRCLE)

| PUBLIC RISK | INSTITUTIONAL RISK | MEDICAL NEEDS | MENTAL HEALTH NEEDS | DRUG/ ALCOHOL NEEDS | EDUCATIONAL NEEDS | SKILL LEVEL | WORK HISTORY |
|---|---|---|---|---|---|---|---|
| P | I | M | MH | D | E | V | W |
| 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 |
| 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |

COMMENTS: _____

**INMATE TREATMENT PLAN**

TREATMENT PLAN

| PROBLEM | OBJECTIVE | PLAN OF ACTION | RESULTS |
|---|---|---|---|
| 1) | 1) | 1) | 1) |
| 2) | 2) | 2) | 2) |
| 3) | 3) | 3) | 3) |
| 4) | 4) | 4) | 4) |

RESIDENT _____ PREPARED BY _____ SUPERVISOR _____ DATE 2/24/97

**ADDITIONAL COMMENTS**

REASON FOR MDT REC./COMMENTS: Mosley reports that he came to DE to visit a friend (codef.), and was in route to catch the train back to Philly when he was arrested, and charged to the instant offense. Supposedly, he was implicated in the crime because of his affiliation to the codef. He stated that his codef. had been co-workers to the victim. Mosley believes that the prosecutor manipulated the facts; therefore, he is appealing the sentence.

Mosley was both cooperative and informative. He expressed that he is angry about the ordeal, but is relieved to know that the case is not over.

DOC. NO. 38-01-84-09-003

2



**INMATE STATUS**

NAME: Manley, Michael    #: 00338485

<u>PREVIOUS SENTENCE:</u>

BEGINS:

ENDS:

<u>T.I.S.:</u>

BEGINS:

ENDS:

<u>BALANCE OF SENTENCE:</u>

BEGINS:

ENDS:

DO NOT RELEASE

<u>COMMENTS:</u>

LEVEL 4:    Hold at Level 3 ___ Level 5

Case #

Case #

DETAINER:    DO NOT RELEASE IF DETAINER HOLD

Detaining State:

SEX OFFENDER:

Case #:

Date Registered:

Date DNA Testing done:

FORM #: 504
(rev. 11/29/99)

*Prostitution overturned — Dom. Sent. + Conviction overturned — pending in appeal*

Form DC-99
Detainer/PC Log
Revised 7/86

INMATE NAME: MANLEY, MICHAEL   R

INSTITUTION NO:   T0892231

DEPARTMENT OF CORRECTION

DETAINER/PENDING CHARGE LOG (DC-99)

| DATE REC'D | REQUESTING AUTHORITY | CHARGES | INIT'S | BAIL AMOUNT | CASE NO. | DISPOSITION & DATE | INIT'S |
|---|---|---|---|---|---|---|---|
| 1/13/95 | GCPNCC | MURDER FIRST DEG. | EW | without bail | | sent | (initials) |
| 1/13/95 | CCPNCC | POSS OF A FIREARM DURING THE | EW | 20,000 | | sent | |
| 1/13/95 | CCPNCC | CONSPIRACY FIRST DEG. | EW | 5,000 | | sent | |

## Offender Status Sheet

Date: 03/04/2003

| SBI #: | 00338485 | Name: MICHAEL R MANLEY | | |
|---|---|---|---|---|
| Location(s): DCC | | Level(s): 0 | Race: BLACK | DOB: 07/29/1974 |
| AKA: | MICHAEL R MANLEY | | | |
| Offender Type: Detentioner | | Officer(s): | | |

### Detentional Charge Detention

| Status Da | Case | Arrs | Descriptn | Convt | Job | Bl Amount |
|---|---|---|---|---|---|---|
| 03/04/2003 | 9511007022 | IN95111323 | MURDER FIRST DEGREE-INTENTIONALLY | Y | SCNC | $0.00 |
| 03/04/2003 | 9511007022 | IN95111324 | POSSESSION OF A FIREARM DURING THE | Y | SCNC | $20,000.00 |
| 03/04/2003 | 9511007022 | IN95111325 | CONSPIRACY FIRST DEGREE-AGREEMEN | Y | SCNC | $5,000.00 |
| 03/04/2003 | 9511007022 | IN95120684 | AGGRAVATED ACT OF INTIMIDATION- THI | Y | SCNC | |
| Sentence and Conviction overturned by Supreme Court 5/2001. Remanded back to Superior Court/New Castle. rlm | | | | | | |
| 03/04/2003 | 9511007022 | IN95120685 | POSSESSION OF A FIREARM DURING THE | Y | SCNC | |
| 03/04/2003 | 9511007022 | IN95120686 | CONSPIRACY SECOND DEGREE-AGREEM | Y | SCNC | |

Page 1 of 1

MERITORIOUS GOOD TIME CREDITS (H.B. 891) DATED APRIL 1, 19

FORM # 543

NAME _Manley  Michael_   NUMBER 108922 3/1 INST. _10_
   (LAST)    (FIRST)   (MIDDLE)

P.E.D. _____   S.T. DATE _____
   (BEFORE CREDITS)          (BEFORE CREDITS)

TDS

| POSTED (INIT) | DATE POSTED (6 digits) | MO. & YEAR EARNED (DAYS) | CREDITS EARNED (DAYS) | CREDITS EARNED (DAYS) | CURRENT PE DATE (6 digits) | CURRENT S.I. DATE (6 digits) | REMARKS |
|---|---|---|---|---|---|---|---|
| | 6/96 | 5/96 | 5 2.8 | 2.0 | | | L-2 CME K |
| BLW | 9/96 | 6/96 | 25 2.5 | 3 | | | U Bldg |
| CE | 11/97 | 10/97 | 5 2.5 | 2 | | | " |
| Z | 12/97 | 11/97 | 5/3 2.8 | 3 | | | |
| Z | 1/98 | 12/97 | 5/2.6 | 2 | | | U Bldg |
| Z | 2/98 | 1/98 | 5/4.8 | 2 | | | |
| UP | 7/02 | 6/02 | 3/1.8 | 1 | | | SHU |
| UP | 9/02 | 7/02 | 5/2.8 | 3 | | | SHU |
| DM | 9/02 | 8/02 | 5/2.5 | 2 | | | SHU |
| SM | 12/12 | 10/12 | 5/2.5 | 2 | | | |
| TO | 11/02 | 9/02 | 5 | 2 | | | " |
| DM | 1/13 | 11/12 | 5 | 3 | | | SHU |
| DM | 2/13 | 1/13 | 4 | 2 | | | SHU |
| MC | 4/03 | 4/13 | 4 | | | | " |
| | | 5/13 | 4 | | | | " |
| | | 6/13 | | | | | " |
| RH | 12/03 | 7/03 | 5 | | | | " |
| | | 10/03 | | | | | " |
| | | 11/03 | | | | | " |
| RH | 2/04 | 3/03 | 4 | | | | " |
| | | 12/03 | | | | | " |
| | | 1/04 | | | | | " |
| RH | 4/04 | 2/04 | | | | | |
| LM | 9/04 | 3/04 | | | | | |
| | | 4/04 | | | | | |
| | | 5/04 | | | | | |
| | | 6/04 | | | | | |
| | | 9/04 | | | | | |
| | | 8/04 | | | | | |

INSTRUCTIONS:  Print or type last name in capital letters neatly, first and middle names in small letters.
Post credits neatly and legibly in column form for ease in totaling.
6 digits date example (03-28-73) 4 digit date example (03-73)
The law provides that no more than 5 days can be credited in any given month.
However, more than 5 credits can be earned by involvement in the various treatment programs.

**DELAWARE CORRECTIONAL CENTER --- MEMORANDUM**

TO:  Inmate _Manley, Michael_, SBI# _338485_, Housing Unit _SHU_
VIA:  Counselor _MCFeddan_
FROM:  I.B.C.C.
DATE:  _1/28/03_
RE:  Classification Results

Your M.D.T. has recommended you for the following: _SHU/MAX_
_QLL1_
_____

The I.B.C.C.'s decision is to:

___ Approve _SHU/max QLL-1_
___ Not Approve _____
___ Defer _____
___ Recommend _____
___ Not Recommend _____

**BECAUSE:**

___ Lack of program participation          ___ Time remaining on sentence
___ Pending disciplinary action            ___ Prior failure under supervision
___ Gradual phasing indicated              ___ Poor institutional adjustment
___ Open charges                           ___ Serious nature of offense
___ Prior criminal history
___ Failure to follow your treatment plan in that you _____
_____
_____

___ You present a current and continuous danger to the safety of staff, other inmates, or the good
order of the Institution. Explanation: _____
_____

OTHER: _Review 04/03_
_____

**ADDITIONAL COMMENTS:**

___ Develop/continue treatment plan with counselor

You will be expected to address the following:_____
_____
_____

Copy to: Classification
Inmate
Institution File

Form #456 (3 Part NCR)
Revised 11/97

FORM # 908

CLASSIFICATION DECISION PAGE

Name: **Michael R. Manley**     SBI#: **338485**

Risk Assessment Scale:

| Community/Minimum | Minimum | Medium | Maximum |
|---|---|---|---|
| -2 to 04 | 05 - 08 | 09 -- 16 | 17 or more |

Override: ☐ Yes     ☐ No     If yes, briefly specify reason: _____

| | Present | ICB or MDT Recommendation | IBCC Recommendation/ Decision | CICB Recommendation/ Decision | IRCB Decision |
|---|---|---|---|---|---|
| Security | max | max | APP'd | | |
| Housing | SHU/DET | SHU | APP'd | | |
| Job | | | | | |
| Education | | | | | |
| Therapy | QLI | APP'd | | | |
| Other | | | | | |
| Other | | | | | |
| Next Review Date | Month 4 Year 03 | Month 04 Year 03 | Month / Year | | |

| MDT or ICB MEMBERS PRESENT | T. Jackson  R Porte | Vote: 2-0 Abstention: |
|---|---|---|
| MDT or ICB CHAIRPERSON | Lt R Porter | Date: 1/28/02 |

MDT or ICB COMMENTS  Recommend max/SHU based RA - Recently granted new penalty phase thus taking away a Murder 1st death sentence. Murder 1st is now an open charge.

| IBCC CHAIRPERSON  Lewis | Date: 01/28/03 | Vote: 3 - 0 Abstention: |
|---|---|---|
| Override (include justification in comments) _____ Comments: | | |

| CICB CHAIRPERSON | Date: | Vote: Abstention: |
|---|---|---|
| Override (include justification in comments) _____ Comments: | | |

| IRCB CHAIRPERSON: | Date: | Approved: Disapproved: |
|---|---|---|
| Override (include justification in comments) _____ Comments: | | |

DELAWARE DEPARTMENT OF CORREC
INITIAL CLASSIFICATION FORM FOR MEN

OFFENDER NAME: Manley, Michael R     DOB 9-09-74 DATE 1/27/03
LAST     FIRST     MIDDLE INITIAL

AKA: _____     SBI# 338485     SS= 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

CURRENT/LEAD OFFENSE: PFCDF     TOTAL # CHARGES _____

SENTENCE LENGTH 35 yrs EFF. DATE 11/31/85 STRD / / PED: / / TIS ___ NON-TIS ___
Years - Months - Days

**SEVERITY OF CURRENT OFFENSE**     RISK ASSESSMENT Conviction
Current Offense (other State, if applicable) Consp 1st

Low Severity ..................................................................1
Moderate Severity ...........................................................3
High Severity (all Felony Escapes) ........................................5     3
Highest Severity .............................................................7

**OTHER OFFENSES/BAIL STATUS**     Other Offense(s) & Bail Amount: Murder 1st

None ..............................................................................0
Pending probation violation; outstanding misdemeanors or bail below $5,000 .......1
Active Federal and/or State warrant or charge(s) with bail of $5,000 to $49,999 ....3     5
Pending charges without bail (not a bailable offense) or bail of $50,000 or more ....5

**ESCAPE, FAILURE TO APPEAR (FTA) HISTORY**     Escape History: none
(date and type/class)

None ..............................................................................0
One or more incidents of FTA (capias issued) or AWOL within past 3 years ..........1
Walk-off from work release, furlough, Delaware Psychiatric Center, community and/or outside job assignment, courtrooms,
police (city, state, military, etc.), Recovery Center within the past 3 years .........2     0
Attempted escape from a secure institution within the past five years or escape from secure institution 10 + years ago...........3
Escape from a secure institution within the past ten years ..........................7

**CURRENT AGE**     Current Age: 29

38+ ..............................................................................0
Age 19 or less/Juvenile convicted as an adult .......................................1
Age 28 - 37 .......................................................................2     2
Age 20 - 27 .......................................................................3

**PRIOR CRIMINAL HISTORY DURING THE LAST 10 YEARS**     Number of Prior Felony Convictions (include Level I-IV, other States) N/A

No prior felony conviction..........................................................0
1 prior felony conviction...........................................................1
2 - 3 prior felony convictions......................................................2     0
4+ prior felony convictions.........................................................3

**SEVERITY OF CRIMINAL HISTORY DURING THE LAST 10 YEARS**   Most Serious Prior Felony Conviction: none

No prior conviction ...............................................................0
Low Severity conviction ...........................................................1
Moderate Severity conviction ......................................................2     0
High Severity conviction ..........................................................4
Highest Severity conviction .......................................................5

**INSTITUTIONAL MISCONDUCT HISTORY (Consider institutional reports during last 5 years )**

First incarceration or No prior Major/Class I Institutional Reports....................0
Major/Class I - Non-Predatory Institutional Misconduct Report .......................5
Major/Class I - Predatory/Assaultive Institutional Misconduct Report ................7     7
Most Serious Institutional Misconduct Report: 10/15/02 ORT
Actual Number of Class I Reports during last 5 years of incarceration. _____
Actual Number of Class I Reports during the first 6 months of the current incarceration _____

TIME REMAINING ON SENTENCE   FORM # 900-A     Actual Time Remaining to Serve: _55 yrs._

Less than 12 months remaining on sentence (up to 11.99 months)................................... 0
12.00 to 23.99 months remaining on sentence .................................................. 1
24.00 to 59.00 months remaining on sentence .................................................. 2
60.00 to 119.00 months remaining on sentence ................................................. 3
120.00 or more remaining on sentence ......................................................... 4    **4**
Life without benefit of parole ................................................................ 6

**RISK ASSESSMENT SCORE:**              **21**

**RISK ASSESSMENT SCALE:**    Community/Minimum    Minimum    Medium    Maximum
                             00 - 04         05 - 08    09 - 16    17 or more

**Preliminary Security Level (as indicated by scale)**

____ Community/Minimum        ____ Minimum        ____ Medium        ✓ Maximum

**OVERRIDES:**

**A. When at least one of the conditions listed below is present, the offender must be assigned no lower than medium security.**
(Check all that apply and comment as deemed appropriate.)

____ Sentenced to Death    ____ Life Without Parole    ____ Time to Serve (120 months or more)    ____ Current Conviction is Rated Highest Severity Score

**B. Any one of the conditions listed below may serve as basis for an override, resulting in higher or lower security than indicated by the preliminary score.** (Check all that apply and comment as deemed appropriate.)

____ Protective Custody or Need for separation from General Population:_____

____ Documented membership in security threat group

____ Pending institutional report(s) under investigation

____ Notorious/high profile case

____ Mental Health

____ Physical/medical limitations that could affect housing placement_____

____ Program Need:_____

____ Court Order:_____

____ Other (specify):_____

**Recommended Security Level (same as preliminary score if no overrides)**

____ Community/Minimum        ____ Minimum        ____ Medium        ____ Maximum

Correction Worker                        Date   11/24/03

Comments:_____

_____

**Final Security Level Recommendation (Check appropriate security level.)**

____ Community/Minimum        ____ Minimum        ____ Medium        ____ Maximum

_____        _____
Classification Officer/Unit Supervisor (required for overrides; optional for other decisions)    Date

**NOTE:** Classification Officer/Unit Supervisor may change recommendation by classification worker, but must provide written justification in comments below.

Comments:_____

_____

**Housing Assignment:**_____    Next Classification Date:_____

*Program Assignment(s)_____

## Offender Status Sheet

Date: 01/27/2003

| | | | | |
|---|---|---|---|---|
| ;BI #: __00338485__ | Name: <u>MICHAEL R MANLEY</u> | | | |
| .ocation(s): <u>DCC</u> | Level(s): 5 | Race: <u>BLACK</u> | DOB: <u>07/29/1974</u> | |
| \KA: <u>MICHAEL R MANLEY</u> | | | | |
| )ffender Type: <u>Sentenced</u> | Officer(s): | | | |

| | | | | | Level: 5 | | | | | | | |

| Start Date: 11/13/1995 | MED: | STRD: | ADJ: | PED: | Statutory Days Earned:  0.00 |

| CASE#/ Court | CRA#/ Judge | Charge Desc/ Sen. Type | Sentence Date | Status/ Eff. Date | Length Y | Length M | Length D | Start Dt | MED | STRD | Adj Date | CR | Wk |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| )511007022 | IN95111323 | MURDER,1ST | | Current | 0 | 0 | 0 | 11/13/1995 | | | | | |
| | Norman A Barron | DEATH | 01/10/1997 | | | | | | | | | | |
| )511007022 | IN95111324 | PFDCF | | Current | 0 | 0 | 0 | 11/13/1995 | | | | | |
| | Norman A Barron | DEATH | 01/10/1997 | | | | | | | | | | |
| )511007022 | IN95111325 | CONSP 1ST | | Current | 0 | 0 | 0 | 11/13/1995 | | | | | |
| | Norman A Barron | DEATH | 01/10/1997 | | | | | | | | | | |

;pecial Conditions:

| CRA# | Level | Code | Condition Description | Condition Comments |
|---|---|---|---|---|
| IN95111323 | 5 | CRT1 | Other Conditions: | AS TO 1323: SENTENCED TO DEATH. AS TO 1324: BE IMP. FO 20 YEARS LEVEL #5. |
| IN95111323 | 5 | CRT1 | Other Conditions: | AS TO 1325: BE IMP. FOR 5 YEARS LEVEL #5. AS TO 0684: BE IMP. FOR 20 YEARS |
| IN95111323 | 5 | CRT1 | Other Conditions: | D. O'HANLON CORR CLERK |
| IN95111323 | 5 | CRT1 | Other Conditions: | FOR 2 YEARS LEVEL #5. DEATH + 55 YEARS. |
| IN95111323 | 5 | CRT1 | Other Conditions: | LEVEL #5. AS TO 0685: BE IMP. FOR 20 YEARS LEVEL #5. AS T 0686: BE IMP. |
| IN95111323 | 5 | CRT1 | Other Conditions: | TIS          TIS          TIS |
| IN95111324 | 5 | CRT1 | Other Conditions: | AS TO 1323: SENTENCED TO DEATH. AS TO 1324: BE IMP. FO 20 YEARS LEVEL #5. |
| IN95111324 | 5 | CRT1 | Other Conditions: | AS TO 1325: BE IMP. FOR 5 YEARS LEVEL #5. AS TO 0684: BE IMP. FOR 20 YEARS |
| IN95111324 | 5 | CRT1 | Other Conditions: | D. O'HANLON CORR CLERK |
| IN95111324 | 5 | CRT1 | Other Conditions: | FOR 2 YEARS LEVEL #5. DEATH + 55 YEARS. |
| IN95111324 | 5 | CRT1 | Other Conditions: | LEVEL #5. AS TO 0685: BE IMP. FOR 20 YEARS LEVEL #5. AS T 0686: BE IMP. |
| IN95111324 | 5 | CRT1 | Other Conditions: | TIS          TIS          TIS |
| IN95111325 | 5 | CRT1 | Other Conditions: | AS TO 1323: SENTENCED TO DEATH. AS TO 1324: BE IMP. FO 20 YEARS LEVEL #5. |
| IN95111325 | 5 | CRT1 | Other Conditions: | AS TO 1325: BE IMP. FOR 5 YEARS LEVEL #5. AS TO 0684: BE IMP. FOR 20 YEARS |
| IN95111325 | 5 | CRT1 | Other Conditions: | D. O'HANLON CORR CLERK |
| IN95111325 | 5 | CRT1 | Other Conditions: | FOR 2 YEARS LEVEL #5. DEATH + 55 YEARS. |
| IN95111325 | 5 | CRT1 | Other Conditions: | LEVEL #5. AS TO 0685: BE IMP. FOR 20 YEARS LEVEL #5. AS T 0686: BE IMP. |
| IN95111325 | 5 | CRT1 | Other Conditions: | TIS          TIS          TIS |

Page 1 of 1

TO: _Manley, Michael_    SBI# _338485_

DATE: _1/27/03_

FROM:    CLASSIFICATION OFFICE

RE:    QUALITY OF LIFE LEVEL ASSIGNMENT/CLASSIFICATION

This is to inform you that you have been classified by the Multi-Disciplinary Team (MDT) to _MAX_ Security level. Your Quality of Life Level assignment is Level _1_. You will be required to complete your treatment plan and follow institutional rules. Negative behavior, excessive write-ups, or failure to complete your treatment plan will result in a higher security level and lower Quality of Life Level with less privileges. Your individual treatment plan is listed below and your assigned counselor will monitor your progress. Direct questions to your counselor. NOTE: This classification is subject to higher review.

### TREATMENT PLAN

_QLL 1 Programs_

Three part form:
Original: Records
Pink: File
Yellow: Inmate

Inmate Signature _[signature]_
Date _1/28/03_

FORM # 99

Appendix E

## DELAWARE CORRECTIONAL CENTER ---- MEMORANDUM

TO:        Inmate _Michel Marshy_        SBI# _378483_ , Housing Unit _U_
VIA:       Counselor _Dupont_
FROM:   I.B.C.C.
DATE:     _3/21/00_
RE:         Classification Results

Your M.D.T. has recommended you for the following: _____
_Continue Max/HC_ _____

The I.B.C.C.'s decision is to:

_X_ Approve _____

____ Not Approve _____

____ Defer _____

____ Recommend _____

____ Not Recommend _____

**BECAUSE:**

____ Lack of program participation        ____ Time remaining on sentence
____ Pending disciplinary action          ____ Prior failure under supervision
____ Gradual phasing indicated            ____ Poor institutional adjustment
____ Open charges                         ____ Serious nature of offense
____ Prior criminal history
____ Failure to follow your treatment plan in that you _____
_____

____ You present a current and continuous danger to the safety of staff, other inmates, or the good
order of the Institution. Explanation: _____
_____

OTHER: _Rev 12/00_ _____
_____

**ADDITIONAL COMMENTS:**

____ Develop/continue treatment plan with counselor

You will be expected to address the following: _____
_____
_____

Copy to: Classification
         Inmate
         Institution File

Form #456 (3 Part NCR)
Revised 11/97

## BUREAU OF PRISONS RECLASSIFICATION FORM #004

**I.** **Vital Indicators/Sentencing Information**

Inmate Name Manley, Michael    AKA    ————    SBI No 338483 Date of Birth 7/29/74

Facility DCC    Security/Custody Level Max H/K    Housing Area MSU

Current Offense(s) Murder 1st, Agg Act of inti.

Level V Sentence: Year(s): Death + 55yrs Month(s): ——    Day(s): ——— Truth in Sentence? Yes ✓ No ———

Sentence Effective Date 11/13/95 STRD: 88    PE Date: ——— Parole Rehearing Date ———

Mandatory Sentence: Year(s) ——— Month(s) ——— Day(s) ——— Level IV Sentence? Yes ——— Length ———
No ✓

Detainer(s)? Yes ——— Agency ——— Open Charge(s)? Yes ——— 4204K? Yes ——— End Date of 4204K ———
No ✓    No ———    No ✓

4205L?    Yes ———    4214B/Habitual Offender? Yes ———
No ✓    No ———

**II.** **Prior Criminal History**

Escape History (List date, charge for which convicted, and location from which escape occurred):

Sex Offenses (List date, charges, and ages of victim(s) for all sex offenses):

DNA sample obtained? Yes ——— No ——— (If no, contact Institutional Investigator)

List the most serious offenses in the past 10 years (not previously listed in Escape History or Sex Offenses).

current

DUI Information (Complete if inmate is serving a sentence for DUI)

Has information been verified via Motor Vehicle Records? Yes ——— No. of DUI's ———
No ———

Date(s) of offense(s): 1st ——— 2nd ——— 3rd ——— 4th ———

BOP-004 / Page 1 of 2
Justification for Request
Form# 135

BOP FORM 004

**III.    Institution Disciplinary History (summarize last 6 months – include dates, offenses, dispositions)**

24 hr. LOAP 7/18/00 ### OH Limit?
PHB 7/18/00 CHSFH, PNDC

**IV.    Current Program Participation/Work Assignment** (Justification for Request/Change or Recommendation must be recorded on page 3.)

**V.    Program Request/Change or Recommendation**

MDT Recommendation:
Housing/Security Level    Cont Max HIC
Employment _____    On/Off Grounds _____
Education _____    Treatment Program _____
Work Release _____    Supervised Custody _____
Halfway House Worker _____    Highway Work Project _____
Other Recommendation: _____
Furlough _____ To Visit: Name _____    Relationship _____
Address _____
Purpose of Visit _____
Has inmate had prior participation in any program recommended?    Yes ____    No ____
Number of prior approvals for any program recommended _____
Is exception to standards requested? Yes _____    No _____
(If yes, give reason for exception) _____

**VI.    Victim Notification Information**

Offender's Release Address (if required) _____
Name of Victim(s) _____
Last Know Address of Victim _____

_____ 9/11/00    _____ 09/12/00
Signature of Counselor    Date    Signature of Counselor Supervisor    Date

**MDT Review**
MTD:    Recommended __✓__    Not Recommended _____    Vote _2-0_
_____    9/11/00
Signature of MDT Chairperson    Date

**IBCC Review**
IBCC:    Approved ____ Disapproved ____ Recommended ____    Not Recommended _____    Vote (5-0)
_____    9/21/00
Signature of IBCC Chairperson    Date
Comments _____

**CICB Review**
CICB:    Approved ____ Disapproved ____ Recommended ____    Not Recommended _____    Vote _____
_____    _____
Signature of CICB Chairperson    Date
Comments _____

**IRCB Review**
IRCB:    Approved ____    Disapproved ____    Vote _____
_____    _____
Signature of IRCB Chairperson    Date
Comments _____

**Distribution After Final Committee Review**
Copy to: Classification
        Institution File (original)
        Special Programs Office (as required)

BOP-004 / Page 2 of 2
Revised 1/98        Form# 135

Form# 135
BOP Form 004

## JUSTIFICATION FOR REQUEST/CHANGE OR RECOMMENDATION

INMATE NAME  Manley, Michael    SBI#  338483

The MDT recommends I/M Manley continue in his present Classification. He has continued to receive writeups along with sentence, continue max H/C seems the most appropriate classification.

Recommended review date: _____

Form 107 (F&B)                    **Staff Observation Report**                    APPENDIX D

## This form is to be considered contraband if in the possession of an inmate.

Inmate's Name: _Mawley, Michael_    SBI# _338 485_    Housing Unit _MSU_    Tier _1143_

Evaluators: 12-8 _C. Laufine_

8-4

4-12 _Aldana Virginia_

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| | | | |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | | |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | | | |
| 24) Keeps room neat/clean, bed made | | | |
| 25) Keeps himself neat/clean | | | |
| 26) Volunteers for projects | | | |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows Inmate Housing Rules | | | |
| 30) Has positive attitude | | | |
| 31) Finds acceptable ways to keep busy | | | |
| 32) Approaches staff in open/honest way | | | |
| Reviewed by Shift Lieutenant | Date 6-14-00 Sgn | Date 25/00 Sgn J.S | Date    Sgn |

Additional comments to be placed on back of form

Form# 107 (F&B)

Additional Comments:_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Form 107 (F&B)

Additional Comments:_____

Form #107 (F&B)                 **Staff Observation Report**                 APPENDIX D

† **This form is to be considered contraband if in the possession of an inmate.**

| Inmate's Name: _Manley, Michael_ | SBI# _338485_ | Housing Unit _MHU_ | Tier _AUS_ |

Evaluators: 12-8  _W. EVANS_                                              _24 July 00_
8-4 _Sgt. Sullivan M, ____
4-12 _Gordon Vaughn Fredrick Bryant_

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | | | |
| 2) Tense, cannot relax | | GR | |
| 3) Takes no pleasure in anything | | JD | |
| | | | |
| 5) Moody, brooding | | L | |
| 6) Tries to con (manipulate) staff | | L | CV |
| 7) Impulsive, unpredictable | | D | KAV w CB |
| 8) Seeks excitement | | as Ry | |
| 9) Is never happy | | L | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | N | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | P | | |
| 15) Participates in group demonstrations | r | | |
| 16) Thinks only of himself | o | L | |
| 17) Displays negative attitude | b | L | |
| 18) Breach of group confidentiality | l | | |
| 19) Speaks of goals/plans | e | | |
| 20) Gets along with others | m | as Ry | CB |
| 21) Accepts blame/some of his troubles | s | | |
| 22) Accepts blame/all of his troubles | | as Ry | CB |
| 23) Respects authority | | as Ry | CB |
| 24) Keeps room neat/clean, bed made | | as Ry | JS CB |
| 25) Keeps himself neat/clean | | as Ry | JS CB |
| 26) Volunteers for projects | | | |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows Inmate Housing Rules | | as Ry | JS P.I. CB |
| 30) Has positive attitude | | | |
| 31) Finds acceptable ways to keep busy | | | |
| 32) Approaches staff in open/honest way | | | |
| Reviewed by Shift Lieutenant | Date: _7-13-00_  Sgn: | Date:          Sgn: | Date:          Sgn: |

Additional comments to be placed on back of form.            X 23        H

**Additional Comments:**

FORM 107 (F&B)

**Staff Observation Report**

**This form is to be considered contraband if in the possession of an inmate.**

| Inmate's Name: Manlay, Michael | SBI# 338 483 | Housing Unit B H/C | Tier A03 |

Evaluators: 12-8 _____   8/31/00

8-4 Sgt. Cullin or C. Hastings

4-12 C/o J. Baker, Kearn, Vaughn, Twoskiewicz

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | | | KW |
| 5) Moody, brooding | No | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | Problem | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | KW |
| 17) Displays negative attitude | | | KW |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | | JB |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | as/CH | JB | W PI |
| 24) Keeps room neat/clean, bed made | | JB | W PI |
| 25) Keeps himself neat/clean | | JB | W PI |
| 26) Volunteers for projects | | JB | |
| 27) Likeable | | JB | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows Inmate Housing Rules | as/CH | JB | JV |
| 30) Has positive attitude | | | |
| 31) Finds acceptable ways to keep busy | | JB | PI  JV |
| 32) Approaches staff in open/honest way | | JB | |

| Reviewed by Shift Lieutenant | Date:   Sign: | Date:   Sign: | Date:   Sign: |

Additional comments to be placed on back of form.

## DELAWARE CORRECTIONAL CENTER ---- MEMORANDUM

TO:      Inmate _Rawley, Michael_____, SBI# _358483_____, Housing Unit _MSU_

VIA:     Counselor _Jack Stevenson_____

FROM:    I.B.C.C.

DATE:    _____

RE:      Classification Results

Your M.D.T. has recommended you for the following: _Continue MAX / HIGH MSU_

_Program_____

_____

The I.B.C.C.'s decision is to:

_X___ Approve

_____ Not Approve

_____ Defer _____

_____ Recommend _____

_____ Not Recommend _____

**BECAUSE:**

_____ Lack of program participation        _____ Time remaining on sentence

_____ Pending disciplinary action          _____ Prior failure under supervision

_____ Gradual phasing indicated            _____ Poor institutional adjustment

_____ Open charges                         _____ Serious nature of offense

_____ Prior criminal history

_____ Failure to follow your treatment plan in that you _____

      _____

_____ You present a current and continuous danger to the safety of staff, other inmates, or the good
      order of the Institution.  Explanation: _____

      _____

**OTHER:** _P/00_____

_____

**ADDITIONAL COMMENTS:**

_____ Develop/continue treatment plan with counselor

You will be expected to address the following:_____

_____

_____

Copy to: Classification
         Inmate                                Form #456 (3 Part NCR)
         Institution File                      Revised 11/97

## BUREAU OF PRISONS RECLASSIFICATION FORM #004

**I.**  **Vital Indicators/Sentencing Information**

Inmate Name _Mawley, Michael_ AKA _none_ SBI No _338143_ Date of Birth _2/29/70_
mo / da / yr

Facility _DCC_ Security/Custody Level _MAX/HIGH_ Housing Area _MHU_

Current Offense(s) _Murder I, Aggravated Act of Intimidation_

Level V Sentence: Year(s): _Death_ Month: _—_ Day(s): _—_ Truth in Sentence? Yes _✓_ No _____
_755 yrs_

Sentence Effective Date _11/13/95_ STRD: _none_ PE Date: _—_ Parole Rehearing Date _—_

Mandatory Sentence: Year(s) _10_ Month(s) _—_ Day(s) _—_ Level IV Sentence? Yes_____ Length _—_
No _✓_

Detainer(s)? Yes_____ Agency _—_ Open Charge(s)? Yes_____ 4204K? Yes_____ End Date of 4204K _—_
No _✓_ No _✓_ No _✓_

4205L?    Yes_____ 4214B/Habitual Offender? Yes_____
No _✓_ No _✓_

**II.**  **Prior Criminal History**

Escape History (List date, charge for which convicted, and location from which escape occurred):

_none_

Sex Offenses (List date, charges, and ages of victim(s) for all sex offenses):

_none_

DNA sample obtained? Yes_____ No _unknown_ (If no, contact Institutional Investigator)

List the most serious offenses in the past 10 years (not previously listed in Escape History or Sex Offenses).

_Current Offenses_

DUI Information (Complete if inmate is serving a sentence for DUI) _N/A_

Has information been verified via Motor Vehicle Records? Yes _____ No. of DUI's _____
No

Date(s) of offense(s): 1st _____ 2nd _____ 3rd _____ 4th _____

BOP FORM 004

III. **Institution Disciplinary History (summarize last _3_ months – include dates, offenses, dispositions)**

_NONE_

IV. **Current Program Participation/Work Assignment** (Justification for Request/Change or Recommendation must be recorded on page 3.)

_BASIC Program_

V. **Program Request/Change or Recommendation**

MDT Recommendation:

| | | | |
|---|---|---|---|
| Housing/Security Level | _Continue · Max / High - Indiv_ | | |
| Employment | | On/Off Grounds | |
| Education | | Treatment Program | _Cont BASIC Program_ |
| Work Release | | Supervised Custody | |
| Halfway House Worker | _N/A_ | Highway Work Project | |

Other Recommendation: _____

Furlough _____  To Visit: Name _____  Relationship _____

Address _____

Purpose of Visit _____

Has inmate had prior participation in any program recommended?    Yes _____    No _____

Number of prior approvals for any program recommended   _N/A_

Is exception to standards requested?  Yes _____    No _____

(If yes, give reason for exception) _____

VI. **Victim Notification Information**

Offender's Release Address (if required) _____   _N/A_

Name of Victim(s) _____

Last Known Address of Victim _____

_Stephenson_   _5-17-00_        _Allston_   _6-7-00_

Signature of Counselor    Date          Signature of Counselor Supervisor    Date

**MDT Review**

MTD:   Recommended _X_    Not Recommended _____    Vote _2-0_

Signature of MDT Chairperson _____    Date _8/11/00_

**IBCC Review**

IBCC:  Approved _____  Disapproved _____  Recommended _____  Not Recommended _____  Vote _3-0_

Signature of IBCC Chairperson _____    Date _6/15/00_

Comments _____

**CICB Review**

CICB:  Approved _____  Disapproved _____  Recommended _____  Not Recommended _____  Vote _____

Signature of CICB Chairperson _____    Date _____

Comments _____

**IRCB Review**

IRCB:  Approved _____  Disapproved _____    Vote _____

Signature of IRCB Chairperson _____    Date _____

Comments _____

**Distribution After Final Committee Review**

Copy to: Classification
    Institution File (original)
    Special Programs Office (as required)

BOP-004 / Page 2 of 2
Revised 1/98        Form# 135

Form# 135
BOP Form 004

## JUSTIFICATION FOR REQUEST/CHANGE OR RECOMMENDATION

INMATE NAME _Manley, Michael_  SBI# _338483_

While Manley has not been a management problem — the Team does not recommend him out of MHU — given the nature of his Sentence (Death). The team votes 2-0 to continue MHU/High - MHU.

Note: Manley refused to attend this Classification review. (See attached 404

Recommended review date: _8/00_

Form# 107 (F&B)                    **Staff Observation Report**                    APPENDIX D

**This form is to be considered contraband if in the possession of an inmate.**

Inmate's Name: _McINNEY MICHAEL_    SBI# _338485_    Housing Unit _MDU_    Tier _AU3_

Evaluators: 12-8 _C. Lelicu_

8-4 _M. Sell_    _5-30-06_

4-12 _Perez Vign_

Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| | | | |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | | _Jc CB GP_ |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | _ur Py MS_ | |
| 23) Respects authority | | _MS_ | _Jc CB GP_ |
| 24) Keeps room neat/clean, bed made | | | _Jc CB GP_ |
| 25) Keeps himself neat/clean | | _MS_ | _Jc CD GP_ |
| 26) Volunteers for projects | | | |
| 27) Likeable | | _MS_ | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows Inmate Housing Rules | | _ur Py MS_ | _Jc CB GP_ |
| 30) Has positive attitude | | | _Jc CB GP_ |
| 31) Finds acceptable ways to keep busy | | | _Jc CB GP_ |
| 32) Approaches staff in open/honest way | | _ur Py MS_ | |
| Reviewed by Shift Lieutenant | Date _5/17/06_ Sign _CLL_ | Date _5/24/06_ Sign | Date _5/31/06_ Sign _CT_ |

107 (F&B)                                                      Appendix D2

**Additional Comments:**_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Form 107 (F&B)                    **Staff Observation Report**                    APPENDIX D

**This form is to be considered contraband if in the possession of an inmate.**

| Inmate's Name: MANLEY MICHAEL | SBI# 335405 | Housing Unit MDa | Tier |
|---|---|---|---|

Evaluators: 12-8 _____

8-4 _____

4-12 _____                                                    2-28-00

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried. anxious | | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 5) Moody, brooding | | C.T.J.A. | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | C.T.J.A. | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | C.T.J.A. | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | C.T.J.A. | |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | | | |
| 24) Keeps room neat/clean, bed made | | | |
| 25) Keeps himself neat/clean | | | |
| 26) Volunteers for projects | | | |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows Inmate Housing Rules | | | |
| 30) Has positive attitude | | | |
| 31) Finds acceptable ways to keep busy | | | |
| 32) Approaches staff in open/honest way | | | |
| Reviewed by Shift Lieutenant | Date: | Date: | 2-26-00 |

Additional comments to be placed on back of form

**Additional Comments:** _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Form# 107 (F&B)                **Staff Observation Report**                APPENDIX D

**This form is to be considered contraband if in the possession of an inmate.**

Inmate's Name: _MANLEY, MICHAEL_  SBI# _338985_  Housing Unit _MSU_  Tier _AU3_

Evaluators: 12-8 _C.u._____

8-4 _will___

4-12 _Vergo___

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive; unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | | |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | av | |
| 23) Respects authority | | av | |
| 24) Keeps room neat/clean, bed made | | av | |
| 25) Keeps himself neat/clean | | av | |
| 26) Volunteers for projects | | | |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | av | |
| 29) Follows Inmate Housing Rules | | av | |
| 30) Has positive attitude | | | |
| 31) Finds acceptable ways to keep busy | | av | |
| 32) Approaches staff in open/honest way | | | |
| Reviewed by Shift Lieutenant | Date 3/08/00 Sign C...u.. | Date 3/8/00 Sign | 3-28-0 Sign PSKC |

Form# 107 (F&B)

**Additional Comments:**_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Form# 107 (F&B)

**Staff Observation Report**

APPENDIX D

**This form is to be considered contraband if in the possession of an inmate.**

| Inmate's Name: Manley, Michael | SBI# 00 338485 | Housing Unit MSU | Tier A43 |
|---|---|---|---|

Evaluators: 12-8  C. Ward

8-4  _____  4-28-00

4-12  Vaughn / (P) Snow  _____

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 5) Moody, brooding | | MY GA | |
| 6) Tries to con (manipulate) staff | | MY GA | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | as GA | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | MY GA | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | MY GA | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | as Ry MY | CB |
| 21) Accepts blame/some of his troubles | | as Ry | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | | as Ry | CB GP |
| 24) Keeps room neat/clean, bed made | | as Ry MY | JS CB GP |
| 25) Keeps himself neat/clean | | as Ry | JS CB GP |
| 26) Volunteers for projects | | | |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows Inmate Housing Rules | | as MY | CB GP |
| 30) Has positive attitude | | | |
| 31) Finds acceptable ways to keep busy | | sia | CB GP |
| 32) Approaches staff in open/honest way | | as MY | JS |

*(vertical note in column: "no problems")*

| Reviewed by Shift Lieutenant | Date: 4/25/00  Sign: C.W. | Date: 4/30/00 | Date: 4-30-00  Sign: PSK |
|---|---|---|---|

+ 44    − 10

Additional comments to be placed on back of form.

Form# 107 (F&B)                                          Appendix D2

**Additional Comments:**_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Appendix E

## DELAWARE CORRECTIONAL CENTER ---- MEMORANDUM

TO:     Inmate _Michael Manley_ , SBI# _338483_ , Housing Unit _U_

VIA:    Counselor _____

FROM:   I.B.C.C.

DATE:   _2/24/00_

RE:     Classification Results

Your M.D.T. has recommended you for the following: _____

_Continue Max/HC_ _____

_____

The I.B.C.C.'s decision is to:

___X___ Approve _____

_____ Not Approve _____

_____ Defer _____

_____ Recommend _____

_____ Not Recommend _____

**BECAUSE:**

_____  Lack of program participation          _____  Time remaining on sentence
_____  Pending disciplinary action            _____  Prior failure under supervision
_____  Gradual phasing indicated              _____  Poor institutional adjustment
_____  Open charges                           _____  Serious nature of offense
_____  Prior criminal history
_____  Failure to follow your treatment plan in that you _____

_____

_____

_____  You present a current and continuous danger to the safety of staff, other inmates, or the good
       order of the Institution.  Explanation: _____

_____

**OTHER:** _Rw 5/00_ _____

_____

**ADDITIONAL COMMENTS:**

_____  Develop/continue treatment plan with counselor

You will be expected to address the following: _____

_____

_____

Copy to: Classification
         Inmate                                    Form #456 (3 Part NCR)
         Institution File                          Revised 11/97

## BUREAU OF PRISONS RECLASSIFICATION FORM #004

**I.**  **Vital Indicators/Sentencing Information**

Inmate Name *MANLEY, MICHAEL* AKA *NONE* ___ SBI No *338483* Date of Birth *2/29/20*

Facility *D.C.C.* ___ Security/Custody Level *MAX/HIGH* Housing Area *MSU.*

Current Offense(s) *MURDER I, AGGRAVATED ACT OF INTIMIDATION*

_____

Level V Sentence:  Year(s): *DEATH* Month: ___ Day(s): ___ Truth in Sentence?  Yes *X* No ___

Sentence Effective Date *4/13/95* STRD: *NONE* PE Date: *NONE* Parole Rehearing Date *NONE*

Mandatory Sentence:  Year(s) *NO* Month(s) ___ Day(s) ___ Level IV Sentence?  Yes ___ Length ___
No *X*

Detainer(s)? Yes ___ Agency ___ Open Charge(s)? Yes ___ 4204K? Yes ___ End Date of 4204K ___
No *X* ___ No *X* ___ No *X*

4205L? Yes ___ 4214B/Habitual Offender?  Yes ___
No *X* ___ No *X*

**II.**  **Prior Criminal History**

Escape History (List date, charge for which convicted, and location from which escape occurred):

*NONE* _____

_____

Sex Offenses (List date, charges, and ages of victim(s) for all sex offenses): _____

*NONE* _____

*Unknown*

DNA sample obtained?  Yes ___ No ___ (If no, contact Institutional Investigator)

List the most serious offenses in the past 10 years (not previously listed in Escape History or Sex Offenses).

*CURRENT OFFENSES* _____

_____

_____

DUI Information (Complete if inmate is serving a sentence for DUI)

Has information been verified via Motor Vehicle Records?  Yes ___ No. of DUI's ___
No ___

Date(s) of offense(s):  1st ___ 2nd ___ 3rd ___ 4th ___

BOP-004 / Page 1 of 2
Justification for Request
Form# 135

BOP FORM 004

**III.    Institution Disciplinary History** (summarize last 3 months – include dates, offenses, dispositions)

*NONE*

**IV.    Current Program Participation/Work Assignment** (Justification for Request/Change or Recommendation must be recorded on page 3.)

*MSU PROGRAM*

**V.    Program Request/Change or Recommendation**
MDT Recommendation:
Housing/Security Level  *CONTINUE - MAX/HIGH-MSU*

| | |
|---|---|
| Employment | On/Off Grounds |
| Education | Treatment Program  *CONT. MSU PROGRAM* |
| Work Release | Supervised Custody |
| Halfway House Worker | Highway Work Project |
| Other Recommendation: | |

Furlough _____ To Visit: Name  *N/A*  Relationship _____
Address _____
Purpose of Visit _____
Has inmate had prior participation in any program recommended?    Yes _____    No _____
Number of prior approvals for any program recommended *N/A*
Is exception to standards requested?  Yes _____  No *N/A*
(If yes, give reason for exception) _____

**VI.    Victim Notification Information**
Offender's Release Address (if required)  *N/A*
Name of Victim(s) _____
Last Know Address of Victim _____

_Signature of Counselor_      Date *2-16-00*        _Signature of Counselor Supervisor_    Date *2-18-00*

**MDT Review**
MDT:  Recommended __X__        Not Recommended _____        Vote *2-0*
_Signature of MDT Chairperson_    Date *2-15-00*

**IBCC Review**
IBCC:  Approved __X__  Disapproved _____  Recommended _____    Not Recommended _____  Vote *3-0*
_Signature of IBCC Chairperson_    Date *2/24/00*
Comments _____

**CICB Review**
CICB:  Approved _____  Disapproved _____  Recommended _____    Not Recommended _____  Vote _____
_Signature of CICB Chairperson_    Date _____
Comments _____

**IRCB Review**
IRCB:  Approved _____  Disapproved _____    Vote _____
_Signature of IRCB Chairperson_    Date _____
Comments _____

**Distribution After Final Committee Review**
Copy to:  Classification
Institution File (original)
Special Programs Office (as required)

BOP-004 / Page 2 of 2
Revised 1/98        Form# 135

Form# 135
BOP Form 004

Appendix C3

Page 3

## JUSTIFICATION FOR REQUEST/CHANGE OR RECOMMENDATION

INMATE NAME _Manley, Michael_    SBI# _00338483_

Given the nature of his sentence (Death)
the team see's no reason to change his
Classification from Max/High.
Manley's S.E.L's continue to be more
Positive than negative and he enjoys Level-
2A privileges.
Vote 2-0 to continue Max/High.

Recommended review date: _5/00_

Form# 107 (F&B)

**Staff Observation Report**    APPENDIX D

**This form is to be considered contraband if in the possession of an inmate.**

Inmate's Name: MANNEY, MICHAEL    SBI# 338483    Housing Unit: MSB/A    Tier: AB3

Evaluators: 12-8 Cpl Robinson

8-4 Cpl Harra, Cpl Kelly, Cpl subington, Plac A/Cx    Return by 1-31-00

4-12 Cpl Welcome (aw) O% Payment SloVaway A/CIW

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | NONE | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | M Ryan W | W Cw    W |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | | M Ryan W | W Cw W    W |
| 24) Keeps room neat/clean, bed made | | M Ryan W | W Cw W    W |
| 25) Keeps himself neat/clean | | M Ryan W | W Cw W    W |
| 26) Volunteers for projects | | | |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows Inmate Housing Rules | | M Ry M ryi | W W W W    W |
| 30) Has positive attitude | | M rr | |
| 31) Finds acceptable ways to keep busy | | M rr | W Cw W    W |
| 32) Approaches staff in open/honest way | | | |
| **Reviewed by Shift Lieutenant** | Date: 1-6-00 Sign: C Rob | Date: 1/10/00 Sign: MJ | 1-27-00 Sign: PSK |

Additional comments to be placed on back of form.

**Additional Comments:**_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Form# 107 (F&B)                    **Staff Observation Report**                    APPENDIX D

**This form is to be considered contraband if in the possession of an inmate.**

| Inmate's Name: _McNeil, Michael_ | SBI# _328905_ | Housing Unit _MSU_ | Tier _A-2_ |

Evaluators: 12-8 _C. Wenzel_
8-4 _A. Acevar_                    _12-29-99_
4-12 _J.C. Gum_

Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.

|  | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| ) Worried, anxious |  |  |  |
| ) Tense, cannot relax |  |  |  |
| ) Takes no pleasure in anything |  |  |  |
| ) Moody, brooding |  | R.y | JG |
| ) Tries to con (manipulate) staff |  |  |  |
| ) Impulsive, unpredictable |  | A+B R.y | JG |
| ) Seeks excitement |  |  |  |
| ) Is never happy |  |  |  |
| 0) Daydreams, is preoccupied |  |  |  |
| 1) Tries to play staff against each other |  |  |  |
| 2) Considers himself unjustly confined |  |  |  |
| 3) Frequently upset after visits |  |  |  |
| 4) Frequently upset after receiving mail |  |  |  |
| 5) Participates in group demonstrations |  |  |  |
| 6) Thinks only of himself |  |  |  |
| 7) Displays negative attitude |  |  |  |
| 8) Breach of group confidentiality | no problems |  |  |
| 9) Speaks of goals/plans |  |  | JG |
| 0) Gets along with others |  |  | JG |
| 1) Accepts blame/some of his troubles |  |  |  |
| 2) Accepts blame/all of his troubles |  |  |  |
| 3) Respects authority |  | R.y | JG |
| 4) Keeps room neat/clean, bed made |  | A+B R.y MG | @ JG |
| 5) Keeps himself neat/clean |  | A+B R.y MG | @ JG |
| 6) Volunteers for projects |  |  |  |
| 7) Likeable |  |  |  |
| 8) Discusses personal problems w/staff |  |  | JG |
| 9) Follows Inmate Housing Rules |  |  | JG |
| 0) Has positive attitude |  |  |  |
| 1) Finds acceptable ways to keep busy |  | A+B R.y MG | @ JG |
| 2) Approaches staff in open/honest way |  | A+B |  |
| Reviewed by Shift Lieutenant | Date 12/15/99 Sgn C. Wenzel | Date 12/14/99 Sgn MG 22 -5 | Date 12-38-99 Sgn PSK |

107 (F&B)

**Additional Comments:**_____

Form # 107 (F&E)
**Staff Observation Report**                                           APPENDIX D
**This form is to be considered contraband if in the possession of an inmate.**

| Inmate's Name: MANLEY, MICHAEL | SBI# 338418 | Housing Unit MSU | Tier A52 |

Evaluators: 12-8  C. Ward
         8-4  _EW RWilkey    mmSullin  MSy  C/O Harling  AKindy  11-22-99_
         4-12  Morgann

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| | | | |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | (MSy) RW | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | | |
| 21) Accepts blame/some of his troubles | | mmb | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | | mmb | |
| 24) Keeps room neat/clean, bed made | | MSy | P SM |
| 25) Keeps himself neat/clean | | mmb  AL | P SM |
| 26) Volunteers for projects | | | |
| 27) Likeable | | mmb | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows Inmate Housing Rules | | MSy | P SM |
| 30) Has positive attitude | | mmb | P SM |
| 31) Finds acceptable ways to keep busy | | | P |
| 32) Approaches staff in open/honest way | | mmb | |
| Reviewed by Shift Lieutenant | Date 1/10/99 Sign C (?)  | Date 11-6-99 Sign M | Date 11-18-99 Sign P ISICi |

*(handwritten vertical note in column 20-21: "no problem")*

Additional comments to be placed on back of form  × 19 — 3

Form 107 (F&B)                                                    Appendix D2

**Additional Comments:**_____

## DELAWARE CORRECTIONAL CENTER ---- MEMORANDUM

TO:     Inmate *Michael Manley*, SBI# *338485*, Housing Unit *U*
VIA:    Counselor *Clark*
FROM:   I.B.C.C.
DATE:   *11/8/99*
RE:     Classification Results

Your M.D.T. has recommended you for the following: *Continue May/HC & MSU Program*

The I.B.C.C.'s decision is to:

_X_ Approve _____

_____ Not Approve _____

_____ Defer _____

_____ Recommend _____

_____ Not Recommend _____

### BECAUSE:

_____ Lack of program participation
_____ Pending disciplinary action
_____ Gradual phasing indicated
_____ Open charges
_____ Prior criminal history
_____ Failure to follow your treatment plan in that you _____

_____ Time remaining on sentence
_____ Prior failure under supervision
_____ Poor institutional adjustment
_____ Serious nature of offense

_____ You present a current and continuous danger to the safety of staff, other inmates, or the good
      order of the Institution. Explanation: _____

OTHER: *Rw 2/00* _____

### ADDITIONAL COMMENTS:

_____ Develop/continue treatment plan with counselor

You will be expected to address the following: _____

Copy to:  Classification
          Inmate
          Institution File

Form #456 (3 Part NCR)
Revised 11/97

## DELAWARE DEPARTMENT OF CORRECTION CLASSIFICATION FORM #004

**I.**   **Vital Indicators/Sentencing Information**

Inmate Name _MANNEY, MICHAEL_ AKA _NONE_ _____ SBI No _338483_ Date of Birth _2/09/80_

Facility _D.C.C._ _____ Security/Custody Level _MAX/HIGH_ _____ Housing Area _W3B1_

Current Offense(s) _MURDER I, AGGRAVATED ACT OF INTIMIDATION_

_____

Level V Sentence:  Year(s): _DEATH + 55 YRS_ Month: ____ Day(s): _____ Truth in Sentence? Yes _X_ No _____

Sentence Effective Date _1/13/95_ STRD: _NONE_ PE Date: _NONE_ Parole Rehearing Date _NONE_

Mandatory Sentence:  Year(s) _NO_ Month(s) ____ Day(s) ____ Level IV Sentence? Yes _____ Length ____

No _X_

Detainer(s)? Yes ____ Agency ____ Open Charge(s)? Yes ____ 4204K? Yes ____ End Date of 4204K ____

No _X_  No _X_  No _X_

4205L?  Yes ____  4214B/Habitual Offender? Yes ____

No _X_  No _X_

**II.**   **Prior Criminal History**

Escape History (List date, charge for which convicted, and location from which escape occurred):

_NONE_

_____

Sex Offenses (List date, charges, and ages of victim(s) for all sex offenses): _____

_NONE_

_____

DNA sample obtained? Yes _____ No _UNKNOWN_ (If no, contact Institutional Investigator)

List the most serious offenses in the past 10 years (not previously listed in Escape History or Sex Offenses).

_CURRENT OFFENSES_

_____

DUI Information (Complete if inmate is serving a sentence for DUI)

Has information been verified via Motor Vehicle Records? Yes _____  No. of DUI's _____

No _____

Date(s) of offense(s):  1st _____  2nd _____  3rd _____  4th _____

BOP FORM 004

**III. Institution Disciplinary History** (summarize last 6 months – include dates, offenses, dispositions)

9-16-99  DR99-3435 — PENDING
10-25-99  DR99-3981 — PENDING

**IV. Current Program Participation/Work Assignment** (Justification for Request/Change or Recommendation must be recorded on page 3.)

MSA PROGRAM

**V. Program Request/Change or Recommendation**

MDT Recommendation:
Housing/Security Level  CONTINUE MAX/HIGH - MSA
Employment _____  On/Off Grounds _____
Education _____  Treatment Program  CONT. MSA PROGRAM
Work Release _____  Supervised Custody _____
Halfway House Worker _____  Highway Work Project _____
Other Recommendation: _____
Furlough _____ To Visit: Name  N/A  Relationship _____
Address _____
Purpose of Visit _____
Has inmate had prior participation in any program recommended?  Yes _____  No _____
Number of prior approvals for any program recommended  N/A
Is exception to standards requested?  Yes _____  No _____
(If yes, give reason for exception) _____

**VI. Victim Notification Information**

Offender's Release Address (if required)  N/A
Name of Victim(s) _____
Last Known Address of Victim _____

Stephenson  11-15-99       11-17-99
Signature of Counselor     Date     Signature of Counselor Supervisor     Date

**MDT Review**
MTD:  Recommended _____  Not Recommended _____  Vote 2-0
Signature of MDT Chairperson     Date

**IBCC Review**
IBCC:  Approved ___ Disapproved ___  Recommended ___  Not Recommended ___  Vote 2-0
Signature of IBCC Chairperson     Date  11/18/99
Comments _____

**CICB Review**
CICB:  Approved ___ Disapproved ___  Recommended ___  Not Recommended ___  Vote _____
Signature of CICB Chairperson     Date
Comments _____

**IRCB Review**
IRCB:  Approved ___ Disapproved ___  Vote _____
Signature of IRCB Chairperson     Date
Comments _____

**Distribution After Final Committee Review**
Copy to:  Classification
          Institution File (original)
          Special Programs Office (as required)

BOP-004 / Page 2 of 2
Revised 1/98        Form# 135

Form# 135
BOP Form 004

## JUSTIFICATION FOR REQUEST/CHANGE OR RECOMMENDATION

INMATE NAME _Manley, Michael_     SBI# _00330483_

Considering the nature of Manley's sentence
(Death) the team sees no reason to change
his classification.
His staff observation reports of late have been
so-so and reflects why he is on 2A-Probation.
It should be noted that while most of the inmates
up for review today refused to attend their reviews,
Manley chose to attend.
The team votes 2-0 to continue Max/High.

Recommended review date: ___2/00___

Form 107 (F&B)
**Staff Observation Report**
**This form is to be considered contraband if in the possession of an inmate.**

| Inmate's Name: MANLEY MICHAEL | SBI# 328485 | Housing Unit MBU | Tier AA2 |
|---|---|---|---|

Evaluators: 12-8 _W. EVANS_
8-4 _Ry_ _W. Massey_ _MJ_     11-1-99
4-12 _Margaret Candith_

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | NO PROBLem | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | | Ry  Wm MJ | (PM) (J) Q |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | (PM) |
| 20) Gets along with others | | | |
| 21) Accepts blame/some of his troubles | | MJ | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | | | |
| 24) Keeps room neat/clean, bed made | | MJ | (PM) (J) Q |
| 25) Keeps himself neat/clean | | MJ | (PM) (J) Q |
| 26) Volunteers for projects | | | |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows Inmate Housing Rules | | MJ | |
| 30) Has positive attitude | | | |
| 31) Finds acceptable ways to keep busy | | | (J) Q |
| 32) Approaches staff in open/honest way | | | |
| Reviewed by Shift Lieutenant | Date 10/28/99 Sign RP | Date 10/27/99 Sign MJ | Date 10-30-99 Sign PISK |

Additional comments to be placed on back of form.   ✔ 29 — 12

Form# 107 (F&B)

Additional Comments:

Form# 107 (F&B)

**Staff Observation Report**

**This form is to be considered contraband if in the possession of an inmate.**

Inmate's Name: _MANLEY, MICHAEL_    SBI# _338485_    Housing Unit _NSH_    Tier _A22_

Evaluators: 12-8 _W EVANS_

8-4 _Whorwood B 13 3ekeded_ _Ly_

4-12 _Calloway Morgan_    _10-15-99_

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | No Problem | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | | MKB | |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | MY | |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | | | |
| 24) Keeps room neat/clean, bed made | | MY | |
| 25) Keeps himself neat/clean | | | |
| 26) Volunteers for projects | | | |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows Inmate Housing Rules | | MY | |
| 30) Has positive attitude | | | |
| 31) Finds acceptable ways to keep busy | | | |
| 32) Approaches staff in open/honest way | | | |
| Reviewed by Shift Lieutenant | Date: 10/13/99 Sign: | Date: 10/15/99 Sign: MY | Date: Sign: |

+15  -6

Additional comments to be placed on back of form.

Form 107 (F&B)

**Additional Comments:**_____

Appendix E

## DELAWARE CORRECTIONAL CENTER ---- MEMORANDUM

TO:    Inmate _Michael Manley_ , SBI# _338483_ , Housing Unit _W_

VIA:    Counselor _____

FROM:  I.B.C.C.

DATE:  _9/23/99_

RE:    Classification Results

Your M.D.T. has recommended you for the following: _____

_Continued Max/HCV NSA Program_ _____

_____

The I.B.C.C.'s decision is to:

_✗_  Approve _____

_____  Not Approve _____

_____  Defer _____

_____  Recommend _____

_____  Not Recommend _____

## BECAUSE:

| | | | |
|---|---|---|---|
| _____ | Lack of program participation | _____ | Time remaining on sentence |
| _____ | Pending disciplinary action | _____ | Prior failure under supervision |
| _____ | Gradual phasing indicated | _____ | Poor institutional adjustment |
| _____ | Open charges | _____ | Serious nature of offense |
| _____ | Prior criminal history | | |
| _____ | Failure to follow your treatment plan in that you _____ |

_____

_____  You present a current and continuous danger to the safety of staff, other inmates, or the good order of the Institution. Explanation: _____

_____

OTHER: _11/99_ _____

_____

## ADDITIONAL COMMENTS:

_____  Develop/continue treatment plan with counselor

You will be expected to address the following: _____

_____

_____

Copy to: Classification
        Inmate
        Institution File

Form #456 (3 Part NCR)
Revised 11/97

CLASSIFICATION FORM #004

**I.  Vital Indicators/Sentencing Information**

Inmate Name _MANEY, MICHAEL_ AKA _NONE_ SBI No._33?483_ Date of Birth _2-09-70_
mo / da / yr

Facility _D.C.C._ Security/Custody Level _MAX/HIGH_ Housing Area _MSU_

Current Offense(s) _REGGED MURDER I, AGGRAVATED ACT OF_
_INTIMIDATION_

Level V Sentence: Year(s)_DEATH + 55 YRS_ Month: _____ Day(s): _____ Truth in Sentence? Yes _X_ No _____

Sentence Effective Date _11/13/95_ STRD: _NONE_ PE Date: _NONE_ Parole Rehearing Date _NONE_

Mandatory Sentence:  Year(s)_NO_ Month(s) _____ Day(s) _____ Level IV Sentence? Yes_____ Length_____
No _X_

Detainer(s)? Yes_____ Agency _____ Open Charge(s)? Yes_____ 4204K? Yes_____ End Date of 4204K _____
No _X_                                    No _X_                No _X_

4205L?    Yes _____    4214B/Habitual Offender?  Yes _____
No _X_                                    No _X_

**II.  Prior Criminal History**

Escape History (List date, charge for which convicted, and location from which escape occurred):

_NONE_

Sex Offenses (List date, charges, and ages of victim(s) for all sex offenses): _____

_NONE_

DNA sample obtained?  Yes _____  No _UNKNOWN_ (If no, contact Institutional Investigator)

List the most serious offenses in the past 10 years (not previously listed in Escape History or Sex Offenses).

_CURRENT OFFENSES_

DUI Information (Complete if inmate is serving a sentence for DUI)

Has information been verified via Motor Vehicle Records?  Yes _____  No. of DUI's _____
No _____

Date(s) of offense(s):  1st _____  2nd _____  3rd _____  4th _____

BOP FORM 004

**III.    Institution Disciplinary History (summarize last 6 months – include dates, offenses, dispositions)**

_5-24-99 - Pos. N/O Contraband - 24 Hr. Hot- (handwritten)_
_7-2-99_

**IV.    Current Program Participation/Work Assignment** (Justification for Request/Change or Recommendation must be recorded on page 3.)

_N.S.W. Program_

**V.    Program Request/Change or Recommendation**

MDT Recommendation:

Housing/Security Level _Continue -Max/High- NSA_

| | |
|---|---|
| Employment _____ | On/Off Grounds _____ |
| Education _____ | Treatment Program _NSA Program_ |
| Work Release _____ | Supervised Custody _____ |
| Halfway House Worker _____ | Highway Work Project _____ |

Other Recommendation: _____

Furlough _____     To Visit: Name _N/A_     Relationship _____

Address _____

Purpose of Visit _____

Has inmate had prior participation in any program recommended?     Yes _____     No _____

Number of prior approvals for any program recommended _N/A_

Is exception to standards requested?  Yes _____     No _N/A_

(If yes, give reason for exception) _____

**VI.    Victim Notification Information**

Offender's Release Address (if required) _____

Name of Victim(s) _N/A_

Last Known Address of Victim _____

_(signature)_ _8-31-99_          _(signature)_ _9-7-99_

Signature of Counselor          Date          Signature of Counselor Supervisor          Date

**MDT Review**

MTP:    Recommended _____X_____     Not Recommended _____     Vote _2-0_

_(signature)_     _8/31/99_

Signature of MDT Chairperson          Date

**IBCC Review**

IBCC:   Approved _____  Disapproved _____  Recommended _____     Not Recommended _____  Vote _3-0_

_(signature)_          _9/22/99_

Signature of IBCC Chairperson          Date

Comments _____

**CICB Review**

CICB:   Approved _____  Disapproved _____  Recommended _____     Not Recommended _____  Vote _____

Signature of CICB Chairperson          Date

Comments _____

**IRCB Review**

IRCB:   Approved _____  Disapproved _____          Vote _____

Signature of IRCB Chairperson          Date

Comments _____

**Distribution After Final Committee Review**

Copy to:  Classification
                Institution File (original)
                Special Programs Office (as required)

BOP-004 / Page 2 of 2
Revised 1/98          Form# 135

Form# 135
BOP Form 004

## JUSTIFICATION FOR REQUEST/CHANGE OR RECOMMENDATION

INMATE NAME _MANLEY MICHAEL_    SBI# _00 338483_

Except for the minor write up Michael received in July, his behavior continues to be acceptable and he maintains Level 2A.

Michael Death sentence is on appeal and his Execution has been stayed.

The team see's no reason to change his classification at this time — Vote 2-0 to Continue Max/Dept.

Recommended review date: _11/99_

Form# 107 (F&B)                    **Staff Observation Report**                    APPENDIX D
**This form is to be considered contraband if in the possession of an inmate.**

Inmate's Name: MANNEY MICHAEL    SBI# 335985    Housing Unit: MSW    Tier: M2

Evaluators: 12-8  W EVANS
8-4  Perkins Rg  w massey  MJ              8-30-99
4-12  MORGAN

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | NO Problem | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | | Pg  wm  MJ  @ Px | |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | Pg | |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | | | Pg Px |
| 24) Keeps room neat/clean, bed made | | | @ Px |
| 25) Keeps himself neat/clean | | | |
| 26) Volunteers for projects | | | |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows Inmate Housing Rules | | MJg | |
| 30) Has positive attitude | | | |
| 31) Finds acceptable ways to keep busy | | Pg | P |
| 32) Approaches staff in open/honest way | | | |
| Reviewed by Shift Lieutenant | 8/30/99  D Evans  Date 8/30  Sign MJ | 8-30-99  Sign PSK | |

Additional comments to be placed on back of form.          +33          -14

Additional Comments:_____

Form# 107 (F&B)          **Staff Observation Report**

**This form is to be considered contraband if in the possession of an inmate.**

Inmate's Name: _MANDEL MICHAEL_    SBI# _335465_    Housing Unit _MSU_    Tier _#5 2_

Evaluators: 12-8 _W. EVANS_

8-4 _W. M. Massey before C/O Berra M_    _8-13-99_

4-12 _Col Carroll Andrew ? Morgan_

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | No PROBLEM | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | | Wm St HKBM | (X) fm (X) |
| 5) Moody, brooding | | | (S) |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | (S) |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | | (M) |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | | | |
| 24) Keeps room neat/clean, bed made | | LL HKB MJ | (X) fm (X) SM |
| 25) Keeps himself neat/clean | | LL HKB MJ | (X) fm (X) SM |
| 26) Volunteers for projects | | | |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows Inmate Housing Rules | | LL HKB MJ | fm |
| 30) Has positive attitude | | | |
| 31) Finds acceptable ways to keep busy | | | (X) fm (X) |
| 32) Approaches staff in open/honest way | | | |
| Reviewed by Shift Lieutenant | Date 8/3/99 Sign 2 C | Date 8/14/99 Sign MJ | 8-13-99 Sign PISK |

Additional comments to be placed on back of form.    ← 24 → 9

Form# 107 (F&B)

**Additional Comments:**_____

Form# 107 (F&B)                          **Staff Observation Report**                          APPENDIX D

## This form is to be considered contraband if in the possession of an inmate.

Inmate's Name: _MANHE, Michael_   SBI# _338 403_   Housing Unit _MSU_   Tier _Ab2_

Evaluators: 12-8 _W EVANS_

8-4 _W. M. Massey  Jenkins  Yau  M_   _7-31-99_

4-12 _Council  Morgan  Member_

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | NO PROBLEMS | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | | Wm BJ RJ MJ | D Jm Jm |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | BJ MJ | |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | | BJ MJ | D Jm Jm |
| 24) Keeps room neat/clean, bed made | | BJ MJ | D Jm Jm |
| 25) Keeps himself neat/clean | | BJ MJ | D Jm Jm |
| 26) Volunteers for projects | | | |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows Inmate Housing Rules | | MJ | |
| 30) Has positive attitude | | | BJ Jm |
| 31) Finds acceptable ways to keep busy | | BJ | BJ Jm |
| 32) Approaches staff in open/honest way | | | |
| **Reviewed by Shift Lieutenant** | Date _7/23/99_ Sign _DE_ | Date _7/27/99_ Sign _W_ | Date _7-30-99_ Sign _PGK_ |

Additional comments to be placed on back of form.

Form 107 (F&B)

Additional Comments:_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Form 107 (F&B)

**Staff Observation Report**

**This form is to be considered contraband if in the possession of an inmate.**

| Inmate's Name: MANNEY MICHAEL | SBI# 337485 | Housing Unit MSN | Tier A-2 |
|---|---|---|---|

Evaluators: 12-8 Green

| 8-4 | MASSEY C/S Young C/S Perkins | 7-15-99 |
| 4-12 | Cpl Caudill Morgan Armstrong | |

Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | | | |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | | |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | | | |
| 24) Keeps room neat/clean, bed made | | | |
| 25) Keeps himself neat/clean | | | |
| 26) Volunteers for projects | | | |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows Inmate Housing Rules | | | |
| 30) Has positive attitude | | | |
| 31) Finds acceptable ways to keep busy | | | |
| 32) Approaches staff in open/honest way | | | |
| Reviewed by Shift Lieutenant | Date 2-21-99  Sign Green | Date 7/9/99  M | 2-15-99  Sign PSKi |

Additional comments to be placed on back of form.   + 24-8

Form# 107 (F&B)

**Staff Observation Report**

APPENDIX D

**This form is to be considered contraband if in the possession of an inmate.**

| Inmate's Name: MAHNEY, MICHAEL | SBI# 33??005 | Housing Unit NBW | Tier A-2 |
|---|---|---|---|

| Evaluators: 12-8 | WEVKS | | |
|---|---|---|---|
| 8-4 | R___  ___Wiseman | | 6-29-?? |
| 4-12 | ___ Beachey Morgan ___ | | |

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | NO PROBLEMS | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | | RJC:talk | T___ |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | | |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | | | |
| 24) Keeps room neat/clean, bed made | | C.T.A. | P ___ |
| 25) Keeps himself neat/clean | | C.T.A. | P ___ |
| 26) Volunteers for projects | | | |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows Inmate Housing Rules | | | |
| 30) Has positive attitude | | | |
| 31) Finds acceptable ways to keep busy | | C.T.A. | P ___ |
| 32) Approaches staff in open/honest way | | | |
| Reviewed by Shift Lieutenant | Date: 6/23/99 Sign ___ | Date: 6/29/99 Sign L.J.___ | 6-6-99 Sign P CSK. |

Additional comments to be placed on back of form.    t29  -8

Form 107 (F&B)

**Staff Observation Report**                                        APPENDIX 6

**This form is to be considered contraband if in the possession of an inmate.**

| Inmate's Name: NANCE, MICHAEL | SBI# 338405 | Housing Unit M8R | Tier R2 |
|---|---|---|---|

Evaluators: 12-8 W. EVANS

8-4 HSO                                                                6-14-99

4-12 Turk Amstrong Morgan Carroll

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | NO PROBLEM | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | | HSO | Turk HSO |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | | |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | | | P BUS BUNG |
| 24) Keeps room neat/clean, bed made | | | P BM BUNG |
| 25) Keeps himself neat/clean | | | |
| 26) Volunteers for projects | | | |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | HSO | |
| 29) Follows Inmate Housing Rules | | | |
| 30) Has positive attitude | | | P BM |
| 31) Finds acceptable ways to keep busy | | | |
| 32) Approaches staff in open/honest way | 6/8/99 | | 6-12-99 |
| Reviewed by Shift Lieutenant | Date 6/8/99 Sign MB | Date 6/13/99 Sign M | 6-12-99 Sign P.S.K. |

Additional comments to be placed on back of form.            #12 — 4

Additional Comments: _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Appendix E

## DELAWARE CORRECTIONAL CENTER ---- MEMORANDUM

TO:     Inmate *Michael Manly*, SBI# *338483*, Housing Unit *U*
VIA:    Counselor _____ *Just*
FROM:   I.B.C.C.
DATE:   *6/19/98*
RE:     Classification Results

Your M.D.T. has recommended you for the following: _____

*Continued Max/HC & MSU Program*
*Reassured Follower*

The I.B.C.C.'s decision is to:

_✓_  Approve _____

_____  Not Approve _____

_____  Defer _____

_____  Recommend _____

_____  Not Recommend _____

**BECAUSE:**

_____  Lack of program participation        _____  Time remaining on sentence
_____  Pending disciplinary action          _____  Prior failure under supervision
_____  Gradual phasing indicated            _____  Poor institutional adjustment
_____  Open charges                         _____  Serious nature of offense
_____  Prior criminal history
_____  Failure to follow your treatment plan in that you _____

        _____

_____  You present a current and continuous danger to the safety of staff, other inmates, or the good
        order of the Institution. Explanation: _____

        _____

OTHER: *Rw 8/98* _____

        _____

**ADDITIONAL COMMENTS:**

_____  Develop/continue treatment plan with counselor

You will be expected to address the following: _____

_____

_____

Copy to:  Classification
          Inmate
          Institution File

Form #456 (3 Part NCR)
Revised 11/97

## BUREAU OF PRISONS RECLASSIFICATION FORM #004

**I.**   **Vital Indicators/Sentencing Information**

Inmate Name *MANKEY, MICHAEL* AKA *NONE*     SBI No *33PAA3* Date of Birth *2/29/7*

Facility *D.C.C.*     Security/Custody Level *MAX/HIGH*   Housing Area *MSU*

Current Offense(s) *MURDER I AGGRAVATED ACT OF INTIMIDATION,*

*P.O.W.D.C.F*

Level V Sentence: Year(s):*DEATH* +55th Month: *00*   Day(s): *00*   Truth in Sentence? Yes *X*   No _____

Sentence Effective Date *11/13/95* STRD: *NONE*   PE Date: *NONE* Parole Rehearing Date *NONE*

Mandatory Sentence: Year(s) *NO* Month(s) *NO* Day(s) *NO* Level IV Sentence? Yes _____ Length _____
                                                                                     No *X*

Detainer(s)? Yes _____ Agency _____ Open Charge(s)? Yes _____ 4204K? Yes _____ End Date of 4204K _____
          No *X*                                    No *X*       No *X*

4205L?   Yes _____   4214B/Habitual Offender? Yes _____
         No *X*                                No *X*

**II.**   **Prior Criminal History**

Escape History (List date, charge for which convicted, and location from which escape occurred):

*NONE*

Sex Offenses (List date, charges, and ages of victim(s) for all sex offenses): _____

*NONE*

DNA sample obtained? Yes _____ No *N/A* _____ (If no, contact Institutional Investigator)

List the most serious offenses in the past 10 years (not previously listed in Escape History or Sex Offenses).

*CURRENT OFFENCES*

DUI Information (Complete if inmate is serving a sentence for DUI)

Has information been verified via Motor Vehicle Record? Yes _____   No. of DUI's _____
                                                       No _____

Date(s) of offense(s): 1st _____   2nd _____   3rd _____   4th _____

BOP-004 / Page 1 of 2
Justification for Request
Form# 135


RECEIVED
JUN 1 0 1999
BY: _____

BOP FORM 004

**III.** **Institution Disciplinary History (summarize last _3_ months – include dates, offenses, dispositions)**

_4-29-99 – F.T.D.A.V. por N/P CORR. -PENDING_

**IV.** **Current Program Participation/Work Assignment** (Justification for Request/Change or Recommendation must be recorded on page 3.)

_MSU PROGRAM_
_TIERMAN_

**V.** **Program Request/Change or Recommendation**

MDT Recommendation:

| | | |
|---|---|---|
| Housing/Security Level | _CONTINUE – MAX/HIGH – MSU_ | |
| Employment | _RESCIND-TIERMAN_ | On/Off Grounds _____ |
| Education _____ | | Treatment Program _CON'T. MSU PROGRAM_ |
| Work Release _____ | | Supervised Custody _____ |
| Halfway House Worker _____ | | Highway Work Project _____ |

Other Recommendation: _____

Furlough _____ To Visit: Name _____ _N/A_ _____ Relationship _____

Address _____

Purpose of Visit _____

Has inmate had prior participation in any program recommended? Yes _N/A_ No _____

Number of prior approvals for any program recommended _N/A_

Is exception to standards requested? Yes _____ No _____

(If yes, give reason for exception) _____

**VI.** **Victim Notification Information**

Offender's Release Address (if required) _____ _N/A_ _____

Name of Victim(s) _____

Last Known Address of Victim _____

_[signature]_  5-24-99          _[signature]_

Signature of Counselor          Date          Signature of Counselor Supervisor          Date

**MDT Review**

MDT:   Recommended _X_   Not Recommended _____   Vote _2-0_

_[signature]_          5/24/99

Signature of MDT Chairperson          Date

**IBCC Review**

IBCC:   Approved _✓_   Disapproved _____   Recommended _____   Not Recommended _____   Vote _3-0_

_[signature]_          6/17/99

Signature of IBCC Chairperson          Date

Comments _____

**CICB Review**

CICB:   Approved _____   Disapproved _____   Recommended _____   Not Recommended _____   Vote _____

Signature of CICB Chairperson          Date

Comments _____

**IRCB Review**

IRCB:   Approved _____   Disapproved _____   Vote _____

Signature of IRCB Chairperson          Date

Comments _____

**Distribution After Final Committee Review**

Copy to:  Classification
          Institution File (original)
          Special Programs Office (as required)

Form# 135
BOP Form 004

Page 3

## JUSTIFICATION FOR REQUEST/CHANGE OR RECOMMENDATION

INMATE NAME *Manley, Michael*    SBI# *003389 3*

Michael's behavior & attitude continues to be satisfactory as indicated in his Staff Observation Reports. He is not a management problem however because of his serious history, the team sees no reason to change his classification at this time.

His death sentence is currently on appeal and his execution has been stayed.

The team recommends his tiermen job be rescinded because the Warden has directed that no inmate with a death sentence will hold a job because of the risk to staff and other inmates. Vote 2-0 to continue Max/High.

Recommended review date: _____ 8/99 _____

Fo # 107 (F&B)

**Staff Observation Report**

APPENDIX D

**This form is to be considered contraband if in the possession of an inmate.**

Inmate's Name: _MANLEY, MICHAEL_ SBI# _338405_ Housing Unit _MBA_ Tier _A-2_

Evaluators: 12-8 _W EVANS_

8-4 _Wayne Massey, Go Ansley, MSy Go Jenkins Feb 1-99_

4-12 _T. H. Armstrong, Morgan_

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|---|
| 1) Worried, anxious | NO PROBLEM | | | |
| 2) Tense, cannot relax | | | C.T.A. | |
| 3) Takes no pleasure in anything | | | | |
| 4) Cannot be trusted | | | C.T.A. WM MSy | T.H. JM Ph |
| 5) Moody, brooding | | | C.T.A. | |
| 6) Tries to con (manipulate) staff | | | | |
| 7) Impulsive, unpredictable | | | C.T.A. | |
| 8) Seeks excitement | | | | |
| 9) Is never happy | | | | |
| 10) Daydreams, is preoccupied | | | | |
| 11) Tries to play staff against each other | | | C.T.A. | |
| 12) Considers himself unjustly confined | | | | |
| 13) Frequently upset after visits | | | | |
| 14) Frequently upset after receiving mail | | | | |
| 15) Participates in group demonstrations | | | | |
| 16) Thinks only of himself | | | | |
| 17) Displays negative attitude | | | | |
| 18) Breach of group confidentiality | | | | |
| 19) Speaks of goals/plans | | | | |
| 20) Gets along with others | | | C.T.A. MSy | |
| 21) Accepts blame/some of his troubles | | | MSy | |
| 22) Accepts blame/all of his troubles | | | | |
| 23) Respects authority | | | | |
| 24) Keeps room neat/clean, bed made | | | C.T.A. WM MSy | JM P Ph |
| 25) Keeps himself neat/clean | | | WM MSy | JM P Ph |
| 26) Volunteers for projects | | | | |
| 27) Likeable | | | | |
| 28) Discusses personal problems w/staff | | | | |
| 29) Follows Inmate Housing Rules | | | C.T.A. WM MSy | |
| 30) Has positive attitude | | | | JM P |
| 31) Finds acceptable ways to keep busy | | | | |
| 32) Approaches staff in open/honest way | | | | |
| Reviewed by Shift Lieutenant | Date 5/19/99 Sign | | Date 5/21/99 Sign MSy | 5-24-99 Sign PSL |

Additional comments to be placed on back of form. _4 40 — 20_

Form# 107 (F&B)

**Additional Comments:**

Fo # 107 (F&B)                    **Staff Observation Report**                    APPENDIX D

**This form is to be considered contraband if in the possession of an inmate.**

| Inmate's Name: MANLEY, MICHAEL | SBI# 33/9/3 | Housing Unit MDR | Tier A2 |
|---|---|---|---|

Evaluators: 12-8  W EVANS

8-4  Wayne Massey MJ                                                     5-17-99

4-12  C/O Wilson  Armstrong  Morgan Smith  Lucas

Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | No PROblem | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | | WM MJ | Tim D @ Ewn DM |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | Tim D DM |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | | |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | | | |
| 24) Keeps room neat/clean, bed made | | WM MJ | @ wn DM |
| 25) Keeps himself neat/clean | | WM MJ | @ wn DM |
| 26) Volunteers for projects | | | |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows Inmate Housing Rules | | WM MJ | |
| 30) Has positive attitude | | | |
| 31) Finds acceptable ways to keep busy | | | @ wn DM |
| 32) Approaches staff in open/honest way | | | |
| Reviewed by Shift Lieutenant | Date 5/13/99 Sign ACE | Date 5/11/99 Sign MJ | 5-17-99 Sign PSR |

Additional comments to be placed on back of form.  ⊬ 2  —9

Form# 107 (F&B)

**Staff Observation Report**

**This form is to be considered contraband if in the possession of an inmate.**

| Inmate's Name: MANKEY, MICHAEL | SBI# 339455 | Housing Unit: MSU | Tier: A-2 |
|---|---|---|---|

Evaluators: 12-8 Wm Greene

8-4 _____    4-28-99

4-12 _____ Morgan

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | | MS (R)BS (24) | (D) Dn |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | B) | |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | | | |
| 24) Keeps room neat/clean, bed made | | BS | (D) Dn |
| 25) Keeps himself neat/clean | | B) | (D) Dn |
| 26) Volunteers for projects | | | |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows Inmate Housing Rules | | MS (R)BS | |
| 30) Has positive attitude | | | |
| 31) Finds acceptable ways to keep busy | | | (D) |
| 32) Approaches staff in open/honest way | | | |
| Reviewed by Shift Lieutenant | Date: 4-28-99  Sign: W. Green | Date: 4/28/99  Sign: MS | Date:         Sign: |

Additional comments to be placed on back of form.        + 22      — 11

Form # 107 (F&B)                                                    Appendix D2

**Additional Comments:**_____

Form# 107 (F&B)               **Staff Observation Report**

**This form is to be considered contraband if in the possession of an inmate.**

Inmate's Name: _MANNEY, MICHAEL_   SBI# _338405_   Housing Unit _MSU_   Tier _A-2_

Evaluators: 12-8
8-4   _____   4-15-99_
4-12 _____

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | MJ BS (RW) | (W) |
| 4) Cannot be trusted | | | |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | BS | |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | | | (W) |
| 24) Keeps room neat/clean, bed made | | BS | (W) |
| 25) Keeps himself neat/clean | | BS | (W) |
| 26) Volunteers for projects | | | |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows Inmate Housing Rules | | MJ (RW) BS | |
| 30) Has positive attitude | | | (W) |
| 31) Finds acceptable ways to keep busy | | | |
| 32) Approaches staff in open/honest way | | | |
| Reviewed by Shift Lieutenant | Date: 4/28/99 Sign: C. W.L | Date: 4/00 Sign: MJ | Date: Sign: |

*(handwritten vertically in 12-8 column: "no problems")*

Additional comments to be placed on back of form.

Form# 107 (F&B)                                                           Appendix D2

**Additional Comments:**_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

## DELAWARE CORRECTIONAL CENTER ---- MEMORANDUM

TO:      Inmate *Michael Manley* , SBI# *338483* , Housing Unit *U*
VIA:     Counselor _____ *Mach* _____
FROM:    I.B.C.C.
DATE:    *4/8/96*
RE:      Classification Results

Your M.D.T. has recommended you for the following: _____
*Continue Max/HC & MSU Programs* _____
_____

The I.B.C.C.'s decision is to:

✗ Approve _____

_____ Not Approve _____

_____ Defer _____

_____ Recommend _____

_____ Not Recommend _____

**BECAUSE:**

_____ Lack of program participation          _____ Time remaining on sentence
_____ Pending disciplinary action            _____ Prior failure under supervision
_____ Gradual phasing indicated              _____ Poor institutional adjustment
_____ Open charges                           _____ Serious nature of offense
_____ Prior criminal history
_____ Failure to follow your treatment plan in that you _____
_____
_____

_____ You present a current and continuous danger to the safety of staff, other inmates, or the good
     order of the Institution.  Explanation: _____
_____

**OTHER:** *Rev 4/69* _____
_____

**ADDITIONAL COMMENTS:**

_____ Develop/continue treatment plan with counselor

You will be expected to address the following: _____
_____
_____

Copy to:  Classification
          Inmate                                          Form #456 (3 Part NCR)
          Institution File                                Revised 11/97

## BUREAU OF PRISONS RECLASSIFICATION FORM #004

**I.**    **Vital Indicators/Sentencing Information**

Inmate Name _MANhEY, MIChAEL_ AKA _NONE_____ SBI No. _33?443_ Date of Birth _2/29/74_
                                                                                                              m / da / yr

Facility _D.C.C._____ Security/Custody Level _MAX/HIGH_ Housing Area _MSU___

Current Offense(s) _MURDER I, AGGRAVATED ACT OF INTIMIDATION,_

_P.D.W.D-C-F_____

                                        + 55 yrs
Level V Sentence: Year(s) _DEATH_ Month: _00_ Day(s): _00___ Truth in Sentence? Yes _X_ No ____

Sentence Effective Date _11/13/95_ STRD: _NONE___ PE Date: _NONE___ Parole Rehearing Date _NONE_

Mandatory Sentence: Year(s) _NO_ Month(s) _NO_ Day(s) _NO_ Level IV Sentence? Yes ____ Length ____
                                                                                                          No _X_

Detainer(s)? Yes ____ Agency _____ Open Charge(s)? Yes ____ 4204K? Yes ____ End Date of 4204K ____
                   No _X_                                                No _X_          No _X_

4205L?    Yes ____    4214B/Habitual Offender? Yes _____
          No _X_                                  No _X_

**II.**    **Prior Criminal History**

Escape History (List date, charge for which convicted, and location from which escape occurred):

_NONE_____

_____

Sex Offenses (List date, charges, and ages of victim(s) for all sex offenses): _____

_NONE_____

_____

DNA sample obtained? Yes ____ No ____ (If no, contact Institutional Investigator)

List the most serious offenses in the past 10 years (not previously listed in Escape History or Sex Offenses).

_NONE_____

_____

_____

DUI Information (Complete if inmate is serving a sentence for DUI)

Has information been verified via Motor Vehicle Records? Yes ____ No. of DUI's _____
                                                          No ____

Date(s) of offense(s): 1st _____ 2nd _____ 3rd _____ 4th _____

BOP-004 / Page 1 of 2
Justification for Request
Form# 135

BOP FORM 004

**III.** **Institution Disciplinary History** (summarize last 6 months – include dates, offenses, dispositions)

*1-9-99 Poss. N/o Contraband - 2+ Hr. Lop*

**IV.** **Current Program Participation/Work Assignment** (Justification for Request/Change or Recommendation must be recorded on page 3.)

*MSU Program*

**V.** **Program Request/Change or Recommendation**

MDT Recommendation:

Housing/Security Level *Cont. Max/High - MSU*

| | |
|---|---|
| Employment | On/Off Grounds |
| Education | Treatment Program *Cont. MSU Program* |
| Work Release | Supervised Custody |
| Halfway House Worker | Highway Work Project |

Other Recommendation:

Furlough _____ To Visit: Name *N/A* Relationship _____

Address *N/A*

Purpose of Visit _____

Has inmate had prior participation in any program recommended?    Yes _____    No _____

Number of prior approvals for any program recommended *N/A*

Is exception to standards requested? Yes _____    No *N/A*

(If yes, give reason for exception) _____

**VI.** **Victim Notification Information**

Offender's Release Address (if required) _____

Name of Victim(s) *N/A*

Last Known Address of Victim

*[signature]* 3-22-99    *[signature]*    4-6-99
Signature of Counselor        Date        Signature of Counselor Supervisor        Date

**MDT Review**

MDT:   Recommended   *X*    Not Recommended _____    Vote *2-0*

*[signature]*        *3/22/99*
Signature of MDT Chairperson        Date

**IBCC Review**

IBCC:   Approved *X*   Disapproved _____   Recommended _____   Not Recommended _____   Vote *3-0*

*[signature]*        *4/20/99*
Signature of IBCC Chairperson        Date

Comments _____

**CICB Review**

CICB:   Approved _____   Disapproved _____   Recommended _____   Not Recommended _____   Vote _____

Signature of CICB Chairperson        Date

Comments _____

**IRCB Review**

IRCB:   Approved _____   Disapproved _____    Vote _____

Signature of IRCB Chairperson        Date

Comments _____

**Distribution After Final Committee Review**

Copy to: Classification
Institution File (original)
Special Programs Office (as required)

BOP-004 / Page 2 of 2
Revised 1/98        Form# 135

Form# 135
BOP Form 004

Appendix C3
Page 3

## JUSTIFICATION FOR REQUEST/CHANGE OR RECOMMENDATION

INMATE NAME _MANLEY, MICHAEL_    SBI# _00 338993_

_Manley's Behavior & attitude continues to be good. His staff Observation Reports continue to be satisfactory. He is not viewed as a management problem for staff. His Death Sentence is currently on appeal and his Execution has been stayed until his appeals are exhausted. The team would like to observe him a while longer. Vot 2-0 to continue Moff___-MDU_

Recommended review date: _5/99_

Form# i07 (F&B)

**Staff Observation Report**

**This form is to be considered contraband if in the possession of an inmate.**

| Inmate's Name: MANLEY, MICHAEL | SBI# 23845 | Housing Unit MCU | Tier A-2 |
|---|---|---|---|

| Evaluators: 12-8 Wm Greene | | |
|---|---|---|
| 8-4 Wayne Massey 9-P Anstoss, MJ∫ | | 3-31-99 |
| 4-12 Morgan Colwell | | |

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | | WM, E.T.A. MJ | |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | | |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | | | |
| 24) Keeps room neat/clean, bed made | | WM, E.T.A. | |
| 25) Keeps himself neat/clean | | WM, E.T.A. | |
| 26) Volunteers for projects | | | |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows Inmate Housing Rules | | WM, E.T.A. MJ | |
| 30) Has positive attitude | | | |
| 31) Finds acceptable ways to keep busy | | | |
| 32) Approaches staff in open/honest way | | | |

| Reviewed by Shift Lieutenant | Date: 3-24-99 Sgn: | Date: 3/21/99 Sgn: | 3-07-89 Sgn: P/SK |
|---|---|---|---|

Additional comments to be placed on back of form.

**Additional Comments:**

Form# 107 (F&B)
**Staff Observation Report**
**This form is to be considered contraband if in the possession of an inmate.**

Inmate's Name: _MANHEY, MICHAEL_  SBI# _33P485_  Housing Unit _MSU_  Tier _A2_

Evaluators: 12-8 _C. Wmd_
8-4 _Sexxer_ _____ _M_
4-12 _(RICHM) (Armstrong)_ _Morgan Carter_     _3-15-89_

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | | BSI2 | W hr GM C |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | no problems | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | BJ | |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | | | |
| 24) Keeps room neat/clean, bed made | | BS I2 | P W em GM |
| 25) Keeps himself neat/clean | | BS I2 | P W hr GM |
| 26) Volunteers for projects | | | |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows Inmate Housing Rules | | BS I2 | P em P |
| 30) Has positive attitude | | | P GM |
| 31) Finds acceptable ways to keep busy | | | P em |
| 32) Approaches staff in open/honest way | | | |
| Reviewed by Shift Lieutenant | Date: 3/10/89 Sign: C. Wmd | Date: 3/15/89 Sign: MJ | 3-13-99 Sign: PISKI |

Additional comments to be placed on back of form.     _+26_     _7_

Form# 107 (F&B)

Additional Comments: I'm supposedly her new lawyers. Their phone number weren't in the computer. I've handled the situation properly & didn't cause an incident

Form# 107 (F&B)

## Staff Observation Report

**This form is to be considered contraband if in the possession of an inmate.**

| Inmate's Name: MANUEL MICHAEL | SBI# 00238413 | Housing Unit MBA | Tier A-2 |
|---|---|---|---|

Evaluators: 12-8 KC Smith SR
8-4 Wilbod Yue Wayne N Massey M   3-1-89
4-12 Tutri MORGAN Armstrong's Clause C

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | No problems | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | | ANKB B(B) wmn M | Tutri Fix (M) RA |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | (B) | |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | | ANKB B wmn M | P Fix WM |
| 24) Keeps room neat/clean, bed made | | ANKB B wmn M | P Fix WM |
| 25) Keeps himself neat/clean | | ANKB B wmn M | P Fix WM |
| 26) Volunteers for projects | | | |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows Inmate Housing Rules | | B wmn M | P WM |
| 30) Has positive attitude | | | |
| 31) Finds acceptable ways to keep busy | | ANKB M | P WM |
| 32) Approaches staff in open/honest way | | | |
| Reviewed by Shift Lieutenant | Date 2/20/99 Sign Harris | Date 2/28/99 Sign M | Date 2-27-99 Sign PLSKI |

| | 54+ | 15- |

Additional comments to be placed on back of form.

Form# 107 (F&B)

## Staff Observation Report

**This form is to be considered contraband if in the possession of an inmate.**

Inmate's Name: _MANLEY, Michael_   SBI# _00338485_   Housing Unit _MBU_   Tier _A-2_

Evaluators: 12-8 _C. Wood_

8-4 _Wayne W. Massey_   MT _____ L. Pinto? Parro B_   Return by 1-29-99

4-12 _J. Morgan_   Armstrong J. Collant? S. Simes

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | | wmnBS PINTO M/LPL | BWU QM K.S |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | No problem | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | BS C.T.A. | GM BWU KS |
| 20) Gets along with others | | | |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | | wmnBS PP | GM BWU QM KS |
| 24) Keeps room neat/clean, bed made | | wmnBS PP | GM P QM KS |
| 25) Keeps himself neat/clean | | | |
| 26) Volunteers for projects | | | |
| 27) Likeable | | Wmn BS C.T.A. | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows Inmate Housing Rules | | wmnBS M/LPL crd | |
| 30) Has positive attitude | | | QM P KS |
| 31) Finds acceptable ways to keep busy | | | |
| 32) Approaches staff in open/honest way | | | 4-28-99 Sign Piski |
| **Reviewed by Shift Lieutenant** | Date _1-27-99_ Sign _Cruz_ | Date _1/6/99_ Sign _M_ | |

− 13                           FSI

Additional comments to be placed on back of form.

**Additional Comments:**

Form# 107 (F&S)

**Staff Observation Report**

APPENDIX 8

**This form is to be considered contraband if in the possession of an inmate.**

| Inmate's Name: MANLEY, MICHAEL | SBI# 338408 | Housing Unit MSU | Tier A-2 |
|---|---|---|---|

| Evaluators: 12-8 | C. Wood | | Return By |
|---|---|---|---|
| 8-4 | MFJ Sgt Wilson Wayne N. Nassey R42 | | 1-15-99 |
| 4-12 | Don, Gary, Scott W. C/O Caiwate C/O Morgan | | |

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | | MJ amm R42 | SWM |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | no problem | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | | |
| 21) Accepts blame/some of his troubles | | W | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | | | |
| 24) Keeps room neat/clean, bed made | | W wmm | W P SW |
| 25) Keeps himself neat/clean | | W wmm | W P SW |
| 26) Volunteers for projects | | | |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows Inmate Housing Rules | | MJ W wmm | |
| 30) Has positive attitude | | | |
| 31) Finds acceptable ways to keep busy | | W | W P SW |
| 32) Approaches staff in open/honest way | | | |

| Reviewed by Shift Lieutenant | Date: 1/13/99 Sign: C. Wood | Date: 1/13 99 Sign: | 1-14-99 Sign: Mcc |
|---|---|---|---|

Additional comments to be placed on back of form.

−5          +19

Form# 107 (F&B)

Additional Comments:_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Form# 107 (F&B)
**Staff Observation Report**
APPENDIX D

**This form is to be considered contraband if in the possession of an inmate.**

| Inmate's Name: _Mathei, Michael_ | SBI# _00 328483_ | Housing Unit _MBU_ | Tier _MB2_ |

Evaluators: 12-8 _C Daniels SR_
8-4 _Wayne M. Massey_
4-12 _Armstrong Scott M., D'Amico, K.Smith, Duncan R.U._

_Return by 12-31-98_

Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | CCDSR | | |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | | |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | | | KS |
| 24) Keeps room neat/clean, bed made | | WMM | KS |
| 25) Keeps himself neat/clean | | WMM | KS |
| 26) Volunteers for projects | | | |
| 27) Likeable | | WMM | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows Inmate Housing Rules | | WMM | |
| 30) Has positive attitude | | | |
| 31) Finds acceptable ways to keep busy | | | KS |
| 32) Approaches staff in open/honest way | | | |
| Reviewed by Shift Lieutenant | Date: 12/24/98 Sign: Harris | Date: 1/15/98 Sign: MB | 12-31-98 Sign: PSLi |

Additional comments to be placed on back of form.

Form# 107 (F&B)

**Additional Comments:**_____

Form# 107 (F&B)

## Staff Observation Report

**This form is to be considered contraband if in the possession of an inmate.**

| Inmate's Name: MANUEL MICHAEL | SBI# 00338985 | Housing Unit: MHU | Tier: A2 |
|---|---|---|---|

Evaluators: 12-8 ___ C.O. Daniels E ___

8-4 ___ MSgt Wayne M. Massey ___    return by 12-14-98

4-12 ___

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | KCCDSR | M Quinn | |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | | |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | | | |
| 24) Keeps room neat/clean, bed made | | Wmm | P |
| 25) Keeps himself neat/clean | | Wmm | P |
| 26) Volunteers for projects | | | |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | M Quinn | P |
| 29) Follows Inmate Housing Rules | | | P |
| 30) Has positive attitude | | | P |
| 31) Finds acceptable ways to keep busy | | | P |
| 32) Approaches staff in open/honest way | | | |
| Reviewed by Shift Lieutenant | Date 12/9/98 Sign Harris | Date 12/7/98 Sign MB | 12-14-98 Sign PSki |

-3     +8

Additional comments to be placed on back of form.

Form# 107 (F&B)

**Additional Comments:** _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

DELAW. ⅃CORRECTIONAL CENTER — MI JRANDUM

TO:        Inmate *Manley, Michael*, SBI# *338483*, Housing Unit *MSY*
VIA:       Counselor *H. T. Stephenson*
FROM:   I.B.C.C.
DATE:    *1/7/99*
RE:        Classification Results

Your M.D.T. has recommended you for the following: *Cont. Max High*

_____

The I.B.C.C.'s decision is to:

X____  Approve _____

_____  Not Approve _____

_____  Defer _____

_____  Recommend _____

_____  Not Recommend _____

**BECAUSE:**

_____  Lack of program participation
_____  Pending disciplinary action
_____  Gradual phasing indicated
_____  Open charges
_____  Prior criminal history
_____  Failure to follow your treatment plan in that you _____

_____  Time remaining on sentence
_____  Prior failure under supervision
_____  Poor institutional adjustment
_____  Serious nature of offense

_____  You present a current and continuous danger to the safety of staff, other inmates, or the good
order of the Institution.  Explanation: _____

OTHER:  *RW 3/99* _____

**ADDITIONAL COMMENTS:**

_____  Develop/continue treatment plan with counselor

You will be expected to address the following: _____

_____

Copy to:  Classification
              Inmate
              Institution File

Form #456 (3 Part NCR)
Revised 11/97

## BUREAU OF PRISONS RECLASSIFICATION FORM #004

**I.**  **Vital Indicators/Sentencing Information**

Inmate Name _MANLEY, MICHAEL_ AKA _NONE_    SBI No _33840_ Date of Birth _2/29/24_

Facility _D.C.C._    Security/Custody Level _MAX/HIGH_    Housing Area _MBW_

Current Offense(s) _MURDER I, AGG. ACT OF INTIMIDATION, P.D.W.D.C.F._

---

Level V Sentence: Year(s): _DEATH +55 YRS_ Month: _DEATH_ Day(s): _DEATH_ Truth in Sentence? Yes _X_ No _____

Sentence Effective Date _11/13/95_ STRD: _NONE_ PE Date: _NONE_ Parole Rehearing Date _NONE_

Mandatory Sentence: Year(s) _NO_ Month(s) _NO_ Day(s) _NO_ Level IV Sentence? Yes _____ Length _____

No _X_

Detainer(s)? Yes _____ Agency _____ Open Charge(s)? Yes _____ 4204K? Yes _____ End Date of 4204K _____

No _X_    No _X_    No _X_

4205L? Yes _____    4214B/Habitual Offender? Yes _____

No _X_    No _X_

**II.**  **Prior Criminal History**

Escape History (List date, charge for which convicted, and location from which escape occurred):

_NONE_

---

Sex Offenses (List date, charges, and ages of victim(s) for all sex offenses): _____

_NONE_

---

DNA sample obtained? Yes _____ No _N/A_ (If no, contact Institutional Investigator)

List the most serious offenses in the past 10 years (not previously listed in Escape History or Sex Offenses).

---

_NONE_

---

DUI Information (Complete if inmate is serving a sentence for DUI)

Has information been verified via Motor Vehicle Records? Yes _____ No. of DUI's _____

No _____

Date(s) of offense(s): 1st _____ 2nd _____ 3rd _____ 4th _____

BOP-004 / Page 1 of 2
Justification for Request
Form# 135

BOP FORM 004

**III.**  **Institution Disciplinary History (summarize last 6 months – include dates, offenses, dispositions)**

11-11-98 FAILING TO OBEY AN ORDER - 24TH HOLE

**IV.**  **Current Program Participation/Work Assignment** (Justification for Request/Change or Recommendation must be recorded on page 3.)

MSA PROGRAM

**V.**  **Program Request/Change or Recommendation**

MDT Recommendation:

Housing/Security Level  CONTINUE - MAX/HIGH - MSA          On/Off Grounds _____

Employment _____                                        Treatment Program  CONT. MSA PROGRAM

Education _____                                         Supervised Custody _____

Work Release _____                                      Highway Work Project _____

Halfway House Worker _____

Other Recommendation: _____                                    Relationship _____

Furlough _____         To Visit: Name _____

Address _____                          N/A

Purpose of Visit _____

Has inmate had prior participation in any program recommended?      Yes _____   No _____

Number of prior approvals for any program recommended  N/A

Is exception to standards requested?  Yes _____  No _____

(If yes, give reason for exception) _____

**VI.**  **Victim Notification Information**

Offender's Release Address (if required) _____  N/A

Name of Victim(s) _____

Last Known Address of Victim _____

_Stephenson_  10/22/98        _signature_        12-25-98

Signature of Counselor        Date        Signature of Counselor Supervisor        Date

**MDT Review**

MTD:  Recommended  X          Not Recommended _____          Vote  2-0

_signature_  12-22-98

Signature of MDT Chairperson        Date

**IBCC Review**

IBCC:  Approved  X   Disapproved _____  Recommended _____  Not Recommended _____  Vote  3-0

_signature_  1/2/99

Signature of IBCC Chairperson        Date

Comments _____

**CICB Review**

CICB:  Approved _____  Disapproved _____  Recommended _____  Not Recommended _____  Vote _____

Signature of CICB Chairperson        Date

Comments _____

**IRCB Review**

IRCB:  Approved _____  Disapproved _____          Vote _____

Signature of IRCB Chairperson        Date

Comments _____

**Distribution After Final Committee Review**

Copy to:  Classification
          Institution File (original)
          Special Programs Office (as required)

BOP-004 / Page 2 of 2
Revised 1/98        Form# 135

form# 107 (F&B)

## Staff Observation Report

**This form is to be considered contraband if in the possession of an inmate.**

Inmate's Name: MANLEY, MICHAEL    SBI# 00338483    Housing Unit: MBN    Tier: AH2

Evaluators: 12-8  W TEVIS

8-4  Wayne Massey Brigham / MJ

4-12  D Morgan Camp H

Relen by
11-30-98

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | | wm BJ MJ | W |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | ✓ | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | W | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | BJ | W |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | W |
| 23) Respects authority | | | W |
| 24) Keeps room neat/clean, bed made | | wm BJ | W |
| 25) Keeps himself neat/clean | | wm BJ | W |
| 26) Volunteers for projects | | | |
| 27) Likeable | | wm BJ | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows Inmate Housing Rules | | wm BJ MJ | |
| 30) Has positive attitude | | | |
| 31) Finds acceptable ways to keep busy | | BJ | W |
| 32) Approaches staff in open/honest way | | | |
| Reviewed by Shift Lieutenant | Date 11/26/98 Sign | Date 11/28/98 Sign MJ | Date 11-30-98 Sign CAT |

Additional comments to be placed on back of form.

Additional Comments:_____

Form# 107 (F&B)

# Staff Observation Report
## This form is to be considered contraband if in the possession of an inmate.

APPENDIX D

| Inmate's Name: MANKEY, MICHAEL | SBI# _____ | Housing Unit _____ | Tier _____ |
|---|---|---|---|

Evaluators: 12-8 _____
8-4 _____
4-12 _____

Return by
11-30-98

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | | wm BJ MJ | (JO) |
| 5) Moody, brooding | ✓ | | |
| 6) Tries to con (manipulate) staff | ✓ | | |
| 7) Impulsive, unpredictable | ✓ | | |
| 8) Seeks excitement | ✓ | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | BJ | (JO) |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | | | (JO) |
| 24) Keeps room neat/clean, bed made | | wm BJ | (JO)(JO) |
| 25) Keeps himself neat/clean | | wm BJ | (JO)(JO) |
| 26) Volunteers for projects | | | |
| 27) Likeable | | wm BJ | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows Inmate Housing Rules | | wm BJ MJ | |
| 30) Has positive attitude | | | |
| 31) Finds acceptable ways to keep busy | | BJ | (JO) |
| 32) Approaches staff in open/honest way | | | |
| Reviewed by Shift Lieutenant | Date 11/26/98 Sign ___ | Date 11/30/98 Sign MJ | Date 11-30-98 Sign ___ |

Additional comments to be placed on back of form.

-7        +39

Form# 107 (F&B)    **Staff Observation Report**

**This form is to be considered contraband if in the possession of an inmate.**

| Inmate's Name: MANLEY, MICHAEL | SBI# 00 331 985 | Housing Unit: MBU | Tier: A 2 |
|---|---|---|---|

| Evaluators: 12-8 | CW EVANS | | Return by |
|---|---|---|---|
| 8-4 | MJ Shayne Massey | | 11-13-98 |
| 4-12 | By Cor M Scott | | |

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | | MJ wm | ⊙ |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | No Problem | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | No | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | | ⊙ |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | ⊙ |
| 23) Respects authority | | | ⊙ ⊙ |
| 24) Keeps room neat/clean, bed made | | wm MJ wm | m ⊙ ⊙ |
| 25) Keeps himself neat/clean | | MJ wm | m ⊙ ⊙ |
| 26) Volunteers for projects | | | |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | | ⊙ |
| 29) Follows Inmate Housing Rules | | MJ wm | ⊙ |
| 30) Has positive attitude | | | ⊙ |
| 31) Finds acceptable ways to keep busy | | | ⊙ |
| 32) Approaches staff in open/honest way | | | |
| Reviewed by Shift Lieutenant | Date 11/11/98 Sign: | Date 11/9/98 Sign: MJ | 11-13-98 Sign: PSKi |

Additional comments to be placed on back of form.

-3   × 18

Form 107 (F&B)

**Additional Comments:**

Form# 107 (F&B)

**Staff Observation Report**

**This form is to be considered contraband if in the possession of an inmate.**

| Inmate's Name: MANLEY, MICHAEL | SBI# 00338445 | Housing Unit: MBA | Tier: A22 |
|---|---|---|---|

| Evaluators: 12-8 | C. Ward | | Return by 10-30-98 |
|---|---|---|---|
| 8-4 | ~~M. Ryan~~  Wayne Wassey | | |
| 4-12 | | | |

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | | MR JS wm | |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | no problems | | |
| 17) Displays negative attitude | | JS | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | | |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | | | |
| 24) Keeps room neat/clean, bed made | | MR JS wm | ℓ |
| 25) Keeps himself neat/clean | | wm | ℓ |
| 26) Volunteers for projects | | | |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows Inmate Housing Rules | | MR JS wm | ℓ |
| 30) Has positive attitude | | | ℓ |
| 31) Finds acceptable ways to keep busy | | | ℓ |
| 32) Approaches staff in open/honest way | | | |

| Reviewed by Shift Lieutenant | Date: 10/21/98 Sign: C. Ward | Date: 10/21/98 Sign: MR | 10-30-98 Sign: Piski |
|---|---|---|---|

Additional comments to be placed on back of form.

**Additional Comments:** _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Form # 107 (F&B)

**Staff Observation Report**

This form is to be considered contraband if in the possession of an inmate.

| Inmate's Name: MANLEY, MICHAEL | SBI# 33405 | Housing Unit MSN | Tier 662 |
|---|---|---|---|

Evaluators: 12-8  WW Shen

8-4  Thorpe  Massey  Berman          10-15-98

4-12  Morgan  Galbreth

Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | | MJ wm ky (w) | |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | (gm)(w) |
| 20) Gets along with others | | | |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | (gm)(w) |
| 23) Respects authority | | | (gm)(w)(g) |
| 24) Keeps room neat/clean, bed made | | wm  ky (g) | (gm)(w)(g) |
| 25) Keeps himself neat/clean | | wm  ky (g) | (gm)(w) |
| 26) Volunteers for projects | | | |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | MJ wm (w) | (g) |
| 29) Follows Inmate Housing Rules | | MJ wm (w) | (g) |
| 30) Has positive attitude | | | |
| 31) Finds acceptable ways to keep busy | | | (w)(g) |
| 32) Approaches staff in open/honest way | | | |
| Reviewed by Shift Lieutenant | Date 9-30-98 Sign WW Shen | Date 9/30/98 Sign MB | Date 11-14-98 Sign SKi |

Additional comments to be placed on back of form.  -4    4 23

**Additional Comments:**_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Form# 107 (P&S)
**This form is to be considered contraband if in the possession of an inmate.**

| Inmate's Name: MANLEY, MICHAEL | SBI# 33793 | Housing Unit MBU | Tier AH2 |
|---|---|---|---|

Evaluators: 12-8  W Dale's
8-4  Wayne Massey
4-12  Morgan Col Quot

Return by 9-30-2

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | | wm | |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | | |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | wm | |
| 23) Respects authority | | wm | |
| 24) Keeps room neat/clean, bed made | | wm | |
| 25) Keeps himself neat/clean | w w s | wm | |
| 26) Volunteers for projects | | | |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | wm | |
| 29) Follows inmate Housing Rules | | wm | |
| 30) Has positive attitude | | | |
| 31) Finds acceptable ways to keep busy | | | |
| 32) Approaches staff in open/honest way | | | |
| Reviewed by Shift Lieutenant | Date 9/10/98 Sign W S ce | Date 9/15/98 Sign MJ | 9-26-98 So PSr |

Additional comments to be placed on back of form.   -8         + 53

Form 107 (F&B)    Appendix D2

**Additional Comments:** _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Form# 107 (F&D)

**Staff Observation Report**

**This form is to be considered contraband if in the possession of an inmate.**

| Inmate's Name: MANLEY, MICHAEL | SBI# 338485 | Housing Unit MSU | Tier A-2 |
|---|---|---|---|

| Evaluators: 12-8 | W. EVANS | Return by |
|---|---|---|
| 8-4 | M. ___ Shley Wasson | 9-14-98 |
| 4-12 | ___ Patterson ___ ___ % J. Morgan | |

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | | MJ JyB | B |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | B | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | B | BJyB |
| 20) Gets along with others | | B | B B |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | B |
| 23) Respects authority | | | B B |
| 24) Keeps room neat/clean, bed made | | | B B B |
| 25) Keeps himself neat/clean | | MJ JyB | B B B |
| 26) Volunteers for projects | | | |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | MJ JyB | |
| 29) Follows Inmate Housing Rules | | MJ JyB | B B |
| 30) Has positive attitude | | | B B |
| 31) Finds acceptable ways to keep busy | | | |
| 32) Approaches staff in open/honest way | | | |
| Reviewed by Shift Lieutenant | Date 9/2/98 Sign. ___ | Date 9/14/98 Sign. MSJ | RDT Sign. SK |

(12-8 column, handwritten vertically: "No Problems")

Additional comments to be placed on back of form.

**Additional Comments:**

## DELAWARE CORRECTIONAL CENTER ---- MEMORANDUM

TO:    Inmate *Michael Manly*, SBI# *338483*, Housing Unit *11*
VIA:    Counselor *Jack*
FROM:    I.B.C.C.
DATE:    *10/1/98*
RE:    Classification Results

Your M.D.T. has recommended you for the following: _____

*Continue Max/IHC & MSU Progm* _____

The I.B.C.C.'s decision is to:

*X*    Approve _____

_____    Not Approve _____

_____    Defer _____

_____    Recommend _____

_____    Not Recommend _____

**BECAUSE:**

_____    Lack of program participation          _____    Time remaining on sentence
_____    Pending disciplinary action            _____    Prior failure under supervision
_____    Gradual phasing indicated              _____    Poor institutional adjustment
_____    Open charges                           _____    Serious nature of offense
_____    Prior criminal history
_____    Failure to follow your treatment plan in that you _____
_____
_____

_____    You present a current and continuous danger to the safety of staff, other inmates, or the good
          order of the Institution. Explanation: _____

**OTHER:** *Rev 12/98* _____

_____

**ADDITIONAL COMMENTS:**

_____    Develop/continue treatment plan with counselor

You will be expected to address the following: _____
_____
_____

Copy to:  Classification                    Form #456 (3 Part NCR)
          Inmate                            Revised 11/97
          Institution File

## BUREAU OF PRISONS RECLASSIFICATION FORM #004

**I.**    **Vital Indicators/Sentencing Information**

Inmate Name _Manley, Michael_    AKA _NONE_    SBI No _338888_ Date of Birth _2-29-74_

mo / da / yr

Facility _D.C.C._    Security/Custody Level _MAX/HIGH_    Housing Area _MHU_

Current Offense(s) _MURDER I, AGG. ACT OF INTIMIDATION, P.D.W.D.C.F., CONSP II._

Level V Sentence: Year(s): _DEATH_ Month _DEATH_ Day(s): _DEATH_ Truth in Sentence? Yes _X_ No ____

Sentence Effective Date _4/18/95_ STRD: _NONE_ PE Date: _NONE_ Parole Rehearing Date _NONE_

Mandatory Sentence: Year(s) _NO_ Month(s) _NO_ Day(s) _NO_ Level IV Sentence? Yes ____ Length ____

No _NO_

Detainer(s)? Yes ____ Agency ____    Open Charge(s)? Yes ____ 4204K? Yes ____ End Date of 4204K ____

No _X_                      No _X_       No _X_

4205L?    Yes ____    4214B/Habitual Offender? Yes ____

No _X_                      No _X_

**II.**    **Prior Criminal History**

Escape History (List date, charge for which convicted, and location from which escape occurred):

_UNKNOWN — NO P.S.E._

Sex Offenses (List date, charges, and ages of victim(s) for all sex offenses): ____

_UNKNOWN — NO P.S.E._

DNA sample obtained? Yes ____ No ____ _UNKNOWN_ (If no, contact Institutional Investigator)

List the most serious offenses in the past 10 years (not previously listed in Escape History or Sex Offenses).

_UNKNOWN EXCEPT FOR CURRENT OFFENSE_

DUI Information (Complete if inmate is serving a sentence for DUI)

Has information been verified via Motor Vehicle Records? Yes ____    No. of DUI's ____

_N/A_   No ____

Date(s) of offense(s): 1st ____    2nd ____    3rd ____    4th ____

BOP FORM 004

**III.** **Institution Disciplinary History** (summarize last 6 months – include dates, offenses, dispositions)

*NONE SINCE HIS LAST REVIEW*

**IV.** **Current Program Participation/Work Assignment** (Justification for Request/Change or Recommendation must be recorded on page 3.)

*M.S.U. PROGRAM*

**V.** **Program Request/Change or Recommendation**
MDT Recommendation:
Housing/Security Level *CONTINUE - MAX/HIGH - MSA*
Employment _____                    On/Off Grounds _____
Education _____                     Treatment Program *CONT. MSA PROGRAM*
Work Release _____                  Supervised Custody _____
Halfway House Worker _____          Highway Work Project _____
Other Recommendation: _____
Furlough _____  To Visit: Name _____  Relationship _____
Address _____  *N/A*
Purpose of Visit _____
Has inmate had prior participation in any program recommended? ___ *N/A* Yes _____  No _____
Number of prior approvals for any program recommended _____
Is exception to standards requested? Yes _____  No _____
(If yes, give reason for exception) _____

**VI.** **Victim Notification Information**
Offender's Release Address (if required) _____ *N/A*
Name of Victim(s) _____
Last Know Address of Victim _____

_____ 9-21-98        _____ 9-25-98
Signature of Counselor      Date      Signature of Counselor Supervisor      Date

**MDT Review**
MDT: Recommended _____  Not Recommended _____  Vote *2-0*
_____ *9-21-98*
Signature of MDT Chairperson      Date

**IBCC Review**
IBCC: Approved _____  Disapproved _____  Recommended _____  Not Recommended _____  Vote *3-0*
_____ *10-1-98*
Signature of IBCC Chairperson      Date
Comments *RW 12/98*

**CICB Review**
CICB: Approved _____  Disapproved _____  Recommended _____  Not Recommended _____  Vote _____
_____
Signature of CICB Chairperson      Date
Comments _____

**IRCB Review**
IRCB: Approved _____  Disapproved _____  Vote _____
_____
Signature of IRCB Chairperson      Date
Comments _____

**Distribution After Final Committee Review**
Copy to: Classification
        Institution File (original)
        Special Programs Office (as required)

BOP-004 / Page 2 of 2
Revised 1/98      Form# 135

Form# 135
BOP Form 004

Page 3

## JUSTIFICATION FOR REQUEST/CHANGE OR RECOMMENDATION

INMATE NAME _Manley Michael_    SBI# _00 320483_

Michael was classified to Max/High because of
the nature of his offense and sentence.
He is considered to be a high profile inmate.
It appears he has not been a management
problem for staff and the staff observation
reports have been satisfactory and he enjoys
Level 2 status.
The team see's no reason to change his
classification at this time. We want to observe
him for a longer period of time - Vote 2-0
to continue Max/High.

Recommended review date: _12/98_

Form# 107 (Feb)  **Staff Observation Report**

**This form is to be considered contraband if in the possession of an inmate.**

| Inmate's Name: MANLEY MICHAEL | SBI# 338405 | Housing Unit MHU | Tier B-2 |
| --- | --- | --- | --- |

| Evaluators: 12-8 | W EVANS | | |
| --- | --- | --- | --- |
| 8-4 | M S Strutteman C/O C. Hastings  W. Moody | | Dec 28 98 |
| 4-12 | S. Morgan  Sgt C | | |

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

|  | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
| --- | --- | --- | --- |
| 1) Worried, anxious | | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | | MS P.T.M. WM RJ | |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | P.T.M | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | No Problem | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | No | | |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | | | SM RJ W |
| 24) Keeps room neat/clean, bed made | | SM WM | SM RJ W |
| 25) Keeps himself neat/clean | | SM WM | SM RJ W |
| 26) Volunteers for projects | | | |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | MS SM WM | SM RJ W |
| 29) Follows Inmate Housing Rules | | | SM RJ W |
| 30) Has positive attitude | | SM | SM RJ W |
| 31) Finds acceptable ways to keep busy | | SM | |
| 32) Approaches staff in open/honest way | | | |
| Reviewed by Shift Lieutenant | Date K 1998 Sign W | Date 8/8/98 Sign M S | PSK Sign 8-28-98 |

*Additional comments to be placed on back of form.*

**Additional Comments:**_____

Form# 107 (7&8)

**This form is to be considered contraband if in the possession of an inmate.**

| Inmate's Name: Mackey Michael | SBI# 338475 | Housing Unit: MBH | Tier: A-2 |

Evaluators: 12-8 _KC Ramies SR_
8-4 _M. Say Wayne M. Massey J Wilmer C/O_  Return by 8-14-98
4-12 _J.I.K. C/o Morgan K.R._

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | No problems | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | | M Say wmm Rg | |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | | |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | | | |
| 24) Keeps room neat/clean, bed made | | wmm RB Rg | |
| 25) Keeps himself neat/clean | | MSy wmm | |
| 26) Volunteers for projects | | | |
| 27) Likeable | | wmm | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows inmate Housing Rules | | MSy wmm | |
| 30) Has positive attitude | | | |
| 31) Finds acceptable ways to keep busy | | | |
| 32) Approaches staff in open/honest way | | | |
| Reviewed by Shift Lieutenant | Date 8/5/98 Harris | Date 8/14/98 Sign MSy | Riski Sign 8-13-98 |

-3    +29

Additional comments to be placed on back of form.

Form 107 (F&B)

**Additional Comments:**

Form# 107 (f&B)                    **Staff Observation Report**                    APPENDIX B

**This form is to be considered contraband if in the possession of an inmate.**

| Inmate's Name: MANLEY MICHAEL | SBI# 00331903 | Housing Unit MBA | Tier A-2 |
|---|---|---|---|

Evaluators: 12-8 _Birlow_          Return by
8-4                    Go Jenkins, Go Hastings Sgt Seau    9-31-98
4-12                    _____ _____ C/O Morgan

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | | MJ/BS C.T.R. | |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | No Problem | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | BS ___ | ___ MN |
| 21) Accepts blame/some of his troubles | NO | | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | | BS ___ | ___ ___ MN |
| 24) Keeps room neat/clean, bed made | | BS ___ | ___ ___ ___ MN |
| 25) Keeps himself neat/clean | | BS ___ | ___ ___ MN |
| 26) Volunteers for projects | | | |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows Inmate Housing Rules | | MJ/BS ___ | ___ ___ MN |
| 30) Has positive attitude | | BS ___ | ___ ___ MN |
| 31) Finds acceptable ways to keep busy | | BS | ___ ___ MN |
| 32) Approaches staff in open/honest way | | | |
| Reviewed by Shift Lieutenant | Date: 7-18-8 Sgt: | Date: 7/18/98 Sgt: MJ | Date: 7-31-98 Sgt: P.S.K. |

Additional comments to be placed on back of form.

Form# 107 (F&B)

**Additional Comments:** _____

Form# 107 (F&B)

**Staff Observation Report**

This form is to be considered contraband if in the possession of an inmate.

| Inmate's Name: MANNEY, MICHAEL | SBI# 00335905 | Housing Unit MSU | Tier AA2 |
|---|---|---|---|

Evaluators: 12-8    JC Daniels SR                        Return RY
                                                        7-17-98
        8-4
        4-12   Collicott  K.As  4LH  E Morgan

*Instructions: Please indicate which of the following behaviors this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.*

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | NO problems | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | Mfg  Ry | |
| 4) Cannot be trusted | | | |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | ⊙ nok ⊙M |
| 20) Gets along with others | | | |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | ⊙ nok ⊙M |
| 23) Respects authority | | | ⊙ nok ⊙ ⊙M |
| 24) Keeps room neat/clean, bed made | | | ⊙ nok ⊙ ⊙M |
| 25) Keeps himself neat/clean | | | ⊙ nik ⊙ ⊙M |
| 26) Volunteers for projects | | | ⊙ ⊙M |
| 27) Likeable | | | |
| 28) Discusses personal problems w/staff | | Mfg  Ry | ⊙ |
| 29) Follows Inmate Housing Rules | | mfg  Ry | ⊙ nik ⊙M |
| 30) Has positive attitude | | | ⊙ nok ⊙ ⊙M |
| 31) Finds acceptable ways to keep busy | | | |
| 32) Approaches staff in open/honest way | | | |

| Reviewed by Shift Lieutenant | Date: 7/9/98 Sign: Harris | 7/14/98 Sign: M | 7-17-98 Sign: Vicki |
|---|---|---|---|

Additional comments to be placed on back of form.   -2        X 31

Form# 107 (F&B)

Appendix D2

Additional Comments:_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____



Form# 107 (F&B)

**Staff Observation Report**

**This form is to be considered contraband if in the possession of an inmate.**

| Inmate's Name: MANLEY, MICHAEL | SBI# 00 331 415 | Housing Unit MBU | Tier A-2 |
|---|---|---|---|

| Evaluators: 12-8 | W. EVANS | |
|---|---|---|
| 8-4 | W. M. MASSEY | Return 6-15-98 |
| 4-12 | P. Ski, K.J.S. G.L.S., %/ J. Morgan | |

Instructions: Please indicate which of the following behavior this inmate exhibits. If the behavior describes the inmate, place your initials in the space beside the behavior.

| | 12-8 Staff Initials | 8-4 Staff Initials | 4-12 Staff Initials |
|---|---|---|---|
| 1) Worried, anxious | | | |
| 2) Tense, cannot relax | | | |
| 3) Takes no pleasure in anything | | | |
| 4) Cannot be trusted | | MB Ry | |
| 5) Moody, brooding | | | |
| 6) Tries to con (manipulate) staff | | | |
| 7) Impulsive, unpredictable | | | |
| 8) Seeks excitement | | | |
| 9) Is never happy | | | |
| 10) Daydreams, is preoccupied | | | |
| 11) Tries to play staff against each other | | | |
| 12) Considers himself unjustly confined | NO PROBLEMS | | |
| 13) Frequently upset after visits | | | |
| 14) Frequently upset after receiving mail | | | |
| 15) Participates in group demonstrations | | | |
| 16) Thinks only of himself | | | |
| 17) Displays negative attitude | | | |
| 18) Breach of group confidentiality | | | |
| 19) Speaks of goals/plans | | | |
| 20) Gets along with others | | WMM Ry | JM |
| 21) Accepts blame/some of his troubles | | | |
| 22) Accepts blame/all of his troubles | | | |
| 23) Respects authority | | | |
| 24) Keeps room neat/clean, bed made | | WMM Ry | |
| 25) Keeps himself neat/clean | | WMM Ry | |
| 26) Volunteers for projects | | | |
| 27) Likeable | | MJ WMM | |
| 28) Discusses personal problems w/staff | | | |
| 29) Follows Inmate Housing Rules | | MJ WMM | |
| 30) Has positive attitude | | | |
| 31) Finds acceptable ways to keep busy | | | |
| 32) Approaches staff in open/honest way | | | |

| Reviewed by Shift Lieutenant | Date 6-10-98 Sign | Date 6-8-98 Sign MB | Date 6-13-98 Sign P.Ski |
|---|---|---|---|

Additional comments to be placed on back of form.    -2-

Form 107 (F&B)    Appendix D2

**Additional Comments:** _____

Would recommend for a Job

## DELAWARE CORRECTIONAL CENTER — MEMORANDUM

TO:      Inmate _Michal Manley_ , SBI# _278483_ , Housing Unit _U_

VIA:     Counselor _____

FROM:    I.B.C.C.

DATE:    _7/9/98_

RE:      Classification Results

Your M.D.T. has recommended you for the following: _____

_Continue May/HC_ _____

_____

The I.B.C.C.'s decision is to:

_X_ Approve _____

_____ Not Approve _____

_____ Defer _____

_____ Recommend _____

_____ Not Recommend _____

### BECAUSE:

| | |
|---|---|
| _____ Lack of program participation | _____ Time remaining on sentence |
| _____ Pending disciplinary action | _____ Prior failure under supervision |
| _____ Gradual phasing indicated | _____ Poor institutional adjustment |
| _____ Open charges | _____ Serious nature of offense |
| _____ Prior criminal history | |

_____ Failure to follow your treatment plan in that you _____

_____

_____ You present a current and continuous danger to the safety of staff, other inmates, or the good order of the Institution. Explanation: _____

_____

OTHER: _Rev 9/98_ _____

_____

### ADDITIONAL COMMENTS:

_____ Develop/continue treatment plan with counselor

You will be expected to address the following: _____

_____

_____

Copy to:  Classification
          Inmate
          Institution File

Form #456 (3 Part NCR)
Revised 11/97

BUREAU OF PRISONS RECLASSIFICATION FORM #004

DATE: _____

**I.  Vital Indicators/Sentencing Information**

Inmate name _MANLEY, MICHAEL_ AKA _NONE_          Institution _DCC/MHU_

Institution Number _NONE_  SBI Number _00338403_ Date of Birth _2-29-84_

Present Offense(s) _MURDER I, AGG. ACT OF INTIMIDATION, P.O.W. P.C.F._
_CONSP. II_          Most Serious Offense _MURDER I_
                    (DEATH PLUS 55 YEARS)

Level V Sentence:  Year(s)_DEATH_ Month_DEATH_ Day(s)_DEATH_ Truth in Sentence Yes _X_ No ___

Sentence Effective Date _1/18/95_ STRD _NONE_ PE Date _NONE_ Rehearing Date _NONE_

Mandatory:  Year(s) _NO_ Month(s) _NO_ Day(s) _NO_  Level IV Sentence? Yes___ No _X_

Detainer(s)? Yes____ No _X_  Open Charge(s)? Yes___ No _X_ 4204K? Yes___ No _X_

Escape/Attempted Escape on Record? Yes___ No _X_ Category_____

**II.  Program Request/Change or Recommendation**

Request: Work Release____ Supervised Custody____ Work Release/Supervised Custody____

Halfway House Worker__Highway Work Project__Community/Governmental Service Project__

Furlough____ To See: Name(s)_____ Relationship_____

Address_____

Purpose_____

Comments_____

Off Grounds Status? Yes___ No _X_ If yes, state program/assignment for which status
is being requested:_____

Change in Security Level and Institution? Yes___ No _X_ If yes, state security level
and institution requested: _CONTINUE MAX/HIGH - MHU_

Has inmate had prior participation in program requested?  Yes_____ No_____

Program_____ Number of approvals_____

Reason(s)/date(s) for failure or return_____

_____

Is inmate eligible in accordance with program standards?  Yes_____ No_____

Is exception to standards requested? Yes__ No__ If yes, give reasons for exception:

_____

_____

BOP-004/Page 1 of 2

III. **Disciplinary ( summary last 3 months-include dates, offenses dispositions)**

_NONE_

Most serious offense within last 3 months: _NONE_

IV. **Program Participation/Work Assignment**

_NONE_

V. **DUI Information (Complete if inmate is serving a sentence for DUI)**

Has information been verified via Motor Vehicle Records? Yes___ No___ No. of DUI's___

Date(s) of offense(s): 1st_____ 2nd_____ 3rd _____ 4th_____

VI. **Victim Notification**          Is victim notification required?    Yes _____ No ___

Name of Victim(s) _____

Last Known Address _____

_____          _____
Counselor Signature                           Supervisor's Signature

**Committee Review**

MDT: Approved _X_ Disapproved ____ Vote Number   2-0  _____ 6-19-98
                                                  MDT Chair Signature/Date

IBCC: Approved _✓_ Disapproved ____ Vote Number   3-0  _____ 9/9/98
                                                  IBCC Chair Signature/Date

CICC: Approved____ Disapproved ____ Vote Number   _____
                                                  CICC Chair Signature/Date

**Distribution After Final Committee Review**

Central Classification Office
Institutional Classification File
Inmate's Record

ADDENDUM TO BOP RECLASSIFICATION FORM 7004

Use this sheet to record any additional information which could not be included in the designated spaces on Form BOP-004.

Inmate Name: _MANLEY, MICHAEL_  SBI Number: _00338485_  Institution: _DCC/MSU_

Manley was classified to Max/High for a period of Observation because his crime & Death sentence. He is considered to be a high Profile Inmate.

It appears he has not been a management problem and keeps to himself.

The team see'd no reason to change his Classification at this time.

We want to observe him for a longer period of time. Vote 2-0

Please note that he refused to attend this Classification review. (See attached 207)

Recommended Review: 9/88

Cont. for
2. print

## M.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANLEY, MICHAEL_____

Evaluators: _____

Shift: _____A-4_____ Date Completed: 4/30/96

Review Date: 5-1-9*- RETURN TO CAPT-BY 9N00.

Shift Lt.: _____MSW_____

INSTRUCTIONS:   Please indicate which of the following behaviors this
inmate exhibits.  If the behavior describes the inmate,
place your initials in the space preceding the describe
behavior.

| | | | |
|---|---|---|---|
| _____ | 1. Worried, anxious. | _____ | 17. Displays negative attitude. |
| _____ | 2. Tense, unable to relax. | _____ | 18. Breach of Group confidentiality. |
| _____ | 3. Seems to take no pleasure in anything. | _____ | 19. Speaks in detail goals, plans.. |
| _By_ | 4. Cannot be trusted at all. | _@R BJ_ | 20. Gets along with others. |
| _____ | 5. Moody, brooding. | _____ | 21. Accepts blame for some of his troubles. |
| _____ | 6. Continually tries to con staff. | _____ | 22. Accepts blame for all of his troubles. |
| _____ | 7. Impulsive, unpredictable. | _____ | 23. Respects authorit |
| _____ | 8. Seems to seek excitement. | _____ | 24. Keeps room neat, clean and bed mad |
| _____ | 9. Never seems happy. | _@_ | 25. Keeps himself nea and clean. |
| _____ | 10. Daydreams, seems preoccupied. | _____ | 26. Volunteers for wo projects. |
| _____ | 11. Attempts to play staff against one another. | _____ | 27. Likeable. |
| _____ | 12. Considers himself unjustly confined. | _@R JM_ | 28. Willing to discuss personal problems w/staff. |
| _____ | 13. Frequently upset after visits. | _____ | 29. Follows the Inmate Housing Rules. |
| _____ | 14. Frequently upset after receiving mail. | _____ | 30. Displays positive attitude. |
| _____ | 15. Participates in group demonstrations. | _@R BJ_ | 31. Finds acceptable ways to keep busy |
| _____ | 16. Seems to think only of himself. | _____ | 32. Approaches some staff in an open, honest maner. |

-6                                                +91

ADDITIONAL COMMENTS:   NUMBER: _____

_____

M.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANLEY, MICHAEL_____

Evaluators: C/o Morgan) _____

Shift: ____4-12_____  Date Completed: ____4-25-98

Review Date: 5-7-98 _ RETURN TO CAPT. BY 0700.

Shift Lt.: R.J. Pawlowski

**INSTRUCTIONS:**  Please indicate which of the following behaviors this inmate exhibits.  If the behavior describes the inmate, place your initials in the space preceding the describe behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable to relax.

_____ 3. Seems to take no pleasure in anything.

_____ 4. Cannot be trusted at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries to con staff.

_____ 7. Impulsive, unpredictable.

_____ 8. Seems to seek excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems preoccupied.

_____ 11. Attempts to play staff against one another.

_____ 12. Considers himself unjustly confined.

_____ 13. Frequently upset after visits.

_____ 14. Frequently upset after receiving mail.

_____ 15. Participates in group demonstrations.

_____ 16. Seems to think only of himself.

_____ 17. Displays negative attitude.

_____ 18. Breach of Group confidentiality.

_____ 19. Speaks in detail goals, plans..

_____ 20. Gets along with others.

_____ 21. Accepts blame for some of his troubles.

_____ 22. Accepts blame for all of his troubles.

_____ 23. Respects authorit

_____ 24. Keeps room neat, clean and bed mad

_____ 25. Keeps himself nea and clean.

_____ 26. Volunteers for wo projects.

_____ 27. Likeable.

_____ 28. Willing to discuss personal problems w/staff.

_____ 29. Follows the Inmate Housing Rules.

_____ 30. Displays positive attitude.

_____ 31. Finds acceptable ways to keep busy

_____ 32. Approaches some staff in an open, honest maner.

**ADDITIONAL COMMENTS:  NUMBER:** Refused the trimen job several times @

M.S.U.    SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: *MANLEY, MICHAEL*

Evaluators: *C/O W. GREENE*

Shift: *2nd*                        Date Completed: *4-22-98*

Review Date: *5-7-98 - RETURN TO CAPT. BY 9/00.*

Shift Lt.: *HARRIS*

<u>INSTRUCTIONS:</u>   Please indicate which of the following behaviors this
                inmate exhibits.  If the behavior describes the inmate,
                place your initials in the space preceding the describe
                behavior.

| | |
|---|---|
| _____ 1. Worried, anxious. | _____ 17. Displays negative attitude. |
| _____ 2. Tense, unable , to relax. | _____ 18. Breach of Group confidentiality. |
| _____ 3. Seems to take no pleasure in anything. | _____ 19. Speaks in detail goals, plans.. |
| _____ 4. Cannot be trusted at all. | _____ 20. Gets along with others. |
| _____ 5. Moody, brooding. | _____ 21. Accepts blame for some of his troubles. |
| _____ 6. Continually tries to con staff. | _____ 22. Accepts blame for all of his troubles. |
| _____ 7. Impulsive, unpredictable. | _____ 23. Respects authorit |
| _____ 8. Seems to seek excitement. | _____ 24. Keeps room neat, clean and bed mad |
| _____ 9. Never seems happy. | _____ 25. Keeps himself nea and clean. |
| _____ 10. Daydreams, seems preoccupied. | _____ 26. Volunteers for wo projects. |
| _____ 11. Attempts to play staff against one another. | _____ 27. Likeable. |
| _____ 12. Considers himself unjustly confined. | _____ 28. Willing to discuss personal problems w/staff. |
| _____ 13. Frequently upset after visits. | _____ 29. Follows the Inmate Housing Rules. |
| _____ 14. Frequently upset after receiving mail. | _____ 30. Displays positive attitude. |
| _____ 15. Participates in group demonstrations. | _____ 31. Finds acceptable ways to keep busy |
| _____ 16. Seems to think only of himself. | _____ 32. Approaches some staff in an open, honest maner. |

<u>ADDITIONAL COMMENTS:</u>   <u>NUMBER:</u> ___ *No problem* _____

## M.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANNEY MICHAEL_____

Evaluators: _____

Shift: _____P-4_____ Date Completed: _4/15/98_____

Review Date: _4-15-98___RETURN TO CAPT. BY 0900._____

Shift Lt.: _____

INSTRUCTIONS:    Please indicate which of the following behaviors this
inmate exhibits.  If the behavior describes the inmate,
place your initials in the space preceding the describe
behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
to relax.

_____ 3. Seems to take no
pleasure in anything.

_____ 4. Cannot be trusted
at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
to con staff.

_____ 7. Impulsive,
unpredictable.

_____ 8. Seems to seek
excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
preoccupied.

_____ 11. Attempts to play
staff against one another.

_____ 12. Considers himself
unjustly confined.

_____ 13. Frequently upset
after visits.

_____ 14. Frequently upset
after receiving mail.

_____ 15. Participates in
group demonstrations.

_____ 16. Seems to think
only of himself.

_____ 17. Displays negative
attitude.

_____ 18. Breach of Group
confidentiality.

_____ 19. Speaks in detail
goals, plans..

_____ 20. Gets along with
others.

_____ 21. Accepts blame for
some of his troubles.

_____ 22. Accepts blame for
all of his troubles.

_____ 23. Respects authority

_____ 24. Keeps room neat,
clean and bed made

_____ 25. Keeps himself neat
and clean.

_____ 26. Volunteers for work
projects.

_____ 27. Likeable.

_____ 28. Willing to discuss
personal problems w/staff.

_____ 29. Follows the Inmate
Housing Rules.

_____ 30. Displays positive
attitude.

_____ 31. Finds acceptable
ways to keep busy

_____ 32. Approaches some
staff in an open,
honest maner.

/3

/17

ADDITIONAL COMMENTS:   NUMBER: _____

_____

M.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANUEL MICHAEL_ _____

Evaluators: _____

Shift: ___4-12___     Date Completed: ___4-11-98___

Review Date: _4-15-98 — RETURN TO CAPT. BY OT00._

Shift Lt.: _R J Pamburski_ _____

**INSTRUCTIONS:**   Please indicate which of the following behaviors this
inmate exhibits.  If the behavior describes the inmate,
place your initials in the space preceding the describe
behavior.

| | |
|---|---|
| ___ 1. Worried, anxious. | ___ 17. Displays negative attitude. |
| ___ 2. Tense, unable to relax. | ___ 18. Breach of Group confidentiality. |
| ___ 3. Seems to take no pleasure in anything. | ___ 19. Speaks in detail goals, plans.. |
| ___ 4. Cannot be trusted at all. | ___ 20. Gets along with others. |
| ___ 5. Moody, brooding. | ___ 21. Accepts blame for some of his troubles. |
| ___ 6. Continually tries to con staff. | ___ 22. Accepts blame for all of his troubles. |
| ___ 7. Impulsive, unpredictable. | ___ 23. Respects authorit |
| ___ 8. Seems to seek excitement. | ___ 24. Keeps room neat, clean and bed mad |
| ___ 9. Never seems happy. | ___ 25. Keeps himself nea and clean. |
| ___ 10. Daydreams, seems preoccupied. | ___ 26. Volunteers for wo projects. |
| ___ 11. Attempts to play staff against one another. | ___ 27. Likeable. |
| ___ 12. Considers himself unjustly confined. | ___ 28. Willing to discuss personal problems w/staff. |
| ___ 13. Frequently upset after visits. | ___ 29. Follows the Inmate Housing Rules. |
| ___ 14. Frequently upset after receiving mail. | ___ 30. Displays positive attitude. |
| ___ 15. Participates in group demonstrations. | ___ 31. Finds acceptable ways to keep busy |
| ___ 16. Seems to think only of himself. | ___ 32. Approaches some staff in an open, honest maner. |

**ADDITIONAL COMMENTS:**   **NUMBER:** _refused therman job twice_ _____

_____

## M.S.U.   SEMIMONTHLY BEHAVIOR REPORT

Inmate's Name: _MANLEY MICHAEL_____

Evaluators: _So A. Parnell_____

Shift: _____12-8_____ Date Completed: _4-9-98___

Review Date: _4-15-98 - RETURN TO CAPT. BY 0800._____

Shift Lt.: _Harris_____

INSTRUCTIONS:   Please indicate which of the following behaviors this
                inmate exhibits.  If the behavior describes the inmate,
                place your initials in the space preceding the describe
                behavior.

_____ 1. Worried, anxious.

_____ 2. Tense, unable
                to relax.

_____ 3. Seems to take no
                pleasure in anything.

_____ 4. Cannot be trusted
                at all.

_____ 5. Moody, brooding.

_____ 6. Continually tries
                to con staff.

_____ 7. Impulsive,
                unpredictable.

_____ 8. Seems to seek
                excitement.

_____ 9. Never seems happy.

_____ 10. Daydreams, seems
                 preoccupied.

_____ 11. Attempts to play
                 staff against one another.

_____ 12. Considers himself
                 unjustly confined.

_____ 13. Frequently upset
                 after visits.

_____ 14. Frequently upset
                 after receiving mail.

_____ 15. Participates in
                 group demonstrations.

_____ 16. Seems to think
                 only of himself.

_____ 17. Displays negative
                 attitude.

_____ 18. Breach of Group
                 confidentiality.

_____ 19. Speaks in detail
                 goals, plans..

_____ 20. Gets along with
                 others.

_____ 21. Accepts blame for
                 some of his troubles.

_____ 22. Accepts blame for
                 all of his troubles.

_____ 23. Respects authorit

_____ 24. Keeps room neat,
                 clean and bed mad.

_____ 25. Keeps himself nea
                 and clean.

_____ 26. Volunteers for wo
                 projects.

_____ 27. Likeable.

_____ 28. Willing to discuss
                 personal problems w/staff.

_____ 29. Follows the Inmate
                 Housing Rules.

_____ 30. Displays positive
                 attitude.

_____ 31. Finds acceptable
                 ways to keep busy

_____ 32. Approaches some
                 staff in an open.
                 honest maner.

ADDITIONAL COMMENTS:   NUMBER: _No problems with Him._

_____

25

## AFFIDAVIT/DECLARATION OF PHILLIP HUDSON

I, Phillip Hudson, pursuant to 28 U.S.C. § 1746, hereby swear, affirm and state that the following is true and correct:

1.    My name is Phillip Hudson. I have been living in Goodyear, Arizona since December of 1996.

2.    On October 31, 1996, I testified on behalf of the prosecution in the case of State of Delaware vs. Michael Manley and David Stevenson.

3.    I have not been contacted by the prosecution since I testified in 1996. Recently I was contacted by Janel Trivelpiece of the Federal Public Defender. Ms. Trivelpiece informed me that there was another trial in this case in 2005. I moved to Arizona in December of 1996. Subsequently, I was arrested on theft related offenses and was incarcerated continuously from September of 2004 through September of 2006. If the prosecution had sought my appearance, I would have cooperated. If the prosecution had filed a writ to transport me to Delaware to testify, I would have cooperated with that order.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

_____  12-4-07
Phillip Hudson

26

MICHAEL K. JEANES, CLERK
BY _E. Ward_ DEP

FILED

2003 JAN 29 PM 4: 04

RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY

Ronald M. Debrigida, Jr.
Deputy County Attorney
Bar Id #: 015697
301 West Jefferson, 6th Floor
Phoenix, AZ  85003
Telephone: (602) 506-8484
MCAO Firm #:  00032000
Attorney for Plaintiff

QUADRANT UA

DR 20021810348 - Mesa Police Dept.

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| THE STATE OF ARIZONA,<br><br>                 Plaintiff,<br><br>      vs.<br><br>PHILLIP HUDSON (001),<br>aka PHILLIP HAROLD HUDSON,<br><br>          Defendant. | CR 2003-006251-001 DT<br><br><br><br>308 GJ 68<br><br>INDICTMENT<br><br>COUNTS 1, 2, 3 & 5: TAKING IDENTITY OF ANOTHER, CLASS 4 FELONIES<br>COUNT 4: FORGERY, A CLASS 4 FELONY<br>COUNT 6: THEFT, A CLASS 6 FELONY ATTEMPTED |

The Grand Jurors of Maricopa County, Arizona, accuse PHILLIP

HUDSON aka PHILLIP HAROLD HUDSON, on this 29th day of January,

2003, charging that in Maricopa County, Arizona:

ν

**COUNT 1:**

PHILLIP HUDSON aka PHILLIP HAROLD HUDSON, on or between the 25th day of June, 2002 and the 1st day of July, 2002, knowingly took, used, sold, or transferred any personal identifying information of JAMES R. CHILDERS, without consent, with intent to obtain, use, sell, or transfer the identity for any unlawful purpose or to cause loss to a person, in violation of A.R.S. §§ 13-2008, 13-701, 13-702, 13-702.01, and 13-801.

**COUNT 2:**

PHILLIP HUDSON aka PHILLIP HAROLD HUDSON, on or between the 12th day of June, 2002 and the 1st day of July, 2002, knowingly took, used, sold, or transferred any personal identifying information of DERL TOTTEN, without consent, with intent to obtain, use, sell, or transfer the identity for any unlawful purpose or to cause loss to a person, in violation of A.R.S. §§ 13-2008, 13-701, 13-702, 13-702.01, and 13-801.

**COUNT 3:**

PHILLIP HUDSON aka PHILLIP HAROLD HUDSON, on or between the 17th day of June, 2002 and the 1st day of July, 2002, knowingly took, used, sold, or transferred any personal identifying information of MATTHEW J. REXING, without consent, with intent to obtain, use, sell, or transfer the identity for any unlawful purpose or to cause loss to a person, in violation of A.R.S. §§ 13-2008, 13-701, 13-702, 13-702.01, and 13-801.

308 GJ 68

**COUNT 4:**

PHILLIP HUDSON aka PHILLIP HAROLD HUDSON, on or about the 1st day of July, 2002, with intent to defraud, knowingly possessed a forged instrument, to-wit: Check #1013 drawn on the Wells Fargo Bank account of Matthew J. Rexing, 1457 W. University, #90, Mesa AZ, in violation of A.R.S. §§ 13-2002, 13-2001, 13-701, 13-702, 13-702.01, and 13-801.

**COUNT 5:**

PHILLIP HUDSON aka PHILLIP HAROLD HUDSON, on or between the 29th day of March, 2002 and the 1st day of July, 2002, knowingly took, used, sold, or transferred any personal identifying information of GEORGE F. SPENCER, without consent, with intent to obtain, use, sell, or transfer the identity for any unlawful purpose or to cause loss to a person, in violation of A.R.S. §§ 13-2008, 13-701, 13-702, 13-702.01, and 13-801.

**COUNT 6:**

PHILLIP HUDSON aka PHILLIP HAROLD HUDSON, on or about the 30th day of June, 2002, without lawful authority, knowingly obtained, by means of a material misrepresentation, SonyStyle's DCR TRV50 Camcorder, of a value $1,000 or more, but less than $2,000, with the intent to deprive SonyStyle of such property or services, in violation of A.R.S. § 13-1801, 13-1802, 13-701, 13-702, 13-702.01, and 13-801, and 13-1001.

308 GJ 68

*"A True Bill"*
("A True Bill")

RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY

RONALD M. DEBRIGIDA, JR.
DEPUTY COUNTY ATTORNEY

RD/kj/AO

Date: January 29, 2003

WILLIAM MCLAUGHLIN
FOREPERSON OF THE GRAND JURY

## COURT INFORMATION SHEET (CIS)

County Attorney Case Number: CA2002041966

Filing ID Number:  CA2002041966-1-1

**STATE v. PHILLIP HUDSON aka PHILLIP HAROLD HUDSON**     Defendant Sequence:

Defendant's Address:        Transient

Defendant's Employer:        UNKNOWN

Defendant's Attorney:

**DEFENDANT'S DESCRIPTION:**
Race:   W      Sex:   M     Hair:   BLK        Eyes:  BRO     Hgt:   511
Wgt:   195     DOB:   8/29/1972      Soc Sec #:  222704611

Old LEJIS #:  Unknown     FBI #: 250735VA0     SID #:  12666691
JMS Booking #: Unknown     JMS LEJIS #:  Unknown

**FILING STATUS:**

____√____Grand Jury Indictment

Court #:                        Filing Court:  Superior
        Date Complaint Filed:

    Grand Jury #:   308 GJ 68        Service Type: WAR
        Date Indictment Filed:  January 29, 2003

Superior Court #:    CR 2003-_____          Adult/Statutory Juv/Juv Transfer
                    **CR 2003-006251-001DT**     (Circle Appropriate Choice)

**ATTORNEY:** RONALD M. DEBRIGIDA, Jr.   **Bar ID: 015697**   Location: Downtown

**PRELIMINARY HEARING/GRAND JURY CHARGES:**

CTS 1, 2, 3 & 5: TAKING IDENTITY OF ANOTHER, CLASS 4 FELONIES
CT 4: FORGERY, A CLASS 4 FELONY
CT 6: THEFT, A CLASS 3 FELONY
  ATT.            6

| Count | ARS | Date of Crime |
|-------|-----|---------------|
| 1 | 13-2008A | 6/25/02-7/1/02 |
| 2 | 13-2008A | 6/12/02-7/1/02 |
| 3 | 13-2008A | 6/17/02-7/1/02 |
| 4 | 13-2002A2 | 7/1/2002 |
| 5 | 13-2008A | 3/29/02-7/1/02 |
| 6 | 13-1802A3 | 6/30/2002 |

**DEPARTMENTAL REPORTS:**

    DR 20021810348 - Mesa Police Dept.

**EXTRADITE:** AO

RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY

Ronald M. Debrigida, Jr.
Deputy County Attorney
Bar Id #: 015697
301 West Jefferson, 6th Floor
Phoenix, AZ 85003
Telephone: (602) 506-8484
MCAO Firm #: 00032000
Attorney for Plaintiff

MICHAEL K. JEANES, CLERK.
BY 711. Launcker DEP
FILED

2003 APR 21 PH 2: 49

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| THE STATE OF ARIZONA,<br><br>  Plaintiff,<br><br>  vs.<br><br>PHILLIP HUDSON (001),<br>aka PHILLIP HAROLD HUDSON,<br><br>  Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CR 2003 - 006251 - 001 DT

308 GJ 68

WARRANT FOR ARREST

TO ALL PEACE OFFICERS OF THE STATE OF ARIZONA:

An Indictment has been filed in this Court against the above-named defendant charging that in Maricopa County, Arizona, COUNT 1: on or between the 25th day of June, 2002 and the 1st day of July, 2002; COUNT 2: on or between the 12th day of June, 2002 and the 1st day of July, 2002; COUNT 3: on or between the 17th day of June, 2002 and the 1st day of July, 2002; COUNT 4: on or about the 1st day of July, 2002; COUNT 5: on or between the 29th day of March, 2002 and the 1st day of July, 2002; COUNT 6: on or about the 30th day of June, 2002, the crimes of COUNTS 1, 2, 3 & 5: TAKING IDENTITY OF ANOTHER, CLASS 4 FELONIES; COUNT 4: FORGERY, A CLASS 4 FELONY; COUNT 6: THEFT, A CLASS 6 FELONY, have been committed. ATTEMPTED

The Court has found reasonable cause to believe that such offenses were committed and that the defendant committed them, and reason to believe that the defendant will not appear in response to a summons, or that a warrant is otherwise appropriate.

YOU ARE THEREFORE COMMANDED to arrest the defendant and bring said defendant before this Court to answer the charges. If this Court is unavailable, or if the arrest is made in another county, you shall take the defendant before the nearest or most accessible magistrate. You may release defendant if said defendant posts a secured appearance bond in the amount of ONE THOUSAND SEVEN HUNDRED AND SEVENTY DOLLARS ($1,770.00).

Given under my hand and seal on January 29, 2003, at the direction of the Court.

By _____
Judge of the Superior Court

MICHAEL K. JEANES
CLERK OF THE SUPERIOR COURT

_____
Deputy Clerk

DEFENDANT'S DESCRIPTION:

| DOB: | 8/29/1972 | Race: | H | Sex: | M | Hgt: | 511 |
|---|---|---|---|---|---|---|---|
| Wgt: | 195 | Hair: | BLK | Eyes: | BRO | | |
| Defendant's Address: | | Transient<br>Az | | | | | |

DR No.: DR 20021810348 - Mesa Police Dept.

MCSO No: _____          PPD No.: _____

CERTIFICATE OF EXECUTION

I certify that I arrested _____ at _____ a.m\p.m.
on _____, and presented him\her before Judge _____ at
_____.

_____
Agency

_____
Deputy Sheriff, Officer

ORDER OF COMMITMENT

_____, having been brought before me at _____ a.m.\p.m. on
_____, is committed to the custody of the Sheriff of Maricopa County,
Arizona, to be detained until he\she complies with the conditions of release order of this
date, or any amendment or modification thereof.

_____
Magistrate

_____
Title

RD/kj/AO

OFFICER Ybarra SER # 2974
AGENCY Gl_nd PD
DATE 4-17-05 TIME 14°°
COPY TELEFAXED

2

* DISTRIBUTION *
MCSO . . . . . . . . . . . .
PUB. DEF. . . . . . . . . .
DOCKET . . . . . . . . . .
PSA . . . . . . . . . . . . . .
OCI . . . . . . . . . . . . . .
FILE ROOM . . . . . . .

BENJAMIN E. VATZ    APR 30 '03        MAY 01 '03 4

**ARIZONA SUPERIOR COURT**
**MARICOPA COUNTY**    DIST. CENTER    Clerk of the Court

NOT GUILTY ARRAIGNMENT

Deputy Court Clerk: _____

Friday, April 25, 2003 at 8:30 AM

Case Number: CR2003006251 001 DT

Court Reporter: Dottie Reaume

**STATE OF ARIZONA**

Booking Number: A924895
Global Booking Number: A810314

        VS.

County Grand Jury
1/29/2003

**PHILLIP HUDSON**
Defense Attorney: PUBLIC DEFENDER

Arraign Custody Status: Jail

Initial Appearance: 4/18/2003

─────────── BOND INFORMATION ───────────

Bond Set: 1,770    Release / Bond Type: Appearance Bond (Secured)

─────────── CHARGES ───────────

| | | | | |
|---|---|---|---|---|
| Count 1 | | TAKING IDENTITY OF ANOTHER | F4 | N |
| Count 2 | | TAKING IDENTITY OF ANOTHER | F4 | N |
| Count 3 | | TAKING IDENTITY OF ANOTHER | F4 | N |
| Count 4 | | FORGERY | F4 | N |
| Count 5 | | TAKING IDENTITY OF ANOTHER | F4 | N |
| Count 6 | Attempt to Commit | THEFT | F6 | N |

─────────── CO DEFENDANTS ───────────

─────────── OTHER CASES ───────────

─────────── ALIAS ───────────

Phillip Harold Hudson

Case assigned to CRJ21 Judge: **BARRY SCHNEIDER**
Defendant is present and enters a plea of NOT GUILTY to all charges.

It is ordered:
1. Setting INITIAL PRETRIAL conference before _IPTC / HO Peterson_
   on ___June 2___, 2003 at _8:30_ in courtroom _802_.
2. Directing the clerk to amend the charge to reflect the true name.

          * * * NOTICE TO DEFENDANTS * * *

☞    YOU ARE ORDERED TO MEET & CONFER WITH YOUR LAWYER WITHIN THE NEXT 25 DAYS
     TO DO THE FOLLOWING:
     ● Prepare for Initial Pretrial Conference (IPTC)
     ● Discuss Charges & Evidence
     ● Discuss Any Plea Offer
     ● Discuss Negotiation & Resolution of Charges Versus Trial
     ● Discuss Requesting A Settlement Conference

☞    FAILURE TO COMPLY WITH THE ABOVE SCHEDULE & ORDERS MAY RESULT IN REVOCATION OF
     YOUR RELEASE FROM CUSTODY AND / OR OTHER SANCTIONS.

☞    YOU MAY BE TRIED IN YOUR ABSENCE IF YOU FAIL TO APEAR FOR TRIAL.

Copies of this minute order are given to all parties this date.
(152)

LAST DAY 9/22/2003

        20

     THE ARRAIGNMENT IS CONDUCTED
     BY CLOSED-CIRCUIT VIDEO.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2003-006251-001 DT                                    01/29/2003

                                           CLERK OF THE COURT
HONORABLE BENJAMIN E. VATZ                       E. Ikard
                                                  Deputy

IN THE MATTER OF THE                 FILED: **January 29, 2003**

308TH COUNTY GRAND JURY              SCOTT F DOERING

TRUE BILL / ISSUE WARRANT

    Present are the above-named Deputy County Attorney and 9 members of the 308th Maricopa County Grand Jury.

    Court Reporter, Jane Westlund, is present.

    Robert Sedgley, Alternate Foreman, presents to the Court Indictment 308 GJ 68, a True Bill.

    IT IS ORDERED assigning this cause a criminal number.

    IT IS FURTHER ORDERED that a Warrant issue for the arrest of the Defendant to be delivered by the Clerk to the Sheriff.

    IT IS FURTHER ORDERED setting bond in the amount of $1,770.00 which include all appropriate statutory assessments.

    IT IS FURTHER ORDERED that these remain secret until the arrest of the Defendant.

Docket Code 604                    Form G604                    Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2003-006251-001 DT                                    12/22/2004

                                        CLERK OF THE COURT
                                             C. Johnston
HONORABLE BARRY C. SCHNEIDER                   Deputy

                                        FILED: DEC 2 3 2004

STATE OF ARIZONA                    .   RONALD M DEBRIGIDA JR.

v.

PHILLIP HUDSON (001)                    JEFFREY A KIRCHLER
DOB: 8/29/1972
                                        APO-SENTENCINGS-CCC
                                        APPEALS-CCC
                                        DISPOSITION CLERK-CSC
                                        RFR
                                        VICTIM SERVICES DIV-CA-CCC


                SENTENCE - IMPRISONMENT AND PROBATION

        State's Attorney:        Ronald Debrigida
        Defendant's Attorney:    Jeffrey Kirchler
        Defendant:               Present
        Court Reporter:          Cindy Lineburg

        WAIVER OF TRIAL: The Defendant knowingly, intelligently and voluntarily waived
all pertinent constitutional and appellate rights and entered a plea of guilty.

        IT IS THE JUDGMENT of the Court Defendant is guilty of the following:

        OFFENSE: Count 1: Taking the Identity of Another
        Class 4 Felony
        A.R.S. § 13-2008, 701, 702, 702.01, and 801
        Date of Offense: Between 6/25/2002 and 7/1/2002
        Non Dangerous - Non Repetitive

        OFFENSE: Count 2: Taking the Identity of Another
        Class 4 Felony
        A.R.S. § 13-2008, 701, 702, 702.01, and 801
        Date of Offense: Between 6/25/2002 and 7/1/2002

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2003-006251-001 DT                                    12/22/2004

Non Dangerous - Non Repetitive

AS PUNISHMENT, IT IS ORDERED Defendant is sentenced to a term of imprisonment
and is committed to the Arizona Department of Corrections as follows:

Count 1:  2.5 year(s) from 12/22/2004
Presentence Incarceration Credit: 138 day(s)
Presumptive

Community Supervision: Waived pursuant to A.R.S. § 13-603(K) and 41-1604.07(D),
due to the term of probation in Count 2.

IT IS ORDERED suspending imposition of sentence and, under the supervision of the
Adult Probation Department (APD), placing the defendant on probation for:

Count 2 Probation Term: 4 years

Upon absolute discharge from prison for a separate offense.

Conditions of probation include the following:

Condition 16 - Restitution, Fines, and Fees:

RESTITUTION: Count 2 - $7,828.24 payable $400.00 per month to the following
persons:

Wade Rodgers (Individual)    $528.00
Dell Computers       (Business)     $2,705.56
Alltel Communications      (Business)      $4,594.68

Restitution ledger provided; priority of payment as stated in the restitution ledger.

Payment shall be 30% of Defendant's earnings while incarcerated at the Arizona
Department of Corrections.

PROBATION SERVICE FEE: Count 2 - $50.00 per month.

ASSESSMENTS:

Count 2: Time payment fee pursuant to A.R.S. § 12-116 in the amount of $20.00.

Count 2: PROBATION SURCHARGE: $5.00

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2003-006251-001 DT                                    12/22/2004

Payment to commence on the first day of the third month following release from DOC and is due on the same day of each month thereafter until paid in full.

All amounts payable through the Clerk of the Superior Court.

The Court retains jurisdiction for any future restitution hearings.

Additional Monetary Information: Defendant's presence shall be waived for the purposes of a restitution hearing.

Condition 17 - Not consume or drink any substance containing alcohol.

Condition 24 - Participate and cooperate in any counseling or assistance as directed by the APD as noted in the Uniform Conditions of Supervised Probation.

Condition 26 - Other: Not own, possess, or use any computer or peripheral.

IT IS ORDERED granting the Motion To Dismiss the following:   Counts 3 through 6; 13-702.02 allegation; state shall not file any further charges arising out of Glendale PD DR #'s 04-063494 and 03-045144; PPD DR #2002-20774549; and Alltel Communications Investigative Report #2004-FD-123.

Count(s) 1:  IT IS ORDERED authorizing the Maricopa County Sheriff to deliver Defendant to the Arizona Department of Corrections.

IT IS ORDERED the Clerk of the Superior Court remit to the Arizona Department of Corrections a copy of this order together with all presentence reports, probation violation reports, and medical and psychological reports that are not sealed in this cause relating to the Defendant.

Count(s) 2: IT IS FURTHER ORDERED Defendant be released from custody for this count only.

cc:  DOC - Certified Copy via Certification Desk

cc:  MCSO-DIS - Certified Copy via Certification Desk

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

HONORABLE BARRY C. SCHNEIDER

CLERK OF THE COURT
FORM TH1

Date: **DEC 22 2004**

C. Johnston
Deputy

CR _2003-006251-001DT_

STATE v. _Hudson_

       Let the record reflect that the Defendant's thumbprint is permanently affixed to this sentencing order in open court.

(thumbprint)

JUDICIAL OFFICER OF THE SUPERIOR COURT

Page 4

6023725720
10/31/2006 TUE 07:42 FAX 6023725720        WRC IPS                                    ☑001

# ADULT PROBATION DEPARTMENT

**SUPERIOR COURT OF ARIZONA**
**MARICOPA COUNTY**

ADMINISTRATION
(602) 506-3261
TDD (602) 506-2324

INFORMATION
(602) 506-3581

BARBARA A. BRODERICK, Chief Probation Officer



MAILING ADDRESS
ADULT PROBATION
P.O. Box 3407
Phoenix, AZ 85030

---

| **Request to Establish Start Date of Restitution, Probation Service Fees, Fines and /or Other Fees** |
| :---: |

October 26, 2006

**FILED**
11/13/06   8:45am
MICHAEL K. JEANES, Clerk
By _____ R. Smith _____
Deputy

To:      Clerk of the Maricopa County Superior Court
Fax #:  (602) 506-5127
RE:     CR2003-006251-001-DT
         Probationer: Phillip Hudson

On **December 22, 2004**, the probationer was ordered to pay:

    Restitution in a monthly payment of $400.00
    Probation Service Fees in a monthly payment of $50.00
    Time Payment Fee in a monthly payment of $20.00

Payments were ordered to begin on the first day of the 3rd month after absolute discharge from prison. The probationer was granted absolute discharge on **September 27, 2006**. Please establish a payment start date of **December 1, 2006**.

Sincerely,

Andrea Stiles
Adult Probation Officer, (602) 619-1827
cc: Adult Probation Support Staff
cc: Adult Probation Trust Accounting (IPS Cases only)

_____
Ron Mitchell, Supervisor (602) 619-1787

_____
                              Date

APD Macros                                                        Rev 03-30/2005

# ILLEGIBLE DOCUMENTS

This document, papers, attachments or portions thereof may be illegible because of the quality of the original document presented at the time of filing.

**Documents**: This image contains a true copy of the original document.

**Photographs**: This image contains the best possible image of the photograph submitted.

Lrd 07/08/03

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA

THE STATE OF ARIZONA,                    )    NO. CR 2003-006251-001 DT
                                         )
                    Plaintiff,           )    PLEA AGREEMENT
                                         )
        vs.                              )    (Page 1 of 3)
                                         )
PHILLIP HUDSON,                          )
                                         )
                    Defendant.           )
_____ )

FILED
11/15/04 9:24am
MICHAEL K. JEANES, Clerk
By _____
        Deputy

The State of Arizona and the Defendant hereby agree to the following disposition of this case:

**Plea:**    The Defendant agrees to plead GUILTY to:

Count 1, Taking the Identity of Another, a class 4 felony, in violation of A.R.S. §§ 13-2008, 13-701, 13-702, 13-702.01 and 13-801, committed between June 25, 2002, and July 1, 2002, and

Count 2, Taking the Identity of Another, a class 4 felony, in violation of A.R.S. §§ 13-2008, 13-701, 13-702, 13-702.01 and 13-801, committed between June 25, 2002, and July 1, 2002.

These are non-dangerous, non-repetitive offenses under the criminal code.

***THIS OFFER EXPIRES AND IS REVOKED IF NOT ENTERED IN COURT BY November 25, 2004***

**Terms:**    On the following understandings, terms and conditions:

1.    Both crimes carry a presumptive sentence of 2.5 years; a minimum sentence of 1.5 years (1 years if trial court makes exceptional circumstances finding); and a maximum sentence of 3 years (3.75 years if trial court makes exceptional circumstances finding); Probation IS available in both counts. Restitution of economic loss to the victim and waiver of extradition for probation revocation procedures are required. The maximum fine that can be imposed is $150,000 plus a 77% surcharge. If the Defendant is sentenced to prison, the Defendant shall also be sentenced to serve a term of community supervision equal to one-seventh of the prison term to be served consecutively to the actual period of imprisonment. If the Defendant fails to abide by the conditions of community supervision, the Defendant can be required to serve the remaining term of community supervision in prison. Special conditions regarding the sentence imposed by statue (if any) are: NONE.

2.    The parties stipulate to the following additional terms, subject to court approval at the time of sentencing as set forth in paragraph 7:

In Count 1, Defendant shall serve a term in the Department of Corrections not to exceed the presumptive. In Count 2, the Defendant shall serve a consecutive term of supervised probation. Defendant shall pay restitution to all victims in all counts, including those dismissed and in the matters set forth below that have not been filed, in amount not to exceed $50,000.00.

3.    The following charges are dismissed or, if not yet filed, shall not be brought against the Defendant:

Counts 3 through 6, the 13-702.02 allegation, and the State shall not file any further charges arising out of Glendale Police Departmental Report Nos. 04-063494 and 03-045144, Phoenix Police Departmental Report No. 2002-20774549, and Alltel Communications Investigative Report No. 2004-FD-123.

4.    This agreement serves to amend the complaint or information, to charge the offense to which the Defendant pleads, without the filing of any additional pleading. However, if the plea is rejected by the court or withdrawn by either party, or if the conviction is subsequently reversed, the original charges and any charges that are dismissed by reason of this plea agreement are automatically reinstated.

THE STATE OF ARIZONA,                    )    NO. CR 2003-006251-001 DT
                                         )
                    Plaintiff,           )    PLEA AGREEMENT
                                         )
            vs.                          )    (Page 2 of 3)
                                         )
PHILLIP HUDSON,                          )
                                         )
                    Defendant.           )
_____)

 5.  If the Defendant is charged with a felony, he hereby waives and gives up his rights to a preliminary hearing or other probable cause determination on the charges to which he pleads. The Defendant agrees that this agreement shall not be binding on the State should the Defendant be charged with or commit a crime between the time of this agreement and the time for sentencing in this cause; nor shall this agreement be binding on the State until the State confirms all representations made by the Defendant and his attorney, to wit:

Defendant avows that he has no allegeable prior felony convictions in this or any other jurisdiction, and that he was not on felony probation or parole at the time of this offense.

If the Defendant fails to appear for sentencing, the court may disregard the stipulated sentence and impose any lawful sentence which is the same as or exceeds the stipulated sentence in the plea agreement. In the event the court rejects the plea, or either the State or the Defendant withdraws the plea, the Defendant hereby waives and gives up his right to a preliminary hearing or other probable cause determination on the original charges.

 6.  Unless this plea is rejected by the court or withdrawn by either party, the Defendant hereby waives and gives up any and all motions, defenses, objections, or requests which he has made or raised, or could assert hereafter, to the court's entry of judgement against him and imposition of a sentence upon him consistent with this agreement. By entering this agreement, the Defendant further waives and gives up the right to appeal.

 7.  The parties hereto fully and completely understand and agree that it is the court's duty to impose sentence upon the Defendant, and that any sentence either stipulated to or recommended herein in paragraph two is not binding on the court. If after accepting this plea the court concludes that any of the plea agreement's provisions regarding the sentence or the term and conditions of probation are inappropriate, it can reject the plea. If the court decides to reject the plea agreement provisions regarding sentencing, it must give both the State and the Defendant an opportunity to withdraw from the plea agreement. In case this plea agreement is withdrawn, all original charges will automatically be reinstated. The Defendant in such case waives and gives up his right to a probable cause determination on the original charges.

 8.  If the court decides to reject the plea agreement provisions regarding sentencing, and neither the State nor the Defendant elects to withdraw from the plea agreement, then any sentence either stipulated to or recommended herein in paragraph 2 is not binding upon the court, and the court is bound only by the sentencing limits set forth in paragraph 1 and the applicable statues.

 9.  This plea agreement in no way affects any forfeiture proceedings pursuant to A.R.S. § 13-4301 et seq., § 13-2314, or § 32-1993, if applicable, nor does the plea agreement in any way compromise or abrogate any civil actions, including actions pursuant to A.R.S. § 13-2301 et seq., or § 13-4301 et seq., or the provisions of A.R.S. § 13-2314 or A.R.S. § 13-4310.

THE STATE OF ARIZONA,                          )      NO. CR 2003-006251-001 DT
                                               )
                              Plaintiff,       )      PLEA AGREEMENT
                                               )
                    vs.                        )      (Page 3 of 3)
                                               )
PHILLIP HUDSON,                                )
                                               )
                              Defendant.       )
_____)

10.  I have read and understand the provisions of pages one and two of this agreement I have discussed the case and my constitutional rights with my lawyer. I understand that by pleading guilty I will be waiving and giving up my right to a determination of probable cause, to a trial by jury, to confront, cross examine, compel the attendance of witnesses, to present evidence in my behalf, my right to remain silent, my priviledge against self-incrimination, presumption of innocence and right to appeal. I agree to enter my plea as indicated above on the terms and conditions set forth herein. I fully understand that if, as part of this plea agreement, I am granted probation by the court, the terms and conditions thereof are subject to modification at any time during the period of probation. I understand that if I violate any of the written conditions of my probation, my probation may be terminated and I can be sentenced to any term or terms stated above in paragraph one, without limitation.

I have personally and voluntarily placed my initials in each of the above boxes and signed the signature line below to indicate I read and approved all of the previous paragraphs in this agreement, both individually and as a total binding statement.

Date_____11/14/04_____          Defendant_____
                                          PHILLIP HUDSON

I have discussed this case with my client in detail and advised him of his constitutional rights and all possible defenses. I believe that the plea and disposition set forth herein are appropriate under the facts of this case. I concur in the entry of the plea as indicated above and on the terms and conditions set forth herein.

Date_____11/14/04_____          Defense Counsel_____
                                          Jeffrey A. Kirchler

I have reviewed this matter and concur that the plea and disposition set forth herein are appropriate and are in the interest of justice.

Date___11/15/04____             Prosecutor_____
                                          Ronald M. De Brigida, Jr.

THE STATE OF ARIZONA,                    )    CR2003-006251-001 DT
                                         )
                    Plaintiff,           )
                                         )
          vs.                            )
                                         )
PHILLIP HUDSON,                          )
                                         )
                    Defendant.           )    PLEA AGREEMENT ADDENDUM
                                         )

The parties hereto fully and completely understand and agree that by entering into a plea agreement, the defendant consents to judicial fact finding by preponderance of the evidence as to any aspect or enhancement of sentence. In making the sentencing determination, the court is not bound by the rules of evidence.

I have read and understand the provisions of pages one through three of this agreement and this addendum to the plea agreement. I have discussed the case and my constitutional rights with my lawyer. I understand that by pleading **GUILTY** I will also be waiving and giving up my right to a trial by jury to determine guilt and to determine any fact used to impose a sentence within the range stated above in paragraph one, page one of this agreement.

I have personally and voluntarily placed my initials in each of the above boxes and signed the signature line below to indicate I read and approved all of the previous paragraphs in this agreement, both individually and as a total binding agreement.

Date: ____11/14/04____          Defendant _____
                                          PHILLIP HUDSON

I have discussed this case with my client in detail and advised him of his constitutional rights and all possible defenses. I believe that the plea and disposition set forth herein are appropriate under the facts of this case. I concur in the entry of the plea as indicated above and on the terms and conditions set forth herein.

Date: ____11/14/04____          Defense Counsel _____
                                          Jeffrey A. Kirchler

I have reviewed this matter and concur that the plea and disposition set forth herein are appropriate and are in the interests of justice.

Date: ____11/15/04____          Prosecutor _____
                                          Ronald M. De Brigida, Jr.

RICHARD M ROMLEY
MARICOPA COUNTY ATTORNEY

Ronald M Debrigida, Jr.,
Deputy County Attorney
Bar Id #: 015697
301 West Jefferson, 6th Floor
Phoenix, AZ 85003
Telephone: (602) 506-8484
MCAO Firm #: 00032000
Attorney for Plaintiff

MICHAEL K. JEANES, CLERK
BY: _____ DEP
FILED

2003 APR 30 PM 4:39

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| THE STATE OF ARIZONA,<br><br>        Plaintiff,<br><br>    vs.<br><br>PHILLIP HUDSON (001),<br>aka PHILLIP H HUDSO,<br>aka PHILLIP HAROLD HUDSON,<br><br>        Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) CR2003-006251-001 DT ____ <br> ) <br> ) <br> ) <br> ) STATE'S ALLEGATION OF MULTIPLE <br> ) OFFENSES NOT COMMITTED ON THE <br> ) SAME OCCASION PURSUANT TO <br> ) A.R.S. § 13-702.02 <br> ) <br> ) (Assigned to the Honorable <br> )  Barry Schneider, Div. U) <br> ) |

Pursuant to A.R.S. § 13-702.02 and Rule 13.5, Arizona Rules of Criminal Procedure, the State of Arizona, by and through undersigned counsel, amends the Indictment to allege that **Count 4 occurred on July 1, 2002 and Count 6 occurred on June 30, 2002** are multiple offenses not committed on the same occasion but consolidated for trial. Therefore, if the Defendant is convicted of these counts, the Defendant must be sentenced pursuant to A.R.S. § 13-702.02.

Submitted April __30__ , 2003.

RICHARD M ROMLEY
MARICOPA COUNTY ATTORNEY

By _____
Ronald M Debrigida, Jr.
Deputy County Attorney

Copy of the foregoing
mailed\delivered this
_30 th_ day of April, 2003,
to:

The Honorable Barry Schneider
Judge of the Superior Court

Not assigned as of this date (Group A)
Public Defender

BY _____
Ronald M Debrigida, Jr.
Deputy County Attorney

2

RICHARD M ROMLEY
MARICOPA COUNTY ATTORNEY

MICHAEL K. JEANES, CLERK
BY, _____ DEP
FILED
2003 APR 30 PM 4:39

Ronald M Debrigida, Jr.
Deputy County Attorney
Bar Id #: 015697
301 West Jefferson, 6th Floor
Phoenix, AZ 85003
Telephone: (602) 506-8484
MCAO Firm #: 00032000
Attorney for Plaintiff

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) CR2003-006251-001 DT ____ |
| PHILLIP HUDSON (001), | ) |
| aka PHILLIP H HUDSO, | ) |
| aka PHILLIP HAROLD HUDSON, | ) |
| | ) STATE'S NOTICE OF DISCOVERY |
| Defendant. | ) |
| | ) (Assigned to the Honorable |
| | ) Barry Schneider, Div. U) |

COMES NOW the State of Arizona, by and through undersigned counsel, and hereby gives notice of disclosure pursuant to Rule 15.1 of the Arizona Rules of Criminal Procedure.

Rule 15.1(a)

1.  The State may call the following witnesses in the case in chief or as rebuttal witnesses:

**MESA POLICE DEPARTMENT OFFICERS:**

| | | |
|---|---|---|
| Det. | Anthony Yim | #11467 |
| Ofc. | Stees | 12884 |
| Ofc. | Guillen | 13535 |
| Sgt. | Ortega | 10000 |
| Det. | Cash | 7074 |
| Det. | Albrecht | 10886 |
| Det. | Morgan | 11957 |
| Det. | Ference | 12356 |
| Det. | Mills | 9432 |
| Det. | Phelps | 7949 |
| Ofc. | Salceda | 12372 |

Jim Mills

**CIVILIAN PERSONNEL:**

James Childers
Derl Totten
Matthew Rexing
George Spencer
Larry Long

**MARICOPA COUNTY ATTORNEY'S OFFICE:**

Det. Larry Core        #140

Any witness from the defense disclosure.

Any other witnesses will be disclosed as they become known.

All of these witnesses relevant written or recorded statements are contained in police reports supplied to defense counsel.

2.   All written statements of the Defendant are in the police reports supplied to defense counsel and any other statements that any witness may remember can be obtained in interviews.

3.   Any experts in this case are listed in the witness list.

4.   The State may introduce into evidence:

   a.   Pictures or diagrams of the crime or crime scene.

   b.   The evidence of the crime, i.e., photograph of the crime, photographs of the victims; photographs of the area.

   c.   Any evidence referred to in the defense disclosure.

   d.   Pursuant to Rule 15.1(A)(3), if there are experts that are listed as witnesses, there may be additional reports, notes, or other documents that

2

are retained by the expert witnesses. These reports, notes, or other documents will be made available for examination or reproduction upon request. To have these items specifically made available, please contact the assigned prosecutor.

e.  Any and all evidence listed to or referred to in Mesa Police Departmental report # 20021810348, 20021320527; Tempe Police Departmental report # 02-102789; Mesa Police Departmental report # 02-1630936; Phoenix Police Departmental report # 200220578671; consent to search forms; search warrants; credit cards; handwritten notes, DNA and computer forensics.

5.  The State intends to use at trial any prior felony convictions of the Defendant for impeachment purposes pursuant to Rule 609, Arizona Rules of Evidence, and for sentence enhancement under A.R.S. § 13-604. The State will provide supplemental notice of prior felony convictions not listed herein: None known at the present time.

6.  At this time, the State will not seek to introduce any prior acts of the Defendant to prove motive, intent, or knowledge or otherwise use at trial that are not contained in the police reports. This may change depending on the defenses once the State receives notice of the defenses and interviews defense witnesses, or if new facts arise in the interview

3

process. If that occurs, the State will notify defense counsel.

7. The State is unaware of any additional information not already contained in the disclosure.

Rule 15.1(b)

1. There was no electronic surveillance.

2. There was a search warrant.

3. There was not an informant.

Submitted April __30__, 2003.

RICHARD M ROMLEY
MARICOPA COUNTY ATTORNEY.

By _____
Ronald M Debrigida, Jr.
Deputy County Attorney

Copy mailed\delivered
April __30__, 2003,
to:

The Honorable Barry Schneider
Judge of the Superior Court

Not assigned (Group A)
Public Defender

By _____
Ronald M Debrigida, Jr.
Deputy County Attorney

4

MICHAEL K. JEANES, CLERK
BY. Q~Dolin OEP.

FILED

2003 MAY 27 PM 3: 35

JEFFREY A. KIRCHLER
Deputy Public Defender
11 West Jefferson, Suite 5
Phoenix, Arizona 85003-2302
(602) 506-8329
Bar No. 021531
Attorney for Defendant

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| STATE OF ARIZONA, | |
|---|---|
| Plaintiff, | No. CR 2003-006251-001 DT |
| v. | **REQUEST FOR AUTOMATIC DISCLOSURE REQUIRED BY RULE 15.1(a) and (b) AND REQUEST FOR ADDITIONAL DISCLOSURE REQUIRED BY RULE 15.1(c)** |
| PHILLIP HUDSON (001), | |
| Defendant. | (Hon. Barry C. Schneider) |

Pursuant to Rule 15.1, Arizona Rules of Criminal Procedure, Defendant, through undersigned counsel, asks the prosecutor to make available to the defendant for examination and reproduction the following material and information within the prosecutor's possession or control:

1.  The names, addresses and phone numbers of all persons whom the prosecutor will call as witnesses in the case-in-chief together with their relevant written or recorded statements.

2.  All statements of the defendant or any person who will be tried with defendant.

3.     The names and addresses of experts who have personally examined a defendant or any evidence in the particular case, together with the results of physical examinations and of scientific tests, experiments or comparisons, including all written reports or statements made by them in connection with the particular case. *State ex rel. Helm v. Superior Court of Cochise County*, 90 Ariz. 133, 367 P.2d 6 (1961). The work product exception of Rule 15.4(b)(1) does not apply to the opinions, theories and conclusions of experts contained in reports to be disclosed under this section. *See* Comment; Ariz. R. Crim. Pro. Rule15.1(a)(3).

This request includes the results of any kind of examination performed on any witness or other person contacted in the course of this investigation, as well as any laboratory tests conducted on behalf of the state, including, but not limited to, DNA, fingerprints, blood spatter, ballistics, polygraphs, and drug examinations or tests. *See Kyles v. Whitley*, 514 U.S. 419, (1995) (prosecutor has obligation to learn of existing exculpatory evidence); *United States v. Bagley*, 473 U.S. 667 (1985) (impeachment evidence must be disclosed); *Brady v. Maryland*, 373 U.S. 83 (1963) (disclosure of information material to guilt or punishment is required).

4.     A list of all papers, documents, photographs or tangible objects which the prosecutor will use at trial or which were obtained from or purportedly belong to the defendant, and any exhibits presented to the grand jury, whether marked or admitted, or unmarked and not admitted.

5.     A list of all prior felony convictions of the defendant which the prosecutor will use at trial, and the means by which the prosecutor intends to prove such prior convictions. This request includes, but is not limited to, all information pertaining to the alleged act or crime,

including where it occurred, when it occurred and the name, address and phone number of any witness who will be called to testify about it.

6.    A list of all prior acts of the defendant which the prosecutor will use to prove motive, intent, character or knowledge or otherwise use at trial, including for Rule 404(b) purposes, the names and addresses of all witnesses which the prosecutor will use to prove the act, the legal basis upon which the state believes the other act is admissible, and the issue at trial to which it is purported to be relevant. *See, State v. Lee*, 189 Ariz. 590, 599, 944 P.2d 1204, 1213 (1997).

7.    Any material or information, whether or not in recorded form, in the possession or knowledge of the state or its agents, including the investigating police agency, county attorney's investigators and victim witness advocates, which tends to mitigate or negate the defendant's guilt as to the offense charged, or which would tend to reduce defendant's punishment[1], including, but not limited to:

a.    All prior adult or juvenile felony convictions of witnesses which the prosecutor expects to call at trial[2];

b.    Any adult or juvenile charges against witnesses which are pending or were dismissed after the commission of the offense[3];

c.    Whether or not the witnesses are now on adult or juvenile probation or parole

---

1 *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963), *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555 (1995).
2 *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763 (1972); *State v. Morales*, 120 Ariz. 517, 587 P.2d 236 (1978); *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105 (1974).
3 *State v. Swinburne*, 116 Ariz. 403, 569 P.2d 833 (1977); *State v. Torres*, 97 Ariz. 364, 400 P.2d 843 (1965).

or were on probation or parole at the time of the incident[4];

d. Copies of the witnesses' N.C.I.C., LEGIS, and F.B.I. sheets;

e. Evidence of any and all proffers of cooperation from or to co-defendants, including notes from meetings related to the proffers, the number of meetings held, who was present, the testimony that was proffered at the initial meeting and the final proffer presented by the witness along with any materials that suggest a variation in the witnesses testimony. *See, U.S. v. Sudikoff,* 36 F.Supp.2d 1196 (C.D. Cal. 1999).

f. A copy of the entire plea agreement or contract of cooperation between the state and any witness, whether or not under seal, and/or any written contract of cooperation between a state's witness and any law enforcement agency, including promises or things of value not contained in the document itself. Things of value include, but are not limited to, money, housing, protection for themselves or their families, cars, transportation of any kind, drugs or medicines (prescribed or not), special treatment while in custody (e.g., phone calls, meals, conjugal or other visits, etc., which are not ordinarily permitted for other inmates) and any other consideration toward charges or sentencing which do not appear in their plea agreement or contract of cooperation.

g. Whether any witness has any history of mental illness or drug addiction, and

---

4 *State v. Van Den Berg,* 161 Ariz. 192, 791 P.2d 1075 (1990).

4

whether the state has had any witness examined by any type of expert, medical or otherwise.

h.  Whether the witness has taken a polygraph or has refused a polygraph examination. If a polygraph examination has been taken, then the defense asks the state to disclose the results of that examination, including the questions asked, any questions determined not to be truthful or equivocal, and the name and address of the person administering the examination.

i.  All information regarding anything of value given or promised to any friend or relative of any witness noticed by the state.

8.  Whether there has been any electronic surveillance of any conversations to which the accused was a party, or of their business or residence.

9.  Whether a search warrant has been executed in connection with the case.

10.  Whether or not the case has involved an informant; and if so, his identity if the defendant is entitled to know either or both of these facts under Rule 15.4(b)(2).

11.  A list of all felony convictions of all disclosed defense witnesses.

12.  All written or otherwise recorded statements of any witness disclosed by the state, to victim assistance caseworkers and/or volunteers and any statements made by the disclosed witnesses at any prior grand jury proceedings pertaining to the current charges against defendant, whether or not they resulted in a true bill.

13.  Whether there has been any contact with any witness by any caseworker and/or volunteer of any victim/witness assistance program and the name, address and telephone

5

number of such caseworkers and/or volunteers.

14.    Pursuant to 15.1(d), the defense requests disclosure of the names of any law enforcement agencies involved in the investigation or evaluation of the case, together with the names of any persons connected with those agencies, including but not limited to assistant attorney generals, deputy county attorneys and/or their investigators, that were present at the scene of the crime during the arrest of the defendant, and/or the execution of a warrant, the seizure of any evidence, and/or were present for the taking of any statements from any persons whether or not named in a police or investigative report, along with their relevant written or recorded statements. *See* Comment, Ariz.R. Crim. Pro. 15.1(d).

15.    To assure that non-lawyers are not making legal decisions, the prosecuting attorney is hereby requested to review all material and gather all information in the possession of their agents, including the investigating police agency, county attorney's investigators and the victim rights advocates, and make the disclosure decisions themselves. *See, Kyles v. Whitley,* 514 U.S. 419.

RESPECTFULLY SUBMITTED this ___ day of May, 2003.

MARICOPA COUNTY PUBLIC DEFENDER

By _____
JEFFREY A. KIRCHLER
Deputy Public Defender

6

Copy of the foregoing motion
mailed/delivered this ____ day
of May, 2003, to:

HON. BARRY C. SCHNEIDER
Judge of the Superior Court
201 West Jefferson Street
Phoenix, AZ 85003

RONALD DEBRIGIDA
Deputy County Attorney
301 West Jefferson Street
Phoenix, AZ 85003

By _____
    JEFFREY A. KIRCHLER
    Deputy Public Defender

JAK:dr/052703/A

7

# IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

FILED
6-8-04 10:40am
MICHAEL K. JEANES, Clerk
By _____
Deputy

STATE OF ARIZONA,
            Plantiff

vs.

PHILLIP HUDSON

            Defendant

)
)
)
)
)
)
)
)
)
)
)

CR 2003-006251-001 DT
CR _____
CR _____

STIPULATION FOR
DETERMINATION OF
COMPETENCY ON BASIS OF
EXPERTS' REPORTS

The State of Arizona, by the undersigned prosecutor(s), and the Defendant, by his undersigned counsel, herby stipulate, pursuant to Rule 11.5(a), that the Court may determine the Defendant's competency based upon the reports of:

DR PARKER          ,    Dated 1/21/04

DR YOUNGJOHN      ,    Dated 3/8/04

DR ALMER          ,    Dated May 10, 2004

which reports have been previoiusly filed with the Court, and the matter is hereby submitted to the Court for its determination based on said reports.

Dated this 8 day of JUNE , 2004.

By: _____
    Prosecutor

By: _____
    Prosecutor

By: _____
    Attorney for Defendant

By: _____
    Attorney for Defendant

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2003-006251-001 DT                                    06/08/2004

                                           CLERK OF THE COURT
HONORABLE BENJAMIN E. VATZ                       E. Bacarella
                                                   Deputy

                                           FILED: 06/10/2004

STATE OF ARIZONA                           RONALD M DEBRIGIDA JR.

v.

PHILLIP HUDSON (001)                       JEFFREY A KIRCHLER
DOB: 08/29/1972
Booking No.: A810314                       CORRECTIONAL HEALTH SERVICES
                                           D & C MATERIALS-CSC
                                           JUDGE SCHNEIDER
                                           MCSO-DIS
                                           VICTIM SERVICES DIV-CA-CCC
                                           JOEL PARKER M D
                                           10000 N 31ST AVE
                                           STE D201
                                           PHOENIX AZ  85051
                                           JAMES YOUNGJOHN PH D
                                           7533 E FIRST ST
                                           SCOTTSDALE AZ  85251
                                           EUGENE ALMER M D
                                           7432 E CAMELBACK RD
                                           SCOTTSDALE AZ  85251


DEFENDANT COMPETENT - A.R.S. Section 13-4510(B) - SUBMISSION

         State's Attorney:        Lisa Parsons
         Defendant's Attorney:    Jeffrey Kirchler
         Defendant:               Present
         Court Reporter:          Monica Hill

    The Court having received a written stipulation for submission of the Defendant's
competency based upon the written report(s) by Dr. Joel Parker dated 01/21/2004, Dr. James
Youngjohn dated 03/08/2004 and Dr. Eugene Almer dated 05/10/2004;

    The stipulation having been accepted and the report(s) having been considered,

Docket Code 123                       Form R123                            Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2003-006251-001 DT                                06/08/2004

THE COURT FINDS the Defendant understands the proceedings and is able to assist counsel with Defendant's defense.

THE COURT FURTHER FINDS the Defendant competent pursuant to A.R.S. Section 13-4510(B).

IT IS ORDERED transferring this matter back to Judge Schneider for all further proceedings.

IT IS FURTHER ORDERED setting Status Conference on 06/18/2004 at 8:30 a.m. before Judge Schneider.

IT IS FURTHER ORDERED excluding the time from 10/09/2003 (date of filing motion to examine) through 06/08/2004 pursuant to Rule 8.4 (243 days).

New Last Day: 07/16/2004.

Counsel are directed by the Court to recompute the new last day and advise the Court within three (3) judicial days of notification if the computation is in error.

IT IS FURTHER ORDERED affirming prior custody orders.

IT IS FURTHER ORDERED that the written report(s) of the expert(s) be sealed and maintained in a confidential manner by the Clerk of the Superior Court; said report(s) shall not be disclosed to anyone except by written order of the Court.

SEALED AND FILED: Medical report(s) by the expert(s).

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2003-006251-001 DT                                      11/15/2004


                                         CLERK OF THE COURT
HONORABLE BARRY C. SCHNEIDER                    C. Johnston
                                                  Deputy


                                         FILED: 11/16/2004

STATE OF ARIZONA                         RONALD M DEBRIGIDA JR.

v.

PHILLIP HUDSON (001)                     JEFFREY A KIRCHLER

                                         APO-PLEAS-CCC
                                         VICTIM SERVICES DIV-CA-CCC



                     PLEA AGREEMENT/CHANGE OF PLEA



        State's Attorney:        Ronald Debrigida
        Defendant's Attorney:    Jeffrey Kirchler
        Defendant:               Present
        Court Reporter:          Cindy Lineburg

        The Court reviews the Plea Agreement with Defendant. The Court advises Defendant of
the range of possible sentence and the availability of probation, and any special conditions of
sentencing and probation. The Court advises Defendant of all pertinent constitutional rights and
rights of review.

        Defendant enters a plea of Guilty to the following:

        OFFENSE: Count 1: Taking the Identify of Another
        Class 4 Felony
        A.R.S. § 13-2003, 701, 702, 702.01, and 801
        Date of Offense: Between 6/25/2002 and 7/1/2002
        Non Dangerous - Non Repetitive

        OFFENSE: Count 2: Taking the Identify of Another
        Class 4 Felony
        A.R.S. § 13-2003, 701, 702, 702.01, and 801
        Date of Offense: Between 6/25/2002 and 7/1/2002

Docket Code 105                          Form R105                           Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2003-006251-001 DT                                    11/15/2004

Non Dangerous - Non Repetitive

IT IS ORDERED accepting the plea.

IT IS ORDERED setting time for sentencing on 12/22/2004 at 8:30 a.m. before this division.

IT IS FURTHER ORDERED that the following will be deemed submitted at the time of sentencing: Motion To Dismiss Counts 3 through 6; A.R.S. §13-702.02 allegation; no further charges arising out of Glendale PD DR 04-063494 and 03-045144, PPD DR 2002-20774549 and Alltell Communications Investigative Report No. 2004-FD-123 as reflected in the Plea Agreement.

IT IS ORDERED the Adult Probation Department shall prepare a Presentence Report, and that Defendant shall report to the Adult Probation Department if not in custody.

IT IS ORDERED vacating any pending dates.

IT IS ORDERED pursuant to Rule 7.2 Defendant shall not be released on bail or own recognizance.

**The Superior Court of Arizona in Maricopa County – Adult Probation Department**
*Chief Probation Officer Barbara A. Broderick*

## PRESENTENCE INVESTIGATION

**CFO**   State of Arizona v. **Phillip Hudson, CR2003-006251-001-DT**

Superior Court Criminal Division **U**

Sentencing Date: **December 22, 2004**

| | |
|---|---|
| Sentencing Judge: **Barry C. Schneider** | Prosecutor: **Ronald M. Debrigida, Jr., DCA** |
| PSI Officer: **Shani Martinez** | Defense Counsel: **Jeffrey A. Kirchler, DPD** |

## Present Offense:

The following information is summarized from Glendale Police Departmental Report #04-063439:

In March of 2004, the victim, Wade Rogers, noticed his and his neighbors' mailboxes had been ransacked several times. In May of 2004, the victim learned that the defendant used the victim's stolen identity to include his social security number and opened a credit card with the victim's information and the defendant's address. The defendant purchased a laptop computer, digital camera, and a scan disc for the camera from Dell Computers totaling $2,705.56. The victim also learned the defendant had purchased several telephones from Alltel. Alltel investigations showed that the defendant attempted to obtain eleven accounts with seventeen lines of service resulting in a known loss of $4,594.68 due to his criminal activity. The defendant's criminal activity dated back to December of 2002 with various victims to include David Schranz, Phil Rossi, Paul Sesma, Michael Miller, Macki Bi, Jon Sletton, and the most recent victim Wade Rogers.

On June 2, 2004, police observed the defendant at the residence where the computer was delivered. He claimed he placed a note on the door looking for a place to rent. Police learned from the neighbor that signed for the computer that the defendant was the person who received the computer. A traffic stop was initiated and the defendant had to be told to get off of his cellular telephone. He told police he did not lie and that he had left a note about the packages and inquiring about renting the home. The defendant admitted picking up the Dell packaged but denied knowing the contents of the package. He claimed he picked up the package for a woman that he used to provide day care to for her children. A computer type box was inside the defendant's vehicle, and he claimed he found it in the trash. There was another electronic item and the defendant claimed it was given to him. When the defendant was being placed under arrest, he refused to remove his hand from his pocket. He had to be threatened with a taser gun if he did not stop resisting. Found in the defendant's pocket was a glass smoking pipe with residue, and in his wallet was a small baggie with methamphetamine. Found in a briefcase inside the vehicle was the victim's identity information, several other documents with other individuals' names and personal information to include letters, and ads, MVD registration, three inoperable cellular telephones. In the trunk were other computer type boxes, electronics, a direct TV dish and autoboot. Also found was tape used to laminate identification cards. The note the

PAGE 1

**The Superior Court of Arizona in Maricopa County – Adult Probation Department**
*Chief Probation Officer Barbara A. Broderick*

State of Arizona v. **Phillip Hudson, CR2003-006251-001-DT**

defendant left on the address where he was first contacted was seized, and it was signed with the victim's names asking that all packages be delivered to the neighbor. There was no mention as to renting the residence as the defendant claimed. Also, witnesses advised police that many times the defendant was seen leaving notes for deliveries on the door. The defendant changed his story with police and eventually stated he took the laptop to a place where he could trade it for drugs. He refused to cooperate with police regarding handwriting. He changed his story again about someone else who had stolen goods gave him the victim's information, so he used it to make his purchases. He had the goods sent to the vacant address. He claimed he needed money to pay for an engine for his girlfriend's vehicle. He kept the camera and card so he could photograph his three-year-old daughter. The items that were supposed to be delivered on this date were going to be used to help pay rent at a hotel for his ex-wife, his daughter, and his girlfriend. He had again used the victim's information to charge $550.00 worth of goods. The defendant denied picking up any other packages stating he was only squatting at the residence, as he was transient.

**Related offenses:**

The following information is summarized from Phoenix Police Departmental Report #02-20774549:

On May 1, 2002, police observed the defendant driving Nicholas Stevens' stolen 1983 Oldsmobile. A traffic stop was initiated, and the defendant was taken into custody without incident. The defendant claimed a friend let him borrow the vehicle because he had no place to stay, so he was living in the vehicle. He denied knowing the vehicle was stolen. The defendant was found to have a probation violation warrant for marijuana charges. Found on the driver side of the vehicle was a blank check and Visa card belonging to Ralph and Bonnie Marsh, and a DES check in the amount of $205.00 belonging to Jeremy Long. The defendant denied knowledge of the items.

The following information is summarized from Glendale Police Departmental Report #03-045144:

On April 17, 2003, police responded to a call about the defendant having a felony warrant for his arrest and driving a stolen vehicle. The defendant was seen at the vehicle and placed under arrest for the felony warrant. He was found to be in possession of methamphetamine, which the defendant stated was for personal use. The officer described the amount of drugs in the defendant's possession as "significant." The defendant's ex-wife told police that the vehicle belonged to her mother and it was a mistake. The defendant had keys to the vehicle. The defendant invoked his rights.

DEFENDANT'S STATEMENT:

The defendant stated that he had an apartment in Mesa, and "this guy" staying with him had a computer and used it to establish cellular telephone accounts with someone else's identity.

PAGE 2

**The Superior Court of Arizona in Maricopa County – Adult Probation Department**
*Chief Probation Officer Barbara A. Broderick*

### State of Arizona v. Phillip Hudson, CR2003-006251-001-DT

The defendant added that he used to use drugs at the apartment and there were always people around using methamphetamine who were at his apartment. The police raided his apartment and took the "guy's" computer and "pinned it on me because the lease was in my name." The defendant stated he initially admitted everything stating that he thought if he "hyped everything" they would release him without any charges. He is innocent but took the plea agreement of guilt because he had made statements that he had knowledge of crimes. He blames his use of methamphetamine stating he did not know what was going on. Also, his defense attorney told him to take the plea agreement. The defendant would like to be granted probation and not serve more than the minimum prison sentence because he claims this is his first offense and he has a methamphetamine addiction problem. The defendant stated he and his mother have been looking into residential rehab for the defendant's release. The defendant would like to receive probation and move to Delaware. His mother is going to sell her house here in Phoenix and move as well. She will find a halfway house for the defendant. The defendant, his attorney, and his family are aware that he does not qualify to be screened for Interstate Compact.

## STATEMENT OF VICTIMS:

Wade Rogers stated that he would like the defendant to receive a prison sentence to the fullest extent of the law. The defendant purchased a computer and cellular telephone using Mr. Rogers identity. Mr. Rogers' information was stolen along with other fire fighters information that was inside their supervisor's suitcase. Other victims have had bank statement problems. Of concern to Mr. Rogers is he believes the defendant was already being prosecuted for similar crimes. Mr. Rogers stated he was very angry because it is getting harder to protect yourself. He believes the defendant will continue to commit crimes from jail. Mr. Wade stated he had to do all the investigation on his own and then gave it to a Glendale detective. They caught the defendant receiving another package of stolen items. Mr. Rogers has had to take time off of work due to the credit problems caused by the defendant and the investigation. He would like compensation for twenty-four hours of lost work at $22.00 an hour. Dell and Alltel have losses as well.

Dell Fraud Department suffered a loss of $2,705.56 and restitution is requested.

Alltel Communications Fraud Department suffered a loss of $4,594.68 and restitution is requested.

Contact information for Nicholas Stevens (stolen Delta 88), Allied Insurance, Ralph and Bonnie Marsh (stolen Visa cards and checks,) Jeremy Long (stolen social security check,) and the owner of the stolen Mercury Villager (whose identity was not listed in the police report), was not provided.

## STATEMENT OF INTERESTED PARTIES:

The Presentence Screening Instrument for Interstate Compact was completed by this officer, and the defendant does not meet the criteria.

PAGE 3

**The Superior Court of Arizona in Maricopa County – Adult Probation Department**
*Chief Probation Officer Barbara A. Broderick*

State of Arizona v. **Phillip Hudson, CR2003-006251-001-DT**

FINANCIAL STATUS AND EVALUATION:

The defendant lives locally with his mother. He reported he is a "self-employed handyman." He was earning $674.00 per month and had no expenses, as he is supported by his mother. The defendant stated he lost his stable employment due to his drug use. He claims he is accredited to teach in a two-year college and can return to his last job at a tire store as long as he does random drug testing.

Restitution as known is $528.00 to Mr. Rogers, $2,705.56 to Dell Computers, and $4,594.68 to Alltel. There are additional victims and a hearing may be necessary to finalize the restitution amount. The defendant should be held responsible for all amounts in their entirety. All standard assessments and fees are recommended.

SENTENCING CONSIDERATIONS:

1. The defendant reported that he is a high school graduate and completed some vocational training. The defendant reported no physical or mental health issues.
2. The defendant stated he used marijuana for six months at age twenty-two, contrary to his arrest and conviction history. He has been using methamphetamine daily since age thirty. He blames his ex-wife for his substance abuse stating she was a drug user and got pregnant by another man when she cheated on him. He first consumed alcohol at age twenty-one and claims he has not had a drink since 2000. He believes he needs treatment only for drug issues. He has previously completed programs for anger management and ADEPT.
3. The defendant's criminal history is comprised of a number of misdemeanors to include convictions for driving under the influence and possession of marijuana. Twice he has been afforded opportunities of treatment and probation services. His most recent grant was a failure as he failed to comply with Court directives. The present offenses occurred prior to, during, and since the probation grant ended. It is clear to this officer that arrests, convictions, opportunities of leniency, and the Court process have done little to impress upon the defendant the need to alter his behavior.
4. The defendant's criminal activity has been prolific and damaging to multiple victims. He denies responsibility, postures himself as the victim, and tries to use substance abuse as a crutch for leniency. However, he has stolen identities, goods, and property over the last two years, all for his personal gain and to service drug addiction. He failed to seek help of his own volition, instead preferring to continue abusing drugs and damaging victims. He has previously been afforded sanctions, which he failed to utilize. While substance abuse treatment would be beneficial, he has also certainly demonstrated the need for considerable incarceration. Once the defendant has completed his prison sanction, lengthy substance abuse treatment and community supervision are necessary.

RECOMMENDATION:

Count I:

**The Superior Court of Arizona in Maricopa County – Adult Probation Department**
*Chief Probation Officer Barbara A. Broderick*

State of Arizona v. **Phillip Hudson, CR2003-006251-001-DT**

It is respectfully recommended that the defendant be committed to the Department of Corrections for a term greater than the presumptive.

It is further recommended that the Court waive the term of community supervision and that probation begin immediately after the defendant's physical release from the Department of Corrections' custody.

Pay through the Clerk of the Maricopa County Superior Court:
Restitution per the attached ledger sheet.
A $20.00 time payment fee.

Count II

It is respectfully recommended that the defendant be granted four year(s) supervised probation to begin upon physical release from prison in count I. Abide by the following additional conditions:

| | |
|---|---|
| Condition #16 | Abide by the following judgment and order of restitution, fines and fees: |
| | 16a.    Restitution per the attached ledger sheet. |
| | 16b.    Probation Service Fee of $50.00 per month beginning on TBD. |
| | 16f.    Reimbursement in the total amount of TBD, at $5.00 per month beginning on TBD. |
| | 16j.    Probation Surcharge in the total amount of $5.00. |
| | 16o.    Time Payment Fee of $20.00. |
| Condition #17 | Not consume or drink any substance containing alcohol. |
| Condition #24 | Participate in counseling as directed by APD pertaining to: |
| | Substance Abuse |
| Condition #26 | Abide by the following additional condition(s) |
| | Not own, possess, or use any computer or peripheral. |

Reviewed by:

Judge: _____

Date: _____12/22/04_____

Respectfully submitted by:

Shani Martinez, Adult Probation Officer
(602) 506-3829/ December 17, 2004
mailto:smartine@apd.maricopa.gov
Maria Teresa Martinez, Supervisor
Office (602) 506-3173, (602) 332-7987

**PAGE 5**

## INTERSTATE COMPACT – Presentence Screening Instrument

Defendant: ~~Willace~~ Phillip Hudson    Cause Number(s): 2003-006251-001

PSI Officer: Sherri Martin    Date: 12-16-04

### I. PSI Screening Questionnaire

If your defendant has requested permission to live outside of the State of Arizona, please answer the following questions by checking the response that best fits the defendant's situation:

YES ☒  NO ☐  Defendant will be placed on standard probation for a felony or undesignated offense?

YES ☒  NO ☐  Defendant's probation grant will be longer than six months?

YES ☒  NO ☐  Defendant is in need of direct supervision by a probation officer?

YES ☐  NO ☒  Defendant does not need residential treatment, or a term of deferred jail?

YES ☐  NO ☒  Defendant's proposed out of state living situation has been verified?

YES ☒  NO ☐  Defendant is moving to a better living situation with better employment opportunities?

YES ☒  NO ☐  Defendant's move is in the best interest of justice and/or any victims?

YES ☒  NO ☐  Defendant will have resolved all local warrants and/or local criminal charges at the time of sentencing?

### Scoring for Section I (check appropriate box):

☒  If there are any "NO" responses:  "__Does Not Meet Interstate Compact Guidelines__"
          –Screening is complete.

☐  If all responses are "YES":   "__May Apply for Interstate Compact__"
          –Continue to Section II.

### II. Permission to Leave Arizona

Defendants are NOT allowed to travel to the other state prior to acceptance of supervision, unless a resident of that state or reporting instructions are issued by that state.  Residency must be verified.  To determine if your defendant meets the Interstate Compact criteria for *immediate* travel, please answer the following questions:

YES ☐  NO ☒  It has been verified that the defendant has continuously lived in the receiving state for the last year or more,  and not in Arizona for more than six continuous months immediately preceding the commission of the present offense.

YES ☐  NO ☒  It has been verified the defendant has been legally (not on warrant status) residing in the receiving state prior to sentencing, but less than one year.

### Scoring for section II :

☐  If either response is "YES": Defendant applies at Indirect Services after sentencing with a $300.00 money order, then travels home.
          Recommendation:  "Be considered for transfer to the state of _____"

☒  If both responses are "NO": Defendant applies through the field officer, but remains in Arizona until the receiving state agrees to accept the case.

**From:**   Jeffrey Kirchler - PDX
**Sent:**   December 8, 2004 12:00 PM
**To:**
**Subject:** Phillip Hudson

This is from Phillip's mother.

Jeff


Jeffrey A. Kirchler
Maricopa County Public Defender
Deputy Public Defender
11 W. Jefferson Suite 5
Phoenix, Arizona 85003
602-506-8282

---

**From:** heyjud711 [mailto:judyishomesick@yahoo.com]
**Sent:** Wednesday, December 08, 2004 9:29 AM
**To:** Jeffrey Kirchler - PDX
**Subject:** Liman House

Mr Kirchler:

I called Scott DeHorty at the Liman House. He said that the Liman House is a highly structured, long term facility. They can and do at times handle level 5 parolees. He has a schedule made up of releases through Aug. 05. At this time he has 1 bed available and in Jan.05 to Feb. 05, he will have 2 beds. All he needs is a few days notice and he will have a bed ready for Phillip.
I also called the DOC transfer department. I was told that after Phillip gets to DOC he has to be the one to request a compassionate transfer. He will also need a letter from his brother verifying Phillip has next of kin in Delaware. Lastly, it will run around $2,000 to $2,100 for two round trip tickets, one 1 way ticket, car rental, hotel, gas and food.
There will be no problem getting the money. I'll let Phillip pay me back when he gets back on his feet.
Questions? My number is 623-925-2287
Thanks,
Judy Hudson


Hey jud 🙂

---

Do you Yahoo!?
The all-new My Yahoo! – Get yours free!

12/8/2004

Judge Schneider:

I stand before you today to receive my sentence. I have no excuses for my actions, but I have a few reasons

I am a meth addict, or a recovering meth addict. Meth. took away my reasonable thinking, pride, self worth and the trust of my family, friends and community. I did things for meth. That I would never have of thought of doing 4 years ago.

Prior to my habit I was a successful mechanic, I made $38.00 pr/hr. I also taught at U.T.I. the nations 3rd. largest Automotive Trade School.

My habit caused me to lose my job, my home, my wife and my self respect.

When my father died in April of last year, everything turned black in my life. In my eyes, my father died thinking of me as jobless, homeless, a liar and a thief. Thoughts of suicide crossed my mind daily. My mother being the only reason I didn't act on my thoughts.

Your honor, I am glad to be here before you today. I can put the worst part of my life behind me.

I have learned, by my incarceration, to laugh, cry and think reasonably and responsibly again and that I am worth more than I have ever imagined.

I would like to ask you to please take all of this into consideration when you pronounce my sentence. I also want to thank my mother and my father for all their love and support. I hope to earn back their trust and faith in me. I love you mom and dad.

Respectfully,

Phillip Hudson

December 6, 2004


Judge Schneider:

I am writing on behalf of my son, Phillip H. Hudson.

Before Phillip became involved in drugs, at the age of 29, he was a very kind, level headed, responsible and honest person.

My last husband and I were so proud of him. He had a very good job, as a Master Mechanic, with ASE certifications in 5 areas of auto repair. His specialty was that of "Trouble Shooter". Phillip could listen to the engine of a car or take it for a test drive and know what the problem was even though other couldn't find the problem. He also was an excellent husband and step father.

I don't know what happened, but at 29, he suddenly changed. He turned into someone I didn't know and hope to never know again. I soon realized he was using drugs. It was at this time that he got into trouble. I hated hearing the telephone ring at 1:30 or 3:00 in the morning. I was sure it was someone calling to tell me that my son was dead.

I am not trying to made excuses for him. On the contrary, he needs help and to break away from everyone from his past life. A decision he has to make. I am here for support. With that in mind, I have contacted a place in Delaware; he can go to and stay. He will have intensive counseling and they will help him get a job, and a place to live so that he can be a self sufficient, responsible citizen again.

Phillip and I chose Delaware because my other two sons, Phillips brothers, live there. Phillip and I feel that getting back to family and friends will be beneficial and healing for both of us.

I am praying that you will take all of this into consideration while you are considering Phillips sentencing.

Thank you for your time.

Sincerely,

Judy M. Hudson

FACIO

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA

THE STATE OF ARIZONA, )
                           )    NO..CR 2003-006251-001 DT
          Plaintiff, )
                           )    PLEA AGREEMENT
     vs.                   )
                           )    (Page 1 of 3)
PHILLIP HUDSON, )
                           )
         Defendant. )
                           )

The State of Arizona and the Defendant hereby agree to the following disposition of this case:

**Plea:**    The Defendant agrees to plead GUILTY to:

Count 1: Taking the Identity of Another, a class 4 felony, in violation of A.R.S. §§ 13-2008, 13-701, 13-702, 13-702.01 and 13-801, committed between June 25, 2002 and July 1, 2002, and

Count 2: Taking the Identity of Another, a class 4 felony, in violation of A.R.S. §§ 13-2008, 13-701, 13-702, 13-702.01 and 13-801, committed between June 25, 2002 and July 1, 2002.

These are non-dangerous, non-repetitive offenses under the criminal code.

**THIS OFFER EXPIRES AND IS REVOKED IF NOT ENTERED IN COURT BY November 25, 2004.**

**Terms:**    On the following understandings, terms and conditions:

1. Both crimes carry a presumptive sentence of 2.5 years; a minimum sentence of 1.5 years (1 year if trial court makes exceptional circumstances finding); and a maximum sentence of 3 years (3.75 years if trial court makes exceptional circumstances finding). Probation IS available in both counts. Restitution of economic loss to the victim and waiver of extradition for probation revocation procedures are required. The maximum fine that can be imposed is $150,000 plus a 77% surcharge. If the Defendant is sentenced to prison, the Defendant shall also be sentenced to serve a term of community supervision equal to one-seventh of the prison term to be served consecutively to the actual period of imprisonment. If the Defendant fails to abide by the conditions of community supervision, the Defendant can be required to serve the remaining term of community supervision in prison. Special conditions regarding the sentence imposed by statue (if any) are: NONE.

2. The parties stipulate to the following additional terms, subject to court approval at the time of sentencing as set forth in paragraph 7:

In Count 1, Defendant shall serve a term in the Department of Corrections not to exceed the presumptive. In Count 2, the Defendant shall serve a consecutive term of supervised probation. Defendant shall pay restitution to all victims in all counts, including those dismissed and in the matters set forth below that have not been filed in amount not to exceed $50,000.00.

3. The following charges are dismissed or, if not yet filed, shall not be brought against the Defendant:

Counts 3 through 6, the 13-702.02 allegation and the State shall not file any other charges arising out of Glendale Police Department Report Nos. 04063494 and 03-045144, Phoenix Police Departmental Report No. 2002-20774549 and Allied Communications Investigative Report No. 2004-FD-129.

4. This agreement serves to amend the complaint or information, to charge the offense to which the Defendant pleads, without the filing of any additional pleading. However, if the plea is rejected by the court or withdrawn by either party, or if the conviction is subsequently reversed, the original charges and any charges that are dismissed by reason of this plea agreement are automatically reinstated.

THE STATE OF ARIZONA,                    )       NO. CR ~~2003-006251-001DT~~
                                         )
                     Plaintiff,          )       PLEA AGREEMENT
                                         )
           vs.                           )       (Page 2 of 3)
                                         )
~~PHILIP HUDSON~~                        )
                                         )
                     Defendant.          )
_____)

 5.   If the Defendant is charged with a felony, he hereby waives and gives up his rights to a preliminary hearing or other probable cause determination on the charges to which he pleads. The Defendant agrees that this agreement shall not be binding on the State should the Defendant be charged with or commit a crime between the time of this agreement and the time for sentencing in this cause; nor shall this agreement be binding on the State until the State confirms all representations made by the Defendant and his attorney, to wit:

~~Defendant avows that he has no alleeable prior felony convictions in this or any other jurisdiction, and that he was not on felony probation or parole at the time of this offense.~~

If the Defendant fails to appear for sentencing, the court may disregard the stipulated sentence and impose any lawful sentence which is the same as or exceeds the stipulated sentence in the plea agreement. In the event the court rejects the plea, or either the State or the Defendant withdraws the plea, the Defendant hereby waives and gives up his right to a preliminary hearing or other probable cause determination on the original charges.

 6.   Unless this plea is rejected by the court or withdrawn by either party, the Defendant hereby waives and gives up any and all motions, defenses, objections, or requests which he has made or raised, or could assert hereafter, to the court's entry of judgement against him and imposition of a sentence upon him consistent with this agreement. By entering this agreement, the Defendant further waives and gives up the right to appeal.

 7.   The parties hereto fully and completely understand and agree that it is the court's duty to impose sentence upon the Defendant, and that any sentence either stipulated to or recommended herein in paragraph two is not binding on the court. If after accepting this plea the court concludes that any of the plea agreement's provisions regarding the sentence or the term and conditions of probation are inappropriate, it can reject the plea. If the court decides to reject the plea agreement provisions regarding sentencing, it must give both the State and the Defendant an opportunity to withdraw from the plea agreement. In case this plea agreement is withdrawn, all original charges will automatically be reinstated. The Defendant in such case waives and gives up his right to a probable cause determination on the original charges.

 8.   If the court decides to reject the plea agreement provisions regarding sentencing, and neither the State nor the Defendant elects to withdraw from the plea agreement, then any sentence either stipulated to or recommended herein in paragraph 2 is not binding upon the court, and the court is bound only by the sentencing limits set forth in paragraph 1 and the applicable statues.

 9.   This plea agreement in no way affects any forfeiture proceedings pursuant to A.R.S. § 13-4301 et seq., § 13-2314, or § 32-1993, if applicable, nor does the plea agreement in any way compromise or abrogate any civil actions, including actions pursuant to A.R.S. § 13-2301 et seq. or § 13-4301 et seq., or the provisions of A.R.S. § 13-2314 or A.R.S. § 13-4310.

THE STATE OF ARIZONA,                    )      NO. CR 2003-006251-001 DT
                                         )
                    Plaintiff,           )      PLEA AGREEMENT
                                         )
            vs.                          )      (Page 3 of 3)
                                         )
PHILLIP HUDSON                           )
                                         )
                    Defendant.           )
_____  )

10.  I have read and understand the provisions of pages one and two of this agreement I have discussed the case and my constitutional rights with my lawyer. I understand that by pleading guilty I will be waiving and giving up my right to a determination of probable cause, to a trial by jury, to confront, cross examine, compel the attendance of witnesses, to present evidence in my behalf, my right to remain silent, my priviledge against self-incrimination, presumption of innocence and right to appeal. I agree to enter my plea as indicated above on the terms and conditions set forth herein. I fully understand that if, as part of this plea agreement, I am granted probation by the court, the terms and conditions thereof are subject to modification at any time during the period of probation. I understand that if I violate any of the written conditions of my probation, my probation may be terminated and I can be sentenced to any term or terms stated above in paragraph one, without limitation.

I have personally and voluntarily placed my initials in each of the above boxes and signed the signature line below to indicate I read and approved all of the previous paragraphs in this agreement, both individually and as a total binding statement.

Date  11/14/04                    Defendant  _____
                                             PHILLIP HUDSON

I have discussed this case with my client in detail and advised him of his constitutional rights and all possible defenses. I believe that the plea and disposition set forth herein are appropriate under the facts of this case. I concur in the entry of the plea as indicated above and on the terms and conditions set forth herein.

Date  11/14/04                    Defense Counsel  _____
                                                   Jeffrey A. Kirchler

I have reviewed this matter and concur that the plea and disposition set forth herein are appropriate and are in the interest of justice.

Date  11/15/04                    Prosecutor  _____
                                              Ronald M. De Brigida, Jr.

THE STATE OF ARIZONA,                    )        CR2003-006251-001 DT
                                          )
                    Plaintiff,            )
                                          )
            vs.                           )
                                          )
PHILLIP HUDSON,                           )
                                          )
                    Defendant.            )        PLEA AGREEMENT ADDENDUM
                                          )

The parties hereto fully and completely understand and agree that by entering into a plea agreement, the defendant consents to judicial fact finding by preponderance of the evidence as to any aspect or enhancement of sentence. In making the sentencing determination, the court is not bound by the rules of evidence.

I have read and understand the provisions of pages one through three of this agreement and this addendum to the plea agreement. I have discussed the case and my constitutional rights with my lawyer. I understand that by pleading **GUILTY** I will also be waiving and giving up my right to a trial by jury to determine guilt and to determine any fact used to impose a sentence within the range stated above in paragraph one, page one of this agreement.

I have personally and voluntarily placed my initials in each of the above boxes and signed the signature line below to indicate I read and approved all of the previous paragraphs in this agreement, both individually and as a total binding agreement.

Date: ___11/14/04___          Defendant _____
                                            PHILLIP HUDSON

I have discussed this case with my client in detail and advised him of his constitutional rights and all possible defenses. I believe that the plea and disposition set forth herein are appropriate under the facts of this case. I concur in the entry of the plea as indicated above and on the terms and conditions set forth herein.

Date: ___11/14/04___          Defense Counsel _____
                                                Jeffrey A. Kirchler

I have reviewed this matter and concur that the plea and disposition set forth herein are appropriate and are in the interests of justice.

Date: ___11/15/04___          Prosecutor _____
                                            Ronald M. De Brigida, Jr.

CAUSE # _CR2003- 006251-001 DT_

Enclosed is the Criminal History
Information portion of the Presentence
Report. Dissemination is restricted to
Criminal Justice Agencies **only.**
Secondary dissemination to
Noncriminal Justice Agencies is
**PROHIBITED.**

RETURN THIS ENVELOPE TO
THE CLERK OF THE SUPERIOR
COURT.

# LOCATION ONLY

## SEE DISCOVERY & CONFIDENTIAL MATERIALS

**CFO**

FILED
12/27/04  9:23 am
MICHAEL K. JEANES, Clerk
By _Johnson_
Deputy

# IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## UNIFORM CONDITIONS OF SUPERVISED PROBATION

STATE OF ARIZONA

VS.

____Hudson, Phillip H____

PID#: __AZ12666691__

COUNTY/DIVISION: __Maricopa__ / __U__

CR: _2003006251-001 DT_

§13-901.01 Offense: ☐1st ☐2nd ☐Ineligible

Offense(s): Count II 13-2008 TAKING IDENTITY OF ANOTHER N 4 F

---

*It is ordered suspending imposition of sentence and, under the supervision of the Adult Probation Department (APD),*

☑ **PLACING** *the defendant on probation for a period of __4__ ☑ year(s) ☐ month(s) ☐ lifetime*
   ☐ *to begin _____ or*
   ☑ *upon absolute discharge from prison for a separate offense or*
   ☐ *upon release from prison for felony DUI ( _____ months; _____ days credit)*

☐ **CONTINUING** *the defendant on probation*
   ☐ *for a modified term*
   ☐ *with a revised expiration date of_____*

**THE DEFENDANT SHALL:** *(Conditions Checked Also Apply)*

1. Obey all laws.
2. Not knowingly associate with any person engaged in criminal activity or who has a criminal record without prior written approval of the APD.
3. Report to the APD within 72 (or __72__) hours of sentencing, absolute discharge from prison, release from incarceration or residential treatment, and continue to report as directed.
4. Reside at an address approved by the APD, provide safe access, and obtain prior approval before changing residence.
5. Submit to search and seizure of your person or property by the APD without a search warrant.
6. Not possess or control any firearms, ammunition, or prohibited weapons as defined in A.R.S. § 13-3101.
7. Not possess or use illegal drugs, toxic vapors, or controlled substances, or use or possess any prescription drugs without a valid prescription.
8. Report any law enforcement contact to the APD within 72 (or __72__) hours.
9. Submit to drug and alcohol testing as directed by the APD and/or court.
10. Participate and cooperate in any program of counseling or assistance as directed by the APD and/or court.
11. Seek, obtain and maintain employment and/or attend school as directed by the APD and advise of any change.
12. Not leave the state (☐ county) without prior permission of the APD.
13. Sign and submit any release, authorization, or consent required for the APD/court to exchange protected healthcare information related to the conditions of probation.
14. Provide a sample for DNA testing if required by law.
15. Comply with any written directive of the APD to enforce compliance with the conditions of probation.
16. Abide by the Judgment and Orders of Restitution, Fines and Fees in this case.

## UNIFORM CONDITIONS OF SUPERVISED PROBATION - PAGE 2 OF 2

**STATE OF ARIZONA**                    COUNTY/DIVISION: ____Maricopa____ / __U__

**VS. Hudson,Phillip H**_____    CR / COUNT: 2003006251-001 DT Count: II____

- ☑ 17. Not consume or drink any substance containing alcohol.
- ☐ 18. Not have any contact with the victim(s) whatsoever, unless approved in writing by the APD.
- ☐ 19. Complete_____ hours of approved community work service at a minimum rate of_____ hours per month beginning ☐ upon sentencing or ☐ as directed in writing by the APD.
- ☐ 20. Not remain in or return to the United States illegally if deported or processed through voluntary departure.
- ☐ 21. Be incarcerated in the county jail for _____ ☐ days ☐ month(s), beginning_____ with credit for _____ days served, ☐ not to be released until _____ . Report to the APD within 72 (or _____ ) hours of release from jail. Comply with all program rules.
  - ☐ Be screened for or ☐ shall participate in Work Furlough.
  - ☐ Eligible for Work Release.
- ☐ 22. Register as a Sex Offender if required by law.
- ☐ 23. Be permitted to apply for Interstate Compact supervision in the state of _____ Do not proceed until reporting instructions are received and the APD issues a written travel permit.
- ☑ 24. Participate and cooperate in any counseling or assistance as directed by the APD pertaining to:
  - ☑ Substance Abuse      ☑ Mental Health
  - ☐ ABE/GED              ☐ Budgeting/Financial
  - ☐ Domestic Violence    ☐ Parenting
  - ☐ Cognitive Skills     ☐ Sex Offender
  - ☐ Anger Management     ☐ _____
- ☐ 25. Abide by the attached special conditions of probation:
  - ☐ Intensive Probation  ☐ Drug Court
  - ☐ Domestic Violence    ☐ DUI Court
  - ☐ Mental Health        ☐ Gang
  - ☐ Sex Offender         ☐ _____
- ☑ 26. Not own, posses, or use any computer or pheripheral.

**RECEIPT AND ACKNOWLEDGMENT:** *I hereby acknowledge receipt of the conditions of probation and any attached addenda. I understand that a violation of any of the conditions could result in the revocation of my probation and the court may impose sentence upon me in accordance with the law. As a further condition, I waive extradition for any probation revocation proceedings in this matter.*

| 12/22/04 | | | 12-22-04 |
|---|---|---|---|
| ·Defendant | Date | Judge of the Superior Court | Date |
| 2723 S 156th Dr | | Goodyear   AZ   85338-3211 | (602) 486-0689 |
| Defendant's Address | Apt. | City   State   Zip | Phone |

DISTRIBUTION: Original - Court, Copies - APD, Defendant

Revision 2004

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
**JUDGMENT AND ORDERS OF RESTITUTION, FINES AND FEES**

State of Arizona

VS.

Hudson,Phillip H

PID#: AZ12666691

COUNTY/DIVISION: _____ Maricopa ____ / __ U __

CASE / CR / COUNT: __ 2003006251-001 DT Count: [] __

☐ Reinstatement Commencing: | Today's date       This Date: _____

Pursuant to Uniform Condition 16 the defendant shall abide by the following Judgment and order of restitution, fines and fees:

**Financial Sanctions**

| | Total Amt | Payment | Begin Date |
|---|---|---|---|
| ☑ a. Total Restitution Ordered * | $7,828.24 | $400.00 | |
| ☑ b. Probation Service Fee (PSF) | | $50.00 | |
| ☐ c. Base Fine: _____ Drug: _____ Non-drug: | | | |
| ☐ d. Surcharge (%): _____ = _____ | | | |
| Total Fine & Surcharges (add c and d) = | | | |
| ☐ e Fine (CPP) | | | |
| ☑ f. Reimbursement | | $5.00 | |
| ☐ g. A R S 31-466 A (Victim Assistance Fund) | | | |
| ☐ h. A.R.S. 13-811 B (Anti-racketeering Fine) | | | |
| ☐ i. Delinquent Probation Service Fees | | | |
| ☑ j. A.R.S. 12-114.01 (Probation Surcharge $5 per fine/assessment) | $5.00 | | |
| ☐ k. A.R.S. 28-1444 (DUI Incarceration Cost) | | | |
| ☐ l. A.R.S. 41-1651 (Prison Construction & Operations Fund) | | | |
| ☐ m. Other: _____ | | | |
| **TOTAL PAYMENT MONTHLY =** | $7,833.24 | $450.00  $455.00 | |
| ☐ n. Interstate Compact Application Fee ** | | | |

*(handwritten: # at the 1st day of 3rd month following release from RDC)*

**Mandatory Assessments (paid in conjunction with monthly payment)**

| | | |
|---|---|---|
| ☑ o. A.R.S. 12-116 (Time Payment Fee)  ☑ $20  ☐ $12 | $20.00 | |
| ☐ p. A.R.S. 36-2219 (Emergency Medical Service)  ☐ $75 | | |
| ☑ q. Other: 12-114.01 | $5.00 | |
| ☐ r. Other: _____ | | |
| Total Mandatory Assessments (o thru r) = | $25.00  $30.00 | |

☐ s. It is ordered credit be given for any monies paid to date, during incarceration and, if necessary, balances are adjusted accordingly. All modified orders are to be considered new orders for billing purposes.

☐ t. Condition(s) # _____ of previous order dated _____ is/are deleted.

☐ u. Condition(s) # _____ is/are suspended until further ordered.

☐ v. Defendants probation is automatically extended for _____ years _____ months from _____ , pursuant to A.R.S. 13-902 C

☐ w. Restitution has been paid in full through JSL payments. It is ordered that any delinquent or unpaid balance be exonerated.

The Court further orders:

All previous orders and conditions of the Court remain in effect, unless otherwise stipulated above

* Probation will automatically be extended pursuant to A.R.S. 13-902 C

** Interstate Compact Process and Application Fee. Only one fee per defendant with entire fee due at time of application

RECEIPT AND ACKNOWLEDGMENT I hereby acknowledge receipt of the Judgment and Orders of Restitution, Fines and Fees and understand my financial obligation to the Court and other related parties, and agree to comply with all directives contained therein. See the reverse side of this form for payment instructions.

| _____ | 12/22/04 | _____ | 12/22/04 |
|---|---|---|---|
| Defendant | Date | Judge of the Superior Court | Date |

White (original): Court File    Yellow: APD File    Pink: Defendant

COURT FILE

Form 1100-044 (R-4-04)



breaks the cycle of addiction.

LIMEN HOUS

CR-2003-001251-001 DT

St. v. Hudson

FEB 23 2004

# LIMEN HOUSE

P.O. Box 1306, Wilmington DE 19899

## What is Limen House?

Limen House offers a residential treatment program for recovering alcohol and drug addicts. We serve adult males who have been arrested and for women, both located in Wilmington. Limen House has the capacity to treat up to 35 clients. It has been in operation since 1969.

## Limen House is Dedicated to Providing

■ A safe, family-like and structured environment for chemically dependent individuals who need transition to the real world.

■ A link to the recovery community and the twelve steps of Alcoholics Anonymous. Individual counseling, vocational rehabilitation and life skills.

# Break the cycle of addiction

## LIMEN HOUSE

## Who Benefits From Limen House?

### Recovering Alcoholics and Addicts

Hundreds of recovering alcoholics and addicts have been helped in making the transition to a productive life.

### All Taxpayers

As residents become self-sufficient, costs for health-care, welfare and legal problems decrease substantially, and residents rely less upon state assistance. They also become contributing members of society, thus eliminating the need for supported programs like welfare, health-care, foster-care and legal aid.

### Families

The quality of life for family members increases as they begin to experience the joy of interacting with a sober loved one.

## How Does Limen House Work?

Research on the disease of addiction shows that if there is not a break in the cycle, the damages of the disease or the disease itself may be passed down from generation to generation. Limen House breaks the cycle.

The program components of Limen House include:

■ Education about alcoholism and addiction as well as active involvement in a twelve-step program

■ A safe and structured environment

■ Group and individual counseling by certified professionals

■ Educational assistance (e.g., computer and business training, GED, etc.)

■ Job training and assistance in job placement

■ Financial guidance

■ Parenting classes

## Admission

Procedures for admission include a referral from a primary-care facility and a personal interview. Applicants should have had primary rehabilitation. Preference is given to adults who are able to work and become self-supporting. Residents pay weekly room and-board according to their income.

## Staff

The professional counseling staff consists of an executive director, two house directors and two full-time counselors. Up to 25 community leaders are on the board of directors, which supervises Limen House and assists in its operation.

## Funding

Limen House is a non-profit organization receiving funds from United Way of Delaware, the Division of Alcoholism and Drug Abuse and Mental Health, State Grant in Aid, individual and corporate contributions.

# LIMEN HOUSE
**Post Office Box 1306**
**Wilmington, Delaware 19899**

| | |
|---|---|
| **Men's House** | **Women's House** |
| 600 West 10th Street | 624 N. Broom Street |
| Wilmington, DE 19801 | Wilmington, DE 19805 |
| 302-652-7969 | 302-571-1216 |
| Fax 302-652-5774 | Fax 302-571-0811 |
| Reginald Irby | Margaret Bowers & Judy Montgomery |
| Men's House Director | Women's House Counselors |

## ADMISSION CRITERIA

Following are the admission criteria used to evaluate potential residents. They are **NOT** listed in order priorities, as potential residents must meet all of the criteria with the exception of any waived by the Executive Director based on his/her discretion.

1. Must be 18 years of age or older.

2. Diagnosis of alcoholism/drug dependence.

3. No pending/open felonies.

4. Completion of 7-14 days in a JCAHO approved rehabilitation treatment program in the past 12 months at the time of referral.

5. Willingness and ability to become independent and economically self-sufficient.

6. Demonstrated commitment to the AA philosophy of living.

7. Demonstrated motivation to participate in the Limen House program.

8. Treatment records provided to Limen House prior to interview must include:
Updated psychiatric evaluation for any Mental Health diagnosis. Medical, which includes diagnosis of chemical dependence and statement that client is free of communicable diseases, both signed by an MD, bio-psycho-social assessment, progress in treatment. Discharge summary must be sent within 5 days from date of admission. If ASI is used, please send biopsychosocial assessment component. There is a required psychiatric evaluation update for any Mental Health diagnosis.

9. Delaware residents will be given preference over out-of-state applicants.

Updated Nov. 16,2004

## RULES FOR LIMEN HOUSE RESIDENTS

Limen House is a facility, which promotes continued recovery from the disease of alcoholism and drug addiction. The resident is to follow certain rules designed to promote physical, mental, social and spiritual recovery to his/her personal and community life.

1. **To promote physical health, we require the resident to:**

   1.1) Get adequate rest

   1.2) Take meals at regular hours:

   1.3) Obtain medical treatment if necessary:

   1.4) No medication is to be used without Staff approval.

2. **To promote mental health, we require resident to:**

   2.1) Commit himself/herself to total abstinence:

   2.2) Participate in individual counseling sessions:

   2.3) Participate in-group counseling sessions.

3. **To promote social health, we require the resident to:**

   3.1) Be responsible for his/her personal cleanliness:

   3.2) Obtain a sponsor (of the same sex) who is willing to spend time with the resident:

   3.3) Develop strong relationships with the community of recovering alcoholics and drug addicts:

   3.4) Develop adequate relationships with the broader social and vocational community.

4. **To promote spiritual health, we require the resident to:**

   4.1) Complete a 4th and 5th Step, which will be written and discussed with an appropriate person, approved by Staff.

   4.2) Embrace the 12 Steps and incorporate them into their lives:

   4.3) Address issues of self-worth and enhance their self-esteem:

   4.4) Avoid any emotional involvement for at least one-year and then only with counselor's sanction.

5. **Grounds for immediate discharge:**

   5.1)  Using or being in possession of alcohol, street drugs, or unauthorized prescription drugs;

   5.2)  Sexual involvement with another resident of Limen House. (Emotional involvement with another resident of Limen House can be a block to therapy and upon Staff review may result in his/her discharge).

   5.3)  Physical violence with another resident or Staff of Limen House. (Threats of violence can be a block to therapy and upon Staff review may result in his/her discharge.)

   5.4)  Stealing money or personal belongings from another person in Limen House.

6. **Grounds for dismissal with notification of one week:**

   6.1)  Evidence of continues lack of progress in sobriety. **LIMEN HOUSE IS NOT A BOARDING HOUSE. OUR PURPOSE IS TO PROVIDE TREATMENT AND SUPPORT TO RESIDENTS IN THE EARLY MONTHS OF SOBRIETY;**

   6.2)  Failure to make arrangements and follow through with the payment of house fees. It is the responsibility of the resident to see the House Director to make these arrangements immediately after receiving ANY income.

   6.3)  Repeated refusal of an unemployed resident to perform short-term jobs at ANY wage.

   6.4)  Inability to adequately maintain work assignments in the House and to maintain personal cleanliness. Work assignments are posted on the Hallway bulletin board. Residents are responsible for their area AT ALL TIMES.

7. **Rules regarding the physical facility:**

   7.1)  Unless given prior permission by the counselor, all residents will be at dinner on weekdays (Men's House - 5:30 p.m.; Women's House - 6:00 p.m.);

   7.2)  Dress appropriately for the community, for example, no one will be allowed on the first floor unless properly dressed.

   7.3)  All residents are to be dressed and downstairs by 8:30 a.m. Residents who are not working or involved in a training program are required to check with Staff before going out.

   7.4)  Food may be used from the kitchen for breakfast, lunch and snacks. The resident is responsible for cleaning up after himself/herself.

   7.5)  Each resident is responsible for his/her own room and cleaning up after himself/herself in the bathroom area.

   7.6)  Each resident is responsible for his/her own laundry, including sheets and towels.

2

7.7) No food is to be consumed outside the Kitchen and Dining Room areas. No beverages are to be taken above the first floor.

7.8) Televisions are to remain off until 4:00 p.m. and are to be turned off at 11:30 p.m. on weekdays. Morning news shows may be watched from 7:00 a.m. to 9:00 a.m.

7.9) Radios and stereos are to be played at a loudness level that does not disturb other residents or the neighboring community.

7.10) Front, back and side doors are to remain locked at all times.

7.11) Curfew is 11:00 p.m. Sunday through Thursday and midnight on Friday and Saturday. At this time the door will be locked and no resident will be admitted unless he/she has been unavoidably detained and phoned the House prior to curfew;

7.12) Residents requesting passes must submit a plan and process it with their counselor prior to Wednesday night group in Women's House or Tuesday night in Men's House. Passes will begin at 6:00 p.m. Friday and end at 11:00 p.m. Sunday.

7.13) The only areas where smoking will be permitted are: Mens' House (Side porch); Women's House (Back Porches);

7.14) The office phone is for Limen House business and is only to be used by residents in the case of an emergency or with Staff permission.

8. **Programming:**

8.1) All residents are required to be in attendance and to participate in House groups. These groups do not take the place of the required AA meetings. These groups will be held as follows:

**Mens' House:** Tuesday, Wednesday and Thursday beginning at 6:30 p.m.

**Women's House:** Monday, Tuesday and Wednesday beginning at 7:00 p.m.

8.2) Residents are responsible for initiating at least one therapy session with their counselor each week. The counselor may also request sessions at his/her option.

8.3) Residents will be required to attend a minimum number of AA/NA meetings per week, Which will be noted in the resident's treatment plan. Daytime AA/NA meetings are encouraged but does not count toward this minimum;

8.4) Residents are required to get a sponsor and to form ties to the recovering community.

3

8.5)  No overnight passes will be granted during the first 30 days of residency. In the 2nd months and third months, each resident I eligible for one weekend pass per month. From their 4th month on, the resident is eligible for two weekend passes per month. All passes are subject to Staff approval.

9.  **Visitors:**

9.1)  All visitors must remain on the first floor and must leave the House no later than 10:00 p.m.

9.2)  An adult must accompany visitors under the age of 16.

9.3)  Residents' children may spend weekends with the parents with the prior permission of the Staff. This permission must be obtained no later than noon on **Wednesday (Women's) and noon on Thursday (Men's)** prior to the planned weekend visit;

9.4)  Visitors of the opposite sex are discouraged due to the tendency for gossip to evolve in the neighborhood and this could be detrimental to the reputation of Limen House.

10.  **Transportation:**

10.1)  Public transportation is available in the Wilmington area. Schedules may be obtained from the Staff or other residents.

10.2)  Limen House Van:

10.2.1) May be driven only by those residents in possession of a valid Driver's license, with no DWI's pending, and covered by Limen House insurance;

10.2.2) May be driven by residents only at the request of or with the permission of a staff member.

10.2.3) Will be used only for official House business or activities approved by Staff members.

10.3)  Residents with their own cars:

10.3.1) May receive a letter to obtain a parking permit, which enables them to park on the street in front of the House.

10.3.2) Residents must be in the House one-month before having their own car.

11.  **ANY BEHAVIOR ON THE PART OF ANY RESIDENT WHICH PROVES TO B DETRIMENTAL TO THE REPUTATION OF LIMEN HOUSE WILL BE CAUSE FO IMMEDIATE DISCHARGE.**

4

# RULE SUPPLEMENT

No hats or head coverings are to be worn inside the House.

No videos are to be watched during the week.

No **Walkman** radios to be used anywhere but in the bedroom.  Limit use of Walkman overall.

No "new" tattoos, ear piercing, or other types of body alteration while a resident of Limen House.

Attend a **minimum** of one Mens' AA/NA meeting weekly.

Attend a **minimum** of one Step AA/NA meeting weekly.

The side door is to remain **locked** at all times.

Requests for resident assistance loans must be submitted by Monday at dinner.

No showers are to be taken between the hours of 8:30 a.m. and 7:00 p.m.

**Do not** operate washing machines between 6:00 a.m. and 8:30 a.m. and 4:00 p.m. and 7:00 p.m.

**Do not** operate the vacuum cleaner after 10:00 p.m.

Limit all phone calls to no longer than **15 minutes**.  No phone calls after 11:30 p.m. weekdays and 12:00 a.m. on weekends unless emergency.

No phone calls for the first seven days of residency.

No visitors for the first 30 days of residency.

No adult or pornographic movies are to be watched on the television.

Any adult or pornographic magazines are to be kept in your room out of view.

No sleeveless shirts are to be worn at the dinner table.

Return and sign in YMCA passes **immediately** upon returning to the House.

You **must** sign out whenever you are leaving the House and put the estimated time or your return (as close as you can estimate).

**Do not** alter the Sign Out book.

**Do not** leave laundry unattended.

Limit milk consumption to one serving per day.

Do not use nicknames to address other residents.

5

*Women's House*
624 N. Broom Street
Wilmington, DE 19805
302-571-1216
Fax 302-652-5774

*Man's House*
600 West 10th Street
Wilmington, DE 19801
302-652-7969
Fax 302-571-0811



# LIMEN HOUSE

Post Office Box 1306
Wilmington, Delaware 19899

## Limen House Mental Health Admission Policy
## Effective September 15, 2001

Due to the increase of mental health diagnosis, the need for subsequent medication, and previous complications upon admission to our agency, Limen House has developed an admission policy for **ALL** substance abuse clients with a Mental Health Diagnosis. This Policy must be agreed with by the referring agency prior to a client's admission to Limen House. The policy is stated as follows:

1. An updated Psychological evaluation performed by a psychiatrist must accompany the client to the initial interview or the interview will be postponed. Delay in interview could jeopardize the client gaining admission to Limen House.

2. The psychological evaluation must include:

   a. A current diagnosis.
   b. List current medications.
   c. Information demonstrating the client's stability with current medication.
   d. Prognosis that will indicate how long the client will need to be on medication.

3. Clients can not be prescribed any mind or mood altering medication

4. Clients must be withdrawn from any medications that are prescribed for sleep prior to Limen House Admission. A Doctor's note stating such activity must accompany the client at admission.

5. There must be a 60-day supply of **ANY and ALL** medication that accompanies the client at the time of admission. Any deviation with the medication from the requirement will result in client not being admitted to The Limen House Program.

6. Upon arrival to Limen House, the driver escorting the client must handle all medication and personally hand deliver all medication and paperwork to a **Limen House Counselor**. If this is not followed to the strictest letter, the client will not be accepted and will be returned to your agency.

This document must be signed and returned to Limen House Inc. prior to the client's interview. By signing this policy our agency agrees with all the policies stated above and understands that violation of any one policy could revoke the admission of the referred client.

_____          _____
Clinical Staff/Continued Care Coordinator                    Date

_____          _____
Medical Director/Psychiatrist                                       Date


United Way
of Delaware

*One of America's Oldest Halfway Houses*

Created on 9/11/01

**LIMEN HOUSE INC.**
**RESIDENT ADMISSION FORM**

*Please Print*                    *Please Print*                                    *Please Print*

REFERRAL SOURCE: _____      ADMISSION DATE: _____

NAME: _____      TODAY'S DATE: _____

ADDRESS: _____      SOC. SEC.#: _____
_____

COUNTY: _____      PHONE#: _____

BIRTH DATE: _____    AGE: _____    SEX: _____    RACE: _____

IN EMERGENCY, NOTIFY: (Name) _____    (Relation) _____

(Address) _____    (Phone) _____

EDUCATION: 1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16  (Other) _____

MILITARY SERVICE: Yes _____    No _____    Type Discharge: _____

MARITAL STATUS: S  M  D  SEP  WID    # of Marriages: _____    # of Children: _____

OCCUPATIONAL SKILLS: _____

PRESENT EMPLOYER: _____  How Long? _____

ALL INCOME: _____    SPECIFY DEPENDENTS _____

MEDICAL INSURANCE: _____

HEALTH PROBLEMS: _____

LIST ALL MEDICATIONS NOW TAKING: _____

PHYSICAL LIMITATIONS: _____

ANY PENDING LEGAL CHARGES: _____

CURRENTLY ON PROBATION?  Yes _____    No _____

NAME AND ADDRESS OF PAROLE OFFICER: _____
_____

WRITE YOUR REASONS FOR WANTING TO COME TO LIMEN HOUSE: _____
_____
_____
_____
_____

ARE YOU AN ACOA?          Yes _____     No _____

DO YOU SMOKE TOBACCO?     Yes _____     No _____

DO YOU HAVE A GAMBLING PROBLEM?    Yes _____     No _____

WHAT IS YOUR DRUG OF CHOICE? _____

HOW MANY DAYS WILL YOU BE IN YOUR PRESENT OR MOST RECENT REHAB? _____

PREVIOUS ALCOHOLISM TREATMENTS, MEDICAL TREATMENTS & JUDICIAL
INTERVENTIONS:

| TYPE OF FACILITY | # OF TIMES | WHEN & WHERE |
|---|---|---|
| DETOXIFICATION | ( ) | |
| REHAB. CENTER | ( ) | |
| PSYCHIATRIC | ( ) | |
| HALFWAY HOUSE | ( ) | |
| INCARCERATED (More than 30 days) | ( ) | |

Revised on 07/01/99

RICHARD M ROMLEY
MARICOPA COUNTY ATTORNEY

MICHAEL K. JEARES, CLERK
BY: [signature] DEP

FILED

2003 APR 30  PM 4: 39

Ronald M Debrigida, Jr.,
Deputy County Attorney
Bar Id #: 015697
301 West Jefferson, 6th Floor
Phoenix, AZ  85003
Telephone: (602) 506-8484
MCAO Firm #:  00032000
Attorney for Plaintiff

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| THE STATE OF ARIZONA, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) |
| PHILLIP HUDSON (001), | ) CR2003-006251-001 DT ___ |
| aka PHILLIP H HUDSO, | ) |
| aka PHILLIP HAROLD HUDSON, | ) ) |
| Defendant. | ) STATE'S ALLEGATION OF MULTIPLE ) OFFENSES NOT COMMITTED ON THE ) SAME OCCASION PURSUANT TO ) A.R.S. § 13-702.02 ) ) (Assigned to the Honorable ) Barry Schneider, Div. U) ) |

Pursuant to A.R.S. § 13-702.02 and Rule 13.5, Arizona Rules of Criminal Procedure, the State of Arizona, by and through undersigned counsel, amends the Indictment to allege that **Count 4 occurred on July 1, 2002 and Count 6 occurred on June 30, 2002** are multiple offenses not committed on the same occasion but consolidated for trial. Therefore, if the Defendant is convicted of these counts, the Defendant must be sentenced pursuant to A.R.S. § 13-702.02.

Submitted April ___30___ , 2003.

RICHARD M ROMLEY
MARICOPA COUNTY ATTORNEY

By _____
Ronald M Debrigida, Jr.
Deputy County Attorney

Copy of the foregoing
mailed\delivered this
___30th___ day of April, 2003,
to:

The Honorable Barry Schneider
Judge of the Superior Court

Not assigned as of this date (Group A)
Public Defender

BY _____
Ronald M Debrigida, Jr.
Deputy County Attorney

2

27

32-95-134010
.MO/11-13-95    0820    ①    HEATH, KRISTOPHER
                                    ~~~~~~ CAPANO DR
                                 → 04-05-70

DAVIS, ANGELA MARIE
    W/F   05-09-71

~~~~~ CAPANO DR    (H) ~~~~~
NEWARK   19702   (W) ~~~~~

HEARD   WOMAN   SCREAMING "IS HE OK"
SAW   BLOOD ON V. WALKED UP
TO W/F AND   MADE  SURE SHE
WAS OK

───────────────────────────────

        0810
HUDSON, PHILLIP HAROLD
    W/M   08-24-72

    13 (-2   CAPANO DR
    NEWARK   19702

    (H) BACK- ~~~~~
    (W) ~~~~~ - ~~~~~

Heard   6 or 7 Shots, then
   Saw   B/M  6FT  250 LBS
         BLUE HAT W/ YELLOW BRIM
         DRK BLUE SWEATSHIRT
         BLUE JEANS / WHITE SNEAKERS

RAN TO 86 or 87 BLUE
ESCORT HATCHBACK. SUSP WAS
PASSENGER, SAW ALL FROM
INSIDE OF HIS GRND FLOOR
APT.

CANVASS BLDG (0825 hrs)
BLDG

#1 - NO ANS
#2 - NO ANS
#3 - PATEL, MINAXI
        HEARD 3 or 4 SHOTS - SAW NOTHING

#4 - PIERCE, GERARD
        Heard 4 or 5 Shots, thought it was Firecracker

#5 - WING, JESSICA
        Approx 0740 Heard 5 Shots, SAW
        NAVY BLUE CAR NEXT TO HER M/V
        IN LOT, SAW DRIVER of CAR FLEE,
        Possibly SAW White hands on STEERING
        Wheel, heard woman Screaming, called
        9-1-1.

#6 covered by Det Lee

28

## AFFIDAVIT/DECLARATION OF WILLIAM D. KINARD

I, William D. Kinard., pursuant to 28 U.S.C. § 1746, hereby swear, affirm and state that the following is true and correct:

1.  My name is William Kinard. I currently live in Laurel, Maryland.

2.  I worked as a Forensic Chemist with the Bureau of Alcohol, Tobacco and Firearms under the Treasury Department, Washington, DC from 1973 until 2000, when I retired.

3.  On October 31, 1996, I testified on behalf of the prosecution in the case of State of Delaware vs. Michael Manley and David Stevenson.

4.  I was not contacted by the prosecution after I testified in 1996. Recently, I was contacted by Janel Trivelpiece of the Federal Public Defender. Ms. Trivelpiece informed me that there was another trial on this case in 2005. No one contacted me in 2005 to see if I was available to testify again. Had I been contacted to testify in November of 2005, I would have been available and willing to testify.

5.  Ms. Trivelpiece also informed me that the prosecution told the Court that I was deceased. That is not true.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

William D. Kinard

29

## AFFIDAVIT/DECLARATION OF MARIO CRUZ

I, Mario Cruz, pursuant to 28 U.S.C. § 1746, hereby swear, affirm and state that the following is true and correct:

1.      My name is Mario Cruz. I currently live in Swedesboro, New Jersey.

2.      I was called as a witness by the prosecution in the 1996 trial in the case of State of Delaware vs. Michael Manley and David Stevenson.

3.      I was not contacted by the prosecution after I testified in 1996. I understand there was another trial in the same cases in 2005. No one contacted me to testify. During the 1996 trial, I testified that I worked for Sun Oil Company. I also gave my address in Sicklerville, New Jersey. I was still working for Sun Oil Company and living in New Jersey in 2005. Had someone contacted me and told me that I was needed to testify, I would have appeared, like I did in 1996.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

_Mario Cruz_
Mario Cruz

11/5/2007

30

## AFFIDAVIT/DECLARATION OF RICHARD WOHLGEMUTH

I, Richard Wohlgemuth , pursuant to 28 U.S.C. § 1746, hereby swear, affirm and state that the following is true and correct:

1.      My name is Richard Wohlgemuth. I have been living in Ithaca, New York since early, 2005.

2.      In 1996, I was employed by the United States Army. I was assigned to a reserve unit in Pedricktown, New Jersey, the 34% General Hospital. I retired from the Army sometime around 1998. I was a private investigator when I was younger, however I did not go back to work as a private investigator after I retired.

3.      On October 31, 1996, I testified on behalf of the prosecution in the case of State of Delaware vs. Michael Manley and David Stevenson.

4.      I was not contacted by the prosecution after I testified in 1996. Recently, I was contacted by Bryant Graham of the Federal Public Defender. Mr. Graham informed me that there was another trial on this case in 2005. No one contacted me in 2005 to have me testify again. Had I been contacted to testify in November of 2005, I would have been willing to testify.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Richard Wohlgemuth

31

## AFFIDAVIT/DECLARATION OF LANCE S. THOMPSON

1.    My name is Lance S. Thompson.  I was called as a witness in the cases of Delaware v. Manly and Delaware v. Stevenson, a murder case that happened in Cavalier Apartments.

2.    I testified at the trial in 1995.  After the trial, I received a call from Police Officer Meadows telling me that I would have to testify again because there was an appeal and that they would let me know when I was needed.

3.    I did not hear from anyone after that.  If I had been subpoenaed, or, if someone had called me, I would have gone to court and testified like I did the first time. I was surprised that no one called me.

I hereby certify that the facts contained in this affidavit are true and correct to the best of my personal knowledge and belief, subject to 28 U.S.C. § 1746.

11/3/07

Lance S. Thompson

32

## AFFIDAVIT/DECLARATION OF BARBARA BAYNARD

I, Barbara Baynard, pursuant to 28 U.S.C. § 1746, hereby swear, affirm and state that the following is true and correct:

1.       My name is Barbara Baynard. I currently live in Philadelphia, PA, and was living here in 1996 and 2005.

2.       I was in charge of the Diamond Youth Program summer camp off and on from 1967 through 1998. The camp was started as a result of the riots in Philadelphia. The camp was held Monday through Friday from 9:00 am to 3:30 pm for children ages 6 through 12. There would be 70 to 80 kids at a time. The camp ran for 8 weeks in the summer. As part of the itinerary for the camp, we would go on day trips to Lancaster and other places and we even did overnight camping trips.

3.       Michael began as a camp participant. He was capable of doing anything he put his mind to. He worked hard and was able to get accepted into Central High, which is a very tough school to get into.

4.       Myself and the others who helped with the camp were so impressed with Michael and fond of him that we allowed him to become a junior aide for the camp and assist with camp activities. Michael was trustworthy and always did a good job. I also remember that Michael was a positive influence on the other children in his group, and especially the younger children at the camp.

5.       Michael's home situation was not pleasant. In fact, things were so bad that Michael would regularly arrive earlier than camp normally started, and always stayed long after camp was finished for the day. I got the sense that he did this to avoid going home to the projects.

1

6.    Despite the many years that Michael attended the camp, his mother never attended any of the camp functions, and I never met her or any of Michael's relatives. The parents were allowed to be chaperones for the day and overnight trips. At the end of the summer, there was a ceremony similar to that of a graduation ceremony and the parents were encouraged to attend.

7.    I was never contacted by anyone on Michael Manley's behalf in either 1996 or 2005. If I had been contacted, I would have told them the information above and would have gladly testified on Michael's behalf.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Barbara Baynard

2



FOCUS - 27 of 27 DOCUMENTS

Copyright 1995 RTV
Radio TV Reports

**SHOW:** Action News 11 pm; WPVI-TV; Philadelphia

November 13, 1995 11:00pm; ET

**NETWORK:** ABC.

**MEDIUM:** Television

**TYPE:** Local

**LENGTH:** 1866 words

**ANCHOR:** Lisa Thomas-Laury

**BODY:**
MONITOR'S NOTE: This broadcast began late because of Monday Night Football.

(T) Flowers mark the scene of a murder in Newark, DE.......a suspected serial killer is caught in Kentucky.

Senator Bob Dole and Representative Newt Gingrich arrived at the (C) White House, along with other congressional leaders to meet with President Clinton about expiration of the government's ability to spend money at midnight. Gingrich said there was no budget agreement, but they would meet. (SB) Representative Newt Gingrich says there's a fair chance we could have another meeting tomorrow. The President vetoed the emergency bill today because he could not agree to a raise in Medicare rates.

Reporter David Henry says military veterans may not get their benefit checks. (C) COBBS CREEK VFW POST. (SB) Vincent Tumminelli says I don't the vet should be cut. (SB) Steve Silverio says without it, I'm done. (C) GREENE FEDERAL BUILDING. (SB) Paula Jackson says there's so many concerns, we don't know where to begin. (SB) Marissa Martino the people at the lower levels probably won't come into work tomorrow. (SB) Silverio says they should have to live our lives sometimes.

(C) Atlantic City, NJ got out its heavy machinery, trying to shore up the beach before an expected Nor'easter. (C) Longport, NJ, where crews removed the wooden steps leading to the beach.

12:05 Time Check

Weatherman David Roberts says the nor'easter will continue from tomorrow morning until tomorrow night.

Voluntary drought warnings were lifted on Sunday for 17 of New Jersey counties.

Six people were killed, five of them Americans, when a bomb went off in (C) Riyadh, Saudi Arabia. More than 30 Americans were among the 60 people injured.

(C) Glenn Rogers was captured and arrested near (C) Waco, Kentucky after a high-speed chase. He was wanted as a

suspected serial killer of at least four women across the nation.

A pre-trial hearing for (C) David and Bryan Freedman, who are accused of killing their parents and their younger brother Eric in Allentown.

Reporter Dann Cuellar says flowers now mark the spot where Chris Heath, a security executive for the MACY'S DEPARTMENT STORE CHAIN, was shot in the parking lot of the (C) CAVALIER COUNTRY CLUB APARTMENTS. (SB) Patrick Crowell says he was ambushed and executed. (SB) David Fincke says I heard a woman screaming in the parking lot and I realized it was too late. (V) **Michael Manley** and (V) David Stevenson were arrested. Stevenson, a UNIVERSITY OF DELAWARE student, had been accused of stealing $4500 from the store at the (C) CHRISTIANA MALL; Heath was scheduled to testify in the case that day. (SB) Crowell says his life has been tragically taken.

Twenty rookie police officers reported to the (C) 39th police district as part of the commissioner's transfer plan.

Guards at federal buildings in Philadelphia set up picket signs in front of the (C) WILLIAM J GREEN FEDERAL BUILDING. They are in a dispute with the private company they work for in Minneapolis.

(T) Governor Whitman returns to work after surgery........a kitten of a different color is a mystery in Denmark.........sports..........weather..........a candy bar that could help lower your cholesterol.

12:11 pm........Commercial break

Israeli television is reporting that Yitzhak Rabin's assassin, (C) Yigal Amir, will go to trial in the next 10 days.

The crew of the (C) ATLANTIS is gearing up with its docking with the Russian space shuttle MIR.

In response to a lawsuit filed by COMMON CAUSE, Pennsylvania Commonwealth court ruled that the legislature violated the state constitution when it passed the 1994-1995 budget. (R)

New Jersey Governor Christie Whitman returned to work, three days after the removal of a cyst from her right ovary. (SB) Governor Christie Whitman says I feel OK.

12:17 pm........Commercial break

Sports - Gary Papa

The Eagles held its annual EVENING WITH THE EAGLES to raise money for Cystic Fibrosis.

The Steelers-Browns football game. The Steelers won.

NFL football injuries.

Darren Dalton helped to raise $66,00 for the homeless. (SB) Darren DAulton says Thanksgiving.

The Flyers news.

NHL hockey scores.

Plans for a deer hunt in lower Merion Township have been scrapped because officials could not reach an agreement

Action News 11 pm; WPVI-TV; Philadelphia Radio TV Reports November 13, 1995

with the STATE GAMING COMMISSION. (R)

12:21 pm........Commercial break

Accu-Weather - Dave Roberts

Health Check - Anita Brikman

According to a survey of elderly heart attack patients nearly 40% did not receive aspirin therapy within two days of their attack.

The JOURNAL OF EPIDEMIOLOGY reports that post-menopausal women who drank modest amounts of alcohol had greater bone density than those who didn't.

UNIVERSITY OF MASSACHUSETTS researchers have invented the CARDIOBAR, a candy bar that lowers cholesterol.

(T) Lucciano Pavoritti returns to Philadelphia for an annual competition.

11:29 pm........Commercial break

A lotus seed taken from a dry lake bed in China that was 12,088 years old has been coaxed into sprouting by scientists at UCLA.

Scientists in (C) Copenhagen, Denmark have a kitten that is green.

The 5th annual LUCCIANO PAVORATTI VOICE COMPETITION came to a close with a demonstration from some of the winning vocalists.

(T) Nightline.


LOAD-DATE: November 15, 1995

FREE

Volume 122, Number 22



*In Sports*

**Hens go north for the Yankee title**

page B10

# THE REVIEW

*An Associated Collegiate Press*

*Four-Star All-American Newspaper*

250 Student Center, University of Delaware, Newark, DE 19716

*In Section 2*

**Banking on having something to eat**

page B1

**FRIDAY**

November 17, 1995

# Student charged with NCCo. murder

*Freshman David D. Stevenson-Brown was to stand trial for credit card fraud Monday; he was arrested after his adviser was killed*

**BY KRISTIN COLLINS**
*Administrative News Editor*

A university freshman was charged with first-degree murder Monday, after allegedly...



Stevenson-Brown (left) and Michael Manley were arrested soon after Kristopher Heath, a Macy's security executive, was shot dead just 15 minutes from campus.





## Federal gov't shuts down over budget disputes

**BY CATHERINE NESSA**



## Blue Hen goes one peck too far with Navy

see MURDER page A8

# Murder suspect

continued from page A1

comment. His mother said only, "I'm not doing too well right now."

Stevenson-Brown, a former employee of Macy's at Christiana Mall, was indicted in October 1994 on nine counts of felony theft and nine counts of unlawful use of a credit card after allegedly using customers' charge numbers to buy $4,500 worth of Macy's gift certificates, said Deputy State Attorney General Stephanie Kinder, who was prosecuting Stevenson-Brown for Macy's.

According to Kinder, Stevenson-Brown had already publicly admitted to the theft and said he stole from Macy's because he owed money to gang members.

Facing a maximum sentence of 6 years for the fraud charges, Stevenson-Brown previously had turned down a plea offer that would have required him to pay back the stolen money and serve two years probation, Kinder said.

Kevin Powlette (AS SO), who also played basketball with him regularly in Carpenter Sports Building, said Stevenson-Brown is one of his best friends at the university. Both Stevenson-Brown and Manley had been in his apartment Sunday night before the murder.

He said he asked Stevenson-Brown whether he would be playing basketball the next day, and he responded that he would not be able to play without giving any hint of his plans for Monday.

"He had given no indications that he would even be capable of something like this," said Powlette, who characterized his friend as an easy-going jokester.

Heather McCabe (AS JR) worked with Stevenson-Brown at the Morris Library and said although she didn't consider him a friend, he called her often.

"Whenever he would call, he'd usually be in an argument with a large group of people," she said, "and there were women crawling all over him." She said the women in the background were often bickering over who they had slept with and sometimes claiming they had slept with Stevenson-Brown.

Though McCabe said "he didn't seem like the violent sort," she described him as "perturbed," "preoccupied" and "slightly angry."

Police gave the following account of Monday's events:

After receiving a 911 call from a resident, police arrived at Cavaliers to find Heath lying dead behind his car with five 9 mm gunshot wounds to his head and back.

Witnesses described the killer's vehicle and police caught up with the drivers in Wilmington. When they turned on their sirens to pull them over, the car sped up and made no attempt to pull to the side.

The driver eventually lost control of the car and jumped the curb at 18th and Washington Streets.

Police caught Stevenson-Brown immediately, but Manley fled on foot and was caught after he boarded a Dart bus.

After questioning, Stevenson-Brown and Manley were charged and sent to Gander Hill Prison for arraignment.

Lisa Coughlin, who lives in the apartment below Heath, said she and her husband heard the shots. When they looked out the window, they saw "this black guy running across the parking lot and he got into a black Ford Escort."

Coughlin said Heath's live-in fiancee told her that the same man she'd seen running from the crime scene had knocked on her door the day before saying he was a friend of Heath's. The man left when he realized Heath wasn't home.

Heath's fiancee was the first to reach the body. "She started screaming hysterically," Coughlin said. "It was really scary how she was screaming ... 'Somebody help me; he's dead.'

"The guy was just laying out in the parking lot dead — you could tell he was dead because he was shot in the head."

Mike Ludington, the only neighbor who approached the body to feel for Heath's pulse, said the shooting was "kind of like execution-style."

Flowers are now heaped on the spot in the parking lot where Heath's body fell. Coughlin said neighbors followed suit after Heath's fiancee placed a single yellow rose at the site.

Macy's case against Stevenson-Brown will continue without Heath's testimony, while he could face the death penalty if convicted of Heath's murder.

Do Yo

REGIST

D.U.S.

individua

C

Monda

in t

You CA

A limited number of



FOCUS - 26 of 27 DOCUMENTS

Copyright 1995 RTV
Radio TV Reports

**SHOW:** CHANNEL TEN NEWS UPDATE; WCAU-TV; Philadelphia

November 13, 1995 11:00pm; ET

**NETWORK:** NBC

**MEDIUM:** Television

**TYPE:** Local

**LENGTH:** 1640 words

**ANCHOR:** Renee Chenault & Ken Matz

**BODY:**
(T) A major storm is barrelling towards our area.

A major weather system that has already produced snow in (C) Montgomery County, VA is headed towards our way. A dusting of snow fell in the (C) Harrisburg area today.

Weatherman John Bolaris says the storm is expected to arrive about late afternoon tomorrow, with the heaviest precipitation to arrive between 3 and 4. The shore is expected to take a real pounding with wind gusts at about 50 miles per hour.

Reporter Doug Shimell live in (C) Atlantic City, NJ says a lot of hotels get bookings for storm watch parties whenever a major storm is predicted. (C) THE KITE SHOP. (SB) Doug Jewell says the water came in the front door and we lost merchandise. Hotels are nearly empty. (SB) Nancy Bell says we're located on a fairly high section so we're fortunate. There is concern for the beaches. (SB) John Brough says the school floods so we get off for a few days until they drain it.

The midnight deadline is approaching for a partial shut down of the federal government. Congressional leaders and the President are meeting at the White House. (SB) Senator Bob Dole says we made a telephone call. (SB) Gingrich says I think we should talk about how we can keep the government open. The President vetoed a Republican-backed bill tonight.

11:04 Time Check

The (C) US PASSPORT OFFICE was busier than usual. (SB) Cynthia Macedo says if they shut down there's a chance that I couldn't go to Europe. (SB) Donald Whitman says I made my decision this morning realizing that this is a critical time.

(C) INDEPENDENCE HALL and the LIBERTY BELL are some of the national parks that may be shut down.

New Jersey Governor Christie Whitman returned to work in (C) Trenton, NJ three days after the removal of a cyst.

CHANNEL TEN NEWS UPDATE; WCAU-TV; Philadelphia Radio TV Reports November 13, 1995

(SB) Governor Christie Whitman says I do believe in some privacy.

A MACY'S DEPARTMENT STORE security guard, Christopher Heath, was found shot to death outside his apartment in (C) Newark, DE. He was scheduled to testify against (V) David Stevenson and (V) **Michael Manley,** former employees who have been charged stealing more than $4500. (SB) Thomas Gordon says the 25 year old man was loading a case file when he was shot in the back. Stevenson was a student at the UNIVERSITY OF DEPARTMENT.

Governor Tom Ridge signed the death warrant was signed for serial killer (C) Harrison Marty Graham.

David & Bryan Freemen appeared for pre-trial motions in (C) Allentown. They will go on trial for the murders of their parents and brother in January.

Closing arguments continue in the federal racketeering trial of reputed mob boss John Stanfa and seven of his associates.

Two gunmen tried to rob an armored car in front of the (C) ACME MARKET in the Juniana Park section. More than a dozen shots were fired before the men got away in a stolen van without the money. (SB) Twanda Casper says he said look get down and turned around and he shot.

Rookie cops showed up for their first day at the (C) 39th district. (SB) Unidentified man says these are all new officers here.

(T) Americans are the target of overseas terrorists.......a man accused of a killing spree is finally caught......weather......local couples who loved their Las Vegas weddings.

11:09 pm........Commercial break

Five Americans were among six killed in (C) Riyadh, Saudi Arabia shortly before noon. Two groups are claiming responsibility for the blast.

The Cross Country Killer, (V) Glenn Rogers was caught after a 15 minute high speed chase in Kentucky. Rogers is said to have found his prey in bars all over the country. (SB) Lynn Jones says everybody clapped that he was caught.

(T) Weather..........what makes Las Vegas weddings so attractive.

11:15 pm........Commercial break

Reporter Sheela Allen Stephens says 75,000 couples get married each year in Las Vegas. (SB) Virginia Jacobson says it was my idea. The Jacobson's wedding at the GRACELAND CHAPEL cost $300. (SB) Virginia says I had a half hour ceremony with Elvis and karoke. (C) Charlotte Richards, owner of the LITTLE WHITE CHAPEL. (SB) Vince Bilotta says they sat down like they were part of your group. (SB) Bilotta says I don't remember the guy's name.

The annual Wedding Gown Sale at (C) FILENE'S BASEMENT.

Weather - John Bolaris

11:24 pm........Commercial break

Sports - Ron Burke

CHANNEL TEN NEWS UPDATE; WCAU-TV; Philadelphia Radio TV Reports November 13, 1995

The Eagles-Broncos football game. The Eagles won.

Steve Young of the 49ers had unannounced surgery on his shoulder.

Troy Aichman's injury has been diagnosed as a bruised tendon.

Greg Maddox won the for the Player of the Year award for the fourth time.

Mike Tyson will fight (C) Frank Bruno on March 16th in Las Vegas.

(T) Some designing women and men show off their creative contraptions.

11:29 pm.......Commercial break

Students displayed their talents at the annual (C) NESBITT COLLEGE OF FINE ARTS at DREXEL UNIVERSITY.


**LOAD-DATE:** November 15, 1995



# The News Journal

© 1995, The News Journal Co.   A Gannett newspaper

Wilmington, Del.   11th year, No. 222 ★★★

**TUESDAY** Nov. 14, 1995

# Civil rights panel rejects public oversight of city

By TRIF ALATZAS
Staff reporter

WILMINGTON -- The city's Civil Rights Commission Monday rejected Mayor James H. Sills Jr.'s proposal for a citizen review board for the police department, but offered other suggestions to help the police monitor Wilmington police.

The 11-member, Sills-appointed commission decided that though citizens prefer independent police oversight, a review board would have to be watered down to deal with a nine-year-old state law that restricts civilians from investigating police.

"The state law makes it so very difficult to put together something that would work well for people," commission chairman Bishop Thomas W. Weeks said.

The commission's rejection was a clear defeat for Sills, who promised during his successful run for office in 1992 that he would form a citizen review board.

Among the commission's other suggestions for Sills:

■ Urge Delaware officials to review the state law and decide whether it instills citizen confidence in police.

■ Establish a group to assist in filing, tracking and keeping statistics on police complaints.

■ Ask the police department to revise its complaint procedure.

Under the plan Sills proposed last year, the citizen board would review case files, recommend reopening closed cases and suggest punishment.

In his Jan. 5, 1993, inauguration speech, Sills said a civilian review board was needed to "contribute to improving trust and cooperation between the police and the community they serve."

A Sills aide said the mayor appreciated the commission's work "though it may not be exactly what Sills could not be reached for comment late Monday, and a ...

---

## Witness slain before he can testify

### Man accused in Macy's fraud case and a friend charged in death

By ANN MANSER
and CHRIS DONAHUE
Staff reporters

NEW CASTLE — A Macy's department store security officer was gunned down Monday morning, and police filed murder charges against a former employee at whose fraud trial he was scheduled to testify later in the day.

Kristopher E. Heath, 25, was shot several times in the parking lot outside building 13-B on Cavano Drive at Cavalier Country Club Apartments about 7:40 a.m. New Castle County police said. He died at the scene.

About a half hour later, Wilmington Police spotted a car matching the description of the gunman's vehicle, chased the two occupants and arrested both within a few blocks — one on foot and one on a public bus.

David D. Stevenson, 21, of the 200 block of W. 20th St., Wilmington, and Michael R. Manley, 22, of the 1500 block of S. 19th St., Philadelphia, were charged with first-degree murder, possession of a firearm during a felony and first-degree conspiracy.

Stevenson, who said in court documents he is a second-semester freshman chemical engineering major at the University of Delaware, and Manley, who is unemployed, were arraigned before Chief Magistrate Patricia Walther Griffin at Gander Hill Prison in Wilmington. They were ordered held without bail on the murder charges. Bail was set at $20,000 for the weapons charge and $5,000 for the conspiracy charge.

Stevenson, a former employee of Macy's at Christiana Mall, was scheduled for a Superior Court trial Monday on 18 felony charges involving a credit card scheme he allegedly operated at the store last year. Heath, an investigator for Macy's security department, was to be a witness against him.

Stevenson had been free on $3,000 bail awaiting the fraud trial.

See KILLING — A4





Kristopher Heath

David D. Stevenson

Slaying suspect David D. Stevenson waits at New Castle County police headquarters Monday.

The News Journal/BOB HERBERT

**Killing leads to arrests**

**Arrest** 7:40 a.m. Monday: Officers spot suspects' car at 20th & Washington streets.

3 Occupants flee. One is caught at 19th & Washington streets.

Other suspect is pulled off a bus at 18th & Bayard.



**1) Homicide** Man shot to death in parking lot of Cavalier Country Club Apartments

Michael Manley (left), suspect in slaying of Kristopher E. Heath, is escorted from county police headquarters by Detective Steven Scotolati.

The News Journal/GARY GARRISON

---

## Ruffled feathers, clipped wings

### Blue Hen mascot suspended for taunting middies

By TOM TOMASHEK
Staff reporter

NEWARK — YoUDee, the University of Delaware's mascot chicken, is in hot water.

At least the person who wore the costume Saturday is, after a series of taunts directed at Navy's mascot before more than 30,000 fans...

any of the remaining football games, any of the basketball games through the end of this semester and will make no other public appearances, Stoner said.

The university is also considering dismissing the person from the YoUDee program, which has four other performers who have experienced...



---

**TODAY'S WEATHER**
HIGH 46  LOW 43
Details on B2

**INDEX**
Business ............ B7
Classified ........... D6
Comics ............. D5
Crossword .......... D5
Dear Abby ......... D4
Movies ............. D4
Obituaries .......... C5
People .............. D1
Public diary ........ B2
Scoreboard ........ C2
Sports .............. C1

---

# 11th hour budget a failure

By ALAN FRAM
Associated Press

WASHINGTON — President Clinton and Republican congressional leaders failed to reach an agreement in late night talks Monday to avert a government shutdown today.

"We will in fact have to close the government," White House Budget ...

► Taxpayers will foot bill   **A5**
► Editorial: Game of chicken **A16**

Director Alice Rivlin said on ABC's "Nightline" program. "It might be one day; it might be two or three or more."

Clinton met with lawmakers for an hour and 40 minutes in the Cabinet Room at the request of GOP leaders. Senate Majority Leader Bob Dole said they "went around and around but we don't have an agreement."

Dole said the talks would continue this morning, with White House chief of staff Leon Panetta meeting with House Budget Committee Chairman John Kasich and his Senate counterpart, Pete Domenici.

It was not immediately clear how the talks would affect plans to shut much of the government because of the expiration of most of its spending authority at midnight Monday. Federal employees were told to report to work as scheduled, this morning and might not be sent home if talks are promising.

But Democratic leaders emerging from the meeting were pessimistic that a short-term extension of spending and borrowing authority could be worked out in less than 24 hours.

"There was no progress at all," said Senate Democratic Leader Tom Daschle.

Even so, Dole said, "The fact we're going to meet tomorrow is progress." House Speaker Newt Gingrich said, "We laid out in a pretty candid way where we feel different in terms of principle."

The White House meeting came after Clinton twice spending and borrowing bills, insisting that Republicans drop provisions that would raise Medicare premiums and cut education and environ...

# Heath: Macy's guard not only fraud witness

FROM PAGE A1

Deputy Attorney General Ferris W. Wharton said the state had made a plea offer of one count of felony theft and probation, with full restitution.

"Certainly he had the opportunity" to put an end to the case without the risk of jail time, said Wharton, who will prosecute both Stevenson and Manley.

"I don't know what could have been going on inside their heads," Maurer said.

Records show both Stevenson and Manley had no prior arrest history in Delaware or Philadelphia.

According to court documents, Stevenson said he was a freshman chemical engineering student at the University of Delaware. University records show him to be a second-semester freshman in the College of Arts and Sciences, without a declared major, a spokeswoman said Tuesday.

Stevenson's mother, Delphine Stevenson of Wilmington, said Tuesday she was too upset to say much about her son's arrest. But she said she did not believe he could have killed Heath.

"He is a good kid," she said. "I am so sure he is not guilty of this crime."

When first arrested on the theft case in 1994, Stevenson told authorities he had been born in Philadelphia and moved to Wilmington in 1992.

He said he lived in Wilmington with his mother and sister, Elissa. His father, Elwood Brown, lives in Philadelphia. In some records, he has used the name David Stevenson-Brown.

Wharton said authorities still have not recovered the weapon used in Monday's shooting.

He also said that there is no indication anyone other than Stevenson and Manley was involved in Heath's death.

► Staff reporter Ann Maiese contributed to this article.



## PIANO AUCTION
### NEW, USED, REPOSSESSED & SLIGHTLY DAMAGED
VERTICALS, GRANDS, DIGITALS, PIANO DISCS, PLAYER PIANOS, CHURCH & HOME ORGANS, GUITARS & KEYBOARDS
**Friday, Saturday, Sunday & Monday 12 PM-8PM**
*Warranties on all items, delivery available.*
*Cash, Check, VISA, MCard or Monthly Payments*
Auction held at **ABC PIANO DISCOUNTERS**
I-95/I-495 (Exit 11) at DEL/PA state line
For info. & directions call 302-791-9399

## Woolworth
**Buy With Confidence, Satisfaction Guaranteed**

*Super Sale*

| HEALTH | FOOD | BASKETBALL |
|---|---|---|
| **Crayola decides to drop food-scented crayons** Business, B5 | **Thanksgiving countdown** A step-by-step strategy for the big feast Pace, D1  | **76ers rally fails to stop Sonics** Sports, C1 |

# The News Journal

© 1995, The News Journal Co.    A Gannett newspaper    Wilmington, Del.    117th year, No. 223 •    40¢

New Castle County Money; 50¢ at other locations.

**WEDNESDAY** Nov. 15, 1995

**FINAL EDITION**

# Macy's mystery: what killing accomplished

By TED CADDELL
Staff reporter

▶ Heath services .......... B4

WILMINGTON — Lawyers say it was unlikely David D. Stevenson would have served prison time had he been convicted of theft in a trial that was scheduled to start Monday.

Now, Stevenson could face the death penalty.

He is charged with the Monday killing of a Macy's security official who was on his way to testify against him.

And legal observers are wondering what the former depart-

ment store employee stood to gain by silencing Kristopher Heath, 25.

According to documents in Stevenson's Superior Court trial, Stevenson told Heath and another Macy's guard, Purmuder Chona, that he committed the thefts and also admitted the crimes to a state police detective.

So even with Heath dead, there are at least two other people who heard Stevenson admit to the thefts, according to the documents.



Kristopher Heath

Stevenson's theft trial, which was postponed Monday, will go forward without Heath's testimony, authorities said.

If his murder case goes to trial, Stevenson will be the first person prosecuted in a Delaware murder case where the state could argue for the death penalty

because he killed a witness. Murder of a witness is one of the aggravating circumstances outlined in the state's death penalty code. Several prosecutors said that particular aggravating circumstance has never been used in a Delaware death penalty case.

About 30 minutes after Heath was shot in front of his Cavalier Country Club apartment near New Castle Monday, police arrested Stevenson, 21, and Michael Manley, 22, after a car and foot chase in Wilmington.

Stevenson, of the 200 block of W. 20th St., Wilmington, and

Manley, of the 4600 block of W. 19th St., Philadelphia, were charged with first-degree murder, possession of a firearm during a felony and first-degree conspiracy.

Both are being held without bail in Gander Hill prison on the murder charge.

Heath was on his way to testify in Stevenson's theft trial when he was shot.

Stevenson was working in the Christiana Mall Macy's shoe department at the time of the alleged thefts. Police said Stevenson told them he used phony credit card numbers to buy 17 gift

certificates with a total value of $4,500 because he owed gang members money and they had threatened him. An attempt last August to have all those statements kept out of evidence was unsuccessful.

"Usually you don't get to jail for something like that," veteran defense attorney Eugene J. Maurer Jr. said of the nine counts of unauthorized use of a credit card and 10 counts of felony theft that Stevenson faced. "It doesn't sound like, to a normal person, enough to set them off to kill someone."

See HEATH — A5

---

# Northeaster a lot of bluster

## Feared storm lacked a punch line

By ESTEBAN PARRA
Sussex Bureau reporter

The season's first northeaster stripped sand from beaches, temporarily isolated some shore communities and knocked out power in one limited area, but it generally wasn't the wrecking ball officials had feared.

"This has been one of the first storms that's been an 8 to 4:30 storm," joked Robert Stickels, county administrator at the Sussex County Emergency Operations Center, where he and officials followed the storm.

The storm's effects were blunted because the highest winds, about 35 mph, didn't arrive until after high tide at about noon. The moon's phase also minimized the tides.

The National Weather Service recorded .91 inches of rain at New Castle County Airport through 11 p.m. No major storm damage was reported in New Castle County.

After talking to the National Weather Service at Mount Holly, N.J., at 11:15, beach community representatives headed for home, confident the worst had past.

Some erosion was common along the Atlantic coast, but officials hope calmer tides will replenish the sand in the next few weeks, Stickels said. If not, beach communities could face problems with the next storm.

Minor damage was reported throughout the sky. A fallen tree knocked out power from 4:28 to 7:50 a.m. to more than 1,800 residents in parts of Selbyville and Frankford.

In Sussex County, the most serious flooding occurred at the Indian River inlet, where a road leading to the South Shore Marina was under 20 inches of water. Flooding was also reported in parts of Lewes and Dewey Beach on Delaware 14.

By early afternoon, the Kent County bayside communities of Woodland Beach, Pickering Beach and South Bowers were inaccessible. Roads leading to

those towns were underwater and were expected to remain so at least until low tide Tuesday night, DelDOT Central District Engineer Dennis Ho said. Waves were reported breaking on Kent 121, the only road into South Bowers.

The heavy surf drew many curious onlookers to the Rehoboth boardwalk, including Sam Knox, 67, and Gelda Knox, 62, of Greensboro, Md.

The retired couple said they drove about 50 miles just to see the storm.

"There's nothing to do out here," Sam Knox said.

▶ Dover Bureau reporter ___ Miller contributed to this story.



Sam and Nelda Knox of Greensboro, Md., braved Rehoboth Beach to take a close look at the churning sea.



A surfer tries to face the full force of the breaking surf near the Indian River bridge, Tuesday as northeast-generated winds make for going perilous.

---

# 2 sides dig in on budget

## Shutdown has Clinton, GOP at impasse

By DAVID ESPO
Associated Press

WASHINGTON — With the Smithsonian's museums shuttered and federal workers sent home in droves, idle Clinton administration and Republican leaders failed to reach accord on the budget Tuesday and sharply attacked each other over a partial government shutdown.

"At this time ... we are at an impasse," White House Chief of Staff Leon Panetta said after several hours of talks with GOP leaders ended without agreement.

With the shutdown less than one day old, however, Republicans moved to shelter certain politically popular programs.

House Speaker Newt Gingrich said legislation would likely begin moving "in the next day or two" to reopen facilities such as Social Security offices so new applications can be taken, veterans' offices, passport facilities and possibly national parks.

Both sides seemed to be digging in, though, as the overall issue of getting the entire government back into operation.

"Let's say 'Yes' to balancing

**BUDGET IMPASSE**

- Confusion marks the day in Delaware.
- Business as usual for Delaware delegation.
- National Gallery closes Vermeer exhibit.
- Stories on A3

the budget, but let us together say 'No' to these deep and unwise cuts in education, technology, the environment, Medicare and Medicaid," Clinton said in an assault on the GOP budget priorities.

Gingrich retaliated, saying Clinton was accusing the GOP of "phony cuts that do not exist." He said the president's own balanced budget proposal would perpetuate deficits forever.

---

# Toll record-keeping changes implemented

Wall Street bond

▶ 5 new toll booths sought

TUESDAY, Nov. 21, 1995

# The News Journal

A Gannett newspaper

Wilmington, Del.

117th year, No. 228

40¢
FINAL EDITION

© 1995, The News Journal Co.

**SKATING**

## Champion Grinko dies of heart attack

Sports, C1

**MOVIES**

## Hollywood presents:
A wrap-up of holiday films

Pace, D1

**STOCK MARKET**

## Dow tops 5,000 for first time

Business, E1

---

# Second Macy guard may have been target

According to New Castle County police detective Craig Weldon, the search turned up a .357-caliber revolver, a roll of duct tape bearing Heath's name and address and two other items of arms-related evidence. Steven J. Macy, a security guard.

Heath, 25, and Mitchell R. Stevenson, 21, were arrested less than 30 minutes after Heath was gunned down in front of his Cavalier County Club apartment Nov. 13. Monday, both were ordered held in Gander Hill prison until the county grand jury considers their cases. Both are charged with first-degree murder and related counts.

Heath was due to testify against Stevenson in Superior Court. Stevenson was being prosecuted for allegedly running a credit-card scam at Macy's while he worked in the women's shoe department.

Parminder Chona, Heath's supervisor, was also on the witness list and took part in the investigation. Weldon testified Monday that Chona's name and address were found in the police car used to transport Stevenson.

Weldon also said a small amount of 9 mm ammunition, and its bag number the one registered to a David Brown in Wilmington.

Weldon testified that two residents of the Cavalier complex each identified photos of one of the defendants.

One of those residents said she saw Stevenson walking away from his car, who had been shot five times.

Apartment residents who heard the shooting provided police with a description of the getaway car and its tag number. The car was registered to a David Brown in Wilmington. Stevenson

... sometimes used Brown as a last name.

Wilmington Police drove to the West 20th Street address listed on the registration in time to see the two men getting into the car. As they pulled up to the curb...

The car sped off, but stopped as other Wilmington officers arrived. Both men inside fled. One they identified as Malone, was then boarded a DART bus.

---

# Molester's presence protested

## Neighbors up in arms over Fred's Marine

(article text obscured)

---

# Budget pledged in weeks



FREE

Volume 122, Number 24

# REVIEW

250 Student Center, University of Delaware, Newark, DE 19716

Non-profit Org.
U.S. Postage PAID
Newark, DE
Permit No. 26

## REVIEW EXCLUSIVE

# Accused freshman denies murder

*David Stevenson-Brown speaks from prison on Nov. 13's brutal killing*

BY KRISTIN COLLINS
Administrative News Editor

Freshman David Stevenson-Brown says being charged with murder is "the least of my worries."

"I'm the tall thin black man struggling into the visiting room dressed in his navy blue prison uniform, clear-eyed and fresh from a workout at the Gander Hill Prison gym.

"I'm really confident about this whole case," he said calmly, speaking through glass on a telephone Monday. "[Police] don't have anything on me, to put it plain."

Stevenson-Brown, who was charged Nov. 13 with murder in the first degree, conspiracy in the first degree and possession of a deadly weapon during the commission of a felony, expressed doubt that the case would even make it to trial due to lack of evidence.

Stevenson-Brown claims he was still at his Wilmington home at 7:40 a.m. when Kristopher Heath, a Macy's security executive scheduled to testify against him in a credit fraud case that day, was shot and killed in the parking lot in front of his Christiana apartment.

"I'm not expecting to be here for life," he said in a steady, nonchalant voice. Despite his denial of guilt, he did not seem angered or upset over his incarceration. He even compared prison time in his cell of watching television. "There's really nothing I can do," he said passively.

"I'm being held on probable cause. There's no evidence," he said.

Stevenson-Brown maintained police are distributing "half-truths" in an attempt to "vilify" him in the public eye. If the police admitted their lack of evidence against him, he said, "it would look like total idiots." Despite his disillusionment with police, no anger or defiant gestures marked his speech.

He claims he was arrested simply because he fit witnesses' description of the murderer as a black man wearing dark clothes, and Michael Manley, the other man charged with Heath's murder, was arrested because of his friendship with Stevenson-Brown.

Prosecution refused to comment on whether they have any conclusive evidence that could place Stevenson-Brown or Manley at the scene of the crime.

Craig A. Weldon of New Castle County Police, however, testified at the preliminary hearing that there were two witnesses who identified photos of either Stevenson-Brown or Manley as the man they saw at the scene. One of the witnesses said she saw Stevenson-Brown walking away from Heath's body, but prosecution's case that no one witness could identify them both at the scene.

Police argued the defendants are charged based on probable cause, meaning they have gathered evidence to convince a "reasonable person" the suspects could have committed the crime in question.

Stevenson-Brown was not informed he was arrested for murder until about six hours after he was taken into police custody, he said, and he didn't learn the details of the murder until about 10 p.m. He said he "spent most of the day handcuffed to a desk."

He denied having any motive to kill Heath, saying he already "had the Macy's trial beat." Stevenson-Brown, who is accused of using customers' credit card numbers to purchase $4,500 worth of Macy's gift certificates, denied stealing any money from Macy's.

"Although Macy's lawyers" said he admitted stealing the money because he owed money to gang members, he denied any involvement in the theft. New evidence had surfaced in the case which would have exonerated him, he said, though he would not reveal what evidence he had.

"I got railroaded in that situation," he said of the Macy's trial, which he claims was no longer a concern for him. He said his employers moved him into the department where the theft was taking place to make it look as if he was the culprit.

"He said he refused the prosecution's plea offer of two years probation simply because he was innocent. "I didn't do it, so why would I take the plea?"

Stevenson-Brown gave the following account of the Nov. 13 events:

He left his house to go to court at approximately 8 a.m. and when he saw that his car — the black Ford Escort witnesses identified at the murder scene — was missing, he decided to take the bus.

Later that morning, his mother realized neither he nor his sister had the car and reported it stolen. New Castle County Police said they never received a report and Wilmington Police would not confirm whether the car was ever reported stolen.

Though he was stopped by four police officers and let go before he boarded the bus. Later, police stopped the bus and took him off, saying the best fit the description of Heath's murderer.

Though he recalled his arrest without emotion, Stevenson-Brown said he was scared because police had their guns drawn.

Manley was at a different Wilmington bus stop and was also apprehended because he fit



**Stevenson-Brown**

witnesses' descriptions, Stevenson-Brown said.

He said neither he nor Manley were in his car that day and they were never involved in the theft, a fine chance, as police have claimed.

Weldon, however, signed court documents saying he apprehended Stevenson-Brown and Manley "after a brief vehicle and foot pursuit."

Police maintain the two defendants after they spotted the car matching the description and license number witnesses gave them driving toward Stevenson-Brown's home in Wilmington.

The car refused to pull to the side and eventually ran off the road. Two men exited the car, and after a short chase during which police never lost sight of the men, Stevenson-Brown and Manley were arrested. Police said Stevenson-Brown did board a dart bus in an attempt to flee and was apprehended on the bus.

Weldon said at the preliminary hearing that he found "9 mm ammunition matching that used in the shooting in Stevenson-Brown's car which is still being held by police as evidence.

Though he said the car was stolen, Stevenson-Brown did not suspect the thief committed the murder. He said perhaps police were unsure of the car's license number and identified the wrong

see MURDER page A8

---

## Domestic partner benefits at UD

A8 ■ THE REVIEW ■ December 1, 1995

# AIDS BENEFIT

# Phatboddum

# The Verge

# Straddle

# The Knobs

# Nero

# Crambone

# DJ Spridle

# & A.O.

## Coda Tavern
Basin Rd, New Castle

(Doors Open @
6:30 PM -1:00 AM)

6:00 PM - 9:00 75 ¢ drafts



# Ski
snowboard
Only
$ 219
Winterbreak &
Springbreak

# Alleged murderer talks

continued from page A1

car as the one at the scene.

Police have never questioned either of the men regarding the case because they both invoked their Miranda right to silence.

Though he has no intention of talking to police, he spoke without hesitation through the scratched glass of the visitor's booth.

"I definitely expect to get out of here even if it goes to trial," he said of his case. "None of the Delaware lawyers are equipped to handle a murder one case."

Since the offenses with which he is charged leave him ineligible for bail, he conceded, "It does kind of look like I'm going to be here for a while."

He said right now he is concentrating on finding a private lawyer, although his family may have trouble paying the fees. They are looking at ways to get him out of prison, though he would not divulge any of his proposed strategies.

His case should come before the grand jury for approval within two weeks.

# Gov. Carpe

continued from page A1

by the Republican cuts. This credit provides a tax cut for 7.7 million low-income households with children in Delaware and, according to Carper, provides incentives for people to work instead of relying on government assistance. Carper said unfair taxes like these "sure don't make sense to me and not to most people."

Along with tax increases, the

New Ark Chorale
presents

## An Americana Christmas
conducted by
Michael Larkin

Saturday, December 9, 1995, at 7:30 p.m.

Newark United Methodist Church, 69 East Main Street
Tickets $7, $5 students & seniors
For info, call 368-4946

## UNIVERSITY FACULTY SENATE
## SUMMARY OF AGENDA
### DECEMBER 4, 1995

I.    ADOPTION OF THE AGENDA

II.   APPROVAL OF THE MINUTES:
        November 6, 1995

III.  REMARKS BY UNIVERSITY PROVOST SCHIAVELLI

IV.   ANNOUNCEMENTS:   Senate President Hall

    1.    Approval of the proposal to designate concentration titles for all students within the M.F.A. in Theatre Program and to include that designation on their transcripts

V.    OLD BUSINESS

# Fate of 2 in jury's hands in killing of Macy's worker

## Prosecutors seek death penalty; deliberations to resume today

**By DON MARSHER**
Staff reporter

WILMINGTON — Exactly one year after Kristopher Heath was gunned down on his way to Macy's in a co-worker's theft trial, a jury is deciding whether that co-worker

But one of Macy's attorneys, Anthony A. Figliola Jr., said this client had no motive to kill Heath. He said Stevenson's car was undoubtedly at the apartment that morning, and that Macy might also have been there, but that no witnesses identified Macley as the

whose testimony was contradicted by other witnesses, said she saw Stevenson running with a gun.

"Just being there [at a crime scene] does not make you guilty," said Michael Macley was just there," Figliola said. "To come here and convict two men when only one is guilty is wrong.

The woman who identified Stevenson as the gunman was "clearly mistaken," said one of his attorneys, Timothy Weiler. He called her testimony "a last-ditch

"He was shot down in cold blood because he was doing nothing more than his job."

**Deputy Attorney General Ferris W. Wharton**



Stevenson        Macley

effort by Mr. Macley's attorneys to confuse you."

Weiler noted that no evidence showed that Stevenson, a University of Delaware freshman at the

intended that Heath should be killed. He told jurors the evidence should mean "at a minimum, reasonable doubt."

Neither defendant testified dur-

WEDNESDAY, NOV. 13, 1996   THE NEWS JOURNAL

# Fate of 2 in jury's hands in killing of Macy's worker

## Prosecutors seek death penalty; deliberations to resume today

By ANN MANSER
Staff reporter

WILMINGTON — Exactly one year after Kristopher Heath was gunned down on his way to testify in a co-workers' theft trial, a jury is deciding whether that co-worker and another man are guilty of his murder.

In their final arguments to the Superior Court jury Tuesday, prosecutors asked the jurors to convict David D. Stevenson and Michael



R. Manley, longtime friends now both age 22, of first-degree murder. The jury deliberated about an hour Tuesday afternoon and will resume its discussions today.

Kristopher Heath

The two men are accused of killing the 25-year-old security officer for Macy's department stores in the parking lot of the Cavalier Apartments complex Nov. 12, 1995. Heath investigated thefts Stevenson was charged with committing while working in the chain's Christiana Mall store in 1994 and was scheduled to testify against Stevenson on the day he was killed.

Prosecutors contend Stevenson drove to Heath's apartment and helped plan the killing, while Manley was the triggerman. Both men are charged with the same offenses and face the death penalty.

"He was shot down in cold blood because he was doing nothing more than his job," Deputy Attorney General Ferris W. Wharton said Tuesday.

Wharton and co-prosecutor Robert H. Surles reviewed the evidence against Stevenson and Manley, including witnesses who saw Stevenson's car fleeing the shooting scene. They also reminded the jury that police traced the car to Stevenson's West 20th Street home in Wilmington and arrested both defendants within a half-hour of the shooting after the pair fled in the car and on foot.

When police searched Stevenson's car, they found an Army camouflage jacket wrapped around 9mm ammunition, which matched the shells found at the shooting scene. The jacket was for someone of the same military rank and size as Manley, who was in the Army Reserve.

"It's not much of a whodunit," Surles said of the case.

## Del. man indicted in bomb scare

### Josephson said he had explosives on plane

From wire and staff reports

A federal grand jury in Dayton, Ohio, on Tuesday indicted an Ontario man for a bomb scare that forced the emergency landing of a jetliner last month.

Lee Robert J. Josephson, 22, of the 200 block of Maple Ave. was indicted on one count of endangering an aircraft by communicating information he knew to be false.

The indictment alleges Josephson made one or false statements and that he had knowledge of the presence of explosives aboard an aircraft...

But one of Manley's attorneys, Anthony A. Figliola Jr., said his client had no motive to kill Heath. He said Stevenson's car was undoubtedly at the apartments that morning, and that Manley might also have been there, but that no witnesses identified Manley as the gunman. One neighbor, much of whose testimony was contradicted by other witnesses, said she saw Stevenson running with a gun.

"Just being there [at a crime scene] does not make you guilty, and Michael Manley was just there," Figliola said. "To come here and convict two men when there's a guilty, is wrong."

The woman who identified Stevenson as the gunman was "clearly mistaken," said one of his attorneys, Timothy Weiler. He called her testimony "a last-ditch"




"He was shot down in cold blood because he was doing nothing more than his job."

Deputy Attorney General Ferris W. Wharton



Join our savings celebration!
New store. New bargains.



Marshalls
Grand Opening Weekend
Starts Saturday at 10:00AM
in Concord Square Shopping Center.



Why pay 20%-60% more at the department stores? You'll always find brand names for you, your family and the home.

FREE!




effort by Mr. Manley's attorney to confuse you."

Weiler noted that no evidence showed that Stevenson, a University of Delaware freshman at the time, ever owned or fired a gun or intended that Heath should be killed. He told jurors the evidence should raise "at a minimum, reasonable doubt."

Neither defendant testified during the two-week trial.

**16**

**1995**

...withdrawn by South Africa, the United States, Canada and several European nations. Nigeria became the first nation ever to be suspended by the 52-member British Commonwealth.

But the multinational company announced it would continue its investment in Nigeria, where it pumps more than a quarter of a billion barrels of oil a day. Then the company added insult by blaming defendants who were sent to their death on orders of a kangaroo court answering to a harsh and corrupt military dictatorship.

If Shell or other companies fail to accept responsibility for propping up this oppressive regime, fail to compensate the region for the fouling of land and water, and the military dictators refuse to make way for democracy, the United States and other democratic governments must take the case to the United Nations.

The State Department should seek U.N. sanctions against Nigeria and any private companies, including Shell, that continue to do business with the regime. If the Nigerian people are ever to have a measure of democracy, the U.N. sanctions must target the oil exports that keep the military bosses in power.

---

**FAST WORK**

# Police deserve credit for fast, efficient arrest of two murder suspects

New Castle County's two major police departments worked quickly, cooperatively and efficiently to apprehend two suspects in the gruesome, execution-style slaying of Kristopher Heath, a security officer at Macy's.

The police were assisted by alert citizens who carefully noted what the suspects looked like and provided a description of the car and its license number. But it was the New Castle County's use of that information that traced the address to the city of Wilmington. They broadcast the descriptions and other information to area police.

Within a half hour of the murder, Wilmington police spotted the car and apprehended the two suspects.

It was crack police work all around. There was good communication. There was rapid response. And, perhaps most important, no innocent person was injured during the pursuit — even when Wilmington officers had to take one suspect from a DART bus.

People are quick to criticize police when they make the slightest mistake. We should all be just as quick to congratulate police officers when they do an exceptional job. Most cases aren't this dramatic, but police officers respond efficiently and effectively to similar dangers every day.

**WHERE WE STAND**

All citizens should applaud the cooperative effort of alert citizens and the New Castle County and Wilmington police in apprehending two suspected cold-blooded killers.

**WHAT SHOULD BE DONE**

Drop a congratulatory note to Chief Prather in Wilmington and Chief Gordon in New Castle County.

---

**The News Journal Editorial Board**

W. Curtis Riddle, John H. Taylor Jr., Colin M. ...

---

...in the good community.

In protest against the hurried executions, ambassadors were...

Letters to the Editor

We should teach our youth to be responsible and correct their desired ideals; not politely, in a friendly manner. Should the business person not respond favorably, the youth should say thank you and leave.

The adults of the Young Ladies of Northside should be acting in a more responsible manner in teaching the youth on how to respond to a negative action to their request for funds.

Using duress is not the answer. Using the young people in the matter was morally wrong.

**John A. Smith**
Milton

## Increase $2,500 tax exemption to $9,000

Steve Forbes advocates a flat tax plan that exempts $36,000 for families of four from income tax. That amounts to $9,000 for each individual. Indexing the old 1950 $600 exemption also yields $9,000 today!

The Republican proposal of a $500 credit for each child equates to an exemption of $3,333 which, when coupled with the current $2,500, would adjust the exemption for children to only $5,833. Why not adjust the exemption to $9,000 as Forbes proposes? Families are overtaxed.

The Forbes proposal is inequitable; it ignores charitable and local tax deductions. Retaining the present tax system but "adjusting" the $2,500 exemption to $9,000 is the correct remedy.

**Joseph F. Armstrong**
Wilmington

## Battaglia's record is merely blemished

The matter of Basil Battaglia and the turnpike tolls should be put in perspective.

It would appear that using toll plaza reserves to cash personal checks and, in some instances, later returning the cash and reclaiming the checks, is not a violation of any specific law. It was, at most, an irregularity and obviously not a good practice.

Most bad practices are bad for the reason that extension of the practice could have undesirable results. That is exactly the situation here. Suppose that other officials of the turnpike made a habit of doing what Mr. Battaglia did; the consequences would undoubtedly be devastating to good management and to good accounting.

None of the foregoing presupposes or presupportes anyone's honesty. All of the evidence far exceeds indicates clearly that there was no dishonesty on the honest part of Mr. Battaglia. That he was morally wrong...

## E Pluribus forget abo...

The official ... the United St... banner in tho... eagle, and the bl... "E Pluribus Un... the motto" is no...

Declaring Engli... language would... ary of this mott...

"Out of many... culture," one sai...

The suggesti... cial language is... founding fathers... and rejected it... want to disenfr... man-speaking p... sylvania.

The current... spite its noble r... so subtle attemp... chise many Spa... taxpaying citiz... rhetoric and the... same as literac... disenfranchise b... generations. I...



Now t...
your ...

The News Journal let...
ters. For verifi...
should be signed...
your home addre...
time telephone nu...
all letters for iden...
Send your le...

Letters to the E...
Box 15505
Wilmington, De...

FAX (302) 324-...
TTD: (302) 324-...

MAKE ...



According to Capt. Jim Flatley of University Police, the student, who was pledging a sorority during 1994 Spring Rush, reported in May 1995 that she had been forced to engage in sexual intercourse with an individual. Several suspects are under investigation in connection with the incident, he said.

The unidentified suspects are fraternity brothers, Flatley said, and the university is currently investigating the matter. Flatley would not reveal which fraternity was involved.

Brooks would not comment on whether or how the alleged sexual assault is linked to the hazing incident.

No charges or lawsuits have been filed, Brooks said, but criminal charges by the university police are pending against the men involved.

National Sigma Kappa refuses to make a statement at this time.

"I hope the other chapters on campus understand the National takes this very seriously," Cook said. "I hope everyone is able to learn from a very unfortunate incident."

see SIGMA KAPPA page A5

— INDEX —
Campus Calendar ..................A2
Police Reports .....................A2
World News ........................A2
Editorial ............................A3
Comics ..............................A10
Classified ..........................B5
Sports ...............................B6
.........................................B10

— Also inside: —
Will English be official? .....A3
New housing options...........A4
Turkey Trot .......................A4
Madonna ...........................A5
.........................................B2



New emissions tests in Delaware, A3

# Freshman held after preliminary hearing

**BY KRISTIN COLLINS**
*Administrative News Editor*

David D. Stevenson-Brown (AS FR) and Michael Manley, the men charged with last Monday's murder at Cavaliers Country Club Apartments in Christiana, were bound over for a grand jury hearing after their preliminary hearing yesterday morning, New Castle County Police said.

The two men were arrested and charged with the murder of Kristopher Heath, 25, a Macy's security executive scheduled to testify against Stevenson-Brown in court that day, after witnesses identified their car leaving the scene of the shooting.

Police caught them shortly after the 7:40 a.m. murder in a car registered to Stevenson-Brown's home that matched witnesses' descriptions. They were apprehended after a short chase.

Police detectives presented evidence in Monday's preliminary hearing in Superior Court against the two defendants to prove a trial was warranted.

The evidence must convince a "reasonable person" that the defendants could have committed the crime with which they are charged, patrolman Pat Crowell said.

Stevenson-Brown and Manley will go next to a grand jury hearing in which a jury of 12 citizens will hear the evidence and determine whether it is sufficient to send the

see MURDER SUSPECT, page A5

Kirchman considers the College of Marine Studies the guinea pigs for the new system because all of the classes taught on the Newark campus now use the ITV system. Other departments that use the system on

using the ITV system.

"I can show pictures in books, and compute simulations with my laptop, and it will be broadcast over the television," Kirchman said.

make it more successful and advertise more to make it the university program.

---

ty's current, was given a chapter, Brooks choose to be status or join

se on Haines sisters, Brooks

ons are met, the will restore the apter in 1997. R), president of

Inter-Fraternity Council, said that without knowing the details of the hazing incident, he is "not in a position to judge. But the Greek community is certainly saddened by the loss of one of our traditionally strong sororities on campus."

Brooks said Sigma Kappa National will participate in anti-hazing programs at the university later in the year. "The university is deeply concerned about any hazing that might occur on this campus," he said.

---

# Turkey trotters strut in 22nd annual run/walk

BY ANGELA ANDRIOLA
*Staff Reporter*

At 10:00 a.m. Saturday morning children, parents and grandparents could be seen trotting and panting with their breath visible in the almost freezing November air.

What could be a better reason for these men and women of all ages to compete against each other than Newark's 22nd annual Turkey Trot Race which commenced from the Norma B. Handloff Park on Barksdale Road.

The event included a 5K run at 9:30 a.m., a 5K walk at 9:31 a.m. and a 10K run at 10:00 a.m.

Each of the three races consisted of men's and women's age divisions with the youngest category being 15 years of age and younger.

According to a spokesperson from the Newark Department of Parks and Recreation, the oldest award recipient was 70 years old.

Awards were distributed directly after the races to the overall male and female

performance in each race, the top three finishers in the 10K and 5K runs and the top three finishers in the 5K walk.

Those participants who received awards could be seen walking away with a trophy in hand as recognition of their hard work, determination and cold bodies.

Unfortunately, the cold weather and early morning hours did not attract a large number of spectators.

However, the cold weather didn't stop Robert Taylor (BE FR) from showing up to support his 16-year-old brother in the 5K run.

"Better him than me," Taylor said. "I wouldn't be able to run the race in such cold weather."

Delaware's second oldest consecutively run race was coordinated by the Department of Parks and Recreation with sponsors and contributors from several local businesses including Rainbow Records and TCBY Yogurt.

---

AL
ALL
'S SHOW

ription

EMBER 25 & 26,

ird Campus
d.), Newark
.m.

dren under 12 are free)
unity and to Exhibitors

ust show UD ID's for

NDAR!!

---

# Murder suspect

continued from page A1

defendants to trial. If the grand jury deems the evidence sufficient, they will issue an indictment and the two will go to trial.

Crowell said the hearing could happen as soon as next week, although he would not speculate if or when they would actually come to trial. He said many legal delays were possible.

The two men are charged with murder in the first degree,

possession of a deadly weapon during the commission of a felony and conspiracy in the first degree.

Crowell said first-degree murder is a non-bailable offense, so both prisoners will be held without bail until the conclusion of their trial.

Both men are being represented by a public defender. If convicted of first-degree murder, Crowell said they will face life imprisonment at best and the death penalty at worst.



# HOW TO USE THE BATHROOM.

# Witnesses describe car like suspect's at scene

BY ANN HARNEY

WILMINGTON — A car seen being one owned by David B. Stevenson was seen outside Kristopher Heath's apartment building near the time Heath was gunned down in the parking lot Nov. 15, several witnesses testified Thursday in Superior Court.

Several of Heath's neighbors at Cavalier Country Club Apartments near New Castle testified in the capital murder trial of Stevenson and Michael R. Manley about seeing the car that morning. One man said he saw it waiting in the apartment parking lot about 40 minutes before the shooting. Another got the car's license number, which police traced to Stevenson.

In a case a prosecutor has described as "a frontal assault on the criminal justice system," Stevenson and Manley, childhood friends now both 22, are charged with conspiring to kill Heath to prevent him from testifying against Stevenson in a theft trial. Heath, a 25-year-old security officer for Macy's department stores, had investigated the thefts Stevenson was accused of committing while he worked in the chain's Christiana Mall store in 1994. Prosecutors are seeking the death penalty for both men.

Prosecutors believe Stevenson drove Manley to the apartment complex that morning and that Manley fired five shots, killing Heath as he stood beside his Jeep Wrangler about 7:40 a.m.

One neighbor, Michael Chandler, said Thursday he noticed a car parked near his when he left for work around 7 a.m. the day of the shooting. He said two black men whom he could not identify,

were in the car.

It isn't just the commuting nature of Manley's testimony, it's suspicious.

Chandler described getting into a police car, seen later from his rearview mirror. Stevenson's car had a similar same when it was seized after Stevenson's arrest, police said. Another neighbor, Laura Thompson, testified that she got the car's tag number as it left the parking lot, wrote it down and gave it to police.

Two other neighbors described seeing "dark" men wearing a blue jacket or shirt who ran past their windows immediately after the shooting.

By about 90 minutes after the shooting, police had traced the car's tag number to Stevenson's address on West 20th Street in Wilmington and arrested both men after a short car and foot chase.

Also Thursday, a Bureau of Alcohol, Tobacco and Firearms agent testified that tests done on Stevenson's and Manley's hands did not show signs of gunshot residue. But, the agent said, such residue often disappears from a person's hands even if he recently fired a gun.

A blue jacket the police sent to the ATF for testing had did have residue on a sleeve and a pocket, the agent said.

Defense attorneys have said that character witnesses will testify during the trial about Stevenson, a University of Delaware freshman at the time of the shooting, and Manley, a Philadelphia high school honors graduate and Army reservist. Neither man had a criminal record other than Stevenson's theft charges.

Thomas A. Foley, one of Manley's attorneys, said his alleged involvement in the killing "defies logic and common sense."



Manley




Stevenson



# CHRISTIANA WEIGHT LOSS CENTER

Oscar E. Galvis M.D.

The weight loss plan that takes the weight off & keeps it off. Combines medication, exercise and a sensible diet.

Using safe FDA Approved medication · As seen on TV and reported in the Wall Street Journal & New York Times

ANNOUNCING OUR NEW LOCATION

302-369-2345

10% OFF INITIAL VISIT USING THIS AD

Sleep

90 DAYS SAME AS CASH!

1/3 of your Life



FREE DELIVERY FAST & FREE PLUS REMOVAL OF ALL PACKING MATERIALS

Better Savings, Better Bedding



FREE BEDFRAME

FREE SETUP & REMOVAL

$369

$549

FOCUS - 16 of 27 DOCUMENTS

Copyright 1995 RTV
Radio TV Reports

**SHOW:** ACTION NEWS; WPVI; Philadelphia

November 20, 1995 6:00am; ET

**NETWORK:** ABC

**MEDIUM:** Television

**TYPE:** Local

**LENGTH:** 3960 words

**ANCHOR:** Rick Williams and Monica Malpass

**BODY:**
Weather.

The partial shutdown of the government is over for now. CONGRESS and the President have agreement on a temporary spending measure but the final federal budget is still up in the air. (C) GOP LEADERS making the announcement yesterday.

LIBERTY BELL at INDEPENDENCE MALL will open again. (C) INDEPENDENCE MALL. (C) Budget agreement.

A one car fatal accident has occurred in BORDENTOWN, NJ. (C) Scene of accident.

Roy Evans of BALTIMORE died of a heart attack in the PHIL MARATHON yesterday he was preannounced dead at ROXBORUGH HOSPITAL. (R)

A early morning blaze is being called arson in QUEENVILLE SECTION of PHIL. (R)

A retired fire fighters and his wife are in the hospital after a fire in their CAMDEN home. (C) Scene of fire in BROOKLYN NJ in which the couple was cleaning their oven and accidental grab a flammable cleaner instead of oven cleaner but have been taken to COOPER MEDICAL CENTER.

Officials are trying to identified a woman after a fire broke out in her CENTER CITY apartment, the woman is in critical condition in ST AGNES MEDICAL CENTER. (C) Scene of fire.

5:35 AM

Jury deliberations continue in the mob trial of John Stanfa and his associates. (C) Stanfa.

It is a day in court for **Michael Manley** and David Stevenson as the two are accused of killing 25 year old Christopher Heath, a MACYS security guard who was going to testify against Stevenson. (V) Photo's of Manley and Stevenson.

A former unidentified bank employee goes on a shooting spree in OH which ends with four people being killed. (R)

Over the weekend FEDERAL OFFICIALS have relaxed some security measures at the airports. (C) PHIL INTERNATIONAL AIRPORT showing travelers at the US AIR counter.

5:40 AM

The Bosnia peace talks have ended in DAYTON OH. (C) Peace talks in OH.

It looks as if Alexander Keynestski has become Poland's next President. (C) Election in Poland.

Former NJ Governor Tom Kean is expected to be home for the Thanksgiving holiday at being released from MORRISTOWN MEMORIAL HOSPITAL. (C) Kean at his office at DREW UNIVERSITY.

Space shuttle ATLANTIS is schedule to land in FL. (C) Pictures from ATLANTIS.

Weather.

5:45 AM Commercial Break.

Traffic check.

Sports. Eagles highlights courtesy of FOX. NFL scoreboard. Flyers highlights courtesy of PRISM. The PHILADELPHIA MARATHON was a big success yesterday with Mark Chapel winning the race for the man and Gene Peterson for the women. NORTHWESTERN is ranked 4th in this weeks AP COLLEGE POLL. Steffie Graf wins the W.T.A. CHAMPIONSHIPS.

Officials in GARY ID want to turn Michael Jackson's boyhood home into a tourist attraction. (C) Jackson.

5:50 AM Commercial Break.

Weather.

The government has reached a compromise in the budget battle. (C) GOP LEADERS making the announcement.

A deadly one car crash has occurred in BORDENTOWN NJ. (C) Scene of accident.

Jury deliberations will continue in the mob trial of John Stanfa. (C) Stanfa.

The music and dance of PUERTO RICO will be celebrated at ROBERTO CLEMENTE MIDDLE SCHOOL in NORTH PHIL tonight. (C) Calendar.

5:55 AM Commercial Break.

The price of gasoline continues to drop. (R)

Stocks. Weather.

6:00 AM Commercial Break.

ACTION NEWS; WPVI; Philadelphia Radio TV Reports November 20, 1995

Weather.

It's back to work for the government with a temporary budget agreement. (C) President Clinton making the announcement. (C) Tour guides will be back on the job in PHIL at the LIBERTY BELL.

Results of Bosnia peace talks will be known this morning. (C) Talks in DAYTON OH.

A fatal one car accident occurred in BORDENTOWN NJ. (C) Scene of accident.

A fire in PHIL officials are calling arson as all occupants of the home are in ST AGNES HOSPITAL. (R)

A unidentified woman is in ST AGNES HOSPITAL after a fire in her CENTER CITY apartment. (C) Scene of fire.

A accidental fire has occurred in BROOKLYN NJ as a couple was trying to clean the oven. (C) Scene of fire.

6:05 AM

Jury deliberations continue in the mob trial of John Stanfa. (C) Stanfa.

Philip Daiquiri is set to go on trial today on charges of beating two men to death in is NORTHEAST PHIL apartment. (C) Daiquiri.

A man has been arrested after a shooting spree in OH leaving four people dead including a 4 month old baby. (R)

In ADDISON ILL three people are charged with murdering a woman and her two children and then removing a fetus from the unidentified woman. (C) Outside of DURAFE COUNTY JAIL.

In LA CA the Mendenz brothers trial is suppose to rest today. (C) Lyle Mendenz in court.

Prosecutor Christopher Darden is schedule to speak at the MERION THEATER in PHIL tonight. (C) Darden.

Weather.

6:10 AM Commercial Break.

Traffic check.

Sports. Eagles highlights courtesy of FOX. NFL scoreboard. Flyers highlights courtesy of PRISM. PHILADELPHIA MARATHON was a success with Mark Andrews and Gene Peterson winning. BALTIMORE wins in the CANADA FOOTBALL LEAGUE. Boris Becker wins the ATP CHAMPIONSHIP. Calcavecchia and Elkington win the SHARK SHOOTOUT.

Weather.

6:15 AM Commercial Break.

The government is back in business. (C) President Clinton making the announcement.

A CAMDEN COUNTY couple is critical burned after a mix up with a oven cleaner causing a fire in their home. (C)

ACTION NEWS; WPVI; Philadelphia Radio TV Reports November 20, 1995

Scene of fire.

Christopher Darden is schedule to speak at the MERINO THEATER tonight. (C) Darden.

A HEALTH SCREENING FAIR will take place at GREATER ST MATTHEW INDEPENDENT CHURCH in WEST PHIL. (C) Calendar.

6:20 AM

DUPONT has agreed to join a 950 million dollar settlement regarding leaky pipe fittings. (R)

Stocks.

Weather.

6:25 AM Commercial Break.

Fans can get their hands on the new BEATLES ANTHOLOGY CD tomorrow.  (C) Inside UNITED PARCEL SERVICE who delivered the CD'S.

The new BEATLE song called FREE AS A BIRD was heard last night on ABC. (C) BEATLES ANTHOLOGY.

JAMES BOND GOLDEN EYE was number one at the box office. (C) Clips of GOLDEN EYE. (C) Number two was ACE VENTURA, and number 3 was THE AMERICAN PRESIDENT.

6:30 AM Commercial Break.

Weather.

The government is back to work with an agreement on a temporary budget. (C) Leaders making the announcement. (C) LIBERTY BELL will reopen today.

Three people remain at large in connection with the beating and stabbing of a man in OLNEY PHIL with the victim at EINSTEIN MEDICAL CENTER. (C) Scene of beating.

A man running in the PHILADELPHIA MARATHON is dead today after suffering from a heart attack. Roys Evans was taken to ROXBORUGH MEMORIAL HOSPITAL were he was DOA. (R)

A fatal one car accident occurred in BORDENTOWN NJ. (C) Scene of accident.

An arson fire in PHIL has left three people in the hospital. (R)

A mix up in cleaning products has sent a CAMDEN NJ couple in the hospital after a fire broke out. (C) Scene of fire in BROOKLYN NJ.

6:35 AM

Officials are trying to identified a woman critical burned when fire broke out in her CENTER CITY apartment. (C) Scene of fire with the victim in ST AGNES HOSPITAL.

ACTION NEWS; WPVI; Philadelphia Radio TV Reports November 20, 1995

David Stevenson and **Michael Manley** will be in court for shooting a MACYS security guard, Christopher Heath, outside of his NEWARK DE apartment. (V) Photo of Stevenson and Manley.

Philip Daiquiri will go on trial for beating two men with a baseball bat in his NORTHEAST PHIL apartment. (C) Daiquiri.

Jury deliberations continue in the mob trial of John Stanfa. (C) Stanfa.

6:40 AM

Federal officials are easing the security restrictions at the nations airports. (C) Travelers at PHIL INTERNATIONAL AIRPORT.

Christopher Darden will speak at the MERINO THEATER in PHIL tonight. (C) Darden.

Delaware Valley residents with links to the MAYFLOWER celebrated an early Thanksgiving yesterday in BRYN MAWR, PA. (C) Celebration.

Weather.

6:45 AM Commercial Break.

Traffic check.

Word will come in a few hours as to whether the Bosnia peace talks have been a success in DAYTON OH. (C) Talks going on in OH.

The death toll stands at 15 in the car bombing in ISLANABAD, Pakistan with the PARTY OF ISLAM is claiming responsibility. (C) Scene of bombing.

The Israel cabinet has announced a crack down on right winged groups. (C) Amir accused of killing Yitzhak Rabin being arrested.

Alexander Keynestski looks as if he will be Poland's next President. (C) Keynestski.

6:50 AM Commercial Break.

HOLIDAY BEAUTY TIPS will be offered at ATLANTIC CITY PUBLIC LIBRARY. (C) Calendar.

Weather.

Sports. Eagles highlights courtesy of FOX. Flyers highlights courtesy of PRISM. PHILADELPHIA MARATHON was a success yesterday. Miami and the 49ers will play on MONDAY NIGHT FOOTBALL. Yankee's first baseman Don Mattingly is considering retiring.

HAHNEMANN UNIVESITY HOSPITAL's Fran Grabowski says most people do not eat lunch anymore and you need to. (C) Man eating pizza with TASTYKAKE'S LOW FAT KRIMPETS. (C) Cover of book called LOW-FAT LIVING FOR REAL PEOPLE by Grabowski.

6:55 AM Commercial Break.

ACTION NEWS; WPVI; Philadelphia Radio TV Reports November 20, 1995

Traffic check.

Weather.

It's back to work for Federal employee after a temporary budget agreement. (C) GOP making the announcement.

Arson is to blame for a fire in PHIL. (C) Scene of accident.

Christopher Darden is to speak tonight at the MERINO THEATER. (C) Darden during the Simpson trial.

A baby rhino named Boo is saying good bye from the COLORADO SPRINGS ZOO and is going to SOUTH DAKOTA. (C) Black rhino.

**LOAD-DATE:** November 22, 1995

FOCUS - 17 of 27 DOCUMENTS

Copyright 1995 RTV
Radio TV Reports

**SHOW:** Action News; WPVI-TV; Philadelphia

November 20, 1995 6:00pm; ET

**NETWORK:** ABC

**MEDIUM:** Television

**TYPE:** Local

**LENGTH:** 1693 words

**ANCHOR:** Jim Gardner

**BODY:**
(T) It's back to work for federal employees........a joint effort to help the less fortunate enjoy a happy Thanksgiving.

Reporter Joe Torres in (C) Gloucester City, NJ says 71 year old (V) Vera Hummel, a crossing guard, was struck and killed by a car at (C) Market Street and Sykes Avenue in a freak accident. (SB) Christine Dooley she wasn't ready to go--she wasn't supposed to. (SB) Kristi Lynn Kuhn says I still can't believe it. Hummel accidently stepped back into traffic on Market Street; the morning sun blinded the driver of an oncoming car. Wendy Burrows was charged with careless driving. (SB) Joe Heintz says I saw her today, right before she died. (SB) Billy Rowand says she used to say how was your day. (SB) Barbara Kuhn says she wanted to do something for kids. (SB) Chief Ted Howarth says she's surely going to be missed.

Agnes Beers was killed, and her passenger, Tina Beers was injured when their car collided with a tractor trailer on (C) Route 63 in Millford Township.

Today there is word that Paulene Tarlton has died from injuries sustained in the crash of an ambulance. Her daughter was killed at the scene.

6:05 Time Check

The entire court trying the case of (C) Michael Graham traveled to the scene of a fatal crash on (C) I-95. Graham is accused of driving while impaired with alcohol and cocaine on the day he crashed his SEPTA paratransit van over the median, landing on the top of another car, and killing (V) Catherine Sweeney, and critically wounding her sister, (V) Kelly Sweeney. Graham claims the vehicle had mechanical problems.

It is day five of jury deliberations of the racketeering, murder, and kidnapping trial of reputed mob boss (C) John Stanfa and seven of his associates without a verdict.

Reporter Lauren Wilson says a hearing was held for (V) David Stevenson and (V) **Michael Manley,** who are accused of the murder of (V) Christopher Heath outside the (C) CAVALIER COUNTRY CLUB APARTMENTS in Newark, DE. Heath was a member of the security staff of MACY'S DEPARTMENT STORE. (SB) Ferris Wharton says there is

Action News; WPVI-TV; Philadelphia Radio TV Reports November 20, 1995

evidence that these people were involved in it. (SB) Unidentified man says I just can't believe it.

Federal employees have been ordered back to work. Park rangers unlocked the doors to the (C) LIBERTY BELL PAVILION and other historical sights.

Reporter David Murphy says federal employees weren't complaining. (SB) Cynthia Miraglia says especially with the holidays. (SB) Ed Horan says some offices, the schedules are backed up 30 days. (SB) Eric Watson says twice. (SB) Donald Hodge says I couldn't get in here because it was closed. (SB) Unidentified man says I agree with the president. (SB) Darlene Cosby says hopefully we won't be going through this next month.

Close to 700 people demonstrated at the (C) State House in New Jersey over proposed cuts in welfare.

In (C) Harrisburg, a demonstration was held in favor of school choice. It was sponsored by the REACH ALLIANCE and the KEYSTONE COALITION FOR EDUCATIONAL REFORM.

The Pennsylvania HOUSE turned down a bid to outlaw the pigeon shoot in (C) Hegins.

CONSERVATION SECRETARY (C) John Oliver announced that the state would kick off a 100 million project to improve more than 100 state parks.

(T) The Eagles.........weather........Don Polec's World.

6:11 pm........Commercial break

(C) Senator Arlen Specter says he is staying in the race for President during a visit to York.

State Senator (C) Mike Fisher announced that he will be running for Pennsylvania Attorney General.

Reporter Cathy Gandolfo in (C) Chester, NJ says 250 eligible residents received Thanksgiving turkeys at the GOOD SAMARITAN CENTER. (SB) Arnold Barfield says no jobs in the city. (SB) Etula Boggs says I'm very happy. (SB) Laurin Stahl says I believe there will be a 30% cut in federal funds. (SB) Betty Mendez says a lot of companies are downsizing.

For the 12th year in a row, the Korean and African-American communities joined together to donate food baskets for more than 450 needy families.

Patrol officers from the (C) Southwest Police Division and employees from the PHILADELPHIA FEDERAL CREDIT UNION teamed up to deliver food baskets.

6:17 pm........Commercial break

Sports - Scott Palmer

The Eagles-Giants football game. The Eagles won.

The Redskins game.

The Flyers-Canuks hockey game. The Flyers won.

Golf - the Field Contest.

Action News; WPVI-TV; Philadelphia Radio TV Reports November 20, 1995

The 19th police district rolled out two new off-road police motorcycles. They were donated by POLICE ATHLETIC LEAGUE board member Ron Cranzer.

6:21 pm........Commercial break

Accu-Weather - Dave Frankel

Don Polec's World

June Knight won a chance to put her husband's picture on a (C) billboard over I-95. (SB) Richard Knight says I had no idea. (SB) June Knight says he's my hero and this is his 15 minutes of fame. (SB) Richard Knight says next think I know we're up on a billboard. (SB) Richard Knight says I don't think they can hack it for a whole month.

(T) Monday night football.

**LOAD-DATE:** November 22, 1995

FOCUS - 22 of 27 DOCUMENTS

Copyright 1995 RTV
Radio TV Reports

**SHOW:** ACTION NEWS; WPVI; Philadelphia

November 14, 1995 6:00am; ET

**NETWORK:** ABC

**MEDIUM:** Television

**TYPE:** Local

**LENGTH:** 4120 words

**ANCHOR:** Rick Williams and Monica Malpass

**BODY:**
A major Nor'easter is on it's way. (C) ATLANTIC CITY NJ getting ready for the storm with the moving of sand. (C) Weather.

The government is partial shutdown this down this morning. (C) Last night at the WHITE HOUSE with leading Congressmen meeting with the President to try to work out a short term spending bill with no luck. (C) Shutdown plans.

5:35 AM

Military Veterans could be one of the first to feel the effects of the government shutdown with no disability checks. (C) Veterans last night in COBBS CREEK. (C) Outside of the GREEN FEDERAL BUILDING in PHIL which employees over 800 federal employees.

A man is clinging to life in CHRISTIAN HOSPITAL after getting hit by a car while crossing I-95 in NEW CASTLE CO, DE. (C) Accident scene.

A domestic dispute has cause a stabbing in WEST PHIL. (C) Scene of the stabbing with the victim at UNIVERSITY OF PA HOSPITAL.

Robbery is believe to be the reason for a overnight stabbing in CAMDEN. (C) Scene of stabbing with the victim at COOPER MEDICAL CENTER.

PA gets ready for the execution of George Edwards schedule for tonight. (C) Harris Marty Gram coming into jail as the Governor has sign his death warrant yesterday.

Friends of a WEST PHIL grocery man shot and killed in WEST PHIL continue to leave flowers outside of Milton Wilkes store. (C) Flowers outside of the unidentified store.

Chris Heath, a security executive for MACYS, is dead after being shot down outside of his CALVARY COUNTY

ACTION NEWS; WPVI; Philadelphia Radio TV Reports November 14, 1995

CLUB APARTMENTS as he was about to testify against a MACYS employee for fraud. (C) Scene of shooting in NEWARK DE. (V) Photos of suspects David Stevenson and **Michael Manley.** (C) Outside of MACYS in DE were Stevenson has worked while a student at the UNIVERSITY OF DE.

Glen Rogers, a suspected serial killer, has been arrested in WACO TN. (C) Rogers being arrested.

5:40 AM

A senior member of a Japan cult has pleaded guilty to the TOKYO subway nerve gas attack. (C) Subway gas attack in TOKYO last May.

The law student accused of assassinating Yitzhak Rabin will be charge with murder sometime in the next 10 days. (C) Amir being arrested.

Two groups have claimed responsibility for the car bombing yesterday in Saudi Arabia. (C) Scene of bombing.

The crew of ATLANTIS is getting ready to meet MIR tomorrow. (C) Pictures of ATLANTIS in space.

Weather.

5:45 AM Commercial Break.

Traffic Check.

Sports. Flyers will play tonight. 76ers will play tonight. Pittsburgh highlights on MONDAY NIGHT FOOTBALL. Eagles had another win last night with the 6TH ANNUAL EVENING WITH THE EAGLES for cystic fibrosis. Phillies Darren Darlton was on hand last night in CENTER CITY to end homeless. Dallas's Troy Aikman has a bruised knee. Buck Showater will manager the Diamondbacks in 1998.

A recent survey by NEWSWEEK MAGAZINE says Cindy Crawford was the topic pick for a dream date and John F. Kennedy Jr topped the woman's list. (C) Crawford in her video.

5:50 AM Commercial Break.

Weather.

A Nor'easter is headed our way. (C) ATLANTIC CITY NJ getting ready for the storm.

Another meeting between Congressional leaders and the President is set today to resumes talks about a bill to keep the government running. (C) Congressional leaders leaving the WHITE HOUSE last night.

An accident on I-95 in NEWARK DE has a man fighting for his life. (C) Scene of accident.

Students at ROWAN COLLEGE will unite to TAKE BACK THE NIGHT which will be held at the STUDENT CENTER PIT. (C) Calendar event.

A recent survey of NJ hospitals has found people spending less time in the hospital for surgery but the bills running about the same.  (R)

A new report says some alcohol may be good for your heart and bones. (C) People drinking wine.

ACTION NEWS; WPVI; Philadelphia Radio TV Reports November 14, 1995

5:55 AM Commercial Break.

UNITED AIRLINES has abandoned plans to acquire US AIR GROUP. (R)

Stocks.

Weather.

6:00 AM Commercial Break.

Nor'easter is coming our way. (C) Work crews in LONGPORT NJ getting ready for the storm.

Weather.

The government has partial shutdown due to Republicans and Democratic could not work out a deal on a short term spending bill before the deadline. (C) The WHITE HOUSE last night. (C) Shutdown plans.

Officials in Saudi Arabia say they are skeptically of two groups claiming responsibility for the car bombing that occurred there yesterday. (C) Bombing scene.

A member of a cult is claiming responsibility for the gas attack on TOKYO'S subway last May. (C) Gas attack in TOKYO.

6:05 AM

The execution of George Edwards is set for 10:00 tonight. (C) Harris Marty Gram coming out of jail as an execution date has been set for him.

Police in NEW CASTLE CO DE have yet to identify a man struck on I- 95 last night. (C) Scene of the accident.

Police in NORTH PHIL are looking for a blue DODGE in connection with a deadly shooting after the victim was rushed to TEMPLE UNIVERSITY. (C) Scene of shooting.

Rubin Reynolds was found dead in a GERMANTOWN house yesterday. (C) Scene of the murder.

A UNIVERSITY OF DE student, David Stevenson is behind bars after shooting down Chris Heath who was to testify against him in a fraud case for MACYS. (C) Scene of the shooting in NEWARK DE.

Thomas Rechinski has been identified as the dead hiker found in the GREAT SMOKEY MOUNTAINS. (R)

6:10 AM Officials are looking for the husband of a Utah Congresswoman, Joe Wallholds is wanted for campaign spending violations. (C) Wallholds with his wife on tape.

Ross Perot's REFORM PARTY is certified for a place on CA 1996 Presidential ballot. (R)

Plans for a deer hunt in LOWER MERION TWP have been scraped for now. The TWP says they were unable to come up with an agreement with the STATE GAME COMMISSION to modify hunting laws. (R)

Opponents of the bill School choice are wasting no time in attacking the PA's Governor School choice bill. (C) Group

ACTION NEWS; WPVI; Philadelphia Radio TV Reports November 14, 1995

called the PUBLIC EDUCATION COLLATION rallying at the STATE HOUSE yesterday.

Weather.

6:15 AM Commercial Break.

Traffic check.

Sports. Pittsburgh highlights on MONDAY NIGHT FOOTBALL. The Flyers and the 76ERS will play again tonight. Phillies Darren Darlton has announced he is getting married. Greg Maddux is a four time winner of the YOUNG AWARD. VILLONOVA UNIVERSITY are ranked 3rd in pre-season polls for basketball. 49ers Steven Young is out for another 4 weeks after surgery.

Weather.

6:20 AM Commercial Break.

A Nor'easter is heading this way. (C) Weather.

Another meeting between Congressional leaders and the President is schedule to come up with a temporary bill to let the government continue working. (C) WHITE HOUSE last night.

A guilty plea from a member of a doomsday cult link to the gas attack on a TOKYO subway last May. (C) Subway attack last May.

Representatives from more than a dozen schools will be on hand at CAMDEN COUNTY COLLEGE for TRANSFER PROGRAM. (C) Calendar.

SONY is ready to expand it's home entertainment empire into the world of computers. INTELL CORP has agree to provide the main circuit systems. (R)

Stocks.

Weather.

6:25 AM Commercial Break.  Don King is on trial for insurance fraud and his faith now rest with a jury. (C) King coming out of NY a courtroom.

The stars showed up in NY CITY to see the new film JAMES BOND movie called GOLDENEYE. (C) Pierce Bronson in NY CITY.

Stocks.

6:30 AM Commercial Break.

A Nor'easter storm is heading our way. (C) Weather.

The government is partial shutdown this morning. (C) President meeting with Congressional leaders last night about a temporary bill to get the government running.

ACTION NEWS; WPVI; Philadelphia Radio TV Reports November 14, 1995

A deadly accident occurred last night in NEW CASTLE CO, DE on I-95. (C) Scene of the accident.

A trial for Betty Taylor will begin today for throwing her dead son out with the trash. (C) Taylor being arrested.

A domestic dispute is being blamed for a stabbing in WEST PHIL. (C) Scene of stabbing.

A UNIVERSITY OF DE student, David Stevenson, for shooting a MACYS employee, Chris Heath, who was to testify against him in a fraud case for MACYS. (C) Scene of the shooting.

6:35 AM

PA is getting ready for the execution of George Edwards tonight. (C) Harris Marty Gram coming out of prison as the Governor of PA signed his death warrant yesterday.

The first wave of transfers took place in the PHIL POLICE DEPARTMENT yesterday. (C) New police officers in NORTH PHIL.

PA COMMONWEALTH COURT has ruled that the legislative violated the state constitution when it passed the 95 96 budget when suit was filed by the citizens lobby group called COMMON CAUSE. (R)

PHIL Mayor Ed Rendell is getting some ideas on building low cost housing in the FRANCISVILLE HOUSING COMPETITION. (C) Mayor last night in CENTER CITY.

Weather.

6:40 AM Commercial Break.

Traffic check.

A member of a Japanese cult has plead guilty to the nerve gas attack on TOKYO last May. (C) Gas attack on subway last May. The law student that alleging killed Israel Prime Minister is expected to be charged in the next 10 days. (C) Amir being arrested.

Two groups have claimed responsibly for the car bombing in SAUDI ARABIA. (C) Bombing damage.

A new study finds that 40% of heart attack victims did not receive aspirin therapy in the first two days. (C) Showing BAYER ASPIRIN.

Researchers at the UNIVERSITY OF MA have invented the first cholesterol lowing candy bar. (R)

6:45 AM Commercial Break.

A job expo is planned at the VALLEY FORGE CONVENTION CENTER tonight for CAREERS 95 night. (C) Calendar.

Weather.

Sports. Flyers and 76ers will play tonight. Steelers highlights on MONDAY NIGHT FOOTBALL. The 6TH ANNUAL EVENING WITH THE EAGLES was held last night to benefit Cystic Fibrous aboard the SPIRIT OF PHIL. Darren Darlton announces he is getting married. Greg Maddux wins his fourth CY YOUNG AWARD. Bronco's John Elway

ACTION NEWS; WPVI; Philadelphia Radio TV Reports November 14, 1995

may be out next Sunday due to a shoulder injury. Mike Tyson will fight for his W.B.C. crown.

This is NATIONAL CHILDREN'S BOOK WEEK. (C) Kids reading at the BARNES & NOBLE JR BOOK STORE in MARLTON NJ. (C) Cover of THE CHILDREN'S BOOK OF VIRTUES by William Bennett.

6:50 AM Commercial Break.

Traffic check.

Weather.

6:55 AM

The government is in partial shutdown. (C) Shutdown plans.

A green tinted cat has been found in COPENHAGEN Denmark. (C) Green cat.

NJ Governor Christie Whitman is expected to be back at her office today after having surgery on Friday. (C) Whitman at her office yesterday.

**LOAD-DATE:** November 16, 1995

FOCUS - 25 of 27 DOCUMENTS

Copyright 1995 RTV
Radio TV Reports

**SHOW:** Action News; WPVI-TV; Philadelphia

November 13, 1995 6:00pm; ET

**NETWORK:** ABC

**MEDIUM:** Television

**TYPE:** Local

**LENGTH:** 1626 words

**ANCHOR:** Jim Gardner

**BODY:**
(T) An armored car holdup triggers a hail of gunfire.....the Delaware Valley cleans up after one storm as another approaches.

A bomb exploded at the SAUDI NATIONAL GUARD TRAINING CENTER in (C) Riyadh, Saudi Arabia, killing a total of 6 people, five of whom were American, and 60 injured, 34 of them American personnel. It is unclear at who the attack was aimed at.

(C) President Clinton vetoed a bill today that would have raised the debt ceiling because it also committed him to balancing the budget in seven years. (C) Newt Gingrich said the White House is waging a campaign of misinformation.

Visits to government agencies were heavier in normal in anticipation of a possible partial shutdown tomorrow. The (C) SOCIAL SECURITY ADMINISTRATION is not taking new applications. (C) PASSPORT OFFICES. Many federal government workers would be laid off during the close down.

Governor Tom Ridge has signed death warrants for (C) Percy Lee for the 1986 murders of a woman and her teenage daughter; Edmond Bracy for the murder of Officer Daniel Boyle and Marty Graham for the murders of 7 women found dead in his apartment.

Reporter David Murphy in (C) Allentown says the trial of (C) David & Bryant Freeman for the murder of their parents (V) Dennis and Brenda Freeman, and their brother, (V) Eric is scheduled for January 8th; the judge is sifting through pre-trial motions. Their cousin, (C) Nelson Birdwell, has also been charged with the murder. Police arrested the three on the farm of Frank Hess in (C) Hope, MI at a known skinhead hangout. (SB) Frank Hess says just like everybody else. Defense attorneys say the multiple confessions made by the boys should be thrown out. (C) Midland, MI.

6:05 Time Check

Christopher Heath was shot to death outside the (C) CAVALIER COUNTRY CLUB APARTMENTS in Newark, DE. Heath, a security guard, was scheduled to testify against 22 year old David Stevenson and **Michael Manley** about a

Action News; WPVI-TV; Philadelphia Radio TV Reports November 13, 1995

MACY'S DEPARTMENT store robbery and police arrested and charged them both with the murder.

Milton Wilkes, owner of (C) WILKES MARKET was shot to during a holdup at 9:30 this morning; he died at UNIVERSITY OF PENNSYLVANIA.

Two gunmen tried to hold up an armored car outside the (C) ACME SUPERMARKET at Castor & Wyoming. Five shots were fired into the armored car, two were fired into the supermarket, and a bullet struck a parked van. No one was hit and no one hurt. The men got away without any money; the stolen getaway vehicle was found a few blocks away.

Reporter Vernon Odom says rookie cops were taken on a personal tour of the 39th district. (C) 33rd & Allegheny. (SB) Capt Frank Hayward talking to the officers. (SB) Rookie officer Heather Jankowski says I like being here. (SB) Ofc Kevin Powell says it's going to take time anywhere. (SB) Ed Marshall says everybody shouldn't be on the corner at night but then the cops could have been nicer. (SB) Unidentified man says you can't place the blame on everybody. (SB) Lincoln Taylor says we're trying to start a Town Watch. (SB) Capt Hayward says I'm going to start right here taking this corner back.

A classic nor'easter is on its way to the Delaware Valley. Crews at (C) Atlantic City were building up depleted dunes. In (C) Longport, NJ crews were taking down the steps to the beach. In (C) Ocean City, NJ, equipment was clearing the outflow.

The damage from Saturday's night storm could top 1 million in (C) Dewey Beach, DE. Officials have determined that the town was not struck by a tornado, but six homes were completely destroyed, and a number of other homes were heavily damaged.

In (C) Concord Township, Delaware County, crews were fixing power lines and cleaning up debris. The storm blew down a major chunk of the back wall of the closed (C) PULSATIONS NIGHTCLUB.

Reporter Cathy Gandolfo says there was a still a lot of cleaning up to do in South Jersey. In (C) Audubon, NJ, winds hit at 75 miles per hour and flattened a garage with a car inside. (SB) Laura Meehan says we knew the car was parked here. (SB) Jennifer Sherry says it was really scary and we heard this big crash. (SB) Joe Maxwell says you heard a lot of noise, then some crashes and it went black. (C) White Horse Pike.

(T) More on the storm watch........Governor Christie Whitman gets back to work..........sports........Don Polec's World. 6:11 pm........Commercial break

Reporter Nora Muchanic says Governor Christie Whitman was back at her desk at the (C) State House in Trenton, three days after undergoing surgery to remove an ovarian cyst, right ovary, and fallopian tube at (C) MORRISTOWN MEMORIAL HOSPITAL. (SB) Whitman says really in very good shape. (SB) Whitman says my doctor says we could take everything. (SB) Whitman says I did not want to go through two weeks of speculation about cancer.

City workers and volunteers helped beautify the (C) TACONY CREEK PARK.

6:17 pm........Commercial break

Sports - Gary Papa

The Eagles-Broncos football game. The Eagles won.

The San Francisco-Dallas football game. San Francisco won.

Action News; WPVI-TV; Philadelphia Radio TV Reports November 13, 1995

The Flyers-Devils hockey game. The Devils won.

6:21 pm........Commercial break

Accu-Weather - Dave Roberts

Don Polec's World

This Saturday will mark the anniversary of the standardization of time. (SB) John Alviti says a little bit more than 100 years ago in 1883. (SB) Alviti says communities set their own time nationwide. (SB) John Alviti says some time that was uniform all over the nation. (SB) Alviti says clocks in the 18th century only had one hand. (SB) Erick Pitts lists the types of times.

**LOAD-DATE:** November 15, 1995

FOCUS - 24 of 27 DOCUMENTS

Copyright 1995 RTV
Radio TV Reports

**SHOW**: ACTION NEWS 5PM; WPVI-TV; Philadelphia

November 13, 1995 5:00pm; ET

**NETWORK**: ABC

**MEDIUM**: Television

**TYPE**: Local

**LENGTH**: 1426 words

**ANCHOR**: Lisa Thomas-Laury & Marc Howard

**BODY**:
(T) An armed robbery turns deadly for a West Philadelphia store owner.........Governor Christie Whitman is back on the job following the removal of a non-cancerous cyst.

Weatherman Dave Roberts says a Nor'easter is headed towards the Delaware Valley. The area is expecting a soaking rain beginning on Tuesday morning, and temperatures will tumble to close to freezing.

Reporter Joe Torres in (C) Ocean City, NJ says the erosion has hit the beach, and workers are clearing the outflow. (SB) Dave Breeden says if we don't clear it out we will have flooding on the street end. In (C) Atlantic City, NJ sand was removed from under the boardwalk and added to depleted dunes. In (C) Brigantine, NJ, where there is a (C) 2.6 million dollar bulkhead. In (C) Hamilton Township, NJ there was heavy damage on Saturday from a storm, and officials are worried that other trees were weakened. (SB) Frank Carlin says we're worried about water right now.

Utility crews are trying to clear the damage from Saturday night's storm. At the (C) FOX VALLEY CONDOS in Concord Township, Delaware County, crews were cutting up downed tree limbs from wind gusts of 70 miles per hour. The (C) PULSATIONS NIGHTCLUB lost a wall from the high winds.

President Clinton is denouncing a terrorist bomb that killed six people, five of them Americans, at a National Guard Training facility in (C) Riyadh, Saudi Arabia. Sixty people were injured, including 34 Americans. Two terrorist groups are claiming responsibility and are demanding the pullout of the Americans.

5:05 Time Check President Clinton is not backing down as the deadline for a government shutdown is nearing for midnight tonight. He has vetoed a government spending bill that he pledged to veto. (SB) President Clinton says the bill obligates the government to pass the government spending plan with hugh cuts. (SB) Clinton says I will fight it today, tomorrow, next week, and next month. The TREASURY DEPARTMENT is taking steps not to default on the nation's debt with the scheduling of a securities option to raise the money.

If the government shuts down, 800,000 government employees will be laid off without pay, and national parks, museums, monuments, and zoos will shut down.

ACTION NEWS 5PM; WPVI-TV; Philadelphia Radio TV Reports November 13, 1995

Reporter Kristen Sze says non-essential employees at the (C) GREENE FEDERAL BUILDING plan to report for work tomorrow, but may be sent home. (SB) Harry Marshall, IRS officer, says I'm going to laid off for a few days it looks like. (SB) Mel Klores says I've been through this a number of times and it's part of the job. (C) PASSPORT OFFICE. (SB) Unidentified woman says my brothers told me this could be shut down. (C) SOCIAL SECURITY ADMINISTRATION BUILDING. (SB) Unidentified man says it would be a shame to shut it down.

Milton Wilkes, owner of (C) WILKES MARKET at 6100 block of Samson Street was shot once in the chest during a robbery at 9:30 this morning. He died at UNIVERSITY OF PENNSYLVANIA HOSPITAL.

Christopher Heath, a MACY'S DEPARTMENT STORE security guard, was discovered shot to death in the parking lot of the (C) CAVALIER COUNTRY CLUB APARTMENTS in Newark, DE. He was scheduled to testify against 22 year old David Stevenson and **Michael Manley** tonight in a fraud case involving the company. Both men are being questioned by police.

This is the second day of closing arguments in the federal racketeering trial of reputed mob boss (C) John Stanfa and seven of his associates. (R)

(T) How a new alternative is breathing life into people like a little girl on the verge of death.......the Eagles big win over the Broncos........weather.

5:11 pm........Commercial break

New Jersey Governor (C) Christie Whitman returned to work three days after the removal of an ovarian cyst and her right ovary.

Health Check - Anita Brikman

The LIVING DONOR TRANSPLANT involving the removal of sections of an organ from a living program, was created to counter the shortage of donor organs for transplant. (SB) Mrs Willis says we couldn't wait she was on the bottom of the list for a donor transplant. (SB) Dr George Mallory, ST LOUIS CHILDREN'S HOSPITAL, says this operation provides the opportunity if time is running out there may be another option. (SB) Randy Willis, father, says I was a little scared, but I knew what the decision was. (SB) Dr Mallory says it stretches very nicely there. (SB) Miranda Willis says I'm able to breathe.

5:17 pm........Commercial break

The Eagles-Broncos football game. The Eagles won.

The 49ers-Cowboys football game. The 49ers won.

The KELLER COMPANY provided breakfast for the homeless at the (C) GATEWAY CENTER in Northeast Philadelphia. Keller employees served the breakfast.

5:21 pm........Commercial break

Accu-Weather - Dave Roberts

(C) VETERANS AFFAIR MEDICAL CENTER held a Veterans Day ceremony.

ACTION NEWS 5PM; WPVI-TV; Philadelphia Radio TV Reports November 13, 1995

**LOAD-DATE:** November 15, 1995

37

SUPPLEMENT: HEATH, K.                2              32-95-134010
DET. A. R. LEE #2338

INVESTIGATION:

ON 111395 AT APPROX. 0745 HRS. WRITER RESPONDED TO THE CRIME
SCENE AT 13C3 CAPANO DR.  WRITER OBSERVED A WHITE MALE FULLY
DRESSED IN BUSINESS ATTIRE LAYING ON THE GROUND BEHIND A VEHICLE
BEARING DE 350100 DISPLAYED ON A JEEP WRANGLER.  WRITER OBSERVED
BLOOD COMING FROM THE VICTIM'S HEAD AND THAT THE VICTIM WAS NOT
CONSCIOUS.  THE PARAMEDICS ARRIVED ON SCENE SIMULTANIOUSLY AND
BEGAN CHECKING THE VICTIM.

WRITER WAS INSTRUCTED BY DET. SGT. HITCH TO LOCATE WITNESSES
RELATED TO THE ABOVE INCIDENT. REFER TO INTERVIEW SECTION.

PHYSICAL EVIDENCE:

NONE

INTERVIEWS:

WITNESS #1:
BROWN, SUSAN A. W/F 072279
CAPANO DR APT. CAVALIER APTS., NEWARK, DE 19702
PH: (H)

DATE/TIME:  111395/0755 HRS.
LOCATION:  PARKING LOT OF 13C3 CAVALIER APTS. (CRIME SCENE)

ON 111395 AT 0755 HRS. WRITER INTERVIEWED THE ABOVE WITNESS, HEREIN
REFERRED TO AS W-1.  THE INTERVIEW WAS CONDUCTED IN THE PARKING LOT
OF SAME CRIME SCENE.  W-1 IS A STUDENT AT WILLIAM PENN. HIGH SCHOOL
AND WAS W-1 STATED SHE WAS SITTING IN THE HALLWAY OF HER BUILDING
(BLDG.12) WHEN SHE HEARD APPROX. 5 TO 6 SHOTS.  W-1 STATED SHE CAME
OUTSIDE AND OBSERVED A B/M SUBJECT, TALL, SLIM BUILD, BUT BUILT,
WEARING A BLUE BASEBALL STYLE HAT THAT COVERED HIS EARS, AND NAVY
BLUE CLOTHING.  W-1 STATED SHE NEVER OBSERVED THE FRONT OF THE
SUBJECTS BODY/FACE.  W-1 STATED THAT THE SUBJECT RAN TOWARDS THE
REAR OF BUILDING #10A, AND SHE DID NOT OBSERVE ANY VEHICLES.  W-1
COULDN'T PROVIDE ANY FURTHER INFORMATION IN REGARDS TO THIS
INCIDENT.

WITNESS #2
THOMPSON, LANCE S. W/M 062770
CAPANO DR. APT. CAVALIER APTS., NEWARK, DE 19702
PH: (H)          (W)

DATE/TIME: 111395/0915 HOURS
LOCATION:  NEW CASTLE COUNTY POLICE HEADQUARTERS